1    MELINDA HAAG (CABN 132612)
     United States Attorney
2
     J. DOUGLAS WILSON (DCBN 412811)
3    Chief, Criminal Division

4    HARTLEY M.K. WEST (CABN 216799)
     WADE M. RHYNE (CABN 216799)
5    Assistant United States Attorneys

6         1301 Clay Street, Suite 340S
          Oakland, California 94612
7         Telephone: (510) 637-3680
          FAX: (510) 637-3724
8         E-Mail: hartley.west@usdoj.gov
                  wade.rhyne@usdoj.gov
9
     Attorneys for United States of America
10

11                        UNITED STATES DISTRICT COURT

12                      NORTHERN DISTRICT OF CALIFORNIA

13                              OAKLAND DIVISION

14

15   UNITED STATES OF AMERICA,              )  CASE NO. 11-00288 SBA
                                            )
16          Plaintiff,                      )  **UNITED STATES' TRIAL MEMORANDUM**
                                            )
17       v.                                 )  PTC Date: September 18, 2013
                                            )  Time: 3:00 p.m.
18   SUSAN XIAO-PING SU,                    )  Judge: Hon. Sandra B. Armstrong
                                            )  Trial: September 30, 2013
19          Defendant.                      )
                                            )
20                                          )

21

22

23

24

25

26

27

28

     UNITED STATES' TRIAL MEM.
     No. CR-11-00288 SBA

**TABLE OF CONTENTS**

I.     CASE SCHEDULING AND CUSTODY STATUS ................................................1

II.    THE SUPERSEDING INDICTMENT ..............................................................1

III.   DEFENDANTS' PRETRIAL MOTIONS ..........................................................1

IV.    SUMMARY OF ANTICIPATED PROOF AT TRIAL ........................................1

A.     Introduction ..................................................................................................1

B.     Student Visa Program ..................................................................................2

C.     TVU's Fraudulent Form I-17 Petition .......................................................3

D.     Student Recruiting, Admission, and Form I-20s .......................................3

E.     Student Victims ............................................................................................4

       1.     B.C. .....................................................................................................4

       2.     K.C. .....................................................................................................5

F.     Fictitious Students ........................................................................................6

       1.     S.A. and K.D. ......................................................................................6

       2.     M.R. and R.B. .....................................................................................7

G.     The Money Laundering................................................................................9

H.     Search Warrants and Su's Interview .........................................................9

I.     Forfeiture ......................................................................................................9

V.     DEFENDANT'S CRIMINAL HISTORIES .....................................................10

VI.    EVIDENTIARY ISSUES FOR TRIAL ...........................................................10

A.     Statements By Defendant ...........................................................................10

B.     Expert Witness Testimony .........................................................................10

C.     Co-conspirator Statements ........................................................................10

D.     Summaries of Voluminous Evidence by Summary Witness ...................13

E.     Impeachment of Testifying Defendant .....................................................14

F.     Business Records and Public Records ......................................................14

G.     Limitations on the Defendant's Use of Character Evidence...................15

H.     Use of Written Transcripts and Translations of Video and/or Audio Recordings as an Aid to the Jury .............................................................16

i

UNITED STATES' TRIAL MEM.

I.      Presence of the Case Agents During Trial ........................................................................17

J.      Stipulations ........................................................................................................................17

K.      Rule 404(b) Evidence ........................................................................................................17

L.      Forfeiture............................................................................................................................18

**VII.    CONCLUSION** ......................................................................................................................21

UNITED STATES' TRIAL MEM.

1

## CASES

2   *Bourjaily v. United States*, 483 U.S. 171 (1987) ................................................................ 11, 12

3   *United States v. Anekwu*, 695 F.3d 967 (9th Cir. 2012) .............................................................. 15

4   *United States v. Bellucci*, 995 F.2d 157 (9th Cir. 1993) ............................................................ 15

5   *United States v. Beverly*, 913 F.2d 337 (7th Cir. 1990) ............................................................. 16

6   *United States v. Black*, 767 F.2d 1334 (9th Cir. 1985) .............................................................. 14

7   *United States v. Booker*, 952 F.2d 247 (9th Cir. 1991) .............................................................. 16

8   *United States v. Bowman*, 215 F.3d 951 (9th Cir. 2000) ........................................................... 11

9   *United States v. Capoccia*, 503 F.3d 103 (2nd Cir. 2007) ......................................................... 20

10  *United States v. Chea*, 231 F.3d 531 (9th Cir. 2000) ................................................................. 18

11  *United States v. Collicott*, 92 F.3d 973 (9th Cir. 1996) ............................................................. 10

12  *United States v. Crespo De Llano*, 830 F.2d at 1543 ................................................................ 13

13  *United States v. Cuozzo*, 962 F.2d 945 (9th Cir. 1992) ............................................................. 14

14  *United States v. Diaz*, 961 F.2d 1417 (9th Cir. 1992) ................................................................ 16

15  *United States v. DiCesare*, 765 F.2d 890 ................................................................................... 11

16  *United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1988) ........................................................ 10

17  *United States v. Foster*, 711 F. 2d 871 (9th Cir. 1983) .............................................................. 13

18  *United States v. Fox*, 189 F.3d 1115 (9th Cir. 1999) ................................................................. 12

19  *United States v. Fuentes–Montijo*, 68 F.3d 352 (9th Cir. 1995) ................................................ 17

20  *United States v. Garcia-Guizar*, 160 F.3d 511 (9th Cir. 1998) ................................................. 19

21  *United States v. Gay*, 967 F.2d 322 (9th Cir. 1992) .................................................................. 14

22  *United States v. Huffhines*, 967 F.2d 314 (9th Cir. 1992) ......................................................... 15

23  *United States v. Johnson*, 297 F.3d 845 (9th Cir. 2002) ........................................................... 15

24  *United States v. Layton*, 720 F. 2d 548 (9th Cir. 1983) ............................................................. 13

25  *United States v. Lewis*, 594 F.3d 1270 (10th Cir. 2010) ........................................................... 15

26  *United States v. Liera*, 585 F.3d 1237 (9th Cir. 2009) .............................................................. 11

27  *United States v. Loya*, 807 F. 2d 1483 (9th Cir. 1987) .............................................................. 12

28  *United States v. Lukashov*, 694 F.3d 1107 (9th Cir. 2012) ....................................................... 16

UNITED STATES' TRIAL MEM.

1    *United States v. Marchini*, 797 F.2d 759 (9th Cir. 1986) .......................................................... 14

2    *United States v. Mason*, 658 F. 2d 1263 (9th Cir. 1981) .......................................................... 11

3    *United States v. Nava*, 404 F.3d 1119 (9th Cir. 2005)............................................................. 20

4    *United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011) ....................................................... 20

5    *United States v. Ogles*, 406 F.3d 586 (9th Cir. 2005).............................................................. 18

6    *United States v. Orellana-Blanco*, 294 F.3d 1143 (9th Cir. 2002) .......................................... 15

7    *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000)............................................................ 10

8    *United States v. Portac, Inc.*, 869 F. 2d 1288 (9th Cir. 1989) ................................................. 13

9    *United States v. Rizk*, 660 F.3d 1125 (9th Cir. 2011) ........................................................ 13, 14

10    *United States v. Rrapi*, 175 F.3d 742 (9th Cir. 1999)........................................................ 16, 17

11    *United States v. Savedra*, 684 F.2d 1293 (9th Cir. 1982) ....................................................... 12

12    *United States v. Silverman*, 861 F.2d 571 (9th Cir. 1988) ..................................................... 12

13    *United States v. Stinson*, 647 F.3d 1196 (9th 2011)............................................................... 13

14    *United States v. Torres*, 908 F.2d 1417 (9th Cir. 1990).......................................................... 12

15    *United States v. Yarborough*, 852 F.2d 1522 (9th Cir. 1993) .................................................. 13

16    *United States v. Zavala-Sierra*, 853  F.2d 1512, 1516 (9th Cir. 1988).................................... 13

17    **FEDERAL STATUTES**

18    8 U.S.C. § 1324(a)(1)(A) ............................................................................................................. 1

19    18 U.S.C. § 1001(a)(2).................................................................................................................. 1

20    18 U.S.C. § 1001(a)(3).................................................................................................................. 1

21    18 U.S.C. § 1030(a)(3).................................................................................................................. 1

22    18 U.S.C. § 1341 ........................................................................................................................... 1

23    18 U.S.C. § 1343 ........................................................................................................................... 1

24    18 U.S.C. § 1546(a) ...................................................................................................................... 1

25    18 U.S.C. § 1957 ........................................................................................................................... 1

26    18 U.S.C. § 371 ............................................................................................................................. 1

27    18 U.S.C. § 982 ........................................................................................................................... 19

28    18 U.S.C. § 982(a)(1).................................................................................................................. 19

UNITED STATES' TRIAL MEM.

18 U.S.C. § 981(a)(1)(C) ............................................................................................ 18, 19

18 U.S.C. § 982(a)(2) .................................................................................................. 19

18 U.S.C. § 982(a)(6)(A)(ii) ........................................................................................ 18,19

21 U.S.C. § 853 ........................................................................................................... 19

28 U.S.C. § 2461(c) ..................................................................................................... 18, 19

**RULES**

Fed. R. Crim. P. 32.2(b) ............................................................................................. 20

Fed. R. Crim. P. 32.2(b)(c) ........................................................................................ 20

Fed. R. Crim. P. 32.2(b)(1) ........................................................................................ 20

Fed. R. Crim. P. 32.2(b)(2) ........................................................................................ 20

Fed. R. Crim. P. 32.2(b)(2),(c) ................................................................................... 20

Fed. R. Crim. P. 32.2(b)(4) ........................................................................................ 19

Fed. R. Evid 902(4) .................................................................................................... 15

Fed. R. Evid. 1006 ...................................................................................................... 13

Fed. R. Evid. 404(a)(1) ............................................................................................... 16

Fed. R. Evid. 404(b) .................................................................................................... 17

Fed. R. Evid. 405(a) .................................................................................................... 16

Fed. R. Evid. 608(a) .................................................................................................... 16

Fed. R. Evid. 801(d)(2)(A) ......................................................................................... 10

Fed. R. Evid. 801(d)(2)(E) .......................................................................................... 11

Fed. R. Evid. 803(6) .................................................................................................... 15

UNITED STATES' TRIAL MEM.

v

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Wade M. Rhyne and Hartley M. K. West, hereby submits its trial memorandum setting forth the relevant procedural history, the anticipated evidence and legal basis for the charges, and a summary of law on anticipated evidentiary issues that may arise at trial.

## I.   CASE SCHEDULING AND CUSTODY STATUS

Defendant Susan Su was released on bond on May 2, 2011, and has remained out of custody pending trial.  Jury trial is set to begin at 8:30 a.m. on September 30, 2013.  The estimated time for the United States' case-in-chief is approximately twelve trial days.  The United States anticipates calling approximately sixty-two witnesses in its case-in-chief, not including business record custodians, for which the parties intend to continue to meet-and-confer regarding stipulations.

## II.   THE SUPERSEDING INDICTMENT

On November 10, 2011, the Grand Jury returned a thirty-five count Superseding Indictment, charging Su with wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-12); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 13-14); conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371 (Count 15); visa fraud, in violation of 18 U.S.C. § 1546(a) (Counts 16-19); use of a false document, in violation of 18 U.S.C. § 1001(a)(3) (Count 20); false statements, in violation of 18 U.S.C. § 1001(a)(2) (Count 21); alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A) (Counts 22-24); unauthorized access, in violation of 18 U.S.C. § 1030(a)(3) (Count 25); and money laundering, in violation of 18 U.S.C. § 1957 (Counts 26-35).  The Superseding Indictment also contains four forfeiture allegations.

## III.   DEFENDANTS' PRETRIAL MOTIONS

Defendant moved to dismiss the original Indictment, which motion was mooted by the Superseding Indictment.  No other pretrial motions have been filed.

## IV.   SUMMARY OF ANTICIPATED PROOF AT TRIAL

### A.   Introduction

Between September 2008 and January 2011, Su engaged in a scheme to defraud non-immigrant aliens of money and property, specifically tuition and other fees, through her establishment of a school called "Tri-Valley University" (TVU), located in Pleasanton, California.  In furtherance of her scheme, she fraudulently obtained authorization from the U.S. Department of Homeland Security (DHS), Student

1

UNITED STATES' TRIAL MEM.

1    and Exchange Visitor Program (SEVP), to admit foreign students.  Su then collected more than $5

2    million in tuition and other payments from the aliens in exchange for maintaining them in an active

3    student visa status, and used these funds to purchase millions of dollars' worth of property.  Su

4    employed some of these aliens at TVU to process student payments, causing them to access government

5    databases without authorization and to create fraudulent visa-related documents.  When questioned by

6    DHS agents regarding certain students' status, Su made materially false representations and submitted

7    materially false documents to the agents.

8          **B.      Student Visa Program**

9          The United States will call as an expert witness Special Agent William R. Elliott of the United

10   States Department of State to provide the jury with background regarding the student visa process.  SA

11   Elliott will explain that there are several categories of foreign nationals who may be admitted to the

12   United States for nonimmigrant purposes, and that one such category, designated "F-1" based on the

13   applicable statutory subsection, comprises bona fide students coming temporarily to study at an

14   approved school.  SA Elliott will explain how aliens wishing to study in the United States obtain F-1

15   visas, and that such students are admitted for a temporary period called "duration of status," which

16   federal regulations define as the time during which the student is pursuing a full course of study at an

17   approved school.  When a student stops pursuing a full course of study, the duration of status ends and

18   the temporary period for which the individual was admitted expires.  A more detailed summary of SA

19   Elliott's anticipated testimony is set forth in the government's expert disclosures.

20        The government will also call as an expert Jason Kanno, who is an Adjudicator at the Analysis

21   and Operations Center of SEVP to explain that schools seeking to admit foreign students must submit a

22   Petition for Approval of School for Attendance by Nonimmigrant Student, also called a Form I-17, to

23   SEVP in Washington, DC, and the criteria for approval.  Among other things, the school must establish

24   that it is a bona fide educational institution and, if unaccredited, must provide "articulation agreements"

25   showing that its courses have been and are unconditionally accepted to at least three accredited

26   institutions of higher learning.  The I-17 must also identify "Designated School Officials" (DSOs), who

27   certify their knowledge of and intent to comply with student immigration laws and regulations.

28        Mr. Kanno will explain that, once a school's I-17 is approved, SEVP issues the DSOs login IDs

UNITED STATES' TRIAL MEM.

1  and passwords enabling them to access the Student and Exchange Visitor Information System (SEVIS) –

2  a nonpublic computer system located in Rockville, Maryland, which is used by the United States

3  government and operated through SEVP for the purpose of collecting nonimmigrant student information

4  from approved schools and monitoring such aliens' status.   Mr. Kanno will describe how SEVIS is used

5  to create student records, including a Certificate of Eligibility for Nonimmigrant (F-1) Student Status,

6  also known as a Form I-20, which is required to obtain a student visa.  Mr. Kanno will also explain how

7  and why SEVP may decertify a school.  Again, the government has included a more detailed summary

8  of Mr. Kanno's expected testimony in its expert disclosures.

9          **C.     TVU's Fraudulent Form I-17 Petition**

10          Through SEVP witnesses and exhibits, as well as through Su's own admissions, the government

11  will show that Su electronically submitted a Form I-17 Petition through SEVIS on September 15, 2008,

12  on behalf of TVU.  The form identified as TVU's administrators and DSOs: Su; her sister, Sophie Su;

13  and Sophie's husband, Vince Wang.  Sophie Su and Wang will testify that they did not actually work as

14  administrators, nor as DSOs.  The Form I-17 also included a list of instructors, many of whom never

15  agreed to teach at TVU.  On December 23, 2008, in response to a request for clarification, Su mailed

16  SEVP a revised Form I-17, which also contained materially false statements.

17          DHS had a contractor inspect TVU's campus as part of the approval process.  This contractor

18  will testify that Su gave him a signed copy of the Form I-17, as well as articulation agreements from

19  three schools, which he passed on to SEVP.  Su then mailed revised articulation agreements to SEVP on

20  February 10, 2009.  Interviews with officials from two of the schools – San Francisco State University

21  and University of Central Florida – reveal that they had no legitimate articulation agreements with TVU.

22  TVU received its approval to admit F-1 students on February 19, 2009.  Su's SEVIS submission and

23  mailings form the basis of the first wire fraud charge (Count 1), and both mail fraud charges (Counts 13

24  and 14).

25          **D.     Student Recruiting, Admission, and Form I-20s**

26          After TVU received SEVP's approval to admit F-1 students, Su entered into recruiting

27  agreements, paying commissions of a percentage of tuition fees for each new F-1 student recruited.  To

28  process the admission of the new recruits, Su hired some F-1 students to work in the TVU office.  At

UNITED STATES' TRIAL MEM.

least three of these student-employees will testify that Su gave them access to SEVIS through DSO accounts, instructed them to create and print Form I-20s for new F-1 students, and forged signatures on the I-20s of the DSO in whose account name the I-20 was generated.  They will further testify that Su admitted all alien applicants without regard to their academic qualifications or intent to pursue a full course of study; that she instructed them to enter false addresses and other information in SEVIS for hundreds of students; that there were no physical classes although some were taught online; and that grades were usually assigned randomly, with none below a B+.  The student-employees will admit that they did not attend online classes at TVU, as Su knew.  Email and other documentary evidence corroborates all of these facts.

The student-employees will explain that they were criminally charged, have pleaded guilty pursuant to plea agreements and been cooperating with the United States' investigation of TVU, and are awaiting sentencing.

The unauthorized SEVIS access is charged as Count 25.  The agreement between Su and her student-employees to create fraudulent SEVIS records is charged as conspiracy to commit visa fraud, Count 15.  Su's employment of three student-employees is charged as alien harboring in Counts 22 through 24.  An email from Su soliciting recruiters of Indian students is charged as wire fraud in Count 2.

### E. Student Victims

There are numerous aliens who applied to TVU believing it was a legitimate school.  At least two such students will testify – Bhanu Challagundla (identified in the Superseding Indictment as "B.C.") and Kalpana Challa (identified in the Superseding Indictment as "K.C.").  Their I-20s contain signatures forged by Su, forming the basis of wire fraud Counts 3 and 4.

#### 1. B.C.

Bhanu Challagundla will testify that she had an undergraduate degree in Pharmacy from a university in India and was seeking to enroll in a Master's program in the United States.  Using a consultancy in India, she applied to TVU and another university, ultimately choosing TVU primarily because it admitted her immediately and provided an initial I-20.  The I-20 was dated January 11, 2010, and signed in the name of Sophie Su.

4

UNITED STATES' TRIAL MEM.

Before leaving India, Challagundla called TVU to arrange transportation, room, and board. She spoke to Su, who referred her to two office workers as points of contact. After arriving in the United States on May 5, 2010, Challagundla reported to TVU on May 10, 2010. She was "shocked" when she saw that TVU was a single room office rather than a traditional university. Challagundla waited to speak with Su, who admitted that all classes were online at that time but advised Challagundla that TVU was buying a new building and would start live classes in approximately two months. When Challagundla informed Su that she wanted to transfer to another school immediately, Su said that United States' rules precluded any transfers until students had completed two full semesters.

Challagundla paid tuition for the fall semester but never received confirmation of her classes. Her multiple calls to TVU went unreturned and, on August 28, 2010, she received a transcript with passing grades for classes she had never taken. On September 7, 2010, Challagundla went to TVU to inquire about her transcript and transferring. An office worker advised Challagundla that Su was too busy to talk to her and that classes would start soon. The staff member showed her two classrooms and collected the $335 balance for her fall semester and a $1,000 deposit for the summer semester, which Challagundla paid believing she needed to complete two semesters. Not long afterward, she received an email with links for her classes but, when she logged in, the instruction was a looping audio tape. After several attempts to reach Su by telephone, Challagundla waited in TVU's office for two hours in November 2010 until Su was available. Su reiterated that Challagundla could not transfer before completing two semesters and assured her that TVU would begin physical classes in January. Accordingly, Challagundla paid the fees for her second semester. TVU ceased operations in January 2011.

2.     K.C.

Kalpana Challa will testify that she had a university degree from Paris and was looking for an MBA degree from the United States because India holds U.S. degrees in high regard. She was enrolled in another Bay Area school when she met Vishal Dasa, one of Su's office workers and recruiters. Dasa advised Challa that he had recently transferred to TVU because it was less expensive for international students, and that she could take three classes in one day. After looking at TVU's website, which appeared to offer the MBA degree she sought, Challa called TVU and spoke to Su. Challa explicitly

5

UNITED STATES' TRIAL MEM.

1   asked whether she could attend as an international student, and that Su confirmed she could.  Challa

2   arranged her transfer to TVU and received an I-20 in the name of Sophie Su, dated January 27, 2010.

3       After the transfer, Challa traveled to TVU and met with Su to pay her fees and register.  She was

4   surprised to see such a small office, but Su told her the classrooms were in nearby buildings.  Su said

5   Challa would get all class information by email.  Only when she got an email advising her to log in for

6   class did Challa realize there were no live classes.  She logged in, and saw that a few other students had

7   logged in as well, but no instructor appeared.  Challa contacted Su and advised that she wanted to

8   transfer out.  Su told her she could not until she had paid for two semesters; otherwise she could only

9   terminate Challa's F-1 status.  Challa paid $2,800 for one semester and $1,000 toward her second

10  semester.  She planned to pay the remainder, request a simultaneous transfer, and promptly cancel

11  payment.  Before that happened, however, TVU was shut down.  Challa never attended another class;

12  although she received a few other emails notifying her of a class the following day, she did not get these

13  emails in time to attend.  Nonetheless, Challa received a transcript for the term (A, A, A-).

14      **F.   Fictitious Students**

15      HSI agents and student-employee Anji Dirisanala will testify regarding four fictitious students at

16  TVU, enrolled at the behest of HSI agents.

17          1.   S.A. and K.D.

18      On June 3, 2010, HSI equipped Dirisanala with an audio recording device and provided him with

19  written identifying information for two foreign nationals – Sparsh Agrawat (identified in the

20  Superseding Indictment as "S.A.") and Kadir Dirikan (identified in the Superseding Indictment as

21  "K.D.") – whose student status had been terminated in SEVIS.  Dirisanala told Su that he had two

22  friends in New York who had been terminated in SEVIS and needed TVU admission and new I-20s

23  reflecting their admission.  Su told him to obtain I-20s from Dasa.  Dasa created and printed admissions

24  letters for TVU's Ph.D. program, entered Agrawat and Dirikan's data into SEVIS, and printed their

25  initial I-20s.  Dirisanala observed Su sign the I-20s in DSO Wang's name.

26      On July 27, 2010, Dirisanala, again wearing a wire, went to TVU's office and paid Su $2,000 to

27  activate Agrawat and Dirikan's status as students at TVU.  Dirisanala saw Su sign new I-20s, again in

28  DSO Wang's name.  Despite neither student actually attending classes at TVU, a SEVIS search on

UNITED STATES' TRIAL MEM.

November 22, 2010, showed that TVU maintained them in active status.  The SEVIS entries and forged I-20s for Agrawat and Dirikan are charged as wire and visa fraud in Counts 5, 6, 16, and 17.

The government will also introduce a recorded call by an HSI agent, posing as an immigration officer at San Francisco International Airport, on September 20, 2010.  The agent told Su that he had stopped S.A. attempting to reenter the United States, and Su confirmed that her records reflect Agrawat as a current, full-time student at TVU.  The agent asked Su to email him scanned copies of Agrawat's I-20, transcripts, and a letter confirming his active full-time status.  After the call concluded, a surveilling agent saw Su quickly exit the TVU office, get an item from her Mercedes Benz, and go back into the TVU office.  A few minutes later, the calling agent received an email from ssu@trivalleyuniversity.org, with three attachments: an active Form I-20 for Agrawat bearing a signature of "Sophie Su"; TVU transcripts for Agrawat; and a letter signed by "Sophie Su" representing that Agrawat is a "full time" graduate student "in good standing."  This emailing is charged as wire fraud in Count 9.

On September 24, 2010, an HSI agent telephoned TVU, spoke to Su, and stated that he was an immigration officer who had stopped Dirikan returning from Yemen.  Again, Su advised that her records confirm Dirikan as a current TVU student and, from the same email account, emailed the agent an active I-20, transcript, and letter confirming that Dirikan is a full time student in good standing.  The I-20 and letter again bore Sophie Su's name "Sophie Su."  This email is charged as wire fraud in Count 10 and as use of a false document in Count 20.

2.    M.R. and R.B.

On August 11, 2010, Dirisanala, wearing a wire, went to TVU's offices to request initial I-20s for three foreign nationals purportedly residing in New York, one of whom was Mohammed Rizwan (identified in the Superseding Indictment as "M.R."), using names, dates of birth, foreign addresses, and email addresses all provided by HSI.  Su instructed Dirisanala to obtain the I-20s from student-employee Tuchar (Jimmy) Tambe, after which Dirisanala brought them back to Su for signing.  Su advised Dirisanala that the students would eventually need to mail additional documentation because TVU was undergoing an accreditation review.  At Dirisanala's request, Tambe emailed the three I-20s to Dirisanala.  The I-20s were signed by Su in her own name.

On August 31, 2010, Dirisanala returned to TVU's office, again wearing a wire, to make a

7

UNITED STATES' TRIAL MEM.

1    $1,000 tuition payment for Rizwan, using funds provided by HSI, and get an active I-20.  Su instructed

2    Dirisanala to give Rizwan's information to Dasa and wait outside.  A secretary then handed Dirisanala

3    an active I-20 in Rizwan's name and bearing a signature for DSO Wang, who was not in the office.  This

4    I-20 is the basis of wire fraud Count 7 and visa fraud Count 18.

5         On September 7, 2010, an undercover HSI agent went to TVU, wearing an audio and video

6    recording device and posing as a prospective foreign student.  The agent was introduced to Dasa, with

7    whom he conversed in Hindi.  The agent advised Dasa that his F-1 visa had expired in 2002 because he

8    never went to school, that he was now "completely out of status," that he feared being deported, that he

9    lived and worked in New York, and that he would not attend classes physically or online.  Dasa created

10   an admission letter and an initial I-20 in SEVIS, using the name provided by the agent, Rajiv Batra

11   (identified in the Superseding Indictment as "R.B.").  Dasa instructed the agent to return later that day

12   for his "madam" to sign.  When he returned, Dasa walked his I-20 to Su, who signed it and handed it

13   back to Dasa, signed with DSO Wang's name.  SEVIS records confirm that Batra was placed into active

14   student status at TVU the same day, and that he remained in such status despite the agent never

15   attending a class.  This I-20 is the basis of wire fraud Count 8 and visa fraud Count 19.

16        On January 7, 2011, an HSI agent called TVU, identifying himself as from Immigration at JFK

17   airport, and spoke to Su.  The agent said that Rizwan and Batra had entered the country from Pakistan

18   without I-20s, claiming to be F-1 students at TVU, and were being held at secondary inspection.  To

19   verify their status, the agent requested that she email him – for both students – signed I-20s, transcripts,

20   attendance records from the most recent grading period, and letters confirming their active status.  Three

21   hours later, the agent received an email from Su, attaching I-20s for Rizwan and Batra, transcripts for

22   both (although Rizwan's stated at the bottom "TVU transcript of Rajiv Batra"), attendance records for

23   Batra, and letters bearing signatures of Sophie Su.  These emails underlie wire fraud Counts 11 and 12.

24        Two hours later, an HSI agent went to TVU, claiming a problem with the email transfer, and

25   collected the documents in person from Su.  Su advised the agent that she had not had time to complete

26   Rizwan's attendance sheets, but that he had attended a class that she personally taught, and that the

27   attendance log reflected that his attendance had been good.  These false statements are charged as Count

28   21.

UNITED STATES' TRIAL MEM.

### G.     The Money Laundering

Su is charged with money laundering in Counts 26 through 35, arising out of her purchases of TVU's offices, three residences, and her Mercedes.  The funds used come from her TVU business accounts, 99% of which money came from F-1 students, commingled with about 1% that was in the account from before she got F-1 approval.  Witnesses and business records from the relevant banks, title companies, and Mercedes dealership will be the primary evidence on these counts.

### H.     Search Warrants and Su's Interview

Su's fraud scheme ended on January 19, 2011, when HSI executed search warrants at TVU's offices (405 Boulder Court, Suites 700 and 800, Pleasanton), Su's homes (2890 Victoria Ridge, Pleasanton and 1371 Germano Way, Pleasanton), and Su's car.  HSI agents will testify to evidence found during the searches, including Articulation Agreements, draft I-17 Petitions, student records, Form I-20s and other SEVIS documents, emails, and correspondence, among other things.

Su consented to an interview at the time of the search, and agents will testify to her admissions. She admitted hiring recruiters and paying commissions to get F-1 students; instructing her staff to enter false addresses in SEVIS as applicants' residences; providing her student-employees with unauthorized access to SEVIS; forging DSO signatures; and instructing her staff not to give students grades below B+.  She also admitted sending the I-17 Petition and supplements, and the emails and attachments to HSI regarding Agrawat, Dirikan, Rizwan, and Batra.  While Su denied falsifying the articulation agreements, she asked the agents "please, please, please" not to contact the schools.  When the agents said they already did, she refused to discuss the articulation agreements further.

### I.     Forfeiture

The government is seeking forfeiture of the proceeds of Su's crimes.  There are four distinct forfeiture allegations, alleging different theories of forfeiture based on the crime of conviction – wire or mail fraud, visa fraud, alien harboring, or money laundering.  In general, the government seeks forfeiture of cash in TVU's and Su's bank and PayPal accounts, which received tuition and other payments from F-1 students, as well as TVU's offices, Su's three homes, and Su's car.  The procedural mechanism for addressing the forfeiture allegations is set forth in Section VI.L below.

///

UNITED STATES' TRIAL MEM.

**V.     DEFENDANT'S CRIMINAL HISTORIES**

Su has no known convictions.

**VI.     EVIDENTIARY ISSUES FOR TRIAL**

**A.     Statements By Defendant**

Prior statements made by a defendant are non-hearsay when offered by a party opponent – the government.  Fed. R. Evid. 801(d)(2)(A).  A defendant, however, may not elicit her own prior statements; they are inadmissible hearsay.  *Id.*; *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).  To hold otherwise would allow a defendant "to place his exculpatory statements 'before the jury without subjecting [himself] to cross-examination, precisely what the hearsay rule forbids.'"  Ortega, 203 F.3d at 682 (quoting *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988)).  This is true even if the government has offered other portions of the defendant's statement, and the defendant purports to offer additional portions for context under the rule of completeness, Federal Rule of Evidence 106.  The rule of completeness, which applies only to written and recorded statements, does not transform inadmissible hearsay into admissible evidence.  *See id*. at 682-83; *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (holding that "Rule 106 'does not compel admission of otherwise inadmissible hearsay evidence'").

**B.     Expert Witness Testimony**

The government expects to call the following expert witnesses in its case-in-chief: (1)  Carolyn Bayer-Boring, a Forensic Document Examiner with DHS; (2) Special Agent William R. Elliott of the State Department; (3) Jason Kanno, an Adjudicator at SEVP's Analysis and Operations Center; and (4) Michael Brown, a Computer Forensic Analyst with DHS.  The United States had previously filed a detailed expert designation and notice outlining the witnesses' expected testimony, their qualifications, and bases for their opinions.

**C.     Co-conspirator Statements**

Pursuant to its prior notice to defendant, the United States intends to offer co-conspirator statements that were made during, and in furtherance of, the conspiracy by persons with knowledge of the conspiracy.  More specifically, the United States intends to offer the following categories of co-conspirator statements, all of which have been previously produced to the defense:

1.      Any statements made by defendant and TVU employees (including Vishal Dasa, Anji Dirisanala, and Tushar Tambe) made during the course of their employment and affiliation with TVU regarding the creation and issuance of Form I-20s; student application, enrollment, and attendance; application and tuition payments; course schedules; creation and issuance of student transcripts; access to SEVIS; and payment of student referral fees, including all recorded statements during the undercover and confidential informant operations.

2.      Any statements made by defendant and TVU recruiters (including Ram Karra, Barhgav Boinpally, Samuel Stevens, and Abhilash Surineni) in email or other correspondence in furtherance of their efforts to recruit foreign TVU students to enroll in school, to purchase degrees, and/or to purchase transcripts.

3.      Any statements made by defendant and signatories of fraudulent articulation agreements (including Xiao Gang Su and Shi-Shenq Liou), in any form, in furtherance of the scheme fraudulently obtain SEVP approval to admit foreign students.

A statement is not hearsay if "the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E); *see also*, *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  The statement of a co-conspirator is admissible if the court finds by a preponderance of the evidence that: (1) a conspiracy existed at the time the statement was made, (2) the defendant knowingly participated in the conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy.  *See United States v. Liera*, 585 F.3d 1237, 1245-1246 (9th Cir. 2009); *United States v. Bowman*, 215 F.3d 951, 960-61 (9th Cir. 2000).  The government cannot establish knowing participation "rely[ing] solely on the alleged co-conspirator statements themselves," Liera, 585 F.3d at 1246, but need present only slight evidence connecting the defendant to the conspiracy, *United States v. Mason*, 658 F. 2d 1263, 1269 (9th Cir. 1981).  The requirements of Rule 801(d)(2)(E) and the Confrontation Clause of the Sixth Amendment are identical.  *Bourjaily*, 483 U.S. at 182-84.

So long as a defendant eventually joins a conspiracy, the admission of a co-conspirator's statement cannot be defeated by an objection that the statement at issue was made prior to the defendant joining the conspiracy.  *United States v. DiCesare*, 765 F.2d 890, 900 (9th Cir.), amended on other

UNITED STATES' TRIAL MEM.

1  grounds, 777 F.2d 543 (1985) ("'[A] conspirator who joins a pre-existing conspiracy is bound by all that

2  has gone on before in the conspiracy."); *United States v. Savedra*, 684 F.2d 1293, 1301 (9th Cir. 1982).

3  Further, once a defendant joins a conspiracy, his continued membership in the conspiracy is presumed

4  absent an affirmative showing of withdrawal.  *United States v. Fox*, 189 F.3d 1115, 1118 (9th Cir. 1999)

5  ("A conspirator can withdraw from a conspiracy by (1) disavowing the unlawful goal of the conspiracy;

6  (2) affirmatively acting to defeat the purpose of the conspiracy; or (3) taking definitive, decisive, and

7  positive steps to disassociate himself from the conspiracy.").

8        In determining whether the requirements of the co-conspirator rule have been met, the Court can

9  rely on any relevant evidence, whether admissible or not.  *Bourjaily*, 483 U.S. at 175 ("[T]he judge

10  should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay.").  Such

11  evidence may include, for example, hearsay evidence, evidence not admitted in the trial, and the co-

12  conspirator statements themselves.  *Id*. at 178-79 ("Out-of-court statements made by anyone, including

13  putative co-conspirators, are often hearsay.   Even if they are, they may be considered . . . .").  A trial

14  court has discretion to vary the order of proof in admitting a co-conspirator's statement; the statement

15  may be admitted prior to the presentation of independent evidence of the conspiracy.  *United States v.*

16  *Loya*, 807 F. 2d 1483, 1490 (9th Cir. 1987).

17        Evidence short of proof of the commission of the substantive offense is sufficient to prove the

18  defendant's knowing participation in the conspiracy by a preponderance of the evidence.  *United States*

19  *v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988).  In determining whether a conspiracy exists, the court

20  may consider the co-conspirator's statements themselves, but those statements alone do not conclusively

21  establish the existence of the conspiracy.  *United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir. 1990).

22  To determine whether evidence supports the existence of a conspiracy, the court considers facts such as

23  the nature of the scheme, the identity of the participants, the quality, frequency and duration of each

24  conspirator's transactions, and the commonality of time and goals.  *Id*.  Once some additional proof of

25  the existence of the conspiracy has been offered, the Court must determine whether such proof, viewed

26  in light of the co-conspirator statement itself, demonstrates by a preponderance that the defendant knew

27  of and participated in the conspiracy.  *Silverman*, 861 F.2d at 579.

28        A conspiracy need not be charged to introduce a co-conspirator's statements.  *United States v.*

UNITED STATES' TRIAL MEM.

1  *Portac, Inc.*, 869 F. 2d 1288, 1294 (9th Cir. 1989).  Participation as an aider and abettor suffices, as a

2  concert of action creates a conspiracy for purposes of the evidentiary rule.  *Id.*

3         In determining whether a statement was made "in furtherance of" a conspiracy, the focus is not

4  on its actual effect in advancing the goals of the conspiracy but rather on the declarant's intent in making

5  the statement.  *United States v. Zavala-Sierra*, 853  F.2d 1512, 1516 (9th Cir. 1988).  Accordingly,

6         [w]hen a declarant seek[s] to induce [the listener] to deal with the
       conspirators or in any other way to cooperate or assist in achieving
7       the conspirators' common objective, the declaration may be admissible
       [as a co-conspirator statement].  Statements concerning activities of the conspiracy,
8       including future plans, also may become admissible when made with such intent.

9

10  *United States v. Foster*, 711 F. 2d 871, 880 (9th Cir. 1983).  A statement is "in furtherance" of a

11  conspiracy if it furthers the common objectives of the conspiracy or sets in motion transactions that are

12  an integral part of the conspiracy.  *United States v. Layton*, 720 F. 2d 548, 556-57 (9th Cir. 1983).

13  Statements made to induce enlistment or further participation in the group's activities are considered to

14  be in furtherance of the conspiracy, as are statements to prompt further action, to allay fears or reassure

15  members of a conspiracy's continued existence, and to keep co-conspirators abreast of an ongoing

16  conspiracy's activities.  *See United States v. Yarborough*, 852 F.2d 1522, 1535-36 (9th Cir. 1993);

17  *Crespo de Llano*, 830 F.2d at 1543.  Acts of concealment charged as part of the scope of a conspiracy

18  are in furtherance of the conspiracy.  *See United States v. Stinson*, 647 F.3d 1196, 1215-16 (9th 2011).

19         **D.      Summaries of Voluminous Evidence by Summary Witness**

20         The United States currently intends to offer the following summary exhibits in its case-in-chief:

21  (1) a graphical summary of defendant's voluminous bank account records, depicting the flow of money

22  through the relevant bank accounts; and (2) a spreadsheet of the same.  Federal Rule of Evidence 1006

23  allows voluminous writings, recordings, or photographs, "which cannot conveniently be examined in

24  court," to be presented in the form of a chart, summary, or calculation.  Fed. R. Evid. 1006.  "The

25  purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the

26  summaries would be useful to the judge and jury."  *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir.

27  2011) (citations omitted).  It is essential that the underlying records from which the summaries are made

28  be admissible in evidence, and available to the opposing party for inspection, but the underlying

13

UNITED STATES' TRIAL MEM.

evidence does not itself have to be admitted in evidence and presented to the jury.  *See id.*; *see also,*
*United States v. Marchini*, 797 F.2d 759, 765-66 (9th Cir. 1986) (affirming admission of summary
exhibit prepared by case agent, where underlying evidence was adduced at trial and agent was subject to
cross-examination).

Here, the summaries consist of a graphical money flow summary and spreadsheet, both of which
were created by the HSI case agent, who will be subject to cross examination.  In creating these
summaries, the case agent used voluminous records, which have been previously produced to defendant
and will be separately admitted at trial.  The evidentiary summaries will also be produced prior to trial.
The summary exhibits will save the Court and the jury from engaging in a timely line-by-line analysis of
the underlying bank account records for each of the relevant transactions, although these records will be
available review.

### E.      Impeachment of Testifying Defendant

A defendant who testifies at trial waives her right against self-incrimination and subjects herself
to cross-examination concerning all matters reasonably related to the subject matter of her testimony.
The scope of the defendant's waiver is co-extensive with the scope of relevant cross-examination.
*United States v. Cuozzo*, 962 F.2d 945, 948 (9th Cir. 1992); *United States v. Black*, 767 F.2d 1334, 1341
(9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of
permissible cross-examination or his waiver.  Rather, the inquiry is whether the government's questions
are reasonably related to the subjects covered by the defendant's testimony.") (internal quotation marks
omitted).  Federal Rule of Evidence 404(b) "does not proscribe the use of other act evidence as an
impeachment tool during cross-examination*."  United States v. Gay*, 967 F.2d 322, 328 (9th Cir. 1992).
Accordingly, prior bad acts of the defendant may be the subject of proper impeachment if (1) defendant
testifies and (2) the underlying conduct is reasonably related to the subjects covered on direct
examination.  As described below, the United States has disclosed all prior bad acts evidence that is
currently in its possession.

### F.      Business Records and Public Records

The United States intends to offer certain documents as business records and public
records.  In this case, the relevant records will be from the following entities: United States District

14

UNITED STATES' TRIAL MEM.

1   Court for the Northern District of California, DHS, SEVIS, SEVP, Wells Fargo Bank, PayPal, Host

2   Monster, G-mail, Comcast, Citibank, Total Merchant Services, Global Payments Inc., American

3   Express, Chicago Title, LSI Title, Old Republic Title, Placer Title, Fidelity National Title, Mercedes

4   Benz of Pleasanton, Prominent Escrow, California Employment Development Division, Equity

5   Residential (Arbor Terrace Apartments), Alameda County, the Secretary of State for the State of

6   California, the Federal Deposit Insurance Corporation (FDIC), and U.C. Berkeley, all pursuant to Fed.

7   R. Evid. 803(6), (8).

8          Properly certified business records are self-authenticating and admissible when supported by

9   sworn declarations from qualified records custodians.  *See* Fed. R. Evid. 803(6) and 902(11); *see also*

10  *United States v. Anekwu*, 695 F.3d 967, 976 (9th Cir. 2012); *United States v. Johnson*, 297 F.3d 845 (9th

11  Cir. 2002) (bank records and sales orders were properly admitted as business records under Rule

12  803(6)); *United States v. Lewis*, 594 F.3d 1270, 1278-79 (10th Cir. 2010) (affirming admission of boxes

13  of bank records under Rule 902(11) because defendant had 39 days from the government's notice of its

14  intention to introduce such evidence to inspect them).

15         Certified public records that are certified correct by a custodian or that bear an official seal of the

16  public entity are also self-authenticating and admissible without live testimony.  *See* Fed. R. Evid 902(4)

17  and 803(8); *see* als,o *United States v. Orellana-Blanco*, 294 F.3d 1143, 1150 (9th Cir. 2002) ("[Rule

18  803(8)] developed to admit . . . public documents for which no serious controversy ordinarily arises

19  about their truth and it would be a great waste of time to have the person who created them come to

20  court and testify, such as birth certificates, death certificates, judgments, licenses, and the like."); *United

21  States v. Huffhines*, 967 F.2d 314, 320 (9th Cir. 1992) (copies of judgments certified by proper custodian

22  of records were admissible under Rule 902(4)); *United States v. Bellucci*, 995 F.2d 157, 161 (9th Cir.

23  1993) ("Because the certificate of insurance is not hearsay, no special showing is required under the

24  Confrontation Clause before it may be admitted in place of testimony by a representative from the

25  FDIC.").

26     **G.     Limitations on the Defendant's Use of Character Evidence**

27         Defendant may elect to call character witnesses to testify on her behalf.  However, evidence of a

28  person's character is not admissible for the purpose of proving a person's actions on a particular

15

UNITED STATES' TRIAL MEM.

1   occasion except "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution

2   to rebut the same." Fed. R. Evid. 404(a)(1).  Rule 405 limits the admission of character evidence to

3   reputation or opinion testimony, but allows inquiry into "relevant specific instances of conduct" on cross

4   examination.

5           Pertinent traits to which a character witness may testify include the very general trait of being

6   law-abiding and other narrow case-specific traits.  *United States v. Diaz*, 961 F.2d 1417, 1419 (9th Cir.

7   1992).  Character witnesses may not testify about specific good acts or specific good deeds performed

8   by the defendant (e.g., that the defendant gives to charity or is a successful business person).  Fed. R.

9   Evid. 405(a), 608(a).  Nor may a character witness testify about a defendant's lack of a criminal record

10  or the absence of bad habits or acts (e.g., that the defendant has never been arrested or does not smoke).

11  *Id*.; *United States v. Beverly*, 913 F.2d 337, 353 (7th Cir. 1990).  A defense witness can offer an opinion

12  of the defendant's truthfulness only if the defendant has already taken the stand and the government has

13  already attacked the defendant's credibility.  Fed. R. Evid. 608(a); *United States v. Lukashov*, 694 F.3d

14  1107, 1117 (9th Cir. 2012).

15          **H.      Use of Written Transcripts and Translations of Audio Recordings to Aid Jury**

16          The United States has prepared for use at trial transcripts of audio and video recordings of certain

17  in-person and telephonic interactions with the defendant to aid the jury in understanding the evidence.

18  This will be particularly helpful to the jury for recordings with poor audio quality.  Transcripts of

19  recordings may be used contemporaneously with the introduction of the recordings in evidence to assist

20  the jury in following the recordings while they are played.  *See United States v. Booker*, 952 F.2d 247,

21  249-50 (9th Cir. 1991) (affirming district court's use of transcripts as aid to recordings).  "A recorded

22  conversation is generally admissible unless the unintelligible portions are so substantial that the

23  recording as a whole is untrustworthy."  *United States v. Rrapi*, 175 F.3d 742, 746 (9th Cir. 1999).

24          The government will review the transcripts with the defense prior to admission to ensure their

25  accuracy, and the jury will be allowed to compare the transcript to the tape and hear argument from

26  counsel regarding the meaning of the conversations.  *See id*.  In addition, the jury will be instructed that

27  the tape, not the transcript, is evidence.  *See id*.

28          The government has also prepared English translation transcripts of recordings of conversations

UNITED STATES' TRIAL MEM.

1  that occurred in a foreign language, specifically Hindi.  Such translations are admissible.  *See id*. (use of

2  English translation transcripts of conversations in foreign language not abuse of discretion when

3  translation is accurate).  The instruction that the tape rather than the transcript is evidence does not apply

4  with foreign language tapes.  *See id*.; *United States v. Fuentes–Montijo*, 68 F.3d 352, 355 (9th Cir.

5  1995).

6  **I.     Presence of the Case Agents During Trial**

7  The United States requests the Court to allow the two case agents, both from HSI, to remain

8  present at counsel table during the trial.  Under Federal Rule of Evidence 615(3), "a person whose

9  presence is shown by a party to be essential to the presentation of the party's cause" should not be

10  ordered excluded from the court during trial.  The case agents' knowledge of the evidence and facts of

11  the case makes them essential to United States' presentation of its case.  As such, their presence at trial

12  is necessary to the United States.

13  **J.     Stipulations**

14  In an effort to streamline trial, the United States will propose stipulations to the defense

15  regarding the admissibility of all business and public records.  Stipulations on these issues will

16  significantly reduce the number of witnesses and length of the United States' case-in-chief.

17  **K.     Rule 404(b) Evidence**

18  The United States has provided notice of its intent to offer certain evidence under Rule 404(b)

19  against Su.  "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

20  person in order to show action in conformity therewith."  Fed. R. Evid. 404(b).  "It may, however, be

21  admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

22  knowledge, identity or absence of mistake or accident."  *Id*.  This "is a rule of inclusion.  Unless the

23  evidence of other crimes tends only to prove propensity, it is admissible."  *United States v. Rrapi*, 175

24  F.3d 742, 748 (9th Cir. 1999) (internal quotation marks and citation omitted).

25  Evidence of prior acts is admissible under Rule 404(b) if: (1) the evidence tends to prove a

26  material element of the offense charged; (2) the prior act is not too remote in time; (3) the evidence is

27  sufficient to support a finding that the defendant committed the other act; and (4) in cases where

28  knowledge and intent are at issue, the act is similar to the offense charged.  *United States v. Ogles*, 406

17

UNITED STATES' TRIAL MEM.

1  F.3d 586, 592 (9th Cir. 2005). If the evidence meets this test under Rule 404(b), the court must then

2  decide whether the probative value is substantially outweighed by the prejudicial impact under Rule

3  403. *United States v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000).     The United States' disclosure has

4  included evidence that defendant sold TVU diplomas and transcripts as part of her fraud scheme.

5  Although such conduct is part of, and/or inextricably intertwined with, the charged offenses, the United

6  States provided notice under Rule 404(b) out of an abundance of caution explaining that such acts are

7  also relevant to prove defendant's motive in her charged fraud schemes (money), her identity as the

8  mastermind behind the frauds (rather than any of her employees), her intent to defraud, and her lack of

9  mistake.

10     **L.     Forfeiture**

11          The Superseding Indictment contains four forfeiture allegations. Criminal Forfeiture Allegation

12  One alleges that upon conviction of visa fraud or visa fraud conspiracy, defendant shall forfeit property,

13  real or personal that constitutes, or is derived from or is traceable to the proceeds obtained directly or

14  indirectly from the commission of the offense of conviction, or that is used to facilitate, or is intended to

15  be used to facilitate, the commission of the offense of conviction, pursuant to 18 U.S.C. §

16  982(a)(6)(A)(ii). The property subject to forfeiture includes but is not limited to money seized from

17  Su's and TVU's bank accounts (Wells Fargo Bank accounts -9937, -2773, -3640, and -0454; Citibank

18  accounts -3045 and -5029; and PayPal account -1921); TVU's property (405 Boulder Court, Suites 700

19  and 800, in Pleasanton, California); Su's homes (2890 Victoria Ridge Court, Pleasanton, California;

20  1371 Germano Way in Pleasanton, California; and 1087 Murrieta Boulevard #133, Livermore,

21  California); and Su's 2009 Mercedes Benz.

22          Criminal Forfeiture Allegation Two alleges that upon conviction of wire fraud and mail fraud,

23  defendant shall forfeit any property, real or personal that constitutes, or is derived from or is traceable to

24  the proceeds obtained directly or indirectly from the commission of the offense of conviction, pursuant

25  to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The property subject to forfeiture includes but is

26  not limited to the same property identified above.

27          Criminal Forfeiture Allegation Three alleges that upon conviction of alien harboring, defendant

28  shall forfeit any property, real or personal, that constitutes or is derived from or is traceable to the

18

proceeds obtained directly or indirectly from the commission of the offense of conviction; or that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of conviction, pursuant to 18 U.S.C. § 982(a)(6)(A)(ii) and/or 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The property subject to forfeiture includes but is not limited to the same property identified above.

Criminal Forfeiture Allegation Four alleges that upon conviction of money laundering, defendant shall forfeit any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).  The property subject to forfeiture includes but is not limited to the real property and Mercedes Benz identified above.

The criminal forfeiture process is set forth in Rule 32.2 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 982, and 21 U.S.C. § 853.   Forfeiture is mandatory upon conviction of the charged offenses.  *See* 18 U.S.C. § 982(a)(2) and (a)(6)(A)(ii)(II).  Rule 32.2 provides that as soon as practicable after a verdict of guilty on any count for which forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute.  If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.  In either case, the government's burden of proof is by a preponderance of the evidence.  *United States v. Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir. 1998) (preponderance standard is constitutional because criminal forfeiture is not a separate offense, but only an additional penalty).

Upon a party's request in a case in which a jury returns a guilty verdict for an offense that gives rise to forfeiture, the jury must determine whether the government has established the requisite nexus between the property and offense giving rise to forfeiture.  Fed. R. Crim. P. 32.2(b)(4).  Absent an explicit waiver by the defendant, the jury's nexus determination should be made in a separate phase from the guilt/non-guilt phase to avoid any confusion over the different burdens of proof.  See Advisory Committee Notes to 2000 Adoption of Federal Criminal Rule 32.2(b); *see also*, *United States v. Garcia-Guizar*, 160 F.3d 511 (9th Cir. 1998).

The jury itself does not order forfeiture, determine ownership, or consider third-party claims.  *See* Fed. R. Crim. P. 32.2(b), (c).  The only issue for the jury is to determine whether the Government

19

UNITED STATES' TRIAL MEM.

1  has established the "requisite nexus between the property and the offense" on which the defendant has

2  been convicted. Fed. R. Crim. P. 32.2(b)(1). In this regard, the government is submitting proposed jury

3  instructions and a proposed special verdict form. The jury's special verdict will serve as the basis for

4  this Court to enter a preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b)(2), (3). The final order of

5  forfeiture will follow notice and publication of the preliminary order and will address any third-party

6  claims. Fed. R. Crim. P. 32.2(b)(2), (c).

7      The jury does not consider whether the defendant has an interest in the property to be forfeited;

8  nor does the jury determine the extent of the defendant's interest in any property to be forfeited. These

9  matters are considered by the court in the ancillary proceedings, following the jury's special verdict and

10  entry of the preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b), (c); Advisory Committee Note to

11  Subsection (b).

12      In determining whether the government has established the requisite nexus between the property

13  sought for forfeiture and the offense of conviction, the trier of fact can rely on any evidence already in

14  the record, or any evidence or information presented by the parties at a hearing after the verdict or

15  finding of guilt, including hearsay. Fed. R. Crim. P. 32.2(b)(1); *see also, United States v. Newman*, 659

16  F.3d 1235, 1245 (9th Cir. 2011); *United States v. Capoccia*, 503 F.3d 103, 109 (2nd Cir. 2007) (Rule

17  32.2(b)(1) allows court to consider "evidence or information" thus making it clear that court may

18  consider hearsay). Once the trier of fact has found that the government has established the requisite

19  nexus between the offense of conviction and the property sought for forfeiture, the court must promptly

20  enter a preliminary order of forfeiture without regards to third parties' interest, if any, as that will be

21  resolved in the ancillary proceeding. Rule 32.2(b)(2); *see also*, *United States v. Nava*, 404 F.3d 1119,

22  1132 (9th Cir. 2005) (district court property instructed jury that questions of ownership "were not before

23  them").

24  ///

25  ///

26  ///

27  ///

28  ///

UNITED STATES' TRIAL MEM.

## VII.    CONCLUSION

The United States respectfully requests leave to file such supplemental memoranda as may be necessary before or during trial in this case.


DATED: August 14, 2013                                Respectfully submitted,

                                                      MELINDA HAAG
                                                      United States Attorney


                                                      _____/s/_____
                                                      HARTLEY M. K. WEST
                                                      WADE M. RHYNE
                                                      Assistant United States Attorneys

21

UNITED STATES' TRIAL MEM.