1                                                Pages 1 - 94

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                BEFORE THE HONORABLE JON S. TIGAR

5


6    UNITED STATES OF AMERICA,        )
                                      )
7    Plaintiff,                       )
                                      )
8    v.                               )    NO. 11-CR-00288 JST
                                      )
9    SUSAN XIAO-PING SU,              )
                                      )    San Francisco, California
10   Defendant.                       )    Tuesday
                                      )    March 18, 2014
11   _____)

12
                       **TRANSCRIPT OF PROCEEDINGS**
13
            **(EXCERPT - JASON MACKEY TESTIMONY ONLY)**
14


15   **APPEARANCES**:

16   For Plaintiff:
                          Department of Justice
17                        United States Attorney's Office
                          1301 Clay Street
18                        Suite 340S
                          Oakland, CA 94612
19            BY:  **WADE MAXWELL RHYNE**
                   **ASSISTANT U.S. ATTORNEY**
20
                          U.S. Attorney's Office
21                        450 Golden Gate Avenue
                          11th Floor
22                        San Francisco, CA 94102
              BY:  **HARTLEY M.K. WEST**
23                 **ASSISTANT U.S. ATTORNEY**

24            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25   Reported by:  Kelly Polvi, CSR, RMR, FCRR, Contract Reporter

1    <u>**APPEARANCES (Continued)**</u>:

2    For Defendant:

3                    Law Offices of Erik Babcock
                     717 Washington St., 2d Floor
4                    Oakland, CA 94607
            BY:  **ERIK G. BABCOCK**
5                 **KEVIN MORLEY**
                  **ATTORNEYS AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

Tuesday, March 18, 2014

<u>GOVERNMENT WITNESS</u>

**JASON MACKEY**
**(Previously Sworn)**                              **PAGE**

<table>
<tr><td>Direct Examination by Mr. Rhyne</td><td>6</td></tr>
<tr><td>Cross-Examination by Mr. Babcock</td><td>71</td></tr>
<tr><td>Redirect Examination by Mr. Rhyne</td><td>86</td></tr>
<tr><td>Recross-Examination by Mr. Babcock</td><td>90</td></tr>
</table>

<u>E X H I B I T S</u>

| <u>GOVERNMENT EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> |
|---|---|---|
| 16 | | 60 |
| 17 | | 63 |
| 18 | | 63 |
| 500 | | 26 |
| 501 | | 26 |
| 501A | | 26 |
| 501B | | 26 |
| 502 | | 29 |
| 503 | | 29 |
| 503A | | 29 |
| 504 | | 56 |
| 505 | | 56 |
| 505A | | 56 |
| 505B | | 56 |
| 506 | | 57 |

E X H I B I T S (Continued)

| GOVERNMENT EXHIBITS | IDEN | EVID |
|---|---|---|
| 507 | | 57 |
| 508 | | 57 |
| 509 | | 57 |
| 510 | | 58 |
| 511 | | 58 |
| 511A | | 58 |
| 512 | | 27 |
| 513 | | 27 |
| 513A | | 27 |
| 515 | | 22 |
| 516 | | 27 |
| 600 | | 33 |
| 601 | | 35 |
| 603 | | 42 |
| 605 | | 45 |
| 606 | | 52 |
| 608 | | 49 |
| 609 | | 47 |
| 650 | | 21 |
| 651 | | 21 |
| 653 | | 21 |
| 700 | | 33 |
| 701 | | 37 |

1       <u>E X H I B I T S</u> (Continued)

2       <u>GOVERNMENT EXHIBITS</u>                              <u>IDEN</u>    <u>EVID</u>

3       702                                                             44

4       704                                                             53

5       705                                                             49

6       705A                                                            55

7       800                                                             64

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MACKEY - DIRECT / RHYNE

1    <u>Tuesday - March 18, 2014</u>                              <u>10:14 A.M.</u>

2                 E X C E R P T   O F   P R O C E E D I N G S

3                              ---oOo---

4         (Proceedings were heard in the presence of the jury.)

5                             **JASON MACKEY,**

6    recalled as a witness for the plaintiff, having been previously

7    duly sworn, was further examined and testified as follows:

8                         <u>DIRECT EXAMINATION</u>

9    BY MR. RHYNE:

10   **Q.**    Good morning, Agent Mackey.

11   **A.**    Good morning.

12   **Q.**    When we last heard from you, you indicated that you were

13   prepared to come back and testify about your financial analysis

14   in this case; is that correct?

15   **A.**    Yes.

16   **Q.**    Can you summarize for the jury the training that you've

17   had on conducting financial analysis in a criminal case like

18   this?

19   **A.**    Sure.  In 2002 I attended the Federal Law Enforcement

20   Training Center in Georgia.  That involved me attending two

21   courses.  One was a basic criminal investigator course that

22   taught general basic investigative techniques, did cover some

23   financial investigative topics; then I took a subsequent

24   follow-on course, which was a customs basic enforcement school,

25   and there I learned customs-specific topics.

1    And at the time, the U.S. Customs Service's primary

2    mandate was basically to go after tax evaders in the sense that

3    importers that don't pay duty, they're trying to attempt to

4    evade paying duties, we would investigate that.

5    We had the secondary mandate of going after contraband

6    smugglers -- people who try to smuggle drugs in this country,

7    as well as individuals who smuggle the proceeds of those drugs

8    out of this country.

9    So that course covered several topics, which would

10   include money laundering, asset forfeiture, tracing of funds,

11   et cetera.

12   Q.    When you use the term "tracing of funds," what do you

13   mean?

14   A.    Basically, once you identify that an individual is

15   involved in smuggling drugs into this country and he's making

16   money from that endeavor, we need to utilize techniques to be

17   able to specifically tie the money that they're making with,

18   for example, specific bank accounts that they're placing it in

19   so that we can inform the Court that the money that we're

20   attempting to seize is the same money that the individual made

21   during the course of their illegal activities.

22   Q.    Have you attended any formal seminars on these topics?

23   A.    Yes, I have.

24   Q.    Can you tell the jury about that?

25   A.    I've attended several financial seminars; various

1    seminars put on by different organizations such as the

2    Department of Treasury.  At the time when I was hired, the

3    Customs Service was under the Department of Treasury.

4         I also attended several trainings put on by FINCEN --

5    it's the Financial Crimes Network, and various other seminars

6    related to money laundering and tracing of funds and financial

7    investigations.

8    Q.   And you covered similar topics in those seminars?

9    A.   Yes.

10   Q.   The contents of those seminars was -- included some other

11   case agents that would come in and talk about methods that they

12   have used in other cases; is that correct?

13   A.   Yes, they talk about current topics and current case law,

14   et cetera.

15   Q.   How many financial accounts did you analyze in this

16   particular case?

17   A.   Probably around a dozen accounts.

18   Q.   How many accounts could you say you looked at all

19   together?

20   A.   It's somewhere in the vicinity of a dozen.  I looked

21   specifically at, I believe, somewhere around nine accounts in

22   detail that appear to be receiving funds from F-1 students.

23   Q.   And 12 total and you looked closely at 9?

24   A.   Yes.

25   Q.   And can you just tell generally what institutions did

1    those accounts belong to?

2    A.    Wells Fargo, CitiBank, PayPal, and they also utilized the

3    credit card processing company called "Global Payments."

4    Q.    I want to just have you generally walk through the

5    methods that you used in conducting the analysis in this case.

6    Where do you start?  What do you look at?

7    A.    Generally, I start with the bank statements, to get an

8    overall picture of the money coming into the account and money

9    being pulled out of the account.

10        From that point I can look at more detailed invoices or

11   the supporting documents which might describe exactly what the

12   credits and debits are.

13   Q.    What date ranges were you concerned with in this case?

14   A.    I started my analysis by looking at February 19th of

15   2009, which was the date that Tri-Valley University received

16   approval to admit F-1 students.

17   Q.    When you started at that point, did you also note the

18   existing balances in the accounts that you were analyzing at

19   that point?

20   A.    Yes, I did.

21   Q.    Why did you do that?

22   A.    I wanted to have an idea of funds that might be in the

23   account that weren't from F-1 students.

24   Q.    What was the end of the date range that you analyzed in

25   this case?

1    A.    January 19th, 2011.

2    Q.    What's the significance of that date, again?

3    A.    That's the day that we went through Tri-Valley

4    University's approval to enroll foreign students.

5    Q.    So those two days are the snapshot of potential

6    Tri-Valley University F-1 students?

7    A.    Yes.

8    Q.    So when you're looking at the actual bank statements --

9    let's go one step forward -- what items are you starting with?

10   A.    I'm looking at the -- there's a date of a transaction,

11   generally there'll be a memo line which will provide some basic

12   information about what the transaction is, and there'll be a

13   credit -- information about whether there's a credit or a debit

14   in the account, basically what you would see in your ordinary

15   bank statements.

16   Q.    I want to talk a little bit about some of these

17   institutions that held accounts in this case, starting with

18   PayPal.  Did you analyze statements from PayPal?

19   A.    Yes, I did.

20   Q.    Can you generally describe for the jury how you would

21   look at a statement in PayPal for Tri-Valley University and

22   determine whether a line item in there was F-1 income or not?

23   A.    Sure.  PayPal is a little different than the other

24   accounts in that they kept more detailed information about who

25   was making the payment, the email address of the person making

1    the payment, they captured the IP address of the person making

2    the payment, et cetera.

3         So I generally would start by looking at the name of the

4    person that PayPal was indicating was making the specific

5    payment and from that point on I would compare that name with

6    names on the SEVIS database to determine whether or not the

7    payment was coming from an F-1 student or not.

8    **Q.**   What if you saw a payment in PayPal that you were not

9    able to link up to a student?  What would you do at that point?

10   **A.**   Sure.  I could tell you from my observations, conducting

11   this analysis, many individuals weren't making payments on

12   behalf of themselves, they were individuals making payments on

13   behalf of other people.

14        So you might have a wife making a payment on behalf of a

15   husband who was a Tri-Valley student, or a friend, et cetera.

16        So in that case I would go through typically what we

17   collected from our search warrant, which were just invoices,

18   handwritten notes, et cetera, which would specify who an

19   individual payment was for.

20        So if I saw a payment that didn't match in SEVIS, I would

21   look for that payment from our search warrant materials and

22   find an invoice that matched that payment and then run the name

23   on the invoice in our SEVIS database to determine whether or

24   not that payment was being made for an F-1 student.

25   **Q.**   How many PayPal line item payments would you say you

1    looked at in conducting your financial analysis just with

2    respect to PayPal?

3    **A.**    There was close to 10,000 transactions.  I couldn't go

4    through all those transactions, I'd still be going through them

5    today if I tried, so I focused on payments that were over $50.

6    **Q.**    Why do you do that?

7    **A.**    To get a better idea of the large transactions that were

8    taking place.

9    **Q.**    Did you have an idea about what a semester tuition

10   payment was going to be at this point?

11   **A.**    Yes.  So I did specifically pick $50 because that was

12   what Tri-Valley University charged for its application fees.

13   They also charged nominal amounts for issuing CPT I-20s, for

14   mailing, FedEx'ing I-20s, et cetera.

15       So there were a lot of little charges which I didn't even

16   look at; I looked at the charges that were over $50, which

17   would include, generally, tuition payments.

18   **Q.**    And we're going to talk about this topic in more detail

19   in a while, but those transactions that were under $50, when

20   you saw those coming into the account you categorized those in

21   a certain way; is that correct?

22   **A.**    Yes.

23   **Q.**    As opposed to the F-1 income that you were able to

24   identify; is that correct?

25   **A.**    Yes.

1    Q.   So you kept a running total of what you would call

2    "unidentified money" versus the F-1 money; is that correct?

3    A.   Exactly.

4    Q.   And you did that for each account?

5    A.   Yes.

6    Q.   Credit cards.  Let's shift to credit cards.

7         Did you see income from credit cards into Tri-Valley

8    University accounts?

9    A.   I did.  Looking at monthly statements for one of

10   Tri-Valley's business Wells Fargo accounts, it was clear that

11   they were processing credit card payments.  The memo line on

12   the monthly statement indicates that they were using a company

13   called "Global Payments."

14        So I subpoenaed Global Payments and obtained the credit

15   card processing application from them, which confirmed that

16   they were, in fact, using Global Payments in that they had

17   linked their credit card processing account to those specific

18   Wells Fargo accounts.

19   Q.   And can you describe for the jury the process by which if

20   a student walks in, swipes a credit card for their $2,700, how

21   that transaction then flows into the bank account?

22   A.   Sure.  TVU had three credit card processing accounts and

23   each account came with a separate credit card machine.  And the

24   way the machines worked, or if -- you can either show up in

25   person to pay your tuition -- at which point they'll swipe the

1    credit card, a receipt will be printed, they'll keep a copy of

2    the receipt, they can give the student a copy of the receipt --

3    or individuals can just call in and provide their credit card

4    number, they'll punch it into a machine, the machine will print

5    out a receipt.

6         Those receipts are all -- or those payments are all put

7    into what's call "batches."  So you might have several payments

8    in a single batch.

9         And then once the merchant at the end of the day -- or

10   whenever that merchant decides to finalize the batch, he'll go

11   in -- or she will go in and finalize the batch, print out a

12   report, and that amount will be the amount that's deposited

13   into the Wells Fargo account that's linked to the credit card

14   processing company.

15        So if they have three credit card transactions, each for

16   a thousand dollars, and they run the batch at the end of the

17   day, the amount that we see deposited into the Wells Fargo

18   account will be $3,000 and all the cards will show the same

19   batch number.

20   **Q.**   And then on site at the merchant, or in this case

21   Tri-Valley University, there would also be a physical receipt,

22   in many cases; is that correct?

23   **A.**   Yes.

24   **Q.**   And those were one of the things you were looking for in

25   your search warrant in this case.

1    **A.**    Yes.

2    **Q.**    How were you able to match up a credit card swipe with a

3    F-1 student in this case in order to categorize F-1 income?

4    **A.**    So when we conducted our search warrants at the

5    Tri-Valley University business, agents found receipts all

6    strewn about the business; it was a little disorganized.  So it

7    was a process of scanning all the receipts -- which were

8    oftentimes stapled to invoices -- and putting them together in

9    the proper batches and matching up the batched amounts with the

10   deposits in the Wells Fargo account.

11        And from that point I would take the names on the

12   invoices -- because a lot of times the credit card receipts

13   won't have a name on the receipt, depending on how it's run, so

14   I have to look at the invoices attached to the receipt and run

15   the name on the invoices in our SEVIS database to confirm that

16   the payment is actually for an F-1 student.

17   **Q.**    And if the name's on the credit card receipt, it's

18   easier; correct?

19   **A.**    Yes.

20   **Q.**    You just take that name, run it into SEVIS, and then you

21   can confirm or deny that they were a student; correct?

22   **A.**    But in the case of Tri-Valley, they ran most of their

23   credit card payments through online payments.  So they punched

24   in their credit card number.  So when they do that, it doesn't

25   print a name on the receipt.

1   Q.   So that's when you had to go in and do an additional step

2   of finding the paperwork that -- underlying that payment to

3   Tri-Valley?

4   A.   A matching invoice, yes.

5   Q.   Checks.  I want to move now to checks.

6        Were you able to find income in the form of checks for

7   Tri-Valley University?

8   A.   Yes.

9   Q.   How were you able to determine whether a particular

10  payment made by a check was F-1 income?

11  A.   At first I'd look at the name of the payer on the check

12  and run that in the SEVIS database.  Obviously, if that

13  matched, I'd know that it was an F-1 student.  If it doesn't

14  match, I'd also look for an invoice to indicate who the payment

15  was for and then I'd indicate whether that payment was for an

16  F-1 student.

17  Q.   EFTs.  Are you familiar with that term?

18  A.   Yes.

19  Q.   What's an EFT?

20  A.   Electronic funds transfer.  It's a transfer of funds

21  between various bank accounts.

22  Q.   Okay.  Did you find income for Tri-Valley University that

23  came in the form of EFTs?

24  A.   Yes.

25  Q.   How would you reconcile that income in categorizing it as

MACKEY - DIRECT / RHYNE

1    an F-1 payment or something else, or an unidentified payment?

2    **A.**    With the EFTs and also with the wires, the monthly

3    statements, they'll annotate in the memo section, statement

4    information, about who the payment's for and any other

5    information that can fit in the memo line that the payor

6    chooses to put in when they make their EFT transaction.

7         So I'd match the name in the memo line with -- number

8    one, I'd run it in our SEVIS and determine whether it comes

9    back to an F-1 student.

10   **Q.**    And you said you do the same thing with respect to wires?

11   **A.**    Yes.

12   **Q.**    Can you just tell the jury what you mean by wires as

13   opposed to EFTs?

14   **A.**    It's very similar; a different way to initiate transfers

15   to accounts.

16        Wires involve you -- require you to go into a bank and

17   fill out a form.  It's often used to move money from one

18   country to another country.

19   **Q.**    Cash.  Did you see income in the form of cash at

20   Tri-Valley University?

21   **A.**    Yes.

22   **Q.**    How did that compare, as far as your analysis goes, in

23   matching that up with a particular student?

24   **A.**    Generally I didn't match up the cash.

25   **Q.**    More difficult?

1    **A.**    Yes.

2    **Q.**    Now, as you're analyzing these different forms of income,

3    you're keeping a running total of the balances in each account;

4    correct?

5    **A.**    I'm keeping a running total of the identified F-1

6    payments and the unidentified payments.

7    **Q.**    And that's for each -- each individual account has its

8    own spreadsheet; correct?

9    **A.**    Correct.

10    **Q.**    Now, previously, when you testified, you talked about

11    Exhibit 109, which was a CD ROM --

12    **A.**    Yes.

13    **Q.**    -- of evidence; correct?

14    **A.**    Yes.

15    **Q.**    What was on Exhibit 109?

16    **A.**    We scanned all of the receipts and invoices.  As a matter

17    of fact, we scanned all the physical documents that we seized

18    from the Tri-Valley University businesses.  And I went through

19    those scanned images and pulled out the receipts and invoices.

20         And that's -- I used the scanned images to sort and

21    organize all the receipts and put them in their proper batches.

22    **Q.**    And in this spreadsheet that you're making, are you able

23    to look at the spreadsheet and easily find the source or the

24    corroboration that you used to identify that income as F-1

25    income?

1    **A.**    It was a lot of work, actually, scanning and organizing,

2    because there were hundreds of thousands of documents, probably

3    hundreds of thousands of invoices and receipts, to kind of put

4    the puzzle together.  It took a long time, yes.

5    **Q.**    And how long did this process take you in conducting this

6    analysis in this case?

7    **A.**    I didn't work on it full time, but, I mean, off and on,

8    probably over a year.

9    **Q.**    Now, in order to present your testimony today and your

10   financial analysis, you've created some summaries; is that

11   correct?

12   **A.**    Yes.

13        **MR. RHYNE:**  Your Honor, may I approach?

14        **THE COURT:**  Yes.

15   BY MR. RHYNE:

16   **Q.**    I'm going to hand you Exhibit 650, 651, and 653, all

17   currently for identification, and have you take a look at

18   those, Agent Mackey.

19        Let's start with 653.  What is Exhibit 653?

20   **A.**    It's basically spreadsheets that I've compiled using the

21   monthly statements as kind of a base showing the running total

22   of unidentified payments and F-1 payments flowing through the

23   accounts.

24        And there's also another tab which actually itemized each

25   individual account.

1      So it breaks down the credit card payments into the, you

2   know, batches, and the individual transactions within those

3   batches, and it also shows the individual PayPal transactions

4   and checks, et cetera.

5   Q.   The first few tabs that we see in there, how is that

6   organized?

7   A.   The first few tabs are organized by account.

8      And, again, it basically mirrors the monthly statement on

9   the left, and on the right is my analysis and the running

10  totals of F-1 payments and unidentified payments.

11  Q.   Now I want to shift your attention to Exhibit 650.

12     Do you recognize Exhibit 650?

13  A.   Yes, I do.

14  Q.   Is that a graphical depiction of the money flow that you

15  were able to determine in this case?

16  A.   Yes, the tuition deposits and transfers between accounts.

17  Q.   And then it goes on to also analyze some of the more

18  major expenditures; is that correct?

19  A.   Yes.

20  Q.   Exhibit 651.  Can you look at that please?  What's

21  Exhibit 651?

22  A.   Spreadsheet depiction of basic account information for

23  the Tri-Valley accounts, would include the account names, the

24  opening dates, who has signature authority over the accounts,

25  what the balances were on the account -- the accounts, when

1    Tri-Valley received its F-1 approval.

2    **Q.**   And the following pages in Exhibit 651, what do we see

3    there?

4    **A.**   It's a breakdown of the F-1 payments identified entering

5    into various Tri-Valley University accounts.

6    **Q.**   And the final page.  What do we see there?

7    **A.**   This is a spreadsheet depiction of the total deposits

8    coming into the accounts.  So that would include identified F-1

9    payments and unidentified payments.

10   **Q.**   Would Exhibits 650, 651, and 653 be helpful today in

11   explaining your testimony to the jury?

12   **A.**   Yes.

13        **MR. RHYNE:**  Your Honor, we would offer those exhibits

14   into evidence at this time.

15        **THE COURT:**  Any objection?

16        **MR. BABCOCK:**  No, Your Honor.

17        **THE COURT:**  Exhibits 650, 651, 653 are now admitted.

18            (Government Exhibits 650, 651, and 653 received in

19            evidence.)

20   BY MR. RHYNE:

21   **Q.**   And those records confirm what we see on Exhibit 651,

22   page 1?

23   **A.**   Yes, they do.

24   **Q.**   Turning to Exhibit 515, what's Exhibit 515?

25   **A.**   It's a CD of PayPal account information produced by

1    PayPal in response to our subpoena.

2    **Q.**   And that includes transaction records; is that correct?

3    **A.**   Yes.

4    **Q.**   Or PayPal's equivalent of the monthly statements?

5    **A.**   Yes.

6        **MR. RHYNE:**   Your Honor, we'd offer Exhibit 515 into

7    evidence.

8        **MR. BABCOCK:**   No objection.

9        **THE COURT:**   Exhibit 515 is admitted.

10        (Government Exhibit 515 received in evidence.)

11   **BY MR. RHYNE:**

12   **Q.**   Agent Mackey, before we talk about 1921 in some more

13   detail, I'm going to refer you back to Exhibit 651, page 1.

14        The opening date on this account is September 22nd, 2003;

15   is that correct?

16   **A.**   Yes.

17   **Q.**   Was this account opened in the name of Tri-Valley

18   University on that day?

19   **A.**   No, it was not.

20   **Q.**   Can you explain to the jury how that came to be?

21   **A.**   It was initially opened as a personal account in the name

22   of Susan Su.  It was converted into a business account in 2008,

23   and then the primary email address -- which is how payments are

24   routed in PayPal, you punch in somebody's email address and

25   that's how PayPal knows how to send the payment -- that was

1    changed from a personal email account to

2    ssu@tri-valleyuniversity.org, which is one of Tri-Valley

3    University's main email accounts.

4    **Q.**    So getting back to 1921, up on Exhibit 650 you have

5    $2.9 million of F-1 proceeds going into this account; correct?

6    **A.**    Yes.

7    **Q.**    And that's the lower number that you calculated based on

8    your review of the records?

9    **A.**    Yes.  If I saw a record in SEVIS, I'd note it as an F-1

10   payment.  That's where that figure comes from.

11   **Q.**    If you were relying on Dr. Su's 98 percent F-1 students

12   at her school, this $2.9 million would be bigger; is that

13   correct?

14   **A.**    Yes.

15   **Q.**    Before we go on, we should clarify that the -- of the F-1

16   payments and the unidentified payments that you saw going into

17   each of these accounts, were you able to see all of it as

18   coming in from Tri-Valley University?

19   **A.**    Sorry.  Could you repeat the question?

20   **Q.**    When you spoke to Dr. Su, you asked her whether she had

21   any other forms of income other than Tri-Valley University;

22   correct?

23   **A.**    Yes.

24   **Q.**    What did she say?

25   **A.**    She said no.

1    Q.   That it was all from Tri-Valley University; correct?

2    A.   Correct.

3    Q.   I want to shift gears.  I want to talk about Wells Fargo

4    Bank account ending in 0454.

5         Do you see that there?

6    A.   Yes.

7    Q.   And, again, we have F-1 proceeds going into this

8    account --

9    A.   Yes.

10   Q.   -- of 2.5 million.

11   A.   Yes.

12   Q.   And, again, this is the lower number that you calculated;

13   correct?

14   A.   Right.

15        MR. RHYNE:  Your Honor, may I approach?

16        THE COURT:  Yes.

17   BY MR. RHYNE:

18   Q.   I'm going to hand the witness Exhibit 500, 501, and 501A,

19   all for identification.

20        Do you recognize those exhibits?

21   A.   I do.

22   Q.   Can you just briefly summarize what Exhibit 500 is?

23   A.   Signature cards and account opening applications for

24   Wells Fargo at 0454 and 3640.  They were linked accounts.

25   Q.   Okay.  So we have another account that's linked to this;

1    is that correct?

2    **A.**   Yes.

3    **Q.**   And that account had $105,000 of F-1 proceeds that you

4    identified.

5    **A.**   Yes.

6    **Q.**   What do we see in Exhibit 501?

7    **A.**   These are monthly statements for both account 0454,

8    Wells Fargo, and Wells Fargo account 3640.

9    **Q.**   And what do we see in 501A?

10   **A.**   These are selected deposits going into accounts,

11   Wells Fargo account 0454 and 3640.

12   **Q.**   I'm also going to hand you 501B.  Can you look at 501B

13   for identification?  What is that?

14   **A.**   Wire transfer records for account 3640, produced by

15   Wells Fargo.

16   **Q.**   Did you rely on all of these documents in your analysis?

17   **A.**   I did.

18   **Q.**   Do the account opening details and opening balances, did

19   you use these documents in making Exhibit 651?

20   **A.**   I did.

21       **MR. RHYNE:**  Your Honor, we'd offer Exhibit 500, 501,

22   501A, and 501B into evidence.

23       **MR. BABCOCK:**  No objection, Your Honor.

24       **THE COURT:**  Exhibits 500, 501, 501A, and 501B are

25   admitted.

1        (Government Exhibits 500, 501, 501A, and 501B

2        received in evidence.)

3   BY MR. RHYNE:

4   Q.    I'm going to go ahead and retrieve those from you,

5   Agent Mackey.

6        Agent Mackey, I'd like to hand you now Exhibit 516 for

7   identification.

8        Do you recognize that?

9   A.    I do.

10  Q.    What is that?

11  A.    It's opening applications and batch deposit statements

12  from Global Payments, the credit card processing company for

13  Tri-Valley.

14  Q.    And those are the records that you found affiliated with

15  0454?

16  A.    Correct.

17  Q.    The credit card swipes that actually feed into that

18  account?

19  A.    Yes.

20  Q.    Were you able to confirm who the account holders were

21  with Global Payments?

22  A.    Yes.

23  Q.    And Dr. Susan Su was account holder; is that correct?

24  A.    On all three accounts, yes.

25  Q.    And with Tri-Valley University listed as the business; is

1    that correct?

2    **A.**   Correct.

3         **MR. RHYNE:**  Your Honor, we offer Exhibit 516 into

4    evidence.

5         **MR. BABCOCK:**  No objection, Your Honor.

6         **THE COURT:**  Exhibit 516 is admitted.

7         (Government Exhibit 516 received in evidence.)

8    BY MR. RHYNE:

9    **Q.**   Agent Mackey, I'd like to hand you Exhibit 512, 513, and

10   513A for identification and have you take a look at them.

11        What's Exhibit 512?

12   **A.**   Signature cards and opening applications for CitiBank

13   account 3045, as well as monthly statements and selected

14   deposits for that same account.

15   **Q.**   And that rounds out 513 and 513A; correct?

16   **A.**   Yes.

17        **MR. RHYNE:**  Your Honor, we'd offer Exhibit 512, 513, and

18   513A into evidence.

19        **MR. BABCOCK:**  No objection.

20        **THE COURT:**  512, 513, and 513A are admitted.

21        (Government Exhibits 512, 513, and 513A received in

22        evidence.)

23   BY MR. RHYNE:

24   **Q.**   And does Exhibit 651 accurately summarize the signature

25   authority, the account name, the balance, and the last four of

1   the account?

2   **A.**   Yes.

3   **Q.**   Now I want to direct your attention to the screen where

4   we have Exhibit 650, also, up.

5        Do you see the CitiBank account at the top?

6   **A.**   Yes.

7   **Q.**   And that's ending in 3045?

8   **A.**   That's correct.

9   **Q.**   That's this account?

10  **A.**   Yes.

11  **Q.**   Any F-1 payments going directly into that account?

12  **A.**   No, I don't believe so.  Just transfers from other

13  accounts.

14  **Q.**   So this was included in your analysis because F-1

15  payments traveled through it; is that correct?

16  **A.**   Correct.

17  **Q.**   I want to direct your attention now to Wells Fargo Bank

18  account ending in 4780.

19       I'm going to hand you Exhibit 502, 503, and 503A, and

20  have you take a quick look at them.  And, as you're looking at

21  them, can you just generally summarize what each of them are?

22  **A.**   502 is opening applications and signature cards for

23  Wells Fargo account 4780, 503 are monthly statements for

24  Wells Fargo account 4780, and 503A are selected deposits going

25  into Wells Fargo account 4780.

1    MR. RHYNE:  Your Honor, we'd offer Exhibit 502, 503, and

2  503A into evidence.

3    MR. BABCOCK:  No objection.

4    THE COURT:  502, 503, and 503A are all admitted.

5    (Government Exhibits 502, 503, and 503A received in

6    evidence.)

7  BY MR. RHYNE:

8  Q.   And, Agent Mackey, you also identified a small amount of

9  F-1 payments going into that account; correct?

10 A.   Yes.

11 Q.   And we see that there also.  The bubble.  16,000.

12 A.   Correct.

13 Q.   Now, once you identified these accounts, were you able to

14 track the money between and among them?

15 A.   Yes, I tracked transfers between the accounts.

16 Q.   I want to direct your attention to this first line that

17 we see coming out of PayPal ending in 1921 and going into

18 Wells Fargo Bank 3640.  What is that?

19 A.   That signifies that between the dates of November 10,

20 2009, and April 27, 2010, there were a series of transfers

21 between the PayPal account 1921 into account 3640 of

22 Wells Fargo.  They all -- all the transfers were in one

23 direction; they went from the PayPal account into the

24 Wells Fargo account.

25 Q.   And that's a series of different transactions occurring

1    over time, not one transaction?

2    **A.**   Correct.

3    **Q.**   Now, I pulled up the second arrow, moving from PayPal

4    ending in 1921, to Citi ending in 3045.  What do we see here?

5    **A.**   Again, that signifies transfers from Tri-Valley

6    University's PayPal account; a series of transfers between

7    December of 2010 to January of 2011 totalling $1.28 million

8    going into the CitiBank 3045.

9    **Q.**   Next slide, we see movement of money from Wells Fargo

10   0454 back to Citi 3045; is that correct?

11   **A.**   Yes.

12   **Q.**   I shouldn't say "back to Citi," I should say "to Citi."

13   Correct?

14   **A.**   Correct.  They're all in one direction.

15   **Q.**   And that's a total of $900,000 was transferred between

16   date ranges of December 22nd '09 and November 11, 2010, is that

17   correct?

18   **A.**   Yes.

19   **Q.**   Moving to the next slide, we see a line from Wells Fargo

20   0454 going into Wells Fargo 3640; is that correct?

21   **A.**   Yes.

22   **Q.**   Could you tell the jury what this is?

23   **A.**   This shows a series of transfers between Wells Fargo

24   account 0454 and 3640 totalling $59,000 net, moving to 3640.

25        So there were transfers going in both directions, but the

1    net amount of transfers, when they're all added up, is $59,000

2    going in the direction of Wells Fargo account 3640.

3    **Q.**    So the arrow runs one way because that's the net?

4    **A.**    Correct.

5    **Q.**    And, finally, we see a list of transactions from 0454

6    into 4870; is that correct?

7    **A.**    Yes.

8    **Q.**    Can you tell the jury what we see here?

9    **A.**    That shows $895,000 in net transfers between -- or from

10   Wells Fargo account 0454 into Wells Fargo account 4780 between

11   the periods of March 2010 and December 2010.

12       Again, that's net.  So they're transfers going back and

13   forth, but the net amount is traveling the direction of 4780.

14   **Q.**    And here, this is a summary of the major transactions as

15   they appear with respect to these particular accounts; correct?

16   **A.**    Yes.

17   **Q.**    And just for the record, there's fewer accounts on

18   Exhibit 650, page 1, than we see on 651, page 1; is that

19   correct?

20   **A.**    Yes.

21   **Q.**    Why is that?

22   **A.**    Generally, I'm only looking at accounts that are either

23   receiving F-1 payments or are being used to purchase

24   large-ticket items.

25   **Q.**    Okay.  So this is the money going in and the money moving

MACKEY - DIRECT / RHYNE

1     around; correct?

2     **A.**    Yes.

3     **Q.**    Did you also analyze the money being spent from these

4     accounts?

5     **A.**    Yes.

6     **Q.**    I want to go to the next slide and keep all of these

7     accounts in the same spot, just for reference.

8          I'm sorry, one more transaction before we do that.

9          What do we see there?

10    **A.**    Net transfers between account 3640 into account 4780,

11    both with Wells Fargo.  Total's $150,000 between the date

12    ranges of May 2010 -- and I think that might be a typo,

13    December of 2010.

14    **Q.**    Oh, 2010.  So that should be 12/14/2010?

15    **A.**    Yes.

16    **Q.**    And this arrow is blue and red; is that correct?

17    **A.**    Yes.

18    **Q.**    And that's because you have money coming in from

19    different sources -- upstream; correct?

20    **A.**    Yes.

21    **Q.**    Okay.  So, again, I want to keep these all in the same

22    place, just for reference.

23          This slide is entitled "Money Laundering Transactions."

24    Is that correct?

25    **A.**    Yes.

MACKEY - DIRECT / RHYNE

1    Q.   I want to direct your attention to the first slide.

2         We see a $36,000 transaction for count 26.  Do you see

3    that?

4    A.   I do.

5    Q.   Can you summarize what that is?

6    A.   That shows, actually, a check that was written against

7    account 0454 to purchase a red Mercedes by Susan Su.

8    Q.   I want to hand you Exhibit 600 and Exhibit 700 for

9    identification.

10        Can you look at Exhibit 600, please.

11        What is Exhibit 600?

12   A.   It's a check drawn on Tri-Valley University Wells Fargo

13   account 0454 for the purchase of a Mercedes-Benz.

14   Q.   And what do we see in Exhibit 700?

15   A.   It's a purchase contract for that Mercedes-Benz.

16        MR. RHYNE:  Your Honor, we'd offer Exhibit 600 and 700

17   into evidence.

18        MR. BABCOCK:  No objection.

19        THE COURT:  Exhibits 600 and 700 are admitted.

20            (Government Exhibits 600 and 700 received in

21            evidence.)

22   BY MR. RHYNE:

23   Q.   I'm going to grab Exhibit 600 and 700 back from you.

24        Agent Mackey, this is Exhibit 600, page 3; is that

25   correct?

1    **A.**    Yes.

2    **Q.**    And this is the check you were referring to?

3    **A.**    Yes.

4    **Q.**    You were able to identify the account this check came

5    from; correct?

6    **A.**    Yes.

7    **Q.**    0454?

8    **A.**    That's correct.

9    **Q.**    Signed by Susan Su?

10   **A.**    Yes.

11   **Q.**    To Mercedes-Benz of Pleasanton?

12   **A.**    Yes.

13   **Q.**    And Exhibit 700, we see a photocopy of that check;

14   correct?

15   **A.**    Yes.

16   **Q.**    And some DMV paperwork?

17   **A.**    Correct.

18   **Q.**    For a Mercedes-Benz?

19   **A.**    Yes.

20   **Q.**    We also see the sales contract; is that correct?

21   **A.**    Yes.

22   **Q.**    And if we zoom in here, we have the buyer as Susan Su; is

23   that correct?

24   **A.**    Yes.

25   **Q.**    And also a copy of her driver's license in there?

1    A.    Yes.

2    Q.    Agent Mackey, that's a picture of the car.

3    A.    Yes, it is.

4    Q.    I want to go to the next slide.  Do you see the $78,000

5    transaction for count 27 for Murrieta Road?

6    A.    Yes.

7    Q.    Can you describe for the jury what we see here?

8    A.    That was a wire transfer from Wells Fargo account 0454 to

9    purchase a condo in Livermore for $78,000.

10   Q.    I'm going to hand you Exhibit 601 for identification.

11         Actually, before we talk about Murrieta Road, you already

12   summarized for the jury your analysis as to the Mercedes-Benz;

13   is that correct?

14   A.    Yes.

15   Q.    That necessarily $11,000 of what you identified to be F-1

16   proceeds was included in that $36,000; is that correct?

17   A.    Yes.

18   Q.    What do we see in Exhibit 601?

19   A.    Wire transfer documents obtained from Wells Fargo

20   relating to this transaction.

21        MR. RHYNE:  Your Honor, we'd offer Exhibit 601 into

22   evidence.

23        MR. BABCOCK:  No objection, Your Honor.

24        THE COURT:  Exhibit 601 is admitted.

25        (Government Exhibit 601 received in evidence.)

1            MR. RHYNE:   I'm publishing that exhibit.

2    BY MR. RHYNE:

3    **Q.**    Here we see the amount for the wire; is that correct?

4    **A.**    Yes.

5    **Q.**    And this is a transaction report; is that correct?

6    **A.**    Correct.

7    **Q.**    And we had it going to Fidelity National Title; is that

8    correct?

9    **A.**    Yes.

10    **Q.**    And the Tri-Valley University name here?

11    **A.**    Yes.  With the account number above that.

12    **Q.**    0454?

13    **A.**    Correct.

14    **Q.**    Were you able to get records from Fidelity Title in this

15    case?

16    **A.**    Yes, we were.

17    **Q.**    Why did you want to do that?

18    **A.**    To confirm that Susan Su, in fact, purchased that

19    property.

20    **Q.**    Okay.  I want to hand you Exhibit 701 and just have you

21    take a quick look at it.  You don't need to flip through it.

22           But do you recognize Exhibit 701?

23    **A.**    Yes, I do.

24    **Q.**    What is it?

25    **A.**    Escrow files related to the purchase of the Murrieta Road

1    property.

2    **Q.**   You find a check register in there?

3    **A.**   Yes.

4    **Q.**   Did it have the $78,000 check?

5    **A.**   Wire transfer.

6    **Q.**   Or wire transfer?

7    **A.**   Yes.

8        **MR. RHYNE:**  Your Honor, move Exhibit 701 into evidence.

9        **MR. BABCOCK:**  No objection.

10       **THE COURT:**  Exhibit 701 is admitted.

11          (Government Exhibit 701 received in evidence.)

12       **MR. RHYNE:**  Your Honor, can we have a side bar?

13       **THE COURT:**  Sure.

14       (A conference was held at the sidebar as follows:)

15       *THE COURT:  We're outside of the presence of the jury.*

16   *The defendant has requested that we take an early 10-minute*

17   *recess.  Is there any objection?*

18       *MS. WEST:  No.*

19       *MR. RHYNE:  No objection.*

20       *MS. WEST:  If the other juror needs to take that*

21   *opportunity, will 10 minutes be sufficient?*

22       *THE COURT:  That's a good point.*

23       *MR. BABCOCK:  I don't know the answer to that.*

24       *THE COURT:  That's fine.  We'll take a recess for 15*

25   *minutes.*

1          (The sidebar conference was concluded.)

2          **THE COURT:**  Members of the jury, something's just come up

3     that requires us to take a recess a little bit early, so we'll

4     be in recess for 15 minutes.

5          THE CLERK:  All rise.

6          (Outside the presence of the jury.)

7          **THE COURT:**  We're outside of the presence of the jury.  I

8     won't take much of your time because I want you to have the

9     full break outside the bar.  The defense counsel advised the

10    defendant needs to use the restroom, so I would take an earlier

11    recess.

12         But while I have been at the bench, I have determined

13    that -- pursuant to Federal Rule of Criminal Procedure 24(c),

14    that alternate jurors are to replace jurors in the same

15    sequence in which the alternates were selected.

16         And that means -- if my notes are correct, and I believe

17    they are -- that Ms. Morgan Stenhouse would be the next juror

18    to be seated, if the Court were to excuse a juror.

19         I've not been able to find any district court judge who

20    made the mistake of selecting a juror by alternate within the

21    last 30 years, but about 30 years ago one did, and here she was

22    promptly reversed, in the case of *Heath v. Cast,* 813 F.2d 254,

23    a Ninth Circuit case from 1957.

24         The Court's in recess.

25         THE CLERK:  All rise.

MACKEY - DIRECT / RHYNE

1            (A recess was taken.)

2            (In the presence of the jury.)

3            THE COURT:  All right, let's go back on the record.

4            MR. RHYNE:  Thank you, Your Honor.

5      BY MR. RHYNE:

6      Q.    Agent Mackey, when we left off you were confirming that

7      you requested and received an escrow file for this purchase; is

8      that correct?

9      A.    Yes.

10     Q.    You were able to find evidence of the transaction in the

11     escrow file?

12     A.    Yes, I was.

13     Q.    By Dr. Su; is that correct?

14     A.    Correct.

15     Q.    Now, I want to direct your attention to your spreadsheet

16     there, Exhibit 653, tab 4, 0454, pages 21 to 22.

17            Can you explain your analysis to the jury as to how much

18     F-1 income would have had to have necessarily been included in

19     the $78,000 transaction?

20     A.    Sure.  So just before the transaction, the balance in the

21     account was $306,000.  Based on my running total of F-1

22     payments and unidentified payments, the amounts of unidentified

23     payments in the account was $56,000.

24            So assuming that that entire $56,000 went into the

25     transaction, it would necessarily have to be $22,000 in F-1

1    proceeds in that transaction.

2    Q.   Now, backing up to the Mercedes transaction, after you

3    used the unidentified income in that transaction, did you erase

4    it or did you put it back in the account to continue to give

5    Dr. Su the benefit of it?

6    A.   So the methodology never changes.  Every time there's a

7    withdrawal on my spreadsheet, I will subtract that withdrawal

8    from the F-1 proceeds balance to continue to give the maximum

9    benefit of the doubt to Ms. Su.

10        The figure, the minimum F-1 payment figure, is a

11   theoretical figure of the minimum possible F-1 payments that

12   could be in that transaction.

13   Q.   So I want to go back to -- just to put this in context,

14   to the Mercedes-Benz.  Because it came from the same account

15   earlier in time; correct?

16   A.   Correct.

17   Q.   So this was the running unidentified balance in the

18   account at that time; is that correct?

19   A.   Well, just above that is the balance.

20   Q.   25,000?

21   A.   Yes.

22   Q.   And then you had a running F-1 payment or balance of

23   130,000; correct?

24   A.   Correct.

25   Q.   And then you have the transaction where you're using up

1  25,000 of the unidentified to give her the benefit of the

2  doubt; correct?

3  **A.**   Correct.

4  **Q.**   And then dipping in for the rest, F-1, it has to be

5  $11,000; is that correct?

6  **A.**   If that $25,000 goes into the $36,000 transaction, there

7  would have to be another $11,000 in it, which would have to

8  come from the F-1 proceeds.

9  **Q.**   Okay.  And now, as we move down in time on the running

10  unidentified balance, you put the $25,000 back in; correct?

11  **A.**   Well, I never took it out.

12  **Q.**   Why do we see it here?

13  **A.**   So that transaction will withdraw from the F-1 payment

14  balance.  So you'll see it's a hundred $33,000.  So the arrow

15  on the top right up there, that's the unidentified balance

16  right before the transaction after the transaction goes down to

17  $93,000.

18      So I'm subtracting, taking the F-1 proceeds out of my

19  running total, to continue to give the maximum benefit of the

20  doubt to Mrs. Su.

21  **Q.**   So going forward, you don't use up that unidentified

22  income, you put it back in so that it can be included in a

23  future transaction.

24  **A.**   I would say that $11,000 is just a theoretical minimum

25  F-1 proceed that goes in the transaction; it doesn't affect how

1    I'm accounting for the running totals.

2    **Q.**    Let me ask it this way:  You're still keeping a running

3    total in her benefit.

4    **A.**    Correct.

5    **Q.**    Very good.

6         I want to direct your attention now to Exhibit 650, to

7    page 2.

8         Do you see the $161,000 transaction for count 29?

9    **A.**    Yes.

10   **Q.**    What is that?

11   **A.**    That was a -- I believe a money order that was used to

12   purchase 405 Boulder Court, Suite 800.  It came out of

13   Wells Fargo account 0454.

14   **Q.**    I'm going to hand you Exhibit 603 for identification and

15   have you take a look at it.

16        What is Exhibit 603?

17   **A.**    A copy of a withdrawal slip and an accompanying cashier's

18   check that was used to purchase that building.

19        **MR. RHYNE:**  Your Honor, we'd offer Exhibit 603 into

20   evidence.

21        **MR. BABCOCK:**  No objection.

22        **THE COURT:**  Exhibit 603 is admitted.

23        (Government Exhibit 603 received in evidence.)

24   BY MR. RHYNE:

25   **Q.**    And, Agent Mackey, for the record, this is 603, page 3.

1    This is the withdrawal slip; is that correct?

2    **A.**    Yes.

3    **Q.**    And you've rounded it up to 163,000 on the graphical

4    depiction; correct?

5    **A.**    Correct.

6    **Q.**    Now I'm turning to page 4.  This is the cashier's check;

7    correct?

8    **A.**    Yes.

9    **Q.**    In the same amount?

10   **A.**    Yes.

11   **Q.**    And this went to Chicago Title?

12   **A.**    Yes.

13   **Q.**    Did you have an opportunity to subpoena Chicago Title in

14   this case?

15   **A.**    Yes.

16   **Q.**    Let me hand you what's been marked as Exhibit 702 for

17   identification.  What do we see in Exhibit 702?

18   **A.**    These are escrow files from Chicago Title related to

19   Suite 700.

20   **Q.**    And were you able to confirm that that transaction was

21   included in the escrow file for that property?

22   **A.**    Yes, a copy of the check was in the file.

23       **MR. RHYNE:**  Your Honor, we'd offer Exhibit 702 into

24   evidence.

25       **MR. BABCOCK:**  No objection.

1        THE COURT:  Exhibit 702 is admitted.

2            (Government Exhibit 702 received in evidence.)

3    BY MR. RHYNE:

4    Q.    Agent Mackey, now I'd like to refer you back to your

5    spreadsheet on Exhibit 653.

6            Can you tell the jury the minimum number of F-1 dollars

7    that would be used to purchase this transaction?

8            And I'll direct you to tab 0454 on page 26.

9    A.    It would be 19,000.  Approximately $19,000.

10   Q.    And can you summarize your analysis?

11   A.    Right before the transaction, there was a running

12   unidentified balance of a hundred and $41,000; approximately

13   $142,000.  If that entire amount went into the transaction,

14   that would leave $19,000 that would have to be from F-1

15   proceeds.

16   Q.    Okay.  I want to move on.

17           This is a picture of that asset; is that correct?

18   A.    Yes.

19   Q.    And that's Suite 800, Tri-Valley University's offices; is

20   that correct?

21   A.    Yes.

22   Q.    I want to talk about this transaction, now.

23           Do you see the $261,000 transaction for count 31, dated

24   July 8th, 2010?

25   A.    Yes.

MACKEY - DIRECT / RHYNE

1   Q.   And that's for 405 Boulder Court; is that correct?

2   A.   Correct.

3   Q.   I'm going to hand you 605 for identification, have you

4   take a look at it.

5        What is Exhibit 605?

6   A.   It's a withdrawal slip and accompanying cashier's check

7   that was used to purchase that property.

8        MR. RHYNE:  Your Honor, we'd move Exhibit 605 into

9   evidence.

10       MR. BABCOCK:  No objection.

11       THE COURT:  Exhibit 605 is admitted.

12          (Government Exhibit 605 received in evidence.)

13       MR. RHYNE:  Publishing Exhibit 605, page 3.

14   BY MR. RHYNE:

15   Q.   We see the withdrawal slip; is that correct?

16   A.   Yes.

17   Q.   0454?

18   A.   Yes.

19   Q.   Date?

20   A.   Yes, I see that.

21   Q.   Page 4.  What do we see here?

22   A.   It's the cashier's check.

23   Q.   In the same amount; correct?

24   A.   Right.

25   Q.   And this particular purchase was made through the same

1    title company; is that correct?

2    **A.**    Yes.

3    **Q.**    And were you able to find evidence of this transaction

4    within Exhibit 702, which was previously admitted?

5    **A.**    Yes.

6    **Q.**    With respect to 405 Boulder Court, 700, I'd like to refer

7    you to Exhibit 653, tab 0454, page 38.

8          And can you tell the jury the minimum amount of F-1

9    dollars that would necessarily be included in that transaction?

10   **A.**    Yes.  Based on the analysis, it would be 140,000 --

11   $140,000.

12   **Q.**    Can you walk them through the balances immediately

13   preceding the transaction?

14   **A.**    Sure.  The balance in the account just before the

15   transaction was $297,000.  There was approximately $121,000 in

16   unidentified proceeds in the account.  Assuming that that

17   entire amount went into the transaction, that would leave

18   $140,000 that would have to be from F-1 proceeds in the

19   transaction.

20   **Q.**    And here we have a picture of the building; is that

21   correct?

22   **A.**    Yes.

23   **Q.**    I want to talk about this transaction now.

24         Do you see the $1.2 million transaction for December 15,

25   2010?

MACKEY - DIRECT / RHYNE

1    A.    Yes.

2    Q.    And that's charged to count 35; correct?

3    A.    Yes.

4    Q.    I'm going to hand you Exhibit 609 for identification and

5    have you take a look at it.

6          What is that?

7    A.    Wire transfer records from CitiBank related to that

8    purchase.

9          MR. RHYNE:  Your Honor, we'd offer Exhibit 609 into

10   evidence.

11         MR. BABCOCK:  No objection.

12         THE COURT:  Exhibit 609 is admitted.

13              (Government Exhibit 609 received in evidence.)

14   BY MR. RHYNE:

15   Q.    Agent Mackey, what do we see here?

16   A.    Wire transfer records from CitiBank.

17   Q.    And this is for $1.2 million; is that correct?

18   A.    Yes.

19   Q.    And the originator is Susan Su; correct?

20   A.    Yes.

21   Q.    And that was to Prominent Escrow Services?

22   A.    That's correct.

23   Q.    Now, the address listed here, physical address of the

24   originator, is the Victoria Ridge Court address; correct?

25   A.    Yes.

1    Q.   This 1.2 million isn't for the purchase of that property;

2    correct?

3    A.   No, that was the residence listed.

4    Q.   Thank you.

5         Did you subpoena records from Prominent Escrow Services?

6    A.   I did.

7    Q.   I'm going to hand you Exhibit 705 for identification.

8         Do you recognize Exhibit 705?

9    A.   Yes.

10   Q.   What is it?

11   A.   Escrow files for the Germano Way property.

12   Q.   And did you find evidence of this transaction in those

13   escrow files?

14   A.   I did.

15   Q.   And were you able to confirm that Dr. Su was the

16   purchaser?

17   A.   Yes.

18   Q.   Were you able to find evidence of that payment in the

19   escrow file?

20   A.   Yes.

21   Q.   Okay.  With respect to this $1.2 million transaction, I'd

22   like to refer you to Exhibit 653, this time to tab 3045,

23   page 3.

24        Can you explain to the jury the minimum number of F-1

25   dollars that would necessarily need to be included in that

1    transaction?

2    **A.**    Yes, there would be $239,000.

3        **MR. RHYNE:**  Your Honor, we'd offer Exhibit 705, the

4    escrow file for the property, into evidence.

5        **MR. BABCOCK:**  Didn't you just do that?

6        No objection, if he didn't.

7        **THE COURT:**  705 is admitted.

8            (Government Exhibit 705 received in evidence.)

9    BY MR. RHYNE:

10   **Q.**    Agent Mackey, I want to talk about this transaction.

11       Do you see the $600,000 transaction, count 34?

12   **A.**    Yes.

13   **Q.**    And that's from December 15, 2010, also; is that correct?

14   **A.**    Yes.

15   **Q.**    I'm going to hand you what's been marked as 608 for

16   identification.

17       What is that?

18   **A.**    It's a monthly statement from Wells Fargo relating to

19   account 4780 with -- showing information about that wire

20   transfer.

21       **MR. RHYNE:**  Your Honor, we'd offer Exhibit 608 into

22   evidence.

23       **MR. BABCOCK:**  No objection.

24       **THE COURT:**  608 is admitted.

25            (Government Exhibit 608 received in evidence.)

1   BY MR. RHYNE:

2   Q.   Agent Mackey, I want to direct your attention over here.

3        You see the $600,000?

4   A.   Yes.

5   Q.   And that's in the withdrawal column; correct?

6   A.   Yes.

7   Q.   Moving over, we have a description of the wire transfer

8   here; correct?

9   A.   Yes.

10  Q.   To Prominent Escrow Services.

11  A.   Correct.

12  Q.   Agent Mackey, sometimes the dates on the bank statements

13  will be a day before or a day after; is that correct?

14  A.   It seems to take a day or two to process a transaction.

15  Q.   I want to direct your attention now to Exhibit 653.  And

16  can you tell -- I'll direct you to 653, tab 4780, at page 1,

17  and reference that $600,000 transaction.

18       Can you explain to the jury the minimum amount of F-1

19  dollars that would have to be included in that transaction?

20  A.   $306,000.

21  Q.   And can you summarize your analysis, briefly, of what's

22  in the account immediately before?

23  A.   So the balance just before the transaction was $898,000.

24  It was $604,000 in F-1 payment from the account, $293,000,

25  approximately -- it's actually $294,000 -- in unidentified

1    funds in the account.  Assuming that all the unidentified funds

2    went to the transaction, that would mean that $306,000 would

3    necessarily have to be from F-1 proceeds.

4    **Q.**    And, again, we see a picture of that asset; is that

5    correct?

6    **A.**    Yes.

7    **Q.**    In Exhibit 607.

8    **A.**    Yes.

9    **Q.**    All right.

10        I want to talk about count 32.

11        Now, do you see that on the screen?

12   **A.**    Yes.

13   **Q.**    And that's a $700,000 transaction from on or about

14   July 21st, 2010; is that correct?

15   **A.**    Yes.

16   **Q.**    I'm going to hand you 606 for identification and have you

17   take a look at it.

18        Do you recognize Exhibit 606?

19   **A.**    I do.

20   **Q.**    What is it?

21   **A.**    It's a withdrawal slip and accompanying cashier's check

22   for the purchase of the Victoria Ridge property in the amount

23   of $700,000.

24        **MR. RHYNE:**  Your Honor, we've offer Exhibit 606 into

25   evidence.

1      **MR. BABCOCK:**  No objection.

2      **THE COURT:**  Exhibit 606 is admitted.

3           (Government Exhibit 606 received in evidence.)

4    BY MR. RHYNE:

5    **Q.**    Agent Mackey, I'm showing you page 3.  What do we see

6    here?

7    **A.**    It's a withdrawal slip.

8    **Q.**    And we have the account number here.

9    **A.**    Yes.

10   **Q.**    We have the amount 700,000.

11   **A.**    Yes.

12   **Q.**    And the defendant's name.

13   **A.**    Yes.

14   **Q.**    Going to the next page, we see the cashier's check; is

15   that correct?

16   **A.**    Yes.

17   **Q.**    Same amount?

18   **A.**    Yes.

19   **Q.**    And this went to Placer Title Company; is that correct?

20   **A.**    That's correct.

21   **Q.**    With an escrow number?

22   **A.**    Yes.

23   **Q.**    Did you subpoena Placer Title Company?

24   **A.**    Yes, I did.

25   **Q.**    Did you get the escrow file in this case?

1   **A.**   Yes.

2   **Q.**   I want to approach and hand you Exhibit 704 for

3   identification.

4        Do you recognize Exhibit 704?

5   **A.**   Yes, I do.

6   **Q.**   Is that the escrow file for this particular property

7   purchase?

8   **A.**   Yes, it is.

9        **MR. RHYNE:**   Your Honor, we'd offer Exhibit 704 into

10   evidence.

11        **MR. BABCOCK:**   No objection.

12        **THE COURT:**   Exhibit 704 is admitted.

13        (Government Exhibit 704 received in evidence.)

14   BY MR. RHYNE:

15   **Q.**   Agent Mackey, I'd like to refer you now back to

16   Exhibit 653, the tab for 3640 to page 7.

17        Can you tell the jury the minimum number of F-1 dollars

18   that would have to necessarily be included in this transaction?

19   **A.**   Yes, it would be $319,000.

20   **Q.**   Can you briefly walk through a summary of how you got

21   there?

22   **A.**   The balance in the account just before the transaction

23   was $829,000; 449,000 of that was F-1 payments, 380,000 of that

24   was unidentified payments.  Assuming that the entire $380,000

25   of unidentified payments went into the transaction, that would

1   leave $319 that would necessarily have to be from the F-1

2   proceeds.

3   **Q.**   Now, as part of your investigation, you also subpoenaed

4   FDIC certificates; is that correct?

5   **A.**   Yes.

6   **Q.**   And that's Federal Deposit Insurance Corporation

7   certificates --

8   **A.**   Yes.

9   **Q.**   -- with respect to Wells Fargo Bank and CitiBank; is that

10  correct?

11  **A.**   Yes.

12  **Q.**   Did you also subpoena or make requests to Alameda County?

13  **A.**   Yes.

14  **Q.**   What did you request from Alameda County?

15  **A.**   Deeds for the properties.

16  **Q.**   Why did you want deeds to the property?

17  **A.**   I wanted to confirm that Susan Su had the deed -- had the

18  title to the property.

19  **Q.**   I want to hand you 705A.  Do you recognize 705A?

20  **A.**   Yes.

21  **Q.**   What is that?

22  **A.**   It's the deed to one of the 405 Boulder Court properties.

23      **MR. RHYNE:**  Your Honor, we'd offer Exhibit 705A into

24  evidence.

25      **MR. BABCOCK:**  No objection.

1      **THE COURT:**  705A is admitted.

2           (Government Exhibit 705A received in evidence.)

3  BY MR. RHYNE:

4  **Q.**   And did you review similar deeds for the other properties

5  in this case?

6  **A.**   Yes.

7  **Q.**   Were you looking to confirm that Dr. Su owned them?

8  **A.**   Yes.

9  **Q.**   Now, we talked about other transactions or other accounts

10  that you analyzed or that you looked at in this case; correct?

11  **A.**   Yes.

12  **Q.**   That also had money in them other than what we see up

13  here; is that right?

14  **A.**   Yes.

15  **Q.**   Okay.  I want to go through these fairly quickly, but I

16  want to ask you, are you familiar with Wells Fargo Bank account

17  9937?

18  **A.**   I am.

19  **Q.**   I'm going to hand you Exhibits 504, 505, 505A, and 505B,

20  and ask you if you recognize those.

21           Is it true that 504 is the opening application and

22  signature authority?

23  **A.**   Yes.

24  **Q.**   And is it true that 505 are the monthly statements?

25  **A.**   Yes.

1    Q.    505A are selected deposits?

2    A.    Yes.

3    Q.    505B are the selected deposits?

4    A.    Yes.

5         MR. RHYNE:  Your Honor, we'd offer 504, 505, 505A, and

6    505B into evidence.

7         MR. BABCOCK:  No objection, Your Honor.

8         THE COURT:  504, 505, 505A, and 505B are admitted.

9              (Government Exhibits 504, 505, 505A, and 505B

10             received in evidence.)

11   BY MR. RHYNE:

12   Q.    And we see that account about halfway down on

13   Exhibit 651, page 1; is that correct?

14   A.    Yes.

15   Q.    Did you also request records for Wells Fargo Bank account

16   ending in 6782?

17   A.    I did.

18   Q.    I'm going to hand you Exhibit 506 and 507 for

19   identification and have you take a look at them.

20        Is it true that Exhibit 506 is the opening application

21   and signature card for Wells Fargo Bank account 6782?

22   A.    Yes.

23   Q.    And Exhibit 507 are the monthly statements?

24   A.    Yes.

25        MR. RHYNE:  Your Honor, we'd offer Exhibit 506 and 507

1        into evidence.

2              MR. BABCOCK:  No objection.

3              THE COURT:  506 and 507 are admitted.

4                  (Government Exhibits 506 and 507 received in

5                  evidence.)

6        BY MR. RHYNE:

7        Q.    Did you do a similar exercise with respect to Wells Fargo

8        Bank account 2773?

9        A.    Yes.

10       Q.    I want to hand you Exhibits 508 and 509 for

11       identification, have you take a look at those, please.

12             MR. BABCOCK:  Those numbers?

13             MR. RHYNE:  508 and 509.

14             MR. BABCOCK:  Thank you.

15       BY MR. RHYNE:

16       Q.    Is it true that 508 is the opening application and the

17       signature card for 2773?

18       A.    Yes.

19       Q.    And 509 are the monthly statements for the same account?

20       A.    Yes.

21             MR. RHYNE:  We'd offer Exhibit 508 and 509 into evidence.

22             MR. BABCOCK:  No objection.

23             THE COURT:  508 and 509 are admitted.

24                  (Government Exhibits 508 and 509 received in

25                  evidence.)

1    BY MR. RHYNE:

2    Q.    One more to go.  5029.  CitiBank.

3          Do you see that up there?

4    A.    Yes.

5    Q.    Same exercise with that account?

6    A.    Yes.

7    Q.    I'd like to hand you Exhibit 510, 511, and 511A for

8    identification and have you take a look at them.

9          Is it true that Exhibit 510 is the signature card for the

10   5029 Citi account?

11   A.    Yes.

12   Q.    Is it true that Exhibit 511 are the monthly statements

13   for that account?

14   A.    Yes.

15   Q.    And 511A are selected deposits into that account?

16   A.    Yes.

17         MR. RHYNE:  Your Honor, we'd offer Exhibit 510, 511, 511A

18   into evidence.

19         MR. BABCOCK:  No objection.

20         THE COURT:  510, 511, and 511A are admitted.

21             (Government Exhibits 510, 511, and 511A received in

22             evidence.)

23   BY MR. RHYNE:

24   Q.    And, Agent Mackey, while these accounts that we've just

25   discussed aren't included in the money laundering transactions,

1    you were still able to trace funds into them; correct?

2    **A.**    Yes.

3    **Q.**    And those funds are currently being held, pending outcome

4    of judicial proceedings; is that correct?

5    **A.**    That's correct.

6    **Q.**    Agent Mackey, with respect to the escrow files that you

7    reviewed in this case, you reviewed escrow files for Suite 700

8    and Suite 800; correct?

9    **A.**    That is correct.

10   **Q.**    Agent Mackey, I want to loop back to the testimony of one

11   of the earlier witnesses and the bank account records that

12   pertained to that witness.

13        You were present when Ms. Bhanu Challagundla testified.

14   **A.**    Yes, I was.

15   **Q.**    During your search warrants at Tri-Valley University,

16   were you able to find evidence of payments that she made to

17   Tri-Valley University?

18   **A.**    Yes.

19        **MR. RHYNE:**  Exhibit 16.

20        **MR. BABCOCK:**  Exhibit 16?

21        **MR. RHYNE:**  Yes.

22   BY MR. RHYNE:

23   **Q.**    I'm going to hand you what's been marked as Exhibit 16

24   for identification, have you take a look at it.

25        What do we see there?

1    A.    Tri-Valley University invoice and credit card receipt

2    relating to Bhanu Challagundla.

3    Q.    Where did you find that document?

4    A.    This was located at the 405 Boulder Court location under

5    our search warrants.

6         MR. RHYNE:  Your Honor, we offer Exhibit 16 into

7    evidence.

8         MR. BABCOCK:  No objection.

9         THE COURT:  Exhibit 16 is admitted.

10        (Government Exhibit 16 received in evidence.)

11   BY MR. RHYNE:

12   Q.    Agent Mackey, Exhibit 16 gives someone an example of the

13   exercise that you did in doing your analysis in this case; is

14   that correct?

15   A.    Yes, it does.

16   Q.    So this would be an example of a document that you found

17   in the physical file of Tri-Valley University --

18   A.    Yes.

19   Q.    -- that you then needed to tie to an F-1 student; is that

20   correct?

21   A.    Yes.

22   Q.    I want to direct your attention to page -- Exhibit 16,

23   page 1.

24        Could you just walk us through this document?

25   A.    Yes.  On the top, the name of the Tri-Valley student is

1    listed that the payment's being made for, along with the email

2    right below that.

3        For card numbers, typically they'll write the credit card

4    number there, but in this case it was swiped in person; she

5    came into the office and she swiped the actual card.  And it

6    also shows the amount of a thousand dollars that was stapled to

7    a receipt, credit card receipt.

8    **Q.**   Okay, and that takes us to page 2.  I'll start at the

9    top.  Can you walk the jury through what we see here?

10   **A.**   Sure.  In this case, because the card was swiped in

11   person, the name actually appears on the receipt, whereas the

12   vast majority of receipts were not swiped in person so they did

13   not have a name, which you pointed to right there.

14       Towards the top, top right, you can see the credit card

15   processing account number ending in 1968.  That was one of

16   three credit card accounts maintained by Tri-Valley University,

17   and that corresponds to a specific credit card machine.

18   **Q.**   Through Global Payment?

19   **A.**   Through Global Payment.  And that name will actually

20   appear on the credit card statement on the memo line showing

21   that the deposit came from that account.

22       Towards the middle, right below the "Visa," you can see

23   the last four of the credit card number, 5134.  Typically that

24   will match with the information on the invoice.  And, below

25   that, you can see the batch number.  Below the word "sell."

1    It's batch number 197.

2        So that might be part of additional credit card

3    transactions that are part of that same batch.

4        So if there was another $1,000 payment that was made

5    before the batch was run, that would also be 197.  That would

6    -- deposited into the Wells Fargo account, would be $2,000, not

7    $1,000.

8    Q.   But is that the same batch number?

9    A.   It would have the same batch number.

10   Q.   Moving down, there's another version of it at the bottom;

11   is that correct?

12   A.   Yes, they printed duplicates; one for the customer and

13   one for the store.

14   Q.   So here's the customer copy you see at the bottom.

15   A.   Yes.

16   Q.   Anything else to note on that, as far as your analysis

17   went?

18   A.   Just the date, which I used, as well.

19       **MR. RHYNE:**  Exhibit 17.

20   BY MR. RHYNE:

21   Q.   I'm going to show you Exhibit 17 for identification, have

22   you take a look at it.

23       Do you recognize Exhibit 17 for identification?

24   A.   Yes, I do.

25   Q.   What is it?

1    **A.**    It's a credit card receipt that was found on computers at

2    Tri-Valley University.

3        **MR. RHYNE:**  Your Honor, we'd offer Exhibit 17 into

4    evidence.

5        **MR. BABCOCK:**  No objection.

6        **THE COURT:**  Exhibit 17 is admitted.

7        (Government Exhibit 17 received in evidence.)

8    BY MR. RHYNE:

9    **Q.**    I'm going to hand you, now, Exhibit 18 for

10   identification, have you take a look at that.

11       What do we see there?

12   **A.**    This is another physical credit card invoice with an

13   accompanying credit card receipt.

14   **Q.**    For the same student?

15   **A.**    For the same student.

16   **Q.**    Where did you find that?

17   **A.**    This was found at the 405 Boulder Court location during

18   our search warrants.

19       **MR. RHYNE:**  Your Honor, we'd offer Exhibit 18 into

20   evidence.

21       **MR. BABCOCK:**  No objection.

22       **THE COURT:**  Exhibit 18 is admitted.

23       (Government Exhibit 18 received in evidence.)

24   BY MR. RHYNE:

25   **Q.**    Agent Mackey, I want to shift gears and -- to the end of

1      this case.

2              Did the Department of Homeland Security receive a claim

3      for damages from the defendant, Dr. Susan Su?

4      A.   We did.

5      Q.   I want to hand you Exhibit 800 for identification and

6      have you take a look at it.

7              Agent Mackey, do you recognize Exhibit 800?

8      A.   I do.

9      Q.   What is it?

10     A.   That's a claim for damages with an accompanying statement

11     from Susan Su.

12     Q.   Did you receive that in your course of your investigation

13     in this case?

14     A.   Yes.

15         MR. RHYNE:  Your Honor, we'd offer Exhibit 800 into

16     evidence.

17         MR. BABCOCK:  No objection, Your Honor.

18         THE COURT:  Exhibit 800 is admitted.

19             (Government Exhibit 800 received in evidence.)

20     BY MR. RHYNE:

21     Q.   Agent Mackey, in this claim is it true that Dr. Su makes

22     statements about the income that she anticipated to be making

23     from Tri-Valley University in the future?

24     A.   Yes, that's true.

25     Q.   And alleges that claim against the Department of Homeland

1    Security in the form of lost income; is that correct?

2    **A.**    Yes.

3    **Q.**    She makes some other claims as well; is that right?

4    **A.**    Yes.

5        **MR. RHYNE:**  Ms. Hughes, can we zoom in at the top where

6    it states "Dr. Susan Su"?  You can just take the whole claim

7    for personal injuries.

8    **BY MR. RHYNE:**

9    **Q.**    This is a cover sheet; is that correct?

10   **A.**    Yes, it is.

11   **Q.**    And the address down there, Sansome Street, that's your

12   business address; is that right?

13   **A.**    Yes, it is.

14       **MR. RHYNE:**  Can we go to page 3 now?

15   **BY MR. RHYNE:**

16   **Q.**    Is it true that -- and we'll focus in on some of this in

17   more detail.

18       But is it true, in general, that Dr. Su refers to

19   January 19, 2011, as Tri-Valley University's "911 attack"?

20   **A.**    Yes, it is.

21       **MR. RHYNE:**  Would you zoom in on the first paragraph?

22   **BY MR. RHYNE:**

23   **Q.**    Is it true that, in summary, she claims that a group of

24   ICE agents came to her home without an appointment at 6:00 A.M.

25   in the morning?  Is that right?

1    A.    Yes.

2    Q.    And then she refers to it as the 911 attack --

3    A.    Yes.

4    Q.    -- on a Christian higher education --

5    A.    Yes.

6    Q.    -- institution, and turned a genuine and reputed woman,

7    good standing, profitable business that created many job

8    opportunities, into another in-debt identity to bankruptcy?

9          Is that correct?

10   A.    Yes.

11   Q.    She claims this is a close-to-complete listing of the

12   damages; is that correct?

13   A.    Yes.

14   Q.    And at the end of that paragraph, she refers to this as

15   an instance of domestic violence.

16   A.    Yes.

17         MR. RHYNE:   Can we back out of that and go to item 1,

18   property damage?   The next paragraph.

19   BY MR. RHYNE:

20   Q.    Is it true here that she makes a claim for a $14,000 door

21   that was damaged during the search warrant --

22   A.    Yes.

23   Q.    -- in addition to a Dell server machine?

24   A.    Yes.

25   Q.    Are you familiar with this Dell server machine?

MACKEY - DIRECT / RHYNE

1    A.    I am.

2    Q.    And was it seized during --

3    A.    It was seized and returned.

4    Q.    It was returned?

5    A.    Yes.

6    Q.    So she's claiming property damage here, in this category,

7    of $25,000; is that correct?

8    A.    Yes.

9         MR. RHYNE:   Can we go to item 2, please?

10   BY MR. RHYNE:

11   Q.    Here she's claiming personal injury; is that correct?

12   A.    Yes.

13   Q.    And she claims, "Before 911, Dr. Su managed TVU with good

14   judgment and integrity."  Is that correct?

15   A.    Yes.

16   Q.    And that on the evening of January 19, 2011, she suffered

17   a serious headache; is that correct?

18   A.    Yes.

19   Q.    And was needed to be taken to the emergency room.

20   A.    Yes.

21   Q.    And at the bottom of this paragraph, she claims damages

22   of $3 million; is that correct?

23   A.    Yes.

24   Q.    And also in there she claims that Dr. Su is an

25   internationally-respected professional, received many awards

1    ever since elementary school, a mature Christian since 18 years

2    old; is that correct?

3    **A.**   Yes.

4        **MR. RHYNE:**  Can we go down to item 3, please?  Financial

5    Damage.

6    **BY MR RHYNE:**

7    **Q.**   In paragraph 1 of the Financial Damage she's claiming a

8    total loss of approximately $10,000 there; is that correct?

9    **A.**   Yes.

10   **Q.**   And that's for, what, an apparent seizure of check?

11   **A.**   Yes, it appears to be the case.

12   **Q.**   Okay.

13       Can we go to paragraph 2 of item 3, please, at the bottom

14   of the page.

15       Here we have Dr. Su again referring it to 911; is that

16   correct?

17   **A.**   Yes.

18   **Q.**   And here she's making a claim for students that are

19   requesting refunds of their tuition; is that correct?

20   **A.**   Yes.

21   **Q.**   And she estimates $3 million in credit card; is that

22   correct?

23   **A.**   Yes.

24       **MR. RHYNE:**  Can we go to the next page, please?

25   **BY MR. RHYNE:**

1    Q.    On the next page you see evidence of how much money

2    Dr. Su is intending to make; is that correct?

3    A.    Yes.

4          MR. RHYNE:   Can we go to paragraph 3 and start with

5    paragraph B?

6    BY MR. RHYNE:

7    Q.    Here we have Dr. Su again referring to the search warrant

8    as the 911 act; is that correct?

9    A.    Yes.

10   Q.    Down further she says the University grows -- she claims

11   that the University has grown within three years; is that

12   correct?

13   A.    Yes.

14   Q.    She claims close to $20 million in income yearly; is that

15   correct?

16   A.    I believe that's a claim to future income.

17   Q.    And she talks about her business model; is that correct?

18   A.    Yes.

19   Q.    And that's that the student body's expected to double or

20   triple to more than 20 million income expecting in this year.

21   Is that correct?

22   A.    Yes.

23         MR. RHYNE:   Can we go to subparagraph C?

24   BY MR. RHYNE:

25   Q.    Here she again refers to it as the 911; is that correct?

1   **A.**   Yes.

2   **Q.**   And she's referring to faculty members and advisory board

3   members that have resigned from positions.

4   **A.**   Yes.

5   **Q.**   And the multi-million-dollar profitable, successful

6   business has essentially been turned into an in-debt bankruptcy

7   corporation; is that correct?

8   **A.**   Yes.

9   **MR. RHYNE:**   Can we go down to the very bottom of this

10   where it has total damage to TVU as a business?   It's one line.

11   Right there.

12   **BY MR. RHYNE:**

13   **Q.**   And here she's alleging $20 million; is that correct?

14   **A.**   Yes.

15   **MR. RHYNE:**   Can we go down to paragraph 4?   Can you go

16   all the way down to the very bottom?

17   **BY MR. RHYNE:**

18   **Q.**   And here's just her claim for spring term tuition damage;

19   is that correct?

20   **A.**   Yes.

21   **Q.**   And she does some arithmetic there, but the bottom line

22   for the spring tuition alone is $5,429,700.  Is that correct?

23   **A.**   Yes.

24   **Q.**   She states above that, "Every single day it's about

25   $300,000."  Is that correct?  In a tuition dispute for the

1    refunds.

2    A.    Yes.

3    Q.    She also talks about how she's been collecting payments

4    through PayPal and credit cards; is that correct?

5    A.    Yes.

6    Q.    And we have total financial damage that Dr. Su is

7    alleging against the Department of Homeland Security in this

8    case of $28 million.  Is that correct?

9    A.    Yes.

10   Q.    And then the lump sum federal tort claim at the bottom is

11   31 million; is that correct?

12   A.    Yes.

13        MR. RHYNE:  No further questions, Your Honor.

14        THE COURT:  Cross-examination.

15                         CROSS-EXAMINATION

16   BY MR. BABCOCK:

17   Q.    Good afternoon, Agent Mackey.

18   A.    Good afternoon, sir.

19   Q.    Are you aware of whether Homeland Security ever paid

20   Dr. Su a penny on this claim?

21   A.    I believe we haven't paid.  I believe she withdrew it.

22   Q.    It's fair to say, though, just in looking at the claim,

23   that she is pretty upset that the school was shut down and

24   everything stopped.

25   A.    Sure.

MACKEY - CROSS / BABCOCK

1    Q.    Does that seem -- does that sound fair?

2    A.    Yes.

3    Q.    She -- you probably observed that.  You spent hours with

4    her that same day.

5    A.    Yes.

6    Q.    Right?

7          We heard about your lengthy interview with Dr. Su.

8    A.    Yes.

9    Q.    Did you tell her or did she -- do you know, was she aware

10   at the beginning of your interview, whether the school was

11   being shut down?

12   A.    We did not tell her initially, no.

13   Q.    Okay.  She found that out later.

14   A.    Yes.

15   Q.    She -- and I think we went over this, but she was

16   actually served with papers from SEVP about the withdrawal of

17   permission for TVU to admit any more F-1 students.

18   A.    Yes.

19   Q.    And you -- in fact, at this point you had been

20   investigating TVU for roughly 8 months or so.

21   A.    Sounds about right.

22   Q.    And you had done -- already issued subpoenaes to the

23   different bank accounts associated with TVU --

24   A.    Yes.

25   Q.    -- as well as Dr. Su.

1    A.    Yes.

2    Q.    And, as we know, you had done a series of under- -- ruse,

3    and undercover operations, beginning in June, I guess, in 2010,

4    and going all the way until January, just a couple of weeks

5    before.

6    A.    I believe the ruses started in September, yes.  The

7    undercover activity started in June and the ruses started in

8    September.

9    Q.    Fair enough.

10         And you had, I assume, been working in conjunction with

11   the U.S. Attorney's Office to get search warrants and issue

12   subpoenaes.

13   A.    Yes.

14   Q.    And you had made plans to seize all these bank accounts

15   that you've gone over with us this morning; right?

16   A.    Yes.

17   Q.    And to take the money that was in them; right?

18   A.    To seize the money.

19   Q.    Fair enough.  I didn't mean you personally, but all the

20   different -- all the monies, all the money that was in all

21   these accounts was seized, pursuant to a federal seizure order,

22   on January 19th, 2011, right?

23   A.    Starting on this date.  I believe there were a few

24   additional follow-up seizures occurred a few days later.

25   Q.    And those monies have remained seized in the last three

MACKEY - CROSS / BABCOCK

1    years and two months or so; right?

2    A.    Yes.

3    Q.    They're still under control.  None of it's ever been

4    released back to Dr. Su or anyone else associated with

5    Tri-Valley University; right?

6    A.    Yes.

7    Q.    And you're -- not "you're" -- the Government, the

8    U.S. Attorney's Office, is seeking to forfeit that money;

9    right?

10   A.    Yes.

11   Q.    As well as all the different properties you've mentioned.

12         So the house on Germano Way; right?

13   A.    Yes.

14   Q.    On Murrieta.

15   A.    Yes.

16   Q.    On Victoria Ridge, and as well as the Boulder Court --

17   A.    Yes.

18   Q.    -- suites.

19   A.    Correct.

20   Q.    And the Mercedes.

21   A.    Yes.

22   Q.    And the theory justifying this seizure, the seizure of

23   these properties and potentially the forfeiture, is that this

24   property, the money in the accounts, and the property that was

25   purchased with money in the accounts, was, quote, proceeds,

1    unquote, of either some sort of fraud or -- well, fraud; right?

2    **A.**    There are multiple theories.

3    **Q.**    Money laundering.

4    **A.**    Yes.

5    **Q.**    Fraud and money laundering, primarily; right?

6    **A.**    Yes.

7    **Q.**    PayPal, the money in PayPal accounts, was seized as well;

8    right?

9    **A.**    Yes.

10   **Q.**    And has the Department -- or the U.S. Attorney's Office,

11   so far as you're aware, made any effort to return any of this

12   money that was seized to students who had paid tuition to

13   Tri-Valley University?

14   **A.**    I believe that hasn't been discussed yet, but PayPal has

15   already refunded many of its students.

16   **Q.**    PayPal received some claims --

17   **A.**    Yes.

18   **Q.**    -- for refunds.

19   **A.**    Yes.

20   **Q.**    Do you know about how much money they refunded?

21   **A.**    I'm not sure.  It's a loss for them in hundreds of

22   thousands.

23   **Q.**    You noticed in Dr. Su's claim she mentioned that the

24   spring semester was just starting and that much of -- some of

25   the monies that had come in were for the upcoming semester;

1      right?

2      A.    Yes.

3      Q.    Is that right?

4      A.    Yes.

5      Q.    Okay.  Did you do any sort of analysis?  You've obviously

6      spent -- you spent a lot of time on this case; fair to say?

7      A.    Yes.

8      Q.    A lot of hours over the last few years.

9            Looking at all the bank accounts, records that you

10     seized, as well as documents that you seized during the

11     execution of the search warrant, --

12     A.    Yes.

13     Q.    -- did you do any sort of analysis of how much money had

14     been paid towards the semester that had just started?  The

15     so-called spring 2011-semester?

16     A.    Not specifically, no.

17     Q.    Tell us again -- I think you said in your earlier

18     testimony, but on January 19th, 2011, can you tell us how many

19     students had enrolled in the spring of 2011 semester?

20     A.    They had approximately 1,760 active students at that

21     time.

22     Q.    For the spring of 2011 semester?

23     A.    They would be actively -- they would be expected to

24     enroll for the spring.

25     Q.    Do you know how many of those 1,760 students had made a

1   tuition payment for the spring semester?

2   **A.**   I haven't broken it down that way, no.

3   **Q.**   So let's -- I'd like to talk about the properties a

4   little bit.

5        As we've seen from your testimony and from this -- these

6   charts that you made here, money from Tri-Valley University was

7   used to purchase five properties and one car.

8   **A.**   Yes.

9   **Q.**   And the ballpark total, you know, on your graphs, do you

10  know what those total to, for those payments?

11  **A.**   The seizures or --

12  **Q.**   The real properties and the car.

13  **A.**   A little under $5 million.

14  **Q.**   To buy all those things?

15  **A.**   Yes.

16  **Q.**   Well, maybe I'm missing something.  The Germano -- on

17  your chart you have about 1.8 million going to Germano Way.

18  **A.**   I'm including the bank accounts in that figure.  So it

19  would be 3.5-ish for the properties and the car.

20  **Q.**   Okay.  Not including money that was in the bank accounts.

21  **A.**   Yes.

22  **Q.**   When you ex- -- you searched all of these properties on

23  January 19, 2011; correct?

24  **A.**   Our agency did, yes.

25  **Q.**   Not you personally.  Fair enough.

MACKEY - CROSS / BABCOCK

1          You, I think, went to Ms. Su's -- Dr. Su's home.

2     **A.**    Yes.

3     **Q.**    Other agents went to 405 Boulder Court.

4     **A.**    Yes.

5     **Q.**    Other agents went to Murrieta Road and Victoria Ridge.

6     **A.**    Yes.

7     **Q.**    And were documents taken from all of the locations?

8     **A.**    Yes.

9     **Q.**    I assume primarily they were taken from 405 Boulder Court

10    as well as from Dr. Su's home.

11    **A.**    That's correct; yes.

12    **Q.**    Which is the one on Germano Way; right?

13    **A.**    Yes.

14         I should correct that.  No search warrants were conducted

15    at the Livermore condo, so no documents were taken from there.

16    **Q.**    From Murrieta Road?

17    **A.**    Yes.

18    **Q.**    Is there a reason for that?

19    **A.**    We weren't given a search warrant for that location.

20    **Q.**    Did you request one?

21    **A.**    No.

22    **Q.**    How come you didn't ask for one?

23    **A.**    We didn't have specific information that we thought would

24    lend to obtaining a search warrant for that location.

25    **Q.**    You didn't have reason to think there would be any

MACKEY - CROSS / BABCOCK

1  evidence there?

2  **A.**   You could say that, yes.

3  **Q.**   Wouldn't it have been possible to -- you had identified

4  1,760 students; right?

5  **A.**   Yes.

6  **Q.**   At some point.

7       How long did it take you to identify the 1,760 students

8  that were active as of January 2011?

9  **A.**   You mean in the system?

10  **Q.**   Yes.

11  **A.**   A few minutes.

12  **Q.**   Could you just go onto SEVIS and type in "Tri-Valley

13  University" and come up with a list?

14  **A.**   Yes.

15  **Q.**   Okay.  Why not just give them refunds after you seized

16  the money?

17  **A.**   That's a determination that needs to be made by the

18  Court.

19  **Q.**   You did surveillance on Murrieta Road; right?  Or other

20  people in your agency did.

21  **A.**   I do not believe so, no.

22  **Q.**   Okay.  A number of the charges against Ms. -- Dr. Su are

23  money laundering.  You're aware of that; right?

24  **A.**   Yes.

25  **Q.**   And they're actually listed on your chart.  The accounts

MACKEY - CROSS / BABCOCK

1      relating to certain transactions; right?

2      **A.**    Yes.

3      **Q.**    For example, count 26 relates to monies that were used to

4      purchase the Mercedes.

5      **A.**    Yes.

6      **Q.**    And count 27 has to do with purchase of the property on

7      Murrieta Road.

8      **A.**    Yes.

9      **Q.**    All of these accounts were in either Dr. Su's name or

10     Tri-Valley University's name.

11     **A.**    Yes.

12     **Q.**    Money that was used to purchase, for example, the home on

13     Germano Way wasn't first deposited to the bank account of a

14     third party who then used it to purchase the house.

15     **A.**    That's correct.

16     **Q.**    Do you understand what I'm saying?

17     **A.**    Yes.

18     **Q.**    So for the purchase for the car, the money came out of

19     the Wells Fargo account, which was in TVU's name, --

20     **A.**    Yes.

21     **Q.**    -- and went straight to the purchase of the car.

22     **A.**    Correct.

23     **Q.**    And that was also true of the purchase of -- $78,000

24     towards the purchase of Murrieta Road.

25     **A.**    Yes.

MACKEY - CROSS / BABCOCK

1    Q.    And the same is true of all these transactions; right?

2    A.    Yes.

3    Q.    The money came straight from one of Dr. Su's accounts or

4    one of the school's accounts --

5    A.    Yes.

6    Q.    -- without passing through someone else's account or some

7    other person's account or an account held by another entity.

8    A.    All the money stayed in those accounts, yes.

9    Q.    Are you aware of -- we've seen a number of times this

10   picture of the Mercedes.  It was purchased for $36,000.

11   A.    Approximately.

12   Q.    When I grew up, that would have been a pretty fancy car,

13   but this is $36,000 for a Mercedes.  This is pretty much the

14   low end of the Mercedes line; is it not?

15   A.    I agree with that.

16   Q.    There are Mercedes that cost many, many tens of thousands

17   of dollars more than that.

18   A.    Sure.

19   Q.    You can spend 36,000, these days, on a Prius or a Honda.

20   A.    Yes.

21   Q.    Did you -- maybe -- if I asked this, I forgot.  Apologies

22   if I did.  Did your agency receive any claims directly from

23   students after January 19, 2011?

24   A.    I'm not aware of any official claims.

25   Q.    Only claim relating to this case was filed by Dr. Su?

1    That you're aware of?

2    **A.**    That I'm aware of, yes.

3    **Q.**    Did you do any sort of analysis of -- you have, yourself,

4    looked through all the bank accounts listed?  All the

5    Wells Fargo accounts and the two Citi accounts; right?

6    **A.**    I have.

7    **Q.**    Were those all the accounts relating to Dr. Su that you

8    could find?

9    **A.**    That I could find, yes.

10   **Q.**    Did you find -- can you tell us --

11   **A.**    I should -- there are additional accounts held by Dr. Su,

12   but they didn't appear to be receiving F-1 proceeds.

13   **Q.**    They didn't get any money from the school accounts --

14   **A.**    Yes.

15   **Q.**    -- so you didn't follow up on them.

16   **A.**    Correct.

17   **Q.**    Fair enough.

18          From the accounts, the money that you did trace from

19   Tri-Valley University, did you do any sort of analysis of

20   whether Dr. Su was paying herself any sort of monthly or

21   bi-weekly salary?

22   **A.**    There was no clear delineation between business expenses

23   and personal expenses.

24   **Q.**    Okay.  So you could see that expenses were being paid,

25   but there wasn't, like, a regular bi-weekly check, for example.

1    A.    No.

2    Q.    Okay.  I wanted to follow up with you a little bit on --

3    to change topics a little bit -- on some testimony that we

4    heard yesterday from Mr. Patel.

5         Do you recall that testimony?

6    A.    I do.

7    Q.    And do you recall I had some questions for him about

8    certain -- certain things that he said, and -- yesterday, in

9    comparison with certain things that he said to you back in

10   March of 2011?  Just generally; right?

11   A.    Yes.

12   Q.    You did meet with Mr. Patel on March 1st of 2011; right?

13   A.    Yes.

14   Q.    And the purpose of the meeting was to talk to him about

15   Tri-Valley University.

16   A.    That's correct.

17   Q.    Isn't it true that one of the things Mr. Patel told you

18   back in March of 2011 was that very few students complained

19   about the lack of instruction?

20   A.    I don't have a specific recollection of that statement.

21   Q.    Well, would it refresh your -- you wrote a report

22   regarding that interview; right?

23   A.    I believe that report was written by another agent --

24   Q.    That's true.

25   A.    -- who writes good reports, so I would have faith in him.

MACKEY - CROSS / BABCOCK

1    Q.    He was present with you during the interview.

2    A.    Yes.

3    Q.    We're talking about Agent Taylor; right?

4    A.    Yes.

5    Q.    He was your co-case agent.

6    A.    Yes.

7    Q.    You guys did this interview together.

8    A.    Yes.

9    Q.    So it might refresh your recollection to review

10   Dr. Taylor -- Agent Taylor's report.

11   A.    Sure.

12   Q.    Ask you to look over the bottom of page 5 and the top of

13   page 6, generally.

14         Have you had a chance to look at that?

15   A.    I did.

16   Q.    Isn't it true -- well, let me ask it.  Does that refresh

17   your recollection about some of the things that Mr. Patel told

18   you during that interview?

19   A.    About some of the things.  I don't have a specific

20   recollection about that statement.  It might be that it's out

21   of context and our reports are just summaries of interviews.

22   Q.    Well, they are just -- you guys don't record these

23   interviews, as I understand it.

24   A.    No.

25   Q.    But you do take detailed notes; right?

MACKEY - CROSS / BABCOCK

1    **A.**   Yes, we do.

2    **Q.**   And type up reports of them after.

3    **A.**   Yes.

4    **Q.**   And I would assume -- or wouldn't you assume that Agent

5    Taylor's report was pretty accurate?

6    **A.**   Yes, if it's in there, Mr. Patel made that statement.  I

7    just don't remember because it might be out of context.

8    **Q.**   I understand.  Well, did -- do you remember whether

9    Mr. Patel told you that if he brought student complaints to

10   Dr. Su that sometimes she would tell him to enroll the student

11   in a different subject or a different class?

12   **A.**   I do remember that.

13   **Q.**   Okay.  And then didn't she also -- didn't Mr. Patel also

14   say that she would tell -- sometimes tell him to call the --

15   that she would sometimes call the instructor and chastise the

16   instructor?

17   **A.**   I don't have an independent recollection of that

18   statement.

19         Again, if it was in there, he said that.  It might just

20   be that I'm not able to pick up the context.

21   **Q.**   Okay.  Were you also present for the other interview of

22   Mr. Patel?

23   **A.**   Yes, I was.

24   **Q.**   And I forget the date of that, off the top of my head.

25   Do you remember when that was?

1    A.    It was much more recent.  I don't remember the specific

2    date.

3    Q.    Last August or September?

4    A.    That sounds about right.

5    Q.    And isn't it true that during your more recent interview

6    with Mr. Patel he said that he did not think Dr. Su, quote, did

7    this for the money?

8    A.    Yes, he said that.

9    Q.    And I assume "did this" meant run the school.

10   A.    Yes.

11        MR. BABCOCK:  I think that's all I have, Your Honor.

12        THE COURT:  Thank you.

13        MR. BABCOCK:  Thank you.

14        THE COURT:  Mr. Rhyne, redirect of this witness?

15        MR. RHYNE:  Yes, Your Honor.

16                    REDIRECT EXAMINATION

17   BY MR. RHYNE:

18   Q.    Agent Mackey, as you sit up there right now, do you have

19   an idea or anything refresh your memory as to the balances in

20   Dr. Su's accounts after she made those purchases that we

21   discussed on direct examination?

22   A.    What time period are you referring to?  Immediately after

23   the purchase of specific property?

24   Q.    Let me be more specific.

25         On January 19th, 2011, that precise day, do you have an

1    idea, would anything refresh your recollection, as to what her

2    balances were?

3    **A.**    I know what the total balances were.

4    **Q.**    Roughly how much cash on hand did she have after she

5    purchased this stuff?

6    **A.**    $1.5 million.

7    **Q.**    Okay.  If Dr. Su weren't in it for the money, if she were

8    in it to operate a school, approximately how many DSOs would

9    that purchase?  How many DSOs could she hire?

10    She said they cost how much per year?

11    **A.**    She stated, during the interview, that one particular DSO

12    wanted $50,000 per year.

13    **Q.**    You don't need to do the math, but she had plenty of

14    money to hire DSOs; correct?

15    **A.**    Sure.

16    **Q.**    She had plenty of money to hire staff.

17    **A.**    Yes.

18    **Q.**    Mr. Babcock also asked you about on that day, January 19,

19    2011, how many active students Tri-Valley University had, and

20    you said 1,760 or so; is that right?

21    **A.**    Yes.

22    **Q.**    What was the peak of active students at Tri-Valley

23    University as far as active students?

24    **A.**    The total number of students activated during its entire

25    existence was 2,048.  Some of those students would have been

1    deactivated and transferred to other schools before the school

2    was shut down.

3    **Q.**    Mr. Babcock also asked you about whether Dr. Su paid

4    herself a salary.  Did you remember that?

5    **A.**    Yes.

6    **Q.**    You actually asked Dr. Su whether she had a payroll; is

7    that correct?

8    **A.**    Yes.

9    **Q.**    And that was during the interview that you had of her on

10   January 19th?

11   **A.**    Yes.

12   **Q.**    What did she say?

13   **A.**    She said she did not run a payroll; that it would be too

14   cumbersome.

15   **Q.**    You also stated on cross that you didn't see any

16   delineation between personal and business expenses; is that

17   correct?

18   **A.**    Yes.

19   **Q.**    Is that the case for each of these accounts that you

20   analyzed?

21   **A.**    Yes.

22   **Q.**    And when Mr. Babcock asked you about she purchased five

23   properties and one car, that's not the only personal expenses

24   that you saw in this case; is that correct?

25   **A.**    That's correct.

1    Q.    Mr. Babcock also asked you why you didn't search certain

2    locations.  Isn't it true that before you can search a location

3    you have to have a reason to do so?  Isn't that right?

4    A.    Yes.

5    Q.    You can't just kick in a door and start searching; right?

6    A.    I would hope not.

7    Q.    You go to a judge and get a search warrant; correct?

8    A.    Yes.

9    Q.    And to get a search warrant, you write an affidavit;

10   correct?

11   A.    Yes.

12   Q.    You explain to the judge why you think particular

13   evidence of a particular crime is going to be there; correct?

14   A.    Yes.

15   Q.    Sometimes judges say you can have a search warrant,

16   sometimes they say you can't.

17   A.    That's my experience.

18   Q.    When Mr. Babcock asked you repeatedly about these seized

19   funds and seized assets, as you sit here today you don't know

20   what's going to happen to those assets or property; is that

21   correct?

22   A.    Yes, that's correct.

23   Q.    It going to be up to the Court; is that correct?

24   A.    It's beyond our control, yes.

25         **MR. RHYNE:**  No further questions, Your Honor.

1          **THE COURT:**  Recross?

2          **MR. BABCOCK:**  Briefly.

3                        <u>RECROSS-EXAMINATION</u>

4     BY MR. BABCOCK:

5     **Q.**   You said it's beyond your control whether those assets

6     remain seized?

7     **A.**   Are forfeited.

8     **Q.**   Or forfeited.

9          Well, that's not exactly how I would view it.  Isn't it

10    true that to keep the proceeds, keep the money, the property,

11    you -- if Ms. -- Dr. Su is convicted, that's a step in keeping

12    the money and the property?

13    **A.**   That's one step.

14    **Q.**   I understand.  But you need to get a conviction; right?

15    **A.**   That's not completely true.  There's also civil remedies

16    that are available for some of the assets.

17    **Q.**   One of the ways the money and property could be forfeited

18    is if Dr. Su's convicted --

19    **A.**   Yes.

20    **Q.**   -- of these crimes.

21    **A.**   Yes.

22    **Q.**   Even if she's not convicted, the Government has also

23    filed a civil action trying to forfeit the money; isn't that

24    right?

25    **A.**   Some of it, yes.

1    Q.    Not all of it, but some of it.

2    A.    Yes.

3    Q.    Okay.  It's also filed a civil action trying to forfeit

4    all those real properties; right?

5    A.    Yes.

6    Q.    The one on Boulder Court, Germano Way, all the actual

7    real properties we're talking about.

8    A.    Yes.

9    Q.    So the Government gets not just one bite at the apple

10   here but two.

11   A.    Yes.

12   Q.    You said you can't just go kicking in a door without a

13   search warrant and I agree.  But once you get a search warrant,

14   you can actually kick in the door; right?

15   A.    Under certain circumstances.  We can't just kick in the

16   door without a reason to.

17   Q.    Once you get a search warrant, you can break into the

18   house.

19         If no one responds pretty quickly; right?

20   A.    Yes.

21   Q.    No one -- you knock on the door and no one answers within

22   how long?

23   A.    A reasonable amount of time.

24   Q.    A reasonable amount of time.

25         And at 6:00 or 6:30 in the morning, what's a reasonable

1    amount of time?

2    **A.**    Depends on the size of the house; depends on other

3    factors such as known weapons inside the house, criminal

4    history.

5    **Q.**    Well, how long -- Dr. Su doesn't have any criminal

6    history; right?

7            **MR. RHYNE:**  Objection.  Relevance.

8            **THE COURT:**  Sustained.

9    **BY MR. BABCOCK:**

10   **Q.**    You didn't have any reason, before you went to Dr. Su's

11   home, to think that she would physically resist.

12           **MR. RHYNE:**  Objection.  Relevance.

13           **THE COURT:**  Overruled.

14           THE WITNESS:  I didn't have a specific reason, but we

15   treat every situation as a potential -- potentially dangerous

16   situation.

17   **BY MR. BABCOCK:**

18   **Q.**    Oh, come on.  She's -- how tall are you?  You're taller

19   than me.  6-4, 6-5?

20   **A.**    That wouldn't stop her from picking up a kitchen knife

21   and --

22   **Q.**    How many agents, how many agents stormed her home that

23   morning, 15 or 20?

24           **MR. RHYNE:**  Objection.  Argumentative.

25           **THE COURT:**  Sustained.

1    BY MR. BABCOCK:

2    **Q.**    You previously testified you weren't at the door.  There

3    was a specially-assigned unit that does the entry; right?

4    **A.**    I did enter the house, yes.

5    **Q.**    How long did you wait before breaking into the house?

6    **A.**    It was a good amount of time.  I want to say two minutes.

7    **Q.**    Okay.  And it is what, 6:00, 6:15, 6:30 in the morning?

8    **A.**    We're knocking very loudly.

9    **Q.**    I understand.  But --

10          **THE COURT:**  I think this field's been plowed.

11          **MR. BABCOCK:**  Fair enough.

12   BY MR. BABCOCK:

13   **Q.**    You said that Dr. Su told you payroll would be too

14   cumbersome, but she did primarily pay people with checks;

15   right?

16   **A.**    That's not the same thing as running a payroll.

17   **Q.**    I understand.  But she wasn't paying employees with cash,

18   is my point; she was writing checks on the TVU account.

19   **A.**    Some of them, yes.

20   **Q.**    Most of them; isn't that fair to say?

21   **A.**    That would be my guess, but just a guess.

22   **Q.**    You haven't done the analysis on that?

23   **A.**    (No response.)

24   **Q.**    Can you tell me, we've heard a lot in this trial about

25   Sophie Su and Wenchao Wang, the other names on the I-20s;

1     right?

2     **A.**     Yes.

3     **Q.**     Can you tell me how many people Dr. Su interviewed to try

4     and hire that actually had any experience and training, prior

5     training as DSOs?

6     **A.**     I can't speculate to that.

7           **MR. BABCOCK:**  Thank you, Your Honor.

8           **THE COURT:**  Redirect?

9           **MR. RHYNE:**  No further questions, Your Honor.

10          **THE COURT:**  Agent Mackey, thank you.  You can step down.

11          THE WITNESS:  Sure.

12          (Conclusion of excerpted portion.)

CERTIFICATE OF CONTRACT REPORTER


I, Kelly Lee Polvi, certify that pursuant to Section

753, Title 28, United States Code, that the foregoing is a

true and correct transcript of the stenographically-reported

proceedings held in the above-entitled matter and that the

transcript format is in conformance with the regulations of

the Judicial Conference of the United States.

Dated this 9th day of April, 2014.

_____

Kelly Lee Polvi
CA CSR No. 6389
Registered Merit Reporter
Federal Certified Realtime Reporter