1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3            BEFORE THE HONORABLE JON S. TIGAR

4    UNITED STATES OF AMERICA,       )
                                     ) Volume 1
5              Plaintiff,            ) Pages 1 - 136
                                     )
6         VS.                        ) NO. 11-00288 JST
                                     )
7    SUSAN XIAO-PING SU,             )
                                     ) San Francisco, California
8              Defendant.            ) Monday, March 3, 2014
     _____) 8:14 a.m.

9

10              **TRANSCRIPT OF COURT PROCEEDINGS**

11

     **APPEARANCES:**

12

13   **For Plaintiff:**          MELINDA HAAG
                                 UNITED STATES ATTORNEY
14                               1301 Clay Street, Suite 340S
                                 Oakland, California 94612
15                     BY:   **HARTLEY M.K. WEST, ESQ.**
                             **WADE M. RHYNE, ESQ.**
16                           **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**          Law Offices of Erik G. Babcock
18                               717 Washington Street, Second Floor
                                 Oakland, California 94607
19                     BY:   **ERIK G. BABCOCK, ESQ.**
                             **ATTORNEY AT LAW**

20

21

22

23

24

     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                 Official Court Reporter - U.S. District Court
                   Computerized Transcription By Case CATalyst

| | |
|---|---|
| 1 | <u>Monday, March 3, 2014</u>                                   <u>8:14 a.m.</u> |
| 2 | ---000--- |
| 3 | THE CLERK:  Calling Criminal Case 11-288, United |
| 4 | States of America versus Susan Su. |
| 5 | Counsel, will you please make your appearances. |
| 6 | MS. WEST:  Good morning, your Honor.  Hartley West |
| 7 | and Wade Rhyne for the United States. |
| 8 | THE COURT:  Good morning. |
| 9 | MR. RHYNE:  Good morning. |
| 10 | MR. BABCOCK:  Good morning.  Good morning, your |
| 11 | Honor.  Erik Babcock for Ms. Su, who's present, with my |
| 12 | co-counsel Kevin Morley. |
| 13 | THE COURT:  Good morning. |
| 14 | I understand that there is a Special Agent Jason Mackey |
| 15 | here also. |
| 16 | MS. WEST:  That's correct.  Department of Homeland |
| 17 | Security Special Agent Mr. Mackey, who's the case agent. |
| 18 | THE COURT:  Good morning, Mr. Mackey. |
| 19 | SPECIAL AGENT MACKEY:  Good morning, sir. |
| 20 | THE COURT:  We are outside the presence of the jury. |
| 21 | We're off the -- excuse me.  We're on the record.  Pursuant to |
| 22 | the stipulation of counsel, the jury office will be determining |
| 23 | whether jurors are time-qualified first.  So that will save us |
| 24 | time in the long run, but it means we'll get a little bit of |
| 25 | time this morning together before those jurors arrive, and I |

1   understand counsel have some matters that they wanted to

2   discuss.

3             MS. WEST:  Just a few.

4       The first is that we've just filed with the Court joint

5   evidentiary stipulations and joint factual stipulations.  So we

6   just wanted to flag that for the Court that we have reached

7   some stipulations, which we -- the parties believe will enable

8   us to streamline the trial.  So we're all pleased about that, I

9   think.

10            THE COURT:  Ms. West -- excuse me.  Mr. Noble, can I

11  have a copy of those documents?

12            THE CLERK:  Sure.

13            THE COURT:  I don't think there's anything I need to

14  do now with regard to the evidentiary stipulations.  It just

15  means that when these records are offered, that those matters

16  to which the parties have stipulated are no longer at issue.

17      So, Mr. Noble, I'll return that to you.

18      The -- when do the parties contemplate that the Court would

19  read the factual stipulations to the jury?

20            MS. WEST:  We can do that however the Court likes.

21  Generally for factual stipulations, in my experience, the

22  parties have read them -- the party offering the factual

23  stipulation reads it in at, you know, some chosen time where

24  the Court gives the appropriate jury instruction on that -- or

25  if the Court wants to read it in, that's fine, too -- and we

1    can do it either partway through the Government's case or right

2    before the Government rests and just let the Court know.  I

3    think most of them are something that we can do at the --

4                THE COURT:  There aren't a number in any event.

5                MS. WEST:  No.  There's only three.

6                THE COURT:  My proposal would be that if I remember

7    to do it, that I read these stipulations when I do preliminary

8    instructions to the jury, and then I tell the jurors that

9    counsel have agreed that these facts are so and that they will

10   hear them again later in the trial.

11       And that way, I know that they're part of the record, and

12   if nothing else happens, either of you is free to use them in

13   closing argument.  Of course, if that isn't the way it plays

14   out, one of you, I'm sure, will come back to that.

15               MS. WEST:  That's fine.

16               THE COURT:  I'm not --

17               MS. WEST:  Yeah.

18               THE COURT:  I'm not whetted to that proposal.  I'm

19   happy to leave things up here, and if they're read, they're

20   read.

21               MS. WEST:  I mean, I guess my preference would be to

22   have it at the conclusion of the Government's case before we

23   rest just because it's talking about some things that they

24   won't yet have heard about.  So it really might not make sense

25   to them without context.

1          THE COURT:  All right.  Mr. Babcock, any comment on

2     that?

3          MR. BABCOCK:  Well, I'm for anything that makes their

4     case not make any sense, but I'm not going to weigh in the

5     timing of the reading of it.

6          THE COURT:  That's why I said, "Any comments?" as

7     opposed to "Any objection?"

8          MR. BABCOCK:  No.  Exactly.

9          THE COURT:  So I -- the Government having gracefully

10     declined the invitation for me to make sure these stipulations

11     are read, I won't do that.  I'll just leave them up here.

12        Mr. Noble, at your pleasure, if you may make copies of

13     those, that would be great.

14        Okay.  So I'll assume at some point the Government will

15     read those in, and the Government can do that at a time of its

16     choosing.

17          MS. WEST:  And then a couple of other items.

18        One is with regard to the setup of -- we're going to have a

19     big screen on which to have the jury be able to view exhibits

20     as witnesses are talking to them.  This is a fairly

21     document-intensive case as the Court may have noticed from the

22     binders.

23          THE COURT:  Yes.  I apologize to the parties about

24     the total lack of any technology in this courtroom.  I assume

25     at some point someone is going to do something about it.

1            MS. WEST:  Well, at this point, we thought we'd solve

2    the problem with a screen, but we do think that would be

3    preferable if we could have it here, although it may -- we

4    don't expect an extensive audience, but it may block people who

5    would be there, but because there are -- you know, we can only

6    blow up the documents so big --

7            THE COURT:  Yes.

8            MS. WEST:  -- to have them closer to the jury, that

9    would be our request if that's okay with the Court.

10            THE COURT:  Mr. Babcock, do you want to be heard?

11            MR. BABCOCK:  No.  I was going to take responsibility

12    for the lack of technology because I just tried a case in front

13    of Judge Castellanos in Hayward in her first -- in her new

14    department in Hayward, and there was no technology.  So we were

15    all winging it.

16            THE COURT:  I saw a very good presentation by Cris

17    Ardatis (phonetic) about ten years ago, in which she said --

18    Mr. Reporter, C-r-i-s -- in which she said it used to be -- ten

19    years ago.  It's 25 years ago today.  If you went in with

20    anything other than butcher block paper on a pad, you looked

21    too fancy, and you had to be nervous that the jury was going to

22    hold it against you.

23        And now the jurors are on the Web all the time.  Many of

24    them prepare PowerPoint presentations for their work, and they

25    don't think anything of having technology.  In fact, it makes

1    it easier for them to follow things.  So I'm hopeful we'll get

2    an upgrade here in the courtroom at some point.

3           MR. BABCOCK:  That's before they all became addicted

4    to *CSI* as well.

5           THE COURT:  Yeah, that's another issue.

6       Are there other issues that the parties wish -- oh.  With

7    regard to the screen, that's fine to have the screen at the

8    other end, far end of the jury box.  Have you tried setting it

9    up?

10          MS. WEST:  On Friday.

11          MR. RHYNE:  We did, your Honor.  We set it up on

12   Friday.  We also tested some of the audio.  So it seems --

13          THE COURT:  Okay.

14          MR. RHYNE:  It seems to be working pretty well.

15          THE COURT:  If it turns out to be the case that we're

16   all wrong about how many jurors are in the audience so that one

17   side of the courtroom is full and the screen is blocking the

18   other side, we can revisit this issue.  I don't have any reason

19   to think that's likely.

20          MR. RHYNE:  Very good, your Honor.

21          MS. WEST:  That's fine.

22      I think just maybe there were two other matters, and one is

23   just a flag for the Court to make sure the Court has no

24   objection -- we already discussed it with Mr. Babcock -- that

25   Special Agent Mackey -- we -- the Government would like to

1   split his testimony so that he testifies two times, once more

2   as to kind of the universe of his knowledge as the case agent

3   except for the financial issues, and then bring him back at the

4   end of the Government's case to talk about the tracing of the

5   financials and so forth.

6       So Mr. Babcock had no objection to that.  We wanted to make

7   sure the Court was fine with that as well.

8           THE COURT:  Mr. Babcock, is it true you have no

9   objection?

10          MR. BABCOCK:  I don't know that I have grounds for an

11  objection.  I'm not aware of a rule that says the case agent

12  can't testify more than once, and I've certainly seen it

13  happen.  So --

14          THE COURT:  I wish it were the case in my judicial

15  practice that someone would closely examine whether there's any

16  grounds before making an objection.

17          MR. BABCOCK:  In that case, I object.

18          THE COURT:  Your objection is overruled.

19      Okay.  Let me read you something.  As part of my comments

20  to the prospective jurors this morning, I want to summarize the

21  case.  This is not a collaborative process -- oh.  The

22  Government -- looks like the Government has something that

23  they're hoping I'll read.  Well, that's okay.  I have a

24  microphone.  This is not meant to be a collaborative process,

25  but I would like to know if you think that what I'm saying is

1     incomplete or unclear or misleading in some way or unfair.

2          "This is a criminal case brought by the United States

3     Government.  The defendant is named" -- oh.  Before I do

4     anything further, Mr. Babcock, does your client pronounce her

5     middle name Xiao-Ping?

6               MR. BABCOCK:  Yes.

7               THE COURT:  Thank you.

8          "This is a criminal case brought by the United States

9     Government.  The defendant is named Susan Xiao-Ping Su.  The

10    Government has charged Ms. Su with wire fraud, mail fraud, visa

11    fraud, use of false documents, false statements to a government

12    agency, alien harboring, unauthorized access to a government

13    computer, and money-laundering.

14         "The charges against Ms. Su are contained in a written

15    document called an indictment.  The indictment simply describes

16    the charges the Government brings against the defendant.  The

17    indictment is not evidence.  It does not prove anything.

18         "Ms. Su has pleaded not guilty to the charges and is

19    presumed innocent unless and until the Government proves her

20    guilty beyond a reasonable doubt.  In addition, Ms. Su has the

21    right to remain silent and never has to prove her innocence or

22    to present any evidence.

23         "In order to give you some background to assist you during

24    jury selection, I will now give you a brief summary of the

25    allegations against Ms. Su.  I'll remind you that these are

1    only allegations and that the Government must prove its case

2    beyond a reasonable doubt.  Also, each crime the Government has

3    charged consists of specific elements that must be proven.  If

4    you're selected for the jury, I will tell you what the elements

5    are.  For now, however, here's a brief summary:

6         "The indictment in this case charges Ms. Su establishing a

7    university in the City of Pleasanton called Tri-Valley

8    University or TVU.  The indictment charges that Ms. Su caused

9    TVU to submit various forms to the United States Government to

10   obtain approval to admit foreign students and to assist those

11   students in obtaining visas that allow the students to stay in

12   the United States.

13        "The Government alleges that Ms. Su provided false

14   information in the forms or directed others to falsify the

15   information in the forms.  For example, the Government alleges

16   that Ms. Su made false representations about TVU's facilities,

17   personnel, courses, and other factual matters.  The Government

18   also alleges that Ms. Su stated that students were attending

19   classes at TVU that the students were not, in fact, attending

20   or did not exist.  These are only examples.

21        "The Government alleges that TVU admitted students without

22   regard to their academic qualifications in an attempt to pursue

23   a full course of study so that Su and TVU could obtain their

24   tuition money.  The Government charges that Su paid a portion

25   of these tuition monies to recruiters as commissions for

1    referrals of new alien students.

2        "The Government also alleges that Ms. Su and others engaged

3    in a scheme to defraud nonimmigrant aliens, which means persons

4    of other countries, of their money and property.  Finally, it

5    alleges that she used the proceeds of this criminal activity to

6    purchase items for herself, including three homes in Pleasanton

7    and a Mercedes Benz automobile.

8        "The fact that Ms. Su is accused of these crimes is not

9    evidence to anything.  You must presume Ms. Su to be innocent

10    unless and until the Government proves the charges against her

11    beyond a reasonable doubt."

12              MS. WEST:  That's fine for the Government.

13              MR. BABCOCK:  I think that's okay.

14              THE COURT:  Okay.

15              MR. RHYNE:  Your Honor, I think the only --

16              THE COURT:  It's a long indictment.

17              MR. RHYNE:  I think the only modification would be

18    the three homes were not only Pleasanton.  There's two homes in

19    Pleasanton and one property in Livermore.

20              THE COURT:  I'll strike the words "in Pleasanton."

21        Very good.  Other housekeeping matters?

22              MS. WEST:  The only other one that I can think of is

23    my standard practice is to provide the defense with a witness

24    lineup for the following day, you know, just the day prior.

25    And so that's the Government's plan, and our hope is that that

1    will be reciprocated by the defense.

2            MR. BABCOCK:  Certainly.

3            THE COURT:  All right.  That will be the Court's

4    order based upon the stipulation of counsel.

5            MS. WEST:  That's all we have, I think.

6            MR. RHYNE:  That's it.

7            THE COURT:  Oh.  Court staff has indicated that

8    counsel has some question about approaching the witness.

9            MS. WEST:  Oh.  Does the Court prefer us to ask each

10   time may we approach when we're showing an exhibit to a

11   witness?

12           THE COURT:  Unless and until I find out that someone

13   has a severe hearing problem, my practice is not to require

14   counsel to ask the Court every time they want to approach a

15   witness.  As long as you're approaching the witness for a

16   proper purpose and once you've accomplished that purpose, you

17   will keep a respectful distance from the witness stand.

18       Sometimes, even though they know that's the rule, lawyers

19   like to ask to approach the witness because it -- they believe

20   that it creates an environment that's more consistent with what

21   jurors think about court.  It's one of the rituals of court.

22           MR. BABCOCK:  Right.

23           THE COURT:  I'm a big believer in the rituals of

24   court.  So I will not stop you from approaching the witness

25   because I am giving you permission to do that, but if you -- if

1    you ask to approach the witness, I also will not say, "I

2    already told you.  Don't ask me that question."  I will grant

3    your permission.

4           MS. WEST:  Similar question with regard to publishing

5    exhibits to the jury.  Once they've been admitted, does the

6    Court prefer the parties or the counsel to ask, "May we publish

7    this to the jury?" or, once it's admitted, just show it to the

8    Court?

9           THE COURT:  I'd prefer you not ask that question.

10   Any document that's been admitted into evidence may be

11   published to the jury at any time without the Court's

12   permission.

13          MS. WEST:  Anything else?

14          MR. BABCOCK:  We had -- there was some e-mail

15   communication with the Court through its clerk last week about

16   scheduling, and my understanding is we are -- we are holding

17   session next Monday when originally we were not holding session

18   next Monday.

19          THE COURT:  Very good.  Yeah.  I was under the

20   mistaken impression that we had filled that day up, and so last

21   week's request was, I think, the second request about that day.

22   I don't recall having -- that I responded to the first request.

23      But anyway, yes, my understanding is this trial will also

24   be in session next Monday.

25          MR. BABCOCK:  Okay.  And as far as this week, Monday

1    and Tuesday and Wednesday?

2            THE COURT:  Correct.

3            MR. BABCOCK:  Very good.

4        So can I just clarify -- we are doing a six-pack method

5    with jury selection?

6            THE COURT:  We are.

7            MR. BABCOCK:  Okay.

8            THE COURT:  And let me just review that so that

9    everyone knows exactly what to expect.

10        First of all, if I have enough prospective jurors this

11   morning -- and I think I will -- I'm determined to select four

12   alternates instead of three.  It doesn't change the number of

13   peremptory challenges each of you gets with regard to the

14   alternates, but since this trial is expected to last more than

15   a month, it just seems like a good idea to me to do that.  If

16   we don't have enough prospective jurors, then we'll proceed

17   with three, and I'll make the determination if three is

18   adequate, but I think we're going to have enough.

19        We will seat 12 jurors in the jury box and six jurors

20   against the rail on what is my right.  I'll conduct voir dire

21   of all 18 of those jurors, and then each of you will have

22   20 minutes to use as you'd like, and then we will take

23   challenges for cause, and then we'll take peremptories.

24        The 12 jurors seated in the box are your 12 jurors unless

25   they're excused.  So you should exercise challenges for cause

1   to all the jurors, but you should only exercise peremptory

2   challenges as to jurors in the box.  If you mistakenly exercise

3   a peremptory challenge to a juror in the six-pack, I'll just

4   challenge directly.

5       The point of the system is that you know exactly what

6   you're getting, and the system takes a little bit longer, but

7   in my experience, the lawyers are very happy with their jury in

8   the end.

9       So when you exercise a peremptory to a juror in the box,

10  the next juror from the six-pack, meaning the juror who's

11  seated closest to the jury box, will take the place of the

12  juror excused.  Not only will you know what you're getting, but

13  you'll be able to usually think a couple steps down the road

14  and anticipate what your opponent is likely to do, that sort of

15  thing.

16      Once the six-pack has been exhausted, we'll refill the six

17  pack, I'll voir dire the six-pack with an additional ten

18  minutes to each side with that six-pack, and then you will have

19  exercised peremptories again only to the jurors in the box, and

20  they'll be refilled in order from the six-pack, and we will

21  continue with that approach until you are satisfied with the

22  jury or you've exhausted your peremptories.

23      You're not required to use all this voir dire time.  It

24  doesn't sound like a lot of time, but in the moment, it

25  actually turns out to be a fair amount of time.

1          MR. BABCOCK:  Are we making verbal or written

2     peremptory challenges?

3          THE COURT:  Verbal.  That is an interesting -- I

4     copied Judge Alsup in my last civil trial, fewer peremptories.

5     They did it in writing.  It was very fast.

6          MR. BABCOCK:  It is very fast.

7          THE COURT:  It was very interesting, but with

8     asymmetrical peremptories and total of peremptories that's more

9     than the number of jurors in the box, I'm just going with

10    verbal.

11         If it comes to pass that we have four or three as the case

12    may be -- and I'll announce before we begin the selection of

13    alternates of what we're selecting.  If it comes to pass that

14    we have that number of prospective jurors in the six-pack

15    already, then I will say -- I will ask you, "Are you satisfied

16    with the first three or the first four as the case may be in

17    the box?"

18         I don't expect you to say, "Yes," but every time the

19    lawyers do say, "Yes," and then we don't have to go through the

20    whole peremptory process for the alternates also.  I just don't

21    want you to be surprised by the question.

22         Challenges for cause should be made at sidebar.  I will --

23    unless there's an objection, I will not report them.  I will

24    give you an opportunity to make a record at the end of the day.

25    Usually I know what's coming.  Occasionally I'm surprised, but

1    usually I know what the challenge is going to be, and I will

2    rule right there at sidebar after a very brief discussion.

3        Mr. Rhyne, we can relax the one-lawyer-at-the-microphone

4    rule. You're going to try this case, too. If you want to just

5    come up to the microphone and ask the question --

6        MR. BABCOCK: You're going to have to share her.

7        MR. RHYNE: Yes, your Honor.

8        The only question I had left was: If we do not exercise a

9    peremptory challenge, is that challenge waived if we pass on

10   one?

11       THE COURT: No. I know judges who do that. You

12   can -- you can keep your -- let's say that you're not sure or

13   on the fence about Juror No. 5 and -- and as jury selection

14   develops, you realize the pool is a little better for you than

15   you thought, and all of a sudden, 5 doesn't look that good, but

16   you let 5 sit there through a round of -- you know, through a

17   six-pack round. That's fine. You can excuse Juror No. 5.

18       MR. RHYNE: Actually, what I mean is if we don't

19   exercise one of our six peremptories when we're going back and

20   forth challenging jurors, would that still count as using one

21   if we say we're not going to strike anyone this particular

22   round?

23       THE COURT: Oh, no.

24       MR. RHYNE: Okay.

25       THE COURT: No.

1          MR. RHYNE:  Very good, your Honor.

2          THE COURT:  I understand my process is a little

3     longer --

4          MR. RHYNE:  Okay.  Thank you, your Honor.

5          THE COURT:  -- and particularly with a trial of this

6     length, my goal is for both sides to be happy with their

7     jurors.  I've never -- that whole -- I've never done that.

8          MS. WEST:  So even though we'll be doing it

9     verbally -- orally rather than in writing, will it still be,

10    you know, one peremptory by the Government, peremptory by the

11    defense, and then at some point two by the defense, going back

12    and forth to exercise peremptories?

13         THE COURT:  I've not thought about how to do that

14    because the defendant does have an advantage on the number of

15    peremptories.  Isn't it six and ten?

16         MS. WEST:  Yeah.

17         THE COURT:  So --

18         MR. BABCOCK:  I'd prefer to save mine to the end,

19    but --

20         THE COURT:  Well, I think -- I think you obviously

21    get to go last because the Government gets to go first, but I

22    don't know -- I don't know -- I don't -- I don't see a good

23    reason for the defendant to have all four -- five at the end --

24         MR. BABCOCK:  Yeah.  I've not actually ever had it

25    done that way where the defense saves -- has all their

1    additionals at the end.  It's usually an alternate method, and

2    I'm trying to remember -- I would suggest something like that,

3    you and me --

4              THE COURT:  What happened, Mr. Babcock?

5              MR. BABCOCK:  It's hard to describe on the record.

6    Maybe I can just show you.

7              THE COURT:  Maybe you can pass Mr. Noble -- pass your

8    notepad.

9        I wrote something very similarly on my legal pad.  Yes,

10   that's fine.  For the record, Mr. Babcock is proposing that

11   after the Government --

12             MR. BABCOCK:  Okay.  So after the third -- my third,

13   I would do two.

14             THE COURT:  Well, except there are -- they have six,

15   not ten.

16             MR. BABCOCK:  Am I getting extra?

17             THE COURT:  They have six, not eight.  So we need

18   something a little different than your chart.  Give me just one

19   moment, please.

20             MR. BABCOCK:  Okay.

21             THE COURT:  The Court will propose that -- that the

22   defendant exercise two peremptory challenges after the

23   Government has exercised its first, second, third, and fourth

24   peremptory challenges and that -- and that the defendant then

25   exercise one of each after the Government has exercised a fifth

1   and sixth.

2           MS. WEST:  That's fine.

3           THE COURT:  Any objection?

4           MR. RHYNE:  No objection, your Honor.  And if both

5   parties should pass in a single round, is the jury then

6   selected based on what exists at the box at that time?

7           THE COURT:  Hold on just one moment.

8       Mr. Babcock, any objection?

9           MR. BABCOCK:  I'm sorry.  Can the Court repeat its

10  proposal?  I'm not sure I got it right.

11          THE COURT:  Yes, that the defendant exercise

12  basically two challenges in response to the Government's first,

13  second, third, and fourth --

14          MR. BABCOCK:  Okay.

15          THE COURT:  -- peremptories and that thereafter the

16  parties go one for one.  The defendant would then still have

17  her last peremptory.

18          MR. BABCOCK:  Got it.

19          THE COURT:  Any objection?

20          MS. WEST:  That's fine for the Government.

21          MR. BABCOCK:  That's fine, your Honor.  Thank you.

22          THE COURT:  Very good.

23      Mr. Rhyne, the answer to your question is yes.  If both

24  sides pass -- in other words, if neither -- if both sides

25  decline to exercise a peremptory, then that is a signal that

1        the jury as constituted is acceptable to both sides.

2                MR. RHYNE:  Thank you, your Honor.

3                THE COURT:  Anything else?

4                MR. BABCOCK:  Might I be so bold to ask if I can have

5        the Court's permission to bring a coffee with a lid on during

6        the morning session?

7                THE COURT:  All of you are welcome to bring a

8        beverage into court whenever you're in trial --

9                MR. BABCOCK:  Thank you.

10               THE COURT:  -- here, and the same rule applies to the

11       jurors.

12               MR. BABCOCK:  And as far as how late the Court

13       intends the schedule for today --

14               THE COURT:  Yes.  That's a good question.

15           So I have -- because most of -- because all of these are

16       citizen volunteers and they come from a great, great distance

17       and because most of them will not be selected for the jury, I

18       have a strong interest in trying to get done today if I can be.

19               MR. BABCOCK:  Sure.

20               THE COURT:  I won't be taking any shortcuts, but I'd

21       like to finish today if I can.

22           So today, I'm not whetted to the 8:30-to-1:30 schedule that

23       we will use for most of the trial, and in fact, the jurors were

24       told that -- or they will be told that by the jury office that

25       today and tomorrow, things might run later.  I'll have a pretty

1     good sense, I think, around noon whether it's possible to

2     finish by 1:30.

3              MR. BABCOCK:  Right.

4              THE COURT:  If I don't think it's likely, then we'll

5     take a lunch break of 45 minutes or an hour, and then we'll try

6     to be done by -- in any event, we'll finish by 4:00 or 4:30,

7     which is a pretty long day.  In the event that jury selection

8     goes until tomorrow, the same thing will be true.  Once we are

9     underway with the taking of evidence, we'll be on an 8:30/1:30

10    schedule.

11             MR. BABCOCK:  Okay.

12             MR. RHYNE:  Thank you, your Honor.

13             THE COURT:  Thank you.

14             THE CLERK:  All rise.

15                      (Recess taken.)

16             THE COURT:  All right.  Let's go back on the record.

17    We're outside the presence of the jury.

18        Is that Ms. Medearis sitting in the back?  It is.  Good

19    morning, Ms. Medearis.  She's not counsel of record in this

20    case, though.

21        So I've got a note from the jury office.  I'm just going to

22    tell you what it says.  The jurors are on their way down.  They

23    wanted to apprise you of what the mechanics are of our jury

24    selection.

25        89 jurors appeared this morning, but only 40 of them

1    replied that they would be available for this trial based on

2    the estimate.  The remaining 49 jurors will wait in the jury

3    room.  I've not released them.  They're here for the day, and

4    it may be that we will be -- I will be called upon toward the

5    end of the day to individually address their request for

6    hardship, or I may simply decide to grant all those requests.

7        Statistically, it's actually likely we'll be okay with 40.

8    It's close, and so I just wanted to let you know those facts.

9        MR. BABCOCK:  Does the Court -- excuse me.  Does the

10   Court know -- I'm not making a suggestion.  I'm just asking if

11   the Court were to let the 49 go, is there a point in time

12   where -- how much notice they need to get another panel in?

13   For example --

14       THE COURT:  We'll have more tomorrow.

15       MR. BABCOCK:  Tomorrow.

16       THE COURT:  If anything, we'll have more tomorrow.

17   I'll be in touch with Mr. Younger about when I need to let them

18   know that.  So, you know, we'll be in touch.

19       Okay.  I'm going to go off the bench.  When the jurors --

20   I'm going to go off the bench.  Now I'm going to go off the

21   record so I can talk to them in court.

22       (Proceedings were heard in the presence of the prospective

23   jurors:)

24       THE CLERK:  Calling Criminal Case 11-288, United

25   States of America versus Susan Su.

```
 1              Counsel, will you please stand and make your appearances.
 2                   MR. RHYNE:  Good morning, your Honor.  Wade Rhyne for
 3         the United States.
 4                   MS. WEST:  Good morning.  Hartley West for the United
 5         States.
 6                   MR. BABCOCK:  Good morning, your Honor.  Erik Babcock
 7         on behalf of Susan Su, who's present, and my assistant Kevin
 8         Morley.
 9                   THE COURT:  Good morning to all of you.  Please go
10         ahead and have a seat.
11              Prospective jurors, good morning.
12                   PROSPECTIVE JURORS:  Good morning.
13                   THE COURT:  Thank you for appearing in Courtroom 9 on
14         the 19th floor of the federal courthouse in San Francisco.  You
15         have been called here today to participate in the selection of
16         12 of you and some number of alternates to sit as jurors in a
17         criminal trial called the United States versus Susan Su.  And
18         in just a few minutes, I will tell you a little bit more about
19         that, what that case is about, but before we do that, I just
20         want to say thank you.
21              I love jury trials.  I love the right to a jury trial.
22         You're a little farther away than I'm used to.  I was a state
23         court judge for about 11 years, and I've been sitting in this
24         federal courthouse for about a year.  In my state courthouse, I
25         had a smaller, much less fancy courtroom, and so I felt like
```

1   when I talked to people, I really was having a conversation

2   with them, and you're a little farther away.  So I hope that

3   you still have that sense that I'm just talking to you one on

4   one because that's important.  I just want to have a

5   conversation with you for a second before we get to the

6   mechanics of picking a jury.

7       Probably when you got your jury summons in the mail, you

8   weren't that excited.  People don't respond to getting jury

9   summons in the mail the way they respond to getting, for

10  example, a check or a present, but jury service is incredibly

11  important because it is the only time in the life of the

12  community that we ask individual members of the community to

13  make the decision directly, and here's what I mean, an

14  important decision.

15      Generally, we hire other people to make decisions.  We have

16  a Water Board, and we have the Animal Control people, and we

17  have our state legislators, and we have mayors, and I can go on

18  and on and on and on.  So many important decisions in the life

19  of our community are made by people that we pick and usually

20  hire and pay to make those decisions for us.  We don't have to

21  think about it.

22      Jury service is the one exception to that.  It's the one

23  time where we say, "We're going to reach into the community,

24  we're going to find 12 people, they're going to pay close

25  attention to the evidence, and they're going to make the

1    decision directly."  And when you're here, it feels like a

2    little bit of an imposition, and it is an imposition.

3         Now, in context, frankly, it's not that big an imposition.

4    In many countries, they have compulsory national service and

5    compulsory military service, other things they demand directly

6    from their citizens.  We don't have that.  Most of us just go

7    about our day-to-day lives, and we enjoy the benefits of being

8    citizens of the United States, one of the wealthiest, freest,

9    most robust countries in the world, and besides paying our

10   taxes, we don't really have to do anything directly.  In jury

11   service, you do.

12        Now, obviously, I can make the decision in this case.

13   That's my job.  I make decisions for a living.  I work for you

14   actually.  You're my bosses.  I work for the people of the

15   United States and particularly this Northern District, and I

16   make decisions every day.  I make a lot of decisions every day,

17   and in some cases in what we call bench trials, I actually make

18   the decision in that case.  I just know how it comes out.

19        But 200 years ago -- more than 200 years ago now when the

20   Founding Fathers -- we didn't have Founding Mothers back

21   then -- the Founding Fathers put together the country, they

22   decided they didn't want judges making the decisions in every

23   case.  They didn't because one person with one person's point

24   of view taking a look at the evidence wasn't going to produce

25   as good a result as 12 people picked from the community.

 1          And the American right to a jury trial has been a beacon, I

 2     think, in our country ever since the country was founded, and

 3     it has produced very, very good results, and it has meant that

 4     the results in these trials -- they reflect the views of the

 5     community in which the trials take place.

 6          And that's what the parties in this case decided, too.

 7     They didn't want a judge to decide this trial.  They could have

 8     said that, but they didn't want me.  It doesn't hurt my

 9     feelings they didn't want me.  They wanted you.  So that's why

10     you're here.

11          The other thing I will tell you is that just knowing that

12     right is out there, the right to a trial by a fair and

13     impartial jury, is one of the most important rights we have,

14     and we never know when we're going to need it.  We don't know

15     that.

16          How many people in this room have said to themselves,

17     "Exactly two years from now, I'm going to need to file a

18     lawsuit" -- right? -- or "I'm going to be sued.  I don't know

19     by whom.  I don't know why.  Someone is going to sue me" or

20     "I'm going to be charged with a crime" or "I'm going to be a

21     victim of a crime"?

22          No one is doing that.  You can't do that.  It's not

23     possible.  Well, parties in a lawsuit don't know that, either.

24     So for the right to a jury trial to stay alive, we all need to

25     do our part when we get a jury summons.

1        I'm going to make you a promise.  If you are the victim of

2    a crime or you're charged with a crime, you're suing somebody

3    for money or you're being sued for money, here's something that

4    you would not tell your lawyer.  I promise you this.  You will

5    not tell your lawyer this.  "Please find me a jury of 12 people

6    who have nothing better to do.  That's the jury I want.  I want

7    people who have nothing going on in their lives.  I want people

8    with no life experience.  That's who I want on my jury."

9        Of course you wouldn't tell your lawyer that.  Why would

10   you?  Those people wouldn't make good decisions.  So instead,

11   what the lawyers want, what the parties want, is people like

12   you who have a lot of other things going on in their lives, and

13   it is an imposition.  We get that.  We're going to use your

14   time productively.  I'm going to use your time productively.  I

15   still work for you, and I'm going to make sure we don't waste

16   your time, but we need exactly people like you.

17       Okay.  Before we go any further, I'm going to ask the clerk

18   to administer an oath to you.  So please listen carefully.

19   This is the best courtroom deputy in California.  His name is

20   William Noble, and he's got some instructions for you.

21       Mr. Noble?

22           THE CLERK:  Thank you, your Honor.

23       Will you all please rise.  Raise your right hand.

24       You and each of you do solemnly swear or affirm that you

25   will -- that you will truly answer to such questions as shall

 1    be put to you touching upon your qualifications to serve as

 2    trial jurors in this case?

 3         (The prospective jurors answered in the affirmative.)

 4              THE CLERK:  Thank you.  You may be seated.

 5              THE COURT:  Okay.  You are here for a process called

 6    voir dire.  If you're from Texas, they say "voir dire."  I

 7    don't know why that is.  Voir dire is an attempt by the lawyers

 8    and the Court -- I call myself the Court -- the lawyers and the

 9    Court to find out more about you to make sure you'll be a good

10    fit on this jury.

11         All of you will be good jurors.  All of you can be good

12    jurors.  The question is:  Are you the right juror for this

13    case?  That's the point of this process.  We need to determine

14    whether any of you needs to be excused for cause, which means

15    that there's something about your background or life experience

16    or views that makes you unable to sit on this particular jury

17    or to enable the lawyers to exercise what we call peremptory

18    challenges, which are challenges where the lawyers don't have

19    to give me a reason.  They can just ask me to excuse a juror,

20    and I grant that request.

21         Let me say a note about peremptory challenges so I don't

22    forget later.  Peremptory challenges are an important part of

23    this system.  You already know how much I like jury trials.

24    One of the reasons I like them so much is I think they're

25    really fair, and not only do I think that they're fair, the

1    litigants think they're fair.  The people who come to court

2    think jury trials are fair, and so our system has a reputation

3    for fairness.

4         One of the advantages to peremptory challenges is the

5    lawyers get to use their gut instinct a little bit.  They may

6    not even have a reason, and that's fine because at the end of

7    the process, now we have a jury that both sides have a lot of

8    confidence in.  They really feel good about the trial, and they

9    feel good about the result.

10        When a lawyer exercises a challenge, whether it's for cause

11   or a peremptory challenge or something else, don't speculate

12   about the reason because it's not important.  It doesn't have

13   any bearing on the outcome of the case.  Okay?  It's just an

14   important part of our process so both sides have confidence in

15   the system.

16        Let me talk about scheduling.  You have already had to fill

17   out an availability questionnaire downstairs, and I'll just

18   remind you of what it says.  We'll go as late as we need to

19   today and tomorrow just to make sure we get a jury picked

20   because most of you won't be on the jury and I want to get you

21   home if you're not going to be helping us on this trial, and

22   then after that, our schedule will be 8:30 to 1:30 Monday

23   through Thursdays.

24        The advantage of that schedule is for me.  I have about 300

25   cases.  So I need to be able to work on the other 299 of them,

1      and that gives me the ability to do that, but for you, it gives

2      you the ability to get back to work or get back to your

3      families and at least spend part of the day with them.  At the

4      very least, you can beat the worst of the rush hour in the

5      afternoon.  So I have a lot of success with that schedule.

6          You will not be in session on Fridays.  We will not be in

7      session on Fridays.  There's one exception to that, and that is

8      when the jury has the case and you're deliberating at the end

9      of the case.  I can't know what Friday that will be.  The

10     chances are good that I will want you to deliberate on Friday

11     also, and that way, your trial can be done sooner rather than

12     later, but just bear that in mind as we're approaching that

13     Friday.

14         The other exception is that the note on this availability

15     questionnaire said there will not be any trial on March 10th,

16     and that's no longer true.  We will be in session next Monday.

17     It turns out that we had some scheduling problems that we were

18     able to resolve, but we will not be in session this Thursday.

19     That's still true.  You won't be in session this Thursday

20     because I have another case in here that's going to take all

21     day.  That's the scheduling.

22         Let me tell you a little bit about this case so you'll know

23     why you've been called here to sit as jurors.  This is a

24     criminal case brought by the United States Government.  The

25     defendant is named Susan Xiao-Ping Su.  The Government has

1    charged Ms. Su with wire fraud, mail fraud, visa fraud, use of

2    false documents, false statements to a government agency, alien

3    harboring, unauthorized access of a government computer, and

4    money-laundering.

5        The charges against Ms. Su are contained in a written

6    document called an indictment.  The indictment simply describes

7    the charges the Government brings against the defendant.  The

8    indictment is not evidence and does not prove anything.

9        Ms. Su has pleaded not guilty to those charges and is

10   presumed innocent unless and until the Government proves her

11   guilty beyond a reasonable doubt.  In addition, Ms. Su has the

12   right to remain silent and never has to prove her innocence or

13   to present any evidence.

14       Let me just pause there and emphasize something to you.  If

15   you are asked right now what your vote in this case would be,

16   it would be not guilty because you've not received any evidence

17   in this case.  You don't know anything about this case except

18   that I've summarized what the charges are against the

19   defendant, but the charges are not evidence.

20       In order to give you some background to assist you during

21   jury selection, however, I do want to give you a brief summary

22   of the allegations against Ms. Su, and I'll remind you again

23   that these are only allegations, and the Government has to

24   prove its case beyond a reasonable doubt.  Also, each crime the

25   Government has charged consists of specific elements the

1    Government has to prove.  If you're selected for the jury, I'll

2    tell you what those elements are later, but for now, here's a

3    brief summary.

4         The indictment in this case charges Ms. Su with

5    establishing a university in the City of Pleasanton called

6    Tri-Valley University or TVU.  The indictment charges that Ms.

7    Su caused TVU to submit various forms to the United States

8    Government to obtain approval to admit foreign students and to

9    assist those students in obtaining visas that allow the

10   students to stay in the United States.  The Government alleges

11   that Ms. Su provided false information on the forms or directed

12   others to falsify the information on the forms.

13        For example, the Government alleges that Ms. Su made false

14   representations about TVU's facilities, personnel, courses, and

15   other factual matters.  The Government also alleges that Ms. Su

16   stated that students were attending classes at TVU, that the

17   students were not, in fact, attending or did not exist.  These

18   are only examples.

19        The Government also alleges that TVU admitted students

20   without regard to their academic qualifications or intent to

21   pursue a full course of study so that Su and TVU could obtain

22   their tuition money.  The Government charges that Su paid a

23   portion of these tuition monies to recruiters as commissions

24   for referrals of new alien students.

25        The Government also alleges that Ms. Su and others engaged

 1      in a scheme to defraud nonimmigrant aliens, which means persons

 2      from other countries, of their money and property.  It alleges

 3      that she used the proceeds of this criminal activity to

 4      purchase items for herself, including three homes and a

 5      Mercedes Benz automobile.

 6          Again, the fact that Ms. Su is accused of these crimes is

 7      not evidence of anything.  You must presume Ms. Su to be

 8      innocent unless and until the Government proves the charges

 9      against her beyond a reasonable doubt.

10          Let me ask counsel for the Government to introduce

11      themselves again.  This time, they'll be facing you in case you

12      weren't able to hear them when they made their appearances.

13      Let me ask the Government to also introduce their case agent

14      and ask Mr. Babcock to introduce the defendant.

15          Will the Government go first?

16          MR. RHYNE:  Good morning.  My name is Wade Rhyne, and

17      I represent the United States.

18          MS. WEST:  Hartley West.  I'm the Assistant U.S.

19      Attorney.  I'm also representing the United States.

20          SPECIAL AGENT MACKEY:  Jason Mackey, Special Agent

21      for the Homeland Security.

22          THE COURT:  Mr. Babcock?

23          MR. BABCOCK:  Thank you, your Honor.

24          Good morning again.  My name is Erik Babcock, and I

25      represent Susan Su, who's right here next to me.

1          MR. MORLEY:  Matt Kevin Morley, and I am assisting

2     the defendant Ms. Su.

3          THE COURT:  All right.  Thank you.

4       When it's your turn in the jury box -- or some of you will

5     be seated on the first bench inside the rail there -- and

6     you're being questioned if you know any of the persons that

7     you've just been introduced to, please make sure that you tell

8     me that so we can talk about that and determine whether that

9     would affect your ability to be fair and impartial in this

10    case.

11       At this time, I'm also going to read you a list of

12    potential witnesses in this case.  The list is kind of long.

13    So I need you to pay very close attention.

14       Can I also ask:  Can everybody hear me okay?

15          PROSPECTIVE JURORS:  Yes.

16          THE COURT:  All right.  If you cannot hear me right

17    now, would you raise your hand?

18       Okay.  I'm not seeing any hands.

19       You'll see me do that a lot this morning.  You'll see me

20    say, "I'm not seeing any hands."  You may wonder, "Why does he

21    keep saying that?"  And that's because our very able court

22    reporter, Mr. Pence, is making a written record of everything

23    that happens in court, and so sometimes I need to draw a word

24    picture for the transcript.

25       If at any time you cannot hear me, raise your hand,

1      interrupt me, and we'll get you an assisted listening device,

2      or we'll move you closer or do something else.  Effective

3      immediately, you are judges in this case.  You are the judges

4      of facts.  You just became the most important people in the

5      room, and that means you need to be able to hear everything

6      very clearly, and if I'm not doing a good job on that, I need

7      you to tell me.

8           Now, I'm going to read you a list of the witnesses in this

9      case.  Please pay attention.  It may be you recognize a name

10     but you don't know the person, but if you recognize the name

11     and think you might know the person, tell us that when it's

12     your turn to speak because you're sitting on the first bench or

13     in the jury box.

14          The following persons may not all be called as witnesses,

15     and in addition, it may be that the parties find it necessary

16     to call additional persons I don't list now, but for now, these

17     are the possible witnesses in this case:

18          Vishal Dasa, Anji Dirisanala, Tushar Tambe, Ramakrishna

19     Karra, Parth Patel, Naveen Kumar Kundar, Latha Chathri, Sophie

20     Su, Wenchao Wang, who is also known as Vince Wang, Renu Philip,

21     Prasad Aluru, Guarav Bhatia, Bhargav Boinpally, Hamat Can

22     Gencer.

23          Rebecca David, Bhanu Challagundla, Kalpana Challa, Vandana

24     Virmani, Adarshynam Vontivalo, Santhosh Sabu Ignatius, Susanna

25     Daniel Varghese, Vijay Amruth Chepuri, Abdul Bari Syed, Reveesh

1    Jangiti, Vinay Kumar Baluguri, Sudarshan Jaya Rao Mamiduri,

2    Kabin Karki, Rajitha Kasula, Syed Masood Ahmed, Shivkumar

3    Baburao Vendra, Hari Parvathaneni, Alexander Avinash, Shane

4    Clayburn, Harsha Parvataneni, Tulasi Paveneni -- excuse me --

5    Tulasi Papeneni, Rizwan Uddin Mohammed.

6         Special Agent Mackey, who you just met, Special Agent Dale

7    Taylor, Special Agent Dylan Critten, Special Agent David

8    Ramirez, Special Agent Rajeev Bhatia, Special Agent Christopher

9    Purfeerst, Special Agent Diana Alvarez, Special Agent Daniel

10   Mills, Special Agent Brian Jang, Coy Wells.

11        Shy Shenq Liou, Xaio Gang Su, also known as Sean Su, Gail

12   Evans, David Nickerson, A. Allen Miller, Gary Fan, Qi Jin, Nik

13   Tehrani, Hao Lieu -- or Luo, Amy Ming Tang Guo, Mark Angel,

14   Carolyn Bayer-Broring, Jason Kanno, Special Agent William

15   Elliott, and Michael Brown.

16        Again, it may be not all these witnesses are called.  It

17   may be that the parties find it necessary to call other persons

18   who I might have not named.

19        At this time, I'm going to ask Mr. Noble to call 18 names.

20   You'll see that each of the seats has a number on it, and

21   behind the number are several questions that we'll ask you to

22   answer once you get in that seat.

23        Before we do that, let me say a few things about mechanics.

24   The system of jury selection is called a six-pack system.  That

25   isn't very judicial-sounding.  I did not choose that name, but

1     that's what it's called.  It's called a six-pack.  So there

2     will be 12 jurors in the box, and there will be six of you

3     against the row there.

4          I just want to remind you again that at some point the

5     lawyers will exercise challenges, and you're not to speculate

6     about the reason for those challenges or hold it against one

7     side or the other because the reasons for the challenges are

8     not important.

9          Even if you're not selected to sit in the six-pack of the

10    jury box, it's very important that you pay close attention to

11    the proceedings because we don't want to have to start all over

12    again every time we refill that six-pack.  You do not want to

13    be here all day while we are having to do a bunch of

14    unnecessary questioning.

15         So I ask:  Please pay very close attention.  Do not have

16    your cell phone on.  Do not text your friend.  Do not read the

17    newspaper.  Do not do any of that.  Pay close attention to the

18    questions so that when we get to you, we can say, "Having heard

19    the questions that the Court or the lawyers asked previously,

20    do you have any information that the Court and counsel need to

21    be aware of?"

22         Okay.  Thank you.

23         Mr. Noble, would you please call our first 18 names.

24              THE CLERK:  Yes, your Honor.

25         Seat No. 1, Brigitte Nager, N-a-g-e-r.  Step forward,

```
1     please.
2            THE COURT:  Let me say a word about names.  My name
3     is Jon Tigar.  You pronounce it just like the animal,
4     T-i-g-a-r.  No one ever pronounces it correctly.  So if we
5     mispronounce your name and when I get to the point where I'm
6     talking to you, tell me how we pronounce your name correctly
7     because that's how we want to do it.
8         Mr. Noble?
9            THE CLERK:  Seat No. 2, Mari Taruc, T-a-r-u-c.
10        Seat No. 3, Jessica Ruiz Ortega, R-u-i-z, O-r-t-e-g-a.
11        Seat No. 4, Jeanne Jones, J-o-n-e-s.
12        Seat No. 5, Steven Sockolov, S-o-c-k-o-l-o-v.
13        Seat No. 6, Georgia Rudderow, R-u-d-d-e-r-o-w.
14        Seat No. 7, Jeanette Davison, D-a-v-i-s-o-n.
15        Ms. Davison, you'll be sitting right here.
16        Seat No. 8, Ellen Fitzgerald, F-i-t-z-g-e-r-a-l-d.
17        Seat No. 9, Patti Coleman, C-o-l-e-m-a-n.
18        Seat No. 10, Shawn Gagnon, G-a-g-n-o-n.
19        Seat No. 11, Julito Camarillo, C-a-m-a-r-i-l-l-o.
20        Seat No. 12, Gail Tam, T-a-m.
21        And starting with the seat in the first row of the benches
22    on this side of the swinging gate, Seat No. 13, Gabrielle
23    Brandon, B-r-a-n-d-o-n.
24        Seat No. 14, Elena Flowers, F-l-o-w-e-r-s.
25        Seat No. 15, Charlene Morgan-Stenhouse, M-o-r-g-a-n,
```

1          hyphen, S-t-e-n-h-o-u-s-e.

2                Seat No. 16, Cathy Schroeder, S-c-h-r-o-e-d-e-r.

3                Seat No. 17, Manuela Higgins, H-i-g-g-i-n-s.

4                Seat number 18, Bernadette Fisher, F-i-s-h-e-r.

5                THE COURT:  Mr. Noble, would you give the wireless

6          microphone to the juror in Seat No. 1, please.

7                THE CLERK:  Yes, your Honor.

8                THE COURT:  Folks, on the back of the numbered pieces

9          of papers, there are standard questions we'd like to start

10         with.  I'm going to have some questions for all of you, but

11         before we get to that, I'd like you to just provide the basic

12         information that's contained on the back of the form.

13               And, Juror No. 1, I'm going to refer to you -- to your

14         juror number because I don't want to mispronounce your last

15         name.  Would you start us off, please.

16               PROSPECTIVE JUROR NAGER:  My name is Brigitte Nager.

17               THE COURT:  Very good.

18               And would you answer the questions on the back of that

19         form, please.

20               PROSPECTIVE JUROR NAGER:  I live in Redwood City.  I

21         work as a systems security agent for Visa.  I'm married, no

22         children.  My husband is a general contractor, and I have no

23         prior jury experience.

24               THE COURT:  Thank you, ma'am.

25               PROSPECTIVE JUROR TARUC:  I'm Mari Rose Taruc,

1    Oakland, California.  I'm a community organizer on

2    environmental and economic justice issues in the Asian and

3    Pacific Islander community.  I'm married.  My husband is an

4    architect.  I have two children, school-age, and I have no

5    prior jury experience.

6                THE COURT:  Ms. Turac -- am I saying that correctly?

7                PROSPECTIVE JUROR TARUC:  Taruc.

8                THE COURT:  Taruc.

9                PROSPECTIVE JUROR RUIZ ORTEGA:  Hi.  I'm Jessica --

10                THE COURT:  Hold on just one second.

11        Ms. Taruc, who's your employer if you have one?

12                PROSPECTIVE JUROR TARUC:  Asian Pacific Environmental

13    Network.

14                THE COURT:  Okay.  Thank you.

15                PROSPECTIVE JUROR RUIZ ORTEGA:  I'm Jessica Ruiz

16    Ortega.  I live in San Rafael in Marin County.  I am an

17    eligibility worker for Health and Human Services.  I am single.

18    I live alone, no children, and I have no prior jury experience.

19                PROSPECTIVE JUROR JONES:  My name is Jeanne Jones,

20    and I live in Martinez in the East Bay.  I'm an elementary

21    school teacher.  I'm married.  The immediate household is my

22    husband, and he is self-employed.  I have three adult children.

23    One is a -- works in public health, one is a geologist, and one

24    has an economics degree and works with the University of

25    California.  I have no prior jury experience.

1          THE COURT:  Ma'am, what general field of work is your

2     husband in?

3          PROSPECTIVE JUROR JONES:  He's a Christmas tree lot

4     salesman and grows Christmas trees.

5          THE COURT:  One of the great things about jury

6     selection is if you're -- we're judging you a lot of times, and

7     eventually you get to find out about every occupation in the

8     world, and it is totally great.  It's one of my favorite

9     things.  Thank you for that.

10        Would you pass the microphone to your right, please.

11        PROSPECTIVE JUROR SOCKOLOV:  Hi.  My name is Steven

12    Sockolov.  I live in Noe Valley.  I'm in the apparel

13    manufacturing business.  I have a mid-wear company with a

14    partner.

15                    (Court reporter clarification.)

16        PROSPECTIVE JUROR SOCKOLOV:  Mid-wear company with a

17    partner, partnership.

18        I'm married.  I have three adult children that don't live

19    in the house.  One is a cross-fit trainer, my oldest.  My

20    daughter works for a bank in San Francisco, and my youngest son

21    is currently in rehab.  I also have a stepson who is in first

22    year of college.  I have --

23        THE COURT:  Mr. Sockolov, is your spouse working

24    outside of the home?

25        PROSPECTIVE JUROR SOCKOLOV:  Yes.

1          THE COURT:  And what does that person do?

2          PROSPECTIVE JUROR SOCKOLOV:  She owns an art gallery

3     in San Francisco.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR SOCKOLOV:  I have served on a jury.

6     It was a -- it was a criminal case.

7          THE COURT:  Tell me a little bit about that.  How

8     long ago was that?

9          PROSPECTIVE JUROR SOCKOLOV:  15 years ago.  In Marin

10    County.

11         THE COURT:  In the State Superior Court over there?

12         PROSPECTIVE JUROR SOCKOLOV:  Yes.  Uh-huh.

13         THE COURT:  What was the charge against the

14    defendant?  Do you remember?

15         PROSPECTIVE JUROR SOCKOLOV:  Yes.  It was a domestic

16    abuse -- spousal abuse case.

17         THE COURT:  And without telling me what the verdict

18    in the case was, did the jury reach a verdict?

19         PROSPECTIVE JUROR SOCKOLOV:  Yes.

20         THE COURT:  Were you the foreperson?

21         PROSPECTIVE JUROR SOCKOLOV:  No.

22         THE COURT:  Thank you, sir.

23         PROSPECTIVE JUROR RUDDEROW:  Good morning.  Excuse

24    me.  I have a little bit of a scratchy voice today.

25         My name is Georgia Rudderow.  I live in Oakland,

1    California.  I am a district manager for Play-Well TEKnologies.

2    We're a company teaching engineering to kids through play with

3    Lego's.  I am single.

4        Members of my immediate household.  I live alone, no

5    children, and I have no prior jury experience.

6            THE COURT:  Thank you.

7        Would you pass the microphone down to the juror sitting in

8    Seat No. 7, please.

9            PROSPECTIVE JUROR DAVISON:  My name is Jeanette

10   Davison.  I live in Woodacre in Marin County.  I work at

11   College of Marin as an adopted PE instructor's aide.  I am

12   single, I have a roommate that works at a music warehouse, and

13   no jury experience.

14           PROSPECTIVE JUROR FITZGERALD:  My name is Ellen

15   Fitzgerald.  I live in Burlingame in San Mateo County.  I just

16   retired from working with Holt International Children's

17   Services at San Francisco Airport as transit director for

18   children, babies coming into the country to be adopted, and

19   also director of volunteers.

20       I'm not married.  I live in a -- kind of a large household.

21   It's an intentional community.  So there are about 25 other

22   people living there.  Your Honor, I don't know if you want me

23   to go through all their occupations.

24           THE COURT:  No.  Thank you.  I'm very glad that you

25   let us know that.

1    You will hear, Ms. Fitzgerald, later on that there will be

2    questions about whether there's anybody in your close circle of

3    family or friends who has experience with a similar kind of

4    case or has law enforcement training, that sort of thing.  You

5    should include your household members in your answers to those

6    questions, but I think for now we don't need to know the

7    occupations of any of them.

8        Thank you.

9            PROSPECTIVE JUROR FITZGERALD:  Thank you.

10    I have no children, and I've never been on a jury before.

11            THE COURT:  Thank you, Ms. Fitzgerald.

12            PROSPECTIVE JUROR COLEMAN:  My name is Patti Coleman.

13    I live in Antioch, which is in Contra Costa County.  I'm a

14    nurse.  I work for the Antioch Union High School District.  My

15    marital status is divorced.  I do have a boyfriend, and I have

16    two school-age children that live in my household, and I have

17    no prior jury experience.

18            THE COURT:  Ms. Coleman, can you tell me, is your

19    boyfriend working right now?

20            PROSPECTIVE JUROR COLEMAN:  Yes.

21            THE COURT:  What line of work is he in?

22            PROSPECTIVE JUROR COLEMAN:  He's a welder for PG&E on

23    the gas pipeline sort of work.

24            THE COURT:  Very good.  Thank you.

25            PROSPECTIVE JUROR GAGNON:  My name is Sean Gagnon.  I

1    live in San Francisco.  I work for Bayer HealthCare over in

2    Berkeley, California.  I am single.  I do have a partner that

3    lives with me.  He works -- he's self-employed, and in San

4    Francisco, he has his own retail outlet for furniture.  I do

5    not have any children.  I have served on a jury down the hall

6    here.

7             THE COURT:  In the Federal Court?

8             PROSPECTIVE JUROR GAGNON:  Yes.

9             THE COURT:  Yeah.  We don't -- we occupy a small part

10   of the business of the courts.  So we don't get a lot of repeat

11   players in the Federal Court.  Tell me about that.

12            PROSPECTIVE JUROR GAGNON:  I -- yeah, I agree.

13            THE COURT:  How long -- how long --

14            PROSPECTIVE JUROR GAGNON:  I should join the lottery

15   or something.

16            THE COURT:  Yeah.  How long ago was that?

17            PROSPECTIVE JUROR GAGNON:  About four years ago,

18   maybe three years ago.

19            THE COURT:  Criminal case or civil?

20            PROSPECTIVE JUROR GAGNON:  It was a civil case.

21            THE COURT:  And just in general terms, what was the

22   case about?

23            PROSPECTIVE JUROR GAGNON:  It was two medical device

24   companies, patent attorney -- or patent claims.

25            THE COURT:  And did -- was the jury able to reach a

1    verdict in that case?

2             PROSPECTIVE JUROR GAGNON:  Yes.

3             THE COURT:  Were you the foreperson?

4             PROSPECTIVE JUROR GAGNON:  No.

5             THE COURT:  You indicated you're working for Bayer

6    HealthCare over in Berkeley?

7             PROSPECTIVE JUROR GAGNON:  Yes.

8             THE COURT:  That's that big campus at the bottom of

9    Dwight?

10            PROSPECTIVE JUROR GAGNON:  Yes.

11            THE COURT:  What kind of work do you do there?

12            PROSPECTIVE JUROR GAGNON:  I'm a supply chain.  I

13   manage the buyer/planners as well as doing master data.

14            THE COURT:  Very good.  Thank you, Mr. Gagnon.

15            PROSPECTIVE JUROR CAMARILLO:  I am Julito Camarillo.

16   I live in Daly City.  I am single, living with my sisters.  My

17   sister works with the Department of Insurance as a clerk, and

18   the other one is a nursing -- street nursing facility.  I

19   served one time as a juror, a civil case.

20            THE COURT:  Mr. -- it's Camarillo; correct?

21   Mr. Camarillo, do you -- was that in County Court or the

22   Federal Court?

23            PROSPECTIVE JUROR CAMARILLO:  Local court.

24            THE COURT:  In your local court.

25        Do you remember what that civil case was about?

```
1              PROSPECTIVE JUROR CAMARILLO:  It was a

2    landlord/tenant case.

3              THE COURT:  Okay.  Like a -- okay.  A landlord/tenant

4    case.

5        And was the jury able to reach a verdict?  Did the jury

6    reach a verdict in the case?

7              PROSPECTIVE JUROR CAMARILLO:  The jury verdict, you

8    mean?

9              THE COURT:  Yeah.  Was the jury able to make a

10   decision?

11             PROSPECTIVE JUROR CAMARILLO:  Yeah, we have a

12   verdict.  The landlord won.

13             THE COURT:  The landlord.

14       Okay.  And were you the foreperson?  Were you in charge of

15   the jury?  Can you hear me okay?

16             PROSPECTIVE JUROR CAMARILLO:  Your Honor, my hearing

17   is not -- not very good.

18             THE COURT:  Okay.  I figured I'm not being clear.

19             PROSPECTIVE JUROR CAMARILLO:  I don't understand.

20             THE COURT:  Or you're not --

21             PROSPECTIVE JUROR CAMARILLO:  I can hear --

22             THE COURT:  Do me a favor.

23             PROSPECTIVE JUROR CAMARILLO:  -- the words -- I can't

24   understand so well -- so well.  So the listening device

25   option --
```

1              THE COURT:  Mr. Camarillo, can you hear me now?  Can

2        you hear me?

3              PROSPECTIVE JUROR CAMARILLO:  Yes.

4              THE COURT:  Okay.  Were you the foreperson on the

5        jury?  Were you in charge of the jury?

6              PROSPECTIVE JUROR CAMARILLO:  I don't understand,

7        your Honor, the words you're talking about.

8              THE COURT:  Okay.  The -- when a jury makes a

9        decision, one juror is in charge of the deliberations.  That

10       juror is called the foreperson or the presiding juror.

11             PROSPECTIVE JUROR CAMARILLO:  I'm not the foreman.

12             THE COURT:  You were not the foreman.

13          Okay.  If you're selected for this jury, I'm going to do

14       something to make sure you can hear.

15          Okay.  Can you hear me right now?

16             PROSPECTIVE JUROR CAMARILLO:  The words you're -- I

17       don't understand what --

18              THE COURT:  Okay.

19             PROSPECTIVE JUROR CAMARILLO:  That's my --

20             THE COURT:  Okay.  Mr. -- yeah.  Mr. Camarillo, you

21       indicate -- you've not told me -- do you work right now?  Do

22       you have a job right now?

23             PROSPECTIVE JUROR CAMARILLO:  I don't understand.

24             THE COURT:  Can I see counsel at sidebar, please.

25                        (Unreported sidebar.)

```
 1              THE COURT:  Mr. Camarillo, I want to have a further
 2     conversation with you about hearing --
 3              PROSPECTIVE JUROR CAMARILLO:  Okay.
 4              THE COURT:  -- English, et cetera, but I want to do
 5     that at a break.  So I'm going to ask you to go back into the
 6     audience, and I'm going to ask Mr. Noble to call another name
 7     to take your seat.
 8          Okay.  Would you go sit in the audience, please, and you
 9     and I will talk at a break.
10          Mr. Noble, may I have -- may I ask you to call one
11     additional name randomly and have the juror sit in Seat No. 11?
12              THE CLERK:  Yes, your Honor.
13          Charlie Allums, A-l-l-u-m-s.
14              THE COURT:  Good morning Ms. Allums.
15              PROSPECTIVE JUROR ALLUMS:  Good morning.
16              THE COURT:  Could I ask you to answer the questions
17     on the back of that form there?
18              PROSPECTIVE JUROR ALLUMS:  My name is Charlie Allums.
19     I'm a resident of El Cerrito, California.  I'm a retired
20     elementary teacher.  I am divorced.  I have three children and
21     one who is currently living with me.  I have my -- one son is
22     an elementary school teacher.  The other one is employed with
23     the Convergent Media Systems in Georgia.  I've had one jury
24     experience, I think, and --
25              THE COURT:  You have a child working for Convergent
```

1    Media right now?

2              PROSPECTIVE JUROR ALLUMS:  Yes.

3              THE COURT:  Man or a woman?

4              PROSPECTIVE JUROR ALLUMS:  Man.

5              THE COURT:  And what does he do for that company?

6              PROSPECTIVE JUROR ALLUMS:  I'm not even positive what

7    he does.

8              THE COURT:  It's probably not going to affect your

9    jury service.  So that's okay.

10        And you have one living with you now?

11             PROSPECTIVE JUROR ALLUMS:  My daughter.

12             THE COURT:  And is she working right now?

13             PROSPECTIVE JUROR ALLUMS:  No.  She's in a Master's

14   program.

15             THE COURT:  Oh.  Interesting.

16        In what discipline?

17             PROSPECTIVE JUROR ALLUMS:  Comparative literature, I

18   guess.

19             THE COURT:  I don't think there are going to be that

20   many comparative literature questions in this trial.  I'm just

21   guessing.  I haven't seen all the evidence.

22        You were on a jury before; correct?

23             PROSPECTIVE JUROR ALLUMS:  Yes.

24             THE COURT:  How long ago was that?

25             PROSPECTIVE JUROR ALLUMS:  Probably 15 years or so.

1                THE COURT:  Civil or criminal?

2                PROSPECTIVE JUROR ALLUMS:  It was a welfare fraud

3      case.

4                THE COURT:  And did the jury reach a verdict in that

5      case?

6                PROSPECTIVE JUROR ALLUMS:  Yes.

7                THE COURT:  Were you the foreperson?

8                PROSPECTIVE JUROR ALLUMS:  No.

9                THE COURT:  Okay.  Thank you.

10          Ma'am, would you pass the microphone to your right, please.

11               PROSPECTIVE JUROR TAM:  My name is Gail Tam.  I live

12     in Concord, California.  I was a senior recruiter for a

13     financial services industry.  I'm currently retired.  I'm

14     married.  I live with my husband, who is also retired.  We have

15     two kids.  One is a certified financial advisor, and the other

16     one is a social worker working with the Oakland Unified School

17     District, and her responsibility is to work with parents of

18     homeless children to get them assigned to a school.

19          I have had one prior jury experience, and it was working --

20     it was with a case regarding theft.  I was not the jury

21     foreman.

22               THE COURT:  Did the jury reach a decision in that

23     case?

24               PROSPECTIVE JUROR TAM:  Yes.

25               THE COURT:  And you indicated that your husband is

1     also retired.  What kind of work was he in prior to his

2     retirement?

3                PROSPECTIVE JUROR TAM:  He was a director of

4     operations for Wente.

5                THE COURT:  That's the winery?

6                PROSPECTIVE JUROR TAM:  Yes.

7                THE COURT:  Thank you.

8        Would you please pass the microphone to that young woman

9     who's got her hand stretched out.

10               PROSPECTIVE JUROR BRANDON:  My name is Gabrielle

11    Brandon, and I live in Oakland, California.  I'm a Human

12    Resources technician employed by the Superior Court of Alameda

13    County.

14               THE COURT:  Let's stop right there for just one

15    second.

16       Now, Ms. Brandon, you and I know each other; is that true?

17               PROSPECTIVE JUROR BRANDON:  Yes.  Yes.

18               THE COURT:  And that's because I used to be a judge

19    on the Alameda County Superior Court?

20               PROSPECTIVE JUROR BRANDON:  Correct.

21               THE COURT:  And that's your current employer?

22               PROSPECTIVE JUROR BRANDON:  Correct.

23               THE COURT:  And you and I have probably known each

24    other the entirety of the time that I was employed with the

25    Alameda County Superior Court?

```
 1                    PROSPECTIVE JUROR BRANDON:  Yes.

 2              THE COURT:  Okay.  You and I have never had any

 3       social interaction?

 4                    PROSPECTIVE JUROR BRANDON:  No.

 5              THE COURT:  And you've never worked in the courtroom

 6       environment on any case that I have?  You've never worked in

 7       the courtroom environment with me?

 8                    PROSPECTIVE JUROR BRANDON:  Never.

 9              THE COURT:  And our interaction was limited to --

10                    PROSPECTIVE JUROR BRANDON:  It was very limited,

11       just --

12              THE COURT:  On occasion, there would be meetings, and

13       you would be responsible for setting up those meetings or

14       taking notes, that sort of thing.  Does that sound right?

15                    PROSPECTIVE JUROR BRANDON:  Yes.  Correct.

16              THE COURT:  You and I are both kind of friendly

17       people.

18                    PROSPECTIVE JUROR BRANDON:  Yeah.

19              THE COURT:  So we've chatted -- we've chatted many

20       times when I was in state court; true?

21                    PROSPECTIVE JUROR BRANDON:  That's true.

22              THE COURT:  All right.  Well, the lawyers may have

23       further questions about that.  I just want to make sure that

24       that was a complete part of the record.

25          So you are a Human Resources technician at the Alameda
```

1        County --

2                    PROSPECTIVE JUROR BRANDON:  Courthouse, yes.

3                    THE COURT:  -- Superior Court?

4                    PROSPECTIVE JUROR BRANDON:  Superior Court of Alameda

5        County.

6                    THE COURT:  Okay.  And please answer the rest of the

7        questions.

8                    PROSPECTIVE JUROR BRANDON:  Yes.

9           I am married.  I live with my husband, who is a substance

10       abuse counselor as well as a pastor, and I have a 15-year-old

11       son who's in high school in Oakland.  I have no adult children.

12       I did serve on a jury trial.  I want to say it was in 2006, and

13       it was a criminal trial in the Alameda County Superior Court.

14                    THE COURT:  Do you remember what the defendant was

15       charged with?

16                    PROSPECTIVE JUROR BRANDON:  Murder.

17                    THE COURT:  Did the jury reach a verdict in that

18       case?

19                    PROSPECTIVE JUROR BRANDON:  We did.

20                    THE COURT:  Were you the forewoman?

21                    PROSPECTIVE JUROR BRANDON:  I was not.

22                    THE COURT:  Very good.

23           Thank you, Ms. Brandon.

24                    PROSPECTIVE JUROR FLOWERS:  Good morning.

25           My name is Elena Flowers.  I also live in Oakland.  I'm a

1    member of the faculty at UCSF.  I'm married to my husband,

2    who's a high school principal in San Francisco.

3              THE COURT:  Can I ask you to slow down just a tad?

4              PROSPECTIVE JUROR FLOWERS:  Sure.

5        I have two children, eight months and 4, and I have

6    previously been on a jury in Superior Court in Alameda County.

7    It was a civil case, personal injury, and a verdict was

8    reached, and I was not the foreperson.

9              THE COURT:  I'm going to ask you just one follow-up

10   question, but it's going to take me a second to write all of

11   that down.

12             PROSPECTIVE JUROR FLOWERS:  Sure.

13             THE COURT:  You said it was a civil case that you

14   were on?

15             PROSPECTIVE JUROR FLOWERS:  That's right.

16             THE COURT:  And a verdict was reached?

17             PROSPECTIVE JUROR FLOWERS:  That's right.

18             THE COURT:  And you were not the foreperson.

19        You indicated you're here on the faculty at UCSF?

20             PROSPECTIVE JUROR FLOWERS:  That's right.

21             THE COURT:  That is the medical school of the

22   University of California or one of them?

23             PROSPECTIVE JUROR FLOWERS:  That's true.  I'm in the

24   faculty in the School of Nursing, though.

25             THE COURT:  Ah.  Very good.

```
 1              And -- and what particular discipline do you teach there at

 2       the School of Nursing?

 3              PROSPECTIVE JUROR FLOWERS:  I primarily do research.

 4       I also teach some courses in clinical genomics.  My background

 5       is as a cardiovascular nurse.

 6              THE COURT:  Very good.

 7          All right.  And should I be addressing you as Dr. Flowers?

 8              PROSPECTIVE JUROR FLOWERS:  Elena is fine.

 9              THE COURT:  Well, we're kind of on a last-name basis

10       here in court.  So I'll go with "Ms."  Does that work?

11              PROSPECTIVE JUROR FLOWERS:  Sure.

12              THE COURT:  Very good, Ms. Flowers.

13          Would you pass the mike over to the right, please.

14              PROSPECTIVE JUROR MORGAN-STENHOUSE:  My name is

15       Charlene Morgan-Stenhouse.  I'm a resident of Oakland,

16       California.  I'm a retired registered nurse.  I'm divorced.

17       I'm -- I live alone.  I have no children.

18          And I've had previous jury duty.  One was a civil case, and

19       I was an alternate, and the other was a criminal case.  It was

20       a DUI, and I was just a juror.

21              THE COURT:  In the DUI criminal case, did the jury

22       reach a verdict?

23              PROSPECTIVE JUROR MORGAN-STENHOUSE:  Yes, they did.

24              THE COURT:  Very good.

25          I will never say "just a juror."
```

```
 1              PROSPECTIVE JUROR MORGAN-STENHOUSE:  Yes.

 2              THE COURT:  I love my jurors.  Every juror is so

 3     important.

 4         Thank you, Ms. Morgan-Stenhouse.  Would you pass the

 5     microphone to your right, please.

 6              PROSPECTIVE JUROR SCHROEDER:  My name is Cathy

 7     Schroeder.  I live in San Rafael.  I am single, never married,

 8     no children.  I live alone.  I am a retired registered nurse,

 9     and I have one prior jury experience when I was living in San

10     Francisco.  It was a civil case involving Wells Fargo probably

11     25 or 30 years ago.

12              THE COURT:  Did -- were you the foreperson on that

13     jury?

14              PROSPECTIVE JUROR SCHROEDER:  No, I was not.

15              THE COURT:  Did they reach a verdict?

16              PROSPECTIVE JUROR SCHROEDER:  Yes.

17              THE COURT:  Thank you.

18              PROSPECTIVE JUROR HIGGINS:  My name is Manuela

19     Higgins.  I live in Livermore, California.  I'm an office

20     manager for Sunshine Home Healthcare.  I am married.  My

21     husband is an IT director in Berkeley.  My two kids -- my

22     daughter is a manufacturing engineer, and my son is a junior

23     studying engineering as well.

24         And I have had one jury experience, criminal trial, in

25     Sacramento 20 years ago, drive-by shooting.  There was a
```

```
 1    verdict, and I was not the foreperson.

 2              THE COURT:  Ma'am, who is your -- you indicated that

 3    your husband is an IT director in Berkeley.  Who's his

 4    employer?

 5              PROSPECTIVE JUROR HIGGINS:  Meyer Sound.

 6              THE COURT:  All right.  Very good.

 7         Thank you.

 8              PROSPECTIVE JUROR FISHER:  My name is Bernadette

 9    Fisher.  I live in Daly City, California.  I am a retired

10    widow.  I have three sons -- plumber, a police officer, and an

11    unemployed person -- and I have never been on a jury.

12              THE COURT:  Ms. Fisher, before you retired, what line

13    of work were you in?

14              PROSPECTIVE JUROR FISHER:  I was a bookkeeper --

15    bookkeeper administrative assistant.

16              THE COURT:  And prior to his death, what line of work

17    was your spouse in?

18              PROSPECTIVE JUROR FISHER:  He was a PG&E electrician.

19              THE COURT:  Thank you.

20         You indicated that you have no prior jury experience; is

21    that right?

22              PROSPECTIVE JUROR FISHER:  That's correct.

23              THE COURT:  Thank you.

24         Okay.  At this time, I'm going to ask each of you a few

25    questions.
```

1          And, members of the audience who have not yet been selected

2     for the jury, just sitting in the jury box or on the rail, I

3     say "yet" because as you know, some of these jurors are going

4     to be excused, and then you'll be asked to sit in those seats,

5     and so please pay -- excuse me.  Please pay close attention to

6     my questions so we don't have to start from scratch when it's

7     your turn.

8          Let me start with a relatively straightforward question.

9     Does any of the 18 of you know or think you know any of the

10    persons seated at counsel table or whose names I read to you

11    earlier?

12         I do not see any hands.

13         Has any of you heard or read -- oh, wait.  I do see a hand,

14    and is it Ms. Taruc?

15              PROSPECTIVE JUROR TARUC:  Yes.  There is a Special

16    Agent Rajeev Bhatia.

17              THE COURT:  Yes.

18              PROSPECTIVE JUROR TARUC:  Is that the same person who

19    was in the Public Health Department here in San Francisco?

20              THE COURT:  I don't think so.  I think for now you're

21    safe in assuming the answer to that question is no.  The

22    Government has indicated to me that that's not the same person,

23    but thank you.  It's better -- by the way, if you are on the

24    fence about raising your hand, please raise your hand.  We want

25    the facts.

1          Yes, Ms. Rudderow.

2               PROSPECTIVE JUROR RUDDEROW:  Yes.  The -- Susan --

3     help me with the name here.

4               THE COURT:  Susan Su.

5               PROSPECTIVE JUROR RUDDEROW:  Thank you.

6          She looks familiar, but I cannot place her face.

7               THE COURT:  Okay.  And as you sit here now, would it

8     be accurate to say that you don't know her?  You don't

9     recognize her in any particular way?

10              PROSPECTIVE JUROR RUDDEROW:  No, but she looks

11    familiar.

12              THE COURT:  Okay.  That's -- I think that's fine.

13         Has any of you heard or read anything about this case or

14    Tri-Valley University before this morning?

15         Okay.  Again, I'm not seeing any hands.

16         Let me say a little something about the difference in the

17    burden of proof between a criminal case and a civil case

18    because some of you have served as civil jurors in the past.

19    In this case, the Government who's bringing the case is

20    required to prove its case beyond a reasonable doubt.  That's

21    the highest burden in our law, and it's different than the

22    burden in a civil case.

23         In a civil case, the burden is more likely than not.

24    Sometimes that's described as a preponderance of the evidence.

25    It just means one side is ever so much more likely than the

1      other.  That's good enough.  This is a much higher standard.

2      It's beyond a reasonable doubt, and I'll read you an

3      instruction later about what that standard is.

4          Does any of you -- does any of the 18 of you have any

5      questions about that or any doubts about your ability to apply

6      that higher standard particularly if you've served as a civil

7      juror before?

8          Okay.  I'm not seeing any hands.

9          Also, I'm not going to ask any questions about this, but

10     I'll just tell you.  In state cases in a civil case, you do not

11     need to have a unanimous jury.  So for those of you who were a

12     juror in state court, nine out of 12 is enough jurors to render

13     a verdict in a civil case.  But in Federal Court in a civil or

14     criminal case, the jury has to be unanimous, and that will be

15     the rule in this case also.

16         Back to the questions for the 18 of you, have you or any

17     member of your family or a close friend or intentional

18     household ever been employed by a law enforcement agency?

19         Yes, Ms. -- Ms. Fitzgerald.

20             PROSPECTIVE JUROR FITZGERALD:  Yes.  I have a nephew

21     who is a police officer in Marin County in the city of San

22     Rafael.

23             THE COURT:  I do not believe that any members of that

24     agency will be testifying in this case.  It doesn't involve the

25     San Rafael Police Department, but nonetheless, let me ask you:

```
1              As you heard me read, there will be several law enforcement

2      witnesses in this case.  Because of your having a nephew who is

3      a sworn police officer, are you going to give the testimony of

4      law enforcement witnesses more weight or less weight, or will

5      that affect your service as a juror in any way?

6              PROSPECTIVE JUROR FITZGERALD:  No, I don't think it

7      would, your Honor, because I would be so conscious of listening

8      to the evidence and looking at what the law is, and nothing

9      else would be as important as that.  It wouldn't be -- I'd

10     agree to it.  It would have nothing to do with this case.

11             THE COURT:  That's a great answer.

12         There used to be a show with Groucho Marx on television.

13     The older I get, the more people who don't know who Groucho

14     Marx is, but that's for another day.  Anyway, in the television

15     show, there was a word of the day, and the show will go

16     along -- this is very low-tech.  The show would go along, and

17     someone would say the word of the day.  The word would drop out

18     of the ceiling.  It was just a piece of cardboard on a string.

19     It was very exciting, and selecting a jury is like that.

20         Every now and then, somebody will say something or I'll

21     have asked a question and it's a chance for me to talk to the

22     room a little bit.  We are not looking for 12 people that have

23     no opinions.  I don't know 12 people who don't have any

24     opinions.  We are not looking for 12 people that don't have any

25     life experiences.  How boring would those people be?
```

1     So I fully expect that there are going to be many "yes"

2   answers to the questions today and tomorrow if it takes that

3   long to pick a jury.  The issue is not "Do you have any

4   opinions?" or "Do you have any life experiences?"  As Ms.

5   Fitzgerald indicated, the question is:  Can you put those to

6   one side and be fair to these parties?  Can you be fair to Ms.

7   Su?  Can you be fair to the Government?

8     And so just because -- please don't assume that -- just

9   because there's some interaction between your life experience

10  or your views in this case, that doesn't mean that you are not

11  going to be a good juror.

12    Anyway, thank you for that answer, Ms. Fitzgerald.  I

13  believe the juror on your right, Ms. Coleman, also had her hand

14  up.

15          PROSPECTIVE JUROR COLEMAN:  I'm not sure if it's

16  relevant, but my ex-husband and I did own a security company

17  who was contracted a lot by the federal government.  So I just

18  wanted to throw that out there.

19          THE COURT:  All right.  There are going to be several

20  witnesses in this case who work for federal agencies in either

21  a law enforcement capacity or a different capacity.  Are you

22  going to be -- are you going to give the testimony of those

23  witnesses any more weight or any less weight because of your

24  experience at this security company?

25          PROSPECTIVE JUROR COLEMAN:  No.  I don't really deal

1    with anybody there anymore.  So that's fine.

2              THE COURT:  And was there anything else about that

3    experience that would affect your ability to be fair and

4    impartial?

5              PROSPECTIVE JUROR COLEMAN:  No.

6              THE COURT:  All right.  Thank you, Ms. Coleman.

7         Before there's a hand, somebody has got -- oh.  Here we go.

8         Ms. Fisher --

9              PROSPECTIVE JUROR FISHER:  Yes.

10             THE COURT:  -- you have -- is it a son?

11             PROSPECTIVE JUROR FISHER:  My son is a police officer

12   in El Centro, California.

13             THE COURT:  That's in Southern California, isn't it?

14             PROSPECTIVE JUROR FISHER:  Pardon me?

15             THE COURT:  That's in Southern California; correct?

16             PROSPECTIVE JUROR FISHER:  Correct, yes.

17             THE COURT:  How long has he been in the department

18   over there?

19             PROSPECTIVE JUROR FISHER:  I believe about nine to

20   ten years.

21             THE COURT:  Okay.  So you know from my description

22   perhaps that there will be some immigration issues in this

23   case.

24             PROSPECTIVE JUROR FISHER:  Yes.  He's also on a Drug

25   Task Force.

```
 1                    THE COURT:  Okay.  This is -- I'm not aware that
 2        there's any --
 3                    PROSPECTIVE JUROR FISHER:  Okay.
 4                    THE COURT:  -- evidence of drugs in this case.  I
 5        don't think it's that kind of case, but there will be some
 6        immigration issues.  Obviously, this is a criminal case, and
 7        there will be some -- there will be many law enforcement
 8        witnesses.
 9            Is the fact that you have a son who is a police officer in
10        El Centro going to affect the weight and credibility you give
11        any witness's testimony?
12                    PROSPECTIVE JUROR FISHER:  I don't believe so.
13                    THE COURT:  Okay.  And you feel that you can be fair
14        to both sides based on not -- that you can still be fair to
15        both sides?
16                    PROSPECTIVE JUROR FISHER:  I believe so.
17                    THE COURT:  All right.  Is there anyone else among
18        the 18 of you who has friends or family or yourself who has law
19        enforcement training or employment?
20            Two more.
21            Ms. Rudderow?
22                    PROSPECTIVE JUROR RUDDEROW:  Yes.  My brother is a
23        chief information officer for Elk Grove PD.
24                    THE COURT:  Is a chief information officer the
25        internal media relations person?
```

1             PROSPECTIVE JUROR RUDDEROW:  Yes.

2             THE COURT:  So it's your brother's job among other

3     things to interface between the department and media and

4     members of the public?

5             PROSPECTIVE JUROR RUDDEROW:  The public, correct.

6             THE COURT:  How long has he held that position?

7             PROSPECTIVE JUROR RUDDEROW:  Oh, many years.

8             THE COURT:  And part of his job is to reflect to the

9     public the official policy or the official statements of the

10    Oakland Police Department; correct?

11            PROSPECTIVE JUROR RUDDEROW:  That's Elk Grove.

12            THE COURT:  Oh.  Elk Grove?

13            PROSPECTIVE JUROR RUDDEROW:  Elk Grove.

14            THE COURT:  Big difference between Elk Grove and

15    Oakland.

16            PROSPECTIVE JUROR RUDDEROW:  Yeah.  He was there,

17    though, many, many years ago.

18            THE COURT:  Is the fact that your brother is the

19    chief information officer for the Elk Grove Police Department

20    going to affect the weight and credibility that you would give

21    to the testimony of any witness?

22            PROSPECTIVE JUROR RUDDEROW:  No.

23            THE COURT:  And is that relationship going to affect

24    your ability to be fair and impartial to both sides in the

25    case?

```
 1                    PROSPECTIVE JUROR RUDDEROW:  No.

 2             THE COURT:  All right.  Thank you, ma'am.

 3         Is it Ms. Tam?

 4             PROSPECTIVE JUROR TAM:  Yes.

 5             THE COURT:  And you had your hand up?

 6             PROSPECTIVE JUROR TAM:  Yes.

 7             THE COURT:  Tell me about that.

 8             PROSPECTIVE JUROR TAM:  We have a very good family

 9     friend who is with the San Francisco Police Department, and

10     he's actually a motorcycle cop.

11             THE COURT:  And how long have you known this

12     gentleman?

13             PROSPECTIVE JUROR TAM:  Over 20 years.

14             THE COURT:  Does your -- and is this someone you

15     socialize with?

16             PROSPECTIVE JUROR TAM:  Yes.

17             THE COURT:  And is -- is the fact that you have a

18     close relationship and your family has a close relationship

19     with a San Francisco police officer going to affect the weight

20     and credibility that you would give to any testimony of any

21     witness in this trial?

22             PROSPECTIVE JUROR TAM:  I do not believe so.  I will

23     base on what they are -- the evidence that we're going to hear.

24             THE COURT:  Very good.

25         And would it otherwise affect your ability to be fair and
```

1    impartial in any way?

2              PROSPECTIVE JUROR TAM:  No.

3         The only thing I would like to mention is as a former

4    recruiter in my prior job, I worked for a financial services

5    industry, and a part of my job had to deal with immigration,

6    and I did have to work with the bank-appointed immigration

7    attorney to facilitate the paperwork to get these people hired.

8              THE COURT:  Okay.  So a part of your job and -- what

9    entity were you working for?

10             PROSPECTIVE JUROR TAM:  Bank of America --

11             THE COURT:  Okay.

12             PROSPECTIVE JUROR TAM:  -- and Bank of the West.

13             THE COURT:  And so at these -- at the two banks, part

14   of your job was to make sure that if you hired someone who was

15   not a United States citizen that they were able to obtain

16   whatever permission they needed to obtain from immigration

17   authorities to lawfully work in the U.S.?

18             PROSPECTIVE JUROR TAM:  Correct.

19             THE COURT:  And you're correct that there will be

20   extensive testimony in this case about the immigration rules

21   and about whether Ms. Su and TVU complied with those rules and,

22   if they did not comply with the rules or if the forms that they

23   submitted were noncompliant, whether the noncompliance was

24   intentional.  I expect that to be the evidence.

25        Are you going to be able to listen to that testimony fairly

1     and then just decide the case based on the evidence that you

2     hear?

3                    PROSPECTIVE JUROR TAM:  Absolutely.

4                    THE COURT:  Okay.  Very good.

5          Now, I notice that Ms. Tam volunteered something that

6     didn't have to -- was not responsive to the question I asked.

7     And instead of saying, "Ms. Tam, that's not the question I

8     asked," I got the information.

9          Who here has teenagers or has ever had teenagers in your

10    house?  Raise your hand.

11         Okay.  Who has ever met a teenager?  Raise your hand.

12         Okay.  Everybody should have their hand up.  I -- I'm also

13    done with having teenagers, but -- because they're growing up,

14    but who's ever had someone, a teenager, say, "TMI.  TMI"?

15         Okay.  And, Ms. Taruc, you had your hand up.  What does TMI

16    mean?

17                    PROSPECTIVE JUROR TARUC:  Too much information.

18                    THE COURT:  Too much information.  This is what my

19    teenagers would say when they didn't want me to talk anymore.

20    "Dad, that's TMI."

21         We do not have a TMI rule in voir dire.  If you are saying

22    something and slowing down the process, believe me, I'll cut

23    you off.  I have all of your time in mind.  We're going to use

24    it productively, but often when someone volunteers something,

25    it's helpful to the process.  It's providing information that

1     allows the lawyers to select a jury that they're confident in,

2     and obviously Ms. Tam's work experience with immigration is

3     relevant to her service as a juror.

4          And so if you think of something similar or you think this

5     is probably going to come up in the trial, I encourage you to

6     volunteer it.  I'll either address it then or we'll come back

7     to it.

8          Anyone else on the -- in the box or on the rail who has law

9     enforcement background, training, or employment, you or your

10    close family or immediate friends?

11         I'm not seeing any hands.

12         Let me say this:  Occasionally, we'll ask a question and

13    you are not comfortable -- you might not be comfortable

14    discussing the answer in front of a large room of people.  It

15    doesn't happen very often, but it does happen.  And if you're

16    in that situation, just let me know that, and then at the break

17    you and I and the lawyers and the court reporter, a much

18    smaller group, will just go into the jury room, and we'll take

19    your answer there.  Again, in most trials, this doesn't come

20    up, but you should know that that is available.

21         Has any of you ever been involved in any court in a

22    criminal manner -- matter that concerned you, a member of your

23    family, or a close friend either as a defendant, a witness, or

24    a victim?

25         Mr. Gagnon?  Am I pronouncing that right?

```
1                    PROSPECTIVE JUROR GAGNON:  Yes.

2                    THE COURT:  That was just an involuntary arm motion?

3                    PROSPECTIVE JUROR GAGNON:  I was scratching my chin.

4                    THE COURT:  Okay.  So then I'm not seeing any hands

5         in response to that question.

6              One of the most important rules of jury service is that

7         you're required to apply the law as I give it to you, and

8         you'll receive a lengthy set of jury instructions.  I don't

9         have the time to give them all to you now, but this is a

10        democracy, and so President Obama did not appoint me to this

11        job to render the law according to Jon Tigar.  He appointed me

12        to render the law according to the United States government.

13        That's my job.

14             If you're selected as a juror in this case, you also will

15        have to apply the law of the United States, whatever it may be.

16        Also, you will have to decide the case based only on the

17        testimony and other evidence you receive and apply the law to

18        that evidence in reaching your decision.

19             So my question is:  If you're selected to sit on this case,

20        I need to know that each of you will be able to render a

21        verdict solely on the evidence present ed at the trial and in

22        the context of the law as I'll give it to you, disregarding any

23        other ideas, notions, or beliefs about the law or the facts

24        that you may have received from some other source.  Would you

25        raise your hand if you're going to have any difficulty in doing
```

```
 1        that or if you think you will?

 2            Okay.  I'm not seeing any hands.

 3            It is virtually a certainty in this case that one or more

 4        of the parties, attorneys, or witnesses will come from a

 5        particular national, racial, ethnic, or religious group or

 6        sexual orientation that's different from yours.  Would that in

 7        any way affect your judgment or the weight and believability

 8        you would give to someone's testimony?  Please raise your hand

 9        if it would.

10            I'm not seeing any hands.

11            Is there any of you who has any special disability or

12        problem that would make serving as a member of the jury

13        difficult or impossible, back trouble, you're working a night

14        shift, anything like that?

15            Okay.  I'm not seeing any hands.

16                MR. BABCOCK:  One actually.

17                THE COURT:  Oh.  I beg your pardon.

18        Oh.  Sorry.  Thank you.

19                PROSPECTIVE JUROR FLOWERS:  Sorry.  Sorry I wasn't

20        more --

21                THE COURT:  Yes.  This is Ms. Flowers; correct?

22                PROSPECTIVE JUROR FLOWERS:  That's right.

23                THE COURT:  Yes, ma'am.

24                PROSPECTIVE JUROR FLOWERS:  I'm breastfeeding.  So I

25        just -- I assume there will be breaks --
```

```
 1              THE COURT:  There will be breaks --

 2              PROSPECTIVE JUROR FLOWERS:  -- today.

 3              THE COURT:  -- generally.

 4              PROSPECTIVE JUROR FLOWERS:  Yeah.

 5              THE COURT:  And I'm glad you mentioned that.  I try

 6    to do everything I can to make sure that individual jurors are

 7    able -- to be able to meet whatever needs they have to be good

 8    jurors.

 9         Generally on an 8:30-to-1:30-day, we will take two breaks.

10    One will be at 10:00, and the other one will be at 11:45.  It

11    moves around a little bit, but that's generally it.  So we go

12    90 minutes.  There's a 15-minute break.  We go 90 minutes.

13    There's a 15-minute break.

14         Is that a good answer to your question?

15              PROSPECTIVE JUROR FLOWERS:  Should be fine.

16              THE COURT:  Very good.

17         Has any of you or your close friends or relatives to your

18    knowledge ever had any unpleasant -- unpleasant or negative

19    experience with law enforcement?  Anybody have that?

20         Okay.  I'm not seeing any hands.

21         Does any of you have positive or negative feelings about

22    law enforcement that you think would make it difficult for you

23    to be fair and impartial in this case?

24         Again, I'm not seeing any hands.

25         As you've heard me say in my summary and also in my
```

1    discussions with another juror, immigration will be an issue in

2    this case, and the ability of alien citizens to be here on

3    visas will be one of the issues in the case.  Is there anything

4    about your knowledge, background, or feelings about immigration

5    that you feel would make it difficult for you to be fair and

6    impartial in the case?

7         I'm seeing two hands.  Let me start with Ms. Ortega.  Tell

8    me about that.

9              PROSPECTIVE JUROR RUIZ ORTEGA:  It's Ruiz Ortega.

10        I'm a naturalized citizen.  So that's my background

11   regarding immigration, but I will remain objective regarding

12   the details and evidence.

13             THE COURT:  Ms. Ruiz Ortega.  I say thank you.

14        Two things.  First is correcting me on your name because

15   you know how I feel about that, and the other is I want the

16   other people in the audience to know Ms. Ruiz Ortega doesn't

17   think it's going to be a problem, and she wanted me to know

18   about it anyway, and that's a good approach.  I appreciate your

19   volunteering, and I thank you.

20        Ms. Rudderow, I think you also had your hand up.

21             PROSPECTIVE JUROR RUDDEROW:  Yes, it's Ms. Rudderow.

22        And I'd just like to volunteer that while I am currently

23   single, I was previously married, and I did go through the

24   immigration process with my ex-husband, him coming from

25   Pakistan.

1          THE COURT:  All right.  And do you think that your --

2    so he was not a citizen previously?

3          PROSPECTIVE JUROR RUDDEROW:  Correct.

4          THE COURT:  And you assisted him in his process of --

5    is he now a citizen?

6          PROSPECTIVE JUROR RUDDEROW:  He is a -- not permanent

7    resident, but he does have a work permit.

8          THE COURT:  Got it.

9        And you assisted him with that?

10          PROSPECTIVE JUROR RUDDEROW:  Correct.

11          THE COURT:  And so you had to deal with the

12    immigration authorities and the paperwork and that sort of

13    thing?

14          PROSPECTIVE JUROR RUDDEROW:  That is correct.

15          THE COURT:  Is there anything about that experience

16    that will make it -- that will affect your ability to be fair

17    and impartial here?

18          PROSPECTIVE JUROR RUDDEROW:  I don't believe so.

19          THE COURT:  So let me ask you a hypothetical.  Let's

20    say that you hear testimony about the immigration process and

21    it's different from your experience.  Do you understand what

22    I'm saying?

23          PROSPECTIVE JUROR RUDDEROW:  Sure.

24          THE COURT:  Someone says, "We needed to submit these

25    kind of forms, and we" -- "that led to this kind of process,"

 1    and that's different from your recollection of what your

 2    ex-husband went through.

 3              PROSPECTIVE JUROR RUDDEROW:  Yeah.

 4              THE COURT:  Will you be able to go back in the jury

 5    room and just decide the case based on the evidence that you

 6    heard in court?

 7              PROSPECTIVE JUROR RUDDEROW:  That might be difficult.

 8              THE COURT:  Okay.  I'm going to let counsel for the

 9    parties explore that with you further to see if they think

10    that's even likely to happen.

11              PROSPECTIVE JUROR RUDDEROW:  Okay.

12              THE COURT:  Okay.

13              PROSPECTIVE JUROR RUDDEROW:  Fair enough.  Thank you.

14              THE COURT:  Anybody else?

15        Mr. Gagnon?

16              PROSPECTIVE JUROR GAGNON:  I don't have anything that

17    would impact my ability to be a juror, but I have had some

18    interactions with immigration.  I have a current employee who's

19    looking to become a permanent citizen here.  He's going through

20    the process right now.  In the past, I've had very good

21    colleagues of mine that went through the process of becoming

22    citizens.  So --

23              THE COURT:  Okay.  But you communicated earlier that

24    you're not worried about your ability to be fair here?

25              PROSPECTIVE JUROR GAGNON:  No.

```
 1              THE COURT:  Okay.  Very good.
 2         Anybody else in that circumstance?
 3         Ms. Taruc?
 4              PROSPECTIVE JUROR TARUC:  I was 8 when we immigrated
 5    to this country, and my parents handled the immigration
 6    paperwork and process.  I work with many Asian immigrants and
 7    refugees from particularly China and Laos in my current work.
 8              THE COURT:  Okay.  And do you think that will affect
 9    your ability to be fair here?
10              PROSPECTIVE JUROR TARUC:  No.
11              THE COURT:  Okay.  In just a little bit, by the way,
12    the lawyers are going to have a chance to ask their own
13    questions, and they may come back to some of these things that
14    I'm asking, and they may follow up a little bit further, but
15    thank you for volunteering that information.
16         Ms. -- is it Schroeder or Schroeder?
17              PROSPECTIVE JUROR SCHROEDER:  Schroeder.
18              THE COURT:  Ms. Schroeder.
19              PROSPECTIVE JUROR SCHROEDER:  I have a housekeeper
20    who is in the process, if she's not finished this yet, in
21    immigrating from Brazil.  And in the past, when she was going
22    through the paperwork part of it, I wrote a letter of
23    recommendation for her.
24              THE COURT:  Okay.  Do you think that will affect your
25    ability to be fair to these parties?
```

```
 1              PROSPECTIVE JUROR SCHROEDER:  No.

 2              THE COURT:  All right.  Thank you.

 3         Anyone else?

 4         And I think just to be -- okay.  Yes, ma'am.  Ms.

 5    Fitzgerald.

 6              PROSPECTIVE JUROR FITZGERALD:  Well, when people are

 7    talking about their immigration background, I should probably

 8    say that all these little 5,000 children who came through my

 9    hands were immigrants.  So I was involved in physically

10    bringing them through the process.

11         And I also worked with refugees entering the United States,

12    you know, getting off the plane and coming in, and I also

13    worked overseas in refugee camps, and all those people

14    eventually got to their countries, not always the United

15    States, but I don't think that would have anything to do with

16    this case because the situations are so different.

17              THE COURT:  They are different, but there will be --

18    I believe the Government will -- will perhaps put on evidence

19    that -- that foreign nationals applied to be students at

20    Tri-Valley University and paid tuition money and that they were

21    victimized by the alleged criminal conduct in this case.

22         And as somebody who has spent a career in working with

23    immigrants, I think if I was the defendant, I would want to

24    know are you going to be a little swayed in advance maybe by

25    leaning toward the Government, or can you put your sympathy to
```

1       one side and just decide the case based on the evidence?

2                   PROSPECTIVE JUROR FITZGERALD:  Well, I truly believe

3       that -- I know I can separate my own experience because as I

4       said, as I understand it, the jurors' duty is to look at what

5       is presented.  Is this evidence credible, is it proven beyond a

6       reasonable doubt, and does it go against what the law is that

7       will be explained to us?  And that would have nothing to do

8       with any job I've ever done in my life.

9                   THE COURT:  All right.  Very good.  Thank you.

10          Has any of you -- any of the 18 of you or close relatives

11      or friends had any contact with any of the following:

12      Department of Homeland Security, Immigration and Customs

13      Enforcement -- unless you've already told me about that -- the

14      United States Department of State, or the United States

15      Attorney's Office, whether it was in this district or any

16      district?

17          Ms. Coleman?

18                  PROSPECTIVE JUROR COLEMAN:  Well, as I had previously

19      stated, my ex-husband and I owned a security company for

20      several years.  We were contracted by Homeland Security.  We

21      secured FEMA sites around tornadoes in Kansas and things to

22      that nature, but -- and my ex-husband is Egyptian.  So he's

23      also had to do -- he's a citizen, but he's constantly dealing

24      with the Departments for Naturalization and things like that,

25      but --

```
1              THE COURT:  Okay.  And -- and you -- I think I asked

2      you this before, but is there anything about that experience

3      that would make it difficult for you to be fair and impartial

4      in this trial.

5              PROSPECTIVE JUROR COLEMAN:  No.

6              THE COURT:  All right.  Ms. Fitzgerald, did you have

7      your hand up again?

8              PROSPECTIVE JUROR FITZGERALD:  Well, all those

9      departments that you mentioned -- most of them are at the

10     airport.  So I would see those people every day.

11             THE COURT:  Yes, and I try to say this before, but if

12     you've -- if this question recalls information that you've

13     already given me, you don't need to put up your hand.

14             PROSPECTIVE JUROR FITZGERALD:  Okay.  Thank you.

15             THE COURT:  Ms. Jones, did you have your hand up?

16     No?

17        Okay.  Did anyone else have a hand up that I didn't get?

18        Ms. Ruiz Ortega?

19             PROSPECTIVE JUROR RUIZ ORTEGA:  Yes.  In my line of

20     work, I'm required to communicate with USCIS Immigration

21     Services to verify potential applicants for eligibility.  So

22     it's my job to determine whether they're legal or not and

23     whether they qualify for benefits and public assistance.

24             THE COURT:  Because of that, are you likely to give

25     the testimony of any witnesses here more or less weight?
```

```
 1              PROSPECTIVE JUROR RUIZ ORTEGA:  No.

 2              THE COURT:  Okay.  Thank you.

 3         Does any of you have any feelings or prejudices against the

 4    Government, the United States Attorney's Office, or criminal

 5    prosecutors just in general where you feel as though you'd not

 6    be able to give the Government a fair trial in this case?

 7         Okay.  I'm not seeing any hands.

 8         Does any of you have any feelings about the criminal

 9    justice system or criminal defendants in general such as you

10    feel like you wouldn't be able to give Ms. Su a fair trial in

11    this case?

12         Okay.  I'm not seeing any hands.

13         And what I mean by that is some people there are people who

14    have strong feelings about the criminal justice system in this

15    country, and they think it's broken one way or the other, and

16    they just are never going to be a good juror because they feel

17    so strongly about it.  So if you're in that category, you

18    should raise your hand.

19         Okay.  I'm not seeing any hands.

20         Has any of you ever been the victim or witness of a crime,

21    whether or not it went to court?

22         Okay.  I'm not seeing any hands.

23         Even if you have not had any contact or experience that we

24    talked about before, let me say there might be evidence in this

25    case that witnesses in this case illegally entered the United
```

1    States or they illegally remained here.  You might find that

2    out about witnesses, or you might hear them say that on the

3    stand.

4         Does any of you have views about the federal government's

5    treatment of illegal aliens that would make it difficult for

6    you to sit as an impartial juror in this case?

7         Again, I'm not seeing any hands.

8         Has any of you had any experience with the student F-1 visa

9    program, federal government program?

10        And that's Ms. Tam.  Is that in connection with your prior

11   job?

12              PROSPECTIVE JUROR TAM:  Yes.

13              THE COURT:  Did we do a good job covering that

14   before?

15              PROSPECTIVE JUROR TAM:  Yes.

16              THE COURT:  Okay.  Does any of you have any

17   particular views regarding immigration from India, the country

18   of India?

19        I'm not seeing any hands.

20        Has any -- has you or anyone close to you ever retained the

21   services of an immigration attorney?  And you don't need to

22   raise your hand if we've already discussed it -- those facts.

23        I'm not seeing any hands.

24        Have you or anyone close to you ever had your legal status

25   in the United States challenged by any government official by

1    being asked to show proof of alienage or proof of citizenship

2    or challenged in any other way?  Has anybody ever had that

3    experience?

4        Ms. Jones?

5            PROSPECTIVE JUROR JONES:  It wouldn't affect me in

6    this situation, but my husband, being in agriculture and

7    farming -- one employee did have an experience where his status

8    was challenged.

9            THE COURT:  I see.

10       And was that in the -- you indicated that he grows

11   Christmas trees?

12           PROSPECTIVE JUROR JONES:  That's correct.

13           THE COURT:  Does he have an agricultural lot where

14   that's taken place?

15           PROSPECTIVE JUROR JONES:  Yes, a property up in

16   Martinez, California.

17           THE COURT:  Okay.  And was it a case -- well, tell

18   me.  I'll stop ask leading questions.  What happened?

19           PROSPECTIVE JUROR JONES:  Just that the gentleman was

20   coming back from a trip to Mexico and was retained in Arizona.

21           THE COURT:  Is it -- this was your --

22           PROSPECTIVE JUROR JONES:  An employee.

23           THE COURT:  I see.

24       One of his employees?

25           PROSPECTIVE JUROR JONES:  Right, and it resolved

1    itself fine, and it wouldn't affect me in this case.

2         THE COURT:  Okay.  Very good.

3         Let's say that the Government in this case proves the

4    defendant guilty beyond a reasonable doubt.  That's their

5    burden.  Is any of you going to hesitate to sign a guilty

6    verdict?

7         I'm not seeing any hands.

8         Let's say it goes the other way.  I just want to remind you

9    the Ms. Su doesn't have a burden in the case.  The Government

10   has the burden.  That's always true.  Let's say the Government

11   doesn't meet its burden.  They don't prove the charges against

12   Ms. Su beyond a reasonable doubt.  Is any of you going to

13   hesitate to acquit Ms. Su and find her not guilty?

14        Okay.  I'm not seeing any hands.

15        Let me ask a catchall question, and then depending on what

16   kind of information we get, maybe this will be a good time for

17   a break.  The catchall question is:  What did I miss?

18   Sometimes a prospective juror will come to court and then

19   they're sitting on a fact and they think, "The Court really

20   wants or the lawyers really want to know this fact because it

21   will affect my ability to be a good and fair and impartial

22   juror in the case."

23        Is there a fact like that, something about your background,

24   your experience, or your views, that you think that the lawyers

25   and their clients would want to know because it will affect

1    your ability to be a fair and impartial juror?

2         Yes, ma'am, Ms. Davison.

3              PROSPECTIVE JUROR DAVISON:  I have assisted some

4    community college students in enrollment, and some have been

5    foreign students.

6              THE COURT:  I see.

7         Okay.  That's -- you indicated that you are helping with

8    adoptive physical education at the College of Marin --

9              PROSPECTIVE JUROR DAVISON:  Correct.

10             THE COURT:  -- if my notes on that are right.

11             PROSPECTIVE JUROR DAVISON:  Yes.

12             THE COURT:  And so sometimes students have sought out

13   your help?

14             PROSPECTIVE JUROR DAVISON:  Correct.

15             THE COURT:  Okay.

16             PROSPECTIVE JUROR DAVISON:  I work with students with

17   physical and/or mental various abilities.  So I assist them in

18   writing their enrollment pages, et cetera, for issues.

19             THE COURT:  Okay.  Well, that could cut any number of

20   ways.  Do you think that because in your day-to-day work you

21   help out -- well, you heard in my description before that there

22   will be student immigration issues in the case --

23             PROSPECTIVE JUROR DAVISON:  Right.

24             THE COURT:  -- and my summary of the charges and so

25   forth.  Do you think that your experience working with students

1    at the College of Marin, foreign students on immigration, will

2    make you biased or partial in favor of one side or the other in

3    the case?

4              PROSPECTIVE JUROR DAVISON:  No, I don't.

5              THE COURT:  And if you hear -- similar to the

6    question I asked -- I'm not going to remember -- it was one of

7    the jurors in the back.  If you hear evidence in the case

8    that -- about the process that's different from your

9    experience, can you put your experience to one side?

10             PROSPECTIVE JUROR DAVISON:  Absolutely, yes.

11             THE COURT:  Just decide the evidence based -- just

12   decide the case based on the evidence?

13             PROSPECTIVE JUROR DAVISON:  Yes.

14             THE COURT:  All right.  Very good.

15        We have been going about an hour and 20 minutes

16   thereabouts, and so this is probably a very good time to take a

17   break.  Let's take ten minutes, and you're in charge of each

18   other's time.  I'm going to give everybody their ten minutes,

19   but we can't be -- we can't get going again unless everybody is

20   back.  So we'll take ten minutes.

21        Court is in recess.

22             THE CLERK:  All rise.

23        Court will be in recess for ten minutes.

24                      (Recess taken.)

25             THE COURT:  Okay.  We are back on the record.

1    For reasons that I discussed actually with one of you, I

2    should have said our break was 15 minutes because we needed

3    that time to do something in court.  So I'm sorry.  We'll be

4    15 minutes.

5    So we are back.  All of the jurors whose names have been

6    called are in the box or against the rail, and this is a chance

7    for counsel to ask you some questions.  They aren't -- their

8    questions are just as important as mine, and the purpose of the

9    questions is just the same, and that is to try to figure out

10   can you be a fair and impartial juror in this case.

11   They are not going to try to precondition you to a certain

12   result in the case, and just as I am not, they are not trying

13   to invade your privacy.  If they're asking you a question, it's

14   just because they need to know more about you and see if you

15   will be a good fit.

16   And the Government will go first.

17        MS. WEST:  Thank you, your Honor.

18   It's still technically morning, so good morning.  As I

19   said, my name is Hartley West, and as the judge has explained

20   to you, this is the lawyers' opportunity to just help them try

21   to make sure that we get 12 jurors who can be fair and

22   impartial in this case.

23   So there are no right or wrong answers, and the judge has

24   actually already done a great job of going through a lot of the

25   questions.  I really don't think I'm going to be using all of

1    my time, but I did have a few follow-up questions for some of

2    you.

3        So let me start, if I could, with you, please, Ms.

4    Rudderow.

5            PROSPECTIVE JUROR RUDDEROW:  Yes.

6            MS. WEST:  You -- oh.  Thank you.

7        You mentioned that you thought you might have some

8    difficulty setting aside personal experience in having to do

9    with some of the immigration procedures and so forth in this

10    trial.  Can you tell us a little bit more about that?  Why do

11    you feel that feeling?

12            PROSPECTIVE JUROR RUDDEROW:  Sure.

13        It was just based off how the judge sort of phrased his

14    question.  If I were to be looking at, you know, information,

15    documentation that has been presented by, you know, people who

16    were involved in immigration of this case, it may conflict with

17    the direct, you know, paperwork or process that I've been

18    through.  So --

19            MS. WEST:  And what was the base -- or process that

20    you were involved in?

21            PROSPECTIVE JUROR RUDDEROW:  It was for permanent

22    residency and also permanent floor work, and also my ex-husband

23    had a student visa --

24            MS. WEST:  Okay.

25            PROSPECTIVE JUROR RUDDEROW:  -- for which he came,

1    you know, from Pakistan to here.

2            MS. WEST:  Okay.  So do I understand right that he

3    had a student visa, then he transferred to -- is it an H-1B

4    visa to work?

5            PROSPECTIVE JUROR RUDDEROW:  I believe that's

6    correct, yes.

7            MS. WEST:  Okay.  So is your concern that you

8    wouldn't be able to listen fairly and impartially to a case

9    that dealt with those sorts of issues or that if something that

10   a witness said conflicted with something that was your

11   experience, you wouldn't be able to take as evidence what the

12   witness said?

13           PROSPECTIVE JUROR RUDDEROW:  Sure, I'd be able to

14   take the evidence as -- for what the witness said.  I think it

15   was really the way that your Honor described the question.  I

16   will do my best to, you know --

17           MS. WEST:  Is there anything about your experience

18   that you think would make it hard for you to be impartial in

19   this case where you don't know any of the facts about it yet?

20           PROSPECTIVE JUROR RUDDEROW:  No.

21           MS. WEST:  Okay.  Great.  Thank you.

22           PROSPECTIVE JUROR RUDDEROW:  You're welcome.

23           MS. WEST:  If you could pass actually just in front

24   of you to Ms. Tam --

25           THE COURT:  Ms. -- Ms. West, I would just say

1     something I wish I had said before.

2          Members of the jury, the way this process works is that I

3     try to ask as many questions as I think so that counsel feel by

4     the time they stand up that they know you pretty well.  So it

5     may be that they don't ask you any questions at all.  Some of

6     you might not be asked any questions either by Ms. West or by

7     Mr. Babcock.

8          If that happens, don't worry about that or don't have your

9     feelings hurt, not that you would, but really the lawyers are

10    just as zealous of your time as I am, and so they're just

11    trying to be efficient, and it might be that they'll focus a

12    lot on one of you and not at all on another.  You shouldn't pay

13    that any mind.

14         Ms. West?

15              MS. WEST:  Thank you, your Honor.  Thank you.

16         Ms. Tam, you said that you also in the course of your job

17    have experience with both F-1 visas and with H-1B visas.  Did I

18    understand that right?

19              PROSPECTIVE JUROR TAM:  More the majority is H-1B.

20    Once in a while, there's an F-1.

21              MS. WEST:  Okay.  Is there anything about how that

22    came up in your job or your experiences in assisting others

23    with those kinds of visas that you think might possibly affect

24    your ability to listen impartially to evidence presented in

25    this case?

1          Now, what you'll hear is this case deals with students

2     coming here on an F-1 visa.

3               PROSPECTIVE JUROR TAM:  I don't believe so.  I -- I

4     would be able to listen to what's presented and base my

5     judgment on that.

6               MS. WEST:  Okay.  Thank you.

7          If you could please pass to -- actually, I would like to

8     jump over to this side and pass it down, please, to Ms. Taruc.

9          Ms. Taruc, you're a community organizer.  Do I have that

10    right?

11              PROSPECTIVE JUROR TARUC:  Yes.

12              MS. WEST:  What do you like best about your job?

13              PROSPECTIVE JUROR TARUC:  Working with the community.

14              MS. WEST:  Okay.  Is there anything that you like

15    least about it?

16              PROSPECTIVE JUROR TARUC:  The injustices that are

17    prevalent in the community.

18              MS. WEST:  What kinds in particular trouble you the

19    most?

20              PROSPECTIVE JUROR TARUC:  Poisoning people.

21              MS. WEST:  I'm sorry?

22              PROSPECTIVE JUROR TARUC:  Poisoning people.

23              MS. WEST:  Poisoning?

24              PROSPECTIVE JUROR TARUC:  Regarding mental issues,

25    yes.

```
 1              MS. WEST:  I'm against that, too.

 2         Okay.  Thank you.

 3         Could you pass that over, please, to Ms. Nager.

 4         Do I have that right?

 5              PROSPECTIVE JUROR NAGER:  Yes.  Correct.

 6              MS. WEST:  Okay.  Thank you, Ms. Nager.

 7         Did I understand right that you are a systems security

 8    engineer?

 9              PROSPECTIVE JUROR NAGER:  No.  I'm a systems quality

10    assurance engineer -- engineer for Visa.

11              MS. WEST:  Can you tell me what that means?

12              PROSPECTIVE JUROR NAGER:  Devotional testing database

13    applications for Visa, the payment processing system.

14              MS. WEST:  And how long have you been working there?

15              PROSPECTIVE JUROR NAGER:  18 years in July.

16              MS. WEST:  Oh.  Okay.  Are you in a management

17    position there?

18              PROSPECTIVE JUROR NAGER:  No.  I'm just an agent,

19    testing application -- testing the application.

20              MS. WEST:  Okay.  What do you like best about your

21    job?

22              PROSPECTIVE JUROR NAGER:  Testing -- testing, making

23    sure that the product will not -- will go in production without

24    any problems --

25              MS. WEST:  Okay.  Great.
```

1        PROSPECTIVE JUROR NAGER:  -- or your credit card

2   won't work.

3        MS. WEST:  Oh, good.  Thank you.

4      Let's see.  One of the topics that the Court touched on

5   briefly is that there's going to be a lot of law enforcement

6   witnesses in this case.  So there will be a number of them, and

7   you've heard -- as the judge ran through the witness list, a

8   lot of names rattled off that were Special Agents.  So my

9   question is a little different, though, than what the Court

10   asked you.

11      What you will hear about in this case is that some of the

12   law enforcement agents -- some of the Special Agents with the

13   Department of Homeland Security performed what are called

14   undercover operations.  So there -- you'll hear evidence that

15   one of the agents was acting as somebody else, that he went to

16   Tri-Valley University pretending that he was somebody else, and

17   you'll also hear that this is, you know, a legitimate law

18   enforcement tool, something that is used in investigations.

19      Does the idea of a law enforcement officer acting

20   undercover -- is there anything about that idea that troubles

21   anyone here?  And I'm directing it for now to the people in the

22   box and to the people in the first row.  Does anybody have any

23   feelings about that, that they're troubled by it?

24      Okay.  I see no hands for that.

25      So something similar to that is you'll hear evidence that

1    some of the Department of Homeland Security agents engaged in

2    what's called a ruse, and what a ruse means, you'll hear --

3             PROSPECTIVE JUROR NAGER:  Sorry.

4             MS. WEST:  -- is that they identified themselves as

5    Department of Homeland Security agents but concealed their true

6    investigatory purpose in a contact with Tri-Valley University

7    and the defendant.  Does anybody here have some feeling of just

8    being uncomfortable with the fact of law enforcement engaging

9    in a ruse?

10        Okay.  No hands.

11        All right.  So then --

12             THE COURT:  Ms. West, I beg your pardon.

13        Ms. -- is it Nager?

14             PROSPECTIVE JUROR NAGER:  I'm sorry.  Yes.

15             THE COURT:  Would you like Mr. Noble to bring you

16    some water?

17             PROSPECTIVE JUROR NAGER:  Yes, please.

18             THE COURT:  All right.  Mr. Noble?

19             PROSPECTIVE JUROR NAGER:  I'm just finishing a cold.

20             THE COURT:  Sir, I'm going to have to ask you to put

21    your hand down.  I'm sorry.

22        And, members of the jury, let me just say, I know there's

23    signs all over the building about no drinks and water and that

24    sort of thing.  Once you get selected for the jury --

25             PROSPECTIVE JUROR NAGER:  Thank you.

1     THE COURT: And we'll finish that process today or

2  tomorrow. Once you're on the jury, you can bring any coffee

3  and water, whatever you want. I don't know if anybody can get

4  through a workday without drinking water and coffee.

5     So, Ms. Nager, you feeling okay?

6     PROSPECTIVE JUROR NAGER: Yeah.

7     THE COURT: All right. Ms. West?

8     MS. WEST: Okay. Thank you.

9     Ms. Allums, how do you feel about the idea of law

10  enforcement engaging in a ruse or undercover activity?

11     PROSPECTIVE JUROR ALLUMS: I have no reservations.

12  What is the real purpose of coming undercover, if you're

13  investigating it? People usually know when strangers are --

14  something -- something is not right.

15     MS. WEST: Well, first one of the things you'll hear

16  about in the trial is maybe that lots of students were coming

17  to apply to this school. So one of the agents, you'll hear,

18  came to the school pretending that he was a student and

19  applying, but he was not letting be known the fact that he was

20  actually a Department of Homeland Security agent.

21     Is there anything about that that troubles you in any way?

22  You seem like you've got a little bit of reservation, and

23  that's totally fine. This is about -- like I said, there's no

24  right answers or wrong answers. It's just about understanding

25  sort of what you bring to the table to make sure that you would

1    be the right juror for this case.

2        I can see from the look on your face you're thinking about

3    it.  Is --

4            PROSPECTIVE JUROR ALLUMS:  I can't really say yes.

5    To put into words how I really feel about it --

6            MS. WEST:  Okay.

7            PROSPECTIVE JUROR ALLUMS:  -- I don't --

8            MS. WEST:  But it makes you uncomfortable?

9            PROSPECTIVE JUROR ALLUMS:  A little bit.

10           MS. WEST:  Okay.  Is there anybody who shares that

11   same feeling as Ms. Alums?

12       Okay.  Thank you so much for telling me.

13       Okay.  One of the other -- or one of the other witnesses

14   that you're going to hear from is a witness who you will hear

15   pleaded guilty to a crime in connection with this same

16   investigation and that that individual is cooperating with the

17   Government's investigation and case in the hopes of trying to

18   get a better deal for himself, that you will also hear

19   instructions from the Court that you should take that into

20   account when you are evaluating this witness's testimony.

21       And that's absolutely right, but is there anybody who would

22   completely disregard out of hand that witness's testimony due

23   to the fact that that individual has pleaded guilty and is

24   attempting to cooperate?  Anyone?

25       Okay.  Has anybody here engaged in any online classes?

```
 1       Have you taken any class online?

 2           Yes.  Tell me about that.

 3               PROSPECTIVE JUROR BRANDON:  I took some at University

 4       of Phoenix.  It was a way for me to go to school and work, and

 5       so I think it's great and convenient.

 6               MS. WEST:  What kind of class did you take?

 7               PROSPECTIVE JUROR BRANDON:  I took management

 8       courses, some math classes.

 9               MS. WEST:  Now, when you took the class online --

10               THE COURT:  Ms. West, I beg your pardon for

11       interrupting you one more time.  I want to make sure our court

12       reporter can hear each of you, and so I'm going to pass Ms.

13       Brandon the microphone.

14               MS. WEST:  Thank you.

15           So did I understand right that you took an online --

16               PROSPECTIVE JUROR BRANDON:  I took several online

17       courses, yes.

18               MS. WEST:  Management?

19               PROSPECTIVE JUROR BRANDON:  For business management,

20       yes.

21               MS. WEST:  And can you tell us a little bit about how

22       those online classes worked?  Do you -- is it something where

23       you see an instructor?

24               PROSPECTIVE JUROR BRANDON:  No, not physically.  It's

25       virtually online, and the interaction with fellow classmates
```

```
 1    were also online.  So I would check in at my convenience,

 2    submit my assignments on time, but it's self-paced courses.

 3              MS. WEST:  And do you have the ability to tell

 4    whether other students are participating in -- or online?  Is

 5    it like a chatting kind of situation?

 6              PROSPECTIVE JUROR BRANDON:  There are some chats that

 7    go on.

 8              MS. WEST:  Okay.  All right.  Anybody else?

 9         Yes.

10              PROSPECTIVE JUROR FLOWERS:  As a student, I've done

11    some partial online course work.  I've read classroom setups,

12    and I'm involved in a lot of discussions and conversations

13    around those kinds of things in my current work.

14              MS. WEST:  Okay.  And in that, do you find that

15    people are interactive and engaging online?

16              PROSPECTIVE JUROR FLOWERS:  Yes.  I mean, generally I

17    think the consensus is that the online format is working for

18    deliberate orientation.

19              MS. WEST:  Okay.  Great.  Thank you.

20         Anybody else?

21         Okay.  Let's see.  I think I just have a couple more.

22              THE COURT:  Ms. West, you have a hand in the back

23    row.

24              MS. WEST:  Oh.  Thank you.

25              PROSPECTIVE JUROR RUDDEROW:  Thanks.
```

1          Yeah, I've taken online classes many years ago maybe going

2     to community college when I was 18, so ten years ago.

3          MS. WEST:  And were those the same sorts of online

4     classes that Ms. Brandon was describing?

5          PROSPECTIVE JUROR RUDDEROW:  Probably similar.  I'm

6     sure a lot has changed.

7          MS. WEST:  But was there an opportunity to interact

8     with the instructor through the online course?

9          PROSPECTIVE JUROR RUDDEROW:  Just turning in

10    assignments, bulletin boards, those kind of things.

11         MS. WEST:  And do you then get a grade based on

12    whatever you turned in?

13         PROSPECTIVE JUROR RUDDEROW:  Correct.

14         MS. WEST:  Is there some ability to -- or was there

15    some ability to grade you based on attendance or class

16    participation?

17         PROSPECTIVE JUROR RUDDEROW:  I don't recall.

18         MS. WEST:  Okay.  Yes, pass the microphone.  Thank

19    you.

20       Ms. Ruiz Ortega?

21         PROSPECTIVE JUROR RUIZ ORTEGA:  Yes.  I haven't taken

22    an online class, but in my regular courses, it was required for

23    students to log in and obtain, like, homework assignments

24    through, like, the hub or an online component of the class.

25         MS. WEST:  Okay.  Great.  Thank you.

1        Ms. Jones, I had a question for you.  You were an

2    elementary school teacher?

3             PROSPECTIVE JUROR JONES:  I am.

4             MS. WEST:  You still are.

5        Okay.  And what grade do you teach?

6             PROSPECTIVE JUROR JONES:  I teach second grade right

7    now.

8             MS. WEST:  I have a daughter in second grade.

9        What do you like best about teaching second grade?

10            PROSPECTIVE JUROR JONES:  I love the children.

11            MS. WEST:  And anything that's sort of a least

12   favorite thing about maybe second grade in particular?

13            PROSPECTIVE JUROR JONES:  No.  I've taught a lot of

14   elementary grades, and there's really nothing that's my least

15   favorite.

16            MS. WEST:  Okay.  And if you can pass it actually to

17   Mr. Sockolov.

18        Mr. Sockolov, how long have you been in the apparel

19   manufacturing business?

20            PROSPECTIVE JUROR SOCKOLOV:  Four years.

21            MS. WEST:  Four?

22            PROSPECTIVE JUROR SOCKOLOV:  Four.

23            MS. WEST:  Okay.  What did you do before then?

24            PROSPECTIVE JUROR SOCKOLOV:  I was in the apparel

25   retail business for about 35.

```
1              MS. WEST:  Where was that?

2              PROSPECTIVE JUROR SOCKOLOV:  Based here in San

3      Francisco.

4              MS. WEST:  Was that with a particular company?

5              PROSPECTIVE JUROR SOCKOLOV:  A retail company, yes.

6      Rochester Clothing.

7              MS. WEST:  Okay.  In your role in the apparel

8      manufacturing business now, is it sort of from the business

9      side or design side?

10             PROSPECTIVE JUROR SOCKOLOV:  More the business side.

11             MS. WEST:  Okay.

12             PROSPECTIVE JUROR SOCKOLOV:  Business -- my business

13     partner is the designer.  I'm the management side of the

14     company.

15             MS. WEST:  Okay.  How big is your company now?

16             PROSPECTIVE JUROR SOCKOLOV:  Pretty small.

17             MS. WEST:  Just the two of you?

18             PROSPECTIVE JUROR SOCKOLOV:  Yeah.

19             MS. WEST:  Okay.  So you don't have to manage a bunch

20     of other people as part of it, or you do?

21             PROSPECTIVE JUROR SOCKOLOV:  No.  We've had sales

22     reps, and at this point, no.  Just the two of us run the

23     company.  We have third-party warehouse distribution centers,

24     but it's just the two of us running this business.

25             MS. WEST:  Okay.  Thank you.
```

```
 1              Okay.  I think if you can pass it actually to this row,
 2        please, and I am looking for Ms. Schroeder.  Thank you.
 3              Ms. Schroeder, you are a retired nurse; is that right?
 4                    PROSPECTIVE JUROR SCHROEDER:  Yes.  Yes, I am.
 5                    MS. WEST:  How long were a nurse?
 6                    PROSPECTIVE JUROR SCHROEDER:  31 years.
 7                    MS. WEST:  Was there a particular area of specialty
 8        that you had?
 9                    PROSPECTIVE JUROR SCHROEDER:  Yes.  Cardiac,
10        catheterization labs, and intensive care.
11                    MS. WEST:  What did you like best about that job?
12                    PROSPECTIVE JUROR SCHROEDER:  The intellectual
13        stimulation.
14                    MS. WEST:  Okay.  Thank you.  And if you can pass it,
15        please, to Ms. Morgan-Stenhouse.
16              You're also a retired nurse; is that right?
17                    PROSPECTIVE JUROR MORGAN-STENHOUSE:  Yes.
18                    MS. WEST:  Did you have a particular area of
19        specialization?
20                    PROSPECTIVE JUROR MORGAN-STENHOUSE:  I just helped
21        the whole hospital.  I liked everywhere I worked.
22                    MS. WEST:  How long were you working as a nurse?
23                    PROSPECTIVE JUROR MORGAN-STENHOUSE:  42.
24                    MS. WEST:  42 years?
25                    PROSPECTIVE JUROR MORGAN-STENHOUSE:  Approximately.
```

1          MS. WEST:  Okay.  Thank you very much.

2          THE COURT:  Ms. West, I'm going to add a couple

3     minutes to account for my interruptions, and taking that into

4     account, you have about four minutes.

5          MS. WEST:  Okay.  I don't even think I'm going to use

6     all of that, but I just have one more question left, and that's

7     for Ms. Higgins.

8       I wanted to make sure I understood your job correctly.  You

9     are an officer manager in the healthcare field?

10          PROSPECTIVE JUROR HIGGINS:  Yes.

11          MS. WEST:  In what particular area?  What field?

12          PROSPECTIVE JUROR HIGGINS:  Home health -- home

13     healthcare.  We send nurses, physical therapists, occupational

14     therapists to patients' homes after they've been discharged

15     from the hospital or skilled nursing facilities that still need

16     skilled care.

17          MS. WEST:  Okay.  How long have you been doing that?

18          PROSPECTIVE JUROR HIGGINS:  Since '09.

19          MS. WEST:  Oh.  Okay.  So about five years?

20          PROSPECTIVE JUROR HIGGINS:  Yeah.

21          MS. WEST:  And what do you like best about that?

22          PROSPECTIVE JUROR HIGGINS:  Something new is going on

23     every day.

24          MS. WEST:  What did you do before you were working as

25     an office manager?

1           PROSPECTIVE JUROR HIGGINS:  I -- I was an office

2     manager for a couple of other companies, a holding company for

3     car dealerships, and before that, I was the administrative

4     assistant for a mortgage -- mortgage company.  It went out of

5     business.

6           MS. WEST:  And as an office manager, can you just

7     summarize what your day-to-day duties are?

8           PROSPECTIVE JUROR HIGGINS:  I ran new employees,

9     screening them, ordering supplies, scheduling clinicians out in

10    the field, making sure that everybody is happy.

11          MS. WEST:  Making everything work?

12          PROSPECTIVE JUROR HIGGINS:  Yes.

13          MS. WEST:  Okay.  Thank you.

14       Before I finish -- and I am just about finished.  Has

15    anything occurred to anybody sitting here, any of the 18 of

16    you, that, after my questions and the Court's questions, you

17    feel like "Oh, the lawyers for the Government or the lawyers

18    for the defense would want to know this about me"?  Anyone?

19       All right.  Well, thank you so much.  I thank you for your

20    time.

21          THE COURT:  Thank you, Ms. West.

22       Mr. Babcock --

23          MR. BABCOCK:  Thank you, your Honor.

24          THE COURT:  -- questions for these prospective

25    jurors?

```
 1              MR. BABCOCK:  Just a few.

 2         Good morning, everyone.  I don't actually have a lot of

 3    questions, a couple follow-ups.

 4         Does anyone have any particular thoughts or feelings about

 5    the law that allows students to get a visa to come from another

 6    country to go to school in the United States?  Do they have

 7    anything?

 8         Yes.

 9              PROSPECTIVE JUROR COLEMAN:  I think it makes --

10              THE COURT:  And for the record, it's Ms. Coleman; is

11    that right?

12              PROSPECTIVE JUROR COLEMAN:  Right.

13              THE COURT:  Thank you, ma'am.

14              PROSPECTIVE JUROR COLEMAN:  I do believe that it

15    tends to make things a little harder for students here to get

16    into certain programs.  If you are familiar with nursing or

17    healthcare, there's sometimes very long wait lists.  If you're

18    in a certain tax bracket, you don't get certain loans, and you

19    have to pay for them cash and things of that nature.

20         So I guess when you're a citizen here and you're paying

21    your taxes and you want to go to school, there's a long wait

22    list that does make it a little difficult to be able to do that

23    when you have students that are getting loans -- federal loans

24    and grants and things of that nature.

25              MR. BABCOCK:  So it sort of creates a competition?
```

1               PROSPECTIVE JUROR COLEMAN:  Right.

2               MR. BABCOCK:  It can crowd out citizens --

3               PROSPECTIVE JUROR COLEMAN:  Uh-huh.

4               MR. BABCOCK:  -- from the gist of it.  Fair enough?

5               PROSPECTIVE JUROR COLEMAN:  Uh-huh.

6               MR. BABCOCK:  I appreciate you sharing that with us.

7           Anyone else have any thoughts or feelings about loans,

8       citizens from other countries who come to the U.S. for their

9       school?

10          And you'll hear -- you'll hear throughout the trial about

11      this terrible term "aliens," which has got to be a holdover

12      from 200 years ago, but unfortunately that's what the law still

13      says.  The first people from other countries is aliens.  So

14      we're sort of forced to use that to a certain extent, but I'm

15      going to try to avoid it.

16          Thank you for sharing, Ms. Coleman.

17          What about -- several of you had some experience about the

18      sort of online or distance-learning thing, and that sort of

19      post-dates my schooling, but does anyone have any feelings

20      about whether that's a good -- good idea or bad idea or whether

21      it should be allowed or disallowed?

22          No hands.

23          So my client is charged with some -- a number of felonies,

24      which you've heard generally.  You'll hear specifically what

25      they are later.  They -- the way this works -- some of you have

1    been on juries before, but the Government has charged -- chosen

2    to charge my client with these felonies.  So they have to prove

3    them.  If they don't prove them, my client's entitled to an

4    acquittal.  The burden is totally on them.

5         Legally, technically I don't have to lift a finger.  I can

6    sit here playing on my iPhone and not ask a single question

7    during the whole trial.  I've never done that, and I'm not

8    going to do that, but as a practical matter, they have the

9    burden here.  That's what the Constitution requires.  That's

10   the way our whole system is set up.

11        Does anybody have any feelings about whether that's fair to

12   require to put the Government to its burden of proof, to make

13   the Government prove these things?  Does anyone have any

14   feelings whatsoever that because we're sitting here today --

15   because my client is sitting here today, that she must have

16   done something wrong, that something happened?

17        Really -- seeing no hands there, too.

18        Really, what this trial is and the only thing this trial

19   is -- if you get on this jury, what you'll be asked to decide

20   is a single question:  Has the Government proven beyond a

21   reasonable doubt the charges that they brought against my

22   client?  You're not necessarily asked to decide what she did,

23   what she really did, did she do anything.  What you have to

24   think about and decide is:  What has the Government proven, and

25   have they proven it beyond a reasonable doubt?

1        Is there anyone among the 18 here that we've been talking

2    to that would have a problem sitting here for most likely most

3    of March, maybe a little bit of April -- I don't know exactly.

4    Estimating these trials is a little bit of an art.  Is anyone

5    going to have a problem holding the Government to its burden of

6    proof here?

7        Is anyone going to have a problem sitting through the

8    testimony and hearing all the evidence and saying at the end of

9    it, "You know, maybe something happened.  Maybe even something

10   probably happened, but they haven't proven it beyond a

11   reasonable doubt.  They haven't proven these specific charges

12   beyond a reasonable doubt"?  Is there any one of you that would

13   have a problem voting not guilty at the end of the day?

14       Most of you have heard this.  I'm sure you've all heard it

15   at some point, but as part of the way our system is set up, my

16   client has an absolute right not to testify if she doesn't want

17   to.  The Government can subpoena anybody in the whole country

18   to testify against her except for one person, and that's her.

19   She can choose to testify at the end of the day, or she can

20   choose not to.

21       Does anyone have any thoughts or feelings about whether

22   that's a good way to run things?  If she chooses not to

23   testify, the judge will instruct you at the end of the case

24   that you're not allowed to consider that.  You're not allowed

25   to go in the jury room and say, "You know, why didn't she

1    testify?  She must have had something to hide."  You have to

2    disregard it.  You have to set it aside.

3         Is there anybody that would have a problem ignoring the

4    fact that my client doesn't testify if she chooses not to?  And

5    I'm not saying that she won't.  I'm not making a prediction one

6    way or another.  Is there anyone that would find that hard?

7         Ms. Brandon, I just have to ask a quick follow-up --

8              PROSPECTIVE JUROR BRANDON:  Sure.

9              MR. BABCOCK:  -- just because you know the judge.

10             PROSPECTIVE JUROR BRANDON:  Well, we worked together.

11   We worked for the same organization.

12             MR. BABCOCK:  I understand.

13        So you were basically an administrative staff of the

14   court --

15             PROSPECTIVE JUROR BRANDON:  That's correct.

16             MR. BABCOCK:  -- at the main courthouse in Oakland?

17             PROSPECTIVE JUROR BRANDON:  At Oakland Superior.

18             MR. BABCOCK:  Okay.  You can see the judge at

19   meetings and things like that?

20             PROSPECTIVE JUROR BRANDON:  I work in an office.

21   That is where the judges' conference room is located, and from

22   time to time, he would have several meetings within that

23   conference room, and sometimes I'd be asked to set up a

24   conference or video system or provide some assistance.

25             MR. BABCOCK:  So it doesn't sound like there's

1    anything about that that's going to make you feel funny about

2    being on this jury.

3              PROSPECTIVE JUROR BRANDON:  Oh, absolutely not.

4              MR. BABCOCK:  Okay.  And if you get on the jury,

5    you'll vote your conscience and not think in the back -- back

6    of your head, "What would Judge Tigar want?"

7              PROSPECTIVE JUROR BRANDON:  Oh, yeah.  No, that has

8    nothing to do with why I'm here.

9              MR. BABCOCK:  Okay.  And I'm sure --

10             PROSPECTIVE JUROR BRANDON:  I'm doing my civic duty.

11             MR. BABCOCK:  I'm sure if you asked him, he'd tell

12   you, "I want you to vote how you decide to vote."

13             PROSPECTIVE JUROR BRANDON:  Right.

14             THE COURT:  Mr. Babcock, that's a good -- that's

15   something else that I think I'd like to talk to the jury about

16   for just one second.

17        You'll hear me instruct you at some point not to pay

18   attention to my facial expressions or the tone of voice that I

19   use or anything else and try to figure out how I want this case

20   to come out, and there are two good reasons for that.

21        The second best reason is I have 300 cases.  So what you're

22   seeing on my face or hearing in my voice may have nothing to do

23   with this case.  It might have to do with a different case, but

24   the best reason is my opinion on how this case should come out

25   is totally irrelevant.  I'm not the judge of anything in this

1    case.

2         I was not exaggerating a moment ago when I said you're the

3    most important people in the courtroom.  You're going to decide

4    this case, and Mr. Babcock is exactly right.  The way I want

5    you to vote in this case is the way you think you should vote

6    after you apply the law to the evidence in this case.  That's

7    what the Constitution requires.

8         And so, again, whatever -- whatever you think you see on my

9    face or however you think I think about the case is totally

10   irrelevant.

11        Mr. Babcock?

12             MR. BABCOCK:  Thank you, your Honor.

13             PROSPECTIVE JUROR BRANDON:  Just as evidence, when I

14   served on the robbery Oakland trial, I was an employee of the

15   Superior Court.  So --

16             MR. BABCOCK:  Fair enough.

17             PROSPECTIVE JUROR BRANDON:  -- I was able to use

18   my -- base my own decisions and make a decision.  Thanks for

19   asking.

20             MR. BABCOCK:  Thank you.

21        Mr. Gagnon, you've actually been on another federal jury?

22             PROSPECTIVE JUROR GAGNON:  Yes.

23             MR. BABCOCK:  That's remarkable.

24             PROSPECTIVE JUROR GAGNON:  It is.

25             MR. BABCOCK:  Who was the judge?

```
 1                    PROSPECTIVE JUROR GAGNON:  I don't remember, but I
 2        think it was two doors down, maybe one door down.  I can't
 3        remember.
 4                    MR. BABCOCK:  Woman judge?
 5                    PROSPECTIVE JUROR GAGNON:  What?
 6                    MR. BABCOCK:  A woman or a man?  Probably Alsup or
 7        Chesney.
 8                    PROSPECTIVE JUROR GAGNON:  What?
 9                    MR. BABCOCK:  Alsup or Chesney, maybe Breyer.
10                    PROSPECTIVE JUROR GAGNON:  I think it was Chesney.
11                    MR. BABCOCK:  And I'm sorry.  How long ago was that
12        jury service?
13                    PROSPECTIVE JUROR GAGNON:  It was either three years
14        ago or four years ago in August.
15                    MR. BABCOCK:  That was --
16                    PROSPECTIVE JUROR GAGNON:  Probably August.
17                    MR. BABCOCK:  That was a civil case?
18                    PROSPECTIVE JUROR GAGNON:  It was a civil case.
19                    MR. BABCOCK:  And you understand the burden of proof
20        in this case is much higher?
21                    PROSPECTIVE JUROR GAGNON:  Yes.
22                    MR. BABCOCK:  You said that was a patent case?
23                    PROSPECTIVE JUROR GAGNON:  It was a patent case.
24                    MR. BABCOCK:  I don't actually know what the burden
25        of proof in a patent case is -- thank goodness -- but I assume
```

 1    it's probably what's called a preponderance of the evidence --

 2              PROSPECTIVE JUROR GAGNON:  Okay.

 3              MR. BABCOCK:  -- which is if you sit through the

 4    trial and if the plaintiff has proven their case more probably

 5    than not, which is usually -- it's like -- it's not 50/50 but

 6    51/49.  They've proved their case.

 7              PROSPECTIVE JUROR GAGNON:  Right.

 8              MR. BABCOCK:  It's more likely than not.  That's

 9    not -- that's not the burden here.

10              PROSPECTIVE JUROR GAGNON:  Okay.

11              MR. BABCOCK:  The burden is beyond a reasonable

12    doubt.

13              PROSPECTIVE JUROR GAGNON:  Right.

14              MR. BABCOCK:  And no one is going to give you a

15    number of exactly what that means, but what it is is the judge

16    set the highest burden we have in the law.

17              PROSPECTIVE JUROR GAGNON:  Correct.

18              MR. BABCOCK:  It's a difficult burden.  So they can

19    prove more likely than not something happened but not prove it

20    beyond a reasonable doubt.

21              PROSPECTIVE JUROR GAGNON:  Correct.

22              MR. BABCOCK:  Does that make sense to you?

23              PROSPECTIVE JUROR GAGNON:  Yes.

24              MR. BABCOCK:  Thank you.

25         One of the things I mentioned -- the way this works is

1    you're going to sit and you're going to listen to the evidence

2    for the next several weeks, and at the end of the case, you'll

3    hear our closing statements, and the judge will tell you what

4    the law is, and then you're going to go in the back there to

5    the jury room, and you're going to deliberate.  And that's just

6    a fancy word for talking to each other, talk to each other

7    about your views of the case.

8        You're not allowed to talk to each other before then about

9    the case.  You're allowed to talk to each other if you're on

10    the jury, but we ask that you don't come to any firm opinions

11    until the very end, until you've heard all the evidence and all

12    the argument and until you start talking to your fellow jurors.

13        So we basically ask you to keep an open mind, but at some

14    point you have to make up your own mind, and you have to talk

15    to your fellow jurors, and you have to consider their views.

16    And after talking to them, you may even change your opinion,

17    but when you cast a vote, when it comes time to vote guilty or

18    not guilty, it's not -- it's not a group decision.  It's not

19    nine people say, "Guilty."

20        "Well, I'm going to go along with that."

21        Everybody has to cast their own vote, make their own

22    decision.

23        Is there anybody that feels uncomfortable -- feels like

24    they would be too uncomfortable talking to their fellow --

25    other jurors and maybe come to a contrary opinion?

 1          There was one of you that was an alternate on a trial.  I

 2     forgot who that was.

 3              PROSPECTIVE JUROR MORGAN-STENHOUSE:  I was.

 4              MR. BABCOCK:  Did you feel a little bit -- you didn't

 5     get to deliberate at the end?

 6              THE COURT:  Excuse me.  Just one second, Mr. Babcock.

 7          Mr. Reporter, Charlene Morgan-Stenhouse.

 8              MR. BABCOCK:  Thank you, your Honor.

 9          You didn't get to deliberate then?

10              PROSPECTIVE JUROR MORGAN-STENHOUSE:  No.

11              MR. BABCOCK:  Did you feel a little bit like you

12     missed out on something?

13              PROSPECTIVE JUROR MORGAN-STENHOUSE:  No.  I sat

14     through everything else that went on.

15              MR. BABCOCK:  Okay.  Fair enough.

16          Now, every -- the judge has asked you this, and Ms. West

17     asked you this, but I'm going to ask one more time because I've

18     sat through a trial.  I've had trials where we went through

19     two, three days of jury selection and at the end of the case

20     the jury is sworn and they come back the next day and first

21     thing in the morning say, "Your Honor, there's something I

22     forgot to tell you.  I can't be on this jury.  I can't be fair"

23     or "I have a scheduling conflict" or something.  If any of you

24     think of anything, just try to let us know.

25          Okay.  Thank you, your Honor.

1          THE COURT:  Thank you.

2      I'm going to ask to see the lawyers at sidebar in just a

3  second.  Before I do that, I want to just say a few things to

4  you as a group.

5      First of all, just a reminder to those of you in the

6  audience or not in the six-pack or the box, please pay close

7  attention because in just a moment the lawyers will start

8  exercising challenges, and then we're going to refill the

9  six-pack, and I'm just going to ask the jurors who sit there,

10  "You've heard the questions that I asked and the questions the

11  lawyer asked" -- "lawyers asked.  Do you have affirmative

12  answers to any of those questions that we need to know to

13  evaluate your fitness to serve on this jury?"

14      And I may come back to a couple of questions, or the

15  lawyers may, but generally we want this to move along.  So I

16  need you to pay close attention.

17      One of you had a hand up at one point in the audience.  I

18  asked you to put your hand down.  That's because we move in a

19  certain way here.  At the break, if there are things that you

20  need to alert the Court to, you can tell court staff, and

21  that's because information needs to flow in a certain way.  You

22  can let Mr. Noble know whatever it is you needed to tell me or

23  the lawyers, and we will respond accordingly.

24      I should have mentioned this earlier.  We have -- we have a

25  lot of Latin in the law by the way.  I don't know why that is,

1    but we love Latin.  There's a rule, no ex parte contact, and

2    all that means is you are not allowed to have contact with

3    anybody, including each other, about the facts of this case

4    unless one of two things happens.

5         If you're excused, you're excused.  I let you go today.  Or

6    you're still on the jury, the jury is excused, or you're on the

7    jury and you are deliberating and you're done.  Well, excuse

8    me.  You're deliberating then.  When you're deliberating, you

9    can talk about the facts of the case.  Obviously, you have to

10   make a decision.

11        Up until that time, it's important for you to do two

12   things.  You're not to form or express any opinion about the

13   case.  So the "form" part means you've got to keep an open

14   mind.  You've got to keep an open mind.  We can only give you

15   the evidence one piece at a time.

16        I'll give you an example.  Let's say you're watching

17   somebody behind the podium and they said, "How tall do you

18   think that guy is?"  And you're a pretty good visual estimator,

19   and you figure out the distance, and you figure out -- you

20   know, you look at the podium and the space and everything and

21   say, "I think that guy is about six feet tall."  See, that's

22   fine.

23        Did you know the second piece of evidence?  You get the guy

24   behind the podium.  He's standing on a little platform that's

25   about one foot tall.  Now how tall do you think he is?  Well,

1       he's about five feet tall.

2           That's the way trials are.  You get a piece of evidence.

3       Then you get another piece.  Then you get another piece.  So

4       you have to keep an open mind and not make up your mind until

5       all of the evidence is in.

6           The second part, though, is "express."  You can't give any

7       information or receive any information about the case from any

8       source, not each other here in the courtroom, not the Internet.

9       There will be a longer instruction on that.  The lawyers know

10      about this rule.

11          And so if you see one of the lawyers or the witnesses in

12      the case, you may want to come up, and they may just turn away

13      and run down the hallway.  They're not trying to be rude, but

14      they -- they are not even going to say good morning to you, and

15      why is that?  Because they don't have any manners?  No.

16          What if you were one of the United States Attorneys or the

17      defendant in this case and in the distance you saw a juror

18      talking to the other side?  You couldn't hear what they said.

19      What would you think?  You wouldn't know what they were saying,

20      and that would make you nervous.  So the parties are not --

21      maybe they're not even going to say good morning to you, and

22      that's because they know how important this rule is to the

23      appearance of fairness in the case.

24          And then just to pick up on what Mr. Babcock said about

25      tomorrow morning, someone is going to raise their hand and say

1      they have a scheduling conflict.  Don't waste your time.

2      Mr. Younger took care of that earlier this morning.  So you're

3      here for the long haul on that.  I'm looking forward to having

4      you be here on the jury, but we're not going to do that

5      anymore.  I don't want anybody to get that idea in their mind.

6           Could I see counsel at sidebar, please.

7                          (Unreported sidebar.)

8           THE COURT:  Okay.  Respective members of the jury, at

9      this point the lawyers are going to exercise peremptory

10     challenges.

11          In our system of justice in criminal justice, we allocate

12     different things in different ways to try to make sure we have

13     a fair process.  The defendant gets a few more peremptory

14     challenges than the Government does.  That's the way Congress

15     wrote the law, and the Government has the burden of proof and

16     so forth.

17          Anyway, one of the things that's different is the defendant

18     has a few more peremptory challenges.  They call them

19     peremptory because the lawyers don't have to have a reason.

20     They're not going to give a reason, and you're not to speculate

21     as to the reason because it's not important, and it's not

22     relevant.

23          For those of you who are about to be excused, I just want

24     to say it doesn't mean that you're not -- you wouldn't be a

25     good juror.  It just means maybe this is not the best case.

1    I'm not going to get a chance to say it later, so I want to

2    thank you for coming in and letting me talk to you and the

3    lawyers talk to you.

4         The first peremptory challenge -- I'm trying to find my

5    notes.  Here we go.  The first peremptory challenge falls to

6    the Government.

7              MS. WEST:  The Government thanks and excuses Juror

8    No. 19, Ms. Allums.

9         Thank you.

10             THE COURT:  Juror Number -- I mean -- okay.  In Seat

11   No. 11?

12             MS. WEST:  Yes.

13             THE COURT:  Ms. Allums, thank you very much.  You are

14   free to go.

15        The next two peremptory challenges fall to the defendant.

16             MR. BABCOCK:  Your Honor --

17             THE COURT:  Oh.  I'm sorry.  I beg your pardon.

18        Could I ask Ms. Brandon to take Seat No. 11?

19        And, counsel, just to let you know, if I forget to do that

20   and refill the box, feel free to stop me and remind me.

21        Mr. Babcock?

22             MR. BABCOCK:  Thanks, your Honor.

23        I'd like to thank and excuse Ms. Coleman, Juror No. 9.

24             THE COURT:  Ms. Coleman, thank you.  You are excused

25   from this jury.

1          The next peremptory challenge also falls to the defendant,

2     and -- I'm sorry.  Yeah.

3          Ms. Flowers, let me ask you to sit in Seat No. 9.

4               MR. BABCOCK:  I pass, your Honor.

5               THE COURT:  Well -- oh, I see.

6          Does the Government need a sidebar on that?

7               MS. WEST:  If we could for a moment, that would be

8     great.

9               THE COURT:  Sure.

10         Let me admit something to everybody in the room.  I've been

11    a trial judge for a long time.  Okay?  I tried a lot of state

12    and -- a lot of civil and criminal cases in the state court,

13    and I've tried several civil cases already.  This is my first

14    federal criminal jury trial.  So Mr. Gagnon actually has one on

15    me.

16         Anyway, I just want to -- this is a question really that I

17    have.  So let me talk to the lawyers at sidebar.

18                        (Unreported sidebar.)

19               THE COURT:  Okay.  The defendant passed.

20               MR. RHYNE:  May we have a moment, your Honor?

21               THE COURT:  Yes.

22               MS. WEST:  The Government passes.  Thank you.

23               THE COURT:  I am -- that just blows my mind.  This is

24    not a very judicial thing to say.  This is a lengthy criminal

25    case in Federal Court, and these parties had a total of 16

1    peremptory challenges they could have exercised, and they

2    exercised two, and the reason they did that is because they are

3    both very satisfied that all 12 of you are going to be fair and

4    impartial jurors in this case.

5        Now, I know there's good things and bad things that means

6    for all of you, but I will tell you that is an extraordinary

7    vote of confidence in your ability to do a good job in this

8    case.

9        I know these lawyers, and these are good lawyers by the

10   way.  I have a lot of confidence in the lawyers on both sides

11   of this case, and I'm glad they're in this courtroom trying

12   this case.  But believe me, they're not trying to do each other

13   any favors.  That's not their job.  So for them to have passed

14   like that -- anyway, that's -- that's a surprise and a very

15   pleasant surprise for me.

16       I'd ask the 12 of you to stand up and raise your right

17   hand.

18           THE CLERK:  Do you and each of you solemnly swear or

19   affirm that you will well and truly try the issues joined in

20   this case and a true verdict rendered according to the law and

21   evidence?

22           (The jurors answered in the affirmative.)

23           THE CLERK:  Thank you.  You may be seated.

24           THE COURT:  Thank you.

25       That does not complete jury selection in this case.  We

1    also need to select four alternates in this case.  One of you

2    knows what an alternate is because you've served as an

3    alternate.  An alternate juror sits in the courtroom and

4    listens to exactly the same evidence and argument and observes

5    the same proceedings as the other 12 jurors and is available if

6    at any time during the trial a juror -- one of your 12 regular

7    jurors needs to be excused for illness or some other reason.

8        I have -- and that person is selected randomly from the

9    four.  So if you are an alternate, you could -- you're just as

10   likely as any other alternate to be selected to substitute in

11   regardless of what order you are selected as an alternate.  I'm

12   going to tell you a story against my better judgment because

13   I'm a little tired, and I'm tired of this story.  It makes me

14   choke up, but it's a good story.

15       I had a civil trial in Alameda County in the state court I

16   used to sit.  It lasted probably three, three and a half weeks,

17   and I had a gentleman who was an alternate juror in the case.

18   He was in the City of Alameda, the little island city right

19   next to Oakland, and he was an engineer of some kind.

20       When you sit up high like I do, you can -- you have a good

21   view of the jurors, and you can see who's getting along, and

22   you can see the friendships that develop and that kind of

23   thing.

24       Everybody really liked this guy.  You could tell.  He was

25   an alternate.  He paid very close attention.  He took notes.  I

1    saw him pass up a question more than one time, would not have

2    been able to distinguish him from one of the regular jurors.  I

3    knew from voir dire that he had been an alternate before and

4    that in another trial he had been an alternate.  He had not

5    been asked to substitute in.  So he was excused without

6    deliberating.

7         And in this trial that I was presiding over, I swore in the

8    bailiff and sent back the jury, and two alternates were

9    remaining, including this gentleman.  He was a veteran of the

10   military, and I said to him, you know, "I just really want to

11   thank you because we need alternates.  They're just as

12   important as every other party of the system, but you're not

13   going to be able to deliberate, and I know you already did this

14   once before, and that just strikes me as a kind of" -- "as a

15   unique and higher contribution to the process.  I just wanted

16   to acknowledge it."

17        And he said, "Well, you know, I put my life on the line for

18   this country twice so you could do this.  This?  Being an

19   alternate?  That's a walk in the park."  A smile on his face

20   the whole time.

21        Anyway, I like alternates, too, and they're just as

22   important as any other kind of juror.  We're going to pick

23   alternates using essentially the same process.

24        Before I ask -- before we refill the six-pack, could I see

25   counsel at sidebar for just one more time?

1              (Unreported sidebar.)

2          THE COURT:  Well, today is full of surprises for me.

3     We're going to select four alternates for this jury, and the

4     lawyers start from scratch on peremptories on that.  So each

5     side gets an additional two peremptories to exercise if they

6     wish, or in this case, they can just decide they're happy with

7     the four people that they've already met, which is the decision

8     that they've made.

9          So, ladies, could I ask the four of you to stand up and

10    raise your right hand?

11         THE CLERK:  Do you and each of you solemnly swear or

12    affirm that you will well and truly try the issues joined in

13    this case and a true verdict rendered according to the law and

14    evidence?

15              (The alternates answered in the affirmative.)

16         THE CLERK:  Thank you.  You may be seated.

17         THE COURT:  Thank you.

18         So let me say to the jurors and my four alternates that we

19    have some administrative things to do together today, and after

20    we do those, I'll let you go for the day, and we'll start up

21    with the presentation of evidence and opening statements and

22    preliminary instructions and all that sort of thing tomorrow.

23    Frankly, I didn't anticipate getting to this point, but it's

24    early in the day.  It's a good sign, and it's a nice way to

25    start the case.

1        But before I do that, let me say to those of you in the

2    audience, you can -- I really like jury trials, and I really

3    like juries, and one of the reasons I like them so much is

4    because I love this Northern District.  I love all the people

5    in this district.  It's one of the most diverse and interesting

6    set of communities, I think, anywhere in the country, and I

7    would match this district against anywhere in terms of the

8    ability of the citizens to make the decisions.

9        I've gotten to know these jurors and these alternates a

10   little bit this morning, and I'll get to know them a little

11   better as the trial goes along.  I've not got to meet any of

12   the rest of you yet, which is too bad for me.  So you may not

13   be looking forward to the next time you get that jury summons

14   in your mailbox, but I'm looking forward to it because I would

15   like to get the chance to meet some more of you.

16       I thank you all for your very close attention today.  Those

17   of you who were not selected for the jury are now excused with

18   my thanks for your service so far today.  Thank you.  You can

19   go ahead and make your way out of the courtroom.

20       And those of you who are on the jury or the alternates,

21   I'll ask you to remain.

22       (Proceedings were heard in the presence of the jury:)

23           THE COURT:  All right.  The record will reflect that

24   those jurors who were not seated as jurors or alternates have

25   now been excused and have left the courtroom.

1     Let me just say a few things.  First of all, a big thank

2     you in advance.  I take your commitment to this process very

3     seriously, and I hope that you'll observe that as we go through

4     this day to day.  We don't take your service for granted.  You

5     are -- we do expect this of our citizens, but we all know the

6     fact is some citizens have to contribute a little more than

7     others.

8     Mr. Gagnon, we really obviously come back to you -- well,

9     with him.  So we take that seriously, and we're going to honor

10    your service in a way that we conduct this trial.

11    Traffic in the Bay Area is not in my area.  I wish there

12    was something I could do, but that -- but there's not -- the

13    traffic isn't good around here, and it will impose some costs

14    on you.  Just looking quickly, we've got jurors -- well, mostly

15    from the adjacent counties, although we've got a couple

16    folks -- Ms. Jones coming all the way from Martinez.

17    The reason I raise this is first to express my sympathy but

18    second to say it's important to get here on time.  All of us

19    are waiting for you to get here on time.  So please figure out

20    how to do that.  I'm not always able and the lawyers are not

21    always able to have everything start and stop exactly when we

22    want, but we're going to try our darnedest, and most of the

23    time we will.

24    So we want you to be on time because your fellow jurors are

25    counting on you to do that.  Get your parking if you need that.

1    Get through security, whatever it is.

2        Effective immediately, if you have water or coffee you want

3    to bring in here, you're welcome to do it.  Please have a lid

4    on it there.  Your federal government, as you know, is not

5    overflowing with money, and so we don't have any money to

6    replace that stuff in the jury box.  We're going to try to keep

7    it nice for the next jury, too, but if you need to bring a

8    beverage in here, you're welcome to do that.

9        I do have the best courtroom deputy in the Northern

10   District.  His name is William Noble.  He will be your

11   ambassador to this court.  In case you have any issues,

12   logistical or otherwise, address those to Mr. Noble.  If I hear

13   about it or the lawyers need to hear about it, he'll make sure

14   to tell us.  Often, these issues are logistical issues that he

15   can just help you with directly.

16       I've already told you about the rule on ex parte contact.

17   I probably will remind you several times throughout the trial

18   of that rule and how important it is.  Tomorrow, I'll read you

19   sort of all of these instructions, but don't use Google.  Don't

20   go on Facebook and talk about it.

21       The rule is actually very simple.  This case is a secret

22   essentially.  This case is a secret, and the only people

23   allowed to talk about secrets are us, and we're not -- you are

24   not even allowed to talk to each other about it.

25       You have to -- one of the great things about American

1    trials is all the evidence gets examined thoroughly by both

2    sides.  All the information gets examined thoroughly by both

3    sides.  Witnesses get cross-examined.  We can hold it up to the

4    light of day.  Everybody -- all of us are looking at that at

5    the same time.  If you go outside and get information or get

6    information, if you talk to somebody about the trial, if you're

7    on the Internet, then that process is not working.

8        So I need you not to get any information or talk to anybody

9    about the case.  Obviously, you can tell your employer or your

10   family about how long the trial is and the fact that it's a

11   criminal trial in San Francisco, and that's it.

12       Generally speaking -- is Ms. Jones here?  Yes, she is here.

13   Not Ms. Jones.  Ms. Flowers, as I told you before, our breaks

14   are -- occur at approximately 10:00 o'clock and approximately

15   11:45.  If you find or if any of you find it's -- because you

16   have back or other issues, if there's something that we can do

17   to accommodate you, we'd like to know what it is.  We're not

18   always able to make that accommodation but would like to be

19   able to try if I can.

20       I think that's all -- all the speeches you're going to get

21   from Judge Tigar today.

22       Just in terms of tomorrow, first of all I'll give you some

23   preliminary jury instructions.  I'll just explain to you a

24   little bit how to do your job as jurors, evaluate the evidence,

25   and that sort of thing.  Then you'll hear opening statements

1    from the lawyers.  Opening statements are not evidence.

2    They're just a description from the lawyers of what they think

3    the evidence in the case is going to show.  Neither side has to

4    make an opening statement if they don't want to.  And then when

5    the opening statements are done, we're going to hear evidence.

6    All of those things are going to happen tomorrow, and then

7    after that, we'll just be hearing evidence.

8         Thank you so much.  I will now excuse you.

9         No.  Actually, do either counsel want to --

10            MR. BABCOCK:  No.

11            THE COURT:  I'm going to excuse you.  Mr. Noble is

12   going to take you and show you the jury room.  I used to have

13   the smallest jury room on this floor, and then I noticed

14   there's some bookshelves in there, and there's big cabinets

15   that no one was using.  So I got -- the federal contractor

16   people just ripped those out and repainted the wall.  Now I

17   still have the smallest jury room on the floor, but it's a

18   little bigger than it used to be.

19        Mr. Noble is going to take you back there and just show you

20   the layout of the building and that sort of thing.  I really

21   appreciate your jury service.  I'm looking forward to seeing

22   you tomorrow at 8:30.

23        Thank you.

24            THE CLERK:  All rise.

25   ///

```
 1              (Proceedings were heard out of the presence of the jury:)

 2              MR. BABCOCK:  Well, that was fast.

 3              THE COURT:  Yes.

 4         I just want to say I was sincere when I said to the jury

 5    about how happy I am with the lawyers that circumstances

 6    conspired to put in the courtroom on this trial, and I -- I'm

 7    not someone who ever feels the need to rush voir dire.  You

 8    already know that, but it sure was a pleasant surprise that it

 9    went that quickly.

10         So I am going to take another look at the Government's

11    proposed jury instructions.  I intend to just read the

12    preliminary Ninth Circuit jury instructions tomorrow.

13         Is there anything on the subject of jury -- preliminary

14    jury instructions anybody would like to say now?

15              MS. WEST:  No, and I don't think these were jointly

16    stipulated, and I don't think there were any variations on the

17    model instructions from the Ninth Circuit.  So --

18              THE COURT:  Oh.  Very good.

19         Oh.  I didn't realize they were subject to a stipulation.

20    Is that so?

21              MR. BABCOCK:  Yeah.  They submitted them on behalf of

22    both of us --

23              THE COURT:  Very good.

24              MR. BABCOCK:  -- after we agreed on them.

25              THE COURT:  Very good.
```

 1        Okay.  Well, that's good to know that the instructions have

 2    been stipulated by the parties.

 3        At sidebar, I would like the record to reflect that at

 4    sidebar the Government made a challenge for cause to Juror --

 5    then-Juror No. 11, Charlie Allums, A-l-l-u-m-s, based on her

 6    comment during voir dire in response to Ms. West's questioning.

 7    And I believe the quote was "can't put into words what" -- "the

 8    Government's ruse makes me feel uncomfortable" or words to that

 9    effect, and I even felt that her expressed opinion did not rise

10    to the level of cause, and I denied that challenge.

11        Ms. West, would you like to supplement the record?

12            MS. WEST:  No.

13            THE COURT:  Very good.

14        Is there anything else at sidebar or otherwise that anyone

15    wants to place on the record?

16            MR. RHYNE:  Your Honor, I believe you wanted to

17    mention the first issue that we had with Juror No. 11, who

18    couldn't hear or possibly not --

19            THE COURT:  Oh.  Thank you.  Yes.  Thank you because

20    otherwise the numbers -- yes.  Thank you.  We need to make a

21    clear record of that.

22        Earlier in the proceeding, there was a juror named -- I

23    have it.

24            MR. BABCOCK:  Got it.  Camarillo.

25            THE COURT:  Julito Camarillo, C-a-m-a-r-i-l-l-o.

1    During my questioning of Mr. Camarillo, he indicated that

2    he was having trouble hearing me, but it also became apparent

3    to the Court that he could hear me but in some respects was

4    having trouble understanding me.

5    And at sidebar, I discussed that issue with counsel, and

6    the parties agreed that I could simply put him back into the

7    audience and call another juror in his place because we really

8    had not done any voir dire of him or the jurors after him and

9    then get to his language issues later if the need arose, and so

10   that's what we did.

11   Anybody want to supplement the record further?

12   MR. BABCOCK:  That's what happened.

13   MR. RHYNE:  That's accurate, your Honor.

14   THE COURT:  Anything else?

15   MS. WEST:  Just one thing to foreshadow -- since we

16   were just talking about the jointly submitted jury

17   instructions.

18   This isn't something we need to deal with now, but there is

19   one jury instruction that -- at least on the Government's side

20   that we submitted for the end of the case that we think is sort

21   of confusing.  So even though that was jointly submitted, we

22   will want to revisit that later.

23   THE COURT:  Very good.

24   We'll have plenty of opportunity for a further jury

25   instruction conference.  I just wanted to make sure we were

```
1     lined up for tomorrow.
2              MR. RHYNE:  Your Honor, with respect to courtroom
3     setup, we anticipate showing a short slide presentation
4     tomorrow in opening.  We wanted to know from your perspective
5     whether you'd like us to try to get the courtroom all set up
6     today or whether you'd like us to come in early tomorrow to do
7     that.
8              THE COURT:  I think today would be better only
9     because I'm jealously guarding Mr. Noble's time, and we find it
10    challenging as a chambers when we're in trial to do all of that
11    and work and that sort of thing.  If you can do that today,
12    that would be great.
13             MR. RHYNE:  We can probably do it in a few minutes.
14             THE COURT:  Okay.  Anything else?
15             MS. WEST:  Just logistically, where would the Court
16    like to seat the four alternates?
17             THE COURT:  I'll have to talk about that with
18    Mr. Noble.  My guess is that -- well, that's interesting
19    because we'll have that screen at the bottom there.
20             MS. WEST:  Yeah.  We were hoping --
21             THE COURT:  Two of them -- two of them could sit in
22    the box --
23             MS. WEST:  Right.
24             THE COURT:  -- because we've got 14 in the box.
25             MS. WEST:  Right.
```

```
 1                    THE COURT:  And then maybe we can have --

 2                    MR. BABCOCK:  One in the --

 3                    MS. WEST:  Would it be possible to seat in front of

 4       the box here, too?  Is that a fire hazard?

 5                    MR. BABCOCK:  That's awkward.

 6                    THE COURT:  My suggestion is that we complete

 7       whatever on-the-record proceedings we need to have, and then

 8       off the record we can find some accommodation of how to work

 9       the chairs.

10          Anything else we need to discuss on the record?

11                    MR. BABCOCK:  Not today, your Honor.

12                    MR. RHYNE:  No, your Honor.

13                    THE COURT:  All right.  Very good.

14                    MS. WEST:  Thank you.

15                    THE COURT:  Let's go off the record.

16                    (Proceedings adjourned at 12:40 p.m.)

17

18

19

20

21

22

23

24

25
```

1    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5        I, James C. Pence, Federal Official Realtime Court

6   Reporter, in and for the United States District Court for the

7   Northern District of California, do hereby certify that

8   pursuant to Section 753, Title 28, United States Code that the

9   foregoing is a true and correct transcript of the

10  stenographically reported proceedings held in the

11  above-entitled matter and that the transcript page format is in

12  conformance with the regulations of the Judicial Conference of

13  the United States.

14

15                    Dated this 10th day of June, 2014.

16

17  _____

                    JAMES C. PENCE, RMR, CRR, CSR NO. 13059

18                  FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25