1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3       BEFORE THE HONORABLE JON S. TIGAR

4  UNITED STATES OF AMERICA,    )
                               ) Volume 2

5          Plaintiff,     ) Pages 137 - 345
                               )

6     VS.                 ) NO. 11-00288 JST
                               )

7  SUSAN XIAO-PING SU,
                               ) San Francisco, California

8        Defendant.      ) Tuesday, March 4, 2014
   _____) 8:31 a.m.

9

10         **TRANSCRIPT OF COURT PROCEEDINGS**

11  **APPEARANCES:**

12

13  **For Plaintiff:**      MELINDA HAAG
                        UNITED STATES ATTORNEY

14                   1301 Clay Street, Suite 340S
                   Oakland, California 94612

15           **BY:   HARTLEY M.K. WEST, ESQ.**
                 **WADE M. RHYNE, ESQ.**

16                 **ASSISTANT UNITED STATES ATTORNEYS**

17

  **For Defendant:**      Law Offices of Erik G. Babcock

18                 717 Washington Street, Second Floor
                   Oakland, California 94607

19           **BY:   ERIK G. BABCOCK, ESQ.**
                 **ATTORNEY AT LAW**

20

21

22

23

24

  Reported By:  James C. Pence, RMR, CRR, CSR No. 13059

25               Official Court Reporter - U.S. District Court
               Computerized Transcription By Case CATalyst

**I N D E X**

Tuesday, March 4, 2014 - Volume 2

|  | **PAGE** | **VOL.** |
|---|---|---|
| Opening Statement by Mr. Rhyne | 157 | 2 |
| Opening Statement by Mr. Babcock | 169 | 2 |

**GOVERNMENT'S WITNESSES**

|  | **PAGE** | **VOL.** |
|---|---|---|
| **SATIJA, VANDANA** | | |
| (SWORN) | 171 | 2 |
| Direct Examination by Mr. Rhyne | 172 | 2 |
| Cross-Examination by Mr. Babcock | 186 | 2 |
| Redirect Examination by Mr. Rhyne | 213 | 2 |
| Recross-Examination by Mr. Babcock | 220 | 2 |
| | | |
| **ELLIOTT, WILLIAM** | | |
| (SWORN) | 226 | 2 |
| Direct Examination by Mr. Rhyne | 227 | 2 |
| Cross-Examination by Mr. Babcock | 235 | 2 |
| | | |
| **WARNER, SUSANNA** | | |
| (SWORN) | 240 | 2 |
| Direct Examination by Ms. West | 240 | 2 |

**E X H I B I T S**

| **GOVERNMENT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1 | 260 | 261 | 2 |
| 2 | 309 | 310 | 2 |
| 3 | 314 | 315 | 2 |
| 4 | 318 | 319 | 2 |
| 5 | 278 | 280 | 2 |
| 12 | 330 | 331 | 2 |
| 13 | 335 | 335 | 2 |
| 50 | 336 | 337 | 2 |
| 102 | 326 | | 2 |

1              **I N D E X**

2

3             **E X H I B I T S**

4     **DEFENDANT'S EXHIBITS**                      **IDEN** **EVID** **VOL.**

5       106A                                        251   252   2

6       860                                         217   217   2

7       862                                         184   185   2

8       1000                                        204   205   2

9       1001                                        208   208   2

10      1002                                        209         2

11      1003                                        221         2

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Tuesday, March 4, 2014                              8:31 a.m.

 2                           ---000---

 3         (Proceedings were heard out of the presence of the jury:)

 4             THE COURT:  Let's go on the record for just one

 5    second.

 6         We're on the record in the matter of the United States

 7    versus Su.  The parties are here.

 8         Please don't respond up on my account.  I do otherwise when

 9    the jury comes in and out, and I encourage you to do the same

10    thing.

11         Mr. Noble and I yesterday discussed how to seat this fairly

12    large jury, and what we've decided to do is to use the chair at

13    the lawyers' bench and put another chair next to it and to have

14    those chairs respectively be Jurors 1 and 2 and then going

15    across the top row 3, 4, 5, 6, and 7 and then 8 through 12 in

16    the bottom row, and that has the effect of having the last four

17    chairs be the chairs for the alternates.

18         So it will all be self-explanatory when there are people in

19    the seats, but I didn't want anybody to be surprised.

20         Also, I'm just noticing now reading the preliminary

21    instructions from the Ninth Circuit model instructions that

22    there isn't very much emphasis and to some degree even any

23    language about the prohibition on outside communication and

24    electronic communication and going on the Internet and that

25    sort of thing.
```

1          And what I'd like to do, if you don't mind, is rather than

2     read Proposed Instruction No. 1 to read from the CACI, the

3     California state -- I have a civil one here, but it's not

4     limited to civil trials -- to read Instruction CACI 100, and

5     I'm happy to hand down my volume so you can see what it says

6     and you're not like a pig in a poke.

7                    MS. WEST:  Great.  Thank you.

8                    THE CLERK:  Bless you.

9                    MS. WEST:  Bless you.

10                   THE COURT:  Thank you.  Thank you.

11         Hold on a minute.

12         There, you can back up.

13                   MS. WEST:  That's fine for the Government.  That's

14    fine.

15                   THE COURT:  Mr. Babcock --

16                   MS. WEST:  Thank you.

17                   THE COURT:  -- does the defendant have any objection?

18                   MR. BABCOCK:  I'm familiar with the five -- I'm

19    sorry.  I'm familiar with it, your Honor, and it's certainly

20    more thorough than their counterpart.

21                   THE COURT:  Very good.

22         We -- I don't think -- two other things in our pretrial

23    conference.  One is the jurors taking notes during the trial.

24    I'll pass out notebooks, and I intend to instruct them that

25    they can take notes.  Does anyone have any objection or want to

1    be heard on that issue?

2              MS. WEST:  No.  I understand that.

3              MR. BABCOCK:  No objection, your Honor.

4              THE COURT:  The other issue is maybe slightly more

5    complicated, and that is jurors asking questions during the

6    trial not by raising their hands but by writing the question

7    down on a piece of blank notepaper, passing the question

8    forward to one of the jurors -- we'll decide who gets that

9    honor -- and then the Court collecting that, reviewing the

10   questions with counsel at sidebar, and then, once the

11   examination has been completed, the Court asking the question.

12       As to this, I'm not suggesting that I strongly want to do

13   it, and I'd also recognize that you are getting this on some

14   sort of a pop-quiz basis.

15             MS. WEST:  I generally don't favor that practice.  So

16   on behalf of the Government, we would vote against it.

17             THE COURT:  Mr. Babcock?

18             MR. BABCOCK:  I have encountered that a number of

19   times.  I'm not opposed to it as long as we have a chance to

20   see the notes and talk about them before the Court discusses

21   whether -- what the Court should -- which ones the Court

22   should --

23             THE COURT:  I think --

24             MR. BABCOCK:  -- make.

25             THE COURT:  Although I -- although I always do that

1    in my civil trials, I think I will not do it.  If we'd talked

2    about it much earlier and had a chance to talk about it at

3    length --

4              MR. BABCOCK:  That's fine.

5              THE COURT:  -- maybe I'd feel differently, but I

6    won't be doing that, but I will be telling the jurors that they

7    can take notes.

8              MS. WEST:  Thank you.

9              THE COURT:  Those are all the issues I have before

10   the jurors come in.

11        Is there anything else?

12             MS. WEST:  No.  Thank you.

13             MR. BABCOCK:  No, your Honor.

14             THE COURT:  Mr. Babcock?

15             MR. BABCOCK:  No, your Honor.

16             THE COURT:  All right.  Thank you.

17        (Proceedings were heard in the presence of the jury:)

18             THE COURT:  Good morning.

19        We are on the record in the case of the United States

20   versus Susan Su.  It's Case No. CR 11-288.

21        We're standing for you.  That's what was happening when you

22   came in.  I told you yesterday you're the most important people

23   in the courtroom.  It's true when I said it, and it's still

24   true.  It remains true.  We're very grateful for your jury

25   service.  This is a very, very important undertaking that we're

1    all doing together.  We're very grateful for your service and

2    for your punctuality this morning, and we so far appreciate

3    your good humor.

4        I told you yesterday that the proceedings this morning will

5    start by my reading you some preliminary jury instructions, and

6    then we'll hear opening statements of the parties, and then

7    we'll begin with the taking of the evidence.

8        You've been provided with notebooks.  You are free to take

9    notes throughout the trial or to not take notes as you'd like.

10   Remember that one of your most important jobs as jurors is to

11   view the credibility of the witnesses -- excuse me -- view the

12   testimony of witnesses and to judge their testimony, and we all

13   know from life experience that part of that task requires

14   observing tone of voice and facial expression and lots of other

15   things.

16       So make sure if you're taking notes not to become totally

17   distracted from your important job of judging the credibility

18   of the witnesses.

19       Later on when you're deliberating, you can use your notes

20   as an aid to refresh your recollection, but if you remember the

21   evidence a certain way and somebody else remembers it a

22   different way, don't give up your view of the evidence just

23   because they took a note and you didn't.  These notes are just

24   personal to you.

25       Also, they are confidential to you.  So at the end of the

1      trial, a member of my staff will collect your notes and destroy

2      them.  No one but you or another juror can be shown -- another

3      juror in deliberations will never see your notes, and so you

4      should feel free just to write down whatever you think will be

5      helpful to you in doing your jobs as jurors.

6          You're not to take the notebooks out of the courtroom or

7      the courthouse.  They're to stay here.  That's part of how we

8      keep them confidential, and we keep them later on through the

9      trial.

10         I am now going to read you some jury instructions, and I'm

11     going to read them to you.  I may depart a couple of times to

12     make short editorial comments, but for the most part I am going

13     to read them.  They state the law.  They're written in a pretty

14     conversational way, but they state the law, and because they

15     state the law, it's important that I read them as they appear

16     on the page.

17         Because there aren't very many of them this morning, I'm

18     just going to read them.  At the end of the trial, you'll get a

19     longer set of instructions, and at that point I'll give you

20     your own written set for each of you to keep just like your

21     notes.  You can write on them, and they'll be able to stick

22     with your notes at the end of the trial.

23         And when I do that, there will be an appendix -- an

24     appendix that has the instructions that I'll give you this

25     morning.  So you don't need to try to write them down in case

1     you think, "Well, at the end, I forgot what the judge told me

2     on the first day of trial."  You'll have a set in writing.  So

3     you don't have to worry about that.

4         All right.  And you may hear me also refer to numbers

5     occasionally, and that's because these are what's called

6     pattern jury instructions, and they have numbers associated

7     with them starting with CACI 100.

8         You have now been sworn as jurors in this case.  I want to

9     impress on you the seriousness and importance of serving on a

10    jury.

11        Trial by jury is a fundamental right in the United States.

12    The parties have a right to a jury that is selected fairly,

13    that comes to the case without bias, and that will attempt to

14    reach a verdict based on the evidence presented.  Before we

15    begin, I need to explain how you must conduct yourselves during

16    the trial.

17        Do not allow anything that happens outside this courtroom

18    to affect your decision.  During the trial, do not talk about

19    this case or the people involved in it with anyone, including

20    family and persons living in your household, friends and

21    coworkers, spiritual leaders, advisors, or therapists.  You may

22    say you're on a jury and how long the trial may take, but

23    that's all.  You must not even talk about the case with the

24    other jurors until after I tell you that it is time for you to

25    decide the case.

1    This prohibition is not limited to face-to-face

2    conversations.  It also extends to all forms of electronic

3    communications.  Do not use any electronic device or media such

4    as a cell phone, Smart Phone, PDA, computer, the Internet, any

5    Internet service, any text or instant-messaging service, any

6    Internet chatroom, blog, or website, including social

7    networking websites or online diaries, to send or receive any

8    information to or from anyone about this case or your

9    experience as a juror until after you have been discharged from

10   your jury duty.

11        During the trial, you mustn't listen to anyone else talk

12   about the case or the people involved in the case.  You must

13   avoid any contact with the parties or lawyers, the witnesses,

14   and anyone else who may have a connection to this case.  If

15   anyone tries to talk to you about this case, tell that person

16   that you can't discuss it because you're a juror.  If they keep

17   talking to you, simply walk away and report the incident to my

18   courtroom deputy, Mr. Noble, as soon as you can.

19        After the trial is over and I've released you from jury

20   duty, you may discuss the case with anyone, but you're not

21   required to do so.

22        During the trial, do not read, listen to, or watch any news

23   reports about this case.  I have no information that there will

24   be any such reports about this case.  Well, actually, I should

25   take that back.

1          Does anyone here -- at least one of you lives in Contra

2     Costa county.  Yes.  My recollection is that in the past there

3     have occasionally been news reports about this case in papers

4     that are specific to where you live, and so if you receive --

5     if there's a local newspaper in that area, it's probably a good

6     idea for you not to read it while this trial is underway.  If I

7     get other information that there is media coverage of any other

8     kind, I'll bring that to your attention.

9          This prohibition extends to the use of the Internet in any

10    way, including reading any blog about the case or about anyone

11    involved with it.  If you receive any information about this

12    case from any source outside the courtroom, promptly report it

13    to Mr. Noble.  It is important that all jurors see and hear the

14    same evidence at the same time.

15         Do not do any research on your own or as a group.  Do not

16    use Dictionaries, the Internet, or other reference materials.

17    Do not investigate the case or conduct any experiments.  Do not

18    contact anyone to assist you such as family, accountant,

19    doctor, or lawyer.  Do not visit or view the scene of any event

20    involved in this case or use any Internet maps or mapping

21    programs or any other program or device to search for or to

22    view any place discussed in testimony.  If you happen to pass

23    by the scene, do not stop and investigate.

24         It is important that you keep an open mind throughout this

25    trial.  Evidence can only be presented one piece at a time.  Do

1    not form or express an opinion about this case while the trial

2    is going on.  You must not decide on a verdict until after you

3    have heard all the evidence and have discussed it thoroughly

4    with your fellow jurors in your deliberations.

5        Do not concern yourselves with the reasons for the rulings

6    I will make during the course of the trial.  Do not guess what

7    I may think your verdict should be from anything I might say or

8    do.

9        When you begin your deliberations, you may discuss the case

10   only in the jury room and only when all the jurors are present.

11   And I think Mr. Noble has told you we're quite conscious of how

12   small our jury room is here, and so by the time you get to your

13   deliberations, I'm very confident that we will have found a

14   bigger place for you to deliberate because when you're

15   deliberating, you'll have to spend a lot more time in there.

16   So don't worry about that.

17       You must decide what the facts are in this case.  Do not

18   let bias, sympathy, prejudice, or public opinion influence your

19   verdict.

20       At the end of the trial, I will explain the law that you

21   must follow to reach your verdict.  You must follow the law as

22   I explain it to you, even if you do not agree with the law.

23       This is a criminal case brought by the United States

24   government.  The Government charges the defendant as follows:

25       In Counts 1 through 12, defendant Susan Xiao-Ping Su is

1       charged with committing wire fraud:

2               On September 15th, 2008, Count 1.

3               February 21st, 2009, Count 2.

4               January 10th, 2010, Count 3.

5               January 27th, 2010, Count 4.

6               July 27th, 2010, Count 5.

7               July 27th, 2010, again, Count 6.

8               August 31st, 2010, Count 7.

9               September 7th, 2010, Count 8.

10              September 20th, 2010, Count 9.

11              September 24th, 2010, Count 10.

12              January 7th, 2011, Count 11.

13              January 7th, 2011, Count 12.

14              Each in violation of 18 United States Code Section 1343.

15              In Counts 13 and 14, defendant Su is charged with

16      committing mail fraud on December 23rd, 2008, and

17      February 10th, 2009, each in violation of 18 United States Code

18      Section 1341.

19              In Count 15, defendant Su is charged with committing

20      conspiracy to commit visa fraud in or about February 2009

21      through January 19th, 2011, in violation of 18 United States

22      Code Section 371.

23              In Counts 16 through 19, defendant Su is charged with

24      committing visa fraud on July 27th, 2010, two counts, on

25      August 31st, 2010, and on September 7th, 2010, all in violation

1     of 18 United States Code Section 1546.

2          In Count 20, defendant Su is charged with using a false

3     document on September 24th, 2010, in violation of 18 United

4     States Code Section 1001, Subpart (a)(3).

5          In Count 21, defendant Su is charged with making a false

6     statement to a government agency on January 7th, 2011, in

7     violation of 18 United States Code Section 1001, Subpart

8     (a)(2).

9          In Count 22 -- excuse me.  In Counts 22 through 24,

10    defendant Su is charged with committing alien harboring in or

11    about February 2009 through January 19th, 2011, in violation of

12    8 United States Code Section 1324, Subpart (a)(1)(A)(iii),

13    (a)(1)(A)(v)(II), and (a)(1)(B)(I).

14         In Count 25, defendant Su is charged with committing

15    unauthorized access of a government computer in or about

16    February 2009 through January 19th, 2011, in violation of 18

17    United States Code Section 1030, Subpart (a)(3).

18         And in Counts 26 through 35, defendant Su is charged with

19    money-laundering on November 28th, 2009; February 25th, 2010;

20    April 2nd, 2010; April 9th, 2010; June 10th, 2000 -- 2010;

21    July 8th, 2010; July 20th, 2010; again on July 20th, 2010; and

22    twice on December 15th, 2010, each in violation of 18 United

23    States Code Section 1957(a).

24         The charges against Ms. Su are contained in the indictment.

25    The indictment simply describes the charges the Government

1    brings against the defendant.  The indictment is not evidence

2    and doesn't prove anything.

3        The defendant has pleaded not guilty to the charges, and

4    she is presumed innocent unless and until the Government proves

5    her guilty beyond a reasonable doubt.  In addition, the

6    defendant has the right to remain silent and never has to prove

7    her innocence or to present any evidence.

8        The evidence you're to consider in deciding what the facts

9    are consists of:

10        1.  The sworn testimony of any witness.

11        2.  The exhibits which are received in evidence; and

12        3.  Any facts to which the parties agree.

13        The parties in this case have agreed on some facts.  When

14    the lawyers agree to a fact, it's called a stipulation.  When

15    the lawyers reach a stipulation, that fact is deemed to have

16    been conclusively proved.  It doesn't require any further

17    evidence.

18        There aren't a lot of these, but there are some, and at the

19    appropriate time in the case, I will read you the stipulation

20    or one of the parties will read you the stipulation that

21    they've reached, and that has the same effect as if the fact

22    had been established by evidence in the trial.

23        The following things are not evidence, and you must not

24    consider them as evidence in deciding facts in this case:

25        1.  Statements and arguments of the attorneys.

1          2.   Questions and objections of the attorneys.

2          3.   Testimony that I instruct you to disregard; and

3          4.   Anything you may see or hear when the court is not in

4     session even if what you see or hear is done or said by one of

5     the parties or by one of the witnesses.

6          Let me just say a note about that.  A question the lawyer

7     asks is not evidence, and you shouldn't assume that something

8     is true just because the question suggests that it's true, but

9     the question is useful to you to the extent it helps you

10    understand the witness's answer.  Sometimes you can't

11    understand what somebody said unless you know a question that

12    is asked.  The question is not evidence, but it can help you

13    understand the testimony.

14         Evidence may be direct or circumstantial.  Direct evidence

15    is direct proof of a fact such as testimony by a witness about

16    what that witness personally saw or heard or did.

17    Circumstantial evidence is indirect evidence; that is, it is

18    proof of one or more facts from which one can find another

19    fact.

20         You're to consider both direct and circumstantial evidence.

21    Either can be used to prove any fact.  The law makes no

22    distinction between the weight to be given to either direct or

23    circumstantial evidence.  It is for you to decide how much

24    weight to give any evidence.

25         There are rules of evidence that -- excuse me.  There are

1    rules of evidence that control what can be received in

2    evidence.  When a lawyer asks a question or offers an exhibit

3    in evidence and a lawyer on the other side thinks it is not

4    permitted by the rules, that lawyer may object.

5         If I overrule the objection, the question may be answered

6    or the exhibit received.  If I sustain the objection, the

7    question cannot be answered or the exhibit cannot be received.

8    Whenever I sustain an objection to a question, you must ignore

9    the question and must not guess what the answer would have

10   been.  If the witness has already answered and I sustained the

11   objection, you're to disregard the answer.

12        Sometimes I may order that evidence be stricken from the

13   record and that you disregard or ignore the evidence for the

14   reason I just stated or for another reason.  That means that

15   when you're deciding the case, you must not consider the

16   evidence that I told you to disregard.

17        In deciding the facts in this case, you may have to decide

18   which testimony to believe and which testimony not to believe.

19   You may believe everything a witness says or part of it or none

20   of it.  In considering the testimony of any witness, you may

21   take into account:

22        1.  The witness's opportunity and ability to see or hear or

23   know the things he or she testified to.

24        2.  The witness's memory.

25        3.  The witness's manner while testifying.

1            4.   The witness's interest in the outcome of the case, if

2       any.

3            5.   The witness's bias or prejudice, if any.

4            6.   Whether other evidence contradicted that witness's

5       testimony.

6            7.   The reasonableness of the witness's testimony in light

7       of all the evidence; and

8            8.   Any other factors that bear on believability.

9            The weight of the evidence as to a fact does not

10      necessarily depend on the number of witnesses who testify about

11      it.  What that means is just because there are four witnesses

12      on one side and two witnesses on the other doesn't mean if

13      that -- that fact by itself does not mean that what the four

14      witnesses said means you have to believe it because they have

15      four on one side and two on the other.  If you believe it, the

16      testimony of a single witness is enough to prove a fact.

17           In light of having read CACI 100, I'm going to skip

18      Proposed Instruction No. 8.

19           At the end of the trial, you will have to make your

20      decision based on what you recall of the evidence.  You won't

21      have a written transcript of the trial.  I'll say a little bit

22      more about that in a second.  So I urge you to pay close

23      attention to the testimony as it's given.  There won't be a

24      written transcript in the sense -- you may have seen a

25      deposition transcript or other trial testimony transcripts at

1    some point.  There won't be any paper transcript for you.

2         Often we're able to get a court reporter to be able to read

3    back the testimony to you, but it doesn't exist in paper form,

4    and finding and getting that information and translating it to

5    you for readback can be time-consuming and complicated.  So

6    it's important during the trial that you pay close attention as

7    pointed out in this instruction.

8         If you wish, you may take notes to help you remember the

9    evidence.  If you do take notes, please keep them to yourself

10   until you or your fellow jurors go to the jury room to decide

11   the case.  Do not let note-taking distract you from being

12   attentive.  When you leave court for recesses, your notes

13   should be left in the courtroom.  No one will read your notes.

14        Whether or not you take notes, you should rely on your own

15   memory of the evidence.  Notes are only to assist your memory.

16   You should not be overly influenced by your notes or those of

17   your fellow jurors.

18        The next phase of the trial will now begin.  First, each

19   side may make an opening statement.  An opening statement is

20   not evidence.  It's simply an outline to help you understand

21   what that party expects the evidence will show.  A party is not

22   required to make an opening statement.

23        The Government will then present evidence, and counsel for

24   the defense may cross-examine the Government's witnesses.  Then

25   if the defendant chooses to offer evidence, counsel for the

1    Government may cross-examine.  However, I'll remind you that

2    the defendant in this case is presumed innocent and is not

3    required to put on any evidence.

4         After the evidence has been presented, I will instruct you

5    on the law that applies to the case, and the attorneys will

6    make closing arguments.  After that, you'll go to the jury room

7    and deliberate on your verdict.

8         That completes the reading of the preliminary instructions.

9    Would the Government like to make its opening statement?

10            MR. RHYNE:  We would, your Honor.

11        This case can be summed up in one word, and that word is

12   "greed."  More specifically, it's about the greed of one

13   person, the defendant, Dr. Susan Su.

14        Now, Dr. Su was the founder, president, and Chief Executive

15   Officer of an unaccredited East Bay university known as

16   Tri-Valley University or TVU.  Susan Su marketed TVU as a

17   Christian university, and it purported to offer degrees at the

18   Bachelor's level, Master's level, and Ph.D. level in various

19   subjects.

20        She also marketed it primarily to foreign students who were

21   admitted into the United States on F-1 student visas, and this

22   case is about how Susan Su used Tri-Valley University to commit

23   fraud and how she made over five and a half million dollars

24   through that fraud in less than two years.

25        Now, the fraud in this case starts in late 2008.  That's

1    when Susan Su petitions the United States Department of

2    Homeland Security for TVU's approval to admit foreign students.

3    You're going to see portions of her petition in this case, and

4    you're going to see evidence that that petition was full of

5    lies and false promises about her intentions to comply with

6    immigration laws.

7        You're also going to hear how the Department of Homeland

8    Security relied on the representations that she made in this

9    petition and how they granted approval to Tri-Valley University

10   to admit foreign students.  And from the financial records in

11   this case, you're going to see that that's when the money

12   starts to flow into Susan Su's pockets.

13       Once she could admit these foreign students, Susan Su used

14   her position as president of Tri-Valley University to admit and

15   maintain her students' immigration status.

16       Now, the case is very simple.  If a student paid their

17   tuition to Susan Su, Susan Su would give that student passing

18   grades, and she would maintain their immigration status.  But

19   if a student came to Susan Su and complained about the lack of

20   classes at Tri-Valley University, the lack of instructors at

21   Tri-Valley University, the lack of course material, or if they

22   said, "I just want to transfer," Susan Su's response was very

23   different in that case.

24       When students came to her with those concerns, she would

25   dismiss their complaints.  She would tell them they need to pay

1    their tuition, and in certain cases, she would threaten them

2    with deportation if they did not.

3        Through this conduct, she was able to make five and a half

4    million dollars in less than two years.  With that money, she

5    bought a number of assets.  You're going to see how she

6    purchased commercial real estate.

7        She purchased this commercial space in Pleasanton.  She

8    purchased another commercial space in Pleasanton.  She

9    purchased a residence in Pleasanton.  She purchased a brand-new

10   Mercedes Benz.  She also purchased a mansion also located in

11   Pleasanton.  This mansion is located on the golf course at Ruby

12   Hills Golf Club in a gated community.

13       That's a summary of the case.  It's about greed.  Now, you

14   have a summary generally of what the case is going to be about.

15   I want to back up.  I want to start at the beginning because

16   it's a helpful place to start of how this happened.  This is a

17   summary of the student visa program.  I want to run through how

18   that student visa program works and how Susan Su was able to

19   circumvent it with false statements.

20       As I mentioned earlier, in late 2008 Susan Su submitted

21   that petition.  This is called an I-17 petition or a Form I-17.

22   Now, you're going to hear testimony about this kind of

23   document.  Every school in the United States that is admitting

24   foreign students on F-1 student visas has to get this initial

25   approval.  It's mailed to the Department of Homeland Security

1    in Washington, DC, and it contains a number of representations.

2       Now, at its very essence, what this form essentially does

3    is the school is representing that it's a real school.  It's

4    telling the Department of Homeland Security that "We have the

5    finances, the infrastructure, the faculty to instruct on

6    recognized courses," and I want to walk you through Susan Su's

7    petition and show you some of the representations that she made

8    in it.

9       As you can see here, this is the Form I-17.  This is

10   Exhibit 1, Page 3.  One of the first representations that Susan

11   Su made about Tri-Valley University is that it had requirements

12   for admission.  That was not true.

13      The evidence in this case is going to show that Tri-Valley

14   University didn't have real requirements for admission.  All

15   the student needed to have to get admitted into Tri-Valley

16   University was a name and a tuition check.  There was no

17   admissions committee.  And if you could pay your tuition, you

18   got admitted, and you got your immigration status.

19      Susan Su also represented that Tri-Valley University had

20   requirements for graduation, also not true.  You're going to

21   hear evidence in this case that grades were given out

22   arbitrarily at Tri-Valley University, passing grades, that

23   allowed the students to stay in their immigration status.

24      You're going to hear how Susan Su was interviewed as part

25   of this case by Special Agent Jason Mackey, seated here at

1    counsel table, and you're going to hear how she admitted that

2    she always gave her students, no matter what, B-pluses or

3    above, that she would always grant them immigration status and

4    that she would never terminate them with respect to their

5    immigration status.  And when you see the bank records in this

6    case, you'll see why she was so interested in keeping them in

7    status.

8        Susan Su also represented that Tri-Valley University was

9    only going to have an average number of 30 students, again, not

10   true.  At the time that Tri-Valley University was shut down in

11   this case in January of 2011, she had nearly 1800 F-1 students

12   enrolled at Tri-Valley University, paying tuition to her.

13       Now, the false statements in Susan Su's I-17 continue.  I

14   mentioned earlier that part of showing you're a real school in

15   the I-17 is saying you have faculty.  You have the instructors

16   on staff to teach the classes that you're telling the

17   Government that you're going to teach.  That's important.

18   You're going to hear how the Department of Homeland Security --

19   when they reviewed this document, they relied on these

20   representations.

21       Susan Su told the Department of Homeland Security that she

22   had 22 people on staff to teach these classes.  You're going to

23   hear from a few of them in this trial.  One of these witnesses

24   is going to tell you, "I've never even heard of Tri-Valley

25   University.  Yeah, those are my credentials up there.  I have

1     my Ph.D., that's where I went to school, and yes, that's my

2     area of expertise, but I've never heard of Tri-Valley

3     University."

4          Two of the other professors who Susan Su listed on her I-17

5     are going to tell you, "I have heard of" -- "I know Susan Su.

6     I've heard of the school, but at no time did I agree to allow

7     her to use my name, my credentials, or my information in

8     association with Tri-Valley University."

9          You're also going to hear in that same interview with

10    Special Agent Mackey that Susan Su admitted that at the time

11    she submitted this list of 22 professors, not one of them had

12    actually taught a class at Tri-Valley University.  When Agent

13    Mackey asked her, "Well, who's teaching the classes?" she said,

14    "I'm teaching all of" -- "I was teaching all the classes at

15    that time."

16         So Agent Mackey says, "Can you name a student in one of

17    your classes?"  She couldn't do it.  She couldn't name one

18    student in the classes that she said she had been teaching.

19         The lies continue in the I-17.  The next component that I

20    want to talk about of Susan Su's submission is this concept of

21    articulation agreements.  These are important, and they're

22    important for unaccredited schools because unaccredited schools

23    have an additional hurdle that they need to meet in order to

24    admit foreign students, and they do that through these

25    articulation agreements, and what these do is they tell the

OPENING STATEMENT / RHYNE

1     Department of Homeland Security that the unaccredited school

2     has an agreement with at least three other accredited schools

3     stating that the unaccredited schools's classes have been and

4     continue to be unconditionally transferrable to the accredited

5     school.

6          So for schools that are not accredited, they have to show

7     that they can transfer their classes to these accredited

8     schools, and they're signed by the unaccredited school and by

9     representatives of the accredited school, and they're included

10    as part of the I-17 petition.

11         Susan Su submitted three articulation agreements in the

12    mail to Washington, DC.  She says, "Here are the originals of

13    three articulation agreements."  During this trial, we're going

14    to focus on two of these articulation agreements.  You're going

15    to hear evidence that two of them were forgeries.

16         You're going to hear testimony from the representatives of

17    those accredited schools who purportedly signed these documents

18    saying, "We never agreed to this," but you're also going to see

19    forensic evidence in this case of where Susan Su got the

20    signatures that she put on these documents, the source

21    signatures for those documents.

22         One was found on her computer, and the other one was found

23    in her house, and the forensic analysis that was done by the

24    Department of Homeland Security in this case is going to show

25    you how when you lift the accredited school representative's

1    signature off Susan Su's source document and overlay it on the

2    signature that she had on the articulation agreement that she

3    submitted to the Department of Homeland Security, they're an

4    exact match.

5         You're going to hear how Jason Mackey asked Susan Su about

6    that when he interviewed her.  He asks her, "Do you mind if I

7    call the schools that signed your articulation agreements?"

8         And her initial reaction is "No, no, no.  Please don't call

9    them.  They're very busy.  They don't want you to call them."

10        You're also going to hear about Susan Su's reaction when

11   Jason Mackey tells her, "I've already called the school."  Her

12   reaction changes, and Jason Mackey is going to testify about

13   what that reaction was.

14        Now, the false statements from Susan Su's I-17 continue.

15   The next component of the I-17 that I want to talk about is

16   this concept of designated school officials.  Like articulation

17   agreements, it's going to be one of the terms that gets thrown

18   around in the trial a lot.

19        A designated school official -- or a DSO is their

20   abbreviation.  They have an important job.  They work at the

21   school that's admitting the foreign students, and their primary

22   duty is to input foreign student information into a government

23   database.  That government database on the other end of it is

24   the Department of Homeland Security.

25        It's important that accurate information is inputted into

1     this database because it's the mechanism by which the

2     Department of Homeland Security is able to confirm that the

3     students are in this country on student visas and are actually

4     complying with the rules they need to comply with.  It's the

5     way to confirm that they're going to class, they're moving

6     through their area of study, and that they're doing what

7     they're supposed to do.  That's why this database is important,

8     and that's why the role of a DSO is important.

9         Susan Su appointed three DSO's in her I-17 for Tri-Valley

10    University.  This is an excerpt from that I-17, and you can see

11    that the undersigned DSO's are stating that they intend to

12    comply with regulations at all times.  Susan Su in the middle

13    there appoints herself, the president, as one of the DSO's.

14    She also appoints a lady named Susan Su, and at the bottom she

15    appoints a man named Vince Wang.

16        You're going to hear testimony in this case how Susan Su --

17    how Sophie Su is Susan Su's sister and Vince Wang is Susan Su's

18    brother-in-law.  You're also going to hear how Susan Su

19    admitted when she spoke with Jason Mackey that she knew at the

20    time she submitted this document to the Department of Homeland

21    Security that neither Sophie Su nor Vince Wang intended to be

22    DSO's at Tri-Valley University.

23        You're also going to hear how, rather than hiring

24    legitimate DSO's, Susan Su had a cost-cutting measure.  She

25    delegated this responsibility to other people that worked in

1    the front office at Tri-Valley University.  You're going to

2    hear from some of those people.  Those people weren't DSO's.

3    They were her own F-1 students that she had brought back into

4    the front office at Tri-Valley University to work as DSO's.

5    They're going to testify how they accessed this government

6    database on a daily basis, pumping out statuses for the

7    students that Tri-Valley University was keeping in immigration

8    status.

9         So based on these representations at the time, the

10   Department of Homeland Security granted Susan Su authorization.

11   They believed what she was telling them.  That's how Tri-Valley

12   University got started, and now I want to talk briefly about

13   how it operated once it got that approval.

14        It didn't operate like a real university, and it didn't

15   operate like it promised to do in its I-17.  We stated earlier

16   it didn't have regular classes.  Classes didn't happen.  Many

17   of them didn't have professors or course material.  It didn't

18   have a legitimate grading system.  It operated almost

19   exclusively to collect tuition from these F-1 students.

20        You're going to hear evidence that when students reached

21   out to Susan Su and said, "I'm worried about my grades.  I'm

22   worried about my status," you're going to see e-mails from her,

23   and you're going to hear testimony about what she said to them.

24        This is one of those e-mails, Exhibit 330.  This is a

25   response from Susan Su.  As you can see, it's November of 2009.

 1   So that would be fairly deep into an academic semester, and

 2   she's telling the student essentially, "We're still searching

 3   for course material for that course.  We'll load it as soon as

 4   possible, and in this case, you'll have a good grade for now

 5   and always will in the classroom until all material is there

 6   and an instructor will teach it."  This is an e-mail that came

 7   directly off Susan Su's computer.

 8        You're also going to hear evidence with respect to

 9   Tri-Valley University's operations that the Department of

10   Homeland Security did a number of undercover operations into

11   Tri-Valley University.  You're going to hear how Jason Mackey

12   and the agents that worked with him sent an individual into

13   Tri-Valley University with just this, a piece of paper with a

14   couple names, a couple dates of birth, and a couple foreign

15   addresses along with a check.

16        You're going to hear how this individual is able to go into

17   Tri-Valley University, came back out.  When Agent Mackey

18   checked the Department of Homeland Security database, they

19   confirmed that this student had immigration status.  They had

20   been enrolled in Tri-Valley University.  And you're also going

21   to hear how later on when the Department of Homeland Security

22   asked for transcripts, these guys got passing grades even

23   though they never existed at Tri-Valley University.

24        As a further part of the undercover operations, the

25   Department of Homeland Security did, you're going to hear how

1    they posed as immigration officials at the airport.  They

2    called Tri-Valley University in a recorded phone call that you

3    will hear during this trial.  They asked to speak to Susan Su.

4    They wanted to know if Susan Su was going to vouch for these

5    guys, these guys that didn't exist at all at the college.

6          Susan Su not only vouched for them as existing at the

7    college, but she sends an e-mail to the agents where she

8    attaches admissions records, fraudulent transcripts, and a

9    fraudulent immigration document, all for a student that never

10   existed at Tri-Valley University.

11         That's just a summary of the evidence that you're going to

12   hear in this case, and at the end of it, you're going to see

13   that the case is about greed, about how Susan Su used her

14   position at Tri-Valley University to grant and maintain

15   immigration status for her tuition-paying students and how she

16   made five and a half million dollars in less than two years

17   doing it.

18         Now, during the evidence, the United States is just asking

19   you to do three things.  We're asking you to listen to the

20   evidence, follow Judge Tigar's instructions, and use your

21   common sense.  If you do those three things, there's only one

22   logical conclusion that you're going to be able to reach at the

23   end of this case, and that's that Susan Su is guilty of all

24   counts.

25         Thank you.

 1          THE COURT:  Thank you, Mr. Rhyne.

 2      Mr. Babcock, does the defendant wish to make an opening

 3   statement?

 4          MR. BABCOCK:  Yes, your Honor, briefly.  Thank you.

 5      Good morning, ladies and gentlemen.  This case is not about

 6   whether my client violated some immigration regulations.

 7   That's not what she's charged with.  She's charged with fraud.

 8   She's charged with stealing.

 9      My client tried and did start a school, but she wasn't

10   Stanford or Harvard.  She didn't have a billion-dollar

11   endowment.  She was doing this all on her own.  Susan Su was

12   trying to start a school.  It's an ambitious project, and there

13   are hundreds, maybe thousands, of things that need to be done

14   to start and run a school, and she was the one doing all of it.

15      So was it perfect?  No, it wasn't perfect, but was it a

16   good-faith effort?  It was.  She was doing her best.  She was

17   doing her best.  I'm sorry this school didn't meet all the

18   Government's standards, but she was really trying.  She did all

19   this on her own.  She's not a lawyer.  She's never started a

20   school before, doesn't have any special background in complying

21   with filling out forms on -- from immigration.

22      They want to shut down the school?  They did.  That's

23   already done.  They want to kick all the students out?  They

24   did that, too, sent them all back home, kept all their money.

25   Susan didn't have the money.  The Government has the money.

1        I'd ask you to keep an open mind and think about the

2    position Susan is in.  Think about if you were trying to start

3    a school from scratch, something you had never done before, and

4    all the work that that would entail, because this case isn't

5    about -- she's not charged with violating regulations.  It's

6    not a crime to -- it's not a crime to incorrectly fill out an

7    I-17.  It's not a crime to give students B-pluses and better.

8    It's not a crime to admit students from other countries.

9        She's charged with fraud.  That's the gist of the case.

10   You heard it.  That's their whole argument.  "This is about

11   greed."  That's what they say.  This case wasn't about greed.

12   This case is about a woman who took on way too much, much more

13   than she could do.  She didn't have a big infrastructure

14   supporting her.  She didn't have a big staff.

15       So no, did she do everything right?  She didn't do

16   everything correctly.  She didn't dot every I and cross every

17   T, but that's not a crime.  What we're really here -- what

18   you're really here to decide is have they -- can they prove

19   beyond a reasonable doubt that this was all a fraud, that this

20   was all about greed.  I submit to you that it was not.

21       I ask you to keep an open mind until you've heard

22   everything, and when the evidence is all closed, I'm going to

23   ask you to return verdicts of not guilty because it's not a

24   crime to try but fail to start a school.

25       Thank you.

```
1            THE COURT:  Thank you, Mr. Babcock.

2        Government ready to call its first witness?

3            MR. RHYNE:  We are, your Honor.

4        The Government calls Ms. Vandana Virmani.

5            THE COURT:  Members of the jury, you're welcome to

6    stand up and stretch right now.  When they're out there getting

7    witnesses, I find it's useful for everybody if you're tired of

8    sitting down all day to keep your circulation going.  It helps

9    to pay attention also, but the Government was pretty quick in

10   getting that witness, and now you have to sit back down.

11       Good morning, ma'am.

12           THE WITNESS:  Good morning.

13           THE COURT:  Let me ask you to remain standing for

14   just a moment.  Raise your right hand and face my courtroom

15   deputy.

16           THE CLERK:  Do you solemnly swear or affirm that the

17   testimony you're about to give in the matter now pending before

18   this Court shall be the truth, the whole truth, and nothing but

19   the truth?

20           THE WITNESS:  Yes.

21           THE CLERK:  Thank you.  Please be seated.  Make sure

22   you speak directly into the microphone.

23       Thank you.

24   ///

25   ///
```

1          **VANDANA SATIJA,**

2     called as a witness for the Government, having been duly sworn,

3     testified as follows:

4                    **DIRECT EXAMINATION**

5     BY MR. RHYNE:

6     Q.   Good morning.

7     A.   Good morning.

8     Q.   Will you please state and spell your name for the record.

9     A.   Vandana Satija.  That's V-a-n-d-a-n-a, S-a-t-i-j-a.

10    Q.   Where do you currently reside?

11    A.   In New Jersey.

12    Q.   What city?

13    A.   Hackensack.

14    Q.   Are you currently employed?

15    A.   Yes.

16    Q.   Where do you work?

17    A.   I work as a contractual employee with Ricoh USA.

18    Q.   Can you -- is "Ricoh" R-i-c-o?

19    A.   R-i-c-o-h.

20    Q.   H.

21         Okay.  What do you do there?

22    A.   I'm a financial analyst.

23    Q.   What are your duties and responsibilities?

24    A.   I work on corporate planning and analysis with

25    post-engineer forecasting.

1    THE COURT:  Ms. Satija, can you move your microphone

2    just about two inches closer to you or -- that's great.  Thank

3    you.

4        Members of the jury, as I told you yesterday, you're the

5    judges of the facts in this case.  It's very important that you

6    be able to hear throughout the proceedings.  If at any time --

7    if any witness you have difficulty in hearing, if you could

8    just raise your hand and let me know that.

9        You're having trouble.

10       Oh.  Mr. Rhyne -- I see.

11       Okay.  Mr. Rhyne, if I can remind you to stay close to the

12   microphone.  Thank you.

13   BY MR. RHYNE:

14   Q.  Do you know the defendant in this case, Dr. Susan Su?

15   A.  Yes.

16   Q.  How do you know her?

17   A.  I applied to Tri-Valley University sometime at the end of

18   2009, and from there, I know her.

19   Q.  Okay.  Can you summarize your current immigration status?

20   A.  I'm a green card holder.

21   Q.  Okay.  Prior to that, what were you?

22   A.  I was on H-4 status, dependent visa on my husband's.

23   Q.  Can you tell --

24                    (Court reporter clarification.)

25             THE WITNESS:  I was on H-4 status, dependent visa on

1    my husband's.

2    BY MR. RHYNE:

3    Q.   And that's a work visa; correct?

4    A.   H-4 is not a work visa.

5    Q.   But your husband's visa was a work visa?

6    A.   Yes.

7    Q.   And you were a dependent on that visa; is that correct?

8    A.   Yes.

9    Q.   Was that your status when you applied to Tri-Valley

10   University?

11   A.   Yes.

12   Q.   When you applied to Tri-Valley University, were you seeking

13   to change your status?

14   A.   Yes.

15   Q.   To what?

16   A.   To a student visa, F-1 status.

17   Q.   Okay.  When did you apply to Tri-Valley University?

18   A.   In November of 2009.

19   Q.   How did you come to learn about Tri-Valley University?

20   A.   It was through online search and -- or probably through

21   friends' friends, discussions and information.

22   Q.   When you went online, what did you see?

23   A.   I saw the website and the courses there.

24   Q.   Did you ever call Tri-Valley University?

25   A.   Yes.

1    Q.   Who did you speak to when you called?

2    A.   I spoke to Dr. Susan Su.

3    Q.   Did Susan Su tell you what her title was at Tri-Valley

4    University?

5    A.   Yes.  She was the president, and even on the website, it

6    was mentioned she was the president.

7    Q.   Did you have an opportunity to ask Susan Su about the

8    courses that Tri-Valley University offered?

9    A.   Yes.  I described my background to her to seek some advice

10   and asked her what courses I should take, and she -- and also

11   what I was interested in.  So she described to me what is there

12   and what is available.

13   Q.   What did she describe to you as being a good fit for you?

14   A.   I -- I just said I wanted to do finance, and she said that

15   would be fine, that would be perfect, and what courses that

16   dealt.  So that just matched with my needs.

17   Q.   Can you tell the jury why you were interested in pursuing

18   finance courses?

19   A.   I wanted to do CPA.  I have -- I had some accounting

20   credits from my previous education.  I needed a little more.

21   So I wanted to get more accounting credits, and I found this

22   course, which was reasonably -- reasonable and cheap, and I

23   could get a degree.  So I just went for it to get some more

24   courses and a degree in Master's -- Master's degree.

25   Q.   Did you talk to Susan Su when you spoke to her on the phone

1    about the tuition that you would have to pay at Tri-Valley

2    University?

3    A.   Yes.

4    Q.   What did she say?

5    A.   It was $900 per course or 300 per credit, and she advised

6    taking three courses at a time per semester, and so I'd pay --

7    ended up paying $2,700 for three courses.

8    Q.   900 per course?

9    A.   Yes.

10   Q.   Three courses?

11   A.   Yes.

12   Q.   Did Susan Su send you any documents after you had that

13   conversation?

14   A.   Yes.  She had sent me documentation working on getting me

15   to regular status, going to F-1, which I had filed -- filed

16   with the authorities for getting a different status.  However,

17   it didn't work out.  I missed out signing the regular form and

18   got rejected.  So -- but I didn't go for it again.  I had

19   decided to rearrange for and continue with my studies like

20   that.

21   Q.   So did you agree to still go to Tri-Valley or take classes

22   at Tri-Valley University?

23   A.   Yes.

24   Q.   How did you pay for those classes?

25   A.   I paid through PayPal.

1    Q.   And did you have receipts for those payments?

2    A.   Yes.

3    Q.   And did you give those receipts to Agent Mackey in this

4    case?

5    A.   Yes.

6    Q.   Did you have any discussion with Susan Su when you spoke to

7    her on the phone about whether the classes would be in person

8    or online?

9    A.   Yes.  I spoke to her, and the conclusion was that there

10   would be online videos.  There would be lectures and

11   discussions.  So I was under the impression that every

12   course -- if it had -- all on video, there would be lectures,

13   and there would be somebody giving online information and be

14   there to answer questions as it would be.

15   Q.   You were expecting an interactive experience, then, with an

16   actual professor?

17   A.   Yes, alongside the online videos.

18   Q.   Did you inform Susan Su during this conversation that you

19   were in New Jersey?

20   A.   Yes.

21   Q.   Okay.  I want to direct your attention to Spring 2010.

22   A.   Okay.

23   Q.   Is that the academic semester where you were supposed to

24   begin your classes?

25   A.   Yes.  It was spring.

1    Q.   Did you try to log into those classes that you had paid

2    for?

3    A.   Yes.  The two classes had online videos.  Initially, I had

4    some sound problems, which became okay afterwards, and the

5    other one -- the third one just had one e-book.  That's a PDF

6    form of a book online, and a professor was supposed to give

7    instructions, but nobody came in.  Nobody came in until -- I

8    mean, until the time I decided to ask for a refund.

9    Q.   Okay.

10   A.   Nothing happened there.

11   Q.   Let me ask you:  What were the three classes that you

12   enrolled in?

13   A.   The first was the Dreamweaver course, which is --

14                 (Court reporter clarification.)

15              THE WITNESS:  The first was Dreamweaver, which was

16   for --

17              MR. BABCOCK:  I'm sorry.  I couldn't --

18   BY MR. RHYNE:

19   Q.   Can you spell that?

20   A.   D-r-e-a-m-w-e-a-v-e-r.

21   Q.   Before we get to the next course, can you just generally

22   describe for the jury what a Dreamweaver course is?

23   A.   It is an open source to build websites, and the reason I

24   took it -- it's not really related to finance, but my husband

25   was trying to get into some online -- online stuff, and I

1     wanted to help him with building a website.  So I thought this

2     course would help me help him.  So that's the reason I took

3     this course.

4     Q.   What's the second course?

5     A.   It is Business Administration and Management.

6     Q.   What's the third course?

7     A.   It was CEO Seminar for Business Administration.

8     Q.   Okay.  I want to focus your attention now on the

9     Dreamweaver course.  Did you try to log into Dreamweaver?

10    A.   Yes.

11    Q.   What happened when you tried to log into Dreamweaver?

12    A.   There was just an e-book, which is a PDF form of a book,

13    and that's it.  And then I was told the instructor would come

14    in, but there was no instructor.  I spoke to Susan Su about it.

15    She said that she used to teach that class before, but now she

16    would be bringing in some other professor, but nobody came in.

17    Q.   Okay.  With respect to the other two courses, did you try

18    to log into those courses as well?

19    A.   Yes.

20    Q.   What did you see when you tried to log into those two

21    courses?

22    A.   They were online videos, and as I said, that -- initially,

23    there was a sound problem, but later on it was okay, but the

24    problem was there was no clear instruction as to how to follow

25    those videos or what were the timelines for the terms because

1    all the courses -- they mentioned that there would be lectures,

2    discussions, midterms.  But I spoke to Susan Su about it as to

3    will the professor come in, and she just asked me to be

4    patient.

5    Q.   Now, you said you expected lectures, courses, and

6    interaction; is that correct?

7    A.   Yes.

8    Q.   Why were you expecting that?

9    A.   Because initially when I spoke to Susan Su about how the

10   courses will be, that's what was communicated to me, and I was

11   going to be under the impression that this would happen.

12   Q.   Okay.  You also stated that you then contacted Susan Su; is

13   that correct?

14   A.   Yes.

15   Q.   To raise your concerns with her?

16   A.   Yes.

17   Q.   Okay.  Tell me about those conversations.  What did you say

18   to her, and what did she say back to you?

19   A.   I told her that this is what is going on and will the

20   professor come in and how the lectures would be, how the

21   midterms have to be.

22       And she said, "Be patient," and -- and she would just say,

23   "Be patient," and just -- the conversation would end there, and

24   I understand that there can be some problems initially with any

25   courses that's just technical or anything that can happen.  So

1    I was patient, but of course my money and time is getting

2    wasted.  So I didn't want to wait any further with her.

3    Q.  As time went on during the Spring 2010 semester, did the

4    classes improve as you had hoped?

5    A.  No.

6    Q.  Did you have any more conversations with Susan Su about the

7    quality or lack of instruction with respect to these classes?

8    A.  I would just continue to follow up on a weekly basis or

9    twice a week to see what's going on because time is getting

10   wasted, and so I just continued to follow up.

11   Q.  Were you familiar or did you become familiar with

12   Tri-Valley University's refund policy?

13   A.  Yes.  Initially, when I was going through the website, I

14   just -- I went through all the pages, whatever information I

15   could seek, and the refund policy initially that was there was

16   40 percent for an ongoing course.

17   Q.  Did you raise this refund policy with Susan Su?

18   A.  Yes.

19   Q.  How did she respond?

20   A.  Well, initially I had spoken to her to -- for a refund of a

21   hundred percent on the Dreamweaver course because it was not an

22   ongoing course.  It was just a PDF book online and no

23   instructors.  So it was not an ongoing course at all.  Nothing

24   happened.

25        So I was -- I wanted to get a full refund for that course,

1    and the other two -- I understand that the videos were there,

2    but still as -- as far as I'm concerned, they were incomplete

3    because the professor was not there.  So I asked for a prorated

4    refund.  Whatever time I was there, I was okay with reducing

5    that amount from the refund.

6    Q.   What did Susan Su say when you made this request?

7    A.   When I made this request, she said that that's not what

8    happens, and as for the website, she would only give me

9    30 percent.  And again, I questioned that 30 percent because as

10   per the website, it was 40 percent.  So after that

11   conversation, then I went back to the website to see.  I saw

12   that the page had completely changed.

13   Q.   Did you confront Susan Su with the fact that you thought

14   the page had changed?

15   A.   I again spoke to her and told her that this is what

16   happened, that I don't see 40 percent anymore.  It seems that

17   somebody has completely changed the page and reduced that --

18   that number to 30 percent.

19   Q.   Can you tell the jury about the tone of this conversation

20   that you were having with Susan Su?

21   A.   Well, we had many conversations with Susan Su over the

22   refund because what we expected was not what she wanted to

23   give.  So solely a refund, but she was getting agitated, she

24   was getting impatient, and to a point of -- she got impatient

25   to a point that she threatened me and my husband that she would

```
 1    cancel our visa statuses and would get us deported.

 2        That's the point when we got scared of this individual, and

 3    we didn't really want to mess much with her, but we still

 4    wanted the money because we knew that what we were doing was

 5    the right thing.

 6    Q.   So what did you do to try to get the money?

 7    A.   Well, initially, Susan Su -- she just gave us 30 percent,

 8    but later on we decided to file a complaint with the Better

 9    Business Bureau.  That's what we did, and we had exchange of

10    e-mails and conversations over the BBB -- through the BBB

11    portal, and ultimately I got the remainder money back.

12        So I got full hundred percent eventually for the

13    Dreamweaver course, and I got additional 10 percent for the

14    remaining two courses.  So I got a total of 40 percent for two

15    courses and a total of hundred percent for the Dreamweaver

16    course.

17    Q.   And these refunds came after you engaged with the Better

18    Business Bureau; is that correct?

19    A.   Yes.  The forced 30 percent came in before BBB complaint

20    and the remainder amount after the BBB complaint.

21    Q.   And the 30 percent was the 30 percent you were referring to

22    on the -- what you believed to be the second version of TVU's

23    website; is that correct?

24    A.   Yes.

25            MR. RHYNE:  Okay.  Your Honor, may I approach the
```

1    witness?

2                 THE COURT:  You may.

3          (Government's Exhibit 862 marked for identification.)

4                 MR. RHYNE:  I'm handing the witness what's been

5    marked as 862 for identification.

6    BY MR. RHYNE:

7    Q.   Do you recognize Exhibit 862?

8    A.   Yes.

9    Q.   What is it?

10   A.   It's a March sheet.  It's a transcript from Tri-Valley

11   University that I received for the three courses.

12                THE COURT:  I'm sorry, ma'am.  I didn't hear the

13   first word you said.  There's a word -- a word and then the

14   word "sheet."  Did you say --

15                THE WITNESS:  March sheet.

16                THE COURT:  I see.  Okay.

17                THE WITNESS:  It is for the three courses.  However,

18   the third course mentioned here is -- I never took this course.

19   I had exchanged this course for the Dreamweaver course, and

20   anyways, I didn't take any of these courses.  I didn't complete

21   any of these courses.

22   BY MR. RHYNE:

23   Q.   How did you get this document?

24   A.   I got it through e-mail.

25   Q.   Okay.  Is it in the same or substantially the same

```
 1    condition as it was when you got it in e-mail?

 2    A.  Yes.  It was the --

 3    Q.  And you provided a copy of that to Special Agent Mackey in

 4    this case; is that correct?

 5    A.  Yes.

 6          MR. RHYNE:  Your Honor, we'd offer Exhibit 862 into

 7    evidence.

 8          THE COURT:  Any objection?

 9          MR. BABCOCK:  No, your Honor.

10          THE COURT:  Exhibit 862 is admitted.

11          (Government's Exhibit 862 received in evidence.)

12          MR. RHYNE:  Ms. Hughes, can you zoom in from the top

13    of the "Tri-Valley University" level all the way down to the

14    bottom square on the right?

15          Correct.  Thank you.

16    BY MR. RHYNE:

17    Q.  So, Ms. Virmani, do we see your name here at the top,

18    "Student Name"?

19    A.  Yes.

20    Q.  Is that correct?

21    A.  Yes.

22    Q.  And then these are the classes, is that correct, that are

23    listed?

24    A.  Yes.  The first two are correct.  The third one is

25    incorrect.
```

1   Q.   And there are grades over here, A, A, A-minus; is that

2   correct?

3   A.   Those are grades, but I never took these classes.  So

4   they're meaningless.

5   Q.   And the name here -- it's Vandana Virmani; is that correct?

6   A.   Yes.  That's my maiden name.

7   Q.   Okay.  Thank you.

8        You stated you never took these classes; is that right?

9   A.   Yeah, because I just had the online videos for the other

10  ones.  So only the time duration -- until I asked for a refund,

11  I was accessing those videos, but I never completed these

12  classes, and even those videos without a lecture were

13  incomplete for me.

14  Q.   At the conclusion of the Spring 2010 semester, did you try

15  to reenroll at Tri-Valley University?

16  A.   No.

17            MR. RHYNE:  No further questions, your Honor.

18            THE COURT:  Thank you.

19        Mr. Babcock, cross-examination?

20            MR. BABCOCK:  Thank you, your Honor.

21                        **CROSS-EXAMINATION**

22  BY MR. BABCOCK:

23  Q.   Good morning -- I'm sorry.

24  A.   Vandana.  Good morning.

25  Q.   Vandana is your first name; right?

1    A.   Yes.

2    Q.   Okay.  What's -- what's your last name now?

3    A.   Satija.

4    Q.   I'm sorry?

5    A.   Satija.

6    Q.   Satija?

7    A.   Yes.

8    Q.   Thank you.

9         Vandana Virmani is what you were going by -- your name when

10   you went to -- when you enrolled in Tri-Valley University;

11   right?

12   A.   Yes.  That's because all my papers had that name on my

13   passport and everything.

14   Q.   So as I understand it, you -- you were already residing in

15   the United States?

16   A.   Yes.

17   Q.   When you applied to -- when you first heard of Tri-Valley

18   University?

19   A.   Yes.

20   Q.   And this was sometime in 2009?

21   A.   Yes.

22   Q.   You had a -- you already had a visa -- an H-4 visa through

23   your husband; right?

24   A.   Yes.

25   Q.   He was living and working in the United States?

SATIJA - CROSS / BABCOCK

1     A.   Yes.

2     Q.   And you, in fact, already had a college degree, as I

3     understand it?

4     A.   Yes.

5     Q.   That you -- from when you studied in India?

6     A.   Yes.

7     Q.   Before you came to the United States?

8     A.   Yes.

9     Q.   But you wanted to take -- sit for the CPA exam here in the

10    United States?

11    A.   Yes.

12    Q.   Is that right?

13    A.   Yes.

14    Q.   And the -- as I understand it, the university you attended

15    in India -- the -- you obtained a Bachelorette with a

16    three-year course of study?

17    A.   Yes.

18    Q.   And to sit for the CPA exam in the United States, you

19    needed to have a four-year course of study?

20    A.   Okay.

21    Q.   Is that -- is that how it worked?

22    A.   I just know that I needed more accounting credits, and

23    initially I had forwarded my credentials for evaluation by the

24    education evaluation agency.  That was seven years back, and --

25    and they just said that these are the credits that I have and

SATIJA - CROSS / BABCOCK

```
 1    -- which were not sufficient as -- for the CPA course.
 2    Q.  And you don't remember if you heard of Tri-Valley
 3    University either through a friend or if you found it online
 4    first?
 5    A.  Yeah.  I don't remember clearly that.
 6    Q.  Okay.  But you were living back east at the time?
 7    A.  I'm sorry?
 8    Q.  You were living back east; right?
 9    A.  Yeah, in New Jersey.
10    Q.  In the eastern United States?
11    A.  Yes.
12    Q.  And you always contemplated that you would be taking these
13    courses online; right?
14    A.  Yes.
15    Q.  Okay.  And you looked at the website and got interested.
16    So you made a phone call?
17    A.  Yes.
18    Q.  And the person you spoke to was actually the president?
19    A.  Yes.
20    Q.  Susan Su?
21    A.  Yes.
22    Q.  You weren't directed to, like, an admissions office or a
23    registrar or anything like that?
24    A.  No.
25    Q.  Have you ever met Ms. Su before today?
```

1    A.   No.

2    Q.   Okay.  The -- so you did not need -- you did not need to go

3    to -- to -- to get an F-1 visa in order to stay in the United

4    States?

5    A.   Yeah.  No.

6    Q.   You were already here?  You already had a visa?

7    A.   Yes.

8    Q.   You were already in the United States legally?

9    A.   Yes.

10   Q.   And as long as your husband's work status didn't change,

11   neither would your visa status change?

12   A.   Yes.

13   Q.   And in fact, you never got an F-1 visa; right?

14   A.   Yeah.  Never got it.

15   Q.   You kept your H-4 visa and at some point became adjusted

16   and became a lawful permanent resident?

17   A.   Yes.

18   Q.   In other words, got your green card?  That's what most

19   people say.

20   A.   Yes.

21   Q.   Okay.  Now, as I understand your testimony today, you said

22   that you enrolled in the Spring 2010 semester?

23   A.   Yes.

24   Q.   And three courses?

25   A.   Yes.

1   Q.   Originally, you had enrolled in two -- in three business

2   courses, but at some point you changed and decided you wanted

3   to take a Dreamweaver course instead?

4   A.   Yes.

5   Q.   Actually, before I forget, you said that the -- TVU charged

6   you $300 a credit?

7   A.   Yes.

8   Q.   Or $900 a course?

9   A.   Yes.

10  Q.   Which would be for a three-unit course -- a three credit

11  course?  Sorry.

12  A.   Yes.

13  Q.   So you enrolled in three courses and paid $2,700?

14  A.   Yes.

15  Q.   Had you shopped around at other schools?  Looked at other

16  schools?

17  A.   Yes.

18  Q.   Do you remember specifically what any of the other schools

19  that you considered were?

20  A.   Like, there were many universities online.  There was

21  University of Phoenix that provides online course and -- like

22  that.  I just shopped around, yes.

23  Q.   Did you consider going to a school near you in New Jersey?

24  A.   Well, being -- I wanted an online course.  So it didn't

25  really matter as to whether it was in New Jersey or California

1    or any other state.  So that was not a criteria for me to

2    search for the course.

3    Q.  Why was it -- if I could ask, why was it you were looking

4    for an online course?

5    A.  Because I was home, and my husband's -- I wasn't really

6    looking for -- for anything full time, going-to-the-class kind

7    of course.  I wasn't really interested in that at that point.

8    Q.  So it was more -- more of a matter of convenience for you?

9    A.  Yes.

10   Q.  Okay.  Did you have children at the time?

11   A.  No.  We were planning.

12   Q.  Okay.  But you basically -- you wanted to stay home but be

13   able to take some classes?

14   A.  Yes.

15   Q.  Okay.  Did you compare the prices that you were charged at

16   TVU with the prices at any other online schools?

17   A.  Of course, yes.

18   Q.  And how did they compare?

19   A.  I just know I didn't want -- I don't remember the exact

20   amounts, but yes, TVU was cheaper.

21   Q.  It seemed the amounts charged seemed reasonable to you?

22   A.  Yeah.  It was cheaper for -- and -- and it was nice that I

23   was able to get a full DB course -- a full Master's degree in

24   that cost range.

25   Q.  Were you planning to get a Master's degree eventually?

1    A.  I'm sorry?

2    Q.  Were you planning to get a Master's degree?

3    A.  Yeah, of course.  When I joined TVU, I wanted to get a

4    Master's degree.

5    Q.  Okay.  So you understood that this -- these courses were

6    going to be online, but you also understood that there was --

7    even though there might be, like, videos, that there would be a

8    live instructor available to answer questions at least some of

9    the time?

10   A.  Yes.

11   Q.  Is that fair enough?

12   A.  Yes.

13   Q.  Okay.  And it sounds like one of your complaints or the

14   issues that you had was that you were having difficulty

15   getting, like, live feedback?

16   A.  Yes.

17   Q.  And was that true for all three courses?

18   A.  For two of them, yes, and the third one -- a professor was

19   to give full instructions because it was just an e-book and no

20   videos.  So for the third course -- every class, I was

21   expecting it to be a live instructor.

22   Q.  Okay.

23   A.  That's -- they were supposed to coordinate that.

24   Q.  But was there a live instructor for the business classes?

25   A.  No.

1    Q.   At any point?

2    A.   No.

3    Q.   Okay.  Now, as I understand your testimony this morning,

4    you say that you asked for a refund because of the

5    difficulty -- because basically you weren't getting the live

6    instruction that you hoped for?

7    A.   I was not getting what I was expecting, yes.

8    Q.   And this was about four weeks or so into the semester?

9    A.   Yeah.

10   Q.   Do you remember how long -- was this a -- was the school on

11   a two-semester or a trimester basis?

12   A.   Probably on a -- I don't remember that.

13   Q.   The -- what about -- but whatever it was, it was about four

14   weeks in?

15   A.   Yeah, four, six weeks, I think.

16   Q.   Four to six weeks when you first asked Ms. Su for a refund?

17   A.   Yes.

18   Q.   You eventually did get a refund?

19   A.   Yes.

20   Q.   Not right away, though?

21   A.   Yes.  Partial refund, yes.

22   Q.   A partial -- well, you got a hundred-percent refund for the

23   Dreamweaver course?

24   A.   Yes, full refund on that.

25   Q.   And I think 40 percent for the other two courses; right?

1    A.   Yes, eventually.

2    Q.   Okay.  Now -- but do you remember -- you were contacted by

3    an agent from the immigration service in the spring of 2011?

4    A.   Okay.

5    Q.   Do you remember that?

6    A.   Yes.

7    Q.   Do you remember speaking telephonically with an agent who

8    identified -- who identified himself as Special Agent James

9    Burke?

10   A.   I don't remember the name.  I'm sorry.

11   Q.   You don't remember the name?

12   A.   Yeah.

13   Q.   Okay.

14   A.   But I did speak to -- I did have an e-mail conversation

15   with somebody.

16   Q.   It was almost -- almost three years ago, March 24th, 2011?

17   Does that sound about right?

18   A.   Yes.

19   Q.   And isn't it true that you told the agent that the reason

20   you wanted to leave the school was because of medical -- a

21   medical issue?

22   A.   I did write that.  I did write that, yes.  The reason

23   was -- the initial reason was that yes, that did -- it wasn't

24   working properly, but the medical reason actually came in, not

25   for leaving the course but actually deciding not to go with the

1    F-1.

2    Q.   I'm sorry.  Can you -- can you say that again?  I --

3    because I'm not understanding that.

4    A.   The actual reason for leaving the course was to -- because

5    I was not satisfied, but the reason -- the medical reason was

6    not to get into F-1.

7         We were trying to conceive that here.  I had medical

8    reasons.  I had medical issues conceiving.  So we finally

9    decided that I would not take up F-1, just continue on H-4 and

10   carry on with the course, but the actual -- but the deciding

11   factor for leaving the course was that I was not satisfied with

12   the course.

13   Q.   You decided that you didn't -- did not want to continue

14   being a student because of a medical reason?

15   A.   Continuing -- not being a student but not being an F-1.

16   Q.   So you were -- you were going to continue to be a student

17   but not change your status?

18   A.   Yes.

19   Q.   And why would the medical reason -- if you were going to

20   continue being a student, why would the medical reason affect

21   your decision whether or not to try to apply for a different

22   type of visa?

23   A.   The reason I was going for F-1 was that I was under the

24   impression that I would work part time.  So obviously, I would

25   like to work some time and pay for my tuition, but when I --

1    when I knew that -- that I had some medical issues -- and I

2    would not like to work.

3        So there was no point getting the hassle of getting my visa

4    to work and especially when my -- initially my F-1 visa got

5    rejected because I missed signing a document -- signing a

6    regular form.  So I didn't want to just redo that thing again.

7    Q.   Okay.  I think I understand the distinction here.

8        Now, you're saying that really the medical -- the medical

9    issue had to do with whether or not you could work, not with

10   whether you could attend school --

11   A.   Yeah.

12   Q.   -- is that right?

13   A.   Yes.

14   Q.   I don't want to --

15   A.   Yes.  I mean, that was the basic criteria that I could get

16   into something else so that I can pay for my tuition.  That's

17   it, but later on I wanted to continue with the program because

18   I wanted to finally take up the CPA course.

19   Q.   And you understood that if you adjusted your status from an

20   H-4 visa to an F-1 visa, in addition to going to school, you

21   could also work part time?

22   A.   Yes.

23   Q.   On an F-1 visa?

24   A.   Yes.

25   Q.   The visa that you had, the H-4, did not allow you to work

1    at all?

2    A.   Yes.

3    Q.   Okay.  You -- isn't it true, ma'am, that on March 24th,

4    2011 -- was that the first time you spoke to an agent about

5    TVU?

6    A.   I cannot confirm exactly the date but yes, during that

7    time.

8    Q.   Okay.  Isn't it true that you told the agent when you were

9    being interviewed about your dealings with TVU that the reason

10   you wanted out of the school was because of the medical issue?

11   A.   I don't remember exactly if I told them that.

12              MR. BABCOCK:  May I approach, your Honor?

13              THE COURT:  You may.

14   BY MR. BABCOCK:

15   Q.   I'm going to ask you to review something and --

16   A.   Sure.

17   Q.   -- see if it refreshes -- just read it to yourself,

18   primarily this middle area.  See if it refreshes your

19   recollection and tell me after you've looked at it.

20   A.   Yeah.  It mentions it there, but probably I just -- because

21   it says I -- I explained two things.  One was the medical

22   procedure, and then I also mentioned that there was no

23   professor assigned and that the classes did not work -- didn't

24   work for me the way they should have.

25   Q.   I understand, but isn't it true, ma'am, that you -- that

1    you told him you wanted out of the school for medical reasons?

2    A.   If you -- yeah.  That statement says that, yes, but

3    probably I just combined all my reasons together.  I don't

4    remember what state of mind I was in at that time.  So --

5            THE COURT:  Mr. Babcock, I don't want to break your

6    chain of thought.  Any time in the next five minutes that's

7    convenient for you, I would like to take our morning recess.

8            MR. BABCOCK:  Thank you.  Oh.  Thank you for the

9    heads-up.

10   BY MR. BABCOCK:

11   Q.   The -- getting back to the way these classes were to be

12   conducted -- so I think you said initially you had some --

13   after you registered and paid your fees, you were given some

14   information about how to log in?

15   A.   Yes.

16   Q.   And you went to, I assume, the TVU website to initiate a

17   log-in process?

18   A.   Yes.

19   Q.   Okay.  And what happened -- you had, like, a username and a

20   password, I assume, of some sort?

21   A.   Yes.

22   Q.   Okay.  What happened once you logged in?

23   A.   Once I logged in, I could view the courses I had.

24   Q.   The courses that you had enrolled in?

25   A.   Yes.

SATIJA - CROSS / BABCOCK

1    Q.   Okay.  And were these courses supposed to take place at

2    certain times?

3    A.   I don't understand.  Sorry.

4    Q.   Well, could you log in at any given time on one of your

5    courses?

6    A.   Yes, that was available.  That was -- yes.

7    Q.   For example, on a Monday night at 7:00 o'clock, you could

8    say, "I want to" -- "I want to do" -- "learn some Dreamweaver"

9    and log in and click on your Dreamweaver course.  That was your

10   expectation?

11   A.   Yes.

12   Q.   Okay.  And do the same thing the next day or not and wait

13   another week?

14   A.   Yeah.  I mean --

15   Q.   Just --

16   A.   -- I could access the videos anytime.

17   Q.   I'm just trying to understand how the process worked -- or

18   let the jury understand better how the process worked.

19   A.   Okay.

20   Q.   Did you try to log onto your courses at certain times or

21   certain intervals?

22   A.   Yes.  The courses' videos were available for anytime

23   viewing, but the only -- the problem was there was no clear-cut

24   back -- on the timeline for the courses.  They were -- there

25   was another link for midterm exam, but what midterm, when,

1    time -- what is the duration, and there was just videos.  If I

2    had questions, if I had problems to access to, that was not

3    there.

4              MR. BABCOCK:  Okay.  Maybe we can take a couple

5    minutes now, your Honor.

6              THE COURT:  Very good.

7         Members of the jury, as I told you, we take two breaks each

8    day.  One is at about 10:00 o'clock, and one is at about 11:45.

9    It's about 10:00 o'clock.  The Court will be in recess for

10   15 minutes.  Thank you.

11             THE CLERK:  All rise.

12                    (Recess taken.)

13             THE COURT:  All right.  All the jurors are in their

14   assigned seats.  We're in the midst of cross-examination.

15        Mr. Babcock, your witness.

16             MR. BABCOCK:  Thank you, your Honor.

17        May I approach, your Honor?

18             THE COURT:  You may.

19   BY MR. BABCOCK:

20   Q.   Ms. -- I'm sorry.

21   A.   Vandana.

22   Q.   Vandana.  Thank you.

23   A.   Yes.

24   Q.   I'm going to -- actually, I'm going to show you -- we

25   were -- before the break, we were talking about the process of

1    which -- when you went to log in for your classes.

2    A.   Yes.

3    Q.   And I'm going to show you -- I'm going to show you -- one

4    of the classes you mentioned that you were taking was the

5    Dreamweaver class?

6    A.   Yes.

7    Q.   And that's some sort of, as I understand it, program for

8    building websites essentially?

9    A.   Yes.

10   Q.   Now, when you log in for your class, there's -- I assume

11   there's some sort of display about the course?

12   A.   I don't remember what exactly, but this is what you're

13   showing me.  This -- I remember it was just PDF book.

14   Q.   Okay.  There was a textbook online?

15   A.   Yeah, just a textbook online.

16   Q.   Okay.  What about some sort of syllabus?

17   A.   The book had a syllabus.  I don't remember if they gave --

18   the book had an index.  That's it.  I don't remember if there

19   was a full syllabus.

20   Q.   And what about for your other courses?  You had a Business

21   Administration class; right?

22   A.   Yes.

23   Q.   All right.  And a management class?

24   A.   Yes.

25   Q.   And did those have anything more than a book?

1    A.    This seems reasonable.  This seems reasonable, but I don't

2    remember if it was Week 1, Week 2.  I don't remember that, but

3    yeah, this still seems reasonable.

4    Q.    It had -- well, let me just ask you:  For example, when you

5    logged onto your Business Administration and Management

6    class --

7            THE COURT:  Mr. Babcock, for a clear record, we

8    should know what number the witness is looking at.

9            MR. BABCOCK:  This has not been marked yet, your

10   Honor, because I didn't know if she would recognize it.  So --

11           THE COURT:  I see.  Well, it's been referred to on

12   the record.  So whether or not it's admitted, can we have an

13   exhibit number, please.

14           MR. BABCOCK:  Certainly.

15           THE COURT:  Thank you.

16           MR. BABCOCK:  I believe it will be 1000, I

17   understand, from your clerk.

18           THE COURT:  Very good.

19       All right.  Members of the jury, we need a clear written

20   record of what happened in this trial, and so sometimes --

21   sometimes you'll see that something is marked as an exhibit and

22   given a number, and it may or may not be admitted into

23   evidence.

24       But -- but even so, even if it's never admitted into

25   evidence, it's important that -- that we be able to know what

1    things were shown to witnesses and that sort of thing.

2         So this next exhibit will be marked as Exhibit 1000.

3         (Defendant's Exhibit 1000 marked for identification.)

4         MR. BABCOCK:  Thank you, Mr. Noble.

5    BY MR. BABCOCK:

6    Q.   So when -- for example, when you went to log into your

7    Business Administration and Management class, was there --

8    there was a textbook; right?  Was it a PDF?

9    A.   It was PDF, but I don't remember if it was the full-fledged

10   textbook or just an instruction book.  Yeah, I don't remember

11   that.

12   Q.   Okay.

13   A.   I know there were videos definitely.

14   Q.   Okay.  Were they broken down by week?  For example, Week 1,

15   Project Management?  Week 2, Human Resource Management?

16   A.   I don't remember.  There were definitely headings, but I

17   don't remember the Week 1, but yeah, that's what you're

18   showing.  That seems reasonable.  There's a possibility it was

19   like that.

20   Q.   I'm going to ask you to look at Exhibit 1000 again.  I know

21   it's been three years or so.

22   A.   Yeah, this seems reasonable.  That's what I said.

23   Q.   So is that -- does that look like -- look roughly like what

24   you saw when you logged into your management class three years

25   ago?

1    A.   Yes.

2              MR. BABCOCK:  Okay.  I'd ask that 1000 be admitted,

3    your Honor.

4              THE COURT:  Any objection?

5              MR. RHYNE:  May I have a quick moment, your Honor?

6              THE COURT:  Yes.

7              MR. BABCOCK:  I believe they have no objection, your

8    Honor.

9              MR. RHYNE:  No objection, your Honor.

10             THE COURT:  Very well.  Exhibit 1000 is admitted into

11   evidence.

12             (Defendant's Exhibit 1000 received in evidence.)

13             MR. BABCOCK:  Let's see.  This is my first run.  So

14   we'll see if we can get the Elmo going.

15        Video; right?

16             MS. WEST:  Yeah.

17             MR. RHYNE:  That's it.

18             MR. BABCOCK:  Can't quite get the whole thing on

19   there.  So we'll have to do it in --

20   BY MR. BABCOCK:

21   Q.   So when you logged -- this was one of the classes you took,

22   was Business Administration and Management; right?

23   A.   Yes.

24   Q.   And when you logged on, there were some materials.  You

25   said you wasn't sure if it was a textbook, but there was some

1    sort of written materials?

2    A.   Yeah.  I now remember that the MBA date was there.  I don't

3    remember the others.

4    Q.   Okay.  I understand.  It's been a while, and then there

5    were areas that were broken down by -- this one by week.

6    A.   Okay.

7    Q.   And taught -- each week was sort of a different -- looks

8    like a different topic; is that right?

9    A.   Yes.

10   Q.   So the first week, the topic was "Project Management."  The

11   second week was "Human Resource Management" and some sort of

12   employee-employer topic.

13   A.   Okay.

14   Q.   Did you -- you said you tried to get a refund four to

15   six weeks into the semester.  Do you remember what part of the

16   materials you got through before you left, how far you got into

17   it?

18   A.   I don't remember.

19   Q.   Okay.

20   A.   I probably looked at some videos.  Initially, when I logged

21   in, there was sound issues.  So I couldn't do anything.

22   Q.   Uh-huh.

23   A.   Later, I did get into some videos.

24   Q.   Okay.  So you were able to access at least some of the

25   material?

1   A.   Yeah.  After that, those technical issues wasn't there with

2   videos.

3   Q.   Okay.  It was just initially that there were technical

4   issues?

5   A.   Yes.  Yes.

6   Q.   And you complained to Ms. Su and told her you were having

7   some problems; right?

8   A.   Yes.

9   Q.   And eventually, the technical -- sort of the accessing the

10  material issues were resolved; right?

11  A.   Yes.

12  Q.   Okay.  And she asked you to be patient.  Did you understand

13  that this was sort of a newer school?

14  A.   Yes.

15  Q.   Okay.  And there was still, for lack of a better word, some

16  glitches to be worked out?

17  A.   I understand, yes.

18  Q.   Fair enough?

19  A.   Yes.

20  Q.   Okay.  It looks like on this Exhibit 1000 at least -- it

21  looks like the materials went as far as up to Week 15?

22  A.   Uh-huh.

23  Q.   So you -- you stopped approximately a quarter to a third of

24  the way through the semester --

25  A.   Yes.

1      Q.   -- roughly?

2           And you also took a course in Business Administration?

3      A.   Yes.

4           MR. BABCOCK:  I'll mark this next one.  Actually, go

5      ahead and do that one, too.

6           (Defendant's Exhibit 1001 marked for identification.)

7      BY MR. BABCOCK:

8      Q.   I'm going to show you what's been marked as Exhibit 1001.

9      This is a similar printout for -- for the other course you

10     took; right?

11     A.   Yes.

12     Q.   Does that look familiar?

13     A.   Yes.

14          MR. BABCOCK:  I'd ask that 1001 be admitted, your

15     Honor.

16          MR. RHYNE:  No objection, your Honor.

17          THE COURT:  1001 is admitted.

18          (Defendant's Exhibit 1001 received in evidence.)

19     BY MR. BABCOCK:

20     Q.   This is topic outline and other information for your

21     Business Administration class?

22     A.   Yes.

23     Q.   And it looks like it started out with a lecture by Scott

24     McNealy, the CEO of Sun Microsystems?

25     A.   Uh-huh.

1    Q.   And Marc -- this -- Andreessen, founder of LoudCloud -- did

2    you watch that one?

3    A.   I don't remember.

4    Q.   Okay.  Did you end up getting a -- completing a -- your MBA

5    at another school?

6    A.   No.

7    Q.   Week 2 was some sort of lecture or information from Jack

8    Welch, the former CEO of GE and the like; right?  Did you watch

9    some of these lectures?

10   A.   Probably, yes.

11   Q.   Okay.

12   A.   In fact, yes, I did.

13   Q.   Okay.

14   A.   But I don't know if I -- I just picked and choosed each one

15   or if I went week by week.

16   Q.   Okay.  So could you go in, for example -- could you have,

17   if you had wanted to, gone in and watched all of these

18   lectures, you know, in one week, or did you have to go week by

19   week?

20   A.   I -- we had access to the videos.  We could have done all

21   of them in one day.

22   Q.   Okay.  You could have accessed it at any time?

23   A.   Yes.

24        (Defendant's Exhibit 1002 marked for identification.)

25   ///

1    BY MR. BABCOCK:

2    Q.   Okay.  And then showing you what's been marked as

3    Exhibit 1002 --

4    A.   Yes.

5    Q.   -- it sounds like you had particular trouble with the

6    Dreamweaver class?

7    A.   Yes.  I don't remember seeing these, though, the lecture

8    one.  I just remember there was the link of the video,

9    downloading, and the link for e-book on Dreamweaver.

10   Q.   Okay.  So does this -- does this -- this one does or does

11   not look familiar like what you saw?

12   A.   Yeah.  This does not look familiar because specifically I

13   was told there would be a lecturer, and specifically that

14   was -- Ms. Su told me initially she used to teach the class,

15   and going forward, they are looking for -- they are getting

16   another one -- getting another lecturer to take up this class.

17   Q.   Ms. Su told you she was getting another lecturer?

18   A.   Lecturer to get -- to teach the class.

19   Q.   Uh-huh.

20   A.   She told me she was doing that.

21   Q.   But by the time you got a refund and left, did you ever --

22   did you ever try to take it after she got a lecturer?

23   A.   By the time I asked for the refund, I didn't get any --

24   there was no lecturer there.

25   Q.   Okay.  So you paid $2,700, you said?

1  A.  Yes.

2  Q.  For the semester?

3  A.  Yes.

4  Q.  And the reason you paid $2,700 was you wanted to take these

5  classes --

6  A.  Yes.

7  Q.  -- right?

8  A.  Yes.

9  Q.  You weren't trying to buy a visa; right?

10  A.  Of course not.

11  Q.  A resident visa?

12  A.  No.

13  Q.  You didn't even need an F-1 visa?

14  A.  No.

15  Q.  You were already in the country here legally?

16  A.  Yes.

17  Q.  You wanted it, but what you really wanted was to take the

18  classes; right?

19  A.  Yes.

20  Q.  And learn the material?

21  A.  Yes.

22  Q.  And advance your education?

23  A.  Yes.

24  Q.  Actually, I have to ask you about that because you

25  mentioned earlier in your direct examination that at some point

SATIJA - CROSS / BABCOCK

1   when you were asking my client for a refund, she made basically

2   what sounded like a threat that, you know, she could have you

3   deported.  Is that what you were saying?

4   A.   Yeah.  She told me that she could get the visa cancelled.

5   Q.   But you had not obtained your visa through TVU?

6   A.   No.

7   Q.   You had obtained your visa through your husband?

8   A.   Yes.

9   Q.   She -- my client didn't have anything to do with your

10   husband obtaining his visa; right?

11   A.   No.

12   Q.   He got it through whatever employer he had, I assume?

13   A.   Yes.

14   Q.   In the United States?

15   A.   Yes.

16   Q.   Someone that was not connected with Ms. Su?

17   A.   Yes.

18   Q.   She didn't have any power to get you or your husband

19   deported, did she?

20   A.   But we were just, like, calling people and dealing with a

21   university and the president of the university, and we were

22   scared.  I was -- you could have people they have contacted,

23   and they can put up a case.  We don't know.  So I just wanted

24   to get over it -- get it over with, and I -- I knew that my

25   reason for asking the amount that I was was correct, and that's

1    why I filed a complaint with the BBB.

2    Q.   And you did get a hundred percent of your Dreamweaver money

3    back?

4    A.   Yes.

5    Q.   And 40 percent for the other classes?

6    A.   Yes.

7    Q.   Did you get that sometime in the spring -- later in the

8    spring of 2010?

9    A.   I -- yeah.  In summer -- in June, July, I got the full --

10   the case was over with.

11   Q.   In the early summer?

12   A.   Yes.

13          MR. BABCOCK:  That's all I have, your Honor.  Thank

14   you.

15          THE COURT:  Thank you.

16      Redirect?

17          MR. RHYNE:  Yes, your Honor.

18                    **REDIRECT EXAMINATION**

19   BY MR. RHYNE:

20   Q.   You stated previously that you had sent documents to the

21   United States government to transfer from H-4 to F-1 status?

22          THE COURT:  Mr. Rhyne, one of the jurors is having

23   trouble hearing you.

24   BY MR. RHYNE:

25   Q.   You stated earlier that you had sent documents to the

 1    United States government regarding your transfer of visa status

 2    from H-4 to F-1; is that correct?

 3    A.   Yes.

 4    Q.   Did you have discussions with Susan Su regarding that

 5    change of status?

 6    A.   Yeah.  I just asked her how it works, and she said that

 7    these would be how much the fees were, and I would find online

 8    all the documents I needed to submit.

 9    Q.   Did Susan Su send you documents?

10    A.   Yes.

11    Q.   Do you remember what those documents were?

12    A.   There was one I-20.

13    Q.   Can you tell the jury what your understanding of an I-20

14    is?

15    A.   I just understand that -- that those -- this document from

16    the university stating that this person has enrolled into the

17    university, and -- yeah, that's about it.  This information

18    has -- I don't remember exactly what is there in that, but I

19    understand that this would be there, that -- stating that this

20    is the student and this is the university.

21              MR. RHYNE:  May I have a moment, your Honor?

22              THE COURT:  Yes.

23              MR. RHYNE:  I'm going to publish for the witness

24    Exhibit 1000.

25    ///

1   BY MR. RHYNE:

2   Q.   And this purports to be the website printout for BA370; is

3   that correct?

4   A.   Yes.

5   Q.   Okay.  I want to direct your attention down here to this

6   spot where it says, "Recent Activity."  Do you see that?

7   A.   Yes.

8   Q.   And that date there is 18 January 2014; is that correct?

9   A.   It reads that, but this is not -- this is not what I have

10  access to.

11  Q.   When were you accessing this class?

12  A.   I was accessing it in 2010, January or probably February --

13  February in the beginning, but after that, I never logged into

14  the class.

15  Q.   Now, keeping that date in mind, do you know for certain as

16  you testify here today 100 percent that that's how it appeared

17  back then when you were trying to log in?

18  A.   The -- these two -- the Business Administration -- yes,

19  they appeared more or less like this, what I reasonably

20  remember, but I don't know the recent activity -- if -- if --

21  this is not my account because I haven't accessed it after

22  January or beginning of February of 2010.

23  Q.   So with respect to your account, do you know whether or not

24  this is what you saw?

25  A.   As far as my account, I saw this kind of thing where there

1    was four on the side, and it was -- there was -- for this

2    point, there were videos like this, yes.  This was there.

3    Q.   Okay.  Now, same questions with respect to 1001.  Do you

4    see in 1001 we have "Recent Activity" here?

5    A.   Yeah.

6    Q.   Same date?

7    A.   This is -- again, this probably -- this cannot be from my

8    account because I never accessed it after 2000 -- the beginning

9    of 2010.

10   Q.   Okay.

11   A.   But as far as the layout of the CEO Seminar, this seems

12   reasonable for what I had because it had on all the details.

13   Q.   But you hadn't logged in as of 2014; is that correct?

14   A.   Of course, definitely not.  After February of 2010 --

15   beginning of February 2010, I never logged in.

16   Q.   On cross-examination, you estimated when you thought you

17   reached out to Susan Su to tell her that the class wasn't

18   working; is that correct?

19   A.   Yes.

20   Q.   Okay.  As part of your Better Business Bureau complaint,

21   did you provide them with correspondence that you had between

22   yourself and Susan Su?

23   A.   Yes.

24   Q.   Okay.  Was that correspondence e-mail?

25   A.   Yes.

1           MR. RHYNE:  Your Honor, may I approach?

2           THE COURT:  You may.

3           MR. BABCOCK:  I'm sorry.  What's the number?

4           MR. RHYNE:  860.

5      (Government's Exhibit 860 marked for identification.)

6           MR. RHYNE:  I'm handing the witness what's been

7    marked as Exhibit 860.

8    BY MR. RHYNE:

9    Q.  Do you recognize Exhibit 860?

10   A.  Yes.

11   Q.  Is that a portion of the Better Business Bureau complaint

12   that you filed?

13   A.  Yes.

14   Q.  Are these e-mails that you referred to earlier between you

15   and Susan Su?

16   A.  Yes.

17           MR. RHYNE:  Your Honor, we move 860 into evidence.

18           THE COURT:  Any objection?

19           MR. BABCOCK:  No, your Honor.  Submitted.

20           THE COURT:  Exhibit 860 is admitted.

21      (Government's Exhibit 860 received in evidence.)

22           MR. RHYNE:  May we publish 860, please, and could we

23   please zoom in to the middle portion here of the e-mail

24   beginning from "Dr. Susan Su."  No, over here.

25   ///

SATIJA - REDIRECT / RHYNE

1    BY MR. RHYNE:

2    Q.   Now, I want to direct your attention to the middle portion

3    of that e-mail.  The date on that e-mail is February 23rd,

4    2010; is that correct?

5    A.   Yes.

6    Q.   And the top of the e-mail -- it's hard to read on the

7    screen, but it says, "From Dr. Susan Su"; is that correct?

8    A.   Yes, yes.

9    Q.   And is this your e-mail here, the "To" line?

10   A.   Sorry?  Sorry?

11   Q.   "To Vandana Satija."  Is that you?

12   A.   Yes.

13   Q.   Okay.  Now, in this e-mail, Susan Su is writing that she

14   used to teach the Dreamweaver class; is that correct?

15   A.   Yes.

16   Q.   She's telling you that it's a step by step on how to build

17   a website such as TVU's website; is that correct?

18   A.   Yes.

19   Q.   And it's going to have practical demos and shows; is that

20   correct?

21   A.   Yes.

22   Q.   And she states, "But due to sudden increase, heavy

23   administrative work for the spring term, I have not been able

24   to host class meeting for this term, and we are also currently

25   looking for another Dreamweaver expert to take care the lec

1    part"; is that correct?

2    A.   Yes.

3    Q.   Referring to the lecturer?

4    A.   Yes.

5    Q.   She says, "It's a rather new program, professional tool,

6    and we have been extremely difficult to find AB expert who can

7    teach the subject"; is that correct?

8    A.   Yes.

9    Q.   And then in the next paragraph, she's telling you to study

10   the course material online, and she's telling you that you will

11   receive a good grade; is that correct?

12   A.   Yes.

13   Q.   And you always will in the classroom; is that correct?

14   A.   Yes.

15   Q.   And you will always be in the classroom; is that correct?

16   A.   Yes.

17   Q.   Until the instructor is teaching it; is that correct?

18   A.   Yes.

19   Q.   And at the end, she tells you, "That's why I told you to be

20   patient"; is that correct?

21   A.   Yes.

22   Q.   You never actually attended this class; is that correct?

23   A.   Yes.

24   Q.   Because you weren't able to?

25   A.   Yes.  There was no instructor until the time I asked for

1        the refund of five to six weeks.

2                MR. RHYNE:  Okay.  No further questions, your Honor.

3                THE COURT:  Thank you.

4            Recross?

5                      **RECROSS-EXAMINATION**

6        BY MR. BABCOCK:

7        Q.   I understand there was no instructor by the time you -- by

8        the time you complained?

9        A.   Yes.

10       Q.   Do you know whether she -- whether Ms. Su eventually

11       obtained an instructor for the Dreamweaver class after you had

12       stopped?

13       A.   Well, after I had asked for the refund and I asked for

14       withdrawal from the course, I got an e-mail stating there would

15       be some -- I don't remember for which part of the course

16       whereby they were trying to set up a class, set up a meeting.

17       So I don't remember exactly for which course it was.  Was it

18       the other two, or was it for the Dreamweaver?

19       Q.   You got an e-mail from an instructor?

20       A.   I'm assuming she was an instructor -- he or she was an

21       instructor.

22       Q.   Okay.  For one -- one of the three classes that you had

23       enrolled in?

24       A.   Yes.

25       Q.   Okay.

1    A.   I don't remember whether it was Dreamweaver or just -- I

2    received it stating that there is -- that -- scheduling a

3    class.

4    Q.   Was that e-mail from --

5             MR. BABCOCK:  This hasn't been marked yet.  What's

6    the next in order?  1002?

7             THE CLERK:  -3.

8             MR. BABCOCK:  -3.

9        (Defendant's Exhibit 1003 marked for identification.)

10   BY MR. BABCOCK:

11   Q.   Does that name look familiar?

12   A.   Yes, this name looks -- this name looks familiar.

13   Q.   I'm going to mark this -- or have it marked as 1003 in a

14   second.  This -- this is the e-mail that appears to be the

15   e-mails you were referring to a second ago from an instructor

16   for TVU?

17   A.   This seems like from the regular information here, but it

18   seems I -- I didn't have this first e-mail, but the second

19   one -- it seems I got this e-mail.  I'm not sure I got the

20   first one where she says, "I'm the new teacher" and -- I don't

21   remember that, but I remember getting "scheduling a session."

22   Q.   So the point being that you received some e-mail

23   communication from an instructor for the Dreamweaver course;

24   right?

25   A.   Yes.

1      Q.   Apparently, the instructor didn't get the memo that you

2      were no longer attending TVU and had asked for a refund; right?

3      A.   Yeah.  In fact, I replied to this e-mail saying that I'm no

4      longer part of this course.

5      Q.   Okay.  But as of some point in March, there actually was an

6      instructor for the Dreamweaver course; right?

7      A.   It seems -- yeah -- from the e-mail that I received, yes.

8      Q.   And I'm sorry.  You said you remember the second e-mail,

9      the one dated March 8th, 2010?

10     A.   Yes.  Yes.

11     Q.   Okay.  And did you stop getting e-mails after that?

12     A.   Yes, just one last e-mail that I received giving me my

13     actual -- my transcript, which was from the -- from the regular

14     e-mail, not from her.

15     Q.   The e-mail that you received on March 8th said that the

16     first session for the Dreamweaver class would be on March 11th;

17     right?

18     A.   Yeah, that's what it reads there.  So --

19     Q.   Well, that's the one that you recognize -- that's the one

20     that you remember receiving --

21     A.   Yes.

22     Q.   -- right?

23     A.   Yes.  I don't remember the exact dates as to what was the

24     schedule, but yes, I received it after I asked for the refund.

25     Q.   As we know from your Better Business Bureau communication

1    you had already asked for a refund in February at some point?

2    A.   Yes.

3    Q.   Thank you.

4         Your -- in your e-mail communication with my client that

5    Mr. Rhyne just went over in Exhibit 860, my client told you

6    that she used to teach that class, but she was no longer able

7    to, and she was looking for another Dreamweaver expert; right?

8    A.   Yes.

9    Q.   And that was sent -- that e-mail was just a couple weeks

10   before you actually received an e-mail from an instructor?

11   A.   Yes.

12   Q.   Doesn't it seem -- it seems sort of clear, does it not,

13   that Ms. Su was struggling to make this school work?

14             MR. RHYNE:  Objection.

15   BY MR. BABCOCK:

16   Q.   Is that --

17             MR. RHYNE:  Speculation.

18             THE COURT:  Sustained.

19   BY MR. BABCOCK:

20   Q.   Okay.  Well, she told you she would find an instructor;

21   right?

22   A.   Yes.

23   Q.   And she did find an instructor?

24   A.   That was way later, way after --

25   Q.   I understand.

1    A.   -- the end of the course.

2    Q.   You had already -- you had already made a decision to leave

3    by that point?

4    A.   Yes.

5    Q.   But she did find an instructor eventually?

6    A.   Yes.

7            MR. BABCOCK:  Okay.  Thank you.

8        Nothing further.

9            THE COURT:  Redirect?

10           MR. RHYNE:  No further questions, your Honor.

11           THE COURT:  Thank you, ma'am.  You're excused.

12           THE WITNESS:  Thank you.

13           THE COURT:  United States, next witness?

14           MR. RHYNE:  Your Honor, may we have a brief sidebar

15   before we call our next witness?

16           THE COURT:  Yes.

17           MR. BABCOCK:  Oh.  Sorry.  I thought they were having

18   a sidebar without me.  So --

19                    (Unreported sidebar.)

20           THE COURT:  Okay.  Members of the jury, before the

21   Government calls their next witness, we just had a sidebar.

22   Sometimes judges call those sidebars.  Sometimes they call them

23   bench conferences.

24       From time to time during the trial, it may become necessary

25   for me to talk with the lawyers outside of your hearing either

1    by having the conference over there at the sidebar when you're

2    present in the courtroom or, if it's something longer, by

3    calling a recess to discuss matters outside of your presence.

4         The purpose of those conferences is not to keep relevant

5    information from you.  There are administrative matters.  There

6    are decisions we have to make about how to treat certain things

7    under the rules of evidence and that sort of thing, and because

8    those conferences don't have to do with the evidence that's

9    actually being presented to you so you can make a decision, we

10   have them outside of your hearing.  I try to keep them to a

11   minimum, but occasionally we have to have those conferences.

12        Please don't be concerned about our discussions or try to

13   guess what is being said.  I may not always grant an attorney's

14   request for a conference.  Please don't consider my granting or

15   denying a request for a conference or a sidebar as any

16   indication of my opinion of the case or my view of the

17   evidence.

18        As I'm sure I will remind you frequently, you're the

19   exclusive judges of the facts, and you make those decisions

20   based on the evidence as you hear in the trial.

21        Mr. Rhyne, the Government's next witness?

22             MR. RHYNE:  Yes, your Honor.

23   The United States calls Special Agent William Elliott.

24             THE COURT:  All right.  Good morning, Mr. Elliott.

25             THE WITNESS:  Good morning, sir.

1        THE COURT:  May I ask you to come up to the witness

2   stand just to my right here?  And when you get there, just

3   remain standing.  Raise your right hand.  Face my courtroom

4   deputy, please.

5        THE CLERK:  Do you solemnly swear or affirm that the

6   testimony you're about to give in the matter now pending before

7   this Court shall be the truth, the whole truth, and nothing but

8   the truth?

9        THE WITNESS:  Yes.

10        THE CLERK:  Thank you.  Please be seated.  Speak

11   close to the microphone.

12        THE WITNESS:  Okay.

13        THE CLERK:  Please state your full name and spell

14   your last name.

15        THE WITNESS:  Yes.

16      My name is William Robert Elliott III.  Last name is

17   E-l-l-i-o-t-t.

18        THE COURT:  Thank you.

19      Your witness.

20        MR. RHYNE:  Thank you.

21                        **WILLIAM ELLIOTT,**

22   Called as a witness by the Government, having been duly sworn,

23   testified as follows:

24   ///

25   ///

**DIRECT EXAMINATION**

BY MR. RHYNE:

Q.  Where do you work?

A.  I work for the U.S. Department of State.  I'm in the Bureau
of Diplomatic Security.  I serve as a Special Agent.

Q.  What are your duties and responsibilities as a Special
Agent with the Department of State?

A.  Well, I'm in the foreign service.  So our duties rotate
from assignment to assignment.  Every two to three years, we
move from one assignment to another.  So I previously served in
Washington for a couple of tours, overseas in China, and
currently in San Francisco.  I serve as the deputy unit
supervisor for one of our criminal units, and we focus
primarily on passport and visa fraud, but we also do protection
and other investigations.

Q.  I want to just summarize your current position.  I want to
back up to your prior position with the Department of State.
You said you worked in Washington, DC; is that correct?

A.  That is correct.

Q.  Okay.  What was your prior position to your current one?
Where did you work prior to your current position?

A.  Prior to my current position, I served overseas in China,
in Guangzhou, China, at the U.S. Consulate General there.

Q.  What was your job title?  What did you do?

A.  And I served as an assistant regional security officer

1    investigator, which is a Special Agent position that is

2    actually embedded in the consular section of the consulate.  So

3    within the consulate, they have a consular section that issues

4    passports and visas, and I was actually a criminal investigator

5    embedded in that section.  I did that for two years.

6    Q.  And can you just kind of summarize the kinds of cases you

7    saw when you were there?

8    A.  Yeah, absolutely.  Primarily, we focused on visa fraud,

9    both immigrant and nonimmigrant visa fraud.  Occasionally, we'd

10   have cases with our American citizens where we'd run into

11   passport fraud, but overall for the most part it's a visa

12   environment.  So we focused mostly on that, primarily on

13   nonimmigrant visas.

14   Q.  When you used the term --

15          MR. BABCOCK:  I'm sorry.  I missed the last thing he

16   said.  What visa?

17          THE WITNESS:  We did a lot of work on nonimmigrant

18   visa cases.

19          MR. BABCOCK:  Nonimmigrant?  Thank you.

20          THE WITNESS:  That's correct.

21   BY MR. RHYNE:

22   Q.  When you use the term "nonimmigrant," what do you mean by

23   that?

24   A.  Well, two different classes of people who come into the

25   United States would be immigrants, who plan to stay in the

1    United States and assimilate, and the other group would be

2    nonimmigrants, who plan on just coming here for a duration of

3    time and then departing and returning to their home country.

4    Q.   And based on your training and experience, you're familiar

5    with the term "F-1 visa"; is that correct?

6    A.   I am.

7    Q.   Which category does that fall into?

8    A.   F-1's would refer to student visas.

9    Q.   Okay.  Would that be a nonimmigrant or an immigrant?

10   A.   It would be a nonimmigrant visa.

11   Q.   And that's because they're only here for a certain period

12   of time; is that correct?

13   A.   That is correct.

14   Q.   At least by the terms of their visa?

15   A.   That is correct.

16        THE COURT:  Agent Elliott, you might want to just

17   move that microphone just a little closer to yourself.  That

18   will make it easier for the jury to hear you, and you won't

19   need to lean forward.

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Thank you.

22   BY MR. RHYNE:

23   Q.   Okay.  Prior to your position in China, where were you

24   before that?

25   A.   Prior to my assignment in China, I was serving the

1    Counterintelligence Division at Diplomatic Security

2    Headquarters.

3    Q.   Where was that?

4    A.   It's in Rosslyn, Virginia, in the Washington, DC metro

5    area.

6    Q.   What were your duties and responsibilities in that

7    counterintelligence position?

8    A.   We ran counterintelligence programs for a number of our

9    posts overseas.  We were assigned to a geographical region.  We

10   also conducted sensitive national security investigations with

11   counterintelligence and espionage.

12   Q.   Now, in your positions with the Department of State, have

13   you come to be trained in the areas of immigration laws and

14   regulations?

15   A.   I have.

16   Q.   Okay.  I want to run through some of the formal training

17   that you've had in that respect.  Are you familiar with the

18   fraud prevention consular manager's course?

19   A.   I am.

20   Q.   What is that?

21   A.   The fraud prevention consulate manager's course -- quite a

22   mouthful -- is an addendum to the basic consular course.  It's

23   designed for fraud prevention managers who will serve in

24   consulate --

25                    (Court reporter clarification.)

1          THE WITNESS:  The consulate -- consulate fraud

2    prevention manager's course is an addendum to the basic

3    consular course, and it's designed for fraud prevention

4    managers who are serving overseas in consular assignments.  The

5    training covers interviewing visa fraud impostors, how to run

6    an effective fraud prevention program at posts.

7    BY MR. RHYNE:

8    Q.   Where is that training given?

9    A.   That training was at the Foreign Service Institute in

10   Virginia.

11   Q.   Are you familiar -- have you taken that course?

12   A.   I have.

13   Q.   Okay.  Are you familiar with the basic consular course as

14   well?

15   A.   I am.

16   Q.   What is that?

17   A.   The basic consular course is a comprehensive 31-day course

18   that every consular officer who goes overseas is required to

19   take, and it covers all aspects of the Immigration and

20   Naturalization Act -- Act -- visas, passport issuances,

21   American citizens service cases -- and it's a very

22   comprehensive course, and I was fortunate to take it prior to

23   my assignment.

24   Q.   Are you familiar with the term "basic Special Agent

25   course"?

ELLIOTT - DIRECT / RHYNE

1    A.   I am.

2    Q.   What is that?

3    A.   The basic Special Agent course is one of two parts of our

4    Special Agent training.  We start training with the Federal Law

5    Enforcement Training Center in Glynco, Georgia.  We follow that

6    up by more specialized training in basic Special Agent courses

7    specific for diplomatic security.  We cover things that we do

8    in our professional duties more often than, say, some other

9    federal agents, visa protection, passport and visa fraud

10   investigation, which is one of the things we primarily focus

11   on.

12   Q.   And in each of these trainings, have you been instructed

13   and received training on how student visas are issued at least

14   with respect to the Department of State?

15   A.   Yes.

16   Q.   Are you familiar with the Immigration and Nationality Act?

17   A.   I am.

18   Q.   I want to focus on the F-1 student visa category that you

19   talked about earlier.  Can you walk the jury through the

20   process through which a student in a foreign country would go

21   through in order to get an F-1 student visa to come to the

22   United States?

23   A.   Absolutely.  So a prospective student would shop for

24   schools and apply to different universities that they might be

25   interested in, and once they're accepted, they would be issued

1   an I-20, which is a form.  It's a certificate of eligibility

2   for studies.  They would come to the U.S. consulate.

3        So in my situation, the consulate would be in Guangzhou.

4   They'd bring their passport, other supporting documentation,

5   and a copy of that I-20, and they would see a consular officer.

6   Q.   And the information on the I-20 indicates the school that

7   they had been accepted to; is that correct?

8   A.   That's correct.  That's correct.

9   Q.   What's assessed at the consulate when they come in with

10  these documents?

11  A.   Okay.

12  Q.   Can you walk through that process?

13  A.   So when these prospective students come into the consulate,

14  they're applying for a visa to go to the United States, which

15  is basically their ticket to get to the U.S. and request entry

16  from DHS, Department of Homeland Security.  And so when they're

17  applying for the visa, we're required to review some of the

18  facts of their application to make sure that they're actually

19  qualified for a visa to travel to the United States.

20       The consular officer assesses the -- it's a bona fide

21  student.  It's an actual student who plans to go to the United

22  States for a full course of study and presents intent to return

23  to their own country after they've completed the studies.

24  Consular officers can also ensure that they have a financial

25  ability to pay for the education.  So if they have an expensive

1    education permit, they have to make sure they can show you they

2    have the funds available to pay for that.

3    Q.   What if there are red flags or something that concerns the

4    officer during this process?  What happens?

5    A.   Well, a couple of different things can happen.  If the

6    officer thinks that it's -- there's no chance that the student

7    is a bona fide student, they can just refuse them under 14B of

8    the Immigration and Naturalization Act and not give them a

9    visa.  They can also refer the case for fraud, in which case

10   the Fraud Prevention Unit eventually might end up on my desk,

11   where we would look into it for visa fraud.

12   Q.   Are you familiar with the term "SEVIS"?

13   A.   I am.

14   Q.   Can you just briefly tell the jury what SEVIS is -- or can

15   you spell it and then tell the jury what it is?

16   A.   Absolutely.  So SEVIS or SEVIS is a program on our computer

17   system that we would use, and it's the Student Exchange

18   Visitors Identification System, and basically these prospective

19   students present an I-20 to the consular officer.

20        And on there, there is an individual SEVIS or SEVIS number,

21   and then the consular officer would check that number in the

22   computer system and ensure that all of the things line up.  So

23   if it says the student is in active status as far as the -- on

24   the computer, then we would know that they've paid their fee

25   and are eligible for studies at that university.

1            MR. RHYNE:  Thank you.

2        No further questions, your Honor.

3            THE COURT:  Thank you.

4        Cross-examination?

5                        **CROSS-EXAMINATION**

6    BY MR. BABCOCK:

7    Q.  Good morning, Officer.

8    A.  Good morning, sir.

9    Q.  So a student abroad who wants to study at a school here in

10   the United States has to get admitted first; right?

11   A.  That is correct.

12   Q.  They apply to a school in the United States, and if they're

13   admitted, the school then issues an I-20?

14   A.  That's correct.

15   Q.  And that is sent to the student?

16   A.  Sir, the I-20 is actually issued by the Department of

17   Homeland Security.

18   Q.  Okay.

19   A.  And so we only see the I-20 when it arrives at the actual

20   foreign consulate.  So we would be on the other side of the

21   ocean waiting for the student to bring the form to us, but it's

22   my understanding, yes, they would be issued the I-20 and would

23   have the name of the university and their name on it.  It would

24   be signed.

25   Q.  You are a very fast speaker.

1    A.   Sorry, sir.

2    Q.   That's okay.

3    A.   I apologize to this gentleman right here.

4    Q.   Just so I understand the logistics, Student A applies to a

5    school here in California from India and gets accepted.  What

6    happens next?

7    A.   After they're accepted?

8    Q.   Yes.

9    A.   My understanding is it's incumbent on the university to

10   send the I-20 to the student.

11   Q.   So the school sends the I-20 to the student?

12   A.   And again, sir, I can't speak to that because we don't

13   actually see the I-20 until it arrives in our consular section

14   and it's presented to the consular officer.

15   Q.   So your --

16   A.   So I don't want to speculate on how it -- how it actually

17   ends up in their hands, but when they arrive and they're

18   standing in front of the window of our consular officer, that

19   is the first time that we see the I-20.

20   Q.   Okay.  So have you done this job at embassies abroad where

21   you are the consular officer reviewing I-20's and --

22   A.   Sir, I'm not a consular officer.  I was the Special Agent

23   assigned to the consular section.  So I was embedded in there,

24   and I walked the line, and I spent my entire day working with

25   about 50 consular officers, and they pass stuff back to me and

1    tell me what was going on.  So I observed the entire process

2    because I was not part of the issuance or refusing process.

3    Q.   Okay.  And this is -- was when you were stationed in what,

4    in China?

5    A.   In Guangzhou, China, yes.

6    Q.   Right.  Okay.  So when you were -- when students in China

7    were applying to schools in the United States, they would get

8    an I-20.  You don't know the exact logistics, but they'd get an

9    I-20 saying they were admitted to a school here in the United

10    States; right?

11    A.   That's correct.

12    Q.   They would --

13    A.   That's correct.

14    Q.   They would bring the I-20 to the -- to the consulate in

15    Guangzhou where a consular -- did I pronounce that right?

16    A.   Close enough.

17    Q.   Not really?

18    A.   Yeah.

19    Q.   Where a consular officer would review the I-20, a passport.

20    What else?

21    A.   They have the passport, the I-20, if the student brought

22    other supporting documentation and an acceptance letter.  They

23    would bring copies of their financial documents that they think

24    they might need for the consular officer.

25    Q.   Isn't the I-20 evidence -- proof that they were admitted to

1    the school?

2    A.   Students would bring supplemental -- supplemental document

3    evidence as well.

4    Q.   Okay.

5    A.   And they would have an interview with the consular officer,

6    who assesses the student in front of them and decides if they

7    fit on the criteria necessary for the visa issuance.

8    Q.   And as I understand it, what the consular officer is mainly

9    looking for is this person really intends to be a student?

10   A.   That's one of the first things, yes.

11   Q.   And do they have the money to support themselves while

12   they're attending school in the United States?

13   A.   That's correct.

14   Q.   And do they plan to come home when it's done?

15   A.   That's also correct.

16   Q.   Those are the three main things?

17   A.   Also, they're able to actually participate in school.  So

18   if they studied in China, for example, and they acquired the

19   equivalent of a high school diploma, then they would be -- you

20   know, logically they would be qualified to start a Bachelor's

21   degree in the United States, but if they only finished up to,

22   say, eighth grade and their education was on an equivalent

23   level, you know, they might have thought there was fraud or

24   that kind of thing.

25   Q.   Okay.  And if the consular officer thinks everything is in

1   order, they issue an F-1 visa?

2   A.   Yes, sir.

3   Q.   And give it to them right there at the consulate?

4   A.   Well, print the visa, and then staff would put it inside

5   the passport.

6   Q.   So when the -- when the prospective student arrives at an

7   airport in the United States, they have the visas to show?

8   A.   Yes.  They used the visa as proof that they can board an

9   airplane, and they would get on the plane.  And once they

10  arrive in the U.S., they would apply with the Department of

11  Homeland Security for initial entry into the United States.

12  The visa is just the ticket that gets you to the door.  They

13  still have to knock on the door after they get there.

14  Q.   Fair enough.

15       Thank you, sir.

16            THE COURT:  Redirect?

17            MR. RHYNE:  Nothing from the Government, your Honor.

18            THE COURT:  All right.  Thank you, Agent Elliott.

19  You can step down.  You're excused.

20            THE WITNESS:  Thank you, sir.

21            THE COURT:  Government's next witness?

22            MS. WEST:  Yes.

23       The United States calls Susanna Warner.

24            THE COURT:  Good morning, Ms. Warner.

25            THE WITNESS:  Hi.

1           THE COURT:  May I ask you to come to the witness

2     stand to my right?  And when you get there, remain standing,

3     raise your right hand, and face my courtroom deputy, please.

4           THE CLERK:  Do you solemnly swear or affirm that the

5     testimony you're about to give in the matter now pending before

6     this Court shall be the truth, the whole truth, and nothing but

7     the truth?

8           THE WITNESS:  Yes, I do.

9           THE CLERK:  Thank you.  Speak close to the

10    microphone.

11          THE WITNESS:  Thank you.

12          THE CLERK:  Please state your full name and spell

13    your last name.

14          THE WITNESS:  Susanna Lee Warner, W-a-r-n-e-r.

15          THE COURT:  Thank you, Ms. West.

16       Your witness.

17          MS. WEST:  Thank you.

18                          **SUSANNA WARNER,**

19    Called as a witness by the Government, having been duly sworn,

20    testified as follows:

21                       **DIRECT EXAMINATION**

22    BY MS. WEST:

23    Q.  Good afternoon, Ms. Warner.

24    A.  Good morning.

25    Q.  What do you do for a living?

1    A.   I'm a section chief at the Student Exchange Visitor

2    Program.

3    Q.   Can you please tell the jury what the Student Exchange

4    Visitor Program is.

5    A.   The Student Exchange Visitor Program is a program that

6    falls under the Department of Homeland Security, and what it

7    does is it certifies schools that want to bring foreign

8    students to study.

9    Q.   And is that -- well, first of all, is the Student Exchange

10   Visitor Program -- is that abbreviated SEVP --

11   A.   Correct.

12   Q.   -- or sometimes called SEVP?

13   A.   Correct.

14   Q.   And is that its only function, to certify schools, or does

15   it have another function as well?

16   A.   It also manages a system called SEVIS, which is used to

17   track and monitor students at the schools that it's certified,

18   and then we also oversee the immigration status of students

19   that enter the country.

20   Q.   All right.  And is SEVIS -- is that the Student Exchange

21   Information System?

22   A.   Correct.

23   Q.   How long have you been in the position of section chief?

24   A.   Three years.

25   Q.   Is that approximately March 2011?

1   A.   Yes.

2   Q.   Can you tell us a little bit, please, about your role as

3   section chief.

4   A.   Primarily, what I do is I oversee two different -- the two

5   different areas related to Student Exchange Visitor Program.  I

6   oversee the schools certified, that the schools that are all

7   certified remain in compliance with the laws, and I oversee the

8   estab- -- the established students and make sure that they

9   remain in compliance with what is required to become a

10  nonimmigrant student in this country.

11  Q.   Can you please tell us approximately how many schools you

12  oversee in your role as section chief.

13  A.   9,000.

14  Q.   Before becoming section chief, what did you do?

15  A.   I worked for a private company that was contracted to the

16  Student Exchange Visitor Program as a senior policy analyst.

17  Q.   For what period of time did you do that?

18  A.   I have done that since 2002, so about nine years.

19  Q.   All right.  As a -- did you say "senior policy analyst"?

20  A.   Yes.

21  Q.   As a senior policy analyst, can you tell the jury, please,

22  what your duties -- excuse me -- were.

23  A.   We -- I had to interpret all the laws and regulations

24  related to the Student Exchange Visitor Program, and then we

25  wrote policy as guidance on how you're supposed to abide by

1      them.

2      Q.   In your capacity as this section chief and in your role as

3      a senior policy analyst, are you familiar with the process for

4      schools to obtain approval from SEVP?

5      A.   Yes.

6      Q.   How so?

7      A.   Well, obviously, we wrote the guidance for how they get

8      approval, and in my current position, we have to know how they

9      receive approval so we can make sure that they remain in

10     compliance while they're approved.

11     Q.   And are you involved directly in the approval process?

12     A.   In the approval process, yes, and their continuing

13     approval.

14     Q.   Okay.  Can you explain that?

15     A.   So we oversee their compliance.  So once a school is

16     approved, they -- they get, you know, continuously monitored to

17     make sure they continue to follow the law, and then I also

18     want -- if we find that they're not following the law, we put

19     into action their withdrawal from the program.

20     Q.   Okay.  And are your familiar with something called site

21     visits?

22     A.   Yes.

23     Q.   Can you tell the jury what that is?

24     A.   A site visit is when we have -- for different reasons, we

25     will visit schools to make sure that -- either that they're

1    eligible for certification or that they're continuing -- you

2    know, following the law and the school is -- you know, retains

3    their eligibility for certification.

4    Q.   And do you in your role as section chief have any direct

5    relationship with site visits?

6    A.   Yes.

7    Q.   Can you tell us about that, please.

8    A.   I oversee a team with the site visits, and I also

9    participate in site visits.

10   Q.   How many would you estimate that you have participated in

11   directly?

12   A.   Probably 40.

13   Q.   And how many would you estimate that you have participated

14   in as sort of an overseeing-type role?

15   A.   Hundreds.

16   Q.   Now, again, in your role as section chief or drawing on

17   experience that you have with SEVP previously, are you familiar

18   with the process by which SEVP's approval of schools may be

19   withdrawn?

20   A.   Yes.

21   Q.   Can you please tell us about that.

22   A.   So in order to be withdrawn, there's certain regulations

23   that relate to how that process must come -- you know, must

24   come into being, and so I oversee that.

25        I oversee a team that investigates the schools, whether

1    they're going to be withdrawn, and there's -- there's many

2    documents that have to be issued, et cetera, that I receive,

3    and I'm the ultimate signator on the withdrawals and the

4    notices of intent to withdraw, which means the notice that

5    we're giving you that we're looking at withdrawing you.

6    Q.   And approximately how many, if you can estimate for us,

7    withdrawal decisions by SEVP have you been involved in?

8    A.   Hundreds.

9    Q.   All right.  Can you tell us a little bit about your

10   educational background, please.

11   A.   Yes.  I have a Bachelor of Science degree from the

12   University of Maryland, and I have a Juris Doctorate degree

13   from the University of Miami School of Law.

14   Q.   In the course of your work with SEVP, have you received any

15   trainings with regard to the Immigration Nationality Act?

16   A.   Yes.

17   Q.   Have you received any trainings with regard to the Code of

18   Federal Regulations as it relates to student visas?

19   A.   Yes.

20   Q.   And are you familiar with the term F-1?

21   A.   Yes.

22   Q.   What is F-1?

23   A.   F-1 is a foreign national who wants to obtain a visa to

24   come into the United States to study for an academic study

25   program.

1    Q.   In your capacity with your work with SEVP, have you

2    received any training with regard to SEVIS?

3    A.   Yes.

4    Q.   Have you actually used the Immigration Nationality Act, the

5    Code of Federal Regulations, and SEVIS as part of your job as

6    section chief?

7    A.   Yes.

8    Q.   How frequently?

9    A.   Every day.

10   Q.   Have you also been involved in training others with regard

11   to these same topics?

12   A.   Yes.

13   Q.   Can you please tell us a little bit about that.

14   A.   I've done many, many trainings.  Primarily, in my current

15   capacity, I train what we call adjudicators, who are from my

16   team.  That means the group that oversees the compliance of

17   schools, you know, investigates them, writes the documents

18   needed to give proper notice that we're looking at the

19   withdrawing of a school or remedial action.  So I'll train them

20   in all the aspects.

21       Recently, I was involved in training a group that we call

22   the field representatives that are going to be located all over

23   the country that are actually there to, you know, give advice

24   to schools to make sure that they're doing their best to

25   maintain compliance with our laws.

1    Q.   Thank you.

2            MS. WEST:  At this point, the Government offers Ms.

3    Warner as an expert in SEVP's procedures, including the school

4    approval and termination process or withdrawal process, and the

5    federal regulations pertaining to those procedures and to

6    students admitted to the United States to study at

7    SEVP-approved schools.

8            THE COURT:  Does the defendant wish to be heard?

9            MR. BABCOCK:  No, your Honor.  Submitted.

10           THE COURT:  The Court will so designate Ms. Warner as

11   an expert.

12      The Court's designating of a witness as an expert is not

13   determinative of anything.  It's merely a signal -- excuse me.

14   It's merely a determination by the Court that this witness has

15   background, training, has acquired knowledge that ordinary lay

16   people do not have in an area that's beyond common

17   understanding.

18      So she's permitted to testify as to that matter, and you

19   are permitted to take her background, training, and experience

20   into account in evaluating her testimony.

21           MS. WEST:  Thank you.

22           THE COURT:  Ms. West?

23   BY MS. WEST:

24   Q.   Ms. Warner, I'd like to turn your attention to the SEVP

25   school certification process.

1      Can you please tell us, if a school wants to -- is seeking

2    to admit foreign students, what steps that school needs to go

3    through --

4    A.  Well, a school that's interested in admitting foreign

5    students -- the first thing they do is they enter the SEVIS

6    database, and at that time --

7    Q.  Let me just actually --

8    A.  Okay.

9    Q.  I want to break it down step by step.

10    A.  Okay.

11    Q.  How would a school access the SEVIS database?

12    A.  It's an Internet-based database.  So they -- they get

13    information on how to actually access that website.

14    Q.  Okay.  So once they access the website, what happens next?

15    A.  They -- they get assigned a temporary user ID and password,

16    and then once they use that, they go in, and they populate

17    something called a Form I-17 with the data about the school.

18    That is required in order for us to review it for

19    certification.

20    Q.  All right.  I want to pause you there.

21      When you say "populate," do you mean basically they fill

22    out this form online?

23    A.  Correct.

24    Q.  Okay.  And what is a Form I-17?

25    A.  It's the petition for approval of a school.

1    Q.   Okay.  And are there additional forms besides the I-17

2    itself that the school needs to complete?

3    A.   At this time, no.  I mean, there -- there's evidence that

4    they have to send in, but at this time, no.  It's just the Form

5    I-17.

6    Q.   That's the first step; right?

7    A.   Yes.

8    Q.   Okay.  How does the school submit that I-17?

9    A.   So once they fill out -- fill out the form, they just

10   submit it through the system.  It's -- you know, you click a

11   button.

12   Q.   So it's electronic?

13   A.   Yes, electronic.

14   Q.   Okay.  Let's back up a moment actually and talk about SEVIS

15   a little bit.

16        You've described the purpose of SEVIS.  Is this a

17   publically accessible database?

18   A.   No.

19   Q.   Who operates SEVIS?

20   A.   Department of Homeland Security.

21   Q.   And what kind of information does it contain?

22   A.   It contains all the pertinent data that we need for

23   monitoring schools that admit nonimmigrant students, and then

24   there's certain requirements and data that we require for all

25   the students that come into the country.

1   Q.   Is the access of SEVIS controlled in some way?

2   A.   Yes.

3   Q.   How so?

4   A.   It's monitored by the Department of Homeland Security, and

5   it -- you need a user ID and password to enter it.

6   Q.   Now, you mentioned that a school seeking to get approval to

7   admit foreign students gets a temporary ID and password.  At

8   some point, does that need to be converted into a permanent

9   one?

10   A.   It is once they receive approval to participate.

11   Q.   Okay.  So a school or an individual with that temporary ID

12   and password that you mentioned -- do they have access to all

13   of the information in SEVIS?

14   A.   No.

15   Q.   So that's access control; right?

16   A.   Right.

17   Q.   Is the use of SEVIS controlled in some way?

18   A.   Is the use?  Yes.

19   Q.   Okay.  Why is the access and use of SEVIS controlled?

20   A.   Because we just don't want anybody to go -- once a school

21   is approved, they gain the ability to issue an immigration

22   document that a student uses to -- in order to obtain a visa

23   and maintain status when they're here.  So we don't want just

24   anybody to go in and be able to create these documents.

25   Q.   Why not?

1    A.   Because the Department of Homeland Security is relying --

2    the system is primarily managed by what we call designated

3    school officials.  Those are what's -- you get -- once the

4    school gets approval, they have to designate a school official

5    to be the person who accesses SEVIS, that creates the

6    documents, and keeps the proper records on the school, and we

7    just don't want anybody to do that because we're really putting

8    our trust in these designated school officials.

9    Q.   Okay.  So that's a little bit of foreshadowing.  We're

10   going to come back to the designated school officials in a

11   moment.

12       Let's stick a little bit for another moment or two with the

13   access and use of the SEVIS database.  Are users advised that

14   access and use of SEVIS is controlled?

15   A.   Yes.

16       (Government's Exhibit 106A marked for identification.)

17   BY MS. WEST:

18   Q.   I'm going to show you what is marked as Government

19   Exhibit 106 and ask if you recognize this.

20   A.   Yes.

21   Q.   What is this?

22   A.   It's a warning that someone will see the minute they access

23   SEVIS.

24   Q.   Is this a SEVIS warning banner?

25   A.   Yes.

1          MS. WEST:  The Government offers Exhibit 106 in

2     evidence.

3          THE COURT:  Any objection?

4          MS. WEST:  It would be 106, Page 2, your Honor.

5          MR. BABCOCK:  Just -- just to clarify the foundation

6     as to time, this is a more recent one, but it's the same --

7     BY MS. WEST:

8     Q.   Ms. Warner, can you please tell us, please, whether this

9     warning banner would have been in effect in the period of 2008

10    through 2011?

11    A.   Yes.

12         MR. BABCOCK:  Submit.

13         THE COURT:  Exhibit 106 -- hold on just one second.

14    I wanted to make sure.  Counsel indicated this is a portion of

15    that exhibit.

16       Ms. West, I would say let's either just admit 106 in its

17    entirety or mark just that page as 106A so we don't have any

18    confusion.  It's up to you either way.

19         MR. RHYNE:  That's fine.  Let's do 106A.

20         THE COURT:  All right.  Exhibit 106A is admitted.

21         (Government's Exhibit 106A received in evidence.)

22         MR. BABCOCK:  I'm sorry.  Is there a B?

23         THE COURT:  No.

24         MR. BABCOCK:  Okay.

25         THE COURT:  It's just that Exhibit 106 in my binder

1    is different from the thing this witness is looking at.

2              MR. BABCOCK:  Oh.  It is?  Can I see what she's

3    looking at?

4              THE COURT:  It's not that complicated.

5         Ms. Warner, that water is there for you if you get thirsty.

6              THE WITNESS:  Yeah, sure, please.

7              MS. WEST:  Can we please pull up Exhibit 106, which

8    is now 106A.

9         Thank you.  And if we could enlarge the warning banner on

10   this.

11   BY MS. WEST:

12   Q.  All right.  Ms. Warner, you testified that this is the

13   warning banner that was in effect at SEVIS between 2008 and

14   2011?

15   A.  Correct.

16   Q.  And has this warning banner changed over time?

17   A.  No.

18   Q.  All right.  I'd like to direct your attention, please, to

19   the first line of this warning.  First of all, do you see it in

20   all capitals at the top, the word "WARNING"?

21   A.  Yes.

22   Q.  And then the first line below that:  "This system is for

23   the use of authorized users only"?

24   A.  Yes.

25   Q.  Now, every time anybody accesses SEVIS, would this warning

1    banner pop up?

2    A.  Yes.

3            MS. WEST:  All right.  If we could go back, please,

4    to the full page, and if you could please blow up the bottom

5    portion just below the box where it has "User Name, Password,

6    Log-In."  Thank you.

7    BY MS. WEST:

8    Q.  Below this warning banner, is there a space where the --

9    the user to input their user name and password?

10   A.  Yes.

11   Q.  And is that required every time in order to access this

12   controlled government database?

13   A.  Yes.

14   Q.  If this information is not put in, can an individual

15   lawfully access and use this database?

16   A.  No.

17   Q.  All right.  Can you tell us, please -- we can pull that

18   off.  Thank you.  Do you know where the servers for SEVIS were

19   located between 2008 and 2011?

20   A.  Yes.

21   Q.  Where?

22   A.  In Rockville, Maryland.

23   Q.  All right.  Can you please now tell us how SEVP determines

24   whether a school is eligible for certification.

25   A.  By the laws and regulations.

1    Q.   I'm sorry.  By the laws and what?

2    A.   And regulations.

3    Q.   And regulations.

4            MS. WEST:  Your Honor, where do you prefer we put an

5    easel?  Do you have a preference?

6            THE COURT:  Well --

7            MS. WEST:  Perhaps --

8            THE COURT:  -- it's not -- it's not necessary that I

9    see the matters on the easel as long as there's not any

10   objection.  The most important thing is that all the jurors can

11   see whatever it is clearly, and provided that --

12           MR. BABCOCK:  That --

13           THE COURT:  Provided that defense counsel doesn't

14   have any objection, I don't have any objection usually to any

15   placement of these --

16   BY MS. WEST:

17   Q.   Ms. Warner, are you familiar with -- as part of the codes

18   of federal regulations dealing with F-1 students, are you

19   familiar with 8 Code of Federal Regulation Section 214.3?

20   A.   Yes.

21           MS. WEST:  Okay.  Can you turn around and look at

22   it -- I think that's a good spot for it.

23       Can everyone see it?  The print is a little small, but

24   we're going to walk through it.

25   ///

1    BY MS. WEST:

2    Q.   Okay.  If you'd take a look at this, does this fairly and

3    accurately reflect 8 CFR Section 214.3, Subsection (a)(3)(i)?

4    A.   Yes.

5    Q.   All right.  What is the point of 8 CFR 214.3(a)(3)(i)?

6    A.   It gives us the rules for a school to be eligible to apply

7    for the Student Exchanges Visitor Program and SEVIS access.

8    Q.   All right.  And if we look there in Subsection (a), it

9    says, "Filing Petition"; is that right?

10   A.   Yes.

11   Q.   And Subsection (3) is "Eligibility"?

12   A.   Yes.

13   Q.   Okay.  So then Subsection little (1) here or little (i) --

14   does that essentially lay out what the criteria is for a school

15   in order to be eligible to admit foreign students?

16   A.   Yes.

17   Q.   All right.  Let's look through it, please.  If you'd turn

18   your direction, please, to little (i), do you see there it

19   states, "The petitioner to be eligible for certification must

20   establish at the time of filing that it..." and then there's A,

21   B, C, and D?  Do you see that?

22   A.   Yes.

23   Q.   A is "Is a bona fide school."  Can you please tell the jury

24   what that means.

25   A.   For a school to be a bona fide school, when they fill out

1    their form and they put a name and address, we want to make

2    sure that there's actually a school at the name and address.

3    Q.   B states, "Is an established institution of learning or

4    other recognized place of study."  Do you see that?

5    A.   Yes.

6    Q.   Can you please tell the jury what that means.

7    A.   An established institution of learning means that the

8    school has some history behind it, graduated students,

9    something like that.  "Other recognized place of study" means

10   the school is accredited or has something that is akin to

11   accreditation.

12   Q.   Okay.  And C, "Possesses the necessary facilities,

13   personnel, and finances to conduct instruction and recognized

14   courses."  Please tell the jury what that means.

15   A.   It means that we want to make sure that, you know, it's --

16   I don't want to use the word "established" again but

17   established so we know, you know, that they're not going to go

18   out of business quickly, that they actually have the ability to

19   conduct instruction.

20   Q.   And D states, "Is, in fact, engaged in instruction in those

21   courses."  Do you see that?

22   A.   Yes.

23   Q.   What does that mean?

24   A.   It means that when they apply for a SEVP certification,

25   they have to have a history of conducting the courses that

1    their -- of study that they're asking for.  They can't be

2    intending to conduct those courses of study in the future.

3    Q.   Now, are these criteria the criteria that SEVP actually

4    uses in determining whether to certify a school to admit

5    foreign students?

6    A.   Yes.

7    Q.   Can you explain to us why A, B, C, and D are important?

8    A.   They're important because, as we've stated, we rely on

9    school officials out there to populate or, you know, fill out

10   the form that we're getting, and so we want to make sure

11   that -- you know, we're also responsible -- SEVP -- for

12   bringing in the students into the country and monitoring them.

13        So we want to make sure that when they're coming here,

14   they're going to what we call a bona fide school, that, you

15   know, they're actually going to be able to complete the purpose

16   for why they're coming, which is to get an education.

17   Q.   Are there special requirements aside from the generic A, B,

18   C, and D as set forth here -- are there specific requirements

19   that apply to a school that may not be accredited?

20   A.   Yes.

21   Q.   Can you tell us about that?

22   A.   If a school is not an accredited school or a recognized

23   place of study, we permit those schools to get three

24   articulation agreements from schools that are accredited that

25   essentially vouch for that school's -- you know, whatever you

1    want to call it -- vouch that that school is good.

2    Q.   All right.  So let's break that down a little bit.

3         First, what do you mean when you use the word "accredited"?

4    A.   Accredited schools -- typically, we like to see that they

5    have been accredited by an accrediting association that's

6    recognized by the Department of Education.

7    Q.   So if a school is not recognized by an accrediting

8    association that's recognized by the Department of Education,

9    is it then that the articulation agreement component can kick

10   in?

11   A.   Correct.  They can send instead -- well, not "instead," but

12   they would have to submit that.

13   Q.   That's a requirement?

14   A.   Yes.

15   Q.   Where does that requirement come from?

16   A.   From the regulations.

17   Q.   All right.  And you mentioned that it was three

18   articulation agreements?

19   A.   Correct.

20   Q.   Do articulation agreements have two components to them?

21   A.   Yes.

22   Q.   What are those?

23   A.   The components are that in order to submit an articulation

24   agreement, the first component is that the school has to be

25   accredited, and then the second component to the school that is

1    submitting the agreement on behalf of the nonaccredited

2    institution has to state that they have been and will

3    unconditionally accept the transfer credits from the

4    unaccredited school.

5    Q.   Why is that important?

6    A.   Because it shows us that -- that an accredited school is

7    recognizing this other school as a place that they see has

8    educational value.

9         (Government's Exhibit 1 marked for identification.)

10   BY MS. WEST:

11   Q.   All right.  I'd like to turn now to Exhibit 1, what's been

12   marked as Exhibit 1.  It's a -- a rather thick document.  I'm

13   going to ask you to first just flip through it and tell us if

14   you recognize it.

15             MS. WEST:  Your Honor, I'd like to take this moment

16   just to make sure Exhibit 106A was actually admitted into

17   evidence.

18             THE COURT:  It was.

19             MS. WEST:  Thank you.

20             THE WITNESS:  Yes, I recognize it.

21   BY MS. WEST:

22   Q.   Taken collectively, what is Exhibit 1?

23   A.   Exhibit 1 is -- is the case file for Tri-Valley University.

24   Q.   Is it every single document that SEVP had relating to

25   Tri-Valley University or just some excerpts?

1    A.   Some excerpts.

2         MS. WEST:  All right.  The Government offers

3    Exhibit 1 in evidence.

4         THE COURT:  Any objection?

5         MR. BABCOCK:  No objection.

6         THE COURT:  Exhibit 1 is admitted.

7         (Government's Exhibit 1 received in evidence.)

8         MS. WEST:  Thank you.

9    Can we please pull up Page 1.  Can we please blow up the

10   top half of those documents so we can -- thank you.

11   BY MS. WEST:

12   Q.   Ms. Warner, can you please tell us what this document is.

13   A.   It's the initial I-17 submission payment and site visit

14   information.

15   Q.   And how was this document used?

16   A.   It's used when a school first submits to SEVIS that it

17   wants to become certified.  It tracks some preliminary things

18   that have to happen before we'll even look at the case for

19   adjudication.

20   Q.   So is it fair to say that this is really an internal

21   tracking document at SEVP?

22   A.   Yes.

23   Q.   All right.  Let's take a look, please, at the top left.  Do

24   you see there it says, "Date Submitted"?

25   A.   Yes.

1    Q.   9/15/2008?

2    A.   Yes.

3    Q.   And the school name below that, "Tri-Valley University"?

4    A.   Yes.

5    Q.   Who actually inputs this information?

6    A.   A case analyst.

7    Q.   What is a case analyst at SEVP?

8    A.   A case analyst basically preps the information we receive

9    from the school for the adjudicator that ultimately looks at

10   it.

11   Q.   So is it the case analyst's job to go through the petitions

12   in a timely fashion when they're filed?

13   A.   Yes.

14   Q.   And so from this document, can we tell that the initial

15   I-17 by Tri-Valley University was submitted on September 15th,

16   2008?

17   A.   Correct.

18   Q.   Let's look, please, at the bottom half of this document.

19   Do you see in the lower right-hand corner of this document it

20   says, "Received by SEVP," and there's an October date there?

21   A.   Yes.

22   Q.   How does that stamp ultimately get on the document later?

23   A.   When -- when -- when the original file -- can I refer to

24   what's at the bottom?  You have to have a site visit in order

25   to -- one of the things that's required is you have to pay for

1    it to be certified, and then you have to have a site visit

2    before I look at the adjudication.  So this particular piece

3    had come through our mailroom, and they stamped it when we

4    received it.

5    Q.  Okay.  Thank you.

6         MS. WEST:  Let's turn now, please, to Page 2, and so

7    that we can all see it again, if we could maybe just enlarge

8    the top third of this document.

9         Thank you.

10   BY MS. WEST:

11   Q.  All right.  Do you see the top right-hand corner, "Petition

12   for Approval of School for Attendance by Nonimmigrant Student"?

13   A.  Yes.

14   Q.  Is that the full name of the Form I-17?

15   A.  Yes.

16   Q.  And if we look, please, at Paragraph 1 there --

17        MS. WEST:  Maybe -- can we blow up Paragraph 1 a

18   little bit more?

19        Great.  Thank you.

20   BY MS. WEST:

21   Q.  Box 1A is checked there.  What does that pertain to?

22   A.  It pertains to what type of student that the school that is

23   applying wants to bring in.

24   Q.  And here, it's Section 101(a), Subsection 15(f) of the act?

25   A.  Yes.

1    Q.   Does that refer to the Immigration Nationality Act?

2    A.   Yes.

3    Q.   And is that the provision that relates to F-1 students?

4    A.   Correct.

5    Q.   All right.  Thank you.

6        MS. WEST:  Can we enlarge now Box 2 of this document?

7    BY MS. WEST:

8    Q.   What school does this I-17 pertain to?

9    A.   Tri-Valley University.

10    Q.   Thank you.

11    And is it fair to say that the name of the school in there

12    is something that is important to SEVP?

13    A.   Yes.

14    Q.   Why?

15    A.   Because we want to know the name of the school that's

16    applying to bring nonimmigrants into the country for study.

17    Q.   All right.  Thank you.

18        MS. WEST:  If we can please pull up Box -- have it

19    maybe just the bottom quarter of the document starting from

20    just above the stamp.

21    Thank you.  That's perfect.

22    BY MS. WEST:

23    Q.   Can you see there in Box 8 "Date School was Established:

24    March 2008"?  Do you see that?

25    A.   Yes.

1    Q.   Is the date that the school is established something that

2    is important to SEVP?

3    A.   Yes.

4    Q.   Why?

5    A.   Because per the regulation that we just looked at, we need

6    to know essentially when they would start it.

7    Q.   Is that part of being established?

8    A.   Yes.

9    Q.   Now, does it -- is it something that is determinative for

10   SEVP if a school is applying in September of 2008 but was only

11   established in March of 2008?  If that school had not yet

12   matriculated students or graduated students, does that rule it

13   out?

14   A.   No.

15   Q.   Let's look at Section 9, "Location of School."  Do you see

16   that?

17   A.   Yes.

18   Q.   And the address there, "4455 Stoneridge Drive, Pleasanton,

19   California"?

20   A.   Yes.

21   Q.   Does the address -- is that something that matters to SEVP?

22   Is that important?

23   A.   Yes.

24   Q.   Why?

25   A.   Because we want to know there's a school actually at the

1    address that's reported.

2    Q.   Why?

3    A.   Because the law requires it.

4    Q.   Is that part of it being a bona fide school?

5    A.   Correct.

6    Q.   Paragraph 11 here, "Petition is For," and the box is

7    checked "Initial Approval."  Do you see that?

8    A.   Yes.

9    Q.   What is initial approval?

10   A.   It means it's the first time the school has ever applied to

11   SEVP to work -- to get certified.

12   Q.   Let's take a look now, please, at the next page of this

13   document.

14          MS. WEST:  And if we can blow up, please, the --

15   Paragraph 13.

16          Yes.  Thank you.

17   BY MS. WEST:

18   Q.   Paragraph 13 states, "The school has been approved by the

19   following nationally recognized accrediting association or

20   agency.  If none, write 'None.'"  Do you see that?

21   A.   Yes.

22   Q.   And why does SEVP ask that question on the I-17?

23   A.   Because that's what tells us if they are recognized for

24   study.

25   Q.   The answer here states, "Submitted," T-R-A-C-S, "TRACS for

1   accreditation candidacy application on July 21st, 2008."  Do

2   you see that?

3   A.   Yes.

4   Q.   Is that information something that would be important to

5   SEVP?

6   A.   Yes.

7   Q.   Why?

8   A.   Well, we want to know if they're accredited, but in this

9   case, they just submitted for accreditation.  So they were not

10   accredited.

11   Q.   Okay.  Thank you.

12          MS. WEST:  Can we now enlarge -- I think we can just

13   do the bottom half starting with Box 18 all the way down.

14   Thank you.

15   BY MS. WEST:

16   Q.   Paragraph 18 states, "Requirements for Admission."  Are the

17   requirements for admission something that is important to SEVP

18   in determining whether to certify a school to admit foreign

19   students?

20   A.   Yes.

21   Q.   Why?

22   A.   Because we want to know that the school has standards for

23   the students to come here.

24   Q.   Why would that matter?

25   A.   Because the purpose -- when you receive an I-20 and given

1    an F-1 visa, the purpose is for the students to study.  We only

2    want legitimate students coming in to study.

3    Q.   Is that part of it being a bona fide school?

4    A.   Yes.

5    Q.   What does "bona fide" mean?

6    A.   "Bona fide" means there's an actual school at the place

7    where the location is and that, you know, there actually -- the

8    class is doing the things that they're supposed to be doing.

9    Q.   Does it basically mean it's real?

10   A.   Yes.

11   Q.   Let's look at Paragraph 20, "Requirements for Graduation."

12   Do you see that?

13   A.   Yes.

14        MS. WEST:  Can we enlarge Paragraph 20, please.  It's

15   just kind of hard to read.

16        Thank you.

17   BY MS. WEST:

18   Q.   "Requirements for Graduation:  GPA 3.0 and research report,

19   thesis, dissertation as specified in each degree program in

20   Catalog Section 5."  Is this question and answer something that

21   is important to SEVP in determining whether to certify a

22   school?

23   A.   Yes.

24   Q.   Can you tell us why?

25   A.   Because, again, it goes back to the bona fide of the

1    school.  It shows that the school is legitimate.  They have

2    standards.

3              MS. WEST:  And if we can now sort of undo this blowup

4    and go to Box 21.

5         Thank you.

6    BY MS. WEST:

7    Q.  "Causes for Expulsion."  The answer provided to Question 21

8    is "Listed in Page 34 in catalog such as cheating, forgery,

9    misrepresentation of self, physical abuse, theft, sale of

10   drugs, process of explosive, dangerous chemicals, et cetera."

11   Do you see that question and answer?

12   A.  Yes.

13   Q.  Is this question and answer something also that is

14   important to SEVP in determining whether to certify a school?

15   A.  Yes.

16   Q.  Is it for the same reasons?

17   A.  Yes.

18             MS. WEST:  Can we now blow up Paragraph 22?

19        Thank you, Ms. Hughes.

20   BY MS. WEST:

21   Q.  Paragraph 22 asks, "Average Annual Number of," and then

22   it's:

23        "A.  Classes.

24        "B.  Students.

25        "C.  Teachers or Instructors.

1          "D.  Nonteaching Employees."

2          Do you see this question and answer?

3     A.   Yes.

4     Q.   Is this question and are these answers something that is

5     important to SEVP in making its certification determination?

6     A.   Yes.

7     Q.   How so?

8     A.   Because Part C of the regulation over here -- we want to

9     make sure that they have adequate facilities for students to be

10    able to be educated.

11    Q.   So --

12    A.   Several of these instructors --

13    Q.   There we go.

14         So if we look at Paragraph -- or Subpart (b) here where it

15    says, "The average annual number of students is 30," then if

16    you look at "Teachers or Instructors:  9," does that seem to

17    fit together in a way that would be satisfactory to SEVP?

18    A.   Yes.

19    Q.   Why?

20              THE COURT:  Ms. West, I'm sorry to interrupt.

21    Anytime in the next five minutes, I'd like to take our second

22    recess.

23              MS. WEST:  Perfect.  We'll be there in about one

24    minute.

25              THE COURT:  Very good.

1           THE WITNESS:  Because it's -- just by looking at how

2     many students and the ratio to instructors, it just -- it seems

3     like they have enough instructors to teach the amount of

4     students.

5     BY MS. WEST:

6     Q.   If that number of students had said approximately 1800,

7     would that number of nine teachers or instructors still seem

8     satisfactory to SEVP?

9     A.   No, I wouldn't think so.

10    Q.   Let's look now, please, at the next page of this document.

11           MS. WEST:  And if we can blow up -- it's the

12    signature block and the little -- the line just above that

13    beginning with "I certify..."

14        Thank you.

15    BY MS. WEST:

16    Q.   Is this the last page of the I-17?

17    A.   Yes.

18    Q.   Do you see there that it states, "I certify that I am

19    authorized to execute this petition.  I understand that unless

20    this institution fully complies with all terms as described on

21    this form, approval may be withdrawn pursuant to 8 CFR 214.4"?

22    Do you see that?

23    A.   Yes.

24    Q.   And why is it that approval may be withdrawn that -- if the

25    institution does not fully comply with all the terms described

1    in this document?

2    A.   Could you repeat that again?

3    Q.   Yes.

4         It states, "I understand that unless this institution fully

5    complies with all the terms described in this form, approval

6    may be withdrawn."  Can you explain why SEVP reserves the right

7    to withdraw approval if the terms of this document are not

8    complied with?

9    A.   Because once again, it goes back to we rely on the

10   designated school officials to properly report in the database

11   by regulation what -- you know, the information that we need.

12   So if they're essentially not properly reporting or not telling

13   us something that's truthful, that would subject them to

14   withdrawal.

15   Q.   And do you see the signature on this document?

16   A.   Yes.

17   Q.   In fact, Susan Xiao-Ping Su?

18   A.   Yes.

19   Q.   And the date here is October 14th, 2008?

20   A.   Yes.

21   Q.   And the title here listed is "President"?

22   A.   Yes.

23            MS. WEST:  Okay.  Let's take a break right now,

24   please.

25            THE COURT:  Very good.

1            Members of the jury, we'll have our second recess.  The

2      Court will be in recess for 15 minutes.

3            THE CLERK:  All rise.

4      (Proceedings were heard out of the presence of the jury:)

5            THE COURT:  Okay.  We're outside the presence of the

6      jury.

7            Ms. Warner, you also get a 15-minute break.

8            THE WITNESS:  Oh.  Okay.

9            THE COURT:  I'm going to ask you to begin that break,

10     though, outside the hallway because there's something I just

11     want to do with the lawyers.

12           THE WITNESS:  Okay.  No problem.

13           THE COURT:  Thank you.

14     Okay.  The record will reflect the jury is gone.  So is Ms.

15     Warner.

16     I just wanted to give either side a chance to put on the

17     record in either of the matters we discussed at sidebar.  They

18     don't directly pertain to Ms. Warner, but it just was an air of

19     precaution.

20     Ms. West?

21           MS. WEST:  Yes.  Thank you, your Honor.

22     There were two things.  One is that we have seen some

23     documents from the defense on cross-examination of the

24     Government's first witness.  I understand that those were used

25     by the defense in cross-examination, which does not implicate

1    Rule 16.

2         However, it is just a flag and is causing the Government to

3    issue a reminder to the defense that in the event that there is

4    any discovery that the defense has not provided to the United

5    States -- and, in fact, the United States, I believe, has

6    received none from the defense -- that will be something that

7    the Government does intend to raise at the time of the

8    defendant's case-in-chief.  So that's Point 1.

9         The second point is that during -- I believe it was the

10   first Government's witness, and I think it was during defense's

11   cross-examination of that witness.  The defendant was speaking,

12   albeit in a whisper, quite audibly to Government counsel table.

13   I believe that it would be easily heard by the jury, and she

14   did appear to the Government to be attempting to convey to the

15   jury basically that she was -- she was pleased.

16        I'm very glad that she's pleased with her counsel's

17   representation.  That's terrific to hear, and it bodes well.

18   However, I do think that it is appropriate for the defendant to

19   not be attempting to communicate to the jury.

20             THE COURT:  Ms. West, if I recall correctly, used the

21   word "staged whisper" at sidebar.

22             MS. WEST:  That is correct.

23             THE COURT:  All right.  Mr. Babcock, I don't -- with

24   regard to the first point, the Government has not asked for any

25   relief, and so you are not required to respond for the record,

1          although you can if you want to in just a second.

2                For the record, at the sidebar Mr. Babcock simply indicated

3          that he used these materials in cross-examination and under the

4          plaintext Rule 16 thereafter was not required to disclose them.

5          For the foreseeable future, we're going to be in

6          cross-examination territory.  So --

7                      MR. BABCOCK:  Indeed.

8                      THE COURT:  -- Ms. West's concern is now part of the

9          record, and I'll have it in mind, and you can respond if you'd

10         like, but you don't have to.

11               I will invite you to respond with regard to the second

12         request because it is something I intend to say something to

13         your client about.

14                      MR. BABCOCK:  I -- for the record, during my

15         cross-examination, I was not at all paying attention to my

16         client.  I was paying attention to my thoughts on the witness.

17         So I did not observe the concern -- anything relating to the

18         concern she raised, but I will admit that during direct

19         examination my client has expressed herself to me -- and I

20         wouldn't say a staged whisper.  She's whispering, but it's

21         quite audible in talking to me.

22               So I've asked her and I think it's appropriate for her to

23         remain composed during the trial, notwithstanding her feelings,

24         and I expect her to abide by that admonition.

25                      THE COURT:  Thank you.

1    Ms. Su, I'm going to say something to you.  I don't want

2    you to respond.  I'm not prohibiting you from responding, but

3    in general when you're in court and you're represented by a

4    lawyer if you're a criminal defendant, it's a good idea only to

5    address the Court through your lawyer.  So I'll just remind you

6    of that good advice.

7    I did not -- I was not watching you while hearing the

8    cross-examination of any witness, and I am not saying that you

9    did any of the things that Ms. West says you did.  I don't know

10   whether you did or not, but I will say that I am -- because of

11   the concerns that Ms. West expressed, I am going to be paying a

12   little bit of attention to you.  That's part of my job.

13   And regardless of whether I'm watching you or not and

14   regardless of whether you're doing what Ms. West said or not,

15   it is your obligation to compose yourself during this trial and

16   not to, by word or deed or body language, convey to the jury or

17   anybody else a view of whether a particular witness is credible

18   or not or whether or not the questions of one or the other of

19   the attorneys are good questions or not or anything else about

20   the trial.

21   You do have the right to attend these proceedings.  That's

22   an important right.  But if you are here, you have an

23   obligation to stay composed, and I trust that nothing further

24   on this subject will need to be said.

25             MR. BABCOCK:  I don't mind addressing the first topic

1    that was raised.

2       I don't have -- I'm not hiding anything.  Anything that I

3    plan to use will also be shared with them, although I can't

4    think of anything I had that they haven't provided to me.  But

5    off the top of my head, when we get there, as soon as I'm --

6    honestly, as soon as I'm able to --

7            THE COURT:  No one has asked for judicial relief --

8            MR. BABCOCK:  Yeah.

9            THE COURT:  -- and I simply wanted to make sure that

10   the Government's concerns were made part of the record.  That's

11   all.

12           MR. BABCOCK:  No problem.

13           THE COURT:  Is there anything further we need to

14   discuss?

15           MS. WEST:  No.

16           THE COURT:  Thank you.

17      We're on a break.

18           MS. WEST:  Thank you.

19           THE CLERK:  All rise.

20                     (Recess taken.)

21      (Proceedings were heard in the presence of the jury:)

22           THE COURT:  All right.  Back on the record.  All the

23   jurors are in their assigned seats.  We're in the midst of Ms.

24   Warner's direct examination.

25      Ms. West, go ahead.

1              MS. WEST:  Thank you.

2     BY MS. WEST:

3     Q.   So we were just looking at the portion of Exhibit 1 that is

4     the I-17; is that right?

5     A.   Right.

6     Q.   And did you previously testify that after the I-17 is

7     electronically submitted -- well, what was the next step after

8     that?

9     A.   So once it's electronically submitted, they check that the

10    school has, in fact, paid their fee for it, and then they

11    assign a site visitor to go visit the school.

12         (Government's Exhibit 5 marked for identification.)

13    BY MS. WEST:

14    Q.   Let me hand you, please, what's been marked for

15    identification as Government Exhibit 5, and I'll ask you if you

16    recognize that.

17    A.   Yes.

18    Q.   What is it?

19    A.   It's a SEVIS certification site visit checklist.

20    Q.   And does this bear an original signature on it?

21    A.   Yes, it does.

22              MS. WEST:  The Government offers in evidence

23    Government Exhibit 5.

24              THE COURT:  Any objection?

25              MR. BABCOCK:  Is Mr. -- is the inspector still

1    expected to testify?

2    BY MS. WEST:

3    Q.   Let me just ask you:  As part of your -- as part of your

4    duties at SEVP, do you come into contact with a SEVIS

5    certification site visit checklist?

6    A.   Yes.

7    Q.   How so?

8    A.   We look at them all the time to see if a site visitor -- if

9    it was a site visit that was done at the local level, we review

10   them to see what they report back to SEVP.

11   Q.   And is this part of the materials that SEVP receives as

12   part of its determination to make -- whether to certify a

13   school to admit foreign students?

14   A.   Yes.

15   Q.   And are these documents upon receipt maintained in the

16   ordinary course of business?

17   A.   Yes.

18             MS. WEST:  The Government offers Exhibit 5.

19             THE COURT:  Any objection?

20             MR. BABCOCK:  Well, it's hearsay.

21             MS. WEST:  It's a business record, your Honor.

22             MR. BABCOCK:  I'll submit.

23             MS. WEST:  Not only is it a business record, but it

24   is encompassed by the --

25             THE COURT:  I'm not asking for argument.  I'm just

 1    pausing for a second to read something.  I'm sorry.  If we'll

 2    have argument, we'll have it outside the presence of the jury.

 3    Just give me one moment, please.

 4         The objection will be overruled.  Exhibit 5 is admitted.

 5              (Government's Exhibit 5 received in evidence.)

 6         MS. WEST:  Could we please pull up Exhibit 5, Page 1,

 7    and if we can please enlarge first the top half of this

 8    document through Part B.

 9         That's fine.  Thank you.

10    BY MS. WEST:

11    Q.   Do you see at the top of this document "SEVIS Certification

12    Site Visit Checklist"?

13    A.   Yes.

14    Q.   What exactly is this document?

15    A.   It's a document that we provide the site visitors so they

16    can -- you know, they have to go through and ask pertinent

17    questions and make certain observations when they visit the

18    school.

19    Q.   When you say "we," who are you referring to?

20    A.   SEVP.

21    Q.   Okay.  So this document is prepared by SEVP?

22    A.   Correct.

23    Q.   And --

24    A.   Well, the beginning of it.

25    Q.   Well, just the template of it?

1    A.   Yes.

2    Q.   Okay.  And who actually fills it out?

3    A.   The site visitor, though this probably -- the very first

4    page could be filled out by a case analyst.

5    Q.   All right.  Let's take a look here under A.  Do you see

6    "Name:  Tri-Valley University"?

7    A.   Yes.

8    Q.   And "Street Address:  4455 Stoneridge Drive, Pleasanton"?

9    A.   Yes.

10   Q.   All right.  Thank you.

11          MS. WEST:  And could we now go to the bottom half of

12   the page starting with the X where it's not accredited.

13       Thank you.

14   BY MS. WEST:

15   Q.   There's some school information, and the box there is

16   checked "Not Accredited."  Do you see that?

17   A.   Yes.

18   Q.   And then in bold, "Name of School Official Interviewed."

19   Do you see there "Susan Su"?

20   A.   Yes.

21   Q.   And below that, "Section C.  Inspector Information."  Do

22   you see that?

23   A.   Yes.

24   Q.   There's a name filled out, "Coy Wells.  Date Visit

25   Conducted:  October 14th, 2008."  Do you see that date?

1    A.   Yes.

2    Q.   And I know you can't see it on here, but looking at the

3    actual exhibit that you have in front of you, does that

4    exhibit, the original, bear a wet signature of Coy Wells?

5    There's a signature in the "Inspector" section?

6    A.   Yes.

7    Q.   Okay.  Now, do you see the "Received by SEVP" stamp?

8    A.   Yes.

9    Q.   And what is the date on that, please.

10   A.   October 15th, 2008.

11   Q.   Given that that stamp there is October 15th, 2008, and the

12   date the site visit was conducted was October 14th, 2008, can

13   you tell the jury how these -- this information -- this SEVIS

14   certification site visit checklist is obtained by SEVP?

15   A.   The site visit inspector would FedEx it to us or mail it.

16   Q.   Okay.  So it's received by mail or Federal Express?

17   A.   Yes, into our mailroom.

18   Q.   I'm sorry?

19   A.   Into the mailroom.

20   Q.   Into the mailroom.

21        And is that when the "Received by SEVP" stamp is applied?

22   A.   Right.

23        MS. WEST:  Can we please pull up Page 2 of this

24   document, and just the top half is fine, Question 1.

25        Thank you.  That's good.

1    BY MS. WEST:

2    Q.   Taking a look at Page 2 of the site visit checklist, do you

3    see at the top "Section 1"?

4    A.   Yes.

5    Q.   And the question is:  "Has the school previously applied

6    for approval to admit nonimmigrant F-1 and/or M-1 students?"

7    Do you see that?

8    A.   Yes.

9    Q.   And the box "No" is checked?

10   A.   Correct.

11   Q.   We've already been talking a little bit about F-1's, but do

12   you know what M-1 students are?

13   A.   Yes.  An M-1 student would be some -- some foreign national

14   that wants to come into the United States to study in a

15   vocational program of study.

16   Q.   So how is that different from M-1 -- I'm sorry -- from F-1?

17   A.   F-1's study academic programs of study.  M-1's are

18   vocational.

19   Q.   Thank you for that clarification.

20        Let's look now, please, at the bottom half of this

21   document.  Question 2:  "Has the school conducted their very

22   first class of instruction?"  The box there is checked "Yes."

23   Do you see that?

24   A.   Yes.

25   Q.   Is that something that is important to SEVP?

1    A.   Yes.

2    Q.   Why?

3    A.   Because it goes back to the regulation that we reviewed

4    earlier, that this school is, in fact, engaged in instruction

5    of the courses that -- of study that they're applying to be

6    certified for.

7    Q.   All right.  And then in bold at the bottom, do you see

8    "Proceed to Section 2, Interview with DSO"?

9    A.   Yes.

10           MS. WEST:  And let's now go to the next page, please.

11   The top half may be through the bottom of Question 2.

12   Hopefully, that will be big enough.

13        Okay.  Great.

14   BY MS. WEST:

15   Q.   "Section 2.  Interview with the Designated School Official,

16   DSO."  And as we just looked on Page 1 of this document, it's

17   stated, "Name of School Official Interviewed:  Susan Su."  Do

18   you see that?

19   A.   Yes.

20   Q.   Okay.  Let's look at Question 1.  "What resources are

21   available to the DSO to ensure compliance and knowledge of

22   SEVIS rules and regulations?  Request a brief description of

23   the resources used by the DSO and list these in the 'Comments'

24   section."

25        Do you see that question?

1    A.   Yes.

2    Q.   The answer here is "Provided website, ICE," slash, "SEVIS

3    question section and training courses.  DSO was also provided

4    with access to other links."  Do you see that?

5    A.   Yes.

6    Q.   Is this question and answer provided something that is

7    important to SEVP in making its certification determination?

8    A.   Yes.

9    Q.   Why?

10   A.   Because designated school officials are the ones that are

11   responsible for the school to follow the regulations and the

12   law pertaining to both their school certification and the

13   students that they bring in.

14   Q.   And so why -- how does the answer -- this question and

15   answer relate to that fact?

16   A.   How do -- I'm sorry.  Repeat that.

17   Q.   The fact that DSO's are charged with the responsibility of

18   following the regulations, how does that relate to the question

19   about the resources to ensure DSO compliance and knowledge of

20   SEVIS rules and regulations?

21   A.   Because we need to know that they have, in fact, become

22   familiarized with all of that because, again, they're the only

23   ones that put the information in SEVIS, and they have --

24   they're the ones that have to make sure the school stays in

25   compliance.

1    Q.   Let's take a look at Question 2.  "Verify that the number

2    of students and programs of study being pursued are supported

3    by the facilities available."  Why -- is this question

4    important to SEVP?

5    A.   Yes.

6    Q.   Why?

7    A.   Because it's in the law that -- again, the regulation we

8    reviewed -- that they have to have the proper and necessary

9    facilities.

10   Q.   And then the answers provided here:  "Number of Students in

11   School:  25.  Average Number of Students per Class:  10."  Are

12   those answers something that is important to SEVP?

13   A.   Yes.

14   Q.   Why?

15   A.   Again, to make sure that they're abiding by regulation with

16   having the necessary and proper facilities, you know?

17   Q.   And there's actually comments down below mentioning,

18   "There's a very small library, but there is computer access.

19   The school had just opened this year."  Is that sort of

20   information something that is important to SEVP as well?

21   A.   Yes.

22   Q.   Why?

23   A.   Again, it goes back to the facilities, and we want to

24   record the observations that the site visitor sees when they're

25   at the school.

1           MS. WEST:  Can we blow up now the bottom part of this

2      page, please, Question 3 and the answers.

3      BY MS. WEST:

4      Q.   Question 2 states:  "The following questions directly

5      relate to processes for both F-1 and M-1 nonimmigrant foreign

6      students only."  And then Question A:  "How do," slash, "will

7      you verify student eligibility when issuing Form I-20 for

8      initial attendance?"

9           The answer provided -- do you see it states, "Review of

10     transcript from prior school and acceptable GPA.  Also check

11     SEVIS site for student's eligibility, passport, visa, I-94"?

12     Do you see that?

13     A.   Yes.

14     Q.   Can you actually just tell us first, what is an I-94?

15     A.   An I-94 is the document that a student receives when they

16     enter the country right at the point of inspection, when you

17     get off the airplane, and it basically lets them know how long

18     they can remain legally in the U.S.

19     Q.   And is there a term that is used for that?

20     A.   Well, for F-1 students, it's called duration of status.

21     Q.   What does that mean for an F-1 student?

22     A.   It means as long as they are remaining in their status,

23     remains in good standing, following all the rules, and as long

24     as they remain studying in an academic program of study, they

25     can remain here in the United States legally.

1    Q.   Are there particular rules about what it means for them to

2    remain in an academic study as you were just saying?

3    A.   Yes.

4    Q.   What is it?

5    A.   They have been making normal progression through their

6    course of study, and they have to remain enrolled in a full

7    course of study.

8    Q.   What is the source of that rule?

9    A.   The law, regulation.

10   Q.   The federal regulations?

11   A.   Yes.

12   Q.   So is this Question A and answer provided -- is that

13   something that is important to SEVP?

14   A.   Yes.

15   Q.   Why?

16   A.   Because we rely on designated school officials to ensure

17   that the -- the nonimmigrants that they want to bring in for

18   study are meeting the requirements of regulation.

19   Q.   And how would a transcript from a prior school and an

20   acceptable GPA figure into that?

21   A.   Again, back to when we discussed on the Form I-17 they had

22   to report the same thing.  We want to know if the school has

23   standards before admitting a student into a program of study.

24   Q.   How about for Question B?  "How do," slash, "will you

25   determine the status of an F-1 student transferring into the

1   school?"

2       And the answer provided:  "Check status of student on

3   SEVIS, review transcript from other school, GPA, and then

4   telephone school."

5       Do you see that information?

6   A.  Yes.

7   Q.  And is that information there something that would be

8   important to SEVP?

9   A.  Yes.

10  Q.  Why?

11  A.  Again, it goes back to the standards that they're going to

12  admit students who are eligible by their admissions standing to

13  get there.

14  Q.  Let's look at Question C.  "How do," slash, "will you

15  verify that F-1 and/or M-1 students are maintaining a full

16  course of study?"

17      Let me just ask you about the language in here, "full

18  course of study."  Is that going back to what you just

19  explained with regard to duration of status for students?

20  A.  Yes, and the fact that regulations describe what the full

21  course of study means.  It essentially means the student has to

22  be attending a study full time.

23  Q.  And what does that mean?

24  A.  As far as what?

25  Q.  Is there a physical-class component to that?

1    A.   Yes.  There's a physical component, and depending on what

2    they're studying, it tells you how many credits or clock hours

3    of coursework they have to do.

4    Q.   And the answer provided here:  "By tracking students

5    successfully completion of nine units a semester."  Is that

6    answer something that would be important to SEVP?

7    A.   Yes.

8    Q.   Why?

9    A.   Because they're describing what they would look at for a

10   full course of study in their programs.

11           MS. WEST:  Can we go to the next page, please.  Maybe

12   blow up just the first D and E.

13       Thank you.

14   BY MS. WEST:

15   Q.   D is "How do," slash, "will you verify that students have

16   completed the program, graduated?"

17       And the answer is:  "Maintain and check records to verify

18   successful completion."

19       Is that question and answer something that is important to

20   SEVP?

21   A.   Yes.

22   Q.   Why?

23   A.   Because it goes back to the school's eligibility, that we

24   want to make sure that they're in an established institution of

25   learning and they have -- they're going to have a history of

1     students graduating.

2     Q.   And E states:  "What is the process by which you will help

3     the student obtain reinstatement to student status?"  Can you

4     tell us, please, what is reinstatement.

5     A.   If a student falls out of nonimmigrant status through no

6     fault of their own, they are permitted -- again, it goes back

7     to the school official, who is responsible for reporting on

8     their students.  The school official can make a recommendation

9     that that student have their legal status reinstated, and then

10    the student has to apply to USCIS to, in fact -- for their

11    adjudication of the reinstatement.

12    Q.   I don't think we need to pull it back up, but I want to go

13    back to a question that we just took a look at, and that was

14    Section 3(b) about students transferring to the school.  Do you

15    recall that?

16    A.   Yes.

17    Q.   Is there a -- are there limitations on a student being able

18    to transfer an F-1 student?

19    A.   No.

20    Q.   Is there something known as a two-semester rule?

21    A.   No.

22    Q.   Have you ever heard of a two-semester rule?

23    A.   I've heard of schools trying to make a two-semester rule,

24    but SEVP allows students to transfer because -- because of the

25    physical presence component.  We need to know where students

1    are going to be, and so we don't permit schools to hold the

2    student's record.  That's the way that we track the students.

3    Q.  So for an F-1 student who seeks to transfer according to

4    the rules in Department of Homeland Security, is that student

5    allowed to transfer?

6    A.  Yes.

7            MS. WEST:  Can we please go to Exhibit 5, Page 8, and

8    just the top half, please.

9        Thank you, Ms. Hughes.

10   BY MS. WEST:

11   Q.  If we look at Page 7 of this same exhibit, do you see at

12   the top it states, "Section 3.  Tour of Campus"?

13   A.  Yes.

14   Q.  Why does SEVP require a tour of the campus?

15   A.  Again, it goes back to the school's eligibility.  We like

16   to make sure that there's a bona fide school there and to have

17   a site visitor record their observations.  So we can use that

18   as part of our adjudication.

19   Q.  And Subparagraph (a) here -- it states, "Comments of

20   observation of live classroom instruction, classroom space,

21   labs and/or library facilities."  And just above that, I'll

22   actually read for context, "Observe that school business

23   operations are taking place even if classes are not in

24   session."

25       Is it a deal-breaker if classes are not in session?

1    A.   No.

2    Q.   All right.  So then the answer provided here:  "No classes

3    were being conducted at the time of site inspections."  As you

4    just stated, that's -- on its face, is that a problem?

5    A.   No.

6    Q.   "Night classes are only being offered at this time.

7    Building has 5,000 square feet, medium to large class" -- I'm

8    sorry -- "five medium to large classrooms.  On" -- I think it's

9    supposed to be "One large meeting area, library, computer lab,

10   and four office spaces.  Sufficient space for planned

11   activities."

12        What is the site inspector supposed to look for in

13   responding to Question A?

14   A.   They look at the classrooms and the seating and make sure

15   that they have -- the facilities are adequate to host the

16   number of students they're reporting that they will be having.

17   Q.   So that would in place -- we refer back to the number of

18   students stated who were attending at the beginning?

19   A.   Correct.

20        MS. WEST:  And if we could now go to the bottom part

21   of this page, please, to Section 2(b).

22        That's great.  Thank you.

23   BY MS. WEST:

24   Q.   Section 2 is "Evidence the DSO is compliant with

25   regulations and reporting requirements or has the ability to be

1      compliant with SEVIS rules and regulations."  And Question B

2      specifically says, "Comments on site visit to location

3      where" -- I'm sorry.  Did I get the right section?  Yes -- "of

4      where nonimmigrant students' records are kept or will be kept

5      upon SEVIS approval."

6           Does that question matter to SEVP?

7      A.   Oh, yes.

8      Q.   Why?

9      A.   Because, again, we go back to the fact that designated

10     school officials are the ones that take care of all the student

11     records.  So we don't want just anybody accessing those

12     records.

13     Q.   Why not?

14     A.   Because there -- it's the Department of Homeland Security.

15     The purpose of the program is to make sure that we know where

16     the students are at all times.  We don't want them altered by

17     somebody who doesn't have authorized use to access them.

18     Q.   And the answer here:  "Access will be in an easy-to-locate

19     office and will be in a secured area."  Is the information

20     about it being in a secured area important?

21     A.   Yes.

22     Q.   Why?

23     A.   Again, we don't want just anybody accessing the records.

24     Only designated school officials should be accessing them.

25     Q.   All right.  We're almost done with this exhibit.

1              MS. WEST:  If we can go to the next page, please, and

2      how about -- let's just start with the top half, please,

3      starting -- yes.

4          Thank you.  That's fine.

5      BY MS. WEST:

6      Q.  Okay.  "Section 4.  Collection of Supporting Material

7      Instructions.  Document all collected material.  If collected

8      material is not in Question 4, please list the additional

9      collected material in other documentation.  All collected

10     materials must be forwarded to the SEVIS program office.

11     Please collect all documentation the school is willing to

12     provide.  Do not advise the school that any documentation they

13     give you is not required."

14         Do you see those instructions at the top?

15     A.  Yes.

16     Q.  Okay.  And so basically is Section 4 just a section where

17     the site visitor checks off the documents that it obtained from

18     the school and school officials?

19     A.  Correct.

20     Q.  So the top box here that is checked -- and it states above

21     "Required Documentation From All Schools" -- do you see there

22     checked "Signed I-17"?

23     A.  Yes.

24     Q.  And after that, "Investigator must verify the Form I-17

25     includes an original signature and stamp/seal of the

1    institution"?

2    A.   Yes.

3    Q.   Okay.  And then below that, checked off -- or X'ed, rather,

4    is "Signed I-17A"?

5    A.   Yes, I see that.

6    Q.   Okay.  And again, original signature is required?

7    A.   Yes.

8    Q.   Again -- I'm sorry.  Just below that, I-17B?

9    A.   Yes.

10   Q.   And below that, "Obtained copies of evidence that all

11   school officials listed on the Form I-17A are U.S. citizens or

12   legal permanent residents"?

13   A.   Yes.

14   Q.   Why does SEVP ask for that?

15   A.   Because, again, the school officials are the ones -- the

16   designated school officials are the ones that are responsible

17   for creating these records to bring a Form I-20 to bring a

18   student in from overseas to study here.  So just to maintain

19   the integrity of the system, we want to make sure that they're

20   legal permanent residents or U.S. citizens.

21             MS. WEST:  All right.  And if we can now go to the

22   bottom half of this document, please, starting with "School

23   Catalog."  Right there.

24        Thank you.

25   ///

1    BY MS. WEST:

2    Q.   The next box X'ed off is "School Catalog."  Do you see

3    that?

4    A.   Yes.

5    Q.   Why does SEVP ask for the school catalog?

6    A.   Because we want to make sure, again, that it is an

7    established place of learning, et cetera, et cetera.  So we can

8    go through the school catalog, make sure all of the programs of

9    study that they're reporting that they want to be certified are

10   in there, make sure we have standards associated with these

11   programs of study, knowing that they basically follow their own

12   rules as far as what they're expecting from students and --

13   Q.   And below that is X'ed "Copy of State License

14   Registration."  Why is that required?

15   A.   Because one of -- it's required by law that they be

16   licensed by an appropriate authority within the state they

17   operate.

18   Q.   Then there's "Documentation Requirements for Schools not

19   Accredited by an Agency Recognized by the U.S. Department of

20   Education."  And do you see below that X'ed "Schools

21   Petitioning for F-1 Classification," colon, "Letters from Three

22   Accredited Institutions of Higher Education That Have Accepted

23   Transfer Credits of Petitioning School."

24        Do you see that?

25   A.   Yes.

1    Q.    Are those the articulation agreements we spoke about?

2    A.    Correct.

3    Q.    And then toward the bottom, it's X'ed off "Certified Signed

4    by Preparer, Financial Documentation."  Why is that requested?

5    A.    Again, it's required by regulation that we verify that the

6    school has adequate finances.

7    Q.    Just below these boxes, there's a statement saying, "Other

8    Documentation," colon, "City of Pleasanton, CA, Business

9    License, Listed Training Staff."  Do you see that?

10   A.    I'm sorry?

11   Q.    At the very bottom, "Other Documentation."

12   A.    Oh, yes.

13   Q.    That's typed in?

14   A.    Yes, I do see that.

15   Q.    Is that just a place to note whether the school has

16   provided additional documentation in addition to these boxes

17   listed?

18   A.    Correct.

19   Q.    Now, if we can just go back to Page 1 of this document, we

20   are going to do a little jumping around here just to walk

21   through it, and let's take a look at that "Received" stamp,

22   October 15th, 2008.  Do you see that?

23   A.    Yes.

24   Q.    All right.  Now, here's the jumping around part.

25             MS. WEST:  You don't need to blow it up.  We're going

1    to go back to Exhibit 1, please.

2    BY MS. WEST:

3    Q.   You mentioned, Ms. Warner, that the site visit

4    inspector -- you can have a sip of water.  That's okay.  I

5    didn't mean to stop you -- that the site visit inspector at the

6    conclusion of the site visit interview mails or FedExes this

7    information with the original signatures back to SEVP.  Did I

8    get that right?

9    A.   Right.

10   Q.   Okay.  So now with that October 15th, 2008, SEVP stamp in

11   mind, let's take a look at the -- actually Page 2 of this

12   document, please.  Do you see that same "Received by SEVP"

13   stamp with the same date of October 15th, 2008?

14   A.   Yes.

15   Q.   And if we can go back to Page 4 of this exhibit, please,

16   and the signature date -- the signature there -- do you have

17   the original -- no, you don't.

18          MS. WEST:  Could I get the exhibit for that, please,

19   the big one.

20      Thank you.  The fat one.

21   BY MS. WEST:

22   Q.   Taking a look, please, at the original of Exhibit 1, is

23   that the original SEVP "Received" stamp on there?

24   A.   Which page am I looking at?

25   Q.   Page 2 of Exhibit 1.

1    A.   Yes.

2    Q.   Okay.  And then if you take a look at Page 4 of Exhibit 1,

3    which is what is here up on the screen, is that the original

4    signature of Ms. Su?

5    A.   Yes.

6    Q.   And is that date the same as the site visit date that we

7    just looked at?

8    A.   Yes.

9         MS. WEST:  If we can now pull up, please, the next

10   page of this document.

11        Thank you.  And we can blow up just on the top down through

12   the signatures, please.

13        Perfect.  Thank you.

14   BY MS. WEST:

15   Q.   Page 5 of Exhibit 1.  What is this document?

16   A.   It's the I-17A.

17   Q.   Which is what?

18   A.   It is the record of designated school officials.

19   Q.   What is --

20        THE COURT:  I'm sorry, ma'am.  What is the first

21   word?  The what?

22        THE WITNESS:  The record.

23        THE COURT:  Record?

24        THE WITNESS:  Yes.

25        THE COURT:  Thank you.

1    BY MS. WEST:

2    Q.   What is the purpose of this document, please.

3    A.   So "1A.  School is" -- it has -- populates Form I-17.  It

4    has a site visit.  It has to nominate people to become school

5    officials of the school.

6    Q.   And how does it nominate people?

7    A.   It -- the president or owner of the school will fill out

8    this document, and then they submit names, and there's certain

9    required evidence that we need to collect in order to become a

10   designated school official.

11   Q.   And can you tell from this document who is nominated on

12   behalf of Tri-Valley University?

13   A.   Yes.

14   Q.   Who is that?

15   A.   The first one is -- the principal designated school

16   official is Sophie Su.  The second one is a designated school

17   official, Susan Su, and Number 3 is designated school official

18   Vince Wang.

19   Q.   You mentioned that the first one, Sophie Su, is a principal

20   designated school official.  What does that mean?  How does it

21   differ?

22   A.   Each school is required to have a principal designated

23   school official.  It only differs in -- I think it's two ways.

24   One, a principal designated school official is the only person

25   who, once the school owner submits these names, can choose

1      another designated school official.

2          And then whenever -- the other way is whenever a SEVP

3      related to a compliance request asks for, like, a piece of

4      evidence or something, it's the principal designated school

5      official that's required to sign or take an attestation towards

6      that.

7      Q.  Why is it so limited?

8      A.  What, related --

9      Q.  The ability to designate new school officials or to --

10     A.  Because --

11     Q.  Why is there just one principal designated school official

12     who has the authority to do those things?

13     A.  Oh, for accountability reasons.

14         MS. WEST:  Let's blow up, please, Paragraph 2 here,

15     second paragraph down.

16         Great.  Thank you.

17         That's still pretty small.

18     BY MS. WEST:

19     Q.  Looking at the document as you have it in front of you, do

20     you see that Paragraph 2 states under "Instructions":

21     "Designated School Official," parentheses, "DSO, means a

22     regularly employed member of the school administration whose

23     office is located at the school and whose compensation does not

24     come from commissions for recruitment of foreign students."

25         Why is there that limitation?

1    A.   Because as I stated, designated school officials have to

2    have -- we expect them to put in all this information about

3    students that they're bringing in.  So we want them to have

4    integrity and be accountable and not doing it for other reasons

5    like they're receiving commission or something like that.

6    Q.   The next sentence there reads:  "A DSO may not delegate

7    this designation to any other person."  Do you see that?

8    A.   Yes.

9    Q.   Why is that rule in place?

10    A.   Because, again, we limit the access to SEVIS for the reason

11    that -- the designated school official wants to take their job

12    seriously, and they have to populate all the information about

13    students.  And the fact that we have 9,000 schools out there --

14    we really have to trust that that is, in fact, the person that

15    the school has asked to take on this job, is the person who's

16    doing it.

17    Q.   Let's look at the next sentence.  "An individual whose

18    principal obligation to the school is to recruit foreign

19    students for compensation may not be a DSO."  Why is that the

20    rule?

21    A.   Because we -- again, it goes back to integrity and

22    accountability, and then we want to make sure that the reason

23    is that they're actually choosing valid students to come in and

24    not doing it because they're receiving some kind of

25    compensation for it.

1    Q.   All right.  Let's skip to the last paragraph.  "The

2    principal DSO is required to have a thorough knowledge of the

3    regulations, policies, and procedures governing nonimmigrant

4    students and is responsible for ensuring that each additional

5    DSO has a thorough knowledge of the same."

6         Do you see that sentence?

7    A.   Yes.

8    Q.   Why is that important?

9    A.   Because it goes back, again, that designated school

10   officials are the only ones that the Department of Homeland

11   Security relies on to gather all the information on the school

12   and students and keep it updated, and so it's -- you know, they

13   need to take it seriously and really have thorough knowledge of

14   the regulations so they can maintain, you know, that

15   information adequately.

16   Q.   All right.  Now, just above --

17             MS. WEST:  Can we just go back to the line just above

18   the signature block and then the signatures, starting with "I,

19   the undersigned..."?

20        Thank you.

21   BY MS. WEST:

22   Q.   Above the signatures, it states:  "I, the undersigned, have

23   read the immigration and naturalization services regulations,"

24   and I'm going to skip over the citations here and just do the

25   text, "relating to nonimmigrant students, the services

1    regulations relating to change of nonimmigrant classification

2    for students, the services regulations relating to school

3    approval and withdrawal of school approval, and intent to

4    comply with these regulations at all times."

5         Why is that certification included in the I-17A?

6    A.   Again, because the designated school officials are the

7    only -- are the ones that the Department of Homeland Security

8    relies on to, you know, keep all the -- you know, admit the

9    students, bring them into the country, keep their records

10   going, you know, the school records current, and so we have to

11   make sure that they know all the associated rules and

12   regulations related to it.

13   Q.   And that they certify they will follow them?

14   A.   Yes.

15   Q.   Now, we've been looking at a document up on the screen, but

16   you have the original in front of you; is that right?

17   A.   Correct.

18   Q.   Do you have wet signatures there; that is, original

19   signatures of each DSO and P/DSO?

20   A.   Yes.

21        MS. WEST:  Can we go to Page 2 of this document,

22   please.  Is that Page 2, the same document?  No.  We should be

23   on Exhibit 1, Page 6.

24        Oh, I'm sorry.  I confused you.  Page 6 of the exhibit,

25   Page 2 of the I-17A.  No.  Exhibit 1, Page 6.

1          Great.  Thank you.

2     BY MS. WEST:

3     Q.  Do you see the signature again of the defendant or Susan Su

4     on this document?

5     A.  Yes.

6     Q.  And what does the signature there represent?

7     A.  Again, it's a certification that she intends to abide by

8     all of those regulations.

9               MS. WEST:  All right.  And just above the signature,

10    can you just go back?  Yes, right there.

11         That's good.  Thank you.

12    BY MS. WEST:

13    Q.  Does this state that "The signatory below certifies that

14    the above individuals are designated school officials.

15    Further, I certify that I will be responsible for providing the

16    resources and training necessary for these officials to

17    implement properly the above-referenced regulations"?

18    A.  Yes.

19    Q.  So this is just yet another certification that training

20    will be provided and these people will follow the rules and

21    regulations?

22    A.  Correct.

23    Q.  Now, we're just going to glance through a few other pages

24    so the jury can see what is in the fat Exhibit 1 that you have

25    in front of you.

1          MS. WEST:  Can you please pull up Page 8 of this

2     exhibit.

3     BY MS. WEST:

4     Q.   Is this part of Exhibit 1 that you have in front of you?

5     A.   Yes.

6     Q.   All right.  And what is this document?

7     A.   It's Tri-Valley University's instructional staff listing.

8     Q.   Is this something that SEVP looks at and pays attention to

9     in deciding whether to certify a school?

10    A.   Yes.

11    Q.   Why?

12    A.   Again, we want to make sure that they have maintained a

13    faculty that will, in fact -- has been trained and -- to teach

14    the courses of study that they have applied for approval.

15         MS. WEST:  Can you please blow up -- enlarge the

16    "Category" line at the top of the chart and then the next line

17    down with "Allen," comma, "A. Miller."

18         Yep, right there.  That's good.

19    BY MS. WEST:

20    Q.   So in this chart of instructors -- instructional staff

21    lists, do you see on the left-hand column is the name and then

22    degrees and discipline courses taught and teaching and

23    qualifications or experience?

24    A.   Yes, I see it.

25    Q.   Does SEVP look at the degrees and the qualifications for

1      these proffered instructors in making its certification

2      decision?

3      A.   Yes.

4      Q.   Why?

5      A.   Because we want to make sure that, you know, they're just

6      not hiring just anybody to teach the courses.  It goes back to,

7      you know, the integrity of the school, the bona fide school,

8      and the school's eligibility.  So we look at the degrees that

9      the instructor has and make sure that the courses that they're

10     listed as teaching -- the degrees, you know, match those --

11     their qualifications match the coursework they're teaching.

12     Q.   Do you have also in front of you -- if you'd direct your

13     attention to Page 11 of this exhibit, starting at Page 11 --

14          MS. WEST:  And can we pull up Page 11, please, the

15     Tri-Valley University catalog.

16          THE WITNESS:  Yes.

17     BY MS. WEST:

18     Q.   And, in fact, it's lengthy, is it?

19     A.   Yes.

20     Q.   Does it go up through Page 158 of the same exhibit?

21     A.   Yes.

22     Q.   And does it include a lengthy course listing?

23     A.   Yes.

24     Q.   All right.  And from looking at the -- the site visit

25     checklist, the catalog is something that is required to be

1    submitted; is that correct?

2    A.   Yes.

3    Q.   Is the catalog something that SEVP looks at?

4    A.   Yes.

5    Q.   Why?

6    A.   Again, going back to the school's eligibility, we want to

7    make sure that everything the school has stated in the Form

8    I-17 -- we can pretty much match the catalog that -- you know,

9    that the school is teaching the coursework, the courses that

10   they have applied for approval, that they have standards in the

11   catalog, et cetera.

12   Q.   And do you also see in Exhibit 1 in front of you after the

13   end of the catalog the financial statements referred to in the

14   site visit checklist; that is, a profit-and-loss statement and

15   copies of passports of the DSO's?

16   A.   Yes.

17   Q.   I can take that back from you now, please.  Thank you.

18        (Government's Exhibit 2 marked for identification.)

19   BY MS. WEST:

20   Q.   I'm going to show you now what's been marked for

21   identification as Government Exhibit 2 and ask you if you

22   recognize this, please.

23   A.   Yes.

24   Q.   What is it?

25   A.   It's a request for evidence from SEVP.

1    Q.   To who?

2    A.   To Tri-Valley University.

3              MS. WEST:  The Government offers Exhibit 2 in

4    evidence.

5              THE COURT:  Any objection?

6              MR. BABCOCK:  I'm sorry, your Honor.  Hold on.  I'm a

7    step behind.

8          No objection.

9              THE COURT:  Exhibit 2 is admitted.

10             (Government's Exhibit 2 received in evidence.)

11             MS. WEST:  Can you please pull up Page 1 of

12   Exhibit 2.

13         Thank you, Ms. Hughes.

14         Let's just enlarge the top -- the "From Subject To" line,

15   please, by "Section."

16         Thank you.

17   BY MS. WEST:

18   Q.   All right.  So Exhibit 2 -- is this from SEVIS?

19   A.   Yes.

20   Q.   "Subject."  Do you see "Request for Evidence"?

21   A.   Yes.

22   Q.   And the date December 10th, 2008?

23   A.   Yes.

24   Q.   And the "To" line there, "Susan XP Su"?

25   A.   Yes.

1   Q.   With an e-mail address of ssu@TriValleyUniversity.org?

2   A.   Yes.

3            MS. WEST:  All right.  Now, if we could go, please,

4   to the middle of this page, it's the paragraph that starts,

5   "Your petition..." and it has a 1 and a 2 just below it, little

6   further down, next section right just below that.

7       Right there.  Great.  Thank you.

8   BY MS. WEST:

9   Q.   Do you see there it says, "Your petition is now in draft

10  status.  Log into SEVIS and make the following edits to your

11  petition"?  Is this something -- a request for evidence --

12  something that is standard as part of the SEVP certification

13  process?

14  A.   Yes.

15  Q.   How does it come up?

16  A.   So once the petition gets passed to an adjudicator for

17  review, if the adjudicator sees something in the petition that

18  they don't think is correct, they will give the school the

19  opportunity to correct it.

20  Q.   And that's normal; right?

21  A.   Yes, happens all the time.

22  Q.   And is this done through the SEVIS system?

23  A.   Yes.

24  Q.   So can a school then just make the changes electronically

25  in the I-17?

1     A.  Yes.

2     Q.  And so if we look at 1 and 2 as part of this -- if you look

3     at 1, that -- the SEVIS states, "Your school is not approved by

4     a nationally accrediting association or agency."  Do you see

5     that?

6     A.  Yes.

7     Q.  All right.  And so then if we could -- I'm sorry.  Same

8     part.  So the instruction, then, is to enter "None" in response

9     to the question regarding accreditation?

10    A.  Correct.

11    Q.  Why is that important?

12    A.  Because we need to know the accreditation status per

13    regulation of the school.

14         MS. WEST:  Now, if we can go to the bottom half of

15    this same page, Ms. Hughes, please.  If you can just blow up 1

16    through 3.  No.  Go down.

17        There you go.  Thank you.

18    BY MS. WEST:

19    Q.  Do you see right after Line 1 it says, "Evidence" -- well,

20    "In addition, provide the following evidence:

21        "1.  Evidence the P/DSO and all DSO are U.S. citizens or

22    lawful permanent residents."

23        Didn't you just look at that in the I-17 and there were

24    passports there?

25    A.  Correct.

1    Q.   If we look at the note at the bottom of this paragraph,

2    does that provide further explanation, specifically, "Note.

3    The proof of citizenship submitted for Vince Wang contains a

4    different first name.  Proof of name change or other acceptable

5    proof listed above with the correct name must be submitted"?

6    A.   Yes.

7    Q.   Why is it important that the names match?

8    A.   Because, again, we need to make sure that the person

9    nominated as a designated school official is, in fact, the

10   person they are purporting to be.  So the way we verify it is

11   by looking at the person's passport or driver's license and

12   making sure that the names match.

13   Q.   So is it fair to say that SEVP takes extra care to make

14   sure they know who is the designated school official and

15   accessing SEVIS?

16   A.   Yes.

17   Q.   Let's take a look at Paragraph 3, that "Tri-Valley

18   University is also instructed to provide a statement by each

19   P," slash, "DSO attesting they have read, understood, and will

20   comply with all federal regulations" -- excuse me -- "all

21   federal regulations relating to nonimmigrant students."

22        Do you see that?

23   A.   Yes.

24   Q.   Why is that request made?

25   A.   Because, again, with 9,000 schools, we, you know, rely on

1    the school -- the designated school officials to, you know,

2    populate these records, keep them current, and then abide by

3    the regulations also related to the school and to student

4    status.

5    Q.  Does it again go back to maintaining the integrity of the

6    system as a whole?

7    A.  Correct.

8        (Government's Exhibit 3 marked for identification.)

9    BY MS. WEST:

10   Q.  I'm going to show you what's been marked for identification

11   as Government Exhibit 3.

12       Do you recognize Exhibit 3?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's -- it's -- do you want me to go page by page or --

16   Q.  Well, just -- is it a letter with attachments?

17   A.  Yeah, it's a letter with attachments.

18   Q.  And who does the letter appear to be from?

19   A.  Tri-Valley University to SEVP.

20   Q.  Okay.  And in particular from Susan Su?

21   A.  Correct.

22   Q.  All right.  Let's --

23           MS. WEST:  The Government offers Exhibit 3 in

24   evidence, please.

25           MR. BABCOCK:  No objection.

```
 1              THE COURT:  Exhibit 3 is admitted.

 2              (Government's Exhibit 3 received in evidence.)

 3              MS. WEST:  And if we could please pull up Page 1.

 4         Thank you very much, Ms. Hughes.

 5         Can you enlarge the date and the top half of the body down

 6    a couple paragraphs, please.

 7         Thank you.

 8         No.  That looks great.  Can you get it all in?

 9    BY MS. WEST:

10    Q.   Okay.  Well, it's a little bit cut off, but do you see on

11    the document in front of you the date on this document,

12    December 11th, 2008?

13    A.   Yes.

14    Q.   And if we look at the body, it states, "I am writing to you

15    in response to the e-mail."  Is this basically a response from

16    Ms. Su to the RFE, the request for evidence we just looked at?

17    A.   Yes.

18    Q.   And in fact, we see --

19              MS. WEST:  Can we blow up the -- starting with "At

20    the same time" in Item 1?

21         Yeah, that's great.  Thank you.

22    BY MS. WEST:

23    Q.   "At the same time, we are submitting the following three

24    evidence items:  Item 1" -- and there, Ms. Su is responding to

25    the issue about Vince Wang's name; is that right?
```

1    A.   Yes.

2    Q.   And she states that "We made a mistake by inputting

3    Mr. Wang's legal name Wenchao Wang with his nickname Vince

4    Wang," and she's indicated she already -- last sentence here:

5    "We attached the I-17 update form."  Do you see that?

6    A.   Yes.

7    Q.   And then -- thank you.

8            MS. WEST:  If we can go to Item 3, please, just

9    below.

10       Thank you.

11   BY MS. WEST:

12   Q.   "Item 3.  Three of the P/DSO's" -- or "P," slash,

13   "DSO's" -- excuse me -- "of TVU have all taken their DSO web

14   training class" -- "web-based training class.  We submitted the

15   statements of all three P," slash, "DSO's for your review."  Do

16   you see that?

17   A.   Yes.

18   Q.   Thank you.

19           MS. WEST:  And if you can also go to the last

20   paragraph just above the signature and through the signature.

21       Great.

22   BY MS. WEST:

23   Q.   Do you see the last line of this sentence?  "The originals

24   of these documents are mailed to the instructed address with

25   first-class mail.  Very truly yours, Susan Xiao-Ping Su."  And

1    do you have an original signature of that in front of you?

2    A.   Yes.

3    Q.   And the SEVP "Received by" stamp?

4    A.   Yes.

5    Q.   Thank you.

6         And the attachments to this document -- is there, in fact,

7    an I-17 attached?

8    A.   Yes.

9              MS. WEST:  And can we pull up, please, Page 4 of this

10   exhibit.

11   BY MS. WEST:

12   Q.   Is that a new signature there by Ms. Su dated 12/11/2008?

13   A.   Yes.

14   Q.   Can you go to the next page of this exhibit, please.

15        Is this a new I-17A now in the name of Wenchao,

16   parentheses, Vince Wang?

17   A.   Yes.

18             MS. WEST:  Yeah.  If we can zoom in, please, on just

19   that line with -- or just the signature blocks.

20        That's great.  Thank you.

21   BY MS. WEST:

22   Q.   And the third one of these is Wenchao, parentheses, Vince

23   Wang.  Do you see that?

24   A.   Yes.

25   Q.   With original signatures?

1     A.   Correct.

2              MS. WEST:  Okay.  Can we please pull up Page 10 of

3     this exhibit.

4          Thank you.

5          And can we enlarge just the text above the signatures,

6     please.

7          Great.

8     BY MS. WEST:

9     Q.   This document is on Tri-Valley University letterhead; is

10    that right?

11    A.   Correct.

12    Q.   And then do you see it states, "This letter is to state

13    that all three P," slash, "DSO's of Tri-Valley University --

14    Susan Su, Sophie Su, and Wenchao," parenthesis, "Vince Wang --

15    have read, understood, and will comply with all federal

16    regulations related to nonimmigrant students"?  Do you see

17    that?

18    A.   Yes.

19    Q.   And then in the original in front of you, you have original

20    signatures of these individuals?

21    A.   Correct.

22    Q.   And again, the "Received by SEVP" stamp?

23    A.   Yes.

24         (Government's Exhibit 4 marked for identification.)

25    ///

1     BY MS. WEST:

2     Q.  I'm going to show you now what's been marked as Government

3     Exhibit 4.

4          Can you please take a look at it and tell me -- oh.  Tell

5     me if you recognize it.  Thank you.

6                    MR. BABCOCK:  Sorry.  What exhibit were you on?

7                    MS. WEST:  4.

8                    MR. BABCOCK:  Thank you.

9                    THE WITNESS:  Yes.

10    BY MS. WEST:

11    Q.  What is Exhibit 4, please.

12    A.  It's correspondence from Tri-Valley University to SEVP.

13                   MS. WEST:  The Government offers Exhibit 4 in

14    evidence.

15                   THE COURT:  Any objection?

16                   MR. BABCOCK:  No objection.

17                   THE COURT:  Exhibit 4 is admitted.

18                     (Government's Exhibit 4 received in evidence.)

19                   MS. WEST:  Can we please pull up Page 1 of Exhibit 4,

20    and let's just do the top half where it's the -- the addressee

21    and the "From" part.

22          Great.  Thank you.

23    BY MS. WEST:

24    Q.  Page 1 of Exhibit 4 is a letter that appears to be

25    addressed to a Mr. Barry Kobe.  Have I pronounced that right?

1    A.   Uh-huh.

2    Q.   Do you know who that individual is?

3    A.   Yes.

4    Q.   Who is that?

5    A.   He was the adjudicator on the Tri-Valley University SEVP

6    approval.

7    Q.   What do you mean "adjudicator"?

8    A.   He's the one who makes the ultimate decision per whether or

9    not they would have received certification or not.

10   Q.   All right.  And then on the lower right of this expanded

11   view, we see "Dr. Susan Su, President, Tri-Valley University,"

12   and the date below, February 10th, 2009.  Do you see that?

13   A.   Yes.

14   Q.   All right.  Thank you.

15        MS. WEST:  And can we now enlarge the text of this

16   letter, please -- "Dear Mr. Kobe" -- and then the bottom of the

17   letter.

18        Great.  Perfect.  Thank you.

19   BY MS. WEST:

20   Q.   This letter states:  "Dear Mr. Kobe, per our phone

21   conversation, here are the three originals of the three

22   articulation" -- I'm sorry -- "the originals of the three

23   articulation agreements."  Do you see that?

24   A.   Yes.

25   Q.   And is there in front of you an original signature from Ms.

1    Su?

2    A.   Yes.

3    Q.   Attached to this cover letter, are there, in fact, three

4    what purport to be articulation agreements?

5    A.   Yes.

6            MS. WEST:  Can we please pull up Page 4 of Exhibit 4.

7    Let's go from the top caption through Section A -- or I, Roman

8    Numeral I.

9    BY MS. WEST:

10   Q.   Okay.  Do you see at the top here "Tri-Valley University

11   and San Francisco State University Articulation Agreement"?

12   A.   Yes.

13   Q.   And then if we look at "Principles of Agreement," the first

14   paragraph of it, do you see there it states, "This articulation

15   agreement serves as an amendment to course articulation

16   agreement dated May 1st, 2008, between Tri-Valley University

17   and San Francisco State University.

18       "SFSU has been accepting TVU's course CS300, Logic and

19   Computer Architecture, in Computer Science and Engineering

20   Department, transferring since then" -- that is presumably

21   since May 1st, 2008 -- "and comparable to SFSU's ENGR356, Basic

22   Computer Architecture, at the School of Engineering."

23       Do you see that?

24   A.   Yes.

25   Q.   Does that satisfy the element that you mentioned earlier,

1    the first component of articulation agreements that

2    historically the partnering school has already accepted credits

3    transferred from this university?

4    A.   Yes.

5              MS. WEST:  All right.  If we can now enlarge the

6    second paragraph of the same section.

7         Great.

8    BY MS. WEST:

9    Q.   "After further careful review of the academic standards

10   adopted and practiced by Tri-Valley University and a thorough

11   evaluation of TVU's School of Engineering course syllabus,

12   curriculum, faculty profile, and qualifications, we have come

13   to the conclusion that the School of Engineering at San

14   Francisco State University will continue unconditionally

15   accept [sic] course-transferring credits for graduate courses

16   from the School of Engineering at TVU into SFSU's School of

17   Engineering in electrical engineering, computer science

18   engineering, and mechanical engineering areas."

19        Do you see that?

20   A.   Yes.

21   Q.   Is this information that I just read important to you --

22   A.   Yes.

23   Q.   -- at SEVP?

24   A.   Yes.

25   Q.   Why is that?

1    A.   Because the requirements are that for an articulation

2    agreement -- is that the school writing the agreement is and

3    will continue to unconditionally accept those transfer credits.

4    Q.   So the particular language "will continue unconditionally

5    accept course-transferring" -- is that the key part of this?

6    A.   Correct.

7            MS. WEST:  And then lastly, if we can just look at

8    Section Roman numeral II(a), please.

9        Thank you.

10   BY MS. WEST:

11   Q.   Do you see under II(a), "SFSU is accredited by Western

12   Association of Schools and Colleges"?

13   A.   Yes.

14   Q.   Is that important?

15   A.   Yes.

16   Q.   Why?

17   A.   Because an articulation agreement has to come from an

18   accredited institution.

19           MS. WEST:  Okay.  And now if we can go to the next

20   page of this exhibit, please.

21       Thank you.

22   BY MS. WEST:

23   Q.   Do you see there signatures for Tri-Valley University and

24   San Francisco State University?

25   A.   Yes.

1   Q.   Is there anything on its face to cause a question about the

2   signatures to SEVP?

3   A.   No.

4   Q.   All right.  Let's look at the next page of this exhibit,

5   please.  We're looking now at Exhibit 4, Page 6.

6        Does this appear to be an articulation agreement between

7   Tri-Valley University and the University of Central Florida?

8   A.   Yes.

9            MS. WEST:  Can we please enlarge, Ms. Hughes, Roman

10  Numeral I, that whole section, up the next paragraph, up --

11  both of those paragraphs of this section, please.

12       Great.

13  BY MS. WEST:

14  Q.   Is this pretty similar to the one we just looked at?

15  A.   Yes.

16  Q.   Okay.  And do you see under "Principles of Agreement":

17  "The primary purpose and content of this agreement is to

18  establish the course-transferring relationship between the

19  Department of Computer Science and Engineering at School of

20  Engineering at Tri-Valley University and the Department of

21  Statistics and Actuarial Science at University of Central

22  Florida.  UCF has been accepting eight courses transferring

23  from TVU since May 1st, 2008"?

24       Do you see that?

25  A.   Yes.

1    Q.   Does that satisfy the historical component of an

2    articulation agreement that courses have in the past been

3    transferred?

4    A.   Yes.

5    Q.   And if we look at the next paragraph here, "On the

6    evaluation of Tri-Valley University recently developed Bachelor

7    of Science program in Computer Science and graduate programs in

8    Data Mining major area in the Department of Computer Science

9    and Engineering at School of Engineering, Department of

10   Statistics and Actuarial Science at University of Central

11   Florida agrees to continue accepting the course-transferring

12   from the entire Department of Computer Science and Engineering

13   at TVU."

14        Do you see that?

15   A.   Yes.

16   Q.   Is that again the forward-looking component?

17   A.   Correct.

18        MS. WEST:  And if we look under Roman Numeral II(a),

19   please, Ms. Hughes.

20   BY MS. WEST:

21   Q.   Does this basically state the University of Central Florida

22   is also accredited?

23   A.   Yes.

24   Q.   So on its face, does this articulation agreement appear to

25   satisfy SEVP's rules and regulations for articulation

1    agreements?

2    A.   Yes.

3    Q.   And if we look at the next page, please, do you see there

4    the signatures purporting to be for Tri-Valley University and

5    University of Central Florida?

6    A.   Yes.

7    Q.   Is there anything on its face that suggests that this is

8    improper in some way?

9    A.   No.

10   Q.   I can go ahead and take that back from you now.  Thank you.

11              MS. WEST:  Can we please -- your Honor, I've spoken

12   to defense counsel.  We have a witness who will be testifying

13   not today but soon about a particular exhibit, and defense

14   counsel has given permission for us to be able to show the jury

15   this exhibit with the intention that he is going to testify.

16        And with that in mind, I would like to show to the jury

17   Exhibit 102, Page 5.

18        (Government's Exhibit 102 marked for identification.)

19              THE COURT:  All right.  Mr. Babcock, is it accurate

20   that the defendant has no objection?

21              MR. BABCOCK:  I understand this particular witness is

22   from the East Coast.  Rather than wait -- keep her here until

23   the following witness testifies to get this in, I have no

24   objection.  If the other witness doesn't testify, obviously, it

25   will be stricken.

1              THE COURT:  Very good.

2              MS. WEST:  Thank you.

3              THE COURT:  Go ahead.

4              MS. WEST:  Can we please pull up Page -- Exhibit 102,

5      Page 5.

6              THE COURT:  Ms. West, could you repeat that exhibit

7      number again just one more time?

8              MS. WEST:  It's Exhibit 102.

9              THE COURT:  Thank you.

10             MS. WEST:  And we're just going to be looking at Page

11     5 of that.

12             THE COURT:  Thanks.

13             MS. WEST:  Can we enlarge, please, the "Principles of

14     Agreement."

15        Great.

16     BY MS. WEST:

17     Q.   Ms. Warner, I'm going to ask you to please take a look at

18     Section 1, "Principles of Agreement."  That states, "This

19     agreement certificates that TVU's course CS300, Logic and

20     Computer Architecture in Computer Science and Engineering, is

21     comparable to SFSU's Engineering 356 at the School of

22     Engineering."

23        Do you see that language?

24     A.   Yes.

25     Q.   Had this language been submitted to SEVP as the

1    articulation agreement between Tri-Valley University and San

2    Francisco State University, would this language of "is

3    comparable to" have been sufficient?

4    A.   No.

5    Q.   Why not?

6    A.   Because it doesn't sound like the requirement.  In the

7    regulations, it says that the school is currently accepting

8    transfer credits.

9    Q.   All right.  And this language here "is comparable to" -- is

10   there any representation in here that anyone has actually

11   transferred?

12   A.   No.

13   Q.   Or any transfer credits have been accepted?

14   A.   No.

15   Q.   Or that they will continue to unconditionally be accepted?

16   A.   Comparable doesn't -- no -- mean that.

17   Q.   It doesn't say that; correct?

18   A.   No.

19         MS. WEST:  All right.  We can take that down now.

20   Thank you, Ms. Hughes.

21       Can we please pull up Exhibit 3, Page 2.

22   BY MS. WEST:

23   Q.   Ms. Warner, while we're pulling that up, at some point did

24   SEVP actually approve Tri-Valley University to accept F-1

25   foreign students?

```
 1    A.   Yes.

 2              MS. WEST:  And if we can enlarge, please, the action

 3    stamp on the right where it says, "HQ, SEVP," about two-thirds

 4    of the way down.

 5         There you go.  Enlarge that area, please.

 6         Perfect.

 7    BY MS. WEST:

 8    Q.   What does this information here reflect?

 9    A.   That SEVP headquarters approved the school on

10    February 17th, 2009.

11    Q.   And do you recognize that signature there?

12    A.   Yes.  That's Barry Kobe.

13    Q.   All right.  Thank you.

14              MS. WEST:  You can take that down.

15    BY MS. WEST:

16    Q.   Now, after SEVP has approved or certified a school to admit

17    foreign students, does SEVIS at that point get used for some

18    reason?

19    A.   Does it get used?

20    Q.   Yes.

21    A.   Yes.

22    Q.   For what?

23    A.   The school has used SEVIS to create -- that's when they

24    actually gain the full access to the system, and they use it to

25    create the Form I-20 to bring students in at that time.
```

1    Q.   Now, you say that they get full access to the system at

2    that time.  Does anyone get full access, or is that limited to

3    the DSO's?

4    A.   Just the designated school officials.

5    Q.   All right.  So from the designated school officials being

6    the only ones to be able to access it, does that mean to access

7    and use is still controlled by the Department of Homeland

8    Security?

9    A.   Yes.

10   Q.   Now, are you familiar with the term I-20?

11   A.   Yes.

12   Q.   What is an I-20?

13   A.   An I-20 is an immigration document that's created by a

14   school official, and it -- that's what a student uses when they

15   need to get a visa to enter the country as a student.

16   Q.   Bear with us just one moment.

17         MS. WEST:  I got it, guys.

18       (Government's Exhibit 12 marked for identification.)

19   BY MS. WEST:

20   Q.   I'm going to show you what's been marked for identification

21   as Exhibit 12.

22       Can you please tell us what kind of document this is.

23   A.   It's a Form I-20.

24   Q.   And this Form I-20 -- is this an official record of SEVIS?

25   A.   Yes.

1              MS. WEST:  The Government offers Exhibit 12 in

2      evidence.

3              THE COURT:  Any objection?

4              MR. BABCOCK:  No objection.

5              THE COURT:  Exhibit 12 is admitted.

6              (Government's Exhibit 12 received in evidence.)

7              MS. WEST:  Could we please pull up Exhibit 12.

8          Your Honor, I'm going to use this.  I know it's a little

9      clearer.

10             MR. BABCOCK:  Just a little.

11             MS. WEST:  Yeah.

12     BY MS. WEST:

13     Q.  Well, is this document all together just referred to as a

14     Form I-20?

15     A.  It's -- it's -- I can't read it right off now, but it says,

16     "Certificate of Eligibility for Student" -- "for Student

17     Status," I think it's called.

18     Q.  For nonimmigrant F-1 student status?

19     A.  Yes.

20             THE COURT:  Yes, ma'am.  I think the question was:

21     Is this also a shorthand designation for this form, an I-20?

22             THE WITNESS:  Yes.

23     BY MS. WEST:

24     Q.  Okay.  So this is what we're talking about when we use the

25     term I-20?

WARNER - DIRECT / WEST

1    A.   Correct.

2    Q.   And do you see in the -- I'll try to zoom in a little here.

3    There we go.  The top left is the space for the name of the

4    individual?

5    A.   Yes.

6    Q.   Is that the individual who's receiving the I-20?

7    A.   Correct.

8    Q.   The intended student?

9    A.   Uh-huh.

10   Q.   "Yes"?

11   A.   Yes.

12   Q.   And then below that is a space for the school who is

13   issuing the I-20.  Is that fair?

14   A.   Yes.

15   Q.   And here, it states, "Tri-Valley University"?

16   A.   Yes.

17   Q.   And then just below that, "School Official," and the name

18   "Sophie Su."  Do you see that there?

19   A.   Yes.

20   Q.   Do you know how that name gets printed on this form?

21   A.   When the -- the designated school official enters --

22   receives this, and they have to populate the user ID and their

23   password into the system.  It pre-populates in that area.

24   Q.   Okay.  So when the DSO logs in, it automatically comes up?

25   A.   Right.

1    Q.   Let's take a look at Question 3 -- or Space 3.   "This

2    certificate is issued to the student named above for..." and

3    then it's filled in there, "initial attendance at the school"?

4    A.   Yes.

5    Q.   What does that mean?

6    A.   "Initial attendance" means it's the first time the student

7    is attending that school.

8    Q.   Does -- does that have anything to do with whether they've

9    actually gone to classes yet?

10   A.   No.

11   Q.   It's just --

12   A.   It's -- it tells the school to expect the student.   Initial

13   attendance tells the school to -- that's the first time they're

14   attending the school, and they expect the student to be showing

15   up to take classes.

16   Q.   Okay.   So is this referred to as an initial I-20?

17   A.   Correct.

18   Q.   All right.   Let's take a look now to the signature area,

19   "School Certification."   Do you see that?

20   A.   Yes.

21   Q.   And again, the name "Sophie Su."   Do you see that there?

22   A.   Yes.

23   Q.   Is that pre-populated as you mentioned just above?

24   A.   Yes.

25   Q.   Same thing when the DSO logs in?   That automatically comes

1    up?

2    A.   Correct.

3    Q.   Now, does the signature there have to match the name there?

4    A.   Yes.

5    Q.   Why?

6    A.   Because we -- to maintain, you know, the integrity of the

7    system, we have to make sure that the person that we -- that

8    was actually approved to be a designated school official is the

9    person who is now issuing that Form I-20.

10   Q.   All right.  Now, let's see if we can do this so the jury

11   can see it.

12        Just above the signature there, do you see -- let me back

13   up a little on it.  I think that backed up too much.  I want

14   you to be able to read it, but I might have to move it as we

15   go.

16        Do you see, "I certify under penalty of perjury that all

17   information provided above" -- oh, it's a little blurry -- "in

18   Items 1 through 9 was completed before I signed this form and

19   is true and correct"?

20        Do you see that?

21   A.   Yes.

22   Q.   Is that important to SEVP?

23   A.   Yes.

24   Q.   Does SEVP ever see these forms or see an I-20?

25   A.   Yeah, every day.

1   Q.   Okay.  So does SEVP rely on them in some way?

2   A.   Yes.

3   Q.   How so?

4   A.   Because part of the law is that we have to know who's

5   coming into the country, you know, and monitor their physical

6   presence at the school where they're going.

7        (Government's Exhibit 13 marked for identification.)

8   BY MS. WEST:

9   Q.   I'm going to show you what's been marked for identification

10  as Government Exhibit 13.

11       Do you recognize that?

12  A.   Yes.

13  Q.   What is it?

14  A.   A Form I-20.

15           MS. WEST:  The Government offers Exhibit 13.

16           MR. BABCOCK:  No objection.

17           THE COURT:  Exhibit 13 is admitted.

18           (Government's Exhibit 13 received in evidence.)

19  BY MS. WEST:

20  Q.   Let's take a look at the top left.  This is the same name

21  that we just looked at but actually a little clearer copy.  Is

22  that -- is that Bhanu Challagundla?

23  A.   Yes.

24  Q.   And again, "Tri-Valley University" in Box 2?

25  A.   Yes.

1    Q.  Here, there's a different school official name.  Do you see

2    "Wenchao," parentheses, "Vince Wang"?

3    A.  Yes.

4    Q.  "Registration Officer"?

5    A.  Yes.

6    Q.  And whereas the other one said, "Initial Attendance."  Do

7    you see under "Section 3," this one says, "Continued attendance

8    at this school"?

9    A.  Yes.

10    Q.  What is the difference?

11    A.  That means that the school -- the designated school

12    officials who issued the I-20's -- they're responsible for

13    reporting to SEVP by regulation when the student actually shows

14    up and is attending a full course of study at this school.

15    Q.  Thank you.

16        And is that continued attendance designation something also

17    that SEVP relies on?

18    A.  Yes.

19    Q.  How?

20    A.  Because it tells us that the student is, in fact, at the

21    school attending a full course of study.

22        (Government's Exhibit 50 marked for identification.)

23    BY MS. WEST:

24    Q.  I'm now showing you what's been marked as Exhibit 50 for

25    identification.

1      Do you recognize that?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's a student information record.

5          MS. WEST:  The Government offers Exhibit 50 in

6    evidence.

7          MR. BABCOCK:  I'm sorry.  15?

8          MS. WEST:  50, 5-0.

9          MR. BABCOCK:  Sorry.  It seems I'm missing 50.

10      No objection.

11          THE COURT:  Exhibit 50 is admitted.

12          (Government's Exhibit 50 received in evidence.)

13          MS. WEST:  Can we please pull up Exhibit 50, Ms.

14    Hughes.

15      Thank you.

16          THE COURT:  Ms. West, anytime in the next five

17    minutes.

18          MS. WEST:  I think we can just get through this

19    exhibit and call it a day.

20          THE COURT:  Very good.

21          MS. WEST:  Thank you.

22      Exhibit 50.  Would you please pull it up.

23      Thank you.

24          THE COURT:  There you go.

25          MS. WEST:  Sorry about that, Ms. Hughes.

1          Great.  Can we enlarge the top half of this, please.

2          Perfect.  Perfect.

3     BY MS. WEST:

4     Q.   A little hard to see, but do you see at the top -- is that

5     the symbol for SEVIS?

6     A.   Yes.

7     Q.   It says "Student Exchange Visitor Information System" there

8     spelled out on the right?

9     A.   Yes.

10    Q.   And there in bold in the center, do you see "Student

11    Information"?

12    A.   Yes.

13    Q.   And then on the left side, it says, "Personal Information"?

14    A.   Yes.

15          MS. WEST:  Can I actually enlarge the "Personal

16    Information" column there, please.

17          That's great.

18    BY MS. WEST:

19    Q.   Under "Personal Information," do you see it says, "SEVIS

20    ID"?

21    A.   Yes.

22    Q.   What is that?

23    A.   When a designated school official goes in and they create a

24    Form I-20 for the student, the student is assigned a unique

25    identifier, and that's what the SEVIS ID is.

1   Q.   Okay.  And then below that, there's the individual's name

2   here, "Sparsh Prashant Agrawat"?

3   A.   Yes.

4   Q.   "Country of Birth:  India"?

5   A.   Yes.

6   Q.   And a date of birth?

7   A.   Yes.

8   Q.   "Country of Citizenship" and "Gender."  Do you see that?

9   A.   Yes.

10  Q.   Why does SEVIS keep records of this sort of information?

11  A.   Because by law, we need to know exactly who's coming into

12  the country and be able to identify them.

13  Q.   And then down at the bottom of this section, do you see

14  "U.S. Address," and there it says, "620 Iris Avenue, Sunnyvale,

15  California"?

16  A.   Yes.

17  Q.   Why does SEVIS keep that kind of information?

18  A.   Because by law, you know, we need to know physically where

19  the student is living.

20  Q.   Why?

21  A.   Because -- because that's a requirement for physical

22  presence.  That's associated with coming in as a nonimmigrant.

23  Q.   And is there some importance also to the Department of

24  Homeland Security to knowing where people admitted to the

25  country are when they're here?

1    A.   Correct.

2    Q.   Or where they're recognized, rather?

3    A.   Right, exactly.

4    Q.   Not tracking every --

5    A.   No.

6         MS. WEST:  Okay.  Can we go to the next column over,

7    please, the program information.

8    BY MS. WEST:

9    Q.   Do you see there at the top, it says, "Status Terminated"?

10   A.   Yes.

11   Q.   What does that refer to, if you know?

12   A.   It means when the student was here after they had been

13   admitted into the country as a student, that they had fallen

14   out of -- they did something to violate their status.

15   Q.   And then "Visa Type:  F-1."  Do you see that?

16   A.   Yes.

17   Q.   Just below "F-1," do you see "School Status:  Withdrawn"?

18   A.   Yes.

19   Q.   And "School Name:  Tri-Valley University"?

20   A.   Yes.

21   Q.   Do you know that Tri-Valley University's status as an

22   SEVP-approved school was, in fact, withdrawn?

23   A.   Yes.

24   Q.   Below that, we have education level of doctorate, a major.

25   There's some information there.  Is that -- why is that

1    something that SEVP tracks?

2    A.   Because we want to be sure the designated school official

3    who issued the document, in fact, issued it for a program of

4    study that they were, in fact, approved for.

5           MS. WEST:  Okay.  And can we now do the left half of

6    the bottom column of the stage, "Financial Information"?

7        Thank you, Ms. Hughes.

8    BY MS. WEST:

9    Q.   What is this?

10   A.   This is the financial information report that the

11   designated school official recorded about the student.

12   Q.   Why is this something that SEVP tracks?

13   A.   Because by law, a -- a nonimmigrant that comes into the

14   country for reason of study has to essentially have the funds

15   in order to do so.

16   Q.   Why?

17   A.   So they don't become a burden on the United States.

18          MS. WEST:  Your Honor, that's all I have with this

19   exhibit.  If this is a good breaking point for the Court, it's

20   good for us.

21          THE COURT:  This is very good -- this is a very good

22   place to break for the day.

23       Members of the jury, you've finished your first day sitting

24   on this jury, and you've got a lot of information.  You've got

25   jury instructions and opening statements and a lot of evidence,

1    and I appreciate your close attention.  As I told you, this is

2    an important thing that you're doing as citizens, this job that

3    you're doing.  We really appreciate it.

4        I'll remind you of my prior admonition not to communicate

5    with anybody about this case, not to receive information or

6    give anybody -- give information -- excuse me -- to anybody,

7    not go on the Web, communicate information or receive

8    information from social websites, not to search for information

9    on the Internet using a search engine.

10       Just leave the case right here where it belongs.  I'm sure

11   you have other interesting things in your life you can be doing

12   or thinking about or talking about.  Again, that issue is very

13   important.  If anybody asks you about the case, just tell them

14   you're a juror in the case, it's a criminal case, tell them

15   about how long it's expected to take, and that's it.

16       I appreciate your service.  I look forward to seeing you

17   tomorrow morning at 8:30.  Just remember that this week only,

18   we will not be in session on Thursday.  So tomorrow will be the

19   last day that we'll be in session for this week.

20       Thank you.

21            THE CLERK:  All rise.

22       (Proceedings were heard out of the presence of the jury:)

23            THE COURT:  Okay.  We're outside the presence of the

24   jury.

25       Ms. Warner, you can step down.  I'll order you to return

```
 1        tomorrow at 8:30 tomorrow morning --

 2                 THE WITNESS:  8:30?

 3                 THE COURT:  -- to resume your testimony.

 4                 THE WITNESS:  Okay.

 5                 THE COURT:  Thank you.

 6        I have something to place on the record briefly before I

 7   hear from counsel to see if they have any input.

 8        You may have observed during the trial that one of our

 9   jurors Ms. Fitzgerald, Juror No. 8, was experiencing a small

10   bout of drowsiness.

11                 MR. BABCOCK:  Yes.

12                 THE COURT:  And I received a note at 12:49 p.m. from

13   my courtroom deputy to that effect, and I do as I often do

14   before, which is I asked Mr. Noble without calling a halt to

15   the proceedings to simply bring her a cold cup of water.

16        And I have often found that the combination of the

17   refreshing quality of the cold cup of water and the mild

18   embarrassment at having the courtroom deputy bring it to you in

19   the middle of the proceedings are sufficient to cure any

20   drowsiness problem, and we all know it's not unusual for jurors

21   to become drowsy.

22        I don't have any lingering concerns about this, but I will

23   say that I'll continue to observe Ms. Fitzgerald's appearance

24   during the trial, and I would invite you to do the same, and if

25   it appears to be an ongoing issue, I'll talk about it.
```

1    MS. WEST:  And I will try to liven up as well the

2    remaining probably ten to 15 minutes of this witness's

3    testimony.  Sorry it's been so tedious.

4         THE COURT:  I would not describe her testimony as

5    tedious.  It's hard for -- most jurors are not accustomed in

6    their day-to-day lives to sitting passively and absorbing

7    information.  None of us do that in our day-to-day jobs, and so

8    it is -- it can be a challenge for jurors, and I'm -- and Ms.

9    Fitzgerald struck me during voir dire as extremely

10   conscientious, and I'm sure she'll make her best efforts.

11        MR. BABCOCK:  It's not just Ms. West, though.  I'll

12   say I did a closing argument in front of Judge Jensen once, and

13   I brought my fifth-grade son and asked him afterwards how --

14   how he thought, and he said, "Hecka boring."

15        THE COURT:  So does anyone have anything else that

16   needs to be placed on the record before we break for the day?

17        MR. BABCOCK:  I'd just ask -- find out who else we're

18   going to have tomorrow after Ms. What's Her Name is off the

19   stand, but she'll be a while in the morning?

20        MS. WEST:  Yeah.

21        THE COURT:  I'm going to allow that order to be

22   self-executed.

23        MR. BABCOCK:  Yeah.

24        THE COURT:  If you don't obtain satisfaction, you let

25   the Court know.  I'm not --

1          MR. BABCOCK:  I'm not worried.

2          THE COURT:  I know you're government lawyers.  So I'm

3     sure Ms. West will tell you all about that when we break for

4     the day.

5          MS. WEST:  Satisfaction guaranteed.

6          THE COURT:  Anything else we need to talk about?

7          MS. WEST:  I don't think so.

8          THE COURT:  Very good.

9        Thank you all.  Court is in recess.

10         MS. WEST:  Thank you.

11         MR. BABCOCK:  Thanks, Judge.

12         MR. RHYNE:  Thank you, your Honor.

13         THE CLERK:  All rise.

14       Court is in recess.

15                  (Proceedings adjourned at 1:35 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, James C. Pence, Federal Official Realtime Court

6    Reporter, in and for the United States District Court for the

7    Northern District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14                          Dated this 10th day of June, 2014.

15

16

17          _____

                   JAMES C. PENCE, RMR, CRR, CSR NO. 13059
18                 FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25