1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          BEFORE THE HONORABLE JON S. TIGAR

4   UNITED STATES OF AMERICA,        )
                                     ) Volume 3
5              Plaintiff,            ) Pages 346 - 533
                                     )
6        VS.                         ) NO. 11-00288 JST
                                     )
7   SUSAN XIAO-PING SU,              )
                                     ) San Francisco, California
8              Defendant.            ) Wednesday, March 5, 2014
    _____ ) 8:36 a.m.

9

10          **TRANSCRIPT OF COURT PROCEEDINGS**

11
    **APPEARANCES:**

12

13   **For Plaintiff:**          MELINDA HAAG
                                  UNITED STATES ATTORNEY
14                                1301 Clay Street, Suite 340S
                                  Oakland, California 94612
15                        BY:    **HARTLEY M.K. WEST, ESQ.**
                                 **WADE M. RHYNE, ESQ.**
16                               **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**          Law Offices of Erik G. Babcock
18                               717 Washington Street, Second Floor
                                 Oakland, California 94607
19                        BY:    **ERIK G. BABCOCK, ESQ.**
                                 **ATTORNEY AT LAW**

20

21

22

23

24

     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                 Official Court Reporter - U.S. District Court
                   Computerized Transcription By Case CATalyst

<pre>                        I N D E X

Wednesday, March 5, 2014 - Volume 3

GOVERNMENT'S WITNESSES                          PAGE  VOL.

WARNER, SUSANNA (RECALLED)
(PREVIOUSLY SWORN)                               361   3
Direct Examination (Resumed) by Ms. West         361   3
Cross-Examination by Mr. Babcock                 380   3
Redirect Examination by Ms. West                 433   3
Recross-Examination by Mr. Babcock               440   3

LUO, HAO
(SWORN)                                          442   3
Direct Examination by Mr. Rhyne                  442   3
Cross-Examination by Mr. Babcock                 453   3

JING, QI
(SWORN)                                          463   3
Direct Examination by Mr. Rhyne                  464   3
Cross-Examination by Mr. Babcock                 469   3

LIOU, SHY SHENG
(SWORN)                                          474   3
Direct Examination by Ms. West                   474   3
Cross-Examination by Mr. Babcock                 497   3
Redirect Examination by Ms. West                 506   3

BAYER-BRORING, CAROLYN
(SWORN)                                          511   3
Direct Examination by Ms. West                   512   3

                     E X H I B I T S


COURT'S EXHIBITS                           IDEN EVID VOL.

  A                                        349        3


GOVERNMENT'S EXHIBITS                      IDEN EVID VOL.

  10                                       361  363  3

  11                                       378  379  3

  30                                       362  363  3

  31                                       378  379  3
</pre>

1                        **I N D E X**

2                      **E X H I B I T S**

3

4      **GOVERNMENT'S EXHIBITS**                    **IDEN** **EVID** **VOL.**

5        51                                         378   379   3

6        60                                         362   363   3

7        61                                         378   379   3

8        70                                         362   363   3

9        71                                         379   379   3

10       80                                         363   363   3

11       81                                         379   379   3

12       102                                              479   3

13       112                                        518   519   3

14       420                                        363   364   3

15       430                                        371   371   3

16       440                                        373   374   3

17

18

19

20

21

22

23

24

25

```
1    Wednesday, March 5, 2014                          8:36 a.m.

2                          ---oOo---

3         (Proceedings were heard out of the presence of the jury:)

4         THE COURT:  Good morning.

5         We're calling Case No. 11-288, matter of the United States

6    versus Susan Su.  Defendant is present.  Counsel are present at

7    counsel table.  We're outside the presence of the jury.

8         And it came to my attention within the last half an hour

9    that yesterday or very, very early this morning, the defendant

10   appears to have sent an electronic mail message to Vandana,

11   V-a-n-d-a-n-a, Satija, S-a-t-i-j-a, who was a witness who

12   testified yesterday.

13        I'll ask my courtroom deputy to mark a copy of that exhibit

14   as Court Exhibit A so that it will become part of the

15   proceedings and will not be an admitted exhibit obviously for

16   the jury's consideration, but we will have a paper record of

17   it.

18             (Court's Exhibit A marked for identification.)

19             THE COURT:  I have my own thoughts about this.  You

20   know, I've not heard from the parties yet obviously.  So I need

21   to do that.

22        I'll hear first from the Government, please.

23             MS. WEST:  Well, I think there's a couple of things

24   to note.  I think substantively we're not asking the Court to

25   take any action based on the e-mail that the defendant has sent
```

1    to the Court and to counsel, but I do think it is probably

2    appropriate to note two things at this point, one being that

3    the Government is aware and has made defense counsel aware that

4    the defendant, who we believe is the defendant and defense

5    counsel has confirmed is the defendant, has been sending

6    e-mails over the last week or so to a number of Government

7    witnesses under various different names, various names for the

8    defendant.

9               THE COURT:  Yes.

10        And for the record, the e-mails which I referred to a

11   moment ago -- and I believe there actually were two e-mails --

12   were sent under the name Susan Stanton.

13              MS. WEST:  Correct.  And then for the last week or

14   so, there was the use of the name Dacey Dale, and then there

15   was one name prior to that which is not coming to me right now.

16        Do you recall?

17              AGENT MACKEY:  Josie Jo.

18              MS. WEST:  Josie Jo; is that right?

19              AGENT MACKEY:  That's correct.

20              MS. WEST:  So our witnesses have been receiving

21   communications from who we believe is the defendant.  It

22   appears from the communications that it is the defendant.  We

23   have discussed this with defense counsel.  It is something that

24   frankly we will be asking for an obstruction charge based on

25   later, but I don't think that that needs to come in this part

1    of the trial.  At this point, we don't have a reason to believe

2    so.

3         The one other thing is a slightly different topic.  So we

4    can finish this one first and then turn to that one.

5              THE COURT:  I would like to complete this topic.

6         Mr. Babcock, do you want to be heard?

7              MR. BABCOCK:  Please.  Thank you, your Honor.

8              THE COURT:  And let me ask you in your remarks to

9    address a couple of things.

10        First, I would note that Ms. Su, I believe, arrived a

11   couple minutes after 8:30 this morning.

12             MR. BABCOCK:  She did.

13             THE COURT:  And it was my -- it's -- this is a matter

14   that we need to resolve outside the jury's presence.

15        It hadn't occurred to me that the defendant's presence

16   might be necessary to start the jury trial on time, but I am

17   considering modifying her conditions of pretrial release under

18   18 United States Code Section 3142 with regard that she also

19   appear each morning at 8:00 a.m.

20        Much more importantly, I am considering modifying the

21   conditions of pretrial release to provide that she not have any

22   contact with witnesses in this case either directly or

23   indirectly except through you or your authorized

24   representative, which is stronger and stricter language than is

25   contained in her current conditions of pretrial release, which

1    I reviewed before I took the bench this morning.

2        I also have a concern, although I don't intend to address

3    it in any detail now, about the source of Ms. Su's contact

4    information for these witnesses, and I have reviewed modified

5    conditions of pretrial release that were submitted earlier in

6    this case that related to the provision of confidential

7    discovery and the restrictions on the use of that discovery.

8        I say that not because I'm considering doing anything about

9    that this morning but just so that I find a concern -- that

10   everybody understands that --

11           MR. BABCOCK:  Certainly.

12           THE COURT:  -- and Ms. Su understands that I am

13   not -- so anyway, if you could indicate whether the defendant

14   would object to either of those two modifications in the

15   context of your remarks, I'd appreciate that.

16           MR. BABCOCK:  Certainly.

17       For starters, I did not -- let's -- your clerk has printed

18   out the e-mails for me, and it appears that I was cc'ed on

19   them.  I did not get them for whatever reason, but Ms. West

20   informed me about them this morning and showed them on her

21   iPhone when I arrived.  The Court mentioned one.  I think there

22   were actually two, the 3:18 and 3:41.

23           THE COURT:  Yes.

24           MR. BABCOCK:  I don't object to the Court's proposed

25   modification.  I have indicated to my client that when she

1    arrived -- and she apologizes for being late -- that it's not

2    appropriate for her to communicate with the Court or the

3    prosecutors or particularly with witnesses, and any issues she

4    wants to raise should be raised with me first.

5        I do -- as far as contact information -- I mean, Ms. Su has

6    had this particular witness's e-mail for years before this case

7    was ever charged.  I didn't ask her where she got it.  I don't

8    even know if this is still a good --

9            THE COURT:  And I'm not asking you to provide that

10   information --

11           MR. BABCOCK:  Okay.

12           THE COURT:  -- and I don't have any reason to doubt

13   what you're saying.

14           MR. BABCOCK:  So she does need to be here on time --

15           THE DEFENDANT:  Yes.

16           MR. BABCOCK:  -- and she should be here at 8:00.  She

17   thought she could be here at 8:30 today but was a little later

18   than -- running a little late, and obviously she was up quite

19   late last night -- or very early, I suppose, but I think it was

20   quite late.

21           THE COURT:  Thank you, Mr. Babcock.

22       I am now ordering pursuant to 18 United States Code Section

23   3142 -- and I will ask the Government to prepare an order that

24   reflects these modified conditions of pretrial release and have

25   that order to me by the close of business today -- that in

1    addition to whatever existing conditions there may be, that

2    there be two additional conditions.

3        Number 1.  That Ms. Su appear each day at the trial not

4    later than 8:00 o'clock a.m. unless otherwise ordered by the

5    Court and that in general she be on time for all the pretrial

6    proceedings as a condition of release in this case.

7        Secondly, that Ms. Su is to avoid all contact with any

8    alleged victim of the crimes alleged in this case and with a

9    potential witness who may testify, who is testifying, or who

10   has testified concerning the offenses alleged in this case

11   reflecting the language contained in the 18 United States Code

12   Section 3142 Subpart (c)(1)(B)(v).

13       Ms. Su, I think you're an intelligent woman, but I'll say

14   this anyway because it's important for me to make it clear to

15   you.  Conditions of pretrial release means that rather than

16   being in custody during the pendency of this proceeding, you

17   are permitted to be at liberty, but that permission is granted

18   by the Court subject to your compliance with certain

19   conditions.

20       I don't have any reason yet to know that you knew or

21   thought that you were doing something wrong in sending e-mails

22   that you sent, and I'm not going to have any further hearing

23   about that right now.  But it needs to be clear to you that

24   effective immediately there's no further contact and that

25   you're going to be on time for this proceeding.

1              THE DEFENDANT:  Yes.

2              THE COURT:  Is that clear to you?

3              THE DEFENDANT:  Yes.  Yes.

4              THE COURT:  Thank you.

5         Do we need to address that topic any further?

6              MS. WEST:  I don't think so.

7              THE COURT:  Mr. Babcock, anything further on that

8    topic?

9              MR. BABCOCK:  No, your Honor.

10             THE COURT:  Ms. Su, why don't you have a seat.

11             THE DEFENDANT:  Thank you.

12             THE COURT:  Ms. West, you had something else you

13   wanted to address?

14             MS. WEST:  Yes, and it's just to flag it for the

15   Court.  We were advised by one of the court security officers

16   this morning that the defendant had contact, sounds like, on

17   Monday with one or more of the jurors or potential jurors.  It

18   sound like it was before the jury was empaneled.

19        We're not asking for any action but, again, to just draw it

20   to the Court's attention.  I don't think that the Court needs

21   to do anything to voir dire the jury about it, but I -- we just

22   learned that.  So we wanted to let the Court know, and we've

23   advised Mr. Babcock as well.

24             THE COURT:  I don't -- are there any requests?  I

25   don't think the Government is making any requests for relief,

1     but your comments are noted for the record.

2          Mr. Babcock, do you want to be heard?

3               MR. BABCOCK:  No, your Honor.

4               THE COURT:  All right.  Anything else?

5               MS. WEST:  No.

6               MR. BABCOCK:  I think we're ready.

7               THE COURT:  Very good.

8               THE CLERK:  Your Honor, we were waiting on one juror.

9               THE COURT:  Oh.  Okay.

10              MR. BABCOCK:  Oh.

11              THE CLERK:  I can go check.

12              THE COURT:  This is just off the record.

13              THE CLERK:  I'll go see if she's here.

14              THE COURT:  I'd like to thank court security staff.

15    It appears that the need for your services is now over.  Thank

16    you.

17              MS. WEST:  There is one additional matter.  I don't

18    know if the Court wants to go back on the record.  We can --

19              THE COURT:  Oh, yes.

20          Mr. Babcock, I think there's -- is this the evidentiary

21    issue about Exhibit 2?

22              MS. WEST:  I think I resolved that with the clerk,

23    but we can address that also.

24              THE COURT:  Okay.  You wanted to talk about something

25    else?

1          MS. WEST:  Well, what my very good co-counsel was

2     pointing out was that because the Court has marked for

3     identification as Exhibit A the e-mail that the Court received,

4     if the Court likes, we can make copies of and mark as B, C, and

5     D the e-mails that witnesses forwarded to us from who we

6     understand to be Susan Su in the last week or so, if the Court

7     likes.

8          THE COURT:  I would -- I would want you to do that,

9     but let me ask you:  Have you already shared the e-mails with

10    Mr. Babcock?

11         MS. WEST:  We've already --

12         THE COURT:  So why don't you talk about that amongst

13    yourselves, and if there's any dispute --

14         MS. WEST:  Sure.

15         THE COURT:  -- about whether those should be marked

16    or whether they should become part of the record, you can raise

17    that after you've had that conversation.

18         MS. WEST:  That's fine.

19         THE COURT:  All right.  Very good.

20         MS. WEST:  And as for Exhibit 2, I -- I've confirmed

21    that what I -- what I showed to the jury and the witness and

22    what we talked about was actually Exhibit 2.  Unfortunately,

23    what I handed to Mr. Noble was Exhibit 2A.  So I think that we

24    got to a place where we can just substitute 2 for 2A since

25    that's what I had intended to hand to Mr. Noble.

1              THE COURT:  Yes.  The written record is already

2      clear.  It's now -- but we're going to make a physical record

3      consistent with it?

4              MS. WEST:  Exactly.

5              THE COURT:  Very good.

6              MS. WEST:  So I've already done that swap.

7         Thank you.

8              THE COURT:  All right.

9              MS. WEST:  And I thank Mr. Noble for drawing that to

10     my attention.

11             THE COURT:  All right.  Very good.

12        Anything further?

13             MS. WEST:  No.

14             THE COURT:  All right.  Let's wait for the jury.

15        Ms. West --

16             MS. WEST:  Yes.

17             THE COURT:  -- I'm going to hand it to Mr. Pence, and

18     then none of us will talk while he hands to you --

19             MS. WEST:  Okay.

20             THE COURT:  -- the language from Section 3142 that I

21     marked and then quoted from a moment ago so that your order can

22     reflect the Court's comments without your having to get a

23     transcript.

24             MS. WEST:  Thank you.

25             THE COURT:  Very good.

1          MS. WEST:  I was taking thorough notes, but this is

2     even better.  Thank you.

3          THE COURT:  Oh.  While we're still outside the jury's

4     presence, let me tell you that I don't know about the paper

5     editions, but the stories about the opening at the trial did

6     appear in the online editions of both the *Contra Costa Times*

7     and the *San Jose Mercury News*.

8       So I just wanted to advise the jurors that I'm aware of

9     that and remind them not to read any accounts of the jury and

10    thus --

11         MS. WEST:  And I saw it in the *Oakland Tribune* as

12    well.

13         THE COURT:  Oh.  Okay.

14         MR. BABCOCK:  We've got Oakland folks and more

15    Oakland jurors than I have in my Oakland trials.

16         THE COURT:  It is funny actually because -- well,

17    this is -- I'm not going to burden the record with this.  Your

18    comment is consistent with my experience in the state court.

19         MR. BABCOCK:  Off the record.

20              (Discussion off the record.)

21         THE CLERK:  Your Honor, she made it.  She was having

22    BART issues.

23         THE COURT:  Very good.

24         THE CLERK:  So --

25         THE COURT:  Okay.  All is well.

```
1              Let's stand up for our jurors.

2              MS. WEST:  Should we bring the witness back on the

3     stand now or wait until they come in?

4              THE COURT:  Oh.  That's a nice idea.  Let's get her

5     on the stand.  Then we can just get started when the jurors

6     come in.

7              (Proceedings were heard in the presence of the jury:)

8              THE COURT:  Good morning.  We're on the record in the

9     United States versus Su trial.  All the jurors are in their

10    assigned seats.

11             Good morning again, members of the jury.  The BART

12    conspired this morning to make it difficult for one of you to

13    be here, and I know that, and I know that's the reason.  I also

14    take the BART, and I saw that service divider, but it didn't

15    affect me personally because I wasn't on that line.  Anyway,

16    that's fine.  We'll resume the testimony of Ms. Warner in just

17    a moment.

18             I wanted to tell you that, of course, right after I

19    instructed you that I didn't think you needed to worry about

20    news reports, moments later there was a report -- an edition

21    about this trial in the *Contra Costa Times*, the *Oakland*

22    *Tribune*, and the *San Jose Mercury News*.  There may have been

23    reports in other online outlets, and there may have been

24    reports in paper editions as well.

25             So I just want to remind you how important it is that you
```

1    not listen to, read, or watch any news reports about this

2    trial.  You may -- you know, a headline may flash in front of

3    you at some point, and in that case, just close that page if

4    you're online or turn the page if it's the newspaper or what

5    have you, but this will allow no ex parte contact or

6    information.  It's very important.  So I just wanted to remind

7    you about that.

8         Ms. Warner is still on the stand.

9         Ms. Warner, I'll remind you you're still under oath.

10        Mr. -- excuse me.  Ms. West, your witness.

11           MS. WEST:  Thank you.

12                        **SUSANNA WARNER,**

13   Called as a witness by the Government, having previously been

14   sworn, resumed the stand and testified further as follows:

15                   **DIRECT EXAMINATION (RESUMED)**

16   BY MS. WEST:

17   Q.  Ms. Warner, when we left off yesterday, we had just looked

18   at what you had referred to as a SEVIS student information

19   screenshot; is that right?

20   A.  Yes.

21   Q.  And I am going to hand you a series of exhibits, and I'm

22   just going to ask you to take a look at each of them and tell

23   me if each of these is another SEVIS-initialed -- I'm sorry --

24   SEVIS student information screenshot.

25        (Government's Exhibit 10 marked for identification.)

WARNER - DIRECT (RESUMED) / WEST

1    BY MS. WEST:

2    Q.   And if you can just start with the top exhibit, is that

3    Exhibit -- what's been marked for identification as Government

4    Exhibit 10 -- is that a student information screenshot from

5    SEVIS?

6    A.   Yes.

7         (Government's Exhibit 30 marked for identification.)

8    BY MS. WEST:

9    Q.   How about Exhibit 30?

10   A.   That's the one in the pile?

11   Q.   Yes.

12   A.   Okay.  Yes, that's a student screenshot.

13        (Government's Exhibit 60 marked for identification.)

14   BY MS. WEST:

15   Q.   Can you turn, please, to the folder that is marked

16   Government Exhibit 60.

17   A.   Yes.

18   Q.   Is that also a student information screenshot --

19   A.   Yes.

20   Q.   -- from SEVIS?

21   A.   Yes.

22        (Government's Exhibit 70 marked for identification.)

23   BY MS. WEST:

24   Q.   How about Exhibit 70?

25   A.   Yes, it's a student screenshot.

1          (Government's Exhibit 80 marked for identification.)

2     BY MS. WEST:

3     Q.   And Exhibit 80?

4     A.   Yes, student -- student screenshot.

5     Q.   And these are all -- sorry.  Student screenshot?

6     A.   Yes.

7     Q.   And these are all records from SEVIS?

8     A.   Correct.

9          MS. WEST:  The Government offers Exhibits 10, 30, 60,

10    70, and 80 into evidence.

11         THE COURT:  Any objection?

12         MR. BABCOCK:  No objection.

13         THE COURT:  Each of the exhibits is admitted.

14         (Government's Exhibits 10, 30, 60, 70, and 80 received in

15    evidence.)

16         MR. BABCOCK:  Sorry.  10, 30, 60, 70, and 80?

17         MS. WEST:  Yes.

18         MR. BABCOCK:  Thank you.

19         (Government's Exhibit 420 marked for identification.)

20    BY MS. WEST:

21    Q.   All right.  I am now going to show you what is marked for

22    identification as Government Exhibit 420 and ask if you

23    recognize this.

24    A.   Yes, I recognize it.

25    Q.   What is it?

1     A.   It's an event history out of SEVIS for a particular

2     student.

3               MS. WEST:  The Government offers Exhibit 420 in

4     evidence.

5               THE COURT:  Any objection?

6               MR. BABCOCK:  No objection.

7               THE COURT:  Exhibit 420 is admitted.

8          (Government's Exhibit 420 received in evidence.)

9               MS. WEST:  Quickly pull up Exhibit 420, Ms. Hughes,

10    and if we can enlarge, please, the top half of this page.

11    Actually, if you can do just the -- the center part under

12    "Event History."  No.  I'm sorry, the part above that.

13         That's fine.  Thank you.

14    BY MS. WEST:

15    Q.   Under "Event History" here, do you see the name "Vishal

16    Dasa"?

17    A.   Yes.

18    Q.   Can you tell us, please, what is an event history.

19    A.   An event history is the record that's within SEVIS.  From

20    here, it's for a student.  They also keep one for schools that

21    tells us every time somebody touches that record and who, in

22    fact, touched the record.

23    Q.   The record in SEVIS?

24    A.   Yes.

25    Q.   All right.  So -- and then the top information that we're

1    looking at right here -- is this just sort of biographical

2    information about the student?

3    A.   Correct.

4    Q.   Okay.  So we see a SEVIS ID number above the individual's

5    name?

6    A.   Correct.

7    Q.   And you explained to us yesterday that's just a unique

8    identifying?

9    A.   Correct.

10   Q.   And then we have a date of birth, the country of birth.  Do

11   you see that?

12   A.   Yes.

13   Q.   Gender?

14   A.   Yes.

15   Q.   Country of citizenship?

16   A.   Yes.

17   Q.   And then the school name, Tri-Valley University?

18   A.   Correct.

19   Q.   Program, start and end date?

20   A.   Correct.

21   Q.   "Visa Type."  Here, F-1?

22   A.   Yes.

23   Q.   Okay.  And then there at the bottom, it says, "Status:

24   Terminated"?

25   A.   Correct.

1          MS. WEST:  Okay.  If we could please go to Page 2 of

2     this exhibit, Ms. Hughes, and let's enlarge just the top

3     quarter of it so hopefully we can read it.

4          That's good.  Thank you.

5     BY MS. WEST:

6     Q.   This is the top of Page 2 of Exhibit 420, and do you see

7     there's a number of columns here?  Can you just tell us what

8     each of these columns is about?

9     A.   Okay.  So to the far left where it starts, "Record

10    Created," that is the column that tells you the type of action

11    that was taken on the record.  So right there, it's indicated

12    where it says, "Record Created" that that's -- they created an

13    initial -- well, you can go over everything.  See where it says

14    record?  But the initial record for the student, the next

15    column from the left, is the date that that occurred.

16         The third column is the status that the student was in

17    when -- when the action was taken, when we discussed initial --

18    the initial record yesterday.  The middle column is the school

19    that took the action.  Then over to the right before the end,

20    the column between "School" and the very end column, that's the

21    school code.  That's a unique identifier for a particular

22    school, and then the very last column to the right is the

23    actual designated school official who took that action.

24    Q.   Thank you.

25         Now, the left column where we see "Record Created" and then

1    "Transfer Completed" and then "Registration" and so forth --

2    why is that column of information important to SEVP?

3    A.   Because it tells us every -- every action that was taken on

4    the record.  So -- so it doesn't matter whether it was

5    something that came through the system or not, but we need to

6    know every single time the record was touched because it could

7    potentially change the student's immigration status.

8    Q.   All right.  Now, let's look at the column that has

9    "Initial" and "Active" in it.  Do you see that?

10   A.   Uh-huh.  Yes.

11   Q.   What is "Initial"?

12   A.   "Initial" means it's the first time a student attended a

13   particular school.

14   Q.   Okay.  Is that --

15   A.   Well, they're expecting the student to attend the school.

16   Q.   So is that from the initial I-20 that we looked at

17   yesterday?

18   A.   Yes.

19   Q.   And basically, that means that that's the date that the

20   initial I-20 was issued?

21   A.   Correct.

22   Q.   Okay.  Then how about the rightmost column where it's

23   "Names"?

24   A.   That's the designated school official who took the action.

25   Q.   Now, why is that important?

1    A.   Because we -- again, it goes back to the warning in the

2    beginning.  We need to monitor the system because these people

3    are the ones that are responsible for determining if a student

4    can legally come into the country, if they're legally in status

5    while they're here.  You know, they keep their immigration

6    status while they're here.  So every time that they touch the

7    record, we want to know exactly what action they've taken for

8    that student.

9    Q.   Okay.  Below the initial line, we have one transfer

10   completed, a date, and then "Active."  Do you see that?

11   A.   Correct.

12   Q.   What is the "Active" there?

13   A.   The "Active" means -- okay.  So when a student first comes

14   into the country, you get an initial I-20, and that's what they

15   use to obtain their visa to come through custom and border

16   protection, you know, when they get to the airport.  And then

17   when they arrive at the school, the initial -- the initial

18   status tells the system the student hasn't started to attend

19   classes yet.

20        So the record remains in initial status.  Once the student

21   shows up at the school, they -- and the school official

22   indicates that the student has shown up, then that record will

23   change to active, and the same thing happens when you transfer.

24   So if you see the student previous to the initial status in the

25   middle column, they had attended another school, the

1    International Technological University, and that student had

2    transferred its -- the student's record to Tri-Valley.

3         So the record kicked back into initial status to let the

4    school -- the designated school officials at Tri-Valley know to

5    expect that student for attendance there.  Then once the

6    student showed up, Mr. Wang had indicated in the system that

7    the transfer was completed and changed the record to active

8    status, and you can see they indicated by "Transfer Completed,"

9    and then the next line down that says, "Registration."  That

10   means that -- that the student had reported to them and

11   enrolled in classes.

12   Q.  All right.  So can we tell from this document, then, that

13   Vishal Dasa -- somebody named Vishal Dasa got an initial I-20

14   on September 8th, 2009?

15   A.  Yes.

16   Q.  And then became active at Tri-Valley University on

17   September 12th, 2009?

18   A.  Yes.

19          MS. WEST:  And, Ms. Hughes, can we now go to the --

20   the last few lines of this page, just, like, the last four

21   lines maybe?

22       That's fine.  Thank you.

23   BY MS. WEST:

24   Q.  Are you able to tell from the same document whether Vishal

25   Dasa at some point was no longer in active status at Tri-Valley

1    University?

2    A.   Yes.

3    Q.   How so?

4    A.   The -- not the bottom line, but the line above it where --

5    on the far left-hand side where it says, "Termination," that

6    means that the student had for some reason fallen out of

7    immigration status and the record was changed.

8    Q.   Okay.  And you see, then, in the third column from the left

9    "Terminated"?

10   A.   Third column from -- yes.

11   Q.   And the date there, January 18th, 2011?

12   A.   Yes.

13   Q.   Now, if we look at the layover to the right, it doesn't

14   have an individual's name.  It says, "SEVIS Data Fix."  What

15   does that mean?

16   A.   It means that somebody -- okay.  There's two ways they can

17   take action -- SEVP can take action in the system.  One is they

18   have automatic SEVIS jobs that just run.  That one was --

19   somebody manually in SEVIS went in and took that action.

20   Q.   Okay.  Now, are you aware that Tri-Valley University's

21   certification with SEVP was at some point withdrawn?

22   A.   Yes.

23   Q.   And do you recall that having been in approximately

24   January 2011?

25   A.   Right.

```
 1                   MS. WEST:  We can take that down now.  Thank you.

 2              (Government's Exhibit 430 marked for identification.)

 3         BY MS. WEST:

 4         Q.  I'm going to show you Exhibit 430 and ask you if you

 5         recognize that.

 6         A.  Yes.

 7         Q.  Is that another event history?

 8         A.  Correct.

 9         Q.  For what individual?

10         A.  You're going to make me say this?  Tushar Paropkar Tambe.

11                   MS. WEST:  The Government offers Exhibit 430 in

12         evidence.

13                   THE COURT:  Any objection?

14                   MR. BABCOCK:  No objection.

15                   THE COURT:  Exhibit 430 is admitted.

16              (Government's Exhibit 430 received in evidence.)

17                   MS. WEST:  Can we please pull up the top half of

18         the -- Page 1 of Exhibit 430.

19              Thank you.  Perfect.

20         BY MS. WEST:

21         Q.  Okay.  So this event history, as you stated, for Tushar

22         Tambe -- do you see that?

23         A.  Yes.

24         Q.  And then his biographical information there?

25         A.  Correct.
```

1    Q.   And school name, "Tri-Valley University"?

2    A.   Correct.

3    Q.   "F-1" -- "F-1 Visa."  Do you see that?

4    A.   Uh-huh.

5    Q.   And at some point deactivated?

6    A.   Yes.

7    Q.   Okay.  Can you tell from looking at the document in front

8    of you -- and then we'll go ahead and pull it up for the jury

9    to see -- when this individual began attending Tri-Valley

10   University?

11   A.   Yes.

12   Q.   Or had first contact with Tri-Valley University?

13   A.   Yes.

14   Q.   When would that have been?

15   A.   It would be -- the first contact with Tri-Valley was on

16   January 17th, 2010.

17          MS. WEST:  And, Ms. Hughes, can we go back to the

18   whole page and then fix -- enlarge for the jury to see

19   beginning with "January 17th, 2010," and through the bottom --

20   "January 17th," about halfway down?  No, the bottom half.

21   BY MS. WEST:

22   Q.   Okay.  And are you referring, Ms. Warner, to the line where

23   it says, "Record Created" in the left-hand column and then

24   "January 17th, 2010"?

25   A.   Yes.

1    Q.   And then after that, "Initial"?

2    A.   Yes.

3    Q.   And who is the DSO who is listed here as having input the

4    initial I-20?

5    A.   Sophie Su.

6    Q.   At some point, does this individual Mr. Tambe become

7    active?

8    A.   Yes.

9    Q.   When is that?

10   A.   I have to look at this.  Sorry.

11        It would be on January 19th, 2010.

12   Q.   And does this individual then remain in active status again

13   until January 18th, 2011?

14   A.   Yes.

15   Q.   At -- what happens on January 18th, 2011?

16   A.   His -- the record was terminated.

17   Q.   And again, is that "SEVIS Data Fix"?

18   A.   Correct.

19   Q.   Showing the manual entry?

20   A.   Yes.

21   Q.   Just like what we looked at on Exhibit 420?

22   A.   Yes.

23        (Government's Exhibit 440 marked for identification.)

24   BY MS. WEST:

25   Q.   Okay.  I'm going to ask you now to take a look, please, at

1    Exhibit 440 and tell me if you recognize this.

2    A.   Yes, I recognize it.

3    Q.   What is it?

4    A.   It's a student event history.

5         MS. WEST:  Can we -- the Government offers

6    Exhibit 440, please.

7         THE COURT:  Any objection?

8         MR. BABCOCK:  No objection.

9         THE COURT:  Exhibit 440 is admitted.

10   (Government's Exhibit 440 received in evidence.)

11        MS. WEST:  Can we please pull up the top part of

12   Exhibit 440.

13        Thank you.

14   BY MS. WEST:

15   Q.   What individual is this event history for?

16   A.   Anji Reddy Dirisanala.

17   Q.   Okay.  And is this another individual from India, a male?

18   A.   Correct.

19   Q.   Here on F-1 status?

20   A.   Yes.

21   Q.   Attending Tri-Valley University, and at some point he is

22   deactivated?

23   A.   Correct.

24   Q.   Okay.  Can you tell perhaps by looking at the document in

25   front of you when this individual had first contact with

1    Tri-Valley University?

2    A.    February 8th, 2010.

3              MS. WEST:  Okay.  Ms. Hughes, can we pull up the

4    bottom half, please, of this -- front page of this exhibit

5    starting with "Tri-Valley University."

6         Thank you.

7    BY MS. WEST:

8    Q.    Okay.  Again, do we see the "Record Created" --

9    A.    Yes.

10   Q.    -- on the left?

11        And "Initial" is the status?

12   A.    Yes.

13   Q.    And who is the DSO who input this record into SEVIS

14   according to SEVIS records?

15   A.    Sophie Su.

16   Q.    At some point, did Mr. Dirisanala become active?

17   A.    Yes.

18   Q.    When was that?

19   A.    February 9th, 2010.

20   Q.    And then at some point, did this individual become

21   deactivated?

22   A.    Yes.

23   Q.    When was that?

24   A.    May 18th, 2010.

25   Q.    And who is the DSO who's listed there?

1    A.   Susan Su.

2    Q.   Can you tell us, please, what "deactivated" means.  How

3    does that differ from "terminated"?

4    A.   "Deactivated" means that the record was transferred.  So

5    per regulation, a school that creates a record is required to

6    retain that record in their SEVIS records.  So it indicates

7    that that student had prior to the deactivated record been at

8    Tri-Valley, but the student has since transferred to another

9    school.

10   Q.   And then do we see that reflected with "Transfer-Out

11   Initiated" and "Transfer Released"?

12   A.   Correct.

13   Q.   On the left-hand column?

14   A.   Yes.

15   Q.   Now, we saw on the last couple of event histories for

16   "Terminated" where it was a SEVIS data fix.  Are there other

17   reasons that an individual could be terminated by a school

18   itself?

19   A.   Yes.

20   Q.   Can you tell us some of those?

21   A.   Well -- well, okay.  Let me just start with this, is

22   that -- that part of the regulations say -- and law -- is that

23   it is the designated school official's primary responsibility

24   to do the termination.  We just use SEVIS as a backup.

25        So some of the reasons actually can be -- be completed by

 1    SEVIS as well as the DSO, but for instance, they terminate for

 2    failure to enroll, which means the student never showed up when

 3    they expected.  They can terminate for expulsion if a student

 4    gets expelled.  They can terminate for unauthorized

 5    withdrawals.  So that means that the student had been in the

 6    school but then just started, you know, failing to show up.

 7    Q.  How -- how about if a student fails to maintain what you

 8    referred to yesterday as, I think, normal progress to a full --

 9    toward a full course of study?

10    A.  Let me think about that one because there's, like, 25

11    different reasons they could terminate.  There -- they can

12    use -- let me think about this.  It could -- if the student

13    just failed to -- stopped going to class.  It could be

14    unauthorized withdrawal, which means withdrawal from school,

15    that they stopped altogether, if they just stopped going to

16    certain classes, but that's -- but they did keep up their

17    current course load.

18        Let me see.  Failure to enroll -- sometimes we use

19    something called otherwise failing to maintain status.

20    Q.  Is that a failure to maintain status if somebody is not

21    maintaining normal progress toward a full course of study?

22    A.  Yes.

23    Q.  Now, these records that we've been looking at, the event

24    histories -- is this something that the Department of Homeland

25    Security and in particular SEVP rely on, the information

1    contained in these?

2    A.   Yes.

3    Q.   How so?

4    A.   Because, you know, by law, DHS has to track all the

5    students, monitor all the students that are in the country, and

6    so we again rely on the designated school officials to do

7    proper reporting and them to take the proper actions when need

8    be.

9    Q.   Okay.  I'm going to hand you again a stack of records and

10   ask you to look through each one, and I'm just going to ask you

11   if this is another example of a SEVIS event history.

12        (Government's Exhibit 11 marked for identification.)

13   BY MS. WEST:

14   Q.   Can you take a look first at the top one, which should be

15   Government Exhibit 11?

16   A.   Yes, it's a SEVIS event history.

17        (Government's Exhibit 31 marked for identification.)

18   BY MS. WEST:

19   Q.   How about Exhibit 31?

20   A.   Yes, it's an event history.

21        (Government's Exhibit 51 marked for identification.)

22   BY MS. WEST:

23   Q.   Exhibit 51?

24   A.   Yes.

25        (Government's Exhibit 61 marked for identification.)

1    BY MS. WEST:

2    Q.   Exhibit 61?

3    A.   Yes.

4         (Government's Exhibit 71 marked for identification.)

5    BY MS. WEST:

6    Q.   Exhibit 71?

7              MR. BABCOCK:  Hold on a second, please.

8              MS. WEST:  Sorry.

9              MR. BABCOCK:  Thank you.

10   BY MS. WEST:

11   Q.   Is Exhibit 71 another SEVIS event history?

12   A.   Yes.

13        (Government's Exhibit 81 marked for identification.)

14   BY MS. WEST:

15   Q.   And Exhibit 81?

16   A.   Yes.

17             MS. WEST:  The Government offers in evidence Exhibits

18   11, 31, 51, 61, 71, and 81.

19             THE COURT:  Any objection?

20             MR. BABCOCK:  No objection.

21             THE COURT:  Exhibits 11, 31, 51, 61, 71, and 81 are

22   admitted.

23        (Government's Exhibits 11, 31, 51, 61, 71, and 81 received

24   in evidence.)

25             MS. WEST:  Thank you, Ms. Warner.

1          THE WITNESS:  Uh-huh.

2          MS. WEST:  No more questions.

3          THE COURT:  Mr. Babcock, cross-examination?

4          MR. BABCOCK:  If she's finished.

5          MS. WEST:  That fast.

6          MR. BABCOCK:  You have a bunch of papers for me on

7     the end there.

8          Just a second, your Honor, to get organized.

9                        **CROSS-EXAMINATION**

10    BY MR. BABCOCK:

11    Q.  Good morning, Ms. Warner.

12    A.  Good morning.

13    Q.  My name is Erik Babcock, and I represent Susan Su.

14    A.  Hi.

15    Q.  Maybe we can do -- go through a couple of documents that

16    you just looked at this morning for starters.

17         Ms. West just went through some of these event histories

18    with you --

19    A.  Uh-huh.

20    Q.  -- for several different students, and as I -- this is

21    basically -- correct me if I'm wrong -- a record of each time

22    someone goes into SEVIS for a particular student and does

23    something --

24    A.  Correct.

25    Q.  -- roughly; right?

1    A.    Uh-huh.

2    Q.    Okay.  With -- with the date -- with the -- identifying the

3    student, of course, the date of the -- the entry into the

4    system, and some description of what happened --

5    A.    Correct.

6    Q.    -- and some other information.

7          I'm looking at Exhibit 430 -- just a minute.  I'll get

8    it -- which is the -- the event history for Tushar Paropkar

9    Tambe.  I'm probably butchering -- do you still -- oh.  You

10   don't have those up there, do you?

11   A.    No, I don't.

12   Q.    Okay.  Can you see that far?

13   A.    No.

14   Q.    Of course not.

15          MS. WEST:  Here.

16          MR. BABCOCK:  Thank you.

17          THE WITNESS:  Thank you.

18   BY MR. BABCOCK:

19   Q.    The -- this student came to -- they came to the U.S., but

20   they started school in the United States in October of 2009;

21   right?

22   A.    Correct.

23   Q.    Does this mean that -- can you tell from this record

24   whether they were in the country already on some other sort of

25   status, or did they come into the country using --

1    A.   I couldn't tell from this.

2    Q.   Okay.  And it looks like the first school they went to --

3    he went to was Globe University?

4    A.   Correct.

5    Q.   Okay.  And until basically the beginning of the next year;

6    right?

7    A.   Actually, I can sort of correct something if you don't

8    mind.

9    Q.   Okay.  Go ahead.

10   A.   Okay.  So you were asking me if he came in in another

11   status.  I can't tell that, but I can tell that he had a visa

12   issue in F-1 status from this record.

13   Q.   Okay.  How can you tell that?

14   A.   Where it says, "NIV Interface."

15   Q.   Where is that on the page?

16   A.   It's the third --

17   Q.   Oh, I see.

18   A.   -- entry down.

19   Q.   You're talking about this entry here?

20   A.   Yes.

21   Q.   Okay.  What is an NIV interface?

22   A.   It means that's the system that the Department of State

23   uses to issue visas, and that means that he received an F-1

24   visa on that day.

25   Q.   Okay.  All right.  So he did not have -- did not have a

1   visa before that?

2   A.   I wouldn't know from that.  He may have had -- SEVIS only

3   tracks students.  So I wouldn't know from stuff -- from --

4   Q.   If he had --

5   A.   -- SEVIS if he came in ever as something else.

6   Q.   It doesn't show if he had, for example, a work visa of some

7   sort?

8   A.   No.

9   Q.   Okay.  Now, as I'm reading this record, it looks like this

10  student transferred from Globe University around January of

11  2000 -- sometime in January 2010; right?

12  A.   Correct.

13  Q.   And started at Tri-Valley University?

14  A.   Correct.

15  Q.   Am I reading that right?

16  A.   Yes.

17  Q.   Okay.  Then if you move to the second page of the SEVIS --

18  actually, if you'd -- starting at the bottom of the first page

19  of the entry, it looks like they were -- the student was still

20  active as of January 18th, 2011, right, at Tri-Valley

21  University?

22  A.   Yes.

23  Q.   I noticed that on a couple of the other -- two of the other

24  event histories that Ms. West went over with you, the students

25  were terminated by -- by your branch on January 18th, 2011?  Do

1    you remember that?

2    A.   Yes.

3    Q.   And that was because the school was shut down on

4    January 18, 2011; right?

5    A.   Yes.

6    Q.   Your office issued, you said, a withdrawal?

7    A.   Correct.

8    Q.   Basically, that means that Homeland Security is withdrawing

9    the school's permission to issue I-20's and access SEVIS and

10   all those sorts of things?

11   A.   Correct.

12   Q.   Withdrawing their permission to allow foreign students to

13   attend the school; right?

14   A.   Correct.

15   Q.   And when -- were you involved -- you -- what position were

16   you in -- I don't remember when you joined the agency.  Were

17   you part of the agency in January 2011?

18   A.   I worked for a private contractor, but I did work at SEVP,

19   but I was not involved in this.

20   Q.   Okay.  So you don't have any personal involvement with the

21   withdrawal?

22   A.   No.

23   Q.   Okay.  Getting back to the exhibit, Exhibit 430, can you

24   tell why -- it doesn't look like anything happened to this

25   student's status in SEVIS on January 18th, 2011.

1    A.   Well, on January 18th, 2011, he was -- the record was

2    terminated.

3    Q.   Then it looks like it was active again that same day?

4    A.   Yeah.  I think what happened was -- sometimes it happens

5    out of order on the event history.  So he was actually

6    previously active and then terminated, and they just happened

7    out of order.  It just depends on, like, how it registers.  We

8    see that frequently.

9    Q.   And then going over to the next page, it says -- the next

10   entry is dated March 24th, 2011?

11   A.   Correct.

12   Q.   And it says that he was deactivated?

13   A.   Correct.  So if I can explain for a minute -- and I can

14   tell now that this happened out of order, that the event

15   history recorded this stuff a little bit out of order because

16   if you look here, if you go on the first page, it's -- it said,

17   "Terminated January 18th, 2011," and then it says, "Manual data

18   change active."

19        So the manual data change actually should have happened --

20   been in order properly.  If it was in proper order, it should

21   have happened before the termination.  Then the student was

22   still in terminated status when he requested to be transferred.

23   So Tri-Valley is -- would have been seeing his record no longer

24   terminated.

25        It would appear even though he was in terminated status, it

WARNER - CROSS / BABCOCK

1    goes to a deactive record for them because he's -- his record

2    is no longer the responsibility of their school per se, and if

3    you see -- when he -- when he tried to transfer to Lincoln

4    University, he was transferred in terminated status.

5    Q.  Okay.  And if I'm reading the record, it looks -- he was

6    put in active status at Lincoln University in November 2012?

7    A.  Correct.

8    Q.  Can you tell from looking at the record exactly when he

9    started at Lincoln University?

10   A.  Okay.  I would have to look down here.

11   Q.  It looks like he tried to start at least in March of 2011.

12   A.  No, that's not correct.

13        Okay.  So what happened was he requested a transfer, and

14   you can -- a record can be transferred through SEVIS and

15   terminated status to the new school.  However, the student is

16   not in a valid immigration status at that point.  He had to

17   request reinstatement through USCIS in order for them to make a

18   determination on his status.

19        So that's what happened.  So he requested reinstatement.

20   The reinstatement was approved on November 2nd, 2012, and

21   that's when Lincoln University was at -- actually, once it was

22   approved, they were actually able to complete that transfer and

23   set the record into active -- and record that the student had

24   registered at their school.

25   Q.  So from January 2011 when he was terminated to March of

1    2000 -- or not March -- November 2012, when he was finally

2    given active status again, what exactly was his status for

3    that?

4    A.   It's --

5    Q.   What, 18 months or so?

6    A.   The regulation is -- is that as long as he continues

7    attending a full course of study at the new school, he's

8    technically in status, even though the record doesn't currently

9    indicate it.

10        So he -- if he didn't -- if he left Tri-Valley and he --

11   and in March went to Lincoln University and said, "I want you

12   to support my reinstatement," and they said, "Okay.  We'll do

13   so," he was required to attend school there in a full course of

14   study that whole time, and those designated school officials at

15   Lincoln University would have basically vouched for him and

16   say, "Yes, he's been attending school.  He's doing the right

17   thing."

18        And the reinstatements aren't part of SEVP.  They're part

19   of a different agency, USCIS.  So they would vouch to USCIS.

20   They often provide letters or what have you saying, "This" --

21   "the student came here.  He's doing a good job.  He's attending

22   school."  And then CIS actually looks at that and adjudicates

23   it and says, "Fine.  We'll let him go back to active status."

24   Q.   So if I understand what you're saying, at some point

25   between January of 2011 and November 2012, maybe as soon as --

1    looks like the first entry from Lincoln University is

2    March 2011; right?

3    A.   Correct.

4    Q.   Which maybe suggests he was trying to transfer; right?  Get

5    to a new school as quick as he could; right?

6    A.   Yes.

7    Q.   Okay.  But that wasn't -- and hopefully was attending

8    school, but it wasn't approved by, say, SEVIS until

9    November 2012?

10   A.   No.  We don't -- again, we don't approve reinstatements.

11   That's a different agency.

12   Q.   Okay.  That's right.  You said it was USCIS?

13   A.   We just record the reinstatement occurred, right.

14   Q.   Okay.

15   A.   They would have to file a petition with USCIS and get it

16   adjudicated on that side.

17   Q.   And what would have happened if the petition for

18   reinstatement was not approved?

19   A.   Then he would have remained on terminated status.

20   Q.   Which means he did not have a valid F-1 visa?

21   A.   Well, "visa" is different than "SEVIS status."

22   Q.   Well, as I understand it, to maintain -- to get the F-1

23   visa, you have to be -- the F-1 visa is what allows you to

24   study; right?

25   A.   Correct, but that's also -- okay.  That's a different

1    agency.  So SEVIS is basically what records your status while

2    you're here in the United States.  So the way we look at it is

3    if -- a visa is essentially like your ticket to the door.  So

4    if they issue a visa, it could be -- depending on the country

5    you go, you get the visa from -- they can issue your visa for

6    ten years, but that doesn't mean you're allowed to stay here

7    for ten years.  They don't -- you don't -- you only get to stay

8    for duration of status.

9        So if you take a program of study that's only two years and

10   then you complete it, you have to leave -- to depart.  Now, you

11   still have this F-1 visa, and sometimes you don't have to renew

12   that visa, but you still have to get a new I-20 to come back

13   in.

14   Q.   How long is the F-1 visa?  Does the F-1 visa have an

15   expiration date on it?

16   A.   That -- it depends on the visa.  It depends on the country.

17   We --

18   Q.   Well, the visa -- the F-1 is issued by the United States

19   Government; right?

20   A.   Correct.

21   Q.   To students from different countries?

22   A.   Correct.

23   Q.   Okay.  You're -- I'm just saying, does the Government give

24   different lengths of visa depending on which country you come

25   from?

1    A.   Yes.

2    Q.   Okay.

3    A.   That's through diplomatic --

4    Q.   How long --

5    A.   -- agreement.

6    Q.   Do you -- if you know, how long is the F-1 visa that the

7    U.S. Government gives to students who are coming from India?

8    A.   I don't know.  You would need to ask somebody from the

9    Department of State.

10   Q.   Do you have any sort of ballpark idea?

11   A.   No, I have no idea.

12   Q.   And it wouldn't typically -- would you be surprised if it

13   was for ten years?

14        MS. WEST:  Objection.  Calls for speculation.  She

15   just testified --

16        THE COURT:  Sustained.

17        MS. WEST:  -- she has no idea.

18   BY MR. BABCOCK:

19   Q.   So you don't know what this particular student's F-1 status

20   was from January 18th, 2011, to November 2nd, 2012?

21   A.   I know -- I know what his status was.  He -- because of Ms.

22   Su -- well, CIS would not have approved the reinstatement if he

23   wasn't continuing a full course of study at Lincoln University.

24   They have to provide evidence to CIS that the student was -- in

25   fact, you can maintain status by actions you take while you're

1    here in the country.

2         So he would have to prove to CIS prior to adjudication in

3    November that he was, in fact, continuing school.  They

4    wouldn't just let him sit here and do nothing --

5    Q.   Right.

6    A.   -- during that period of time.

7    Q.   But --

8    A.   So yes, I can say he was in valid status.  His SEVIS record

9    wasn't in terminated status, but he had filed for

10   reinstatement, which is sort of like a pause.  You know, when

11   you hit "Pause" on something, you're still going, but you're --

12   but you're -- you know, they're waiting for you to, you know,

13   make a proper adjudication of that status.

14   Q.   I understand.

15        If you enter the country on an F-1 student visa, generally

16   you get to stay here while you're attending school in a regular

17   course of study; right?

18   A.   Correct.

19   Q.   You don't get to enter on a student visa, never go to

20   school, and stay forever?

21   A.   Correct.

22   Q.   So presumably, from -- the way you're reading this record

23   is when Tri-Valley University was shut down, he enrolled in

24   Lincoln -- is it Lincoln -- Lincoln University and started

25   studying there while his petition to reinstate was pending with

1    USCIS?

2    A.  Correct.

3    Q.  Just for the jury's -- I don't know if you said, but what

4    is USCIS?

5    A.  Oh.  It's United States Immigrations Citizenship Services,

6    I think it is.

7    Q.  Close enough.

8    A.  Citizenship and Immigration Services.  I'm sorry.  I had to

9    do the letter on the --

10   Q.  Thank you.

11       So did -- you're aware that SEVIS -- Tri-Valley University

12   was shut down on or around January 18th, 2011; right?

13   A.  Correct.

14   Q.  Do you know roughly how many students were enrolled there

15   at that point?

16   A.  I don't -- I thought maybe there were around 2,000.  I'm

17   not really sure.  I don't have the exact number.

18   Q.  Okay.  And as we've seen from some of these other records,

19   it looks like -- do you know if Tri-Valley University knew that

20   it was going to be shut down?

21   A.  I would have no idea.

22   Q.  Okay.

23   A.  I wouldn't know that.

24   Q.  SEVIS went in and, it looks like, administratively changed

25   the status for the students that were at Tri-Valley University;

1    right?

2    A.   Yes.

3    Q.   We don't have all -- whatever -- 2,000 event histories

4    here, but from the ones we've seen -- right? -- there was

5    administrative action by SEVIS on January -- January 18th,

6    2011 --

7    A.   Yes.

8    Q.   -- the date -- or around that date?

9         Do you know what happened to those however many students?

10   You estimated 2,000?

11   A.   Do I know what happened to every one?  No.

12   Q.   Do you know what happened to most of them?

13   A.   Well, I understand that the students that were withdrawn --

14   I mean, the students that were terminated -- a decision was

15   made because they terminated the students because if you can't

16   go to a school -- if you're enrolled in a school that's been

17   withdrawn, the school is closed.  You can't maintain your --

18   your course of study; right?  That's the requirement to remain

19   in status.

20        So they terminated these students, but then the Government

21   made the decision -- SEVP, you know, along with Immigration

22   Customs Enforcement -- that the fault didn't really lie with

23   the students.  It was actually with the designated school

24   officials that had not taken the proper actions, and that's why

25   the school was withdrawn.

1     So they did give these -- the students the opportunity to

2     correct their status if so be.  If they couldn't find another

3     school to go to or something like that, then they had to depart

4     the country, but if they could, as you saw on the records, they

5     allowed them to transfer somewhere else.

6   Q.   So -- I'll just take that one back.  I'm going to show you

7     what's been marked and admitted as Exhibit 420, which is the

8     event history for Vishal Dasa that you looked at earlier.

9         Now, Mr. Dasa entered the country -- started school in the

10    United States in 2008; right?

11  A.   Correct.

12  Q.   At Antioch University?

13  A.   Yes.

14  Q.   And then in 2009, transferred to International

15    Technological University?

16  A.   Correct.

17  Q.   And then did he transfer back to Antioch University later

18    in the year?

19  A.   Okay.  Let me -- could you give me just a moment to --

20  Q.   Sure.

21  A.   Okay.  I'm sorry.  I'm speaking to myself.

22        No, that's not what happened.  Actually, again, it's

23    something that occurred out of order.  So from -- okay.  So

24    if -- I can run through briefly what happened.  He came in as

25    an initial student on August 20th, 2008, intending to attend

1    Antioch University.  Again, the NIV interface indicates that he

2    received his visa.

3        The next indication where it says, "ADIS Arrival," that

4    means he went through the Port of Entry.

5    Q.  I'm going to stop you real quick there.

6        Where does it say that he received his visa?

7    A.  "NIV Interface."

8    Q.  Oh.  Okay.  Got it.

9    A.  So he got his visa on September 24th, 2008.  He came into

10   the country on October 7th, 2008.  He enrolled in Antioch on

11   10/8/2008.

12   Q.  Right.

13   A.  On -- let's see -- January 14th of '09, he requested that

14   Antioch transfer his record.  The same date, the transfer was

15   released.  International Technological created him the same day

16   an initial record, again, saying that he intends to go there,

17   and on January 27th of '09, he enrolled in International

18   Technological.

19       Now, we're -- down at the bottom, you see it says, "ADIS

20   Departure."  So what happens is -- ADIS is the system the Port

21   of Entry uses to record each time a student leaves the country

22   and comes back in.

23   Q.  You're talking about --

24   A.  So --

25   Q.  -- June 16th, 2009?

1    A.    Correct.  So it says, yeah, that he departed on June 16th,

2    2009, but what happens is, if you remember, Antioch is

3    retaining that deactive record, and now International

4    Technological is retaining an active record for the student.

5    So when he departs, that database, ADIS, bounces on both

6    records.  So that's what you're seeing.

7         Even though he came back and forth and he's not going to

8    Antioch anymore, it's still recording on that deactive record

9    that he departed the country, and then on the next page where

10   you're asking me did he reenroll there, no.  He just -- it

11   bounced there again that he had come back into the country, I

12   think.  Let me see.  Yeah, that should be the date, on

13   September 14th, 2009.  Let me just read this again.

14        Yes.  So on September -- on the second page, on

15   September 8th --

16   Q.    2009?

17   A.    On the first page, on September 8th, 2009, he requested

18   that International Technological University transfer his

19   record, and they released it to Tri-Valley.  And then on

20   September 14th, 2009, he came into the country, and so it

21   bounced off of the two deactivated records from Antioch and

22   International Technological and indicated on those records he

23   had come back in the country on September 14th, and then it

24   also -- the arrival attached to the Tri-Valley University

25   active record.

1      But -- I can make another comment, too.  But if he was

2   coming into the country on September 14th, 2009, his record

3   should be active.  His record should be -- from Tri-Valley, it

4   should be an initial because he hasn't enrolled yet at that

5   school.

6   Q.  Okay.

7   A.  So if you look on September 12th, 2009, before he arrived

8   in the country, Wenchao Vince had actually activated his record

9   even before he arrived.

10  Q.  Up at the top where it says -- the top of the second page?

11  A.  Yes.  So they created -- they created an initial record for

12  him on September 8th, and then they set the record to active on

13  September 12th.

14  Q.  Even though presumably --

15  A.  Even though he wasn't here, yeah.

16  Q.  He wasn't in the country yet until --

17  A.  Until the 14th.

18  Q.  The arrival date on the last -- the ADIS arrival?

19  A.  Yes.  So the record actually should have been left in

20  initial because they don't know if he's ever going to show up.

21  Q.  The -- and it looks like Dasa stayed -- then stayed at

22  Tri-Valley University until when?

23  A.  January 18th, 2011.

24  Q.  Okay.  And once -- and this was -- is this the same --

25  looks like his status was terminated on January 18th, 2011?

1    A.   Correct.

2    Q.   And that was done, if I'm reading this right,

3    administratively by SEVIS again?

4    A.   Correct.

5    Q.   And it does not look like he -- he was never activated

6    again in SEVIS?

7    A.   No.  It looks like it went out of order again at the

8    bottom, but --

9    Q.   I understand, but can you tell from this -- does it seem to

10   indicate that he didn't go to another school?

11   A.   Correct.

12   Q.   Okay.  Okay.  I just want to look at one -- couple things

13   from one of the other ones, which is actually 440.  Thank you.

14        440 is the SEVIS event history for Dirisanala, Anji Reddy

15   Dirisanala --

16   A.   Correct.

17   Q.   -- that we looked at, and this person also went to

18   International Technical -- Technological University?

19   A.   Yes.

20   Q.   Do you know where that is?

21   A.   I do not.  I mean, I can tell it's in this area just from

22   the code on the -- it says, "SFR."  That means it's in the --

23   Q.   Like San Francisco region?

24   A.   San Francisco region.  I've never been there.

25   Q.   Okay.  And transferred to Tri-Valley in February 2010 --

1    A.   Correct.

2    Q.   -- right?

3         And stayed active there until May of 2010?  Am I reading

4    that right?

5    A.   Yes.

6    Q.   At which point, he transferred to -- back to International

7    Technological University?

8    A.   Correct.

9    Q.   And on the left there on May 18th, 2010, the left --

10   leftmost column says, "Transfer Released."  What does that mean

11   exactly?

12   A.    It means that -- that the person on the right-hand column,

13   Susan Su, had -- had actually transferred the record.  You have

14   to take action in SEVIS --

15   Q.   Okay.

16   A.   -- to transfer the record.

17   Q.   What happens if -- as I understand the process, a student

18   is -- a prospective student, while they're still in a foreign

19   country, another country, is given an I-20, which allows him to

20   get the F-1 visa to enter the country, at which point basically

21   they need to report to the school; right?

22   A.   Yes, once they come to the United States.

23   Q.   To be activated and registered for the school and be

24   activated; right?

25   A.   Correct.

1    Q.   In the SEVIS system?

2    A.   Yes.

3    Q.   What happens if they get to the country, they go to the

4    school, and they decide they don't want to go there, they want

5    to go somewhere else?

6    A.   Then they go to the designated -- the designated school

7    official at that school and say, "I don't want to attend this

8    school," and the designated school official by regulation has

9    to transfer them to the new school.

10   Q.   But is there -- was there a transfer system in 2000 -- say,

11   around 2010, and was there -- and the software -- this is all

12   done online; right?  All these -- all these SEVIS entries by

13   designated --

14   A.   Yes.

15   Q.   -- school officials are done on a computer; right?

16   A.   Yes.

17   Q.   At the school?

18   A.   Yes.

19   Q.   They don't call up SEVIS and say, "I want you to change

20   the" -- "change the status of such-and-such student"?

21   A.   Well, they could if they were having issues with the

22   system.

23   Q.   Presumably, that's what they did in the old days?

24   A.   I -- I wouldn't know.

25   Q.   Okay.  But based -- most of the school's interaction with

1    SEVIS is online --

2    A.   Correct.

3    Q.   -- right?

4         They're given a user ID and login, and they can log -- the

5    designated school official can log into the system and change

6    the student's status --

7    A.   Correct.

8    Q.   -- right?

9         Was there in 2010 when -- for a student that had not yet

10   been activated -- in other words, they had just arrived at the

11   country and not registered.  Was there a function in the

12   software that allowed the designated school official to

13   transfer them to another school?  Do you understand the

14   question?

15   A.   I mean, yes.

16   Q.   It's poorly phrased.

17   A.   Yes.  Yeah, they can transfer the student at any time.

18   Q.   Okay.  Did SEVIS -- we heard about how -- we'll get more to

19   this later, but when Ms. Su submitted the I-17 to SEVP to get

20   approval to be allowed to admit foreign students, there was a

21   site visit?

22   A.   Correct.

23   Q.   Someone came out to the site, looked at the facilities, met

24   with Ms. School -- Ms. Su, and we saw that whole checklist that

25   he went through; right?

WARNER - CROSS / BABCOCK

1      A.   Uh-huh.

2      Q.   Was there ever a -- a -- was there ever any training

3      session given to Ms. Su either before or after the TVU --

4      Tri-Valley University was approved on how to work the SEVIS

5      system?

6      A.   That would be her responsibility, and I wouldn't know if

7      she took a training or not.

8      Q.   Okay.

9      A.   If you -- we have --

10     Q.   As a matter --

11     A.   -- a certification that says it's their responsibility.

12     Q.   Well, let me ask you:  As a matter of course, roughly how

13     many -- how many I-17's does your branch get a year, petitions

14     for approval to admit foreign students?

15     A.   I wouldn't know.  I know there's currently 9,000 schools

16     approved in the system.  I don't know how much they get yearly.

17     You're talking about schools?

18     Q.   How many app- -- how many petitions for approval are made

19     each year?  Do you have any idea?

20     A.   I wouldn't know that.

21     Q.   Okay.  There are roughly 9,000 schools in the nation that

22     are approved at this point to teach foreign students?

23     A.   Yes.

24     Q.   Okay.  Do you have any idea how many schools have

25     petitioned for approval and been denied?

1    A.   I do not know that.

2    Q.   How many people are there -- this is your office that

3    actually does the approval or disapproval; right?

4    A.   It's a different unit within my office --

5    Q.   Okay.

6    A.   -- but yes, it does appear -- yes.

7    Q.   Okay.  How many people in that other unit do you know are

8    assigned to review these I-17's for approval and disapproval?

9    A.   20.

10   Q.   Okay.

11   A.   That's roughly.  I'm not sure.

12   Q.   Okay.  And was that -- was that -- do you know -- are you

13   technically employed by the agency, then?  But it sounds like

14   you were dealing with them as a contractor.  Was it roughly 20

15   people in 2009?

16   A.   That I wouldn't know.

17   Q.   Okay.

18   A.   I don't recall.

19   Q.   There have been a lot of budget issues in the last few

20   years, which I'm sure you're painfully aware.

21   A.   Yes.

22   Q.   The -- do you remember offhand who was -- who was the

23   person that was assigned to approve the I-17's for TVU?

24   A.   Barry Kobe.

25   Q.   Kobe.

1          And is Kobe still with the agency?

2     A.   Yes.

3     Q.   Okay.

4          THE COURT:  Mr. Babcock, any time in the next five

5     minutes, I'd like to take our first break.

6          MR. BABCOCK:  Thank you, your Honor.

7     BY MR. BABCOCK:

8     Q.   The -- when someone is assigned -- someone gets the initial

9     I-17 to review it and see if it's sufficient or adequate and --

10    or if it needs other evidence and make a decision whether to

11    approve it or not, does that person stay with the I-17 until

12    it's approved or disapproved, or does it get handed off to

13    different people within the office?

14    A.   No.  They stay with it.

15    Q.   Okay.  So Mr. Kobe had got the I-17 initially and

16    eventually made the final decision?

17    A.   Correct.

18    Q.   Okay.  I'm going to show you --

19         MR. BABCOCK:  Well, actually, I guess maybe we should

20    break now.

21         THE COURT:  Let's do that.

22      Members of the jury, we'll take our first morning recess.

23    The Court will be in recess for 15 minutes.

24         THE CLERK:  All rise.

25                       (Recess taken.)

1          (Proceedings heard out of the presence of the jury:)

2              THE COURT:  We're on the record in the United States

3      versus Su.  We're outside the presence of the jury.

4          I understand there's an issue -- we were on the break.  I

5      understand an issue arose during the break that requires some

6      discussion.

7              MR. RHYNE:  Yes, your Honor.

8              THE COURT:  Mr. Rhyne?

9              MR. RHYNE:  Yes, your Honor.

10         It was brought to our attention by the co-case agent in

11     this case, who's outside with our witnesses, who are waiting in

12     the hallway, that during the break the defendant made attempts

13     to greet Dr. Shy Shenq Liou, which is one of the next

14     witnesses.

15         According to the agent, she called his name multiple times,

16     and he was aware of the Court's order, and he told her not to

17     talk to the witness, at which point she -- he was able to keep

18     her from talking to the witness, but this is obviously a

19     concern given the Court's order a few moments ago and also due

20     to the fact that this is one of the witnesses who's already

21     received an e-mail from Susan Su regarding his testimony in

22     this case.

23         We wanted to bring it to the Court's attention.

24             THE COURT:  Mr. Babcock?

25             MR. BABCOCK:  I think she was trying to say hi, which

1    was probably not a good idea.

2            THE COURT:  Ms. Su, I'm going to address you

3    directly.  Can you hear me okay?

4            THE DEFENDANT:  Yeah.  Yes.  Yes.

5            THE COURT:  I made an order early this morning

6    modifying your conditions of release.  Those are the conditions

7    under which you are allowed to remain free from custody while

8    your trial is pending.

9        To the best of my recollection, the order prohibited you

10   from having any contact directly or indirectly with any person

11   who was going to testify as a witness, was testifying as a

12   witness, or had testified as a witness.

13       It seems to me very likely that when you recognized the

14   person in the hallway and attempted to greet them that you must

15   have known that they were here to testify as a witness because

16   why else would that person be in the Federal Court?  I don't

17   think that my order was unclear.  I think my order was clear,

18   but I'm going to repeat it.

19       "No contact" means no contact.  It means you can't say good

20   morning.  You can't say good evening.  You can't say hello.

21   You can't say anything.  You can't say it orally.  You can't

22   say it in writing.  You can't say it over the telephone.  You

23   can't say it on the Internet.

24       The reason for this blanket prohibition is if there's any

25   contact of any kind, there might be some concern about what the

1    content of the conversation is, and we'd have a hearing about

2    it.  On the other hand, if there's no contact of any kind, then

3    it's clear that there hasn't been any violation of the Court's

4    order.

5        I am attempting to deal with this issue in a very

6    evenhanded and patient way, but at some point if you violate

7    the Court's order about not contacting witnesses, there will be

8    consequences.  So I will simply remind you of the Court's order

9    and urge you to comply with it to the letter.

10                THE DEFENDANT:  I understand.

11                THE COURT:  Does anyone have anything further that

12   they wish to say on this topic?

13                MR. RHYNE:  Submitted, your Honor.

14                MR. BABCOCK:  No, your Honor.

15                THE COURT:  Thank you.

16                MR. BABCOCK:  Thank you.

17                THE CLERK:  Can we adjust this Elmo, the lights down?

18   They were blinding one of the jurors.  Just -- yeah, this

19   over --

20                THE COURT:  Or maybe --

21                MR. BABCOCK:  I can just turn it off when I'm not

22   using it.

23                THE COURT:  Yeah.  I think that's probably best.

24                THE CLERK:  Okay.  Thank you.

25                THE COURT:  All right.  Okay.

1        THE CLERK:  We're missing one?

2        THE COURT:  We're missing Ms. --

3        MR. BABCOCK:  Warner.

4     (Proceedings heard in the presence of the jury:)

5        THE COURT:  All right.  Back on the record in United

6   States versus Su.  Ms. Warner is still under cross-examination.

7        Mr. Babcock, your witness.

8        MR. BABCOCK:  Thank you, your Honor.

9   BY MR. BABCOCK:

10  Q.   Ms. Warner -- actually, I'm going to show you what's

11  been -- two exhibits -- let's see if I can keep them apart

12  here -- Exhibits 3 and 4, which were admitted yesterday.

13       This -- we were just discussing this -- the I-17 for

14  Tri-Valley University was reviewed by Mr. Kobe, as I understand

15  it?

16  A.   Correct.

17  Q.   And it was approved on February 17th, 2009; right?

18  A.   I would have to --

19  Q.   Can you tell from looking at the I-17?

20  A.   Oh, yes.  Yes, I see that.

21  Q.   There's a signature and a date that says when it was

22  approved; right?

23  A.   Correct.

24  Q.   Sorry.  I'm looking for my copy.  What page is that?

25  Actually, I'm going to use --

1          MR. BABCOCK:  I apologize, your Honor.  The paper is

2     getting ahead of me.

3     BY MR. BABCOCK:

4     Q.   The -- I'm looking at part of Exhibit 4, which is the first

5     page of the I-17, right, submitted for Tri-Valley University?

6     A.   That's what you just took from here; right?

7     Q.   Yeah.

8     A.   Okay.

9     Q.   I -- sorry.  I took the original, but it's -- can you see

10    it there, "Tri-Valley University"?

11    A.   Yes.

12    Q.   And over on the right, it says, "For INS use only."  I

13    assume that was --

14          MS. WEST:  Mr. Babcock, which exhibit are you

15    referring to?

16          MR. BABCOCK:  This is Exhibit 4, Page 8.

17          MS. WEST:  I don't think so.

18          MR. BABCOCK:  Well, I'm looking at it.

19    BY MR. BABCOCK:

20    Q.   If you'll look along -- you can't see it so clearly on the

21    Elmo, but this handwritten stuff on the right-hand side on the

22    original is written in red ink --

23    A.   Yes.

24    Q.   -- it looks like.  Doesn't look so red on the Elmo.

25          And in the first box where it says, "Fee Stamp," it's

1    written, "Private School of Higher Education"?

2    A.   Correct.

3    Q.   And then in the next box for "Action" -- is that "Action

4    Stamp"?  Looks like "HQ-SEVP."  That's your office?

5    A.   Correct.

6    Q.   And then the date of February 17th, 2009, "Approved"?

7    A.   Correct.

8    Q.   And I think you looked at the signature yesterday, but do

9    you know whose signature that is?

10   A.   Barry Kobe.

11   Q.   Barry Kobe?

12   A.   Uh-huh.

13   Q.   The gentleman who was assigned to review the TVU petition?

14   A.   Yes.

15   Q.   Okay.  Now, just to make sure we're looking at the

16   originals here, I'm going to take -- I'd like you to look at

17   Exhibit 3, Page 2.

18        This again is -- appears to be the I-17 for TVU; right?

19   A.   Uh-huh.  Yes.

20   Q.   Can you see that far?

21        And let me make sure I don't -- let me make sure I keep

22   these separate.

23        This one also has some red writing along the right-hand

24   side of the page, but it's slightly different.  I wonder if I

25   can do these side by side actually.  I'm going to display --

1    try to display the right-hand side so the two different

2    petitions -- it's -- the one on the left is from Exhibit 3, and

3    the one on the right is from Exhibit 4.  They're similar but a

4    little different; right?

5    A.   Correct.

6    Q.   The -- Exhibit 3 also in the area where it says, "Fee

7    Stamp," says, "Private School of Higher Education," which is

8    what it says in Exhibit 4, but then it says, "Only approved for

9    classes listed in Section 19."

10   A.   Correct.

11   Q.   Do you see that?

12   A.   Uh-huh.

13   Q.   Section 19 -- there is a section in the I-17, Section 19;

14   right?

15   A.   Yes.

16   Q.   I'll show that in a second.

17        And then Exhibit -- the one in Exhibit 3 has a "Received"

18   stamp of December 2008, and it looks like it says -- it's again

19   "HQ-SEVP," dated February 17th, 2009, "Approved."  There's also

20   a signature, though it's a little obscured by the "Received"

21   stamp.  Is that Mr. Kobe's signature?

22   A.   I believe so, yes.

23   Q.   Yeah.

24        Now, the two have one other difference, which is in the

25   "Remarks" section.  At the bottom in Exhibit 3, the "Remarks"

1    section is blank.  In Exhibit 4, the "Remarks" section says,

2    "Articulation agreements are acceptable"; right?

3    A.  Correct.

4    Q.  Okay.  The -- Section 19 of the petition -- I'm not going

5    to get the whole thing up -- blown up very well, but let's just

6    do -- look at that.

7         Do you see the block for Section 19?

8    A.  Yes.

9    Q.  All right.  It's the section in the I-17 where the

10   applicant -- at least in this one, it looks like Ms. Su listed

11   some specific courses; right?

12   A.  Correct.

13   Q.  The first one being CS300, Logic and Computer Architecture,

14   the next one being ME324, Introduction to MEMS, and then a

15   further listing of classes, all of which seem to be sort of

16   engineering- or software-related; right?

17   A.  Yes.

18   Q.  Now -- so as of February 17th, Tri-Valley University was

19   approved to admit students from other countries to study at

20   Tri-Valley University; right?

21   A.  Yes.

22   Q.  Okay.  And when -- one follow-up question I thought of

23   during the break.  When a student arrives from a foreign

24   country, isn't it true they have a certain amount of time after

25   they arrive to report to the school and enroll?

WARNER - CROSS / BABCOCK

1    A.   Correct.

2    Q.   Otherwise, they're out of status or --

3    A.   Correct.

4    Q.   -- something of that nature?

5         And is that period 30 days?

6    A.   For a first-time student.  If they're transferring, it's

7    15 days.  So if they transferred from another school and they

8    depart the country in between attending the first school and

9    the second school, they have to -- they have to report to their

10   new school within 15 days.

11   Q.   Okay.  And if they're just arriving for the first time,

12   they have 30 days?

13   A.   Correct.

14   Q.   And what exactly is it that they have to do?  They have to

15   enroll?

16   A.   They have to enroll in classes, yes --

17   Q.   Okay.

18   A.   -- and report to their designated school official if

19   they've not done so.

20   Q.   Now, the schools we've talked about up here are Tri-Valley

21   University and a couple others I pointed out on the event

22   histories.  These same rules apply to all secondary schools

23   that want to admit students from other countries; right?

24   A.   Yes.

25   Q.   In other words, for example, UC Berkeley has to follow

1    these same rules?

2    A.   Exactly.

3    Q.   Stanford, Harvard, more sort of recognized schools, as it

4    were; right?

5    A.   The regulations apply to each -- every kind of school.

6    Q.   Okay.  They also apply to community colleges?

7    A.   Yes.

8    Q.   Okay.  What about high schools?

9    A.   Yes.

10   Q.   And it's the same -- exact same process for all schools?

11   A.   I mean, pretty much.  To get approved, it may depend on the

12   type of school they -- it is.

13   Q.   Fair enough.

14   A.   It is very different, but yes, as far as students, the

15   students, not the process.

16   Q.   The public universities do not have to prove that they're

17   recognized or accredited; right?

18   A.   Correct.

19   Q.   For example --

20   A.   Well, because they are done so by the State.

21   Q.   Now, we saw on -- on the -- some of the screenshots for

22   SEVIS, for example, on Exhibit 50.  This is one of the

23   screenshots that you looked at earlier; right?

24   A.   Yes.

25   Q.   It has -- is this all the information that SEVIS has about

1    a particular student?

2    A.   In SEVIS, yes.

3    Q.   In other words, it's got --

4    A.   Well, no, because you have the event history, and you have

5    different links of this.  Okay?

6    Q.   The event history, though, has to do with the history in

7    SEVIS.  I guess what I'm asking is as far as the name and

8    the -- these screenshots have the student's name; right?

9    A.   Yes.

10   Q.   The country where they're a citizen, their gender, their

11   date of birth, personal information; right?

12   A.   Yes.

13   Q.   As well as their address overseas?  For example, this

14   gentleman -- there's an address in Mumbai in India; right?

15   A.   Correct.

16   Q.   And then there's a U.S. address?

17   A.   Correct.

18   Q.   Which in this case was 620 Iris Avenue.

19        And SEVIS requires this information; right?

20   A.   Correct.

21   Q.   You want to know where the student is?

22   A.   Correct.

23   Q.   And that is so that you can verify that they're in the

24   country?

25   A.   Yes.

1    Q.   Or -- I'm just asking.  I don't know.  Is -- what's the --

2    what's the purpose of having the student's address?

3    A.   The U.S. address?

4    Q.   The U.S. address.

5    A.   Because there's a requirement that -- per regulation that

6    we know where they physically reside and that they're residing

7    in the area where they go to school.

8    Q.   Okay.  So it's to verify that the address is near the

9    school where they're -- where they show -- where SEVIS shows

10   they're going to school?

11   A.   Correct.

12   Q.   In other words, if this gentleman who's -- who is this?

13   Mr. -- Mr. Agrawat showed he was going to school at Tri-Valley

14   University in Pleasanton, California, but the U.S. address was,

15   for example, in New Jersey or New York, would that raise some

16   sort of red flag for SEVIS?

17   A.   Yes.

18   Q.   And what would happen?

19   A.   What would happen?  We would send a request for evidence to

20   the school to find out why that differs.

21   Q.   Uh-huh.  Does -- does SEVIS communicate directly with the

22   student?

23   A.   The -- no.

24   Q.   Okay.  All your communications are just with the schools?

25   A.   Primarily.  Occasionally -- and it's something that started

1    that's relatively new.  If there's an action that we're going

2    to take -- because we don't want the students to be surprised.

3    For instance, if they're involved in a school that's going to

4    be withdrawn, we will send a letter to their last known address

5    explaining their options.

6         So we'll say, you know, "You have to transfer within so

7    many days and find a new school to go to.  Otherwise, you have

8    to depart the country."  But other than that, we don't

9    correspond with students at all.  Students do have the option

10   of polling -- we have a response side of it.  That's outside of

11   the people that do approvals.

12   Q.   Okay.  So before I forget, the -- Ms. West went through

13   some of the I-17 with you yesterday that was submitted for

14   Tri-Valley University.  And the actual I-17 form, the part that

15   you fill out online, is -- looks like just three pages or so?

16   A.   I believe so, yes.

17   Q.   And then there's -- there's a two-page form that is signed

18   by the designated school officials?

19   A.   Yes.

20   Q.   That -- which in this case -- now, that is done -- I'm

21   referring to Page 5 of Exhibit 1 here, which we saw yesterday.

22   It had the signatures of three people -- three people.  They

23   look like Sophie Su, Susan Su, and Vince Wang; right?

24   A.   Yes.

25   Q.   Or Wang.

1    This was signed in the presence of the site inspector?

2    A.   I wouldn't -- I wouldn't know if it was signed in the

3    presence.

4    Q.   Okay.  Is the site inspector supposed to meet with the

5    designated school officials?

6    A.   They are --

7    Q.   Okay.

8    A.   -- but it's not necessary at the time they collect that.

9    We also have school officials that mail it to us later.

10   Q.   Oh, I see.  So someone could sign it later and mail it in?

11   A.   Yes.

12   Q.   At some point, you want an original signature?

13   A.   Just the way -- the adjudication of the school.  That's

14   all.

15   Q.   I understand.

16        So you don't know -- do you remember who did this site

17   inspection for this?

18   A.   I do not.

19   Q.   Okay.  But one of the things they routinely do is meet with

20   designated -- the prospective designated school officials;

21   right?

22   A.   Correct.

23   Q.   Is it the site inspector's job to inform the person who's

24   going to be a designated -- who's sort of a nominated or agreed

25   to be a designated school official -- is it the site

1    inspector's job to -- to verify with them that they're familiar

2    with the regulations and requirements?

3    A.   It probably is a question.  I'd have to refer back to the

4    site inspection sheet, but it's actually the principal

5    designated school official's job to make sure that all

6    designated school officials are aware of all the requirements.

7    Q.   You're referring to Exhibit 5, the site inspection sheet?

8    A.   So --

9    Q.   You can tell me which page you're going to be looking at.

10   A.   Yeah.  I'm just -- let me just -- so what I see is what

11   happens on a site inspection is they go in, and they try to get

12   a sense of how comfortable the designated school officials are

13   with the regulations and how we expect them to operate.

14        And so he doesn't -- they don't on the site inspection

15   sheet take any type of certification or anything from the

16   designated school officials.  They ask them a question, what

17   resources are available to a designated school official, to

18   ensure compliance and knowledge of SEVIS rules and regulations.

19   Q.   Which question is that?

20   A.   So -- it's -- oh.  I'm sorry.  Page 3, Question 1.

21   Q.   When the -- now that you have it in front of you, is the

22   site inspector supposed to go through and ask -- basically ask

23   each one of these numbered questions verbatim?

24   A.   Yes.

25   Q.   Okay.  The site inspection in this case -- I'm looking at

1    Page 3.  The site inspector discussed the number of students

2    that were in the school --

3    A.  Yes.

4    Q.  -- with -- presumably with Ms. Su or with someone

5    associated with the school.  Does it say on the form who she --

6    who he spoke with?

7    A.  Yeah.  That's what I was looking at, I believe.  Yes, it

8    does.  He did.  He spoke with Ms. Susan Su.

9    Q.  That's all right.

10       And looked at the classrooms, looked at the library,

11   basically looked at the facilities; right?

12   A.  Correct.

13   Q.  And that site inspector noted that the library was small

14   and that the school had just opened earlier this year?

15   A.  Right.

16   Q.  The site inspection was in 2008; right?  October 14th, if

17   you remember?

18   A.  One minute.  Oh, yes.

19   Q.  If you look at Page 6, the top of Page 6, the inspector

20   made a comment that underlined part of the -- Page 6 is entered

21   by the site inspector; right?

22   A.  Correct.

23   Q.  And the inspector noted, "The DSO was forthcoming, although

24   needed to study procedure on application rules and regulations

25   regarding students more."

1    A.   Correct.

2    Q.   Suggesting perhaps that the DSO was not really fully quite

3    up to speed yet?

4    A.   That's what -- yeah.  Whatever they record is

5    observational.

6    Q.   Yeah.

7              MR. BABCOCK:  Do you have the original of Exhibit 1?

8              MS. WEST:  I'm sorry?

9              MR. BABCOCK:  Exhibit 1.

10             MS. WEST:  It should be up there.

11             MR. RHYNE:  Is that your copy?

12             MR. BABCOCK:  That's my copy.  You can use my copy if

13   I get mine.

14        I'd like to -- we seem to have misplaced the original, your

15   Honor.  So I'm going to give her one of the Court's backup

16   copies if that's okay.

17             THE COURT:  That's fine.  I also have a set on the

18   bench right there.

19             MS. WEST:  It's right here.

20             THE COURT:  You can share those with the witness or

21   counsel whenever that is necessary.

22   BY MR. BABCOCK:

23   Q.   I'd like you to flip back to --

24             THE COURT:  The exhibit number that's been placed

25   before you, please.

1          MR. BABCOCK:  I'm sorry.  The missing exhibit is

2     Exhibit 1 --

3          THE COURT:  Thank you.

4          MR. BABCOCK:  -- which was in the Exhibit 2 folder.

5     BY MR. BABCOCK:

6     Q.   I'd like you to look at -- Exhibit 1 has the different --

7     the I-17 plus the different attachments that were submitted to

8     your -- to SEVP in support of the app- -- petition; right?

9     A.   Correct.

10    Q.   And one of the attachments was a catalog which -- if you

11    look at Page 11; right?

12    A.   Uh-huh.

13    Q.   And flipping through it, it had the different policies of

14    the school, including school regulations, et cetera, right,

15    which is -- I'm sorry -- Page 14?

16    A.   Yes.

17    Q.   And specifically, if you flip back to Page 30 of the

18    catalog, it had the school policies on refunds?

19    A.   Yes.

20    Q.   It seems to say that first-time fees and every trimester's

21    registration fees are all nonrefundable regardless of the

22    number of units registered in the first paragraph; right?

23    A.   Correct.

24    Q.   On the second paragraph, it says that -- however, it says

25    for the rest of the trimesters other than the first one -- it's

1    not very artfully phrased, but it seems to suggest that if it's

2    not your first semester, that some of the -- some of the fees

3    are refundable.

4        It says that students who formally withdraw from a class

5    and do a course drop form -- they may be eligible to receive a

6    refund according to the following chart, and there's a chart

7    down at the bottom which ties the amount refunded to how long

8    into the semester it is; right?

9    A.   Yes.

10   Q.   And this was submitted to SEVP in 2008 or the beginning of

11   2009?

12   A.   I would have to look at the state's end.  Yeah, 2000 --

13   October 15th, 2008.

14   Q.   I just want to review a couple other things that you looked

15   at yesterday.  So I can take that one back.

16       One of the things you looked at yesterday was Exhibit 106,

17   which I think you described as like a warning banner?

18   A.   Correct.

19   Q.   And as I understand it, this is something that you see that

20   a school -- designated school official sees each time they log

21   into SEVIS?

22   A.   Correct.

23   Q.   This is basically like the first page --

24   A.   Yes.

25   Q.   -- that pops up, which says the system is only for

WARNER - CROSS / BABCOCK

1    authorized users and that all other -- anyone using the system

2    is being monitored; right?

3    A.   Correct.

4    Q.   And recorded as well?

5    A.   Yes.

6    Q.   And it tells them when using the system, they consent to

7    being recorded?

8    A.   Right.

9    Q.   And warns -- warns them that if the monitoring reveals

10   possible evidence of criminal activity, system personnel may

11   provide evidence of such monitoring to law enforcement

12   officials; right?

13   A.   Correct.

14   Q.   It doesn't say -- doesn't say that unauthorized access

15   itself is a crime.  It says if the monitoring reveals evidence

16   of crimes, that that -- that may be reported; right?

17   A.   Can I read the -- can I read the thing in its entirety?

18   Q.   Certainly.

19   A.   Well, I would disagree because it tells you -- okay -- that

20   the systems are for authorized users only.  It says individuals

21   using the system without authority are subject to have their --

22   their activities in the system monitored, and then it says

23   anyone using the system expressly consents to monitoring and is

24   advised that if such monitoring reveals possible evidence of

25   criminal activity, system personnel may provide the evidence of

1    such monitoring to law enforcement.

2        So that would mean whether you were an authorized user or

3    an unauthorized user, you subject yourself to -- to that use

4    being turned in to law enforcement.

5    Q.   You went to law school; right?

6    A.   Yes, I did.

7    Q.   I don't know -- so you were trained as a lawyer?

8    A.   Yes.

9    Q.   Okay.  Are you practicing as a lawyer?

10   A.   No, not while -- I registered inactive with the Bar

11   because -- no, I'm not -- I'm not in the official capacity of

12   an attorney at ICE.

13   Q.   I understand.  I get your point about the language.  It

14   doesn't say in so many words unauthorized access is a crime or

15   words to that effect?

16   A.   It does not say that -- it does not say unauthorized access

17   is a crime, but it does say that anyone subjects themselves.

18   Q.   Fair enough.

19       Does your office -- the people -- the 20 or so people that

20   review these I-17's for approval or disapproval -- are those

21   people required to have any sort of background in education?

22   A.   They're required to have a Bachelor of Arts or Bachelor of

23   Science and that they get training.

24   Q.   Does the Bachelor's have to be in any particular field?

25   A.   I'm not -- I don't hire those people.  So I wouldn't know.

1    Q.   Okay.  Fair enough.

2              MR. BABCOCK:  Do you have the one you used yesterday?

3              MS. WEST:  Do you have --

4              MR. BABCOCK:  I can grab it.  I just want to quickly

5    look at the regulation that we saw yesterday.  Thank you.

6         Can everybody see that?

7              THE COURT:  And for the record, this has not been

8    marked as an exhibit, but it's actually 214.3, which has

9    previously been the subject of some examination.

10             MR. BABCOCK:  Is that better?  Oh, it's because of

11   the bar here?

12             THE JURORS:  Yes.

13             MR. BABCOCK:  How's that?

14   BY MR. BABCOCK:

15   Q.   Can you see that?

16   A.   Uh-huh.

17             MR. BABCOCK:  Thank you, your Honor.

18   BY MR. BABCOCK:

19   Q.   This is Section 214.3 of what?

20   A.   Of the 8 CFR, the Code of Federal Regulations.

21   Q.   8 CFR generally is sort of the section of the federal

22   regulations dealing with immigration; right?

23   A.   Correct.

24   Q.   And in particular, the regulations governing probably most

25   of what you have to do?

WARNER - CROSS / BABCOCK

1    A.   Correct.

2    Q.   And this particular section is -- or subsection -- that's

3    not -- that's not all of 214.3; right?

4    A.   No.

5    Q.   The part -- this is Subsection (a), Subsection (3),

6    Paren -- I always forget all that -- all the special words for

7    the subsections, but this is actually a really, really long

8    regulation, is it not?

9    A.   Yes.

10   Q.   This particular part of it has to do with the petition with

11   the I-17 --

12   A.   Correct.

13   Q.   -- with what's required?

14        And for those of the jurors that were not trained as

15   lawyers -- and I don't think we had any -- what exactly -- what

16   exactly is a federal regulation?

17   A.   A federal regulation -- typically, what happens is you'll

18   have Congress pass a statute, and then -- so in this case, it

19   was the Immigration Nationality Act, which came into being a

20   while ago, and then the regulations give meat to that statute.

21   So they basically, you know, give more explanation to it.

22   Q.   So this -- this particular regulation was not passed by

23   Congress; right?

24   A.   No.

25   Q.   Or signed by the President?

```
 1    A.   No.  I -- no.

 2    Q.   They're proposed by the agency; right?

 3    A.   Correct.

 4    Q.   Which gives a certain amount of public notice?

 5    A.   Correct.

 6    Q.   Time for people to comment on -- the people or agencies to

 7    comment on proposed regulations?

 8    A.   Right.

 9    Q.   And either it's modified or not, and at some point a

10    regulation is adopted?

11    A.   Correct.

12    Q.   Do you know how long this particular regulation has been in

13    its current form?

14    A.   It's been quite a while, maybe since the 80's.

15    Q.   Okay.

16    A.   It's gone through -- it has gone through a few since SEVIS

17    in 2001 was started, but this particular chunk, I think, has

18    remained pretty much the same.

19    Q.   Fair to say this particular regulation was enacted before

20    people started going to school -- before the Internet really

21    became widely used?

22    A.   I would disagree with that because the whole 214.3 went

23    under review when SEVIS began.  So they only changed

24    sections -- they kept in place certain sections the way they

25    wanted it to happen, and then they changed certain sections to
```

1    accommodate the fact that you have to enter SEVIS and go

2    through it again, et cetera.

3    Q.  I understand.  It was modified in -- what did you say?

4    2001?

5    A.  Somewhere -- early 2000's, yeah.

6    Q.  Okay.

7    A.  I'm not exactly sure of that date.

8    Q.  Was the language of this particular part of the regulation

9    changed in 2001?

10   A.  I wouldn't -- I wouldn't know, but I know the whole 214.3

11   was under review, and they went line by line and decided what

12   needed changes to accommodate SEVIS and what did not.

13   Q.  Okay.  Is there -- is there somewhere in 214.3 that says

14   students cannot take classes -- Internet-based classes?

15   A.  Yes.

16   Q.  What section is that?

17   A.  I would have to see the -- I would have to physically see

18   the regulation.

19       Okay.  Bear with me for a minute.

20   Q.  I'm sorry.

21           THE COURT:  Does the witness now have the regulation

22   in front of her?

23           MR. BABCOCK:  She does.

24           THE WITNESS:  I have 214.3.

25   ///

1    BY MR. BABCOCK:

2    Q.   You can ignore my highlights.

3    A.   It might take me a minute to find it.

4         It -- okay.  I'm not finding it yet, but there's also a

5    portion -- it's 214.2 -- that designated school officials are

6    supposed to be aware of, and it may be in that.  Let me just

7    keep going through this.

8              THE COURT:  Is it possible for this to be the subject

9    of some later testimony by the witness so that she's not made

10   to review at length --

11             MR. BABCOCK:  I will -- I'm not going to be --

12             THE COURT:  Excuse me.  Please do not interrupt me

13   while the court reporter is taking down what I'm saying.

14        Instead of having her go through this lengthy piece of

15   paper -- and she's acknowledged it might be in a different

16   regulation -- that she can have an opportunity to look at.

17             MR. BABCOCK:  Certainly.

18             THE COURT:  Thank you.

19             MR. BABCOCK:  I apologize for interrupting, your

20   Honor.

21             THE COURT:  Thank you.  I didn't mean to be quite so

22   stern.  It's just that it's hard to be a court reporter.  It's

23   not magic.  He can't take down two people at once.

24             MR. BABCOCK:  My experience is when I interrupt a

25   judge, the court reporter ignores my interruption and just

1    reports the judge.

2             THE WITNESS:  Yeah.  So I may be mistaken, but I know

3    it says it.  It may be in 214.2.  I have to -- I have to sit

4    down and --

5    BY MR. BABCOCK:

6    Q.   Okay.

7    A.   -- go through it.

8    Q.   Do you know if -- do you know if Ms. Su has any legal

9    training?

10   A.   I don't know that.

11   Q.   Fair to say just this one regulation is very lengthy?

12   A.   Correct.  I mean, it's more than a few pages.

13   Q.   Even for a lawyer.

14        Do you know if she had any legal assistance when she --

15   when she prepared -- when she applied?

16   A.   I don't know.

17             MR. BABCOCK:  Okay.  I'm getting close, your Honor.

18   Sorry.

19   BY MR. BABCOCK:

20   Q.   I'm sorry.  Can you tell the jury what curricular practical

21   training is?

22   A.   Curricular practical training is a type of employment that

23   students are eligible for, but it's akin to doing an

24   internship.

25   Q.   When students are -- when foreign students are attending

1    the school in the United States, are they allowed to work?

2    A.   Not without permission.

3    Q.   Okay.  And who do they get permission from?

4    A.   Depending on what type of work it is.  Some of it is

5    through solely the designated school officials.  Other types of

6    work, you have to get the designated school official to

7    recommend that you do that type of work, and then you have to

8    submit an application with USCIS and get approval.  Curricular

9    practical training is solely a designated school official

10   approves it.

11   Q.   I think --

12           MR. BABCOCK:  May I have one second, your Honor?

13   BY MR. BABCOCK:

14   Q.   If a person is doing curricular practical training, are

15   they allowed to have a reduced course load?

16   A.   No.

17   Q.   They have to take a full course load at the same time?

18   A.   Correct.

19           MR. BABCOCK:  Okay.  I think that's all I have, your

20   Honor.

21           THE COURT:  Thank you, Mr. Babcock.

22           MR. BABCOCK:  May I have just a second to get out of

23   the way?

24           THE COURT:  Ms. West, redirect?

25           MS. WEST:  Yes.  Thank you.

1    Mr. Noble, if you can actually leave some of those out, I'm

2    just going to use them.

3    Thank you.  Thank you very much.

**REDIRECT EXAMINATION**

5    BY MS. WEST:

6    Q.  Ms. Warner, there are a few points that I want to follow up

7    on from what Mr. Babcock was asking you.  One of the questions

8    that he asked you about related to the event history -- or

9    rather the student information -- student event history where

10   we looked at some things that you said were out of order.  Do

11   you remember that?

12   A.  Correct.

13   Q.  And when those are out of order, is that within the -- two

14   different actions within the same day?

15   A.  Yes.

16   Q.  So if they're on different dates, those are automatically

17   ordered by SEVIS?

18   A.  Yes.  Yes.

19   Q.  And one of the other things that you had talked about a few

20   minutes ago was when somebody would apply for reinstatement,

21   while that reinstatement was pending, you explained to the jury

22   how -- if the individual was actually pursuing a full course of

23   study during that time, there's sort of a pause -- that for

24   SEVIS purposes, they are still terminated while the

25   reinstatement is pending before it's approved.  Do I have that

1    right?

2    A.   Correct.  In order to be -- to be eligible, one of the

3    requirements to be eligible for reinstatement is they have to

4    maintain status while they're waiting for the reinstatement to

5    happen.  So they would have to attend a full course of study at

6    a school.

7    Q.   Because attending a full course of study is maintaining

8    status?

9    A.   Correct.

10   Q.   Okay.  So if somebody is attending a full course of study,

11   they would be in status; is that right?

12   A.   Correct.  Well, there's other ways you can fall out of

13   status, but yes.

14   Q.   Okay.  And if they're not maintaining the full course of

15   study, they're not in status; is that right?

16   A.   Correct.

17   Q.   Now, for the -- whether somebody is actually in status --

18   who do you rely on to find out if somebody actually is

19   maintaining the full course of study?

20   A.   Designated school officials.

21   Q.   And that would be the person on the right-hand column on

22   the event history; is that right?

23   A.   Correct.

24   Q.   So where do you -- where is SEVP?

25   A.   Located?

WARNER - REDIRECT / WEST

1    Q.   Yes.

2    A.   In Washington, DC.

3    Q.   So as you sit there in Washington, DC, do you have any idea

4    what a student in the San Francisco Bay Area is actually doing,

5    whether they are actually going to their classes?

6    A.   No.  I mean, no.  We rely on the designated school

7    officials to tell us.

8    Q.   There were some questions also about SEVIS training --

9    A.   Yes.

10   Q.   -- and whether you know to what extent Ms. Su had SEVIS

11   training.

12   A.   Correct.

13        MS. WEST:  Let's -- if we could please pull up

14   Exhibit 3, Page 10.

15        Oh.  You know what?  We've already got this on.  I'll just

16   use this.  Let's zoom out for a moment so we see what we're

17   looking at.

18   BY MS. WEST:

19   Q.   This is Page 10 of Exhibit 3, which we looked at earlier,

20   on Tri-Valley University letterhead, and do you recall that

21   this was submitted to SEVP by Ms. Su?

22   A.   Yes.

23   Q.   All right.  And in fact, we actually see Ms. Su's signature

24   on the first line there?

25   A.   Yes.

1    Q.   Followed then by Sophie Su and Wenchao Vince Wang?

2    A.   Correct.

3    Q.   All right.  So if we zoom in here, do you see it states,

4    "This letter is to state that all three P," slash, "DSO of

5    Tri-Valley University -- Susan Su, Sophie Su, and Wenchao,"

6    parentheses, "Vince Wang -- have read, understood, and will

7    comply with all federal regulations relating to nonimmigrant

8    students."  And then the last sentence there is "Each P,"

9    slash, "DSO has also taken the DSO web-based training program."

10        Do you see that?

11   A.   Yes.

12   Q.   What is the DSO web-based training program?

13   A.   It's -- SEVP provides many resources for school officials

14   to learn the regulations and learn the system, and one of the

15   things that we have for them is that there's a web-based

16   training that they can go into to learn how to use SEVIS and to

17   learn all the regulations, and they could test it, and so --

18   and then they'd come back, and they'd tell us, you know, that

19   they've, in fact, successfully completed that training.

20   Q.   And that's what that certification is; right?

21   A.   Correct.

22   Q.   It's a certification that Ms. Su has been trained in SEVIS

23   and the regulations?

24   A.   Correct.

25   Q.   I wanted to also show you -- we looked at two I-17's side

1    by side, and one of them -- let's take a look.  One of them was

2    Exhibit 3, Page 2, and we looked there, and it had "Private

3    School of Higher Education only approved for classes listed in

4    Section 19."

5        Do you see that?

6    A.   Yes.

7    Q.   And if we look actually at Page 6 of the same document

8    and -- there we go -- you kind of direct your attention to just

9    below the signature line there, do you see -- let's zoom in --

10   a date there?

11   A.   Yes.

12   Q.   What does that date reflect?

13   A.   That -- that was the date that this Form I-17 was actually

14   printed out and --

15   Q.   From SEVIS?

16   A.   Yes, from -- well, I would have to go back and see what the

17   reason was for printing.  It could -- I'm -- if those are

18   original signatures, it may, in fact -- because I notice a date

19   stamp -- well, yes.  The date it was printed was from SEVIS,

20   yes.  I don't know who did the printing.  I want to say --

21   Q.   Okay.  So is it possible -- or do you know -- not is it

22   possible, but do you know whether during the I-17 approval

23   process -- if different copies of it are floating around that

24   people might make remarks on?

25   A.   Yes.

1    Q.   That does happen?

2    A.   Oh, yeah, all the time.

3    Q.   So how do you know which one is the actual final copy?

4    A.   So actual -- we gather that information on the Form I-17,

5    and then we use that to collect the actual -- you know, they

6    call it a wet signature, but the actual system of record for us

7    is SEVIS itself.  So that approval does not become effectual

8    until the adjudicator actually comes into SEVIS and clicks the

9    button saying the school was approved.

10   Q.   Okay.  And then a few minutes ago also, do you remember you

11   were taking a look at the Tri-Valley University catalog?

12   A.   Yes.

13   Q.   And there was some information there about refunds?

14   A.   Yes.

15   Q.   And Ms. Su provided the catalog with her -- the information

16   she provided with the site visit; is that right?

17   A.   Correct.

18   Q.   Did you actually look at Tri-Valley University's website?

19   A.   I have not.

20   Q.   You've never seen it?

21   A.   No.

22   Q.   So you have no idea what the website said about refunds?

23   A.   No.

24   Q.   All right.  And then we also looked at that warning banner,

25   Exhibit 106?

1    A.   Correct.

2    Q.   And you explained that that pops up when somebody logs in?

3    A.   Correct.

4    Q.   So what if somebody logged in and then handed the

5    computer -- the laptop or whatever to somebody else and

6    somebody else then sat in front of that same computer?  Would

7    that popup warning banner somehow pop back up after it's

8    already logged in?

9    A.   If somebody logged in their user ID and their password and

10   then handed the laptop to somebody else, no, it wouldn't pop

11   back up.  It's a one-time thing because we are relying that

12   it's actually the person populating in that user ID and

13   password as the one who is going to be accessing the system.

14   Q.   Okay.  And now that warning banner that we looked at -- and

15   I don't think I need to pull it up again, but if you want me

16   to, I'm happy to.  Did that apply to initial access of SEVIS or

17   to all users?

18   A.   All -- all users.

19   Q.   And it actually stated that in the warning banner?  Let's

20   pull it up.

21   A.   Yeah, I believe so.

22   Q.   Let's make sure we get it right and look at Exhibit 106

23   again.

24        Is this what we were just looking at with the warning

25   banner?

1    A.   Yes.

2    Q.   Do you see the first sentence?

3    A.   Yes.

4    Q.   Can you read it, please.

5    A.   "This system is for the use of authorized users only."

6    Q.   Now, do you happen to know if SEVIS at some point may time

7    out if there's inactivity on it?

8    A.   Yes, it does.

9    Q.   And when it -- after it's timed out, does the user have to

10   log back in?

11   A.   Yes.

12   Q.   And at that point, would that warning banner come back up?

13   A.   Yes.

14            MS. WEST:  No more questions.

15            THE COURT:  Recross?

16            MR. BABCOCK:  Just briefly.

17                      **RECROSS-EXAMINATION**

18   BY MR. BABCOCK:

19   Q.   The -- the exhibit listed as Exhibit -- the -- what is it?

20   Page 1 of the I-17; right?  We've seen that there are two, the

21   first page and -- of this one is somewhat different than the

22   first page of the I-17 in Exhibit 4; right?

23   A.   Correct.

24   Q.   This one has the language in the -- this middle section

25   about the classes listed in Section 19; right?

1      A.   Correct.

2      Q.   And this one actually -- this is the one that has the

3      "Received" stamp, which overlaps with Mr. Kobe's signature;

4      right?

5      A.   Correct.

6               MR. BABCOCK:  That's all I have.

7           Thank you, ma'am.

8               THE COURT:  Anything more, Ms. West?

9               MS. WEST:  No, your Honor.

10              THE COURT:  Ms. Warner, thanks for your testimony.

11     You're excused.

12              THE WITNESS:  All right.  Thank you.

13          I might want somebody to move this before I come --

14              THE COURT:  Oh, yeah.  Can someone move the blowup?

15              MR. BABCOCK:  You're trapped.

16              THE COURT:  Government's next witness?

17              MR. RHYNE:  Yes, your Honor.

18          The United States calls Dr. Hao Luo.

19              THE COURT:  Good morning, Dr. Luo.

20          Could I ask you to come to the witness stand, please, which

21     is this platform right next to me.  And when you get there, if

22     you can just raise your right hand, please, and face my

23     courtroom deputy.  Please remain standing.

24          Perfect.

25              THE CLERK:  Do you solemnly swear or affirm that the

1    testimony you're about to give in the matter now pending before

2    this Court shall be the truth, the whole truth, and nothing but

3    the truth?

4              THE WITNESS:  Yes.

5              THE CLERK:  Thank you.  Please be seated.  Get real

6    close to this microphone in order to be heard.

7              THE WITNESS:  Okay.  Can you hear me?

8              THE CLERK:  Please state your full name and spell

9    your last name.

10             THE WITNESS:  My last name is L-u-o.  My first name

11   is H-a-o.  So I'm Hao Luo.

12             THE COURT:  All right.  Very good.

13        Your witness.

14             MR. RHYNE:  Thank you, your Honor.

15                           **HAO LUO,**

16   Called as a witness by the Government, having been duly sworn,

17   testified as follows:

18                      **DIRECT EXAMINATION**

19   BY MR. RHYNE:

20   Q.   Where are you currently employed?

21   A.   Currently, I'm a research scientist at Intel Company.

22   Q.   How long have you been there?

23   A.   I've been in Intel for one year.

24   Q.   What are your duties and responsibilities there?  What do

25   you do?

1    A.   Up there, I am kind of researching between -- like,

2    finishing technology.

3    Q.   What did you do before that job?

4    A.   Before that, I was hired at a Hewlett-Packard lab.  I was

5    also a researcher there and doing research for making a

6    flexible display device.

7    Q.   What's a flexible display device?

8    A.   It's basically a display but on fabric -- on plastic and

9    film.

10   Q.   Okay.  So it's a display with plastic and film, you said?

11   A.   Yes.  It's like actually, like, an easy display fabric --

12   flexible plastic substance.  So you bend it.

13   Q.   Very good.

14        Can you summarize for the jury your educational background?

15   A.   Okay.  So I got my Ph.D. degree at the Carnegie-Mellon

16   University in 2003.  Before that, I also got my Master's degree

17   at the same school, and before I came to the U.S., I got my

18   Bachelor's in China in Tsinghua University in 1994.

19   Q.   Can you spell "Tsinghua University"?

20   A.   Tsinghua University in China.  It's Tsing- --

21   Q.   Okay.  Can you spell that for us?

22   A.   T-s-h-i-n-g-h-u-a.

23   Q.   Now, that university is commonly referred to in the United

24   States as the MIT of China; is that correct?

25   A.   Yes.  That's one of the best universities in China.

1    Q.   So it's referred to as that name; is that correct?

2    A.   Yes.  Correct.

3    Q.   What year did you graduate with your Ph.D. from

4    Carnegie-Mellon?

5    A.   That's in January 2003.

6    Q.   What area was your Ph.D. in?

7    A.   Oh.  My Ph.D. -- I majored in the double E department.

8    So --

9                   (Court reporter clarification.)

10              THE WITNESS:  Electrical -- electrical engineering.

11   BY MR. RHYNE:

12   Q.   Do you know the defendant in this case, Dr. Susan Su?

13   A.   Yes.

14   Q.   How do you know her?

15   A.   In the year 2007, one of my friends -- his name is called

16   David.  So he wanted to start a company to make a device.  It's

17   called a motion sensor.  It's a device that they use in your

18   Smart Phone, for example, when you're playing a game or you're

19   displaying -- changing picture orientation.  So for that

20   device, it's called a MEMS device.  That's my research status.

21   Q.   Can you spell -- MEMS is M-E-M-S; correct?

22   A.   Correct.

23   Q.   What does that stand for?

24   A.   That means microelectromechanical systems.

25   Q.   Can you just -- can you tell the jury in a simple way --

1    A.   Okay.

2    Q.   -- what's a MEMS device?

3    A.   It's just kind of a -- if you are familiar with an IC, an

4    integrated circuit.  So this is very similar like that.  We use

5    an integrated circuit technology to fabricate -- miniaturize

6    the device on a specific chip.  So that device -- it's

7    basically a very small mechanical part that senses motion.  So

8    it's a sensor.

9    Q.   So a small mechanical device that fits on a chip that --

10   A.   Yeah.

11   Q.   -- detects motion?

12   A.   So -- right.  So --

13   Q.   Okay.

14   A.   -- after fabrication, it's just like a normal integrated

15   circuit chip that you can use in any kind of computer or tablet

16   or cellular phone.

17   Q.   Can you explain the circumstances under which your friend

18   David introduced you to Susan Su?

19   A.   Yes.  In 2007, David -- as I said, David wanted to start

20   his company to making this device.  So he first found me

21   because my research background that -- I published a paper.  So

22   he knows I do those publications.  So he knows me.

23   Q.   So you had -- I'm sorry.  You said you had -- you had

24   published a publication on this area?

25   A.   Yes.

1    Q.   Okay.  Very good.

2    A.   So one day, he called me to lunch.  So during lunch, that's

3    when I went to the lunch, and David sat there with the

4    defendant, and David introduced -- the defendant graduated from

5    UC Berkeley in the same area I did.  So basically, he just

6    tried to gather all kinds of experts in this area to making

7    this device.

8    Q.   And the purpose of this meeting was to discuss the possible

9    development of a company; is that correct?

10   A.   Yes.

11   Q.   Okay.  Involving yourself, David, and possibly Dr. Su, the

12   defendant; is that correct?

13   A.   Correct.  Actually, before that, David had already

14   contacted a bunch of other people.  So --

15   Q.   Okay.

16   A.   But we are the experts in this area.  So --

17   Q.   So there were other people involved as well?

18   A.   Yes.

19   Q.   You had a couple additional meetings with Susan Su; is that

20   correct?

21   A.   As I remember, one -- there was a lunch meeting in the

22   restaurant.  Another one is at her house in Pleasanton.  After

23   that, there was just a bunch of online meetings and -- online

24   meetings.

25   Q.   During these meetings, did you ever discuss your academic

1    credentials?

2    A.   Yes.  When you want to start a -- start a startup company

3    and you're the founder, you exchange your -- all your

4    informations.

5    Q.   What happened with that company?  Did it get off the

6    ground?

7    A.   Actually, we hold a series of online meetings because we

8    didn't find a VC.  So people come and go after a couple months

9    or so.  People just left.  And then in the year -- probably

10   2008 or so -- so David went back to China in Shanghai.  So he

11   tried to -- he did his business in China now, and since then,

12   the rest of the people did not contact each other.

13   Q.   So David took the business back to China after you

14   couldn't -- you said VC.  That's venture capital; correct?

15   A.   Yes, venture capital.

16   Q.   You couldn't find that in the United States.  So he moved

17   back to China; correct?

18   A.   Right.

19   Q.   Did you have any contact with Susan Su after that business

20   venture?

21   A.   No.  No -- any contact, no meeting, no e-mail, no call.

22   Nobody mentioned about the defendant.

23   Q.   At any of these meetings, did you ever tell Susan Su that

24   she could use your name or your credentials in starting a

25   university called Tri-Valley University?

1   A.   Let me say it this way.  In the lunch meeting -- during the

2   lunch meeting, she -- when she introduced herself, she

3   mentioned once that she was teaching at a local college, but

4   other time, I don't know -- I know nothing about what school.

5        And actually -- honestly, at that time, I only know three

6   local schools, Berkeley -- first, UC Berkeley.  Another one is

7   Stanford.  Another one is San Jose State.  So I --

8                    (Court reporter clarification.)

9                    THE WITNESS:  San Jose State.

10       So I assumed that she was just an assistant professor or

11  somehow in San Jose State.

12  BY MR. RHYNE:

13  Q.   So let me ask you again, then --

14  A.   So I -- no.  So she said -- so she said that her college

15  also looking for teachers and suggests that during the lunch

16  chat.

17       So then I had said -- because of generosity -- so I said,

18  "Okay.  I might be interested in it," but I didn't -- we didn't

19  specifically talk about that because that was the first -- this

20  meeting was not just between the two of us.  It was called by

21  David, and it was about to start a company.

22  Q.   Let me ask you this:  Did you ever receive any money from

23  Tri-Valley University?

24  A.   Never.

25  Q.   Did you ever sign a contract to teach at Tri-Valley

1    University?

2    A.   Never.

3    Q.   Did Susan Su ever ask you to teach a particular class at

4    Tri-Valley University?

5    A.   No.

6    Q.   Okay.  I want to publish, if we can, Exhibit 1, Page 8, and

7    can we just zoom in at --

8    A.   I can't see very clear.

9    Q.   -- "Tri-Valley University Instructor Listing" in the first

10   paragraph.

11       And you stated your background was in engineering; correct?

12   A.   Yes.

13            MR. RHYNE:  Okay.  Can we pull back out of that, and

14   can we go down to the line for Hao Luo?

15   BY MR. RHYNE:

16   Q.   Is that your name there on the left?

17   A.   Yes.

18   Q.   And is that your educational background in the next column

19   over?

20   A.   Yes.  Yes.

21   Q.   Okay.  And over on the far right, it says, "TA,

22   Carnegie-Mellon University."  Were you a TA at Carnegie-Mellon?

23   A.   Yeah, I was a TA there.  Yes.

24   Q.   And were you also a senior engineer at HP?

25   A.   Yes.

1   Q.   Okay.  Did you ever agree to teach the class?

2   A.   No.

3   Q.   Do you see "Microelectronics IC"?

4   A.   No.

5   Q.   Did you ever agree to teach CMOS, Memory Circuit Design?

6   A.   No.

7   Q.   Did you ever agree to receive any kind of salary -- say,

8   $85 an hour -- from Dr. Su?

9   A.   No.  Nobody mentioned anything about -- not even penny.

10   Q.   Did you ever agree to teach anything at Tri-Valley --

11   A.   No.  No.

12   Q.   Let me finish my question just so he can type it.

13        Did you ever agree to teach anything at Tri-Valley

14   University?

15   A.   No.  I don't know even know the name of this school.

16   Q.   Did you ever agree to be a staff member?

17   A.   No.

18   Q.   When was the first time you actually heard the name

19   "Tri-Valley University"?

20   A.   The first time I heard of this word was when the agent

21   questioned me at the immigration office in San Jose, like, two

22   or three years ago.  I've gone --

23   Q.   So somebody came to interview you; is that correct?

24   A.   Yeah.  That's the first time I heard about this name.

25            THE COURT:  Dr. Luo, there's some water there in case

1    you get thirsty.

2              THE WITNESS:  Oh, I'm okay.  Thank you.

3              THE COURT:  Yeah.

4              MR. RHYNE:  Can we go to Exhibit 1, Page 148, please,

5    and can we zoom in to the "Hao Luo" section?

6         Actually, Ms. Hughes -- Ms. Hughes, can we back up just to

7    put it in some context Page 11 of Exhibit 1?  I apologize.

8    BY MR. RHYNE:

9    Q.  Dr. Luo, have you ever seen the Tri-Valley University

10   catalog?

11   A.  Never.

12   Q.  Okay.  Now let's go back to that other page, please, 148.

13        Again, we see your credentials here; is that correct?

14   A.  Yes.

15             MR. RHYNE:  Can we back out of that, please.

16   BY MR. RHYNE:

17   Q.  Now, we backed out a little bit to include some credentials

18   below your name.  I want you to look at those credentials below

19   your name for Chi Jing.  Do you recognize those credentials?

20   A.  From the credentials, it looks like it's my wife, but

21   actually it's spelled -- it's not correct.

22   Q.  You know that's your wife's credentials because you went to

23   school with her?

24   A.  Yes.  We went to the same school actually.  We had the same

25   graduate advisor.

1    Q.   Can you state your wife's real name?

2    A.   Her name?

3    Q.   Or correct name, I should say.

4    A.   Q-i, N-g.

5              MR. RHYNE:  Thank you.

6         No further questions, your Honor.

7              THE COURT:  Thank you.

8         Cross-examination?

9         Oh.  Dr. Luo, you said her -- her -- your wife's name --

10             THE WITNESS:  Q-i --

11             THE COURT:  -- is Q-i-n-g?

12             THE WITNESS:  Yeah.  Q-i.

13             THE COURT:  Oh.  Q-i?

14             THE WITNESS:  Yeah.  In Chinese, it's Q-i.

15             THE COURT:  And so -- and so --

16             THE WITNESS:  In conversation, it is Qi.

17             THE COURT:  So is the last name printed on the screen

18    now correct with the first name?

19             THE WITNESS:  The last name is correct.  The first

20    name is not.

21             THE COURT:  I see.

22        Okay.  Thank you for that clarification.

23        Cross-examination?

24             MR. BABCOCK:  Thank you, your Honor.

25    ///

1                    **CROSS-EXAMINATION**

2    BY MR. BABCOCK:

3    Q.  Good morning, Mr. Luo.

4    A.  Good morning.

5    Q.  My name is Erik Babcock, and I represent Ms. Su.

6        You -- you mentioned that you -- strike that.  Let me start

7    over.

8        You're working at Intel now --

9    A.  Right.

10   Q.  -- for the last year or so.

11       Before that, you worked at HP?

12   A.  Yes.

13   Q.  You have a Ph.D.?

14   A.  Yes.

15   Q.  In some sort of engineering field, I assume?

16   A.  Yes.

17   Q.  Okay.  And you got -- you went to school at Cal; is that

18   right?

19   A.  No.  No.  School -- Carnegie-Mellon University.

20   Q.  Oh, that's right.  Carnegie-Mellon.

21       Okay.  And at some point in -- you got involved in a

22   possible project -- I didn't catch the name of the person whose

23   idea it was.

24   A.  David.

25   Q.  David?

1    A.   Yes.

2    Q.   Okay.  What's David's last name?

3    A.   The Chinese last name is Zou, Z-o.

4    Q.   Z-o?

5    A.   Yeah.  Z-o-u.  Z-o-u.

6    Q.   Okay.

7    A.   Z-o-u.

8    Q.   And there were several people potentially involved in this

9    project?

10   A.   Yes.

11   Q.   And one of those was Ms. Su?

12   A.   Exactly.

13   Q.   And as I understand it, there was sort of a series of

14   meetings and discussions both in person as well as by e-mail;

15   right?

16   A.   Right.

17   Q.   Which is when you first -- is that when you first became

18   acquainted with Ms. Su?

19   A.   The first meeting we went to -- the defendant was at the

20   lunch meeting.

21           THE COURT:  I'm sorry, sir.  I didn't -- I didn't

22   catch the last couple things you said.

23           THE WITNESS:  I -- can you repeat?

24   BY MR. BABCOCK:

25   Q.   Do you remember the first -- when you first met Ms. Su?

1    A.   Uh-huh.  Yes.

2    Q.   Was it at this lunch meeting you described?

3    A.   Yes, it was the lunch meeting.

4    Q.   Okay.  Was that at her house?

5    A.   No.  That was at a restaurant, local.  I remember it was in

6    Mountain View.

7                    (Court reporter clarification.)

8            THE WITNESS:  In Mountain View.

9    BY MR. BABCOCK:

10   Q.   In Mountain View.

11        Okay.  And who else attended this meeting?

12   A.   David.

13   Q.   So it was you, David, and Ms. Su?

14   A.   Yes.

15   Q.   Anyone else?

16   A.   No.

17   Q.   Okay.  And this was to discuss this project that David --

18   this idea that David had for a possible project?

19   A.   Yes.

20   Q.   What was it?  A flexible motion device?

21   A.   No, no, no.  It was a MEMS sensor, M-E-M-S sensor.

22   Q.   Okay.  And at some point, Ms. Su mentioned that she was

23   teaching at a local --

24   A.   College.

25   Q.   -- college?  Okay.

LUO - CROSS / BABCOCK

1    A.   Yes.

2    Q.   Now, did you -- are you saying that you assumed that meant

3    that it was like either Stanford or San Jose State?

4    A.   No.  She said a local college.  So I -- so I thought

5    that -- okay.  Because at that time, I only know three schools.

6    So I thought -- when she said "college," I just assumed like

7    San Jose State.

8    Q.   Okay.  You don't remember her mention -- you -- you --

9    those were the colleges you were familiar with in the area?

10   A.   That's all the three names I know --

11   Q.   Okay.

12   A.   -- at the time.

13   Q.   Fair enough.

14        And she had a discussion with you about whether you would

15   be interested at some point about being a teacher there?

16   A.   Yes, she mentioned that.

17   Q.   Okay.  And did you express some interest?

18   A.   It was not a discussion.  I was being generous in saying,

19   "Yeah, I might be interested.  I will see."

20   Q.   I understand.

21   A.   Yeah.

22   Q.   You didn't get to the point of, you know, reviewing

23   documents?

24   A.   No, never.

25   Q.   Talking about a salary?

1    A.    No.

2    Q.    Anything like that?

3    A.    No.

4    Q.    But you did tell her you'd be interested in teaching as a

5    possibility --

6    A.    Yeah.

7    Q.    -- right?

8    A.    Yes.

9    Q.    And you also spoke with -- this was -- you also had some

10    social interaction with Ms. Su beyond just discussing this

11    project that ended up not getting off the ground; right?

12    A.    Right.

13    Q.    Is that right?

14    A.    Yes.

15    Q.    Did Ms. Su also speak to you at some point about who your

16    wife was and what her qualifications were?

17    A.    She didn't ask actually.  I mentioned that during the

18    lunch.  Continue?  I mean --

19    Q.    During the lunch?

20    A.    Yeah, during the lunch --

21    Q.    Okay.

22    A.    -- because of -- I mean, the first time when David said,

23    "Okay.  She graduated from UC" -- "UC Berkeley actually" -- so

24    because my graduate advisor graduated from the same

25    institute -- in the same research institute, and she

1    mentioned -- the defendant mentioned that she even know my

2    advisor.

3         And so I -- at that time, I felt kind of even closer.  So I

4    mentioned, "Oh, my wife also have the same advisor as me."  So

5    I just feel closer.  So I just talked about it.

6    Q.   So you understood -- you learned that Ms. Su had graduated

7    from Cal, right, or from Berkeley?

8    A.   From Berkeley.

9    Q.   And you found out, in fact, she had the same advisor that

10   you and your wife had?

11   A.   No, no, no.  She does not have the same advisor.

12   Q.   Okay.

13   A.   My wife's advisor is the same --

14   Q.   Oh, I see.

15   A.   -- as I did.

16   Q.   Your wife's advisor was from Berkeley?

17   A.   Yes.

18   Q.   My point being your discussions with -- you had some

19   discussions with Ms. Su not just about this project for this

20   sensor but about your qualifications, possibly teaching, and

21   making some other connections?

22   A.   No.

23   Q.   Well, you just testified about -- you talked with her

24   about -- about her background; right?

25   A.   Yeah.

1     Q.   As well as your wife's background?

2     A.   Yes.

3     Q.   This connection you had with the advisor?

4     A.   Yes.

5     Q.   Didn't you -- in fact, this lunch meeting was not the last

6     time you spoke with Ms. Su?

7     A.   Right.

8     Q.   You talked with her after that?

9     A.   Yes.

10    Q.   Okay.  And in fact, didn't you talk with her at a later

11    point about you and your wife being either faculty advisors for

12    the school where she was at?

13    A.   No.

14    Q.   Okay.  You were working at HP in 2011; right?

15    A.   2 -- 2000 -- last year?  That's 2000 -- 2013.

16    Q.   You mentioned this interview you had with immigration?

17    A.   Yes, an agent from Homeland Security.  It looks like we

18    could use the office at the immigration --

19         THE COURT:  I'm sorry.  There was a previous question

20    that Mr. Babcock asked you earlier, and I'm not sure we got a

21    clear answer.

22         In 2011, is it true that you were working at HP?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  Thank you.

25         Mr. Babcock?

1    BY MR. BABCOCK:

2    Q.    Let -- you mentioned an interview that you had with an

3    immigration officer or someone -- with someone at the

4    immigration office in San Jose?

5    A.    Yes.

6    Q.    In connection with -- with Ms. Su; right?

7    A.    Right.

8    Q.    Actually, a -- someone from Homeland Security came to your

9    work first; right?

10   A.    Yes.

11   Q.    They came to HP?

12   A.    Yes.

13   Q.    And you did not want to --

14   A.    No.

15   Q.    -- talk to them while you were at work?

16   A.    No.  They came to HP and tried to find me.  At that time,

17   I'm not at the office.

18   Q.    I see.

19   A.    So they told my boss at HP.  So my boss told me that

20   somebody was trying to look for me.  So then I called back, and

21   so he asked me to go to this immigration office at San Jose.

22   So I went there.  I met an agent there.  So he questioned me

23   the first time, and -- he questioned me, and so that's the

24   first time I heard about it, the defendant, after a couple of

25   years.

1    Q.   You -- did you ever go to Ms. Su's home?

2    A.   Yes.

3    Q.   You did?

4         And you also met her at the restaurant the once for lunch?

5    A.   Yes.

6    Q.   Do you remember any other times that you socialized

7    together?

8    A.   Another -- if you say "social," is that after -- yes.  I

9    remember after the lunch meeting a time when my -- my company

10   issued -- gave her some discount for Gilroy Gardens.

11                  (Court reporter clarification.)

12             THE WITNESS:  Gilroy Gardens.

13        So at that time -- so I told -- I told the boss -- the

14   defendant and David.  He say, "Okay.  I can get some discount

15   for some park tickets.  Do you want that?"  So I got some

16   tickets.  So we can buy some discount tickets, and that's it.

17   BY MR. BABCOCK:

18   Q.   I'm sorry.  This -- you got some -- your company got some

19   sort of discount tickets at Gilroy Gardens?

20   A.   Yes.

21   Q.   And did you offer those to Ms. --

22   A.   Yeah.  I offered that to both David and her.

23   Q.   I see.

24   A.   Yeah.

25   Q.   Did she take you up on the offer?

```
1    A.   Yes.

2              MR. BABCOCK:  Okay.  Thank you.

3         That's all I have.

4              THE COURT:  Thank you.

5         Redirect?

6              MR. RHYNE:  May I have a moment, your Honor?

7              THE COURT:  Yes.

8              MR. RHYNE:  No further questions, your Honor.

9              THE COURT:  All right.  Thank you.

10        Dr. Luo, thank you very much for your testimony.  You're

11   excused.

12             THE WITNESS:  So I can go?

13             THE COURT:  You can step down, and you can go.  Yes,

14   sir.

15             THE WITNESS:  Okay.  Thank you.

16             THE COURT:  Well, the timing on that is very good

17   because its 11:45, and that's when we like to take our second

18   morning recess.  So we're going to do that very thing.

19        Please remember my prior admonition.  Don't form or express

20   any opinion about this case.  Don't talk to anybody, even each

21   other.  We'll be in recess for 15 minutes.

22             THE CLERK:  All rise.

23             THE COURT:  All right.  This will be off the record.

24                  (Recess taken.)

25             THE COURT:  Okay.  Let's go back on the record.
```

1  Before we get to the Government's next witness, I know that

2  the -- this projection device frequently in front of me is

3  called an Elmo like the character on *Sesame Street*, and --

4  anyway, it has two light bars on either side, and at least one

5  of you has been bothered by that light bar.

6  So when we looked at it at the break, the offset angle is

7  fixed.  There's nothing I can do about that to make those light

8  wings get closer or further away, but in another direction, we

9  kind of articulated one of them along that.

10  So anyway, I just wanted to let you know we're doing what

11  we can, if that's helpful.

12  Government's next witness?

13  MR. RHYNE:  Yes, your Honor.

14  The United States calls Dr. Qi Jing.

15  THE CLERK:  Remain standing.  Please raise your right

16  hand.

17  Do you solemnly swear or affirm that the testimony you're

18  about to give in the matter now pending before this Court shall

19  be the truth, the whole truth, and nothing but the truth?

20  THE WITNESS:  Yes.

21  THE CLERK:  Thank you.  Please be seated.  Get close

22  to this microphone in order to be heard.

23  Please state your full name and spell your last name.

24  THE WITNESS:  Okay.  My name is Qi Jing.  Last name

25  is J-i-n-g.

1          THE COURT:  Ms. Jing, several people are kind of

2     loud -- I'm in that category -- and some people are a little

3     bit soft-spoken.  These ladies and gentlemen over here on the

4     right are going to be deciding this case, and I want them to be

5     able to hear every word you say, and your voice is a little bit

6     quiet.

7          So if you can make sure to speak up and talk into that

8     microphone, it would be very helpful.

9          THE WITNESS:  Certainly.

10          THE COURT:  Thank you.

11     Mr. Rhyne, your witness.

12                              **QI JING,**

13     Called as a witness by the Government, having been duly sworn,

14     testified as follows:

15                        **DIRECT EXAMINATION**

16     BY MR. RHYNE:

17     Q.   Dr. Jing, where are you currently employed?

18     A.   I work at Mentor Graphics Corporation.

19     Q.   What do you do there?

20     A.   I'm a market tech -- technical marketing engineer working

21     for an electronic design automation product.

22     Q.   And what are your responsibilities there?  What's your

23     day-to-day things that you do?

24     A.   We supply the tools, working with customers, and do work on

25     presale and post-sale benchmarking.

1           (Court reporter clarification.)

2           THE WITNESS:  Benchmarking.  It's like working on the

3     same project from our side and the manager side, and we compare

4     the result.  The customer will pick which tool works better for

5     them.

6     BY MR. RHYNE:

7     Q.  How long have you worked there?

8     A.  Ten years.

9     Q.  I want to talk about your educational background now.

10          Can you tell the jury where you were educated?

11    A.  Okay.  I got my Bachelor's degree and Master's degree from

12    Tsinghua University in China and then Ph.D. degree from

13    Carnegie-Mellon University in Pittsburgh, Pennsylvania.

14    Q.  What was your area of emphasis in your studies, namely your

15    Ph.D.?

16    A.  In my Ph.D., I studied in the area of MEMS,

17    Microelectromechanical systems.

18    Q.  Do you know the defendant in this case, Dr. Susan Su?

19    A.  No.

20    Q.  I want to direct your attention over there to this table,

21    the woman sitting in the middle.  Do you recognize her?

22    A.  No.

23          MR. RHYNE:  Can we publish Exhibit 1, Page 8, and can

24    we go down to Dr. Jing's row?

25    ///

1    BY MR. RHYNE:

2    Q.   Do you see that okay?

3    A.   Yeah, that's good.

4    Q.   Is that an accurate summary of your educational background

5    on the second row from the right?

6    A.   Yes.

7    Q.   And now I want to direct your attention all the way over to

8    the right-hand side.

9         Were you a TA at Carnegie-Mellon?

10   A.   I was an RA, not TA.

11   Q.   Oh.  Okay.  And a senior engineer at -- it says there

12   Mental Graphics.

13   A.   No, that's incorrect.

14   Q.   Okay.  What's the name of the company?

15   A.   It's Mentor Graphics.  Mentor, M-e-n-t-o-r.

16   Q.   Okay.  Do you see those classes listed in the third row?

17   A.   Yes.

18   Q.   Is that your area of -- or do you recognize what those

19   classes are?

20   A.   I know those technology term -- technical terminologies,

21   but I don't know those classes.

22             MR. RHYNE:  Okay.  Can we go to Page 11, please.  Can

23   you just get the little --

24   BY MR. RHYNE:

25   Q.   Have you ever seen this document before?

1    A.   No, I've never seen this before.

2              MR. RHYNE:  Can we go to Page 148, please, and can we

3    zoom in on Dr. Luo and Dr. Jing, please.

4    BY MR. RHYNE:

5    Q.   Is that an accurate summary at the bottom there of your

6    credentials?

7    A.   No.  My first name is wrong there, and the rest of that,

8    no.  The specialization, MEMS, is correct.  "Simulation" is

9    correct, but FPG?  No, I never worked in that area.

10   Q.   Have you ever been -- have you ever had any publications in

11   your name?

12   A.   Yes, certainly.

13   Q.   In those publications, does it have your credentials noted

14   in there?

15   A.   Yes, especially, like, for my electrical journal papers --

16              (Court reporter clarification.)

17              THE WITNESS:  IEEE.  That's for my academic field.

18   For formal journal papers, we -- as an author, we are required

19   to provide a full biography.

20   BY MR. RHYNE:

21   Q.   I just have a few quick questions for you.

22        Did you ever receive any money from Tri-Valley University?

23   A.   No, not at all.

24   Q.   Did you ever agree to teach VS -- VLSI for anyone at

25   Tri-Valley University?

1    A.   No, never.

2    Q.   Did you ever agree to teach Digital System Design with

3    Verilog?

4    A.   No.

5    Q.   Did you ever agree to be a staff member at Tri-Valley

6    University?

7    A.   No.

8    Q.   Okay.  Did you ever agree to let anybody use your name or

9    your credentials in association with Tri-Valley University?

10   A.   No, not at all.

11   Q.   Did you ever agree to have your information published on

12   their website?

13   A.   No.

14   Q.   When was the first time you heard the name of the school

15   Tri-Valley University?

16   A.   The first time was when I was called to the Homeland

17   Security security officer -- office by an agent.

18   Q.   Okay.  An agent came to interview you?

19   A.   Yeah.

20   Q.   About how long ago do you think that was?

21   A.   The interview?  Half an hour to one hour, as I remember.

22   Q.   Do you remember what year that was?

23   A.   Not exactly.  Several years ago, I believe, it was back.

24   Q.   Thank you, Dr. Jing.

25        MR. RHYNE:  No further questions.

1          THE WITNESS:  Okay.

2          MR. RHYNE:  The defense is going to ask you some

3     questions maybe.

4          THE WITNESS:  Okay.

5          THE COURT:  Cross-examination?

6          MR. BABCOCK:  Thank you, your Honor.

7                          **CROSS-EXAMINATION**

8     BY MR. BABCOCK:

9     Q.  Good morning --

10         THE COURT:  Dr. Jing -- excuse me.  Doctor, there's

11    some water there for you if you're thirsty.

12         THE WITNESS:  Uh-huh.

13    BY MR. BABCOCK:

14    Q.  Good morning, Mrs. Jing.

15    A.  Good morning.

16    Q.  So as I understand it, how do you spell your first name?

17    A.  It's Q-i.

18    Q.  Q-i?

19    A.  Uh-huh.

20    Q.  Thank you.

21         You -- you are published -- you said you've published what,

22    articles?

23    A.  Yes.

24    Q.  How many, just approximately?

25    A.  Approximately?

1    Q.   It's okay to brag, too.

2    A.   Around ten, yeah.

3    Q.   Very nice.

4         I assume when you published articles, you were -- your name

5    was spelled correctly; right?

6    A.   Oh, yes, of course.

7    Q.   Yeah.

8         And looking at Exhibit -- Exhibit 1 -- oh, that's just

9    terrible.

10            THE CLERK:  You've got to turn the lamps on.  The

11   lamps are not turned on.  Push that button right here.  Push it

12   again.

13            MR. BABCOCK:  Let's see.  There we go.

14   BY MR. BABCOCK:

15   Q.   You've never spelled your name C-h-i; right?

16   A.   No.

17   Q.   At least not in any -- any -- certainly not in any of your

18   publications; right?

19   A.   In English, it's pronounced as "Chi."  So sometimes I see

20   people spell my name like that, but I never did by myself.

21   Q.   I understand.

22        Some people -- if you don't tell them how to spell -- if

23   they don't see it in writing or you don't tell them how to

24   spell it, they might spell it C-h-i; right?

25   A.   Uh-huh.

```
 1              THE COURT:  Ma'am, I need you to say "yes" or "no"
 2     because this gentleman is making a record.  So when we're
 3     talking, just -- on the street, you might use noises like
 4     "uh-huh" or "huh-uh," but this gentleman can't write those
 5     down.
 6          So if you can answer the lawyer's questions with a "yes" or
 7     "no," that would be very good.
 8              THE WITNESS:  Okay.
 9     BY MR. BABCOCK:
10     Q.  Do you remember my last question?  I'll repeat it.  That's
11     okay.
12          Sometimes if -- my name is Erik, but I spell it with a K.
13     People -- if I don't tell people that, though, usually they
14     spell it with a C; right?  Sometimes if people hear your name
15     but they don't see it in writing or you don't tell them how
16     it's spelled, then they spell it C-h-i?
17     A.  Yes.
18     Q.  Do you --
19     A.  It might be.  I don't know.
20     Q.  Okay.
21     A.  It's just sometimes I see people do that.
22     Q.  You do?
23     A.  Yeah.
24     Q.  Okay.  And the -- at the end of this list, you -- it has
25     your educational background; right?
```

1    A.   Uh-huh.  Yes.

2    Q.   Starting with you got a Bachelor's at Tsinghua University

3    in '94 --

4    A.   Yes.

5    Q.   -- is that correct?

6    A.   Uh-huh.

7    Q.   And then --

8    A.   Yes.

9    Q.   -- you've also got a Master's at the same university in

10   1997?

11   A.   Yes.

12   Q.   And is that information correct?

13   A.   Yes.

14   Q.   Okay.  And then you got your Ph.D. at Carnegie-Mellon in

15   2003?

16   A.   Yes, that is correct.

17   Q.   And I assume that's when you -- is that when you met your

18   husband, or did you meet him back at Tsinghua?  If you see,

19   your husband's credentials are below yours; right?

20   A.   Yeah, I know him back in Tsinghua.

21   Q.   Okay.  Certainly, your husband knows all about your

22   educational background; right?

23   A.   Please repeat the question.

24   Q.   Certainly.

25        Your husband certainly knows about your educational

1    qualifications?

2    A.   Oh, yes.

3    Q.   He knows exactly where you went to school, what degrees you

4    got, and when you graduated; right?

5    A.   Yes.

6         MR. BABCOCK:  Okay.  That's all I have.

7         Thank you, ma'am.

8         THE COURT:  Thank you, Mr. Babcock.

9         Mr. Rhyne, further questions for this witness?

10        MR. RHYNE:  No, your Honor.

11        THE COURT:  Dr. Jing, thank you very much for your

12   testimony.  You're excused.

13        THE WITNESS:  Thank you.

14        THE COURT:  Government's next witness?

15        MS. WEST:  The United States calls Shy Sheng Liou.

16        THE COURT:  Is this witness also a doctor?  I'm being

17   on a -- that's all right.  I'll find out.

18        Mr. Liou, could I ask you to come up to this witness stand?

19   Good afternoon, sir.

20        THE WITNESS:  Good afternoon.

21        THE COURT:  Could I ask you to come up to this

22   witness stand that's next to me?  And when you arrive there,

23   just remain standing and raise your right hand and face my

24   courtroom deputy, please.

25        THE CLERK:  Do you solemnly swear or affirm that the

1    testimony you're about to give in the matter now pending before

2    this Court shall be the truth, the whole truth, and nothing but

3    the truth?

4              THE WITNESS:  I do.

5              THE CLERK:  Thank you.  Please be seated.  You'll

6    want to get close to this microphone in order to be heard.

7              THE WITNESS:  Okay.

8              THE CLERK:  Please state your full name and spell

9    your last name.

10             THE WITNESS:  My name is Shy Sheng Liou.  Last name

11   is spelled as L-i-o-u.

12             THE COURT:  Thank you.

13      Your witness.

14             MS. WEST:  Thank you, your Honor.

15                          **SHY SHENG LIOU,**

16   Called as a witness by the Government, having been duly sworn,

17   testified as follows:

18                          **DIRECT EXAMINATION**

19   BY MS. WEST:

20   Q.  I'm going to ask actually if you can spell your first name

21   as well, please.

22   A.  First name is Shy, S-h-y, S-h-e-n-g.

23   Q.  Thank you.

24      And is it Dr. Liou?

25   A.  Yes.

1    Q.   Okay.  Thank you.

2         Dr. Liou, what do you do for a living?

3    A.   I used to be a professor at San Francisco State University,

4    but I retired in 2012.  Now I'm working for a solar company.

5    Q.   What do you do for the solar company?

6    A.   We try to develop some solar projects in the United States,

7    especially in California.  We would try to own a solar project

8    and enter into some kind of power purchase agreement with an

9    off-taker or customers, so to speak.

10   Q.   And when did you start doing that?

11   A.   Last year, January 1st, 2000 -- 2013.

12   Q.   Okay.  And you mentioned that you are retired from San

13   Francisco State; is that right?

14   A.   Yes.

15   Q.   When -- you said 2012.  Do you remember more specifically?

16   A.   August in 2012.  It would be August 23rd.

17   Q.   Okay.  That's very specific.  August 23rd, 2012?

18   A.   Yeah.

19   Q.   Thank you.

20        What did you do at San Francisco State?

21   A.   I was hired by the San Francisco State as an assistant

22   professor in 1991.  Then from there, until I retired in 2012, I

23   basically was teaching electrical engineering subjects.

24   Q.   And did you stay -- was it you were hired as an assistant

25   professor or associate?

1    A.   Yes, assistant professor in '91.

2    Q.   Did you remain with that same title all the way through?

3    A.   No.  I was promoted to associate professor in 1994.  Then

4    in 1998, I was promoted to full professor.

5    Q.   And at some point, did you obtain tenure?

6    A.   Yes.  It probably would be 1997.

7    Q.   Did you have any particular position in addition to your

8    role as professor with regard to your department?

9    A.   I believe in 1997 to 2001, I was the program head for the

10   electrical engineering program.  From 2001 to 2008, I was the

11   director of the School of Engineering.

12   Q.   Now, why -- was there a particular reason that you chose to

13   retire?

14   A.   My daughter was hit by an automobile in 2006.  So I took

15   her to Beijing for medical treatment, and I just couldn't -- I

16   had to do two things simultaneously.  So it would be best for

17   me to step down or retire from the school.

18   Q.   Did you at some point take a leave of absence before

19   retiring?

20   A.   No, I did not.  I had some sabbatical leave for one year.

21   Then after that, I had secured some research projects allowing

22   me to spend some time to do research and also care for my

23   daughter, but eventually it was becoming impossible for me to

24   be productive in the School of Engineering.  So I decided to

25   retire.

1      Q.   And where do you live now?

2      A.   I split my time between California and Taipei, Taiwan now.

3      I spend about one month here and one month in Taipei.

4      Q.   Before retiring at some point, were you spending some

5      portion of your time in China?

6      A.   Yes.  I probably spent about five years in China, but I

7      traveled back and forth during that time.

8      Q.   Can you tell us a little bit, please, about your

9      educational background.

10     A.   I got my BS degree in Electrical Engineering in National

11     University of Taiwan.  Then after two years of military

12     service, I went to the University of Texas in Austin to get my

13     Master's degree and also Ph.D. degree both in Electrical

14     Engineering.

15     Q.   Dr. Liou, do you know Susan Su?

16     A.   Yes, I do.

17     Q.   Are you able to identify her here in the courtroom?

18     A.   Yeah.  She's the lady sitting in the middle over there.

19     Q.   Between the two gentlemen?

20     A.   Yes.

21     Q.   How did you first meet her?

22     A.   When I was the director of the School of Engineering, one

23     of my responsibilities is to hire a part-time instructor to

24     teach some of our courses we offer, and Susan Su is one of the

25     instructors I hired to teach one -- one class at the beginning

1    in undergraduate.  That's how I know her.

2    Q.  Do you remember particularly what course she was hired to

3    teach?

4    A.  Yes.  The course number was Engineering 356.  I believe the

5    title is Digital Design.

6    Q.  And was she working full time?  Part time?

7    A.  Part time.

8    Q.  For how many years?

9    A.  I don't exactly remember but probably -- I would say

10   between two to three semesters.

11   Q.  And do you recall roughly when that was?

12   A.  I don't -- I don't know the exact time of the semester.

13   Q.  Do you have -- after she stopped teaching at San Francisco

14   State, did you have any further contact with her?

15   A.  We exchanged e-mails and sometimes a phone call regarding

16   something else.

17   Q.  About what?

18   A.  When I was in China, I know some friends -- they are kind

19   of venture capital.  They always look for some idea for them to

20   invest money in.

21       So I asked Susan Su about whether she has any technology

22   that she thinks can be -- attract investors to invest in that,

23   and that's one of the things we talked about.  And she sent me

24   some PowerPoint presentation material, and I tried to show it

25   to the potential investor, but nothing came out of that.

LIOU - DIRECT / WEST

1    Q.   So you thought maybe you could find an invest -- somebody

2    to invest in some of her ideas?

3    A.   Yes.

4    Q.   But nothing came of it?

5    A.   Yes, nothing came out of it.

6    Q.   Did you at any point have any contact with something called

7    Tri-Valley University?

8    A.   Contact with Tri-Valley University?

9    Q.   Let me rephrase that question.

10       Have you ever heard of Tri-Valley University?

11   A.   I've heard about it now.

12   Q.   I'm going to show you an exhibit and ask if you recognize

13   it.  I'm showing you what's been marked as Government

14   Exhibit 102.  Please take a moment to flip through it and tell

15   me if you recognize it.

16   A.   Yes, I have seen these documents before.

17   Q.   What is it?

18   A.   It's an e-mail correspondence between Susan Su and me, and

19   also there's an agreement I signed and sent to her.

20            MS. WEST:  The Government offers Exhibit 102 in

21   evidence.

22            MR. BABCOCK:  No objection.

23            THE COURT:  Exhibit 102 is admitted.

24        (Government's Exhibit 102 received in evidence.)

25            MS. WEST:  Thank you.

1          Ms. Hughes, I'm actually going to do this one up here on

2     the Elmo.

3     BY MS. WEST:

4     Q.  This is Page 1 of Exhibit 102; right?  Let me just back it

5     up here.  Is that what you were just looking at, Page --

6     A.  Yes.

7     Q.  It's -- on here, it's marked Page 2 of Exhibit 102.  Let's

8     zoom in on the top part here.

9          All right.  Do you see here "From Shy Shenq Liou"?  Is that

10    your e-mail address, s- -- I should put my glasses back on for

11    this -- ssl@sfsu.edu?

12    A.  Yes.

13    Q.  That was your e-mail address?

14    A.  Yes, it is.

15    Q.  It is or it was when you were at San Francisco State?

16    A.  It is my San Francisco State e-mail address.

17    Q.  Okay.  And the "To" line on here is

18    ssu@trivalleyuniversity.org.  Do you see that?

19    A.  Yes.

20    Q.  The subject line says, "From Susan"?

21    A.  Yes.

22    Q.  Okay.  And are you familiar with when you're reading a

23    string of e-mails that the earlier one is at the bottom and it

24    goes to the more recent?

25    A.  I didn't quite understand your question.

1    Q.   Let's just take a look here.

2         This is -- the "Sent" date is June 11th, 2008.  Do you see

3    that?

4    A.   Yes.

5    Q.   And if we go down a little bit, is this an e-mail from

6    Susan Su to you?

7    A.   Yes.

8    Q.   And is the date prior June 10th, 2008?

9    A.   Yes.

10   Q.   Okay.  And this is what you were responding to; is that

11   right?

12   A.   Yes.

13   Q.   All right.  Let's take a look at this e-mail from Ms. Su --

14   or Dr. Su.  Excuse me.

15        "Dear Professor Liou, how are you?  I wrote to you a while

16   ago but have not heard from you.  I think you must be very

17   busy.  You know one thing is about the course transfer

18   agreement for ENGR356" -- was that the course that you said

19   that she taught?

20   A.   Yes.

21   Q.   "Recently, I obtained a letter from Professor Hu."  Do you

22   see that up there?

23   A.   Yes.

24   Q.   Okay.  "Who originally developed Engineering 356 at SFSU.

25   Here I am attaching.  So now I only need your signature.  The

1    procedure is through Bob.  I have e-mailed him, but he is on

2    vacation till 6/18."

3        Let me just pause for a moment.  Do you know who Professor

4    Hu is?

5    A.  Yes, I do know.

6    Q.  Who is that?

7    A.  He's one of my colleagues at the School of Engineering in

8    San Francisco State University.

9    Q.  What is his full name?

10   A.  Sung Hu.  First name is Sung, S-u-n-g.  Last name is Hu,

11   H-u.

12   Q.  Okay.  And do you know who Bob is?

13   A.  Yes, I do.

14   Q.  Who is Bob?

15   A.  Bob is a Dr. Bob de Guzman.  He handles the articulation

16   agreements among other community college and CSU and also UC

17   campus with San Francisco university.

18   Q.  Is that d-e G-u-z-m-a-n?

19   A.  I believe so.

20   Q.  Okay.  All right.  "So recently I am trying to put

21   everything together to submit an I-17 application to SEVIS.  So

22   I am wondering if it is possible for me" --

23        MS. WEST:  I apologize for the back-and-forth, but I

24   think this makes it a little bigger so you can actually read

25   it, members of the jury.

1    BY MS. WEST:

2    Q.   "I'm wondering if it is possible for me to have your

3    signature now.  I attached the agreement and the letter here."

4         And do you recall this e-mail?

5    A.   Yes, I do.

6    Q.   All right.  And there was a little bit more to it; right?

7    If we go to the next page, which is Page 3 of Exhibit 102, do

8    you see this additional part of her e-mail?

9    A.   Yes.

10   Q.   Okay.  "The other thing is that would you be interested in

11   serving in the advisory board or potentially consultant advisor

12   of the engineering program at TVU?  If TVU can issue I-20,

13   there will be many international students, and also the

14   university will be in need and is able to have consultant

15   advisors.  Would you please let me know.  Best regards, Susan."

16        Do you recall that e-mail?

17   A.   Yes, I do.

18   Q.   And did you actually respond to this e-mail?

19   A.   Yes.

20   Q.   Do you remember whether there -- as it's stated on here

21   from Ms. Su, she stated that she had written to you a little --

22   while or a while ago but hadn't heard back.  Do you recall

23   whether you had received prior e-mail communications from her?

24   A.   Yes, I did receive the prior e-mail from her.

25   Q.   And had you responded to those?

1    A.   No.

2    Q.   All right.  Let's take a look at your response.  Were her

3    prior e-mail communications also about something called TVU?

4    A.   I believe it was regarding the course transfer agreement.

5    I don't remember the details, but I believe in our previous

6    communication, she might have sent a detailed version to me,

7    but I never got a chance to reply to her until the time I took

8    care of these things in this e-mail.

9    Q.   And did you have an understanding at this point what TVU

10   referred to?

11   A.   I only have the understanding that she's tried to establish

12   a university.  That's all the notion I have regarding the

13   TUV [sic].

14   Q.   Okay.  And so let's take a look at your response now.

15       "Dear Susan, sorry it took me so long to reply to you.  I

16   am in China right now."

17       Do you recall whether you actually were in China in June of

18   2008?

19   A.   I don't remember exactly, but it should be.  That would be

20   in the summertime.  I should be in China at that time.

21   Q.   "Anyway, the signed agreement is attached.  If you need a

22   hard copy, please let me know your mailing address."  Oops.

23   Sorry.  I think I missed something here.  "I will send it to

24   you from China.

25       "Yes, I will be interested in serving in your advisory

1    board.  Count me in.  Since I will be in China for a while, is

2    there anything you need me to do here?  Let me know."  Oh.  "If

3    there is anything you need me to do here, let me know.  If I

4    have time, I would be more than happy to help out.  Shy Sheng

5    Liou."

6        So I have a couple questions about this.  First of all, it

7    appears that your name here is -- ended with a Q instead of a

8    G.  At some point, was your name ending with a Q?

9    A.   Yeah.  The -- when I first came here, my name is -- ended

10   with a Q.  So it was always S-h-y, S-h-e-n-q.  But when I tried

11   to apply for the driver's license and the -- or even my

12   passport, I always put the Q there, but eventually they -- the

13   document I got -- they misinterpret it to be a G.  So now my

14   driver's license and passport has a G in it.  So that's what

15   happened.

16   Q.   Okay.  So now you just use the spelling ending with a G?

17   A.   Yes.

18   Q.   Okay.

19   A.   It's supposed to be the same as whatever documents I have.

20   Q.   Okay.  All right.  So here you're actually responding to

21   the e-mail from Ms. Su -- or Dr. Su; is that right?

22   A.   Yes.

23   Q.   And you've -- you're sending an agreement, which you've

24   attached.  And actually, if we look up here, you see there's

25   some attachments.  Do you see that?

1    A.   Yes.

2    Q.   And one of them is "TVU," underscore, "SFSU," underscore,

3    "AA"?

4    A.   Yes.

5    Q.   Okay.  We'll take a look at that in a moment, but let's

6    spend another minute or two here.

7         Can you tell us why you signed that document?

8    A.   As the director of the school, as I mentioned earlier, my

9    responsibility would be for me to attract more students to

10   enroll in our program.

11        So when anybody come to me and say, "I'd like for me to

12   have some kind of an indication that whatever courses they took

13   in other institutions can be transferred to our school," as

14   long as they follow the proper procedure within the school

15   policies, I would be more than happy to -- to do it.

16        So that's one of the reasons that I signed the document.

17   Q.   Okay.  And let's actually see what she was asking you for.

18   She's talking about -- do you see on here a course transfer

19   agreement?

20   A.   Yes.

21   Q.   What is your understanding of a course transfer agreement?

22   A.   To me, a course transfer agreement is if some student took

23   certain courses at other university or colleges, if the

24   content -- course content is similar to one of the courses we

25   offer, then we can give him or her the credit so he or she

1    doesn't need to retake the course when he or she transfers to

2    San Francisco State University.

3    Q.   And are you aware of what San Francisco State's procedure

4    was at this time -- that is, in the summer of 2008 -- for

5    issuing course transfer agreements?

6    A.   Dr. Bob de Guzman is in university administration.  He

7    usually handled these -- what we call articulation or course

8    transfer agreements.  Most of these kind of transfer agreements

9    are among the community colleges in California or California

10   State University system campuses or University of California

11   campuses.  We serve San Francisco State.  Most of the documents

12   will come through Dr. Bob de Guzman to my office, and I will do

13   whatever it takes to approve -- approve it or disapprove it.

14   Q.   What do you mean by that?  To approve or disapprove what?

15   A.   Whether the course presented by other institutions can be

16   transferred to San Francisco State.

17   Q.   And how do you make that determination?

18   A.   Depends upon the course number.  We have a system.  It is

19   lower division courses if the course number is 200 or less.

20   Then the program head or the director of the school can look at

21   the course content and compare that against the course content

22   we have and make a decision.  Are they equivalent or not?

23   Q.   And I'm sorry.  Let me just stop you there.  You said if

24   the course number is 200 or lower?

25   A.   Yes.

1    Q.   Why is there that cutoff?

2    A.   We call that lower division courses.  It's like electric

3    study classes.  Those courses are from the mentor to the other

4    engineering program.  So the program head or the director --

5    being a professor for some time, they are already familiar with

6    what is the content of the course.  So they know, and they can

7    make a decision based upon the course contents presented from

8    the other institution.

9    Q.   Now, does that differ if the course number is above 200?

10   A.   Yes.

11   Q.   How so?

12   A.   If it's a course number above 200, we call them specialized

13   courses.  Then the procedure established in the school is the

14   instructor for that specific course shall take a look at the

15   course content and decide whether it is included or not because

16   after the fundamental courses, we think -- we've kind of been

17   through the specialty area, and the prior area might not have

18   sufficient knowledge or experience to determine an individual

19   course is equivalent or not.

20        So we rely upon the professor who usually teaches those

21   courses to make a determination first.

22   Q.   Now, you say "first."  Are there other steps that have to

23   happen after that?  Well, let me -- actually, let me stop for a

24   moment and clarify.

25        Do I understand right that that first step is to determine

1    whether the two courses are actually similar?

2    A.   Yes.

3    Q.   Okay.  After that first step of determining whether they

4    are similar or comparable, is there other further steps?

5    A.   Usually, it will come to -- come to the director's office.

6    The director can sign it off or make it official.

7    Q.   And at that time, were you the Director of Engineering?

8    A.   Yes, I am.

9    Q.   And when you -- had you ever signed off on statements of

10   the comparability of classes before?

11   A.   I have signed quite a few papers from the -- Dr. Bob de

12   Guzman's office before.

13   Q.   Now, have you ever before stated that San Francisco State

14   would unconditionally accept particular courses?

15   A.   No, I have not.

16   Q.   Is that something that was within your purview as Director

17   of Engineering to commit -- were you able to commit San

18   Francisco State on something like that?

19   A.   No.  It is -- I don't believe it is the director's

20   responsibility to do that.

21   Q.   And let me ask you also:  In this letter we just looked

22   at -- or the e-mail -- I'm sorry -- where Ms. -- where Dr. Su

23   states that she obtained a letter from Professor Hu, who

24   originally taught and developed Engineering 356, do you know,

25   in fact, whether Dr. Hu did develop Engineering 356?

1    A.   I know it is a fact that Dr. Hu did develop the Engineering

2    356 course.

3    Q.   Okay.  So would it be out of the ordinary for you if a

4    professor who developed a course said that it's comparable for

5    you to sign as director that this course is comparable?

6    A.   It is a routine.  If Dr. Hu looked at it and indicated it's

7    okay, that's exactly what I need.

8    Q.   And that's what he would look -- he would look at it first

9    because the number of the course is above 200; right?

10   A.   Yes.

11   Q.   Okay.  Before we go to the attachment, I want to take a

12   look here where you say that "Yes, I will be interested in

13   serving in your advisory board."  What did you understand that

14   you were agreeing to do there?

15   A.   I know she's trying to start a university, and a university

16   usually has an advisory board to try to have people to

17   provide -- advise how to do a university, and I'd be more than

18   happy to help out if I can be helpful.  Since I've been with

19   San Francisco State for sometime, I know how university can be

20   run.  So for that reason only, I say, "Yes, I'd be more than

21   happy to provide my advice."

22   Q.   All right.  Let's take a look now at the attachment.

23        Let's start with the last page.  This is Exhibit 102, Page

24   7 for the record, and is that your signature there?

25   A.   Yes, it is.

1    Q.   All right.  We'll talk more about that in a moment, but

2    let's go to the whole document first.

3         Okay.  Is this what the attachment was?

4    A.   I believe so.

5    Q.   "Tri-Valley University and San Francisco State University

6    Course Articulation Agreement."  Do you see that at the top?

7    A.   Yes.

8    Q.   All right.  And then the top line -- the "Date" part is

9    blank, but there's a bunch of text; right?

10   A.   Yes.

11   Q.   Let's zoom in a little so we can take a look.

12        All right.  Oh, close.

13        All right.  It states at the top, "This agreement is made

14   by and between Tri-Valley University, hereinafter called TVU,

15   and San Francisco State University, hereinafter called SFSU."

16   Do you see that at the top?

17   A.   Yes.

18   Q.   All right.  I want to go through the principles of

19   agreement.  That is Roman Numeral I on here.  This states,

20   "This agreement certificates that TVU's course CS300, Logic and

21   Computer Architecture and Computer Science and Engineering is

22   comparable to SFSU's Engineering 356, Basic Computer

23   Architecture, at the School of Engineering" -- "at the School

24   of Engineering," period.

25        Do you see that part?

1    A.   Yes.

2    Q.   Okay.  And so by this agreement, were you certifying that

3    the two courses are, quote, "comparable"?

4    A.   Yes.

5    Q.   And what did you understand that to mean that they're

6    comparable?

7    A.   Any student who took this course, CS300, at the TVU -- when

8    he or she come to San Francisco State, I -- we can give him or

9    her the credit for this course.

10   Q.   Okay.  And so in your position as Director of Engineering,

11   you're saying that the courses are comparable enough that you

12   as the Director of Engineering would consider them to be the

13   same?

14   A.   Yes.

15   Q.   All right.  And this up here at the top, Paragraph E, says,

16   "This is the entire agreement."  And then just above the

17   signature block, "This articulation agreement between

18   Tri-Valley University and" -- here, it says, "Florida College

19   of Integrative Medicine was accepted and approved."

20        Did you notice that error with the Florida College of

21   Integrative Medicine?

22   A.   When I signed it, I did not.  It's my mistake.

23   Q.   Okay.  And then how did you provide your signature on here?

24   Do you remember?

25   A.   It was electronic.

1    Q.   An electronic signature?

2    A.   Yes.

3    Q.   Okay.  And then did you -- how did you attach this document

4    to the e-mail that you sent to Ms. Su -- Dr. Su?

5    A.   I have a scanned copy of my signature on my computer.  So I

6    just cut and paste into here -- into the Word document.

7    Q.   And sent it back?

8    A.   Yeah.

9    Q.   Okay.  I'm going to show you now what is already in --

10   admitted in evidence as Exhibit 4, and I'm going to show you

11   what is Page 4 of that document.  I'm going to hand you Pages 4

12   and 5.

13       If you can look at Page 2 -- or the second page of what

14   I've handed you, please, does that appear to be your signature

15   at the bottom?

16   A.   Yeah.  It appears to be my signature at the bottom.

17   Q.   All right.  Let's put it up here so everyone can see.

18       Okay.  Up at the top again, do you see "Tri-Valley

19   University and San Francisco State University Articulation

20   Agreement"?

21   A.   Yes.

22   Q.   Okay.  And this one is -- the date is filled in, the 2nd

23   day of February, 2009.  Do you see that up at the top?

24   A.   Yes.

25   Q.   Let's take a look at these principles of agreement.  Now,

1    there's two paragraphs; right?

2    A.   Yes.

3    Q.   This states, "This articulation agreement serves as an

4    amendment to course articulation agreement dated 5/1/2008

5    between TVU and SFSU," and then it continues to state, "SFSU

6    has been accepting TVU's course CS300, Logic and Computer

7    Architecture in Computer Science and Engineering Department

8    since then and comparable to SFSU's Engineering 356, Basic

9    Computer Architecture, at the School of Engineering."

10        Do you see that language?

11   A.   Yes.

12   Q.   Had San Francisco State actually accepted transfer credits

13   from Tri-Valley University -- already accepted?

14   A.   I haven't signed any -- any paper for any student request

15   to transfer any courses.

16   Q.   So as far as you're aware, no?

17   A.   Yes.

18   Q.   Let's look at the second paragraph.

19        "After further careful review of the academic standards

20   adopted and practiced by Tri-Valley University and a thorough

21   evaluation of TVU's School of Engineering course syllabus,

22   curriculum, faculty profile, and qualification, we have come to

23   the conclusion that the School of Engineering at San Francisco

24   State University will continue to unconditionally accept course

25   transferring credits for graduate courses from School of

1    Engineering at TVU into SFSU's School of Engineering in

2    Electrical Engineering."

3         Do you see that sentence?

4    A.   Yes.

5    Q.   Let me ask you first:  Had you thoroughly evaluated TVU's

6    course syllabus?

7    A.   I have not.

8    Q.   Or its curriculum?

9    A.   I have not.

10   Q.   Have you thoroughly reviewed its faculty profile and

11   qualifications?

12   A.   I have not.

13   Q.   Did you ever come to the conclusion that San Francisco

14   State's School of Engineering would unconditionally accept

15   course transfer credits from Tri-Valley University?

16   A.   No, I did not.

17   Q.   In that particular area?

18   A.   No.

19   Q.   Did you have authority to bind San Francisco State in that

20   way?

21   A.   No.

22   Q.   All right.  Let's go back to the next page of this document

23   where it's the signatures.

24        All right.  Above the signature here, it states, "This

25   articulation agreement between Tri-Valley University and San

1    Francisco State University is accepted and approved by the

2    participating entities this 2nd day of February 2009."

3         Do you see that?

4    A.   Yes.

5    Q.   Were you the director of the School of Engineering in

6    February of 2009?

7    A.   No, I am not.

8    Q.   Had you retired by then?

9    A.   I had not retired, but I stepped down from the director in

10   summer of 2008.

11   Q.   Right.  You're not the director of the School of

12   Engineering anymore; right?

13   A.   Yes, I was not.

14   Q.   Dr. Liou, I want to ask you:  Did you sign this document?

15   A.   I did not sign that document.

16   Q.   How sure are you?

17   A.   A hundred percent sure.

18   Q.   Thank you, Dr. Liou.

19             THE COURT:  Mr. Babcock, questions of this witness?

20             MR. BABCOCK:  Yes, please, your Honor.

21             THE COURT:  Dr. Liou, that water there is for you in

22   case you get thirsty.

23             THE WITNESS:  Okay.  Thank you.

24   ///

25   ///

1                            **CROSS-EXAMINATION**

2    BY MR. BABCOCK:

3    Q.   Good morning, Professor.

4    A.   Hi.

5    Q.   Do you prefer Professor or Doctor?

6    A.   Doesn't matter.

7    Q.   Okay.  Fair enough.

8         So you first met -- my name is Erik Babcock.  I represent

9    Susan Su.

10   A.   Hi.

11   Q.   You first met Susan when you hired her to work -- to teach

12   a course at San Francisco State --

13   A.   Yes.

14   Q.   -- where she taught for two or three semesters.  You're not

15   sure exactly what year.  Fair to say in the mid-2000's?  Does

16   that sound about right?

17   A.   Yes.

18   Q.   Okay.  And this was a computer engineering course?

19   A.   Yes, and also electrical engineering course, too.

20   Q.   Also electrical engineering?

21   A.   Yes.

22   Q.   Okay.  Did you -- did you ever socialize with Ms. Su

23   outside of school?

24   A.   No, I have not.

25   Q.   Okay.  It was just a professional relationship?

1    A.   Yes.

2    Q.   Okay.  About how many instructors are there at the School

3    of Engineering at San Francisco -- San Francisco State, say,

4    around 2005 in that neighborhood?

5    A.   We have about 17 or 18 permanent faculties, and any

6    semester we might have another 15 or 20 part-time instructors.

7    All together, that may be 30 or something.

8    Q.   Okay.  And after you -- as I understand it, your daughter

9    had an accident in 2006?

10   A.   Yes.

11   Q.   Okay.  At which point you began spending some more time in

12   China?

13   A.   Yes.

14   Q.   And at some point, you received -- Ms. Su reached out to

15   you and told you that she was starting a university?

16   A.   Yes.

17   Q.   Okay.  Do you remember if that initial contact was by

18   phone, or was it by some sort of e-mail or --

19   A.   I don't remember exactly whether it was by phone or e-mail.

20   Most likely, it would be e-mail because I spent most of the

21   time in China.

22   Q.   Okay.  Do you remember talking to her on the phone at all

23   while you were in China?

24   A.   Not in China.

25   Q.   Do you recall speaking to her over the phone when you were

1    not in China?

2    A.   Yeah.  It's kind of very difficult to make a phone call

3    from China.  First of all, the time differences --

4    Q.   Right.

5    A.   -- and there's some other difficulty there.  So --

6    Q.   Okay.  Do you remember Ms. West showed you an e-mail from

7    Ms. Su to you in June of 2008 that you responded to in June of

8    2008?

9    A.   The one that was just shown?

10   Q.   Yeah, these -- these e-mails.

11            THE COURT:  Could you just say the exhibit number?

12            MR. BABCOCK:  Yeah.  I'm sorry, your Honor.  I'm

13   referring to Exhibit 102.

14            THE WITNESS:  Yeah, I believe that's the same e-mail.

15   BY MR. BABCOCK:

16   Q.   Do you remember if this was -- it looks like the e-mail

17   from Ms. Su to you was dated June 10th, 2008; right?

18   A.   Yes.

19   Q.   If you can read -- see that far.

20   A.   Yes.

21   Q.   Do you remember if that -- whether or not that was the very

22   first time that she reached out to you about this issue, or had

23   there been prior --

24   A.   There should be a previous version of that letter if I

25   remember it correctly, but I'm not a hundred percent sure.

1    Q.   Do you think there may have been some prior communications

2    as well?

3    A.   I believe so.

4    Q.   Okay.  You also mentioned you had been in communication

5    with her at some point about a project for -- a proposal for

6    some venture capitalists in China?

7    A.   Yes.

8    Q.   Did that -- was that before June of 2008?

9    A.   I -- I don't remember the exact time, whether it was before

10   or after.

11   Q.   Okay.  It's possible it was after?

12   A.   Since I don't remember exactly -- so --

13   Q.   Okay.

14   A.   -- I couldn't say.

15   Q.   Fair enough.

16        Okay.  The -- the document that you signed was sent to you

17   as an attachment to Ms. Su's e-mail; right?

18   A.   Yes.

19   Q.   And there was also -- there was another attachment to that

20   e-mail, which was a letter from Professor Hu; right?

21   A.   Yes.

22   Q.   Which is also included in the same Exhibit 102.  Do you

23   remember seeing that letter?

24   A.   Yes.

25   Q.   From Professor Hu?

1    A.   Yes.

2    Q.   Is that what -- is that -- did you ever teach that -- what

3    is the course?  Did you ever teach the 356 course?

4    A.   I have never taught that course myself.

5    Q.   Okay.  I think you said Professor Hu had designed that

6    course.

7    A.   Yes.

8    Q.   Okay.  So typically, he would -- if another school or a

9    student was asking to transfer credit for a class that they

10   thought was equivalent, that probably would have landed on

11   Professor Hu's desk; right?

12   A.   Yes.

13   Q.   And it appeared based on this letter that the request had

14   initially gone to Ms. -- to Professor Hu?

15   A.   Yes.

16   Q.   Do you remember whether you had ever -- did you ever talk

17   with Professor Hu directly about this issue before May 29th,

18   2008?

19   A.   I might have, but I don't remember exactly --

20   Q.   Okay.

21   A.   -- what we talked about, but when I was the director of the

22   school, I talked to Professor Hu daily.

23   Q.   Okay.

24   A.   Multiple times.

25   Q.   Okay.  How often -- just as a matter of curiosity, when you

1    were the department head, how often did you have to deal with

2    these requests to see if courses from other schools would be

3    given credit at San Francisco State?

4    A.   When you say "how often," what do you mean?  How -- how

5    many --

6    Q.   Well, does it come up weekly?  Monthly?  Yearly?  Just --

7    A.   It would come by every semester when we have a new student

8    coming in.  They always like to transfer some courses from

9    whatever colleges or university they took from to our school.

10        So any semester, we will have a new student coming in.

11   We've had to do these quite often.  Then it kind of dies down

12   in the middle of the semester unless there's some new student

13   or a student wants to graduate, they forgot to do it before,

14   and they may need to do that at the end of the semester.  So --

15   Q.   Is it typically an issue that comes up that's raised by a

16   student when they're -- when they're admitted into San

17   Francisco State and they're trying to get credit for previous

18   work that they've done?

19   A.   Yes.

20   Q.   Okay.  What about -- do -- did you get requests from

21   schools -- other schools asking for -- well, let me just ask

22   you this:  Have you ever seen any -- anything before called an

23   articulation agreement?

24   A.   Form articulation agreement?

25   Q.   Yeah, anything -- the document you signed is called a

1    course articulation agreement; right?

2    A.   Uh-huh, but I don't know where I signed this one.  Is this

3    a letter that -- shown by --

4    Q.   You don't have your original up there?  Sorry.  My -- my

5    mistake.

6              THE COURT:  What is the number of the exhibit in

7    front of the witness now?

8              MR. BABCOCK:  Sorry.  That's 102, your Honor.

9              THE COURT:  Thank you.

10             THE WITNESS:  Can you repeat your question again?

11   BY MR. BABCOCK:

12   Q.   Yes.

13        I was asking you whether or not this -- this is the

14   document -- this is the document that Ms. Su e-mailed to you

15   and that you signed --

16   A.   Yes.

17   Q.   -- right?

18   A.   Yes.

19   Q.   And it's got a title at the top.  It's "Tri-Valley

20   University and San Francisco University Course Articulation

21   Agreement."  Have you ever received requests from other

22   colleges or universities to sign off on articulation

23   agreements?

24   A.   In this format, I believe this is the first time.  We

25   receive some kind of a -- similar documents from the -- Bob de

1      Guzman -- Dr. de Guzman's office.  A lot of other community

2      colleges and CSU or UC campus want to make sure the courses are

3      transferrable.

4           So we receive a lot of documents from his office, not

5      exactly this -- this format.  This is probably the first one.

6      Q.   I understand.

7      A.   Uh-huh.

8      Q.   Not in this particular format, but you did regularly get

9      requests from other community colleges and other -- and state

10     universities asking -- to make sure that you would recognize

11     the course -- certain courses; right?

12     A.   Yes.

13     Q.   Okay.  You -- do you remember whether or not you were in

14     China in June of 2008?  Were you -- sounded like you weren't

15     positive.

16     A.   I should be in China --

17     Q.   Uh-huh.

18     A.   -- but I'm not a hundred percent sure --

19     Q.   Uh-huh.

20     A.   -- but I should be in China because I spent most of my time

21     in there.

22     Q.   Well, let me ask you:  San Francisco State is on the

23     semester system; right?

24     A.   Yes.

25     Q.   And when did the spring semester end?

1    A.   Spring semester usually will be ending in early May.

2    Q.   Early May.

3         Okay.  Do you remember in the spring of -- did you teach in

4    the spring of 2008?

5    A.   No, I did not.

6    Q.   Were you on leave at that point?

7    A.   I'm working on a research project.  So I don't have to

8    teach.

9    Q.   I see.

10        You did agree to be on the advisory board for Tri-Valley

11   University; right?

12   A.   Yes, I did.

13   Q.   And your words were -- said to "count me in"?

14   A.   Yes.

15   Q.   And the person in your department that typically -- that

16   these sort -- requests for course credit from other schools

17   went through was Bob de Guzman; right?

18   A.   In the San Francisco State University, yes.

19   Q.   Now, is he in the Department of Engineering, or is that

20   school-wide?

21   A.   These are school-wide.

22   Q.   I see.

23        Not just for the Department of Engineering?

24   A.   Yes, it's not just for School of Engineering.

25   Q.   I see.

1          So his whole job was to be sort of the point person for

2     requests for credit from other -- for courses and work from

3     other schools?

4     A.   Yes.

5     Q.   You -- did you ask Ms. Su for any sort of remuneration for

6     agreeing to be on her advisory board?

7     A.   You mean compensation?

8     Q.   Yeah.

9     A.   No, I did not.

10    Q.   It just seemed like a good idea?  A good thing to do?

11    A.   As I said, I've been a professor for some years.  I'd be

12    more than happy to provide my advice if somebody asks for it --

13    Q.   Right.

14    A.   -- but I never asked for any -- anything in return.

15    Q.   Fair enough.

16         Thank you, sir.

17             THE COURT:  Thank you, Mr. Babcock.

18         Ms. West, questions for the witness?

19             MS. WEST:  Yes, briefly.

20                      **REDIRECT EXAMINATION**

21    BY MS. WEST:

22    Q.   You said you didn't ask for anything in return, and you

23    never actually received anything in return; right?

24    A.   Yeah.  I never received anything in return, either.

25    Q.   But Susan Su has never paid you any money for anything to

1    do with Tri-Valley University?

2    A.   No, she has not.

3              MR. BABCOCK:  He's got it up there.

4              MS. WEST:  Oh.

5              THE COURT:  I believe the original exhibit is with

6    the witness.

7              MS. WEST:  Thank you.

8         And, your Honor, just to clarify, the pages of Exhibit 102

9    that are in evidence for reasons we discussed previously and

10   off the record are -- we're skipping Page 1.  It's Pages 2

11   through 9 of Exhibit 102.

12             THE COURT:  All right.  Is that because there's a

13   kind of computer-looking certification page?

14             MS. WEST:  Yes.

15             THE COURT:  I'm just going to tell the jury about

16   that --

17             MS. WEST:  Sure.

18             THE COURT:  -- because it's going to come up more

19   than once.

20        Members of the jury, in the process of -- you can already

21   tell there are a lot of documents in this case.  You can see

22   how many notebooks I have up here and how many boxes of

23   notebooks the lawyers have.

24        You're not going to see all those documents, but you're

25   going to see some of them.  When they were generated, there's a

1    certification page in front of many of them.  That's the first

2    page of the document.  It's not actually part of the

3    substantive document.

4         So Ms. West is just reminding me on this particular

5    document it looks like the first page isn't there, but the

6    original -- that first page is not actually part of the

7    document, and -- anyway, I'm just telling you that so you're

8    not confused later.

9         Ms. West?

10              MS. WEST:  Thank you.

11        And now that we've done that preamble, I'm actually going

12   to jump over to Exhibit 4 really quickly.

13   BY MS. WEST:

14   Q.   You, sir, looked at the two pages of Exhibit 4 that was

15   this agreement with the two paragraphs under the principle --

16   principles of agreement saying that San Francisco State has

17   been accepting TVU's courses, and then in the second paragraph,

18   that it will continue unconditionally to accept that.  Do you

19   recall that from a few minutes ago?

20   A.   Yes.

21   Q.   Okay.  And we looked at what appears to be your signature

22   here, but you testified that you were quite sure that you never

23   signed this document; is that right?

24   A.   Yes.  I did not sign the document.

25   Q.   And -- thank you.

1        And just to clarify for the record, this is Page 1 of

2    Exhibit 4, which is the cover letter from Susan Su, "Per our

3    phone conversation and addressed to SEVP, here are the pages of

4    the three articulation agreements."

5        All right.  Now, I wanted to just jump real quick back to

6    Exhibit 102.  You spoke a few minutes ago about Mr. de Guzman's

7    role in dealing with articulation agreements; is that right?

8    A.   Yes.

9    Q.   Is there an actual position at San Francisco State that

10   handles official articulation agreements?

11   A.   Yeah.  We call him the articulation officer in private.

12   He's the person to coordinate all the articulations, not just

13   for the school but for the whole university.

14   Q.   Okay.  And are you aware of a rule that San Francisco State

15   has for official articulation agreements that San Francisco

16   State does not make such agreements with unaccredited schools?

17   Are you aware of such a rule?

18   A.   I'm not aware.

19   Q.   All right.  Now, let's -- from Pages 5 and 6 of

20   Exhibit 102 -- now, this is the one with just the one

21   paragraph, "Principles of Agreement"; right?

22   A.   Yes.

23   Q.   That was attached to your e-mail?

24   A.   Yes.

25   Q.   And you said -- you described how you put your signature on

1    here and that it was -- did you say it was a scanned signature?

2    A.   Yes.

3    Q.   And that you could just insert it into the document?

4    A.   Yes.

5    Q.   Since this time, have you continued to use such a practice

6    of inserting scanned signatures?

7    A.   No.

8    Q.   Why not?

9            MR. BABCOCK:  Objection.  Relevance.

10           THE COURT:  Overruled.

11           THE WITNESS:  Well, it's -- I made a mistake doing

12   that.  I should know better than to give out an electronic

13   signature.  So I don't do that anymore.  I was naive at that

14   time.

15           MS. WEST:  No more questions.

16           THE COURT:  Recross?

17           MR. BABCOCK:  No recross, your Honor.

18           THE COURT:  Dr. Liou, thank you for your testimony,

19   sir.  You're excused.

20           THE WITNESS:  Thank you.

21           THE COURT:  Members of the jury, it's -- I'm going to

22   tell you this more than once.  It's hard to just sit still and

23   listen to information for a long period of time.  So I'm going

24   to invite you just to stand up and stretch.  I'm going to do

25   that.  I'm going to do that right now because then we'll all do

```
 1      a better job of paying attention.

 2           And while that is underway, can I ask the Government who

 3      their next witness is, please.

 4                 MS. WEST:  Yes.

 5           The United States is going to call Carolyn Bayer-Broring.

 6                 THE COURT:  Ms. West, the last name is Borin?

 7                 MS. WEST:  It's a hyphenated last name.  The first

 8      name is B-a-y-e-r.

 9                 THE COURT:  Bayer or Borin?

10                 MS. WEST:  It's B-r-o-r-i-n-g, Broring.

11                 THE COURT:  Broring.  I have it now.  Thank you.

12           All the members of the jury, let me ask you to retake your

13      seats.

14           Ms. Bayer-Broring, am I pronouncing your name correctly?

15                 THE WITNESS:  Yes.

16                 THE COURT:  May I ask you to come to the witness

17      stand that's next to me?  And when you get there, just remain

18      standing, raise your right hand, and face my courtroom deputy,

19      please.

20                 THE CLERK:  Do you solemnly swear or affirm that the

21      testimony you're about to give in the matter now pending before

22      this Court shall be the truth, the whole truth, and nothing but

23      the truth?

24                 THE WITNESS:  I do.

25                 THE CLERK:  Thank you.  Please be seated.  Get close
```

1    to this microphone over here.

2            THE WITNESS:  Thank you.

3            THE CLERK:  Please state your full name and spell

4    your last name.

5            THE WITNESS:  My name is Carolyn Bayer-Broring, and

6    the last name is spelled B-a-y-e-r, hyphen, B-r-o-r-i-n-g.

7            THE COURT:  Ms. West, your witness.

8            MS. WEST:  Thank you.

9                        **CAROLYN BAYER-BRORING,**

10   Called as a witness by the Government, having been duly sworn,

11   testified as follows:

12                        **DIRECT EXAMINATION**

13   BY MS. WEST:

14   Q.   Good afternoon, Ms. Broring.

15   A.   Good afternoon.

16   Q.   Bayer-Broring.  Pardon me.

17        What do you do for a living?

18   A.   I am a forensic document examiner.

19   Q.   What does that mean?

20   A.   I am with the Homeland Security Investigations Forensic

21   Laboratory, and what I do is I examine travel and identity and

22   immigration-related documents to see if they are genuine or if

23   they have been altered in some way.

24   Q.   And as some component of that, are you involved in some

25   sort of handwriting examination as well?

1    A.   Yes.  Many of the cases do involve handwriting, whether

2    it's something like a passport that may have a signature on it

3    or a handwriting case such as perhaps a passport application

4    that may contain a lot of handwriting.

5    Q.   So is your employer the Department of Homeland Security?

6    A.   Yes, it is.

7    Q.   And how long have you been working with them as a forensic

8    document examiner?

9    A.   Since 2001.

10   Q.   Have you since then devoted your entire time to that work?

11   A.   Yes, I have.

12   Q.   Can you tell us, please, a little bit about your formal

13   education.

14   A.   Certainly.  I have a Bachelor of Science degree in Criminal

15   Justice and Sociology from Trinity College, now Trinity

16   University, in Washington, DC.  And then I have a Master of

17   Forensic Science degree from the George Washington University

18   also in Washington, DC.

19   Q.   Have you had any specialized training as it relates to

20   document examination?

21   A.   Yes, I have.  I underwent a three-year apprenticeship

22   program at our laboratory, the forensic laboratory in Plain,

23   Virginia.  I also regularly on an annual basis attend seminars,

24   conferences, training courses, things like that, to maintain my

25   proficiency.

BAYER-BRORING - DIRECT / WEST

1    Q.   Can you please tell us whether you belong to any

2    professional organizations that relate to the field of

3    forensics document examination.

4    A.   I do.  I belong to the American Academy of Forensic

5    Sciences, the Midatlantic Association of Forensic Scientists,

6    the Society for Imaging Science and Technology, the Document

7    Security Alliance, and I am certified with the American Society

8    of Forensic Document Examiners.

9    Q.   Thank you.

10        And what was the name of the lab?  Is there an official

11   name of the lab that you work with, or is it just the

12   Department of Homeland Security's lab?

13   A.   The official name of the laboratory is Homeland Security

14   Investigations Forensic Laboratory.

15   Q.   Thank you.

16        Is that laboratory accredited in some way?

17   A.   It is.

18   Q.   How so?

19   A.   It is accredited by an external -- external board we call

20   the American Society of Crime Lab Directors Laboratory

21   Accreditation Board, and it's an independent entity that

22   oversees laboratory operations to make sure that we are

23   following policies and procedures that are established as well

24   as to make sure that we are following practices that are

25   accepted within the field.

1    Q.   Now, as a forensic document examiner, are you tested in

2    some way?

3    A.   Yes.  I am proficiency-tested twice a year again by an

4    external board called the Collaborative Testing Services.

5    That's -- CTS is the acronym.  I am also competency-tested on

6    all of the equipment that I utilize for my examinations.

7    Q.   Can you please tell us, Ms. Bayer-Broring, approximately

8    how many cases that you have worked on involving disputed

9    documents.

10   A.   I've worked 1100 cases.  Any case could contain something

11   from one document to hundreds of documents.

12   Q.   And have you ever been qualified before this testimony here

13   today as an expert witness?

14   A.   Yes, I have.

15   Q.   Approximately how many times?

16   A.   Approximately 16 times, four times in Federal Court and

17   about 12 times in U.S. Immigration Court.

18   Q.   I'm sorry.  That was four times in Federal Court?

19   A.   Yes, ma'am.

20   Q.   All right.  Thank you.

21        MS. WEST:  At this time, your Honor, the United

22   States offers Ms. Bayer-Broring as an expert in the area of

23   forensic document examination.

24        THE COURT:  Any objection?

25        MR. BABCOCK:  No objection.

1      THE COURT:  The witness will be permitted to testify

2   on those topics.

3      THE WITNESS:  Thank you, sir.

4   BY MS. WEST:

5   Q.   Ms. Bayer-Broring, I'm going to hand you part of what has

6   already been admitted in evidence as Government Exhibit 4 --

7   and for the record, this is Pages 6 and 7 of Government

8   Exhibit 4 -- and ask you -- whoops.  There we go.

9      Now I have the right pages.  This is Pages 6 and 7 of

10   Government Exhibit 4.  I'll ask if you recognize this.

11   A.   Yes, ma'am, I do recognize this document.

12   Q.   And did you examine this document?

13   A.   I did.

14   Q.   How can you tell?

15   A.   When I examine a document in the laboratory, I mark the

16   evidence with the exhibit number for our case.  I include our

17   case number, my initials, and the date that I examined the

18   evidence, and I do see those markings here on this piece of

19   evidence.

20   Q.   And what exhibit number did you give this document?

21   A.   This particular document, I gave the exhibit Number 1.1 for

22   the purposes of my report.

23   Q.   All right.  Now, I want to show you two other pages from

24   that same Government Exhibit 4, these being Pages 4 and 5 of

25   Exhibit 4, and ask you the same question.  Do you recognize

1    this?

2    A.   Yes, ma'am, I do.

3    Q.   What is this?

4    A.   This document is a two-page document that purports to be an

5    articulation agreement.  The second page of the document

6    contains two signatures.

7    Q.   And what -- does it have your initials on it?

8    A.   Yes, ma'am, it is marked.

9    Q.   Are you able to determine that you examined this as well?

10   A.   I am.  My markings again are on the back of the document,

11   my exhibit number initials, the internal case number for our

12   laboratory, and the day that I examined it.

13   Q.   Thank you.

14        And what exhibit number did you give this?

15   A.   This was Exhibit No. 1.2 for the purposes of my report.

16   Q.   Thank you.

17        All right.  And I would like to show you, please, Page 5 of

18   Exhibit 102, which is also already in evidence.  I'm going to

19   show you Pages 5 -- what are marked as Pages 5 through 8.  It's

20   a two-page document.  Both the front and the back are marked.

21   Do you recognize that?

22   A.   Yes, ma'am, I do.

23   Q.   And did you examine this document as well?

24   A.   Yes, ma'am.

25   Q.   How can you tell?

BAYER-BRORING - DIRECT / WEST

1    A.  Similar to the previous documents, my markings are on here,

2    the exhibit number for my report, my initials, the case number

3    for our internal case at the laboratory, and the date that I

4    examined it.

5    Q.  And what exhibit number did you give this?

6    A.  1.4 for the purposes of my report.

7        (Government's Exhibit 112 marked for identification.)

8    BY MS. WEST:

9    Q.  Now, I am also going to show you what has been marked for

10   identification but not yet admitted as Government Exhibit 112

11   and ask if you recognize this document.

12   A.  Yes, ma'am, I do.

13   Q.  Did you examine this as well?

14   A.  Yes, ma'am.

15   Q.  How can you tell?

16   A.  Similar to the previous documents, again, this document

17   bears my markings, exhibit number, case number, date of my

18   examination.

19          MR. BABCOCK:  I'm sorry.  What was the last exhibit

20   number?

21          MS. WEST:  112.

22          THE COURT:  112.

23          MR. BABCOCK:  112.

24       Thank you, your Honor.

25   ///

1    BY MS. WEST:

2    Q.   And I'm sorry.  Do you see your initials on this one as

3    well?

4    A.   Yes, ma'am.

5    Q.   And that tells you what?

6    A.   That I examined this document, the date that I examined it,

7    the case number that was assigned to that internally to our

8    laboratory.

9    Q.   And did you assign -- what exhibit number did you assign to

10   it for your purposes?

11   A.   For my report, it was 3.1.

12          MS. WEST:  Your Honor, this document is not yet in

13   evidence, but we -- I've discussed with defense counsel.  We've

14   agreed to provisionally admit it pending Special Agent Mackey's

15   testimony.

16          MR. BABCOCK:  That's correct.

17          THE COURT:  Very good.  Exhibit 112 will be admitted

18   subject to a motion to strike.

19             (Government's Exhibit 112 received in evidence.)

20          THE COURT:  What that means, ladies and gentlemen, is

21   you can assume it's in evidence.  If somebody makes a motion to

22   strike and I grant it, I'll tell you about that.

23   BY MS. WEST:

24   Q.   Now, Ms. Bayer-Broring, you've said that you've examined

25   these four separate documents.  Can you please tell us

1    generally what kinds of examinations you conducted.

2    A.   Yes, ma'am.  I conducted microscopic, instrumental, and

3    comparative examinations on the documents, looking at the

4    documents themselves for any outstanding features, alterations,

5    things like that.  Primarily, my focus in this particular case

6    was between the signatures that were contained on those

7    documents.

8    Q.   And were you able to reach any conclusions as a result of

9    your examinations?

10   A.   Yes, I was.

11   Q.   Can you tell us very generally what those are, and then I'm

12   going to ask you to explain after.

13   A.   Certainly.  The conclusions that I reached in this case

14   were that on two of the documents, there were signatures that

15   were common and that they actually came from one source.  They

16   overlay exactly.  And then on another set of documents, there

17   was another set of signatures in a different name that again

18   came from a common source and overlaid exactly.

19   Q.   Now, did you prepare any demonstrative exhibits?

20   A.   Yes, I did.

21   Q.   And can you use those to help you explain your testimony

22   and help us to understand it?

23   A.   Yes, ma'am.

24   Q.   All right.  Let --

25             MS. WEST:  Your Honor, may I put her demonstratives

1      up?

2                  THE COURT:  Yes.

3          Any objection?

4                  MR. BABCOCK:  No, your Honor.

5                  THE COURT:  That's fine.

6          Members of the jury, while Ms. West is getting that, I'll

7      give you just a brief instruction about demonstrative exhibits.

8      I don't have the official instruction in front of me.  So I'm

9      kind of winging it, but I've seen this many times before.

10         A demonstrative exhibit is an exhibit that is intended to

11     help you understand the testimony of a witness.  That's why

12     it's called demonstrative.  It's intended to demonstrate some

13     point that the witness wants to make.  Sometimes demonstrative

14     exhibits are admitted into evidence, and sometimes they're not,

15     and -- but in any event, the lawyers have agreed this exhibit

16     can be in front of you to help you understand this witness's

17     testimony.

18         Ms. West?

19                 MS. WEST:  Thank you.

20         Now, I know that this font is small for everyone to read,

21     and I don't expect you to be able to, but there will be some

22     bigger ones afterwards.  So I invite Ms. Bayer-Broring, if it's

23     all right with the Court -- if she gets down to explain --

24                 THE COURT:  Yes.

25                 THE WITNESS:  Thank you, your Honor.

BAYER-BRORING - DIRECT / WEST

1    BY MS. WEST:

2    Q.   All right.  Can you please tell us what is marked as --

3    what the document there that is marked as Chart 1 helps us to

4    understand.

5    A.   Certainly.  This document is marked for the purposes of the

6    Court -- in the lower corner here, it's marked with Chart 1.

7    There are going to be other charts.  So we will refer to them

8    as the numeral here, which chart I'm talking about.

9         So for Chart 1, you see I have two documents up here, and

10   then I have some numerals at the very top of the document.  On

11   the viewer's left here, I have Exhibit 1.1.  So we referred

12   earlier to that exhibit that I had examined.  The 1.1 was the

13   numeral -- numerals that I assigned it for my laboratory

14   purposes.  That is being treated as Government's Exhibit 4.

15        And here on the viewer's right, you see Exhibit 3.1.

16   Again, that was one of the documents I examined that Ms. West

17   had given me to -- to prove that I had examined it.  3.1 was

18   the numerals that were assigned in my laboratory, and that's

19   being treated as Government's Exhibit 112.

20        These two documents -- I conducted a comparative analysis

21   of these two documents.  I looked at the documents themselves

22   to see if there were any indications on the documents -- if

23   there were alterations or something that might give me pause to

24   examine further.  I was focused mostly on the signatures on

25   these documents, however.  I did a comparative examination of

1      the signatures on these documents.

2              MS. WEST:  Now, since it's been provisionally

3      admitted, if we can please pull up Exhibit 112 just so that the

4      jurors on this side can see what she's referring to, that would

5      be great.

6          Can you expand from the top just down to the signature

7      part, please.

8      BY MS. WEST:

9      Q.   Okay.  Ms. Bayer-Broring, does this appear to be some sort

10     of tax-type form?

11     A.   Yes, ma'am.  It appears to be an IRS form.

12     Q.   Okay.  And then at the bottom there, do you -- are there

13     two names that -- the names read Susan Su and Xiao-Gang Su?

14     A.   Yes, ma'am.

15     Q.   Okay.  Thank you.  You can take that down.

16         All right.  Were you able to tell us anything -- or were

17     you able to tell anything about the quality of the signatures

18     on these two original documents that you looked at?

19     A.   Yes, ma'am.  The document on this side labeled Government's

20     Exhibit 4 -- the document was originally a two-page document,

21     but as I said, I was focused on the signatures on the

22     documents.  So I have only shown you here the second page that

23     bears the signatures.

24         The document in its entirety, Page 1 and Page 2, were

25     printed with an Inkjet printer.  That's a standard desktop

1     technology many people are familiar with.  The signature -- the

2     upper signature that says "Susan Xiao-Ping Su" -- that was

3     written in ballpoint pen, again, normal blue ballpoint pen that

4     many people have on their desks.  The lower signature here

5     reading Xiao-Gang Su -- that was printed in Inkjet, as was the

6     remainder of this document.

7         The document here listed as Government's Exhibit 112 --

8     this was a single-page document, and that is -- Ms. West just

9     explained it is an IRS form.  The document was printed in

10    toner.  So all the black text you see on here is toner, again,

11    just a simple desktop technology that many people are familiar

12    with.

13        It has three signatures, two here in the center of the

14    page.  The upper signature says, "Susan Su."  The lower of

15    those two signatures says, "Xiao-Gang Su."  And then again,

16    there's a bottom signature here that says, "Susan Su."

17        In all three instances on this particular document, these

18    were written in pen.  These were true ink signatures just as if

19    someone had signed them with a pen.  The Susan Su signatures

20    appear to be Xiao-Ping while the Xiao-Gang Su signature

21    appeared to be a ballpoint pen.

22            MS. WEST:  Could you please put up Chart 2.  I think

23    it's the one furthest from you.

24    BY MS. WEST:

25    Q.  What is Chart 2?

A.   Chart 2 is labeled here in the bottom corner.  It is
close-ups of the signatures that we just looked at.

Okay.  So we just looked at the two documents themselves,
and I said I was focused on the signatures.  The upper
signature is the Xiao-Gang Su signature that was taken from
Government's Exhibit 4, and the lower signature here that you
see on Chart 2 is from Government Exhibit 112.  That was that
tax form, and this, again, is the Xiao-Gang signature that was
taken from that document.

So these are demonstrative charts.  These are just blown-up
images so that you can see them more easily.

Q.   And is there anything in particular about the quality of
these signatures enlarged this way that stands out to you?

A.   Yes, ma'am.  The Xiao-Gang signature -- as I explained
previously, that document was printed with Inkjet printing.  So
again, it was a normal desktop technology that many people are
familiar with.

The signature also was printed with Inkjet.  At the bottom
of the signature here, you see a black horizontal line.  We
call that the baseline.  So when people sign their name, they
oftentimes use what's called a baseline to sign their signature
on.  In this instance, you see that the signature is up above
the baseline.  Well, that's very common.  Many people don't
write on the line.  They oftentimes write above it.

But here, you see the last letter in the name Gang is a

1    lowercase G.  It goes down, and it stops right here at the

2    baseline.  There's a break, a clear break right there.  And

3    then where you think the letter G would go down and swoop back

4    up, you see a break here as well.

5        So those two breaks right there along that baseline were my

6    first indication that something had been done with this

7    signature, some sort of cut-and-paste, as it were.  I don't

8    know if someone took scissors and perhaps cut a signature out

9    and cut off that bottom part.  It could have been done with

10   Photoshop or something like that, but something was done to cut

11   off the bottom of that G.

12       The ballpoint signature here taken from Government's

13   Exhibit 112 is the exact same signature showing the lower loop

14   of that G.  Again, you see a horizontal black baseline that

15   that signature was written closely in relation to, but we see

16   where that lower part of that lowercase G extends through that

17   baseline.  This signature and this signature are common

18   signatures.

19            THE COURT:  Ms. West, we're at 1:30.  How long do you

20   think your direct will be?

21            MS. WEST:  I think it would be appropriate to break

22   after the next chart, which would be about two to three more

23   minutes, if that's okay.

24            THE COURT:  Okay.  Very good.  Thank you.

25   ///

1    BY MS. WEST:

2    Q.   Can you pull up Chart 3, please.

3    A.   Certainly.

4    Q.   What is Chart 3?

5    A.   Chart 3, as we see with the number here in the corner,

6    references again those signatures that we just looked at, those

7    Xiao-Gang signatures.  The -- what we're seeing now is a

8    combination of the two signatures.

9         There is a piece of instrumentation in our office that I

10   used to make these images, and they're very colorful images,

11   but the reason they're colorful is this piece of equipment

12   allows me to capture the image as if -- take a picture of it,

13   save that image, and make it semitransparent and bring in

14   another image and make that one semitransparent.

15        I can make one pink and one green just for the purposes of

16   contrast.  So it's more easily seen by me during that

17   examination that I have one document that now appears green

18   under the camera and one that appears pink, and that's just for

19   contrast purposes.  There's nothing that's being done to this

20   document.

21   Q.   Can you tell us here which one is pink and which one is

22   green?

23   A.   Certainly.  In this particular instance, the pink signature

24   page that we're seeing here came from what was my Exhibit 1.1,

25   which was Government's Exhibit 4.

BAYER-BRORING - DIRECT / WEST

1    Q.   Which was a course articulation agreement?

2    A.   That's correct.  That was the second page of that

3    articulation agreement, and what is showing up as green is

4    taken from Government's Exhibit 112, which was my Exhibit 3.1

5    in my examination.

6    Q.   And that was the IRS document we just looked at?

7    A.   That's correct.  So I have the two contrasting colors here.

8    These are semitransparent images in this piece of equipment,

9    and I can move them in this piece of equipment without ever

10   harming them or changing them in any way.

11        This is simply done with the cameras and a piece of

12   equipment that I use, and anything that becomes common as I

13   move these around would become dark because the pink and green

14   are contrasting colors, and when they come together, they

15   create a dark image.

16   Q.   So is it fair to say that you're essentially overlaying the

17   two images?

18   A.   That is correct.

19   Q.   Okay.  What do you get when you overlay them?

20   A.   The result of this becomes this when I overlay those

21   images.  Now we have a dark image here with the two signatures

22   overlaid exactly showing that they were common signatures.

23   There's no variation in those signatures, and normal human

24   beings -- when they write, they have what's called variation in

25   their signatures.  There's -- no two signatures are ever going

1    to be exactly the same.

2        So when these two overlay exactly with no variation, no

3    differences, it shows me that these were both the same

4    signature.  One was original ink, and then one was Inkjet,

5    which means the Inkjet signature came from that original ink

6    signature.

7        And you can see right here at the bottom the two baselines

8    are coming together, and you see actually it's a little bit

9    darker here, but there's some overlap of those two baselines.

10   But here at the bottom, you see that break that I called

11   attention to earlier at the bottom of that lowercase G.

12       You can see the rest of the signatures overlay exactly, but

13   remember in one of those documents -- in that Exhibit 1.1

14   document or Government's Exhibit 4, that break is very evident

15   at the bottom where it did not -- or along that baseline, it

16   did not move.

17   Q.   And do you see here that they do not both have that hook at

18   the bottom of the G?

19   A.   That is correct.  You can see that the green remains behind

20   from that inked signature that had the full lowercase G and the

21   hook at the bottom.

22   Q.   Okay.  So in the bottom image here, if the pink and the

23   green overlay exactly, does the color change?

24   A.   Yes, ma'am.  It becomes a dark image, and again, this is

25   only in the cameras.  There's nothing that's being done in the

1    document itself.  It's only this piece of instrumentation I was

2    using in the laboratory that allows me to make these

3    transparent images, and then the lab is color-changed for

4    contrast.

5    Q.   And then that allows you to capture that image?

6    A.   Yes, ma'am.

7                   MS. WEST:  I think this is a good time for our break.

8                   THE COURT:  Very good.

9         Ms. Bayer-Broring, I order you to return Monday morning at

10   8:30 to resume your testimony.  Thank you.

11        Members of the jury, let me say a few things before we

12   break because I will not see you again until Monday morning.

13   We are not in session tomorrow, just a reminder.  Next week,

14   we'll have full four days of trial.  So I will look forward to

15   seeing you Monday morning at 8:30.

16        I wish I had told you this during jury selection.  I need

17   to remember, but I'll just say it now.  The power of a jury

18   comes from having people from different points of view of the

19   same evidence.  It's not just that -- it's not the judge.  It's

20   that you have people looking at things differently and then

21   coming together.

22        And the Forefathers knew that.  They figured that out, but

23   at that time when the Constitution was -- was written, only

24   certain people were allowed to be on a jury, and that limited

25   the power of the jury, and I told you we are so lucky to be in

1    the Northern District of California because we have such a

2    diverse population, and what's happened over time is the juries

3    have just gotten better and better and better and better.

4        We stopped having the property ownership requirement.  We

5    let women on juries.  We've stopped discriminating against

6    jurors on the basis of race.  There was just a decision out of

7    the Ninth Circuit in the last month.  You cannot discriminate

8    on the grounds of sexual orientation in a federal jury, and

9    that means that as -- all you've done is add to the diversity.

10   We've made the jury even more powerful.

11       I don't know any of you personally.  I have to imagine that

12   most of your jobs, you do not make important -- very important

13   decisions on a routine basis with a group of people this

14   diverse.  So at least once in this trial today or some other

15   day, look around you.  Just reflect on that fact because it's

16   one of the things that makes you so strong.

17       The second thing I want to say -- I said this earlier.

18   It's hard work to be a good juror.  Another thing that we don't

19   always do during our day-to-day lives is just sit and receive

20   information minute after minute.  It requires sustained

21   attention and effort.  It is not easy to be a good juror, and I

22   can see from where I'm sitting that you are working very hard

23   and paying close attention.  I notice that, and I'm very

24   appreciative of it.

25       Last thing is that same admonition I gave you a couple

1     times a day.  Don't form or express an opinion -- an opinion

2     about this case.  Don't talk with anyone or give any or receive

3     any information about this case or any subject connected with

4     this case.  You've got a few well earned days off, and I look

5     forward to seeing you Monday morning at 8:30.  Thank you.

6              THE CLERK:  All rise.

7          (Proceedings heard out of the presence of the jury:)

8              THE COURT:  Okay.  We're outside the presence of the

9     jury.

10         Is there anything that anyone wishes to --

11             MR. RHYNE:  Your Honor, one minor thing.

12         In -- when Dr. Jing --

13             THE COURT:  Hold on.

14         All right.  Just want to make sure the door to the jury

15    area was closed.

16         Mr. Rhyne?

17             MR. RHYNE:  Yes, your Honor.  At the conclusion of

18    Dr. Jing's testimony, I didn't mean to usurp your role of

19    passing the witness.  I could see that she was getting up to

20    leave, and I didn't want you to think that I was --

21             THE COURT:  No.  I didn't even notice it.

22             MR. RHYNE:  Okay.  Thank you, your Honor.

23             THE COURT:  I want to say a note about -- on a

24    reference -- Ms. Su is -- has, I believe, a Ph.D.  Mr. Babcock

25    has been referring to her, as I also have, as Ms. Su.  If she

```
1      wishes to be referred to as Dr. Su, I'm happy to make that
2      adjustment.
3                 MR. BABCOCK:  I appreciate that.
4                 THE COURT:  Mr. Babcock, you did refer to Dr. Jing as
5      Ms. Jing and Dr. Liou as Mr. Liou, and you referred to your
6      client as Susan, and I ask you to stay on a last-name basis,
7      and that will be the reference.
8                 MR. BABCOCK:  Fair enough.
9                 THE COURT:  Anything else that we need to put on the
10     record or talk about?
11                MS. WEST:  I don't think so.
12                MR. RHYNE:  I don't think so, your Honor.
13                THE COURT:  Very good.  I will see you all on Monday
14     at 8:30.  If anything comes up, I'm here all day tomorrow
15     picking a grand jury, and this particular Friday, I'm in San
16     Francisco, too.  So I'm easy to find.
17                MS. WEST:  Thank you.
18                THE COURT:  Oh.  I beg your pardon.  We'll all see
19     each other at 8:00 o'clock.  The jurors we'll see at 8:30.
20        Okay.  Thank you.
21                MR. BABCOCK:  Thank you.
22                MS. WEST:  Thank you, your Honor.
23                MR. RHYNE:  Thank you, your Honor.
24                THE CLERK:  All rise.
25                     (Proceedings adjourned at 1:40 p.m.)
```

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, James C. Pence, Federal Official Realtime Court

6     Reporter, in and for the United States District Court for the

7     Northern District of California, do hereby certify that

8     pursuant to Section 753, Title 28, United States Code that the

9     foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14
                            Dated this 11th day of June, 2014.
15

16

17    _____

18    JAMES C. PENCE, RMR, CRR, CSR NO. 13059
      FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25