1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3          BEFORE THE HONORABLE JON S. TIGAR

4 UNITED STATES OF AMERICA,    )
                           ) Volume 4

5          Plaintiff,   ) Pages 534 - 726
                           )

6       VS.                 ) NO. 11-00288 JST
                           )

7 SUSAN XIAO-PING SU,       )
                           ) San Francisco, California

8         Defendant.   ) Monday, March 10, 2014
     _____) 8:08 a.m.

9

10          **TRANSCRIPT OF COURT PROCEEDINGS**

11

12 **APPEARANCES:**

13 **For Plaintiff:**         MELINDA HAAG

14                         UNITED STATES ATTORNEY
                        1301 Clay Street, Suite 340S
                        Oakland, California 94612

15             BY:    **HARTLEY M.K. WEST, ESQ.**
                  **WADE M. RHYNE, ESQ.**

16                   **ASSISTANT UNITED STATES ATTORNEYS**

17

18 **For Defendant:**       Law Offices of Erik G. Babcock
                        717 Washington Street, Second Floor
                        Oakland, California 94607

19             BY:    **ERIK G. BABCOCK, ESQ.**
                  **ATTORNEY AT LAW**

20

21

22

23

24

25 Reported By:   James C. Pence, RMR, CRR, CSR No. 13059
                 Official Court Reporter - U.S. District Court
                 Computerized Transcription By Case CATalyst

**I N D E X**

Monday, March 10, 2014 - Volume 4

**GOVERNMENT'S WITNESSES**                          PAGE  VOL.

**BAYER-BRORING, CAROLYN (RECALLED)**
(PREVIOUSLY SWORN)                                   543   4
Direct Examination (Resumed) by Ms. West             543   4
Cross-Examination by Mr. Babcock                     552   4

**ALLEN, ADOLPH MILLER**
(SWORN)                                              556   4
Direct Examination by Mr. Rhyne                      556   4
Cross-Examination by Mr. Babcock                     563   4

**MACKEY, JASON**
(SWORN)                                              568   4
Direct Examination by Mr. Rhyne                      569   4
Cross-Examination by Mr. Babcock                     685   4

**E X H I B I T S**

**GOVERNMENT'S EXHIBITS**                      IDEN  EVID  VOL.

7                                               587   588   4

100                                             575   576   4

100A                                            580   580   4

100C                                            670   671   4

109                                             648   649   4

122                                             650   651   4

206B                                            639   640   4

207B                                            639   640   4

300                                             612   613   4

303B                                            617   618   4

305                                             660   661   4

307                                             653   654   4

# I N D E X

## E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 309 | 658 | 659 | 4 |
| 315 | 663 | 664 | 4 |
| 320 | 666 | 667 | 4 |
| 320A | 672 | 673 | 4 |
| 327 | 675 | 676 | 4 |
| 330 | 677 | 678 | 4 |
| 331 | 680 | 681 | 4 |
| 332 | 682 | 682 | 4 |
| 333 | 684 | 684 | 4 |
| 400 | 631 | 632 | 4 |
| 401 | 631 | 632 | 4 |
| 403 | 631 | 632 | 4 |
| 405 | 633 | 634 | 4 |
| 406 | 628 | 629 | 4 |
| 407 | 584 | 585 | 4 |
| 580 | 621 | 622 | 4 |
| 581 | 621 | 622 | 4 |
| 582 | 621 | 622 | 4 |
| 582A | 621 | 622 | 4 |
| 583 | 621 | 622 | 4 |
| 584 | 621 | 622 | 4 |

# **I N D E X**

## **E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 585 | 621 | 622 | 4 |
| 587 | 621 | 622 | 4 |
| 588 | 621 | 622 | 4 |
| 589 | 621 | 622 | 4 |
| 590 | 621 | 622 | 4 |
| 591 | 621 | 622 | 4 |
| 592 | 621 | 622 | 4 |
| 706 | 582 | 582 | 4 |
| 709 | 606 | 607 | 4 |

1    Monday, March 10, 2014                                    8:08 a.m.

2                              ---o0o---

3         (Proceedings were heard out of the presence of the jury:)

4              THE COURT:  Calling the Su matter, Ms. Su and counsel

5    are at counsel table.  We're outside the presence of the jury.

6         I understand from counsel that there's something that you

7    wish to discuss before the jury comes in.

8              MR. RHYNE:  Yes, your Honor.  Good morning.

9              THE COURT:  Good morning, Mr. Rhyne.

10             MR. RHYNE:  Over the weekend, it came to our

11   attention while we were speaking with the defendant's brother

12   regarding his potential travel and possible testimony in this

13   case that there had been telephonic contact between him and the

14   defendant.

15        As he explained it to the case agent, the defendant's

16   brother actually called her, the defendant, and then he stated

17   that she called him back, and during the course of the phone

18   call, she explained to him that she wasn't supposed to talk to

19   him, and I guess there was a brief discussion about scheduling

20   and his possible testimony.  It didn't sound like it was

21   anything substantive, but we did want to bring it to the

22   Court's attention.

23        We have a similar question out to her sister's counsel in

24   this case to see if they had any contact between them as well,

25   and we'll update the Court if we learn anything.

1          THE COURT:  Additional facts might change the Court's

2     mind if that's not okay to me, and I'll say why.

3          Ms. Su did not initiate the contact with her brother.  Her

4     brother called her.  She called him back, and it sounds like

5     the first thing she said was "I can't talk to you," and it

6     doesn't sound like there was any substantive discussion about

7     the case.

8          MR. BABCOCK:  Actually, I didn't think of it last

9     week, your Honor, but -- and the Court probably wasn't even

10    aware who was on the witness list, but her brother and sister

11    are, and -- I mean, I'd ask for an exception to the Court's

12    modification of the conditions of release to allow

13    communications with her family that don't pertain to the

14    substance of their testimony, just --

15         THE COURT:  Unless -- unless there's a showing that

16    she needs to have those communications, I'm not inclined to

17    grant that reception -- that exception.  I'm assuming that not

18    all of her family members are going to be witnesses in this

19    case.

20         MR. BABCOCK:  That's true.

21         THE COURT:  And so to the extent that -- that she

22    does have family members who are going to be witnesses in this

23    case, I think that, particularly given Ms. Su's track record

24    last week, I would like to avoid creating a situation where

25    there's unnecessary temptation on either side to have a

1    discussion about the case.

2         And you've all been in this situation where we know there's

3    something we're not supposed to talk about and we're in a

4    conversation, and it just requires additional effort to avoid

5    that subject, and I'm not prepared to put Ms. Su in that

6    situation right now.

7              MR. BABCOCK:  I understand.

8              THE COURT:  So that request is denied.

9              MR. BABCOCK:  I was just -- there was a -- there was

10   a situation this weekend where my client locked herself out of

11   her house, and her family has a set of keys.

12             THE COURT:  She can call somebody who's not a witness

13   and have that person call her family and get a key.  I just --

14             MR. BABCOCK:  Okay.

15             THE COURT:  Until someone shows me until there's a

16   showing of need, I'm not going to grant that exception.

17             MR. BABCOCK:  Understood.

18             MR. RHYNE:  Thank you, your Honor.

19             THE COURT:  Anything further that we should discuss

20   this morning?

21             MR. RHYNE:  No, your Honor.

22             MR. BABCOCK:  I -- well, just to give the Court a

23   heads-up, counsel have given me a witness lineup on Friday.  I

24   understand one of those witnesses' wife is in labor and is now

25   not going to testify.  So it's possible we may be a little bit

1    short today.

2              THE COURT:  I see.

3              MR. BABCOCK:  I don't know.

4              MS. WEST:  We -- counsel is correct.  There was --

5    one of the witnesses -- we thought we were trying to get ahead

6    of the game by calling him out of order in our case before his

7    wife goes into labor, but then it turns out during the night

8    she went into labor.

9              THE COURT:  Mother Nature has her clients.

10             MS. WEST:  Apparently so.

11        So our plan now is to put him back in order, which would be

12   at the end of our case.  When counsel and I communicated on --

13   I guess it was Thursday or Friday about the witness list.  We

14   would finish this witness now, a couple short witnesses, one of

15   whom is the one whose wife is in labor, and then the case

16   agent, and Counsel advised -- I didn't think we'd get too far

17   at all beyond the case agent.

18        So with that in mind, we hadn't really planned anything

19   else until we were thinking, "Well, what if" -- "what if he

20   were to not ask any questions on cross-examination?  We'd need

21   somebody else."  So we have prepared somebody else.  We've

22   notified Counsel, but it wasn't until about 5:00 o'clock

23   yesterday.  So it did violate the 24-hour rule if we get -- if

24   we get past Agent Mackey.  So --

25             THE COURT:  I appreciate everyone bringing me up to

1    date.

2              MS. WEST:  We'll see where we --

3              THE COURT:  And counsel correctly assumed that I have

4    a strong interest in using every minute of the jury's time

5    while they're here because they are volunteers, and I do guard

6    their time jealously.

7         However, it's not every trial that a witness's wife goes

8    into labor, and I think if I tell our jurors -- you know, if we

9    only get until noon or whenever it is and I tell the jurors

10   that -- that a witness's wife went into labor, I think they'll

11   all understand.  So I appreciate you telling me that.  It

12   doesn't sound like there was a failure of effort in this part.

13             MR. BABCOCK:  That's true.

14             THE COURT:  Anything else?

15             MR. BABCOCK:  No.

16             MS. WEST:  No.

17             THE COURT:  All right.  Thank you.

18             MS. WEST:  Thank you.

19             THE COURT:  So off the record.

20        (Proceedings were heard in the presence of the jury:)

21             THE COURT:  Good morning.  The jurors are in their

22   assigned seats.

23        I hope everyone had a good weekend.  We have a good week of

24   us ahead in the trial.  Daylight savings time came.  It's nice

25   because it's a little light at the end of the day, but waking

1    up that hour early the first Monday of the week is not fun for

2    most people.  So thank you again for your punctuality and for

3    your jury service.

4        When you broke last week, we were in the midst of the

5    testimony of a handwriting expert named Ms. Bayer-Broring, if

6    my notes are correct.  So let's recall her.

7            MS. WEST:  Yes, your Honor.

8        The United States recalls Carolyn Bayer-Broring.

9            THE COURT:  Good morning, Ms. Bayer-Broring.

10            THE WITNESS:  Good morning.

11            THE COURT:  Oh.  You have already been sworn in.

12    You're still under oath.

13            THE WITNESS:  Okay.  Thank you.

14                    **CAROLYN BAYER-BRORING,**

15    Called as a witness by the Government, having previously been

16    sworn, resumed the stand and testified further as follows:

17                    **DIRECT EXAMINATION (RESUMED)**

18    BY MS. WEST:

19    Q.  Welcome back.

20    A.  Thank you.

21    Q.  We've had a few days off, but as you probably recall, we

22    had just gotten through Chart 3 when we broke Wednesday

23    afternoon.

24    A.  That's correct.

25    Q.  Have you prepared additional charts with regard to the

1     other two exhibits we looked at?

2     A.   Yes, ma'am.  I do have them down in that selection of

3     exhibits.

4          MS. WEST:  Your Honor, may she step down to show the

5     jury --

6          THE COURT:  Yes.

7          MS. WEST:  -- Chart 4?

8          THE COURT:  Yes, she may.

9     BY MS. WEST:

10    Q.   Can you please show us how Chart 4 helps explain your

11    testimony with regarded -- with regard to the -- your forensic

12    document examination of these two exhibits?

13    A.   Sure.

14    Q.   That is, Government's Exhibits 4 and 102.

15    A.   Certainly.  As I explained with the previous charts, this

16    is an overview of two documents that I examined.  Again, I had

17    numbered the charts, 1 through 6.  So we probably saw 1 through

18    3.

19         This is Chart 4.  So for the record, here numbered in the

20    corner is Chart 4, and it deals with two exhibits that I

21    examined.  For my report, I amended Exhibit 1.2 and

22    Exhibit 1.4.  That's my report from my laboratory, and for the

23    trial, it's Government's Exhibit 4 and Government's

24    Exhibit 102.

25         So Government's Exhibit 4 was a two-page document.  It was

1    printed entirely in toner.  So again, it's a desktop technology

2    that everyone should be familiar with, just something that you

3    probably have on your desk perhaps.  So it's -- it was toner,

4    black text.  It had two signatures on it, a signature here and

5    a signature here.  They were both in toner, this black-toner

6    signature here, "Shy Shenq Liou," and then "Liou" and then the

7    name "Susan Xiao-Ping Su."

8        And then Government's Exhibit 102 was again a two-page

9    document, and again, we're only showing you the second page,

10   focusing on the signatures, black toner again, including the

11   signature here.  So this signature was black toner.  It was

12   printed when this document was printed, and this signature --

13   and these signatures were printed when this document was

14   printed.

15       So moving on to Chart 5, again, the number here in the

16   lower corner, concentrating just on the signatures alone, the

17   upper signature is from Government's Exhibit 4.  The lower

18   signature is from Government's Exhibit 102.  Concentrating on

19   the signatures, "Shy Shenq Liou," in both of those documents,

20   the signatures -- again, we look -- there is what's called a

21   baseline.  So there's a line -- a horizontal line that's drawn

22   that somebody would sign their signature on or perhaps above

23   and -- as you've seen here.

24       Now, in this instance, these were both toner.  So these

25   were not signed on this document.  These were toner signatures.

1    So they printed -- when these documents were printed, these

2    signatures were not signed in ink.

3    Q.   Ms. Bayer-Broring, are these just enlargements of the two

4    that we just saw in Exhibit -- or better, Chart 4?

5    A.   Yes, ma'am.  The -- both are what we saw on Exhibit 4, and

6    as we see here in Exhibit 5 -- Chart 5 -- excuse me -- these

7    are enlargements again for the purposes of the jury to be able

8    to see a little better what I'm explaining.  There was no

9    changes made to these signatures, but they are just

10   enlargements for the purposes of these charts so that you can

11   see them better.

12   Q.   All right.  Is there anything else that we can tell from

13   Chart 5, or are we ready for Chart 6?

14   A.   There is one other thing.  It's going to be a little

15   difficult to see, but the signature -- the print on this

16   document -- for example, let's look at Government's Exhibit 4

17   first where it says, "San Francisco State University."  That

18   was printed in toner, and when toner prints on a page, it -- if

19   you type a document, let's say, in Word and then you hit

20   "Print" and it prints it out, the edges of these letters are

21   going to be fairly smooth.

22       Now, if you put a document on the scanner and scan it in at

23   perhaps 300 dots per inch, DPI, or fairly low resolution and

24   then hit "Print" and printed that document up, you might see

25   that it looks like it's pixilated.  You might see more dots or

1    blocks or something like that.

2        The signature "Shy Shenq Liou" in Government's Exhibit 4

3    and the "Shy Shenq Liou" signature in Government's

4    Exhibit 102 -- they both exhibit that sort of block structure

5    where the text on the remainder of the document does not show

6    that block structure.

7    Q.   Now, when you're saying "text," are you referring to the

8    San Francisco State University and the print below the

9    signature at the baseline?

10   A.   Yes, ma'am, the remainder of the text that was on that

11   page.

12       So the -- the signature in each of these instances was

13   somehow scanned in at some time and then added to this

14   document.  It's different.  It's got that block sort of

15   structure showing that it was scanned at perhaps a low DPI or

16   something like that and then added to this document because the

17   remainder of the text does not show that sort of block or

18   stairstep effect of the pixels that I see in those two

19   signatures alone.

20   Q.   Ms. Bayer-Broring, what is DPI?

21   A.   DPI is dots per inch.  So when you scan something in and

22   you want to print it out, you can scan something in at a very

23   high resolution, 1200 DPI, for example.  So that adds more dots

24   to those -- to that area and makes it a finer resolution.  If

25   you do something at a fairly low resolution, 300 DPI or 200

1    DPI, for example, then it adds more pixels and more blocks.  So

2    you get more of that sort of block effect.

3    Q.   So from the block effect that you're referring to, you're

4    able to tell -- do I understand correctly? -- that the

5    signature was scanned?

6    A.   It was scanned, or perhaps it may have been added from

7    Photoshop or something like that, but the -- the signatures

8    were not part of the original document.  They were simply typed

9    in and printed out.  They were somehow added into that

10   document.

11   Q.   All right.  What can we tell from Chart 6?

12   A.   The -- Chart 6 -- again, numbered here in the corner.

13   Again, this is one of those very colorful charts that we had

14   seen previously, and the colors are simply to allow for

15   contrast.  There's no changes that have been made, but the --

16   there was a piece of instrumentation that I used to capture

17   these images that allowed me to scan and to capture both

18   signatures and then to make them semitransparent.

19       So I scanned in the first one in the -- showing up in pink

20   and made that semitransparent, and then the second one I

21   captured in green and made that semitransparent, and the only

22   reason they're pink and green is so there's more contrast, so I

23   can see them more clearly, so I can see the two different

24   documents.

25   Q.   Let me stop you for a second.

1      What is the -- can you tell us a little bit more about the

2      type of equipment that you use to do the red and the -- or the

3      pink and the green?  Is there a name for that?

4      A.   Certainly.  The piece of equipment is called a video

5      spectral comparator.  And for the record, that's video,

6      v-i-d-e-o, spectral, s-p-e-c-t-r-a-l, third word comparator,

7      c-o-m-p-a-r-a-t-o-r.

8      Q.   And what is that instrument?

9      A.   There's an acronym for it, VSC.  That just makes it easier

10     than saying the long name all the time.  The VSC is a piece of

11     equipment that -- it contains a microscope.  It contains a

12     camera.  So it's a microscope so I can enlarge images, it

13     contains a camera so I can then capture those images, and it

14     contains a number of different light sources.

15         So it has infrared light, ultraviolet light, and many

16     documents have ultraviolet security features that you can't see

17     with the unaided eye, but if you put them under an ultraviolet

18     black light, then you can see things glow in a different color.

19     It has what's called transmitted light.

20         So if you were looking at, for example, a piece of

21     currency, currency has a watermark in it so that it can't be

22     counterfeited.  Transparent -- transmitted light allows you to

23     see through that document to see what a watermark would look

24     like, for example.

25         So the piece of equipment I used here was the VSC, and one

1    of these features that the VSC has is it allows me to capture

2    these two images and change those colors in the camera alone.

3    There's no changes done to the document itself.  It's simply in

4    the camera, but I can make the one image pink and the one image

5    green just to allow for greater contrast.

6    Q.   Thank you for that explanation.

7         And which exhibit signature is pink and which is green, if

8    you can tell us, please.

9    A.   In the upper -- upper image on Chart 6 here, the -- what

10   looks like pink is from Government's Exhibit 102, which was

11   Exhibit 1.4 in my report.  And then the green is from

12   Government's Exhibit 4, which was Exhibit 1.2 in my report.

13        And then we have the upper image showing the separation

14   before I combine them and then the lower image where I move

15   those images together.  And you can see areas that remain pink,

16   there's nothing matching there, areas that remain green,

17   there's nothing overlapping there.  But here in the signatures,

18   those two signatures overlap exactly.

19        And what that is telling me is those two signatures came

20   from one source.  They overlap exactly.  There's no variation

21   in those signatures.  There's nothing that differs between

22   those two signatures, and a naturally written -- when you write

23   a signature naturally in ink, there's variation.  There's

24   always some variation in your signature.

25        So if you were to write your signature twice and try to

1    make it overlap, if you were to try to do this perhaps by

2    holding it up to the light, you couldn't make two signatures

3    overlap.  There's always just natural variation.  So showing

4    that these two overlap -- will overlay exactly, thus causing a

5    dark image, that shows me that those two signatures were

6    exactly the same signature at some point.

7    Q.   Meaning that one is just a total duplicate of the other?

8    A.   That's correct.

9    Q.   And they may, in fact, be both duplicates of some other

10   original signature?

11   A.   That's correct because these are both toner.  I don't

12   have -- I've never seen another document that had an original

13   ink signature from which these came.  So I don't know where

14   they came from, but I can just tell you that these two, both

15   being toner signatures, both came from some other signature

16   someplace.  They are both the same signature.

17   Q.   And could you put Chart 4 back up for us, please.

18   A.   Chart 4?

19   Q.   Yes, please.

20        Okay.  So then just circling back, Government Exhibit 4 was

21   an articulation agreement between San Francisco State

22   University and Tri-Valley University; is that right?

23   A.   Yes, ma'am.  It says so right here, "Articulation Agreement

24   Between Tri-Valley University and San Francisco State

25   University."  Yes, ma'am.

1    Q.   Okay.  And then Government Exhibit 102 there -- do you

2    remember what the first page of that one was?

3    A.   It was a -- I think it was a course agreement or something

4    that -- I think it was a course agreement for San Francisco

5    State University.

6    Q.   Okay.  That's all I have for you.  Thank you very much.

7    A.   Okay.  Thank you.

8            THE COURT:  Mr. Babcock, questions for this witness?

9            MR. BABCOCK:  Just briefly.

10                          **CROSS-EXAMINATION**

11   BY MR. BABCOCK:

12   Q.   Good morning, ma'am.

13   A.   Want me to sit, Mr. Babcock, or stand?

14   Q.   Yeah.  You can go ahead and take your seat.

15   A.   Okay.  Thank you.

16   Q.   So the --

17           MR. BABCOCK:  May I?

18           THE COURT:  Yes.

19   BY MR. BABCOCK:

20   Q.   Getting back to Chart 5 -- actually, I guess you can't see

21   that from there.  Can you -- you don't need to see it.

22   A.   Okay.

23   Q.   But when you're looking at Chart 5, as I understand it, you

24   said that signatures -- or I guess not "signatures" -- any sort

25   of document where something has been scanned, you can sometimes

1    tell that it's -- that it's scanned as opposed to printed

2    because it has less dots per inch?

3    A.   Depending on the -- on the resolution that you scan it in,

4    yes, sir.

5    Q.   Right.  Is there different ways of scanning things

6    depending on the technology you have available?  It is possible

7    to scan things at a very high resolution; right?

8    A.   Yes, it is.

9    Q.   But is it -- do you know -- is it more common when people

10   scan things -- are most scanners set at a lower resolution so

11   that there's less dots per inch?

12   A.   I don't know.  I'm not familiar with all the vast variety

13   of scanners that are out there, what the different software

14   packages are for those scanners.  I don't know.

15   Q.   Okay.  And there are -- there is technology available for

16   people, for lack of a better word?  They have what are -- could

17   be referred to as e-signatures on their computers?

18   A.   Yes.

19   Q.   So that they can -- they have a -- a pre-done signature,

20   and using some sort of software, they can affix that to a

21   document and e-mail it back to somebody?

22   A.   Yes, certainly.

23   Q.   And is that -- is that type of process using an

24   e-signature -- does that have the same type -- could you --

25   would the dots per inch analysis you're using -- would that

1    apply to e-signatures as well?

2    A.   It certainly could.  It depends again on how the signature

3    is captured.  It certainly could.

4    Q.   One of the ways people put e-signatures into software is

5    through a scanner-type process; is that right?

6    A.   Yes, that's correct.

7    Q.   Okay.  Now, is this dots-per-inch analysis -- is that also

8    true of signatures that have been -- where the original

9    signature has been faxed?

10   A.   Yes, that could be very true.

11   Q.   Okay.  You never saw -- or neither of these signatures in

12   Exhibit 4 or Exhibit -- Exhibit 102 for Mr. Liou were original

13   signatures; right?

14   A.   On these two documents?  No, sir, they were not.

15   Q.   They were both scanned in some fashion?

16   A.   They were -- the documents themselves were toner, both

17   documents --

18   Q.   Okay.

19   A.   -- as were the signatures.

20   Q.   But you believe before they were printed there was some

21   sort of scanning involved?

22   A.   It could have been one of those e-signatures, as you said.

23   It could have been scanning.  It could have been something that

24   was captured in Photoshop.  I don't know how -- how those

25   images were captured, but they were -- the -- the line quality

1    of those signatures was different from the line quality of the

2    text surrounding those signatures.

3    Q.   I gotcha.  Thank you.

4              MR. BABCOCK:  That's all I have.

5              THE COURT:  Redirect?

6              MS. WEST:  No.  Thank you.

7              THE COURT:  Ms. Bayer-Broring, thanks for your

8    testimony.  You're excused.

9              THE WITNESS:  Thank you, sir.

10             MS. WEST:  Thank you.

11             THE WITNESS:  Your Honor, may I be excused to depart

12   back to my laboratory?

13             THE COURT:  Yes, you are.

14             THE WITNESS:  Great.  Thank you.

15             THE COURT:  You're now a member of the public.

16   You're no longer under court order.  You're welcome to stay if

17   you'd like, but you probably have other things to do.

18             THE WITNESS:  Thank you.

19             THE COURT:  Thank you.

20        Government's next witness?

21             MR. RHYNE:  Yes, your Honor.

22        The Government calls Dr. A. Miller Allen.

23             THE COURT:  All right.  And is the last name Allen or

24   another Allen?

25             MR. RHYNE:  It's -- Miller Allen is his last name.

1    THE COURT:  Very good.

2    Good morning.  Is it Dr. Miller Allen?

3    THE WITNESS:  Good morning.

4    THE COURT:  Good morning.

5    I'm going to ask you to come up to the witness stand to my

6    right, and when you get there, just remain standing and raise

7    your right hand and face my courtroom deputy, please.

8    THE CLERK:  Please raise your right hand.

9    Do you solemnly swear or affirm that the testimony you're

10   about to give in the matter now pending before this Court shall

11   be the truth, the whole truth, and nothing but the truth?

12   THE WITNESS:  Yes.

13   THE CLERK:  Thank you.  Please be seated.  Get close

14   to this microphone to be heard.

15   Please state your full name and spell your last name.

16   THE WITNESS:  Adolph Miller Allen, A-l-l-e-n.

17   THE COURT:  Thank you.

18   Your witness.

19                    **ADOLPH MILLER ALLEN,**

20   Called as a witness by the Government, having been duly sworn,

21   testified as follows:

22                    **DIRECT EXAMINATION**

23   BY MR. RHYNE:

24   Q.   Good morning.

25   A.   Good morning.

1    Q.   Where are you currently employed?

2    A.   Applied Materials Corporation.

3    Q.   What's your job title there?

4    A.   I'm the director of process engineering.

5    Q.   How long have you been with Applied Materials?

6    A.   A little over 11 years.

7    Q.   What are your duties and responsibilities in your current

8    position?

9    A.   I manage two groups that work on semiconductor

10   manufacturing equipment.

11   Q.   Can you tell the jury about your educational background?

12   A.   Yeah.  I attended Berkeley for a Bachelor's, Master's and

13   Ph.D. in Mechanical Engineering.

14   Q.   The Ph.D. is in Mechanical Engineering?

15   A.   Yes, it is.

16   Q.   Any particular subspecialty?

17   A.   In MEMS.  It's microelectromechanical systems.

18   Q.   Okay.  And the jury has heard some testimony about MEMS.

19   Can you just generally tell them what that is?

20   A.   MEMS is a way to use semiconductor manufacturing techniques

21   to make mechanical systems, so small gears or small vibrating

22   systems.

23   Q.   Do you know the defendant in this case, Dr. Susan Su?

24   A.   Yes, I have met her.

25   Q.   How many times have you met her?

1    A.   Really once or twice.  I couldn't really recall.

2    Q.   Okay.  I want to talk about that.  How did you meet her?

3    A.   She was the -- she was the wife of a former coworker, Hang

4    Yang.  He was in my department and co-department several years

5    ago in bonding materials, and he had a going-away party when he

6    left, and that was the first time I had really, you know,

7    talked to her directly.

8    Q.   Where was that going-away party?

9    A.   That was at their home.

10   Q.   Okay.  Do you recall approximately when that was?

11   A.   That was around five or six years ago in 2008 probably.

12   Q.   And you had a discussion with Dr. Su, the defendant in this

13   case, at that party; is that correct?

14   A.   That's correct.

15   Q.   Can you tell the jury about that discussion?

16   A.   Yes.  So she invited me into, like, an office area and said

17   that she was going to start an online university and would I be

18   interested in teaching or lecturing, and -- and she asked me

19   what my emphasis was in the school.

20        And I knew that she also attended Berkeley.  Her husband

21   told me that, and she said that I would be able to, you know,

22   do online teaching through this university.  And she asked my

23   name and what my emphasis was in school, and I told her MEMS,

24   and she took notes.

25   Q.   Did she also ask you about your educational background as

1    well?

2    A.   Yes.  Yes.

3    Q.   And she was taking notes during that conversation?

4    A.   Yes, she was.

5    Q.   I want to talk about the level of detail that you got into

6    in this discussion with Dr. Su about this school and the

7    possibility of you teaching there.  Was there any -- any

8    discussion about specific courses that you would teach?

9    A.   No.  She just said, "What was your emphasis?"  And she

10   wrote down -- or I told her MEMS.

11        And we didn't really talk about specifics.  It seemed

12   pretty nebulous what was going to happen in the future, and I

13   just said, "Oh, you know, if it happens, you can contact me and

14   talk to me."  I knew she knew how to get in touch with me in

15   terms of having worked with her husband.  So --

16   Q.   Was there any discussion about salary?

17   A.   No.

18   Q.   Did you fill out an employment application?

19   A.   No.

20   Q.   Did you ever have any other contact with Dr. Su about the

21   school that you spoke about during that party?

22   A.   No.

23   Q.   Have you ever heard of the school Tri-Valley University?

24   A.   I have, yes.

25   Q.   When did you first hear of it?

1    A.   I heard of it about three years later.  My boss asked me if

2    I'd heard of this and was I -- did I know I was listed as a

3    faculty member, and -- and then another coworker of mine

4    Googled it to see what it was, and we saw sure enough, you

5    know, I'm listed there as a lecturer.  And I was kind of

6    surprised by that because I never had heard of the place or

7    signed up to do anything like that.  So --

8    Q.   Was there any -- when you viewed the website, was there any

9    reference to Applied Materials?

10   A.   There -- yes, there was.  So in addition to my name,

11   there's also a link -- a hotlink to our corporate website.

12   Q.   When you viewed the website, did you note anybody else that

13   you knew from Applied Materials that was on the website?

14   A.   Yes.  My -- my current boss.  His name was there but

15   misspelled.  They did have his correct colleges that he

16   attended, and also another colleague who had left Applied was

17   also listed there.

18   Q.   When you viewed the website, could you see the credentials

19   that were listed for you?

20   A.   Yes, I did.

21   Q.   How did those credentials compare to the credentials you

22   told Dr. Su at the party?

23   A.   Yeah.  It said along the lines of, you know, "Ph.D., UC

24   Berkeley."

25   Q.   So a few more questions here.

1      Did you ever receive any money from Tri-Valley University?

2   A.  No.

3   Q.  Did you ever agree to teach the class Dynamics?

4   A.  No.

5   Q.  Did you ever agree to teach the class Graduate Researches?

6   A.  No.

7   Q.  Did you ever agree to be any kind of staff member at

8   Tri-Valley University?

9   A.  No.

10  Q.  Did you ever allow Dr. Su to use your name or credentials

11  in Tri-Valley University's materials or on this website?

12  A.  No.

13          MR. RHYNE:  Can we pull up Exhibit 1, please, and can

14  we go into Dr. Allen's -- you can go to the very top of the

15  screen all the way down to the bottom, "Dr. Allen."

16          MR. BABCOCK:  I'm sorry.  What page are we on?

17          MR. RHYNE:  Page 8.

18          MR. BABCOCK:  Thank you.

19  BY MR. RHYNE:

20  Q.  Can you see that okay?

21  A.  Yes, I can.

22  Q.  On the second column over, "Degrees and Discipline," is

23  that an accurate summary of your educational background?

24  A.  Yes, that's correct.  The Engineering Mechanics part is

25  not, but I think the rest is correct.

1  Q.  And those were the classes I asked you about earlier that

2  you said you had not agreed to teach; correct?

3  A.  No.

4  Q.  Again -- and finally, "Other Qualifications and

5  Experience."  Were you a TA at UC Berkeley?

6  A.  I was -- I was the RA, and I did some tutoring.  I was

7  never directly a TA.

8  Q.  Okay.  And is the "Senior Engineering, Applied

9  Materials" -- was that correct at the time?

10  A.  At the time, yes, that's correct.

11        MR. RHYNE:  Can we go to Page 11 of Exhibit 1?

12  BY MR. RHYNE:

13  Q.  Can you see that okay?

14  A.  Yes, I can.

15  Q.  Have you ever seen this document before?

16  A.  No, I have not.

17        MR. RHYNE:  Can we go to Page 148, the second from

18  the bottom, please.

19     Thank you, Ms. Hughes.

20  BY MR. RHYNE:

21  Q.  And again, we see your -- your name and your credentials

22  here; is that correct?

23  A.  The top part is correct and the MEMS.  I don't know what

24  "Slid Mechanics" would be, but otherwise --

25  Q.  Otherwise correct?

1     A.   Yeah.

2          MR. RHYNE:  No further questions, your Honor.  Thank

3     you.

4          THE COURT:  Cross-examination?

5                       **CROSS-EXAMINATION**

6     BY MR. BABCOCK:

7     Q.   Good morning, Dr. Miller.

8     A.   Allen.

9     Q.   Oh.  I'm sorry.  Dr. Allen.

10    A.   Oh.  You can call me Miller.  You can choose.

11    Q.   What do you prefer?

12    A.   I like to be called Miller.  I'm fine with that.

13    Q.   Okay.  My name is Erik Babcock, and I represent Ms. Su.

14         So you met -- you used to work with Ms. Su's husband?

15    A.   Yes, I did.

16    Q.   He also worked at Applied Materials?

17    A.   Yes, he did.

18    Q.   Until around 2008 or so?

19    A.   That's right.

20    Q.   At which point, there was some sort of going-away party --

21    A.   That's correct.

22    Q.   -- at their house?

23         You have to answer out loud.  Sorry.

24    A.   Yes.

25    Q.   This gentleman can't take down nods of the head.

1    A.   Okay.

2    Q.   Do you remember where the house was?

3    A.   It's in Pleasanton, Ruby Hill area.

4    Q.   Okay.  And did -- were there a number of people from

5    Applied Materials attending?

6    A.   Yes.

7    Q.   Mostly Applied?

8    A.   Yes.  Yes.

9    Q.   Mostly coworkers, I would assume?

10   A.   Yes.

11   Q.   Okay.  Was that the first time that you had met my client?

12   A.   That's the first time I really recall.  I don't know if --

13   she may have come by work or something.  That's the first time

14   I remember having a conversation with her, yeah.

15   Q.   Okay.  And she told you that she was starting a university?

16   A.   Yes.

17   Q.   And that among other things, they would be teaching --

18   offering courses in kinds of things that you studied?

19   A.   Yes.

20   Q.   And that you do at work?

21   A.   Not specifically what I do at work, but generally, you

22   know, mechanical engineering seemed to be part of the courses.

23   Q.   Uh-huh.

24        When you had this conversation with her, did it sound like

25   the school was already up and running, or was it something that

1    she was in the process of getting going?

2    A.   It sounded like something she was in the process of getting

3    going.

4    Q.   Okay.  So you didn't understand that there were already

5    other courses being offered?

6    A.   No.

7    Q.   Okay.  And she asked you if you would be interested in

8    teaching?

9    A.   Yes.

10   Q.   Did she specifically ask you what kind of course you would

11   be interested in teaching?

12   A.   She asked what my background had been at Berkeley and, you

13   know, what I was capable of teaching, I guess.  That's when we

14   discussed MEMS, which shows up in some of the documents.

15   Q.   MEMS is something that -- is that where you got your Ph.D.

16   in?

17   A.   My dissertation is on MEMS, yeah.

18   Q.   Okay.  So I assumed you'd be qualified to teach in that?

19   A.   Yes.

20   Q.   What about -- I don't know what this is, but generally can

21   you tell us what Dynamics is?

22   A.   Dynamics is the study of moving bodies.  So the type of

23   MEMS research I did was studying a MEMS -- a particular type is

24   called an electrostatic resonator.  It moves back and forth.

25   You need some knowledge of dynamics to study the motion.

1    Q.   Okay.

2    A.   So yes.

3    Q.   And you feel you'd be qualified to teach a course like

4    that?

5    A.   That -- I could teach a course like that, yes.

6    Q.   Okay.  So you -- my client was asking you about your

7    educational background, and it looks like you did all of

8    your -- all of your schooling at Cal?

9    A.   Yes.

10   Q.   Including your Bachelor's, your Master's, and your

11   doctorate?

12   A.   Yes.

13   Q.   And you told her about those degrees; right?

14   A.   Yes.

15   Q.   And as you were doing -- having this discussion, she was

16   taking notes?

17   A.   Yes.

18   Q.   Writing down your qualifications?

19   A.   Yes.

20   Q.   Okay.  Did she seem genuinely interested in having you

21   teach?

22   A.   She did, yes.  Yes.

23   Q.   Okay.  But it never came to the point where you didn't talk

24   money per se --

25   A.   No.

1    Q.   -- it sounds like?

2    A.   No.

3    Q.   She didn't ask you to sign any sort of contract or anything

4    like that?

5    A.   No.

6    Q.   Did you have any sort of -- do you remember receiving any

7    sort of follow-up e-mail from Dr. Su about -- about these

8    issues?

9    A.   No.

10   Q.   Did she have your e-mail?

11   A.   She may have.  I don't recall if I -- she wrote that down.

12   I know that through Applied Materials, it's very easy to

13   discern the e-mail.  You know, I worked with her husband.  So I

14   didn't think that would be hard --

15   Q.   She could --

16   A.   -- for her to contact me.

17   Q.   She knew where to find you, in other words?

18   A.   Exactly.  Yes.

19   Q.   I gotcha.

20        Thank you, sir.

21             MR. BABCOCK:  That's all I have.

22             THE COURT:  Redirect?

23             MR. RHYNE:  No further questions for Dr. Allen, your

24   Honor.

25             THE COURT:  Doctor, thank you for your testimony.

1       You can stand down.

2            Government's next witness?

3                MR. RHYNE:  Yes, your Honor.

4            The United States calls Special Agent Jason Mackey.

5                THE COURT:  Good morning, Mr. Mackey.

6                THE WITNESS:  Good morning, sir.

7                THE COURT:  You've seen me say this probably ten

8       times now.  So you know what I'm going to say.

9            Come up to the witness stand, please.  When you get there,

10      remain standing, raise your right hand, and face my courtroom

11      deputy.

12               THE CLERK:  Do you solemnly swear or affirm that the

13      testimony you're about to give in the now -- matter now pending

14      before this Court shall be the truth, the whole truth, and

15      nothing but the truth?

16               THE WITNESS:  I do.

17               THE CLERK:  Thank you.  Please be seated.  Make sure

18      you speak directly into the microphone.

19           Please state your full name and spell your last name.

20               THE WITNESS:  Jason Mackey, M-a-c-k-e-y.

21               THE COURT:  All right.  Your witness.

22               MR. RHYNE:  Thank you, your Honor.

23      ///

24      ///

25      ///

| | |
|---|---|
| 1 | **JASON MACKEY,** |
| 2 | Called as a witness by the Government, having been duly sworn, |
| 3 | testified as follows: |
| 4 | **DIRECT EXAMINATION** |
| 5 | BY MR. RHYNE: |
| 6 | Q.   Where are you currently employed? |
| 7 | A.   With Homeland Security Investigations. |
| 8 | Q.   What's your job title there? |
| 9 | A.   Special Agent. |
| 10 | Q.   Can you tell the jury what your duties and responsibilities |
| 11 | are as a special agent with its -- HSI is the abbreviation; |
| 12 | correct? |
| 13 | A.   Correct.  I conduct criminal investigations, violations |
| 14 | related to immigration and custom statutes.  That involves |
| 15 | anything smuggled into or out of the country, including people, |
| 16 | goods, narcotics, contraband, and also immigration violations. |
| 17 | Q.   How long have you been a special agent with HSI? |
| 18 | A.   Approximately 12 years. |
| 19 | Q.   Can you tell the jury what your training is to become an |
| 20 | agent with HSI? |
| 21 | A.   Sure.  In 2002, I attended a several-month academy in |
| 22 | Georgia.  It was the Federal Law Enforcement Training Center. |
| 23 | There, I attended two classes in particular.  It was the |
| 24 | criminal investigator training program, which covered basic |
| 25 | federal investigations, investigative techniques. |

1        And then I attended a follow-up specialization course

2    called the customs basic enforcement school, which focused on

3    customs, specific types of investigations.  So, again,

4    money-laundering, international money-laundering, international

5    smuggling, asset forfeiture, tracing of funds to support asset

6    forfeiture cases.

7    Q.  You're what's called the case agent on this case; is that

8    correct?

9    A.  That's correct.

10   Q.  Can you tell the jury what the term "case agent" means?

11   A.  It means that I'm responsible for the overall development

12   of the case.

13   Q.  And you were essentially the lead investigator; is that

14   right?

15   A.  That's correct.

16   Q.  And do you know the defendant through that investigation,

17   Dr. Susan Su?

18   A.  Yes, I do.

19   Q.  And can you -- do you see her in the courtroom today?

20   A.  I do.

21   Q.  Can you please point her out and describe what she's

22   wearing.

23   A.  She's sitting between the two gentlemen at the defense

24   table wearing a pink blouse.

25            MR. RHYNE:  Your Honor, may the record reflect a

1    positive identification of the accused?

2            THE COURT:  It will so reflect.

3    BY MR. RHYNE:

4    Q.   I want to talk about how the investigation started.

5        Can you just generally tell the jury how the case came to

6    your attention?

7    A.   Sure.  Sometime in the middle of probably May of 2010, I

8    received a telephonic tip alleging irregularities at Tri-Valley

9    University.

10   Q.   What did you do after you received that tip?

11   A.   I ordered the Tri-Valley University's I-17 application.

12   It's an application to enroll foreign students.  I reviewed

13   that.  I also reviewed their reportings in our SEVIS database

14   and initiated surveillance.

15   Q.   Okay.  Did you also look at the website as well?

16   A.   Yes, I did.

17   Q.   I want to talk about your initial observations on the I-17.

18   Can you tell the jury what you noted when you initially looked

19   at that document?

20   A.   Sure.  One of the first things I noted was that the school

21   indicated that it was enrolling -- or had enrolled an average

22   of 30 students per year, and that was the capacity that was

23   confirmed by a site visit subsequently after the school filed

24   its I-17 application.

25       I also interviewed school -- the school was unaccredited

1    and had to support articulation agreements.  I looked at the

2    standards for admissions, standards for graduations, and I

3    looked at the teaching roster that the school had submitted as

4    well.

5    Q.   Okay.  Why did you note the number of students at 30?  Why

6    was that relevant to you?

7    A.   Because when I subsequently checked the SEVIS database,

8    they indicated they were enrolling a far greater number than

9    30.

10   Q.   Do you recall approximately how many were enrolled at that

11   point?

12   A.   At that time in May of 2010, they had probably 900

13   students.

14   Q.   And you subsequently checked the SEVIS database towards the

15   end of the investigation as well; is that correct?

16   A.   I did.

17   Q.   That number grew --

18   A.   It did.

19   Q.   -- to --

20   A.   To approximately 1760 students, active students.

21   Q.   Okay.  You also said you noted the number of professors.

22   Why was that something that you noted?

23   A.   I was looking at the supporting documents submitted by the

24   school to see if their facilities and resources and faculty

25   were reasonable for the number of students that they were

1    purporting to bring to the country.

2    Q.   How reasonable in comparison to the number that were

3    actually enrolled in SEVIS, though?

4    A.   I'm sorry?

5    Q.   You said you noted that it was reasonable as -- are you

6    talking as to 30 students or as to --

7    A.   At the time, I was looking at their reporting in the I-17.

8    So I was looking to see if the documents that they had

9    submitted would support the 30 that they reported to us.

10   Q.   And you concluded that they would at that point?

11   A.   Yes.

12   Q.   Okay.  Did you also look at the economics that the school

13   had reported in its I-17?

14   A.   Yes, I did.

15   Q.   Can you tell the jury what you did?

16   A.   Tri-Valley University submitted accounting sheets from a

17   CPA indicating that they had a very modest amount of income and

18   money in their bank accounts at the time they applied for the

19   approval with us.

20   Q.   You also said you checked SEVIS; correct?

21   A.   Yes.

22   Q.   And you have the ability to check SEVIS in your official

23   capacity as an agent with HSI; correct?

24   A.   Yes, I do.

25   Q.   Okay.  Can you tell the jury generally what you observed

1    when you checked SEVIS with respect to Tri-Valley University?

2    A.   Certainly.  Again, I noted that there were at the time 900

3    students.  I looked at the rate of growth, and the school

4    appeared to be enrolling its student base at an exponential

5    rate.  I also noted that over half of the students reported --

6    of those 900 students reported to us were reporting the exact

7    same apartment in Sunnyvale, California.

8    Q.   And that was -- do you remember what that apartment address

9    was?

10    A.   Yes.  It was 555 East El Camino Real, Apartment 415, in

11    Sunnyvale.

12    Q.   There was another address that Tri-Valley University

13    reported in SEVIS as well; correct?

14    A.   Yes.

15    Q.   Can you tell the jury what that address was?

16    A.   They also reported a large number of students at 620 Iris

17    Avenue in Sunnyvale, California.

18    Q.   Did you go to the El Camino Real location?

19    A.   I did.

20    Q.   Why?

21    A.   To interview the residents of 555 East El Camino Real,

22    Apartment 415, to determine whether or not there were any

23    Tri-Valley University students residing there.

24    Q.   Can you generally describe how big is this space?

25    A.   It was a two-bedroom -- two-bedroom apartment.

1    Q.   Were you able to observe through your SEVIS observations

2    the nationality of most of the students at Tri-Valley

3    University?

4    A.   Yes.  Approximately 95 percent of the students were of

5    Indian nationality.

6    Q.   Now, I want to talk about what you saw when you looked at

7    Tri-Valley University's website.

8         Were you able to capture screenshots of the website?

9    A.   Yes.

10   Q.   Can you tell the jury what that means?

11   A.   We utilize one of our computer forensic agents to basically

12   download the website or portions of the website and preserve

13   them for me to view as part of this trial.

14        MR. RHYNE:  Your Honor, may I approach the witness?

15        THE COURT:  You may.

16   (Government's Exhibit 100 marked for identification.)

17        MR. RHYNE:  I'm handing the witness what's been

18   marked for identification as Exhibit 100.

19   BY MR. RHYNE:

20   Q.   Can you please take a look at that.

21        Do you recognize that?

22   A.   I do.

23   Q.   What is it?

24   A.   It's a "Welcome to Tri-Valley University" page from

25   Tri-Valley University's website.

1   Q.  And does it fairly and accurately depict the website as it

2   appeared when you looked at it?

3   A.  Yes.

4           MR. RHYNE:  Your Honor, we'd move Exhibit 100 into

5   evidence.

6           THE COURT:  Any objection?

7           MR. BABCOCK:  No objection.

8           THE COURT:  Exhibit 100 is admitted.

9               (Government's Exhibit 100 received in evidence.)

10          MR. RHYNE:  Can you publish Exhibit 100?

11  BY MR. RHYNE:

12  Q.  Now, Agent Mackey, the first thing that I want to discuss

13  with you --

14          MR. RHYNE:  Ms. Hughes, can we zoom in to the bottom

15  right-hand corner?  There's a date down there.  Yeah.

16  BY MR. RHYNE:

17  Q.  Agent Mackey, do you see that date?

18  A.  Yes, I do.

19  Q.  Is that the date that you captured the website?

20  A.  No.  That's the date that our computer forensic agent

21  printed out this page.

22  Q.  Okay.  So you captured it back in 2008 but printed it

23  sometime in August; correct?

24  A.  2010.

25  Q.  Or 2010.  I'm sorry.

1    A.  Yes.

2            MR. RHYNE:  Okay.  All right.  Can we back that out,

3    please.  Can we -- from "Welcome to Tri-Valley University" down

4    through the first paragraph, can we zoom in that, please.

5    BY MR. RHYNE:

6    Q.  It's a little tough to read, Agent Mackey, but can you see

7    it okay?

8    A.  Yes.

9    Q.  Okay.  I want to read this into the record, and you can

10   tell me if I'm reading correctly.

11       "Welcome to Tri-Valley University.  Tri-Valley University

12   is a Christian Higher Education Institution aiming to offer

13   rigorous and excellent quality academic programs in the context

14   of Christian faith and world view.

15       "Tri-Valley University's academic programs include School

16   of Engineering, Department of Electrical Engineering, Computer

17   Science and Engineering, Meta" -- "Mechanical Engineering,

18   School of Business and School of Art, School of Trinity, School

19   of Law, and School of Medicina [sic].

20       "Degree programs in these schools are Bachelor of Science

21   (BS), Master of Science (MS), Master in Business Administration

22   (MBA), Master of Art (MA), MA in Liberal [sic] Science (MALS),

23   and Doctor of Philosophy (Ph.D.)  Non-degree programs are

24   certificate programs and open-enrollment programs."

25       Is that correct?

1    A.   Yes.

2              MR. RHYNE:  Okay.  Can we go to the next paragraph?

3    BY MR. RHYNE:

4    Q.   The second paragraph is a mission statement; is that

5    correct?

6    A.   Yes.

7    Q.   And it states, "Our mission is to make Christian

8    scientists, engineers, business leaders, and lawyers for the

9    glory of God with both solid academic professionalism and

10   Christian faith, therefore to live out Christian-like

11   characters, value, and compassion in the world, to make an

12   impact and shine as its light.

13        "Our institution objective is to equip individuals with

14   academic excellence, practical skillfulness, and spiritual

15   maturity.  We advocate academic excellence, character

16   integrity, Christ-like compassion, inclusion and

17   nondiscrimination and integration" -- "integration of academic

18   professionalism with Christian faith, integration of principle

19   with practical application, integration of career pursuit with

20   spiritual growth."

21        Is that correct?

22   A.   Yes.

23   Q.   Now, the third paragraph is a general summary of the

24   academic principles; is that correct?

25   A.   Yes.

1    Q.   And it begins with "With" -- I'm sorry.  Quote, "With

2    gentle hills, beautiful vineyards, historical oaks, Tri-Valley

3    has been the high-tech extension of Silicon Valley, not only

4    becoming the residential area of many engineers, professionals,

5    and executives working at Silicon Valley but also the home of

6    many high-tech companies.  The academic programs at Tri-Valley

7    University reflect the integration of academic principle with

8    practical industry application, especially semiconductor

9    industry."

10        Is that correct?

11   A.   Yes.

12   Q.   And then it goes on to list a number of degrees that are

13   offered at Tri-Valley University; is that right?

14   A.   Yes.

15        MR. RHYNE:  Okay.  Can we skip down two paragraphs to

16   the paragraph beginning with "Faculty Members"?

17   BY MR. RHYNE:

18   Q.   This paragraph states, quote, "Faculty members and speakers

19   at Tri-Valley University are renowned professionals in the

20   field with both academic and industry backgrounds.  Most of

21   them have many years of industrial experiences and are managers

22   and/or executives in semiconductor industry with extensive

23   expert knowledge to offer," end quote.

24        Is that right?

25   A.   Yes.

1        MR. RHYNE:  May I approach, your Honor?

2        THE COURT:  You may.

3        (Government's Exhibit 100A marked for identification.)

4        MR. RHYNE:  I'm handing the witness what's been

5    marked as Exhibit 100A for identification.  I'm retrieving

6    Exhibit 100.

7    BY MR. RHYNE:

8    Q.   Do you recognize Exhibit 100A?

9    A.   Yes, I do.

10   Q.   What is it?

11   A.   This is a printout again from Tri-Valley University's web

12   page entitled "A Message from the President."

13   Q.   You obtained this as part of your website capture in this

14   case?

15   A.   Yes.

16   Q.   Is it in the same or substantially the same condition as it

17   was when you captured it?

18   A.   Yes, it is.

19       MR. RHYNE:  Your Honor, we would offer Exhibit 100A

20   into evidence.

21       MR. BABCOCK:  No objection.

22       THE COURT:  Exhibit 100A is admitted.

23       (Government's Exhibit 100A received in evidence.)

24       MR. RHYNE:  Can you publish Exhibit 100A, please, Ms.

25   Hughes, and can we just zoom into the first paragraph and the

1    picture.

2    BY MR. RHYNE:

3    Q.   Agent Mackey, I'd just like to talk about this first

4    paragraph here.  It states, quote, "Located at the beautiful

5    Tri-Valley area surrounded with championship golf courses and

6    fine vineyards in an extension of Silicon Valley, Tri-Valley

7    University is a Christian higher education institution offering

8    quality academic programs in engineering, business, ministry,

9    law, and medicine at a Christian learning environment.

10        "The undergraduate," slash, "graduate degree and non-degree

11   programs at Tri-Valley University are designated with the key

12   of integration, integration of Christian faith with academics,

13   academic principles with industry practical application,

14   integration of career pursuit with spiritual growth.

15        "Instructors and speakers at TVU are with both academic and

16   industry background.  Many are well known and respected leaders

17   and professionals in the field."

18        Is that correct?

19   A.   Yes.

20           MR. RHYNE:  Okay.  Can we go back out of there?

21   BY MR. RHYNE:

22   Q.   And the signature block at the bottom is "Susan Xiao-Ping

23   Su, Ph.D."; correct?

24   A.   Yes.

25   Q.   "Founder and President of Tri-Valley University"?

1    A.   Yes.

2              MR. RHYNE:  Your Honor, may I approach the witness?

3              THE COURT:  You may.

4         (Government's Exhibit 706 marked for identification.)

5              MR. RHYNE:  I'm handing the witness what's been

6    marked as Exhibit 706 for identification.  I'm retrieving

7    Exhibit 100A.

8    BY MR. RHYNE:

9    Q.   Do you recognize Exhibit 706?

10   A.   Yes, I do.

11   Q.   What is it?

12   A.   There are UC Berkeley transcripts for Ms. Susan Su.

13   Q.   Are they certified?

14   A.   Yes.

15   Q.   How did you get them?

16   A.   Through my grand jury subpoena.

17   Q.   Are they in the same or substantially the same condition as

18   they were when you received them?

19   A.   Yes.

20             MR. RHYNE:  Your Honor, we'd move Exhibit 706 into

21   evidence.

22             THE COURT:  Any objection?

23             MR. BABCOCK:  No objection, your Honor.

24             THE COURT:  Exhibit 706 is admitted.

25         (Government's Exhibit 706 received in evidence.)

1          MR. RHYNE:  Please publish Exhibit 706.

2      Can we go to the next page?  Can you zoom in to the top?

3   BY MR. RHYNE:

4   Q.  Agent Mackey, this transcript indicates that Dr. Su

5   received her Ph.D. in Mechanical Engineering from UC Berkeley

6   in 2001; is that correct?

7   A.  Yes, it does say that.

8   Q.  It also indicates she has prior degrees; is that correct?

9   A.  Correct.

10  Q.  Including an MS from UC Davis in 1997?

11  A.  Yes.

12  Q.  And then a degree from 1991 from Tsinghua University;

13  correct?

14  A.  Yes.

15  Q.  Was this something that you got in the initial course of

16  the investigation as well?

17  A.  Towards the beginning of the investigation, yes.

18          MR. RHYNE:  Can you take that down, please.

19  BY MR. RHYNE:

20  Q.  Now, also as part of the investigation, you interviewed the

21  defendant Dr. Susan Su; is that correct?

22  A.  Yes.

23  Q.  I want to go a little bit out of chronological order from

24  your investigation, but this happened toward the end; is that

25  correct?

1    A.   Correct.

2    Q.   Okay.  What date did you interview her?

3    A.   January 19th, 2011.

4    Q.   What was happening that day?

5    A.   We were serving a series of search-and-seizure warrants on

6    businesses and accounts related to Susan Su and Tri-Valley

7    University.

8    Q.   Did those search warrants also include search of a vehicle?

9    A.   Yes.

10   Q.   Where did this interview take place?

11   A.   At Mrs. Su's residence in Germano Way in Pleasanton.

12        MR. RHYNE:  Your Honor, may I approach the witness?

13        THE COURT:  You may.

14   (Government's Exhibit 407 marked for identification.)

15        MR. RHYNE:  I'm handing the witness what's been

16   marked as Exhibit 407 for identification.  I'm retrieving

17   Exhibit 706.

18   BY MR. RHYNE:

19   Q.   Do you recognize Exhibit 407?

20   A.   I do.

21   Q.   What is it?

22   A.   It's a picture of Mrs. Su's Germano Way residence that was

23   taken during our search warrants.

24   Q.   And does it depict how the residence looked that day?

25   A.   Yes.

1          MR. RHYNE:  Your Honor, we move Exhibit 407 into

2     evidence.

3          THE COURT:  Any objection?

4          MR. BABCOCK:  Relevance.

5          THE COURT:  Overruled.  Exhibit 407 is admitted.

6          (Government's Exhibit 407 received in evidence.)

7     BY MR. RHYNE:

8     Q.  Agent Mackey, can you describe the community where this

9     house is located?

10         THE WITNESS:  It's located in the Ruby Hills

11    community.  It's a gated community in Pleasanton.

12    BY MR. RHYNE:

13    Q.  Describe what happened when you showed up that day.

14    A.  We searched her trunks -- as we usually do, we arrived at

15    the location of -- early in the morning.  We attempted to

16    notify the occupants of the residence that we had a search

17    warrant.  A team made entry into the residence and began a

18    protective sweep for weapons.

19         Once the location was secured, a -- our team then began

20    collecting evidence, creating an inventory of items that we had

21    found and were seizing, and at the end of the day, we secured

22    the residence and left a copy of the warrant and the inventory

23    at the residence.

24    Q.  Now, I want to talk briefly about the protective sweep.

25    That's something you do in all cases, correct, when you're

1    doing a search warrant?

2    A.   That's correct.

3    Q.   It wasn't anything particular for this case?

4    A.   No.

5    Q.   When agents entered the house, did you see Susan Su?

6    A.   Not immediately, but she -- the agents did encounter her in

7    the residence.

8    Q.   Did you have an opportunity to talk with her inside the

9    residence that day?

10   A.   Yes.

11   Q.   Can you tell the jury how that happened?

12   A.   By the time I saw Mrs. Su, she -- our team had sat her down

13   in, I believe, the kitchen area, and me and another agent

14   approached her and asked her if she'd be willing to answer some

15   questions.

16   Q.   What did she say?

17   A.   She said, "Yes."  We also notified her that she was not

18   under arrest at the time.

19   Q.   Did you give her any other information at that point about

20   whether she's free to leave, things like that?

21   A.   Yes, we did.  She suggested that we conduct the interview

22   at her dining room table.  So we began walking towards that

23   area, and before we began the interview, I notified her -- or

24   informed her that she could take a break at any time, that

25   again she was not under arrest, she could refuse to answer any

1    particular questions if she was uncomfortable answering, or she

2    could stop the interview at any time.

3    Q.  Did she agree to speak with you?

4    A.  Yes.

5    Q.  Did you have an opportunity to -- well, let me back up.

6        Before you came to the interview, did you have some

7    documents that you brought with you to ask her about?

8    A.  Yes.

9    Q.  What were those documents?

10   A.  A copy of the I-17 and supporting documents and a couple of

11   financial documents that we received during the course of this

12   investigation.

13   Q.  Why did you take those documents with you?

14   A.  I wanted to ask her, Mrs. Su, about the validity of the

15   I-17 and supporting documents, and I wanted to inquire into the

16   purpose of some of her financial transactions.

17              MR. RHYNE:  Your Honor, may I approach?

18              THE COURT:  You may.

19       (Government's Exhibit 7 marked for identification.)

20   BY MR. RHYNE:

21   Q.  I'm handing you what's been marked as Exhibit 7.

22       Do you recognize Exhibit 7?

23   A.  Yes, I do.

24   Q.  What is Exhibit 7?

25   A.  It's a copy of Tri-Valley University's I-17 and supporting

1    documents.  It's some financial documents and student-related

2    documents that we showed Ms. Su during the search warrant.

3    Q.   How do you know those are the same documents you took with

4    you that day?

5    A.   Because they bear her originals on certain sections.

6         MR. RHYNE:  Your Honor, we move Exhibit 7 into

7    evidence.

8         MR. BABCOCK:  No objection.

9         THE COURT:  Exhibit 7 is admitted.

10        (Government's Exhibit 7 received in evidence.)

11   BY MR. RHYNE:

12   Q.   Did you ask the defendant about the I-17?

13   A.   Yes.

14   Q.   What did she tell you about it?

15   A.   I generally asked her if she completed the I-17 submitted

16   and if she, in fact, signed the document, and she confirmed

17   that yes, she did initially the application online, and the

18   signature of the document was hers and that she witnessed the

19   other signers of the document, the signed document.

20   Q.   Did you ask her where she transmitted the information from?

21   A.   Yes.

22   Q.   What did she say?

23   A.   She stated that the first submission was made through the

24   Internet at her residence in Pleasanton.

25        MR. RHYNE:  Can we publish Exhibit 7, Page 3, please.

1    Can we focus in on the signature block?

2    BY MR. RHYNE:

3    Q.   Agent Mackey, you referenced initials earlier.  Do you see

4    the SS on the bottom right-hand corner?

5    A.   Yes, I do.

6    Q.   Are those Susan Su's initials?

7    A.   Yes, they are.

8    Q.   Did you have an opportunity to ask her about Sophie Su and

9    Vince Wang during this interview when discussing the I-17?

10   A.   Yes, I did.

11        MR. RHYNE:  Can we go to Page 5, please.

12   BY MR. RHYNE:

13   Q.   What did you ask her?

14   A.   Again, I asked her to confirm that their signatures on this

15   document -- that she actually observed them sign this document,

16   and she confirmed that she physically saw them sign the

17   document.  I also asked her about their role in Tri-Valley

18   University.

19   Q.   Did you ask the defendant in this case why Sophie Su and

20   Vince Wang signed the document?

21   A.   Yes, I did.

22   Q.   What did she say?

23   A.   Well, during the course of the interview, she explained

24   that both Sophie and Vince Wang had full-time jobs and didn't

25   actually intend to be designated school officials at Tri-Valley

1    University, and at that point I asked her why she submitted

2    them on the document if, in fact, they weren't intended to be

3    designated school officials.

4    Q.   What did she say?

5    A.   She stated that it was her belief that SEVIS -- or SEVP

6    regulations require that the P/DSO or the principal designated

7    school official be a different person than the president of the

8    school.  So she felt she needed another person to be the P/DSO,

9    and she also was under the belief that multiple DSO's had to be

10   listed on the I-17 for it to be approved.

11         MR. RHYNE:  Go to Page 4 of this document.  Can we

12   zoom in on the signatures, please, all three.

13   BY MR. RHYNE:

14   Q.   Were these the signatures you were asking her about?

15   A.   Yes.

16   Q.   Forgive me if you stated this already.  Did you ask what

17   Dr. Su's relationship was to Sophie Su and Vince Wang?

18   A.   Yes, I did.

19   Q.   What did she say?

20   A.   She explained that Sophie Su was her sister and Vince -- or

21   Wenchao Vince Wang is her brother-in-law.

22   Q.   Did you ask her about the appointment of these people into

23   the particular positions?  And what I'm referring to is namely

24   the primary DSO.

25   A.   Yes.

1   Q.   What did you ask her?

2   A.   Again, I asked her why she listed somebody else as a

3   primary or principal designated school official, and she

4   explained that she -- she believed that the regulations

5   required that somebody other than the president be nominated as

6   a P/DSO.

7   Q.   Did you ask her about articulation agreements during this

8   interview?

9   A.   Yes, I did.

10  Q.   At this point, had you developed an understanding what an

11  articulation agreement was?

12  A.   Yes.

13  Q.   How many articulation agreements did you bring with you to

14  this interview?

15  A.   Three.

16  Q.   Okay.  Did you bring one between Tri-Valley University and

17  San Francisco State University?

18  A.   Yes, I did.

19       MR. RHYNE:  Can we go to Page 12 of Exhibit 7?

20  BY MR. RHYNE:

21  Q.   Did you ask Dr. Su about that articulation agreement with

22  San Francisco State?

23  A.   Yes.

24  Q.   Where did you get this articulation agreement?

25  A.   This is a copy from Tri-Valley University's I-17

1   application.

2   Q.   What did you ask her about it?

3   A.   First, I asked her to confirm that she, in fact, signed the

4   document for Tri-Valley University, and she did, and she placed

5   her initials next to her name to indicate that she, in fact,

6   signed the document.

7        And then I asked her generally who wrote it or how it came

8   to its existence, and she explained that she wrote the entire

9   document herself and just provided it to the San Francisco

10  State University official for signature.

11  Q.   Did you ask her about an initial articulation agreement

12  that she submitted?

13  A.   Yes.  She explained that this was an amendment to a

14  previously created articulation agreement.  She stated that she

15  contacted Mr. Shy Sheng Liou, who she used to work for at San

16  Francisco State University, and inquired into him helping her

17  obtain an articulation agreement.

18       She indicated that he agreed to provide an articulation

19  agreement to her and, in fact, signed the document and faxed it

20  to her.  She also explained that he faxed it because he was in

21  China at the time.  She explained that she submitted this

22  agreement to SEVP, and it was rejected.  I believe she stated

23  that it was rejected because SEVP was telling her that

24  additional classes had to be listed on the agreement for them

25  to accept it.

1     So she -- at that point, she amended the agreement, resent

2     it to Mr. Liou, who resigned the document and faxed it back to

3     her.

4     Q.  Did you ask her about an articulation agreement between

5     Tri-Valley University and University of Central Florida?

6     A.  Yes, I did.

7     Q.  What did you ask her?

8     A.  Again, I asked her who wrote the agreement, and I asked her

9     about the signatures.

10          MR. RHYNE:  Can we go to Page 8 of Exhibit 7?

11    BY MR. RHYNE:

12    Q.  What did she say when you asked her if she wrote it?

13    A.  She stated that she again wrote the entire agreement, that

14    the signer of the other school didn't participate in the

15    writing of the agreement, that he, in fact, only signed the

16    document that had already been created and provided to --

17    provided to him.

18    Q.  Did you ask her about how she came into possession of this

19    document?

20    A.  Yes.

21    Q.  What did she say?

22    A.  She stated that she initially approached a Department Chair

23    at the University of Central Florida and asked about the

24    process for obtaining an articulation agreement.  She stated

25    that she was told by that person that the University of Central

1   Florida doesn't enter into blanket articulation agreements and

2   they review all other transfers on case-by-case basis, at which

3   point she then approached -- approached her brother, who worked

4   at the University of Central Florida and who then signed it.

5   Q.   She told you that her brother worked there?

6   A.   Yes.

7   Q.   Did she tell you what his job title was?

8   A.   I believe she called him a student advisor.

9   Q.   Did she tell you whether or not she approached her brother

10  at that point?

11  A.   She stated that she did approach her brother into signing

12  the agreement.

13  Q.   What did she say about that interaction?  Let me rephrase

14  the question.

15      Did she tell you whether her brother told her anything

16  different than the Department Chair had told her?

17  A.   Yes.  She stated that her brother confirmed that he had the

18  authority to sign such an agreement.

19  Q.   Did she say how he went about signing it?

20  A.   Yes.  She stated that he signed it in her presence.  She

21  actually observed him sign the document.

22  Q.   Did you also ask her about a third articulation agreement?

23  A.   Yes, I did.

24  Q.   And that articulation agreement was between Tri-Valley

25  University and what school?

1    A.   The University of East-West Medicine.

2    Q.   Did the defendant Dr. Su tell you how she obtained that

3    signature?

4    A.   Yes.

5    Q.   What did she say?

6    A.   She stated that she used to work for the signer of that

7    document, Ying Qiu Wang, that she approached this individual

8    after she had left.  She used to be a teacher at a school

9    called Herguan University, which Ying Qiu Wang also owns, which

10   is co-located with the University of East-West Medicine.

11        And she stated that she approached him and asked him to

12   sign an articulation agreement with Tri-Valley University, and

13   he agreed, and he signed the document.

14   Q.   Can you spell the name of that signer for the record?

15   A.   Sure.

16   Q.   It's probably in Exhibit 7, I believe.

17   A.   It's Y-i-n-g, middle name of Qiu, Q-i-u, last name Wang,

18   W-a-n-g.

19   Q.   Did you ask Dr. Su about the prospect of you contacting

20   people who purportedly signed these articulation agreements?

21   A.   I did.

22   Q.   How did you ask that question?

23   A.   I asked her if she felt that there were -- if the documents

24   were valid, and she indicated that she believed the documents

25   were valid, and then I asked her if that was the case if she

1   would have any concerns about us contacting either the signers

2   or the schools listed on the documents.

3   Q.  What was her response when you asked that question?

4   A.  She appeared to become nervous at that point.  Her voice

5   started -- she started talking a lot faster.  Her voice started

6   breaking up and became shaky.  My interpretation was she was

7   nervous, and she asked us to please, please, please not contact

8   the signers.

9       And she explained that -- when I asked why, she explained

10  that they were very busy, and I again asked her if she thought

11  there was anything wrong with the documents or anything else

12  she wanted tell us, and she said, "No."

13  Q.  Did you ask her whether Tri-Valley University had ever

14  transferred any credits from any of these schools?

15  A.  I did.

16  Q.  I'm sorry.  To any of these schools?

17  A.  Yes.

18  Q.  What did she say?

19  A.  She stated that no students had taken advantage of the

20  agreements, that no students had actually transferred credits

21  from Tri-Valley University to any of these schools.  She

22  explained that Tri-Valley University was a good school and

23  nobody wanted to transfer.

24  Q.  At the time you asked her this question about contacting

25  the signers of the articulation agreements, had you already

1    taken steps to investigate the validity -- validity of these

2    articulation agreements?

3    A.  I had contacted the schools.

4    Q.  Okay.  Did you inform the defendant Dr. Su that you had

5    already contacted the schools?

6    A.  I did.  Shortly after the previous conversation about

7    requesting her permission, I told her that we had already

8    actually, in fact, contacted the schools.

9    Q.  How did Dr. Su respond when you informed her of that?

10   A.  At that point, her demeanor changed to -- she became

11   agitated, she started shouting, and she asked why we were

12   trying to verify these documents so many years after they had

13   been submitted.

14   Q.  What did you do at that point?

15   A.  At that point, she was agitated.  So we suggested that we

16   take a break.  She got up and prepared herself a cup of warm

17   milk, and then she sat back down and indicated she wanted to

18   continue the conversation.

19   Q.  Did you change topics at that point?

20   A.  Yes.  She -- she did tell us she no longer wanted to talk

21   about the articulation agreements.

22   Q.  So you changed topics?

23   A.  Yes.

24   Q.  I want to talk about the list of professors on the I-17.

25   Did you ask her about those?

1    A.   I did.

2              MR. RHYNE:  Can we go to Exhibit 7, beginning at Page

3    13?

4    BY MR. RHYNE:

5    Q.   Did you ask her whether she recognized Exhibit 7?  And I'm

6    referring to Pages 13 through 15.

7    A.   Yes.  I showed her the document, and she acknowledged it.

8    Q.   Did you ask her whether she had sent this with part of her

9    I-17?

10   A.   Yes.

11   Q.   What did she say?

12   A.   She confirmed that she sent this document to SEVP.

13   Q.   Did you ask her how many of these professors had taught

14   Tri-Valley University courses?

15   A.   I did.

16   Q.   What did she say?

17   A.   Her answer initially was nonresponsive.  She said that all

18   of the people listed on the document had agreed to teach and

19   that she had since hired new professors.

20   Q.   Okay.  Did you follow up with that answer?

21   A.   I did.  Again, I asked her who actually on that list had

22   taught at Tri-Valley University.

23   Q.   How many people did she say actually taught at Tri-Valley

24   University from this list?

25   A.   She indicated that three people on the list ended up

1    teaching some sort of class at Tri-Valley University.

2    Q.   Did you ask her how many of these professors had taught any

3    classes at the time she submitted the I-17 to the Department of

4    Homeland Security?

5    A.   Yes, I did.

6    Q.   What did she say?

7    A.   She stated that at the time she submitted the document to

8    SEVP, that nobody on that list had actually taught any classes

9    yet.  Again, they all agreed to teach, and at the time she was

10   teaching all of the classes herself.

11   Q.   When she told you she had been teaching all the classes

12   herself, did you have follow-up questions regarding that?

13   A.   Yes.  I asked her if she could verify the information by

14   providing us with names of students we could contact that she

15   had taught.

16   Q.   What did she say?

17   A.   She stated that she couldn't recall any names of those

18   students at that time.

19   Q.   Did you ask her whether she had any subsequent contact with

20   any of the people she listed as a professor at Tri-Valley

21   University?

22   A.   Yes.  Based on the information that I was already aware of,

23   I did ask her if any of the instructors had contacted her about

24   their names being listed on these publications.

25   Q.   What was her response to that question?

1    A.   She acknowledged that she had been contacted by at least

2    three of the professors on there to have their names removed

3    from Tri-Valley University's website.

4    Q.   There's some notes on this document; is that correct?

5    A.   Yes.

6    Q.   Can you tell the jury generally what these notes are?

7    A.   She started making checkmarks next to the names of

8    individuals that she claimed had actually taught classes, and

9    then she circled some names of instructors who had contacted

10   her regarding having the names removed, and at that point she

11   just started marking up the document because to me it appeared

12   she was nervous.

13   Q.   Did you discuss the topic of Tri-Valley University's site

14   visit with her?

15   A.   Yes.

16   Q.   Can you tell the jury your understanding at the time what a

17   site visit was?

18   A.   Yes.  A site visit occurs during the initial I-17

19   application process or during recertifications for

20   SEVP-approved schools.  It involves an inspector, an officer,

21   traveling to the school to verify the information on the I-17

22   and confirm that the school actually has the capacity to enroll

23   the number of students that they propose.

24   Q.   Did you ask her when Tri-Valley University had its site

25   visit?

1    A.   Yes.

2    Q.   What did she say?

3    A.   She indicated on October 14th, I believe, of 2008.

4    Q.   Did she tell you where the site visit occurred?

5    A.   Yes.

6    Q.   Or I should say what site it occurred.

7    A.   Yes.

8    Q.   What did she say?

9    A.   She stated that it occurred at the location listed on her

10   I-17, which was a church in Pleasanton, California.

11   Q.   And that's on Stoneridge Drive; is that correct?

12   A.   Yes.

13   Q.   Did you ask her whether she contacted anybody prior to that

14   site visit?

15   A.   Yes, I did.

16   Q.   What did she say?

17   A.   She indicated that she had contacted the DSO's or P/DSO

18   listed on her I-17 -- so that would be Sophie Su and Wenchao

19   Wang -- and she asked them to be present for the site visit.

20   Q.   Did she tell you whether Sophie Su and Vince Wang agreed?

21   A.   She stated that they agreed, but they didn't ask very many

22   questions at the time.

23   Q.   Did she tell you what happened during the site visit?

24   A.   Generally, she explained that an inspector came out and

25   toured her campus, her facility, and interviewed her.

1    Q.   Did you have any discussion with Dr. Su during this

2    interview about her understandings of the regulations and full

3    courses of study requirement for schools?

4    A.   Yes, I did.

5    Q.   What did you ask her?

6    A.   I asked her what Tri-Valley University considered a full

7    course of study.

8    Q.   What did she say?

9    A.   She stated that nine units was considered a full course of

10   study at Tri-Valley University.

11   Q.   Did you ask her about a physical attendance requirement?

12   A.   Yes.

13   Q.   What did you ask her?

14   A.   I asked her how many of those nine units that she permitted

15   her students to attend online or not actually physically at the

16   campus.

17   Q.   What did she say?

18   A.   She stated that her students were allowed to take three

19   units online and that the rest had to be done on campus -- or

20   "physical," I should say.  She didn't say "on campus."  She

21   said "physically."  She said they had to physically attend

22   those six units.

23   Q.   Did she tell you where those classes occurred?

24   A.   I asked a follow-up question, and she said that physical

25   attendance takes place at -- at 405 Boulder Court, which was a

1    place they had moved to by then in Pleasanton.

2    Q.   Had you done surveillance outside 405 Boulder Court up to

3    that point?

4    A.   Yes.

5    Q.   Did you inform Susan Su at that point that you had done

6    surveillance?

7    A.   I did.

8    Q.   What did you say to her?

9    A.   I explained that agents had been conducting surveillance at

10   the location and didn't observe any student activity.

11   Q.   How did the defendant respond when you told her that?

12   A.   At that point, she began explaining that all of her

13   students take classes -- take virtual classes and that she

14   explained that the attendance -- her students had physically

15   attended through an online mechanism, but she explained that

16   there was some kind of interaction.  So she considered that

17   fulfilling the physical attendance requirement.

18   Q.   Did you ask her any questions about how Tri-Valley

19   University enforces the attendance for those classes?

20   A.   I did.

21   Q.   What did she say?

22   A.   She stated that she instructed her staff to send reminders

23   to students that they have to attend their classes, but she

24   doesn't -- she didn't take any follow-up action.

25   Q.   Earlier, you mentioned that you did some investigating into

1  SEVIS; correct?

2  A.  Yes.

3  Q.  And you mentioned two particular addresses came up with

4  regularity; is that correct?

5  A.  Yes.

6  Q.  Can you explain to the jury exactly where those addresses

7  or what field those addresses are in?

8  A.  In SEVIS?

9  Q.  Right.  What do they purport to be?

10  A.  So they would be the fields you populate related to the

11  physical address that a student lives at in the United States,

12  a foreign student.

13  Q.  Did you ask her about those addresses?

14  A.  I did.

15  Q.  What did she say?

16  A.  She explained that those two addresses which were occurring

17  very frequently in SEVIS were actually her student dormitories.

18        MR. BABCOCK:  I'm sorry.  I couldn't hear.

19        THE WITNESS:  Her student dormitories.

20        MR. BABCOCK:  Thank you.

21  BY MR. RHYNE:

22  Q.  Did you ask her about the fact that they were showing up in

23  SEVIS?

24  A.  I did.

25  Q.  What did she say?

1    A.   She stated that she had -- they were occurring in SEVIS

2    because she had instructed her staff, who at that point were

3    entering the information in SEVIS, to use that address for

4    foreign students who either were newly arriving and didn't have

5    an address in the United States or students that weren't in the

6    area, so outside of California, she would use that address for.

7    Q.   Did she identify any TVU staffers that had done this?

8    A.   She specifically named a Parth Patel who was accessing

9    SEVIS and inputting that address.

10   Q.   And Parth is P-a-r-t-h; correct?

11   A.   Yes.

12   Q.   And Patel, P-a-t-e-l?

13   A.   Yes.

14   Q.   Did she give you any other reasons why those addresses were

15   reoccurring in SEVIS?

16   A.   She also explained that she wasn't certain that her virtual

17   classes were allowed by SEVP yet and that she intended to

18   change the addresses back to the true addresses once she

19   received notification that her system was approved.

20   Q.   During your investigation, did you do follow-up

21   investigation as to these two addresses?

22   A.   Yes, I did.

23        MR. RHYNE:  Your Honor, may I approach the witness?

24        THE COURT:  You may.

25        MR. RHYNE:  I'm going to leave Exhibit 7.

1      (Government's Exhibit 709 marked for identification.)

2          MR. RHYNE:  I'm going to hand the witness what's been

3      marked as 709 for identification.

4      BY MR. RHYNE:

5      Q.  Do you recognize Exhibit 709?

6      A.  Yes, I do.

7      Q.  What is it?

8      A.  It's a lease agreement for 555 East El Camino Real,

9      Apartment 415, in Sunnyvale.

10     Q.  How did you get it?

11     A.  Through a subpoena.

12     Q.  Why did you get it?

13     A.  Because I wanted to learn who was actually residing at the

14     address that was being reported in SEVIS for a large percentage

15     of Tri-Valley students.

16     Q.  You received those records in response to that subpoena?

17     A.  Yes.

18     Q.  Did it have a certification on the front?

19     A.  Yes, it does.

20     Q.  Is it in the same or substantially the same condition it

21     was when you received it?

22     A.  Yes, it is.

23          MR. RHYNE:  Your Honor, we move Exhibit 709 into

24     evidence.

25          THE COURT:  Any objection?

1          MR. BABCOCK:  Can I see it real quick?

2          THE COURT:  Sure.

3          MR. BABCOCK:  My -- my exhibit is missing from that

4    binder.

5          THE COURT:  Sure.

6          MR. BABCOCK:  No objection, your Honor.

7          THE COURT:  Exhibit 709 is admitted.

8          (Government's Exhibit 709 received in evidence.)

9          THE COURT:  Mr. Rhyne, any time in the next five

10   minutes, I would like to take our first recess.

11         MR. RHYNE:  Okay.  I think now is just as good a time

12   as any, your Honor.

13         THE COURT:  Very good.

14      All right.  Members of the jury, remember my admonition not

15   to form or express any opinion about the case.  Let's take our

16   first morning recess.

17         THE CLERK:  All rise.

18              (Recess taken.)

19         THE COURT:  All right.  Back on the record.

20         MR. RHYNE:  Thank you, your Honor.

21      Ms. Hughes, can we get Exhibit 709 ready?

22   BY MR. RHYNE:

23   Q.   Agent Mackey, when you were reviewing the lease records for

24   that particular property, did you note anything for your

25   investigation?

1     A.   I did.

2     Q.   What did you note?

3     A.   I noted that between 2007 through June of 2009, a few

4     Tri-Valley students had lived at that address.

5          MR. RHYNE:  Okay.  Can we publish Page 7, please.

6     Can we zoom in to the area -- top handwritten area all the way

7     up?

8     BY MR. RHYNE:

9     Q.   Do you recognize this name, Agent Mackey?

10    A.   I do.

11    Q.   And this is Samuel Steven Kancharakuntla; is that correct?

12    A.   Yes.

13    Q.   Can you spell the last name for the court reporter?

14    A.   K-a-n-c-h-a-r-a-k-u-n-t-l-a.

15    Q.   And these records indicated that this individual is a

16    former resident at that address; is that correct?

17    A.   That's correct.

18    Q.   Within these lease records, did you find information

19    pertaining to the Iris Avenue address as well?

20    A.   Yes.  It was Mr. Kancharakuntla's list -- previous listed

21    address or, I believe, emergency notification address.

22          MR. RHYNE:  Can we go to Page 10 -- actually, no.  We

23    can leave it right there.

24    BY MR. RHYNE:

25    Q.   It's right there on that screen; correct?

1    A.   Yes.

2    Q.   With these two addresses in mind, were you able to go into

3    SEVIS and find out approximately the percentage of students

4    that were listed living at one of those two addresses?

5    A.   Yes.  Again, in May when I looked, it was over half of the

6    900 students at the -- that specific apartment, Number 415.  By

7    the time we conducted our search warrants and were interviewing

8    Mrs. Su, 80 percent of the records were of some variation

9    between 555 East El Camino Real or 620 Iris Avenue.

10   Q.   Was this the first time you had seen the name Samuel Steven

11   Kancharakuntla?

12   A.   No, it's not.

13   Q.   You had seen his name in e-mails by this time; is that

14   correct?

15   A.   That's correct.

16   Q.   You had done a search warrant where you obtained a number

17   of e-mails from Tri-Valley University and Susan Su's computers;

18   is that correct?

19   A.   Yes.

20   Q.   Okay.  Did you ask Dr. Su during this interview about her

21   relationship with this individual?

22   A.   I did.

23   Q.   What did she say?

24   A.   She indicated that Samuel Steven Kancharakuntla and a

25   couple of his associates were previous students at a school

1    that she used to teach at Herguan University, and they were

2    skilled recruiters for foreign students, and she approached

3    them very shortly after she received her SEVIS approval to help

4    her obtain foreign students for Tri-Valley University.

5    Q.   When you said "couple of associates," can you -- did Susan

6    Su tell you their names?

7    A.   Yes.

8    Q.   What were their names?

9    A.   One of them was Bhargav Boinpally, B-a-r-g-h-a-v [sic],

10   Boinpally, B-o-i-n-p-a-l-l-y.

11   Q.   Did you --

12   A.   And --

13   Q.   Did she mention the other name?

14   A.   Yes.  The other individual was Abhilash Surineni, I believe

15   A-b-h-a-s-h [sic], Surineni, S-u-r-i-n-e-n-i.

16   Q.   Did you ask her whether she had any contact with these

17   individuals regarding the recruitment process at Tri-Valley

18   University?

19   A.   Yes, I did.

20   Q.   What did she say?

21   A.   Again, she said that shortly after she received her SEVIS

22   approval, she contacted them to help her build her foreign

23   student base.

24   Q.   Did you ask her whether she met with them?

25   A.   Yes.

1    Q.   What did she say?

2    A.   She stated that she e-mailed them and subsequently met with

3    them and entered into a recruiting contract with them.

4    Q.   Did she tell you the name that they went by in the

5    contract?

6    A.   Yes.  She indicated they were part of a company or what

7    they call a consultancy in India, and the name of the

8    consultancy was ABS Consultancy.  The ABS stood for the first

9    three letters of the first names of the members.

10   Q.   Did Dr. Su indicate how many students, if any, this company

11   had referred to Tri-Valley University?

12   A.   Yes.  She estimated that the first 200 students at

13   Tri-Valley University were recruited by them, and she

14   specifically -- or she also estimated that the first 150

15   students were Samuel Steven Kancharakuntla's recruits, and

16   the -- Boinpally recruited -- recruited another 50 students.

17   Q.   Did you ask Dr. Su about the immigration status of the

18   three ABS members?

19   A.   Yes.  She stated that she basically made them Tri-Valley

20   University F-1 students after they entered into their

21   precontract.

22   Q.   Did you ask her whether they attended classes at Tri-Valley

23   University?

24   A.   I did.

25   Q.   What did she say?

1    A.   She indicated that the three members of ABS as well as

2    their recruits didn't attend or participate in classes.  She

3    even said something to the effect of ABS spread rumors that

4    there were no classes at Tri-Valley University, and that's

5    partially why many of the recruits didn't attend or

6    participate.

7    Q.   But she stated to you that she was aware that these three

8    students had not gone to classes; is that correct?

9    A.   Yes.

10             MR. RHYNE:  Your Honor, may I approach the witness?

11             THE COURT:  You may.

12        (Government's Exhibit 300 marked for identification.)

13             MR. RHYNE:  I'm going to hand the witness Exhibit 300

14    for identification.  I'm going to retrieve Exhibit 709.

15    BY MR. RHYNE:

16    Q.   Do you recognize that document, Agent Mackey?

17    A.   Yes, I do.

18    Q.   What is it?

19    A.   It's an e-mail exchange between Bhargav Rao in 2003 and

20    Susan Su at Tri-Valley University.

21    Q.   When was the first time you saw this document?

22    A.   When we conducted search warrants on Tri-Valley University

23    e-mail accounts.

24    Q.   Where did this particular document come from during that

25    search warrant?

1    A.   I believe this document was part of the e-mail search

2    warrant results, but we also found copies of these e-mails on

3    computers and hard drives seized from Susan Su's office at

4    Tri-Valley University.

5              MR. RHYNE:  Your Honor, we move Exhibit 300 into

6    evidence.

7              THE COURT:  Any objection?

8              MR. BABCOCK:  No objection.

9              THE COURT:  Exhibit 300 is admitted.

10             (Government's Exhibit 300 received in evidence.)

11             MR. RHYNE:  Can you publish Exhibit 300, Page 1,

12   starting at the bottom?  Can we start at the very bottom where

13   it -- where it has the date "Saturday" -- "on Saturday,

14   February 21st"?

15   BY MR. RHYNE:

16   Q.   Can you just -- Agent Mackey, through your investigation in

17   this case and your previous investigations, have you reviewed

18   e-mail correspondence before?

19   A.   Yes, I have.

20   Q.   In print form like this?

21   A.   Yes.

22   Q.   Is it true that an e-mail chain normally has the oldest one

23   at the bottom and moves up?

24   A.   Yes.

25   Q.   In this particular e-mail, it's stated -- it states it was

1    sent on February 21st, 2009; is that correct?

2    A.   Yes, it does.

3    Q.   This says, "Hi.  This is Dr. Susan Su from Tri-Valley

4    University," a website address.  "I am trying to reach Rao

5    Bhargav"; is that correct?

6    A.   Yes.

7    Q.   And then it begins -- the sentence begins with "Rao" and

8    then runs to the next page; is that correct?

9    A.   Yes.

10        MR. RHYNE:  Can we go to the next page at the top,

11   please, and can we zoom in down to "Best regards, Susan" --

12   "Susan Su"?

13   BY MR. RHYNE:

14   Q.   Now, this states, "I hope one of these e-mail address will

15   reach you.  I meet you before at Herguan University.  I know

16   that you have been working actively as the student recruiter

17   recruiting students from India.

18        "The reason I am in contact is that Tri-Valley University

19   has recently received full SEVIS approval for issue I-20 to

20   international student.  We are currently looking for student at

21   India and other countries.

22        "Would you please give me a call, (925) 202-9538, to talk

23   about details, and also if you have friend who work as

24   recruiter, please also pass their contact to me.  If you have

25   Abhilash and Samuel Steven contact information, please also

1    pass to me.

2         "Best regards, Susan Su."

3         Is that correct?

4    A.  Yes.

5              MR. RHYNE:  Okay.  Can we go back to Page 1, please,

6    Ms. Hughes.  Can we go to the e-mail above there?  Yes, please,

7    down to the signature.

8    BY MR. RHYNE:

9    Q.  And this is a response; is that correct?

10   A.  Yes, it is.

11   Q.  A purported response from somebody named Bhargav?

12   A.  Yes.

13   Q.  Stating, "Hello, Susan Su" -- "Su.  Thanks a lot for

14   contacting us.  I, Abhilash, and Samuel Steven, we are one.

15   Our company name is ABS.  Let's fix a meeting in your

16   university in the coming week" -- "in the coming week.  We are

17   free on Tuesday.  So is it okay to meet us on Tuesday in your

18   TVU?  Please reply to my e-mail address, bhargav" --

19   "bhargavrao2003@gmail.com."

20        Is that correct?

21   A.  Yes.

22             MR. RHYNE:  Okay.  Can we go up to the next portion

23   of the e-mail?

24   BY MR. RHYNE:

25   Q.  This is the purported response from Susan Su; is that

1    correct?

2    A.   Yes.

3    Q.   Sent on February 22nd, 2009; is that correct?

4    A.   Yes.

5    Q.   It reads, "Hi, Bhargav.  I am really glad to hear from you

6    and all of your three together.  Coming Tuesday this morning

7    time is good.  What time all of you can come over?  TVU campus

8    address is at 4455 Stoneridge Drive, Pleasanton, California,

9    94588.  Let me know if you need any instructions or can call

10   me.  I am attaching TVU SEVIS approval, the entire

11   institution's academic programs.

12        "Best regards, Susan Su."

13        Correct?

14   A.   Yes.

15        MR. RHYNE:  And finally, Ms. Hughes, can we go to the

16   very top of the page down to the end of the top e-mail?  You

17   can include the "Re" at the top.

18        Thank you.

19   BY MR. RHYNE:

20   Q.   And finally, a response from Bhargav Rao; is that correct?

21   A.   Yes.

22   Q.   Telling Dr. -- telling Dr. Susan Su, "Congratulations.

23   Thanks for welcoming.  We'll visit the TVU campus on Tuesday at

24   11:00 a.m."

25        Is that correct?

1    A.   Yes.

2              MR. RHYNE:  Your Honor, may I approach?

3              THE COURT:  Yes.

4         (Government's Exhibit 303B marked for identification.)

5              MR. RHYNE:  I'm handing the witness 303B for

6    identification.

7    BY MR. RHYNE:

8    Q.   Agent Mackey, do you recognize Exhibit 303B?

9    A.   Yes, I do.

10   Q.   What is it?

11   A.   It's a memorandum of understanding between Tri-Valley

12   University and ABS Consultancy.

13   Q.   When did you first see it?

14   A.   We recovered this during our search warrants on

15   January 19th, 2011.

16   Q.   When you say you recovered it during the search warrants,

17   which search warrants in particular?

18   A.   At 405 Boulder Court.

19   Q.   Is it in the same or substantially the same condition it

20   was when you recovered it?

21   A.   Yes, it is.

22             MR. RHYNE:  Your Honor, we move Exhibit 303B into

23   evidence.

24             THE COURT:  Any objection?

25             MR. BABCOCK:  No objection.

1          THE COURT:  303B is admitted.

2              (Government's Exhibit 303B received in evidence.)

3          MR. RHYNE:  Can we publish Page 1 of 303B, please.

4    Can we just skip the text?

5    BY MR. RHYNE:

6    Q.  This purports, as you stated, to be an MOU between

7    Tri-Valley University and ABS Consultancy; is that correct?

8    A.  Yes.

9    Q.  Tri-Valley University is represented by President Dr. Susan

10   Su; is that correct?

11   A.  Yes.

12   Q.  And ABS Consultancy is represented by its presidents

13   Abhilash Surineni, Bhargav Boinpally, and Samuel Steven; is

14   that correct?

15   A.  Yes.

16         MR. RHYNE:  Can we go to Page 2?  Can we just zoom in

17   on the top of the page down to the end of the first section,

18   down right there?

19   BY MR. RHYNE:

20   Q.  And this just summarizes the duties of ABS Consultancy; is

21   that correct?

22   A.  That's correct.

23         MR. RHYNE:  Can we back out of that now and zoom into

24   the duties of the university?

25   ///

1    BY MR. RHYNE:

2    Q.   It states that the first duty of the university is to issue

3    I-20's in time to the students applying from South Asia;

4    correct?

5    A.   Yes.

6    Q.   The second responsibility, issuing acceptance letter and

7    transfer form to the local students in time; correct?

8    A.   Yes.

9         MR. RHYNE:  Okay.  Can we go to Page 3, please, and

10   could we go to the top of the page, Paragraph 5.  You can even

11   do 4 and 5.

12        That's fine.

13   BY MR. RHYNE:

14   Q.   And 4 indicates that the university is going to issue

15   necessary documents to the embassy; correct?

16   A.   Yes.

17   Q.   To process the visa for the student?

18   A.   Correct.

19   Q.   And then the university is agreeing to give a referral

20   amount to ABS, 21-percent semester fee on each student; is that

21   correct?

22   A.   Yes.

23        MR. RHYNE:  Can we go to Page 6, please.  Can we just

24   see if you can capture the whole portion of that?

25   ///

1    BY MR. RHYNE:

2    Q.   And this is just a signature page; correct?

3    A.   Yes.

4    Q.   Signed by Dr. Susan Xiao-Ping Su?

5    A.   Yes.

6    Q.   President of Tri-Valley University?

7    A.   Correct.

8    Q.   And signed by the president of ABS Consultancy.  Then

9    there's three other signatures; is that correct?

10   A.   Yes.

11   Q.   I want to go a little out of order here.  You're going to

12   testify later about your financial analysis in this case; is

13   that correct?

14   A.   Yes, it is.

15   Q.   During your financial analysis, did you look for payments

16   from Dr. Susan Su and Tri-Valley University to ABS Consulting

17   members?

18   A.   I did.

19   Q.   Did you find some?

20   A.   I did.

21        MR. RHYNE:  Your Honor, I'd like to list some

22   exhibits that we intend to offer all together.  I've provided a

23   list of these in advance to defense counsel.  For the record,

24   they are Exhibits 580, 581, 582, 582A, 583, 584, 585, 587, 588,

25   589, 590, 591, and 592.

1        (Government's Exhibits 580, 581, 582, 582A, 583, 584, 585,

2   587, 588, 589, 590, 591, and 592 marked for identification.)

3             MR. RHYNE:  May I approach?

4             THE COURT:  You may.

5             MR. RHYNE:  I'm going to hand those exhibits for

6   identification to the witness.

7   BY MR. RHYNE:

8   Q.   Agent Mackey, can you just take a second to flip through

9   those exhibits?

10       And, Agent Mackey, just for the record, if you look at

11  Exhibit 580, you can confirm that there's some sheets that are

12  vertical; is that correct?

13  A.   Yes.

14  Q.   And that's a copy of one of the actual checks; is that

15  correct?

16  A.   Yes.

17  Q.   And the exhibit label?

18  A.   Correct.

19  Q.   The remainder of what's in that file is what?

20  A.   A check to Samuel Steven K.

21  Q.   Are there bank certifications in there?

22  A.   Yes.

23            MR. RHYNE:  Okay.  Your Honor, just for the record,

24  we're going to just offer the checks and not the actual

25  certification.

1    BY MR. RHYNE:

2    Q.   How did you get these -- these checks?

3    A.   Through a grand jury subpoena.

4    Q.   Okay.  And you've reviewed the response to that subpoena?

5    A.   Yes.

6         MR. RHYNE:  All right.  Your Honor, we offer these

7    exhibits into evidence.

8         THE COURT:  Is there any objection?

9         MR. BABCOCK:  There is not.

10        THE COURT:  The following exhibits are admitted:

11   580, 581, 582, 582A, 583, 584, 585, 587, 588, 589, 590, 591,

12   and 592.

13       (Government's Exhibits 580, 581, 582, 582A, 583, 584, 585,

14   587,  588, 589, 590, 591, and 592 received in evidence.)

15        MR. RHYNE:  Can we publish Exhibit 580, and can we go

16   two more pages in, please, and can we just zoom in to the

17   check.

18       Go all the way down to the bottom.  Keep going, please.

19   BY MR. RHYNE:

20   Q.   Agent Mackey, can you just describe for the grand jury how

21   you read something like this?  I'm sorry.  For the jury.

22   A.   Sure.  It's a check that's cleared through Wells Fargo Bank

23   accounts associated with Tri-Valley University.

24   Q.   The account number is the bottom left-hand number; is that

25   correct?

1    A.   Yes, that's correct.

2    Q.   And that's ending in 0454; is that correct?

3    A.   Yes.

4    Q.   That's one of the primary accounts you examined in this

5    case; is that correct?

6    A.   Yes, it is.

7    Q.   And this check is to Samuel Steven for $1,073; correct?

8    A.   Yes.

9         MR. RHYNE:  Could we go to 581, please, to Page 3.

10   BY MR. RHYNE:

11   Q.   Another example of a check; correct?

12   A.   Yes.

13   Q.   Same account number, 0454?

14   A.   Yes.

15   Q.   This check, though, actually has a Tri-Valley University

16   name on it; is that correct?

17   A.   Yes.

18        MR. RHYNE:  Okay.  Can we jump now to Exhibit 592,

19   and let's go a couple pages in, please, to Page -- I'm sorry.

20   Just Page 2.

21        Can you just zoom in to the top there?

22   BY MR. RHYNE:

23   Q.   Agent Mackey, this is a larger check; is that correct?

24   A.   Yes, but it's to another individual.

25        MR. RHYNE:  Okay.  I'm sorry.  Can we back out of

1    that?  I meant 591.  Page 3, please.

2    BY MR. RHYNE:

3    Q.  This is a larger check; is that correct?

4    A.  Yes.

5    Q.  This is for $39,010; is that correct?

6    A.  Yes.

7    Q.  Again, for Tri-Valley University to Mr. Samuel

8    Kancharakuntla; is that right?

9    A.  That's correct.

10   Q.  This is the largest of the checks that you saw from

11   Tri-Valley University to ABS; is that correct?

12   A.  That's correct.

13   Q.  And Exhibits 580 through 592 that were just admitted range

14   approximately from $600 to this large amount; is that correct?

15   A.  I believe 592 is related to another individual, but the

16   rest is all related to ABS.

17   Q.  Okay.  And that's an approximate summary of the amounts,

18   600 at the low end to this at the high end; correct?

19   A.  Yes.

20          MR. RHYNE:  Okay.  All right.  We can take that down.

21   Thank you.

22   BY MR. RHYNE:

23   Q.  During the interview with Dr. Su, did you ask her about

24   whether non-DSO's had been accessing SEVIS?

25   A.  Yes.  Yes, I did.

1    Q.   What did she say?

2    A.   She stated that she used her students to access the SEVIS

3    database for Tri-Valley University, and she acknowledged that

4    that was one of the things that she thought might be illegal.

5    Q.   Was there more discussion at this point about her DSO's

6    that were listed, Sophie Su and Vince Wang?

7    A.   Yes.

8    Q.   What did she say about them?

9    A.   She explained that she had to use students because --

10   administer students because her -- Vince Wang or Wenchao Wang

11   and Sophie Su, the DSO's listed on the I-17, actually had

12   full-time jobs and were too busy to work.

13       And she also stated that hiring a qualified DSO that is a

14   U.S. citizen or a lawful current resident as required by SEVP

15   would be too expensive, and she provided an example of one DSO

16   that she just -- or one person she discussed potentially being

17   a DSO who wanted $50,000 a year.

18   Q.   And she stated that was too expensive for Tri-Valley

19   University; is that correct?

20   A.   Yes.

21   Q.   At this point, had you reviewed her financial records?

22   A.   Yes.

23   Q.   Did you have an idea of the amount of revenue that

24   Tri-Valley University had received up to that point?

25   A.   Yes.

1    Q.   What's the estimation of that number?

2    A.   A little shy of $6 million.  5.5 million were identified

3    from proceeds.

4    Q.   Did you ask Dr. Susan Su about Tri-Valley University's

5    grading policies and its transcript procedure?

6    A.   Yes.

7    Q.   How did you ask that question?

8    A.   At the time, I was aware of the irregularities with

9    transcripts that were being issued, and I asked her about the

10   legitimacy of transcripts, and she explained that a lot of

11   transcripts issued by Tri-Valley University showed straight A's

12   because she was creating draft transcripts and placing A's on

13   those transcripts as placeholders until she received real

14   grades from real instructors, which -- she indicated that she

15   would change the transcripts later once the real grades came

16   in.

17   Q.   Did she note any grades that a professor had provided to

18   her?

19   A.   She indicated that of the professors that she had that --

20   or the instructors that were teaching online classes, she had a

21   few problem instructors who were failing students for

22   nonattendance and nonparticipation, and she indicated that it

23   was Tri-Valley -- it was Tri-Valley University's policy not to

24   give a grade below a B-plus.  So she would have to change those

25   F's to a B-plus.

1    Q.   Did you ask her whether she did this alone or whether she

2    had staff members who assisted her with this?

3    A.   I believe she stated that she instructed her staff to

4    create those transcripts.

5    Q.   Okay.  And you stated that it was the policy not to give

6    anybody below a B-plus?

7    A.   Yes.

8    Q.   Did you ask her about whether a failing grade would result

9    in Tri-Valley University or Dr. Susan Su entering that into

10   SEVIS?

11   A.   Yes.

12   Q.   What did you ask her, and what did she say?

13   A.   I asked her about Tri-Valley University's termination

14   policy, and -- in SEVIS, and she stated that she would under no

15   circumstances terminate a student for nonparticipation or

16   nonattendance, that all of her students were good people and

17   she cared for them, and she basically didn't want to create a

18   consequence that would potentially result in their deportation.

19   Q.   Did you ask her about some of the accounts that she used to

20   collect the tuition from these students?

21   A.   Yes.

22   Q.   Did you ask her specifically about PayPal?

23   A.   Yes, I did.

24   Q.   Why did you ask her about PayPal?

25   A.   Because I had reviewed PayPal accounts for Tri-Valley

1    University which they were using to collect tuition from

2    foreign students.

3    Q.   What did she say when you asked her about PayPal?

4    A.   She stated that all the money in the PayPal account came

5    from F-1 students paying for tuition fees.

6    Q.   And did you know -- I'm sorry.  Go ahead.

7    A.   I should say that she stated all the money came from her

8    students at Tri-Valley University.  I don't think she got to

9    the specifics of F-1 students.

10   Q.   At this point, you had also reviewed a number of the

11   expenditures that had been made from the accounts with Dr. Su's

12   name on them; is that correct?

13   A.   Yes.

14   Q.   Did you ask her about some of the purchases she made out of

15   those accounts?

16   A.   Yes, I did.

17   Q.   Did you ask her about 2890 Victoria Ridge Court?

18   A.   Yes.

19        MR. RHYNE:  Your Honor, may I approach?

20        THE COURT:  You may.

21   (Government's Exhibit 406 marked for identification.)

22   BY MR. RHYNE:

23   Q.   Handing you Exhibit 406 for identification -- I'm going to

24   take these checks back -- do you recognize Exhibit 406?

25   A.   Yes, I do.

1    Q.   What is it?

2    A.   It's a picture of the Victoria Ridge Court residence.

3    Q.   Have you seen that residence before?

4    A.   Yes.

5    Q.   And does that fairly and accurately depict it?

6    A.   Yes.

7         MR. RHYNE:  Your Honor, we move Exhibit 406 into

8    evidence.

9         THE COURT:  Any objection?

10        MR. BABCOCK:  Both pages?  Just one?

11        MR. RHYNE:  Oh.

12   BY MR. RHYNE:

13   Q.   There's two pages; correct?

14   A.   Yes.

15   Q.   And do you recognize both of them?

16   A.   Yes, sir.  They're both different shots of the same front

17   of the building.

18        MR. RHYNE:  We'd offer both.

19        MR. BABCOCK:  No objection.

20        THE COURT:  Exhibit 406 is admitted.

21        (Government's Exhibit 406 received in evidence.)

22        MR. RHYNE:  Can we pull up Page 1 of Exhibit 406?

23   BY MR. RHYNE:

24   Q.   This is Page 1 of 406; is that correct, Agent Mackey?

25   A.   Yes.

1          MR. RHYNE:  And can we go to Page 2?

2     BY MR. RHYNE:

3     Q.   That's just moving over a little bit to the right; is that

4     correct?

5     A.   Yes.

6     Q.   What did the defendant say when you asked her about how she

7     purchased this property?

8     A.   She stated that this property was purchased entirely from

9     funds from Tri-Valley University.

10    Q.   Did you also ask her about 1371 Germano Way?

11    A.   Yes.

12    Q.   And that was the exhibit that was previously on the board

13    behind you; is that correct?

14    A.   Yes.

15    Q.   What did Dr. Su say about how she purchased that property?

16    A.   Again, accounts -- she said she purchased that property

17    with accounts that contained entirely amounts of tuition and

18    fees from Tri-Valley students.

19    Q.   Did you ask her about the address located at 1087 Murrieta

20    Boulevard, Number 133, in Livermore?

21    A.   Yes.

22    Q.   And did you ask her about how she purchased it?

23    A.   Yes.

24    Q.   What did she say?

25    A.   Again, all from funds from Tri-Valley University

1    students -- students.

2    Q.   Did you also ask her about properties located at 405

3    Boulder Court?

4    A.   Yes.

5    Q.   Which property specifically?

6    A.   Suite 700 and Suite 800.

7           MR. RHYNE:  Your Honor, may I approach?

8           THE COURT:  You may.

9       (Government's Exhibits 401 and 403 marked for

10   identification.)

11          MR. RHYNE:  I'm handing the witness Exhibit 401 and

12   403 for identification.

13   BY MR. RHYNE:

14   Q.   Do you recognize those two photographs?

15   A.   Yes, I do.

16   Q.   What are they?

17   A.   They're pictures of the front of 405 Boulder Court,

18   Suite 700 and Suite 800.

19      (Government's Exhibit 400 marked for identification.)

20          MR. RHYNE:  I'm also going to hand the witness

21   Exhibit 400 for identification.

22   BY MR. RHYNE:

23   Q.   Do you recognize that?

24   A.   Yes.

25   Q.   And what is it?

1    A.   It's a wider shot of 405 Boulder Court, Suite 700 and

2    Suite 800.

3    Q.   Do each of those photographs fairly and accurately depict

4    the scene?

5    A.   Yes.

6         MR. RHYNE:  Your Honor, we would admit those exhibits

7    into evidence, 400, 401, 403.

8         MR. BABCOCK:  No objection.

9         THE COURT:  400, 401 and 403 are admitted.

10   (Government's Exhibits 400, 401, and 403 received in

11   evidence.)

12        MR. RHYNE:  Can we publish Exhibit 400, please.

13   BY MR. RHYNE:

14   Q.   Agent Mackey, this is what you referred to as the wider

15   shot?

16   A.   Yes.

17   Q.   Can you just describe for the jury where Suite 700 and 800

18   are in this particular photo?

19   A.   Sure.  Suite 700 is the door directly under the Tri-Valley

20   University sign towards the side closest to us, and Suite 800

21   is actually to the left kind of around the corner a little bit.

22   There's another door that goes into Suite 800.

23        MR. RHYNE:  Can we see Exhibit 401, please.

24   BY MR. RHYNE:

25   Q.   This is Exhibit 401.  Do you recognize this, Agent Mackey?

1    A.   Yes.

2    Q.   And this is Suite 700; correct?

3    A.   Correct.

4    Q.   Okay.  And 403, please.

5         And Suite 800; correct?

6    A.   Yes.

7    Q.   Okay.  Did you ask the defendant Dr. Susan Su how she

8    purchased these properties?

9    A.   Yes.

10   Q.   What did she say?

11   A.   Again, entirely with funds from Tri-Valley University

12   students.

13   Q.   Did you also ask her about a Mercedes Benz automobile?

14   A.   Yes.

15        (Government's Exhibit 405 marked for identification.)

16   BY MR. RHYNE:

17   Q.   I'm going to hand you 405 for identification and have you

18   take a look at it.

19        Do you recognize that?

20   A.   I do.

21   Q.   What is it?

22   A.   It's a picture of Mrs. Su's Mercedes Benz.

23   Q.   Did you take that picture during the search warrants, or

24   did somebody take that picture during the search warrants?

25   A.   Yes, someone took that picture.

1    Q.   And does it depict what the car looked like on that day?

2    A.   Yes.

3              MR. RHYNE:  Your Honor, we'd offer Exhibit 40 --

4    BY MR. RHYNE:

5    Q.   405?

6    A.   Yes.

7              MR. RHYNE:  -- into evidence.

8              MR. BABCOCK:  Submitted.

9              THE COURT:  Exhibit 405 is admitted.

10             (Government's Exhibit 405 received in evidence.)

11             MR. RHYNE:  Can we publish Exhibit 405, please.

12   BY MR. RHYNE:

13   Q.   Did you ask Dr. Su how she purchased this automobile?

14   A.   Yes.

15   Q.   What did she say?

16   A.   Again, with funds entirely from Tri-Valley University

17   students, and it was outright.  It wasn't --

18             (Court reporter clarification.)

19             THE WITNESS:  It was purchased outright, so no lease

20   or financing, just paid with a check.

21   BY MR. RHYNE:

22   Q.   And that was the same with all the assets we discussed;

23   correct?

24   A.   Correct.  All the assets we discussed were purchased

25   outright.  So no loans were taken on any of the properties.

1    Q.   You brought a copy of the check that was used to purchase

2    this car to the interview with Dr. Su; is that correct?

3    A.   I did.

4    Q.   And you still have Exhibit 7 up there, is that right, in

5    front of you?

6    A.   Oh, yes, I do.

7    Q.   And can you turn to Page 16 of that exhibit?

8         And you had her authenticate the check; is that correct?

9    A.   Yes, I showed her the check.

10   Q.   Okay.  And did she acknowledge that was the check she

11   wrote?

12   A.   Yes.

13   Q.   Did you ask her about other expenditures during the

14   interview?

15   A.   Yes, I did.

16   Q.   Okay.  Did you ask her about a check she had written to her

17   family members?

18   A.   Yes.

19   Q.   Specifically, what did you ask her?

20   A.   I discovered through a review of Tri-Valley University's

21   management records that two checks were written to Susan Su's

22   daughters, a Jenny Yang and a Rachel Yang, and I asked her

23   about these checks and the purpose of these checks.

24        MR. RHYNE:  Okay.  Can we go back to Exhibit 7, Page

25   17.

1    BY MR. RHYNE:

2    Q.  Did you have an understanding at this point in time the

3    approximate ages of Dr. Su's daughters?

4    A.  Yes.

5    Q.  What were their approximate ages?

6    A.  I believe around 14 and 15 at that time.

7    Q.  Did you ask Dr. Su what a 14- or 15-year-old would do with

8    $30,000?

9    A.  I did.

10   Q.  What did she say?

11   A.  She stated that she wrote them checks so that they can

12   learn to be responsible with money.

13           MR. RHYNE:  Can we go to Page 18?

14   BY MR. RHYNE:

15   Q.  And is this the other check?

16   A.  Yes.

17   Q.  Did you ask her about another check that was written to her

18   husband?

19   A.  Yes, I did.

20   Q.  What did you ask her?

21   A.  It was a $75,000 check written to her husband.  I asked her

22   what the purpose of the check was.

23   Q.  What did she say?

24   A.  She stated that she wrote the check against her Tri-Valley

25   University business account to Mr. Yang in order to get them to

1    relinquish his property rights in one of the properties she was

2    purchasing, so in order to have him sign the interspousal deed.

3              MR. RHYNE:  Your Honor, may we have a brief sidebar?

4              THE COURT:  Yes.

5                        (Unreported sidebar.)

6    BY MR. RHYNE:

7    Q.   Agent Mackey, I want to go on a little bit of an aside here

8    and ask you some questions about your training and

9    responsibility as a Special Agent with HSI pertaining to

10   immigration violations.

11        You enforce immigration violations pertaining to student

12   visas; is that correct?

13   A.   Yes, that's correct.  Yes.

14   Q.   Now, if an F-1 student who is in the United States on that

15   kind of visa is getting failing grades or not attending their

16   full course of study, what are your duties and responsibilities

17   as a Special Agent?

18   A.   So if an F-1 student doesn't depart the country, he's

19   basically ineligible -- what we call a visa overstay.  It's

20   just like coming in on a visitor visa and you're admitted for

21   30 days.  If you stay beyond that period, you're subject to

22   deportation.

23        If you come on a student visa and you stop attending or you

24   drop below or you otherwise don't maintain your status, you

25   essentially have overstayed your visa, and you're subject to

1    deportation, and we oftentimes will place those individuals in

2    deportation proceedings.

3    Q.   Okay.  But if a student is passing a full course of study

4    and attending classes, then they can reenroll; is that correct?

5    A.   That's correct.

6    Q.   And they can continue to stay in for their duration of

7    status; is that correct?

8    A.   That is correct.

9    Q.   Okay.  I want to get back to the interview of -- with Dr.

10   Susan Su.

11        Did you ask her about the composition of Tri-Valley

12   University's student body?

13   A.   Yes, I did.

14   Q.   What did you ask her, and what did she say?

15   A.   I asked her how many students that she had enrolled, and I

16   also asked her what percentage or how many of those students

17   were not F-1 or in F-1 status.

18   Q.   Okay.  What did she say?

19   A.   She estimated that she had around 1700 students, and she

20   believed that 25 of those students weren't in F-1 status.

21   Q.   Okay.  And you had a chance to crunch that percentage of

22   the students that would necessarily be F-1 students, then?

23   A.   Based on her estimates, yes.

24   Q.   And what was that percentage?

25   A.   Approximately 90 -- over 90 percent were F-1 students.

1    Q.   Did you talk with Dr. Su about any of the undercover

2    operations that had occurred up to that point?

3    A.   I did.

4    Q.   What did you ask her?

5    A.   I asked her about students -- or individuals that we had

6    enrolled at the school who didn't actually exist at the school.

7    I showed her some documents that she submitted to us verifying

8    or vouching for those students, and I asked her -- I had her

9    look at the documents, and I asked her for the reasoning as to

10   why she sent them to us.

11            MR. RHYNE:  Your Honor, may I approach?

12            THE COURT:  You may.

13        (Government's Exhibits 206B and 207B marked for

14   identification.)

15            MR. RHYNE:  I'm going to hand the witness 206B and

16   207B for identification.

17   BY MR. RHYNE:

18   Q.   Starting with 206B, Agent Mackey, can you generally

19   describe what that is?

20   A.   It's an e-mail from Ms. Su to one of our agents, Dale

21   Taylor, with information about those essentially fictitious

22   students.

23   Q.   And did you have her acknowledge -- is that one of the

24   e-mails you had her acknowledge?

25   A.   Yes.

1    Q.   Okay.  Same question with 207B.  Do you recognize that?

2    A.   Yes, I do.

3    Q.   And did Dr. Su also authenticate that during the interview?

4    A.   Yes, she did.

5         MR. RHYNE:  Your Honor, we move Exhibit 206B and 207B

6    into evidence.

7         THE COURT:  Any objection?

8         MR. BABCOCK:  No, I don't think so, your Honor.

9         THE COURT:  Exhibits 206B and 207B are admitted.

10   (Government's Exhibits 206B and 207B received in evidence.)

11   BY MR. RHYNE:

12   Q.   Now, Agent Taylor -- I believe another witness is going to

13   testify about this, but can you generally just describe -- set

14   the stage for how you received these two e-mails or how DHS

15   received these two e-mails?

16   A.   Sure.  So during the course of its investigation, we

17   basically enrolled students that didn't exist at Tri-Valley

18   University and get Tri-Valley University -- to see how long

19   they would be maintained in their status.

20        And towards the end of -- before we took our enforcement

21   actions, we began contacting Ms. Su posing as immigration

22   officials at the airport and telling Ms. Su that we encountered

23   these individuals and asking for transcripts, verification

24   letters, I-20 permission documents to confirm that they were,

25   in fact, maintaining their status, that they were studying,

1    full-time students.  And in response to those inquiries, she

2    sent these e-mails with those documents.

3              MR. BABCOCK:  Your Honor, I'm sorry.  I'm going to

4    have to object and move to strike.  I think pretty much all of

5    that last answer is hearsay-based.

6              THE COURT:  Do you want to be heard?

7              MR. RHYNE:  I think I can clear it up with one

8    question.

9              THE COURT:  All right.  I'll withhold a ruling on the

10   objection for the moment, but ask the question.

11   BY MR. RHYNE:

12   Q.   Agent Mackey, were you involved in these undercover

13   operations with first-hand knowledge of what happened?

14   A.   Yes.  I was present for all the phone calls.

15   Q.   And did you see these e-mails when they were received?

16   A.   Yes.

17             MR. BABCOCK:  Submitted.

18             THE COURT:  Overruled.

19   BY MR. RHYNE:

20   Q.   Agent Mackey, you're familiar with how the students' -- you

21   called them fictitious students -- names were selected?

22   A.   Yes.

23   Q.   How were they selected?

24   A.   We ran a report in our SEVIS database and basically

25   randomly pulled names of terminated students in the system to

1    see if Ms. Su would reactivate or attempt to reactivate those

2    students.

3    Q.   Okay.  Did you inform Dr. Su during this interview these,

4    in fact, were fictitious students?

5    A.   I did.

6    Q.   What was her reaction?

7    A.   At first, it seemed like surprise.  I believe she told us

8    that -- when we told her that they weren't real students at

9    Tri-Valley University, she said that was -- that's impossible,

10   and then I believe she basically called us tricky.

11   Q.   And Agent Taylor was present; correct?

12   A.   Yes.

13   Q.   And Agent Taylor was the individual who made the phone

14   call; is that correct?

15   A.   Yes.

16   Q.   Did you inform her at that point of that fact?

17   A.   Yes, I did.

18   Q.   Then did you then follow up regarding the legitimacy of

19   these attachments in both of these e-mails that she sent --

20   A.   Yes.

21   Q.   -- to you?

22   A.   I did.

23   Q.   What did she say?

24   A.   She explained that she created these transcripts and the

25   verification letters and the I-20 and sent them to us because

1    she was concerned for these students, that we had told her they

2    were at the airport and that they were stuck.  So she in

3    response sent these documents to us.

4    Q.   So she admitted that they were false; correct?

5    A.   Yes.

6    Q.   Agent Mackey, I want to shift gears now and talk about --

7    you mentioned search warrants that you did in this case.

8        You stated previously that there were search warrants at

9    Tri-Valley University; is that correct?

10   A.   Yes.

11   Q.   Also at the defendant's residences; is that correct?

12   A.   Yes.

13   Q.   Her car; is that correct?

14   A.   Yes.

15   Q.   And an e-mail account; is that correct?

16   A.   Yes.

17   Q.   Through those search warrants, agents seized a number of

18   computers, hard drives, records, and e-mails; is that correct?

19   A.   Yes.

20   Q.   Can you just describe for the jury generally how a search

21   warrant is conducted so they have an idea of how it works?

22   A.   Sure.  Again, we generally arrive early at the place to be

23   searched.  We'll have a team do a knock-and-talk, announce that

24   we're there with the warrants, that we're police, and demand

25   entry.

1    At that point, a team will enter the residence.  Depending

2    on whether or not an occupant comes to the door quickly enough,

3    you might be let in the residence, or you might have to force

4    entry.  But a team will then go into the residence and make it

5    safe, conduct a protective sweep for weapons.

6    Once the residence is safe, that team will generally switch

7    to a searching role, and they'll search for evidence, find it,

8    collect it, annotate the collection of that evidence in

9    inventory, create a chain of custody for the evidence.  And

10   then once we're done with the search, we'll secure the

11   residence, make sure the doors are locked, et cetera, and then

12   leave a copy of the search warrant and an inventory at the

13   location and then depart.

14   Q.   Now, you mentioned the term "force entry."  What would be

15   the reason -- why don't you just wait for somebody to come?

16   A.   At a certain point, there's a risk of officer safety.  We

17   don't know if somebody is going to grab a weapon.  There's also

18   a risk of destruction of evidence.  So we wait a reasonable

19   amount of time that's based partly on the size of the house,

20   how long it would take for one person to get, you know, from

21   the bedroom to the door.  And then if the reasonable time

22   passes, we force entry.

23   Q.   Okay.  And in this particular case on Germano Way, you had

24   to force entry; is that correct?

25   A.   That's correct.

1   Q.   I want to talk now about -- are you familiar with the term

2   "chain of custody"?

3   A.   Yes.

4   Q.   What is that?

5   A.   A chain of custody is basically a history of a piece of

6   evidence, where it was collected and who's touched that

7   evidence from the period it's collected to when it's presented

8   in court.

9   Q.   How does HSI record chain of custody when it's doing search

10  warrants?

11  A.   We document the collection of evidence on both inventory

12  and a chain of custody form and then basically transport the

13  evidence from the search warrant location to an evidence room,

14  and the evidence custodian will sign for it, and then everybody

15  from then on will sign for that evidence.

16  Q.   Did you follow those procedures in this case?

17  A.   Yes.

18  Q.   I want to talk about electronic data and how that's seized.

19  Can you tell the jury generally how electronic information is

20  seized during a search warrant?

21  A.   Sure.  So if it's a hard drive or a thumb drive or a

22  computer with a hard drive in it, we'll have a computer expert

23  on scene, and he'll make an assessment as to whether or not he

24  can -- what's called image the digital media onsite, which is

25  making a forensic copy, an exact copy, of the items and leave

1    the originals at the location if feasible.  If it's not

2    feasible, then we'll just take the actual digital media back to

3    our office, where we'll image at our office.

4    Q.   Now, once an item is imaged, what do you do with it?  You

5    used the term "forensic copy," I guess.  Can you explain to the

6    grand -- or to the jury what a forensic copy is?

7    A.   It's basically an exact copy byte for byte of a piece of

8    additional media, thumb drive, hard drive.

9    Q.   What do you do with it once you have that copy?

10   A.   Well, a computer forensic expert will be responsible for

11   maintaining the original evidence and creating the image, and

12   that individual will make an image available for me to search,

13   basically hook it up to software that can allow me to do word

14   searches and search for files on those documents.

15   Q.   And did you do that in this case?

16   A.   Yes.

17        MR. RHYNE:  I'm going to hand the witness what's been

18   previously admitted as Exhibit 102.

19   BY MR. RHYNE:

20   Q.   Do you recognize Exhibit 102?

21   A.   Yes, I do.

22        MR. RHYNE:  Can we publish Exhibit 102, and can we

23   just zoom in to the top, please, from -- from "Susan" --

24   regarding "Susan" down to "Shy Shenq Liou."

25   ///

1    BY MR. RHYNE:

2    Q.   Agent Mackey, this is an e-mail that's previously been

3    admitted.  This is something you found during the search

4    warrant; is that correct?

5    A.   That's correct.

6    Q.   Where did you find this e-mail?

7    A.   It was located on a piece of digital media inside Ms. Su's

8    office at 405 Boulder Court.

9    Q.   When you say "digital media," what do you mean?

10   A.   It was present in a hard drive.

11   Q.   And this e-mail had an attachment to it; is that correct?

12   A.   Yes.

13        MR. RHYNE:  Okay.  Can we go to 102, Page 5, and can

14   we go to Section 1, "Principles of the Agreement"?

15   BY MR. RHYNE:

16   Q.   Did you note this portion of the attachment?

17   A.   I did.

18   Q.   What did you note about it?

19   A.   It contained language regarding the transfer of courses

20   between San Francisco State University and Tri-Valley

21   University, which the -- ultimately, the articulation agreement

22   that was submitted to SEVP also contained similar language.

23        MR. RHYNE:  Can we go to Page 7, please.

24   BY MR. RHYNE:

25   Q.   And did you note the signature on this particular page?

1    A.   I did.

2    Q.   Did you have the opportunity to compare this signature on

3    this exhibit to any other evidence in this case?

4    A.   Yes, I did.

5    Q.   What did you -- what did you do?

6    A.   The signature on the document appears to be very similar to

7    the signature on the approved articulation agreement that Susan

8    Su submitted to SEVP.  So at that point, I took the approved

9    articulation agreement and this e-mail copy, and I submitted it

10   to Carol Bayer-Broring, our forensic document expert.

11        (Government's Exhibit 109 marked for identification.)

12   BY MR. RHYNE:

13   Q.   I'm going to hand you now what's been marked as Exhibit 109

14   for identification.

15        Do you recognize Exhibit 109?

16   A.   Yes, I do.

17   Q.   What is Exhibit 109?

18   A.   It's a collection of a copy of receipts -- credit card

19   receipts and invoices located during our search warrant on 405

20   Boulder Court.

21   Q.   And those are all scanned onto that CD?

22   A.   Yes.

23   Q.   How do you know that that CD contains those scans?

24   A.   Because I created this CD, and I put my initials on it.

25   Q.   And this is something you relied on during your financial

1    analysis; is that correct?

2    A.   Yes.

3           MR. RHYNE:  Your Honor, we'd offer Exhibit 109 into

4    evidence.

5           THE COURT:  Any objection?

6           MR. BABCOCK:  No, your Honor.

7           THE COURT:  Exhibit 109 is admitted.

8              (Government's Exhibit 109 received in evidence.)

9           MR. RHYNE:  Mr. Noble, can I get 112?

10       Thank you.

11   BY MR. RHYNE:

12   Q.   I'm now going to hand you what's been previously admitted

13   as Exhibit 112.  Can you take a look at 112?

14       What is it?

15   A.   It's an IRS tax document bearing Susan Su's signature and

16   the signature of Xiao-Gang Su.

17   Q.   Where did you first see this document?

18   A.   This was located at the Germano Way residence.  It was

19   contacted during our search warrant there.

20           MR. RHYNE:  Your Honor, may we publish Exhibit 112?

21           THE COURT:  Any objection?

22           MR. BABCOCK:  It's already admitted, isn't it?

23           THE COURT:  Oh.  In that case, permission granted.

24           MR. RHYNE:  Let's publish it, please.  Can we zoom in

25   on the signatures at the bottom?

1   BY MR. RHYNE:

2   Q.   Agent Mackey, during your investigation, did you submit

3   this document to Carolyn Bayer-Broring as well?

4   A.   I did.

5   Q.   Why did you do that?

6   A.   Because it appeared to me that the signature was very

7   similar to the Xiao-Gang Su signature on the articulation

8   agreement for the University of Central Florida that Susan Su

9   submitted to SEVP, and I wanted a comparison.

10       (Government's Exhibit 122 marked for identification.)

11   BY MR. RHYNE:

12   Q.   I'll hand you Exhibit 122 for identification.

13       Do you recognize Exhibit 122?

14   A.   I do.

15   Q.   What is it?

16   A.   Tri-Valley University transcripts for Bhargav Boinpally,

17   Samuel Steven Kancharakuntla, and Abhilash Surineni.

18   Q.   When did you first see these?

19   A.   We located these on a hard drive found in Susan Su's office

20   during our search warrants.

21   Q.   And those names are the three ABS employees; is that

22   correct?

23   A.   That is correct.

24   Q.   And you asked Dr. Su during the interview whether

25   Tri-Valley University had sponsored them as students; is that

1   correct?

2   A.   Yes, I asked her that.  Yes.

3   Q.   And you asked her about whether they went to class;

4   correct?

5   A.   I did.

6   Q.   And what did she say?

7   A.   She stated that these individuals neither attended nor

8   participated in their classes at Tri-Valley University.

9        MR. RHYNE:  Your Honor, we'd offer Exhibit 122 into

10  evidence.

11       THE COURT:  Any objection?

12       MR. BABCOCK:  No objection.

13       THE COURT:  Exhibit 122 is admitted.

14          (Government's Exhibit 122 received in evidence.)

15       MR. RHYNE:  Can we publish Exhibit 122, starting with

16  Page 2?

17  BY MR. RHYNE:

18  Q.   Agent Mackey, Page 2 of Exhibit 122 purports to be a

19  transcript for Bhargav Boinpally; is that correct?

20  A.   Yes, for the summer of 2009, it appears.

21  Q.   It purports to issue grades in Semiconductor Physics and

22  Devices, Nanotechnology, Business Administration and

23  Management; is that correct?

24  A.   Yes.

25  Q.   With the respective grades of A, A, and A-minus; is that

1    correct?

2    A.   Yes.

3          MR. RHYNE:  Can we go to Page 4, please.

4    BY MR. RHYNE:

5    Q.   Agent Mackey, this purports to be a transcript for Samuel

6    Steven Kancharakuntla; is that correct?

7    A.   Yes.

8    Q.   Can you please read for the record the classes that he's

9    purportedly taken and the grades that he was issued.

10   A.   Yes.  Electrical -- or E300, which is titled Semiconductor

11   Physics and Devices, with a grade of A.  BA350 --

12   Q.   I'm sorry.  Are you looking at Page 4?

13   A.   Oh.  My apologies.

14        Course Title -- or Course Number BA370 titled Business

15   Administration and Management with a grade of A.  BA353, Human

16   Resource Management with a grade of A.  BA352, Project

17   Management with a grade of A-minus.

18         MR. RHYNE:  Can we go to Page 6, please.

19   BY MR. RHYNE:

20   Q.   And this is a transcript purportedly for Abhilash Surineni;

21   is that correct?

22   A.   Yes.

23   Q.   His degree program is actually a law degree; correct?

24   A.   Yes.

25   Q.   And he's enrolled in Business Law -- or he purportedly took

1    Business Law, Healthcare Law, Business Administration and

2    Management; correct?

3    A.   Yes.

4    Q.   With the same grades, A, A, A-minus; is that correct?

5    A.   Yes.

6    Q.   During your review of the e-mails during this search

7    warrant, did you note e-mails other than ones we've already

8    mentioned between Dr. Susan Su and the individuals from ABS?

9    A.   Yes, I did.

10         (Government's Exhibit 307 marked for identification.)

11         MR. RHYNE:  I'm going to hand the witness Exhibit 307

12   for identification.

13   BY MR. RHYNE:

14   Q.   Do you recognize Exhibit 307, Agent Mackey?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   It's an e-mail exchange between bhargavrao2003 again and

18   Dr. Susan Su.

19   Q.   Where did you find it?

20   A.   It was located on a hard drive found in Susan Su's office.

21   Q.   Does it fairly and accurately represent what that e-mail

22   looked like when you reviewed it?

23   A.   Yes.

24         MR. RHYNE:  Your Honor, we'd offer Exhibit 307 into

25   evidence.

1          THE COURT:  Any objection?

2          MR. BABCOCK:  No objection.

3          THE COURT:  Exhibit 307 is admitted.

4          (Government's Exhibit 307 received in evidence.)

5          MR. RHYNE:  Can we publish Exhibit 307, please, Page

6    1, and can we start with "Hello, Dr. Susan Su" and run all the

7    way down to "Best regards," please.

8    BY MR. RHYNE:

9    Q.  Agent Mackey, can you generally set the stage for what this

10   e-mail is requesting?

11   A.  This e-mail appears to be requesting certificates otherwise

12   known as diploma with a program --

13   Q.  And --

14   A.  -- in the program of -- Master's degree in Software

15   Programming and also listing specific courses and what the

16   courses are going to be placed on transfers.

17          MR. RHYNE:  Can we zoom into "His subjects are as

18   follows..."

19          Actually, you know what?  Let's start at the top and just

20   do it piece by piece because this is kind of small, starting

21   with "Hello, Dr. Susan Su," running down to "Password."

22          Stop there.

23   BY MR. RHYNE:

24   Q.  This is somebody stating that they need a Master's degree

25   for their uncle; correct?

1    A.  Yes.

2    Q.  In Software Programming?

3    A.  Yes.

4        MR. RHYNE:  Can we go down to the paragraph that

5    reads, "His subjects are as follows..."

6    BY MR. RHYNE:

7    Q.  And bhargavrao2003@gmail is stating the subjects that the

8    uncle needs to have; is that correct?

9    A.  Yes.

10   Q.  And it lists Introduction to Linux, Advanced Linux

11   Programming, Software Engineering, and all the way down to 12

12   different classes; correct?

13   A.  Yes.

14       MR. RHYNE:  Okay.  Can we back out of that?  Can we

15   start now where it says, "Transcripts must be issued..." down

16   to "Best regards"?

17   BY MR. RHYNE:

18   Q.  And it's stating that transcripts must be issued to these

19   following semesters:  Summer 2008, one to four subjects; Fall

20   2008, five to eight subjects; Spring 2009, nine to 12 subjects.

21   Is that correct?

22   A.  Yes.

23   Q.  And it states, "I will call you, Dr. Su, tomorrow morning";

24   is that correct?

25   A.  Yes.

1    Q.   And then it goes on to the next page, and it's signed by

2    Bob; is that correct?

3    A.   Yes.

4    Q.   Now, with respect to these dates -- Summer 2008, Fall 2008,

5    Spring 2009 -- for the dates of the transcripts, how does that

6    compare to the date of the e-mail?  What's the date of the

7    e-mail at the top?

8    A.   The date of the e-mail is April 8th, 2009.

9         MR. RHYNE:  Okay.  Can we go up to the top of that

10   e-mail and go down all the way to "Susan"?

11   BY MR. RHYNE:

12   Q.   Here, we have a response from ssu@trivalleyuniversity

13   signed in the name of Susan; correct?

14   A.   Yes.

15   Q.   And she claims to be providing an attached diploma in the

16   software programming and also a transcript; correct?

17   A.   Yes.

18        MR. RHYNE:  Can we go to Page 3, and can we just take

19   maybe the top half down to the first term?

20        There you go.  Thank you.

21   BY MR. RHYNE:

22   Q.   What do we see here, Agent Mackey?

23   A.   It's the top half of the Tri-Valley University transcript

24   for a Ram Reddy Tippani.

25   Q.   Okay.  And how do these classes compare to the classes that

1    are requested in the subjects for these transcripts?

2    A.   They match the classes in the e-mail -- the listed e-mail.

3    Q.   And as requested, it starts with Summer 2008; correct?

4    A.   Yes.

5             MR. RHYNE:  And can we go down and capture "Fall

6    2009" and "Spring 2009"?

7        Can you go down one more?

8    BY MR. RHYNE:

9    Q.   So this is Fall 2009; correct?

10   A.   Yes.

11   Q.   Passing grades of A, A, A-minus, and a B-plus; correct?

12   A.   Yes.

13   Q.   And I should have asked you:  Summer 2008 has passing

14   grades as well; correct?

15   A.   Yes it does.

16   Q.   Two A's, an A-minus, and another A?

17   A.   Yes.

18            MR. RHYNE:  Okay.  Can we go down to Spring 2009?

19   BY MR. RHYNE:

20   Q.   Spring 2009 is consistent with the request; is that

21   correct?

22   A.   Yes, it is.

23   Q.   Again with passing grades?

24   A.   Yes.

25            MR. RHYNE:  And can we go to Page 4 of Exhibit 307?

1    BY MR. RHYNE:

2    Q.   Can you tell the jury what Page 4 is?

3    A.   It's a Tri-Valley University diploma for -- issued to Ram

4    Reddy Tippani in Master of Science in Software Programming.

5    Q.   For a date of May 23rd; correct?

6    A.   May 23rd, 2009, yes.

7         (Government's Exhibit 309 marked for identification.)

8              MR. RHYNE:  Handing the witness 309 for

9    identification.

10   BY MR. RHYNE:

11   Q.   Do you recognize Exhibit 309?

12   A.   Yes, I do.

13   Q.   What is it?

14   A.   It's an e-mail exchange between Susan Su and bhargavrao2003

15   again in which they're discussing the requests -- they're

16   discussing payment, and --

17   Q.   Where did you find this?

18   A.   This was located on a hard drive in Susan Su's office.

19   Q.   Does it appear in the exhibit the way it appeared when you

20   found it?

21   A.   Yes.

22             MR. RHYNE:  Your Honor, we'd offer Exhibit 309 into

23   evidence.

24             THE COURT:  Any objection?

25             MR. BABCOCK:  No objection.

1        THE COURT:  309 is admitted.

2            (Government's Exhibit 309 received in evidence.)

3    BY MR. RHYNE:

4    Q.  Agent Mackey, this is a continuation of that other e-mail;

5    is that correct?

6    A.  Yes, it is.

7            MR. RHYNE:  Okay.  Can we go to -- can we pull up

8    Exhibit 309, and can we just capture the top of that exhibit

9    from "Re:  Credit Card Details" at the top down to "Susan,"

10   that first -- first e-mail?

11   BY MR. RHYNE:

12   Q.  Agent Mackey, this is a response from Dr. Susan Su at

13   trivalleyuniversity.org to Bhargav Rao; correct?

14   A.  Yes.

15   Q.  "Credit Card Details, Uncle" is the subject line?

16   A.  Yes.

17   Q.  And this is also on 9 April 2009?

18   A.  Yes.

19   Q.  And Dr. Su is attaching a receipt; is that correct?

20   A.  Yes.

21   Q.  And it's stating, "It is very kind that your uncle wrote us

22   a check.  You know the credit card machine charges quite

23   amount, too"; correct?

24   A.  Yes.

25   Q.  And then she's telling him, "Let him now [sic] that he can

1    also come to the graduation ceremony, taking pictures, if he

2    likes"; is that correct?

3    A.   Yes.

4    Q.   Agent Mackey, did you find other e-mails between

5    Mr. Bhargav and Susan Su in this case?

6    A.   I did.

7         (Government's Exhibit 305 marked for identification.)

8    BY MR. RHYNE:

9    Q.   I want to hand you 305 for identification.

10        Do you recognize that?

11   A.   Yes.

12   Q.   What is it?

13   A.   It's an e-mail exchange between Bob Bhargav to -- and Susan

14   Su.

15   Q.   Where did you find it?

16   A.   On a hard drive located -- a hard drive -- on a hard drive

17   located in Susan Su's office.

18   Q.   Does it look in the exhibit the way it looked when you

19   found it?

20   A.   Yes.

21        MR. RHYNE:  Your Honor, we'd offer Exhibit 305 into

22   evidence.

23        THE COURT:  Any objection?

24        MR. BABCOCK:  No objection.

25        THE COURT:  Exhibit 305 is admitted.

1        (Government's Exhibit 305 received in evidence.)

2        MR. RHYNE:  Can you publish Exhibit 305, please, and

3    can we start at the bottom of this e-mail where it says,

4    "Hello, Dr. Susan Su"?  It's about halfway.  I'm sorry.

5    BY MR. RHYNE:

6    Q.  Agent Mackey, this is a longer e-mail.  So it's smaller on

7    the screen.  I want to read it, have you confirm.  It states:

8        "Hello, Dr. Susan Su.  My relative, who is a citizen here

9    in USA, working CISCO and leaving to India for his business

10   development early next month.  He want a diploma in MBA.  He

11   will not take classes.  He will just buy a degree.  We have

12   said to him that in $3,000 a university will directly issue

13   diploma in MBA.

14       "Because of he is a citizen, he doesn't require any I-20,

15   and moreover, he is a citizen, so no problem for issuing direct

16   diploma to him.  Because other universities will take $3,000 to

17   issue direct diploma in MBA, we have thought that you will get

18   good business for just issuing diploma because all the

19   universities will do the same thing here.  We have given such

20   business to all the universities which are located here in our

21   Sunnyvale area.  This is what I said to you on the phone.

22       So, Dr. Susan Su, there is no problem for issuing diploma

23   directly for working candidates and citizens because we have

24   previously issued to some citizens through other universities,

25   but we now thought you must get business for developing our

1    university.  So we are asking you to issue diploma in MBA" --

2                MR. RHYNE:  Can we go to the next page?

3    BY MR. RHYNE:

4    Q.   -- "for my relative?  Best regards, Bob."

5         Correct?

6    A.   Yes.

7                MR. RHYNE:  Can we go up to the top of Page 1 and get

8    the response, and please grab the subject line at the top.

9    BY MR. RHYNE:

10   Q.   In the response, we see the subject line of the e-mail; is

11   that correct?

12   A.   Yes.

13   Q.   "Want to buy degree without taking classes"; correct?

14   A.   Yes.

15   Q.   And here we have somebody signing under the name of Susan

16   from ssu@trivalleyuniversity.org responding to this e-mail; is

17   that correct?

18   A.   Yes.

19   Q.   And she states, "Hi, Bob.  Okay.  If it is legal and other

20   university can do it, we can do it, too"; is that correct?

21   A.   Yes.

22   Q.   "We will still need his complete application package.  We

23   will give him nine to 11 courses materials in a DVD.  He will

24   be responsible to study these material at his own paste [sic],

25   maybe pass a test.  We can then issue him transcripts and

1    diploma in MBA.  So mail his application form and payment.

2    Then we can process as I said.  Also, the other three students'

3    credit card," question mark, "Susan."

4         Correct?

5    A.   Yes.

6         (Government's Exhibit 315 marked for identification.)

7    BY MR. RHYNE:

8    Q.   I'm going to hand you Exhibit 315 for identification.

9         Do you recognize Exhibit 315?

10   A.   Yes, I do.

11   Q.   What is it?

12   A.   It's an e-mail exchange between Susan Su and

13   bhargavrao2003, Abhilash, and preethamsam.

14   Q.   I should go back and ask you:  You did search warrants on

15   other individuals' e-mail, not just Tri-Valley University; is

16   that correct?

17   A.   Yes.

18   Q.   And one of those included Mr. Bhargav?

19   A.   Yes.

20   Q.   How many e-mails did you search of his?

21   A.   Probably thousands.

22   Q.   I mean, how many accounts?

23   A.   Two -- two accounts.

24   Q.   Does Exhibit 315 -- I'm sorry.  Where did you find 315?

25   A.   It was located on a hard drive in Susan Su's office.

1    Q.  Does it look the same way in the exhibit as it did when you

2    found it?

3    A.  Yes.

4            MR. RHYNE:  Your Honor, we'd offer 315 into evidence.

5            THE COURT:  Any objection?

6            MR. BABCOCK:  No objection.

7            THE COURT:  315 is admitted.

8            (Government's Exhibit 315 received in evidence.)

9            MR. RHYNE:  Can we publish Exhibit 315, please, and

10   can we start at -- near the top where it says, "Samuel, Bob,

11   and Abhilash" and just go down a couple paragraphs.

12   BY MR. RHYNE:

13   Q.  Agent Mackey, this purports to be an e-mail from Dr. Susan

14   Su; correct?

15   A.  Yes.

16   Q.  And she's stating to Samuel, Bob, and Abhilash, "Good work

17   on the summer tuition.  So far, almost everyone makes their

18   payment.  Shanshikanth called today to mail a check, and Anil

19   actually volunteered to pay the tuition earlier"; is that

20   correct?

21   A.  Yes.

22   Q.  "So now we only left your three situation, and here's the

23   most generous solution for you guys."

24        First of all, did I read that correctly?

25   A.  Yes.

1    MR. RHYNE:  Okay.  Can we go down a little bit more?

2    Oh, it's there.

3    BY MR. RHYNE:

4    Q.  Okay.  "In order to maintain your F-1 status in the United

5    States when transferring schools, you need to enroll in classes

6    within five months of transferring out of your previous

7    school"; is that correct?

8    A.  Yes.

9    Q.  "Your record indicates that you transferred in February and

10   are scheduled to begin classes at your new school today";

11   correct?

12   A.  Yes.

13        MR. RHYNE:  Okay.  I want to jump now down to the

14   paragraph beginning with "Regarding your summer tuition..."

15   I'm sorry.  "I checked three of your SEVIS record..."  let's

16   get that paragraph and one more below it.

17   BY MR. RHYNE:

18   Q.  This is more of that e-mail; correct?

19   A.  Yes.

20   Q.  Where Dr. Susan Su is stating, "I checked three of your

21   SEVIS record to issue your travel I-20 and to avoid any

22   complication.  I actually register all three of you full time

23   for summer courses.  Because SEVIS has the record, all three of

24   you will also have three courses in your transcript for summer

25   term.  Especially for Bob and Abhilash, you may need more

1    courses to have Ph.D. degree."

2         Is that correct?

3    A.   Yes.

4    Q.   "Regarding your summer tuition, I am giving you three the

5    most generous, unbelievable deal.  Your tuition is supposed to

6    be 3 times 2700 equals $8,100"; is that correct?

7    A.   Yes.

8    Q.   "Minus 20 percent off equal $6,480"; is that correct?

9    A.   Yes.

10   Q.   "I am giving you all your three a total of $3,000.  This is

11   the most generous, good deal, and it is nonnegotiable";

12   correct?

13   A.   Yes.

14   Q.   And these were the three individuals that you asked Dr. Su

15   about during your interview; is that correct?

16   A.   Yes.

17   Q.   During your review of the electronic evidence in this case,

18   did you look for e-mail correspondence -- or I should say other

19   e-mail correspondence pertaining to articulation agreements?

20   A.   Yes, I did.

21        (Government's Exhibit 320 marked for identification.)

22   BY MR. RHYNE:

23   Q.   I'm going to hand you what we've marked as 320 for

24   identification, have you take a look at it.

25        Do you recognize Exhibit 320?

1    A.   I do.

2    Q.   What do you recognize it as?

3    A.   It's an e-mail exchange between Susan Su and a Bjorn

4    Frogner.

5    Q.   Can you spell the name?

6    A.   Bjorn, B-j-o-r-n, Frogner, F-r-o-g-n-e-r.

7    Q.   Where did you find this e-mail?

8    A.   On a hard drive located in Susan Su's office.

9    Q.   Does the exhibit look the same way the actual e-mail looked

10   when you saw it?

11   A.   Yes.

12        MR. RHYNE:  Your Honor, we'd offer 320 into evidence.

13        THE COURT:  Any objection?

14        MR. BABCOCK:  No objection.

15        THE COURT:  Perhaps after the examination on

16   Exhibit 320, we can take our break.

17        MR. RHYNE:  Very good, your Honor.

18     Can we publish Exhibit 320?

19        THE COURT:  Exhibit -- Exhibit -- let's get through

20   this exhibit.

21     Oh.  I'm sorry.  It's admitted in evidence.  Yes.  Thank

22   you.

23        (Government's Exhibit 320 received in evidence.)

24   BY MR. RHYNE:

25   Q.   Agent Mackey, can you just generally summarize what this

1    e-mail correspondence is about?

2    A.   It appears to be an e-mail exchange commenting on an offer

3    to purchase an articulation agreement.

4    Q.   Okay.  I want to focus on what you talked about regarding

5    the purchase of the articulation agreement.

6          MR. RHYNE:  Can we just go to the top of the e-mail,

7    "Re" all the way down to "Susan"?

8    BY MR. RHYNE:

9    Q.   This is the final e-mail in that chain, is that correct, or

10   at least on this document?

11   A.   Yes.

12   Q.   And it reads as follows:  "Bjorn, that's okay.  All right.

13   I just talked to my brother and other members.  So we decide to

14   give you the position of Vice President of Academic Affair.

15          "We want this to be a long-term working position.  In the

16   future when TVU is in a position to pay, we will pay you full

17   time.  Right now, it will be in contract format and in-need

18   basis.  Like right now, the two AA's, we will pay $1,000 for

19   the two signed ones with any university.

20          "If you agree, I'm going to add you to the team and go

21   ahead talking to my connection at Beijing to try to have any

22   university there sign the contract.  Of course, we shall meet

23   when you are back.  Susan."

24          Is that correct?

25   A.   Yes.

1      MR. RHYNE:  And can we go to Page 2 and go down to

2  the point where it says, "On Monday, May 5th, 2008," and go

3  down to where it's signed "Susan"?

4  BY MR. RHYNE:

5  Q.   This is an earlier e-mail in that exchange; is that

6  correct, Agent Mackey?

7  A.   Yes.

8  Q.   And when Dr. Su used the abbreviation "AA," did you know

9  what she was referring to?

10  A.   Yes.  She spells it out earlier in the chain as an

11  articulation agreement.

12      MR. RHYNE:  Okay.  Can we zoom in, Ms. Hughes, where

13  it says "Articulation Agreement" there?  Yes, all the way down.

14  BY MR. RHYNE:

15  Q.   Agent Mackey, here we see the term "Articulation

16  Agreement"; correct?

17  A.   Yes.

18      MR. RHYNE:  I think that's a good time to break, your

19  Honor.

20      THE COURT:  All right.  Let's take our second morning

21  recess.

22      THE CLERK:  All rise.

23     Court is in recess for 15 minutes.

24           (Recess taken.)

25      THE COURT:  All right.  We're back on the record.

1    Agent Mackey is still on the stand.

2        Mr. Rhyne, your witness.

3            MR. RHYNE:  Thank you, your Honor.

4    BY MR. RHYNE:

5    Q.   Agent Mackey, before we continue with the articulation

6    agreement e-mails that we were discussing previously, I want to

7    ask a couple follow-up questions with respect to the e-mail

8    exchange where the individual is requesting to purchase a

9    degree for his uncle.

10   A.   Okay.

11   Q.   I'm publishing 307, Page 4.

12        This is that -- that degree; is that correct?  It was

13   attached to the e-mail?

14   A.   Yes.

15   Q.   For the name Ram Reddy Tippani; is that correct?

16   A.   Yes, it is.

17   Q.   Did you find Ram Reddy Tippani's name in any other

18   literature for Tri-Valley University?

19   A.   I did.

20            MR. RHYNE:  May I approach, your Honor?

21            THE COURT:  You may.

22            MR. RHYNE:  Actually, may I mark this as 100C?

23        (Government's Exhibit 100C marked for identification.)

24   BY MR. RHYNE:

25   Q.   I'm going to hand you what's been marked as 100C for

1    identification and ask you if you recognize it.

2    A.   I do.

3    Q.   What is it?

4    A.   It's a printout from the Tri-Valley University website of

5    the student profile page.

6    Q.   Okay.  And did you find Mr. Tippani's name on here?

7    A.   I did.

8    Q.   I'm going to publish Exhibit 100C.

9         This is --

10              MR. BABCOCK:  Was this admitted already?

11              MR. RHYNE:  Oh.  I'm sorry.

12   BY MR. RHYNE:

13   Q.   Does this web page look the same way it did when you

14   captured it?

15   A.   Yes.

16              MR. RHYNE:  Your Honor, we'd ask that 100C be

17   admitted.

18              THE COURT:  Any objection?

19              MR. BABCOCK:  No objection.

20              THE COURT:  100C is admitted.

21            (Government's Exhibit 100C received in evidence.)

22   BY MR. RHYNE:

23   Q.   Okay.  I'm going to direct your attention here near the

24   bottom of the page.  Do you see where it says, "Ram Reddy

25   Tippani"?

1    A.   Yes.

2    Q.   And it's tough to read even on the Elmo, but I'm going to

3    read it in.  This is under the student profile; is that

4    correct?

5    A.   Yes.

6    Q.   And it states, "Ram Reddy Tippani, Ph.D., Computer Science

7    and Engineering Department, Major Software Programming"; is

8    that correct?

9    A.   Yes.

10   Q.   It states, "Education:  BE, Computer Science Engineering,

11   Osmania University" in the year 2000.  "MS, Software

12   Programming, Tri-Valley University, 2009"; is that correct?

13   A.   Yes.

14   Q.   It states, "Profile:  Ram completed his MSCS in 2009 at TVU

15   and is currently working for a company"; is that correct?

16   A.   Yes, it does.

17   Q.   And this is the top, is that correct, Tri-Valley

18   University's student profile?

19   A.   Yes.

20          MR. RHYNE:  Mr. Noble, can we mark this as

21   Exhibit 320A?

22          THE CLERK:  Okay.  I'll give you a sticker.  Hold on.

23       (Government's Exhibit 320A marked for identification.)

24   BY MR. RHYNE:

25   Q.   I'd like to approach and hand you Exhibit 320A for

1    identification.

2          Do you recognize that?

3    A.   I do.

4    Q.   What is it?

5    A.   It's part of a previous e-mail chain we discussed between

6    Susan Su and Bjorn Frogner.

7    Q.   Okay.  Where did you find that e-mail?

8    A.   On a hard drive located in Susan Su's office.

9    Q.   Is it in the same or substantially the same condition as it

10   was when you found it?

11   A.   Yes.

12         MR. RHYNE:  Your Honor, we'd offer Exhibit 320A into

13   evidence.

14         THE COURT:  Any --

15         MR. BABCOCK:  No objection.

16         THE COURT:  320A is admitted.

17         (Government's Exhibit 320A received in evidence.)

18   BY MR. RHYNE:

19   Q.   Agent Mackey, why did you note this particular e-mail in

20   your investigation?

21   A.   Because prior to Susan Su requesting the purchase of the

22   articulation agreements, she provides Mr. Frogner with SEVP

23   materials and instructions on exactly what she needs for an

24   articulation agreement, the regulations.

25   Q.   I'm going to publish Exhibit 320A.

1          This is the top e-mail; is that correct?

2     A.   Yes.

3     Q.   From 5 May 2008?

4     A.   Yes.

5     Q.   And in this particular e-mail exchange, I want to direct

6     your attention to an attachment.  Dr. Su provides an attachment

7     to this individual; is that correct?

8     A.   Two attachments, yes.

9     Q.   Okay.  I want to go to Page 3.

10         Do you recognize this document?

11    A.   Yes, I do.

12    Q.   And this is one of the attachments to the e-mails; correct?

13    A.   Correct.

14    Q.   What is this particular document generally?

15    A.   It's instructions that SEVP provides to individuals

16    applying for approval to -- for the school to enroll foreign

17    students.

18    Q.   And have you seen this in the normal course of your duties?

19    A.   I have.

20    Q.   I want to direct your attention to Page 6.  At the top,

21    this is a particular portion of this literature that applies to

22    F schools; is that correct?

23    A.   Yes.

24    Q.   And in that literature in this attachment, it states that

25    it need -- a school needs articulation agreements; is that

1    correct?

2    A.   Yes, it does.

3    Q.   Evidence that its credits have been and are accepted

4    unconditionally by at least three nationally recognized

5    accredited institutions or public institutions of higher

6    learning; is that correct?

7    A.   Yes.

8    Q.   And in this e-mail chain, we have Dr. Su providing this to

9    somebody; is that correct?

10   A.   Yes.

11   Q.   Agent Mackey, during your investigation and your review of

12   the e-mails in this case, did you find e-mail exchanges between

13   Dr. Su and some of her students?

14   A.   Yes.

15       (Government's Exhibit 327 marked for identification.)

16   BY MR. RHYNE:

17   Q.   Okay.  I'm going to hand you what's been marked as

18   Exhibit 327 for identification.

19       Do you recognize that?

20   A.   I do.

21   Q.   What is it?

22   A.   It's an e-mail exchange between Susan Su and a Dr. Gemello

23   at San Francisco State University.

24   Q.   Where did you find this e-mail?

25   A.   On a hard drive located in Susan Su's office.

1    Q.   Is it in the same or substantially the same condition as

2    when you found it?

3    A.   Yes.

4         MR. RHYNE:  Your Honor, we'd offer Exhibit 327 into

5    evidence.

6         MR. BABCOCK:  No objection.

7         THE COURT:  Exhibit 327 is admitted.

8         (Government's Exhibit 327 received in evidence.)

9         MR. RHYNE:  Can we publish Exhibit 327, Page 1?

10   BY MR. RHYNE:

11   Q.   I want to talk about this exhibit, Agent Mackey, before we

12   get to those e-mails with the students.

13        MR. RHYNE:  And can we zoom in to the top, please.

14   BY MR. RHYNE:

15   Q.   Agent Mackey, I want to direct your attention to the date

16   of the e-mail.  That date is February 6th, 2009; is that

17   correct?

18   A.   Yes.

19   Q.   How does this date compare to the date of the original

20   articulation agreement that was submitted to SEVIS?

21   A.   The San Francisco State University articulation agreement

22   was dated February 2nd, 2009, so four days after the date on

23   that agreement.

24   Q.   And this particular e-mail purports to be from Susan Su to

25   somebody at San Francisco State; is that correct?

1    A.   Yes.

2    Q.   And in the e-mail, she's requesting a copy of the

3    articulation agreement; is that correct?

4    A.   She's requesting an articulation agreement, yes.

5    Q.   She states --

6         MR. RHYNE:  And can we zoom in to the paragraph below

7    the website address?

8    BY MR. RHYNE:

9    Q.   It begins with "I am writing to you again with a request."

10   And here we have Dr. Su writing, quote, "I am writing to you

11   again with a request to build a course-transferring

12   articulation agreement with San Francisco State University.  I

13   know that there is the articulation agreement office handling

14   all undergraduate courses articulation agreement"; correct?

15   A.   Yes.

16   Q.   So here we have somebody purporting to be Susan Su

17   requesting an articulation agreement from a school that she

18   already represented she had one with; is that correct?

19   A.   Yes.

20   Q.   Now, I'd like to get to some of these e-mails that we were

21   discussing with respect to the students.

22        (Government's Exhibit 330 marked for identification.)

23   BY MR. RHYNE:

24   Q.   I'm handing you what's been marked Exhibit 320 [sic] for

25   identification.

1          Do you recognize that?

2     A.   Yes, I do.

3     Q.   What is it?

4     A.   It's an e-mail between Susan Su and a Harman Jeet.

5               MR. BABCOCK:  I'm sorry.  What number are we on?

6               MR. RHYNE:  330.

7               MR. BABCOCK:  Thank you.

8     BY MR. RHYNE:

9     Q.   Where did you find this e-mail?

10    A.   On a hard drive located in Susan Su's office.

11    Q.   Does it look the same way now that it did then?

12    A.   Yes.

13              MR. RHYNE:  Your Honor, we'd offer Exhibit 330 into

14    evidence.

15              THE COURT:  Any --

16              MR. BABCOCK:  No objection.

17              THE COURT:  Exhibit 330 is admitted.

18              (Government's Exhibit 330 received in evidence.)

19    BY MR. RHYNE:

20    Q.   Agent Mackey, is it true in summary this is an e-mail

21    exchange between a purported student and Dr. Susan Su at

22    Tri-Valley University?

23    A.   Yes.

24    Q.   And the sum and substance is the student is requesting

25    information about classes; is that correct?

1    A.   Yes.

2         MR. RHYNE:  Could we publish Exhibit 330, Page 1, and

3    can we go from "Thursday, 5/11/09," all the way down to where

4    it says, "Thanks.  In regards, Harman"?

5    BY MR. RHYNE:

6    Q.   Agent Mackey, I'd like to start at the bottom of this

7    portion of the e-mail exchange.  The person is writing, "Susan.

8    Hi, Susan.  I want to say that as per your referral system, I

9    have referred my friend Vishal Dasa according to your referral

10   procedure.  Just make sure that I get 15 percent off on

11   first-semester tuition fee.

12        "And one more thing I want to ask, that there is no slide

13   uploaded in course material for Healthcare Management class.

14   So can you please tell me from where I can get that.  Thanks."

15        As we move up, we see a response from Dr. Su; is that

16   correct?

17   A.   Yes.

18   Q.   Dated 5 November 2009?

19   A.   Yes.

20   Q.   At this point, were you aware of the general dates of the

21   semester systems at Tri-Valley University?

22   A.   Yes.

23   Q.   And where would this fall, November of 2009 -- or 5

24   November?

25   A.   This would be about a month before the end of the semester.

1    Q.  And in this e-mail, Dr. Su is writing, "Sure.  Vishal is in

2    your referral folder.  We will mail you the referral check in

3    11's week while the 10W everyone complete the tuition.

4       "We are still search for course material for that courses,

5    will upload material as soon as possible.  In this case, you

6    will have good grade for now and will always in the classroom

7    till all material are there, and also an instructor will teach

8    it."

9       Is that correct?

10   A.  Yes.

11      (Government's Exhibit 331 marked for identification.)

12  BY MR. RHYNE:

13  Q.  I'm going to hand you now what's been marked as Exhibit 331

14  for identification and ask you if you recognize it.

15  A.  Yes.

16  Q.  What is it?

17  A.  It's an e-mail between -- I should probably spell this

18  first name.  V-a-i-b-h-a-v, last name N-y-a-l-k-a-l-k-a-r -- to

19  Susan Su.

20  Q.  Where did you find this e-mail?

21  A.  On a hard drive located in Susan Su's office.

22  Q.  Does it look now like it did when you found it?

23  A.  Yes.

24      MR. RHYNE:  Your Honor, we'd offer Exhibit 331 into

25  evidence.

1          THE COURT:  Any objection?

2          MR. BABCOCK:  No objection.

3          THE COURT:  331 is admitted.

4              (Government's Exhibit 331 received in evidence.)

5          MR. RHYNE:  Can we publish Exhibit 331, Page 1,

6     please, and can we start at the bottom where it says, "On

7     Tuesday, September 22nd, 2009," and go down to where it says,

8     "Best regards, Susan."

9     BY MR. RHYNE:

10    Q.   And this is generally, again, somebody inquiring about

11    classes at Tri-Valley University; is that correct?

12    A.   That's correct.

13    Q.   And here we have Susan Su writing, "Vaibhav, I will try to

14    change.  How about..."  She's referring to some different

15    courses; is that correct?

16    A.   Yes.

17    Q.   "BA356 is a newly added course.  Do not have instructor

18    yet, just reading material.  BA300 is also reading, but you

19    will have a good grade.  BA380 is videotape.  Let me know if

20    these courses work for you.  If so, I will make the changes."

21         Is that correct?

22    A.   Yes.

23         MR. RHYNE:  Okay.  Can we go up to the next e-mail up

24    in the chain, the "Tuesday, September 22nd"?  It's just a few

25    lines.

1      Next one up, please.  11:52 is the time.

2    BY MR. RHYNE:

3    Q.  Here, we have a response from Susan Su; is that correct?

4    A.  Yes.

5    Q.  Telling the student, "They are 5:30 to 8:30 p.m. Pacific

6    time, but these courses you" -- "you do not need to attend the

7    lec.  If this is okay with you, I will make the changes"; is

8    that correct?

9    A.  Yes.

10      (Government's Exhibit 332 marked for identification.)

11    BY MR. RHYNE:

12    Q.  Agent Mackey, I'm going to hand you now 332 for

13    identification and ask you if you recognize it.

14    A.  Yes, I do.

15    Q.  Is this another e-mail you found on Susan Su's computer?

16    A.  Hard drive in her office, yes.

17    Q.  Okay.  Does it look now like it did then?

18    A.  Yes, it is.

19      MR. RHYNE:  Your Honor, we'd offer Exhibit 332 into

20    evidence.

21      THE COURT:  Any objection?

22      MR. BABCOCK:  No objection.  Sorry.

23      THE COURT:  332 is admitted.

24      (Government's Exhibit 332 admitted into evidence.)

25      MR. RHYNE:  Could we publish Exhibit 332?

1      BY MR. RHYNE:

2      Q.   Agent Mackey, I want to direct your attention to the

3      portion of the e-mail where it reads, "Hi, Susan.  I have a few

4      questions as follows..."

5           Do you see that?

6      A.   Yes.

7      Q.   And that e-mail reads from there, "When can I get my

8      student ID?  I can send my pic for that as well.  For my

9      classes, there is no ongoing meeting as well as no instructor.

10     How does it work?  Kindly explain.  I am hoping that these

11     three classes would be counted for my Ph.D.  Kindly let me

12     know.  Thanks, Anuja," A-n-u-j-a.

13          Is that correct?

14     A.   Yes.

15          MR. RHYNE:  Okay.  Can we go up to the e-mail that's

16     immediately above it?

17     BY MR. RHYNE:

18     Q.   Here, we have a response from Susan Su; is that correct?

19     A.   Yes.

20     Q.   Stating, "Anuja, please send in your pictures for student

21     ID.  For the courses, several courses are in developing stage

22     and are still waiting for instructors.  So now just reading the

23     course materials, and they will be counted towards your Ph.D.,

24     and normally you will have good grade for these courses."

25          Is that correct?

1    A.   Yes.

2         (Government's Exhibit 333 marked for identification.)

3    BY MR. RHYNE:

4    Q.   I'm going to hand you 333 for identification and ask you if

5    you recognize it.

6    A.   Yes, I do.

7    Q.   Another e-mail you found on a hard drive in Susan Su's

8    office?

9    A.   Yes.

10   Q.   Does it look now like it looked when you found it?

11   A.   Yes.

12        MR. RHYNE:  We'd offer Exhibit 333 into evidence.

13        THE COURT:  Any objection?

14        MR. BABCOCK:  No, your Honor.

15        THE COURT:  333 is admitted.

16        (Government's Exhibit 333 received in evidence.)

17        MR. RHYNE:  Can we publish Page 1 of Exhibit 333 and

18   zoom in on the very center of the e-mail that begins with, "On

19   Saturday, September 19th, 2009," and go down to "Susan"?

20        Thank you.

21   BY MR. RHYNE:

22   Q.   Agent Mackey, is this e-mail similar to the other ones,

23   that a student is requesting information about classes?

24   A.   Yes.

25   Q.   And this is a response from Dr. Su stating, "Vamsee, good

1    to hear from you.  We switched the course to BA300, Business

2    Communication.  This course currently, the instructor is

3    currently still not in yet.  So most activity is reading, and

4    we will normally give good grade.  The fees are the same.  Let

5    me know if you need anything else.  Susan."

6        Is that correct?

7    A.   Yes.

8    Q.   Now, Agent Mackey, as part of your testimony in this trial,

9    you're going to come back and testify again before the jury; is

10   that correct?

11   A.   Yes.

12   Q.   That will be regarding the financial analysis that you did

13   in this case?

14   A.   Yes.

15        MR. RHYNE:  Your Honor, we don't have any further

16   questions for Agent Mackey.

17        THE COURT:  Thank you, Mr. Rhyne.

18     Mr. Babcock, questions for Agent Mackey?

19        MR. BABCOCK:  Yes, your Honor.  Thank you.

20     Are these your copies or my copies?

21        MR. RHYNE:  Oh, yeah.

22                        **CROSS-EXAMINATION**

23   BY MR. BABCOCK:

24   Q.   Good afternoon, Agent Mackey.

25   A.   Good afternoon, sir.

1    Q.   So you -- you were assigned this case starting when?

2    A.   Early May of 2010.

3    Q.   Okay.  And we know that you executed some search warrants

4    at Ms. Su's home as well as the school on January -- was it

5    18th or 19th, 2011?

6    A.   19th.

7    Q.   The 19th.

8         You -- do you recall what day of the week it was?

9    A.   I believe it was a Monday.  I could be wrong, though.

10   Q.   Do you recall Ms. Su was home with her two daughters?

11   A.   Yes.

12   Q.   Right?

13   A.   Correct.

14   Q.   And you showed up at about 6:00 in the morning?

15   A.   A little after 6:00, yes.

16   Q.   And there were what, 15 or 20 agents?

17   A.   Probably there -- in that range.

18   Q.   I assume no one gave Ms. Su a call ahead of time and said,

19   "Hey, we're coming over.  We're going to search your place"?

20   A.   No.

21   Q.   Okay.  Was she still in a bathrobe or pajamas when you

22   first saw her?

23   A.   By the time I saw her, she was already downstairs.  The

24   entry team encountered her first.

25   Q.   Okay.  You weren't the first one to the door?

1    A.   No.

2    Q.   Some other people went in and -- and cleared the residence

3    for lack of a better word?

4    A.   That's correct.

5    Q.   Made sure there were no firearms or anything dangerous?

6    A.   Correct.

7    Q.   But you didn't really expect to find any in this case;

8    right?

9    A.   Well, we never know what to expect.

10   Q.   Well, hadn't you done -- you had been doing some

11   surveillance of Ms. Su before that; right?

12   A.   Yes.

13   Q.   Followed her to and from school?  Had an idea of what she

14   was doing with her time?

15   A.   Yes.

16   Q.   You knew that she had two daughters?

17   A.   Yes.

18   Q.   It was actually -- it may have been a Monday.  Do you

19   recall because her daughters had to go to school that day?

20   A.   Yes.

21   Q.   Does that sound right?

22   A.   Correct.

23   Q.   And you ended up having a very lengthy interview with her?

24   A.   Yes.

25   Q.   As I understand it, you talked to her for what, some five

1    or six hours?

2    A.   That range, yes.

3    Q.   Good portion of the day; right?

4    A.   Yes.

5    Q.   This was an interview that she agreed to voluntarily.  She

6    wasn't required to talk to you; right?

7    A.   No, she was not.

8    Q.   You told her that she didn't have to talk to you?

9    A.   Yes.

10   Q.   She didn't have a lawyer or anyone with her --

11   A.   No.

12   Q.   -- right?

13        It was just her and you and, I think, another agent; right?

14   A.   Correct.

15   Q.   And at this point, you had been investigating her for what,

16   about eight months or so --

17   A.   Yes.

18   Q.   -- give or take?

19        Now, as of January 2011, TVU had upwards of 1500 students?

20   A.   A little bit more than that.

21   Q.   Around 1700?

22   A.   Yes.

23   Q.   Something like that; right?

24   A.   Yes.

25   Q.   The vast majority of which were of Indian nationality;

1    right?

2    A.   Yes.

3    Q.   Around -- I think you said 90 percent or so?

4    A.   95 percent of the students that they had reported to us.

5    Q.   You mentioned that the reason your investigation started

6    was you got an anonymous phone call; right?

7    A.   We received many tips through the course of this case, but

8    yes, that's -- it started with a tip.

9    Q.   And you started looking at the website as well as the SEVIS

10   entries for the school, and you mentioned one of the things you

11   noticed was that about 95 percent of the students were Indian?

12   A.   Yes.

13   Q.   Is that some sort of -- raise some sort of red flag for

14   you?

15   A.   It can be indicative of fraud.

16   Q.   The -- and I'm sorry.  You mentioned the numbers.  I don't

17   remember off the top of my head, but as of May 2010, there were

18   what, around 900 students?

19   A.   Yes.

20   Q.   Okay.  And as we have seen, before TVU qualified to admit

21   foreign students, it was -- it had a much smaller number?

22   A.   Yes.

23   Q.   Around 30 or so?

24   A.   A few-line representation in the I-17, yes.

25   Q.   That's right.  We'll get to that a little bit later.

1    Now -- so -- and she was -- sorry.  The school was given

2    permission to admit foreign students starting in February 2009?

3    A.  Yes.

4    Q.  And as we've seen from some of the documents that you

5    reviewed here this morning, she had been seeking approval --

6    contemplating and seeking approval to get approved by SEVIS --

7    or SEVP for a good portion of 2008; right?

8    A.  Yes.

9    Q.  The -- if you'll recall, the petition, the I-17, was

10   submitted in October, right, of 2008?

11   A.  It was actually initially submitted in September.

12   Q.  Okay.  And we've seen some of the -- from some of the

13   e-mails you just reviewed that even a few months before that,

14   she was looking for other schools to -- to recognize the

15   courses from TVU?

16   A.  Yes.

17   Q.  So sometime between February -- between February of 2009

18   and January of 2011, basically a two-year period, a little bit

19   shy, TVU went from being a very small school; right?

20   A.  Yes.

21   Q.  Isn't that fair to say?

22   Whether it was exactly 30 students or -- I don't know -- 25

23   or 40, it was -- whatever students she had, it was a small

24   school before she was approved by SEVIS?

25   A.  Yes.

1    Q.  And within a two-year period, the school -- I wouldn't

2    characterize it as a big school, but TVU growing from -- would

3    it be fair to say growing from around 30 students to around

4    1700 students in about 23 months is a pretty drastic change for

5    a school?

6    A.  Yes.

7    Q.  I haven't done the percentages, but it's a pretty good

8    growth rate?

9    A.  It is.

10   Q.  And before I leave the topic, I do want to ask you about

11   the -- the number of students she started with because I think

12   you said that that was one of the concerns that you had, which

13   was that the I-17 only listed the school as having, like, 30

14   people, and you were referring, I assume, to -- if we look at

15   Exhibit 1, Page 3, you were referring to Box No. 22?

16   A.  I was referring to both that and the representations to the

17   site visit inspector coupled with the capacity that was

18   confirmed by the site visit inspector.

19   Q.  The petition only asked for information about the average

20   number of students in this -- in this case as of October 2008;

21   right?

22   A.  That question does ask that, yes.

23   Q.  Is there a form -- is there a place on this petition where

24   it asks the petitioner, "What" -- "how many students do you

25   plan to admit if you're approved by SEVIS?"

1    A.    No, there's not.

2    Q.    And if you need to look at it real quick, I can certainly

3    give it to you.

4    A.    No, there's not.

5    Q.    There's not, is there?

6    A.    No.

7    Q.    There's no -- there's no place in there that says, "If we

8    approve your petition and you're allowed to admit foreign

9    students, you're only allowed to grow by whatever, a hundred

10   percent a year"?

11   A.    There actually is a regulation that says if you have a

12   material change at your school, which would include expanding,

13   you would have to resubmit I-17 and resubject yourself to a

14   site visit.

15   Q.    Is this one of the regulations -- the Code of Federal

16   Regulation?

17   A.    Yes.

18   Q.    Okay.  Do you know what number that is?

19   A.    It would be in 28 -- 8 CFR 213.3.  You'd have to look at

20   the actual regulation to find that.

21   Q.    Okay.  Well, you have studied the Immigration Code?

22   A.    I have.

23   Q.    You are an immigration agent for lack of a -- you're a

24   Special Agent whose job it is to enforce the immigration laws;

25   right?

1    A.   Yes.  That's sometimes what I have to do, yes.

2    Q.   And as part of that job, you had to study the Immigration

3    Code --

4    A.   Yes.

5    Q.   -- right?

6         Do you know what kind of training Ms. Su received, if any,

7    in immigration laws when she filled out this petition?

8    A.   I don't know what she took upon herself to study.  I'm

9    aware that she took an online training session and claimed that

10   she had read the regulations.

11   Q.   We actually know a little bit about what she studied

12   because you pulled her transcripts; right?

13   A.   Yes.

14   Q.   Which is Exhibit 706.  This was a transcript from Ms.

15   Su's -- Dr. Su, I should say.  I never refer to her as

16   "Doctor," but I should -- from her studies at UC Berkeley?

17   A.   Yes.

18   Q.   And her degree was in Engineering; right?

19   A.   Yes.

20   Q.   Mechanical Engineering, if I'm reading that correctly?

21   A.   Yes.

22   Q.   Do you see -- and then there's a listing of the courses

23   that she took while she was in Berkeley starting in 1996, I

24   think.  Do you see any sort of courses in -- any legal courses?

25   A.   No, I don't.

1    Q.   What about any education courses?

2    A.   No.

3    Q.   Or, you know, like, public-administration-type courses?

4    A.   No.

5    Q.   It's all engineering, is it not?

6    A.   It's quite impressive.  It's all engineering.

7    Q.   Everything from Mechanical Engineering to the Theory of

8    Plastic, I think, and Heat Conduction and Thermodynamics,

9    nothing that would appear at least on its face to be relevant

10   training for understanding the immigration laws; right?

11   A.   No.

12   Q.   Though obviously she had been to school for a number of

13   years; right?

14   A.   Yes.

15   Q.   And we know that she had done some teaching before?

16   A.   Yes.

17   Q.   We know that from Professor Liou at San Francisco State?

18   A.   Yes.

19   Q.   But as far as -- at least as far as Professor Liou said,

20   her duties at San Francisco State were teaching classes, not in

21   the -- on the administration side of the university --

22   A.   Yes.

23   Q.   -- right?

24        So -- so you looked at -- when you were assigned this case,

25   you looked at the I-17.  You saw that at least in 2008 the

1    school was only -- had an average of 30 students; right?

2    A.   That was what was represented on there, yes.

3    Q.   And as of May 2010, almost two years later or a year and a

4    half or so after the petition was filled out, TVU -- you

5    checked in SEVIS and saw that it had around 900 students?

6    A.   Yes.

7    Q.   And that raised a flag to you because it was a pretty quick

8    growth rate?

9    A.   Yes, it was.

10   Q.   Although there's nothing in -- there's nothing in the I-17

11   that says you're not allowed to grow or that you have to update

12   that information if you do grow?

13   A.   That would be in the regulations.

14   Q.   I understand.  You've got to go find a regulation

15   somewhere.

16       Is there anywhere in the I-17 that says you have to

17   regularly update SEVIS if you get new professors or different

18   professors than you had originally listed with your petition?

19   A.   I don't think -- using that specificity, no.

20   Q.   Not as far as you're aware?  You would probably know;

21   right?  You studied these regulations, and you're familiar with

22   these forms?

23   A.   I have reviewed the regulations.  I can't say for certain

24   whether or not I would know the specific things in there or

25   not.

1    Q.   You also -- you -- you weren't the only agent in this case.

2    There were a number of agents from your office also involved in

3    the investigation; right?

4    A.   That's correct.

5    Q.   And one of the things that you and your colleagues did

6    during the course of your investigation was interview students?

7    A.   Yes.

8    Q.   We've seen some e-mails between Ms. Su and some of the

9    students.  About how many students did you interview during the

10   course of your investigation?  How many TVU students did you

11   interview?

12   A.   Did I personally interview?

13   Q.   Well, let's broaden it.  How many did you and your

14   colleagues in relation to this case -- how many TVU students

15   were interviewed?

16   A.   The vast majority of students were spread out throughout

17   the country.  So there would be outlying offices that

18   interviewed those students.  Our office might have been

19   involved in, you know, maybe a hundred students.  It's kind of

20   a rough guess, but everybody else was outside California.

21   Q.   Your office?  You mean here in the Bay Area?

22   A.   Yes.

23   Q.   Okay.  And how many did your colleagues in other offices

24   interview?

25   A.   It was over a thousand.  I don't know the exact number.

1    Q.   Did you -- I'm sorry.  We've been turning this off and on,

2    but I'm trying to keep the glare down.

3        The -- a couple of the -- a couple of the documents you

4    reviewed with Mr. Wade -- I mean -- I'm sorry -- Mr. Rhyne, one

5    of which was Exhibit 100 -- this is -- this was a -- whoops --

6    a screenshot from the website; is that right?

7    A.   Yes.

8    Q.   Which is in exceedingly small type, but is there anything

9    unusual to you to -- part of -- I don't know -- can you read

10   that or no?

11   A.   I can -- I can make it out.

12   Q.   I guess I'm just wondering, you know -- in the first part

13   of the -- the first part of the -- the first couple paragraphs,

14   there's sort of an overall description; right?

15   A.   Sure.

16   Q.   And the third paragraph goes into a description of the

17   location, "gentle hills, beautiful vineyards, historical oaks"?

18   A.   Yes.

19   Q.   That seems pretty accurate to me.  Does that sound sort of

20   like the Pleasanton area?

21   A.   Yeah.  The Pleasanton area is very nice, yes.

22   Q.   Is there a problem with having a description of this school

23   in school materials?

24   A.   No.

25   Q.   Well, I haven't checked, but probably if you looked at a

1    lot of schools websites, they'd have similar types of

2    descriptions; right?

3    A.   Well, it's a very ambitious description, but yeah.

4    Q.   Are you referring to the academics?

5    A.   Just the number of programs offered, the types of programs

6    offered.  It looks like an ambitious undertaking to me.

7    Q.   An ambitious undertaking.

8         Well, I would certainly agree with that, but there's

9    nothing illegal about having ambition to start a school?

10   A.   No.

11   Q.   When was the first time that you spoke with Ms. Su?

12   A.   Probably during --

13   Q.   Approximately, just so the jury --

14   A.   Past -- December of 2010.

15   Q.   The first time you met Ms. Su face to face was in January;

16   correct?

17   A.   No.  It was in December.

18   Q.   Oh, that's right.  So when you sat down with Ms. Su on

19   January 19th, it was not -- not only not the first time you

20   spoke with her, it wasn't even the first time you met with her?

21   A.   That's correct.

22   Q.   Okay.  There had been some -- you described this process by

23   which your office with you participating had enrolled

24   student -- I say "students" in quotes there for the record --

25   in TVU that weren't really people?

1    A.   They weren't students at Tri-Valley University.

2    Q.   And were they real people?

3    A.   The names matched with names in the SEVIS database.

4    Q.   Okay.  And the way this was done at least in part -- I'm

5    sorry.  Not the way that was done.

6         And then later on, you asked Ms. Su for transcripts for

7    these students; right?

8    A.   Yes.

9    Q.   As well as other records?

10   A.   Yes.

11   Q.   You asked her to send you documentation about these

12   students that you had actually enrolled and you knew hadn't

13   attended any classes or gone to any -- done any sort of

14   coursework?

15   A.   Yes.

16   Q.   And the way that you did that was to call Ms. Su and tell

17   her that these students were at the airport and they were being

18   held in immigration detention --

19   A.   Yes.

20   Q.   -- right?

21   A.   Well, if they were being held, they wouldn't be admitted

22   until we have verified their status.

23   Q.   I understand, but you told her that they were in the

24   custody of immigration; right?

25   A.   You can say that, yes.

1   Q.  And that they weren't going to get out unless she would

2   verify that they were actually attending Tri-Valley University?

3   A.  Well, they can also be turned around, sent back, which is

4   common practice.

5   Q.  Fair enough.

6       They wouldn't get into the country without documentation?

7   A.  Yes.

8   Q.  Okay.  And in fact, she validated -- she -- when you

9   interviewed her on January 19th, that's exactly why she told

10  you she did it; right?

11  A.  That's what she told us, yes.

12  Q.  The -- that was also the reason she gave you -- or one of

13  the reasons why -- she didn't want people to be failed?

14  A.  Yes.

15  Q.  In other words, if they -- if they got bad grades and they

16  failed, that would affect their status in the United States --

17  A.  Yes.

18  Q.  -- right?

19      She was worried that they could be deported?

20  A.  Yes.

21  Q.  And she specifically told you she didn't want any of her

22  students to get deported, did she not?

23  A.  Yes.

24  Q.  Okay.  Now, one of the things is we've seen from the

25  documents her sister and brother-in-law were both -- both

1  signed as designated school officials?

2  A.  Correct.

3  Q.  In other words, they agreed to be two of the people who

4  monitored the status of students and dealt with the SEVIS

5  system; right?

6  A.  Correct.

7  Q.  But your understanding from Ms. Su was that both her sister

8  and her brother-in-law have regular jobs outside the school and

9  never planned to be that involved with the school?

10  A.  Yes.

11  Q.  And in fact, she said she had interviewed someone at that

12  point -- someone at some point to hire to do this job, and the

13  person wanted around $50,000 a year?

14  A.  Yes.

15  Q.  And you mentioned -- well, do you know when exactly that

16  interview took place?

17  A.  The interview that we got the information from Mrs. Su or

18  the interview of the potential DSO?

19  Q.  The interview by Mrs. -- by Dr. Su of the potential DSO.

20  A.  I have no idea.  She didn't tell us.

21  Q.  By the time you searched the school in January of 2011, the

22  school had some -- some finances because of all the students;

23  right?

24  A.  Yes.

25  Q.  Did you have any understanding of what kind of finances the

1    school had as of February 2009 when it was first approved --

2    A.   Yes.

3    Q.   -- approved by SEVIS?

4    A.   Yes.

5    Q.   What was that?

6    A.   They supplied some accounting forms in their I-17 showing

7    their -- how much money they had and how much money they

8    expected to make, and it was a couple thousand dollars.  I

9    think -- I think they said they had $6,000 at the time, and

10   they were planning on making several thousand dollars a year.

11   Q.   It didn't appear at least as of February 2009 that TVU had

12   the money to hire somebody for a $50,000 salary, did they?

13   A.   In February 2009, no.  They also didn't seem to have the

14   finances to pay for instructors, either.

15   Q.   Well, that would depend on what instructors charged,

16   wouldn't it?

17   A.   That's true.  That's true.

18   Q.   And what they were paid.

19        Now, we've seen that eventually later on Dr. -- at some

20   point, the school was bringing in money; right?

21   A.   Yes.

22   Q.   And as a matter of fact, your office not only searched Ms.

23   Su's homes as well as the business, they also seized all of the

24   bank accounts related to the school; right?

25   A.   All the bank accounts that we could identify.

1    Q.   Yes, as well as the PayPal account -- some PayPal accounts?

2    A.   Yes.

3    Q.   Including those broadly in bank accounts.

4         And in fact, you seized upwards of what, about $2 million

5    in assets?

6    A.   About $5 million.

7    Q.   $5 million in assets.

8         Money which you're now trying to forfeit to the U.S.

9    Government?

10   A.   We're holding it pending a decision by the Court for

11   forfeiture.

12   Q.   And if it is forfeited, it will go to the U.S. Government;

13   right?

14   A.   Yes.

15   Q.   I assume as part of your investigation, you did some sort

16   of check analysis of what kind of entity TVU was.  It was a

17   corporation?

18   A.   Yes, it was a corporation.

19   Q.   Do you know what kind of corporation it is?

20   A.   No.

21   Q.   Okay.  Do you know who owns TVU?

22   A.   I know that Susan Su is the CEO, and she's listed herself

23   as the president and owner on corporation documents.

24   Q.   Okay.  Do you know if there are any other owners besides

25   Ms. Su?

1   A.   Initially, when Tri-Valley first started, I believe she

2   listed her brother as a 25-percent owner, and she subsequently

3   took him off.

4   Q.   Okay.  And any other owners that you're aware of?

5   A.   No.

6   Q.   Okay.  Now, at some point -- at some point -- well, strike

7   that.

8        Do you know what, if anything, Ms. Su was able to pay

9   herself -- well, Dr. Su was able to pay herself from TVU in

10  2008?

11  A.   You mean as a salary?

12  Q.   Yeah.

13  A.   I have no idea in 2008.

14  Q.   Are you aware of any evidence that she paid herself

15  anything?

16  A.   No.

17  Q.   What about in 2009?

18  A.   In 2009, they took in some money, but I don't believe she

19  paid herself a salary.  She just started spending from the

20  account.

21  Q.   And can you tell me how much she spent from the accounts in

22  2009 that was just for her as opposed to being for the school

23  somehow?

24  A.   I'd have to look at the financial records again.  I believe

25  she bought the Mercedes in 2009, and then she started buying

1    properties after that.

2    Q.   You mentioned the properties.   The properties were

3    purchased in Ms. Su's name; right?

4    A.   Yes.

5    Q.   In 2009, TVU at that point had been in existence for,

6    depending on what part of 2009 you started counting, a year, a

7    little more, a little less; right?

8    A.   I believe they indicated in their I-17 that they opened up

9    operation in March of 2008.

10   Q.   Right.

11       So as of -- as of 2009, TVU didn't have, say -- for

12   example, five or ten years' worth of financials to show to a

13   bank; isn't that right?

14   A.   Yes.

15   Q.   Are you aware of just generally the financial condition of

16   the banking industry in 2009?

17   A.   Yes.

18   Q.   And it was not the easiest time in the world to get a loan,

19   was it?

20   A.   No, it was not.

21   Q.   If a corporation, a school, came to a bank in 2009, had

22   about a one-year track history, and the first year looked like

23   it made $6,000 -- is that what you said? -- do you think any

24   bank in its sound mind would have approved a loan for

25   properties being purchased?

1     A.   I can speculate, but I'm more familiar with obtaining

2     consumer loans as opposed to corporate loans.

3     Q.   I don't think it takes much speculation.  It doesn't sound

4     very likely, does it?

5     A.   I'd guess no.

6     Q.   At least not without some sort of cosigner?

7     A.   Yes.

8     Q.   Does that sound fair?

9     A.   Yes.

10    Q.   How many computers did you -- you and your colleagues

11    either search -- either copy or take with you on January 19th?

12    A.   I'd have to look at our inventory sheet.  I know it was

13    probably somewhere in the range of 70 pieces of media and

14    terabytes of data.

15    Q.   You said "pieces of media."  That includes, like, hard

16    drives and flash drives and things of that nature?

17    A.   That's correct.

18    Q.   As well as laptops as well as PC's?

19    A.   Yes.

20    Q.   Okay.  And these were both at the school itself as well as

21    at her residence?

22    A.   A majority were found at the school.  I believe there were

23    a few items at the residence as well.

24    Q.   Did you know the school was going to be shut down on

25    January 19th?

1    A.   I knew they were going to be pending a -- a notice of

2    intent to withdraw the SEVIS approval.  We don't have the

3    authority to shut down a school.  We don't have the authority

4    to initiate the process of pulling their authorization to

5    foreign students.

6    Q.   Do you know if the school had any -- did the school ever

7    operate after January 19th?

8    A.   It did not, at least not with State approval.

9    Q.   How many -- it seems like -- just using Exhibit 333 as an

10   example, we have seen a lot of e-mails from this e-mail address

11   ssu@trivalleyuniversity.org?

12   A.   Yes.

13   Q.   That appeared to be the primary e-mail that Dr. Su used?

14   A.   You can say that, yes.

15   Q.   Were there any other e-mails that she used for work?

16   A.   She also had -- yes.  She also had an SUS, and I believe

17   there was a TVU and a few other accounts.

18   Q.   Okay.  And about how many other e-mails of Dr. Su's did you

19   review?

20   A.   Thousands.

21   Q.   Tens of thousands?

22   A.   Well, I didn't go through every single e-mail line by line.

23   I conducted word searches primarily, but there were definitely

24   tens of thousands of files, e-mails, et cetera, on the

25   computers.

1    Q.  I want to talk to you about a couple of the ones that you

2    reviewed.  Specifically, you were shown some e-mails in March

3    of 2009 to and from Bob Bhargav?

4    A.  Yes.

5    Q.  And specifically regarding his uncle obtaining a degree;

6    right?

7    A.  Yes.

8    Q.  And the -- essentially, Mr. Bhargav indicated that his

9    uncle wanted an MBA?

10    A.  Yes.

11    Q.  And looked into how much he thought a fair price would be

12    to obtain an MBA?

13    A.  Yes.

14    Q.  And Ms. -- sorry -- Dr. Su, looking at Exhibit 305, on

15    March 17th, 2009, said she could do it if it was legal; right?

16    A.  That's what it says.

17    Q.  And she also said she would need him to complete an

18    application and sent him courses on a DVD, which he would be

19    responsible for studying --

20    A.  Yes.

21    Q.  -- at his own "paste."  That appears to be a typo; right?

22    A.  Yes.

23    Q.  Now, this gentleman -- this gentleman was a citizen, or at

24    least that's what Mr. Bhargav told Dr. Su; right?

25    A.  That's what he told her, yes.

1    Q.   And said that he was a citizen, and he didn't need this for

2    immigration purposes?

3    A.   That's what he appears to be telling her in the e-mail.

4    Q.   Did you do any sort of analysis of how many e-mails from

5    students Dr. Su had to deal with roughly, for example, per day

6    in the fall of 2009?

7    A.   No, but I have a general idea.

8    Q.   Yeah?  And what's your general idea?

9    A.   In the fall of 2009, there were very few.

10   Q.   Okay.  What about by the fall of 2010?

11   A.   There were quite a few -- quite a few inquiries coming out

12   at that period.

13   Q.   The -- is this the first time that you've investigated a

14   school?

15   A.   No.

16   Q.   Roughly how many times have you investigated schools?

17   A.   Probably been involved at this point -- over a dozen

18   schools.

19   Q.   Okay.  And are these schools -- are these typically schools

20   that have a heavy population of students from other countries?

21   A.   Yes.

22   Q.   Okay.  You've investigated other schools where there was a

23   large percentage of the student -- the student body was from

24   India?

25   A.   We've been involved in other cases with large Indian

1    populations.

2    Q.   Okay.  One of the things that you testified about with Mr.

3    Rhyne was the relationship of Tri-Valley -- Tri-Valley

4    University with ABS Consultancy?

5    A.   Yes.

6    Q.   And this is -- as I understand it, was basically an

7    agreement to try to find students to refer to and enroll in

8    TVU --

9    A.   Yes.

10   Q.   -- right?

11        And in fact, there was a formal memorandum of understanding

12   which was already admitted as Exhibit 303B.

13   A.   Yes.

14   Q.   That was signed by Dr. Su and individuals from ABS.

15        Now, this -- TVU is not the first school to use a

16   consultancy like this, is it?

17   A.   No.

18   Q.   There are a lot of schools that rely on agencies to

19   facilitate the admission of foreign students; right?

20   A.   From my experience particularly with the unaccredited

21   schools, they have a harder time drawing students, yes.

22   Q.   And in fact, ABS is -- consultancy is far from the only

23   consultancy that operates in India; right?

24   A.   No.  India has a lot of consultancies, yes.

25   Q.   And as -- part of the agreement was that -- that ABS agreed

1    to recruit students from South Asia; right?

2    A.   Yes.

3    Q.   As well as students in the USA?

4    A.   Yes.

5    Q.   And to explain the university rules and regulations and to

6    do some advertising?

7    A.   Yes.

8    Q.   And among other things, they agreed to pick up students

9    from the airports when they arrived in the United States?

10   A.   Yes.

11   Q.   As well as give them temporary and permanent

12   accommodations?

13   A.   Yes.

14   Q.   And they agreed to do this for a fee of -- do you know who

15   drafted this agreement?

16   A.   I can't tell from that document, no.

17   Q.   Did you find an original of this -- an original, unsigned

18   of this anywhere in the computers of Dr. Su's?

19   A.   I believe there would be an e-mail back and forth at one

20   point in time.

21   Q.   Do you remember who the -- like, as an attachment?

22   A.   Yes.

23   Q.   Do you remember who the first e-mail -- what party it was

24   from?

25   A.   Not off the top of my head, no.

1    Q.   Okay.  As part of the -- their fee for doing this, ABS must

2    be given a referral amount of 20 -- 21 percent --

3    A.   Yes.

4    Q.   -- right?

5         Okay.  Now, as of May 2008, it looked like Dr. Su was

6    looking for other schools that would recognize a credit from

7    TVU; right?

8    A.   Yes.

9    Q.   And I'm referring to the e-mails with Bjorn Frogner.

10        And one of the things that you mentioned was there was an

11   attachment to one of the e-mails from Dr. Su to Mr. Frogner on

12   May 5th, 2008, which included some documents from the SEVIS

13   website; right?

14   A.   Yes.

15   Q.   Including a checklist -- I don't know if it's a checklist

16   but document entitled "How to Prepare for a Site Visit" --

17   A.   Yes.

18   Q.   -- as well as something called Attachment A.

19        Do you know if that attachment is an attachment to how to

20   prepare for a site visit?  Is there an attachment on the

21   website?

22   A.   It was an attachment in that particular e-mail.

23   Q.   Okay.  It was an attachment to the e-mail, but if you look

24   at the document, there's an Attachment A.  Is that -- do you

25   know if that's how it looked on the website in 2008?

1    A.   I don't know off the top of my head, no.

2    Q.   Okay.  Flipping to Page 6, there are different --

3    Attachment A has a list of different documents that are needed

4    for different types of schools; right?

5    A.   Correct.  Correct.

6    Q.   And this is part of the I-17 application to get approved to

7    admit foreign students; right?

8    A.   That's guidance for that, yes.

9    Q.   That's the documentation they're talking about?

10   A.   Yes.

11   Q.   Now, Page 6 is the part -- the section that would apply to

12   schools such as TVU; that is, a public -- private or public

13   degree granting institution or seminary.  Is that your

14   understanding?  That's the part you went over with Mr. Rhyne.

15   Do you have some question about it now?

16   A.   No, I don't.

17        THE COURT:  Mr. Babcock, could you say the exhibit

18   number, please.

19        MR. BABCOCK:  Yeah.  I'm sorry.  This is Exhibit 320.

20        THE COURT:  Thank you.

21        MR. BABCOCK:  This has already been received.

22   BY MR. BABCOCK:

23   Q.   Looking at the documents needed, that includes an original

24   signed I-17; right?

25   A.   Right.

1    Q.   As well as an original signed I-17A with the signatures of

2    the P/DSO and DSO's --

3    A.   Yes.

4    Q.   -- as well as the owner, a copy of any state license and

5    registration or proof of an exemption?

6    A.   Yes.

7    Q.   Now, as we -- as we've seen at the -- TVU was not

8    accredited by the State of California in 2008 because the State

9    of California was not requiring accreditation --

10   accreditation -- accreditation in 2008?

11   A.   It wasn't approved.  The body the principal was supposed to

12   operate was not in operation at that time.

13   Q.   Right.  And then this part that I highlighted here, which

14   is what you testified about -- this -- the school is supposed

15   to provide evidence that its credits have been accepted

16   unconditionally by at least three nationally recognized --

17   recognized accredited institutions or public institutions of

18   higher learning, and there's a cite to a document on the

19   website; right?

20   A.   Yes.

21   Q.   Do you know if that was like a model articulation

22   agreement?

23   A.   The document that's linking to it?

24   Q.   Yeah.

25   A.   I believe it was additional guidance on how to create an

1    articulation agreement.

2    Q.   Then it says, "Institutions with articulation agreements

3    must follow the same regulations listed for institutions

4    providing letters"?

5    A.   Yes.

6    Q.   What are the letters they're referring to?

7    A.   For vocational schools, they're to provide employment

8    letters, so a letter from a graduate of a school from an

9    employer stating that this individual graduated, and based on

10   what he learned at his school, he's qualified in this field.

11   So it would be for vocational or if they have a visa.

12   Q.   So in other words, if the school had a graduate, if they

13   got a job using that education as -- as a basis for getting the

14   job?

15   A.   Right.  That would fall under the M visa category for

16   vocational students.

17   Q.   Why is it listed here in the -- as a section for private or

18   public degree-granting institutions?  This is the part that

19   applies to TVU; right?

20   A.   That's not the way I'm reading it.

21   Q.   Well --

22   A.   I believe that there are two different standards for two

23   different visa classes, and --

24   Q.   Do vocational -- and are vocational schools subject to

25   the -- to the same requirements as TVU's subject to?

1    A.   No.  They would have different requirements per regulation.

2    Q.   Okay.  Well, TVU applied as a private degree-granting

3    institution; right?

4    A.   I believe there's a reference down there to M programs.

5    That's referring to the M visa.  Now, Tri-Valley applied as an

6    F school.  So the regulations related to the F visa apply to

7    that.  Without taking a closer view of this, I can't exactly

8    tell you why there's references to M visa in there.

9    Q.   All these documents are supposed to be provided either with

10   the I-17 or in follow-up requests or at the site inspection;

11   right?

12   A.   Yes.

13            THE COURT:  Can I see counsel at sidebar?

14                 (Unreported sidebar.)

15            MR. BABCOCK:  Thank you, your Honor.

16   BY MR. BABCOCK:

17   Q.   What is your understanding of when a student transfers -- a

18   student -- sorry -- that's on a -- is on an I-20 and then an

19   F-1 visa -- of how long that student has to transfer to another

20   school?

21   A.   That goes back to the regulations.  If you already have

22   depleted a year of study, then you can take a break like a

23   summer break.  So you're permitted extra time.  If you've just

24   come to the United States and you've -- you immediately try to

25   transfer from another year, you've got to make this transfer

1    more quickly.

2    Q.   And do you know exactly how quickly?

3    A.   I'd have to look at the regulations, consult with SEVP.

4    Q.   Do you know how long a student has to enroll in the school

5    that issued an I-20 once they arrive in the United States?

6    A.   Yes.

7    Q.   How long is that?

8    A.   30 days.

9    Q.   30 days.

10        If they transfer -- if they're already enrolled in one

11   school and they want to transfer to a different school at some

12   point, is the period longer or shorter than 30 days?

13   A.   I'd have to reread the regulations.

14   Q.   Isn't it true, Agent Mackey, that a student -- the school

15   has to provide the -- when they provide SEVIS an address for

16   the student -- an address where they can be reached in the

17   United States?

18   A.   The school's required to report the physical address of the

19   student.

20   Q.   Right.  And we've seen in some of those SEVIS

21   screenshots -- you were here when Ms. Warner testified --

22   A.   Yes.

23   Q.   -- right?

24        One of the -- one of the -- one of the fields that's

25   supposed to be filled out is an address for the student?

1    A.   Yes.

2    Q.   And when you were testifying earlier about the addresses

3    on -- in particular the address on El Camino Real in -- was it

4    Sunnyvale?

5    A.   Yes.

6    Q.   You said that address was used as the address in SEVIS for

7    approximately how many of the students?

8    A.   That particular apartment was used for over 500 students.

9    Q.   And that was when?

10   A.   That was throughout.  So when I looked in May, it was about

11   500.  By the time the school was shut down, they were using a

12   variation of different apartments in that complex and 620 Iris

13   Avenue.

14        So by -- by January of 2011, a lot of the records were just

15   555 East El Camino Real, no apartment, or 620 Iris Avenue, no

16   apartment, or sometimes threw in apartment numbers that

17   appeared to be just random apartment numbers thrown in there.

18   Q.   Now, are you aware of any instance when -- is that the

19   address -- strike that.

20        Is that the address that -- for example, is that address

21   available -- the address in SEVIS -- listed by the school -- is

22   that address available to anyone in Homeland Security who's

23   trying to get in touch with the student?

24   A.   Anybody who has access to SEVIS.

25   Q.   And is that anyone in the Department of Homeland Security?

1    A.   Not everybody has access to SEVIS.

2    Q.   Fair enough.

3         Any agents in Homeland Security?

4    A.   That have access to SEVIS.

5    Q.   Not all agents have access to SEVIS?

6    A.   No.

7    Q.   Okay.  Agents in your department, which is HSI; right?

8    A.   Yes.

9    Q.   Homeland Security Investigations?

10   A.   Correct.

11   Q.   Do all the agents in HSI have access to SEVIS?

12   A.   Not necessarily all of them.

13   Q.   Okay.

14   A.   I would say most should have it, but we have hundreds of

15   databases, and we don't have -- maintain access to all those

16   databases.

17   Q.   When a student from another country comes to the United

18   States -- and are they required to give -- for example, if they

19   land at San Francisco International Airport, are they required

20   to give a physical address to anyone at the airport?

21   A.   Yes.

22   Q.   Okay.  Who do they have to give -- report that address to?

23   A.   Customs and Border Protection on what's called an I-94

24   admission departure form.

25   Q.   Okay.  And that address could be the same or different than

1    the address that's listed in SEVIS?

2    A.   Sure.

3    Q.   Okay.  They have to give an address in the United States to

4    Customs and Border Protection?

5    A.   They have to give their arrival address.

6    Q.   Okay.  What does that mean, "arrival address"?

7    A.   Well, if you're coming on an F-1 visa and you're planning

8    to stay four years to complete your studies, your arrival

9    address may not be where you end up at.  You may end up two

10   years later with a dorm address, for example.

11   Q.   Do you -- are students arriving from foreign countries

12   required to have a range for housing and already paid for

13   housing before they get here?

14   A.   No.

15   Q.   The logistics can be quite difficult; right?

16   A.   Sure.

17   Q.   If you're coming from Bangalore, for example, and you've

18   never been to the Bay Area --

19   A.   Yes.

20   Q.   -- you don't have anybody here to find an apartment for you

21   or shop around type of thing?

22   A.   Yes.

23   Q.   So it's not usual, is it, for schools to facilitate --

24   schools such as TVU or other schools that have a lot of

25   students from foreign countries to help facilitate them

1    obtaining a local address?

2    A.   Not -- I wouldn't think that would be odd.

3    Q.   Okay.

4         THE COURT:  Ladies and gentlemen, we're going to

5    break about two minutes early today, which is right now.

6         So thank you for your close attention throughout this

7    morning's proceedings.  We'll be in recess again until

8    8:30 a.m. tomorrow morning.  Remember my prior admonition.

9    Don't talk to anybody about the case.  Don't gather or get

10   information about the case.  We'll see you tomorrow morning at

11   8:30.

12        Thank you.

13        THE CLERK:  All rise.

14   (Proceedings heard out of the presence of the jury:)

15        THE COURT:  We're outside the presence of the jury.

16        The Court was observing that Ms. Su had risen from counsel

17   table and was speaking in a tone of voice loud enough that I

18   could hear that she was speaking, although I couldn't hear what

19   she was saying.  She was carrying her laptop.  She was

20   attempting to signal Mr. Babcock.

21        That behavior had interrupted the attention of at least a

22   couple of the jurors, and because the -- it had become enough

23   of a distraction that I was concerned about the level of all

24   the jurors to observe testimony, and since we were only a

25   couple minutes away from our normal breaking time, I called the

1      break in the proceedings.

2          MR. BABCOCK: I appreciate that.

3          THE COURT: And I will say earlier that I had had

4      counsel at the sidebar and at the sidebar had indicated that

5      the reason I had called the sidebar, since it was probably

6      15 minutes ago, was that Ms. Su was speaking. Again, I

7      couldn't hear what she was saying, but she was talking loud

8      enough that I could hear it.

9      She was attempting -- it appeared to me she was attempting

10     to direct her comments to Mr. Babcock, and I just wanted him to

11     be aware of it frankly because of the potential for distraction

12     to the jurors. It really just was a courtesy to defense

13     counsel and also because perhaps Ms. Su had something of

14     importance to tell.

15     Does anyone want to say anything further before I admonish

16     the defendant?

17         MR. RHYNE: No, your Honor. The only other thing

18     that I was going to add, if there's an opportunity to do so, is

19     the content of our other sidebar earlier and Agent Mackey's

20     testimony.

21         THE COURT: Sure. Let's do this. Let's do this, and

22     I can put that on the record.

23     Mr. Babcock, anything further you want to say?

24         MR. BABCOCK: No, your Honor.

25         THE COURT: Ms. Su, you can't do that. Okay? And by

1    "that," I mean you can't stand up and signal your lawyer and

2    speak in a tone of voice loudly enough that I can hear you. I

3    know this case is important to you, but when you do that, it's

4    distracting to the jury, and it makes it difficult for them to

5    do their job, which is an important job.

6        Parenthetically, I would say it is my opinion you do not

7    help yourself when you do that. My opinion about that is

8    neither here nor there. I'm ordering you to do it. So if you

9    have something that is very important Mr. Babcock's co-counsel

10    whose name -- I apologize. I've forgotten what it is.

11        MR. MORLEY: Mr. Morley. Kevin Morley.

12        THE COURT: Mr. Morley is sitting right next to you.

13    You can pass a note to Mr. Morley if Mr. Babcock is not seated

14    there. Mr. Morley will use his professional judgment to

15    determine whether he needs to pass that information to Mr.

16    Babcock or do something else.

17        But you're to remain seated, you are not to speak loudly

18    enough that the jurors or I can hear you, and that's the

19    Court's order.

20        We did have an additional sidebar, which was prior to the

21    one I just mentioned. At the sidebar, Mr. Rhyne indicated that

22    he -- that his next set of questions would ask Agent Mackey

23    whether, in Agent Mackey's interview of Dr. Su, she had paid

24    taxes on the income that she had received from Tri-Valley

25    University and that she indicated that she hadn't, and Mr.

1    Rhyne raised that appropriately outside the jury's hearing to

2    see whether the defense counsel would raise an objection.

3        Defense counsel did make an objection, and I sustained the

4    objection on the grounds that the defendant in this case is not

5    charged with tax fraud, that the failure to pay -- an admission

6    of a failure to pay taxes is very bad conduct and that the

7    admission of that testimony might unduly prejudice the jury

8    against the defendant.

9        Is there anything further we need to say about that?

10            MR. RHYNE:  I don't believe so, your Honor.

11            THE COURT:  Mr. Babcock?

12            MR. BABCOCK:  No.

13            THE COURT:  Gentlemen, anything further we need to

14    say on any other topic?

15            MR. BABCOCK:  I think we're good.

16            MR. RHYNE:  I think we're good, too.

17            THE COURT:  Let me ask the Government how we appear

18    now that we have -- that we've had our first week and a day of

19    trial, how the Government feels about its initial time

20    estimate.

21            MS. WEST:  I think we're still on -- I think we're on

22    track for what we had originally estimated.

23            THE COURT:  Very good.  Okay.

24            MR. BABCOCK:  Remind me what that was.  It's not a

25    trick question.  It's okay.

1          MR. RHYNE:  Probably the end of next week; right?

2          MS. WEST:  Yeah.  I think that some point next week

3    and by the end of next week certainly, the Government would

4    rest, sooner if possible, but we'll -- I don't know.

5          THE COURT:  All right.  I'm going to place something

6    on the record, which is -- in the state court, I would have

7    done this as a matter of course.  I understand the practice is

8    somewhat different -- different in Federal Court, but

9    nonetheless I love sunshine and disclosure.

10         I've become aware that Ms. West has her hat in for the

11   Marin County Superior Court, and as a sitting judge, I received

12   forms from the judicial -- from the evaluation people at the

13   State Bar, and I intend to fill out that form for Ms. West

14   positively.

15         I do that in my official role as a sitting judge, and the

16   fact that I intend to do that and that I will do that is not a

17   reflection of any partiality or bias on my part in favor of or

18   against the Government or the defendant.  As I said a moment

19   ago, most federal judges, when they're not going to recuse,

20   don't put anything on the record.  But if I was a defendant or

21   the Government, I would want to know this fact.

22         And so without inviting anyone to do anything, I simply am

23   making that disclosure.

24         MR. BABCOCK:  I appreciate that, your Honor.

25         MR. RHYNE:  Thank you.

1          MS. WEST:  Just since your Honor has made that

2     statement just to be clear, it is both for Marin and for San

3     Francisco in case that affects anything.

4          THE COURT:  All right.  Well, either I'll read that

5     form more closer or I'll get another form.  It will be one of

6     the two.  I don't remember which one it is.

7          MR. BABCOCK:  I don't expect she'll need it.  She'll

8     get it.

9          MS. WEST:  That's true.

10          MR. BABCOCK:  You wouldn't be the first federal

11     prosecutor on the Marin bench.

12          THE COURT:  I -- I remember when I was still

13     practicing at my law firm and I had my name in for the state

14     court bench, and judges started to say things in hearings and

15     in a lot of cases.  Not everybody knew, and I appreciate Ms.

16     West.

17       I don't know who in the room knew, but I did feel that it

18     was better practice for me to make that disclosure.  So --

19          MS. WEST:  Thank you.

20          THE COURT:  -- thank you all.  I'll see you tomorrow

21     morning.

22          MR. RHYNE:  Thank you, your Honor.

23          THE CLERK:  All rise.

24          THE COURT:  Oh.  This can be off the record.

25                    (Proceedings adjourned at 1:36 p.m.)

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5        I, James C. Pence, Federal Official Realtime Court

 6   Reporter, in and for the United States District Court for the

 7   Northern District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14
                         Dated this 12th day of June, 2014.
15

16

17   _____
                 JAMES C. PENCE, RMR, CRR, CSR NO. 13059
18               FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```