1        Pages 1548 - 1710

2        UNITED STATES DISTRICT COURT

3        NORTHERN DISTRICT OF CALIFORNIA

4        BEFORE THE HONORABLE JON S. TIGAR

5    UNITED STATES OF AMERICA,        )
                                      )
6        Plaintiff,                   )
                                      )
7    v.                               )    NO. 11-CR-00288 JST
                                      )
8    SUSAN XIAO-PING SU,              )
                                      )    San Francisco, California
9    Defendant.                       )    Tuesday
                                      )    March 18, 2014
10   _____)    A.M. Session

11                  **TRANSCRIPT OF PROCEEDINGS**

12                        **VOLUME 9**

13   <u>**APPEARANCES**</u>:

14
     For Plaintiff:      Department of Justice
15                       United States Attorney's Office
                         1301 Clay Street
16                       Suite 340S
                         Oakland, CA 94612
17              BY:  **HARTLEY M.K. WEST**
                     **WADE M. RHYNE**
18                   **ASSISTANT U.S. ATTORNEYS**

19
     For Defendant:
20
                         Law Offices of Erik Babcock
21                       717 Washington St., 2d Floor
                         Oakland, CA 94607
22              BY:  **ERIK G. BABCOCK**
                     **KEVIN MORLEY**
23                   **ATTORNEYS AT LAW**

24

25   Reported by:  Kelly Polvi, CSR, RMR, FCRR, Contract Reporter

1                        I N D E X

2    Tuesday, March 18, 2014

3    <u>GOVERNMENT WITNESS</u>                          <u>PAGE</u>  <u>VOL.</u>

4    NAVEEN KUNDUR
     (SWORN)
5    Direct Examination................................. 1565    9
     Cross-examination.................................. 1584    9
6    Redirect Examination............................... 1598    9

7

8    DAVID RAMIREZ
     (SWORN)
9    Direct Examination................................. 1599    9
     Cross-examination.................................. 1611    9

10

11   JASON MACKEY
     (PREVIOUSLY SWORN)
12   Direct Examination by Mr. Rhyne.................... 1618    9
     Cross-Examination by Mr. Babcock.................. 1683    9
13   Redirect Examination by Mr. Rhyne................. 1698    9
     Recross-Examination by Mr. Babcock................ 1701    9

14

15

16

17

18

19

20

21

22

23

24

25

| | <u>E X H I B I T S</u> | | | |
|---|---|---|---|---|
| | **<u>GOVERNMENT'S EXHIBITS</u>** | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
| 3 | 16 | | 1672 | 9 |
| 4 | 17 | | 1675 | 9 |
| 5 | 18 | | 1675 | 9 |
| 6 | 209 | | 1604 | 9 |
| 7 | 209A | | 1604 | 9 |
| 8 | 209B | | 1605 | 9 |
| 9 | 500 | | 1638 | 9 |
| 10 | 501 | | 1638 | 9 |
| 11 | 501A | | 1638 | 9 |
| 12 | 501B | | 1638 | 9 |
| 13 | 502 | | 1641 | 9 |
| 14 | 503 | | 1641 | 9 |
| 15 | 503A | | 1641 | 9 |
| 16 | 504 | | 1668 | 9 |
| 17 | 505 | | 1668 | 9 |
| 18 | 505A | | 1668 | 9 |
| 19 | 50B | | 1668 | 9 |
| 20 | 506 | | 1669 | 9 |
| 21 | 507 | | 1669 | 9 |
| 22 | 508 | | 1669 | 9 |
| 23 | 509 | | 1669 | 9 |
| 24 | 510 | | 1670 | 9 |
| 25 | 511 | | 1670 | 9 |

| | E X H I B I T S (Cont.) | | | |
|---|---|---|---|---|
| | GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
| 3 | 511A | | 1670 | 9 |
| 4 | 512 | | 1639 | 9 |
| 5 | 513 | | 1639 | 9 |
| 6 | 513A | | 1639 | 9 |
| 7 | 515 | | 1634 | 9 |
| 8 | 516 | | 1639 | 9 |
| 9 | 600 | | 1645 | 9 |
| 10 | 601 | | 1647 | 9 |
| 11 | 603 | | 1654 | 9 |
| 12 | 605 | | 1657 | 9 |
| 13 | 606 | | 1664 | 9 |
| 14 | 608 | | 1661 | 9 |
| 15 | 609 | | 1659 | 9 |
| 16 | 650 | | 1633 | 9 |
| 17 | 651 | | 1633 | 9 |
| 18 | 653 | | 1633 | 9 |
| 19 | 700 | | 1645 | 9 |
| 20 | 701 | | 1649 | 9 |
| 21 | 702 | | 1656 | 9 |
| 22 | 704 | | 1665 | 9 |
| 23 | 705 | | 1661 | 9 |
| 24 | 705A | | 1667 | 9 |
| 25 | 800 | | 1676 | 9 |

<u>Tuesday - March 18, 2014</u>                        <u>8:26 A.M.</u>

P R O C E E D I N G S

---oOo---

(Heard outside the presence of the jury.)

**THE COURT:**  We're on the record.  We're outside of the presence of the jury.  Counsel and counsel -- excuse me, counsel and the defendant, the case agent, are all at counsel table.

I understand that counsel had something to discuss before the jury comes in this morning.

**MS. WEST:**  Yes, Your Honor.  We reevaluated our witness list yesterday and made the decision to cut out certain witnesses, and we intend to rest today.

**THE COURT:**  All right.  Will Agent Mackey be doing his financial analysis?

**MS. WEST:**  He will.

**THE COURT:**  And did we finish yesterday -- we concluded a witness yesterday.

**MS. WEST:**  So we have two short witnesses this morning and then Agent Mackey will testify for a while and I'm sure some cross, but I do think we will finish before the court day ends.

So we advised Mr. Babcock of that, right after we made our official decision on it, and --

**MR. BABCOCK:**  Possible that they may finish before lunch,

1   would be my guess, although Agent Mackey has a fair bit to go

2   through.  But 40 witnesses on their list that they're not

3   calling, so we're a little ahead of schedule apparently.

4        I'm told that -- I'm prepared to go forward today,

5   though, in all honesty, I could use another day.  But we could

6   reevaluate that later this morning.

7        We'll have a Rule 29 and some jury instruction issues to

8   deal with, as well, whenever the Court prefers.

9        THE COURT:  Does the defendant anticipate putting on a

10  case?

11       MR. BABCOCK:  I believe that Ms. Su is probably going to

12  testify.

13       THE COURT:  All right.

14       MR. BABCOCK:  I'll have that final conversation after the

15  Government rests, but that seems to be her inclination.

16       THE COURT:  Let me, before I say what I think a good

17  schedule is, just mention a couple of other things.

18       The jury instructions and the verdict form need to be in

19  a good condition before both sides have rested.  And so -- or

20  if we don't do that, then the trial needs to go dark while we

21  put them in that condition before I instruct the jury and

22  you-all close, which is the order in which I will do it.

23       The jurors will hear last from you, not from me.

24       MR. BABCOCK:  Right.

25       THE COURT:  And during jury selection, I advised the

1    jurors that, while trial would not be in session on Friday,

2    that I would expect them to deliberate on Friday.  But given

3    the schedule that they were provided at the start of trial, I'm

4    sure that none of them is planning to come in this Friday.  And

5    so I think we'll have more luck if -- in avoiding any

6    scheduling problems if they were told that they would not be

7    deliberating this Friday but if they were in deliberations a

8    week from this Friday we would expect them to be here.

9        Does the -- let me think about this.

10       **MR. BABCOCK:**  On that same topic --

11       **THE COURT:**  Yes.  Before that, let me just say a couple

12   of other things.

13       Playing out the possibilities in my mind, one possibility

14   is that I advise the jury, as I just indicated, we have our

15   jury instruction and special verdict form conference this

16   afternoon, we break a little early today after the Government

17   rests, tomorrow morning we hear, once and for all, whether the

18   defendant will be testifying, if she does testify.

19       The other possibility is she indicates that she's not

20   going to testify, in which case the Court will have had to make

21   whatever decisions need to be made about the jury instructions.

22   And I don't even yet know what those decisions are.

23       Anyway.  Mr. Babcock.

24       **MR. BABCOCK:**  I would say -- I mean, it's hard to know.

25   I would say if Ms. Su testifies tomorrow morning I don't think

1    it's going to be an all-day affair, and I would certainly think

2    that there would be time for her testimony and the Court's

3    instruction.  And quite likely -- I don't know how long it's

4    going to take the Court to read the instructions, but probably

5    40 minutes or 30 or 40 minutes, and at least the beginning of

6    opening statements, unless the Court were to continue them over

7    to the next day.

8        THE COURT:  Mm-hm.

9        MR. BABCOCK:  And I don't really have preference on that

10   issue.

11       I do sort of have a preference -- by the time I learned

12   that the Government anticipated resting today, Ms. Su had

13   already gone back to Pleasanton and I had other things to deal

14   with so that I couldn't be with her personally again last night

15   after we -- I learned the news, so -- but I do --

16       THE COURT:  I understand you will be making a

17   well-informed and well-supported request that your client be

18   allowed -- that she not be put to the choice of testifying

19   immediately upon conclusion of the Government's case today.

20       MR. BABCOCK:  I do think --

21       THE COURT:  Let me ask --

22       MR. BABCOCK:  -- we're well ahead of schedule.

23       THE COURT:  We are.

24       I want to ask one question of the Government so I can try

25   to keep all the plates spinning at the end of the balls here.

1     If Ms. Su testifies, do you have a sense, at a gross

2  order of magnitude, how long cross-examination would be?

3     **MS. WEST:**  Potentially quite long.  It would depend on

4  the scope of her direct.  It could be trimmed down a lot.  We

5  kind of left it fluid, depending on what happens on direct.

6     **THE COURT:**  Does the Government have any objection or

7  comment regarding the defense request that if the Government's

8  case does conclude today that the Court recess for the day?

9     **MS. WEST:**  Personally I would say that it depends on what

10 time we're able to finish.  If it's significantly early, I

11 think it would make sense to have her at least begin her

12 testimony.  If it's, you know, noon or thereafter, then maybe

13 it makes sense to break for the day and we can start the jury

14 instruction conference earlier.

15    But just not knowing the duration of the

16 cross-examination of Agent Mackey or the other two witnesses

17 who will precede him, you know, if it happens to be -- it seems

18 probably not likely, but if it happens to be 11:00 o'clock or

19 so, then I think we should start with Ms. Su's testimony, if

20 she's going to testify.

21    **MR. BABCOCK:**  I can add, actually, a wrinkle to that as

22 well.  I don't actually think the cross on the financial stuff

23 is going to be that lengthy.

24    **THE COURT:**  No.

25    **MR. BABCOCK:**  It certainly is what it is.  I would like

1    to put Agent Mackey back on the stand in my own case to deal

2    with some of the issues that were raised with Mr. Patel

3    yesterday.

4        THE COURT:  Yes, there was some impeachment evidence that

5    you have that requires Agent Mackey to testify.

6        MR. BABCOCK:  That won't be lengthy.

7        THE COURT:  Yes.

8        MR. BABCOCK:  That certainly could be done today as well.

9        MS. WEST:  Well, I think that could actually just be done

10   at the same time while he's on the stand so that we're not

11   calling him back a third time, but we'll leave that up to the

12   Court.

13       MR. BABCOCK:  That's fine too.

14       THE COURT:  If I'm not hearing any objection, I would

15   order that then.  I hear the Government saying explicitly that

16   they won't raise a scope objection, so I think you should feel

17   free to ask Agent Mackey whatever questions you have for him in

18   your own case.

19       MR. BABCOCK:  Fair enough.

20       THE COURT:  Yeah.  Well --

21       MR. BABCOCK:  The only other question --

22   I'm sorry to interrupt.

23       THE COURT:  Yes.

24       MR. BABCOCK:  -- was did the Court -- does the Court let

25   the jury set its own hours during deliberations?

1       **THE COURT:**  Typically, I do.

2       **MR. BABCOCK:**  It's been my experience that they usually

3   sort of stick with the schedule that they've been keeping.  Not

4   always, but --

5       **THE COURT:**  So I should tell you.  When I was in the

6   state court, I had colleagues who adopted the same trial

7   schedule that I now use in the federal court, which is 8:30 to

8   1:30 with no lunch break.  And then, when I was a lawyer, I

9   tried a very lengthy bench trial in front of -- then Judge, now

10  -- Justice Pollack and he used that schedule, and I loved that

11  as a lawyer.  I actually had dinner with my family while I was

12  in trial.  It's unimaginable.  Not every time, but still.  And

13  that afternoon I had a couple of hours where I could prepare

14  witnesses and that kind of thing during all the business hours.

15      But for whatever reason, as a state court judge I never

16  adopted that schedule, so I don't have so much experience with

17  it.

18      This is my third jury trial in federal court.  Each of

19  the times that I've -- each of the two prior times the jurors

20  have decided to come in a little bit later, say at 9:00

21  o'clock, and then work a full day.

22      But as you suggested, I let the jurors set their schedule

23  and I told them we're here to serve at their pleasure.

24      So it's possible they will say 8:30 to 1:30, but it's

25  possible that they will figure out that if they adopt a longer

1    work day that they're likely to be here less.  Fewer days.

2        MS. WEST:  And it might be that if they were to decide

3    they want to deliberate this Friday, it's certainly fine with

4    us, we're here, if we want to leave that up to them as well.

5        THE COURT:  If they were to deliberate this Friday, it

6    would create some significant problems on my end, actually.

7        MS. WEST:  Okay.

8        THE COURT:  I now get all of my criminal cases from

9    Oakland and I'm required to be there now two days, two Fridays

10   a month.  And in June, I'll move to three.  And tomorrow is one

11   of those days.  And I'm taking a plea from someone who requires

12   a Japanese interpreter.

13       So I will tell you, for that reason, unless there's an

14   objection, in which case I'll evaluate the objection on its

15   merits, I would not order the jurors to deliberate on Friday,

16   even if we went full steam ahead.

17       MS. WEST:  That's fine.

18       MR. BABCOCK:  No objection.

19       THE COURT:  All right.

20       So one more thing, before we bring the jurors in.  I know

21   we have a jury instruction conference scheduled today.  Does

22   the defendant have any -- can you give me a sense of how

23   detailed or lengthy the objections are likely to be?

24       MR. BABCOCK:  I do have some issues and proposed

25   modifications to raise, only to the substantive things.

1   Although I don't think they'll be -- I don't know; they're not

2   that lengthy, I don't think.

3        THE COURT:  I'm just trying to set whether there will be

4   some back-office work on the Court's part to get the

5   instructions in shape.

6        MR. BABCOCK:  Well, I guess -- well, we're not doing it

7   yet.  Depends -- I guess part of it depends on whether the

8   Court is planning to give the jurors a copy of the Indictment

9   or not.  If we don't, then I do think actually there's a fair

10  amount of things that need to be added to the substantive

11  instructions on the elements to give them the guideposts of

12  what they're deciding.  Sort of cut-and-paste parts of the

13  indictment into the instructions.

14       If they're going to have their own copy of the Indictment

15  in tandem with the Jury Instructions, then I don't think that

16  that needs to happen.  And I don't have strong preference.

17       Some judges like to give them the Indictment; some don't.

18  I don't remember if we discussed it or not.  But that's sort of

19  the two ways to deal with it.

20       THE COURT:  Does the Government -- have you told the

21  Government what your objections and requests are?

22       MR. BABCOCK:  No, I have not.

23       THE COURT:  The reason I'm asking these questions is so I

24  can determine whether I can know if I order the jury back at

25  8:30 a.m. that --

1           MR. BABCOCK:  We'll be ready.

2           THE COURT:  -- the Court will be ready to instruct them

3      at whatever time that's required.

4           MR. BABCOCK:  I would think so.  I mean, I don't think --

5      I don't think it's anything the Court's going to have to take

6      under submission or require hours and hours of editing.

7           MS. WEST:  We can discuss it more at the appropriate

8      time, but --

9           THE COURT:  Exactly.

10          MS. WEST:  -- in terms of the Indictment going to the

11     jury, I -- actually, I don't think I've ever had the Court send

12     the Indictment to the jury.  But it's something that we can

13     discuss, with the appropriate redactions for the counts that

14     the Government will be dismissing.

15          THE COURT:  Okay.  Well, this doesn't need to be our last

16     conversation about this today.

17          Is there anything further we should discuss before the

18     jury comes in?

19          MR. RHYNE:  Yes, Your Honor.  Two more minor issues.

20          Last night, in re-reviewing Agent Mackey's anticipated

21     testimony today on the financial analysis, we noticed that

22     Exhibit 650, which is the money flow with the arrows that track

23     the money between and among the accounts, had one arrow that is

24     incorrect.  We fixed it on the presentation, we fixed it on the

25     original exhibits, and we've given a copy of the new version to

1    the defense for their binders.  But we also need to give the

2    Court one copy.  So we would like to tender that to the Court.

3         THE COURT:  All right.  What's the exhibit number,

4    please?

5         MR. RHYNE:  They're 650 and 651.  Two minor changes to

6    each.

7         And then the other issue is related to Agent Mackey's

8    testimony, and that's Exhibit 800.  I just want to call it to

9    the Court's attention.  This is a tort claim that the defendant

10   filed after the search warrants in this case in which she makes

11   the claim for lost income and also for future lost income.  And

12   we intend to cover it with Agent Mackey.

13        As was the case earlier, this is one of those issues that

14   I wanted teed-up for the defense and the Court in case there's

15   something that the defense is going to object to.

16        There is a note in there that she has suffered emotional

17   distress, as well, so that's just something we wanted to call

18   the Court's attention during the break to plan to take a look

19   at Exhibit 800.

20        MR. BABCOCK:  I didn't expect that during Agent Mackey's

21   testimony.  I thought it would be potential cross-examination,

22   but -- so I haven't looked at it with that eye --

23        THE COURT:  Doesn't sound like --

24        MR. BABCOCK:  -- last night or this morning.

25        THE COURT:  It doesn't sound as though there's a role for

1    the Court yet.  It does sound as though it makes sense for me

2    to advise the jury that, in fact, the case will not go into

3    April, as they were originally told, that is it possible that

4    the evidence will conclude this week, that it is possible that

5    I will even instruct them this week, and that they might even

6    begin their deliberations.  That they won't be deliberating on

7    Friday of this week, but if they are still in deliberations

8    next week, that they should plan on deliberating on Friday.

9    And then I'll give them more information when I have it.

10             MS. WEST:  Sounds good.

11             THE COURT:  Very good.  Okay.

12             MR. RHYNE:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14             (In the presence of the jury.)

15             THE COURT:  Good morning.  We have a scheduling update

16   for you.  It's a good update, not a bad update.

17             During jury selection you were advised that this trial

18   might go into April.  That isn't going to happen.  It's

19   possible that the evidence in this case will conclude this

20   week.  It's possible that I'll actually instruct you this week.

21             The order of events in this trial will be that the

22   evidence will finish, and then, at the conclusion of the

23   evidence, I will instruct you, and the lawyers will make

24   closing arguments, then the case will be given to you for a

25   decision.

1    I advised you during jury selection that the trial will

2    not be in session on Fridays but that if you were deliberating

3    you should plan to deliberate on Fridays.  But that's not true

4    this week.  This is coming as a bit of a surprise to everybody,

5    including me, and I have a large criminal calendar in Oakland

6    on the Friday morning which would make it very difficult for me

7    to supervise you if you were deliberating in that room that's

8    right next to our courtroom.  So if you are deliberating, which

9    may start on Thursday or may be even tomorrow -- I don't know,

10   evidence is coming in faster than we thought.  So all those are

11   possible -- in any event, if you are deliberating, you won't be

12   here on Friday.  This is -- and I want to also be very clear

13   I'm not sure that the case will conclude this week.  That's not

14   a certainty; it may be that the evidence will go into next

15   week.

16   The one thing that is sure, that the very lengthy

17   estimate that you were given by the jury office when you came

18   in is longer than necessary.  That's how we like to do it, by

19   the way, that sort of under-promise/over-deliver thing.  Jurors

20   are very upset when it goes the other way.

21   So that's the latest.  And as the information gets

22   clearer or better, then I'll give that information to you when

23   I have it.

24   We concluded with a witness yesterday.

25   Government's next witness.

1    MR. RHYNE:  Yes, Your Honor.  The United States calls

2  Mr. Naveen Kundur.

3    THE COURT:  Good morning, Mr. Kundur.  Would you please

4  come to this witness stand, which is where the chair is, and,

5  when you get there, remain standing, raise your right hand, and

6  face my courtroom deputy.

7    THE CLERK:  Right here, sir.

8                    NAVEEN KUNDUR,

9  called as a witness by the Government herein, having been first

10  duly sworn, was examined and testified as follows:

11    THE CLERK:  Thank you.  Please be seated.  Speak directly

12  into the microphone.  Can you please state your full name and

13  spell your last name for the record.

14    THE WITNESS:  Naveen Kundur.  My last name is Kundur.

15  K-u-n-d-u-r.

16    THE COURT:  Your witness.

17    MR. RHYNE:  Thank you, Your Honor.

18                 DIRECT EXAMINATION

19  BY MR. RHYNE:

20  Q.   Where do you currently reside, Mr. Kundur?

21       Where do you currently reside?

22  A.   Fremont.

23  Q.   Where do you currently work?

24  A.   Walmart.

25  Q.   What's your job title at Walmart?

1  A.    Software engineer.

2  Q.    What do you do as a software engineer for Walmart?

3  A.    We work, along with the Canada team, to do their reports

4  on a weekly, monthly and a yearly basis.

5  Q.    How long have you been a software engineer at Walmart?

6  A.    From November.

7  Q.    Since November?

8  A.    Since November.

9  Q.    Can you summarize your educational background for the

10  jury?

11  A.    Back home I was a pharmacist.  In India.  I have a

12  Bachelor's degree in pharmacy.  And here I had a Master's

13  degree from -- I started from Oklahoma State -- Oklahoma City

14  University, and then I moved to Northwestern Polytechnic

15  University and completed my MBA from there.

16  Q.    What year did you complete your MBA?

17  A.    2009.

18  Q.    Where did you go after Northwestern Polytechnic

19  University?

20  A.    After one year of OPT I went to Tri-Valley.

21  Q.    What program did you enroll in at Tri-Valley?

22  A.    A doctorate degree.

23  Q.    In what area?

24  A.    Management.

25  Q.    Do you know the defendant in this case, Dr. Susan Su?

1    A.    Yes.

2    Q.    How do you know her?

3    A.    From Tri-Valley University.

4    Q.    From Tri-Valley?

5    A.    Yeah.

6    Q.    I want to have you summarize your immigration history for

7    the jury.  Can you tell the jury when you first came to the

8    United States?

9    A.    2007, January 2nd, I came to the US.

10   Q.    And on what type of document or visa did you come to the

11   country at that time?

12   A.    A foreign student visa.

13   Q.    For which school?

14   A.    Oklahoma City University.

15   Q.    From there you said you transferred; is that correct?

16   A.    Yes.

17   Q.    And did you remain on an F-1 visa?

18   A.    Yes.

19   Q.    Through the completion of your MBA?

20   A.    Yes.

21   Q.    And then you went to TVU -- approximately when was that?

22   A.    That's May 2010.

23   Q.    And that was for the Ph.D. program; correct?

24   A.    Yes.

25   Q.    Did you stay on an F-1 visa during that time frame?

1    A.    Yes.

2    Q.    What's your current immigration status today?

3    A.    I'm on a H-1B.

4    Q.    Can you tell the jury what an H-1B visa is?

5    A.    It's a work permit.

6          THE COURT:  I'm sorry, would you say that again?

7          THE WITNESS:  It's a work permit.

8          THE COURT:  A work permit.

9          THE WITNESS:  Yeah.

10         THE COURT:  Okay.

11   BY MR. RHYNE:

12   Q.    I want to talk about how you came to learn about

13   Tri-Valley University.  When did you first hear about it?

14   A.    I was trying to search for the universities by 2010

15   because my OPT was completing and I did not get my H-1 by then,

16   so I was trying for universities.

17         I went for Northwestern Polytechnic University where I

18   did -- completed my MBA.  And they gave me Master's in

19   computers and I was asking them for a Ph.D.  They said that

20   okay, Ph.D. takes a really long time and are you really

21   interested in doing that.  So then, if you want, you can have a

22   Master's degree in computer science, if you want.

23         So they gave me a Master's degree in computer science, as

24   well, and an I-20 -- an admission into a Master's, computer

25   science.

1    At the same time, I want a doctorate degree.  So I was

2    Googling out and then I found Tri-Valley.

3    Q.   So the information that you learned about Tri-Valley

4    pertained to the Ph.D. that you were going to pursue; is that

5    correct?

6    A.   Yes.

7    Q.   I want to back up.  You mentioned that your OPT was

8    coming to an end.

9    A.   Yes.

10    Q.   What does that mean?

11    A.   My optional practical training.  It's a work permit after

12    you complete your Master's.

13       That was the thing happen -- that was the time frame of

14    one year they normally give after completion of Master's

15    degree, and that was coming to an end.

16    Q.   And then you mentioned that you weren't able to get your

17    H-1B.  Is that because you tried to transfer from a CPT to an

18    H-1B work visa at that time?

19    A.   OPT to an H-1.

20    Q.   I'm sorry, OPT to H-1.

21    A.   Yes.

22    Q.   And that didn't work, so you explored other options with

23    another F-1 visa; is that correct?

24    A.   Yeah.  You know how 2009 was, the market was a total

25    slump, nobody was getting enough jobs at the time, so I had to

1     go to the university to study again.

2     **Q.**    Did you research Tri-Valley University on-line?

3     **A.**    Yes, that's true.

4     **Q.**    Did you look at the website?

5     **A.**    Yes.

6     **Q.**    What did you see, when you looked at the website?

7     **A.**    As usual, as the other universities, the site was a

8     little bit sloppy, but the same thing as other universities.

9     **Q.**    You saw the courses that they offered?

10    **A.**    Yes, that's true.

11    **Q.**    And the professors that they claimed to have?

12    **A.**    Yes.

13    **Q.**    Did you visit Tri-Valley University?

14    **A.**    Yes.

15    **Q.**    When did you visit it for the first time?

16    **A.**    Before my admission I went with my documents to the

17    Tri-Valley University.

18    **Q.**    Where was Tri-Valley University at that time?

19    **A.**    It was in Pleasanton.

20    **Q.**    Do you remember the area where it was located or the

21    address?

22    **A.**    Not exactly the address, but it was in Pleasanton School

23    District.  And you take the exit -- a couple of signals, you

24    take right, left, right, and you have -- it is the Pleasanton

25    School District.

1  Q.   Did you register for classes?

2  A.   Yes.

3  Q.   Who did you register for classes with?  Who helped you?

4  A.   There was a guy, but I don't know his name.  Or somebody.

5  I gave my details to, you know, the guy, and he gave me an

6  admission after a couple of days.  I went to the university,

7  two or three days, they give me an I-20.

8       And first, once I went there, there was nobody; it was

9  locked.  So I went down the university and came back, there was

10  nobody there, and just went home.

11      The next day I came in and there was a guy who had been

12  registering the process.

13  Q.   Did you make a tuition payment, when you enrolled for

14  classes?

15  A.   Yes.

16  Q.   How much tuition did you pay for that first semester?

17  A.   Initially I think I paid around a thousand dollars.  A

18  thousand.  But later, I paid another 1,700.

19      It was total 2,700.

20  Q.   2,700?

21  A.   Yes.

22  Q.   Do you remember how many classes that was for?

23  A.   Three classes.

24  Q.   So three classes, $900 per class, for one semester?

25  A.   Yes.

1   Q.   At the time you enrolled in the classes, did you have an
2   expectation of whether they were going to be physical classes,
3   with a classroom where you sit down, or online classes?
4   A.   Obviously, it would be a physical classes because --
5   Q.   Did you learn that to be the case?  Were there physical
6   classes?
7   A.   No.
8   Q.   What kinds of classes were offered to you?
9   A.   After a couple of days, I went there, to the university,
10  and one of the guys sitting in the class -- in the office gave
11  me -- he said go online and register in this website, you'll
12  have online classes.
13  Q.   Did you try to do that?
14  A.   Yes.
15  Q.   What happened when you tried to register online for these
16  classes?
17  A.   Oh, one of the class was working and a couple of other
18  classes were not working.  And, in fact, I called a couple of
19  times to the university to -- I was not able to log into that
20  university -- to the website or --
21  Q.   When you say you weren't able to log into the website, do
22  you mean you weren't able to log in for the instruction?
23  A.   Yes, that's --
24  Q.   When you contacted the university to inform them of your
25  difficulty in logging into these classes, what response did you

1    get from the university?

2    A.    "You will have access in a short while," or something

3    like that.

4         MR. BABCOCK:  I'm sorry.  I missed that.

5         THE COURT:  "You'll have access in a short while."

6    BY MR. RHYNE:

7    Q.    Did you continue to have technical problems in logging

8    into these classes?

9    A.    Yes.

10   Q.    Did you ever get any books for these classes?

11   A.    I had many books from my previous, so I was using a lot

12   of them.

13   Q.    Did Tri-Valley University ever issue any books?

14   A.    Not really.

15   Q.    Did you ever receive transcripts for these classes?

16   A.    No.

17   Q.    What happened with your immigration status?  Did you

18   continue to be an F-1 student?

19   A.    Yes.

20   Q.    I want to fast forward to summer of 2010.  Did you have

21   an opportunity to be an employee at Tri-Valley University

22   during that time frame?

23   A.    Yes.

24   Q.    Who hired you?

25   A.    Susan.  Susan Su.

1    Q.   Approximately what month do you think you started working

2    at Tri-Valley University?

3    A.   I joined maybe in August or something.  August/September.

4    Q.   Of 2010?

5    A.   Yes.

6    Q.   Approximately how many -- how long did you work there,

7    would you say?

8    A.   Around 45, 50 days, or a little bit less/more than that.

9    Q.   So 45 or 50 days?

10   A.   Yeah.

11   Q.   How many hours per day were you working on average?

12   A.   I was going to there around 10:00, 10:30 in the morning,

13   and probably 4:30, 4:00, full days, to leave the place.

14   Q.   How many days a week were you working?

15   A.   Five days.

16   Q.   Were you paid for your services you provided?

17   A.   Yes.

18   Q.   How much were you paid?

19   A.   One time I had a $1,200 check, and other time I had a

20   $800 check I made.

21   Q.   Who gave you those checks?

22   A.   Susan Su.

23   Q.   I want to talk about your duties and responsibilities

24   while you were working at Tri-Valley University.  Did you

25   receive instruction on how to make transcripts?

1    A.    Yes.

2    Q.    Who trained you on how to make transcripts?

3    A.    Susan.

4    Q.    What instruction did she give you on making transcripts?

5    A.    Normally what happens is, like, you have all the details

6    of the students in a hard drive, a physical hard drive, and you

7    plug it into the computer.  And whenever a student request for

8    a transcript, it will be in an email.  So the subject will be

9    in a transcript, or in a request for transcript or something.

10          You search on the email with the transcript, you take the

11   name of the student, the first name or the last name, and you

12   put that in the search, and search the hard drive.

13          Wherever you find the student's name, you take the

14   printout and give the grades.

15   Q.    Would you work from a template, when you were making

16   these transcripts?  Did you work from a template?

17   A.    Yes.

18   Q.    Did Dr. Su give you instructions on what grades to put in

19   these transcripts?

20   A.    Yes.

21   Q.    What did she tell you to put in the transcripts?

22   A.    A.  A-minus.  B.  The least you can give is B-minus.

23   Q.    The lowest you could give is B-minus?

24   A.    (Nods head.)

25   Q.    And once you would put these grades into the transcripts,

1    would you send them off to the student?

2    **A.**    Yes.

3    **Q.**    Would you report back to Dr. Su at the end of each day as

4    to how many transcripts you were able to make?

5    **A.**    Yes, that's true.

6    **Q.**    What were her responses, when you would tell her how many

7    transcripts you made?

8    **A.**    Around the first couple of weeks -- I mean, first couple

9    of weeks, I did different work.  And after, then I started

10   doing transcripts.  And, like, I was a little bit slow.  Like,

11   20, 25, was the amount.

12        And we got -- she used to say "little bit more" and more

13   transcripts may be done.

14   **Q.**    She told you you needed to make more transcripts?

15   **A.**    Yes, that's true.

16   **Q.**    Did you also write DMV letters while you were there?

17   **A.**    Yes.

18   **Q.**    Can you tell the jury what a DMV letter is?

19   **A.**    A person normally goes to the DMV at first, and once they

20   go to the DMV office they ask, "We need information of where

21   you study."

22        So we normally have a template.  What we do is, like,

23   take -- on a template, you just plug in the name with the first

24   name and last name and tell they are still there and just send

25   it to the student.

1    Q.    And your understanding is the students take these letters

2    to the DMV to get driver's licenses and things like that?

3    A.    Yes, that's true.

4    Q.    When you would create these letters, would you work from

5    a template as well?

6    A.    Yes, that's true.

7    Q.    And you would just change the student's name?

8    A.    The course and the duration.

9    Q.    And then you would email that to the student as well?

10   A.    Yes.

11   Q.    Who trained you on how to do those letters?

12   A.    It was Susan Su.

13   Q.    Who else worked in the office with you during those 45 or

14   50 days?

15   A.    On the front office we hired a guy by the name Vishal

16   Dasa and Jimmy Tambe, and then there was a receptionist for a

17   few days and she left later.  I don't know.

18        And there was other guys like Nashanders Ashokbabukolla

19   and myself.

20   Q.    Can you spell that last name for the court reporter?

21   A.    Ashokbabukolla.  Ashokbabukolla.

22   Q.    Can you spell it for her?

23   A.    A-s-h-o-k-b-a-b-u-k-o-l-l-a.

24   Q.    Are you familiar with the name "Parth Patel"?

25   A.    Yes.

1   Q.   Did he ever work in the front office?

2   A.   Yes, that's true.  He was also there.  But he left in

3   between -- I believe.  Before me, I believe.

4   Q.   During your 45 or 50 days that you were working at

5   Tri-Valley University, did you ever see a physical class?

6   A.   No.

7   Q.   I'm sorry?

8   A.   No.

9   Q.   Did you make requests to Dr. Su to have physical classes?

10  A.   Yes.

11  Q.   What was her response, when you would make those

12  requests?

13  A.   She would say -- telling that we would be having the

14  other building as well.  That once we have that other building,

15  we will be having the classes.

16  Q.   You ever see any professors come in to teach classes?

17  A.   No.

18  Q.   Are you familiar with the name "Sophie Su"?

19  A.   No.

20  Q.   Are you familiar --

21  A.   I heard after the incident happened, but not before that.

22  Q.   Did you ever see anybody -- or were you introduced to

23  anybody named Sophie Su while you were working at Tri-Valley

24  University?

25  A.   No.  Apart from Susan Su, I didn't see anybody.

1    Q.   What about Vince Wang?

2    A.   No.

3    Q.   You were never introduced to Vince Wang?

4    A.   No.

5    Q.   Why did you leave Tri-Valley University?

6         I'm sorry.  Why did you stop working at Tri-Valley

7    University?

8    A.   There was an incident for working there.  Like, 45, 50

9    days, like, I was getting, like, pressure up, and a lot of many

10   things going on.  And sometimes I hear yelling on me as well,

11   so I said, "Okay, this is not a place I work."

12   Q.   You said the pressure was going up?

13   A.   Yes.  Pressure was building up and people started yelling

14   at the work I do.

15        And once we -- sometimes we receive phone calls from

16   students saying that this is taking lot of time.

17        And I heard, a couple of times, Susan Su yelling on me as

18   well, so I have to leave that job.

19        Because most the people on there was taking a CPT and

20   doing jobs, so I thought, let me take that.

21   Q.   Who were the people who were yelling at you?

22   A.   Susan Su.  And once I heard, like, Vishal did it.

23   Q.   And what were the reasons that Dr. Su yelled at you?

24   A.   Because we had little bit of transcripts I was making.

25   Because my target was around 30, 40 a day.  I was able to make

1    20, 25 a day, something like that.

2    **Q.**   As you sit here today, do you ever remember accessing a

3    computer program known as SEVIS?

4    **A.**   No.  Even when I used to do, my computer was logged in by

5    Susan Su for me.

6    **Q.**   So you were working primarily on transcripts and DMV

7    letters?

8    **A.**   Transcripts, DMV letters.  In the case some students are

9    new students, they ask for some of the documents required to

10   get admission.  So I used to write because, like, what other

11   documents needed to get an admission.  So I used to write them.

12   **Q.**   After that summer ended, did you re-enroll for the next

13   semester?

14   **A.**   Yes.

15   **Q.**   That would be fall of 2010; correct?

16   **A.**   Yes.

17   **Q.**   Do you remember what classes you registered for?

18   **A.**   Not really, no.

19   **Q.**   Do you remember how much tuition you paid for those

20   classes?

21   **A.**   Same.  2,700.  But I believe I paid 1,700.  I don't

22   remember.  But I paid 1,700 or -- I don't remember.

23   **Q.**   And you made that payment to Tri-Valley University,

24   obviously.

25   **A.**   Yes.

1    Q.    What did you do during that academic semester?  Did you

2    go to classes?

3    A.    On the second semester, as well, I logged in a couple of

4    times from my home.  And then I started working at Tri-Valley,

5    so I did not really go to many -- much classes.

6    Q.    Did you get CPT at some time during that semester?

7    A.    Yes.

8    Q.    Can you tell the jury about that?

9    A.    I took CPT from the university and left the university

10   and started working at Level 3 Communication in Denver,

11   Colorado.

12         THE REPORTER:  Say the name again, please.

13         THE WITNESS:  Level 3 Communication, Denver, Colorado.

14   BY MR. RHYNE:

15   Q.    Could you spell that?

16   A.    "Denver" or --

17   Q.    No.

18   A.    L-e-v-e-l 3 Communications.

19   Q.    How many hours a week were you working at that company?

20   A.    Forty hours a week.

21   Q.    And that was in Denver?

22   A.    Yes.

23   Q.    Did you have any more contact with Tri-Valley University

24   after you left for this CPT?

25   A.    Could you repeat that question?

1    Q.    Did you have any more contact with Tri-Valley University?

2    A.    Yes, I do.

3    Q.    What was that contact?

4    A.    One of my cousins, she was working at Tri-Valley too.

5    Q.    I want to fast forward to January of 2011.

6          Are you aware that Tri-Valley University was shut down in

7    that month?

8    A.    Yes.

9    Q.    Where were you at that time when that happened?

10   A.    Denver.

11   Q.    What happened to your immigration status at that point?

12   A.    I went out of status.  And I believe it was January

13   20th -- it was 19th or 20th, the university got closed.

14         The same day, I flew from Denver to California again.

15   Because my wife, she used to be here and I used to fly every

16   other week to Denver.

17         So I came back from Denver to this -- California, and I

18   lost my status too.

19         MR. RHYNE:  May I have a moment, Your Honor?

20         THE COURT:  All right.

21   BY MR. RHYNE:

22   Q.    Mr. Kundur, I just want to clarify one thing with respect

23   to physical classes.

24         At any point did you go to any physical classes at

25   Tri-Valley University?

1    **A.**    No.

2    **Q.**    And you continued to request them from Dr. Su; is that

3    correct?

4    **A.**    I requested the first semester a couple of times.  And

5    second semester, when I was working there, I asked her, "When

6    are we going to have physical classes?"  She said that we will

7    be having the other building, then we'll have the physical

8    classes.

9    **Q.**    So she told you when Tri-Valley University was going to

10   move then they would implement physical classes?

11   **A.**    No.  The thing is, the place where I worked the second

12   time was a different building the place where I took the

13   admission.

14   **Q.**    Okay.

15   **A.**    The second time was a different place where I was, and

16   that's -- that's where she was telling that we will have the

17   other building to work.

18   **Q.**    But in the time that you worked there, you never saw

19   physical classes; is that correct?

20   **A.**    Yes, that's true.

21       **MR. RHYNE:**  No further questions, Your Honor.

22       **THE COURT:**  Mr. Babcock.

23       **MR. BABCOCK:**  Thank you, Your Honor.

24   //

25   //

1          **CROSS-EXAMINATION**

2    BY MR. BABCOCK:

3    Q.   Good morning, Mr. Kundur.

4    A.   Good morning.

5    Q.   Am I saying that right?

6    A.   Yeah.

7    Q.   My name is Erik Babcock and I represent Dr. Su.

8         So do you remember how you heard of Tri-Valley

9    University?

10   A.   Yes, I Googled it out.

11   Q.   You Googled it.

12   A.   Yeah.

13   Q.   Okay.  And you started -- you first enrolled in -- for

14   the summer semester in 2010?

15   A.   Let me -- May.  Zero five.

16   Q.   You enrolled in May.

17   A.   Mm-hm.

18   Q.   It was for the semester that was over the summer; right?

19   A.   Mm-hm.

20        **THE COURT:**  Mr. Kundur, you need to say "yes" or "no,"

21   since the court reporter can't --

22        THE WITNESS:  Oh, okay.  "Yes."  I'm sorry.

23   BY MR. BABCOCK:

24   Q.   And you said you realized after a couple of days that

25   there were only online classes and no physical classes.

1    A.    A couple of weeks.

2    Q.    A couple of weeks.  Okay.

3          At that point did you ask Dr. Su if you could get a

4    refund or transfer?

5    A.    No, I went to the university to ask for online -- I went

6    to the university to have when can be the classes, or when can

7    be the classes.

8    Q.    Okay.  You asked her when the physical classes would be

9    starting?

10   A.    Yes, that's true.

11   Q.    And she said it would be --

12   A.    It's not "he" -- it's not "she."  There was another guy

13   sitting in that administrative building who told that there

14   would be other physical classes.

15   Q.    Do you remember that gentleman's name?

16   A.    Not really.

17   Q.    Okay.  So you stuck that semester out.

18   A.    Mm-hm.

19   Q.    You have to say "yes" or "no."  Sorry.

20   A.    I'm sorry.  "Yes."

21   Q.    That's okay.

22         You finished that semester.

23   A.    Yes.

24   Q.    You said you had some difficulty logging in, but you did

25   try to log in and do your classes; right?

1    A.   Yes, that's true.

2    Q.   And I think you said you were able --

3    A.   To log in one of the class, and just the other two

4    classes I was not able to log in.

5    Q.   Do you remember which class you were able to log into?

6    A.   Not really, at this point.

7    Q.   Okay.  Can you tell the jury, what happened when you

8    logged in?  What -- this was an on- -- you said online, but

9    what did you see and what did you do?

10   A.   From the class which I was able to log in?

11   Q.   Yes, exactly.

12   A.   There was plenty of the students on your -- you have a

13   log-in screen, and you hear the person speaking on the other

14   end, like, what the class.  And you have -- right there you

15   have the participants and the number of participants in the

16   class.

17   Q.   Did there seem to be a lot of participants?

18   A.   Yes, that's true.

19   Q.   And there was an instructor?

20   A.   Yeah.

21   Q.   And do you remember who the instructor was?

22   A.   Not really.

23   Q.   Okay.  Do you remember how -- did you log in at a certain

24   time?

25   A.   Yes.

1    Q.    Do you remember what the schedule was?

2    A.    It was evening.  After 6:00.  Or around 6:00 in the

3    evening.

4    Q.    It was an evening class?

5    A.    Yes.

6    Q.    Do you remember how many days a week it was?

7    A.    It was weekly once, I believe, in start.  Weekly once or

8    twice.  No, it was once-a-week class.

9    Q.    Okay.  And how long was this semester?

10   A.    It's three months.

11   Q.    Okay.  And did you get assignments in that class?

12   A.    Yes.

13   Q.    Things you were supposed to do?

14   A.    Yes.

15   Q.    And did you do the assignments?

16   A.    Yes, few of the assignments.  Yes.

17   Q.    Did you -- was there any testing?  Did you have to take

18   any tests?

19   A.    Not really.  I did not took any tests.

20   Q.    You said you enrolled in a Ph.D. program; correct?

21   A.    Yes, that's true.

22   Q.    So this was a graduate-level course of some sort?

23   A.    What do you mean by "graduate level"?

24   Q.    Fair enough.  It was not a -- I just meant as opposed to

25   under-grad, but I don't know that that helps.

1      Can you estimate for us how many other participants there

2  were in this class, the one that you were able to take?

3  **A.**  Yeah, sure.  As it being the first semester for me, I had

4  few prerequisites.

5  **Q.**  I'm sorry, you had what?

6  **A.**  Prerequisites.  Pre- -- prerequisites.  I don't know how

7  to spell it.

8      **THE DEFENDANT:**  "Prerequisites."

9      **MR. BABCOCK:**  Shhh.

10      I apologize, Your Honor.

11      **THE WITNESS:**  Yeah, there were few prerequisites, which

12  makes you qualified to go for a doctorate degree.

13      So I was studying in one of the classes and rest of them

14  are from MBA.  And I was in the doctorate program, but I still

15  lacked some prerequisites, so I was doing the prerequisites.

16  **BY MR. BABCOCK:**

17  **Q.**  So you had to do some sort of foundational work first.

18  **A.**  Yes, that's right.

19  **Q.**  Okay.  Now, you enrolled for the fall semester.

20  **A.**  Yes.

21  **Q.**  Did you consider, at that point, not reenrolling and

22  trying to transfer to a different school?

23  **A.**  Yes.

24  **Q.**  And did you look into it?

25  **A.**  Yes.

1  Q.   And was there a reason that you decided not to?

2  A.   Because I was not getting a transfer out.

3  Q.   You asked for a transfer?

4  A.   Yes.

5  Q.   From Dr. Su?

6  A.   Yes.

7  Q.   What did she say, when you asked for a transfer?

8  A.   We would be having -- very soon, we would be having

9  physical classes.  "You can stay here.  You can -- at the same

10  time, you can work here."

11  Q.   Is that when she offered you a job?

12  A.   Yes.

13  Q.   I see.  So this was around August or so.

14  A.   Mm-hm.

15  Q.   Of 2010.

16  A.   Yes.

17  Q.   And I think you said you worked for about 45, maybe 50

18  days.

19  A.   Yes, that's true.

20  Q.   Actually, I forgot to ask you one question.

21       Do you remember, in the first semester, the class you

22  were taking and logging into, was there any sort of attendance

23  taken?

24  A.   Yes.

25  Q.   The instructor took attendance?

1    **A.**    Yes.

2    **Q.**    I think you said that you had -- you didn't directly

3    enroll -- and tell me if I'm wrong -- you didn't directly apply

4    to TVU yourself originally; you said a guy helped you out.

5    **A.**    Applying in the sense you want me to say that Googled it

6    out or applying for a job?

7    **Q.**    I'm sorry, can you say that again?

8    **A.**    Okay.  Applied in the sense is it for a job or is it for

9    admission?

10   **Q.**    I was talking about the admission.

11   **A.**    I Googled it out, and one of the guys sitting in the hall

12   helped me.

13        First, let me put this way, the whole admission process,

14   what happened.

15        First I went there and it was only Susan Su was there.

16   And after a few minutes, or something like that, a couple of

17   persons came into the university and I gave the documents to

18   the guys.

19        Susan Su supposed to be able to admission my doctorate

20   program.

21        I spoke to her about my doctorate program.  She said that

22   we have them.  In fact, I saw the same thing, the website, too.

23        So she said the same thing, what she was offering, and I

24   hand over my documents to the guys who were sitting in that

25   room.  So --

1    Q.    What kind of documents did you bring?

2    A.    My 10th -- my interrelated -- my 10th degree

3    interrelated.  My graduation.  My Master's degree.

4    Q.    Okay.  You said you had Googled it and you found the TVU

5    website.  And I forget the word you used, but you said

6    something along the lines of it was not a particularly

7    well-done website; is that right?

8    A.    Yes.

9    Q.    And you said it was similar to other schools' websites.

10   A.    Yes.

11   Q.    Can you tell me a little more about what you meant by

12   that?

13   A.    Most of the universities, you have -- what you say --

14   when you click on any link, you -- it goes to a different link.

15        And, say, like, you click on course, on any of the

16   subject or any of the course, it goes to the next level and

17   that is in detail about what the course and what are the things

18   you have in that course.

19        And when you log into student center -- a student site,

20   or when you click on a help desk, help, it will give you more

21   information than coming to Tri-Valley.

22        And the letters, her presentation was not that really

23   good as a professional website, but it was okay.

24   Q.    How many other schools did you -- did you look at or

25   consider before you decided on TVU?

1 A. I was looking at NPU, Northwestern Polytechnic

2 University, where I had my graduation, MBA, and I looked at

3 San Jose University.  I looked at Santa Clara State University,

4 and I looked at International Technological University, ITU.

5 Q. And how did the fees at TVU compare, for example, with

6 the last school you went to, which was Northwestern -- I'm

7 sorry.

8 A. Northwestern Polytechnic University.

9 Q. Polytechnic.

10 Do you recall what the registration fees were at

11 Northwestern?

12 A. Yes, it was $180 to $150 for initial enrollment to get an

13 admission into that, and it was, like, 4,800 to 5,200 for

14 semester.

15 Q. Somewhere around $5,000 a semester?

16 A. Yes.

17 Q. Now, you mentioned that -- and one of the reasons, it

18 sounds like, that you -- that you left -- left working at --

19 stopped working at Tri-Valley University, you said that the

20 pressure was building.

21 A. Yes.

22 Q. This was in, what, September/October 2010?

23 A. Yes, around sometime August/September.  Yes.

24 Q. It was around the beginning of the semester?  Do you

25 remember?

1    A.   Not beginning of the semester, but later on.

2         Pressure in the sense not in the course or in the

3    studies, but in the sense of number of calls you are getting at

4    working place.

5         When you sit there, you start working, the phone keeps on

6    ringing.  A couple of guys, they just work.  And there used to

7    be a cell phone, as well.  People whoever working there does

8    not want to take that cell phone to answer the calls because

9    the phone keeps just ringing ringing ringing all the time.

10        Sometimes the people at work doesn't want to answer; they

11   pass the cell phone to other people.

12   Q.   There seem to be -- the school was receiving a lot of

13   phone calls.

14   A.   Yes.

15   Q.   And there were not enough staff to handle all the calls.

16   A.   Yes.

17   Q.   Is that fair to say?

18   A.   You can say either -- or two ways.  But the thing is,

19   like, when student calls in, they ask too many questions, and

20   they have really doubt.  And there are things, like, they want

21   transcripts, they want DMV letters, they want questions on what

22   are the object to be study, they want enrollment, they want

23   I-20s.

24        They have not many emails coming out late, so --

25   Q.   A lot of things to deal with.

1    A.    Yes, that's true.

2          And we were, like, not enough people to work on them.

3          And we were not even permission to answer the students

4    who are calling from another university too.

5    Q.    So during the time that you -- the month and a half that

6    you worked for TVU, I heard that it was you, Vishal, Jimmy, a

7    receptionist for a while, and then, what, two other people?

8    A.    Parth Patel.  Nashanders Ashokbabukolla.  Keith -- Pete

9    Tambuli [phonetic].

10   Q.    So 7 or 8 people?

11   A.    Yes.

12   Q.    Okay.  Did any new people get hired, while you were

13   working there, if you remember?

14   A.    I don't remember that part.

15   Q.    Okay.

16         THE COURT:  Mr. Kundur, that water is there for you, in

17   case you get thirsty.

18   BY MR. BABCOCK:

19   Q.    So you ended up taking a job in Denver.

20   A.    Yes.

21   Q.    In the fall of 2010.

22   A.    Yes.

23   Q.    And doing some commuting, it sounds like.

24         You, when you were -- took the job in Denver, though, you

25   still had your F-1 status through TVU; is that right?

1    A.    Yes.

2    Q.    Okay.  And then at some point you learned that TVU had

3    been shut down.

4    A.    Yes.

5    Q.    Do you remember how you learned that?

6    A.    One of my cousin said that she was -- would go at the

7    university.  She called me and said that the university had

8    closed.

9    Q.    Okay.  What did you do after you heard the university had

10   been closed?

11   A.    I stopped working and flew back from Denver and went to

12   California.

13   Q.    Had you received any sort of communication from Homeland

14   Security or immigration that your immigration status was about

15   to be or had just been affected by the closure of TVU?

16   A.    Yes.  On January 28th, four immigration officers came to

17   my home.

18   Q.    On January 28th?

19   A.    January 20th.  Two-zero.

20   Q.    20th.  Sorry.  Thank you.

21   A.    Four immigration officers came into my house, and, like,

22   I had one and a half hours to two hours to have all the

23   documents.  What are all the documents.  What other documents I

24   have, they have the documents as well.  So whether I was

25   telling the truth or wrong, they were checking all those

1    things.

2    Q.    You said four immigration officers showed up at your

3    home.

4    A.    Yeah.

5    Q.    Okay.  And had some questions about Tri-Valley

6    University.

7    A.    Yes.  And my -- what I was doing all these years and what

8    was all this stuff.

9    Q.    They asked you some detailed questions about when you

10   came to the United States, where you'd gone to school, things

11   like that; right?

12   A.    Yes.

13   Q.    What kind of work you'd been doing.

14   A.    (Nods head.)  Yes.

15   Q.    Did they tell you, at that point, that you were out of

16   status because TVU had been shut down?

17   A.    Yes.

18   Q.    Okay.  But did that seem to be -- did it seem that their

19   purpose in coming to your house was just to tell you that, or

20   did it seem that their purpose was there to ask you questions

21   about TVU?

22        MR. RHYNE:  Objection.  Calls for speculation.

23        THE COURT:  Sustained.

24   BY MR. BABCOCK:

25   Q.    About how long was this meeting?

1    A.    One hour, two and a half hour.

2    Q.    Okay.  And how much of that time was spent talking to you

3    about your history in the United States?

4    A.    Not really much of the history of United States but they

5    were asking me how the Tri-Valley classes was doing and what

6    are the classes you and others.  That kind of questions.

7    What's going on.

8    Q.    About about whether there were physical classes or online

9    classes, things like that?

10   A.    Yeah.  Mm-hm.

11   Q.    And about your employment at TVU?

12   A.    Yes.

13   Q.    Did they give you any advice on exactly how to get back

14   this status or did you figure that out on your own?

15   A.    Not real- -- they said that you are good to go.  You are

16   out of status, but you need to get registered or you need to go

17   out of the country.

18   Q.    So get back in school or --

19   A.    Or go the country.

20   Q.    Or leave the country.

21   A.    Yeah.

22   Q.    Fair enough.

23         That's all I have.  Thank you.

24         **THE COURT:**  Thank you.

25         Redirect.

<u>**REDIRECT EXAMINATION**</u>

BY MR. RHYNE:

Q.   Mr. Kundur, I just want to follow up on your request to transfer out of Tri-Valley University.

     Was it your testimony that you went to Dr. Su and asked to transfer?

A.   Yeah.

Q.   And at that time she refused to grant you a transfer?

A.   She did not refuse, but she said that, "Okay, we will have classes very soon in other building, and you can have a job here as well."

Q.   So she promised you additional classes?

A.   Yes.

Q.   And she also gave you a job?

A.   Yes.

Q.   So based on that representation, you decided to stay for another semester?

A.   Yes, that's true.

Q.   Okay.

     No further questions, Your Honor.

     THE COURT:  Recross?

     MR. BABCOCK:  No, Your Honor.

     THE COURT:  Mr. Kundur, thanks for your testimony. You're excused.  You can step down.

     THE WITNESS:  Thank you, sir.  Thank you.

1    THE COURT:  The Government's next witness.

2    MS. WEST:  United States calls David Ramirez.

3    THE COURT:  Good morning, Mr. Ramirez.

4    THE WITNESS:  Good morning.

5    THE COURT:  I'm going to ask you to come to the witness

6    stand where that chair is.  When you get there, remain

7    standing, raise your right hand and face my courtroom deputy

8    please.

9    THE WITNESS:  Sure.

10                           DAVID RAMIREZ,

11   called as a witness by the Government herein, having been first

12   duly sworn, was examined and testified as follows:

13   THE CLERK:  Thank you.  Please be seated.

14   Please state your full name and spell your last name.

15   THE WITNESS:  My name is David Ramirez.  Last name is

16   spelled R-a-m-i-r-e-z.

17   THE COURT:  Your witness.

18   MS. WEST:  Yes, thank you.

19                      DIRECT EXAMINATION

20   BY MS. WEST:

21   Q.    Good morning, Mr. Ramirez.  How are you?

22   A.    Good.  How are you?

23   Q.    Fine.  Thanks.

24         Please tell us what you do for a living.

25   A.    I'm currently employed with Homeland Security

1    Investigations here in San Francisco.

2    **Q.**    What is your official title?

3    **A.**    Special Agent.

4    **Q.**    How long have you been employed by Homeland Security

5    Investigations?

6    **A.**    Since December 2009.

7    **Q.**    And have you had particular assignments within -- is it

8    HSI?

9    **A.**    Yes.  I'm currently assigned to the document and benefit

10   fraud task force here in San Francisco.

11   **Q.**    How long have you been so assigned?

12   **A.**    Since June of 2010.

13   **Q.**    Are you familiar with Tri-Valley University?

14   **A.**    Yes.

15   **Q.**    How so?

16   **A.**    Our group has been investigating Tri-Valley University

17   since I arrived here in 2010.

18   **Q.**    Did you have any particular role in the investigation?

19   **A.**    Yes, I have.

20   **Q.**    Can you please direct your attention to January 7th of

21   2011.  Do you have that date in mind?

22   **A.**    Yes.

23   **Q.**    Did you have any involvement in particular on that date?

24   **A.**    Yes, on January 7, 2011, I was asked by the case agent,

25   Jason Mackey, to make a phone call to Tri-Valley University.  I

1    was asked to request to speak with a designated school

2    official.  I was told to tell the DSO when answered that I was

3    calling from John F. Kennedy International Airport and to let

4    them know that we had two students who had recently arrived

5    from Pakistan and that these students were traveling without

6    proper immigration documents.

7    **Q.**   And did you, in fact, make that call?

8    **A.**   Yes, I did.

9    **Q.**   Was that call recorded in some way?

10   **A.**   Yes, it was.

11   **Q.**   When you called Tri-Valley University, how did you know

12   what number to call?

13   **A.**   I was given the phone number by Agent Mackey.

14   **Q.**   Did you identify yourself when you called?

15   **A.**   Yes, I told them that my name was -- I told them my true

16   name.  I told them I was Officer David Ramirez with

17   Immigration, I was calling from JFK.

18   **Q.**   And do you know who you spoke to?

19   **A.**   The woman -- when I asked -- I asked to speak to a

20   designated school official.  The person had to find themselves

21   a DSO.  And I asked for the person's name and they said Susan,

22   Susan Su.

23   **Q.**   Okay.  When you identified yourself as an immigration

24   official at JFK, what did Ms. Su say?

25   **A.**   I told her that I had two students.  I let her know that

1   the students had been in secondary -- this was a ruse phone

2   call, so parts of this were not entirely true.

3       So I let her know that we had two students that had been

4   in secondary inspection for two hours and that we needed to get

5   documentation from her since to had to clear the people, let

6   them continue on their way.

7   **Q.**   Let me just stop you for a moment.  You mentioned this is

8   a ruse call; is that right?

9   **A.**   Correct.

10  **Q.**   And ruses are an investigation technique used at HSI; is

11  that fair?

12  **A.**   Yes.

13  **Q.**   All right.  You say that this wasn't all entirely true.

14  Did you, in fact, have two students at JFK?

15  **A.**   No, to my knowledge these students were both fictitious.

16  **Q.**   And you actually weren't at JFK, were you?

17  **A.**   No, I was at my desk in San Francisco.

18  **Q.**   Okay.  So now when you conveyed this information to

19  Dr. Su, how did you she respond?

20  **A.**   She didn't really hesitate.  The conversation went

21  normally.  I just let her know that we needed to get

22  documentation from her.  I told her I needed I-20s for each

23  student, transcripts, attendance records, and a letter signed

24  by a designated school official stating that the students were,

25  in fact, attending Tri-Valley in good standing.

1   Q.   And do you recall how you identified the students for

2   whom you're requesting these records?

3   A.   Yes, I told her my name, that I needed documentation for

4   a student by the name of Mohammed Rizwan, another a student

5   named Rajeev Batra, I spelled out the names, I believe, and I

6   gave her SEVIS numbers, which are unique student identification

7   numbers for each.

8   Q.   Did you give her any instructions for how to deliver this

9   information to you?

10  A.   Yes, I asked her to send them to my government email.

11  Q.   And did you give her your true email address?

12  A.   Yes.

13  Q.   Have you had an opportunity to listen to the recording of

14  the phone call with Dr. Su?

15  A.   Yes, I have.

16  Q.   And was that a true and accurate representation of the

17  conversation that you had with Tri-Valley University on

18  January 7th, 2011?

19  A.   Yes.

20      **MS. WEST:**  The United States now offers in evidence

21  Exhibit 209, which is the recording, and 209A, which is the

22  transcript.

23      **THE COURT:**  Is there any objection?

24      **MR. BABCOCK:**  There is not.

25      **THE COURT:**  209 and 209A are both admitted.

1          (Government's Exhibits 209 and 209A were received in

2          evidence.)

3          THE COURT:  Madam Reporter, while the recording itself is

4     being played, you don't need to transcribe it because the

5     parties have agreed and the Court has ordered that 209A will be

6     the transcript of the recording.

7          MS. WEST:  Can we please play Exhibit 209?  Thank you.

8          (Government's Exhibit 209 was played in open court.)

9     BY MS. WEST:

10    Q.   Agent Ramirez, did you receive documents from Susan Su

11    right away?

12    A.   No, I didn't.  I actually called the school back

13    approximately 90 minutes later and inquired where the documents

14    were.  I was told that she still had to get some documentation

15    together and needed about another 30 minutes.

16         I believe I received an email approximately 12:30 or so

17    that afternoon, about three hours after the initial call.

18    Q.   All right.  I'm going to show you what is marked for

19    identification as Government Exhibit 209B -- as in boy -- and

20    ask if you recognize this.

21    A.   Those appear to be the documents that were emailed to me.

22    It was a total of eight attachments.

23         MS. WEST:  United States offers in evidence Exhibit 209B.

24         MR. BABCOCK:  No objection.

25         THE COURT:  209B is admitted.

1        (Government's Exhibit 209B was received in evidence.)

2    BY MS. WEST:

3    Q.   All right, I'm showing you what is Exhibit 209B, page 1.

4    And is this the email that you received, Agent Ramirez?

5    A.   It appears so, yes.

6    Q.   Okay.  Now, the date at the top, if you see that there --

7    let's go out a little.  This is from you to Dale Taylor and

8    Jason Mackey.  Do you see that?

9    A.   Yes.

10   Q.   And is that just forwarding to them what you received

11   from Dr. Su --

12   A.   Correct.

13   Q.   -- on January 10th, --

14   A.   Yes.

15   Q.   -- 2011?

16        Let's go a little more.  Okay.  And there's various

17   attachments here.  Those are the eight that you referred to; is

18   that right?

19   A.   Yes.

20   Q.   Okay.  And the bottom half of this email, do you see from

21   ssu@tri-valleyuniversity.org to yourself?

22   A.   Yes.

23   Q.   And that was January 7th, 2:50 P.M.?

24   A.   Yes.  This looks like this was actually the second email.

25   I basically received two emails that were nearly identical.

1    The first one, the document came in a four-megabyte zipped

2    file, and then the second email, I believe they came separated.

3    **Q.**    I wanted to ask you about that.  Did you receive, then,

4    another email from Dr. Su?

5    **A.**    Yes, I did.

6    **Q.**    So this was the second one that you received.

7    **A.**    Correct.

8    **Q.**    Did they both contain the same attachments?

9    **A.**    I believe so, yes.

10   **Q.**    All right.  And the text in the bottom part of page 1 of

11   Exhibit 209B, do you see there it says, "David, sorry it takes

12   longer than expected.  Attached please find the required

13   documents.  Let me know if that is enough or you may need more.

14   Susan."

15   **A.**    Yes.

16   **Q.**    And then the attachments are part of Exhibit 209B, as you

17   just looked at; is that right?

18   **A.**    Yes.

19   **Q.**    Let's take a look at page 2 of 209B.  Does this appear to

20   be an attendance record for a class at TVU?

21   **A.**    Yes.

22   **Q.**    Do you see a course name at the top, BA 353?

23   **A.**    Yes.

24   **Q.**    And if we look down the left-hand column, there's one

25   name in blue.  Can you see that?

1   A.   Looks like Batra Rajeev.

2   Q.   There you go.  It's kind of blurred.

3        Is that one of the individuals that you were requesting

4   attendance records for?

5   A.   Yes.

6   Q.   And I'm showing you, now, page 3 of the same exhibit.

7        Again, looking down the left-hand corner, there appears

8   to be one name in blue; is that fair?

9   A.   Yes.

10  Q.   Again, this one actually it's reversed, Batra Rajeev; is

11  that correct?

12  A.   Yes.

13  Q.   And the third page of attendance records, which is page 5

14  of Exhibit 209B, do you see there the name about halfway down

15  that's left justified Batra Rajeev?

16  A.   Yes.

17  Q.   Okay.  I'm going to jump to page 7 of this exhibit,

18  please.  Okay.  Is this the letter that you had requested

19  regarding Rajeev Batra?

20  A.   Appears so, yes.

21  Q.   And then if you look down toward the -- about halfway

22  down, where it states Mr. Rajeev Batra was admitted to the MBA

23  program based on complete evaluation of his credentials by the

24  admission committee, do you see that?

25  A.   Yes.

1    Q.    He's been attending class at the University and in good

2    standing.

3    A.    Yes.

4    Q.    And did you also receive an I-20 for Rajeev Batra?

5    A.    Yes, I did.

6    Q.    Let's look at page 8 of Exhibit 209B.  And looking in box

7    one, do you see the name Rajeev Batra?

8    A.    Yes.

9    Q.    All right.  And if we look off to the right, is that the

10   SEVIS identification number that you referred to?

11   A.    Yes.

12   Q.    That number where it says SEVIS and then students copy,

13   that's the SEVIS identification number?

14   A.    Correct.

15   Q.    And then, if we look at box 10, the DSO certification, do

16   you see there the name Susan Su?

17   A.    Yes.

18   Q.    And then the date issued was January 7th, 2011?

19   A.    Yes.

20   Q.    All right.  Then you received some documents for another

21   individual as well; is that right?

22   A.    Yes.

23   Q.    All right.  I'm showing you page 11 of 209B.  Do you see

24   the name Mohammed Rizwan?

25   A.    Yes.

1    Q.    Now, in listening to the audio, you had actually stated

2    the name in reverse; right?  With Mohammed as the last name and

3    Rizwan as the first.

4    A.    That was the first I heard of that name.  It was a few

5    minutes before I called.  I got them backwards.

6    Q.    But you provided a SEVIS identification number; correct?

7    A.    Yes.

8    Q.    And do we see that SEVIS identification number here in

9    the upper right-hand corner of page 11?

10    A.    Yes.

11    Q.    And, again, if we go down to the bottom there on the box

12    header, there's a signature and the name Susan Su.

13    A.    Yes.

14    Q.    And with the same date of January 7th, 2011.

15    A.    Yes.

16    Q.    Let's look at page 6 of Exhibit 209B.  And is this the

17    same sort of good-standing letter that we just looked at for

18    Mr. Batra but now for Mohammed Rizwan.

19    A.    Yes.

20    Q.    And, in fact, if you look at the first sentence here,

21    this letter is written to verify Mr. Mohammed Rizwan's

22    full-time student status at Tri-Valley.

23    A.    Yes.

24    Q.    Did you receive attendance records for Mr. Rizwan?

25    A.    No, I don't believe so.

1    Q.    Okay.  You got a couple of transcripts, though; is that

2    right?

3    A.    Yes.

4    Q.    Let's take a look at page 15 of Exhibit 209B.

5          Is this a transcript here, the name states, last name,

6    Mohammed, first name Razwan?

7    A.    Yes.

8    Q.    A, A, A-minus, A-minus?

9    A.    Correct.

10   Q.    And page 14, a transcript for Rajeev Batra.  Do you see

11   that?

12   A.    Yes.

13   Q.    A, A, A-minus?

14   A.    Yes.

15   Q.    Now, did you -- that same day, were you aware of another

16   agent who was actually sent over to Tri-Valley University?

17   A.    Yes.  Sometime later on that afternoon, maybe around 2:30

18   in the afternoon, an agent in our group, Dylan Critten, was

19   sent to Tri-Valley University.

20   Q.    That was Agent Critten, you said?

21   A.    Yes, Dylan Critten.

22   Q.    Did you receive contact from Agent Critten while he was

23   at Tri-Valley?

24   A.    Yes.  About 15 to 20 minutes after Agent Critten entered

25   Tri-Valley University he called me on my cell phone pretending

1    to be calling back to New York City to John F. Kennedy

2    requesting what documentation needed to be retrieved from

3    Tri-Valley University.

4    **Q.**    And do you recall -- actually, I think that's it.  I

5    think we've covered it.

6         Thank you.

7         **THE COURT:**  Cross-examination.

8         **MR. BABCOCK:**  Thank you, Your Honor.

9                        <u>**CROSS-EXAMINATION**</u>

10   BY MR. BABCOCK:

11   **Q.**    Good morning, Agent Ramirez.

12   **A.**    Good morning.

13   **Q.**    You -- we heard -- that recording was the full

14   conversation between you and Dr. Su.

15   **A.**    Yes.

16   **Q.**    In other words, the recording device was on the whole

17   time --

18   **A.**    Yes.

19   **Q.**    -- as I understand it.  Okay.

20        We've heard the tape and that's everything that was said.

21   Didn't appear to be, as you were listening to it, was there

22   anything that stuck out as missing or not?

23   **A.**    No.

24   **Q.**    Okay.  Dr. Su asked for your number at some point --

25   **A.**    Yes.

1    Q.    -- in case she needed to call you back.

2    A.    Yes.

3    Q.    And she offered you her cell number as well.

4    A.    She offered me a number.  I'm not sure what the number

5    was.

6    Q.    Fair enough.  In case the number you called previously

7    was busy or didn't get answered.

8    A.    Yes.

9    Q.    I don't remember if you said this, but so after this

10   conversation, which is on the recording the jury just heard,

11   you waited a while for an email from her and didn't receive it;

12   right?

13   A.    Correct.

14   Q.    So you called back to the school to check on the status,

15   basically; right?

16   A.    Yes.

17   Q.    And who did you talk to at that point?

18   A.    Dr. Su.

19   Q.    Okay.  Anybody else or just Dr. Su?  Did you call her

20   cell?

21   A.    I believe I called back the number she gave me.

22   Q.    The number she gave you during the first call?

23   A.    Yes.

24   Q.    Okay.  Now, you mention on the -- what time did you

25   originally place the call?  Do you recall?

1    A.    I believe it was approximately 9:25 a.m.

2    Q.    Okay.  And what time did you call back, roughly?

3    A.    I believe it was approximately 10:55.

4    Q.    Okay.  And then you didn't get an email until later that

5    afternoon.  Mid afternoon, maybe?

6    A.    Around 12:35, 12:37, I believe.

7    Q.    Okay.  Thank you.  That's all I have.

8          THE COURT:  All right.  Does it make sense just to take

9    our morning recess?

10         MS. WEST:  That's fine.  I don't have redirect.

11         THE COURT:  Okay.  No redirect?  The magic words.

12         Agent, thank you for your testimony.  We're going to take

13   our morning recess a little early.  I think the next witness

14   will be lengthy, so we'll be in recess.

15         THE CLERK:  All rise.

16              (Outside the presence of the jury.)

17         THE COURT:  How long -- Ms. West, how long do you think

18   the Government's direct examination of Agent Mackey will be?

19         MR. RHYNE:  I'm guessing it will be about 90 minutes,

20   Your Honor.

21         THE COURT:  Very good.  Court's in recess.

22         THE CLERK:  All rise.  Court is in recess for 15 minutes.

23              (Recess taken from 9:51 A.M. to 10:07 A.M.)

24              (Outside the presence of the jury.)

25         THE COURT:  We're outside of the presence of the jury.  I

1    understand the Government had something they wanted to take up

2    with the Court.

3        **MR. RHYNE:**  Yes, Your Honor.  We just wanted to note

4    again for the record I noticed Juror No. 8, who had previously

5    been noted as dozing through part of the testimony earlier in

6    the case, was repeatedly doing the same thing today.  There

7    were a few times where I thought she was taking notes and I

8    realized at the time when she's taking notes it seems that she

9    might be asleep.  And during multiple instances this morning I

10   saw her head actually come down to a rest and stop.  She

11   appeared to be not taking notes but actually somewhat asleep.

12       And we wanted to raise it for the Court's attention

13   because given the number of times that we've now noticed this

14   we do have concerns about whether she should continue to sit as

15   a juror in the case.

16       **THE COURT:**  Mr. Babcock.

17       **MR. BABCOCK:**  If I could, if the Court could remind me

18   because I forget at this point.  If the Court were to let her

19   go, does the alternates get selected randomly or in order?

20       **THE COURT:**  I would have to look that up.

21       **MR. BABCOCK:**  We discussed it, but I can't remember what

22   you said.

23       **THE COURT:**  We would have to look that up.  I just

24   selected the next grand jury for the Northern District of

25   California so I have that process completely fresh in mind,

1   which is not the same process, and I'm familiar with the state

2   court process.  So my guess would be that the alternate would

3   be selected randomly, but I would have to double-check.

4       **MR. BABCOCK:**  That's my recollection, but I wasn't

5   positive.

6       **MS. WEST:**  That is my recollection of what the Court

7   stated at the outset.  In my experience, it's been next in

8   order.  But however the Court wanted to proceed on that would

9   be fine.

10      **MR. BABCOCK:**  I did not notice Juror No. 8 this morning,

11  but it has happened before.

12      **THE COURT:**  We need a clearer record, I think.

13      Is the Government requesting that the Court excuse

14  Ms. Fitzgerald?

15      **MR. BABCOCK:**  Or maybe talk to her first.  I don't know.

16      **THE COURT:**  I would -- well, if there's a request that

17  she be excused, then the next thing I would do is find out

18  whether the defendant joins in that request or has any

19  objection to that request, and then I would determine whether

20  or not to speak to Ms. Fitzgerald.

21      Even if the request were stipulated, I might speak to

22  her.

23      But at this point, I'm just trying to find out, I'm just

24  trying to find out what relief is being requested from the

25  Court.

1    MR. RHYNE:  Yes, Your Honor.  At this point it would be

2    our request to have her replaced, subject to obviously what she

3    says during the voir dire process.  But at this point we're

4    moving for her to be replaced.

5    THE COURT:  Mr. Babcock?

6    MR. BABCOCK:  I would -- I think we should hear from her,

7    before the Court makes a determination.  Depending on what she

8    says, we can decide.

9         If she admits it and says she was sleeping, then I may --

10   she may say she was taking notes, which she has been doing a

11   lot too.  It's sometimes hard to distinguish between nodding

12   off and taking notes.

13   THE COURT:  This question has arisen once before.  On

14   this one occasion it appeared to me that she might have been

15   drowsing off, very briefly.  And so, using a Post-It note, I

16   asked Mr. Noble, my courtroom deputy, to bring her a cup of

17   water.  That was more than a week ago.

18        I've not been observing her today, so I don't

19   independently have anything to say on this topic.

20        I do want to speak to her.  We are in the middle of a

21   trial day and I'm not going to -- unless there's an objection,

22   I would prefer to wait until the end of the day to have this

23   conversation with her and then we can have a further hearing

24   after I've spoken to her.

25   MS. WEST:  I think that makes sense.  And also, although,

1    we did not draw it to the Court's attention, we had, over the

2    course of last week, noted at least once -- and I think twice,

3    just amongst ourselves, that she appeared to be dozing off,

4    although it seemed to be of very brief duration.  Our concern

5    today is that it seemed to be of longer duration.  And I

6    recognize that we didn't draw that to the Court's attention

7    earlier, but it's fine for the Court to hold off and wait until

8    the end of today's proceedings.

9         THE COURT:  All right.

10        MR. BABCOCK:  No objection.

11        THE COURT:  That's what I'll do.  Thank you.  And when we

12   return to this matter I'll have a clearer answer for the

13   parties about how an alternate would be selected, if the need

14   were to arise.

15        MR. BABCOCK:  Thank you.

16        MR. RHYNE:  Thank you, Your Honor.

17        THE COURT:  Is there anything further we should discuss

18   before the jurors come in?

19        MR. BABCOCK:  No.

20        MR. RHYNE:  I don't believe so.

21        THE COURT:  All right.  Mr. Noble.

22        THE CLERK:  Thank you.

23             (In the presence of the jury.)

24        THE COURT:  All right.  Back on the record.

25        Mr. Rhyne, your next witness, please.

1    MR. RHYNE:  Your Honor, the Government recalls Special

2  Agent Jason Mackey.

3    THE COURT:  All right.  Mr. Mackey, you can retake your

4  seat.  You're already under oath.

5                    JASON MACKEY,

6  recalled as a witness for the plaintiff, having been previously

7  duly sworn, was further examined and testified as follows:

8                  DIRECT EXAMINATION

9  BY MR. RHYNE:

10  Q.    Good morning, Agent Mackey.

11  A.    Good morning.

12  Q.    When we last heard from you, you indicated that you were

13  prepared to come back and testify about your financial analysis

14  in this case; is that correct?

15  A.    Yes.

16  Q.    Can you summarize for the jury the training that you've

17  had on conducting financial analysis in a criminal case like

18  this?

19  A.    Sure.  In 2002 I attended the Federal Law Enforcement

20  Training Center in Georgia.  That involved me attending two

21  courses.  One was a basic criminal investigator course that

22  taught general basic investigative techniques, did cover some

23  financial investigative topics; then I took a subsequent

24  follow-on course, which was a customs basic enforcement school,

25  and there I learned customs-specific topics.

1    And at the time, the U.S. Customs Service's primary

2    mandate was basically to go after tax evaders in the sense that

3    importers that don't pay duty, they're trying to attempt to

4    evade paying duties, we would investigate that.

5    We had the secondary mandate of going after contraband

6    smugglers -- people who try to smuggle drugs in this country,

7    as well as individuals who smuggle the proceeds of those drugs

8    out of this country.

9    So that course covered several topics, which would

10   include money laundering, asset forfeiture, tracing of funds,

11   et cetera.

12   Q.    When you use the term "tracing of funds," what do you

13   mean?

14   A.    Basically, once you identify that an individual is

15   involved in smuggling drugs into this country and he's making

16   money from that endeavor, we need to utilize techniques to be

17   able to specifically tie the money that they're making with,

18   for example, specific bank accounts that they're placing it in

19   so that we can inform the Court that the money that we're

20   attempting to seize is the same money that the individual made

21   during the course of their illegal activities.

22   Q.    Have you attended any formal seminars on these topics?

23   A.    Yes, I have.

24   Q.    Can you tell the jury about that?

25   A.    I've attended several financial seminars; various

1    seminars put on by different organizations such as the

2    Department of Treasury.  At the time when I was hired, the

3    Customs Service was under the Department of Treasury.

4        I also attended several trainings put on by FinCEN --

5    it's the Financial Crimes Network, and various other seminars

6    related to money laundering and tracing of funds and financial

7    investigations.

8    Q.    And you covered similar topics in those seminars?

9    A.    Yes.

10   Q.    The contents of those seminars was -- included some other

11   case agents that would come in and talk about methods that they

12   have used in other cases; is that correct?

13   A.    Yes, they talk about current topics and current case law,

14   et cetera.

15   Q.    How many financial accounts did you analyze in this

16   particular case?

17   A.    Probably around a dozen accounts.

18   Q.    How many accounts could you say you looked at all

19   together?

20   A.    It's somewhere in the vicinity of a dozen.  I looked

21   specifically at, I believe, somewhere around nine accounts in

22   detail that appear to be receiving funds from F-1 students.

23   Q.    And 12 total and you looked closely at 9?

24   A.    Yes.

25   Q.    And can you just tell generally what institutions did

1    those accounts belong to?

2    **A.**    Wells Fargo, CitiBank, PayPal, and they also utilized the

3    credit card processing company called "Global Payments."

4    **Q.**    I want to just have you generally walk through the

5    methods that you used in conducting the analysis in this case.

6    Where do you start?  What do you look at?

7    **A.**    Generally, I start with the bank statements, to get an

8    overall picture of the money coming into the account and money

9    being pulled out of the account.

10        From that point I can look at more detailed invoices or

11   the supporting documents which might describe exactly what the

12   credits and debits are.

13   **Q.**    What date ranges were you concerned with in this case?

14   **A.**    I started my analysis by looking at February 19th of

15   2009, which was the date that Tri-Valley University received

16   approval to admit F-1 students.

17   **Q.**    When you started at that point, did you also note the

18   existing balances in the accounts that you were analyzing at

19   that point?

20   **A.**    Yes, I did.

21   **Q.**    Why did you do that?

22   **A.**    I wanted to have an idea of funds that might be in the

23   account that weren't from F-1 students.

24   **Q.**    What was the end of the date range that you analyzed in

25   this case?

1    A.    January 19th, 2011.

2    Q.    What's the significance of that date, again?

3    A.    That's the day that we went through Tri-Valley

4    University's approval to enroll foreign students.

5    Q.    So those two days are the snapshot of potential

6    Tri-Valley University F-1 students?

7    A.    Yes.

8    Q.    So when you're looking at the actual bank statements --

9    let's go one step forward -- what items are you starting with?

10   A.    I'm looking at the -- there's a date of a transaction,

11   generally there'll be a memo line which will provide some basic

12   information about what the transaction is, and there'll be a

13   credit -- information about whether there's a credit or a debit

14   in the account, basically what you would see in your ordinary

15   bank statements.

16   Q.    I want to talk a little bit about some of these

17   institutions that held accounts in this case, starting with

18   PayPal.  Did you analyze statements from PayPal?

19   A.    Yes, I did.

20   Q.    Can you generally describe for the jury how you would

21   look at a statement in PayPal for Tri-Valley University and

22   determine whether a line item in there was F-1 income or not?

23   A.    Sure.  PayPal is a little different than the other

24   accounts in that they kept more detailed information about who

25   was making the payment, the email address of the person making

1    the payment, they captured the IP address of the person making

2    the payment, et cetera.

3        So I generally would start by looking at the name of the

4    person that PayPal was indicating was making the specific

5    payment and from that point on I would compare that name with

6    names on the SEVIS database to determine whether or not the

7    payment was coming from an F-1 student or not.

8    Q.   What if you saw a payment in PayPal that you were not

9    able to link up to a student?  What would you do at that point?

10   A.   Sure.  I could tell you from my observations, conducting

11   this analysis, many individuals weren't making payments on

12   behalf of themselves, they were individuals making payments on

13   behalf of other people.

14       So you might have a wife making a payment on behalf of a

15   husband who was a Tri-Valley student, or a friend, et cetera.

16       So in that case I would go through typically what we

17   collected from our search warrant, which were just invoices,

18   handwritten notes, et cetera, which would specify who an

19   individual payment was for.

20       So if I saw a payment that didn't match in SEVIS, I would

21   look for that payment from our search warrant materials and

22   find an invoice that matched that payment and then run the name

23   on the invoice in our SEVIS database to determine whether or

24   not that payment was being made for an F-1 student.

25   Q.   How many PayPal line item payments would you say you

1    looked at in conducting your financial analysis just with

2    respect to PayPal?

3    **A.**    There was close to 10,000 transactions.  I couldn't go

4    through all those transactions, I'd still be going through them

5    today if I tried, so I focused on payments that were over $50.

6    **Q.**    Why do you do that?

7    **A.**    To get a better idea of the large transactions that were

8    taking place.

9    **Q.**    Did you have an idea about what a semester tuition

10   payment was going to be at this point?

11   **A.**    Yes.  So I did specifically pick $50 because that was

12   what Tri-Valley University charged for its application fees.

13   They also charged nominal amounts for issuing CPT I-20s, for

14   mailing, FedEx'ing I-20s, et cetera.

15        So there were a lot of little charges which I didn't even

16   look at; I looked at the charges that were over $50, which

17   would include, generally, tuition payments.

18   **Q.**    And we're going to talk about this topic in more detail

19   in a while, but those transactions that were under $50, when

20   you saw those coming into the account you categorized those in

21   a certain way; is that correct?

22   **A.**    Yes.

23   **Q.**    As opposed to the F-1 income that you were able to

24   identify; is that correct?

25   **A.**    Yes.

1    Q.   So you kept a running total of what you would call

2    "unidentified money" versus the F-1 money; is that correct?

3    A.   Exactly.

4    Q.   And you did that for each account?

5    A.   Yes.

6    Q.   Credit cards.  Let's shift to credit cards.

7         Did you see income from credit cards into Tri-Valley

8    University accounts?

9    A.   I did.  Looking at monthly statements for one of

10   Tri-Valley's business Wells Fargo accounts, it was clear that

11   they were processing credit card payments.  The memo line on

12   the monthly statement indicates that they were using a company

13   called "Global Payments."

14        So I subpoenaed Global Payments and obtained the credit

15   card processing application from them, which confirmed that

16   they were, in fact, using Global Payments in that they had

17   linked their credit card processing account to those specific

18   Wells Fargo accounts.

19   Q.   And can you describe for the jury the process by which if

20   a student walks in, swipes a credit card for their $2,700, how

21   that transaction then flows into the bank account?

22   A.   Sure.  TVU had three credit card processing accounts and

23   each account came with a separate credit card machine.  And the

24   way the machines worked, or if -- you can either show up in

25   person to pay your tuition -- at which point they'll swipe the

1    credit card, a receipt will be printed, they'll keep a copy of

2    the receipt, they can give the student a copy of the receipt --

3    or individuals can just call in and provide their credit card

4    number, they'll punch it into a machine, the machine will print

5    out a receipt.

6         Those receipts are all -- or those payments are all put

7    into what's call "batches."  So you might have several payments

8    in a single batch.

9         And then once the merchant at the end of the day -- or

10   whenever that merchant decides to finalize the batch, he'll go

11   in -- or she will go in and finalize the batch, print out a

12   report, and that amount will be the amount that's deposited

13   into the Wells Fargo account that's linked to the credit card

14   processing company.

15        So if they have three credit card transactions, each for

16   a thousand dollars, and they run the batch at the end of the

17   day, the amount that we see deposited into the Wells Fargo

18   account will be $3,000 and all the cards will show the same

19   batch number.

20   Q.   And then on site at the merchant, or in this case

21   Tri-Valley University, there would also be a physical receipt,

22   in many cases; is that correct?

23   A.   Yes.

24   Q.   And those were one of the things you were looking for in

25   your search warrant in this case.

1    **A.**    Yes.

2    **Q.**    How were you able to match up a credit card swipe with a

3    F-1 student in this case in order to categorize F-1 income?

4    **A.**    So when we conducted our search warrants at the

5    Tri-Valley University business, agents found receipts all

6    strewn about the business; it was a little disorganized.  So it

7    was a process of scanning all the receipts -- which were

8    oftentimes stapled to invoices -- and putting them together in

9    the proper batches and matching up the batched amounts with the

10   deposits in the Wells Fargo account.

11       And from that point I would take the names on the

12   invoices -- because a lot of times the credit card receipts

13   won't have a name on the receipt, depending on how it's run, so

14   I have to look at the invoices attached to the receipt and run

15   the name on the invoices in our SEVIS database to confirm that

16   the payment is actually for an F-1 student.

17   **Q.**    And if the name's on the credit card receipt, it's

18   easier; correct?

19   **A.**    Yes.

20   **Q.**    You just take that name, run it into SEVIS, and then you

21   can confirm or deny that they were a student; correct?

22   **A.**    But in the case of Tri-Valley, they ran most of their

23   credit card payments through online payments.  So they punched

24   in their credit card number.  So when they do that, it doesn't

25   print a name on the receipt.

1    Q.    So that's when you had to go in and do an additional step

2    of finding the paperwork that -- underlying that payment to

3    Tri-Valley?

4    A.    A matching invoice, yes.

5    Q.    Checks.  I want to move now to checks.

6          Were you able to find income in the form of checks for

7    Tri-Valley University?

8    A.    Yes.

9    Q.    How were you able to determine whether a particular

10   payment made by a check was F-1 income?

11   A.    At first I'd look at the name of the payer on the check

12   and run that in the SEVIS database.  Obviously, if that

13   matched, I'd know that it was an F-1 student.  If it doesn't

14   match, I'd also look for an invoice to indicate who the payment

15   was for and then I'd indicate whether that payment was for an

16   F-1 student.

17   Q.    EFTs.  Are you familiar with that term?

18   A.    Yes.

19   Q.    What's an EFT?

20   A.    Electronic funds transfer.  It's a transfer of funds

21   between various bank accounts.

22   Q.    Okay.  Did you find income for Tri-Valley University that

23   came in the form of EFTs?

24   A.    Yes.

25   Q.    How would you reconcile that income in categorizing it as

1    an F-1 payment or something else, or an unidentified payment?

2    **A.**   With the EFTs and also with the wires, the monthly

3    statements, they'll annotate in the memo section, statement

4    information, about who the payment's for and any other

5    information that can fit in the memo line that the payor

6    chooses to put in when they make their EFT transaction.

7        So I'd match the name in the memo line with -- number

8    one, I'd run it in our SEVIS and determine whether it comes

9    back to an F-1 student.

10   **Q.**   And you said you do the same thing with respect to wires?

11   **A.**   Yes.

12   **Q.**   Can you just tell the jury what you mean by wires as

13   opposed to EFTs?

14   **A.**   It's very similar; a different way to initiate transfers

15   to accounts.

16       Wires involve you -- require you to go into a bank and

17   fill out a form.  It's often used to move money from one

18   country to another country.

19   **Q.**   Cash.  Did you see income in the form of cash at

20   Tri-Valley University?

21   **A.**   Yes.

22   **Q.**   How did that compare, as far as your analysis goes, in

23   matching that up with a particular student?

24   **A.**   Generally I didn't match up the cash.

25   **Q.**   More difficult?

1  A.   Yes.

2  Q.   Now, as you're analyzing these different forms of income,

3  you're keeping a running total of the balances in each account;

4  correct?

5  A.   I'm keeping a running total of the identified F-1

6  payments and the unidentified payments.

7  Q.   And that's for each -- each individual account has its

8  own spreadsheet; correct?

9  A.   Correct.

10  Q.   Now, previously, when you testified, you talked about

11  Exhibit 109, which was a CD ROM --

12  A.   Yes.

13  Q.   -- of evidence; correct?

14  A.   Yes.

15  Q.   What was on Exhibit 109?

16  A.   We scanned all of the receipts and invoices.  As a matter

17  of fact, we scanned all the physical documents that we seized

18  from the Tri-Valley University businesses.  And I went through

19  those scanned images and pulled out the receipts and invoices.

20       And that's -- I used the scanned images to sort and

21  organize all the receipts and put them in their proper batches.

22  Q.   And in this spreadsheet that you're making, are you able

23  to look at the spreadsheet and easily find the source or the

24  corroboration that you used to identify that income as F-1

25  income?

1    **A.**    It was a lot of work, actually, scanning and organizing,

2    because there were hundreds of thousands of documents, probably

3    hundreds of thousands of invoices and receipts, to kind of put

4    the puzzle together.  It took a long time, yes.

5    **Q.**    And how long did this process take you in conducting this

6    analysis in this case?

7    **A.**    I didn't work on it full time, but, I mean, off and on,

8    probably over a year.

9    **Q.**    Now, in order to present your testimony today and your

10   financial analysis, you've created some summaries; is that

11   correct?

12   **A.**    Yes.

13          **MR. RHYNE:**  Your Honor, may I approach?

14          **THE COURT:**  Yes.

15   BY MR. RHYNE:

16   **Q.**    I'm going to hand you Exhibit 650, 651, and 653, all

17   currently for identification, and have you take a look at

18   those, Agent Mackey.

19          Let's start with 653.  What is Exhibit 653?

20   **A.**    It's basically spreadsheets that I've compiled using the

21   monthly statements as kind of a base showing the running total

22   of unidentified payments and F-1 payments flowing through the

23   accounts.

24          And there's also another tab which actually itemized each

25   individual account.

1           So it breaks down the credit card payments into the, you

2    know, batches, and the individual transactions within those

3    batches, and it also shows the individual PayPal transactions

4    and checks, et cetera.

5    Q.    The first few tabs that we see in there, how is that

6    organized?

7    A.    The first few tabs are organized by account.

8           And, again, it basically mirrors the monthly statement on

9    the left, and on the right is my analysis and the running

10   totals of F-1 payments and unidentified payments.

11   Q.    Now I want to shift your attention to Exhibit 650.

12          Do you recognize Exhibit 650?

13   A.    Yes, I do.

14   Q.    Is that a graphical depiction of the money flow that you

15   were able to determine in this case?

16   A.    Yes, the tuition deposits and transfers between accounts.

17   Q.    And then it goes on to also analyze some of the more

18   major expenditures; is that correct?

19   A.    Yes.

20   Q.    Exhibit 651.  Can you look at that please?  What's

21   Exhibit 651?

22   A.    Spreadsheet depiction of basic account information for

23   the Tri-Valley accounts, would include the account names, the

24   opening dates, who has signature authority over the accounts,

25   what the balances were on the account -- the accounts, when

1    Tri-Valley received its F-1 approval.

2    **Q.**   And the following pages in Exhibit 651, what do we see

3    there?

4    **A.**   It's a breakdown of the F-1 payments identified entering

5    into various Tri-Valley University accounts.

6    **Q.**   And the final page.  What do we see there?

7    **A.**   This is a spreadsheet depiction of the total deposits

8    coming into the accounts.  So that would include identified F-1

9    payments and unidentified payments.

10   **Q.**   Would Exhibits 650, 651, and 653 be helpful today in

11   explaining your testimony to the jury?

12   **A.**   Yes.

13        **MR. RHYNE:**  Your Honor, we would offer those exhibits

14   into evidence at this time.

15        **THE COURT:**  Any objection?

16        **MR. BABCOCK:**  No, Your Honor.

17        **THE COURT:**  Exhibits 650, 651, 653 are now admitted.

18             (Government's Exhibits 650, 651, and 653 were

19             received in evidence.)

20   BY MR. RHYNE:

21   **Q.**   And those records confirm what we see on Exhibit 651,

22   page 1?

23   **A.**   Yes, they do.

24   **Q.**   Turning to Exhibit 515, what's Exhibit 515?

25   **A.**   It's a CD of PayPal account information produced by

1    PayPal in response to our subpoena.

2    **Q.**    And that includes transaction records; is that correct?

3    **A.**    Yes.

4    **Q.**    Or PayPal's equivalent of the monthly statements?

5    **A.**    Yes.

6    **MR. RHYNE:**   Your Honor, we'd offer Exhibit 515 into

7    evidence.

8    **MR. BABCOCK:**   No objection.

9    **THE COURT:**   Exhibit 515 is admitted.

10    (Government's Exhibit 515 was received in evidence.)

11    **BY MR. RHYNE:**

12    **Q.**    Agent Mackey, before we talk about 1921 in some more

13    detail, I'm going to refer you back to Exhibit 651, page 1.

14    The opening date on this account is September 22nd, 2003;

15    is that correct?

16    **A.**    Yes.

17    **Q.**    Was this account opened in the name of Tri-Valley

18    University on that day?

19    **A.**    No, it was not.

20    **Q.**    Can you explain to the jury how that came to be?

21    **A.**    It was initially opened as a personal account in the name

22    of Susan Su.  It was converted into a business account in 2008,

23    and then the primary email address -- which is how payments are

24    routed in PayPal, you punch in somebody's email address and

25    that's how PayPal knows how to send the payment -- that was

1    changed from a personal email account to

2    ssu@tri-valleyuniversity.org, which is one of Tri-Valley

3    University's main email accounts.

4    Q.   So getting back to 1921, up on Exhibit 650 you have

5    $2.9 million of F-1 proceeds going into this account; correct?

6    A.   Yes.

7    Q.   And that's the lower number that you calculated based on

8    your review of the records?

9    A.   Yes.  If I saw a record in SEVIS, I'd note it as an F-1

10   payment.  That's where that figure comes from.

11   Q.   If you were relying on Dr. Su's 98 percent F-1 students

12   at her school, this $2.9 million would be bigger; is that

13   correct?

14   A.   Yes.

15   Q.   Before we go on, we should clarify that the -- of the F-1

16   payments and the unidentified payments that you saw going into

17   each of these accounts, were you able to see all of it as

18   coming in from Tri-Valley University?

19   A.   Sorry.  Could you repeat the question?

20   Q.   When you spoke to Dr. Su, you asked her whether she had

21   any other forms of income other than Tri-Valley University;

22   correct?

23   A.   Yes.

24   Q.   What did she say?

25   A.   She said no.

1   Q.   That it was all from Tri-Valley University; correct?

2   A.   Correct.

3   Q.   I want to shift gears.  I want to talk about Wells Fargo

4   Bank account ending in 0454.

5        Do you see that there?

6   A.   Yes.

7   Q.   And, again, we have F-1 proceeds going into this

8   account --

9   A.   Yes.

10  Q.   -- of 2.5 million.

11  A.   Yes.

12  Q.   And, again, this is the lower number that you calculated;

13  correct?

14  A.   Right.

15       MR. RHYNE:  Your Honor, may I approach?

16       THE COURT:  Yes.

17  BY MR. RHYNE:

18  Q.   I'm going to hand the witness Exhibit 500, 501, and 501A,

19  all for identification.

20       Do you recognize those exhibits?

21  A.   I do.

22  Q.   Can you just briefly summarize what Exhibit 500 is?

23  A.   Signature cards and account opening applications for

24  Wells Fargo at 0454 and 3640.  They were linked accounts.

25  Q.   Okay.  So we have another account that's linked to this;

1   is that correct?

2   **A.**   Yes.

3   **Q.**   And that account had $105,000 of F-1 proceeds that you

4   identified.

5   **A.**   Yes.

6   **Q.**   What do we see in Exhibit 501?

7   **A.**   These are monthly statements for both account 0454,

8   Wells Fargo, and Wells Fargo account 3640.

9   **Q.**   And what do we see in 501A?

10  **A.**   These are selected deposits going into accounts,

11  Wells Fargo account 0454 and 3640.

12  **Q.**   I'm also going to hand you 501B.  Can you look at 501B

13  for identification?  What is that?

14  **A.**   Wire transfer records for account 3640, produced by

15  Wells Fargo.

16  **Q.**   Did you rely on all of these documents in your analysis?

17  **A.**   I did.

18  **Q.**   Do the account opening details and opening balances, did

19  you use these documents in making Exhibit 651?

20  **A.**   I did.

21       **MR. RHYNE:**  Your Honor, we'd offer Exhibit 500, 501,

22  501A, and 501B into evidence.

23       **MR. BABCOCK:**  No objection, Your Honor.

24       **THE COURT:**  Exhibits 500, 501, 501A, and 501B are

25  admitted.

1           (Government's Exhibits 500, 501, 501A, and 501B were

2           received in evidence.)

3     BY MR. RHYNE:

4     Q.    I'm going to go ahead and retrieve those from you,

5     Agent Mackey.

6           Agent Mackey, I'd like to hand you now Exhibit 516 for

7     identification.

8           Do you recognize that?

9     A.    I do.

10    Q.    What is that?

11    A.    It's opening applications and batch deposit statements

12    from Global Payments, the credit card processing company for

13    Tri-Valley.

14    Q.    And those are the records that you found affiliated with

15    0454?

16    A.    Correct.

17    Q.    The credit card swipes that actually feed into that

18    account?

19    A.    Yes.

20    Q.    Were you able to confirm who the account holders were

21    with Global Payments?

22    A.    Yes.

23    Q.    And Dr. Susan Su was account holder; is that correct?

24    A.    On all three accounts, yes.

25    Q.    And with Tri-Valley University listed as the business; is

1    that correct?

2    **A.**    Correct.

3         **MR. RHYNE:**  Your Honor, we offer Exhibit 516 into

4    evidence.

5         **MR. BABCOCK:**  No objection, Your Honor.

6         **THE COURT:**  Exhibit 516 is admitted.

7         (Government's Exhibit 516 was received in evidence.)

8    BY MR. RHYNE:

9    **Q.**    Agent Mackey, I'd like to hand you Exhibit 512, 513, and

10   513A for identification and have you take a look at them.

11        What's Exhibit 512?

12   **A.**    Signature cards and opening applications for CitiBank

13   account 3045, as well as monthly statements and selected

14   deposits for that same account.

15   **Q.**    And that rounds out 513 and 513A; correct?

16   **A.**    Yes.

17        **MR. RHYNE:**  Your Honor, we'd offer Exhibit 512, 513, and

18   513A into evidence.

19        **MR. BABCOCK:**  No objection.

20        **THE COURT:**  512, 513, and 513A are admitted.

21        (Government's Exhibits 512, 513, and 513A were

22        received in evidence.)

23   BY MR. RHYNE:

24   **Q.**    And does Exhibit 651 accurately summarize the signature

25   authority, the account name, the balance, and the last four of

1    the account?

2    **A.**    Yes.

3    **Q.**    Now I want to direct your attention to the screen where

4    we have Exhibit 650, also, up.

5         Do you see the CitiBank account at the top?

6    **A.**    Yes.

7    **Q.**    And that's ending in 3045?

8    **A.**    That's correct.

9    **Q.**    That's this account?

10   **A.**    Yes.

11   **Q.**    Any F-1 payments going directly into that account?

12   **A.**    No, I don't believe so.  Just transfers from other

13   accounts.

14   **Q.**    So this was included in your analysis because F-1

15   payments traveled through it; is that correct?

16   **A.**    Correct.

17   **Q.**    I want to direct your attention now to Wells Fargo Bank

18   account ending in 4780.

19        I'm going to hand you Exhibit 502, 503, and 503A, and

20   have you take a quick look at them.  And, as you're looking at

21   them, can you just generally summarize what each of them are?

22   **A.**    502 is opening applications and signature cards for

23   Wells Fargo account 4780, 503 are monthly statements for

24   Wells Fargo account 4780, and 503A are selected deposits going

25   into Wells Fargo account 4780.

1    MR. RHYNE:  Your Honor, we'd offer Exhibit 502, 503, and

2    503A into evidence.

3    MR. BABCOCK:  No objection.

4    THE COURT:  502, 503, and 503A are all admitted.

5    (Government's Exhibits 502, 503, and 503A were

6    received in evidence.)

7    BY MR. RHYNE:

8    Q.   And, Agent Mackey, you also identified a small amount of

9    F-1 payments going into that account; correct?

10   A.   Yes.

11   Q.   And we see that there also.  The bubble.  16,000.

12   A.   Correct.

13   Q.   Now, once you identified these accounts, were you able to

14   track the money between and among them?

15   A.   Yes, I tracked transfers between the accounts.

16   Q.   I want to direct your attention to this first line that

17   we see coming out of PayPal ending in 1921 and going into

18   Wells Fargo Bank 3640.  What is that?

19   A.   That signifies that between the dates of November 10,

20   2009, and April 27, 2010, there were a series of transfers

21   between the PayPal account 1921 into account 3640 of

22   Wells Fargo.  They all -- all the transfers were in one

23   direction; they went from the PayPal account into the

24   Wells Fargo account.

25   Q.   And that's a series of different transactions occurring

1    over time, not one transaction?

2    A.    Correct.

3    Q.    Now, I pulled up the second arrow, moving from PayPal

4    ending in 1921, to Citi ending in 3045.  What do we see here?

5    A.    Again, that signifies transfers from Tri-Valley

6    University's PayPal account; a series of transfers between

7    December of 2010 to January of 2011 totalling $1.28 million

8    going into the CitiBank 3045.

9    Q.    Next slide, we see movement of money from Wells Fargo

10   0454 back to Citi 3045; is that correct?

11   A.    Yes.

12   Q.    I shouldn't say "back to Citi," I should say "to Citi."

13   Correct?

14   A.    Correct.  They're all in one direction.

15   Q.    And that's a total of $900,000 was transferred between

16   date ranges of December 22nd '09 and November 11, 2010, is that

17   correct?

18   A.    Yes.

19   Q.    Moving to the next slide, we see a line from Wells Fargo

20   0454 going into Wells Fargo 3640; is that correct?

21   A.    Yes.

22   Q.    Could you tell the jury what this is?

23   A.    This shows a series of transfers between Wells Fargo

24   account 0454 and 3640 totalling $59,000 net, moving to 3640.

25         So there were transfers going in both directions, but the

1    net amount of transfers, when they're all added up, is $59,000

2    going in the direction of Wells Fargo account 3640.

3    Q.   So the arrow runs one way because that's the net?

4    A.   Correct.

5    Q.   And, finally, we see a list of transactions from 0454

6    into 4870; is that correct?

7    A.   Yes.

8    Q.   Can you tell the jury what we see here?

9    A.   That shows $895,000 in net transfers between -- or from

10   Wells Fargo account 0454 into Wells Fargo account 4780 between

11   the periods of March 2010 and December 2010.

12        Again, that's net.  So they're transfers going back and

13   forth, but the net amount is traveling the direction of 4780.

14   Q.   And here, this is a summary of the major transactions as

15   they appear with respect to these particular accounts; correct?

16   A.   Yes.

17   Q.   And just for the record, there's fewer accounts on

18   Exhibit 650, page 1, than we see on 651, page 1; is that

19   correct?

20   A.   Yes.

21   Q.   Why is that?

22   A.   Generally, I'm only looking at accounts that are either

23   receiving F-1 payments or are being used to purchase

24   large-ticket items.

25   Q.   Okay.  So this is the money going in and the money moving

1    around; correct?

2    **A.**   Yes.

3    **Q.**   Did you also analyze the money being spent from these

4    accounts?

5    **A.**   Yes.

6    **Q.**   I want to go to the next slide and keep all of these

7    accounts in the same spot, just for reference.

8         I'm sorry, one more transaction before we do that.

9         What do we see there?

10   **A.**   Net transfers between account 3640 into account 4780,

11   both with Wells Fargo.  Total's $150,000 between the date

12   ranges of May 2010 -- and I think that might be a typo,

13   December of 2010.

14   **Q.**   Oh, 2010.  So that should be 12/14/2010?

15   **A.**   Yes.

16   **Q.**   And this arrow is blue and red; is that correct?

17   **A.**   Yes.

18   **Q.**   And that's because you have money coming in from

19   different sources -- upstream; correct?

20   **A.**   Yes.

21   **Q.**   Okay.  So, again, I want to keep these all in the same

22   place, just for reference.

23        This slide is entitled "Money Laundering Transactions."

24   Is that correct?

25   **A.**   Yes.

1    Q.   I want to direct your attention to the first slide.

2         We see a $36,000 transaction for count 26.  Do you see

3    that?

4    A.   I do.

5    Q.   Can you summarize what that is?

6    A.   That shows, actually, a check that was written against

7    account 0454 to purchase a red Mercedes by Susan Su.

8    Q.   I want to hand you Exhibit 600 and Exhibit 700 for

9    identification.

10        Can you look at Exhibit 600, please.

11        What is Exhibit 600?

12   A.   It's a check drawn on Tri-Valley University Wells Fargo

13   account 0454 for the purchase of a Mercedes-Benz.

14   Q.   And what do we see in Exhibit 700?

15   A.   It's a purchase contract for that Mercedes-Benz.

16        MR. RHYNE:  Your Honor, we'd offer Exhibit 600 and 700

17   into evidence.

18        MR. BABCOCK:  No objection.

19        THE COURT:  Exhibits 600 and 700 are admitted.

20            (Government's Exhibits 600 and 700 were received in

21            evidence.)

22   BY MR. RHYNE:

23   Q.   I'm going to grab Exhibit 600 and 700 back from you.

24        Agent Mackey, this is Exhibit 600, page 3; is that

25   correct?

1    A.   Yes.

2    Q.   And this is the check you were referring to?

3    A.   Yes.

4    Q.   You were able to identify the account this check came

5    from; correct?

6    A.   Yes.

7    Q.   0454?

8    A.   That's correct.

9    Q.   Signed by Susan Su?

10   A.   Yes.

11   Q.   To Mercedes-Benz of Pleasanton?

12   A.   Yes.

13   Q.   And Exhibit 700, we see a photocopy of that check;

14   correct?

15   A.   Yes.

16   Q.   And some DMV paperwork?

17   A.   Correct.

18   Q.   For a Mercedes-Benz?

19   A.   Yes.

20   Q.   We also see the sales contract; is that correct?

21   A.   Yes.

22   Q.   And if we zoom in here, we have the buyer as Susan Su; is

23   that correct?

24   A.   Yes.

25   Q.   And also a copy of her driver's license in there?

1    A.    Yes.

2    Q.    Agent Mackey, that's a picture of the car.

3    A.    Yes, it is.

4    Q.    I want to go to the next slide.  Do you see the $78,000

5    transaction for count 27 for Murrieta Road?

6    A.    Yes.

7    Q.    Can you describe for the jury what we see here?

8    A.    That was a wire transfer from Wells Fargo account 0454 to

9    purchase a condo in Livermore for $78,000.

10   Q.    I'm going to hand you Exhibit 601 for identification.

11         Actually, before we talk about Murrieta Road, you already

12   summarized for the jury your analysis as to the Mercedes-Benz;

13   is that correct?

14   A.    Yes.

15   Q.    That necessarily $11,000 of what you identified to be F-1

16   proceeds was included in that $36,000; is that correct?

17   A.    Yes.

18   Q.    What do we see in Exhibit 601?

19   A.    Wire transfer documents obtained from Wells Fargo

20   relating to this transaction.

21        MR. RHYNE:  Your Honor, we'd offer Exhibit 601 into

22   evidence.

23        MR. BABCOCK:  No objection, Your Honor.

24        THE COURT:  Exhibit 601 is admitted.

25             (Government's Exhibit 601 was received in evidence.)

1     MR. RHYNE:  I'm publishing that exhibit.

2    BY MR. RHYNE:

3    Q.   Here we see the amount for the wire; is that correct?

4    A.   Yes.

5    Q.   And this is a transaction report; is that correct?

6    A.   Correct.

7    Q.   And we had it going to Fidelity National Title; is that

8    correct?

9    A.   Yes.

10   Q.   And the Tri-Valley University name here?

11   A.   Yes.  With the account number above that.

12   Q.   0454?

13   A.   Correct.

14   Q.   Were you able to get records from Fidelity Title in this

15   case?

16   A.   Yes, we were.

17   Q.   Why did you want to do that?

18   A.   To confirm that Susan Su, in fact, purchased that

19   property.

20   Q.   Okay.  I want to hand you Exhibit 701 and just have you

21   take a quick look at it.  You don't need to flip through it.

22        But do you recognize Exhibit 701?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   Escrow files related to the purchase of the Murrieta Road

1    property.

2    **Q.**    You find a check register in there?

3    **A.**    Yes.

4    **Q.**    Did it have the $78,000 check?

5    **A.**    Wire transfer.

6    **Q.**    Or wire transfer?

7    **A.**    Yes.

8         **MR. RHYNE:**  Your Honor, move Exhibit 701 into evidence.

9         **MR. BABCOCK:**  No objection.

10        **THE COURT:**  Exhibit 701 is admitted.

11            (Government's Exhibit 701 was received in evidence.)

12        **MR. RHYNE:**  Your Honor, can we have a side bar?

13        **THE COURT:**  Sure.

14            (A conference was held at the sidebar as follows,

15            outside the presence of the jury.)

16        **THE COURT:**  We're outside of the presence of the jury.

17        The defendant has requested that we take an early

18   10-minute recess.  Is there any objection?

19        **MS. WEST:**  No.

20        **MR. RHYNE:**  No objection.

21        **MS. WEST:**  If the other jurors need to take that

22   opportunity, will 10 minutes be sufficient?

23        **THE COURT:**  That's a good point.

24        **MR. BABCOCK:**  I don't know the answer to that.

25        **THE COURT:**  That's fine.  We'll take a recess for 15

1    minutes.

2              (The sidebar conference was concluded.)

3         THE COURT:  Members of the jury, something's just come up

4    that requires us to take a recess a little bit early, so we'll

5    be in recess for 15 minutes.

6         THE CLERK:  All rise.

7              (Outside the presence of the jury.)

8         THE COURT:  We're outside of the presence of the jury.  I

9    won't take much of your time because I want you to have the

10   full break outside the bar.  The defense counsel advised the

11   defendant needs to use the restroom, so I would take an earlier

12   recess.

13        But while I have been at the bench, I have determined

14   that -- pursuant to Federal Rule of Criminal Procedure 24(c),

15   that alternate jurors are to replace jurors in the same

16   sequence in which the alternates were selected.

17        And that means -- if my notes are correct, and I believe

18   they are -- that Ms. Morgan Stenhouse would be the next juror

19   to be seated, if the Court were to excuse a juror.

20        I've not been able to find any district court judge who

21   made the mistake of selecting a juror by alternate within the

22   last 30 years, but about 30 years ago one did, and here she was

23   promptly reversed, in the case of *Heath v. Cast,* 813 F.2d 254,

24   a Ninth Circuit case from 1957.

25        The Court's in recess.

1           THE CLERK:  All rise.

2                (A recess was taken.)

3                (In the presence of the jury.)

4           THE COURT:  All right, let's go back on the record.

5           MR. RHYNE:  Thank you, Your Honor.

6      BY MR. RHYNE:

7      Q.   Agent Mackey, when we left off, you were confirming that

8      you requested and received an escrow file for this purchase; is

9      that correct?

10     A.   Yes.

11     Q.   You were able to find evidence of the transaction in the

12     escrow file?

13     A.   Yes, I was.

14     Q.   By Dr. Su; is that correct?

15     A.   Correct.

16     Q.   Now, I want to direct your attention to your spreadsheet

17     there, Exhibit 653, tab 4, 0454, pages 21 to 22.

18          Can you explain your analysis to the jury as to how much

19     F-1 income would have had to have necessarily been included in

20     the $78,000 transaction?

21     A.   Sure.  So just before the transaction, the balance in the

22     account was $306,000.  Based on my running total of F-1

23     payments and unidentified payments, the amounts of unidentified

24     payments in the account was $56,000.

25          So assuming that that entire $56,000 went into the

1    transaction, it would necessarily have to be $22,000 in F-1

2    proceeds in that transaction.

3    Q.    Now, backing up to the Mercedes transaction, after you

4    used the unidentified income in that transaction, did you erase

5    it or did you put it back in the account to continue to give

6    Dr. Su the benefit of it?

7    A.    So the methodology never changes.  Every time there's a

8    withdrawal on my spreadsheet, I will subtract that withdrawal

9    from the F-1 proceeds balance to continue to give the maximum

10   benefit of the doubt to Ms. Su.

11        The figure, the minimum F-1 payment figure, is a

12   theoretical figure of the minimum possible F-1 payments that

13   could be in that transaction.

14   Q.    So I want to go back to -- just to put this in context,

15   to the Mercedes-Benz.  Because it came from the same account

16   earlier in time; correct?

17   A.    Correct.

18   Q.    So this was the running unidentified balance in the

19   account at that time; is that correct?

20   A.    Well, just above that is the balance.

21   Q.    25,000?

22   A.    Yes.

23   Q.    And then you had a running F-1 payment or balance of

24   130,000; correct?

25   A.    Correct.

1   Q.    And then you have the transaction where you're using up

2   25,000 of the unidentified to give her the benefit of the

3   doubt; correct?

4   A.    Correct.

5   Q.    And then dipping in for the rest, F-1, it has to be

6   $11,000; is that correct?

7   A.    If that $25,000 goes into the $36,000 transaction, there

8   would have to be another $11,000 in it, which would have to

9   come from the F-1 proceeds.

10  Q.    Okay.  And now, as we move down in time on the running

11  unidentified balance, you put the $25,000 back in; correct?

12  A.    Well, I never took it out.

13  Q.    Why do we see it here?

14  A.    So that transaction will withdraw from the F-1 payment

15  balance.  So you'll see it's a hundred $33,000.  So the arrow

16  on the top right up there, that's the unidentified balance

17  right before the transaction after the transaction goes down to

18  $93,000.

19        So I'm subtracting, taking the F-1 proceeds out of my

20  running total, to continue to give the maximum benefit of the

21  doubt to Mrs. Su.

22  Q.    So going forward, you don't use up that unidentified

23  income, you put it back in so that it can be included in a

24  future transaction.

25  A.    I would say that $11,000 is just a theoretical minimum

1    F-1 proceed that goes in the transaction; it doesn't affect how

2    I'm accounting for the running totals.

3    Q.    Let me ask it this way:  You're still keeping a running

4    total in her benefit.

5    A.    Correct.

6    Q.    Very good.

7          I want to direct your attention now to Exhibit 650, to

8    page 2.

9          Do you see the $161,000 transaction for count 29?

10   A.    Yes.

11   Q.    What is that?

12   A.    That was a -- I believe a money order that was used to

13   purchase 405 Boulder Court, Suite 800.  It came out of

14   Wells Fargo account 0454.

15   Q.    I'm going to hand you Exhibit 603 for identification and

16   have you take a look at it.

17         What is Exhibit 603?

18   A.    A copy of a withdrawal slip and an accompanying cashier's

19   check that was used to purchase that building.

20       MR. RHYNE:  Your Honor, we'd offer Exhibit 603 into

21   evidence.

22       MR. BABCOCK:  No objection.

23       THE COURT:  Exhibit 603 is admitted.

24         (Government's Exhibit 603 was received in evidence.)

25   BY MR. RHYNE:

1  Q.    And, Agent Mackey, for the record, this is 603, page 3.

2  This is the withdrawal slip; is that correct?

3  A.    Yes.

4  Q.    And you've rounded it up to 163,000 on the graphical

5  depiction; correct?

6  A.    Correct.

7  Q.    Now I'm turning to page 4.  This is the cashier's check;

8  correct?

9  A.    Yes.

10  Q.    In the same amount?

11  A.    Yes.

12  Q.    And this went to Chicago Title?

13  A.    Yes.

14  Q.    Did you have an opportunity to subpoena Chicago Title in

15  this case?

16  A.    Yes.

17  Q.    Let me hand you what's been marked as Exhibit 702 for

18  identification.  What do we see in Exhibit 702?

19  A.    These are escrow files from Chicago Title related to

20  Suite 700.

21  Q.    And were you able to confirm that that transaction was

22  included in the escrow file for that property?

23  A.    Yes, a copy of the check was in the file.

24       MR. RHYNE:  Your Honor, we'd offer Exhibit 702 into

25  evidence.

1        MR. BABCOCK:  No objection.

2        THE COURT:  Exhibit 702 is admitted.

3            (Government's Exhibit 702 was received in evidence.)

4    BY MR. RHYNE:

5    Q.    Agent Mackey, now I'd like to refer you back to your

6    spreadsheet on Exhibit 653.

7          Can you tell the jury the minimum number of F-1 dollars

8    that would be used to purchase this transaction?

9          And I'll direct you to tab 0454 on page 26.

10   A.    It would be 19,000.  Approximately $19,000.

11   Q.    And can you summarize your analysis?

12   A.    Right before the transaction, there was a running

13   unidentified balance of a hundred and $41,000; approximately

14   $142,000.  If that entire amount went into the transaction,

15   that would leave $19,000 that would have to be from F-1

16   proceeds.

17   Q.    Okay.  I want to move on.

18         This is a picture of that asset; is that correct?

19   A.    Yes.

20   Q.    And that's Suite 800, Tri-Valley University's offices; is

21   that correct?

22   A.    Yes.

23   Q.    I want to talk about this transaction, now.

24         Do you see the $261,000 transaction for count 31, dated

25   July 8th, 2010?

1   A.   Yes.

2   Q.   And that's for 405 Boulder Court; is that correct?

3   A.   Correct.

4   Q.   I'm going to hand you 605 for identification, have you

5   take a look at it.

6        What is Exhibit 605?

7   A.   It's a withdrawal slip and accompanying cashier's check

8   that was used to purchase that property.

9        MR. RHYNE:  Your Honor, we'd move Exhibit 605 into

10   evidence.

11        MR. BABCOCK:  No objection.

12        THE COURT:  Exhibit 605 is admitted.

13            (Government's Exhibit 605 was received in evidence.)

14            MR. RHYNE:  Publishing Exhibit 605, page 3.

15   BY MR. RHYNE:

16   Q.   We see the withdrawal slip; is that correct?

17   A.   Yes.

18   Q.   0454?

19   A.   Yes.

20   Q.   Date?

21   A.   Yes, I see that.

22   Q.   Page 4.  What do we see here?

23   A.   It's the cashier's check.

24   Q.   In the same amount; correct?

25   A.   Right.

1   **Q.**   And this particular purchase was made through the same

2   title company; is that correct?

3   **A.**   Yes.

4   **Q.**   And were you able to find evidence of this transaction

5   within Exhibit 702, which was previously admitted?

6   **A.**   Yes.

7   **Q.**   With respect to 405 Boulder Court, 700, I'd like to refer

8   you to Exhibit 653, tab 0454, page 38.

9        And can you tell the jury the minimum amount of F-1

10   dollars that would necessarily be included in that transaction?

11   **A.**   Yes.  Based on the analysis, it would be 140,000 --

12   $140,000.

13   **Q.**   Can you walk them through the balances immediately

14   preceding the transaction?

15   **A.**   Sure.  The balance in the account just before the

16   transaction was $297,000.  There was approximately $121,000 in

17   unidentified proceeds in the account.  Assuming that that

18   entire amount went into the transaction, that would leave

19   $140,000 that would have to be from F-1 proceeds in the

20   transaction.

21   **Q.**   And here we have a picture of the building; is that

22   correct?

23   **A.**   Yes.

24   **Q.**   I want to talk about this transaction now.

25        Do you see the $1.2 million transaction for December 15,

1    2010?

2    A.    Yes.

3    Q.    And that's charged to count 35; correct?

4    A.    Yes.

5    Q.    I'm going to hand you Exhibit 609 for identification and

6    have you take a look at it.  What is that?

7    A.    Wire transfer records from CitiBank related to that

8    purchase.

9         MR. RHYNE:  Your Honor, we'd offer Exhibit 609 into

10   evidence.

11        MR. BABCOCK:  No objection.

12        THE COURT:  Exhibit 609 is admitted.

13            (Government's Exhibit 609 was received in evidence.)

14   BY MR. RHYNE:

15   Q.    Agent Mackey, what do we see here?

16   A.    Wire transfer records from CitiBank.

17   Q.    And this is for $1.2 million; is that correct?

18   A.    Yes.

19   Q.    And the originator is Susan Su; correct?

20   A.    Yes.

21   Q.    And that was to Prominent Escrow Services?

22   A.    That's correct.

23   Q.    Now, the address listed here, physical address of the

24   originator, is the Victoria Ridge Court address; correct?

25   A.    Yes.

1    Q.    This 1.2 million isn't for the purchase of that property;
2    correct?
3    A.    No, that was the residence listed.
4    Q.    Thank you.
5          Did you subpoena records from Prominent Escrow Services?
6    A.    I did.
7    Q.    I'm going to hand you Exhibit 705 for identification.
8          Do you recognize Exhibit 705?
9    A.    Yes.
10   Q.    What is it?
11   A.    Escrow files for the Germano Way property.
12   Q.    And did you find evidence of this transaction in those
13   escrow files?
14   A.    I did.
15   Q.    And were you able to confirm that Dr. Su was the
16   purchaser?
17   A.    Yes.
18   Q.    Were you able to find evidence of that payment in the
19   escrow file?
20   A.    Yes.
21   Q.    Okay.  With respect to this $1.2 million transaction, I'd
22   like to refer you to Exhibit 653, this time to tab 3045,
23   page 3.
24         Can you explain to the jury the minimum number of F-1
25   dollars that would necessarily need to be included in that

1  transaction?

2  **A.**   Yes, there would be $239,000.

3      **MR. RHYNE:**  Your Honor, we'd offer Exhibit 705, the

4  escrow file for the property, into evidence.

5      **MR. BABCOCK:**  Didn't you just do that?

6      No objection, if he didn't.

7      **THE COURT:**  705 is admitted.

8          (Government's Exhibit 705 was received in evidence.)

9  BY MR. RHYNE:

10  **Q.**   Agent Mackey, I want to talk about this transaction.

11      Do you see the $600,000 transaction, count 34?

12  **A.**   Yes.

13  **Q.**   And that's from December 15, 2010, also; is that correct?

14  **A.**   Yes.

15  **Q.**   I'm going to hand you what's been marked as 608 for

16  identification.

17      What is that?

18  **A.**   It's a monthly statement from Wells Fargo relating to

19  account 4780 with -- showing information about that wire

20  transfer.

21      **MR. RHYNE:**  Your Honor, we'd offer Exhibit 608 into

22  evidence.

23      **MR. BABCOCK:**  No objection.

24      **THE COURT:**  608 is admitted.

25          (Government's Exhibit 608 was received in evidence.)

1    BY MR. RHYNE:

2    Q.    Agent Mackey, I want to direct your attention over here.

3          You see the $600,000?

4    A.    Yes.

5    Q.    And that's in the withdrawal column; correct?

6    A.    Yes.

7    Q.    Moving over, we have a description of the wire transfer

8    here; correct?

9    A.    Yes.

10   Q.    To Prominent Escrow Services.

11   A.    Correct.

12   Q.    Agent Mackey, sometimes the dates on the bank statements

13   will be a day before or a day after; is that correct?

14   A.    It seems to take a day or two to process a transaction.

15   Q.    I want to direct your attention now to Exhibit 653.  And

16   can you tell -- I'll direct you to 653, tab 4780, at page 1,

17   and reference that $600,000 transaction.

18         Can you explain to the jury the minimum amount of F-1

19   dollars that would have to be included in that transaction?

20   A.    $306,000.

21   Q.    And can you summarize your analysis, briefly, of what's

22   in the account immediately before?

23   A.    So the balance just before the transaction was $898,000.

24   It was $604,000 in F-1 payment from the account, $293,000,

25   approximately -- it's actually $294,000 -- in unidentified

1    funds in the account.  Assuming that all the unidentified funds

2    went to the transaction, that would mean that $306,000 would

3    necessarily have to be from F-1 proceeds.

4    **Q.**   And, again, we see a picture of that asset; is that

5    correct?

6    **A.**   Yes.

7    **Q.**   In Exhibit 607.

8    **A.**   Yes.

9    **Q.**   All right.

10        I want to talk about count 32.

11        Now, do you see that on the screen?

12   **A.**   Yes.

13   **Q.**   And that's a $700,000 transaction from on or about

14   July 21st, 2010; is that correct?

15   **A.**   Yes.

16   **Q.**   I'm going to hand you 606 for identification and have you

17   take a look at it.  Do you recognize Exhibit 606?

18   **A.**   I do.

19   **Q.**   What is it?

20   **A.**   It's a withdrawal slip and accompanying cashier's check

21   for the purchase of the Victoria Ridge property in the amount

22   of $700,000.

23        **MR. RHYNE:**  Your Honor, we've offer Exhibit 606 into

24   evidence.

25        **MR. BABCOCK:**  No objection.

1       THE COURT:  Exhibit 606 is admitted.

2           (Government's Exhibit 606 was received in evidence.)

3   BY MR. RHYNE:

4   Q.    Agent Mackey, I'm showing you page 3.  What do we see

5   here?

6   A.    It's a withdrawal slip.

7   Q.    And we have the account number here.

8   A.    Yes.

9   Q.    We have the amount 700,000.

10  A.    Yes.

11  Q.    And the defendant's name.

12  A.    Yes.

13  Q.    Going to the next page, we see the cashier's check; is

14  that correct?

15  A.    Yes.

16  Q.    Same amount?

17  A.    Yes.

18  Q.    And this went to Placer Title Company; is that correct?

19  A.    That's correct.

20  Q.    With an escrow number?

21  A.    Yes.

22  Q.    Did you subpoena Placer Title Company?

23  A.    Yes, I did.

24  Q.    Did you get the escrow file in this case?

25  A.    Yes.

1    Q.    I want to approach and hand you Exhibit 704 for

2    identification.

3          Do you recognize Exhibit 704?

4    A.    Yes, I do.

5    Q.    Is that the escrow file for this particular property

6    purchase?

7    A.    Yes, it is.

8          MR. RHYNE:  Your Honor, we'd offer Exhibit 704 into

9    evidence.

10         MR. BABCOCK:  No objection.

11         THE COURT:  Exhibit 704 is admitted.

12         (Government's Exhibit 704 was received in evidence.)

13   BY MR. RHYNE:

14   Q.    Agent Mackey, I'd like to refer you now back to

15   Exhibit 653, the tab for 3640 to page 7.

16         Can you tell the jury the minimum number of F-1 dollars

17   that would have to necessarily be included in this transaction?

18   A.    Yes, it would be $319,000.

19   Q.    Can you briefly walk through a summary of how you got

20   there?

21   A.    The balance in the account just before the transaction

22   was $829,000; 449,000 of that was F-1 payments, 380,000 of that

23   was unidentified payments.  Assuming that the entire $380,000

24   of unidentified payments went into the transaction, that would

25   leave $319 that would necessarily have to be from the F-1

1    proceeds.

2    **Q.**    Now, as part of your investigation, you also subpoenaed

3    FDIC certificates; is that correct?

4    **A.**    Yes.

5    **Q.**    And that's Federal Deposit Insurance Corporation

6    certificates --

7    **A.**    Yes.

8    **Q.**    -- with respect to Wells Fargo Bank and CitiBank; is that

9    correct?

10   **A.**    Yes.

11   **Q.**    Did you also subpoena or make requests to Alameda County?

12   **A.**    Yes.

13   **Q.**    What did you request from Alameda County?

14   **A.**    Deeds for the properties.

15   **Q.**    Why did you want deeds to the property?

16   **A.**    I wanted to confirm that Susan Su had the deed -- had the

17   title to the property.

18   **Q.**    I want to hand you 705A.  Do you recognize 705A?

19   **A.**    Yes.

20   **Q.**    What is that?

21   **A.**    It's the deed to one of the 405 Boulder Court properties.

22        **MR. RHYNE:**  Your Honor, we'd offer Exhibit 705A into

23   evidence.

24        **MR. BABCOCK:**  No objection.

25        **THE COURT:**  705A is admitted.

1          (Government's Exhibit 705A was received in evidence.)

2     BY MR. RHYNE:

3     Q.   And did you review similar deeds for the other properties

4     in this case?

5     A.   Yes.

6     Q.   Were you looking to confirm that Dr. Su owned them?

7     A.   Yes.

8     Q.   Now, we talked about other transactions or other accounts

9     that you analyzed or that you looked at in this case; correct?

10    A.   Yes.

11    Q.   That also had money in them other than what we see up

12    here; is that right?

13    A.   Yes.

14    Q.   Okay.  I want to go through these fairly quickly, but I

15    want to ask you, are you familiar with Wells Fargo Bank account

16    9937?

17    A.   I am.

18    Q.   I'm going to hand you Exhibits 504, 505, 505A, and 505B,

19    and ask you if you recognize those.

20         Is it true that 504 is the opening application and

21    signature authority?

22    A.   Yes.

23    Q.   And is it true that 505 are the monthly statements?

24    A.   Yes.

25    Q.   505A are selected deposits?

1    **A.**    Yes.

2    **Q.**    505B are the selected deposits?

3    **A.**    Yes.

4         **MR. RHYNE:**  Your Honor, we'd offer 504, 505, 505A, and

5    505B into evidence.

6         **MR. BABCOCK:**  No objection, Your Honor.

7         **THE COURT:**  504, 505, 505A, and 505B are admitted.

8              (Government's Exhibits 504, 505, 505A, and 505B were

9              received in evidence.)

10   BY MR. RHYNE:

11   **Q.**    And we see that account about halfway down on

12   Exhibit 651, page 1; is that correct?

13   **A.**    Yes.

14   **Q.**    Did you also request records for Wells Fargo Bank account

15   ending in 6782?

16   **A.**    I did.

17   **Q.**    I'm going to hand you Exhibit 506 and 507 for

18   identification and have you take a look at them.

19         Is it true that Exhibit 506 is the opening application

20   and signature card for Wells Fargo Bank account 6782?

21   **A.**    Yes.

22   **Q.**    And Exhibit 507 are the monthly statements?

23   **A.**    Yes.

24         **MR. RHYNE:**  Your Honor, we'd offer Exhibit 506 and 507

25   into evidence.

1      MR. BABCOCK:  No objection.

2      THE COURT:  506 and 507 are admitted.

3           (Government's Exhibits 506 and 507 were received in

4           evidence.)

5   BY MR. RHYNE:

6   Q.   Did you do a similar exercise with respect to Wells Fargo

7   Bank account 2773?

8   A.   Yes.

9   Q.   I want to hand you Exhibits 508 and 509 for

10  identification, have you take a look at those, please.

11     MR. BABCOCK:  Those numbers?

12     MR. RHYNE:  508 and 509.

13     MR. BABCOCK:  Thank you.

14  BY MR. RHYNE:

15  Q.   Is it true that 508 is the opening application and the

16  signature card for 2773?

17  A.   Yes.

18  Q.   And 509 are the monthly statements for the same account?

19  A.   Yes.

20     MR. RHYNE:  We'd offer Exhibit 508 and 509 into evidence.

21     MR. BABCOCK:  No objection.

22     THE COURT:  508 and 509 are admitted.

23          (Government's Exhibits 508 and 509 were received in

24          evidence.)

25  BY MR. RHYNE:

1  Q.  One more to go.  5029.  CitiBank.

2      Do you see that up there?

3  A.  Yes.

4  Q.  Same exercise with that account?

5  A.  Yes.

6  Q.  I'd like to hand you Exhibit 510, 511, and 511A for

7  identification and have you take a look at them.

8      Is it true that Exhibit 510 is the signature card for the

9  5029 Citi account?

10 A.  Yes.

11 Q.  Is it true that Exhibit 511 are the monthly statements

12 for that account?

13 A.  Yes.

14 Q.  And 511A are selected deposits into that account?

15 A.  Yes.

16     MR. RHYNE:  Your Honor, we'd offer Exhibit 510, 511, 511A

17 into evidence.

18     MR. BABCOCK:  No objection.

19     THE COURT:  510, 511, and 511A are admitted.

20         (Government's Exhibits 510, 511, and 511A were

21         received in evidence.)

22 BY MR. RHYNE:

23 Q.  And, Agent Mackey, while these accounts that we've just

24 discussed aren't included in the money laundering transactions,

25 you were still able to trace funds into them; correct?

1  A.   Yes.

2  Q.   And those funds are currently being held, pending outcome

3  of judicial proceedings; is that correct?

4  A.   That's correct.

5  Q.   Agent Mackey, with respect to the escrow files that you

6  reviewed in this case, you reviewed escrow files for Suite 700

7  and Suite 800; correct?

8  A.   That is correct.

9  Q.   Agent Mackey, I want to loop back to the testimony of one

10  of the earlier witnesses and the bank account records that

11  pertained to that witness.

12       You were present when Ms. Bhanu Challagundla testified.

13  A.   Yes, I was.

14  Q.   During your search warrants at Tri-Valley University,

15  were you able to find evidence of payments that she made to

16  Tri-Valley University?

17  A.   Yes.

18       MR. RHYNE:  Exhibit 16.

19       MR. BABCOCK:  Exhibit 16?

20       MR. RHYNE:  Yes.

21  BY MR. RHYNE:

22  Q.   I'm going to hand you what's been marked as Exhibit 16

23  for identification, have you take a look at it.

24       What do we see there?

25  A.   Tri-Valley University invoice and credit card receipt

1  relating to Bhanu Challagundla.

2  **Q.**  Where did you find that document?

3  **A.**  This was located at the 405 Boulder Court location under

4  our search warrants.

5  **MR. RHYNE:**  Your Honor, we offer Exhibit 16 into

6  evidence.

7  **MR. BABCOCK:**  No objection.

8  **THE COURT:**  Exhibit 16 is admitted.

9  (Government's Exhibit 16 was received in evidence.)

10  BY MR. RHYNE:

11  **Q.**  Agent Mackey, Exhibit 16 gives someone an example of the

12  exercise that you did in doing your analysis in this case; is

13  that correct?

14  **A.**  Yes, it does.

15  **Q.**  So this would be an example of a document that you found

16  in the physical file of Tri-Valley University --

17  **A.**  Yes.

18  **Q.**  -- that you then needed to tie to an F-1 student; is that

19  correct?

20  **A.**  Yes.

21  **Q.**  I want to direct your attention to page -- Exhibit 16,

22  page 1.

23  Could you just walk us through this document?

24  **A.**  Yes.  On the top, the name of the Tri-Valley student is

25  listed that the payment's being made for, along with the email

1    right below that.

2         For card numbers, typically they'll write the credit card

3    number there, but in this case it was swiped in person; she

4    came into the office and she swiped the actual card.  And it

5    also shows the amount of a thousand dollars that was stapled to

6    a receipt, credit card receipt.

7    Q.   Okay, and that takes us to page 2.  I'll start at the

8    top.  Can you walk the jury through what we see here?

9    A.   Sure.  In this case, because the card was swiped in

10   person, the name actually appears on the receipt, whereas the

11   vast majority of receipts were not swiped in person so they did

12   not have a name, which you pointed to right there.

13        Towards the top, top right, you can see the credit card

14   processing account number ending in 1968.  That was one of

15   three credit card accounts maintained by Tri-Valley University,

16   and that corresponds to a specific credit card machine.

17   Q.   Through Global Payment?

18   A.   Through Global Payment.  And that name will actually

19   appear on the credit card statement on the memo line showing

20   that the deposit came from that account.

21        Towards the middle, right below the "Visa," you can see

22   the last four of the credit card number, 5134.  Typically that

23   will match with the information on the invoice.  And, below

24   that, you can see the batch number.  Below the word "sell."

25   It's batch number 197.

1          So that might be part of additional credit card

2     transactions that are part of that same batch.

3          So if there was another $1,000 payment that was made

4     before the batch was run, that would also be 197.  That would

5     -- deposited into the Wells Fargo account, would be $2,000, not

6     $1,000.

7     Q.   But is that the same batch number?

8     A.   It would have the same batch number.

9     Q.   Moving down, there's another version of it at the bottom;

10    is that correct?

11    A.   Yes, they printed duplicates; one for the customer and

12    one for the store.

13    Q.   So here's the customer copy you see at the bottom.

14    A.   Yes.

15    Q.   Anything else to note on that, as far as your analysis

16    went?

17    A.   Just the date, which I used, as well.

18         MR. RHYNE:  Exhibit 17.

19    BY MR. RHYNE:

20    Q.   I'm going to show you Exhibit 17 for identification, have

21    you take a look at it.

22         Do you recognize Exhibit 17 for identification?

23    A.   Yes, I do.

24    Q.   What is it?

25    A.   It's a credit card receipt that was found on computers at

1   Tri-Valley University.

2        MR. RHYNE:  Your Honor, we'd offer Exhibit 17 into

3   evidence.

4        MR. BABCOCK:  No objection.

5        THE COURT:  Exhibit 17 is admitted.

6             (Government's Exhibit 17 was received in evidence.)

7   BY MR. RHYNE:

8   Q.   I'm going to hand you, now, Exhibit 18 for

9   identification, have you take a look at that.

10       What do we see there?

11  A.   This is another physical credit card invoice with an

12  accompanying credit card receipt.

13  Q.   For the same student?

14  A.   For the same student.

15  Q.   Where did you find that?

16  A.   This was found at the 405 Boulder Court location during

17  our search warrants.

18       MR. RHYNE:  Your Honor, we'd offer Exhibit 18 into

19  evidence.

20       MR. BABCOCK:  No objection.

21       THE COURT:  Exhibit 18 is admitted.

22            (Government's Exhibit 18 was received in evidence.)

23  BY MR. RHYNE:

24  Q.   Agent Mackey, I want to shift gears and -- to the end of

25  this case.

1    Did the Department of Homeland Security receive a claim

2    for damages from the defendant, Dr. Susan Su?

3    **A.**   We did.

4    **Q.**   I want to hand you Exhibit 800 for identification and

5    have you take a look at it.

6    Agent Mackey, do you recognize Exhibit 800?

7    **A.**   I do.

8    **Q.**   What is it?

9    **A.**   That's a claim for damages with an accompanying statement

10   from Susan Su.

11   **Q.**   Did you receive that in your course of your investigation

12   in this case?

13   **A.**   Yes.

14        **MR. RHYNE:**  Your Honor, we'd offer Exhibit 800 into

15   evidence.

16        **MR. BABCOCK:**  No objection, Your Honor.

17        **THE COURT:**  Exhibit 800 is admitted.

18        (Government's Exhibit 800 was received in evidence.)

19   BY MR. RHYNE:

20   **Q.**   Agent Mackey, in this claim is it true that Dr. Su makes

21   statements about the income that she anticipated to be making

22   from Tri-Valley University in the future?

23   **A.**   Yes, that's true.

24   **Q.**   And alleges that claim against the Department of Homeland

25   Security in the form of lost income; is that correct?

1    A.    Yes.

2    Q.    She makes some other claims as well; is that right?

3    A.    Yes.

4          MR. RHYNE:  Ms. Hughes, can we zoom in at the top where

5    it states "Dr. Susan Su"?  You can just take the whole claim

6    for personal injuries.

7    BY MR. RHYNE:

8    Q.    This is a cover sheet; is that correct?

9    A.    Yes, it is.

10   Q.    And the address down there, Sansome Street, that's your

11   business address; is that right?

12   A.    Yes, it is.

13         MR. RHYNE:  Can we go to page 3 now?

14   BY MR. RHYNE:

15   Q.    Is it true that -- and we'll focus in on some of this in

16   more detail.  But is it true, in general, that Dr. Su refers to

17   January 19, 2011, as Tri-Valley University's "911 attack"?

18   A.    Yes, it is.

19         MR. RHYNE:  Would you zoom in on the first paragraph?

20   BY MR. RHYNE:

21   Q.    Is it true that, in summary, she claims that a group of

22   ICE agents came to her home without an appointment at 6:00 A.M.

23   in the morning?  Is that right?

24   A.    Yes.

25   Q.    And then she refers to it as the 911 attack --

1   A.   Yes.

2   Q.   -- on a Christian higher education --

3   A.   Yes.

4   Q.   -- institution, and turned a genuine and reputed woman,

5   good standing, profitable business that created many job

6   opportunities, into another in-debt identity to bankruptcy?

7        Is that correct?

8   A.   Yes.

9   Q.   She claims this is a close-to-complete listing of the

10  damages; is that correct?

11  A.   Yes.

12  Q.   And at the end of that paragraph, she refers to this as

13  an instance of domestic violence.

14  A.   Yes.

15       MR. RHYNE:  Can we back out of that and go to item 1,

16  property damage?  The next paragraph.

17  BY MR. RHYNE:

18  Q.   Is it true here that she makes a claim for a $14,000 door

19  that was damaged during the search warrant --

20  A.   Yes.

21  Q.   -- in addition to a Dell server machine?

22  A.   Yes.

23  Q.   Are you familiar with this Dell server machine?

24  A.   I am.

25  Q.   And was it seized during --

1  A.   It was seized and returned.

2  Q.   It was returned?

3  A.   Yes.

4  Q.   So she's claiming property damage here, in this category,

5  of $25,000; is that correct?

6  A.   Yes.

7       MR. RHYNE:  Can we go to item 2, please?

8  BY MR. RHYNE:

9  Q.   Here she's claiming personal injury; is that correct?

10  A.   Yes.

11  Q.   And she claims, "Before 911, Dr. Su managed TVU with good

12  judgment and integrity."  Is that correct?

13  A.   Yes.

14  Q.   And that on the evening of January 19, 2011, she suffered

15  a serious headache; is that correct?

16  A.   Yes.

17  Q.   And was needed to be taken to the emergency room.

18  A.   Yes.

19  Q.   And at the bottom of this paragraph, she claims damages

20  of $3 million; is that correct?

21  A.   Yes.

22  Q.   And also in there she claims that Dr. Su is an

23  internationally-respected professional, received many awards

24  ever since elementary school, a mature Christian since 18 years

25  old; is that correct?

1   **A.**   Yes.

2         **MR. RHYNE:**   Can we go down to item 3, please?   Financial

3   Damage.

4   **BY MR RHYNE:**

5   **Q.**   In paragraph 1 of the Financial Damage she's claiming a

6   total loss of approximately $10,000 there; is that correct?

7   **A.**   Yes.

8   **Q.**   And that's for, what, an apparent seizure of check?

9   **A.**   Yes, it appears to be the case.

10  **Q.**   Okay.

11        Can we go to paragraph 2 of item 3, please, at the bottom

12  of the page.

13        Here we have Dr. Su again referring it to 911; is that

14  correct?

15  **A.**   Yes.

16  **Q.**   And here she's making a claim for students that are

17  requesting refunds of their tuition; is that correct?

18  **A.**   Yes.

19  **Q.**   And she estimates $3 million in credit card; is that

20  correct?

21  **A.**   Yes.

22        **MR. RHYNE:**   Can we go to the next page, please?

23  **BY MR. RHYNE:**

24  **Q.**   On the next page you see evidence of how much money

25  Dr. Su is intending to make; is that correct?

1    A.    Yes.

2          MR. RHYNE:   Can we go to paragraph 3 and start with

3    paragraph B?

4    BY MR. RHYNE:

5    Q.    Here we have Dr. Su again referring to the search warrant

6    as the 911 act; is that correct?

7    A.    Yes.

8    Q.    Down further she says the University grows -- she claims

9    that the University has grown within three years; is that

10   correct?

11   A.    Yes.

12   Q.    She claims close to $20 million in income yearly; is that

13   correct?

14   A.    I believe that's a claim to future income.

15   Q.    And she talks about her business model; is that correct?

16   A.    Yes.

17   Q.    And that's that the student body's expected to double or

18   triple to more than 20 million income expecting in this year.

19   Is that correct?

20   A.    Yes.

21         MR. RHYNE:   Can we go to subparagraph C?

22   BY MR. RHYNE:

23   Q.    Here she again refers to it as the 911; is that correct?

24   A.    Yes.

25   Q.    And she's referring to faculty members and advisory board

1    members that have resigned from positions.

2    A.    Yes.

3    Q.    And the multi-million-dollar profitable, successful

4    business has essentially been turned into an in-debt bankruptcy

5    corporation; is that correct?

6    A.    Yes.

7         MR. RHYNE:  Can we go down to the very bottom of this

8    where it has total damage to TVU as a business?  It's one line.

9    Right there.

10   BY MR. RHYNE:

11   Q.    And here she's alleging $20 million; is that correct?

12   A.    Yes.

13        MR. RHYNE:  Can we go down to paragraph 4?  Can you go

14   all the way down to the very bottom?

15   BY MR. RHYNE:

16   Q.    And here's just her claim for spring term tuition damage;

17   is that correct?

18   A.    Yes.

19   Q.    And she does some arithmetic there, but the bottom line

20   for the spring tuition alone is $5,429,700.  Is that correct?

21   A.    Yes.

22   Q.    She states above that, "Every single day it's about

23   $300,000."  Is that correct?  In a tuition dispute for the

24   refunds.

25   A.    Yes.

1  Q.   She also talks about how she's been collecting payments
2  through PayPal and credit cards; is that correct?
3  A.   Yes.
4  Q.   And we have total financial damage that Dr. Su is
5  alleging against the Department of Homeland Security in this
6  case of $28 million.  Is that correct?
7  A.   Yes.
8  Q.   And then the lump sum federal tort claim at the bottom is
9  31 million; is that correct?
10  A.   Yes.
11      MR. RHYNE:  No further questions, Your Honor.
12      THE COURT:  Cross-examination.
13              <u>CROSS-EXAMINATION</u>
14  BY MR. BABCOCK:
15  Q.   Good afternoon, Agent Mackey.
16  A.   Good afternoon, sir.
17  Q.   Are you aware of whether Homeland Security ever paid
18  Dr. Su a penny on this claim?
19  A.   I believe we haven't paid.  I believe she withdrew it.
20  Q.   It's fair to say, though, just in looking at the claim,
21  that she is pretty upset that the school was shut down and
22  everything stopped.
23  A.   Sure.
24  Q.   Does that seem -- does that sound fair?
25  A.   Yes.

1    Q.    She -- you probably observed that.  You spent hours with

2    her that same day.

3    A.    Yes.

4    Q.    Right?

5          We heard about your lengthy interview with Dr. Su.

6    A.    Yes.

7    Q.    Did you tell her or did she -- do you know, was she aware

8    at the beginning of your interview, whether the school was

9    being shut down?

10   A.    We did not tell her initially, no.

11   Q.    Okay.  She found that out later.

12   A.    Yes.

13   Q.    She -- and I think we went over this, but she was

14   actually served with papers from SEVP about the withdrawal of

15   permission for TVU to admit any more F-1 students.

16   A.    Yes.

17   Q.    And you -- in fact, at this point you had been

18   investigating TVU for roughly 8 months or so.

19   A.    Sounds about right.

20   Q.    And you had done -- already issued subpoenaes to the

21   different bank accounts associated with TVU --

22   A.    Yes.

23   Q.    -- as well as Dr. Su.

24   A.    Yes.

25   Q.    And, as we know, you had done a series of under- -- ruse,

1    and undercover operations, beginning in June, I guess, in 2010,

2    and going all the way until January, just a couple of weeks

3    before.

4    **A.**   I believe the ruses started in September, yes.  The

5    undercover activity started in June and the ruses started in

6    September.

7    **Q.**   Fair enough.

8        And you had, I assume, been working in conjunction with

9    the U.S. Attorney's Office to get search warrants and issue

10   subpoenaes.

11   **A.**   Yes.

12   **Q.**   And you had made plans to seize all these bank accounts

13   that you've gone over with us this morning; right?

14   **A.**   Yes.

15   **Q.**   And to take the money that was in them; right?

16   **A.**   To seize the money.

17   **Q.**   Fair enough.  I didn't mean you personally, but all the

18   different -- all the monies, all the money that was in all

19   these accounts was seized, pursuant to a federal seizure order,

20   on January 19th, 2011, right?

21   **A.**   Starting on this date.  I believe there were a few

22   additional follow-up seizures occurred a few days later.

23   **Q.**   And those monies have remained seized in the last three

24   years and two months or so; right?

25   **A.**   Yes.

1    Q.   They're still under control.  None of it's ever been

2    released back to Dr. Su or anyone else associated with

3    Tri-Valley University; right?

4    A.   Yes.

5    Q.   And you're -- not "you're" -- the Government, the

6    U.S. Attorney's Office, is seeking to forfeit that money;

7    right?

8    A.   Yes.

9    Q.   As well as all the different properties you've mentioned.

10        So the house on Germano Way; right?

11   A.   Yes.

12   Q.   On Murrieta.

13   A.   Yes.

14   Q.   On Victoria Ridge, and as well as the Boulder Court --

15   A.   Yes.

16   Q.   -- suites.

17   A.   Correct.

18   Q.   And the Mercedes.

19   A.   Yes.

20   Q.   And the theory justifying this seizure, the seizure of

21   these properties and potentially the forfeiture, is that this

22   property, the money in the accounts, and the property that was

23   purchased with money in the accounts, was, quote, proceeds,

24   unquote, of either some sort of fraud or -- well, fraud; right?

25   A.   There are multiple theories.

1    Q.    Money laundering.

2    A.    Yes.

3    Q.    Fraud and money laundering, primarily; right?

4    A.    Yes.

5    Q.    PayPal, the money in PayPal accounts, was seized as well;

6    right?

7    A.    Yes.

8    Q.    And has the Department -- or the U.S. Attorney's Office,

9    so far as you're aware, made any effort to return any of this

10   money that was seized to students who had paid tuition to

11   Tri-Valley University?

12   A.    I believe that hasn't been discussed yet, but PayPal has

13   already refunded many of its students.

14   Q.    PayPal received some claims --

15   A.    Yes.

16   Q.    -- for refunds.

17   A.    Yes.

18   Q.    Do you know about how much money they refunded?

19   A.    I'm not sure.  It's a loss for them in hundreds of

20   thousands.

21   Q.    You noticed in Dr. Su's claim she mentioned that the

22   spring semester was just starting and that much of -- some of

23   the monies that had come in were for the upcoming semester;

24   right?

25   A.    Yes.

1    Q.    Is that right?

2    A.    Yes.

3    Q.    Okay.  Did you do any sort of analysis?  You've obviously

4    spent -- you spent a lot of time on this case; fair to say?

5    A.    Yes.

6    Q.    A lot of hours over the last few years.

7          Looking at all the bank accounts, records that you

8    seized, as well as documents that you seized during the

9    execution of the search warrant, --

10   A.    Yes.

11   Q.    -- did you do any sort of analysis of how much money had

12   been paid towards the semester that had just started?  The

13   so-called spring 2011-semester?

14   A.    Not specifically, no.

15   Q.    Tell us again -- I think you said in your earlier

16   testimony, but on January 19th, 2011, can you tell us how many

17   students had enrolled in the spring of 2011 semester?

18   A.    They had approximately 1,760 active students at that

19   time.

20   Q.    For the spring of 2011 semester?

21   A.    They would be actively -- they would be expected to

22   enroll for the spring.

23   Q.    Do you know how many of those 1,760 students had made a

24   tuition payment for the spring semester?

25   A.    I haven't broken it down that way, no.

1  Q.   So let's -- I'd like to talk about the properties a

2  little bit.

3       As we've seen from your testimony and from this -- these

4  charts that you made here, money from Tri-Valley University was

5  used to purchase five properties and one car.

6  A.   Yes.

7  Q.   And the ballpark total, you know, on your graphs, do you

8  know what those total to, for those payments?

9  A.   The seizures or --

10 Q.   The real properties and the car.

11 A.   A little under $5 million.

12 Q.   To buy all those things?

13 A.   Yes.

14 Q.   Well, maybe I'm missing something.  The Germano -- on

15 your chart you have about 1.8 million going to Germano Way.

16 A.   I'm including the bank accounts in that figure.  So it

17 would be 3.5-ish for the properties and the car.

18 Q.   Okay.  Not including money that was in the bank accounts.

19 A.   Yes.

20 Q.   When you ex- -- you searched all of these properties on

21 January 19, 2011; correct?

22 A.   Our agency did, yes.

23 Q.   Not you personally.  Fair enough.

24      You, I think, went to Ms. Su's -- Dr. Su's home.

25 A.   Yes.

1    Q.    Other agents went to 405 Boulder Court.

2    A.    Yes.

3    Q.    Other agents went to Murrieta Road and Victoria Ridge.

4    A.    Yes.

5    Q.    And were documents taken from all of the locations?

6    A.    Yes.

7    Q.    I assume primarily they were taken from 405 Boulder Court

8    as well as from Dr. Su's home.

9    A.    That's correct; yes.

10   Q.    Which is the one on Germano Way; right?

11   A.    Yes.

12         I should correct that.  No search warrants were conducted

13   at the Livermore condo, so no documents were taken from there.

14   Q.    From Murrieta Road?

15   A.    Yes.

16   Q.    Is there a reason for that?

17   A.    We weren't given a search warrant for that location.

18   Q.    Did you request one?

19   A.    No.

20   Q.    How come you didn't ask for one?

21   A.    We didn't have specific information that we thought would

22   lend to obtaining a search warrant for that location.

23   Q.    You didn't have reason to think there would be any

24   evidence there?

25   A.    You could say that, yes.

1    Q.    Wouldn't it have been possible to -- you had identified

2    1,760 students; right?

3    A.    Yes.

4    Q.    At some point.

5          How long did it take you to identify the 1,760 students

6    that were active as of January 2011?

7    A.    You mean in the system?

8    Q.    Yes.

9    A.    A few minutes.

10   Q.    Could you just go onto SEVIS and type in "Tri-Valley

11   University" and come up with a list?

12   A.    Yes.

13   Q.    Okay.  Why not just give them refunds after you seized

14   the money?

15   A.    That's a determination that needs to be made by the

16   Court.

17   Q.    You did surveillance on Murrieta Road; right?  Or other

18   people in your agency did.

19   A.    I do not believe so, no.

20   Q.    Okay.  A number of the charges against Ms. -- Dr. Su are

21   money laundering.  You're aware of that; right?

22   A.    Yes.

23   Q.    And they're actually listed on your chart.  The accounts

24   relating to certain transactions; right?

25   A.    Yes.

1    Q.   For example, count 26 relates to monies that were used to

2    purchase the Mercedes.

3    A.   Yes.

4    Q.   And count 27 has to do with purchase of the property on

5    Murrieta Road.

6    A.   Yes.

7    Q.   All of these accounts were in either Dr. Su's name or

8    Tri-Valley University's name.

9    A.   Yes.

10   Q.   Money that was used to purchase, for example, the home on

11   Germano Way wasn't first deposited to the bank account of a

12   third party who then used it to purchase the house.

13   A.   That's correct.

14   Q.   Do you understand what I'm saying?

15   A.   Yes.

16   Q.   So for the purchase for the car, the money came out of

17   the Wells Fargo account, which was in TVU's name, --

18   A.   Yes.

19   Q.   -- and went straight to the purchase of the car.

20   A.   Correct.

21   Q.   And that was also true of the purchase of -- $78,000

22   towards the purchase of Murrieta Road.

23   A.   Yes.

24   Q.   And the same is true of all these transactions; right?

25   A.   Yes.

1    Q.   The money came straight from one of Dr. Su's accounts or

2    one of the school's accounts --

3    A.   Yes.

4    Q.   -- without passing through someone else's account or some

5    other person's account or an account held by another entity.

6    A.   All the money stayed in those accounts, yes.

7    Q.   Are you aware of -- we've seen a number of times this

8    picture of the Mercedes.  It was purchased for $36,000.

9    A.   Approximately.

10   Q.   When I grew up, that would have been a pretty fancy car,

11   but this is $36,000 for a Mercedes.  This is pretty much the

12   low end of the Mercedes line; is it not?

13   A.   I agree with that.

14   Q.   There are Mercedes that cost many, many tens of thousands

15   of dollars more than that.

16   A.   Sure.

17   Q.   You can spend 36,000, these days, on a Prius or a Honda.

18   A.   Yes.

19   Q.   Did you -- maybe -- if I asked this, I forgot.  Apologies

20   if I did.  Did your agency receive any claims directly from

21   students after January 19, 2011?

22   A.   I'm not aware of any official claims.

23   Q.   Only claim relating to this case was filed by Dr. Su?

24   That you're aware of?

25   A.   That I'm aware of, yes.

1  Q.   Did you do any sort of analysis of -- you have, yourself,

2  looked through all the bank accounts listed?  All the

3  Wells Fargo accounts and the two Citi accounts; right?

4  A.   I have.

5  Q.   Were those all the accounts relating to Dr. Su that you

6  could find?

7  A.   That I could find, yes.

8  Q.   Did you find -- can you tell us --

9  A.   I should -- there are additional accounts held by Dr. Su,

10  but they didn't appear to be receiving F-1 proceeds.

11  Q.   They didn't get any money from the school accounts --

12  A.   Yes.

13  Q.   -- so you didn't follow up on them.

14  A.   Correct.

15  Q.   Fair enough.

16       From the accounts, the money that you did trace from

17  Tri-Valley University, did you do any sort of analysis of

18  whether Dr. Su was paying herself any sort of monthly or

19  bi-weekly salary?

20  A.   There was no clear delineation between business expenses

21  and personal expenses.

22  Q.   Okay.  So you could see that expenses were being paid,

23  but there wasn't, like, a regular bi-weekly check, for example.

24  A.   No.

25  Q.   Okay.  I wanted to follow up with you a little bit on --

1    to change topics a little bit -- on some testimony that we

2    heard yesterday from Mr. Patel.

3        Do you recall that testimony?

4    A.    I do.

5    Q.    And do you recall I had some questions for him about

6    certain -- certain things that he said, and -- yesterday, in

7    comparison with certain things that he said to you back in

8    March of 2011?  Just generally; right?

9    A.    Yes.

10   Q.    You did meet with Mr. Patel on March 1st of 2011; right?

11   A.    Yes.

12   Q.    And the purpose of the meeting was to talk to him about

13   Tri-Valley University.

14   A.    That's correct.

15   Q.    Isn't it true that one of the things Mr. Patel told you

16   back in March of 2011 was that very few students complained

17   about the lack of instruction?

18   A.    I don't have a specific recollection of that statement.

19   Q.    Well, would it refresh your -- you wrote a report

20   regarding that interview; right?

21   A.    I believe that report was written by another agent --

22   Q.    That's true.

23   A.    -- who writes good reports, so I would have faith in him.

24   Q.    He was present with you during the interview.

25   A.    Yes.

1    Q.    We're talking about Agent Taylor; right?

2    A.    Yes.

3    Q.    He was your co-case agent.

4    A.    Yes.

5    Q.    You guys did this interview together.

6    A.    Yes.

7    Q.    So it might refresh your recollection to review

8    Dr. Taylor -- Agent Taylor's report.

9    A.    Sure.

10   Q.    Ask you to look over the bottom of page 5 and the top of

11   page 6, generally.

12         Have you had a chance to look at that?

13   A.    I did.

14   Q.    Isn't it true -- well, let me ask it.  Does that refresh

15   your recollection about some of the things that Mr. Patel told

16   you during that interview?

17   A.    About some of the things.  I don't have a specific

18   recollection about that statement.  It might be that it's out

19   of context and our reports are just summaries of interviews.

20   Q.    Well, they are just -- you guys don't record these

21   interviews, as I understand it.

22   A.    No.

23   Q.    But you do take detailed notes; right?

24   A.    Yes, we do.

25   Q.    And type up reports of them after.

1    **A.**    Yes.

2    **Q.**    And I would assume -- or wouldn't you assume that Agent

3    Taylor's report was pretty accurate?

4    **A.**    Yes, if it's in there, Mr. Patel made that statement.  I

5    just don't remember because it might be out of context.

6    **Q.**    I understand.  Well, did -- do you remember whether

7    Mr. Patel told you that if he brought student complaints to

8    Dr. Su that sometimes she would tell him to enroll the student

9    in a different subject or a different class?

10   **A.**    I do remember that.

11   **Q.**    Okay.  And then didn't she also -- didn't Mr. Patel also

12   say that she would tell -- sometimes tell him to call the --

13   that she would sometimes call the instructor and chastise the

14   instructor?

15   **A.**    I don't have an independent recollection of that

16   statement.

17        Again, if it was in there, he said that.  It might just

18   be that I'm not able to pick up the context.

19   **Q.**    Okay.  Were you also present for the other interview of

20   Mr. Patel?

21   **A.**    Yes, I was.

22   **Q.**    And I forget the date of that, off the top of my head.

23   Do you remember when that was?

24   **A.**    It was much more recent.  I don't remember the specific

25   date.

1    Q.    Last August or September?

2    A.    That sounds about right.

3    Q.    And isn't it true that during your more recent interview

4    with Mr. Patel he said that he did not think Dr. Su, quote, did

5    this for the money?

6    A.    Yes, he said that.

7    Q.    And I assume "did this" meant run the school.

8    A.    Yes.

9        MR. BABCOCK:  I think that's all I have, Your Honor.

10       THE COURT:  Thank you.

11       Mr. Rhyne, redirect of this witness?

12       MR. RHYNE:  Yes, Your Honor.

13                    <u>REDIRECT EXAMINATION</u>

14   BY MR. RHYNE:

15   Q.    Agent Mackey, as you sit up there right now, do you have

16   an idea or anything refresh your memory as to the balances in

17   Dr. Su's accounts after she made those purchases that we

18   discussed on direct examination?

19   A.    What time period are you referring to?  Immediately after

20   the purchase of specific property?

21   Q.    Let me be more specific.  On January 19th, 2011, that

22   precise day, do you have an idea, would anything refresh your

23   recollection, as to what her balances were?

24   A.    I know what the total balances were.

25   Q.    Roughly how much cash on hand did she have after she

1    purchased this stuff?

2    A.    $1.5 million.

3    Q.    Okay.  If Dr. Su weren't in it for the money, if she were

4    in it to operate a school, approximately how many DSOs would

5    that purchase?  How many DSOs could she hire?

6          She said they cost how much per year?

7    A.    She stated, during the interview, that one particular DSO

8    wanted $50,000 per year.

9    Q.    You don't need to do the math, but she had plenty of

10   money to hire DSOs; correct?

11   A.    Sure.

12   Q.    She had plenty of money to hire staff.

13   A.    Yes.

14   Q.    Mr. Babcock also asked you about on that day, January 19,

15   2011, how many active students Tri-Valley University had, and

16   you said 1,760 or so; is that right?

17   A.    Yes.

18   Q.    What was the peak of active students at Tri-Valley

19   University as far as active students?

20   A.    The total number of students activated during its entire

21   existence was 2,048.  Some of those students would have been

22   deactivated and transferred to other schools before the school

23   was shut down.

24   Q.    Mr. Babcock also asked you about whether Dr. Su paid

25   herself a salary.  Did you remember that?

1   A.   Yes.

2   Q.   You actually asked Dr. Su whether she had a payroll; is

3   that correct?

4   A.   Yes.

5   Q.   And that was during the interview that you had of her on

6   January 19th?

7   A.   Yes.

8   Q.   What did she say?

9   A.   She said she did not run a payroll; that it would be too

10   cumbersome.

11   Q.   You also stated on cross that you didn't see any

12   delineation between personal and business expenses; is that

13   correct?

14   A.   Yes.

15   Q.   Is that the case for each of these accounts that you

16   analyzed?

17   A.   Yes.

18   Q.   And when Mr. Babcock asked you about she purchased five

19   properties and one car, that's not the only personal expenses

20   that you saw in this case; is that correct?

21   A.   That's correct.

22   Q.   Mr. Babcock also asked you why you didn't search certain

23   locations.  Isn't it true that before you can search a location

24   you have to have a reason to do so?  Isn't that right?

25   A.   Yes.

1   Q.   You can't just kick in a door and start searching; right?

2   A.   I would hope not.

3   Q.   You go to a judge and get a search warrant; correct?

4   A.   Yes.

5   Q.   And to get a search warrant, you write an affidavit;

6   correct?

7   A.   Yes.

8   Q.   You explain to the judge why you think particular

9   evidence of a particular crime is going to be there; correct?

10   A.   Yes.

11   Q.   Sometimes judges say you can have a search warrant,

12   sometimes they say you can't.

13   A.   That's my experience.

14   Q.   When Mr. Babcock asked you repeatedly about these seized

15   funds and seized assets, as you sit here today you don't know

16   what's going to happen to those assets or property; is that

17   correct?

18   A.   Yes, that's correct.

19   Q.   It going to be up to the Court; is that correct?

20   A.   It's beyond our control, yes.

21        MR. RHYNE:   No further questions, Your Honor.

22        THE COURT:   Recross?

23        MR. BABCOCK:   Briefly.

24                   <u>RECROSS-EXAMINATION</u>

25   BY MR. BABCOCK:

1  Q.   You said it's beyond your control whether those assets

2  remain seized?

3  A.   Are forfeited.

4  Q.   Or forfeited.

5       Well, that's not exactly how I would view it.  Isn't it

6  true that to keep the proceeds, keep the money, the property,

7  you -- if Ms. -- Dr. Su is convicted, that's a step in keeping

8  the money and the property?

9  A.   That's one step.

10  Q.   I understand.  But you need to get a conviction; right?

11  A.   That's not completely true.  There's also civil remedies

12  that are available for some of the assets.

13  Q.   One of the ways the money and property could be forfeited

14  is if Dr. Su's convicted --

15  A.   Yes.

16  Q.   -- of these crimes.

17  A.   Yes.

18  Q.   Even if she's not convicted, the Government has also

19  filed a civil action trying to forfeit the money; isn't that

20  right?

21  A.   Some of it, yes.

22  Q.   Not all of it, but some of it.

23  A.   Yes.

24  Q.   Okay.  It's also filed a civil action trying to forfeit

25  all those real properties; right?

1   A.    Yes.

2   Q.    The one on Boulder Court, Germano Way, all the actual

3   real properties we're talking about.

4   A.    Yes.

5   Q.    So the Government gets not just one bite at the apple

6   here but two.

7   A.    Yes.

8   Q.    You said you can't just go kicking in a door without a

9   search warrant and I agree.  But once you get a search warrant,

10  you can actually kick in the door; right?

11  A.    Under certain circumstances.  We can't just kick in the

12  door without a reason to.

13  Q.    Once you get a search warrant, you can break into the

14  house.

15        If no one responds pretty quickly; right?

16  A.    Yes.

17  Q.    No one -- you knock on the door and no one answers within

18  how long?

19  A.    A reasonable amount of time.

20  Q.    A reasonable amount of time.

21        And at 6:00 or 6:30 in the morning, what's a reasonable

22  amount of time?

23  A.    Depends on the size of the house; depends on other

24  factors such as known weapons inside the house, criminal

25  history.

1    Q.    Well, how long -- Dr. Su doesn't have any criminal

2    history; right?

3           MR. RHYNE:  Objection.  Relevance.

4           THE COURT:  Sustained.

5    BY MR. BABCOCK:

6    Q.    You didn't have any reason, before you went to Dr. Su's

7    home, to think that she would physically resist.

8           MR. RHYNE:  Objection.  Relevance.

9           THE COURT:  Overruled.

10          THE WITNESS:  I didn't have a specific reason, but we

11   treat every situation as a potential -- potentially dangerous

12   situation.

13   BY MR. BABCOCK:

14   Q.    Oh, come on.  She's -- how tall are you?  You're taller

15   than me.  6-4, 6-5?

16   A.    That wouldn't stop her from picking up a kitchen knife

17   and --

18   Q.    How many agents, how many agents stormed her home that

19   morning, 15 or 20?

20          MR. RHYNE:  Objection.  Argumentative.

21          THE COURT:  Sustained.

22   BY MR. BABCOCK:

23   Q.    You previously testified you weren't at the door.  There

24   was a specially-assigned unit that does the entry; right?

25   A.    I did enter the house, yes.

1    Q.   How long did you wait before breaking into the house?

2    A.   It was a good amount of time.  I want to say two minutes.

3    Q.   Okay.  And it is what, 6:00, 6:15, 6:30 in the morning?

4    A.   We're knocking very loudly.

5    Q.   I understand.  But --

6         THE COURT:  I think this field's been plowed.

7         MR. BABCOCK:  Fair enough.

8    BY MR. BABCOCK:

9    Q.   You said that Dr. Su told you payroll would be too

10   cumbersome, but she did primarily pay people with checks;

11   right?

12   A.   That's not the same thing as running a payroll.

13   Q.   I understand.  But she wasn't paying employees with cash,

14   is my point; she was writing checks on the TVU account.

15   A.   Some of them, yes.

16   Q.   Most of them; isn't that fair to say?

17   A.   That would be my guess, but just a guess.

18   Q.   You haven't done the analysis on that?

19   A.   (No response.)

20   Q.   Can you tell me, we've heard a lot in this trial about

21   Sophie Su and Wenchao Wang, the other names on the I-20s;

22   right?

23   A.   Yes.

24   Q.   Can you tell me how many people Dr. Su interviewed to try

25   and hire that actually had any experience and training, prior

1    training as DSOs?

2    **A.**    I can't speculate to that.

3         **MR. BABCOCK:**  Thank you, Your Honor.

4         **THE COURT:**  Redirect?

5         **MR. RHYNE:**  No further questions, Your Honor.

6         **THE COURT:**  Agent Mackey, thank you.  You can step down.

7         **THE WITNESS:**  Sure.

8         **THE COURT:**  Members of the jury, we're going to break a

9    little bit on the early side today, only in part because I

10   haven't taken an extra recess.  In six minutes you will have

11   gone 90 minutes since we resumed, and that's about as long as I

12   like to ask any jury to sit.

13        Ms. Fitzgerald, I'd like to have a brief conversation

14   with you after the other jurors have excused themselves.

15        I don't yet have more information about scheduling than I

16   gave you earlier today, but I may have some when you get in

17   again.  I'm quite confident the trial won't go as long as I

18   said at the beginning.  Exactly when it will complete, I don't

19   know.  Remember my prior admonition not to talk to anybody

20   about the case or accept any information about the case.  I'll

21   see you all at 8:30.

22        **THE CLERK:**  All rise.

23        (Jurors excused; Juror Fitzgerald present only.)

24        **THE COURT:**  All right.  Ms. Fitzgerald, thank for coming

25   back into the courtroom.  I just need to ask you a few

1    questions about your jury service.  I'm not trying to put you

2    on the spot.  It can be difficult for me to see exactly what's

3    happening for people from where I'm sitting I wonder if you'd

4    have any difficulty in staying awake during the trial has that

5    been an issue for you.

6         THE JUROR:  No, I have very complete notes of everything.

7    And I close my eyes to concentrate.   But you're welcome --

8         THE COURT:  No, the last thing I want to do is read those

9    notes.  Those are personal to you.  I just wanted to assure

10   myself and the parties that drowsiness was not an issue for

11   you.

12        THE JUROR:  Well, I have 85 pages of notes.

13        THE COURT:  All right.

14        THE JUROR:  But so I -- I can say I've been awake and

15   writing everything down.

16        THE COURT:  Counsel do we need to have a side bar?

17        THE JUROR:  But I will, like --

18        THE COURT:  Well, that's why I'm asking the question.

19        THE JUROR:  But I'm not asleep, Your Honor, really.

20        THE COURT:  All right.  That's why I'm asking the

21   question I have.  Because you can, I hope, appreciate --

22        THE JUROR:  Oh, yes.

23        THE COURT:  -- I have to err on the side of caution, so

24   that's all I'm doing.

25        THE JUROR:  From my point of view --

1      THE COURT:  Let me see counsel at side bar for just a

2  second.

3      (A conference was held at the sidebar as follows, outside

4  the presence of the jury.)

5      THE COURT:  All right.  We're at side bar outside the

6  hearing of our juror.  Does anyone have anything further that

7  they want the Court to ask or anything they want to say.

8      MR. RHYNE:  Your Honor, I did notice that at times she

9  does have her head down when she's taking notes but today

10  specifically I saw her with her eyes closed and her head slowly

11  drooping down --

12      THE COURT:  Okay, so my question is --

13      MR. RHYNE:  -- and then waking up.

14      THE COURT:  Is there anything that you want me to ask her

15  or can I let her go for the day?

16      MR. RHYNE:  You can let her go for the day.

17      THE COURT:  Is the Government going to be renewing its

18  request that she be excused?

19      MR. RHYNE:  Yes, based on the testimony we believe she

20  missed today as to the money laundering counts we're going to

21  stick with our motion.

22      THE COURT:  Mr. Babcock.

23      MR. BABCOCK:  I'm satisfied with her answers.  I think

24  she's being attentive.  I think we should keep her on.

25      MS. WEST:  I will say that during Agent Mackey's

1    testimony I did see her, she was taking notes, and then she had

2    her pen to her mouth and she just demonstrated -- however,

3    there were, I think, at least three times where the pen clearly

4    was falling out of her mouth and then she would catch it and

5    reawaken.

6        So I did see a problem, although it seemed to be of short

7    duration, during Agent Mackey's testimony.  And Mr. Rhyne and

8    myself has witnessed it during Agent Ramirez's testimony as

9    well.

10        MR. RHYNE:  And with the exception of the time we had

11   noticed it before, I would say that day and today have been the

12   only instances that I've noticed her specifically falling

13   asleep, but today was a big day of evidence.

14        THE COURT:  I deny this request.

15            (The side bar conference was concluded.)

16        THE COURT:  Ms. Fitzgerald, thank you for staying back.

17   I'll see you tomorrow at 8:30.

18            (Outside the presence of the juror.)

19        THE COURT:  All right.  We're now outside of the presence

20   of all jurors.  Before we turn to other topics, is there

21   anything that anyone would like to say about Ms. Fitzgerald?

22        MR. BABCOCK:  No, Your Honor.

23        MR. RHYNE:  No, Your Honor.

24        THE COURT:  All right.  I will say that there was some

25   evidence in support of the Government's request.  Excusing the

1    juror is not something that I would ever do lightly and I'll

2    make a point to pay particular attention to Ms. Fitzgerald from

3    this point forward.  I am hopeful that the issue will not

4    reoccur, but I'll be particularly mindful of it.  We had

5    earlier discussed having a juror instruction conference at

6    2:30, it's now about 10 past 1:00, and my suggestion would be

7    we all take as brief a lunch as we can and then convene earlier

8    than 2:00 o'clock.  Not as brief a lunch as I think we can, but

9    I think I'd like to have the court reporter have an honest

10   break.  But we could take a break for 45 minutes and then

11   reconvene.  Does that sound good?

12           MR. RHYNE:  Yes, Your Honor.

13           MR. BABCOCK:  Yes, Your Honor.

14           THE COURT:  All right.  Then why don't we reconvene at

15   1:55.

16           THE CLERK:  All rise.  Court will be in recess until

17   1:55.

18           (A lunch recess was commenced at 1:10 P.M.)

19

20

21

22

23

24

25

<u>CERTIFICATE OF CONTRACT REPORTER</u>

        I, Kelly Lee Polvi, certify that pursuant to

Section 753, Title 28, United States Code, that the

foregoing is a true and correct transcript of the

stenographically-reported proceedings held in the

above-entitled matter and that the transcript format is in

conformance with the regulations of the Judicial Conference

of the United States.

        Dated this 24th day of June, 2014.

_____

Kelly Lee Polvi
CA CSR No. 6389
Registered Merit Reporter
Federal Certified Realtime Reporter.