1          Pages 1737 - 1907

2          UNITED STATES DISTRICT COURT

3          NORTHERN DISTRICT OF CALIFORNIA

4          BEFORE THE HONORABLE JON S. TIGAR

5

6    UNITED STATES OF AMERICA,        )
                                      )
7         Plaintiff,                  )
                                      )
8    v.                               )    NO. 11-CR-00288 JST
                                      )
9    SUSAN XIAO-PING SU,              )
                                      )    San Francisco, California
10        Defendant.                  )    Wednesday
                                      )    March 19, 2014
11   _____ )

12

13              **TRANSCRIPT OF COURT PROCEEDINGS**

14                      **VOLUME 11**

15   **APPEARANCES**:

16   For Plaintiff:      Department of Justice
                         United States Attorney's Office
17                       1301 Clay Street
                         Suite 340S
18                       Oakland, CA 94612
                  BY:    **HARTLEY M.K. WEST**
19                       **WADE M. RHYNE**
                         **ASSISTANT U.S. ATTORNEYS**
20

21
     **For Defendant:**      Law Offices of Erik G. Babcock
22                       717 Washington St., Second Floor
                         Oakland, California 94607
23                BY:    **ERIK G. BABCOCK**
                         **KEVIN MORLEY**
24                       **ATTORNEYS AT LAW**

25   Reported by:  Kelly Polvi, CSR, RMR, FCRR, Contract Reporter

1    <u>**I N D E X**</u>

2    **Wednesday, March 1, 2014**

3                                                              <u>**PAGE**</u>

4    MOTION FOR RECONSIDERATION.......................... 1742

5    INSTRUCTIONS BY THE COURT........................... 1765

6    CLOSING ARGUMENTS BY MS. WEST....................... 1803

7    ClOSING ARGUMENTS BY MR. BABCOCK.................... 1860

8    REBUTTAL ARGUMENT BY MS. WEST....................... 1889

9

10

11

12                   <u>**E X H I B I T S**</u>

13
     <u>**GOVERNMENT'S EXHIBITS**</u>              <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>
14
     705B                                        1756   11
15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>Wednesday - March 19, 2014</u>                    <u>8:24 A.M.</u> |

2              P R O C E E D I N G S

3                   ---oOo---

4        (Heard outside the presence of the jury and the

5        defendant.)

6     **THE COURT:**  Good morning.

7     **MR. BABCOCK:**  Good morning, Your Honor.

8     **MR. RHYNE:**  Good morning.

9     **THE COURT:**  We're outside of the presence of the jury.

10  Counsel are at counsel table.  It is 8:25 A.M.

11     I understand -- Ms. Su is not here -- Dr. Su, rather, is

12  not here.

13     Mr. Babcock, I understand you've had some contact with

14  her this morning.

15     **MR. BABCOCK:**  I spoke with her a little over an hour ago;

16  about 7:20.  She was in her car and still in Pleasanton, she

17  told me, and frantic, I would say.  I told her to get here as

18  soon as she could.  She said she was on her way.

19     She normally BARTs in, so I don't know how long, exactly,

20  it takes to get from Pleasanton, if it started over an hour

21  ago.  But I'm led to believe it may be longer than an hour.

22     **THE COURT:**  If she drove on a weekday, it could easily

23  take an hour and a half.

24     With absolutely no traffic at all -- which is a condition

25  which is almost never obtained -- driving lawfully, it takes

1    about 45 minutes to get from the center of Pleasanton to this

2    courthouse.

3        But on a Wednesday morning at this hour, that's usually

4    on the order of double.

5        So I am not going to begin any portion of the jury

6    proceedings until she gets here.  She is under order to be here

7    by 8:00 A.M., and it's a condition of her release.  And I'll

8    decide whether I want to address that later on in the day, once

9    she gets here, ask her about that.

10       There are two matters that I need to address before the

11   jury proceedings begin, though, and I wonder if anyone has a

12   view about whether I can address those matters in Dr. Su's

13   absence.

14       The first is the motion for reconsideration, which I read

15   last night when it was filed.

16       **MR. BABCOCK:**  The Court can rule on a matter of law in

17   the absence of the defendant under Rule 43, and I'm fine with

18   that.

19       **THE COURT:**  The other is Ms. Su -- I keep doing that, and

20   I apologize, because is it my practice that people use

21   honorifics.

22       Dr. Su sent an email to counsel and the Court that I'm

23   led to believe -- I have not read the email -- has

24   approximately 2000 pages of attachments.  And I'm wondering if

25   anyone wants any further record of that fact made, beyond the

1    one that I just made by saying it.

2        Does someone believe that the email needs to be filed or

3    otherwise made a part of the record of the case?

4        I want to be quite clear that it is an ex parte

5    communication and I have not read it and the only information

6    that I have about that email -- I don't even know what it looks

7    like.  The only information about that email that I have is

8    that my courtroom deputy sent me an email saying we received

9    this email.

10       **MR. BABCOCK:**  I received the email as well, Your Honor,

11   at about 5:30 this morning.  I was not able to open it, and the

12   attachment's so large my phone froze and it took me a while

13   just to get my phone working again.

14       I have not had access to a real computer to actually open

15   the attachment.  I had some, I think, idea of what will be in

16   there, but I haven't actually seen it.  I'm not asking that it

17   be part of the record.

18       **THE COURT:**  It wasn't -- let me say this:  To the best of

19   my knowledge, it wasn't filed, it wasn't introduced in this

20   proceeding.  To the extent that it was a communication from

21   Dr. Su to the lawyers, the Court is not involved in that.  And

22   the fact that it was placed temporarily on the Court's email

23   server is of no further consequence.

24       So unless somebody asks me to do otherwise, I'm simply

25   going to instruct Mr. Noble to delete the email, since I've now

1    made a record of the fact that it was sent.

2         MR. BABCOCK:  Fine with me, Your Honor.

3         MR. RHYNE:  Your Honor, we think that that's perfectly

4    appropriate.  We just wanted to put the Court and defense

5    counsel on notice that to the extent there's a sentencing in

6    this case we plan to rely on the emails that Dr. Su has sent to

7    counsel and the Court.

8         I don't think that they need to be a part of the current

9    proceeding, but we did want to bring that to the defense's

10   attention.

11        THE COURT:  And now I've done that.  That's fine.  Okay.

12        So that's that, with regard to Dr. Su's email.

13        Mr. Noble, I am -- as I indicated a moment ago, I am

14   instructing you simply to delete that email.  And I will delete

15   your email to me letting me know, et cetera.

16        Let's turn to Ms. West's motion for reconsideration.

17        Ms. West, do you want to be heard further in support of

18   that motion?

19        MS. WEST:  Your Honor, just to say that I actually

20   realized when I saw your order that I had misunderstood the

21   argument of counsel and so I did want to respond to it and

22   provided Court with some law.

23        It's set forth briefly, and with that I would just

24   submit.

25        THE COURT:  Mr. Babcock, I will say that Ms. West has

1    tentatively succeeded in persuading me that regardless of how

2    the argument is characterized, either by you or by the Court --

3    and yesterday I was the first one to make the characterization,

4    it would have the effect -- making the argument would have the

5    effect of improperly focusing the jury on punishment, and I'm

6    concerned about that.  So let me invite to you respond.

7        MR. BABCOCK:  Okay.  Well, first I would say that they

8    should have objected when I was asking those questions, if they

9    were objectionable, if that was evidence that they believed the

10   jury shouldn't hear, it was inadmissible.  They didn't.

11       I think they waived their objection because I repeatedly

12   asked those questions on more than one occasion, I think I

13   asked them both times Agent Mackey was on the stand.

14       So there was certainly ample notice between last week and

15   this week, even if they sort of didn't get up to speed during

16   the first examination.  And not to raise it until after Agent

17   Mackey's off the stand and done testifying, I don't

18   particularly think that's fair, actually.  If they have an

19   objection, they need to lodge it when the evidence comes in.

20       I don't intend to argue that this is punishment.  I never

21   did.  Much as I would like to, the rule's always been, in state

22   and federal court, that punishment's for the Court and counsel

23   doesn't get to argue it.  But I do believe I get to argue

24   motive and bias, and that applies to the Government that's a

25   party in this case, and -- excuse me -- and so the case is -- I

1   don't have it in front of me, but the cases she cited have to

2   do with arguing punishment and that's not what I intend to do.

3       To the extent there's sort of a collateral inference of

4   punishment, if it was really that objectionable to them they

5   should have objected to start with.

6       That's not how I plan to argue it though.  I'm arguing

7   motivation.

8       **THE COURT:**  Ms. West.

9       **MS. WEST:**  Yes, Your Honor.  With regard to the waiver

10   argument, I don't believe that it has been waived.  Yes, the

11   bell cannot be un-rung in the sense of that testimony has come

12   in, but there's no need to compound that prejudice through

13   closing argument.

14       In terms of counsel stating that he doesn't intend to

15   argue it as punishment, I don't think that matters.  That as a

16   prac- -- and forfeiture is punishment.

17       So whether he argues it as this is punishing her more or

18   less -- and using the word "punishment" doesn't matter because

19   the case law is quite clear that criminal forfeiture is

20   punishment, it's intended as punishment, it's part of

21   sentencing, and it should not be addressed in the trial.

22       So yes, it has been raised, it came in sort of as a

23   segueway from the seizure stuff, which I believe the seizure

24   was properly in, but I would ask the Court to step off that

25   slippery slope and not allow it at closing argument.

1    It's not proper argument, it doesn't go to any of the

2    elements of the offense, so it's not relevant to prove guilt

3    here.

4    **THE COURT**:  Do you want to address the question of

5    motive?  So I understand the argument with regard to -- I

6    understand the argument that even if Mr. Babcock's closing

7    argument explicitly addresses the Government's motive for

8    prosecuting Dr. Su, that the effect of the argument will be to

9    focus the jury on punishment.

10    Let's put that argument to one side for a moment and let

11    me hear from you on the question of whether it's okay to

12    address the Government's motive.

13    And I will say, I spent an hour -- when I got off the

14    bench yesterday -- looking for cases on this point and I

15    couldn't find any and then I asked one of my law clerks to

16    spend an hour on the theory that he was a better researcher

17    than I was and he couldn't find anything.  He found an

18    unhelpful half sentence of dictum from a Tenth Circuit case

19    that I don't even recall what case it was because I didn't

20    think it was helpful.

21    And I'm just surprised that -- you know, this isn't the

22    first forfeiture case the Government's ever brought.  I'm just

23    surprised that this issue or something like it hasn't ever been

24    discussed.

25    **MS. WEST**:  Well, that's not what I was targeting my

1    search on yesterday, but I suspect that it would come up, if we

2    were to look at it in terms of arguments or efforts to argue by

3    counsel or to bring evidence in with regard to prosecutorial

4    discretion in bringing a case because that's really what the

5    motive is that we're talking about.

6         What I hear counsel saying is that the argument is, the

7    reason the Government is prosecuting Susan Su is to somehow,

8    you know, get this enormous stash of money and houses that

9    she's accumulated. And so if that's the argument, that really

10   just goes to the prosecutor's discretion in bringing the case,

11   which is not proper argument or proper basis of evidence in the

12   case. It doesn't go to any of the elements. And it really

13   isn't any different than saying well, the government's motive

14   is to put Susan Su in jail.

15        **THE COURT:** I think that's -- I think -- okay.

16        Mr. Babcock.

17        **MR. BABCOCK:** Again, I mean, if they'd raised this issue

18   a week ago when we first spoke with Agent Mackey, we could have

19   all thoroughly researched it. I frankly didn't have time to

20   deal with it last night. But I don't think it just goes to

21   prosecutorial discretion; it also goes to the agent's

22   investigation here.

23        **THE COURT:** But how is it different for the individual

24   agent from the idea that they're just trying to get Dr. Su

25   convicted? In an ordinarily criminal case there's no

1    forfeiture allegation, it's part of the -- you know, on

2    cross-examination you would expect to talk about how the agent

3    is part of the prosecution team and they're trying to get a

4    conviction in the case; right?  How is this different from

5    that?

6        Agent Mackey, whether he would like to or not, isn't

7    going to to get any part of the 5 million dollars, if the Court

8    orders a forfeiture.  So why is that different -- Ms. West says

9    that is not different from the fact that the folks on the

10   Government's side of the courtroom are trying to get a

11   conviction.

12       **MR. BABCOCK:**  Well, I would disagree because not all the

13   cases are created equal.  Agents don't have the same interest

14   in doing a quick interview at the jail and determine someone's

15   an alien and filing a 1326 charge as they do -- and spending

16   hundreds or thousands of hours investigating something and

17   coming up with 35 -- I guess now 30 -- less than 35 count

18   charges.

19       These are the kind -- these are the kinds of cases that

20   lead to promotions, build careers, things like that.

21       It's not necessarily an issue of prosecutorial

22   discretion; it's an issue of bias in the investigation.

23       So I think it is different.

24       And it's -- I think it's ironic, also --

25       **THE COURT:**  Let me ask you this:  Let's say that

1    Dr. Su -- that the evidence was that Dr. Su didn't buy any real

2    properties and she didn't buy what you've characterized as a

3    low-end Mercedes, she just left the money in the bank.  Well, I

4    suppose the Government would still be seizing that.  Let's say

5    that -- let's say that Dr. Su only charged $500 tuition per

6    student.  And let's say the evidence was that she accumulated a

7    hundred thousand dollars.

8         Would it be all right, in your view, for a defense

9    lawyer, in that circumstance, to say in closing argument, "Can

10   you believe the Government came after this woman for a hundred

11   thousand dollars?"  "$20,000?"

12        "Can you believe it?  This is how they're going to use

13   your taxpayer dollars?  Over this chump-change case?"

14        Anything wrong with that?

15        MR. BABCOCK:  Actually, I don't think so.  I think

16   defense counsel should be allowed --

17        THE COURT:  And why is that?

18        MR. BABCOCK:  I think defense counsel should be entitled

19   to disparage government investigation and that includes agent's

20   motives, whatever they may be.

21        MS. WEST:  If I may, Your Honor.

22        THE COURT:  Ms. West.

23        MS. WEST:  What's interesting is I actually don't hear

24   disparagement of the government's investigation; what I hear

25   the argument of counsel to be is not that they were biased in

1    that they conducted an investigation that wasn't fair, but

2    rather that the agents did too good a job because there was

3    going to be some money at the end of it that would be forfeited

4    to the United States.

5        THE COURT:  Oh, no.  Win or lose, if this goes up to the

6    Ninth Circuit, I want them to figure, you know, to tell me what

7    the rule is so the next time I can know what the rule is.

8        I understand Mr. Babcock very clearly on motive.  This is

9    not different from an estate -- this is not different from a

10   probate case in which you have a witness on the stand and if

11   things go her way she stands to get a million dollars from the

12   will, if it doesn't go her way, she doesn't.  That's his

13   argument.  That's what this is.  But I'm not sure I see that

14   direct a connection.

15       And I hear you very clearly on your selective-prosecution

16   argument.  But that's the argument Mr. Babcock wants to make.

17   It's no different.  He wants to treat Agent Mackey like one of

18   the daughters in *Hanson v. Denckla*, a civil procedure case that

19   some of you may remember from your days as -- first year in law

20   school.

21       MS. WEST:  I think that with regard to the hypothetical

22   Your Honor posed a moment ago, that Mr. Babcock can still get

23   where he feels like he needs to go without raising forfeiture.

24       THE COURT:  And so I can rule appropriately, if he does

25   go the way you think he can go, what is that?

1     MS. WEST:  I think that -- while I think that it doesn't

2     go to any of the elements of the offense for defense counsel to

3     argue that the -- the Government -- big government versus

4     little defendant, you know, breaking down the door that we

5     heard a lot about yesterday, it doesn't go to any of the

6     elements, but it is certainly argument that I hear regularly by

7     defense counsel.

8         So I haven't considered whether there's appropriate

9     challenges to that or not, but that doesn't raise the issue of

10    punishment.  And I think it's the raising of the issue of

11    punishment that's the problem.

12        It is inappropriate for counsel to say, "If you convict

13    this person she could go to jail for 15 years," or even, "She

14    could go to jail for, you know, five years if you convict her,

15    so don't convict her."  And it's the same sort of argument that

16    he's making with regard to forfeiture.

17        MR. BABCOCK:  Not exactly.  I mean --

18        THE COURT:  Let me you ask you a different hypothetical.

19    Dr. Su's not here, so I've got a lot of time.

20        Let's say, in closing argument, that you wanted to say --

21    and this is not in reference to this case -- I have no idea, if

22    Dr. Su were convicted, what a potential sentence in this case

23    would be.

24        But let's say you had a defendant facing a statutory

25    minimum of 10 years in a case and you wanted to say the reason

1     that the agents prosecuted her is they have it in for her and

2     they want to see her do 10 years.

3          Now, there are people that believe that there are

4     prosecutors and government agents who enjoy the idea of

5     defendants doing time.  And I'm sure that in that group there

6     are people who think that that motivation far exceeds the

7     secondhand attenuated motivation that an agent might have to

8     see that his employer gets the money in a forfeiture

9     proceeding.

10          So what would be wrong with applying your motive argument

11     in that circumstance, if anything?

12          That convoluted question come out clearly enough?

13          MR. BABCOCK:  I think I get it.

14          Well, I do think it would be appropriate to argue that an

15     officer or an agent had a motive to see someone do time.  I

16     don't know that that would lead to being able to reference a

17     mandatory minimum of any sort.

18          That's maybe a different question, but --

19          THE COURT:  Ms. West, further thoughts?  I'll give you,

20     each one, a chance to be heard.

21          MS. WEST:  Well, for the hypothetical that Your Honor

22     proposed, that's what *Frank* exactly says.  And the Ninth

23     Circuit in *Frank* said to inform a jury that the court may

24     impose minimum or maximum sentences is what opens the door to

25     compromised verdicts and to confuse the issues or issues to be

1    decided in explaining why that's not allowed.

2         So any reference to, you know, this person faces a

3    10-year mandatory minimum, or anything like that, is improper

4    for exactly the reasons that *Frank* in -- the Fifth Circuit --

5    actually, it was a Fifth Circuit case I was actually quoting --

6    explains.

7         The question of whether counsel can say that, you know,

8    don't you just want this defendant to go to jail, I think it

9    comes awfully close to the line.  But I don't think that that's

10   what counsel is doing here.  Or as I understood what they want

11   to be able to argue to the jury, is much closer to this, you

12   know, "This person's got a 10-year mandatory minimum," than,

13   "Didn't you want the money you seized?"

14        I think the seizure stuff is okay; I think that comes in.

15   It's the forfeiture that's the punishment.

16        **THE COURT:**  Now I have a hypothetical for you.

17        **MS. WEST:**  Okay.

18        **THE COURT:**  Try to imagine a circumstance in which

19   there's a big drug dealer in Oakland, California.

20        **MS. WEST:**  I can imagine it.

21        **THE COURT:**  Yeah, so can I.

22        And he does a lot of things in the community because he

23   has a lot of money that he makes in the community.  He helps

24   old people out with utility bills and that kind of thing.

25        He also engages in free speech that's offensive to the

1    government.  He puts up things around town telling people not

2    to trust the police, or otherwise says things that he's

3    permitted under the First Amendment to say but that are not

4    helpful to the government.

5        Eventually, he's caught and prosecuted for drug dealing.

6        In closing argument, the defendant wants to say, "Let me

7    tell you why they're prosecuting my client.  It's not for the

8    drug sales; it's because they don't like the speech."

9        Is there any problem there?

10   **MS. WEST:**  I think there is.  I think that the problem is

11   that that's not arguing evidence regarding the elements of the

12   offense to the jury.

13   **THE COURT:**  Well, he says the witnesses are biased.

14   Here's why they say -- they say they saw these transactions.

15   There's no video.  You believe the agent's testimony or you

16   don't.  And you heard from the Court during jury instructions

17   say anything that goes to bias or prejudice you can consider in

18   determining the witnesses' credibility.

19       These guys are -- these agents are sick of this guy.

20   They're sick of all that anti-cop propaganda.  They're sick of

21   reading it from their patrol cars.  They're sick of hearing it

22   from the people in the community.  They want this guy off the

23   street.  That's why they prosecuted him.

24       So did all these transactions happen exactly the way

25   these officers testified?  You can decide.

1    It is a hard hypothetical.  It's the hardest one I could

2    think of on short notice.  Because I'm trying to get right at

3    this issue of motive.

4        By the way, if anybody has found a case on that in the

5    last 45 minutes, let me know.  That would be great.

6        MS. WEST:  I understand the argument that the Court's

7    making, and I guess my easy cop-out answer is, of course that's

8    different than what we've got here and it doesn't go to the

9    issue of punishment, which the Court has clearly said is off

10   the table.

11       THE COURT:  Yes.  That's what makes this different.

12       Mr. Babcock.

13       MR. BABCOCK:  I actually think the Court's last

14   hypothetical is an easy one.  That sounds completely

15   appropriate.  I mean, if that's what the evidence is.

16       THE COURT:  Yes.  That's why I asked her about the hard

17   hypothetical; I knew what you were going to say.

18       MR. BABCOCK:  I'm predictable that way.

19       THE COURT:  Well, okay.

20       MS. WEST:  Should we see where Ms. Su might be?

21       THE COURT:  We'll talk about Dr. Su in a second.

22       This is extremely close, but I'm going to let the

23   defendant make this argument.

24       I'll tell you, I took a straw poll of my colleagues last

25   night, too, the ones I could round up, and they all came out

1    the same way.  That's not why I made my decision; otherwise, I

2    wouldn't have had this hearing.

3         But that will be the Court's ruling.

4         I do -- it's an extremely close case.  At some point, I

5    just have to make a decision.  And that will be the decision.

6         I need to set a time by which I am going to begin these

7    proceedings and make a finding that Dr. Su has voluntarily

8    abscinded herself.

9         **MR. BABCOCK:**  Can I call her for an estimate, Your Honor?

10        **THE COURT:**  You may do that.

11        **MR. BABCOCK:**  Thank you.

12        (A recess was taken from 8:52 A.M. to 8:57 A.M.)

13        **THE COURT:**  We're back on the record.  Counsel has now

14   had an opportunity to contact Dr. Su.

15        Mr. Babcock.

16        **MR. BABCOCK:**  As of just a couple of minutes ago, she had

17   just gotten off 80 here in the city.  So as long as it takes

18   her to get -- find parking, get up in the building.  Shouldn't

19   be much longer.

20        **THE COURT:**  Okay.  Anything else that we need to -- oh, I

21   understand the Government has -- this is a housekeeping matter.

22   The Government has a conditional exhibit they'd like to offer

23   into evidence.

24        **MR. RHYNE:**  Yes, Your Honor.  It's Exhibit 705B, and it

25   obviously relates to 705A, which we admitted yesterday.  It is

1   also a certified public record, Alameda County Recorder's

2   Office.

3         And I've spoken with defense counsel and I believe we

4   have an agreement that we can put it into evidence.

5         **THE COURT:**  Mr. Babcock, any objection to the Court

6   admitting Exhibit 705B?

7         **MR. BABCOCK:**  No objection.

8         **THE COURT:**  Exhibit 705B is admitted.

9            (Government's Exhibit 705B was received in evidence.)

10        **THE COURT:**  I'll just advise the jury that it was admitted

11   outside of their presence.

12        The Court will be in recess until Dr. Su comes in.

13        **MR. RHYNE:**  Thank you, Your Honor.

14           (A recess was taken from 8:58 A.M. to 9:16 A.M.)

15           (The following proceedings were held outside the

16            presence of the jury, the defendant now being

17            present.)

18        **THE COURT:**  Good morning.  Again, we're outside of the

19   presence of the jury.  Dr. Su is here.

20        Dr. Su, I'm going to hold a hearing later today regarding

21   the time that you arrived at court.

22        Ms. West, do you have copies of the Revised Jury

23   Instructions?

24        **MS. WEST:**  Yes.  I hope the Court received the email

25   yesterday as well, but I do have a copy.

1      **THE COURT:**  I don't have my email with me at the bench.

2    Were they sent, also, to Mr. Noble?

3      **MS. WEST:**  Yes, as well as the special verdict form.

4      **THE COURT:**  All right.  How many copies does the

5    Government have?

6      **MS. WEST:**  I have one, but I can quickly have somebody

7    make more.

8      **THE COURT:**  That would be great.  It is my practice to

9    give the jurors their own set.

10     **MS. WEST:**  How many copies would the Court like?

11     **THE COURT:**  Mr. Babcock, you have your own copy?

12     **MR. BABCOCK:**  I do, thank you.

13     **THE COURT:**  Mr. Noble's printing me one, so I guess just

14    copies for the jury, which would be 16.

15     **MR. BABCOCK:**  Does the Court give them to the jurors

16    while you're instructing them?

17     **THE COURT:**  I do, and I explain to the jurors it's

18    because they have different learning styles and it's important

19    to me that they absorb the information and some people, they

20    can't the absorb the information fast enough if you're just

21    talking to them and they can't read the information at the

22    time.

23     So my suggestion, in light of the hour, actually would be

24    that --

25     Well, before I finish that sentence.  Ms. West, how long

```
 1       do you think it would take to make the copies?
 2            MS. WEST:  My supervisor's pretty quick, so I would guess
 3       within five minutes she'll be back up here.
 4            THE COURT:  Wow, your supervisor is making the copies.
 5            MS. WEST:  Yes, she is.
 6            THE COURT:  From one public servant to another, I
 7       appreciate that very much.
 8            Then never mind what I was going to say.
 9            We'll wait until the copies come, and if, by 9:30, we
10       don't have the copies, we'll do something else.
11            Who will be delivering closing argument on behalf of the
12       Government?
13            MS. WEST:  I will, Your Honor.
14            THE COURT:  All right.  Thank you.
15            MR. BABCOCK:  I will, for the defense.
16            THE COURT:  Thank you.
17            Ms. West, can you remind me, please, which counts the
18       Government dismissed from the indictment?
19            MS. WEST:  Yes.
20            MR. BABCOCK:  28, 30, 33, and 23.
21            MS. WEST:  I believe that's right.
22            THE COURT:  Say that again?  28, 30 --
23            MR. BABCOCK:  33 and 23.
24            THE COURT:  I'm going to read Instruction No. 2 so as to
25       omit any reference to those numbers.
```

1    The district requires the use of the word "and," and that

2    sort of thing.

3        So, for example, instead of saying, "In Count 26 through

4    Count 35 --

5    MS. WEST:  Yes, I didn't correct that.  The early

6    instructions were the preliminary ones that the Court gave

7    before the trial began.

8    THE COURT:  Ah.  All right.  So maybe I don't need to --

9    oh, I see.  Okay.  I often will just append those and put them

10   at the back.

11   MR. BABCOCK:  Can the Court take out 23 as well?

12   Actually, it's --

13   THE COURT:  I think -- before we get to that, I think we

14   can disregard Instruction No. 14 and tell the jury to disregard

15   it.  There's not stipulated testimony in the case.  There's

16   stipulations, but there's not, "If so and so testified, this

17   would be their testimony."

18   MS. WEST:  That's right.

19   THE COURT:  So I intend to tell the jury that.

20   MS. WEST:  And just looking at the Ninth Circuit Manual,

21   Your Honor, it breaks down in here what is 1.1 through 1.13 as

22   preliminary instructions, and then -- not having prepared the

23   final version for the Court, I took off that numbering.

24   THE COURT:  Right.  Right.  I intended to not read

25   Instructions 1 through 13 but simply to tell them that the

1    instructions are in their set and that those are the

2    instructions that I gave them previously.

3         Then we can either pull out 14 or -- from their sets, or

4    I can, just as easily, tell them to disregard the instruction.

5         MS. WEST:  No, I think we should take it out.

6         THE COURT:  All right.  So that will be removed.

7         And then, with regard to Instruction No. 16, the last

8    sentence says, "Listen carefully.  The transcript will not be

9    available during your deliberations."

10        But in point of fact, as to each recording that was

11   played, a separate exhibit was admitted that is a transcript

12   and it will be available during their deliberations because it

13   is an admitted exhibit, and so --

14        MS. WEST:  I actually don't think we need to give that

15   one at all.  That would be one that would be given during the

16   course of the trial.

17        THE COURT:  Yes.

18        Mr. Babcock, any objection to the removal of Instruction

19   16?

20        MR. BABCOCK:  No objection.

21        THE COURT:  The Court will not give Instruction 16.

22        The Court does not intend to give Instruction 17.  Any

23   objection?

24        MR. BABCOCK:  No objection.  Sorry.

25        MS. WEST:  None.

1   THE COURT:  The Court was not asked to give Instruction
2   18 at any time in the trial.  And there's a separate question
3   of whether there's any evidence fitting that description, but
4   if there was, it was admitted for all purposes.
5       MS. WEST:  It was.
6       THE COURT:  So unless there's an objection, the Court
7   intends not to give Instruction 18.
8       Any objection?
9       MR. BABCOCK:  No objection.
10      MS. WEST:  I think that goes for 19 as well.
11      MR. BABCOCK:  No objection.
12      THE COURT:  I'd like to read Instruction 21 out of order.
13  I would like it to be the first thing that I read to the jury.
14      MR. BABCOCK:  Fine.
15      MS. WEST:  No objection.
16      (Brief Pause.)
17      THE COURT:  Again, we're outside of the presence of the
18  jury.
19      We had a tentative decision from the defendant yesterday,
20  but now I have to decide whether to give the Government's
21  proposed instruction -- which version of the Government's
22  Instruction 23 to give.
23      Mr. Babcock, will Dr. Su be testifying in her own defense
24  in this case?
25      MR. BABCOCK:  She will not.

1    THE COURT:  Thank you.

2        Then we need to remove the second proposed version of

3    Instruction 23.  And I'm just going to take that out of my own

4    set, actually, to eliminate the risk that I read it by mistake.

5        Would someone please tell me how they want the Court to

6    fill in the parenthetical information in Instruction No. 34, if

7    they do?

8        Hearing none, the Court will withdraw the instruction.

9    MR. BABCOCK:  That's fine, Your Honor.  Thank you.

10    MS. WEST:  I agree.

11    THE COURT:  Instruction No. 35 begins by informing the

12    jury that they heard testimony from witnesses who received

13    immunity.  I don't recall having heard such testimony.

14    MS. WEST:  That's correct; we didn't call those

15    witnesses.  We can cut that one as well.

16    MR. BABCOCK:  Well, parts of the instruction still apply.

17    THE COURT:  Is the defendant proposing that the first

18    paragraph of the instruction be deleted and that the word

19    "also" be deleted in the second paragraph?

20    MR. BABCOCK:  Yes.

21    THE COURT:  Any objection?

22    MS. WEST:  No objection.

23    THE COURT:  I'm going to read 46 out of order.  It's

24    going to be the last instruction that I read.

25    MR. BABCOCK:  No objection.

1    **THE COURT:**  I know with every passing minute we make it
2    more likely that the instruction copies will come through the
3    door.  I wonder if I should begin proceedings and then
4    interrupt them when the copies come.
5        Do Counsel have a view on this?
6    **MS. WEST:**  I wonder if the Court might consider
7    instructing from the modified version that the Court has, and
8    then, as soon as they retire, we can make the modifications,
9    print it, and then bring it to -- or the Court to bring it to
10   the jury room for them to begin their deliberations.
11       It would make it so that they're not reading from it,
12   but, given the modifications that need to be made now --
13   **THE COURT:**  I hear what you're saying.  I'm going to do
14   that.  That will be the Court's order.
15       I typically do give the jurors their own copies, but I'll
16   just tell them that copies will be provided to them during
17   their deliberations.
18       Mr. Babcock, do you have any objection?
19   **MR. BABCOCK:**  No objection.
20   **THE COURT:**  Mr. Noble, would you please tell the jurors
21   that they should take care of any personal needs that they have
22   and, as soon as that's completed, that we will bring them in?
23       Thank you.
24       Ms. Polvi -- this is off the record.
25       (Off-the-record discussion.)

1           (In the presence of the jury.)

2       THE COURT:  Good morning.  We're starting somewhat later

3    than we normally do.  You're a very punctual jury, and I

4    appreciate that very much.  And we've not had to delay you

5    before this, and I apologize for that.

6           But I can say, with some high degree of confidence, that

7    that will not have any effect on the estimate that I had

8    previously given you, as I think you, yourself, will see a

9    little bit later on this morning.

10          First of all, I should tell you that Exhibit 705B was

11   admitted earlier this morning outside your presence.  That is

12   just related to some of the transactions that you heard

13   testimony about from Agent Mackey yesterday.  So that exhibit

14   will also be available for you during your deliberations, if

15   you want to see it.

16          With that having been said, would the Government like to

17   call another witness?

18       MR. RHYNE:  Your Honor, the Government rests.

19       THE COURT:  Thank you, Mr. Rhyne.

20          Members of the jury, that concludes the presentation of

21   the Government's case in chief.

22       MR. BABCOCK:  Your Honor, could we have a quick side bar?

23       THE COURT:  Yes.

24          (A sidebar was held as follows, out of the hearing of

25          the jury.)

1

2          THE COURT:  We're at side bar outside of the hearing of

3      the jury.

4          MR. BABCOCK:  Your Honor, I'm making my Rule 29 motion at

5      this point, judgment of acquittal on all counts.  I understand

6      the Court's going to defer a ruling on that.  I assume it's

7      still the Court's ruling.

8          THE COURT:  Yes.  As I indicated, anticipating you making

9      this motion, the Court will reserve ruling on Defendant's Rule

10      29 motion until after the jury has returned its verdict or

11      until such other time as the Court may say.

12          MR. BABCOCK:  Thank you.

13          THE COURT:  Thank you.

14          MR. RHYNE:  Thank you.

15              (The sidebar conference was concluded.)

16              (Proceedings heard in open court.)

17          THE COURT:  Mr. Babcock, does the defendant wish to call

18      a witness?

19          MR. BABCOCK:  Your Honor, the defense also rests.

20          THE COURT:  Thank you, Mr. Babcock.

21          Members of the jury, that completes the evidence in this

22      case.

23          So if you were following along, I described the different

24      stages to you.  You know that all that's left is for me to

25      instruct you in the law that you're to apply in case and then

1    for the jury to retire to deliberate and make a decision, if

2    you can, in this case.

3        I'm going to read the instructions to you, and I'll ask

4    that you pay close attention.  I've made some very last-minute

5    modifications to these instructions, so I apologize, because

6    it's my normal practice to have a set for you to have in your

7    hand while I'm reading them.  I understand for some people it's

8    easier for people to absorb information that way.  I know that

9    from my own practice.  But it just isn't possible to do that in

10   this case.

11       If I receive copies in the midst of my instructions and

12   it's not too disruptive, I'll distribute them.  If that doesn't

13   happen, then I'll make sure you have sets to refer back to

14   during deliberations, knowing that you may choose not to take

15   notes if, by taking notes, you're able to pay closer attention.

16       Once I start with the instructions, there will be few, if

17   any, editorial asides.

18       The instructions are written in a conversational way, but

19   they do state the law, and so it's important that I read them

20   exactly or nearly exactly to you.

21       I gave you some instructions at the beginning of the

22   case.  I won't reread those now, but printed copies of those

23   instructions will be included in the set that you'll be given.

24       I'll say to my alternates -- I love alternates so much,

25   and actually, it's a testament to the health and well-being of

1    the 12 regular jurors here that we've not had to substitute any

2    alternates in.  It happens more often than you think that an

3    alternate needs to be substituted in, and it still may happen,

4    so.

5         I have observed how closely you have been paying

6    attention to the proceedings.  I really appreciate your close

7    attention.  And I would just say to you that it can happen

8    during deliberations that we need an alternate to be

9    substituted in, and so I appreciate your continued close

10   attention.

11        Members of the jury, now that you've heard all the

12   evidence, it is my duty to instruct you on the law that applies

13   in this case.  A copy of these instructions -- or copies of

14   these instructions will be available in the jury room for you

15   to consult.  It is your duty to weigh and to evaluate all the

16   evidence received in this case and, in that process, to decide

17   the facts.

18        It is also your duty to apply the law as I give it to you

19   to the facts as you find them, whether you agree with the law

20   or not.

21        You must decide the case solely on the evidence and the

22   law and must not be influenced by any personal likes or

23   dislikes, opinions, prejudices, or sympathy.

24        You will recall that you took an oath promising to do so

25   at the beginning of this case.  You must follow all these

1    instructions and not single out some and ignore others.

2    They're all important.

3         Please don't read into the instructions or into anything

4    I may have said or done any suggestion as to what verdict you

5    should return.  That is a matter entirely up to you.

6         The parties have agreed to certain facts that have been

7    stated to you.  You should therefore treat these facts as

8    having been proved.

9         At the beginning of the trial, I described the charges

10   against the defendant, and I'll be doing so later in these

11   instructions.

12        For reasons that do not concern you, Counts 23, 28, 30

13   and 33 are no longer before you.  Do not speculate about why

14   those charges are no longer part of this trial.

15        The defendant is on trial only for the remaining charges,

16   as to which I will instruct you now.  You may consider the

17   evidence presented only as it relates to those remaining

18   counts.

19        The indictment is not evidence.  The defendant has

20   pleaded not guilty to the charges.  The defendant is presumed

21   to be innocent unless and until the Government proves the

22   defendant guilty beyond a reasonable doubt.

23        In addition, the defendant does not have to testify or

24   present any evidence to prove innocence.  The Government has

25   the burden of proving every element of the charges beyond a

1    reasonable doubt.

2         The defendant in a criminal case has a constitutional

3    right not to testify.  You may not draw any inference of any

4    kind from the fact that the defendant did not testify.

5         The burden in this case is beyond a reasonable doubt.

6    Proof beyond a reasonable doubt is proof that leaves you firmly

7    convinced the defendant is guilty.  It is not required that the

8    Government prove guilt beyond all possible doubt.

9         A reasonable doubt is a doubt based upon reason and

10   common sense and is not based purely on speculation.  It may

11   arise from a careful and impartial consideration of all the

12   evidence or from a lack of evidence.

13        If after careful and impartial consideration of all the

14   evidence you're not convinced beyond a reasonable doubt that

15   the defendant is guilty, it is your duty to find the defendant

16   not guilty.  On the other hand, if after a careful and

17   impartial consideration of all the evidence you are convinced

18   beyond a reasonable doubt that the defendant is guilty, it is

19   your duty to find the defendant guilty.

20        The evidence from which you are to decide what the facts

21   are consists of one, the sworn testimony of any witness; two,

22   the exhibits which have been received into evidence; and three,

23   any facts to which all the lawyers have stipulated.

24        In reaching your verdict, you may consider only the

25   testimony and exhibits received in evidence.  The following

1  things are not evidence and you may not consider them in

2  deciding what the facts are:  One, questions, statements,

3  objections and arguments by the lawyers are not evidence.  The

4  lawyers are not witnesses.  Although you must consider a

5  lawyer's question to understand the answer of a witness, the

6  lawyer's questions are not evidence.

7         Similarly, what the lawyers have said in their opening

8  statements and what they will say in their closing arguments

9  and what they've said at other times is intended to help you

10  interpret the evidence, but is not, itself, evidence.  If the

11  facts, as you remember them, differ from the way the lawyers

12  state them, your memory of those facts controls.

13         Any evidence that I've excluded, stricken, or instructed

14  you to disregard is not evidence.

15         Anything you may have seen or heard when the court was

16  not in session is not evidence.  You're to decide this case

17  solely on the evidence received at the trial.

18         Evidence may be direct or circumstantial.  Direct

19  evidence is direct proof of a fact, such a testimony by a

20  witness about what that witness personally saw or heard or did.

21          Circumstantial evidence is indirect evidence; that is,

22  it is proof of one or more facts from which you could find

23  another fact.  You are to consider both direct and

24  circumstantial evidence.  Either can be used to prove any fact.

25  The law makes no distinction between the weight to be given to

1    either direct or circumstantial evidence.  It is for you to

2    decide how much weight to give to any evidence.

3         In deciding the facts in this case, you may have to

4    decide which testimony to believe and which testimony not to

5    believe.  You may believe everything the witness says, or a

6    part of it, or none of it.

7         In considering the testimony of any witness, you may take

8    into account, one, the witness's opportunity and ability to see

9    or hear or know the things testified to; two, the witness's

10   memory; three, the witness's manner while testifying; four, the

11   witness's interest in the outcome of the case, if any; five,

12   the witness's bias or prejudice -- excuse me.  Five, the

13   witness's bias or prejudice, if any; six, whether other

14   evidence contradicted the witness's testimony; seven, the

15   reasonableness of the witness's testimony in light of all the

16   evidence; and eight, any other factors that bear on

17   believability.

18        The weight of the evidence as to a fact does not

19   necessarily depend on the number of witnesses who testify.

20   What is important is how believable the witnesses were and how

21   much weight you think their testimony deserves.

22        You are here only to determine whether the defendant is

23   guilty or not guilty of the charges in the indictment.  The

24   defendant is not on trial for any conduct or offense not

25   charged in the indictment.

1    A separate crime is charged against the defendant in each

2   count.  You must decide each count separately.  You'll get a

3   special -- excuse me, you'll get a verdict form that lists each

4   count separately.  Your verdict on one count should not control

5   your verdict on any other count.

6        An intent to defraud is an intent to deceive or cheat.

7        You have heard testimony that the defendant made a

8   statement.  It is for you to decide one, whether the defendant

9   made the statement, and two, if so, how much weight to give to

10  it.  In making those decisions, you should consider all the

11  evidence about the statement, including the circumstances under

12  which the defendant may have made it.

13       I don't have a note on this to myself, but I believe that

14  I determined not to give Instruction 33; is that accurate?

15       MR. BABCOCK:  That is.

16       MS. WEST:  Yes.

17       THE COURT:  Thank you.

18       You've heard testimony from witnesses who received

19  benefits from the government in connection with this case.

20  You've also heard testimony from witnesses who pleaded guilty

21  to a crime arising out of the same events for which the

22  defendant is on trial.  This guilty plea is not evidence

23  against the defendant and you may consider it only in

24  determining this witness's or that witness's believability.

25       For these reasons, in evaluating the testimony of those

 1    witnesses, you should consider the extent to which or whether

 2    their testimony may have been influenced by any of these

 3    factors.  In addition, you should examine the testimony of

 4    those witnesses with greater caution than that of other

 5    witnesses.

 6         You've also heard testimony from uncover agents and

 7    informants who were involved in the Government's investigation

 8    in this case.  Law enforcement officials may engage in stealth

 9    and deception, such as the use of informants and undercover

10    agents, in order to investigate criminal activities.

11    Undercover agents and informants may use false names and

12    appearances and assume the roles of members of criminal

13    organization.

14         You've heard testimony from persons who, because of

15    education or experience, were permitted to state opinions and

16    the reasons for their opinions.  Such opinion testimony should

17    be judged like any other testimony; you may accept it or reject

18    it and give it as much weight as you think it deserves,

19    considering the witness's education and experience, the reasons

20    given for the opinion, and all the other evidence in the case.

21         Certain charts and summaries were admitted into evidence.

22    The charts and summaries are only as good as the underlying

23    supporting material.  You should therefore give them only such

24    weight as you think the underlying material deserves.

25         The defendant can be found guilty of wire fraud, mail

1    fraud, visa fraud, using a false document, making a false

2    statement to a government agency, alien harboring, unauthorized

3    access of a government computer, and/or money laundering, even

4    if the defendant personally did not commit the act or acts

5    constituting the particular crime but aided and abetted in its

6    commission.

7         To prove the defendant guilty of aiding and abetting, the

8    Government must prove beyond a reasonable doubt first, that the

9    particular crime was committed my someone; two, the defendant

10   knowingly and intentionally aided, counseled, commanded,

11   induced or procured that person to commit each element of the

12   particular crime; and three, the defendant acted before the

13   crime was completed.

14        It is not enough that the defendant merely associated

15   with the person committing the crime, or unknowingly or

16   unintentionally did things that were helpful to that person, or

17   was present at the scene of the crime.  The evidence must show

18   beyond a reasonable doubt that the defendant acted with the

19   knowledge and intention of helping that person commit wire

20   fraud, mail fraud, or the other crimes that I just described.

21        The Government is not required to prove precisely --

22        May I omit the last sentence of Instruction 39?

23        **MR. BABCOCK:**  Please do.

24        **MS. WEST:**  Yes.

25        **THE COURT:**  An act is done knowingly if the defendant is

1    aware of the act and does not act through ignorance, mistake,

2    or accident.  The Government is not required to prove that the

3    defendant knew that her acts or omissions were unlawful.  You

4    may consider evidence of the defendants's words, acts, or

5    omissions, along with all the other evidence, in deciding

6    whether the defendant acted knowingly.

7         Counsel, I'm going to move 41 through 45 to the end, as I

8    did with 46, and just skip to 47 and come back to the other

9    ones.

10        Members of the jury, as I am instructing you, the

11   defendant is charged with wire fraud, mail fraud, conspiracy to

12   commit visa fraud, and visa fraud.  Each of these charges

13   relate to the scheme to defraud set forth in the indictment.

14        It is alleged that, from in or about September 2008

15   through on or about January 19, 2011, in the Northern District

16   of California and elsewhere, Defendant Susan Xiao-Ping Su and

17   others engaged in an illegal scheme to defraud nonimmigrant

18   aliens of money and property, specifically tuition and other

19   fees.

20        In furtherance of this scheme to defraud, Su and others

21   caused TVU to submit a Form I-17 to admit foreign students,

22   along with revisions, supplements, and attachments, to SEVP in

23   Washington, DC.  These submissions allegedly contained

24   materially false representations regarding TVU's

25   administrators, instructors, and articulation agreements, as

1    well as materially false promises by TVU's DSOs to comply with

2    all federal regulations regarding nonimmigrant students.

3         As a further part of this scheme to defraud, after TVU

4    received SEVP approval to admit F-1 students, Su and others

5    allegedly recruited and admitted aliens as TVU students without

6    regard to their academic qualifications and intent to pursue a

7    full course of study.

8         As a further part of the scheme to defraud, Su and others

9    allegedly caused TVU student-employees to access DSOs' SEVIS

10   accounts to enter data concerning TVU students, and to create

11   SEVIS entries according to Su's instructions.  Many of these

12   SEVIS entries contained materially false representations

13   regarding the applicant's residence, means of support, course

14   of study, and purpose of entry, among other things.  Su then

15   allegedly signed the printed I-20s from SEVIS, sometimes

16   forging the signature of the DSO from whose account the form

17   was printed.

18        As a further part of the scheme to defraud, Su and others

19   allegedly collected tuition and other payments from aliens in

20   exchange for maintaining them in active F-1 status.  Su

21   allegedly paid a percentage of these fees to recruiters as

22   commissions for referrals of new alien students.

23        As a further part of the scheme to defraud, Su and others

24   allegedly made materially false representations and submitted

25   materially false documents to DHS agents who are routinely

1    tasked with contacting SEV-approved schools to verify the F-1

2    status of nonimmigrants in the United States or those who are

3    seeking to reenter the country.

4         In response to such requests for verification, Su and

5    others allegedly repeatedly brought false materially -- excuse

6    me, allegedly repeatedly provided materially false I-20s,

7    letters of good standing, transcripts, and attendance letters.

8         Similarly, during DHS site visits, Su allegedly made

9    materially false representations regarding TVU's classes,

10   instructors, DSOs, office staff, and school policies.

11        The defendant is charged with Counts 1 through 12 of the

12   indictment with wire fraud in violation of Section 1343 of

13   Title 18 of the United States Code.

14        In order for the defendant to be found guilty of that

15   charge, the Government must prove each of the following

16   elements beyond a reasonable doubt:  First, the defendant

17   knowingly participated in, devised or intended to devise a

18   scheme or plan to defraud or a scheme or plan for obtaining

19   money or property by means of false or fraudulent pretenses,

20   representations, or promises.

21        Second, that the statements made or facts omitted as part

22   of the scheme are material; that is, that they had a natural

23   tendency to influence or were capable of influencing a person

24   to part with money or property.

25        Third, the defendant acted with the intent to defraud;

1     that is, the intent to deceive or cheat.

2           Fourth, the defendant used, or caused to be used, the

3     wires to carry out or attempt to carry out or attempt to carry

4     out an essential part of the scheme, and fifth, the wire

5     communication traveled in interstate commerce.

6           In determining whether a scheme to defraud exists, you

7     may consider not only the defendant's words and statements but

8     also the circumstances in which they are used as a whole.

9           An email, fax, or internet communication from one state

10    to another may constitute a wire transmission in interstate

11    commerce.  The wire is caused when one knows that the wires

12    will be used in the ordinary course of business or when one can

13    reasonably foresee such use.

14          It doesn't matter whether the material sent by wire was

15    itself false or deceptive, so long as the wires were used as

16    part of the scheme.  Nor does it matter whether the scheme was

17    successful or that any money or property was obtained.

18          The defendant is charged in Count 13 and Count 14 of the

19    indictment with mail fraud in violation of Section 1341 of

20    Title 18 of the United States Code.

21          In order for the defendant to be found guilty of that

22    charge, the Government must prove each of the following

23    elements beyond a reasonable doubt:  First, that the defendant

24    knowingly participated in, devised, or intended to devise, a

25    scheme or plan to defraud, or a scheme or plan for obtaining

1    money or property, by means of false or fraudulent pretenses,

2    representations or promises.

3         Second, the statements made or facts omitted as part of

4    the scheme were material; that is, they had a natural tendency

5    to influence, or were capable of influencing a person to part

6    with money or property.

7         Third, the defendant acted with the intent to defraud.

8    That is, the intent to deceive or cheat.

9         And fourth, the defendant used or caused to be used the

10   mails; namely, anything to be sent or delivered by the postal

11   service or by any private or commercial interstate carrier to

12   carry out or to in attempt to carry out any part of the scheme.

13        In determining whether a scheme to defraud exists, you

14   may consider not only the defendant's words and statements, but

15   also the circumstance in which they are used in a whole.

16        A mailing is caused when one knows that the mails will be

17   used in the ordinary course of business or when one can

18   reasonably foresee such use.

19        It does not matter whether the material mail was itself

20   false or deceptive so long as the mail was used as part of the

21   scheme, nor does it matter whether the scheme or plan was

22   successful or that any money or any property was obtained.

23        The defendant is charged in Count 15 of the indictment

24   for conspiring to commit visa fraud in violation of Section 371

25   of Title 18 of the United States Code.

1          In order for the defendant to be found guilty of that

2     charge, the Government must prove each of the following

3     elements beyond a reasonable doubt.

4          First, beginning on or about February 2009 and continuing

5     through on or about January 19, 2011, there was an agreement

6     between two or more persons to commit visa fraud.

7          Second, the defendant became a member of the conspiracy

8     knowing of at least one of its objects and intending to help

9     accomplish it.

10         And third, one of the members of the conspiracy performed

11    at least one overt act in or after February 2009 for the

12    purpose of carrying out the conspiracy, with all of you

13    agreeing on a particular overt act that you find was committed.

14         This is very important information.  It's also somewhat

15    dense.  Would each of you stand up for a moment and stretch,

16    please?

17         **MS. WEST:**  Your Honor, perhaps while they're stretching

18    if there's something we could address briefly at sidebar.

19         **THE COURT:**  Yes.

20         Madam Reporter.

21              (A sidebar was held as follows, outside the hearing

22              of the jury.)

23              THE COURT:  Yes.  We're at sidebar, outside

24         the hearing of the jury as well.

25         **MS. WEST:**  As Your Honor was reading and appropriately

1    inserting "allegedly" in all of the parts of the alleged scheme

2    to defraud in Special Instruction No. 47, there was one

3    sentence where the Court did not insert allegedly.

4    While I think it would be harmless later, we have the

5    opportunity to cure it now.  I think that would be the

6    preferred course.

7        It would be the sentence line 20, beginning --

8        THE COURT:  Any objection to the Court rereading the

9    sentence as corrected?

10       MR. BABCOCK:  Either way.

11       THE COURT:  I'll do that.

12       MR. BABCOCK:  They're going to get a corrected later copy.

13   They're going to be looking at all of this stuff again.

14       THE COURT:  I think it's best to err on the side of

15   caution, so I'll read the corrected sentence.

16       I normally have jurors take a stretch break at some point

17   during the instructions, one of our jurors at the back row is

18   starting to -- she was awake the whole time, but you could tell

19   it was getting tough, so that's why I called the break when I

20   did.

21       Thank you.

22           (The sidebar was concluded.)

23           (Proceedings heard in open court.)

24       THE COURT:  All right, back on the record.

25       Members of the jury, when I was instructing you regarding

1    the scheme to defraud that's alleged against Dr. Su, I was

2    reading from this printed text.  And the printed text is

3    missing a word, so I'm going to reread the sentence and I'll

4    get it in its corrected form.

5        But the sentence should have read, "Many of these SEVIS

6    entries allegedly contained materially false representations

7    regarding the applicant's residence, means of support, course

8    of study, and purpose of entry, among other things."

9        And that sentence comes from Special Instruction No. 47.

10       Turning to Instruction No. 50 -- and I'm reading them to

11   you in a different order than you'll get them, you'll get them

12   in numerical order, but the order of instructions doesn't make

13   any difference.

14       And by the way, none of the instructions is any more

15   important than any other instruction.

16       And finally, you may find that -- after you've determined

17   what the facts in the case are, that some of the instructions

18   don't apply.

19       Now, that's a decision that you will make after you have

20   determined what the facts are.  And if that happens, then you

21   simply don't apply that instruction, and then use the other

22   instructions to decide the case.

23       Returning to Instruction 50, which is where I left off --

24   and I had just finished describing to you what the elements of

25   conspiring to commit visa fraud are and told you that you have

1    to agree on a particular overt act to find that one of the

2    members of the conspiracy performed at least one overt act.

3         Turning to Instruction 50.  The overt acts alleged by the

4    Government are on or about February 21, 2009, Defendant Su sent

5    an email to an unindicted co-conspirator regarding recruiting

6    students from India.

7         Next, on or about April 30, 2010, TVU issued a $945

8    check, drawn on TVU's Wells Fargo Bank account ending in -0454,

9    as a commission payment to an unindicted co-conspirator for

10   recruiting an alien student.

11        Next, on or about July 27, 2010, Defendant Su falsely

12   signed another DSO's name on a Form I-20 for a person described

13   as S.A.

14        Next, on or about July 27, 2010, Defendant Su falsely

15   signed another DSO's name on a Form I-20 for a person described

16   as the initials K.D.

17        Next, on or about September 7, 2010, Defendant Su falsely

18   signed another DSO's name on a Form I-20 for a person described

19   by the initials R.B.

20        And next, on or about January 7, 2011, Su falsely told a

21   DHS agent that a person described by the initials M.R. attended

22   a TVU class that she taught.

23        Again, these are overt acts that are alleged by the

24   Government.

25        A conspiracy is a kind of criminal partnership -- an

1   agreement between two or more persons to commit one or more

2   crimes.  The crime of conspiracy is the agreement to do

3   something unlawful.  It does not matter whether the crime

4   agreed upon was committed.

5       For a conspiracy to have existed, it isn't necessary that

6   the conspirators made a formal agreement or that they agreed on

7   every detail of the conspiracy.  It is not enough, however,

8   that they simply met, discussed matters of common interest,

9   acted in similar ways, or perhaps helped one another.  You must

10  find that there was a plan to commit visa fraud.

11      One becomes a member of a conspiracy by willfully

12  participating in the unlawful plan with the intent to advance

13  or further some object or purpose of the conspiracy, even

14  though the person does not have full knowledge of all the

15  details of the conspiracy.  Furthermore, one who willfully

16  joins an existing conspiracy is as responsible for it as the

17  originators.  On the other hand, one who has no knowledge of a

18  conspiracy but happens to act in a way which furthers some

19  object or purpose of the conspiracy does not, thereby, become a

20  conspirator.

21      Similarly, a person does not become a conspirator merely

22  by associating with one or more persons who are conspirators or

23  merely by knowing that a conspiracy exists.

24      An overt act does not, itself, have to be unlawful.  A

25  lawful act may be an element of a conspiracy if it was done for

1    the purpose of carrying out the conspiracy.  The Government is

2    not required to prove that the defendant personally did one of

3    the overt acts.

4         Turning to visa fraud.

5         The defendant is charged in Counts 16 through 19 of the

6    indictment with fraud in the use of an immigration document in

7    violation of Section 1546(a) of Title 18 of the United States

8    Code.  The Government can prove that this crime was committed

9    under one of two theories.  For you to find the defendant

10   guilty, you must unanimously agree on the theory proved and the

11   Government must prove each of the elements of that theory

12   beyond a reasonable doubt.

13        Under the first theory, the Government must prove that,

14   first, the defendant forged or falsely made a document

15   prescribed by statute or regulation for entry into or as

16   evidence of authorized stay or employment in the United States.

17   Namely, a Form I-20, for the following individuals identified

18   by initials on the following dates:  For S.A., on July 27,

19   2010.  That's Count 16.  For K.D., on July 27, 2010.  That's

20   Count 17.  For M.R., on August 31, 2010.  That's Count 18.  And

21   for R.B., on September 7, 2010.  That's Count 19.

22        And, the second element is the defendant acted knowingly.

23        Under the second theory, the Government must prove that

24   first, the defendant knowingly used, attempted to use,

25   possessed, obtained, or received a document prescribed by

1    statute or regulation for entry into or as evidence of

2    authorized stay or employment in the United States, namely a

3    Form I-20, for the following individuals (identified by

4    initials) on the following dates:  For S.A., on July 27, 2010.

5    That's Count 16.  For K.D., on July 27, 2010.  That's Count 17.

6    For M.R., on August 31, 2010.  Count 18.  And for R.B., on

7    September 7, 2010.  Count 19.

8         And the second element, that the defendant knew the

9    document to be forged, falsely made, or procured by fraud or

10   unlawfully obtained.

11        The defendant is charged in Count 20 of the indictment

12   with knowingly and willfully making or using, on or about

13   September 24, 2010, the document containing a false statement

14   in a matter within the jurisdiction of the governmental agency

15   or department in violation of Section 1001 of Title 18 of the

16   United States Code.

17        In order for the defendant to be found guilty of that

18   charge, the Government must prove each of the following

19   elements beyond a reasonable doubt:  One, the defendant made or

20   used a writing which contained a false statement in a matter

21   within the jurisdiction of the Executive Branch of the

22   United States, namely, the Department of Homeland Security.

23   Two, the defendant acted willfully; that is, deliberately and

24   with knowledge that the statement is untrue.  And three, the

25   statement was statement was material to the activities or

1     decisions of the Department of Homeland Security; that is, it

2     had a natural tendency to influence, or was capable of

3     influencing the agency's decisions or activities.

4          The defendant is charged in Count 21 of the indictment

5     with knowingly and willfully making a false statement, on or

6     about January 7, 2011, in a matter within the jurisdiction of a

7     government agency or department in violation of Section 1001 of

8     Title 18 of the United States Code.

9          For the defendant to be found guilty of that charge, the

10    defendant must prove each of the following elements beyond a

11    reasonable doubt:

12         **MR. BABCOCK:**  I'm sorry, Your Honor.  You misspoke there

13    and said "the defendant" must prove.

14         **THE COURT:**  I beg your pardon.  The Government must

15    prove.

16         Let me start from the beginning.  The defendant does not

17    ever have the burden of proof in this case.

18         In order for the defendant to be found guilty of that

19    charge, the Government must prove each of the following

20    elements beyond a reasonable doubt:  First, the defendant made

21    a false statement in a matter within the jurisdiction of the

22    Executive Branch of the United States; namely, the Department

23    of Homeland Security.  Second, the defendant acted willfully;

24    that is, deliberately and with knowledge that the statement was

25    untrue.  And third, the statement was material to the

1    activities or decisions of the Department of Homeland Security;

2    that is, it had a natural tendency to influence or was capable

3    of influencing the agency's decisions or activities.

4        The defendant is charged in Counts 22 through 24 of the

5    indictment with harboring an alien in violation of Section

6    1324(a)(1)(A)(iii) of Title 18 of the United States Code.  In

7    order for the defendant to be found guilty of that charge, the

8    Government must prove each of the following elements beyond a

9    reasonable doubt:

10       Count 22.  First, the person known by the initials V.D.

11   was an alien; second, V.D. was not lawfully in the

12   United States; third, the defendant knew or acted in reckless

13   disregard of the fact that V.D. was not lawfully in the

14   United States; fourth, the defendant harbored, concealed, or

15   shielded from detection V.D. through employment at TVU for the

16   purpose of avoiding his detection by immigration authorities or

17   attempted to harbor, conceal, or shield from detection V.D.

18   through employment at TVU for the purpose of avoiding his

19   detection by immigration authorities and did something that was

20   a substantial step toward committing the crime; and fifth, that

21   the defendant acted for the purpose of commercial advantage or

22   private financial gain.

23       For Count 24:  First, A.D. was an alien; second, A.D. was

24   not lawfully in the United States; third, the defendant knew or

25   acted in reckless disregard of the fact that A.D. was not

1     lawfully in the United States; fourth, the defendant harbored,

2     concealed, or shielded from detection A.D. through employment

3     at TVU for the purpose of avoiding detection by immigration

4     authorities, or attempted to harbor, conceal or shield from

5     detection A.D. through employment at TVU for the purpose of

6     avoiding detection by immigration authorities and did something

7     that was a substantial step toward committing the crime; and

8     fifth, the defendant acted for the purpose of commercial

9     advantage or private financial gain.

10         Mere preparation is not a substantial step toward

11    committing the crime.  To constitute a substantial step, a

12    defendant's acts or actions must demonstrate that the crime

13    will take place unless interrupted by independent

14    circumstances.

15         An alien is a person that is not a natural-born or

16    naturalized citizen of the United States.  An alien is not

17    lawfully in this country if the person was not duly admitted by

18    an Immigration officer.

19         The defendant is charged in Count 25 of the indictment

20    with unlawfully accessing a computer in violation of Section

21    1030(a)(3) of Title 18 of the United States Code.

22         In order for the defendant to be found guilty of that

23    charge, the Government must prove each of the following

24    elements beyond a reasonable doubt:  First, the defendant

25    intentionally accessed a nonpublic computer of the Department

1    of Homeland Security; namely, the Student and Exchange Visitor

2    Information System, also known as "SEVIS" or "SEVIS."  Second,

3    the defendant accessed that computer without authorization.

4    And third, the computer accessed by the defendant was used

5    non-exclusively by or for the United States Government, but the

6    defendant's conduct affected that computer's use by or for the

7    United States Government.

8         Members of the jury, these instructions that I'm reading

9    you -- and I'm also going to wade through the substantive ones

10   about the charges in the case -- are so important because they

11   tell you the elements that the Government needs to prove in

12   this case, but they're a little dry.  And I can see some of you

13   are -- I can see all of you are folks -- and in closing, what

14   I'm saying is I want to let you know that I just have a couple

15   more of those to read and then we'll be on the concluding

16   instructions.

17        The defendant is charged in Counts 26, 27, 29, 31, 32,

18   34, and 35 of the indictment with money laundering in violation

19   of Section 1957 of Title 18 of the United States Code.  In

20   order for the defendant to be found guilty of that charge, the

21   Government must prove each of the following elements beyond a

22   reasonable doubt:  First, the defendant knowingly engaged or

23   engaged or attempted to engage in a monetary transaction;

24   second, the defendant knew the transaction involved criminally

25   derived property; third, that property had a value greater than

1    $10,000; fourth, the property was, in fact, derived from visa

2    fraud; and fifth, the transaction occurred in the

3    United States.

4         The term "monetary transaction" means the deposit,

5    withdrawal, transfer or exchange, in or affecting interstate

6    commerce, of funds or a monetary instrument by, through, or to

7    a financial institution.

8         The term "financial institution" includes a bank insured

9    by the Federal Deposit Insurance Corporation.

10        The term "criminally derived property" means any property

11   constituting, or derived from, the proceeds of a criminal

12   offense.  The Government must prove that the defendant knew

13   that the property involved in the monetary transaction

14   constituted, or was derived from, proceeds obtained by some

15   criminal offense.  The Government does not have to prove that

16   the defendant knew the precise nature of that criminal offense

17   or knew the property involved in the transaction represented

18   the proceeds of the visa fraud and/or visa fraud conspiracy.

19        Although the Government must prove that of the property

20   at issue more than $10,000 was criminally-derived, the

21   Government does not have to prove that all the property at

22   issue was criminally-derived.

23        A conspiracy may continue for a long period of time and

24   may include the performance of many transactions.  It is not

25   necessary that all members of the conspiracy join in at the

1    same time, and one may become a member of a conspiracy without

2    full knowledge of all the details of the unlawful scheme, or

3    the names, identities, or locations of all the other members.

4         Even though a defendant did not directly conspire with

5    the other defendant or other conspirators in the overall

6    scheme, the defendant has, in effect, agreed to participate in

7    the conspiracy if the Government proves each of the following

8    beyond a reasonable doubt:  That one, the defendant directly

9    conspired with one or more conspirators to carry out at least

10   one of the objects of the conspiracy; two, that the defendant

11   knew or had reason to know that the other conspirators --

12   excuse me -- knew or had reason to know that other conspirators

13   were involved with those with whom the defendant directly

14   conspired; and three, the defendant had reason to believe that

15   whatever benefits the defendant might get from the conspiracy

16   were probably dependent on the success of the entire venture.

17        It is not a defense that a person's participation in a

18   conspiracy was minor, or for a short period of time.

19        If you decide that the defendant was a member of a scheme

20   to defraud and that the defendant had the intent to defraud,

21   the defendant may be responsible for other co-schemer's actions

22   during the course of and in furtherance of the scheme, even if

23   the defendant did not know what they said or did.

24        For the defendant to be guilty of an offense committed by

25   a co-schemer in furtherance of the scheme, the offense must be

1   one that the defendant could reasonably foresee as a necessary

2   and natural consequence of a scheme to defraud.

3        Now I'm going to talk about deliberation.

4        When you begin your deliberations, you need to elect one

5   member of the jury as your presiding juror who will preside

6   over the deliberations and speak for you here in court.

7        And I'll just insert one editorial comment here which is

8   the most important quality of a presiding juror is that

9   person's ability to -- well, I should say "abilities" -- first,

10  to be organized in the way that you discuss the questions posed

11  to you on the verdict form and marshal the evidence in support

12  of whatever arguments are being made in the jury deliberation

13  room, but secondly, that the person is someone that all of the

14  group feels will do a good job to make sure that everyone's

15  voice is heard in the deliberations so that everyone gets a

16  chance to fairly speak on whatever questions the jury is

17  discussing.

18       Returning to Instruction No. 41.

19       After you have selected a presiding juror, you will then

20  discuss the case with your fellow jurors to reach agreement, if

21  you can do so.  Your verdict, whether guilty or not guilty,

22  must be unanimous.

23       Each of you must decide the case for yourself, but you

24  should do so only after you've considered all the evidence,

25  discussed it fully with the other jurors, and listened to the

1    views of your fellow jurors.

2        Don't be afraid to change your opinion if the discussion

3    persuades you that you should; but don't come to a decision

4    simply because other jurors think that it's right.

5        It's important that you attempt to reach a unanimous

6    verdict, but, of course, only if each of can you do so after

7    having made your own conscientious decision.  Do not change an

8    honest belief about the weight and effect of the evidence

9    simply to reach a verdict.

10       Because you must base your verdict only on the evidence

11   received in the case and on these instructions, I remind you

12   that you must not be exposed to any other information about the

13   case or to the issues it involves.  Except for discussing the

14   case with your fellow jurors during your deliberation, do not

15   communicate with anyone in any way and do not let anyone else

16   communicate with you in any way about the merits of the case or

17   anything to do with it.

18       This includes discussing the case in person, in writing,

19   by phone or electronic means, by email, text messaging, or any

20   Internet chat room, blog, website or other feature.  This

21   applies to communicating with your family members, your

22   employer, the media or press, and the people involved in the

23   trial.

24       If you're asked or approached in any way about your jury

25   service or anything about this case, you must respond that

1    you've been ordered not to discuss the matter, and report the

2    contact to the Court.

3         Do not read, watch or listen to any news or media

4    accounts or commentary about the case or anything to do with

5    it.

6         As you know, at the very beginning of this case there

7    were a couple of reports in the newspaper.  So I don't know how

8    likely it is that there'll be reports in the media, but it's

9    not impossible.  So the instruction that I just gave you is

10   important.

11        Do not do any research, such as consulting dictionaries,

12   searching the Internet, or using other reference materials, and

13   do not make any investigation or in any other way try to learn

14   about the case on your own.

15        The law requires these restrictions to ensure the parties

16   have a fair trial based on the same evidence that each party

17   has had an opportunity to address.

18        A juror who violates these restrictions jeopardizes the

19   fairness of these proceedings.  If any juror is exposed to any

20   outside information, please notify the Court immediately.

21        Some of you have taken notes during the trial.  Whether

22   or not you took notes, you should rely on your own memory of

23   what was said.  Notes are only to assist your memory.  You

24   should not be overly influenced by your notes or those of

25   fellow jurors.

1    The punishment provided by law for this crime is for the

2    Court to decide.  You may not consider punishment in deciding

3    whether the Government has proved its case against the

4    defendant beyond a reasonable doubt.

5    A verdict form has been prepared for you.  After you've

6    reached unanimous agreement on a verdict, your foreperson

7    should complete the verdict form according to your

8    deliberation, sign and date it and advise the clerk that you're

9    ready to return to the courtroom.

10   If it becomes necessary during your deliberations to

11   communicate with me, you may send a note through the clerk

12   signed by any one or more of you.  Although it's often the

13   practice that if it's a request from the jury the presiding

14   juror will be the one to sign the note, that is not required.

15   No member of the jury should ever attempt to communicate

16   with me except by a signed writing, and I will respond to the

17   jury concerning the case only in writing or here in open court.

18   If you send out a question, I will consult with the

19   lawyers before answering it, which may take some time.

20   You may continue your deliberations while waiting for the

21   answer to any question.

22   Remember that you're not to tell anyone, including me,

23   how the jury stands numerically or otherwise on any question

24   submitted to you, including the question of the guilt of the

25   defendant, until either you've reached a unanimous verdict or

1    you've been discharged.

2         Let me say a couple more things about deliberations and

3    then we'll take a break and there will be the closing arguments

4    of the lawyers and you're not going to hear from me very much

5    anymore.

6         I always like to do it this way, and that is give the

7    jury instructions, then have closing arguments, and then the

8    lawyers get the last word and that's last thing that you hear

9    before you deliberate.

10        I think that's more interesting for you and also gives

11   them a chance to talk about the jury instructions that you just

12   heard, if they think that will be helpful to you.

13        The closing arguments of lawyers are not evidence.  I

14   already told you that.  But they can be very helpful to you

15   because they tell you, from each side's perspective, what they

16   think the evidence in the case showed.  And so I will urge you

17   to give the closing arguments your close attention.

18        Because they have the burden of proof in this case, the

19   Government gets the first word and the last word.  That's how

20   every trial in the United States is done.  It's true on the

21   civil side too.  The party with the burden of proof gets to go

22   first; the other last.  So you'll hear first from the

23   Government, if they want to make a closing argument.  I think

24   they probably do.  They don't have to do that.  They will have

25   that opportunity.  And then, if they want, the Government can

1   have a reply.

2       On this question of deliberations and having a question

3   for the Court, please note that when you send out a question

4   that's the most important thing in my life and the lives of the

5   lawyers in this case.

6       The moment you send out a question, we drop whatever

7   we're doing, everybody gets here as fast as they can, we read

8   the question, and we decide what a good answer to the question

9   will be.

10      But that's not always a simple process.  Sometimes, as

11  can you imagine, the parties have different views about what a

12  good answer is.  Sometimes we need to go through the evidence

13  in the case.  Sometimes I or one of my law clerks or the

14  lawyers need to look up a point of law.

15      All of these things can take time, so please don't think

16  just because time is passing that we're not working on your

17  question or we don't think it's important.

18      When a criminal trial is going on in this building, it's

19  the most important thing that's going on, so your question is

20  important.

21      The second thing to know is that you do have the ability

22  to ask for read-backs of testimony, but it may surprise you to

23  know that our court reporter is not typing the English

24  language; she's using very complicated software and she's

25  typing a specialized form of court reporter shorthand.

1    Also, as you've undoubtedly noticed, we have more than

2    one court reporter in this proceeding.

3    So read-backs are available, but they can take a long

4    time to get for you.

5    Also, if you ask for a read-back, you need to be aware

6    that it will take just as much time to read the testimony back

7    to you as it took for the witness to give the testimony in

8    court because it will be read to you in question and answer

9    format, just like it was in court.

10    And so if you make that request, the more specific you

11    can be about who was on the stand, who was asking questions,

12    what the topic of the testimony would be, of course that would

13    be helpful.

14    And finally, on this question of questions from the jury,

15    I've had the privilege of doing this job for a while now and

16    have presided over a lot of trials, and it's very -- it

17    frequently happens that the jurors will send out a question and

18    then we'll all get to work, try to get an answer, and then they

19    reach a verdict before they get the answer.

20    And what that tells me is that the jurors kept working

21    and, as they kept discussing the case and the evidence, they

22    realized in some instances they didn't need the answer to the

23    question they sent out.

24    And so I would urge you, if you can, after you send out a

25    question, if you can keep working, to do that.  And we don't

1    mind working on parallel tracks, and it doesn't hurt our

2    feelings if you reach a verdict and we did this other work.

3         So experience has taught me the value of that.

4         I don't have anything further to say by way of

5    instruction.  We're going to go ahead and take a 15-minute

6    recess.  When we come back, we'll hear closing arguments.

7         Thank you.

8              (Out of the presence of the jury.)

9         THE COURT:  We're outside the presence of the jury.  Just

10   for scheduling purposes this morning, does the Government have

11   an estimate?

12        Ms. West, do you have an estimate of how long the

13   Government's closing argument is going to be?

14        MS. WEST:  I'm guessing about an hour, but I haven't

15   clocked it out.

16        THE COURT:  All right.  If it's anything in that

17   ballpark, what I'm mostly trying to do -- for both sides -- is

18   not interrupt you at an inopportune moment to take a break.

19        As you've noted during the trial, when we're at break

20   time I'd like to say, "Any time during the next five minutes."

21   What I'd like to do during your closing arguments is not talk

22   at all.

23        So that sounds fine.  We'll let you make that argument.

24   It's 10:30 now, just a little after 10:30, so we'll probably

25   get going about 10 minutes to 11:00.  And unless it gets to be

1      12:30, you're not going to hear from the Court interrupting

2      you.

3            Mr. Babcock, any sense, on the defense side, how long

4      closing argument will be?

5            **MR. BABCOCK:**  Hour seems like a good estimate.  Estimate

6      being in quotes, but --

7            **THE COURT:**  Okay.  So why don't the two of you talk

8      during the break about today's scheduling.  I don't mind going

9      a little longer than 1:30, if it gets all the arguments done,

10     but maybe that's not what you-all have in mind.

11           You can see the issue coming though.

12           **MR. BABCOCK:**  Yeah.

13           **THE COURT:**  So why don't you just talk amongst yourselves

14     and then I can come back a couple of minutes early.

15           **MR. BABCOCK:**  I have a visiting judge, Judge Shubb from

16     Sacramento, down here.  I have a specially-set hearing before

17     him in 2:00.

18           **THE COURT:**  In this building or in Oakland?

19           **MR. BABCOCK:**  In this building in a case the entire bench

20     recused themself from.

21           **THE COURT:**  I'm familiar with the case.

22           **MR. BABCOCK:**  I don't know if he's got other cases or if

23     I'm the only thing up, but that's -- anyway, we'll talk.

24           **THE COURT:**  Talk amongst yourselves.

25           Are there co-defendants in that case?

1          MR. BABCOCK:  No.

2          THE COURT:  So it's just you and the Government.

3          MR. BABCOCK:  Yes.

4          THE COURT:  Well, I know Judge Shubb, so why don't you

5     and Ms. West talk and see what kind of -- why don't you just

6     see, and I'll come out in a little while.

7          MS. WEST:  Okay.  And the copies of the jury instructions

8     are here.  I know that we've made modifications to them.

9          Shall I hand them up to Mr. Noble, as is, and we'll have

10    to deal with them --

11         THE COURT:  Let's wait until the closing arguments are

12    done and then -- now that we know that they're not going back

13    until the jury starts deliberating, we can talk about that at

14    the end of the day.

15         MS. WEST:  That's fine.

16         THE COURT:  Yes.  Thank you.

17         THE CLERK:  All rise.  Court is in recess.

18              (A recess was taken from 10:34 A.M. to 10:50 A.M.)

19              (Outside the presence of the jury.)

20         THE CLERK:  Remain seated and come to order.  Court is in

21    session.

22         THE COURT:  Let's go back on the record.  We're outside

23    the presence of the jury.

24         MR. BABCOCK:  Your Honor, I called Judge Shubb's clerk.

25    He is apparently on the way down already and I'm the only case

1    that he's on the way down for.  She didn't talk to him; he's in

2    route.  So we're going to try to -- we should probably, after

3    my closing -- depending upon where the clock's at, have a quick

4    meet and confer.  We'd like to finish, get it to the jury

5    today, but see how far we can each get with our closing.

6         THE COURT:  Ms. West?

7         MS. WEST:  Sounds good to me.

8         THE COURT:  Okay.

9         MR. BABCOCK:  Looks like the Court also has a docket this

10   afternoon as well.

11        THE COURT:  I don't let other things get in the way of

12   jury trials if I can help it, so the case management people can

13   wait.  Let's bring in the jury.

14        THE CLERK:  Yes, sir.

15             (In the presence of the jury.)

16        THE CLERK:  You may be seated.

17        THE COURT:  All the jurors are in their assigned seats?

18        Ms. West, is the Government ready to make its closing

19   argument?

20        MS. WEST:  Yes, Your Honor.  Thank you.

21        THE COURT:  Please.

22        MS. WEST:  When we started about two and a half weeks

23   ago, Mr. Rhyne told you that this case was about greed, the

24   greed of the defendant, Susan Su.  Now all the evidence that

25   you're going to hear in this case has come in and this is the

1    opportunity, as the Court instructed you, for closing

2    statements.  This is a chance for myself, Mr. Babcock, to

3    summarize the evidence that you've heard to you.

4         And I think of trial as a puzzle, I think of each bit of

5    evidence that comes in as a piece of that puzzle, and the

6    closing statements are an opportunity to show you what that

7    puzzle looks like when you fit all the pieces together.  So as

8    you listen to what I tell you today in closing statements and

9    what Mr. Babcock tells you in his closing statement, and then

10   as you evaluate the evidence in the jury room afterward, I'm

11   going to ask you to keep in mind the old saying "follow the

12   money."

13        As I mentioned, closing statements are a chance to show

14   you how the pieces come together.  And you're going to -- when

15   you go back into the jury room, you're going to consider all of

16   the evidence that you've heard.  Now, that includes the

17   testimony of the witnesses, it includes documents -- and you've

18   seen a lot of them, maybe too many of them, it includes the

19   stipulations of facts agreed to by the parties, and you'll have

20   the opportunity and duty to go back into the jury room and

21   consider each of these.

22        And after you consider all of them and after you talk to

23   each other about it, the evidence will firmly convince you

24   beyond a reasonable doubt that Susan Su is guilty of all of the

25   charges:  Wire fraud, mail fraud, visa fraud, conspiracy,

1    aiding and abetting, unauthorized access of computer, alien

2    harboring, and money laundering.

3         Now, as the judge told you, nothing I say now or nothing

4    Mr. Babcock says is evidence in this case.  It's the evidence

5    that you're going to have to go through.  But I want to take

6    this opportunity to walk you through and help you put the

7    pieces of the puzzle together so that you can make sense of the

8    evidence.  Because there was a lot of it.

9         So let's start at the beginning.  The beginning really

10   was a Form I-17.  And the I-17, you heard, Susan Su submitted

11   on behalf of Tri-Valley University when it was located on

12   Stoneridge Drive in Pleasanton.  And at that point you heard

13   testimony that Tri-Valley was just getting started and Susan Su

14   wanted to grow it by admitting F-1 students.  Well, to do this

15   she had to satisfy SEVP.  Remember?  The Student Exchange

16   Visitor Program.  You heard about that in the beginning.  And

17   there was a witness from SEVP here, Susanna Warner, who talked

18   to you about the I-17 and the approval process for it and the

19   qualifications.  So in order to get approval from SEVP to admit

20   foreign students, F-1 students, you heard and you saw that

21   Susan Su had to satisfy criteria that were set forth in the

22   regulations.

23        And you looked at this demonstrative exhibit when Susanna

24   Warner testified, and she explained to you how 8 CFR -- -

25   that's the Code of Federal Regulations -- Section 214.3 deals

1    with the approval of schools for enrollment of, in particular,

2    here, F-1 students.  And there's the filing of the petition,

3    which is the I-17, and there's eligibility prerequisites.  And

4    the regulation requires that, in order for a petitioner to be

5    eligible for SEVP certification to admit F-1 students, it has

6    to establish that it's a bona fide school, that it's an

7    established institution of learning or other recognized place

8    of study -- and there was discussion about what that meant with

9    accreditation, that it possesses the necessary facilities,

10   personnel, and finances to conduct instruction in recognized

11   courses, and that the school is, in fact, engaged in

12   instruction in those courses.  So that's what Susan Su had to

13   convince SEVP of.  And in order to do that, she filed an I-17

14   and a bunch of attachments in support of it that contained a

15   lot of false statements.

16        And you've seen these false statements, as we've gone

17   through the two and a half weeks of evidence.  She had to show

18   in there that Tri-Valley University had requirements for

19   admission and requirements for graduation.  This is all part of

20   making it seem to be a real school.  She had a statement in

21   there about the average number of classes and students and

22   teachers.  There was -- and you saw this a couple of times --

23   DSO certification.  There was a designation of the school

24   officials -- herself, her sister, her brother-in-law -- and

25   then there was also the certification that they were required

1       to submit.

2           I'm going to reference a few exhibits as we go through

3       this and then we're going to -- to look at some slides to break

4       it down.  But right now I kind of want to give you the big

5       picture of it.  But if you feel like writing them down, you'll

6       see it on the slides.  But the I-17 is one -- the one that's

7       approved is a little bit later.  But the initial one, the

8       electronic submission, which you'll see is one of the wire

9       fraud counts, is Exhibit 1.  There's -- in the DSO

10      certification, that's part of Exhibit 1, and then it gets

11      resubmitted.  You remember that you heard testimony about a

12      request for evidence as part of the SEVP approval process

13      saying, "We need this DSO certification on Tri-Valley

14      letterhead."  And then she sent it in.  And that's actually

15      what the mail fraud count is.

16          She also has to show that they've got instructors; right?

17      So there's an instructor list.  We spent a lot of time on that,

18      looking at the list.  And then you also heard from three of the

19      instructors who were on that list:  Miller Allen.  Hao Luo.  Qi

20      Jin.  And you heard them testify that they did not agree to

21      teach at Tri-Valley University, but nonetheless their names are

22      there.  And there are 3 of 22 instructors who were on that

23      list.  And you may recall that Agent Mackey testified that when

24      he interviewed Susan Su later, at the end of the investigation,

25      that she actually admitted that none of these instructors had

1    taught yet.  That she was teaching some classes, but at the

2    time this was submitted no one on that list had taught.  But

3    that list was important.  It was important to show subsection

4    C, that TVU possessed the necessary personnel, and that it was

5    actually engaged in instruction in those courses.  Not hope to

6    be at some point in the future.  And that actually goes to the

7    course catalogue that she submitted.  And you'll see it again

8    in Exhibit 1.  And then she resubmitted it later.  She actually

9    resubmitted both the course catalogue and the instructor list

10   toward the end of this investigation.

11        You remember that Agent Taylor testified that they did a

12   ruse site visit, and at the end of that they did another

13   request for evidence and they asked for certain things, and

14   Susan Su provided that response by FedEx.  And that included

15   the same instructor list.

16        Now, we're talking at the end of December of 2010.  Those

17   people still hadn't testified -- or hadn't instructed at

18   Tri-Valley, and it included the course catalogue again.

19        You'll get a chance to look through that course

20   catalogue.  It's in evidence.  We didn't page through it

21   because it's very long, but what you'll see when you look

22   through it is there's actually somewhere around 200 courses

23   supposedly offered at Tri-Valley University which all of these

24   lists of instructors are supposedly teaching.

25        And that was important.  She had to show SEVP that they

1    possessed the necessary facilities, personnel, so forth, and

2    that they were actually engaged in instruction.

3        You'll also see, as you look through the evidence -- it's

4    actually at the back of the course catalogue, there's a

5    statement of Tri-Valley University administrator.  And that's

6    false too.  It lists a bunch of people, and two of them are

7    Sophie Su, who is listed as the registrar and librarian, and

8    Vince Wang, who is listed as the registrar and the webmaster.

9        And you heard testimony from people who worked in the

10   office that they never saw these people around.  They weren't

11   aware of the librarian or a webmaster.  They were the ones

12   doing the registration and the I-20s.

13       And your own memory of the witnesses should control, but

14   one of the witnesses I think said that he actually saw Sophie

15   Su there to get jumper cables one day when it was raining.

16       So think about the testimony of those witnesses as you

17   consider whether it was false that these people were actually

18   administrators at Tri-Valley University.

19       And remember, too, that when Sophie Su was interviewed,

20   as Agent Mackey explained -- and that was at the time of the

21   search warrant, she admitted that she knew Sophie Su and Vince

22   Wang had full-time jobs.  Not at Tri-Valley University.

23       Now, in order, also, to get SEVP approval, you heard

24   testimony and saw an exhibit, Exhibit 5, that Tri-Valley had to

25   go through a site visit.

1    And that was, as you heard, a normal part of this

2    approval process.

3    And as part of this site visit process, you saw, from

4    Exhibit 5 -- and you heard, that Susan Su was the person who

5    was interviewed and that she made various statements about

6    Tri-Valley University.

7    Some of them are the same ones that are on the I-17.

8    There was a discussion about the number of students who were

9    attending and the number of instructors.

10   But she also says that there's physical classes, and she

11   makes statements about the number of staff who work there.

12   And she was asked questions as part of that routine site

13   visit questionnaire that get to her understanding of the

14   policies and demonstrate that she actually had a pretty clear

15   understanding of the regulations.

16   Now, she also had to submit -- and you heard a lot about

17   this -- articulation agreements.

18   There was that letter that she sent saying -- and this

19   was Exhibit 4, and this is one of the mail fraud counts, as

20   well, and we'll see it in a few moments -- "In response to your

21   request, here are the three articulation agreements."

22   And then of course you heard Susanna Warner from SEVP

23   talked about why the articulation agreements are important and

24   why they're required, by the regulation, for schools that are

25   not accredited, such as Tri-Valley University.

1    You didn't just hear from Ms. Warner; you also heard from

2    the forensic document examiner, Carolyn Bayer-Broring, who

3    spent a while showing you the graphics that she created to help

4    explain her testimony.

5         And we can look at them again soon, but here is, to

6    refresh your memories on it, what she described as Chart 6.

7         And she showed you how she did her examination comparing

8    the two documents, one that was submitted with the articulation

9    agreement and then one that Shy Sheng Liou testified and he

10   told you that he had sent an electronic signature in a

11   different document to the defendant and how she overlaid them.

12   Made one pink and the other green.  And when she overlays them

13   and puts them together, it shows black because they're exactly

14   the same, and how that told her that they were from the same

15   source, that one was copied from the other -- or at least both

16   copied from one source.

17        So based on all of this information that the defendant

18   provided to SEVP, all this false information, information that

19   was important to SEVP, based on that, SEVP approved Tri-Valley

20   University to admit foreign students.  And you heard that that

21   happened February 17th of 2009.

22        Once that approval was granted, Tri-Valley was able to

23   admit foreign students; it was able to admit F-1 students.

24        And you heard how F-1 students, when they get a visa to

25   come to the United States, they need an I-20.  And every I-20

1    that Tri-Valley University issued, everything that flowed down

2    from that SEVP approval, flowed from fraud.  Every I-20 was

3    procured by fraud because the F-1 approval from SEVP was

4    approved by fraud.

5        But after Susan Su got that approval, she was able to

6    grow her school, and that was her plan.

7        She started -- I believe it was four days later,

8    February 21st, 2009.  You'll see the email, and you already saw

9    it.  It was Exhibit 300.  This was the email where she started

10   recruiting students, or she tried to find recruiters who help

11   her recruit students, particularly from India, but she was open

12   to other places as well.

13       The recruiting email she sent to what was known as ABA

14   Consulting.

15       She hired people to work at Tri-Valley.  Who did she

16   hire?  Well, she hired F-1 students.  A couple of other

17   employees too.

18       There was that individual who you met -- I think it was

19   yesterday -- who was from San Jose State.  She hired Vishal

20   Dasa.  She hired Anji Dirisanala.  You met both of them.  You

21   met Parth Patel, who was from San Jose State.

22       You heard about Jimmy and other employees, as well.

23       And you heard how some of these employees, they told you

24   they worked 10 to 12 hours a day, six or seven days a week.

25       And what they did in the office, you heard how they were

1    in charge of giving people admission.  They told you that there

2    was a no-admission criteria.

3         One of them stated that if Susan Su was the admission

4    committee, then there wasn't an admission committee.

5         And at one point, when he asked a question too many, she

6    said, "Just admit everyone.  Even if they attach a picture of a

7    puppy, admit them."

8         You heard these witnesses testify about how, for a number

9    of them, it was their job to access SEVIS every day.  That the

10   defendant was the one who would log into the laptop and then

11   hand them the laptop and that their job was to create I-20s as

12   part of their job.  And they would create whole stacks of them

13   over the course of the day.  The end of the day they would

14   present the stack to Susan Su, and that she would go through

15   and she would sign all of them, no matter which DSO's name was

16   on them.  Wenchao Vince Wang, Sophie Su, or some in her own

17   name.  That's what she did at the end of the day, and they

18   would mail them off.

19        You heard, when they created these I-20s, that a lot of

20   information they put in the SEVIS system was false.  They had

21   to put in a residence, so if they didn't have another local

22   residence, you heard Susan Su instructed them to enter 555 East

23   El Camino Real.

24        They had to enter the student's means of support.  So if

25   they didn't have that, there was the default $12,000.

1    They had to enter a course of study.  So if they didn't

2    have one provided, they would just pick something.

3        You heard how these student employees created

4    transcripts.  How they had a template and it was basically A,

5    A, A-minus, and you would just change the course.

6        You heard how they were supposed to register people for

7    classes and they would just pick some, if the person didn't

8    specify.

9        And then you heard about referral agreements.  And that

10   was part of the plan to grow the school.  Susan Su, as you

11   heard, issued a number of people referral agreements.  And you

12   heard specifically from Vishal Dasa -- and maybe some others as

13   well -- about the referral agreement of getting 15 percent of

14   the fees that were paid, tuition fees that were paid by F-1

15   students who were recruited to the school.

16       You heard how the phone was ringing off the hook.

17       The school was growing, the plan was working, the phone

18   was ringing off the hook, emails were coming in, it was really,

19   really busy there.

20       And a lot of the calls were complaints.  There were

21   complaints that there were no classes, that they couldn't log

22   in, that there was no instructor.

23       And then you also heard that when Mr. Patel went to go

24   look at a class list -- and he had gotten, I think, two or

25   three complaints from one class, looked at the class list and

1    there's a lot more people in the class, well, that told him

2    that most of those other people weren't complaining.  And his

3    inference from that, as he told you, is because they didn't

4    really care.

5         So the school grew.  The school grew and, at the end,

6    when it was shut down, Agent Mackey testified that it was

7    approximately 1,700 F-1 students in active status.  At its

8    peak, Agent Mackey testified that it had actually been 2,000

9    something, but by the time January 2011 rolled around it was

10   about 1,700.

11        And then you saw at length yesterday, when Agent Mackey

12   was testifying as to his financial analysis in this case, that

13   on January 19th, 2011, there were approximately $6 million that

14   had been brought in from Tri-Valley University into the various

15   different accounts.

16        And you heard his painstaking process of trying to tether

17   every dollar to an F-1 student if he could.  And he explained

18   to you he tried to give every inference to the defendant.  If

19   he couldn't match it up directly with a name that was in SEVIS

20   that showed F-1, he categorized it as "unidentified."

21        So for the ones that he was able to identify, the ones

22   that he was able to tether directly to an F-1 student in SEVIS,

23   he explained to you and showed to you on the chart that was

24   approximately $5.6 million in less than two years.

25        So the school grew.  And it was a clear business plan by

1    Susan Su.  The plan was get SEVP approval, undercut the cost of

2    other similar schools.  And you heard about -- repeatedly, from

3    the defense, about how the fees were less than, for instance,

4    at ITU or some other schools, to recruit a lot of F-1 students,

5    get their fees, get their tuition, and keep it by giving them

6    A, A, A-minus.  They're not motivated to leave, and by, if they

7    ask for a transfer, telling them no, there's a two-semester

8    rule.  A couple of people said a three-semester rule.  They

9    were told by Susan Su directly that they could not transfer

10   until they paid two more semesters of tuition to her.  And

11   these students told you how they thought they had no choice,

12   they had no option.  In order to be able to transfer, they had

13   to wait and pay their fees and then they were hoping they could

14   leave.

15        And the other critical component of the business plan was

16   to have no expenses.  There were no physical classes.  There

17   was no campus in which to teach physical classes.  She didn't

18   pay professors to teach the nearly 200 classes listed in the

19   course catalogue.  She hired, as you heard, several of the

20   instructors -- to the extent that there were instructors, were

21   F-1 students themselves.

22        She didn't hire other people to work in the office; she

23   hired F-1 students.  She had them work 10 to 12 hours a day, 6

24   to 7 days a week, paying them a small amount.

25        She didn't hire real DSOs.  All of that would have cost

1    money.  That would have cut into her bottom line.

2         So as you think about all of the evidence -- and I'm sure

3    defense counsel is going to ask you to think about, as he

4    stated in his opening, that it was really a good-faith effort

5    by Susan Su.  Maybe she didn't dot her i's or cross her t's,

6    but really she was trying her best to start a school and she

7    felt overwhelmed.

8         Well, as you look at the evidence, I submit that you

9    think about whether that is true.  Because there's a lot of

10   evidence here that shows what her real intent was, and the

11   biggest part of it is follow the money.

12        She did not invest in her school with the DSOs and

13   employees and campuses and classes.  What she invested in was

14   herself.  As soon as she started earning money, the first big

15   purchase was November 2009.  So about nine months after she got

16   that first SEVP approval and could start admitting F-1

17   students, she bought the Mercedes.

18        February 2010, so about three months later, she bought

19   the building, Murrieta Boulevard, that you heard about.  I'm

20   sorry, I think it was "Drive."  Murrieta.

21        A couple of months after that she began the process --

22   which took a couple of months, as you saw from some of the

23   transactions yesterday -- of buying Boulder Court.  So that

24   allowed her to move from the Pleasanton Unified School District

25   to a bigger office.  They wouldn't be in that same small room

1    anymore.

2         Really, the difference, as you heard from the witnesses,

3    was that she would have her own private office in there.  The

4    other employees are still working in the same place, but she's

5    got her own -- she has her own office, once they move to

6    Boulder Court.

7         So she bought suite 700 and 800 there.  Still no physical

8    classes.

9         In July 2010, just toward the end of buying the Boulder

10   Court property, she bought Victoria Ridge.  You saw a picture

11   of that.  Another property in Pleasanton.

12        And then, in December of 2010, just about three months

13   later, she brought Germano Way.  And that's the big property

14   that you saw a picture of and we'll look at again.

15        So that's where she was making her investments.

16        Now, in addition to getting approval from SEVP, she had

17   to maintain approval.  Because the plan wouldn't work and the

18   money would stop rolling in if she lost her SEVP approval.

19        And you heard testimony from the agents about how -- and

20   also from one of the office employees, about how it's normal to

21   get a call from an agent or an officer who's at a point of

22   entry in an airport and somebody, an F-1 student, is traveling

23   into the country and they need to ask for follow-up documents.

24        Well, what happened in this case, as you heard, the --

25   there were some ruse calls in that same vein.

1    And as the judge instructed you just a few minutes ago on

2    the law, law enforcement officials may engage in stealth and

3    deception, such as use of informants and undercover agents, in

4    order to investigate criminal activity.  They can use false

5    names and so forth.  And that's what was going on here.

6    This was, as the agent explained to you, a legitimate law

7    enforcement technique used to investigate Tri-Valley

8    University.  And what they did was they made ruse calls saying

9    that they were calling from the airport, identifying themselves

10   as Department of Homeland Security, and saying there's a person

11   here who says he goes to Tri-Valley University, can you confirm

12   it, you need to send this information.

13   And she doesn't take an opportunity to say, "I have no

14   idea if that person's attending classes.  We don't have

15   physical classes here."  Or, "Well, we didn't actually go

16   through any of the background information when we admitted that

17   person and issued an I-20 in the first place."

18   No, what she does is she says, "Just a few minutes," and

19   then she goes ahead and she sends the emails.

20   And you saw that there was the manufactured attendance

21   records for some of these people, there were the transcripts,

22   usually A, A, A-minus, sometimes they had the wrong name on

23   them.  You heard a lot about that.  The letters of the good

24   standing, and, of course, the I-20s.

25   Then there was also the ruse site visit, and that was in

1    December of 2010, so winding down the investigation.  And that

2    was an opportunity to see Tri-Valley University and for Susan

3    Su to say the truth to the agents, if she chose to.  But she

4    chose not to.

5        What she said was that she knew that some students had

6    previously accessed what she called "the window" and the agents

7    clarified meant SEVIS, but since moving to Boulder Court, no

8    student had done that.

9        You've heard that that's not true.

10       She stated that Tri-Valley University -- she reaffirmed

11   that it has admission standards, GPA that would be required,

12   and then she answered questions about physical class

13   requirements at the school and some other questions that

14   demonstrated she actually had a good understanding of what

15   these regulations were.

16       So when defense counsel argued or said in opening

17   statements -- and may raise again in closing -- that this was

18   very confusing for her, she didn't really understand, she

19   demonstrated, in her statements, she understood quite well.

20       So now I'd like to show you some slides.  And we're going

21   to walk through the counts and apply it more specifically.

22       The first set of counts that you need to consider are

23   wire fraud, and then, following that, there's two mail-fraud

24   counts.

25       Now, I've combined them up here because they're very

1    similar.  There's one difference, and that is one requires use

2    of the mails, one requires use of an interstate wire.

3          But they both require, first, that the defendant

4    knowingly devised a scheme to defraud or a scheme for obtaining

5    money or property by means of false or fraudulent

6    representations.

7          They both require, second, that the statements made or

8    the facts omitted as part of the scheme were material.

9          What does that mean?  Well, that means that they had a

10   natural tendency to influence or were capable of influencing a

11   person to part with money or property.

12         Both wire and mail fraud require that the defendant acted

13   with the intent to defraud.

14         I'm going to remind you to follow the money when you

15   consider that element.

16         And then here's the difference:  They both require that

17   the defendant used or caused to be used -- and here's the

18   difference -- for wire fraud, interstate wires.  Wires between

19   states.  For mail fraud, the mails, to carry out an essential

20   part of that scheme.

21         So what is the scheme?  Well, the scheme was to defraud

22   nonimmigrant aliens of tuition and other fees, and, in

23   particular, F-1 students.

24         What were the means that she used to carry out that

25   scheme?  Started with the false I-17, then it was recruiting

1    students, recruiting F-1 students who were going to pay the

2    tuition and other fees.  Because that's where the money's made.

3    Admitting those students without any criteria.  Just get them

4    in, get the tuition and the fees.  Making the fraudulent I-20s.

5         And, again, all I-20s flowing from that fraudulently-

6    acquired SEVIS approval are fraudulent, and many, in addition,

7    contain a number of false statements as part of the entry of

8    data into SEVIS.

9         And then the means was also the concealment stage.  The

10   false statements and the documents to the Department of

11   Homeland Security.

12        So let's talk about what materiality means.  Here, in the

13   facts of this case, the materiality is the SEVP approval

14   because that equals tuition and fees from F-1 students.

15   Without that approval -- obtaining it, and then maintaining it,

16   she couldn't have gotten all that money; she couldn't have

17   gotten the $5.6 million of identified, particularly-tethered,

18   F-1 proceeds.  Okay.

19        So just on the technical aspect of the interstate wires,

20   there were two stipulations here.  You didn't hear testimony

21   from witnesses, but they're factual stipulations read in by the

22   Government and agreed to by the parties that SEVIS, the

23   database, was located, at that time, in Rockville, Maryland,

24   and so that anything that is emailed or wired to SEVIS or

25   electronically-transmitted to SEVIS goes through Maryland.  And

1    then, as you heard, originated here in Pleasanton.  Or in

2    Pleasanton.

3         And then the website or the emails, anything ending with

4    that tri-valleyuniversity.org, the Government's -- or the

5    parties' fourth factual stipulation was that that all went

6    through Utah.

7         Okay.  So Count 1 is the first wire fraud count you're

8    going to need to consider.  That's Exhibit 1.  And if you look

9    at page 1 of Exhibit 1, there's the date that this was

10   submitted.  And you heard the testimony from Susanna Warner.

11   It was submitted on September 15th, 2008.

12        It's the I-17.  And here we're looking at page 2 of the

13   I-17.

14        And these are just some of the examples of the false

15   statements in here.  As we've said, it's the requirements for

16   admission, GPA 3.0 and above.  It references to catalogue for

17   more detail.  Each degree program has specific initial

18   requirements.  Requirements for graduation, GPA of 3.0,

19   research, thesis, and a dissertation.  Average annual number of

20   classes, students, teachers, employees, all listed in here.

21   But you heard her say that nobody was teaching classes at that

22   point except her.

23        And of the nearly 200 classes listed in the course

24   catalogue, according to this there were 45 classes taught

25   apparently all by her.

1        All right.  So that's Count 1.

2        Count 2 is Exhibit 300.  This is the email, the

3   recruiting email, where she sends it to Bhargav, and this is

4   what results in the ABS Consulting agreement.

5        And the key part is here, the date, February 21st, 2009.

6   So right just a couple of days after SEVP approval is granted.

7        She explained that Tri-Valley University has recently

8   received full SEVIS approval for issuing I-20s to international

9   students and are looking for students in India and other

10  countries.

11       And then they set up that consulting agreement that you

12  saw and you heard testimony about.

13       So this email is Count 2.  This is sent by Susan Su

14  through tri-valleyuniversity.org.

15       Count 3.  Now, the next few counts deal with SEVIS

16  entries relating to particular individuals.  And you heard

17  testimony from Susanna Warner from SEVIS and others explaining

18  how the SEVIS entry process works, and then the I-20s are

19  what's printed out from that data being entered.

20       So Count 3, first there's Exhibit 12.  This Count 3 deals

21  with Bhanu Challagundla.  You heard from her directly.

22       So this one, this I-20, was dated -- it think it says

23  January -- it's a little hard to read -- January 10, 2010, in

24  the name of Sophie Su.

25       And here is the event history that you saw also.  This is

1    Exhibit 11.

2         The record was created January 10, 2010.  This is her

3    initial.  This gives her the initial steps, the initial I-20s

4    performed by Sophie Su, who already had another full-time job

5    and nobody ever saw around.

6         The next three counts are similar.  Count 4, you can look

7    at Exhibit 32.  This one is for Kalpana Challa.  You just saw

8    recently.  Also signed in the name of Sophie Su, January 27th,

9    2010.  And here's the event history for her.

10        The initial.  There's the date right there.  Created in

11   the name of Sophie Su.

12        Count 5.  It's another I-20, another SEVIS entry, this

13   one in the name of that fictitious student, the name that Agent

14   Mackey heard, picked from the SEVIS database as a terminated

15   student, and then Anji Dirisanala presented with another

16   individual on that scrap of torn paper with the name, a date of

17   birth, and a foreign address, and that's it.

18        Anji Dirisanala told you how he talked with Susan Su

19   right across from her, showed her that piece of paper, she

20   said, "Yeah, yeah," and referred him to somebody to create the

21   I-20.

22        That I-20, the name on here, Wenchao Wang.  January 27,

23   2010.  But Anji told you he saw Susan Su sign it.

24        And here's the event history.  This one, there was the

25   initial, and then this one was activating it.

1       So the date of July 27th was when the fees were paid and

2   it's activated.

3       Again, name reflected in SEVIS, "Wenchao Wang."

4       Count 6, Kadir Dirikan.  This was the other fictitious

5   individual for purposes of Tri-Valley, but the name selected

6   from terminated students in SEVIS.  Kadir Dirikan, I-20, signed

7   in the name of Wenchao Wang.

8       Mr. Dirisanala told he saw her sign it, and this one,

9   also, is active July 27, 2010.  And you can see "active" also

10  from the event history here, which is Exhibit 61.

11      We're working our way through the I-20s.  We're on count

12  7 now.

13      This one's Mohammed Rizwan.  This was the undergraduate

14  student that Anji Dirisanala explained to you how he registered

15  and then later some calls were made and documents were sent.

16      And we're looking, now, at the August 31st, 2010, I-20

17  for Mohammed Rizwan.  The name on this I-20, Wenchao Wang.

18      You heard testimony about Susan Su actually being the one

19  who signed that.

20      And here's the event history.  Mohammed Rizwan.

21      There's the date, August 31, 2010.  Active status.  Fees

22  are paid.  The name Wenchao Wang.

23      Now, this document -- it's not expanded on here, but this

24  document gives you the SEVIS number for these individuals.  And

25  you heard some testimony about it and you can look through the

1    document itself to see how it ties together.

2         But you'll see that what the practice was, that the

3    Tri-Valley University student ID number, the last digits of

4    that are the SEVIS identification number.

5         So you saw a bunch of documents where this name, in

6    particular, was mixed up and spelled wrong and different.  Look

7    at the SEVIS identification numbers to know that he's talking

8    about the same person.

9         And Count 8, Rajeev Batra.  This was Rajeev Bhatia, the

10   undercover agent, who you heard was brought in to actually go

11   over to Tri-Valley University and to say that he was out of

12   status.  He'd come here as an F-1 but had never gone to classes

13   and he needed to get some status.  And this was the result of

14   it.

15        Rajeev Batra is his undercover name.

16        This, again, signed in the name Wenchao Vince Wang.  He

17   said he saw the employee bring the document, the I-20, to Susan

18   Su, and he saw her sign it.  And then afterwards he said, "Is

19   this your Madam?"  Referring to what Dasa -- Mr. Dasa had told

20   him; that he needed to wait for the madam to sign it.

21        Mr. -- Agent Bhatia, with the undercover name Rajeev

22   Batra, asked, at the end, "Is this your Madam?"  And he said

23   yes.

24        This was September 7, 2010.  And we've got the event

25   history also, Exhibit 81, showing same day, September 7, 2010.

1    Both the initial and the active records created in the name

2    Wenchao Wang in the SEVIS database.

3        So that's it for the I-20s and the wire fraud counts and

4    the SEVIS entries.

5        Now we're going to some emails.  There's a few emails

6    that are charged as wire fraud.

7        Let's start with Count 9.  Count 9, the email that's

8    charged is September 20, 2010.  This was an email from Susan

9    Su.  And of course she signed it "Susan," and actually she

10   later initialled it, when she was interviewed, "SS," to show

11   that yes, she had, in fact, sent this, and it's sent from

12   tri-valleyuniversity.org.

13       So, again, going through Utah to Agent Taylor.

14       And this was in response to the ruse call saying that

15   this individual for whom these records are attached was stopped

16   at the airport, said he was a Tri-Valley student, and could

17   Susan Su or a DSO confirm.  And she did confirm.

18       "It was nice speaking with you.  Please see the attached

19   documents.  Let me know if you need anything else.  Have a

20   wonderful day.  Susan."

21       And here's the attachments.

22       This was the inquiry regarding Sparsh Prashant Agrawat,

23   and this first attachment was an I-20.  This one was signed in

24   the name of Sophie Su.

25       And you'll remember Agent Taylor explaining how, when he

made this call, he was watching, and after the call he saw her
run out to her car, get something, come back in.  She's working
on it.  She's working on it.  And then comes out with the name
Sophie Su the same day.

She also sent the transcript, as she was requested to do,
to confirm that this person's in active status.  Because you've
heard that F-1 students can't just come to the United States to
study, they actually have to be pursuing a full course of study
in order to maintain active status.

And you also heard about the school officials, the DSOs.
Part of their obligation, and part of why they have to certify
that they understand the regulations and will follow them, is
because they're charged with making sure that these individuals
are, in fact, working toward a full course of study and
maintaining status.  Otherwise, the period for which they've
been admitted, what was called "duration of status" that you
heard about, it's over.  If they're not maintaining full course
of study, they are -- their duration of status is over and they
are unlawfully in the United States.

Okay.  So here's the transcript.  It was for the recent
term, summer 2010.  B-plus -- it's got a logo here -- B-plus,
A, A.  School of Business.  Sparsh Agrawat.

Then the third document that was sent was that letter of
good standing.  And this was important because it had to be
signed by the DSO.  And here you heard that there's the

1    electronic signature of Sophie Su.

2         This letter was dated, again, September 20, 2010.  And

3    it's not a long letter, but the important part of it is these

4    two sentences.  It states -- falsely -- because this was a

5    fictitious individual -- "Mr. Sparsha Prashant Agrawat was

6    admitted to the Ph.D. program at Tri-Valley University based on

7    complete evaluation of his credentials by the admission

8    committee."

9         Remember, this is one of the individuals for whom Anji

10   Dirisanala brought in the scrap of paper bearing only name,

11   date of birth, and foreign address.

12        He has been registered, in class at the university, and

13   in good standing, with all academic requirements and

14   regulations.

15        This is basically saying he's maintaining progress toward

16   a full course of study; he's in status.

17        The next few counts are similar for different

18   individuals.

19        Count 10 is the same -- I'm sorry, this is four days

20   later, September 24, 2010.  Again, from Susan Su.  And, again,

21   it's got her name and the initials that she later verified

22   she'd sent it.  Tri-valleyuniversity.org.  So it's going

23   through Utah to Agent Taylor.

24        "Please see the attachments.  Let me know."

25        Here are the attachments.  We've got the I-20 for Kadir

1    Dirikan, the other fictitious student pulled from SEVIS's

2    terminated list, the signature in the name of Sophie Su,

3    designated school official, and the date September 24th, 2010.

4         Here's our transcript:  A, A, B-plus.

5         And the letter of good standing.

6         It's the same as what we just saw, just the name is

7    changed, and of course the date, September 24th, 2010.

8         This fictitious student was admitted based on a complete

9    evaluation of his credentials and he's been registered and

10   attending classes at the university in good standing.

11        Count 11.  This one's a little bit later.  This was

12   January 7th, 2011.  So shortly before the shutdown of the

13   school.  And you heard how this one was to Agent Ramirez, who

14   you heard from yesterday.

15        "David.  Sorry.  It takes longer than expected."

16        You'll remember that Agent Ramirez testified that he had

17   to follow-up call with her because he hadn't gotten it yet.

18        "Attached please find the required documents.  Let me

19   know if that's enough.  Susan."

20        And there's a bunch of attachments.

21        Now, this -- you'll probably remember, this -- Agent

22   Ramirez testified he was asking about two individuals here.  So

23   this is for one of them.  This one's for Rajeev Batra.  And

24   here's attendance sheets.  He requested the same documents but

25   also attendance sheets.

1    So let's take a look at those attendance sheets.  And

2    we'll want to go through it kind of quickly because you saw

3    them at length during the trial.

4        And you'll remember that -- a lot of them are all listed

5    in black and then the name is asserted in blue, Rajeev Batra or

6    some variation of that name.  Sometimes it's not centered; it's

7    left justified.  So this is an example.

8        When you look at this example, which is 209B; right?  It

9    was actually emailed to Agent Ramirez and then it was

10   hand-delivered to Agent Critten when he went over there.

11       So one of them -- one part of Exhibit 209B is what was

12   emailed to Agent Ramirez, and then 209D is what was handed to

13   Agent Critten.

14       So here we're looking at 209B, which is the one that has

15   got blue.

16       And what's interesting to note -- and, again, this is

17   sort of the pieces of the puzzle -- it didn't come in all

18   together because it's coming in through different witnesses

19   helping put this together.

20       Agent Taylor testified that after the ruse site visit of

21   December 2010 he and Agent Mackey issued a request for evidence

22   to Susan Su.  And 208D -- as in dog -- was Susan Su's response.

23   That's what she Fed-Ex'd in response to their request for

24   evidence.

25       And one of things that they asked for, they asked for the

1  course catalogue and the instructor list, which she re-sent two

2  years later from when she originally sent it.

3      But what they also asked for were certain attendance

4  records.  And the way he chose them, he told you, was he chose

5  the classes that the undercover agent, Rajeev Batra -- the

6  undercover name -- was registered for.  But he didn't say

7  anything about that in the request for evidence.  He just said,

8  "Please give me your attendance records for most recent term

9  for -- and then he listed 3 classes.

10     Well, those are the same ones that later, when they do

11 the ruse call about Rajeev Batra and ask for the attendance

12 records, same classes.

13     So we can do a little side by side here.  The last one is

14 what she provided as the attendance records for the class with

15 no mention of Rajeev Batra.

16     Here we go.  This was for -- you can compare all of them.

17 There are three sets of attendance records, one for each class,

18 but this is just an example.

19     So this was for the course BA 353, and this is what she

20 provided in response to the RFB from the ruse site visit.

21     And you can see everything there's in black and it's

22 listed.  And it went off to the right with PPP for the

23 different weeks.

24     And here's the one when she was asked specifically for

25 the attendance record for Rajeev Batra.  Right?  Same class, BA

1    353, the same term, but there you can see inserted -- and

2    actually even inserted in a different color ink is the name --

3    which she's got backwards here -- but it's Batra Rajeev

4    inserted right in there.

5         Same thing on the other attendance records.  This is just

6    an example.

7         All right.  So now Count 11.

8         The other things that were sent in this same email to

9    Agent Ramirez were the records that were requested for Mohammed

10   Rizwan.

11        So here's the letter of good standing, January 7th, 2011,

12   same language as the others with the name substituted in.

13        Here's the I-20, January 7, 2011.  This one actually is

14   in the name Susan Su.  Not a lot of those.

15        And here's the transcript.  Four classes:  A, A, A-minus,

16   A-minus.

17        Now, you'll notice, as you probably did during the

18   testimony, the student name is different.  The name that was

19   provided and that the SEVIS entries were made in was Mohammed

20   Rizwan.  This transcript is last name Mohammed, first name

21   Razwan.

22        Again, you saw some variations of that.

23        But here it's important to look at the student ID because

24   the latter part of the student ID is what matches the SEVIS

25   record for that individual who was entered into SEVIS in the

1    name Mohammed Rizwan.

2        And you also heard, when you listen to the audio of that

3    recording when Agent Ramirez called, he provided the SEVIS

4    number for her.  That's how she found it and that's how she

5    created this with the right number.

6        Count 12.  Okay.  So we've got a couple of those slides

7    mixed up.

8        Mohammed Rizwan.  Rajeev Batra.

9        Count 12 -- Count 11 was relating to Mohammed Rizwan and

10   Count 12 was Rajeev Batra.

11       So here, Count 12.  Here's a letter of good standing.

12   Whoop.  There's the letter of good standing.  There's the I-20,

13   again.  Name Susan Su.  Same day, January 7, 2011.  And there's

14   the transcript.

15       That's it for the wire fraud counts.

16       There's two mail fraud counts.  And, again, the

17   difference is that there's no interstate wire; it's the use of

18   the mails.

19       And there's two ways, as the Court instructed, this can

20   be satisfied, which is through the US Mail or through a

21   commercial carrier or something like FedEx or UPS.

22       And let's look at these two counts.  Count 13.  This is

23   Exhibit 3.  Let's look at the cover page of it.

24       This was from Susan Su and it's to SEVP and it's in

25   response to the request for evidence that's asking for -- it

1  was a clarification on Wenchao Vince Wang's name, and, in

2  particular, also certification that three -- the P slash DSOs

3  have all taken a web-based training class, and they need that

4  certification.

5       So this is the letter from Susan Su, December 11th, 2008.

6  It's Count 13, saying, "I'm attaching the signed I-17 form and

7  the DSO certification," and the originals of these documents

8  are mailed to the instructed address with the first class

9  mailing, and the signature of Susan Su.

10      Now, the statement in there that she's intending to mail

11  it is consistent with what you heard from Susanna Warner.

12  Whenever you see this stamp in the bottom, "Received by SEVP"

13  and then a date on it, she told you that that meant that it was

14  received in their mailroom.

15      And here's the DSO certification.  You saw this a few

16  times during the trial.  And what it says is that Susan,

17  Sophie, and Wenchao have read, understood, and will comply with

18  all federal regulations relating to nonimmigrant students, and

19  that they've all taken the web-based training program.

20      So this is -- the certification is important when you

21  consider the argument by Dr. Su's attorney that this was just

22  confusing and she didn't have any training.  And you heard some

23  cross-examination questions about that.  But she's saying here

24  that she was trained and that she understands it all.

25      And there's signatures here in the names of Sophie Sue

1    and Wenchao Wang as well.

2        So that's Count 13.

3        Count 14.  Again, we've got that "Received by SEVP" stamp

4    on there showing the date that this document was received in

5    their mailroom.  This is another letter from Susan Su to -- it

6    was Barry Kobel at SEVP, and this letter is dated February

7    10th, 2009.  And this was her last mailing to them.  And it was

8    important because it's the three copies of the articulation

9    agreement.

10       It's what they ended approving her I-17 petition based

11   on, after she sends those three articulation agreements.

12       And what's attached to it -- and when you look through

13   Exhibit 4 you'll see that there are the three agreements and

14   two are the ones that we took a very close look at with

15   forensic document examiner Carolyn Bayer Broring, and that we

16   see -- you saw the overlay of the signature and you saw that

17   Shy Sheng Liou's signature on the articulation agreement that

18   was submitted to SEVP matched the email with totally different

19   language that he had sent to her with that electronic signature

20   saying that the courses were similar.

21       And then she modified it.  Remember?  She modified it in

22   a very important way.  Because you heard the testimony from

23   Susanna Warner about what articulation agreements actually

24   require in order to meet the criteria of showing it's an

25   established institution of learning.

1    It is not accredited; right?  And they needed three

2    articulation agreements showing that it had already accepted

3    course transfers from this -- from Tri-Valley, and that it

4    unconditionally would in the future.

5        And that is not what Shy Sheng Liou agreed to.  You heard

6    him telling you.  He's sure he didn't agree to it.

7        And you saw the email that he actually -- attaching the

8    document that he did agree to, saying the course is similar.

9        Well, he thought that was fine.  The course was similar.

10   But it wasn't sufficient for SEVP.  It needed to have those two

11   elements satisfied.

12       And that's not what he said, but that's what she said.

13   Because she changed it.  She lifted his signature, and she put

14   it in Exhibit 4.

15       And then the other one was with Central Florida.  And

16   there you saw it was the signature of the Xiao Gang Su.

17       And then you heard testimony from Carolyn Bayer-Broring

18   and you saw her forensic document analysis showing that that

19   signature was a duplicate of the tax document that was found in

20   Susan Su's house during the search warrant.

21       So you know where those signatures came from and they

22   weren't original.

23       But she sent them to SEVP, and based on those

24   articulation agreements that actually matched what the

25   regulations require, her approval was granted.

1    That's it for mail fraud.  We're on to visa fraud

2    conspiracy.

3    Visa fraud conspiracy has a few elements in it.  It

4    starts with beginning on or about February 2009, which is when

5    the SEVP approval was granted, and continuing through on or

6    about January 19th, 2011, which is when the search warrants

7    happened and the interview of Dr. Su happened and Tri-Valley

8    was shut down.

9    There was an agreement.  There had to be an agreement

10   between two or more persons.  And the way it's charged is it's

11   to commit visa fraud.  So you had to find there was agreement

12   to commit visa fraud.

13   And you also have to find that the defendant, Dr. Su,

14   became a member of the conspiracy, knowing of at least one of

15   its object and intending to help accomplish it.

16   She had to know what the agreement was and she had to

17   mean for it to be carried out, and then you have to find that

18   one of the members of conspiracy performed at least one overt

19   act.  An overt act is kind of a term of art and we'll walk you

20   through them in a moment.  And the judge read to you the

21   instructions on which overt acts were alleged in the

22   indictment.

23   But somebody who's part of the conspiracy -- didn't have

24   to be Dr. Su -- performed at least one overt act in or after

25   February 2009 for the purpose of carrying out the conspiracy.

1    And here you have to all agree on which -- at least one

2    particular overt act that was committed.  It can be more than

3    one, but it has to be at least one you can agree on.

4        So let's go through the overt acts.  This is the same

5    recruiting email that we already looked at.  Dr. Su sent this

6    email on February 21st, 2009.  It's Exhibit 300.  We already

7    looked at it.  There it is again.

8        This is Su to Barghav trying to set up the recruiting for

9    F-1 students -- particularly from India but other countries as

10   well -- for Tri-Valley.

11       This is Overt Act B.  You saw this briefly during the

12   trial.  This was a check paid by Susan Su, referral fees, to

13   Vishal Dasa, $945.  The date was April 30th, 2010.

14       Overt Act C.  This is the I-20.  You've already taken a

15   look at this one.  This was the same document that we looked at

16   with Count 5, I-20, for Sparsh Agrawat.

17       Now, each of these overt acts are in furtherance of the

18   conspiracy.  Again, they don't, themselves, have to be illegal.

19   So the referral payment to Vishal Dasa, that's just part of the

20   conspiracy to issue these fraudulently-procured I-20s.

21       Most of them were forged, too, as you saw in hers, but

22   all fraudulently-procured because they couldn't have been

23   issued in the first place without that fraudulently-obtained

24   SEVP approval.

25       So Overt Act D.  This one is the I-20 for Kadir Dirikan,

1    and this is actually the same as what we looked at with Count

2    6.  In the name Wenchao Wang.

3          Overt Act E.  This was an I-20 for Rajeev Batra.  This

4    was the same as what we looked at in Count 8.  There's the

5    name, and signed, in the DSO name, Wenchao Vince Wang.

6          Overt Act F.  Now, this one is not a visual; that's why

7    there's words instead of a nice picture on the screen.  This

8    one was the false statement by Dr. Su on January 7th, 2011, to

9    Agent Critten, Agent Dylan Critten, who you heard from, who

10   said that his job in this was to go over to Tri-Valley

11   University, say there was some trouble receiving the email at

12   the airport and that he was sent here to actually pick up hard

13   copies of the documents that she was trying to send to Agent

14   Ramirez.

15         And so he did.  And in that process he noticed that he

16   got attendance records for Rajeev Batra, those ones that we

17   just looked at where the name was in blue, but he didn't get

18   any attendance records for Mohammed Rizwan.

19         So he asked her about it and she assured him, "Oh, I

20   taught him personally."  Well, this is one of the fictitious

21   students.  But he attended her class.

22         Now, you saw that the SEVIS numbers matched up for these

23   people.  So even if there's an argument about oh, she was

24   confused because there was somebody who actually had a

25   different but sort of similar name was registered there, she

1    knew who it was.  The documents had the right SEVIS numbers on

2    it.  She's saying she taught him personally.

3        So that false statement is charged as Overt Act F, and

4    we'll see it again later as a substantive count.

5        And, again, this was when Agent Ramirez made the call

6    that you heard a day or two ago.  He provided the SEVIS number

7    for it.  So that's how you know it's really talking about the

8    same person that they registered as a ruse.

9        All right.  That brings us to visa fraud.  We've got a

10   few visa fraud counts.  And in order to prove visa fraud, the

11   Government has to prove that the defendant acted knowingly and

12   that she forged or falsely made a document described for entry

13   into or as evidence of authorized stay in the United States,

14   here a Form I-20.

15       These instructions are what the Court read to you a

16   little while ago and what you will have with you in the jury

17   room, so you don't to need to remember this; you'll have it all

18   in front you from the Court as jury instructions.

19       So this "or," this is the one that's got alternate

20   theories.  She knowingly forged or falsely made these I-20 --

21   and, again, the aiding and abetting theory applies even if she

22   instructed somebody else to actually print out or enter the

23   data into SEVIS for the I-20.  As long as she's aiding and

24   counseling that to happen before it happens and acting

25   knowingly and intentionally, she's still culpable for it.

1    So "or."  Here's the alternate.  She knowingly used,

2    attempted to use, possessed, obtained or received a document.

3    Again, it's the I-20.

4    So we've got a few visa fraud counts, as I said.

5    This is the same I-20 we looked at a little while ago for

6    Count 16.  This is the I-20 for Sparsh Agrawat in the name Weng

7    Chao Wang as the DSO.  This is the same as Count 5 and Overt

8    Act 15 C that we just looked at.

9    Count 17 we also looked at.  This was charged as Count 6

10   and Overt Act 15 D, the I-20, Kadir Dirikan.

11   Count 18 you saw also as the wire fraud Count 7.  This is

12   the I-20 Count 7 and the wire fraud counts for the SEVIS entry.

13   The visa fraud is for the document itself, the I-20.

14   And here Mohammed Rizwan.  Again, the name, Wenchao Wang.

15   And then similarly for Count 19.  This is for the I-20,

16   the document that needs to be used to enter or maintain in the

17   United States.

18   For Rajeev Batra.  Again, the name "Wenchao Vince Wang,"

19   the date, September 7th, 2010, and this I-20 is part of the

20   evidence that you would see on the SEVIS entry and what we

21   already looked at for Count 8 and Overt Act 15 E.

22   So these line up a little bit.  You won't to have to go

23   through as many documents as you might fear.

24   So that's it for the visa fraud documents.

25   So now we have -- there's one use-of-false-document

1    charge.  And the element is the defendant made or used a

2    writing, and that writing had to contain a false statement, and

3    it's in the jurisdiction of the Department of Homeland

4    Security, and that's DHA, and that the defendant acted

5    willfully.

6        What does that mean?  That means deliberately, with the

7    knowledge that the statement was untrue.

8        And then, finally, that the statement was material.

9        We talked about what material means.  Material to the

10   activities or decisions of the Department of Homeland Security.

11   That means has a natural tendency to influence or is capable of

12   influencing Department of Homeland Security's decisions or

13   activities.

14       And the false document that is charged here -- this is

15   Count 20, and this is the emails that were sent to Dale Taylor.

16       Here you go.  This was the September 24th, 2010, email.

17       And this was -- also came up in Count 10 with the wire

18   transaction.

19       So this is the email from Susan Su.  There she's

20   initialed it.  And the attachment.  There's the I-20.  There's

21   the transcript.  And there's the letter of standing.

22       And in particular on Count 20, it's the transcript for

23   Mr. Dirikan that's specifically referenced in the count.

24       Okay.  Then there's a false statement charge.  And this

25   is the false statement to Agent Critten that you heard about

1    where he said that -- he testified that Dr. Su told him, "Don't

2    worry about the attendance records because Mohammed Rizwan is

3    in one of my classes and I taught him personally."

4         So the elements for false statement, the defendant made a

5    false statement.  Again, in a matter under the jurisdiction of

6    the Executive Branch of the United States, particularly, here,

7    Department of Homeland Security, that she acted willfully,

8    deliberately, and with knowledge that it was untrue, and that,

9    again, it was material to the Department of Homeland Security.

10        Okay.  So Agent Critten testified that Dr. Su said

11   Mohammed Rizwan attended classes she personally taught but then

12   also you should consider with it, when you evaluate any

13   argument by the defense, that she was confused and it was

14   actually somebody else.

15        The testimony from Agent Ramirez that you recall that you

16   heard, that not only he provide the names but he provided the

17   SEVIS number and that SEVIS number did match up.

18        Now, when you're thinking about the materiality to the

19   Department of Homeland Security, remember that the testimony

20   that these calls from points of entry are something that

21   happens normally.  The fact that these were ruses doesn't

22   undermine the materiality.  Because these statements, these

23   providing these false documents to somebody who Dr. Su knows is

24   Department of Homeland Security, is an act that is capable of

25   influencing the Department of Homeland Security.

1    So it doesn't change materiality, the fact that this,

2  itself, was a ruse.

3    Okay.  So then there are two alien harboring charges.

4  And I have named here -- because there's two individuals that

5  it relates to -- one of the counts.  And we'll go through this.

6    One of the counts relates to Vishal Dasa, as you've heard

7  from; the other relates to Anji Dirisanala, who you've heard

8  from.

9    So for each of them, the Government has to proved beyond

10  a reasonable doubt that that person was an alien; not a citizen

11  of the United States.  They both testified that they were here

12  on F-1s, that they were not lawfully in the United States.

13    And here the issue is duration of status.  Are they

14  actually maintaining full course of study?  Not just SEVIS, to

15  show that they were in active status, because the information

16  being input into SEVIS is false.  Well, that's not a measure of

17  whether they are actually lawfully in the United States.

18    Third, that the defendant knew or acted in reckless

19  disregard of the fact that Mr. Dasa and Mr. Dirisanala were not

20  unlawfully in the United States.

21    Fourth -- and here we've got a little alternate thing

22  going on -- the defendant, Dr. Su, A, harbored, concealed or

23  shielded from detection Mr. Dasa or Mr. Dirisanala for the

24  purpose of avoiding detection by immigration authorities, or

25  she attempted to do so and did something that was a substantial

1    step toward committing that crime.

2         And then the last element here -- and you'll see in your

3    verdict form you were asked to determine whether the Government

4    meets this element in particular -- it's alleged that she acted

5    for the purpose of commercial advantage or private financial

6    gain.

7         So there's two counts here.  Count 22 is the one that

8    relates to Vishal Dasa; Count 24 is the one that relates to

9    Anji Dirisanala.

10        And the evidence, as you heard, was that there were no

11   physical classes.  Even though Dr. Su, in the -- in her

12   interview with the ruse site visit confirmed that she knew

13   exactly what the rules were regarding attendance at physical

14   classes, there weren't any.  They couldn't possibly have been

15   maintaining progress toward a full course of study.

16        But beyond that, there was testimony that you heard that

17   for Mr. Dasa she said, "Well, you're one --

18        He is registered for health care management, you may

19   remember.

20        And she said, "Well, there's only a few students who

21   registered for that, so switch to this other program."

22        "I don't want to switch to this other program."

23        "It's okay.  It's only auditing."

24        He didn't really know what that meant.  He wasn't going

25   to any classes.  There weren't any, physically.  But he wasn't

1    trying to do classes on line and he was working at the office

2    at Tri-Valley 10 to 12 hours a day, 6 days a week -- or 7.

3         In fact, actually, you also heard the testimony of

4    Santosh Ignatius, who only spent one day working in the office.

5    And one of the things he remembered about that day was that

6    Susan Su locked them in.  When she left for lunch, she locked

7    them in.  And he recalled Vishal Dasa was there too.

8         And Count 4, as I mentioned, deals with Anji Dirisanala.

9         And he actually told you that at some point he heard that

10   he could get in trouble -- or somebody told him that he might

11   get in trouble for not going to classes and that he actually

12   approached Dr. Su about that.  And he said something like, "I'm

13   a little worried because I'm not going to classes."  And she

14   said, "Huh.  Let's switch you to mechanical engineering because

15   I teach those classes and then don't worry about it; I'll

16   protect you," or words to that effect.

17        She knew they weren't going to classes and that's why he

18   was working 10 to 12 hours a day, 6 to 7 days a week.  And you

19   actually heard how sometimes -- one time he had to move

20   furniture on the weekend and another time she had him going to

21   paint her house.  And, in fact, as he testified, he worked,

22   along with somebody else, painting her house on Saturday but

23   didn't show up on Sunday and she said, "I'm not paying you at

24   all."

25        With these facts, you can conclude beyond a reasonable

1    doubt that she knew or, at minimum, acted in reckless disregard

2    that these people were not maintaining the full course of

3    study, they were not lawfully in the United States because

4    their durational status, given that they were not attending

5    physical classes or even on line, which is just grading, means

6    they're out of status.

7         Okay.  Then there's an unauthorized access count.  And

8    this is an aiding and abetting theory.  Because Susan Su

9    actually did have access, as a DSO, to SEVIS.

10        Now, even though her access was actually fraudulently

11   procured because of the whole I-17 was fraudulent in the first

12   place, she got a DSO log-in and password.

13        But you know who didn't have access lawfully to use SEVIS

14   are the students, the F-1 students who worked in the office.

15        And you heard from Susanna Warner why that's important.

16   It's important because the DSO is somebody who's charged with

17   maintaining the integrity of this law enforcement database,

18   this database that is used to maintain the information about

19   F-1, and also M -- I believe it was -- students throughout the

20   country.

21        And the problem is exactly what happened here.  When it's

22   not a real DSO, when it's not somebody who has been trained and

23   certifies that they're going to follow all of the regulations,

24   this is what happens.  There's all sorts of false data entered

25   into SEVIS, people where there's no admission criteria or

1    anything.  And you can't actually rely on what ends up being in

2    SEVIS if you don't comply with that part about the DSOs being

3    legitimate.  And that's why that certification is so important

4    about the DSO's understanding, following, promising to follow

5    the Code of Federal Regulations.

6         It's so important that not only was it in the I-17 A,

7    that's part of Exhibit 1, but that there was that special

8    request for evidence from SEVP saying, "We want it on your

9    letterhead and signed also."

10        So these students are the ones who are accessing what you

11   heard is the nonpublic computer of Department of Homeland

12   Security -- SEVIS.  And we saw the warning letter on that,

13   which we'll get to in a second.

14        And those students are the ones who are accessing that

15   computer without authorization.

16        And the third element is the Government has to prove

17   beyond a reasonable doubt that the defendant that's here, Susan

18   Su, she's the one who knowingly and intentionally aided,

19   counseled, commanded, induced or procured that public, those

20   F-1 students, those office employees who were not DSOs, to

21   access SEVIS without authorization.

22        And finally, because SEVIS is not used exclusively by and

23   for the US Government because DSOs have access to it, there's

24   this element here that while it was not used exclusively by or

25   for the US Government, the unauthorized access affected that

1        computer or SEVIS's use by or for the US Government.

2             And you heard how it affected it.  Because people from

3        the the State Department, from Department of Homeland Security,

4        people at the airport who are checking, have to know that this

5        information about these students, that they're actually

6        lawfully here in the United States, that the duration of status

7        is good.

8             They're supposed to be terminated, if they're not

9        actually going to classes, if they're living on the east coast

10       and working at a grocery store or anything else but not

11       attending classes because the person's admitted to the country

12       to go to school.  They're supposed to go to school.  That's why

13       they're allowed to be here.

14            So this just recaps evidence that you heard on Count 25.

15       Count 25 being the unauthorized access count.

16            The testimony that you heard is that Susan Su actually

17       admitted that she was allowing people to access it without

18       authorization.  She admitted that actually in her ruse site

19       visit when she said, "Oh, I did that before we moved to Boulder

20       Court, but I'm not doing it anymore."  And then, actually, when

21       she's interviewed at the time of the search warrant, she

22       admits, "Well, you got me there.  That's the one thing I

23       actually broke the rules on."

24            And of course you heard all the employees who testified

25       explain just how the process works.  She would log in, she'd

1    hand them the computer, and she'd say, "Get to work on those

2    I-20s."

3         And then Mr. Dasa and Mr. Dirisanala both testified how

4    they actually pleaded guilty to unauthorized access and how

5    they did that at Susan Su's instruction.

6         You saw the warning banner that was Exhibit 106A -- and

7    you'll have that in evidence -- that says the use of SEVIS is

8    limited; you have to be authorized.

9         And then you heard the testimony from Susanna Warner

10   about how DHS and, also, others rely on the accuracy of the

11   SEVIS entries by DSOs.

12        And that brings us to the money laundering counts.  And

13   that's the last of those.

14        And you heard that testimony very recently.  We're going

15   to go through it quickly.

16        The elements of money laundering are that the Government

17   has to prove beyond a reasonable doubt that Dr. Su knowingly

18   engaged or attempted to engage in a monetary transaction.

19        Well, that's pretty straightforward.  Knowingly in a

20   monetary transaction.  She has to know that the transaction

21   involved criminally-derived property.  So she has to know that

22   the money that's happening in these transactions came from her

23   committing a crime.  The Government has to prove beyond a

24   reasonable doubt that that property had a value greater than

25   $10,000.

1    You were probably wondering, when you heard Agent Mackey

2    testifying yesterday, why he went to such pains to make sure he

3    was giving every possible benefit of doubt to the defendant in

4    figuring out if any money in that account that he could not

5    identify as F-1 proceeds directly tethered to an F-1 student

6    would count as unidentified, and then he assumed that, for

7    every transaction, all unidentified funds available were used,

8    and only then would he say, "What's left over?"  And if there's

9    more than $10,000 left over, that has to have come from an F-1

10   student, being a result and the proceeds of the fraud alleged

11   here.

12       So that's the reason for his painstaking analysis on

13   that.

14       And then you heard, for each of the counts that we're

15   going to go through, what that amount was and that it did

16   necessarily include more than $10,000 of what had to be F-1

17   student proceeds.

18       The way it's alleged is that the property was derived

19   from visa fraud.  So she has to know that that transaction

20   involved criminally-derived property, and the property itself

21   has to have been derived from visa fraud.

22       You heard the judge instruct you that she doesn't have to

23   know, "Oh, this is visa fraud proceedings," but she has to know

24   that it's criminal proceeds.  And the Government has to prove

25   to you that, in fact, it actually was proceeds of visa fraud

1    for the reasons that we've already discussed.

2         And, lastly, the transaction occurred in the

3    United States.

4         So those remaining counts are all money laundering.  This

5    is Count 26.  This is the Mercedes-Benz of Pleasanton check

6    from November of 2009, the amount of $36,783.61 signed by Susan

7    Su, and there's the car that it bought.

8         And you heard from Agent Mackey how he knows this

9    included more than $10,000 of F-1 student proceeds.

10        Count 27 is a wire, and this is one relating to Murrieta,

11   the property there.  The wire was $78,700, February 25th, 2010,

12   from Tri-Valley to Fidelity National Title.

13        Count 29, the charges for the cashier's check, 160,000

14   and some odd dollars, to Chicago Title Company, bought Suite

15   800, Boulder Court.

16        Count 31, another cashier's check, 261,000-plus dollars,

17   Suite 700.

18        Count 32 is a cashier's check for $700,000 even to Placer

19   Title Company.  This was Victoria Ridge.  And this isn't the

20   full house, but this is a transaction that Agent Mackey

21   explained to you how he knew more than $10,000 of it

22   necessarily came from F-1 student proceeds, taking every

23   benefit in favor of the defendant to reach that dollar amount.

24        Now, the last two counts are Germano Lane.  There's two

25   transactions here.

1    So the first one is here this is the transaction that

2    they're both September 15th, 2010, this one is $600,000 to

3    Prominent Escrow Services, there's Germano Lane.

4    And Count 35, the final count in the indictment, is --

5    here you can see the originator, Susan Su, beneficiary,

6    Prominent Escrow Services, the amount, $1.2 million.  And then

7    you can also see -- actually, if you look up above you, it will

8    be a little confusing.  Because if you look at the wire

9    document, it shows, in the upper left, 12/14/2010, the date

10   that's charged.  And it's always on or about.  But if you look

11   at the bank records, which are in evidence, I think there's the

12   exhibit numbers that are referenced in the lower right of each

13   slide.  And I think that 513 ties to the bank statement itself.

14   And that CitiBank record shows that it was posted

15   December 15th, 2010, outgoing wire transfer, $1.2 million.

16   Those are all the counts that are before you.  There's a

17   lot of evidence for you to sift through.  I hope that this is

18   helpful as a way of piecing together these pieces of the

19   puzzles and that when you go through all of this testimony -- I

20   saw a lot of you taking notes actively -- discuss it with each

21   other, review the testimony, review the documents and the

22   exhibits that you will have back there with you, take into

23   account the stipulations of fact agreed to by the parties and,

24   importantly, take into account the law as instructed to you by

25   Judge Tigar.  We're confident that after you do that you will

1    reach a verdict of guilty on all of these counts.

2        Thank you.

3        THE COURT:  Thank you, Ms. West.

4        Members of the jury, let's take a 15-minute break recess.

5        THE CLERK:  All rise.

6        (Out of the presence of the jury.)

7        THE COURT:  All right.  We're outside the presence of the

8    jury.  I wanted to discuss scheduling with counsel, and also,

9    because Mr. Babcock has another obligation to the Court in

10   front of a different judge immediately following today's

11   proceedings, I want to talk briefly about Ms. Su's lateness

12   today.

13       First, let's talk about scheduling.

14       Mr. Babcock, I probably ought to hear from you first.

15   We'll reconvene, presumably, somewhere around 12:30.

16       MR. BABCOCK:  Yes.  I think it's very unlikely we're

17   going to be able to finish today.  I don't know how long we're

18   going to be.  Probably be about how long Ms. West was.  Unless

19   she has a very brief rebuttal, that will put us past 2:00

20   o'clock.

21       THE COURT:  Judge Shubb's staff -- my staff's been in

22   communication with Judge Shubb's staff.  He'd already left

23   Sacramento by the time we got in touch with his chambers and

24   he's traveling here for this hearing.

25       So Ms. West, I'll hear from you.

1        **MS. WEST:**  Without hearing argument from defense counsel

2    first, it's hard to predict exactly how long my rebuttal will

3    be.  But based on my history, my rebuttals are pretty short.

4        So I would say it wouldn't exceed 10 minutes, most

5    likely.  But I can't commit to that, without actually hearing

6    what he has to say.

7        **MR. BABCOCK:**  Fair enough.

8        **THE COURT:**  Well, then, I'll --

9        **MR. BABCOCK:**  Then let's see how long I go.

10        **THE COURT:**  Then I'll just keep my powder dry on that one

11    and stop trying to anticipate every eventuality in terms of

12    scheduling.

13        **MR. BABCOCK:**  That's why you get paid the big bucks.

14        **THE COURT:**  Let's talk for a second about the defendant's

15    appearance in court.

16        Ms. Su --

17        I had some well-supported concerns about Ms. Su's

18    timeliness, so I previously made it a condition of her

19    supervised release that she be in court by 8:00 o'clock every

20    day.  I think -- except for one day before today -- since I

21    issued that order, she's been in compliance with it.

22        Today, however, we know she was there at 5:00 o'clock in

23    the morning or 5:30 because she sent an email to everybody at

24    that hour.  And she didn't come to court today until 9:30 and

25    the jury was kept waiting for an hour.  And all the scheduling

1    problems that we're now addressing, or concerns that we're now

2    addressing stem from that arrival.

3         Mr. Babcock, do you want to be heard on her behalf?

4         **MR. BABCOCK:**  Thank you, Your Honor.

5         I've spoken to my client about that and she -- she woke

6    up about 2:00 in the morning last night and could not get back

7    to sleep.  And -- for several hours.  And actually nodded off

8    shortly after sending that email to all of us, woke up not in

9    time to get here on time, and apologizes to the Court for that.

10        She is obviously under a lot of stress, and I understand

11   her inability to sleep well last night in a normal fashion, so

12   I just ask the Court to take that into consideration.

13        She has been -- I believe the Court's right; she's been

14   on time every other day since her last issue.  I do believe

15   she's been making a real effort.

16        **THE COURT:**  Does the Government want to be heard?

17        **MS. WEST:**  No.  We submit.

18        **THE COURT:**  I don't want to make a mountain out of a

19   molehill, but I'll say this:  It's not a big deal to be on

20   time.  It's not asking a lot to say to somebody, "You need to

21   be on time."  I have 12 volunteer jurors.  In the Northern

22   District they don't just come from one county, they come from

23   all the counties.  They get paid a little something but, for

24   the most part, they are all volunteers.

25        I have four alternate jurors.  The same thing applies to

1    them.

2        That means that every time that one of us is four minutes

3    late we're using an hour of jury time that we don't need to

4    use.

5        I'm going to go on just a little bit because I need to

6    emphasize this point because it cannot happen again.  It cannot

7    happen again.

8        I took a lot of economics classes in college and one of

9    them was taught by a professor from the University of Chicago.

10   He was kind of a stern guy.  He was a pretty good teacher.  The

11   first day of class he said, "I know you're all economics majors

12   so you understand about opportunity cost."

13       He didn't explain what that is, but I'll explain.

14   Opportunity cost is when you give up -- when do you one thing,

15   you give up the ability to do something else.

16       The value of a dollar is really what it will buy, but the

17   opportunity cost of that purchase says you can't buy something

18   else.

19       He said, "Now, I mention that because if you make an

20   agreement with somebody to be somewhere at a particular time

21   and you're not there at that time, you are telling them that

22   your time is more important than their time.  That's what

23   you're doing.  You may say, 'That's not true.  My car wouldn't

24   start.  I had to put the dog in the backyard.  I left something

25   on my dresser.'  None of that matters because the fact is,

1    while you were doing whatever you were doing, that person was

2    standing on the street corner and they were not doing all the

3    other things they could have been doing.  And the reason for

4    that is because you were late."

5         Now, he said, "I promise you one thing.  Your time is not

6    more valuable than my time."

7         So most people were not late to that class.  That was a

8    very effective way of making that point.

9         Dr. Su, your time is not more important than the time of

10   the lawyers, the Court and the jury.  I don't have a lot of

11   choices.  I don't have a lot of tools available to me to make

12   this happen that you come to court on time.  As I said before,

13   I don't think it's asking very much of somebody in a trial to

14   be on time, especially their trial.  This is a condition of

15   your release in this case, and I'll let Mr. Babcock explain to

16   you -- if it needs to be explained with more clarity -- what

17   that means.  The Court's in recess.

18        **THE CLERK**:  All rise.  The Court is in recess.

19             (Recess taken from 12:22 P.M. to 12:36 P.M.)

20             (In the presence of the jury.)

21        **THE COURT**:  All right.  Back on the record.  All the

22   jurors are in their assigned seats.

23        Mr. Babcock, defendant's closing argument.

24        **MR. BABCOCK**:  Thank you, Your Honor.

25        Good afternoon.  I always get to close in the lunch hour

1    for some reason.  I hope you got a little blood sugar left.

2        I have a different view, obviously, of this case.  This

3    case is weak.  This case -- if you look at the evidence for

4    each count, this case is weak.

5        They have to prove each of these counts beyond a

6    reasonable doubt.  And if it wasn't clear already, let me make

7    it crystal clear now:  If there's a single element for any of

8    the crimes that they can't prove, then you have to find my

9    client not guilty.  They have to prove everything and they have

10    to prove everything beyond a reasonable doubt.  You can assume

11    nothing.  If they haven't proven it, then it doesn't exist,

12    once you get back in the jury room.  And they haven't proven

13    these charges.

14        They've showed you a lot of documents and made a lot of

15    insinuations, but what does it prove?  I don't think any of

16    these charges have been proven, and I'll go through them a

17    little bit -- all of them, in more detail, to tell you why.

18        This case has not been proven beyond a reasonable doubt.

19    Half the indictment -- more than half, actually, are fraud

20    charges.  Twelve counts of wire fraud, two counts of mail

21    fraud, and then one count of conspiracy to commit visa fraud

22    and four counts of visa fraud.  Fraud.  Fraud.

23        And the fraud that's charged, the fraud that they have to

24    prove, is that my client, Dr. Susan Su, in 2008, came up with a

25    scheme to defraud, a plan to defraud, foreign students.  That

1    was her plan.  That was her scheme.  This whole school, this

2    whole university that she started from scratch, by herself,

3    that this was all just a big -- to use the word that we've

4    heard a lot -- ruse.  She never planned to have a school; it

5    was a cover.  It was really a scheme to defraud foreign

6    students.

7         Have they proven that in the last two weeks of testimony?

8    Is that what you heard?  It's not what I've heard.  I don't

9    think they've proven it.  And you, obviously, are the ones that

10   have to decide.

11        Have they proven that for more than two years my client

12   had a -- created this scheme to defraud?  That it was all her

13   idea?  She was the mastermind?

14        Let's think about it a little from the beginning.

15   Because where did she come from?  You know a little about her

16   background.  She got her Ph.D. at Cal in engineering in some

17   technical field I really don't understand.

18        If you look at the transcript, the transcripts are in

19   evidence, all the courses she took.  Did she take a single

20   class in education?  A single class in law?  A single class in

21   business administration or in public administration or anything

22   that would be relevant to starting a school from scratch and to

23   running a school after it's started?  No.  It's not there.

24        It's all MEMS, I think they called it.  MEMS.  Various

25   engineering courses.  That's her background.  That's what she

1   taught at San Francisco State.  That's what she knows how to

2   do.  She knows engineering, and she knows how to teach.  She'd

3   never run a school before.  She'd never started a business.

4   She'd never started a business from scratch.

5          And this isn't just some business down on the street

6   corner where you open a store and start selling things.

7   Starting a school is a complicated affair.  You've got to come

8   up with courses, you're going to have a curricula for the

9   courses, you got to get students, you got to have facilities.

10  And if you want to teach foreign students, you have to jump

11  through all these hoops for the federal government.

12         And the Government's theory is that when she started this

13  school back in the spring of 2008 her big plan, her big scheme,

14  was all just a fraud.

15         'Cause she worked that first year.  Let's be clear.  She

16  didn't -- she didn't have any students.  She had none, at the

17  start.

18         Did she have financing?  She was doing this out of her

19  own pocket.  She was doing this out of her own heart.  For all

20  of 2008.  She had to figure out how to incorporate a business,

21  which she did.  In the spring of 2008, she incorporated

22  Tri-Valley University.  And then she had to put together a

23  catalogue and figure out what kind of classes were going to be

24  offered.

25         And she had to find people, start finding people to teach

1    those classes.

2         She taught herself.  You've heard that.  There are

3    classes that she's more than qualified to teach.  But you heard

4    she talked to other people, people -- find out if they'd be

5    interested.  She asked Professor Liou, from

6    San Francisco State, whether he would agree to help out with

7    this school.  He said that he would.  She asked some other

8    people that she met in -- through her husband's work and in her

9    field if they'd be interested, and they said that they would.

10        Did they all sign contracts and negotiate salaries and

11   stuff like that?  No.  But she was taking -- she was starting a

12   process.  She was taking the steps.  She did -- she did get

13   this school off the ground.  1,700 students.  From zero to

14   1,700.  1,760 I guess.  From zero to 1,700 in less than two

15   years.

16        Well, that's not true.  She already had some students

17   before she got approval to admit foreign students.  Not nearly,

18   nearly so many.  But she did have students.

19        But did she know she was going to grow from, whatever, a

20   dozen students, to 1,700 students in less than two years?  Was

21   she prepared to manage that process?  To deal with it?  She

22   wasn't.

23        You know, one of the interesting things about this case,

24   they spent a long time investigating my client.  More than six

25   months, you heard.  Eight months.  From May 2010, before they

1    finally shut the school down in January 2011.

2         And they knew who all the students were.  They just went

3    in to SEVIS, typed in Tri-Valley University, and they got a

4    list of all the enrolled students.  1,760 of them.  And they

5    went and they talked to most of them.  You heard that.  I think

6    from Agent Mackey.  They talked to around 900 students,

7    something like that.   900 students.

8         And out of 900 students that they talked to, the best

9    they could come up with was the eight students who testified.

10   That's all they got?

11        Their very first witness, Vandana Virmani, she was

12   already legally in the country.  She didn't need a visa.  Her

13   husband had an H-1 visa.  He was working here.  She said she

14   knew from the start, she knew exactly what she was getting

15   into.  She knew she was going to be taking on-line courses.

16   That's what she expected.  She never expected to get the class.

17   You heard her say that.  It's been two weeks.  But that's what

18   she said.

19        But she wasn't happy with it, she was having trouble

20   logging in, and the material offered really wasn't that great,

21   so she asked for her money back.

22        And did she get it?  She asked for her money back, you

23   remember, not until pretty far along into the semester.  I

24   think it was like five or six weeks, if I remember right.  She

25   ended up getting most of her money back.  Not all of it.  She

1    didn't ask right away.

2         But that's not fraud.  Does that sound like fraud?  You

3    have to decide.  This is the best they got.  These eight

4    students they put on from more than 1,700 potential witnesses,

5    or 900, whichever pool you decide to compare it to.  And these

6    witnesses -- we'll get more to the witnesses later.

7         So what's the most important thing they have to prove for

8    the fraud counts?  They have to prove my client came up with a

9    scheme to defraud.

10        Have they proven that?  Well, after listening to

11   Ms. West's opening, one of the main things they're relying on

12   is the I-17 petition, the application for permission to be able

13   to admit foreign students.  And we've gone through that

14   petition in great detail.

15        What didn't you hear?  What do you know?  You go to the

16   website, you log in, and there's a form to fill out.

17        Do we know what kind of instructions Ms. Su was given?

18   Dr. Su?  Exactly what she was informed when she filled out the

19   application?  No.  We don't.

20        Did anybody help her fill out the petition?  There was no

21   lawyers involved.  This wasn't some big, fancy affair.  This

22   was her on her laptop at her house, sitting in bed or sitting

23   on the couch, trying to fill out this form on this federal

24   website.

25        Is it that complicated?  It's not particularly

1    complicated.  You want to check the boxes.  What are you going
2    to offer?  Et cetera, et cetera.
3         And it's interesting to note.  Nowhere on this form is
4    there any sort of request for information, "How many students
5    do you plan to admit?  How much do you want to grow your
6    school, if we let you admit foreign students?"  Right?
7         She says question 22 -- this is Exhibit 1, the first
8    document you saw in this case, how many -- "What's the average
9    annual number of students?"  Thirty.  Thirty a year.  That's
10   not that many.  She was starting small.
11        "What's your average annual number of teachers or
12   instructors?"  Nine.
13        Well, then, how many instructors are listed?  A lot more
14   than nine.  I want to know, where's the fraud here?  This is
15   all given to the people at SEVP.  The Student Exchange Visitor
16   Program.  They get all this stuff.
17        And then a guy comes out from the program, he's got this
18   information, he looks at the site, he meets with Dr. Su, he
19   asks her a bunch of questions.  Why didn't we hear from him?
20   Why didn't we hear from anybody at the Student Exchange Visitor
21   Program who had one-on-one dealings with my client?  These
22   people still work there.  That's what Ms. Warner said.  Why not
23   bring out the guy that came to the site and talked to her about
24   the school, talked to her about what her plans were, talked to
25   her about all this information, who looked at the facilities?

1    That's a reasonable doubt right there.  Because their whole

2    case rests on the I-17.

3        The Government's theory:  My client already had a plan.

4    She already had a scheme to defraud.  And this was the first

5    big step.  Ms. West said it several times.  Everything after

6    this was obtained by fraud because the Government gave my

7    client permission to admit foreign students based on this

8    information.

9        But have they proven that?  Have they proven that, when

10   my client submitted this, there was a big scheme to defraud?

11   Because it really boils down to what was my client's intent

12   when she filled out this form in 2008.  What was she planning

13   to do.  What was going through her head at that point.

14       Has the Government proven that?  Their whole case rests

15   on it, so why don't they bring out the people that have direct

16   knowledge of it?  And we know there's at least two, if not

17   more, people that she dealt with at SEVIS in getting the

18   petition approved.

19       There's the person that -- there's the person that came

20   out, for one, for starters, that came out to the site and met

21   with her, and then there's the person who ended up giving the

22   approval down the road.  And there's some communication back

23   and forth in between.

24       The Government has to prove my client's intent when she

25   submitted this form.  Why haven't they put on the best evidence

1    of that?  Why haven't they put on the witnesses who have

2    firsthand knowledge, firsthand interaction with Dr. Su back in

3    2008, witnesses who still work for the federal government,

4    witnesses who could talk about what she was told about what the

5    requirements are, what she knew, what she understood, what her

6    plans were?  They haven't done that.

7        You should find my client not guilty of all the fraud

8    charges based on that alone.  That is a reasonable doubt.  The

9    Government's failure to put on the most important firsthand

10   witnesses in this case.  Because it all goes back to 2008, all

11   the fraud charges.

12       Instead, she called the head of the department, Susan

13   Warner.  She didn't have anything to do with processing my

14   client's application.  That's not even her job.  She didn't

15   even work for the department back then.  She was a private

16   contractor for the Department of Homeland Security.

17       What does she know about Dr. Su?  She doesn't know

18   anything.  She doesn't have any information about what my

19   client was told, about what my client understood.

20       You should acquit my client on the first 14 counts based

21   on that fact alone.  That is a reasonable doubt.

22       Now, years later, the Government, they sure have a lot of

23   quibbles with exactly what was submitted here.  They haven't

24   even answered all the questions.  These documents raise serious

25   questions.  Why, for example, we know -- we were told that this

1    form is submitted electronically, Exhibit 1.  That you fill it

2    out online and then it uploads somewhere in a computer in

3    Washington, DC.

4        Though I'm curious.  Because if you look at it in

5    Exhibit 1, down at page 2, it's got that received stamp.  That

6    received stamp that, according to Ms. Warner, means it was

7    mailed.  Received in the mail room.  That's a reason to doubt

8    whether this is a wire fraud at all.  It says it was received

9    by mail.  This is charged as Count 1.  This document.

10       And why -- we know there was more communication.  It

11   wasn't just her submitting this, my client submitting.  It

12   wasn't my client just submitting this form online and then

13   waiting for the approval.

14       She had some interaction with the people at SEVIS, she

15   writes this letter on December 11th, "Dear Ms. Deuell, I'm

16   writing you in response to your email," she gives copies of her

17   sister and -- sister and brother-in-law's passports and some

18   information about the accreditation in California, and says her

19   sister and brother-in-law had taken the web course.  That's all

20   the government asks for.

21       And this, you'll remember, is after the site review.  The

22   gentleman had already come out and met with Dr. Su at the

23   school at the site and looked at it and had his questions

24   answered.  And this is the only follow-up they asked for.

25       These documents raise more questions than they answer.

1    This is page 2 of Exhibit 3.  Once again, this is the first

2    page of I-17.  You'll remember Ms. Warner identified the

3    signature there of the gentleman at SEVIS who approved the

4    petition.  That's his signature.  It was approved on

5    February 17th.  There's that same mail stamp; right?  This does

6    look like a copy that was mailed later.

7         What I don't understand is why the one that was

8    supposedly submitted online is also stamped like it was mailed.

9         But you remember there's some different versions of this

10   document.  There's that version in Exhibit 3 and then there's

11   -- I'll put it side by side -- nearly, but not exactly, the

12   same document in Exhibit 7.  Page 1 of Exhibit 7.  Looks like

13   the same handwriting; it is the same signature.  I asked

14   Ms. Warner that.  That's the same fellow at SEVIS who looked at

15   these and signed them.  It's the same date.

16        But if you look at it, the one's not just a -- I'm doing

17   this all wrong.  The one's not just a copy of the other; right?

18   I mean, the handwriting's similar but it's not the same.  There

19   were at least -- there were at least two of these at the

20   office, and they say different things.

21        One says, at the bottom, the articulation agreements are

22   acceptable, and the other does not.  Then the other says

23   private school of higher education only approved for classes

24   listed in Section 19.

25        And those are the classes.  Those are the classes that

1    Dr. Su was qualified to teach and that Dr. Liou, Professor Liou

2    of San Francisco State, approved.  You'll remember, in the

3    articulation agreement, that he did sign.

4         These documents, to me -- and you have to decide, they

5    raise some real doubts.  What exactly happened here?  What

6    exactly happened at SEVIS between SEVIS and my client?  Because

7    they, they have the burden of proof here.  I don't have to

8    explain these doubts.  They have the burden of showing that

9    there's no doubt here exactly what happened has been proven

10   beyond a reasonable doubt.  I don't think it has.

11        And there's a simple way to clear it up.  Call Mr. Cody.

12   Put him on the stand.  And he could tell you, "This is what

13   happened.  This is why there's different ones of these dated

14   the same day.  This is what I told Dr. Su."

15        Why is this important?  It's important for two reasons.

16   Because it all comes down to my client's intent.

17        And this is the best evidence.  Exhibit 1 is the best

18   evidence of what my client understood back in 2008 when she

19   first asked for permission to teach foreign students.

20        And to follow up a little on that point, I mentioned

21   earlier about my client's education.  It's no question, you

22   know, where her training is.  It's in engineering.  And if you

23   look at some of the documents that she did write, for example,

24   one we saw yesterday, I think it was Exhibit 800, my client's

25   claiming it's the Government.

1    You can look at the way it's written and decide for

2  yourself what her level of sophistication was in these matters.

3  What her real ability to deal with these things was.  This

4  was -- strike that.

5    The Government has so many quibbles about this I-17.

6  What else do they allege that proves that she had a scheme to

7  defraud, she made up a scheme to defraud?  Well, they say she

8  didn't have physical classes.  She just had online classes.  At

9  times they seem to say there were no classes, but we know

10  that's not true.

11    Mr. Kundur yesterday, one of the last witnesses,

12  testified he had some difficulty logging into everything, but

13  he did -- the classes he was able to log into he did attend,

14  and that it was a virtual class.  That there was a professor

15  there, there was instructions, there was testing.  He said that

16  the attendance was taken.

17    This is their witness.  Their witness confirming that

18  there were virtual classes here.  This wasn't just some sham.

19  Were there logistic difficulties?  Absolutely.  You'll notice

20  most of their witness -- most of the testimony all relates to

21  2010.  They don't focus back at the start, when it was small,

22  before she had any foreign students, what the classes were like

23  then.  It's just later, when there's a lot of people trying to

24  log in.

25    She was dealing with it the best she could, but obviously

1      it wasn't quite up to speed.

2          But that's not proof of an intent to defraud.  If she was

3      trying, if she was trying, then they haven't proven their case.

4          And she was trying to make it better.  She didn't stay in

5      that original small building; she did get a bigger building.

6      She did invest in growing the school to meet the needs of the

7      growing students.

8          The Government focused a lot on -- at least in the first

9      week, about these articulation agreements.  Looking at the

10     different documents that were written at SEVIS about those, I

11     don't see how you can find that anything has been proven beyond

12     a reasonable doubt.

13         But there's -- let's be clear, there's not even -- there

14     were three articulation agreements, one of them there's no

15     question was legitimate.  There's been no evidence and no claim

16     that the third articulation wasn't valid.  Their quibble is

17     with two.

18         Once again, Central Florida University articulation

19     agreement.  Whose signature was on there?  My client's

20     brother's.  He was a professor at that university.

21         Did the Government call him to say she didn't have my

22     authority to use my signature?  No.  They called the head of

23     the department who didn't have anything to do with this.

24         All he can testify to is general practice and general

25     procedure.  He didn't say exactly what Professor Su, the other

1  Professor Su was told, what his understanding was, whether he

2  knew or not he had the authority to do this.

3      What about Professor Liou from San Francisco State?

4  Because he admitted.  He said, "Yeah, I signed one of these

5  articulation agreements.  I knew Dr. Su.  I agreed to help her

6  out with the school."  He says, "I sent an e-signature from

7  China because I was spending a lot of time in China."  He said,

8  "I didn't sign the second one."  And the second one is just the

9  e-signature from the first one.

10     Well, Professor Liou had been very helpful with my

11  client.

12     And you remember, there was a third professor involved,

13  Professor Hu.  When my client was interviewed by Agent Mackey

14  back in January 2011 for six hours, there was another professor

15  at San Francisco State involved, Professor Hu, and the

16  Government didn't put him on either.

17     I keep saying this because the burden always stays with

18  the Government.  I don't have to prove a thing.  Dr. Su doesn't

19  have to prove a thing.

20     When you got on this jury, I asked every single one of

21  you if you get on this jury will you hold the Government to its

22  burden of proof.  Because that's the job here.  That's the job.

23  It's more of an analytic -- objective analytic procedure.  It's

24  nothing against Mr. Rhyne and Ms. West.  The question is, what

25  have they proven.  Have they proven these charges beyond a

1    reasonable doubt.

2         What else does the Government have to prove?  On the

3    fraud charges, they have to prove materiality.  They have to

4    prove basically that these were important.  That any, any

5    falsehoods or discrepancies were significant, they were

6    material.  Was this Stanford University?  No.  It was a

7    small -- very small, originally -- school in Pleasanton.

8         And we heard some complaints about, "I thought it was

9    going to be a better school.  I thought there were going to be

10   physical classes."  But you know what?  Sometimes you get what

11   you pay for.  That doesn't mean it's fraud, okay?

12        All these students looked around at more than one school,

13   not just TVU.  I asked all the students who testified about the

14   fees.  And you'll remember every one of them said TVU was the

15   cheapest.  It was cheaper than that school down in

16   Santa Clara.  ITU.  It was cheaper than all the other schools

17   we heard about.

18        And there were several.  That's one of the reasons they

19   chose this school.  Because it was cheaper.

20        So they knew they weren't going -- they knew.  They knew

21   they weren't going to be getting everything that they would

22   want, would expect at a school where they're paying 15-,

23   $20,000 a semester.  They were paying 2,700 bucks, and they

24   didn't even have to pay it up front; they were allowed to pay

25   it in installments.

1    And the Government keeps saying this case was about
2    greed.  That's what they said in their opening statement.  This
3    case is about greed.  Well, the tuition didn't sound very
4    greedy and the collections didn't either.
5        We heard some of these students, they didn't even -- they
6    didn't even pay off their tuition.  They'd make the first
7    thousand dollars' installment and that was it.
8        And Mr. Patel, who worked there for about a month and a
9    half in 2010, Parth Patel, who was there daily, saw Dr. Su
10   daily, saw how this operation was conducted, and when he was --
11   he was interviewed by the agents, what did he say?  He said, "I
12   didn't think Dr. Su did it for the money."  He didn't want to
13   admit that for me on the stand; remember?  We had quite a
14   struggle with that.  But when it was just him and the agents
15   and not me confronting him in the court, he said, "This wasn't
16   about the money."
17       I'm not making this up.  This is -- this is the best
18   witnesses they had out of 1,700 students.  Their own witnesses
19   told them this was not about the money.  What else do they have
20   to prove?  All these wire charges.  All these wire fraud
21   charges.  They have to prove that the wiring itself, that the
22   defendant used or caused to be used the wires to carry out or
23   attempt to carry out an essential part of the scheme.
24       So you're going to have to go through all these wires one
25   by one and ask yourself, "Was this an essential part?"  And if

1    you have any doubt, if you have a reasonable doubt -- not any

2    doubt, but if you have a reasonable doubt, then you have to

3    find my client not guilty.

4         The I-17.  Well, if there was a scheme you'd have to

5    decide whether that -- you'd also have to decide whether it's

6    material.  We already talked about that.  Was I-17 an essential

7    part?  I guess that it was.  The school would never have gotten

8    the permission to admit foreign students without it.

9         What about this email in Count 2?  Email.  Mr. Barghav in

10   India, saying, "I got F-1 approval; I'd like to start getting

11   some foreign students.  Can you help me out?"

12        Is that -- she showed you that email.  Was that email

13   essential to this alleged scheme?  How would any of these, how

14   would any of these alleged wirings further the scheme?  Because

15   almost all of them, all of them, have to do with what the

16   agents did.  Except for those first two.  Those are the only

17   two that Dr. Su did on her own.  The rest of them were all

18   created by the agents asking her to -- asking her to admit

19   students.  Asking her to email things.  These are things

20   created by the agents.  They weren't part of the school's --

21   some sort of scheme at the school.

22        But you're going to have to go through them.  Most of

23   them, Counts 3 through -- well, I guess one, one was an agent

24   undercover, but the rest of these relate to people that didn't

25   exist or hadn't really applied to this school.  Were those

1    essential to anything?  Let's talk a little about these, these

2    ruse operations.  Because the Government spent a lot of time

3    and a lot of energy on it.  Because you remember in May 2010 my

4    client found out that Anjiray Dirisanala ended up basically

5    stealing from the school.  And he made something like $20,000.

6    And she told him not to come back.  Oh, I'm sorry, it was a

7    different reason.  She learned that a student's credit card had

8    been used outside of the school, so she assumed it was somebody

9    working in the office and she reported it to Pleasanton police

10   and she told Anji to take a break while it was being

11   investigated.  At that point he goes to Immigration.  His

12   friend Ron Krishna Karra takes him there, introduces him to

13   Agent Mackey, and they begin an investigation.

14       And what do they do?  They just come out and talk to her,

15   say, "We want to look into your school more.  Can we see a

16   little more of what's going on?"  No.  They start an

17   eight-month investigation and end up shutting the whole thing

18   down.  Most of the counts of the indictment, almost all of

19   them, have to do with these ruse operations.  They sent them in

20   and said, "Try to enroll Mr. Agrawat," who doesn't even exist.

21   "Try to enroll Mohammed Rizwan," who doesn't even exist.  And

22   does he do it?  Do they get enrolled?  They do.

23       But my client doesn't know that these people aren't

24   actually enrolling.  You remember he goes in and he says, "I've

25   got some friends.  I want to enroll some friends."  How is that

1    evidence of my client's intent to defraud?  Did she go and

2    check for every transcript right away, check their prior

3    degrees?  No.

4        But you know what?  All these students, they all had

5    degrees.  Every one of them had at least a Bachelor's.  One of

6    them already had an MBA.  I forget who it was.  Maybe

7    Mr. Ignatius.

8        These students were legitimately qualified to be

9    students.  There's no question about that.  You heard that they

10   were supposed to get prior degrees and transcripts.  But did

11   they always do it?  Apparently not.  That doesn't make it a

12   fraud.  These people were legitimately students, at least as

13   far as my client knew, and that's what counts.  That's what

14   counts on all the fraud charges.  What about the visa fraud?

15   Let's strike that.  Before we get there, there's the conspiracy

16   to commit visa fraud.  What do you have to find?  You have to

17   find the Government proved beyond a reasonable doubt that there

18   was an agreement between my client and other members of a

19   conspiracy to commit visa fraud.  There was an agreement.

20       Where is the proof of that?  Anybody get up there and say

21   "Yeah, Dr. Su came to me, she said -- she said, 'I want to make

22   a deal with you.  We're going to admit all these foreign

23   students, even though they're not qualified, or even though

24   they don't have all the necessary paperwork'?"  No, nobody said

25   that.  They haven't proven that.  Did they prove that she

worked with some people?  Sure.  People that worked in the
office, Anjiray Dirisanala, Parth Patel.  But just employing
them does not make them co-conspirators.  You have to find,
beyond a reasonable doubt, that there was an agreement to
commit visa fraud.  That there was a plan.

And what is the visa fraud?  All the visa fraud -- they
haven't charged, by the way, any of the actual students as visa
fraud counts; right?  Because these people were lawfully in the
country.  They have to prove that my client forged or falsely
made a document, and the documents they're relying on for each
of these counts -- this is 16, 17, 18, and 19, is an I-20, an
I-20.  That these were forged.

Were they forged?  No.  The Government hasn't proven
that.  Were there -- did my client sign in her sister's name?
Absolutely.  Did she sign her brother-in-law's name?
Absolutely.  That doesn't make it a forgery.  It's not a
forgery if you have someone's permission.  Secretaries sign for
their boss.  Husband's and wives sign for each other.  That
doesn't make it a forgery.

It's a forgery if you sign someone's name without their
authorization.  Does this prove that my client did not have
authorization to sign Sophie Su, to sign Vince Wang?  No.  They
haven't even tried to prove it.  They want you to assume it.
They didn't put on a single witness to say, "Dr. Su did not
have permission to sign her sister's name."  And without that

1    evidence, you can't assume that she didn't have authorization.

2         And the same is true of her brother-in-law.  They have to

3    prove it.  Have they proven that?  There wasn't a single shred

4    of evidence on it.  They just want you to assume that because

5    she signed someone's else's name, that's a forgery.  But what

6    they really want you to assume is she didn't have

7    authorization.  They also have to prove -- or they could prove

8    it in the alternative instead of proving that it was forged.

9    They could say that it was falsely made.

10        All of these I-20s, as far as my client knew, were for

11   real people.  There's no claim that anyone was admitted under a

12   phony name, anyone was using anyone else's name; right?

13        There's a lot of quibble about, "Well, they used the same

14   address and they used the same income."  But does that really

15   matter?

16        I asked, you know, Dr. Warner about it.  What's this

17   address for?  We actually -- we went over the regulations.

18   Immigration wants an address.  If you're a student in the

19   United States, they want an address to contact you.

20        Is there any evidence that anybody ever tried or actually

21   needed to contact one of the foreign students at these

22   addresses?  No.  Does the address really matter?  No.  Does

23   income really matter?  I guess you should ask.  I mean, do they

24   really check up on it?  Did any agents ever say, "Yeah, I went

25   to any of these students at Tri-Valley University and I checked

1    on their income and it wasn't what it said it was on their

2    I-20"?  No.  None of that really matters.

3         Okay.  The next count is the giving a false document to a

4    government agent.  In this case we're talking about on

5    September 24th, during one of the ruse operations, which was

6    the email to Agent Taylor for the fictitious person, Dirikani,

7    who was the foreign student.

8         Have they proved that my client knew that that document

9    was false?  Have they proved that she knew that this wasn't

10   really a student?  Because you remember there was -- of these

11   phony names that were given to TVU, they actually used --

12   picked a name that happened to coincide -- it was back-flipped,

13   but coincided with a real student.  They used the name Mohammed

14   Rizwan, but it turns out there either was a student named

15   Rizwan Mohammed or Rizwana Mohammed.

16        And even the agent -- sorry, even Anji Dirisanala, when

17   he went there, was confused about the first and last name and

18   he had to go out and ask the agent to figure it out himself.

19   He went into TVU, he wasn't sure what the first name was, he

20   wasn't sure what the last name was.

21        Count 20, you also have to find that this email to Agent

22   Taylor was material.  That it was material to the Homeland

23   Security.  I don't think they've proven that.

24        The alien harboring counts also relate to Anjiray

25   Dirisanala, as well as Vishal Dasa.  If you look at the

1    elements, that should be an easy not guilty.  They say my

2    client harbored, concealed or shielded Vishal Dasa?  Their

3    theory is that by giving him a job she was harboring him in

4    that she was concealing him from Immigration?  I don't even get

5    that.  They also have to prove that he was not -- that she knew

6    he was not lawfully in the country.  Well, that's not what he

7    testified to.  That's not what either of them testified to.

8    They were both lawfully admitted to go to other schools, and

9    that her purpose was to help him avoid detection by the

10   Immigration authorities.

11        Where is the evidence of that?  They didn't present any

12   facts on that.

13        I'll note that the end of the instruction -- and this is

14   Instruction 54, which defines the alien harboring -- an alien's

15   not lawfully in this country if the person was not duly

16   admitted by an Immigration officer.

17        Neither of them said that.  Neither of them said they

18   snuck into the country or anything like that.  There's just no

19   evidence on that.  You have to find her not guilty on those

20   charges.  That's Counts 22 and 24.  Neither of them ever said

21   that they told her that they were here illegally.

22        What about the unlawful access charges -- charge, which

23   is Count 25?  They say my client didn't have the authority to

24   access SEVIS.  Well, she did have the authority.  They gave her

25   the authority to access SEVIS.  So they talked a little bit and

said, "Well she aided somebody else.  She aided and abetted
somebody else in unlawfully accessing SEVIS."  That's the
people that work in the office.  But that's not what they said.
They said she would log in and she took steps, she was careful,
so that the staff didn't see the log-in information.  She
wasn't sharing the log-in information.  She didn't let the
staff use the computer until she completed the log in.  That's
the accessing.  There's -- nobody said that they were ever able
to log into SEVIS because Dr. Su gave them the information or
showed them how to do it.

We're almost through this.  Bear with me.  I hate the
lunch-hour closing.

Last group of counts is the money laundering.  Why should
my client be found not guilty of that?  Because they haven't
proven beyond a reasonable doubt that she knew these were
criminally-derived proceeds.  They have to prove that.  They
have to prove that she knew it.  Criminally-derived property,
sorry.  Not proceeds.

What's the best evidence?  What's the best evidence at
trial that she didn't think that?  She didn't -- she did
everything in her name, in the school's name.  She didn't try
to hide any of this.  She wrote checks on the school account,
she drew money from the school account.  She didn't transfer it
to some -- some unknown bank or to some third party.  She
bought a car.  She bought property for the school.  She bought

1    herself a house.  She did it all in her own name.

2        Does that sound like somebody who knew that they were

3    using criminally-derived property?  No.  Just the opposite.  It

4    sounds like somebody who doesn't think they're doing anything

5    wrong.

6        And this sounds hyper-technical, and it is, but the

7    Government still has to prove it.  They have to prove this was

8    in or affecting commerce.  Look at the jury instruction.  They

9    have to prove each of these checks and these transfers from the

10    bank that she did, that they charged with money laundering,

11    affected commerce.  There was no testimony on that.  They

12    didn't put on some economist or any other sort of expert.  They

13    put on bank records, I guess, that Wells Fargo was federally

14    insured, but these were all local.  These were all local.  It

15    was all out in Pleasanton and Livermore.

16        Okay, this is my last chance to talk to you.  Ms. West

17    gets a chance to get up again.  There's been a lot of testimony

18    and there's certainly a lot of documents and I certainly

19    haven't covered them all, so I just ask you, when you get back

20    there and start deliberating, the question comes up and it's

21    something I haven't talked about, just take a second to say,

22    "Well, is there another side to this?  What would Mr. Babcock

23    have said?"  Try to look at it from both ways.

24        When you get back there, this is totally up to you.  You

25    have to deliberate.  You got to talk to each other.  That's all

1       it means.  It's a fancy word to talk to each other.  You

2       finally get to talk to each other about the case.  Consider

3       each other's views, but when it comes time to vote, it's not a

4       group decision.  It's not a majority rule.  It's not a

5       go-along-with-the-group thing.  Everybody's got to decide their

6       own vote.  There are reasons -- each of these counts, there are

7       reasons to doubt whether these charges are true.  One of the

8       biggest reasons, from where I'm sitting there really wasn't a

9       single unbiased witness in this case.  All of these students

10      are from another country.  All of them were here either on an

11      F-1 or another type of visa.  On January 19th several of them,

12      like my client, were woken up, 6:00, 6:30 in the morning, with

13      Immigration agents at their door.  Some of them were arrested

14      and deportation proceedings were started, or at least they had

15      to go to Immigration court.

16          Were they scared?  Absolutely.  Naturally.  They're all

17      concerned about their immigration status.  About staying here.

18      And the only reason -- well, I guess I didn't ask all of them,

19      I didn't ask them if they wanted to stay here, but I think it's

20      mostly self-evident.  All of these witnesses had a reason to

21      slant their testimony in favor of the government.  I'm not

22      saying they made all this stuff up, they didn't, but it

23      definitely colored their testimony.

24          Remember when I was asking Mr. Patel, I was trying to ask

25      him about these things, he told the agents last year and a

1    couple of years ago.  And he kept denying it.  He kept denying

2    it.  He says, "I didn't say that."  Or, "I don't remember

3    saying that."  And as soon as Mr. Rhyne gets up on redirect,

4    he's got -- the answers are flowing again.  It's like pulling

5    teeth, when I was asking him questions.  Because they are

6    afraid of Immigration, they are afraid of the Government.  And

7    I understand that.  It's nothing personal.  But you got to take

8    that into consideration.  Thank you for your time.  I thank you

9    for it, my client thanks you for it.  I just ask you to take it

10   seriously and really look at the evidence because I don't think

11   it's there.  Out of these thousands of students, they

12   cherry-picked a few and they still haven't proven it.  Thank

13   you for your time.

14        **THE COURT:**  Thank you, Mr. Babcock.

15        May I see counsel at sidebar, please.

16        **MS. WEST:**  Yes.

17             (A sidebar was held as follows, out of the hearing of

18             the jury.)

19        **THE COURT:**  We're at sidebar outside of the hearing of

20   the jury.  Ms. West, do you want the proceedings to continue

21   today so you can make your rebuttal closing argument?  And how

22   long do you think that will take, if you do?

23        **MS. WEST:**  I would like to do that.  I think it could be

24   done in 15 minutes or less.

25        **THE COURT:**  All right, then let's proceed.  And that way

1    we can -- I can let the alternates go home today and put them

2    on phone standby.

3         MR. BABCOCK:  Would the Court ask them when they start

4    deliberating to talk about schedule and let us know what they

5    think their hours are going to be.

6         THE COURT:  Yes, I will do that.  Okay.  Thank you.

7    Thank you, Madam Reporter.

8              (The sidebar was concluded.)

9              (Proceedings heard in open court.)

10        THE COURT:  Members of the jury, I'm aware that I'm

11   keeping you a few minutes late today.  And, again, I'm the

12   captain of the ship, I'm the one that makes all the decisions,

13   so if there's something about the schedule you don't like,

14   don't get mad at the defendant or the Government or the

15   lawyers; get mad at me.  That's my job.  I'm aware I am keeping

16   you a few minutes late.  I have asked the Government to make

17   their rebuttal closing argument.  Now, I participate that Ms.

18   West will be done by 2:00 o'clock then I will put the

19   alternates on standby.  It's not that you will be deliberating

20   today, it's not I expect you to stick around and start

21   deliberating, that won't happen until tomorrow, but I'm going

22   to do that.

23        And Ms. West, I invite you to make the Government's

24   rebuttal closing, please.

25        MS. WEST:  The Court instructed you this morning that --

1    and I'm reading from the instruction -- "A reasonable doubt is

2    a doubt based upon reason and common sense and is not based

3    purely on speculation."  Defense is asking you to speculate.

4    Applying your reason and common sense to the evidence that

5    you've seen and heard in this case and the law that you've

6    heard from Judge Tigar will lead you to conclude that the

7    Government has proved its case and has done so beyond a

8    reasonable doubt.  There are a few points raised by defense

9    counsel in his closing statement that I did want to address

10   with you.  And the first one is the claim of the lack of

11   sophistication by the defendant, Dr. Su.  She was very

12   sophisticated.  You heard about her degree and her training and

13   her background.  She's a smart woman.  You heard her voice on

14   the calls; she understood what was going on.  She signed

15   certifications saying that she understood everything and was

16   planning to follow it.  And what happened is pretty much every

17   time she had an interaction with the defendant of Homeland

18   Security she lied.  She made a choice.  She made a choice.  She

19   wasn't caught unawares or overwhelmed; she made a choice each

20   and every time, and the choice she made was to lie.  She made

21   that choice with the original I-17, her electronic submission,

22   when she talked about the requirements for admission and

23   graduation and so forth.

24        And defense counsel said well, she started with 30

25   students.  That would be speculating that that was actually

```
 1    true.  It says on the form that there was 30 students, but
 2    there was no evidence here as to what the true number was.  She
 3    made a choice when she forged signatures of designated school
 4    officials.  Counsel says she had authorization to sign, so it's
 5    not forgery.  First of all of, she didn't sign "Susan Su" for
 6    Sophie Su or "Susan Su" for Wenchao Vince Wang.  And
 7    furthermore, if you look at that certification, Exhibit 1,
 8    page 5, what it states flat out is, quote, "A DSO may not
 9    delegate this designation to any other person."  That's not
10    allowed.  She couldn't sign "Susan Su" for Sophie Su.  She had
11    to forge Sophie's name.  She had to forge Wenchao Wang's name.
12    Why is this material?  Well, you've heard that from Ms. Warner.
13    It matters because the DSOs, as I explained to you in my
14    original closing statement, they're charged with a very
15    important responsibility.  They're the gatekeepers in a big
16    way.  Because the person at the consulate office in a different
17    country in India, or wherever else, and the state department
18    issuing the visa, they don't have all of the background.  They
19    have to rely on, in part, the I-20.  They're relying on a
20    school that's been deemed to be bona fide, legitimate, real, in
21    making a determination that this is a real person and that they
22    are actually coming to the United States to study.  And then,
23    after that, they rely on the later I-20s and SEVIS entries that
24    that person really is actually here studying, that they're not
25    doing something they shouldn't be doing that can cause problems
```

1    for the United States.  They rely on what that DSO said and

2    that's why -- as Ms. Warner told you, that's why they can't be

3    delegated, that's why the DSOs are important.  It is important,

4    and you heard all about that during the trial.  Probably, at

5    the time, more than you wanted to hear about it.

6         She also made choices when she sent emails where she was

7    making up the grades and making up courses of study, making up

8    letters of good standing, saying that the person, fictitious

9    student, was admitted after going through the admissions

10   process and was maintaining the full course of study and in

11   good standing.  She made all that up, too, every time she made

12   the choice.

13        And she made the choice to lie.  This wasn't her trying

14   to find her way and trying her best to start a school; this was

15   her, every chance, making a choice to commit fraud.  She could

16   have waited until she had lined up instructors, if that's what

17   she wanted to do.  She could have waited until she had a school

18   to actually conduct class, if that's what she wanted.  But

19   that's not what she did.  Every time it was a choice.

20        And another example that you heard about during the

21   course of the trial, she made a choice to sell degrees.  You

22   remember you saw an email that said -- I think the subject line

23   was, "Want to buy a degree without taking classes?"  Okay.

24   Sounds good.  As long as I get the money.  Here it is.  And she

25   attached it to the email.  She made a choice.  And it was a

1    choice to commit fraud.  There was one little technical thing I
2    wanted to address with you from the testimony of Ms. Warner.
3    You probably understood it, but since it was raised by counsel,
4    I wanted to address it.  An Exhibit 1 -- or Count 1, rather, is
5    the wire fraud count that related to the original electronic
6    submission in SEVIS with the I-17.  The testimony that you
7    heard, you probably recall, was all of that stuff that gets
8    received electronically, it gets printed out, it gets put in a
9    file, the stuff gets accumulated, that "Received by" stamp on
10   there was what was actually sent by the site visit inspector
11   after he got the original inspection.  So the I-17 original
12   application with the content on the form was what was
13   electronically submitted.  That document itself, with the
14   Received by stamp, was what gets sent in with the original
15   signatures after it's all collected by the site visit
16   inspector.
17       There was some argument by counsel that Dr. Su just
18   didn't know a lot of this stuff.  She didn't know that they
19   weren't real students.  She thought everything was going
20   totally lawfully.  Well, we've already discussed some of the
21   reasons why you know from the evidence that that's not true.
22   One of the other ones is that she had a duty to know.  That's
23   her job as the DSO, is to know that there's a real school, that
24   there's real admissions procedures -- I don't want to belabor
25   it, but I want to make sure the point isn't lost -- that the

1    DSO's job is to know all this stuff.  And, in fact, as defense
2    counsel argued, the Government hasn't proven -- and had a duty
3    to prove that she was the mastermind behind the scheme.
4    Actually, that's not what the jury instruction is.  That she
5    participated in or planned the scheme.  And you'll have the
6    jury instructions to take a look at the exact words itself.

7         But actually, here, the evidence does show that she was
8    the mastermind.  There was nobody else who was planning all of
9    this.  It was her.  She was planning it.  She was giving all
10   the instructions.  She was telling her employees what to do.
11   She was yelling at them when they didn't do it fast enough.
12   She told everyone what to do and she was pulling all the
13   strings, she was controlling all of it all along.  She was the
14   mastermind.  I want to make sure I don't miss any big points,
15   so forgive me as I flip around here.

16        Going back to her making a choice to lie.  Again and
17   again and again, every step of the process, each point in the
18   wire fraud counts and in the mail fraud counts there's a
19   choice, again, to lie.  You know why she did it.  The evidence
20   told you why she did it.  Even if Parth Patel said at some
21   point that he wasn't sure that -- I think his word was
22   inspiration, the inspiration was the money, maybe there were
23   other inspirations.  Maybe it was status or maybe she was
24   inspired by power, the power that she was wielding over all of
25   these students when she told them that they couldn't transfer

1    and that they were trapped at Tri-Valley until they paid her

2    several more thousands of dollars.  Maybe that was part of it.

3    But you do know, from the evidence, that she was motivated by

4    the money.  Because what did she do with it?  Follow that

5    money.  Follow the money.  She spent it on herself, she did not

6    invest it in the school.  She made a choice again, again, every

7    time she spent that money.  She made a choice not to have a

8    legitimate school, not to hire employees, not to hire DSOs or

9    instructors or build a campus.  She was smart, she knew what

10    she was doing, she made choices.

11        There was a mention about how the Government did not call

12    the site inspector.  You don't need to hear from the site

13    inspector; you have the exhibit in front of you that the site

14    inspector filled out.  It's a business record.  It's in

15    evidence.  Go ahead and look at it.  It shows that he spoke to

16    Susan Su.  And all of her statements are reflected on that

17    form.  You have all of that evidence already in front of you.

18    Oh, another time that she made a choice, just in that process

19    going through those counts, she made a choice with those

20    articulation agreements.  She could have established a real

21    school, gotten articulation agreements that were legitimate.

22    As counsel pointed out, she did have people who were willing to

23    help her, if it was real.  She could have gone that extra step.

24    But she chose not to.  And she chose to lift signatures from

25    other documents.  And you have plenty of evidence from the

1    forensic document examiner about that.  She made a choice and

2    then she chose to submit that to SEVP and you saw articulation

3    agreements approved and a couple of days later out comes the

4    SEVIS approval.  Interestingly, when Agent Mackey testified, he

5    told you about how he was interviewing Dr. Su and he was

6    talking to her about the articulation agreements.  And he said,

7    "Okay if we call those people, those schools, those

8    signatories?"  And she said, "Oh, no, no, no.  Please don't do

9    that.  They're very busy.  They're very busy."  And then he

10   said, "Well, actually, we've already contacted them."  And she

11   was very upset, was the testimony that you heard from Agent

12   Mackey.  She was very upset.  She took a break.  She did agree

13   to reconvene on that interview, but she couldn't talk about

14   that anymore.  She was very upset when she found out, in fact,

15   too late, he'd already called the schools and found out that

16   those articulation agreements were false and he called Shy

17   Sheng Liou.

18        Let's talk about one more point on the wire fraud.  It

19   was a technical point made by counsel, but he was saying that

20   the wires have to be an essential part of this scheme.  I think

21   this was already covered, but to make sure, as the jurors

22   instructions say, they have to be used to carry out an

23   essential part of the scheme.  So when you go through those

24   wire fraud counts, do ask yourself -- I agree, ask yourself,

25   and answer that question for yourself, was it to carry out an

1    essential part of the scheme?  Well, counsel's conceded that

2    the I-17, itself, was the recruiting.  The efforts to recruit

3    Indian students.  Well, that was essential because you're not

4    going to make money with your plan on the F-1 if you're not

5    going to get students recruited and brought over here.  So that

6    was to carry out an essential part of the scheme, to recruit

7    these Indian students -- and all of the students.

8        And then all of the I-20s.  Well, if you're not issuing

9    I-20s for these people, you're not going to get money and

10   you're not going to have these F-1-supported students.  So

11   that's an essential part of the scheme.

12       And then very essential is maintaining your SEVIS

13   approval.  You're not going to have -- you admit that these

14   people are -- you actually have no idea if they're attending

15   classes.  Dr. Su couldn't do that.  She had to send -- in order

16   to continue to perpetrate her fraud, she had to send Agent

17   Taylor and Agent Ramirez the documents to show that these

18   students who were supposedly being held at the airport, JFK and

19   SFO, were actually legitimate students in good standing.  That

20   was an essential part of her scheme.  Because had she admitted

21   that she had no idea because she didn't keep track of anything

22   and there weren't really classes being held physically anyway

23   well, the school would be shut down.  It was certainly

24   essential.

25       Let's talk about alien harboring for a moment.  Dr. Su

1    kept Mr. Dasa and Mr. Dirisanala in status.  She kept them in

2    active status despite knowing they weren't going to any

3    physical classes, even that they weren't attending on-line

4    classes.  Because they're working around the clock,

5    practically.  She did it -- she did it to maintain them.  And

6    to maintain them in active status is a way of concealing them

7    from the Department of Homeland Security.  That's the

8    concealment.  That she maintained them in active status.  I

9    wanted to make sure that that was clear for you.  And she also

10   did it for the money, just as she did everything else for the

11   money, as the evidence has shown.

12        She kept them in status, too, for the money.  Because it

13   would have been much more expensive to hire a bunch of real

14   employees than use the F-1 students that they had, working 12

15   hours a day, 6, 7 days a week, painting her house.

16        And then acting as a DSO was supposed to would have been

17   much more expensive.  And she chose not to hire real DSOs.  She

18   did it for the money.

19        On the unauthorized access, aiding and abetting charge,

20   counsel says she didn't -- she accessed it herself.  The

21   question you need to ask yourselves is did she provide access

22   to SEVIS to people who weren't authorized to use it?  Answer to

23   that has to be yes.  Every witness here has stated that that's

24   true.  Every witness that you've heard from who talked about

25   SEVIS.  And counsel doesn't seem to dispute that; they just

1        point out that she was the one who actually entered the log in.

2            Did she provide access to SEVIS to these people?  The

3        answer is yes.  And as Agent Mackey told you when he

4        interviewed her, even her answer to that was yes.

5            So that brings us to money laundering.  Concealment's not

6        an element of money laundering.  You see the elements, you saw

7        them up on the screen, you heard them from the judge, and

8        you're going to have them in front of you in the jury room.

9            Did Susan Su know that the money that she was spending on

10       a Mercedes, a bunch of houses, and some other real property,

11       was proceeds of the crime?  She did because she committed the

12       crime.  She committed that whole fraud scheme for the reasons

13       that we've already discussed.  And she admitted, as Agent

14       Mackey told you, that all of the money in that account -- she

15       admitted to him in the interview -- was from TVU.  And then of

16       course you heard in detail about how the vast majority of that

17       5.6 million was traced directly to the F-1.

18           She knew it, and that's what she spent, and she spent it

19       on herself, rather than on the school.  And the last technical

20       point that counsel made regarding money laundering was that was

21       it in or affecting commerce.  There's a stipulation by the

22       parties that these banks were FDIC insured.  But in addition to

23       that, these transactions, all the money laundering transactions

24       that you heard about and saw the exhibits on, they are

25       commerce.  They're buying property.  They're buying cars.

1   That's what commerce is.

2       As you go back into the jury room, think really

3   carefully.  Defense counsel's absolutely right.  The Government

4   has a burden here beyond a reasonable doubt.  That's a

5   reasonable doubt.  That's not wild speculation.  That's what

6   does the evidence show?  Use your common sense.  What do the

7   documents prove?  What was the witness testimony?  Remember the

8   stipulations' effect.  They were small and technical but they

9   matter for some of these technical elements.  And go through

10  the Court's jury instructions very carefully.  When you put

11  that all together, we ask you to find the defendant guilty

12  beyond a reasonable doubt of all counts.  Thank you.

13      **THE COURT:**  Thank you, Ms. West.

14      Members of the jury, that concludes the evidence in this

15  case and the closing arguments of counsel.  Now what's left is

16  for the jury to retire and deliberate in an attempt to make a

17  decision.  I need to actually swear a bailiff to conduct you to

18  the jury room for that purpose, and the person whom I was

19  hoping to swear just stepped outside, so Mr. Noble is going to

20  get him.

21      Let me take this opportunity to thank you again.  A

22  criminal case in a federal courthouse is a very important

23  thing.  It's very important to the parties and the fair

24  administration of justice; it's important to everybody in the

25  country, and by participating in a jury, you're contributing to

1    that, and so I thank you.

2         What's going to happen now is that I'll ask Mr. Noble to

3    swear Mr. Constantina to act as your bailiff, and then -- well,

4    I'll let that happen and then the other things will happen.

5         **THE CLERK:**  Please raise your right hand.

6         (Bailiff's oath administered.)

7         **THE CLERK:**  Thank you.

8         **THE COURT:**  So I'm going to ask my four alternate jurors

9    to stay behind when the regular jurors are conducted into the

10   deliberation room.  To the jurors, let me say I am going to ask

11   you to make two decisions today; first, to select a foreperson,

12   and then that person will guide you in making your second

13   decision, which is what your deliberation schedule will be

14   tomorrow.  You have been on a trial schedule of 8:30 to 1:30,

15   and the main reason for that is so that I can conduct other

16   court business in the afternoon.  I usually have hearings in

17   the afternoon and that sort of thing.  But now you'll be in the

18   jury room, so if 8:30 is a little too early for you, you can

19   come in a little later.  If you would prefer to work later than

20   1:30, you can do that.

21        Because of staffing considerations, I have to ask you to

22   set the schedule within the hours of 8:30 to 4:30.  And

23   obviously the more hours you commit to the task per day, the

24   more likely it is that you'll finish that task sooner rather

25   than later.  But I also understand that 8:30 to 1:30 has

1    benefits for people in terms of their ability to do their work

2    and connect with their families and that sort of thing.  So

3    this is really the schedule that you, as a group, conclude is

4    the best for you.

5        Once you've sent us a note indicating what the schedule

6    is, signed by a person who indicates they're the foreperson,

7    I'll know you've done your work and you can go on your way and

8    then we'll just look forward to seeing you all tomorrow at the

9    time that you've indicated as a start time.

10       Again, thank you very much.  Oh, and tomorrow we'll send

11   back paper copies of the jury instructions and also the

12   exhibits.  Thank you.

13       **THE CLERK:**  All rise.

14           (Jury excused; in the presence of the alternate

15           jurors.)

16       **THE COURT:**  All right.  Let me say to my alternates:  As

17   I've told you before, the task of an alternate is very

18   important because that means that everybody can know that, no

19   matter what happens, the trial will be completed, and so I

20   appreciate your service so much.  At this point, I'm going to

21   place you on telephone standby.  Will each of you raise your

22   hand if you don't have a cell phone?  Okay.  That's Ms. Fisher.

23   Am I saying that right?  Ms. Fisher, you don't have a cell

24   phone.  Are you near a landline --

25       **ALTERNATE JUROR:**  Yes.

1        **THE COURT:**  -- where you can be contacted, if the need

2    arises?

3        **ALTERNATE JUROR:**  Yes.  And may I interrupt for a second?

4    I do have a cell phone, but I normally have it -- I leave it in

5    the car and it's turned off half the time.  Can I call and give

6    them that alternate number, if they don't reach me on that one?

7        **THE COURT:**  Yes.  And Mr. Noble is the master of all

8    things and he's showing me a piece of paper and will give you a

9    copy of that.  It has everyone's contact information.

10       But I'll just ask you to check in with him on the way out

11   to make sure he has your best information, and if there's

12   back-up information, he should have that also.

13       With that being understood, and that is that -- is any of

14   you more than an hour away from the courthouse?  Okay, no one's

15   raising their hand.

16       Then I'll put you on phone standby, which means that if

17   the need arises for your service as a juror, we'll contact you

18   and have you come into the courthouse.

19       It's important that you continue not to discuss the case

20   with anybody, not accept information or do research on the

21   Internet or do any of the other things that I've prohibited you

22   from doing until either you're discharged from service because

23   you're still serving on this jury as an alternate or you are

24   substituted.  And then, of course, you'll be talking about the

25   case because you'll be deliberating.

1    But unless one of those two things happens, you can't

2    talk about the case.  It's very important.

3        If you would like to know what the verdict in the case

4    is, if the jury reaches a verdict and you're not substituted

5    in, tell Mr. Noble that, and when he contacts you to let you

6    know that the case is concluded, he'll tell you what the

7    verdict is.

8        I might not have a chance to talk to you again, so,

9    again, I can't figure out any way to say it but thank you very

10   much.  I've enjoyed having you very much, but I hope that so

11   far the experience has been a rewarding one.

12       Mr. Noble, is there anything further before court stands

13   in recess?  Thank you.  Court's in recess.

14           **THE CLERK**:  All rise.

15               (Outside the presence of the jurors and alternate

16               jurors.)

17       **THE COURT**:  So we're outside the presence of the jury

18   and the alternates and I was about to step off the bench but I

19   forgot we need to get our note back from the jury so we know

20   what our schedule is during the next day or days.

21       Very well tried on both sides.  Let me say that now,

22   while the jury is deciding it.  And I'm looking forward to

23   having all of the lawyers in this case back in my courtroom on

24   some other occasion.  So thank you for trying this case.

25       So is there anything else that we need to discuss as a

1    group before we get our scheduling information from the jury?

2        MS. WEST:  Only if the Court wanted yet another attempt

3    of assistance on the jury instructions.  And we apologize there

4    were so many modifications that still needed to be made.

5        MR. BABCOCK:  I apologize too.  I should have -- when I

6    looked at them again this weekend I only focused on the

7    substantive --

8        THE COURT:  I will say that I was somewhat surprised by

9    the number of brackets and modifications and that sort of thing

10   that I had to make on the fly.  I think, to the extent that the

11   Government was taking good notes as it went along, that

12   providing -- taking the time overnight to correct those before

13   they were submitted to the jury would be a good thing, and you

14   can just show that to counsel before the set goes to the jury.

15       MR. BABCOCK:  I will just note for the record the Court

16   did have to improvise during the reading, and I don't have any

17   objection to the the improvisations that the Court dealt with.

18       THE COURT:  Thank you.  For the most part, they were

19   intended to simply effectuate what I'm certain was the parties'

20   intent.  On the one occasion that I inserted the word

21   "allegedly," on several occasions it was to protect the

22   defendant.

23       Is there anything else we should talk about before we go

24   off the record and wait for the jury's note?

25       MS. WEST:  I think just to confirm that the Court did

1    receive the modified verdict form and to assure that that is an

2    appropriate form to provide to the jury, or if there's any

3    additional changes that should be made.

4        THE COURT:  Well, I think the best way of making sure of

5    that is for me to hand back to you the form that was printed

6    for me and to tell you that this is the one I intend to give to

7    the jury, and that way you can all assure yourselves that the

8    version that I've received is the one that you've intended to

9    submit.

10       MR. BABCOCK:  And does the Court intend to let the jury

11   deliberate as soon as they're all convened in the back without

12   convening in court first, I assume, or no?

13       THE COURT:  Yes.  Let me solicit some stipulations here.

14   First would be to the procedure that you've just described, and

15   that is to have the jurors convene in the jury room at the

16   beginning of each day, and then, once they have concluded their

17   deliberations for the day -- if it takes more than one day,

18   that they be permitted to leave without convening in open

19   court.

20       MS. WEST:  Stipulated.

21       MR. BABCOCK:  So stipulated.

22       THE COURT:  The second is when the jury asks a question,

23   that unless the Court feels it's advisable to bring the jurors

24   into court to answer the question in open court, that the Court

25   be permitted simply to respond to the written question with a

1  written answer that I send back to the jury after conferring

2  with counsel.

3        MR. BABCOCK:  That's fine, Your Honor.

4        MS. WEST:  That's fine.

5        THE COURT:  Is there anything else that we should take

6  up?

7        MR. BABCOCK:  With the Court's permission, I'm going to

8  run to another courtroom and I'll check back with the clerk

9  about the hours.

10        THE COURT:  I have no objection to that.

11        Dr. Su, I'm going to order you to be here not later --

12  and by "here," I mean physically in the courtroom, not later

13  than 8:30 A.M., unless your lawyer tells you that the schedule

14  is such that we're starting at a later time, in which case

15  you're to be here not later than the time that the jury has

16  selected as its starting deliberation time.

17        Anything else?

18        MR. RHYNE:  I don't believe so, Your Honor.

19        MS. WEST:  No, thank you.

20        THE COURT:  Thank you.

21        MR. BABCOCK:  Thank you, Your Honor.

22        THE CLERK:  All rise.  Court is in recess.

23        (The proceedings were recessed at 2:18 P.M.)

24

25

## CERTIFICATE OF CONTRACT REPORTER

I, Kelly Lee Polvi, certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 26th day of June, 2014.

_____
Kelly Lee Polvi
CA CSR No. 6389
Registered Merit Reporter
Federal Certified Realtime Reporter