1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          BEFORE THE HONORABLE JON S. TIGAR

4   UNITED STATES OF AMERICA,        )
                                     ) Volume 5
5              Plaintiff,            ) Pages 727 - 927
                                     )
6        VS.                         ) NO. 11-00288 JST
                                     )
7   SUSAN XIAO-PING SU,              )
                                     ) San Francisco, California
8              Defendant.            ) Tuesday, March 11, 2014
    _____ ) 8:28 a.m.

9

10          **TRANSCRIPT OF COURT PROCEEDINGS**

11

    **APPEARANCES:**

12

13   **For Plaintiff:**          MELINDA HAAG
                                UNITED STATES ATTORNEY
14                              1301 Clay Street, Suite 340S
                                Oakland, California 94612
15                    BY:   **HARTLEY M.K. WEST, ESQ.**
                            **WADE M. RHYNE, ESQ.**
16                          **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**         Law Offices of Erik G. Babcock
18                              717 Washington Street, Second Floor
                                Oakland, California 94607
19                    BY:   **ERIK G. BABCOCK, ESQ.**
                            **ATTORNEY AT LAW**

20

21

22

23

24

     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                 Official Court Reporter - U.S. District Court
                   Computerized Transcription By Case CATalyst

1                          **I N D E X**

2       Tuesday, March 11, 2014 - Volume 5

3       **GOVERNMENT'S WITNESSES**                        <u>PAGE</u> **VOL.**

4       **MACKEY, JASON (RECALLED)**
        (PREVIOUSLY SWORN)                                731   5
5       Cross-Examination (Resumed) by Mr. Babcock        731   5
        Redirect Examination by Mr. Rhyne                 748   5
6       Recross-Examination by Mr. Babcock                761   5
        Further Redirect Examination by Mr. Rhyne         767   5
7       Further Recross-Examination by Mr. Babcock        771   5

8       **COLE, SCOTT**
        (SWORN)                                           774   5
9       Direct Examination by Ms. West                    774   5
        Cross-Examination by Mr. Babcock                  780   5
10
        **DASA, VISHAL**
11      (SWORN)                                           785   5
        Direct Examination by Mr. Rhyne                   786   5
12      Cross-Examination by Mr. Babcock                  836   5
        Redirect Examination by Mr. Rhyne                 881   5
13      Recross-Examination by Mr. Babcock                882   5

14      **CHALLAGUNDLA, BHANU**
        (SWORN)                                           886   5
15      Direct Examination by Ms. West                    887   5

16                        **E X H I B I T S**

17

18      **GOVERNMENT'S EXHIBITS**                     <u>IDEN</u> <u>EVID</u> **VOL.**

        15                                            903  904  5
19
        19                                            909  909  5
20
        311                                           755  756  5
21
        450                                           874  875  5
22
        477                                           821  822  5
23
        478                                           821  825  5
24
        479                                           798  799  5
25
        480                                           802  803  5

1

## **I N D E X**

2

### **E X H I B I T S**

3

4  **GOVERNMENT'S EXHIBITS**                                    **IDEN** **EVID** **VOL.**

5    520                                                      899  900   5

6    588A                                                     831  831   5

7

**DEFENDANT'S EXHIBITS**                                    **IDEN** **EVID** **VOL.**

8    1004                                                     742       5

9    1005                                                     742       5

10   1006                                                     764       5

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>Tuesday, March 11, 2014</u>                                    <u>8:28 a.m.</u> |
| 2 | ---oOo--- |
| 3 | (Proceedings were heard out of the presence of the jury:) |
| 4 | THE COURT:  We're on the record.  Counsel and the |
| 5 | defendant are at counsel table. |
| 6 | I understand that the parties want to address something |
| 7 | outside the presence of the jury.  We are outside the presence |
| 8 | of the jury. |
| 9 | MS. WEST:  Thank you, your Honor. |
| 10 | I am wondering if the Court would consider changing the |
| 11 | practice at sidebar to have the court reporter move over so |
| 12 | that the sidebars can be held still on the record just for |
| 13 | appellate purposes. |
| 14 | I think it does create for a cleaner record, and there |
| 15 | haven't been any issues that I've been concerned about so far, |
| 16 | but just -- one never knows moving forward, and in the event |
| 17 | that this case does come up on appeal, it would be nice just to |
| 18 | have a verbatim record of what transpires at the sidebar. |
| 19 | THE COURT:  That request is granted.  I don't need to |
| 20 | hear from the defendant because I grant that request whenever |
| 21 | it's made, and so I'll have to have an off-the-record |
| 22 | discussion with the court reporter about the logistics of that, |
| 23 | but we have not had so many sidebars in this case. |
| 24 | MR. RHYNE:  No. |
| 25 | MR. BABCOCK:  Right. |

1          THE COURT:  But that -- it will be the Court's

2     practice that -- that any sidebars are on the record in this

3     court.

4          MS. WEST:  Thank you, your Honor.

5          THE COURT:  Is there anything else we should talk

6     about before the jurors come in?

7          MR. BABCOCK:  No.

8          MS. WEST:  No.

9          THE COURT:  All right.  Thank you.

10     (Proceedings were heard in the presence of the jury:)

11          THE COURT:  Good morning.  The jurors are in their

12     assigned seats.  Everybody was very punctual today, which I

13     appreciate.

14     When we broke yesterday, Agent Mackey was on the stand.

15     He's still on the stand.

16     Mr. Babcock, your witness.

17          MR. BABCOCK:  Thank you, your Honor.

18     Good morning, ladies and gentlemen.

19                              **JASON MACKEY,**

20     Called as a witness by the Government, having previously been

21     sworn, resumed the stand and testified further as follows:

22                         **CROSS-EXAMINATION (RESUMED)**

23     BY MR. BABCOCK:

24     Q.  Good morning, Agent Mackey.

25     A.  Good morning, sir.

1    Q.  One of the things you said you noticed when you started

2    looking into TVU was the number of the students that were --

3    had the same address in Sunnyvale?

4    A.  Yes.

5    Q.  Which you noted to be what you thought was an unusually

6    large percentage of the student body?

7    A.  Yes.

8    Q.  Did you ever or did any of your -- anyone else in your

9    office ever contact the school and ask Ms. Su why -- why so

10    many -- before -- before you interviewed her on January 19th,

11    2011, did you ever try to contact Ms. Su -- Dr. Su and ask her

12    why so many students had the same address in SEVIS?

13    A.  No, I did not.

14    Q.  Did you -- did anyone else from your -- any of the

15    colleagues that were also involved in the investigation contact

16    her and make such a request?

17    A.  Not that I'm aware of.

18    Q.  Okay.  You would probably know; right?

19    A.  Probably.

20    Q.  You -- the regulation that requires the school to maintain

21    addresses for the students is 8 Code of Federal Regulations

22    214.3?

23    A.  It's in there, yes.

24    Q.  That's the regulation that governs most of the issues

25    regarding what schools have to do with SEVIS; right?

1    A.   Sure.  Yes.

2    Q.   And you're familiar with that regulation, I assume?

3    A.   I'm familiar with it, yes.

4    Q.   You -- you were trained to enforce it; right?

5    A.   Well, I don't know it backwards and forwards right now.

6    I'd have to refer to it for details.

7    Q.   I'm not going to ask you to quote it.  As we've heard, it

8    is lengthy, but you're familiar with the provisions of what it

9    requires?

10   A.   Yes.

11   Q.   Okay.  Isn't it true that the regulation -- that the

12   regulation says that if a student has different mailing and

13   physical addresses, that the school is required to maintain

14   both of those addresses?

15   A.   Yes.

16   Q.   And on request by the Department of Homeland Security, the

17   school has to provide the physical address?

18   A.   Yes.  That would be separate from what's in the report in

19   SEVIS, but yes.

20   Q.   But there is a provision in the code -- in the law that if

21   a student has a different mailing and physical address, the --

22   Homeland Security can request the school to provide the

23   physical address?

24   A.   Yes.

25   Q.   And that request was never made in this case?

1    A.   No, it was not.

2    Q.   The -- you have dealt with -- as part of your investigation

3    here, you've been involved in getting witnesses together

4    against Ms. Su -- Dr. Su?

5    A.   We've interviewed witnesses, yes.

6    Q.   You've interviewed witnesses -- you interviewed witnesses

7    with an eye to -- towards finding people that would be

8    witnesses against Dr. Su; right?

9    A.   No, I wouldn't say that's true.

10   Q.   Well, you certainly have discussed with your colleagues

11   which witnesses you would prefer to call or who would be good

12   witnesses, have you not?

13   A.   I would say we interviewed everybody that we could, and

14   then the prosecution made a choice as to which of those

15   witnesses would be selected for our case.

16   Q.   The prosecution made a choice without your input?

17   A.   They would read my reports.

18   Q.   Well, before I leave that topic, I'm reminded the school is

19   required -- required to report an address in SEVIS for the

20   student --

21   A.   Yes.

22   Q.   -- right?

23        And if -- okay.  Getting back to where I left off -- I'm

24   sorry -- is it your position that you didn't have any input

25   into who would be your -- who would be witnesses in this case?

1    A.   Obviously, we had discussions as to who had what

2    information, but as far as the prosecution's strategy and what

3    they're looking for, that's not up to me.

4    Q.   Well -- but did you make recommendations?

5    A.   If I was asked if anybody had any particular information or

6    particular experience, I provided that information.

7    Q.   Well, did you not make a recommendation to Mr. Rhyne and

8    Ms. West on October of 2012 about a witness you said would be,

9    quote, "extremely effective," unquote?  I'm not going to ask

10   you to pull that out of thin air.  I'm going to show you an

11   e-mail and ask you if you recognize that.

12   A.   I do.

13   Q.   That was an e-mail from you to the prosecutors in this case

14   in October 2012?

15   A.   Yes.

16   Q.   Where you mentioned some discussions about a student

17   witness that you said would -- you believed would be extremely

18   effective?

19   A.   Yes.

20   Q.   Extremely effective in what?

21   A.   I believe she had pieces to the puzzle of this case that

22   the prosecution might be interested in being aware of.

23   Q.   Extremely effective as a witness against Dr. Su; right?

24   That's the whole point of this prosecution?

25   A.   Sure.  Sure.

1    Q.   Ms. Su has been charged with 30-some felonies; right?

2    You've recommended that she be prosecuted; right?

3    A.   I presented the case for prosecution, yes.

4    Q.   You spent months investigating this case, brought it to the

5    U.S. Attorney's Office, and recommended that Dr. Su be

6    prosecuted?

7    A.   I presented the case for prosecution.  I present many

8    cases, many of which are not accepted.

9    Q.   Was there ever any -- was there ever any question in your

10   mind that Dr. Su would be prosecuted?

11   A.   Yes, absolutely.

12   Q.   You didn't -- you didn't reach out to her at the beginning

13   of your investigation informally and say, you know, "We have

14   some people who have made some allegations, and we'd just like

15   to talk to you informally and find out what's going on," did

16   you?

17   A.   The allegations were pretty egregious at that point.  So we

18   don't typically approach subjects in investigations when the

19   allegations are that egregious.

20   Q.   So the answer is you did not approach her informally;

21   right?

22   A.   No.

23   Q.   You didn't give her any chance to explain before you tried

24   to set her up and trick her into committing some more crimes;

25   right?

MACKEY - CROSS (RESUMED) / BABCOCK

1    A.   I wouldn't characterize it that way, no.

2    Q.   You wouldn't characterize the trickery that way or --

3    A.   We used ruses and undercover operations and other

4    investigative tools, yes.

5    Q.   Other investigative tools to try to trick her into

6    committing a crime?

7    A.   She made her own choice.

8    Q.   I understand, but those -- were under ruses and false

9    pretenses; right?

10   A.   A ruse is also an opportunity for a subject to vindicate

11   themselves or not commit a crime.

12   Q.   As part of -- excuse me.  You -- as part of this

13   investigation, you have worked with cooperating witnesses --

14   A.   Yes.

15   Q.   -- right?

16        One of which I expect we're going to hear from later today?

17   A.   Perhaps.

18   Q.   That's Vishal Dasa.

19        Mr. Dasa was arrested by immigration and then agreed to

20   cooperate against Dr. Su --

21   A.   Yes.

22   Q.   -- isn't that right?

23   A.   Yes.

24   Q.   And he was given certain immigration benefits while he's

25   been cooperating against Dr. Su?

1    A.   He's been given -- he's been given no immigration benefits.

2    He was placed on deferred action, which is not a status.  It's

3    a discretion from the agency that temporarily allows him to

4    stay in the country, even though he's subject to deportation,

5    for a specific period of time just for the specific purposes of

6    this investigation.

7    Q.   He wasn't deported because he was helping you; right?

8    A.   He may still very well be deported.

9    Q.   I understand, but this was -- he was arrested what, over

10   three years ago; right?

11   A.   Yes.

12   Q.   Coming up on three and a half years ago?

13   A.   It's not a practice to deport witnesses in a criminal

14   investigation.  We extend the offer to both the prosecution and

15   the defense.

16   Q.   So you would extend the offer to keep witnesses here for

17   the defense?

18   A.   Absolutely.

19   Q.   That's news to me.

20        So Mr. Dasa was given the benefit.  He wasn't deported?

21   A.   It's not a benefit in my opinion, and according to the

22   readings of the regulations in the INA, it's -- the individuals

23   are literally given a letter saying, "You're deportable, but

24   for this one-year period, it's subject to extensions.  You will

25   not be deported in exchange for" -- they're providing

1    information and testimony in the case.

2    Q.   You can't seriously tell this jury that you think telling

3    Mr. Dasa he's not going to be deported while he cooperates

4    against Dr. Su is not a benefit in his eyes?

5    A.   I can't speak to his perceptions, but he's not been given a

6    green card.  He's not been given a new visa.  He's --

7    Q.   Well, why --

8    A.   -- in the same status he previously was.

9    Q.   I understand.  He can still be deported if he decides not

10   to testify against Dr. Su; right?

11   A.   Yes.

12   Q.   He could be deported even if he does testify against

13   Dr. Su?

14   A.   Yes.

15   Q.   You haven't promised him one way or another what's going to

16   happen?

17   A.   Frankly, I don't have the authority to give anybody an

18   immigration benefit or status.  That's -- those are given out

19   by a different agency.

20   Q.   Well, you have the authority to make recommendations, do

21   you not?

22   A.   No.  That would be outside the scope of my employment.

23   Q.   Well, didn't you, in fact, make a recommendation for

24   Mr. Dasa in April of 2011 that he be given -- that -- he was in

25   Immigration Court proceedings?

1    A.  Yes, he was.

2    Q.  Because he was deportable at the time?

3    A.  Yes.

4    Q.  Didn't you recognize -- recommend the Immigration Court

5    proceedings be administratively closed so that he can stay

6    here?

7    A.  Our office made sure we closed his case pending the outcome

8    of this investigation.  It's subject to being reopened.

9    Q.  You did make that recommendation?

10   A.  Our office did --

11   Q.  Well --

12   A.  -- and I was involved in the discussions on that, yes.

13   Q.  Your name was on the memo; right?

14   A.  It might have been.

15   Q.  The memo was actually from you to the Deputy Chief Counsel.

16   This is a memo from April 18th, 2011?

17   A.  Yes.  My mistake.  I thought my supervisor initiated that.

18   Q.  You initiated it; right?

19   A.  Yes.  Yes, I did.

20   Q.  And you recommended that the Immigration Court proceedings

21   against Mr. Dasa be closed so that he could stay here?

22   A.  Without prejudice.  We could reopen it.

23   Q.  I understand.  You're reserving the right to deport him

24   later if you choose to; right?  Your agency is -- sorry -- not

25   you personally.

1    A.   Yes.

2    Q.   And that's true of other witness -- witnesses in this case

3    as well?

4    A.   Yes.

5    Q.   How many cooperating witnesses does your office have that

6    are in this -- what did you call it? -- deferred action status

7    while this case is going on?

8    A.   I don't know the exact number.  The number has shrunk over

9    the last couple of years because they've independently applied

10   for -- many have applied independently for reinstatement or

11   have left the country and come back on a new status.

12   Q.   Okay.  Well --

13         THE COURT:  Mr. Babcock, just a minute.  For the

14   record, is it accurate that the last two documents shown to

15   this witness are Exhibits 1004 and 1005?

16         MR. BABCOCK:  I'm sorry, your Honor.  We can number

17   them however -- yes, 1004 would be this one.

18         THE COURT:  Very good.

19      Members of the jury, I don't know whether those documents

20   are coming into evidence, but it's important that we have a

21   clear record of everything the witness sees, whether or not

22   it's ultimately admitted for your consideration.

23         MR. BABCOCK:  Just to make it clear, the first

24   document I showed him is 1004, which is the e-mail, and the

25   second one is 1005, which is the memo from April 18th, 2011.

1           THE COURT:  Thank you.

2       (Defendant's Exhibits 1004 and 1005 marked for

3   identification.)

4   BY MR. BABCOCK:

5   Q.  How many potential witnesses did your agency offer

6   deferred -- deferred action or have a deferred action, say, in

7   2011?

8   A.  I don't know the exact figure.  I mean, it would be dozens

9   at least.

10  Q.  40-something, 50-something, or more like a hundred?

11  A.  Probably not a hundred, maybe 30, 40.  I honestly don't

12  know.  I didn't initiate most of the deferred actions.

13  Q.  Okay.  I'd like to move to a slightly different topic,

14  which has to do with your interview of Dr. Su on January 19th,

15  2011.

16      That interview started before 6:30 in the morning?

17  A.  Yes.

18  Q.  And didn't finish up until almost 1:00 in the afternoon?

19  A.  Approximately.

20  Q.  I assume this interview was recorded.

21  A.  It was not.

22  Q.  Don't you typically record interviews with witnesses?

23  A.  No, we do not.

24  Q.  So you didn't write a report of your interview until what,

25  almost two weeks later?

1    A.   I believe I began a report probably the next day in a Word

2    document, and it didn't get approved until, I believe, ten days

3    later.

4    Q.   Around the 28th; right?

5    A.   Yes.

6    Q.   And one of the things you talked to her about were these

7    articulation agreements?

8    A.   Yes.

9    Q.   That we've already heard quite a bit about in this trial?

10   A.   Yes.

11   Q.   The three that were -- one from San Francisco State, one

12   from the University of Central Florida.  And in relation to the

13   San Francisco State one, she said that she wrote it?

14   A.   Yes.

15   Q.   And that she provided it to San Francisco State, and then

16   there was -- there was an amendment; right?

17   A.   Yes.

18   Q.   Is that what you testified to yesterday?

19   A.   That is correct.  I recall that.

20   Q.   And if I heard you right yesterday, you said that after it

21   was amended, my client said that she sent it to Dr. Liou, and

22   he faxed it back to her?

23   A.   Yes.

24   Q.   Is that what she told you?

25   A.   Yes, it is.

1    Q.  Isn't it true what she actually told you was that she

2    thought that another professor, Professor Hu, had reviewed it

3    first and approved it before Dr. Liou signed it?

4    A.  I believe she indicated the first generation of the

5    document had gone through Mr. Hu for review or that she

6    believed that it had.

7    Q.  But not the second one?

8    A.  I don't believe we talked about the second one.

9    Q.  Well --

10           MR. BABCOCK:  I was just going to ask him to refresh

11   his recollection with this report, your Honor, if I might.

12           THE COURT:  All right.

13   BY MR. BABCOCK:

14   Q.  Does that refresh your recollection?

15   A.  Yes.

16   Q.  Isn't it true that she said that she thought Professor Hu

17   had reviewed the amended version before Dr. Liou signed it?

18   A.  Yes, that's true.  I recall now.

19   Q.  Okay.  You also spoke to Dr. Su about the -- the list of

20   professors that were identified in the -- that accompanied the

21   I-17 petition?

22   A.  Yes.

23   Q.  And you asked her about the -- how many of them had

24   actually taught -- ended up teaching classes at TVU?

25   A.  Yes.

1    Q.   And I think you -- I don't have my notes in front of me,

2    but I think you said she had indicated that three -- was it

3    three?

4    A.   Yes.

5    Q.   And that the rest had not; is that right?

6    A.   That's what she told us, yes.

7    Q.   Okay.  Do you remember how many professors -- how many

8    different people were listed as potential faculty?

9    A.   22.

10   Q.   Okay.  As part of the I-17 application process, one of the

11   things that's required is some sort of information at least for

12   unaccredited schools -- information about what kind of people

13   are going to be available to teach --

14   A.   Yes.

15   Q.   -- at the school?

16   A.   Yes.

17   Q.   And that is -- actually, "available" is the word that's

18   used at least in the informational material.  Do you remember

19   that?

20   A.   In which informational material are you referring to?

21   Q.   Fair enough.  We -- let's use the same material that Dr. Su

22   used.  I'm referring to Exhibit 320A.

23        320, if you don't remember, was one of the documents we

24   reviewed yesterday.  It was the e-mails with Bjorn Frogner with

25   the attachments?

1    A.   Yes.

2    Q.   Do you recall those?

3    A.   I do.

4    Q.   And this was a discussion it appeared Dr. Su was having

5    with Mr. Frogner looking for schools that would recognize

6    credits from TVU?

7    A.   Yes.

8    Q.   And put that recognition in the form of some sort of

9    articulation agreement?

10   A.   Yes.

11   Q.   And one of the documents that you found was an attachment.

12   We actually reviewed it a little yesterday.  This is -- this is

13   one of -- Attachment A, which is Page 5 to Exhibit 320A, is one

14   of the things that can be found on the -- on the status

15   website; right?

16   A.   At least one -- at least at one point it was.  I don't know

17   if it is there still.

18   Q.   But back in 2008, there were -- there were materials on the

19   website for people that were filling out I-17's and trying to

20   figure out how to get their schools approved; right?

21   A.   Yes.

22   Q.   And this was one of the -- this was one of the -- one of

23   the materials?

24   A.   Yes.

25   Q.   Probably under, like, a Frequently Asked Questions type of

1    thing; right?

2    A.   Perhaps.

3    Q.   And this is -- this -- on Page 6, this is the section that

4    you reviewed both with Mr. Rhyne yesterday as well as with me a

5    little bit, and the top box is -- is the general area category

6    that would pertain to TVU; right?

7    A.   Yes.

8    Q.   Because -- because it was not an accredited school?

9    A.   Well, it's a summary to help an applicant understand the

10   regulations.

11   Q.   Exactly.  And it doesn't actually say anything about --

12   strike that.

13        Looking at the second-to-last bullet point in that top box,

14   it says to provide a witness statement containing information

15   on educational, vocational, or professional qualifications of

16   teaching staff by name, salaries, teacher's attendance and

17   scholastic policy, amount and character of supervisory and

18   consultative services available to students and trainees;

19   right?

20   A.   Yes, I see that.

21   Q.   That was -- that was an exact quote, just -- what I just

22   read; right?

23   A.   Yes.

24   Q.   It says, "The available" --

25   A.   Supposed to be -- depending on how you define "available."

1     If there are no instructors there, you can argue that they're

2     available because they're listed on a form.

3     Q.  Well, as you know in 2008, the school was really just

4     getting started?

5     A.  Yes, it was.

6     Q.  Isn't that fair to say?

7     A.  Yes.

8     Q.  She didn't have a large staff yet?

9     A.  Yes.

10    Q.  She had been talking to people to see if they would be

11    interested in teaching in the future --

12    A.  Yes.

13    Q.  -- right?

14    A.  Yes.

15    Q.  Because you know from your investigation --

16          MR. BABCOCK:  That's all I have right now, your

17    Honor.  Thank you.

18          THE COURT:  All right.  Thank you.

19       Mr. Rhyne, redirect?

20                     **REDIRECT EXAMINATION**

21    BY MR. RHYNE:

22    Q.  Agent Mackey, I want to follow up on a few questions that

23    Mr. Babcock asked you on cross-examination.

24       The first thing I want to ask you about is surveillance

25    that you conducted at Tri-Valley University's campus.  There

1    were instances in this case where you were conducting

2    surveillance; is that correct?

3    A.   Yes.

4    Q.   What were you looking for during these surveillances?

5    A.   I was looking for Ms. Su.  I was looking for DSO's,

6    instructors, students.

7    Q.   Did you know what the DSO's looked like at that point?

8    A.   I did.

9    Q.   How did you know what they looked like?

10   A.   I reviewed their driver's license photos from the DMV

11   address.

12   Q.   Did you ever see either of the DSO's, Sophie Su or Vince

13   Wang, come and go from Tri-Valley University?

14   A.   Only once in connection with the site visit in December.

15   Q.   Okay.  And that was the site visit on December 1st; is that

16   correct?

17   A.   Yes.

18   Q.   And that was the site visit that you and Special Agent

19   Taylor set up in an undercover capacity; is that correct?

20   A.   Yes.

21   Q.   And during that interview -- or during that site visit, you

22   had an opportunity to talk to Dr. Su?

23   A.   Yes.

24   Q.   And Dr. Su had an opportunity to tell you about the school;

25   is that correct?

1    A.   Yes.

2    Q.   And she told you things during that site visit; is that

3    correct?

4    A.   She did.

5    Q.   And those were some of those things you were able to later

6    confirm to be not true; is that correct?

7    A.   Certainly.

8    Q.   She also had an opportunity to talk to you and tell you the

9    truth about the school when you interviewed her on

10   January 19th, 2011?

11   A.   Yes.

12   Q.   Yesterday, Mr. Babcock asked you about whether you were

13   aware if Dr. Su had any formal training on the regulations in

14   this case.  Do you remember that?

15   A.   Yes.

16   Q.   You reviewed evidence in this case where Dr. Su swore that

17   she had reviewed these regulations; is that correct?

18   A.   In several places, yes.

19          MR. RHYNE:  Okay.  Can we publish Exhibit 1, Page 5,

20   please.

21       Can we zoom in on this paragraph here?

22   BY MR. RHYNE:

23   Q.   This is part of the initial I-17; is that correct?

24   A.   Yes.

25   Q.   And here it states, "I, the undersigned, have read the

1    Immigration and Naturalization Services' regulations relating

2    to nonimmigrant students, namely the number of CFR's, the

3    services, regulations related to change of nonimmigrant

4    classification for students" -- again, a cite to a

5    regulation -- "the services' regulations relating to school

6    approval and withdrawal of school approval" -- again, a cite to

7    regulations -- "and intent to comply with these regulations at

8    all times"; is that correct?

9    A.   Yes.

10           MR. RHYNE:  Can we go to the next page of this

11   exhibit, and can we go to this paragraph, please.

12       Actually, let's go down -- capture the signature as well,

13   please.

14   BY MR. RHYNE:

15   Q.   This is the next page of the I-17; is that correct?

16   A.   Yes.

17   Q.   And here we have Dr. Su again signing, "I, the undersigned,

18   president, owner, or head of the school or school assistant,"

19   name below, "certify that the above individuals are designated

20   school officials of the school or school system.  I further

21   certify that I will be responsible for providing the resources

22   and training necessary for these officials to implement

23   properly the above referenced" -- "referenced regulations"; is

24   that correct?

25   A.   Yes.

1    Q.   And Dr. Su submitted a supplemental I-17; is that correct?

2    A.   She did.

3    Q.   And you heard testimony about that in this case?

4    A.   Yes.

5    Q.   And these two pages are also in that document as well?

6    A.   Yes.

7    Q.   So she's represented at least two more times that she's

8    familiar with these regulations; is that correct?

9    A.   Yes.

10         MR. RHYNE:  Can we go to Exhibit 3, Page 10, please,

11   and can we zoom into the top paragraph there.

12         MR. BABCOCK:  Of which number, please.

13         MR. RHYNE:  Exhibit 3, Page 10.

14         MR. BABCOCK:  Thank you.

15   BY MR. RHYNE:

16   Q.   This is part of the supplemental I-17; is that correct?

17   A.   Yes, it is.

18   Q.   And we have another instance here where there's reference

19   to the regulations; is that correct?

20   A.   Yes.

21   Q.   And this is Susan Su representing to the Department of

22   Homeland Security, quote, "This letter is to state that all

23   three P/DSO at Tri-Valley University -- Susan Su, Sophie Su,

24   and Wenchao Vince Wang -- have read, understood, and will

25   comply with all federal regulations relating to nonimmigrant

1     students.  Each P/DSO also has taken the DSO web-based training

2     program."

3          Is that correct?

4     A.  Yes.

5              MR. RHYNE:  You can take that down.

6          Thank you.

7     BY MR. RHYNE:

8     Q.  Yesterday, Mr. Babcock asked you about whether you believed

9     that Tri-Valley University had the ability to pay its

10    professors.  Do you remember that?

11    A.  Yes.

12    Q.  And you said it depended on what you paid them; correct?

13    A.  I believe you have that in reverse, but --

14    Q.  Okay.

15    A.  -- the discussion happened.

16    Q.  You knew from the I-17 what Dr. Su was purportedly paying

17    these professors; is that correct?

18    A.  She provided information about that, yes.

19    Q.  That's because one of the columns for the courses that are

20    being taught states what they're being paid per hour; is that

21    correct?

22    A.  Yes.

23    Q.  And that included also the list of classes that each

24    professor was going to take?

25    A.  Correct.

1    Q.   Now, with respect to these classes and these professors,

2    those classes were also listed in Tri-Valley University's

3    course handbook; is that correct?

4    A.   Yes.

5    Q.   And that course handbook was also submitted as part of the

6    initial I-17 as classes at Tri-Valley University; is that

7    correct?

8    A.   It was.

9    Q.   Having reviewed the I-17 to include its attachments, the

10   course handbook, is there anywhere in there where Dr. Su says,

11   "This class isn't being held, but it's going to be held"?

12   A.   No.

13   Q.   Mr. Babcock also asked you about searching for witnesses

14   and interviewing witnesses in this case, and you stated that it

15   was close to a thousand witnesses, was your guess, that had

16   been interviewed; is that correct?

17   A.   We made an effort to interview every witness in this case.

18   Obviously, we had difficulty locating many because of the

19   addresses being reported to us.

20   Q.   What addresses were you relying on to find those students?

21   A.   The addresses input into SEVIS was the first place we

22   looked.

23   Q.   In a case like this, what are some of the other challenges

24   in locating witnesses?

25   A.   Many of the witnesses -- typically, the witnesses in this

1    case are drawn towards jobs, and they'll move from state to

2    state to state to follow jobs.  They don't stay in one

3    particular place for a long period of time.  So it can be

4    difficult tracking them down.

5    Q.   Mr. Babcock also asked you about the duration of some of

6    the deferred action in this case, namely with respect to Vishal

7    Dasa.  I want to follow up on that, and I want to ask you a

8    very narrow question.

9         The deferred action and the length of it is directly

10   related to when this trial takes place; is that correct?

11   A.   Yes, that's correct.

12   Q.   Yesterday, Mr. Babcock also asked you about the e-mail that

13   I showed you on direct where there's discussion between Dr. Su

14   and an individual about buying a degree without taking classes.

15   Do you remember that?

16   A.   Yes, I do.

17   Q.   Mr. Babcock pointed out in Exhibit 305 that Dr. Su in one

18   of her responses says, "He will be responsible to study these

19   materials at his own pace, maybe pass a test."  Do you remember

20   that?

21   A.   I do.

22   Q.   I want to follow up on -- on some of that and show you

23   Exhibit 311.

24        (Government's Exhibit 311 marked for identification.)

25             MR. RHYNE:  Your Honor, may I approach?

1              THE COURT:  You may.

2     BY MR. RHYNE:

3     Q.   Handing you 311 for identification, I'll have you take a

4     look at it.

5              Do you recognize that e-mail?

6     A.   I do.

7     Q.   Where did you find it?

8     A.   It was located -- located on a hard drive found in Susan

9     Su's office during our search warrants.

10    Q.   Does it look now like it looked when you found it?

11    A.   Yes, it does.

12             MR. RHYNE:  Your Honor, we'd offer Exhibit 311 into

13    evidence.

14             THE COURT:  Any objection?

15             MR. BABCOCK:  No objection, your Honor.

16             THE COURT:  Exhibit 311 is admitted.

17             (Government's Exhibit 311 received in evidence.)

18             MR. RHYNE:  Can we publish Exhibit 311, please, and

19    could we start on Page 2.

20    BY MR. RHYNE:

21    Q.   Agent Mackey, I want to direct you to the bottom portion of

22    this e-mail and then ask you questions as we move up the

23    document.

24             MR. RHYNE:  Can we start with "Hello, Dr. Susan Su"

25    and go down to "Bob"?

1    BY MR. RHYNE:

2    Q.   Agent Mackey, this is part of that same e-mail chain that

3    you testified about yesterday; correct?

4    A.   Yes, it is.

5    Q.   And this is where there's a request to buy a degree and

6    transcripts without taking classes; correct?

7    A.   Yes.

8    Q.   And then there's a response from Dr. Su where she's

9    providing those transcripts and that degree as requested;

10   correct?

11   A.   I recall, yes.

12   Q.   And then that student is later referenced on Tri-Valley

13   University's website as one of the students that she's

14   highlighting; is that correct?

15   A.   Yes.

16   Q.   Okay.  I want to direct your attention to this e-mail.  It

17   states, "Hello, Dr. Susan Su.  Here are the credit card details

18   from my uncle.  He cancelled his check because of some personal

19   reasons."  Do you see that?

20   A.   Yes.

21   Q.   Then there's a credit card number?

22   A.   Yes.

23   Q.   And down below, it says, "Amount Charged:  $3,600."  Do you

24   see that?

25   A.   I do.

1          MR. RHYNE:  Okay.  I want to go up now to the next

2     portion of the e-mail also on Page 2, top of the page, just the

3     very top down to "Bob."

4          I'm sorry.  Down right there.

5     BY MR. RHYNE:

6     Q.   And this is a response from ssu@trivalleyuniversity.org;

7     correct?

8     A.   Yes.

9     Q.   Saying, "Bob, did you find out why?  Susan"; correct?

10    A.   Yes.

11         MR. RHYNE:  Okay.  Can we go to the bottom of Page 1,

12    and can we start with "On Wednesday, April 15th, 2009," and go

13    down to the bottom of the page, a little bit from there?

14    "Wednesday, April 15th, 2009."

15         Thank you.

16    BY MR. RHYNE:

17    Q.   This is the next portion of the e-mail chain; correct?

18    A.   Yes.

19    Q.   And this is Bhargav replying, "Hello, Dr. Susan Su.  The

20    amount has been updated yesterday night.  It is okay to scratch

21    the credit card now.  It will pass through.  Our actual charge

22    is $3,000, but I've asked my uncle to give me $600 for my

23    pocket money.  So he added the amount, and now the whole amount

24    has been updated.  We can charge his card."

25         And then there's credit card details; correct?

1    A.   Yes.

2    Q.   Again, with a $3,600 total amount?

3    A.   Yes.

4         MR. RHYNE:  Can we go up to the next portion of this

5    e-mail?  It's short, and it begins with "Hello, Dr. Susan Su"

6    and then ends with "Bob" and a phone number, it looks like.

7    BY MR. RHYNE:

8    Q.   And do you recognize this portion of the e-mail?

9    A.   I do.

10   Q.   And what do we see here?

11   A.   Susan Su appears to be attaching a receipt for the

12   transcript and degrees.

13   Q.   And there's a phone number at the bottom; is that correct?

14   A.   Yes.

15   Q.   Do you recognize that number?

16   A.   I do.

17   Q.   How do you recognize it?

18   A.   This was a Tri-Valley student.  I actually contacted him on

19   this phone number.

20        MR. RHYNE:  Okay.  Can we go up to the top of the

21   e-mail from the very top down to "Susan," please.

22   BY MR. RHYNE:

23   Q.   Here we have Dr. Su's response; is that correct?

24   A.   Yes.

25   Q.   Stating, "This time, it went through.  See the attached

1    receipt."  Do you see that?

2    A.   Yes.

3    Q.   "Let me know when you can come to have his original diploma

4    and transcripts"; correct?

5    A.   Yes.

6    Q.   And then she signs the e-mail; is that correct?

7    A.   Yes.

8    Q.   Okay.  Can we go now -- let me ask you this:  Was there an

9    attachment to this e-mail when you found it?

10   A.   Yes, there was.

11          MR. RHYNE:  Can we go to Page 4 of Exhibit 311?

12   BY MR. RHYNE:

13   Q.   Do you recognize this attachment?

14   A.   I do.

15   Q.   What is it?

16   A.   It's a credit card receipt for -- it appears to be related

17   to this e-mail chain for the purchase of the transcripts and

18   degree.

19   Q.   Did you use this piece of evidence in your financial

20   analysis that you're going to talk about later?

21   A.   I did.

22   Q.   Can you just generally tell the jury how you used something

23   like this?

24   A.   During our search warrants, we found thousands of credit

25   card receipts strewn about the business, and I went through the

1    process of matching up the credit card receipts with invoices

2    created at Tri-Valley University to identify F-1 foreign

3    students that their payments were being made for, and then I

4    matched up the names -- the invoices with the records in the

5    SEVIS database to confirm that -- whether or not payment was

6    being made for an F-1 student or not.

7    Q.   I want to follow up generally on this concept of

8    "taking" -- "taking class, maybe passing a test, after you're

9    granted a degree," and I forgot to ask you this yesterday.  You

10   have a degree; is that correct?

11   A.   I do.

12   Q.   Where is it from?

13   A.   UC Berkeley.

14   Q.   Did you get that before or after you took your classes and

15   passed your tests?

16   A.   After.

17            MR. RHYNE:  No further questions, your Honor.

18            THE COURT:  Thank you, Mr. Rhyne.

19       Mr. Babcock, recross?

20                    **RECROSS-EXAMINATION**

21   BY MR. BABCOCK:

22   Q.   You -- the -- you got a degree at Cal?

23   A.   I did.

24   Q.   If you missed a class, did the school call you and say

25   where were you?

1    A.   Of course not.

2    Q.   No.  It's not grade school; right?

3    A.   Correct.

4    Q.   It was college?

5    A.   Yes.

6    Q.   You were in charge -- it was your decision whether to go to

7    classes or not; right?

8    A.   Yes.

9    Q.   The school didn't force you; right?

10   A.   Correct.

11   Q.   The school didn't check up on you each day?

12   A.   Correct.

13   Q.   This is your -- Mr. Rhyne was just showing you that e-mail

14   chain in Exhibit 311 between Bhargav Rao and -- it says from

15   Dr. Susan Su; right?

16   A.   Yes.

17   Q.   The e-mail address associated with that was

18   ssu@trivalleyuniversity.org?

19   A.   Yes.  Yes.

20   Q.   You are aware from your investigation that Dr. Su was not

21   the only person that used that e-mail?

22   A.   I am aware.

23   Q.   In particular, Mr. Dasa used it sometimes; right?

24   A.   My understanding is he never signed Susan Su's name on

25   those e-mails.

1    Q.   That's what he told you; right?

2    A.   Yes.  Yes.

3    Q.   Okay.  But he did admit to using this e-mail account?

4    A.   Yes.

5    Q.   Okay.  The -- the I-17 -- the I-17 itself, the actual

6    petition, did not say that TVU had 22 professors, did it?

7    A.   No, I believe it did not.

8    Q.   And actually, the petition doesn't ask for professors.  It

9    asks in Box 22 for an average number of teachers or

10   instructors?

11   A.   Yes.

12   Q.   And the I-17, if you recall -- I can show you if you don't.

13   The I-17 that Dr. -- Dr. Su submitted -- next to the -- in

14   Box 22 for "Teachers and Instructors," it said, "9"?

15   A.   That sounds about right.

16   Q.   It -- just give me one second.

17        This is Page 3 from Exhibit 1.  I'm looking at Box 22.

18   There's some different information requested there.  The 9 is

19   extremely small, but next to the "Teachers and Instructors," it

20   looks like a 9; right?

21   A.   Yes, it does.

22   Q.   Certainly doesn't look like a 22?

23   A.   No.

24   Q.   Did anybody at SEVIS follow up with Dr. Su and noticed that

25   there were more names -- more than nine names listed as

1    possible -- as being available to students?

2    A.   Not that I'm aware.

3    Q.   Can you tell me where in that Code of Federal Regulation it

4    says that school -- that foreign students cannot take online or

5    virtual classes?

6    A.   If you showed me the regulations, I can probably find it.

7            MR. BABCOCK:  Maybe I should mark this by now.  This

8    will be what, 2 -- or 1000?

9            THE CLERK:  -6.

10           MR. BABCOCK:  -6.

11   (Defendant's Exhibit 1006 marked for identification.)

12           THE WITNESS:  It's actually 214.2.

13   BY MR. BABCOCK:

14   Q.   214.2.

15   A.   .3 relates to school approval.  .2 relates to students'

16   responsibilities.

17   Q.   So it's not in 214.3?

18   A.   No.

19   Q.   Okay.  I don't happen to have a copy of 214.2.

20       The -- Mr. Rhyne showed you the materials -- those portions

21   of the I-17 where Dr. Su signed indicating that she was

22   familiar with the regulations and agreeing to comply with them?

23   A.   Yes.

24   Q.   The regulations themselves are not attached to the I-17

25   when you go fill it -- when you go print it out or go fill it

1    out online?

2    A.   No.  I believe the I-20's reference some of the

3    regulations, but I'm not sure exactly what's referenced on the

4    I-17.  I think it does summarize a few of the regulations,

5    student records, requirements, et cetera.

6    Q.   You're referring to Page 4 of Exhibit 1 in this case?

7    A.   I believe it's in several places.  I'd be happy to point

8    out those particular sections.  So Page 3 will list some of the

9    recordkeeping records that schools are responsible for when

10   they sign this form.  Page 5 will list the definition of a

11   designated school official and their responsibilities, and then

12   they'll specifically cite some regulations that we expect DSO's

13   to read.

14   Q.   You're -- the page numbers you're referring to are the page

15   numbers actually on the form, not the page numbers on our

16   exhibit; right?

17   A.   Correct.  I apologize.

18   Q.   That's okay.

19        So you were referring to Pages 4 and 5 of Exhibit 1

20   respectively; right?

21   A.   Yes.

22   Q.   The -- showing the jury Page 4 of Exhibit 1, it's hard to

23   get to a readable level, but in Number Paragraph 2, "The

24   petitioner" -- the person applying for the school; right?

25   A.   Correct.

1   Q.   -- "agrees to maintain certain" -- "certain records," which

2   are listed below?

3   A.   Yes.

4   Q.   "And it actually agrees to make these records available to

5   the service upon request"; right?

6   A.   Yes, of the physical copies.

7   Q.   That's the immigration service that's referring to?

8   A.   I think it's referring to the old INS, which is --

9   Q.   The Immigration and Naturalization -- the Immigration and

10  Naturalization Service?

11  A.   Which no longer exists, but yes.

12  Q.   That's not what it's called anymore?

13  A.   Correct.

14  Q.   It's been -- it's been broken into different departments?

15  A.   Yes.

16  Q.   But basically, anybody from -- anybody such as yourself

17  from Immigration could go to a school and request these

18  records; right?

19  A.   Yes.

20  Q.   Anyone from -- anyone from SEVIS could reach out to a

21  school and request these records?

22  A.   Correct, and several other agencies as well.

23  Q.   Any other agencies within Homeland Security?

24  A.   Typically, yes, and State Department perhaps as well.

25  Q.   Okay.  Apart from the fictitious students whose records you

1    requested from Dr. Su, the rest of these records weren't

2    requested informally?

3    A.   I imagine Customs and Border Protection and several other

4    agencies -- State Department -- have contacted DSO's requesting

5    records in the past.

6    Q.   You imagine?

7    A.   It's pretty routine.

8    Q.   Once you began -- once you began investigating Dr. Su, did

9    you reach out informally to Dr. Su and request any of this

10   stuff?

11   A.   I personally did not.

12        MR. BABCOCK:  Nothing further.  Thank you, your

13   Honor.

14        THE COURT:  Thank you.

15     Mr. Rhyne?

16        MR. RHYNE:  Briefly, your Honor.

17              **FURTHER REDIRECT EXAMINATION**

18   BY MR. RHYNE:

19   Q.   Were you an F-1 student when you were at Cal?

20   A.   I was not.

21   Q.   I want to follow up on the e-mail questions that Mr.

22   Babcock asked you about, the SSU and SUS e-mails.  You reviewed

23   a number of e-mails to and from that account; is that correct?

24   A.   I did.

25   Q.   Did you see different signature blocks in those e-mails?

MACKEY - FURTHER REDIRECT / RHYNE

1    A.   I did.

2    Q.   And one of those signature blocks was "Susan"; is that

3    correct?

4    A.   Yes.

5    Q.   And the e-mails that Dr. Su admitted to sending to you --

6    or I should say to the Department of Homeland Security -- how

7    did she sign those e-mails?

8    A.   "Susan Su."

9    Q.   What are some of the other signature blocks other than

10   "Susan" and "Susan Su" that you saw in those e-mails?

11   A.   "Assistant President Vishal," "Parth," names of various --

12   the people who were employees in the office.

13   Q.   Mr. Babcock asked you about your understanding of the

14   physical attendance requirement.  You asked Dr. Su specifically

15   about that during your interview with her on January 19th,

16   2011; is that correct?

17   A.   Yes.

18   Q.   Why were you asking her that question?

19   A.   I wanted to gauge her knowledge of the regulations.

20   Q.   Can you tell the jury what she initially said when you

21   asked that question?

22   A.   She stated that no more than three units or one class was

23   allowed to be taken online by her F-1 students, which is

24   consistent with the regulations.

25   Q.   And how did the remainder of the classes need to be taken

1    in?

2    A.   Physically.

3    Q.   And you conducted surveillance outside of Tri-Valley

4    University up to that point; is that correct?

5    A.   I had.

6    Q.   And you were choosing times where classes were supposed to

7    be held; is that correct?

8    A.   Yes.

9    Q.   Did you ever see any students come and go carrying

10   backpacks, anything like that?

11   A.   There were people coming and going.  I wouldn't

12   characterize them as appearing to be students.

13   Q.   You followed up with Dr. Su about the physical attendance

14   requirement, is that correct, during the interview?

15   A.   Yes.

16   Q.   What did she say next?

17   A.   We covered a lot of topics during her interview.

18   Q.   About the physical attendance requirement, she initially

19   gave you the answer you just spoke about.  Did that

20   subsequently change?

21   A.   Yes.  When I informed her that agents had been conducting

22   surveillance outside of her school, she changed her answer

23   about whether or not Tri-Valley students were physically

24   attending at the Tri-Valley campus, and she explained that

25   physical attendance was occurring online, that students were

1    physically somewhere when they were logging in.

2         So she considered that physical attendance, and she also

3    stated that students had the option of coming to class or

4    taking their classes on campus if they wanted to.  So because

5    of that, she characterized her classes as physical.

6    Q.   That was after you had informed her of your knowledge

7    regarding the surveillance; correct?

8    A.   Yes.

9    Q.   Mr. Babcock asked you also about the articulation

10   agreements.  During your investigation through the evidence

11   that's been admitted at trial, you're aware that SEVP

12   specifically requested articulation agreements from Dr. Su;

13   correct?

14   A.   They did.

15   Q.   And you've seen the letter where she sends them to SEVP;

16   correct?

17   A.   Yes.

18   Q.   My final question has to do with Mr. Babcock's question

19   about the regs not being attached to the I-17.  Can you tell

20   the jury, aside from referencing the regs, what other kind of

21   training can somebody like Dr. Su do in order to learn these

22   regs?  Actually, let me rephrase my question.

23        Does a DSO have to take any training in order to become a

24   DSO?

25   A.   Yes.

1    Q.   What kind of training is that?

2    A.   There's a web-based training course that a site visit

3    inspector will ask or confirm the DSO took during the site

4    visit.

5    Q.   Regarding your status at Cal as not being an F-1 student,

6    how is that different than being an F-1 student?

7    A.   My attendance at Berkeley wasn't tied to a visa.  I wasn't

8    required to maintain a full course of study and make a specific

9    type of progress in my program to stay in the United States.

10         MR. RHYNE:  Thank you.

11      No further questions.

12         THE COURT:  Mr. Babcock?

13                    **FURTHER RECROSS-EXAMINATION**

14   BY MR. BABCOCK:

15   Q.   You said that -- that Dr. Su, when you were interviewing

16   her about this physical attendance requirement, said that her

17   courses did involve physical attendance because they were

18   interactive and monitored in realtime?

19   A.   She said that as well, yes.

20   Q.   She also said that these students had the option of

21   attending classes at the campus where the virtual classes could

22   be projected onto the wall using a computer?

23   A.   A projector and a computer, yes.

24   Q.   Right.  She also said that she sent periodic e-mails to

25   students reminding them to attend classes but didn't take any

1    other -- any actions beyond that to make them attend classes?

2    A.   She stated that, yes.

3                   MR. BABCOCK:  Thank you.

4                   THE COURT:  Mr. Rhyne?

5                   MR. RHYNE:  No further questions, your Honor.

6                   THE COURT:  Agent Mackey, thanks for your testimony.

7    You can step down and resume your place at counsel table.

8                   THE WITNESS:  Thank you, sir.

9                   THE COURT:  I'll be with the attorneys in just a

10   second, and I'll ask the Government for their next witness.

11       It occurred to me and I might tell you that -- you might be

12   wondering, "Why does the judge have a computer screen on his

13   bench?  I, the juror, am not even allowed to look at my cell

14   phone occasionally, and he has a computer and is looking at it

15   all the time.  What is he doing?  Is he playing *Madden NFL*?  Is

16   he ordering things for his children on Amazon?  What is he

17   doing?"

18       I do actually use my computer occasionally because, as you

19   know, I have a lot of other cases, and I may have hearings on

20   motions and that sort of thing.  So sometimes I want to watch

21   the law, open up a book on the law while I'm looking at my

22   scheduling program, that sort of thing.

23       I also have a realtime rough draft of the transcript of

24   this trial as it goes along to make sure that I don't miss

25   something.  If one of the lawyers objects, I want my ruling on

1        that objection to be a good ruling, and so I have that realtime

2        transcript as a backup to what I'm hearing.

3              Anyway, I didn't want you to think that I wasn't doing my

4        job, and I also want to remind you of what I instructed you

5        before, which is that you're not to infer anything from what I

6        say or do about my view of the evidence in this case.  You're

7        the exclusive judges of the facts, and there are two reasons

8        for the rule that you're not to rely on anything I say or do.

9              First, I'm the judge, but I'm not the decider of this case.

10       You are.  So what I think about the evidence is irrelevant.

11       Secondly, my face -- my facial expression may not tell you

12       anything about what I think about the evidence because

13       sometimes I have to be looking at other things while I'm also

14       presiding over the trial.  So that's why this computer screen

15       is on.

16             Government's next witness?

17                   MS. WEST:  Thank you, your Honor.

18             The United States calls Scott Cole.

19                   THE COURT:  Good morning, Mr. Cole.

20                   THE WITNESS:  Good morning.

21                   THE COURT:  May I ask you to come up to the witness

22       stand, please --

23                   THE WITNESS:  Sure.

24                   THE COURT:  -- which is just to my right.  When you

25       get there, remain standing, raise your right hand, and face my

COLE - DIRECT / WEST

1    courtroom deputy, please.

2            THE CLERK:  Do you solemnly swear or affirm that the

3    testimony you're about to give in the matter now pending before

4    this Court shall be the truth, the whole truth -- truth, and

5    nothing but the truth?

6            THE WITNESS:  I do.

7            THE CLERK:  Thank you.  Please be seated.  You have

8    to speak into the microphone over there.

9            THE WITNESS:  Okay.

10            THE CLERK:  Please state your full name and spell

11    your last name.

12            THE WITNESS:  It's Scott Cole, C-o-l-e.

13            THE COURT:  Ms. West?

14                           **SCOTT COLE,**

15    Called as a witness by the Government, having been duly sworn,

16    testified as follows:

17                        **DIRECT EXAMINATION**

18    BY MS. WEST:

19    Q.  Good morning, Mr. Cole.

20    A.  Good morning.

21    Q.  Can you please tell us where you are currently employed.

22    A.  Yes.  The University of Central Florida.

23    Q.  What is your title at the University of Central Florida?

24    A.  Vice president and general counsel.

25    Q.  As vice president and general counsel, can you please tell

1    us what your job duties there include.

2    A.   Yes.  I'm the chief legal officer for the university.  So I

3    am responsible for ten lawyers at the university, and we

4    provide virtually all the legal services for the university.

5    Q.   Now, are you familiar with something called an articulation

6    agreement?

7    A.   I am.

8    Q.   Can you please tell us what that is.

9    A.   Yes.  An articulation agreement is an agreement between two

10   universities where one university gives credit for courses from

11   another university as part of their curriculum.

12   Q.   Does the University of Central Florida enter into any

13   articulation agreements?

14   A.   We do.

15   Q.   Do you have any role in that?

16   A.   I do.  By university policy, every contract prior to being

17   signed by the authorized signatory has to come to the general

18   counsel's office, and one of our lawyers has to approve that

19   contract prior to signature.

20   Q.   Are you familiar with the procedure that University of

21   Central Florida goes through in creating and approving an

22   articulation agreement?

23   A.   Yes, I am.

24   Q.   Can you please explain that to the jury.

25   A.   Yes.  Usually, the articulation agreement will start in the

1    college, and they'll reach out to a colleague at another

2    university, and they'll discuss giving credit for a course at

3    that university, at the University of Central Florida. That

4    then has to go through an approval process.

5        After all the courses are reviewed and made sure they're

6    appropriate to be transferred, it will have to get approval by

7    the dean of the college in question, and then it will have to

8    go to the student development and enrollment services area,

9    which is overall student affairs.

10        Then we'll come to -- the agreement will come to my office,

11    and we'll review it, and if it's an appropriate agreement, it

12    will be sent to the president of the university requesting

13    their courses to be transferred. Once that president signs the

14    agreement, then it will come back to the University of Central

15    Florida, and our president will sign the agreement.

16    Q.   Why are there so many signatures on it?

17    A.   Well, UCF is accredited. It is an accredited university,

18    and we are just -- not only on the courses that we provide but

19    to the extent that we accept any courses from another

20    university, those become our courses, and so we have to make

21    sure that any courses we accept as part of an articulation meet

22    our standards that we have as an accredited university.

23    Q.   Have you heard of something called Tri-Valley University?

24    A.   Yes.

25    Q.   How did you first hear of it?

1    A.   My first -- first time I became aware was when two agents

2    came to my office in Orlando, and they showed me an agreement

3    that was supposedly between Tri-Valley and the University of

4    Central Florida, and that was the first time I became aware.

5    Q.   Okay.  Have you had an opportunity to determine whether UCF

6    actually entered into a real articulation agreement with

7    Tri-Valley University?

8    A.   I have.

9    Q.   How did you determine that?

10   A.   Well, I looked at the agreement they presented to me, and I

11   can tell just on the basis of how it was formatted and the

12   signatures that it was not a legitimate agreement.  There was

13   no approval by the dean, no approval by the vice president for

14   student development.  There was no stamp from our office that

15   one of our attorneys had reviewed the agreement.  So -- and

16   then it was not signed by our president.  So I knew it was not

17   a real agreement.

18   Q.   Did you take any steps to determine whether UCF had ever

19   entered into an articulation agreement properly with

20   Tri-Valley?

21   A.   I did.  I did two things.  One, we have an electronic log

22   of every contract that comes through our office, and so I had

23   my administrative assistant go through that log, did a key word

24   search and some other searches for Tri-Valley University, and

25   there were no contracts in our database for Tri-Valley.

1     I also checked with the Department of Statistics to see if

2     they had an agreement.  They were not aware of one.  So I came

3     to the conclusion that it was not a valid agreement.

4     Q.  Okay.  I'm going to show you what is already in evidence as

5     Government Exhibit 4, and I'm going to show you two pages of

6     that.  Bear with me a moment.  Just go ahead and put them up on

7     the screen here.

8         Okay.  While we're looking at the top half of Exhibit 4,

9     Page 6, can you tell from looking at the top half of this

10    agreement whether this is what the agents showed you?

11    A.  Yes, it is.

12    Q.  All right.  And this purports to be an articulation

13    agreement between Tri-Valley University and UCF?

14    A.  That's correct.

15    Q.  I'll zoom in a little here.  It's hard to strike that

16    balance between getting more words and still having it be

17    visible.

18        Okay.  If we look at that first paragraph under "Principles

19    of Agreement," do you see that?

20    A.  Yes.  Uh-huh.

21    Q.  Okay.  And the last sentence of that paragraph starts with

22    "UCF has been accepting eight courses transferring from TVU

23    since May 1st, 2008."  Do you see that?

24    A.  I do.

25    Q.  Did you take any steps to determine whether UCF had

1    actually accepted courses transferred from Tri-Valley?

2    A.  Yes.

3    Q.  And had they?

4    A.  No.

5    Q.  Let's look at the second paragraph there, the highlighted

6    portion.  "University of Central Florida agrees to continue

7    accepting the course-transferring from the entire Department

8    of" -- sorry for the back-and-forth, ladies and gentlemen of

9    the jury -- "of Computer Science and Engineering at TVU."  Do

10   you see that?

11   A.  Yes.

12   Q.  Are you aware of any agreement actually approved by

13   University of Central Florida authorizing it to continue

14   accepting course-transferring from any program at TVU?

15   A.  No.

16   Q.  I'm going to show you the second page of this document,

17   which is Page 7 of Exhibit 4.  Let me go out a little.

18       Okay.  In particular, the signature block.

19   A.  Yes.

20   Q.  Do you see that there?

21   A.  I do.

22   Q.  And on behalf of University of Central Florida, there's a

23   name -- pardon me -- Professor Xiao-Gang Su.  Do you see that?

24   A.  Yes.

25   Q.  And it states, "Student Advisor, Department of Statistics

COLE - CROSS / BABCOCK

1    and Actuarial Science, University of Central Florida"?

2    A.   Yes.

3    Q.   Have you ever heard of Xiao-Gang Su?

4    A.   I have now.  I had not at the time I was presented with the

5    agreement.

6    Q.   Do you know whether he was in -- let's see what date we

7    have here.  This date above the signature block reads, "2nd day

8    of February 2009."  Do you see that?

9    A.   Yes.

10   Q.   Okay.  Do you know whether in February of 2009 he was

11   affiliated with UCF?

12   A.   Yes, he was a professor at UCF.

13   Q.   Okay.  Would Professor Xiao-Gang Su as a student advisor

14   with the Department of Statistics and Actuarial Science at UCF

15   authorize to enter into an articulation agreement on behalf of

16   UCF?

17   A.   No, he would not have.

18   Q.   Thank you.

19   A.   Uh-huh.

20          THE COURT:  Mr. Babcock, questions for this witness?

21                      **CROSS-EXAMINATION**

22   BY MR. BABCOCK:

23   Q.   Good morning, Mr. Cole.

24   A.   Good morning.

25   Q.   My name is Erik Babcock, and I represent Dr. Su.

1          You have been with the University of Central Florida -- I'm

2     sorry -- for how long now?

3     A.   12 years.

4     Q.   12 years.

5          Okay.  So you were with the school back in 2009?

6     A.   Correct.

7     Q.   Is this the same school that made -- made a run at the NCA

8     tournament a couple years ago?

9     A.   Yes.

10    Q.   I thought I'd heard of it.

11         You -- does your school ever sign articulation agreements

12    that -- I don't know if there's a term for it.  I'll call it,

13    like, a blanket articulation agreement that would approve

14    recognized course -- all courses from a particular school?

15    A.   The only ones that I have seen have listed courses

16    individually that are accepted with the course number and then

17    our corresponding courses.

18    Q.   That's typically how it's done; right?

19    A.   That's correct.

20    Q.   Sort of on a course-by-course basis?

21    A.   Yes.

22    Q.   Have you seen one that's -- that's broader than that?

23    A.   I have not, no.

24    Q.   Do you have any notion why -- you're familiar with the --

25    with SEVIS or SEVP?

1    A.   I'm familiar with what it is, yes.

2    Q.   Yes.

3         And some of the -- some of the requirements of the

4    school -- for schools that admit foreign students?

5    A.   Yes.

6    Q.   Does University of Central Florida admit foreign students?

7    A.   We do.

8    Q.   Do you have any notion why SEVIS would require a school

9    petitioning to get approval to admit foreign students to -- to

10   enter into sort of a blanket or general articulation agreement?

11            MS. WEST:  Objection.  Outside the scope certainly of

12   this witness's knowledge.

13            THE COURT:  I'll sustain on the second ground.

14   BY MR. BABCOCK:

15   Q.   The -- you are aware that Xiao-Gang Su was a professor at

16   your school in 2009?

17   A.   Yes.

18   Q.   Had you met him in 2009?

19   A.   I had not.

20   Q.   Okay.  He didn't come to you and talk to you about this

21   particular articulation agreement?

22   A.   No.

23   Q.   Okay.  So you've never -- strike that.

24        Does University of Central Florida allow its F-1 students

25   to take online classes?

1    A.   I don't know the answer to that.

2    Q.   Does University of Central Florida offer online classes?

3    A.   Yes, we do.

4    Q.   It's become more common in the last few years; right?

5    A.   It's about 30 percent of our credit hours.

6    Q.   Does your office -- strike that.

7         How large is your school?

8    A.   I'm sorry?

9    Q.   How many -- how many students at your school?

10   A.   60,000.

11   Q.   60,000.

12        Well, that would characterize it as a pretty big school?

13   A.   Yes.

14   Q.   Approximately what percentage of your student body are from

15   foreign countries?

16   A.   Around 5 percent.

17   Q.   Okay.  And does your school -- are you aware -- does your

18   school have a particular office for employees that deal with --

19   they're responsible for dealing with the requirements for the

20   legal requirements for F-1 students?

21   A.   Yes.

22   Q.   Okay.  Does it -- what office is that?

23   A.   Office of International Studies.

24   Q.   Okay.  So that is pretty much the job of the Office of

25   International Studies?

1    A.   That's correct.

2    Q.   To deal with all of the various legal requirements for

3    admitting and maintaining foreign students?

4    A.   That's correct.

5    Q.   Do you have any notion of how many people work in that

6    office?

7    A.   There's probably ten people maybe, maybe a few less.

8    Q.   That is full-time staff?

9    A.   Yes.

10   Q.   Okay.  Are there any -- do you know if there's any student

11   employees in that office?

12   A.   I don't know.

13   Q.   Okay.  Thank you, sir.

14   A.   Uh-huh.

15        MR. BABCOCK:  Nothing further.

16        MS. WEST:  No questions.  Thank you.

17        THE COURT:  All right.  Thank you.

18   Mr. Cole, you're excused.

19        THE WITNESS:  Thank you.

20        THE COURT:  Thank you for coming all the way from

21   Florida.

22        THE WITNESS:  Absolutely.

23        THE COURT:  Government's next witness?

24        MR. RHYNE:  Yes, your Honor.

25   The United States calls Vishal Dasa.

1           THE COURT: All right. Good morning, sir.

2           THE WITNESS: Good morning.

3           THE COURT: Let me ask you to come to the witness

4    stand, which is where this chair is right next to me. And when

5    you get there, just remain standing, raise your right hand, and

6    face my courtroom deputy, please.

7           THE CLERK: Do you solemnly swear or affirm that the

8    testimony you're about to give in the matter now pending before

9    this Court shall be the truth, the whole truth, and nothing but

10   the truth?

11          THE WITNESS: Yes.

12          THE CLERK: Thank you. Please be seated. You'll

13   need to speak directly into the microphone in order to be

14   heard.

15          THE WITNESS: Okay.

16          THE CLERK: Thank you.

17       Please state your full name and spell your last name.

18          THE WITNESS: Vishal Dasa, D-a-s-a.

19          THE COURT: Sir -- and actually, I'm going to ask

20   that you spell your first name. I want to make sure our

21   transcript is accurate.

22          THE WITNESS: Sure. It's Vishal, V-i-s-h-a-l.

23          THE COURT: Thank you, Mr. Dasa.

24       Mr. Rhyne, your witness.

25   ///

1                        **VISHAL DASA**,

2     Called as a witness by the Government, having been duly sworn,

3     testified as follows:

4                        **DIRECT EXAMINATION**

5     BY MR. RHYNE:

6     Q.   Good morning.

7     A.   Good morning.

8     Q.   Can you please summarize your educational background.

9     A.   I'm a registered pharmacist back from India.  I have

10    completed my Bachelor of Pharmacy.

11    Q.   Where did you go to school in India?

12    A.   Bharat Institute of Technology, Hyderabad, Andhra Pradesh,

13    India.

14    Q.   Can you spell the school for the court reporter?

15    A.   Sure.  It's B-h-a-r-a-t.  Bharat.  Technology,

16    T-e-c-h-n-o-l-o-g-y.  Technology.

17    Q.   Are you currently employed?

18    A.   Yes.

19    Q.   Where do you work?

20    A.   I work at eHarmony.com.

21    Q.   Whereabouts?

22    A.   I'm sorry?

23    Q.   In what -- in what city?

24    A.   It's in Santa Monica, California.

25              THE COURT:  Did you say eHarmony?

```
 1                 THE WITNESS:  Yes.

 2                 THE COURT:  Thank you, sir.

 3     BY MR. RHYNE:

 4     Q.  What's your job title there?

 5     A.  I work as a QA mobile engineer.

 6     Q.  What does that mean?

 7     A.  We have an iOS app that I test before it's pushed into the

 8     market and make it available for other users.

 9                     (Court reporter clarification.)

10                 THE WITNESS:  Make it available for other users.

11     BY MR. RHYNE:

12     Q.  How long have you been there?

13     A.  I've been working since -- eight months.

14     Q.  Are you familiar with the defendant in this case, Dr. Susan

15     Su?

16     A.  Yes.

17     Q.  Do you see her in the courtroom today?

18     A.  Yes.

19     Q.  Can you describe where she's sitting?

20     A.  She's sitting right over there wearing a black suit.

21     Q.  How do you know her?

22     A.  I used to work at Tri-Valley University, and she's the

23     president of Tri-Valley University.

24     Q.  I want to -- I want to talk about that, but before we do, I

25     want to talk about your immigration history.
```

1    A.    Sure.

2    Q.    Can you tell the jury your immigration history beginning

3    when you first entered the United States?

4    A.    Sure.  I -- I entered the United States on an F-1 visa, and

5    I studied at Antioch University in Santa Barbara, California.

6    I came on -- I came to the U.S. to study initially on MA for

7    Organizational Psychology.  I completed my semester.  Then I

8    made -- took a transfer to International Technological

9    University.

10   Q.    What year did you come into the United States to study at

11   Antioch University?

12   A.    October 2008.

13   Q.    Okay.  And then you said you transferred from there?

14   A.    Yes.

15   Q.    Where did you transfer?

16   A.    I transferred to International Technological University,

17   which was in Sunnyvale, California.

18                    (Court reporter clarification.)

19              THE WITNESS:  Sunnyvale, California.

20   BY MR. RHYNE:

21   Q.    What did you study there?

22   A.    MS in Healthcare Management.

23   Q.    You said MS in Healthcare Management?

24   A.    Master of Science in Healthcare Management.

25   Q.    How long did you stay at ITU?

DASA - DIRECT / RHYNE

1    A.   For two semesters.

2    Q.   Okay.  Where did you go after that?

3    A.   I went to Tri-Valley University.

4    Q.   Did you go anywhere between leaving ITU and Tri-Valley

5    University?

6    A.   Yes.  I went to India.  I took a summer of vacation.  I

7    went to India, and I came back and joined Tri-Valley

8    University.

9    Q.   Okay.  Do you know what your immigration status was when

10   you were traveling to India?

11   A.   Yes.  It was an F-1.

12   Q.   From which school?

13   A.   From ITU.

14   Q.   Okay.  And then when you came back from India, you started

15   at Tri-Valley University; is that correct?

16   A.   Yes.

17   Q.   Okay.  I want to talk about Tri-Valley University now.  I

18   want to direct your attention to the fall of 2009.

19   A.   Okay.

20   Q.   Is that about when you first contacted Tri-Valley

21   University?

22   A.   Yes.

23   Q.   Okay.  How did you hear about Tri-Valley University?

24   A.   After I come back to United States, one of my friends --

25   her name is Harman Jeet Kaur.

1    Q.   Can you spell that name for the court reporter?

2    A.   H-e -- I don't know the exact spelling, but H-e-r-m-a-n

3    [sic].  J-e-e-t.  K-a-u-r.

4    Q.   So you heard about the school from this person?

5    A.   From -- yes, and she actually told me about this

6    universities.  And then after that, I contact -- I e-mailed

7    Tri-Valley University, and I got a reply and an appointment

8    from Susan Su --

9    Q.   Okay.

10   A.   -- to come to the university and meet her on September 4th.

11   Q.   Okay.  I want to back up a little bit.  Before you went to

12   Tri-Valley University and before you spoke with Dr. Su, did you

13   research Tri-Valley University?

14   A.   Yes, I did.

15   Q.   How did you research it?

16   A.   After listening from Harman Jeet, I went to Tri-Valley

17   University's web page, and I looked for it in, I believe, a

18   random way, and I saw that the university was accredited.  I

19   saw they had an MS in Healthcare Management course available.

20   Q.   Did you have an opportunity to look at the faculty that was

21   listed?

22   A.   Yes, I did, and all of the faculty names right next to the

23   courses were, like, all of them having doctorates and high

24   professional degrees.

25   Q.   Did you have an opportunity to see how much it charged per

1   semester?

2   A.   No.

3   Q.   Okay.  Did you later learn that?

4   A.   Yes.

5   Q.   And how did that -- how did the fees at Tri-Valley compare

6   to the fees at your prior school?

7   A.   Compared to International Technological University, it was

8   a thousand dollars less than compared to International

9   Technological University.

10  Q.   Okay.  Now, you stated you called, and you spoke to Dr. Su;

11  is that correct?

12  A.   Yes.

13  Q.   I want to talk about that phone call.

14       How do you know it was Dr. Su?

15  A.   I don't know about her.  I called her, and then later on, I

16  came to know that she was the president of the university

17  because I've seen her name at the time on the web page stating,

18  "Dr. Susan Su, President of Tri-Valley University."

19  Q.   Did she tell you she was the president?

20  A.   When I met her in person, yes, she did.

21  Q.   Okay.  How was the school described to you during the phone

22  conversation?

23  A.   She didn't describe anything on -- while I was talking on

24  the phone.

25  Q.   Did you ask whether they offered a degree in your area?

1    A.   I didn't ask about that.

2    Q.   Okay.  Was there any discussion about you visiting during

3    that call?

4    A.   Actually, I took an appointment to meet her on

5    September 5th --

6    Q.   Okay.

7    A.   -- and that was the one -- but later on, I sent an e-mail

8    to her saying I would like to meet her on September 4th.

9    Q.   Okay.  I want to talk about the visit.  You went to

10   Tri-Valley University after this call; correct?

11   A.   Yes.

12   Q.   How did you get there?

13   A.   I took -- I and my friend Sushumma Andal, and she was --

14   S-u-s-h-u-m-m-a.  Her last name is Andal, A-n-d-a-l.  We both

15   went -- we took a car train from Sunnyvale Cal Station to

16   Millbrae Cal Station.

17   Q.   To Millbrae Garden Station?

18   A.   Millbrae Cal Station -- Caltrain Station.

19   Q.   Okay.

20   A.   From there, I took a BART to Pleasanton BART Station.

21   Q.   And that was to Pleasanton, you said?

22   A.   Yes.

23   Q.   What happened when you got to Pleasanton?

24   A.   And we gave a call to Susan Su, and she came in a Toyota

25   car.  She picked us, and she took us to the university.

1    Q.   When you got to the university, what happened?

2    A.   She showed us the administrative room, and she also showed

3    us the classrooms which were located back of the administrative

4    room, and she showed us the parking area.

5    Q.   Where was Tri-Valley University's office located at that

6    time?

7    A.   At that time, it was located in Unified District School,

8    Pleasanton, Bernal Avenue.

9    Q.   You said Bernal Avenue?

10   A.   Yes.

11   Q.   During this --

12   A.   Can I have some water?

13          THE COURT:  Sure.  Mr. Dasa, that water is for

14   witnesses like yourself.  So go ahead.

15   BY MR. RHYNE:

16   Q.   During this tour, did you have any discussions with Dr. Su

17   about the transfer of classes, what classes could be

18   transferred?

19   A.   Yes.  She told me that I could transfer both my

20   International Technological University credits and also my

21   Antioch University credits.

22   Q.   Did Dr. Su tell you whether classes would be physically

23   held at that location?

24   A.   Yes, she did.

25   Q.   What did she tell you?

1    A.   When she was making -- taking me on a tour of the

2    classrooms, she did mention -- saying students would be coming

3    over there and taking physical classes.

4    Q.   After this tour, did you make a decision on whether you

5    were going to transfer to Tri-Valley University?

6    A.   Yes, I did make a -- made a decision to join Tri-Valley

7    University.

8    Q.   Okay.  Now, after this visit, you had some e-mail

9    correspondence with Dr. Su; is that correct?

10   A.   Yes.

11   Q.   Were you employed at the time?

12   A.   No.

13   Q.   Did you want to be employed?

14   A.   I was looking for an on-campus job at that time.

15   Q.   Can you summarize the nature of those e-mails with Dr. Su?

16   A.   On the day when I met -- I was asking her, "Are there any

17   on-campus jobs available or not?"

18        Then she said, "As of that time, there are no on-campus

19   jobs available," and she said she would let me know when

20   that -- any jobs available.

21   Q.   Okay.  So I want to move forward now, and I want to talk

22   about -- you had another visit to Tri-Valley University; is

23   that correct?

24   A.   Yes.

25   Q.   Okay.  Approximately how much later did you go back to

DASA - DIRECT / RHYNE

1    Tri-Valley University?

2    A.   About a month after.

3    Q.   Okay.  And tell me what happened during that second visit.

4    A.   Second visit -- I rented a car.  I and Sushumma Andal -- we

5    both went together.

6    Q.   Can you spell that name?

7    A.   S-u-s-h-u-m-m-a.  A-n-d-a-l.  We both rented a car.  We

8    went to the university.  We actually was trying to -- we took a

9    different address, which was listed on the website.  We went to

10   a different address.  Then from there, we gave a call to

11   Tri-Valley University, and Susan directed us to the Bernal

12   Avenue Unified District School.

13   Q.   So this visit, you drove a rental car?

14   A.   Yes.

15   Q.   And the address you went to was an address you had gotten

16   from where?

17   A.   From the website -- Tri-Valley website.

18   Q.   And that was not the actual address of the school?

19   A.   No.

20   Q.   It was different than where you had been before?

21   A.   Yes.

22   Q.   And you found your way to the location by calling Dr. Su?

23   A.   Yes, and she directed me to the new place.

24   Q.   Was the new place the same place you had been before?

25   A.   Yes.

1    Q.   When you got to the campus, what happened?

2    A.   I parked my car, and I remember the administrative room was

3    over there.  So I went, and I saw Susan over there, and I think

4    I saw Susan, and I spoke to her about on-campus job and my

5    classes.

6    Q.   Okay.  Did you -- did you enroll in classes?

7    A.   Sorry?

8    Q.   Did you enroll in classes?

9    A.   I did enroll --

10   Q.   Okay.

11   A.   -- before.

12            THE COURT:  Mr. Rhyne, at any point in the next five

13   minutes, I'd like to take our first break.

14            MR. RHYNE:  We can certainly do it now, your Honor.

15            THE COURT:  All right.  Let's do that.

16      Members of the jury, we'll take our first morning recess.

17   The Court will be in recess for 15 minutes.

18            THE CLERK:  All rise.

19      Court will be in recess for 15 minutes.

20                       (Recess taken.)

21            THE COURT:  Members of the jury, I won't belabor the

22   point, but you should know that the reason that I'm standing --

23   it seems like you're waiting for me to sit down.  I'm waiting

24   for you to sit down.  You're the most important people in this

25   proceeding.

1          And so counsel normally stand up when I come in here.  I

2     don't ask them to, but it's our practice here when the jury

3     enters and leaves the courtroom for everyone to stand up.  It's

4     just the way folks -- folks view your role.

5          So please -- I don't -- I can't know that you're waiting

6     for me, but it looks like you might be.  So please don't do

7     that.

8          Mr. Rhyne?

9              MR. RHYNE:  Thank you, your Honor.

10    BY MR. RHYNE:

11    Q.   Mr. Dasa, when we left off, we were talking about fall of

12    2009.  I want to pick up there.

13         At some point during the fall of 2009, did you sign up for

14    classes at Tri-Valley University?

15    A.   Yes, I did.

16    Q.   How did you pay for those classes?

17    A.   I -- excuse me.  My uncle actually made a wire transfer to

18    the university account, and the first transaction he made was

19    that thousand dollars on September 11th.

20    Q.   After that transfer, did you get anything from Tri-Valley

21    University?

22    A.   Yes.

23    Q.   What did you get?

24    A.   I got my fee payment receipt along with my continued

25    attendance I-20 showing that --

1   Q.  When --

2   A.  -- I registered for the classes.

3           MR. RHYNE:  Your Honor, may I approach the witness?

4           THE COURT:  You may.

5           MR. RHYNE:  479.

6       (Government's Exhibit 479 marked for identification.)

7   BY MR. RHYNE:

8   Q.  Mr. Dasa, I'm going to hand you an exhibit that's been

9   marked Exhibit 479 for identification.  I'll just ask you to

10  take a look at it.

11      Do you recognize those documents?

12  A.  Yes.

13  Q.  What are they?

14  A.  Admission letter, my fee payment invoice, my good standing

15  letter, and my address DMV verification letter, the results of

16  my invoice, which shows that I registered for these courses.

17  Q.  Did you get those documents from Tri-Valley University?

18  A.  Yes, I did.

19  Q.  Did you give them to any member of the Government in this

20  case?

21  A.  Yes, I did.

22  Q.  Who did you give them to?

23  A.  Jason Mackey.

24  Q.  Do those documents look like they looked when you got them

25  from Tri-Valley University?

1    A.   Yes.

2              MR. RHYNE:  Your Honor, we'd offer Exhibit 479 into

3    evidence.

4              THE COURT:  Any objection?

5              MR. BABCOCK:  No objection, your Honor.

6              THE COURT:  Exhibit 479 is admitted.

7                   (Government's Exhibit 479 received in evidence.)

8              MR. RHYNE:  And can we publish Exhibit 479, Page 1,

9    and can we just start with the date September 7th and go down

10   to the signature line?

11   BY MR. RHYNE:

12   Q.   Mr. Dasa, this letter states that "The Admissions Committee

13   at Tri-Valley University has reviewed your application package

14   and made decision on your application.  I am very glad to

15   inform you that you have been admitted to the Master of Science

16   in Healthcare program in the School of Medicine at Tri-Valley

17   University.  Congratulation," exclamation point.

18        Is that correct?

19   A.   Yes.

20             MR. RHYNE:  Can we go to Page -- actually, can we

21   back out and just capture the top right block there for the

22   term?  There's a little block on the top -- it says, "Year."

23        Yeah, that right there.

24   BY MR. RHYNE:

25   Q.   Fall of 2009; is that correct?

DASA - DIRECT / RHYNE

1    A.   Yes.

2              MR. RHYNE:  Can we go to the next page, and can we,

3    just starting with the box with his name, go all the way down

4    to the signature block at the bottom, please.

5         Thank you.

6    BY MR. RHYNE:

7    Q.   Are these the classes that you registered for initially?

8    A.   Yes.

9    Q.   I want to talk about what happened after you registered for

10   these classes.  Did you ever receive a schedule from the school

11   about when these classes would take place?

12   A.   No.

13   Q.   Did you ever receive any information about who your

14   professors would be?

15   A.   No.

16   Q.   Did you ever receive any information about when the start

17   of instruction would be?

18   A.   She used to send me an e-mail.  As soon as the classes

19   would begin, she would let me know.

20   Q.   At some point, did you call to inquire about the status of

21   these classes that you had enrolled in?

22   A.   Yes.

23   Q.   Who did you call?

24   A.   I called Tri-Valley University, and Susan Su answered the

25   call.

1    Q.   Okay.  What did you ask her?

2    A.   I asked her, like, when are the classes would begin from.

3    Q.   And what did she say?

4    A.   She said she would get back to me.

5    Q.   Did you ask her about the status of what your grades would

6    be?

7    A.   No.

8    Q.   Was there any discussion about what your grades would be in

9    these classes?

10   A.   No.

11   Q.   Would there later be a discussion about what your grades

12   would be in these classes?

13   A.   There was no discussion, but finally, I received a

14   transcript from Susan Su, and I got A, A, A-minus.

15   Q.   Did you continue to ask Dr. Su about when these classes

16   would start throughout that semester?

17   A.   I asked a couple of times.

18   Q.   Okay.  Did you stay enrolled in these classes?

19   A.   Yes.

20   Q.   Okay.  Was there any attempt to enroll you in some other

21   classes?

22   A.   Yes.

23   Q.   Can you tell the jury about that?

24   A.   So back in September, like, I -- after I registered for my

25   classes, I e-mailed her, and one day she replied back to me

1    saying they registered me for Computer Science Database and

2    Management course.

3    Q.   Do you know what level that course was?  Was it Bachelor's?

4    Master's?  Ph.D.?

5    A.   I don't know.

6    Q.   Okay.

7    A.   And the second one she registered me was Human Resource

8    Management, and I replied back to her saying I would like to

9    study for a healthcare management course, and I wouldn't

10   understand those database management courses.

11   Q.   What did she say when you told her that?

12   A.   I remember her saying I -- in the e-mail, she says it's

13   just for the auditing purpose.

14   Q.   For what?

15   A.   Auditing purposes.

16   Q.   Auditing purposes?

17   A.   Purposes, yeah.

18              MR. RHYNE:  Your Honor, may I approach the witness?

19              THE COURT:  You may.

20        (Government's Exhibit 480 marked for identification.)

21              MR. RHYNE:  Handing the witness what's been marked as

22   Exhibit 480 for identification.

23   BY MR. RHYNE:

24   Q.   Mr. Dasa, do you recognize that exhibit?

25   A.   Yes.

1    Q.   What is it?

2    A.   It's my transcript.

3    Q.   Okay.  From where?

4    A.   From Tri-Valley University.

5    Q.   Okay.  How did you receive it?

6    A.   I guess I received it at the university from one of the

7    staff members at the university.

8    Q.   Does it look now like it looked when you received it?

9    A.   Yes.

10        MR. RHYNE:  Your Honor, we'd move Exhibit 480 into

11   evidence.

12        THE COURT:  Any objection?

13        MR. BABCOCK:  No objection.

14        THE COURT:  Exhibit 480 is admitted.

15        (Government's Exhibit 480 received in evidence.)

16   BY MR. RHYNE:

17   Q.   Mr. Dasa, this document identifies itself as a Tri-Valley

18   University official transcript; is that correct?

19   A.   Yes.

20   Q.   It has your name there?

21   A.   Yes.

22   Q.   It has an address of 620 Iris Avenue.  Do you see that?

23   A.   Yes.

24   Q.   As we go down, we see that the degree program is a Master's

25   in Healthcare Management; is that correct?

DASA - DIRECT / RHYNE

1    A.   Yes.

2    Q.   In the School of Medicine business; correct?

3    A.   Yes.

4    Q.   And here, we have some indications that some prior classes

5    had transferred; is that correct?

6    A.   Yes.

7    Q.   This says from Antioch?

8    A.   Yes.

9    Q.   And also from ITU?

10   A.   From ITU, I only studied the first three.  I didn't do CEN

11   and SEN subjects.

12   Q.   Okay.  So the bottom two, you didn't actually complete?

13   A.   I didn't register those at International Technological

14   University at any time.  I don't know how it got added.

15   Q.   Okay.  I want to go down to the -- do you see the fall of

16   2009?

17   A.   Yes.

18   Q.   You received grades in those classes, you mentioned

19   earlier?

20   A.   Yes.

21   Q.   And that was A, A, A-minus; correct?

22   A.   Yes, but there's a different subject than -- compared to

23   what I registered.

24   Q.   Explain that.

25   A.   I never -- like, Susan Su added two of the classes, which

DASA - DIRECT / RHYNE

1    were, like, Database Management and Human Resource Management,

2    which -- I never opted for those, but you can see the third

3    subject is Human Resources Management, which -- I never

4    enrolled for that course at all.

5    Q.   I want to talk about the computer science classes that she

6    said you were going to be auditing.  Did she tell you why you

7    needed to audit those classes and not take the classes that you

8    signed up for?

9    A.   She did mention in the e-mail saying for Healthcare

10   Management -- that only less than five students enroll.  That's

11   the reason why she's making me enroll for those classes.

12   Q.   Okay.  Did you try to log into the computer science

13   classes?

14   A.   Yes, I did.

15   Q.   What happened when you tried to log into those classes?

16   A.   Obviously, I'm a healthcare management guy.  So when I

17   logged into classes, everything was looking new to me.  So I

18   e-mailed back to her saying I couldn't able to do anything nor

19   understand the subjects.

20   Q.   And that's when she told you you're just auditing?

21   A.   Yes.

22   Q.   I want to move forward now to the spring of 2010.

23   A.   Okay.

24   Q.   Did you have any more discussions with Dr. Su about

25   classes -- having classes?

1    A.   I had only a few times before I got the grades, but once I

2    got the grades, I never discussed about that.

3    Q.   Okay.  Did you have a discussion with her about what you

4    would do during the spring semester?

5    A.   No.  Actually, when I met Dr. Susan Su early -- first or

6    second week of January, as soon as I'm over there, she told me

7    that I can take a break in the spring semester.

8    Q.   Okay.  I want to talk about that.  Tell me about that

9    conversation.

10   A.   So I went along with my friend, and my friend was asking

11   courses, and then when it -- when I started talking to her, she

12   told that I can take a break for that semester, and even I was

13   happy for that because there's no need for me to pay the

14   tuition fees for that semester.

15   Q.   Okay.  What was your immigration status during the spring

16   of 2000 --

17   A.   F-1 visa.  F-1 student visa.

18   Q.   Let me finish my question.

19        That's the spring of 2010; correct?

20   A.   Yes.

21   Q.   And the F-1 visa was for Tri-Valley University?

22   A.   Yes.

23   Q.   And that was after Dr. Su told you you didn't have to take

24   classes that semester?

25   A.   Yes.

DASA - DIRECT / RHYNE

1   Q.  What did you do instead that semester?

2   A.  She offered me an on-campus job.  So I started working at

3   Tri-Valley University in that semester.

4   Q.  Now, I just want to talk generally.  You worked different

5   time frames at Tri-Valley University; correct?

6   A.  Yes.

7   Q.  Approximately how many different periods of employment did

8   you have at Tri-Valley University?

9   A.  Three.

10  Q.  And we'll talk about those in a little while, but I want to

11  talk about how your position started there.

12      Did Dr. Su offer you the employment?

13  A.  Yes.

14  Q.  Did she tell you how much you would make?

15  A.  She told me I'll be getting paid $10 an hour.

16  Q.  Are you familiar with the term "Assistant to the

17  President"?

18  A.  Not when I was joining, but later on I came to know about

19  it.

20  Q.  What was that?  What was that job title?  Who had that job

21  title?

22  A.  Susan Su told me to put that title when I'm trying to send

23  the e-mails.

24  Q.  So you would send e-mails with that job title?

25  A.  Yes.

DASA - DIRECT / RHYNE

1    Q.   What were some of your initial duties when you started

2    working at Tri-Valley University?

3    A.   At the beginning, I used to answer the phone calls and

4    reply back to the e-mails and register a few of the students.

5    Q.   Would calls and e-mails normally be questions from

6    students?

7    A.   Yes.

8    Q.   I want to talk about any instruction or training that you

9    received on how to perform your duties at Tri-Valley

10   University.  Did you receive instruction and training from

11   anyone?

12   A.   Yes.

13   Q.   Who trained you and instructed you?

14   A.   Susan Su and Parth Patel.

15   Q.   That was Parth Patel?

16   A.   Yes.

17   Q.   As you continued to work at Tri-Valley University, did you

18   take on additional jobs?  Did you handle other things besides

19   just answering the phone?

20   A.   Yes.

21   Q.   Okay.  Are you familiar with the term "SEVIS"?

22   A.   Yes.

23   Q.   And the SEVIS database?

24   A.   Not at the beginning when I joined, but later on, I came to

25   know.

1   Q.   Okay.  And did you receive training on how to operate

2   SEVIS?

3   A.   Yes.

4   Q.   Who trained you?

5   A.   Susan Su and also Parth Patel.

6   Q.   Did Dr. Su provide you any information or training about

7   what addresses to enter into SEVIS?

8   A.   Yes.

9   Q.   What did she tell you?

10  A.   If a student was not providing any address while applying

11  to Tri-Valley University, the student who got enrolled into CPT

12  and is working at some other -- apart from California, I should

13  use the California address, which was listed in that manual.

14  Q.   Okay.  What do you mean "manual"?

15  A.   There was a -- they gave me a manual, which was created by

16  Parth Patel and other folks, which was having the California

17  address, which I needed to copy and paste into the SEVIS.

18  Q.   And how did that address in the manual -- was that the same

19  address that Dr. Susan Su told you to enter as well?

20  A.   Yes.

21  Q.   Do you remember what that address was?

22  A.   555 East El Camino Real, Sunnyvale, California.  There was

23  some apartment number.  I don't remember.

24  Q.   Did you ever receive any training or hear Dr. Su talk about

25  the Tri-Valley University admissions process?

1    A.    Always -- not particularly, but every time she used to

2    scream at me, and she used to tell, like, I should process an

3    application as soon as possible.

4    Q.    Did she tell you about whether any students should or

5    should not get into the school?

6    A.    I haven't seen any student not getting an admission at

7    Tri-Valley.

8    Q.    Did you hear Dr. Su give people instructions on who to

9    admit?

10   A.    We used to admit all the students.

11   Q.    Why?

12   A.    Because it was from Susan Su.  She told us to do that.

13   Q.    She -- did you ever request additional information from

14   applicants that were applying to Tri-Valley University?

15   A.    Yes, I did.

16   Q.    How would you request that information?

17   A.    There is an application requirement which has -- like, the

18   basic requirements is passport, visa, previous I-20's, and

19   other financial information.  But when I requested the

20   students, she actually yelled at me, and she said what those

21   students submit, I should process the application even if all

22   the documents are not available.

23   Q.    How did she know you were requesting this information?

24   A.    Every day when I sent an -- when I sent e-mails to -- when

25   I reply back to the students in the night, she used to verify

1    all my e-mails.  And in the morning, she used to do a

2    one-on-one with me, and she used to shout at me.

3    Q.  When you would sign these e-mails, how would you -- how

4    would you sign the name at the bottom of the e-mail?

5    A.  As soon as -- when I'm trying to reply, it should -- at the

6    bottom, it was already saying, "Dr. Susan Su, President of

7    Tri-Valley University," and there was "Assistant of President"

8    above it.  I used to, like, write -- reply back with the e-mail

9    at the same time and my name Vishal.

10   Q.  Did you ever use Dr. Su's name without her permission and

11   sign her name as "Susan" at the bottom of e-mails?

12   A.  No.

13   Q.  Did you receive training and instruction from Dr. Su about

14   what grades students should get?

15   A.  No.

16   Q.  Did you receive training or instruction about transcripts?

17   A.  Yes.

18   Q.  Did that training and instruction come from Dr. Susan Su?

19   A.  Yes.

20   Q.  What were her instructions to you in creating transcripts?

21   A.  So that's the transcript.  Always, she was telling me to

22   update the student name, student program, student -- the

23   program the student got enrolled into, student's date of birth,

24   and all I need to do is change the course code and course

25   title.  The grades, the units, and the GPA points remains the

DASA - DIRECT / RHYNE

1    same.

2    Q.   Was there ever any discussion with Dr. Su about changing

3    the grades and whether that would change the GPA?

4    A.   I think once I changed, she shouted at me saying not to

5    change anything, and I should only change these fields.

6    Q.   When did Tri-Valley University send out its transcripts to

7    the students?

8    A.   At the end of the semester.

9    Q.   Okay.  And is this a fairly good example of what they

10   looked like when they go out at the end of the semester?

11   A.   Yes.

12   Q.   Now, down here at the bottom, do you see where it says,

13   "Registrar's Stamp"?

14   A.   Yes.

15   Q.   Did Tri-Valley University have a registrar stamp?

16   A.   Yes, we did.

17   Q.   When would a transcript have a registrar stamp on it?

18   A.   So as soon as they -- we used to e-mail the transcripts to

19   the students, and if the student is asking for a hard copy,

20   then we used to, like, print out this, put the stamp, and then

21   mail the hard copy to the student.

22   Q.   So you would e-mail final transcripts to students.  It

23   wouldn't have the stamp?

24   A.   Yes, without stamp.

25   Q.   Without stamp.

1          I want to talk a little bit more about SEVIS.  Did you

2     access SEVIS while you were working at Tri-Valley University?

3     A.   Yes, I did.

4     Q.   On what kind of machine were you working on?

5     A.   There were a couple of laptops and one desktop, I guess,

6     one or two desktops.

7     Q.   Do you know what the term "designated school official"

8     means?

9     A.   Not at the beginning, but later on, I came to know.

10    Q.   And you've heard of it referred to as DSO?

11    A.   Yes.

12    Q.   Do you know who the DSO's at Tri-Valley University were?

13    A.   Yes.

14    Q.   Who were they?

15    A.   Susan Su, Wenchao Wang, and Sophie Su.

16    Q.   Explain to me how your day would start.  How would you

17    access SEVIS?

18    A.   I would come in the morning, and once I'm over there, Susan

19    Su used to -- she used to tell me to grab a laptop.  I used to

20    grab a laptop and give it to her.  She used to log into some of

21    the sites, and then after logging in, she used to hand the

22    laptop to me.

23    Q.   And the site that she was logging into -- was that SEVIS?

24    A.   Yes.

25    Q.   When you would work in SEVIS, what would you do?

DASA - DIRECT / RHYNE

1    A.   I'd go back to the e-mails.  I'd take the application,

2    documents.  I tried to input the student's first name, last

3    name, date of birth, address, course, and financial information

4    and print the I-20.

5    Q.   How many I-20's would you say you printed per day?

6    A.   An average, like, 15 to 20.

7    Q.   What would you do with those I-20's at the end of the day?

8    A.   I would print out and give it to Susan -- Susan Su, then

9    she would sign it, and then we were going to mail it.  And

10   before that, like, once I create the I-20, I attach those to

11   the student's e-mail and reply back to them saying, "Your I-20

12   has been created."

13   Q.   Is it true that the DSO's name is preprinted on the I-20?

14   A.   Yes.

15   Q.   And that depends on which account you're using; correct?

16   A.   Yes.

17   Q.   Did you always use the same account?

18   A.   No.  It was different accounts.

19   Q.   When you would take the I-20's to Dr. Su, were they all the

20   same DSO, or were there different names?

21   A.   They were all the same DSO's --

22   Q.   Did you sign --

23   A.   -- on a particular day.

24   Q.   On a particular day.

25        Okay.  Did you take I-20's to Dr. Su that were in her name?

DASA - DIRECT / RHYNE

1    A.   Yes.

2    Q.   Did you see her sign her name on those I-20's?

3    A.   Yes, I did.

4    Q.   Did you take I-20's to Dr. Su in the DSO name of Sophie Su?

5    A.   Yes, I did.

6    Q.   Did you see Dr. Su sign those names?

7    A.   Yes.

8    Q.   Or those signatures?

9    A.   Yes.

10   Q.   Whose name would she sign?

11   A.   Sophie Su's and Wenchao Wang.

12   Q.   So you saw her do the same thing with Wenchao Wang as well?

13   A.   Yes.

14   Q.   Did you come to learn that you weren't supposed to be

15   accessing SEVIS?

16   A.   Yes.

17   Q.   What did you do when you learned that -- well, let me ask

18   you this:  How did you learn that?

19   A.   So one day what happened -- every day, she used to log in

20   and give it to me.  One day, the SEVIS logged out, and when

21   I -- when the site got logged out, there was a disclaimer on

22   the site saying only DSO's should be accessing the SEVIS.

23   Q.   What did you do at that point?

24   A.   At that point, I took the laptop and went back to Susan,

25   and she logged in back and gave it to me.

1    Q.   Did you inform Dr. Su of what you had seen on the screen,

2    that you weren't supposed to access SEVIS?

3    A.   Yes, I did.

4    Q.   What did she say when you told her that?

5    A.   She said she's the DSO of the university.  She knows all --

6    every single rule, and I shouldn't tell anything to her, and

7    there's a lot of situations where she used to shout at me.

8    Q.   Mr. Dasa, I want to shift gears a little bit here, and I

9    want to talk very narrowly about the next topic.

10        You were charged with crimes surrounding your access to

11   SEVIS in this case; is that correct?

12   A.   Yes.

13   Q.   And you pleaded guilty to conspiracy to commit unauthorized

14   access of a government computer system; is that correct?

15   A.   Yes.

16   Q.   And that government computer system was SEVIS?

17   A.   Yes.

18   Q.   And that agreement requires you to cooperate with the

19   United States; is that correct?

20   A.   Yes.

21   Q.   And to give testimony in this case?

22   A.   Yes.

23   Q.   And to give documents to the agents; is that correct?

24   A.   Yes.

25   Q.   And to meet with the Government; is that correct?

1    A.   Yes.

2    Q.   To be interviewed; correct?

3    A.   Yes.

4    Q.   And you -- you've done all those things to date; is that

5    correct?

6    A.   Yes.

7    Q.   Okay.  I want to now shift gears and talk about Tri-Valley

8    University's classes.

9         In order to put this in perspective, can you tell the jury

10   the different date ranges approximately that you were working

11   onsite at Tri-Valley University?

12   A.   I was working -- I joined Tri-Valley University for the

13   first time in January, middle of January, and I quit Tri-Valley

14   University, like, early February.  And again, I joined end of

15   February or March and continued to work until May.  And in the

16   beginning of May and -- again, I joined Tri-Valley University

17   at the end of May and quit the job on September 7th --

18   September 31st, 2010.

19   Q.   During the time you were working at Tri-Valley University,

20   were you working in the front office?

21   A.   Yes.

22   Q.   Now, Tri-Valley University initially was at Pleasanton

23   Unified School District?

24   A.   Yes.

25   Q.   Later moved to 405 Boulder Court; is that correct?

1    A.   Yes.

2    Q.   During your time frame working at Tri-Valley University,

3    did you ever see any physical classes?

4    A.   No.

5    Q.   How often would you see an instructor?

6    A.   Twice -- once or twice a month.

7    Q.   What was the purpose of the instructor's presence at

8    Tri-Valley University, if you know?

9    A.   Couple of them were, like, Ph.D. students at Tri-Valley

10   University.  They were coming at the university to get enrolled

11   for the classes, and that's how I met them.

12   Q.   Were these also F-1 students?

13   A.   Yes.

14   Q.   How did you know they were F-1 students?

15   A.   Because I was helping them in order to register their

16   classes, and sometimes they used to come for their paycheck.

17   Q.   Did you ever see them sit at the front of a room and start

18   to teach a class?

19   A.   No.

20   Q.   What about an online class?  Did you ever see them get in

21   front of a camera and start teaching an online class?

22   A.   At the beginning, there were no classes, but later on there

23   were a couple of online classes.

24   Q.   You saw a couple of those?

25   A.   Couple of them, yeah.

1    Q.   Now, you actually tried to log into some of your classes;

2    is that correct?

3    A.   Yes.

4    Q.   What would happen when you would log into your classes?

5    A.   I see a few of the books attached and materials attached to

6    it, and that's what I've seen.  When I was getting bored while

7    I'm working, I used to log in, and I used to go through the PDF

8    documents.

9    Q.   How did you log in?

10   A.   I used to have my user ID and password.  It's -- we need to

11   go onto TVU's admin website where they administer the classes,

12   and that's when I log into -- using my account.  I see my

13   classes over there.

14   Q.   What else would you see when you would log into these

15   classes?  Anything else?

16   A.   No, and there would be always a professor's name right next

17   to the course.

18   Q.   Would you see the live professor?

19   A.   I haven't seen at any time.

20   Q.   Did Dr. Su give -- or did you hear Dr. Su give instructions

21   to you or other people that worked in Tri-Valley's office about

22   what to do if a teacher submits grades that have F's for their

23   students?

24   A.   I never heard about that, and up to my knowledge, I never,

25   like, college students -- to know a student who got F grade.

DASA - DIRECT / RHYNE

1    Q.   Did you ever see anybody get an F that was sent out on a

2    transcript?

3    A.   No.

4    Q.   If a student -- would students call sometimes and ask about

5    their transcripts?

6    A.   Yes.

7    Q.   What would you do when a student called and asked about

8    transcripts?

9    A.   We used to tell them to deliver e-mails to the university,

10   and after they e-mail to the university, we used to update the

11   course name and other things and were not updating the grades,

12   and we used to send the e-mail back to them.

13   Q.   Are you familiar with the term "referral fee" or "referral

14   agreement"?

15   A.   Yes.

16   Q.   What is that?

17   A.   It's like a referral agreement like -- you join the

18   university.  You refer a new student.  If you refer a student,

19   you'll get 15 percent, and that student -- when they refer to

20   other students, you'll get, like, 5 percent, something like

21   that.

22   Q.   Who told you about the referral -- did Tri-Valley

23   University have a referral fee program?

24   A.   Yes.

25   Q.   Who told you about it?

1     A.   Susan Su.

2     Q.   And what percentage of the students' tuition would the

3     referring student get?

4     A.   15 percent and -- plus 5 or 3 percent if the other student

5     refers some other students.

6     Q.   So the first student -- if you're at the top, you'd get

7     15 percent for this student; correct?

8     A.   Yes.

9     Q.   And then if this student refers other students, then 5

10    percent would go up to the top person?

11    A.   Yes.

12              MR. RHYNE:  Your Honor, may I approach the witness?

13              THE COURT:  You may.

14         (Government's Exhibits 477 and 478 marked for

15    identification.)

16    BY MR. RHYNE:

17    Q.   Mr. Dasa, I'm going to hand you Exhibit 477 and 478 for

18    identification, and I'll ask you to look at Exhibit 477 first.

19         Do you recognize that?

20    A.   Yes.

21    Q.   What is it?

22    A.   It's a referral agreement.

23    Q.   Where did you get it?

24    A.   From Susan Su.

25    Q.   Is that a document you provided to Agent Mackey in this

1    case?

2    A.   Yes.

3    Q.   And does it look the same way it looked when you got it

4    from Dr. Su?

5    A.   Actually, I got two referral agreements.  The first one

6    was, like I mentioned, the 5-percent one.  This is a different

7    referral agreement, which has 1200 one-time bonus, and it's

8    only for -- most of the times, it was to -- very less people

9    used to get this $1,200.

10   Q.   Does that look like that particular referral agreement,

11   though?

12   A.   Yes.

13   Q.   The one you're talking about?

14   A.   Yes.

15        MR. RHYNE:  Okay.  Your Honor, we'd move Exhibit 477

16   into evidence.

17        THE COURT:  Any objection?

18        MR. BABCOCK:  No objection, your Honor.

19        THE COURT:  477 is admitted.

20        (Government's Exhibit 477 received in evidence.)

21        MR. RHYNE:  Can you publish 477, please, and can we

22   just zoom in from the "Student Referral" title at the top and

23   just down to the bottom, "January," all the way down.

24   BY MR. RHYNE:

25   Q.   Mr. Dasa, in Section 1 of this agreement, it states that

1  the agent will recruit international local students to

2  Tri-Valley University; correct?

3  A.  Where is that?

4  Q.  See the Roman Numeral I where it says, "Principles of

5  Agreement"?

6  A.  Yes.

7  Q.  And then there's a Subparagraph 1?

8  A.  Yeah.

9  Q.  The first principle for the agent is recruit international

10  local students to Tri-Valley University; correct?

11  A.  Yes.

12  Q.  And the first principle for Tri-Valley down below is

13  issuing I-20's in time to the admitted students for visa

14  application; is that correct?

15  A.  Yes.

16  Q.  And at the top, we see -- in the preamble, we see your name

17  there typed in, "Mr. Vishal Dasa"; correct?

18  A.  Yes.

19  Q.  And you mentioned that there was other referral agreements?

20  A.  Yes.

21  Q.  And how were those different than this one?

22  A.  That was having -- this was a one-time $1200, which is

23  mentioned in the fifth point of the second -- the university

24  shall give a total amount of $1200, one-time referral.

25  Q.  Oh.  Down in Block 5 --

1    A.   Yes.

2    Q.   -- of the Tri-Valley --

3    A.   Yes.

4    Q.   You're referring to this spot right here?

5    A.   Yes.

6    Q.   Okay.  Let me ask you to close that, put that back in the

7    folder there, and look at Exhibit 478.

8         Do you recognize Exhibit 478?

9    A.   Yes.

10             MR. RHYNE:  You can take that down.  Thanks.

11   BY MR. RHYNE:

12   Q.   What's Exhibit 478?

13   A.   It states that I've got, like, 15-percent referral fees,

14   and it also states that 12 -- like, 12-percent extra bonus for

15   those 12 and for the other students.

16   Q.   Is this a receipt for your payments?

17   A.   Yes.

18   Q.   Okay.  You received referral payments?

19   A.   Yes.

20   Q.   Did you get this from Tri-Valley University?

21   A.   Yes.

22   Q.   Did you give it to Agent Mackey?

23   A.   Yes.

24   Q.   Does it look -- if you look at Exhibit 478, does it look

25   like it looked when you got it?

1    A.   Yeah.

2              MR. RHYNE:  Your Honor, we'd ask that 478 be admitted

3    into evidence.

4              THE COURT:  Any objection?

5              MR. BABCOCK:  No objection, your Honor.

6              THE COURT:  478 is admitted.

7                (Government's Exhibit 478 received in evidence.)

8              MR. RHYNE:  Can we publish Exhibit 478, the first

9    page, please, and can we just start at the top, "Agent Referral

10   Fees," and go down about halfway.

11        Thank you.

12   BY MR. RHYNE:

13   Q.   Mr. Dasa, this is the receipt you're referring to?

14   A.   Yes.

15   Q.   It's for Spring 2010?

16   A.   Yes.

17   Q.   And it has a referral agreement rate of 15 percent?

18   A.   Yes.

19   Q.   Has your e-mail address there?

20   A.   Yes.

21   Q.   A mailing address for a check?

22   A.   Yes.

23   Q.   Is that your address?

24   A.   Yes, that's my address.

25   Q.   It was?

1    A.   It was my address.

2    Q.   Okay.

3    A.   Yeah.

4    Q.   Now, referring to "Student Name," we see Harpreet Singh.

5    Do you see that?

6    A.   Yes.

7    Q.   And there's a referral fee amount of 2700 times 15 percent;

8    correct?

9    A.   Yes.

10   Q.   And that came out to $405?

11   A.   Yes.

12   Q.   Was that a -- did you receive checks in the amount of $405

13   from time to time?

14   A.   Yes, I did.

15   Q.   And those are other students you referred there?

16   A.   Yes.

17            MR. RHYNE:  Ms. Hughes, can we continue on down the

18   page?

19       Zoom in a little more.

20   BY MR. RHYNE:

21   Q.   And are these more students that you referred?

22   A.   Yeah, and it shows, like, 5 percent, which was referred by

23   those other students.

24   Q.   Oh.  Those are the 5-percent ones?  So 5 percent of 2700 is

25   135?

1    A.   Yes.

2    Q.   And that's the referral's referral?

3    A.   Yes.

4    Q.   Okay.  Can we go to Page 2?

5         And more students that you referred; is that correct?

6    A.   Yes.

7    Q.   Now, Mr. Dasa, there was a rule at Tri-Valley University

8    about students who work in the front office referring other

9    students; is that correct?

10   A.   Yes.

11   Q.   When did that -- whose rule is that?

12   A.   It was from Susan Su's.

13   Q.   When did that rule come into effect?

14   A.   I don't know the exact date, but it was the second time

15   when I joined -- when I started working at Tri-Valley

16   University.  One fine morning, she told me that I should be not

17   eligible -- I will not be eligible to refer my students.

18   Q.   Did she tell you why she didn't want the staff members

19   referring students?

20   A.   She never told me that.

21   Q.   Do you know why?

22   A.   Maybe because we work and we recruit the student and get

23   their referral fees.

24   Q.   Because you could refer students who came in to yourself;

25   correct?

DASA - DIRECT / RHYNE

1    A.   Yes.

2    Q.   And as you were working at Tri-Valley University over time,

3    you did some of that; is that correct?

4    A.   Yes.

5    Q.   And other people in the office were doing that as well; is

6    that correct?

7    A.   Yes.

8    Q.   And that was against the instructions that Dr. Su had given

9    to you about the referral fees; is that correct?

10    A.   Yes.

11    Q.   Now, you would also refer walk-in students to other people

12    that you knew; correct?

13    A.   Yes.

14    Q.   One of those people was Ram Karra?

15    A.   Yes.

16    Q.   And his name is spelled R-a-m, C-a-r-r-a; correct?

17    A.   No.  R-a-m, K-a-r-r-a.

18    Q.   K-a-r-r-a.  I'm sorry.

19         And you would refer those students out so he could get the

20    referral fee; correct?

21    A.   Yes, and he told me that he will give me some percentage of

22    it.

23    Q.   He, in fact, gave you something in return for that; is that

24    correct?

25    A.   He just gave me a cell phone.

1    Q.   What kind of phone?

2    A.   iPhone.

3    Q.   You also passed along some walk-in students to somebody

4    named Golla; is that correct?

5    A.   Yes.

6    Q.   Who is that?

7    A.   He was a student at Tri-Valley University.

8    Q.   Okay.  How do you spell his name?

9    A.   Hari, H-a-r-i.  His middle name is B, and Golla is his last

10   name, G-o-l-l-a.

11   Q.   And he got referral fees for those students; is that

12   correct?

13   A.   Yes.

14   Q.   Even though they were walk-in students?

15   A.   Yes.

16   Q.   You also received extra payments for some other things you

17   did at Tri-Valley University; is that correct?

18   A.   Yes.

19   Q.   Would you -- did you ever expedite referred students'

20   application fees, speed them up?

21   A.   Hari Golla actually used to message to myself saying that

22   if I give a high priority to his applications, then he will

23   give me some money, and he gave me a thousand dollars for it.

24   Q.   What was Dr. Su paying you at this point?

25   A.   She was paying about, like -- it was depending on the

1    number of days when I worked over there.  So it was about 1500

2    to $1800 per month.

3    Q.   Okay.  And how many days a week were you working?

4    A.   At that time, I used to work five days a week, and I used

5    to work, like, more than -- like, about 12 hours a day.  Not

6    every day I used to work 12 hours.  It would -- like, ten to

7    12 hours.

8    Q.   Did Dr. Su find out that you were referring these students

9    and breaking some of these rules?

10   A.   Yes.

11   Q.   What did she do?

12   A.   Actually, for the second time when I joined, she came to

13   know in the month of May, and we had a very bad argument, and I

14   left the university.  I left the job, and she was telling me to

15   go off.

16        Then later on, I started coming to the university for my

17   friend's -- friend's I-20's and other admission documents.  She

18   actually took me aside, and she asked me what happened, why I

19   was doing that.  And I told her -- saying it was Ramakrishna

20   Karra who made me do all these, and he told me that he will pay

21   a percentage, and that's how I got involved in it.  And then

22   later on when -- after I told her everything, she rehired me.

23   Q.   I want to jump back to -- to one question I asked you

24   earlier.

25             MR. RHYNE:  Your Honor, may I approach the witness?

```
 1              THE COURT:  You may.

 2          (Government's Exhibit 588A marked for identification.)

 3    BY MR. RHYNE:

 4    Q.  Mr. Dasa, I'm showing you what's been marked as

 5    Exhibit 588A for identification.

 6          Do you recognize that?

 7    A.  Yes.

 8    Q.  What is that?

 9    A.  This is my first referral check.

10                    (Court reporter clarification.)

11              THE WITNESS:  Sorry.  I don't remember where I got my

12    first -- it's my first referral check.

13              MR. RHYNE:  Your Honor, we'd offer Exhibit 588A into

14    evidence.

15              THE COURT:  Any objection?

16              MR. BABCOCK:  Probably not, but I'm catching up here.

17    This is a check?

18          No objection.

19              MR. RHYNE:  Can we publish 588A --

20              THE COURT:  588A is admitted.

21              MR. RHYNE:  -- Page 3, please.

22          (Government's Exhibit 588A received in evidence.)

23              THE COURT:  Mr. -- Mr. Dasa, I'm not sure I caught

24    the exact word you used.  Did you mean to say this is the first

25    referral fee check you got?
```

DASA - DIRECT / RHYNE

```
 1              THE WITNESS:  I'm not sure about that.

 2              THE COURT:  I see.

 3         Okay.  But it is a referral fee check?

 4              THE WITNESS:  Yes, a check -- referral fee check.

 5              THE COURT:  Okay.  I just want to remember your

 6    words.

 7    BY MR. RHYNE:

 8    Q.  And this is a referral fee check for $945?

 9    A.  Yes.

10    Q.  And it's from Tri-Valley University; is that correct?

11    A.  Yes.

12    Q.  Now, I want to shift gears and talk about another topic.

13         You were interviewed in this case back in November of 2010

14    by Special Agent Mackey; is that correct?

15    A.  Yes.

16    Q.  That's the first time you saw Special Agent Mackey?

17    A.  Yes.

18    Q.  Where did that interview take place?

19    A.  At my house.

20    Q.  And did he knock on the door?

21    A.  Yes.

22    Q.  Did you talk with him that day?

23    A.  Yes.

24    Q.  Now, during that interview, you told him some things that

25    weren't true; is that correct?
```

1    A.   Yes.

2    Q.   You told him that you had attended -- you had been

3    attending classes at Tri-Valley University two weeks before; is

4    that correct?

5    A.   Yes.

6    Q.   That wasn't true, was it?

7    A.   It was not true.

8    Q.   You told him that the class was a business administration

9    class taught by Gangoo, G-a-n-g-o-o; is that correct?

10   A.   Yes.

11   Q.   At that point, the agent saw something on your floor; is

12   that correct?

13   A.   Yes.

14   Q.   What did they see?

15   A.   They saw the I-20's of different students.

16   Q.   Then they told you that they didn't believe what you were

17   saying; is that correct?

18   A.   Yeah.

19   Q.   At that point, did you begin telling the truth?

20   A.   Not at that time.

21   Q.   Okay.  Did you eventually?

22   A.   Yes.  They actually took me to one of the buildings in San

23   Francisco.  Then I told everything about what was happening.

24   Q.   Did you give the agents any documents after that interview?

25   A.   Yes, I did.

1    Q.  And you consented for them to take those documents; is that

2    correct?

3    A.  Yes.

4    Q.  Now, I want to go back and talk a little bit more about you

5    working at Tri-Valley University.

6        You stated earlier that students would sometimes request a

7    transfer; is that correct?

8    A.  Yes.

9    Q.  Was there any direction from Dr. Su about referring those

10   kinds of questions to her?

11   A.  Yes.

12   Q.  What did she tell you?

13   A.  She told me, like, if a student applies -- is asking or

14   forcing -- if he's asking the university to transfer, then I

15   should always take those to Susan.

16   Q.  And just for clarification, these are students who want to

17   transfer out; right?

18   A.  Yes.

19   Q.  Okay.  And she told you to refer the students who want to

20   transfer out to her?

21   A.  Yes.

22   Q.  Did you hear conversations that Dr. Su would have with some

23   of these students who wanted to transfer out?

24   A.  A couple of them.

25   Q.  What would she tell the students when they asked her to

1    transfer?

2    A.   That the student should at least enroll for two semesters

3    at Tri-Valley University, and then only she will be able to

4    transfer them to other schools.

5    Q.   What if they said they didn't want to pay for two more

6    semesters and they wanted out now?  What would she say to them?

7    A.   I think they wouldn't have any other choice, and I've seen

8    a couple of students -- like, they wanted to have a transfer,

9    and Susan Su actually terminated them and made out of status

10   and then transferred.

11   Q.   Okay.  Do you know anybody named Santhosh?

12   A.   Yes.

13   Q.   Did you hear a conversation between Dr. Su and Santhosh?

14   A.   Yes.

15   Q.   What did Dr. -- what was that conversation about?

16   A.   They were literally arguing.  Like, he was requesting her

17   for a transfer, and Susan Su was, like, not allowing -- not

18   transferring him to the other school.

19   Q.   Did she give him any options during that argument?

20   A.   She said, like, he should register for the classes, and he

21   was refusing to do that.

22   Q.   What about somebody named Susanna?  Do you know somebody

23   named Susanna?

24   A.   Yes.  They were both together at that time.

25   Q.   Okay.  What did Dr. Su tell Susanna?

1    A.   I think it was the same because they were, like,

2    boyfriend/girlfriend.  They were talking to Susan at the same

3    time.

4    Q.   So I want to move on to -- from fall of 2010 into Summer

5    2010.

6         Were you enrolled in classes in summer of 2010?

7    A.   Yes.

8    Q.   Were you going to classes?

9    A.   No.

10   Q.   What was your visa status?

11   A.   F-1 visa on Tri-Valley University.

12   Q.   Fall of 2010, what was your status then?

13   A.   Fall 2010?  F-1 status, Tri-Valley University.

14   Q.   Were you enrolled in classes?

15   A.   I enrolled for the classes, but I didn't go to classes.

16   Q.   And then spring of 2011 is when the school was shut down;

17   is that correct?

18   A.   Yes.

19              MR. RHYNE:  No further questions, your Honor.

20              THE COURT:  Cross-examination?

21                      **CROSS-EXAMINATION**

22   BY MR. BABCOCK:

23   Q.   Good morning, Mr. Dasa.

24   A.   Good afternoon.

25   Q.   Not quite.

1          My name is Erik Babcock, and I represent Dr. Su.

2          You, as I understand it, first came to the United States in

3     2008?

4     A.   Yes, October 2008.

5     Q.   From India?

6     A.   Yes.

7     Q.   You used what's called a consultant -- a consultant or a

8     consultancy, an agency in India, when you were trying to get to

9     the United States?

10    A.   Yes.

11    Q.   Do you recall the name of the consultancy?

12    A.   Optimus Consultancy.

13    Q.   Optimus?

14    A.   Yep.

15    Q.   You paid them a fee to --

16    A.   Yes.

17    Q.   -- to help you?

18    A.   Not to help me, but in order to -- for me to -- like, let

19    me know that I really need a GI TOEFL, an IELTS for processing

20    my application as if -- if I applied for a Master's program,

21    there's a graduation called Exam, which I need to take, and

22    also an English proficiency test, which is called TOEFL.  And

23    there's another called IELTS, which I need to take.

24         And I really don't know the exact process.  So they were,

25    like, telling me and directing me where and what exam do I need

DASA - CROSS / BABCOCK

```
 1     to take, where to go for training, and how to input my

 2     application and all this stuff.

 3     Q.   They gave you some guidance?

 4     A.   Yes.

 5     Q.   Because you didn't exactly know what was involved?

 6     A.   Yes, when I joined that consultancy.

 7     Q.   Did they make suggestions as to what schools to apply to?

 8     A.   They -- yeah, a couple of them.

 9     Q.   The first school you attended was -- I think you said

10     Antioch University?

11     A.   Antioch University.

12     Q.   Which is down in Santa Barbara?

13     A.   Santa Barbara, California.

14     Q.   Was that one of the schools the consultancy had suggested

15     as a possibility?

16     A.   Yes.

17     Q.   Okay.  And you first enrolled in -- was it the --

18     A.   The MA in Organizational Psychology.

19     Q.   I was actually looking for the date.

20     A.   October 2008.  I got enrolled for -- I think first or

21     second week of -- first week of October, and I landed in the

22     U.S. on October 4th.

23     Q.   Before you -- was it -- when you came in October 2008, was

24     that the first time you had been to the United States?

25     A.   Yes.
```

1    Q.   Okay.  Did you have any relatives living here?

2    A.   One of my uncles used to live in Irvine, California.

3    Q.   Where?

4    A.   Irvine, California.  Irvine.

5              THE COURT:  Irvine.

6              THE WITNESS:  It's Southern California.

7              MR. BABCOCK:  Irvine.  I see.

8         Thank you, your Honor.

9    BY MR. BABCOCK:

10   Q.   And did you -- before you landed -- well, strike that.

11        Where did you fly into?  Los Angeles?

12   A.   Los Angeles.

13   Q.   Okay.  Before you arrived at Antioch University to

14   register, had you already lined up housing to stay in?

15   A.   My uncle picked me up, and he took me to Irvine, and then

16   he dropped me at Santa Barbara.

17   Q.   I see.

18        And had your uncle lined up a place for you to live

19   already?

20   A.   Not at that time.  I was living in a motel at the

21   beginning.

22   Q.   Okay.  It took some time to find a place to live?

23   A.   Actually, it didn't took any time.  The moment I registered

24   at the classes, the university provided housing for me.

25   Q.   The university provided you a place to stay?

DASA - CROSS / BABCOCK

1    A.   Yes.

2    Q.   Okay.  Was this more like a dorm or more like an off-campus

3    apartment or what?

4    A.   Off-campus apartment.  It was, like, two blocks away from

5    the university.

6    Q.   Were there other students from the university living there?

7    A.   Yes.

8    Q.   Okay.  And you stayed at Antioch University for one

9    semester?

10   A.   Yes.

11   Q.   At which point, you transferred to International Technical

12   University; right?

13   A.   International Technological University.

14   Q.   Technological University.  My mistake.

15        And where you went for another semester?

16   A.   Yes.

17   Q.   Okay.  International Technological University is here in

18   the Bay Area; right?

19   A.   Yes.  It was in Sunnyvale, California.  Now they are

20   relocated to San Jose, California.

21   Q.   And you -- what were you studying at IT -- it goes by ITU;

22   right?

23   A.   Yes.

24   Q.   What were you studying at ITU?

25   A.   MS in Healthcare Management.

1    Q.   Okay.  And at some point, you learned -- you heard about

2    the school called TVU?

3    A.   Later on, I went to India for my summer break.  Then I came

4    back to U.S.  That's when I came to know.

5    Q.   When you came back -- this was in the summer of 2009;

6    correct?

7    A.   2009, yes.

8    Q.   The summer of 2009, you went home for a while?

9    A.   Yes.  I went for three months.

10   Q.   For the full summer?

11   A.   Almost.  The summer semester is four months.  So I went for

12   three months.

13   Q.   Okay.  And after you came back, you learned of TVU?

14   A.   Yes.

15   Q.   At which point, you went online and checked it out a little

16   bit?

17   A.   Yes.

18   Q.   And at some point, you called and made an appointment to go

19   visit?

20   A.   Yes.

21   Q.   In the first week of September 2009?

22   A.   Yes.

23   Q.   And one of the things you looked at -- you spoke with

24   Dr. Su?

25   A.   I'm sorry?

1    Q.   You spoke with Dr. Su?

2    A.   Yes.

3    Q.   And you learned about the fees?

4    A.   Not at that time.  Later on, I came to know.

5    Q.   Okay.  Well, you learned what the tuition was; right?

6    A.   Not at that time, later on when I met her in person.

7    Q.   Right.  What were -- what was the tuition?

8    A.   It was 2700 -- $900 a subject, and it's three subjects

9    which I need to enroll.  It's 2700 plus $50 registration and

10   $50 application fees.

11   Q.   And what had the fees been at ITU, the tuition?

12   A.   3800 -- 38- and some other extra fees.

13   Q.   So the fees at -- the tuition at ITU was more than a

14   thousand dollars --

15   A.   Yes.

16   Q.   -- more?

17        And what about at Antioch University?

18   A.   Antioch University -- for a quarter, it was, like, $6,000.

19   Q.   That was -- so TVU was substantially less than Antioch

20   University?

21   A.   Yeah.

22   Q.   And ITU was also substantially less than Antioch?

23   A.   Yes.

24   Q.   More than $2,000 less; right?

25   A.   Yes.

1    Q.   Is that why you transferred to ITU?

2    A.   That's one of the reasons, but the major reason was --

3    like, at Antioch University, I was doing MA in Organizational

4    Psychology because I'm from a science background.  I've done my

5    Bachelor of Pharmacy.  I wanted to do my Master's in Healthcare

6    Management so that it's related to my course of study.  That's

7    the reason why I transferred to International Technological

8    University.

9    Q.   And Antioch did not offer the program you were interested

10   in?

11   A.   They were not offering me that.

12   Q.   Okay.  But I'm curious.  Why did you go to Antioch in the

13   first place if it didn't offer a program you were interested

14   in?

15   A.   I was -- at the beginning, I was interested to do some

16   organizational psychology stuff, but later on, I think, like,

17   healthcare management would be more, like, closer to my

18   professional Bachelor of Pharmacy degree than organizational

19   psychology because psychology is completely different.

20   Q.   Okay.  When you -- so you registered in September of 2009

21   for -- strike that.

22        I meant to ask and forgot:  The ITU -- did ITU offer -- so

23   ITU did offer courses that you were interested in studying?

24   A.   Yes.  They were having an MS in Healthcare Management.

25   Q.   And isn't it true one of the main reasons, if not the

1    reason, that you transferred to TVU was because it was -- the

2    tuition was less than the tuition at ITU?

3    A.   Yes.

4    Q.   Okay.  And you made that transfer in September 2009?

5    A.   Yes.

6    Q.   Did you have to -- strike that.

7         You paid your portion of your first -- your uncle paid a

8    first portion of your first semester's tuition?

9    A.   Yes.

10   Q.   With a wire transfer?

11   A.   Yes.

12   Q.   You enrolled.  You told Ms. Su that you were interested in

13   on campus employment, but at the time, she said she didn't have

14   any positions available?

15   A.   Yes.

16   Q.   Okay.  You mentioned a friend that had visited with you, I

17   think, on both occasions the first two times you went?

18   A.   Sushumma Andal.

19   Q.   Did she register as well?  Did she -- did she attend TVU?

20   A.   She got enrolled for the classes, but I don't know at that

21   time she registered for classes or not, but eventually she

22   registered for the same -- the same semester.

23   Q.   Okay.  So if I understand the timing, you -- you first

24   enrolled in 2000 -- in September 2009, but you didn't start

25   working in the office until the next semester; is that right?

1    A.   Yes.

2    Q.   Okay.  And -- sorry.  And you actually took the next

3    semester off and just worked; is that right?

4    A.   Yes.  Susan Su actually gave me a break.

5    Q.   And you began working basically full time in the office?

6    A.   Yes.

7    Q.   Who else was working in the office when you started?

8    A.   There were -- I don't remember all of the names.  At that

9    time, it was Parth Patel, and there were a couple of other

10   students from San Jose State University and a couple of other

11   different folks.

12   Q.   You mentioned Mr. Patel before.  He was -- in addition to

13   Dr. Su, he was one of the ones who trained you?

14   A.   Yes.

15   Q.   He had been working there before you arrived?

16   A.   Yes.

17   Q.   Okay.  Was he doing the same kinds of things that you ended

18   up doing as far as admitting students that were making

19   applications?

20   A.   Yes.

21   Q.   Responding to phone calls and e-mails?

22   A.   Yes.

23   Q.   Entering student information into SEVIS and issuing I-20's?

24   A.   Yes.

25   Q.   Can you describe for us the office layout a little bit?  We

1    don't have any photographs of the inside.  Did you share a room

2    with all of the -- all of the -- did you share the same office

3    space with all of your coworkers?

4    A.   So there was a -- as soon as we enter that unified district

5    school, there was a small room, like, probably from there to

6    here, and then there's a classroom attached right next to that

7    office.  So --

8    Q.   Let me just stop you right there because you were -- you

9    were making some motions with your hands, and I'm asking -- you

10   indicated the distance from the wall to about the first part of

11   the judge's bench here, which I would say is maybe, what,

12   12 feet or so?

13              THE COURT:  Mr. Dasa, when you're saying how big the

14   room was, I understand you to say that wall would be one side

15   of the room, the wall that I'm facing.  How far away from that

16   would the other wall be?  Is it your chair, where I'm sitting,

17   or where?

18              THE WITNESS:  Probably here until this wall.

19              THE COURT:  I think 12 feet is a reasonable estimate.

20         Does the Government agree with that?

21              MR. RHYNE:  We do.

22              THE COURT:  Good enough for these purposes.  All

23   right.

24              MR. BABCOCK:  Yeah.  Thank you, your Honor.

25              THE WITNESS:  And there was a classroom right next to

DASA - CROSS / BABCOCK

1    it --

2    BY MR. BABCOCK:

3    Q.  Okay.

4    A.  -- and we used to sit in that classroom.

5    Q.  Okay.  So you would actually work in the classroom?

6    A.  Yes.

7    Q.  Where would Dr. Su work?

8    A.  Dr. Su used to sit in this small room.

9    Q.  Okay.  So she was in an office or in a room next to the

10   room where you were working?

11   A.  Yes, at the beginning, but later on she -- like, we were

12   not -- she was not renting that classroom, and later on

13   everyone used to sit in that small room.

14   Q.  So this -- do you remember the address of the school when

15   you first started working there?  Do you remember the street?

16   A.  Bernal Avenue.

17   Q.  Bernal Avenue.

18       Okay.  And you mentioned that it was within Pleasanton

19   Unified School District --

20   A.  Yes.

21   Q.  -- is that right?

22   A.  Yes.

23   Q.  As part of the district -- district building -- one of the

24   district buildings?

25   A.  I guess.  I'm not sure about that.  I think it's a district

DASA - CROSS / BABCOCK

1    school, but I don't know all that information.

2    Q.   Okay.  And you were there -- you were in that space for

3    approximately how long before the school moved?

4    A.   I don't know because on the day I joined the university in

5    September 2009, I was already -- I -- she actually took us to

6    that place.

7    Q.   On Bernal?

8    A.   On Bernal.

9    Q.   Yes.

10   A.   So I don't know prior to that how many days she --

11   Q.   Yeah.  I'm sorry.  I meant to ask -- I was asking about

12   afterwards because you mentioned the second location on Boulder

13   Court.

14   A.   Boulder Court?  Probably May of 2010.

15   Q.   Okay.

16   A.   And actually, I helped her in moving the stuff, too.

17   Q.   You helped her in the move?

18   A.   Move the stuff.

19   Q.   So you were at the Pleasanton Unified School District space

20   for what, about a year and a half?

21   A.   No, about four to five months.

22   Q.   Okay.  And at that point, the whole -- all the facilities

23   were upped and moved to the building on Boulder Court?

24   A.   Yes.

25   Q.   Which you understood had recently been purchased?

DASA - CROSS / BABCOCK

1    A.   I think so.  I was not sure.

2    Q.   Okay.

3    A.   I'm not sure.

4    Q.   Did Dr. Su ever tell you that she had bought the school

5    building or anything like that?

6    A.   She said there was a new building which we are moving on

7    to, but I don't remember whether she told me that she purchased

8    or she's renting.

9    Q.   Okay.  Now, I asked you earlier about how many people were

10   working in the office when you started.

11   A.   Yes.

12   Q.   And you said?

13   A.   Three to four.  It depends on the day.  Like --

14   Q.   Okay.

15   A.   -- it depends on those summers because university guys --

16   there were, like, three or four guys.  If they had classes,

17   they used -- they were not showing up if they had classes.

18   Some of them used to show up, and some were not showing up.

19   Q.   You're talking about the students from San Jose State

20   University?

21   A.   Yes.

22   Q.   Okay.  So they were only working when they were attending

23   classes?

24   A.   I think so.

25   Q.   Okay.  Was there anyone else working full time in the

1    office that was not attending classes when you started working?

2    A.   I don't remember.

3    Q.   Okay.  That's fair enough.  It's been five years or so,

4    four and a half years; right?

5    A.   Yeah.

6    Q.   Actually, four years since you started roughly --

7    A.   Okay.

8    Q.   -- in the beginning of 2009.

9         So -- I didn't understand exactly what you said about your

10   first semester.  So I'd like to ask you some questions about

11   that.

12   A.   Sure.

13   Q.   So your first semester, you enrolled in which classes?

14   A.   As I remember, I registered for Healthcare Management and

15   Leadership Management, and there was some -- some other course

16   related to Healthcare Management.

17   Q.   The third course was some sort of healthcare course?

18   A.   Yes, because I was an intention to health -- to do

19   Healthcare Management course.  I wanted to do the core subjects

20   in healthcare.

21   Q.   I understand.  That would -- that's what you planned to

22   study.

23        And Ms. Su -- when you tried to log in, you had some

24   difficulty?

25   A.   At -- not at that time.  Later on when I was asking her

1    when the classes would begin from, she actually added a

2    computer science course and some human resource management

3    course.  That's when I -- when I was trying to log into the

4    computer course.  That's when I was not understanding anything.

5    Q.  So -- and what was the reason Dr. Su gave you for enrolling

6    you in the other classes?

7    A.  She made me take -- that Healthcare Management course has

8    less than five students.  That's the reason why she's enrolling

9    me for computer science and human resource management course.

10   Q.  I see.  The third class you wanted -- there weren't enough

11   students enrolled then?

12   A.  The first day which I registered for.

13   Q.  I'm sorry?

14   A.  The first three courses which I registered for.

15   Q.  Yeah.

16   A.  She said that the first three registered courses were

17   having less than five students --

18   Q.  I got it.

19   A.  -- and that's the reason why she's enrolling me --

20   Q.  Okay.

21   A.  -- for the extra classes.

22   Q.  And did you -- did you log in for the other classes and

23   review the materials?

24   A.  I tried logging in, and I was trying to do the homework,

25   but I was not able to understand because I'm from -- I'm -- I

DASA - CROSS / BABCOCK

1    have a healthcare background.

2    Q.   I understand.

3         The courses that she asked you to take that you hadn't

4    originally signed up for related to computer science; right?

5    A.   Computer science and human resource management.

6    Q.   Which was not anything that you had a background in?

7    A.   Yes.

8    Q.   So you were having difficulty with the material?

9    A.   With the -- understanding those.

10   Q.   Is that fair to say?

11        Did you try to do -- did you try to do the material for the

12   courses?

13   A.   I did, and I was unable to do that.  That's when I e-mailed

14   Susan Su about this, and she replied back to me saying it's

15   just for the auditing purposes.

16   Q.   And you ended up -- didn't you say at the beginning of your

17   testimony that you're now doing some sort of -- you're working

18   for a company and doing some sort of engineering, are you not?

19   You said you were working for eHarmony?

20   A.   I work at eHarmony.

21   Q.   And doing -- working with the IOS development?

22   A.   QA, yes.

23   Q.   So you ended up --

24             THE COURT:  Mr. Dasa, what does QA stand for?

25             THE WITNESS:  Quality Assurance.

1          MR. BABCOCK:  Thank you, your Honor.

2     BY MR. BABCOCK:

3     Q.  So you ended up, it sounds like, learning some computer

4     science; right?

5     A.  Yes.

6     Q.  And becoming at least in the -- in fall of 2008, you were

7     struggling with it?

8     A.  Yes.

9     Q.  But now you're actually working in the field; is that

10    right?

11    A.  Yes.

12    Q.  Now, when Mr. Rhyne, the prosecutor, showed you

13    Exhibit 480, which is the transcript you received for that

14    first semester, it shows credits -- some credits for your --

15    from the first two schools you went to, and you mentioned that

16    you hadn't done all of those -- hadn't done all of those

17    classes; right?

18    A.  Are you referring to Tri-Valley University subjects?

19    Q.  Actually, no.  I'm sorry.  I'm referring to the transfer

20    credits.  So for example, you see up -- the credits from

21    Antioch University?

22    A.  Yes, I've done those courses.

23    Q.  You took all three of those courses?

24    A.  Yes, I did.

25    Q.  Okay.  And the credits from International Technological

1    University -- I think you said there were two of those that you

2    did not do; is that right?

3    A.   I did not do the last two ones.

4    Q.   That -- you're referring to the Intro to Computer

5    Networking and -- I don't know what -- the Clint Service --

6    Server --

7    A.   Yeah.

8    Q.   -- Server on the Internet?

9    A.   I have not done those courses.

10   Q.   What about the first three?  The first three are accurate?

11   A.   Yes, I did.  I did -- took Bioethics, International

12   Marketing, and High-Tech Biotech Enterprise.

13   Q.   Okay.  Can you tell us, if you know, how -- because you

14   ended up working in the office, and I assume you've dealt with

15   these transfers at some point; right?

16   A.   I didn't get your question.

17   Q.   Well, later on when you worked in the office, you dealt

18   with students who were transferring from other schools?

19   A.   What do you mean by that?  I'm not getting your question.

20   Q.   Well, for example, students that transferred from

21   International Technological University to Tri-Valley -- to

22   Tri-Valley University; right?

23   A.   Yes.

24   Q.   Okay.  How did -- if you know, how did -- how did

25   Tri-Valley University get this information about the previous

1    credits that you are shown here?

2    A.    All the -- all that Tri-Valley University was doing was

3    getting the transfer -- request the student to send the

4    previous transcript, the one which the student has studied, and

5    we used to copy and paste over there.  That's right.

6    Q.    So did you ask International Technological University to

7    send TVU your transcripts?

8    A.    No.  All we -- so I got my International Technological

9    University transcript.  I take a scanned copy and send it to

10   the university.

11   Q.    Okay.  So you got the transcript and gave it to the school?

12   A.    Yes.

13   Q.    Okay.  And the same for the transcript from Antioch

14   University?

15   A.    Yes.

16   Q.    Okay.  So do you know how these two classes that you didn't

17   actually take from ITU ended up in the transcript?

18   A.    I really don't know.  Probably there were -- someone was

19   trying to edit something, and they hadn't deleted those

20   courses.  It might have been from another student because all

21   they do is modify those information.

22   Q.    In other words, this -- this transcript was not created

23   from the beginning each time; right?

24   A.    There were a lot of transcripts created on my name, like,

25   every time because they would keep on updating, and the one

DASA - CROSS / BABCOCK

1     which I really got from the first time, when I got A, A,

2     A-minus -- except it's a completely different transcript than

3     this.

4     Q.   This is not the first transcript you got?

5     A.   No.

6     Q.   I thought you said this was the first transcript you got.

7     A.   No, this is not my first transcript.

8     Q.   Well, how is it different than the first transcript?

9     A.   The first transcript was only having the bottom three

10    subjects, the one at Tri-Valley.  I was not having my transfer

11    credits, the Antioch ones, not the IT ones.

12    Q.   When is the first time that you saw this particular

13    transcript?

14    A.   Somewhere, like, in -- I don't remember.

15    Q.   Since the school was shut down?

16    A.   No, before that.  I really don't know, before that, but I

17    see that this is not my final transcript.

18    Q.   Did you see a final -- another transcript after this that

19    was more accurate?

20    A.   Before this, I got a transcript, which is in my e-mail,

21    saying I took the Tri-Valley University courses, and I got A,

22    A, A-minus, and I don't know when I got this transcript and the

23    other stuff.

24    Q.   Was the first transcript that you got -- so it didn't have

25    this information itself about your transfer credits?

DASA - CROSS / BABCOCK

1    A.   Yes.

2    Q.   It did have a list of three courses and grades --

3    A.   Yes.

4    Q.   -- for TVU?

5    A.   Yes.

6    Q.   Okay.  And was it one of the ones listed, these three

7    courses?

8    A.   Yeah, exactly the same ones.

9    Q.   Okay.  So this particular -- this particular part of the

10   transcript is accurate?

11   A.   Yes.

12   Q.   And that -- it's the same as what you got in the first

13   transcript you received from TVU?

14   A.   Yes.

15   Q.   But the top part is not -- was not what you received from

16   TVU after the first semester?

17   A.   I don't remember when I received this because there were a

18   lot of people who were working on updating the transcripts.

19   So --

20   Q.   That was one of the -- that was something that was done in

21   the office; right?

22   A.   Yes.

23   Q.   That was one of the things -- one of the jobs that you did?

24   A.   I also used to update the transcript, but it was other

25   people who used to update the transcripts and also work on

1    SEVIS.

2    Q.   So is it -- is it true that your job had more to do with

3    admissions and I-20's?

4    A.   So it has nothing to do with all those.  Like, as soon as I

5    get -- go to the office in the morning, Susan Su used to tell

6    me, like, "Work on this.  You work on this.  They work on

7    this."  It's like that.

8    Q.   So it was --

9    A.   Everyone ended up doing everything.

10   Q.   I see.

11       Okay.  So it just depended on what needed to be done each

12   day?  Different people would do it?

13   A.   Yes.

14   Q.   Okay.  Now, I started to ask you when you first started

15   working at TVU how many coworkers you had in the office.  What

16   about by the time -- when was the last date you worked in the

17   office at TVU?

18   A.   It was on September 30th or 31st, 2010.

19   Q.   Okay.  So at the end of September 2010, how many people

20   were working in the office?

21   A.   About seven to eight people.

22   Q.   Okay.  More than had been working in the office when you

23   first started working in the office?

24   A.   Yes.

25   Q.   Okay.  About double, give or take?

1    A.   Yes.

2    Q.   How many -- how much -- so when you first started working

3    at the school, which was at the Pleasanton Unified, you were in

4    a room adjoining where Dr. Su worked?

5    A.   Yes.

6    Q.   About how many days -- how many days -- hours a day would

7    Dr. Su be in the office?

8    A.   She would be about, like, five to six hours.  She used to

9    go for a break in the afternoon and then come back.

10   Q.   Did she work at home sometimes?

11   A.   Yes.  I -- like, one of -- so what happens is she used to

12   come to the office.  She used to give all the log-in

13   credentials.  She used to handle with the laptops and then go

14   home and work from that.

15   Q.   I see.

16        She would get everyone started for the day and then --

17   A.   Yes.

18   Q.   -- sometimes goes -- go home to work?

19   A.   Yes.

20   Q.   Do you remember that she was working at -- when you started

21   on trying to get the school accredited -- accredited?

22   A.   Okay.

23   Q.   Do you remember that or no?

24   A.   I think she was doing some paperwork, submissions,

25   something.  She used to tell me, like, she's trying to apply

1    for accreditation, and she -- she also -- yeah.  I've seen her

2    doing the paperwork.

3    Q.   Okay.  And you said, I think, that there were what, two

4    laptops and one PC in the office?

5    A.   About two lap -- about two to three -- three laptops, two

6    PC's.

7    Q.   Okay.

8    A.   And then later on, she keep on adding other laptops.

9    Q.   Okay.  Did -- did you always use a particular -- particular

10   machine, or did -- just whatever machine was handy that day?

11   A.   Whatever machine was handy at that time.

12   Q.   Okay.  Were -- were all of the people that worked in the

13   office with you when you were working in the office -- were

14   they also Indian?

15   A.   Yes.

16   Q.   What is your -- besides English, what's your first

17   language?

18   A.   Telugu.

19   Q.   Telugu.

20        And did your coworkers also speak Telugu?  Some of them?

21   A.   No, they don't.

22   Q.   Okay.

23   A.   Some of them.

24   Q.   Okay.  And what did your coworkers speak in addition to

25   English?

1    A.   So Susan Su used to tell me, like, when I'm working over

2    there, I should only speak in English because she wanted to

3    know everything -- whatever we speak and communicate.

4                 (Court reporter clarification.)

5              THE WITNESS:  Susan Su?

6              THE COURT:  How do you spell "Telugu"?

7              THE WITNESS:  Telugu?  T-e-l-u-g-u.

8              THE COURT:  Mr. Babcock, any time in the next five

9    minutes is a good time for a break.

10             MR. BABCOCK:  So everyone else can get a drink.

11   BY MR. BABCOCK:

12   Q.   So just one last clarification before the break.  So you

13   ended up quitting a couple of times; right?

14   A.   Yes.

15   Q.   When was the first time that you quit?

16   A.   It was, like, end of January or early February 2010.

17   Q.   Okay.  And the next time you quit?

18   A.   Was in early May.

19   Q.   Of 2010?

20   A.   2010.

21   Q.   Was that the time you described where Dr. Su found out that

22   you had been referring walk-in students --

23   A.   Yes.

24   Q.   -- to other people and collecting some of the referral

25   fees?

1    A.   Yes --

2    Q.   Okay.

3    A.   -- but I was not collecting anything.

4    Q.   We'll get back to that.

5         MR. BABCOCK:  That would be an appropriate point to

6    break, your Honor.

7         THE COURT:  All right.  Very good.

8      Members of the jury, let's take our second recess for the

9    morning.  Court will be in recess for 15 minutes.

10        THE CLERK:  All rise.  We'll be in recess for

11   15 minutes.

12                        (Recess taken.)

13        THE COURT:  All right.  Let's go back on the record.

14     Mr. Babcock?

15        MR. BABCOCK:  Thank you, your Honor.

16   BY MR. BABCOCK:

17   Q.   Mr. Dasa, you mentioned that Dr. Su would log into SEVIS

18   and then give the computer back to you or whoever else in the

19   office needed to access SEVIS --

20   A.   Yes.

21   Q.   -- right?

22     Did she ever give you the login information or password for

23   SEVIS, or did she always do the login herself?

24   A.   She used to do the login and then hand over the laptop to

25   me.

1   Q.   In other words, she never -- she never gave you or the

2   other office personnel the information to log in by themselves?

3   A.   First time, she never gave me, but for TVU admin for

4   distributing the classes, she gave me the password.

5   Q.   I understand.  You can log into the university computer

6   system by yourself.  You had that password.

7   A.   Yes.

8   Q.   But not for SEVIS?

9   A.   Not for SEVIS, yeah.

10  Q.   Not for SEVIS.

11       Now, you mentioned that some of the office personnel were

12  taking potential students who walked into TVU and making it

13  look like they had referred them in collecting a fee from

14  Dr. Su?

15  A.   Can you repeat the question one more --

16  Q.   Sure.

17       People in the office were taking referral fees for people

18  that they didn't actually refer; isn't that right?

19  A.   Yes, but not for the people who used to walk in most -- so

20  how it would be used in our case -- some of the students used

21  to call Tri-Valley University, and they used to say that "I

22  heard this Tri-Valley" -- "this university online or

23  somewhere," and then -- then those type of people were, like,

24  referred back to these guys.

25  Q.   So the office personnel that would do this -- they would

```
 1    get paid money by Dr. Su because it made -- they made it look

 2    like they had referred the student, in other words?

 3    A.  Yes.

 4    Q.  Okay.  And when, in fact, they had not?

 5    A.  Yes.

 6    Q.  Dr. Su found out about this at some point, and she became

 7    rather upset?

 8    A.  Are you talking about me or about the other students in

 9    Tri-Valley University?

10    Q.  Good point.  Well, let's break it down.

11        Did she find out about it -- find out about it with

12    reference to you first or to someone else --

13    A.  I think --

14    Q.  -- if you know?

15    A.  Out of my knowledge, it's me first --

16    Q.  Okay.

17    A.  -- but I don't know about the others.

18    Q.  Okay.  And is it fair to say when she found out that you

19    had done it, she was upset?

20    A.  Yes.

21    Q.  And this was, I think you said, in May of 2010?

22    A.  First -- first week of May 2010.

23    Q.  Okay.  Did you quit, or did she fire you, or was it sort of

24    mutual --

25    A.  You can say --
```

1    Q.   -- at that point?

2    A.   -- that because we were totally arguing.  She was yelling

3    at me, why did I do it.  Then I was shouting at her, like, "I

4    don't like the work here" and all this stuff.

5         Then she said, "You shouldn't work here."

6         I said, "Why shouldn't I work and all this?"  And then I

7    left.

8    Q.   Okay.

9    A.   I totally don't remember the exact conversation, but we

10   were, like, shouting on each other, and then I left.

11   Q.   Excuse me one second.  This was in roughly May -- the first

12   part of May 2010?

13   A.   Somewhere like that, yes.

14   Q.   But you ended up coming back and making amends with her?

15   A.   Yes.

16   Q.   You came back, I think you said, with some friends or on

17   behalf of some friends to get transcripts or something for

18   them?

19   A.   They wanted the I-20's, a DMV, or an admission letter or

20   something like that.  I used to come to the university --

21   so-called university, and then I used to, like, ask for these.

22   Then -- then later on, she pulled me aside, and she asked me,

23   like, why did I do all this stuff.

24        Then I explained it to her, saying it was Ramakrishna Karra

25   who told me that he will give me a percentage of the referrals,

1    and he actually told me that if I transfer these people of

2    friends to him, he will give me a percentage of that.  And when

3    I told this to Susan Su, she said that I'm really, really good

4    at, like, accepting what I've done, and she said I should never

5    repeat this again, and she told me to come on board.

6    Q.   So you told her that Ramakrishna Karra had gotten you into

7    it?

8    A.   Yes.

9    Q.   And she was grateful for that information, it sounded like?

10   A.   Yes, because she knows everything -- what was happening

11   because I think it was the student who told her, like, what

12   happened, and I also told everything what happened exactly, and

13   that's when she again hired me.

14   Q.   Okay.  It sounds like you got her trust back at that point?

15   A.   Yes.

16   Q.   Okay.  And this was -- was this before or after the move to

17   the Boulder Court facility?

18   A.   Before.

19   Q.   Okay.  And then you guys moved to the Boulder Court

20   facility?

21   A.   Yes.

22   Q.   And isn't it fair to say that you became sort of not like

23   the official office manager, but she -- she gave a lot of --

24   she had a lot of trust in you at that point afterwards?

25   A.   Not only on me but others, too.

DASA - CROSS / BABCOCK

1    Q.   Okay.  Did she give you -- after the office move -- the

2    school moved to Boulder Court.  Did she give you a special

3    laptop to work with?

4    A.   No.

5    Q.   No?

6         Did you -- you took the spring of 2010 off; is that right?

7    A.   Yes.

8    Q.   Okay.  Did you register for any classes after that?

9    A.   After that?

10   Q.   Yes.

11   A.   Yes.

12   Q.   And did you -- did you do them?  Did you go online and do

13   the classes?

14   A.   I did log in a couple of times, but I never took any class.

15   Q.   Uh-huh.

16        Did -- did you tell Dr. Su that you weren't doing the --

17   doing work -- doing the classes that you had enrolled in?

18   A.   I never --

19   Q.   Did it ever come up at all?

20   A.   No.

21   Q.   Okay.  And you were -- the -- I'm curious.  You said

22   that -- we know you've gone to at least three schools in the

23   United States:  Antioch University, ITU, and then TVU?

24   A.   Yes.

25   Q.   Have you gone to any other schools since then?

DASA - CROSS / BABCOCK

1    A.   No.

2    Q.   Okay.

3    A.   Actually, I did.  I have done two or three credits at

4    Foothill College.  I was trying to get into pharmacy technician

5    after --

6    Q.   What --

7    A.   Foothill College.

8    Q.   Can you spell that?

9           THE COURT:  You mean Foothill?

10          THE WITNESS:  Yes.

11          THE COURT:  Thank you.

12          MR. BABCOCK:  Foothill.  Thank you.

13   BY MR. BABCOCK:

14   Q.   At any of the times that you quit or stopped working for

15   Dr. Su, did she deactivate your -- your SEVIS status, terminate

16   it?

17   A.   I don't know.

18   Q.   Not that you're aware of?

19   A.   Not that I'm aware of.

20   Q.   Okay.  You -- Agent Mackey here came to your residence in

21   October of 2010?

22   A.   No.  November of 2010.

23   Q.   Oh.  November?

24   A.   November 2010.

25   Q.   Okay.  I stand corrected.

DASA - CROSS / BABCOCK

1          In November 2010, he came to your residence, and he saw

2      some -- some I-20's; right?

3      A.   Yes.

4      Q.   That were not in your name?

5      A.   Yes.

6      Q.   And he asked you what you were doing with someone else's

7      I-20's --

8      A.   Yes.

9      Q.   -- right?

10          You were arrested and taken into custody --

11     A.   Yes.

12     Q.   -- right?

13          You were taken to the immigration building here in San

14     Francisco, which is down on Sansome Street?

15     A.   Yes.

16     Q.   And -- and proceedings were -- you were eventually released

17     on, like, a bond; right?

18     A.   On a GPS.

19     Q.   They put, like, a electronic bracelet around your ankle --

20     A.   Yes.

21     Q.   -- that keeps track of where you are basically?

22     A.   Yes.

23     Q.   Because at that point, proceedings started in Immigration

24     Court?

25     A.   Yes.

DASA - CROSS / BABCOCK

1   Q.   To potentially remove -- remove you from the country;

2   right?

3   A.   Yes.

4   Q.   Potentially?

5   A.   Yes.

6   Q.   That was in November of 2010?

7   A.   Yes.

8   Q.   Did -- did you -- at that point, were you -- were you still

9   working at TVU?

10  A.   No.

11  Q.   Okay.  You had several meetings after that with -- with

12  Agent Mackey as well as with one or both of these -- the

13  prosecutors here; right?

14  A.   Yes.

15  Q.   Mr. Rhyne and Ms. -- Ms. West?

16  A.   Yes.

17  Q.   And you agreed to cooperate and testify against Dr. Su?

18  A.   I just wanted to tell everything, what happened truthfully.

19  So --

20  Q.   I understand.

21  A.   Yeah.

22  Q.   But you agreed to be a witness if they needed you?

23  A.   Yes.

24  Q.   In whatever case they needed you for?

25  A.   I didn't get that.

DASA - CROSS / BABCOCK

```
 1    Q.   Never mind.  It was poorly phrased.

 2         You pled guilty to a crime; right?

 3    A.   Yes.

 4    Q.   A misdemeanor, I believe?

 5    A.   Right now, it has not been finalized.  It's a felony, but

 6    if I'm truthful and if I answer all the questions, they will

 7    recommend me -- recommend me to the judge, and it's the judge's

 8    decision to go with misdemeanor or a felony.

 9    Q.   That's your understanding of what's -- do you remember --

10    so you haven't been sentenced yet?

11    A.   No.

12    Q.   And your understanding is you won't be sentenced until the

13    Government has finished using you to testify?

14    A.   I'm not sure about that, but my next sentencing date is in

15    June.

16    Q.   Okay.  Fair enough.

17         At that point, I assume you're hoping for a misdemeanor as

18    opposed to a felony?

19    A.   I guess, like -- I'm not sure.

20    Q.   Okay.  Do you have any understanding of what kind of --

21    whether or not you could go to jail or prison?

22    A.   Yes.  It clearly states that I can go up to one year of

23    jail, and I also need to pay, like, a hundred thousand dollars.

24    Q.   Up to a hundred thousand dollars?

25    A.   I -- yes, I guess.
```

DASA - CROSS / BABCOCK

1    Q.   They didn't say they were going to fine you a hundred

2    thousand dollars, did they?

3    A.   I don't know.

4    Q.   Do you -- do you remember a time in September of 2010 when

5    Dr. Su said that there was some students stuck at the airport

6    in New York?

7    A.   I don't remember exactly, but I heard these words.

8    Q.   Well, did she ask you -- did she ask you --

9    A.   Because a couple of times, a lot of students got stuck at

10   the airport.

11   Q.   Oh.  This was sort of a regular occurrence?

12   A.   Not regularly but maybe a couple of times which I heard,

13   like --

14   Q.   Okay.  And when -- when someone got stuck at the airport

15   when the school was called, what was it that you needed to do?

16   A.   Okay.  So if I answer the call -- so obviously, I will say

17   that Susan Su is there or not at the university.  If she is

18   there, I'll give the call to her to let her handle it.  If

19   she's not there, I'll let that person know, saying that the

20   president is not at the university.  And if that other person

21   asks whether this student had enrolled for the classes or not,

22   I will look into the TVU registration page, I'll see that the

23   student got registered or not, and I'll reply back the thing.

24   Q.   So would you, for example, print out an I-20?

25   A.   At that time, I wouldn't do that.

```
 1                 THE COURT:  You said you would not do that?

 2                 THE WITNESS:  No, I wouldn't.

 3      BY MR. BABCOCK:

 4      Q.   Would you do that -- did you do that at any point when

 5      somebody was stuck at the airport?

 6      A.   If Susan Su tells me to do that, I will -- I might do it.

 7      Q.   Okay.  I assume --

 8      A.   I think -- I still remember back in, like, somewhere,

 9      like -- I don't remember the exact date.  One time a student

10      got stuck, Susan Su was over there.  She told me to print out

11      the I-20, and I print out the I-20 and gave it to her.  She

12      signed, and she faxed it to someone.

13                 THE DEFENDANT:  Yes.  Yes.

14                 MR. BABCOCK:  Okay.

15                 THE DEFENDANT:  Yes.  Yes.

16      BY MR. BABCOCK:

17      Q.   Was that in September of 2010?  Does that sound familiar?

18      A.   Not in September 2010.  It was earlier when we were in the

19      Pleasanton Unified School District.

20      Q.   I see, but were there other occasions after you moved to

21      the Boulder Court address where students got stuck in the

22      airport?

23      A.   I heard a couple of times because at that time we had -- we

24      used to have a customer -- there was a woman called Martha.

25      She used to answer the calls, and she used to note down
```

1    everything instead of me handling the calls.  So she used to

2    tell me, like, if someone is stuck or something.

3    Q.  I'm going to --

4              MR. BABCOCK:  May I approach, your Honor?

5              THE COURT:  You may.

6         (Government's Exhibit 450 marked for identification.)

7    BY MR. BABCOCK:

8    Q.  Mr. Dasa, I'm going to show you what's been marked as

9    Government's Exhibit 450, ask if you recognize it.

10   A.  Yes, I do.

11   Q.  What is that?

12   A.  This is a plea agreement.

13   Q.  That's the plea agreement that you entered with the

14   Government; right?

15   A.  Yes.

16   Q.  If you look near the back page, you'll see some signatures.

17   A.  Yes.

18   Q.  Is that your signature?

19   A.  Yes.

20   Q.  Looks like --

21             MR. BABCOCK:  I'd ask that 450 be admitted, your

22   Honor.

23             THE COURT:  Any objection?

24             MR. RHYNE:  No objection.

25             THE COURT:  Exhibit 450 is admitted.

DASA - CROSS / BABCOCK

1                    (Government's Exhibit 450 received in evidence.)

2        BY MR. BABCOCK:

3        Q.   This is -- it's a document that says sort of in the middle

4        on the right there "Plea Agreement"?

5        A.   Yes.

6        Q.   And it's between the United States of America and you;

7        right?

8        A.   Yes.

9        Q.   And in this document, it looks like it was filed last --

10       almost a year ago, last April Fools Day?

11       A.   Yes.

12       Q.   Now -- and you identified your signature on the last page.

13       That's your signature on the top; right?

14       A.   Yes.

15       Q.   As well as it looks like Ms. West's signature below yours?

16       A.   Uh-huh.

17       Q.   And your -- your lawyer's signature at the very bottom;

18       right?

19       A.   Yes.

20       Q.   And in particular, there's sort of a lot -- there's a lot

21       of legal -- legal words in here; right?  It talks about what

22       you're -- what you're pleading to and what kind of penalties

23       you can get, things like that; right?

24       A.   Yes.

25       Q.   Okay.  There's also -- there's also a section where you

1    agreed to certain facts, and in particular, I'm referring to

2    Page 4.  It looks like at about -- starting around Line 12, you

3    said on or about September 7th, 2010, you knowingly accessed

4    SEVIS to create a false Form I-20 for Student R.B., presented

5    it to Su for signature, and saw her forge another DSO's

6    signature.  Do you -- do you recall that?

7    A.   Yes.

8    Q.   What -- what was -- do you know -- remember the name of the

9    student R.B.?

10   A.   I don't remember.

11   Q.   Okay.

12   A.   Rakish -- Rakish or something like that.

13   Q.   Okay.  Do you remember this happening?

14   A.   Yes.

15   Q.   Yeah.

16        Was this one of those times where someone was stuck at the

17   airport?

18   A.   No.

19   Q.   Okay.  This was a different -- different time?

20   A.   Yes.

21   Q.   Looks like you also agreed that you had received payments,

22   referral fees of a little over 4300 bucks; is that right?

23   A.   Yes.

24   Q.   Do you remember a time where -- any time where a student

25   called from the airport and needed documents -- the reason --

1    strike that.

2        Students didn't call from the airport.  When you got a call

3    from the airport, it was usually from someone in Immigration;

4    right?

5    A.   Okay.  I don't know.

6    Q.   Did you ever answer these calls?

7    A.   Yes.

8    Q.   Okay.  Do you remember who was making them?  Was it the

9    students or the personnel at the airport?

10   A.   Some other people, like, not the student.

11   Q.   Right.  And what kind of documents did the school furnish

12   to help the students who were stuck at the airport?

13   A.   All they were saying was they wanted to talk to a DSO.

14   That's what the call would be.

15   Q.   Okay.

16   A.   Then I -- if Susan is available, I used to hand the call to

17   her, and if she's not available, I used to tell them that the

18   DSO is not available.

19   Q.   What kind of -- so you didn't deal with the substance of

20   the call?  You would give it to Dr. Su if she was there?

21   A.   If she's there.

22   Q.   And if -- what kind of documents did she request when she

23   was responding to these calls?

24   A.   You mean to say what Susan Su would submit the documents to

25   them?

1    Q.   Yeah.  What kind of documents were needed?

2    A.   I don't know.  I don't have a list of the documents, but

3    once she told me to print out the I-20's and give it to her.

4    Q.   Okay.

5    A.   That's what I've done.  She signed the documents, and apart

6    from that, she added a few more documents and, I think, a

7    letter or something like that.

8    Q.   Uh-huh.

9    A.   Then she faxed the documents to that guy.

10   Q.   Okay.  I had a -- you had mentioned in your direct

11   testimony that -- that the e-mail -- when you were receiving

12   and responding to e-mails, the address -- do you remember the

13   address -- the e-mail address itself?

14   A.   I don't remember that e-mail address.

15   Q.   Was it ssu@trivalley- --

16   A.   Yes, that's the one.

17   Q.   -- -university.org?

18   A.   Yes.

19   Q.   And you mentioned that it had, like, sort of an automatic

20   signature?  You didn't have to input it in?  It just showed up

21   automatically?

22   A.   Yes.

23   Q.   Do you know what I mean?

24   A.   Yeah.  When I'm trying to reply, it would pop up

25   automatically.

1    Q.   And do you remember what that signature was?

2    A.   It was "Dr. Susan Su," and she -- it was saying the

3    president of Tri-Valley University and Tri-Valley University's

4    phone number, and above it, it would say, "Assistant of

5    President."

6    Q.   Now --

7                    (Court reporter clarification.)

8              THE WITNESS:  "Assistant of President" above "Dr.

9    Susan Su."

10   BY MR. BABCOCK:

11   Q.   Now, it wasn't just you that was using -- accessing the

12   school e-mail address.  It was also the other students in the

13   office as well; isn't that right?

14   A.   Yes.  Yeah.  We were all using the same e-mail address.

15   Q.   And the automatic signature came down regardless of who was

16   accessing the e-mail --

17   A.   Yes.

18   Q.   -- if you understand what I'm saying?

19   A.   Yes.

20   Q.   Now, when you logged in at -- you had to use your own

21   e-mail to log into the TVU system; is that right?

22   A.   I didn't get that.

23   Q.   Do you remember -- you had to -- when you logged into TVU,

24   you used an e-mail; right?

25   A.   I never logged in.  Most of the times, it was Susan Su who

1    used to log in and give me the access.

2    Q.   I'm sorry.  I'm not talking about -- my mistake.  I'm not

3    talking about when you're working in the office.  I'm talking

4    about students who were trying to log in for classes and things

5    like that.

6    A.   Yes.  It's the e-mail address.

7    Q.   And do you remember which e-mail address you used when you

8    were -- to do that?

9    A.   Dasavishal@gmail.com.

10   Q.   Dasavishal -- one word -- at gmail.com?

11   A.   @gmail.com.

12   Q.   Uh-huh.

13        And did you -- did you also use a yahoo address at some

14   point?

15   A.   I think initially I was using yahoo.  Then I was never

16   using yahoo e-mail address to sign into my account nor into my

17   courses.  Every time, I was using a gmail.com.

18   Q.   Are you sure that you weren't at some point when you were

19   at TVU using the dasavishal@yahoo.com e-mail?

20   A.   Maybe I was trying to log in with that or something like

21   that to verify the -- because a lot of times users were unable

22   to, like, click on a subject or something like that.  So I

23   would -- because I was having admin access to my account, I was

24   trying to use a different e-mail address of the school so that

25   I could log in, but I never had any material online nor took

1    any classes with yahoo.com.

2    Q.   Well, I meant -- I had forgotten one follow-up question.

3    On the -- when you're using the -- using a -- responding in the

4    e-mail -- on the university e-mail account -- so Dr. Su's name

5    would come in automatically.  If you wanted to put your name,

6    you had to manually type that in; right?

7    A.   Yes.

8            MR. BABCOCK:  May I have just one second, your Honor?

9            THE COURT:  Yes.

10           MR. BABCOCK:  I think that's all I have, your Honor.

11           THE COURT:  Thank you.

12       Redirect?

13           MR. RHYNE:  May I have a moment, your Honor?

14           THE COURT:  Sure.

15       Members of the jury, why don't you stand up and stretch.

16   Getting to be about that time of day.

17                       **REDIRECT EXAMINATION**

18   BY MR. RHYNE:

19   Q.   Mr. Dasa, I want to follow up on just one question that Mr.

20   Babcock asked you.  He asked you about the other DSO's at

21   Tri-Valley University.

22       Did you ever see Sophie Su or Vince Wang come into

23   Tri-Valley University to work as DSO's?

24   A.   I saw Sophie Su twice.  I never saw Wenchao Wang.

25   Q.   When you saw Sophie Su, what was she doing?

1    A.   The first time that I saw her, it was on a rainy day.  She

2    came in to pick her jumper cables from Susan Su, and she spoke

3    about, like, ten minutes, and she left.  The second time when I

4    saw her was in the Boulder Court building, and she was there

5    about, like, half an hour, and she left.

6              MR. RHYNE:  No further questions, your Honor.

7              THE COURT:  Mr. Babcock?

8              MR. BABCOCK:  Just one.

9                        **RECROSS-EXAMINATION**

10   BY MR. BABCOCK:

11   Q.   Did Dr. Su ever ask you to sign Sophie Su's name?

12   A.   No.

13   Q.   Or the other DSO, Mr. Wang?  She never --

14   A.   She never asked to.

15   Q.   She never asked you to sign anyone's signatures; right?

16   A.   No.

17   Q.   Thank you.

18   A.   And we never signed any of those.

19   Q.   Thank you, sir.

20             THE COURT:  Mr. Rhyne, anything within that scope?

21             MR. RHYNE:  No, your Honor.  No further questions.

22             THE COURT:  Mr. Dasa, thanks for your testimony.

23   You're excused as a witness.  You can step down.

24             THE WITNESS:  Thank you.

25             THE COURT:  Thank you.

1           Members of the jury, I'm going to take advantage of this

2      break to have a brief hearing outside your presence.  So I'm

3      going to ask Mr. Noble to escort you back in the jury room.  As

4      I told you, I try to keep these interruptions to a minimum.  I

5      know we haven't had one of these yet.  I don't expect this to

6      take very long.

7                 THE CLERK:  All rise.

8           (Proceedings heard out of the presence of the jury:)

9                 THE COURT:  We're now outside the presence of the

10     jury.

11          The reason for my calling a brief break in the jury

12     proceedings was to make a record of something that occurred

13     during Mr. Dasa's examination and to further admonish the

14     defendant.

15          At approximately 12:20 p.m. as reflected in the court

16     reporter's transcript, during Mr. Babcock's examination of

17     Mr. Dasa, Dr. Su began cheering him on and saying, "Yes.  Yes,"

18     which she did twice, in a voice so loud that I don't need to

19     make an additional record of it because it's already contained

20     in the Court's transcript.

21          I have previously spoken to Dr. Su, who is smiling now and

22     smiled at me earlier in the proceedings when I looked at her

23     after her outburst, but I don't -- I need to make it very clear

24     to Dr. Su.  It is not appropriate to speak so loudly that you

25     can be heard by the Court, the court reporter, and the jury.

```
 1        It is not appropriate to cheer during these proceedings.

 2           And before I go any further, I'd like to give Mr. Babcock

 3        an opportunity just to speak to Ms. Su directly if either of

 4        you would like because I'm about to warn the defendant of the

 5        consequences of further outbursts.

 6              MR. BABCOCK:  Thank you, your Honor.  Just a second.

 7        Thank you, your Honor.

 8              THE COURT:  Mr. Babcock, before I proceed any further

 9        on the defendant's behalf, do you have anything you wish to say

10        for the record?

11              MR. BABCOCK:  Your Honor, it's -- I thought overall

12        my client had actually done much better today, and apart from

13        that -- the outburst occurred -- the outburst the Court

14        noted -- it's genuinely hard for her.  It's not, I don't think,

15        strategic in any way.  She just -- it's very hard for her not

16        to.  She's, I believe, endeavoring to be quiet and refrain from

17        making such outbursts.  I thought overall she did pretty well

18        today.

19              THE COURT:  I appreciate those comments, and I have

20        no reason to disbelieve them.

21           I don't find that, viewed in isolation, Dr. Su's cheering

22        today deprived the Government of a fair trial, but the comments

23        are disorderly and disruptive and disrespectful.  And to the

24        extent that they come after repeated admonitions from the

25        Court, they are, to use the words of the Ninth Circuit,
```

1    stubbornly defiant.

2         I appreciate that being a defendant in a lengthy criminal

3    trial is difficult.  Certainly, I don't want to ever exercise

4    the Court's authority lightly, but it also can't be the case

5    that every day there's one more thing and every day the Court

6    repeats itself, and in retrospect, it's a course of continuing

7    conduct.

8         So, Dr. Su, I am admonishing you that you have the right to

9    be present in the courtroom at every stage of the proceedings

10   under the Constitution but that if you engage in disruptive

11   conduct, the Court has the authority to order your removal from

12   the courtroom and to find that you have waived your right to be

13   present in the courtroom.  I'm not making that finding, but I

14   am giving you what I hope is a very clear warning.

15        Is there anything further we need to put on the record?

16             MR. RHYNE:  I don't believe so, your Honor.

17             THE COURT:  Mr. Babcock?

18             MR. BABCOCK:  No, your Honor.

19             THE COURT:  Thank you.

20        (Proceedings were heard in the presence of the jury:)

21             THE COURT:  All right.  All the jurors are in their

22   assigned seats.

23        The Government's next witness, please.

24             MS. WEST:  Thank you.

25        The United States calls Bhanu Challagundla.

```
1              THE COURT:  Good afternoon, Ms. Challagundla.

2          I'm going to ask you to come up to the witness stand, which

3      is where this chair is over to my right.  And when you get

4      there, just remain standing, raise your right hand, and look at

5      my courtroom deputy.

6              THE CLERK:  Do you solemnly swear or affirm that the

7      testimony you're about to give in the matter now pending before

8      this Court shall be the truth, the whole truth, and nothing but

9      the truth?

10             THE WITNESS:  I'll say the truth.

11             THE CLERK:  Thank you.  Please be seated.  You need

12     to speak directly into the microphone in order to be heard.

13         Please state your full name and spell your last name.

14             THE WITNESS:  My full name is Bhanu Teja

15     Challagundla.

16             THE COURT:  Ms. Challagundla, could you do me a favor

17     and just spell "Challagundla" so the gentleman can write it

18     down correctly?

19             THE WITNESS:  C-h-a-l-l-a-g-u-n-d-l-a.

20             THE COURT:  All right.  Thank you.

21         Ms. Challagundla, that water right there is for you in case

22     you get thirsty.  Okay?

23             THE WITNESS:  Thank you.

24                  (Court reporter clarification.)

25             THE WITNESS:  B-h-a-n-u.  My middle name is Teja,
```

1    T-e-j-a.

2                          **BHANU CHALLAGUNDLA,**

3    Called as a witness by the Government, having been duly sworn,

4    testified as follows:

5                          **DIRECT EXAMINATION**

6    BY MS. WEST:

7    Q.   Ms. Challagundla, hello.

8         Can you please tell the jury where you grew up.

9    A.   India.

10   Q.   And where are you living now?

11   A.   Minneapolis.

12   Q.   How did you come to the United States?

13   A.   On F-1 status.

14   Q.   On an F-1 visa?

15   A.   Visa, yeah.

16   Q.   Why did you come to the United States?

17   A.   To get my Master's degree.

18   Q.   And how did you get the idea to do your Master's in the

19   United States?

20   A.   After completion of my Bachelor's, my dad approached his

21   friend, and the reason was it's my dad's wish to get my

22   Master's in the United States.

23   Q.   Can you tell us a little bit about your educational

24   background in India?  You said you got a Bachelor's?

25   A.   Yeah.

CHALLAGUNDLA - DIRECT / WEST

1    Q.   In what area?

2    A.   Bachelor's of Pharmacy.

3    Q.   When did you get that degree?

4    A.   2009.

5    Q.   Now, have you heard of something called Tri-Valley

6    University?

7    A.   No.

8    Q.   Sitting here now today, have you heard of Tri-Valley?

9    A.   Yes.

10   Q.   How did you first hear of it?

11   A.   When my dad approached his friend to get information about

12   the university, he got a consultancy through my dad's friend.

13   Q.   A consultancy?

14   A.   Yeah.

15   Q.   What is a consultancy?

16   A.   Albright Consultancy.

17   Q.   Albright?

18   A.   Uh-huh.

19   Q.   And what is Albright Consultancy?

20   A.   If any students -- they get -- they help process the

21   students who are wanting to pursue their Master's degree

22   abroad.  So they do all the process.  They help out with the

23   students.

24              (Court reporter clarification.)

25              THE WITNESS:  They help out the students.

1    BY MS. WEST:

2    Q.   Now, when you -- did you ultimately speak to Albright

3    Consultancy?

4    A.   Yes.

5    Q.   And did you tell them that you were looking to do a

6    Master's in the United States?

7    A.   I didn't know which university I wanted to approach in the

8    United States.  So I asked for a few universities regarding my

9    Master's.

10   Q.   Did you tell them what area you wanted to get a Master's

11   degree in?

12   A.   They suggested me the Master's course in Healthcare because

13   the Bachelor's I did in Pharmacy.  So they gave me an idea that

14   if I get a Master's in Healthcare, I would be getting a good

15   future in the United States.

16   Q.   I'm sorry.  You would get a what?

17   A.   A good future in the United States.

18   Q.   Now, at some point before you first arrived in the United

19   States, did you do any research about Tri-Valley University?

20   A.   Starting this -- when I approached the consultancy, I asked

21   them about Tri-Valley University.  Once -- after I got my I-20

22   from Tri-Valley University, I did research on that.

23   Q.   And what kind of research did you do?

24   A.   I searched through the website, and I found pictures on the

25   website and also the courses.

1    Q.   This was Tri-Valley University?

2    A.   Tri-Valley University.

3    Q.   Their website?

4    A.   Yeah.

5    Q.   Okay.  Can you tell us what you remember about the pictures

6    that you saw?

7    A.   The first picture -- I can see the building with the name

8    "Tri-Valley," and then the other picture was -- there are some

9    people who are holding glasses in their hands, like, wearing

10   the gowns.

11   Q.   Graduation-type gowns?

12   A.   Yes.

13   Q.   Okay.  And you say they're holding glasses.  You mean like

14   toasting?

15   A.   Cheers.

16   Q.   Cheers?

17   A.   Yeah.

18   Q.   Okay.  Did you see any other pictures that you remember?

19   A.   I can remember a picture with -- a library picture, and it

20   just looked like a bookshelf.  At the top of it, I can see the

21   name "Library."

22   Q.   Okay.  And you mentioned that you also saw something about

23   courses on the website?

24   A.   Yeah.

25   Q.   What do you remember about that?

1   A.   I can see some engineering courses and then the Master's in

2   Healthcare courses.

3   Q.   Okay.  So you saw the program that you were looking for?

4   A.   Yeah.  Yeah.

5   Q.   Okay.  You need to make sure I finish asking my question

6   before you answer so that he can take down everything we both

7   say.

8   A.   Okay.

9   Q.   Thank you.

10       Did you see anything about faculty on the website?

11   A.   Faculty?  Yes, I see some faculty names.

12   Q.   What do you remember about that?

13   A.   I don't remember exactly what names I looked for, but I've

14   seen some names over the degrees, "Ph.D." after them.

15   Q.   Okay.  So names of faculty and after that, "Ph.D."?

16   A.   "Ph.D.," yeah.

17   Q.   Did that look impressive to you?

18   A.   Yes.

19   Q.   You also need to answer out loud.  Thank you.

20       I'm going to show you what I believe is already in evidence

21   as Government Exhibit 12.

22       THE COURT:  Can you hold on just one moment, please.

23   Okay.  Thank you.  Did you say 12?

24       MS. WEST:  Yes.

25       12 is already in evidence; right?

CHALLAGUNDLA - DIRECT / WEST

 1          Can we please pull up Government Exhibit 12, Page 1.

 2               MR. BABCOCK:  It's not on here.  Oh.  You're doing it

 3     there?

 4               MS. WEST:  Yeah.

 5          Oh, there we go.  Thank you.

 6          And, Ms. Hughes, can we just enlarge Box 1 of this document

 7     from the very top where it says, "U.S. Department of Justice"

 8     down through Box 1?

 9          That's great.  Thank you.

10     BY MS. WEST:

11     Q.   Are you able to see this from where you are?

12     A.   No.

13     Q.   No?

14          All right.  Well, I'm going to hand you the actual exhibit,

15     then, so you can take a look.  You can just see it now in front

16     of you.

17     A.   Yes.

18     Q.   Ms. Challagundla, do you see your name at the top of this

19     document?

20     A.   Yes.

21     Q.   Okay.  And is that in the box that is marked 1?

22     A.   Uh-huh.

23     Q.   Okay.

24     A.   Yes.

25     Q.   What is this document?

1    A.   I-20.

2    Q.   Okay.  And did you receive this at some point?

3    A.   Yes.

4    Q.   How did you receive it?

5    A.   From the consultancy back in India.

6    Q.   Okay.  And if you'd look in Box 2 there -- and we have that

7    here up on the screen, too -- do you see the school name?

8    A.   Yes.

9    Q.   What is it?

10   A.   Tri-Valley University.

11   Q.   Okay.  So you received this I-20 from Tri-Valley

12   University, but you received it through the consultancy; is

13   that right?

14   A.   Yes.

15   Q.   Okay.  What did you do once you received this?

16   A.   After I received this I-20, the consultancy -- they allowed

17   me one date for a visa interview in Hyderabad.

18                  (Court reporter clarification.)

19            THE WITNESS:  After I received this I-20, the

20   consultancy people -- they allowed me one date for me for a

21   visa interview in Hyderabad.

22   BY MS. WEST:

23   Q.   And Hyderabad -- where is that?

24   A.   In India.

25   Q.   Okay.  And -- I'm not sure if you can -- let's see.  Are

1    you able to see on that copy the stamp that is just to the

2    right of your name on here?

3    A.   Yes.

4    Q.   Can you read what that stamp says at all?

5    A.   "F-1."

6    Q.   Yeah.  On the outside -- let's see.  Ah.  It's outside this

7    picture.

8                MS. WEST:  Can we go outside of this, please.  Thank

9    you.  And can you just -- underneath that stamp, can you just

10   enlarge where it says, "Hyderabad"?

11       That's great.

12   BY MS. WEST:

13   Q.   Is that where you went to have your visa interview?

14   A.   Yes.

15   Q.   And did you have to provide them with this document --

16   A.   Yes.

17   Q.   -- for the visa interview?

18   A.   Yeah.

19   Q.   Did you have to bring anything else?

20   A.   I needed to take my Bachelor's degree and the bank

21   statement and also the I-20.

22   Q.   Okay.  And what happened at the visa interview?

23   A.   They asked me a few questions like why would I want to go

24   to the United States and the university.  They asked me about

25   my I-20 and which course I'm going to pursue on -- which course

1    I'm going to pursue for a Master's.  These questions they

2    asked.

3    Q.   And did they then tell you that you were going to be

4    approved for an F-1 visa?

5    A.   Yes.

6    Q.   And do you recall what date that was?

7    A.   It takes maybe about ten days to get my visa from the U.S.

8    consultancy.

9    Q.   In order to get the visa, it takes about ten days?

10   A.   Yeah.

11   Q.   April 16th, 2010.  Was that the date that you did your

12   interview?

13   A.   Yes.

14            MS. WEST:  All right.  And if we can go out of this

15   part, please, and just enlarge the signature block on there.

16   BY MS. WEST:

17   Q.   And you can look at the one that's right in front of you if

18   that's easier, Ms. Challagundla.

19        Do you see under the school certification the name there is

20   Sophie Su?

21   A.   Yes.

22   Q.   "Admission Officer"?

23   A.   Yes.

24            MS. WEST:  Okay.  We can take that down now.  Thank

25   you.

1    BY MS. WEST:

2    Q.   Now, Ms. Challagundla, when did you actually arrive in the

3    United States?

4    A.   On May 5th, 2010.

5    Q.   And did you go to Tri-Valley University on that same day?

6    A.   No.

7    Q.   Why not?

8    A.   When I -- before coming to the United States, like, I got

9    in contact by Keerthana from the consultancy.  She was driving

10   already to Tri-Valley University.

11   Q.   So you received a contact with some -- contact information

12   from the consultancy?

13   A.   Yeah.

14   Q.   And can you say the name again of the person?

15   A.   Keerthana.

16   Q.   Can you spell that, please, for the court reporter.

17   A.   K-e-e-r-a-d-h-a [sic].

18   Q.   Okay.  And did you end up contacting Keerthana?

19   A.   Yes.  I contacted her a couple of times before coming to

20   the U.S., and I requested for accommodation, and also I asked

21   her to arrange a person who can take me from San Francisco

22   Airport.

23   Q.   And why did you ask Keerthana for accommodation?

24   A.   I don't know anyone other than her because that's the only

25   contact I got from consultancy to Tri-Valley University direct.

1  Q.  Did she agree to provide you accommodation?

2  A.  Yes.

3  Q.  And did your dad actually talk to her, too?

4  A.  Before coming to the U.S., I talked to her.

5  Q.  You talked to her?

6  A.  Yeah.

7  Q.  So when did you actually go to Tri-Valley for the first

8  time?

9  A.  On May 10th or 11th of -- because Keerthana asked me to

10  wait for a couple of days because I met an individual named

11  Rajida, R-a-j-i-d-a.  Keerthana wanted me to wait until she

12  comes to the United States because of Rajida.  She got her

13  I-20 -- I mean, she got her F-1 visa at Tri-Valley University.

14      So she wanted to come to the same place.  So Keerthana

15  wanted me to wait to take both of us at the same date to the

16  university.

17  Q.  Okay.  So it was a few days before -- after you arrived

18  before you actually went?

19  A.  Yes.  Yes.

20  Q.  Now, when you did go visit Tri-Valley University for the

21  first time, do you remember where it was that you went?

22  A.  It's in Dublin/Pleasanton.

23  Q.  The Dublin/Pleasanton area?

24  A.  Yeah.

25  Q.  Can you describe to us what you saw when you went?

1   A.   When I went there, I see a large room in the building, what

2   I saw on the website the day I was in India when I did research

3   for that, and I told her I saw some pictures of the university.

4   So that's the same building I had seen there when I went.

5        And after getting into the room, it's a very big room.  In

6   one corner of the room, a person was busy having three lines in

7   front of her and taking calls, and when I asked Keerthana, she

8   told me that she was Susan Su, Director of the Tri-Valley

9   University.  And then on the other side of the room, I see two

10  people, one girl and then a boy.  They were assisting the

11  people who were coming to the -- to the university.

12  Q.   What do you mean "assisting people"?

13  A.   If anybody wants to -- if new-coming students who want to

14  pay the fee or if they need an ID card or that information,

15  they will help the student then.

16  Q.   Now, what you saw when you arrived, was that what you

17  expected?

18  A.   No.

19  Q.   Why not?  How was it different?

20  A.   In -- when I was in India when doing my Bachelor's, like --

21  I've done my Bachelor's in Andhra University.  So it was a huge

22  university, and when I was coming to the United States, I

23  expected more than that.  I expected a huge building, like,

24  with a lot of students and offices, and I expected a different

25  thing than what I had seen on that day.

1   Q.   When you went to Tri-Valley on that day, did you see any

2   classes in session?

3   A.   No.  It was just a single room.

4   Q.   Did you meet Susan Su on that day?

5   A.   Keerthana take both myself and then Rajida to Dr. Susan Su.

6   She just introduced us to her, and Susan Su asked me -- she

7   just asked me, "Okay," and she asked me whether I enrolled my

8   name to the university, and she asked whether I had paid the

9   fee or not.  That's it.

10  Q.   And had you paid fees yet?

11  A.   The same day, I paid the fee.

12  Q.   You did or did not?

13  A.   I did not.

14  Q.   Okay.  At some point, did you pay fees?

15  A.   Yes.

16  Q.   How did it -- why -- or -- let's do it this way.

17       (Government's Exhibit 520 marked for identification.)

18  BY MS. WEST:

19  Q.   I'm going to show you what is marked for identification as

20  Government Exhibit 520, Page 4.

21       Can you please take a look at Government Exhibit 520, Page

22  4, and tell me if you recognize that.

23  A.   Yes.

24  Q.   What is it?

25  A.   This is the check given to Keerthana to pay my fee.

1      MS. WEST:  The United States offers Government

2   Exhibit 520, Page 4.

3      MR. BABCOCK:  No objection.

4      THE COURT:  That exhibit will be admitted.

5         (Government's Exhibit 520 received in evidence.)

6      MS. WEST:  Actually, let me let you -- no.  Let's put

7   it up here.

8      THE COURT:  And, Ms. West, just for housekeeping

9   purposes, is that because the remainder of Exhibit 520 will not

10  be offered?

11     MS. WEST:  That's just the certification.  So this is

12  the only substantive page.

13     THE COURT:  I see.  Very good.  We'll just call it

14  Exhibit 520, then.

15     Thank you.

16     MS. WEST:  Great.  Thank you.

17  BY MS. WEST:

18  Q.   Okay.  Ms. Challagundla, this is the check that you used to

19  pay fees at Tri-Valley?

20  A.   Yes.

21  Q.   Was this your first fee payment?

22  A.   Yes.

23  Q.   What is the amount?

24  A.   $2,365.

25  Q.   How did you get this check?

1    A.   When I was coming to the United States, my dad -- he asked

2    me to carry a check instead of carrying cash.  So we paid

3    amount in the bank by the name of Andhra Bank.  We paid the

4    rupees to them, and they gave me the check in the dollars.

5    Q.   Okay.  And is that the bank name that's reflected --

6    A.   Andhra Bank, yes.

7    Q.   Reflected at the top of this?

8    A.   Yes.

9    Q.   Now, who did you give this check to?

10   A.   Keerthana.

11   Q.   And was that the same day that you first went to Tri-Valley

12   or after?

13   A.   After.

14   Q.   Why did you do it after?

15   A.   By looking at the -- by looking at the room on that day, I

16   thought of waiting for a few days to decide what would happen,

17   you know?  And after that, Keerthana asked of me, like, I have

18   to pay the fee and enroll for the courses to -- and she told --

19   I asked why, and she told me, like, I have to.  If I don't

20   enroll my name into the university and pay the fee, then I'll

21   be out of status.  Like, I'll have to register for the classes,

22   she said.

23   Q.   But were you worried about what would happen if you

24   didn't --

25   A.   Yes.

1    Q.   -- pay the fee?

2    A.   Yeah.

3    Q.   Why?

4    A.   Sorry.  I didn't get it.

5    Q.   What made you worry?

6    A.   Because she told -- I'm new to the U.S. at that time.  It

7    was my initial days, and I don't know what the SEVIS means and

8    all.

9         And Keerthana told me, like, I want to -- if I want to run

10   my SEVIS in the university, I have to pay my fee, and also I

11   have to enroll for the courses.  They will enroll my name to

12   the courses only after I pay the fee.  So I paid the fee.  I

13   gave my check to Keerthana on that day.

14   Q.   Now, at some point, did you actually enroll in courses?

15   A.   Yes.

16   Q.   About how much after you gave the check to Keerthana was

17   that?

18   A.   After more than two weeks.

19   Q.   How did you enroll in classes?

20   A.   After two weeks of my payment, I did not -- actually, at

21   that time, Keerthana left to India for her marriage.  So I've

22   been trying to contact the university people for getting the

23   information for running the courses, and after two weeks of my

24   payment, I got an e-mail with a link providing for enrollment

25   of the courses.

1   Q.   Did you -- had you made any inquiries or asked any

2   questions to Tri-Valley University before you got that link?

3   A.   I wrote several times saying that I paid my fee, I enrolled

4   my name, but until now -- I did not get any information from

5   anyone until now to whom do I need to contact.  These were

6   questions I made in my e-mail.

7   Q.   And who did you try to e-mail?

8   A.   Susan Su.

9   Q.   And you got no response?

10  A.   I did not get any response, and also I tried to contact

11  some students who was working at the Tri-Valley.

12  Q.   Did you get a response from them?

13  A.   No.

14  Q.   Did you try to call anyone?

15  A.   Yes.  I called them, but I did not get any response.

16  Q.   Who did you try to call?

17  A.   I don't know their names.  I just got their contact numbers

18  from a person by the name of Anji Reddy.

19  Q.   So after you got this e-mail with the link, were you able

20  to register?

21  A.   I registered for the courses.

22  Q.   How many courses?

23  A.   I really don't remember.  Maybe two or three.

24       (Government's Exhibit 15 marked for identification.)

25  ///

1    BY MS. WEST:

2    Q.   I am going to show you what is marked as Government

3    Exhibit 15, Page 2.

4         Do you recognize this?

5    A.   Yes.

6    Q.   What is it?

7    A.   It's the courses that I enrolled.

8    Q.   Is that a class receipt that you received from Tri-Valley?

9    A.   Yes.

10             MS. WEST:  The United States offers Exhibit 15.

11             THE WITNESS:  Uh-huh.

12             MR. BABCOCK:  No -- no objection.

13             THE COURT:  Exhibit 15 is admitted.

14          (Government's Exhibit 15 received in evidence.)

15             MS. WEST:  Can we please pull up Page 2 of

16    Exhibit 15.

17        And again, your Honor, Page 1 is just the certification.

18             THE COURT:  Yes.

19             MS. WEST:  Could we please enlarge from the line up

20    at the top.  Nope, a little higher, all the way from the line.

21        Great.  Thank you, and then just down to the signature

22    block.

23        Perfect.  Thank you.

24    BY MS. WEST:

25    Q.   Do you see the emblem on the side where it says,

1    "Tri-Valley University"?

2    A.   Uh-huh.  Yes.

3    Q.   And then your name, "Ms. Bhanuteja Challagundla"?

4    A.   Yes.

5    Q.   Okay.  And the date on this, May 21st, 2010?

6    A.   Yes.

7    Q.   Does that sound like about the day that you actually were

8    able to register or close to it?

9    A.   I don't remember the date which I -- whenever I registered

10   for the courses, but I got a chance to enroll for the courses

11   after I'm done with the payments.  So it's near to that date.

12           MS. WEST:  Okay.  Now, if we can actually now just

13   enlarge the classes.  No.

14   BY MS. WEST:

15   Q.   Are these the courses that you registered for?

16   A.   I don't remember the courses' names.

17   Q.   How did you choose what to register for?

18   A.   I got the list from Keerthana that day when I asked for --

19   after I -- whenever I paid -- whenever I gave the check to her.

20   She sent me -- she showed me some courses.  It's -- it's a

21   paper of the courses list she handed that day because she used

22   to work in the Tri-Valley University, and she's -- she's

23   handing some documents regarding the university courses online.

24   Q.   So she gave you advice on what courses?

25   A.   Yes.

CHALLAGUNDLA - DIRECT / WEST

1   Q.   And did you take her advice?

2   A.   Yeah.

3   Q.   And do you see here it's reflected three courses:  Medical

4   Law and Ethics, Healthcare Management, and Leadership and

5   Management?

6   A.   Uh-huh.  Yes.

7   Q.   And then just below the classes listed, do you see "Receive

8   Payment of $2,365.00"?

9   A.   Yes.

10  Q.   And that was the amount on the check that we looked at --

11  A.   Yes.

12  Q.   -- is that right?

13       Now, how did you know where to go for your first -- or for

14  your classes that first semester?

15  A.   After enrolling for -- after I clicked on the link, what I

16  received from the e-mail listing.

17  Q.   Well, when did you get a link?

18  A.   After -- after I gave -- I gave her a check -- after two

19  weeks of my giving the check to her.

20  Q.   So a couple of weeks after you gave the check?

21  A.   Yeah, a couple of weeks after I gave the check to her.

22  Q.   Is that the link where you were able to register?

23  A.   Yes.

24  Q.   Okay.

25  A.   So after registering -- after I clicked on the link --

1    whenever I clicked on the link, I got a chance to create my own

2    ID and the password.  And then after that, I see some courses,

3    and I -- then I choose some courses from the link -- from the

4    list.

5    Q.   The courses that you registered for?

6    A.   Yes.

7    Q.   Okay.  Now, after you registered for the courses -- so now

8    your registration is complete?

9    A.   Yes.

10   Q.   Did you -- were you told what day and time your class was

11   and where to go?

12   A.   No.

13   Q.   Did you receive any information about how to attend those

14   classes that you registered for, these three that we're looking

15   at?

16   A.   I got this information from Keerthana state -- I mean, the

17   day that I went to the university, I got to know that for the

18   first semester, there will be only online courses.

19   Q.   How did you get to know that?

20   A.   Sorry.  Can you repeat?

21   Q.   Who told you that?

22   A.   Keerthana.

23   Q.   So she told you that they were just online?

24   A.   Yeah.  Whenever -- I mean, whenever I tried to approach

25   Susan Su, they used to give me this information saying that

1    this is work you have to get from Susan Su if you even approach

2    her because she's the one who is working at the university.  So

3    she's handling all the information, whatever Susan Su tells

4    her.  So I believed the information, what she -- what she gave.

5    Q.   Did you try to talk to Susan Su about where the classes

6    would be held?

7    A.   In the first semester, I didn't get a chance to talk to

8    her.

9    Q.   What do you mean you didn't get a chance?

10   A.   I don't have a car to commute, and I live in Fremont,

11   and -- and in the middle of the first semester, Keerthana left

12   India for her marriage, and I don't know anyone else who can

13   take me to the university, and I -- and that's the reason why I

14   tried e-mailing and calling to Susan Su and other -- other

15   students who was working at the university.

16   Q.   Let me ask you about that.

17        Why did you try -- let's start with Susan Su.  Why did you

18   try calling and e-mailing Susan Su?

19   A.   Keerthana was not there with me.  She actually left to

20   India, and I thought of contacting the president, Susan Su,

21   because before approaching her, I tried to reach the students

22   who were working in the university.  I did not get any

23   response.  So after that, I tried to reach out to Susan Su.

24   Q.   But what was your purpose in reaching out to her?  What did

25   you want to ask her?

 1    A.   To know about the classes, when it would be.

 2    Q.   And did you receive a response from her?

 3    A.   No.

 4    Q.   Did you receive a response from anyone?

 5    A.   No.

 6    Q.   Did you attend any classes that first semester?

 7    A.   No.

 8    Q.   Let me take that back.  Thank you.

 9              MS. WEST:  We can take that down.  Thank you.

10         (Government's Exhibit 19 marked for identification.)

11    BY MS. WEST:

12    Q.   I'm going to show you what is marked as Government

13    Exhibit 19, Page 2.

14         Do you recognize this?

15    A.   Yes.

16    Q.   What is it?

17    A.   This is the transcript I received.

18    Q.   From Tri-Valley?

19    A.   Yes.

20              MS. WEST:  The Government offers Exhibit 19, Page 2.

21              MR. BABCOCK:  No objection.

22              THE COURT:  Exhibit 19 is admitted.

23            (Government's Exhibit 19 received in evidence.)

24              MS. WEST:  Can we please pull up Exhibit 19, Page 2.

25         Thank you, Ms. Hughes, and can you enlarge the -- yeah,

1      just the text part.

2          Thank you.

3      BY MS. WEST:

4      Q.   Okay.   You said that you received this transcript from

5      Tri-Valley?

6      A.   Yes.

7      Q.   What was your reaction when you received this?

8      A.   I haven't take -- I haven't taken any class online, and I

9      haven't done any assignments, any homework regarding -- for

10     these courses.   So I was surprised looking at -- like, how did

11     I get the -- get the transcript without doing any homework,

12     without -- without getting any examination from the university?

13     Q.   And do you recall how you received this, whether it was by

14     mail or e-mail or some other way?

15     A.   By mail.

16     Q.   Mail?

17     A.   Yeah.

18     Q.   Now, you see your name at the top; right?

19     A.   Yes.

20     Q.   All right.   And then it says, "Admitted," and there's a

21     date, February 2010.   Do you see that?

22     A.   Yes.

23     Q.   Were you -- had you been admitted to Tri-Valley in February

24     of 2010?   Where were you in February of 2010?

25     A.   2010, I was in India.

1   Q.   And had you already been talking to the consultancy?

2   A.   No.

3   Q.   I'm sorry.  Louder.

4   A.   In 2010 February?

5   Q.   Yes.

6   A.   Yes, I approached the consultancy.

7   Q.   Had you applied to Tri-Valley at that point?

8   A.   Yes.

9   Q.   Okay.  And do you see the degree program, "Healthcare"?

10  A.   Yes.

11  Q.   And that was the program that you chose; right?

12  A.   Uh-huh.

13  Q.   And that -- are these the three courses that we just looked

14  at on your registration?

15  A.   Sorry?  I didn't get the question.

16  Q.   Let me hand you back Exhibit 15, Page 2, which is your

17  course receipt.  These are for the same classes that you had

18  registered for on your transcript; right?

19  A.   No.  It's different.

20  Q.   How does it differ?

21  A.   In the transcript, the first course I can see is Leadership

22  and Management, and the course number was PM323.  And in the

23  receipt, I can see it's the third course mentioned with the

24  course number HN323.

25  Q.   Well, that's the third one listed on your receipt; right?

CHALLAGUNDLA - DIRECT / WEST

1    A.   Yes.

2    Q.   Okay.  So that one is the same.

3         And then on the transcript and the receipt, is it -- do you

4    see both "Healthcare Management"?

5    A.   Yes.

6    Q.   And also both "Medical Law and Ethics"?

7    A.   Yes.

8    Q.   Okay.  So these are the three courses that you registered

9    for; right?

10   A.   Yes.

11   Q.   But did you attend any of the classes in any way?

12   A.   No.

13   Q.   Were you ever even able to log in?

14   A.   No.

15   Q.   And you received these grades as you see on the transcript;

16   right?

17   A.   Yes.

18   Q.   Can you tell us what those are in case anyone can't see?

19   A.   The courses' names?

20   Q.   No, the grades that you received.

21   A.   The grades?  For the Leadership and Management, I got A

22   grade; and in the Healthcare Management, A; and in the Medical

23   Law and Ethics, A-minus.

24   Q.   I can take those back.  Thank you.

25   A.   Thank you.

1    Q.   Ms. Challagundla, did you have an opportunity to discuss

2    your transcript with Susan Su?

3    A.   Yes.

4    Q.   How did you do that?

5    A.   I approached one of my family friends who lives next to --

6    next to my apartment.  I requested them to take me to Dublin in

7    their car.  So they take me to the university.

8    Q.   And do you remember where that was?

9    A.   It's in the same -- same city as Dublin, but it's a

10   different building.

11   Q.   Do you remember whether that was something called Boulder

12   Court?

13   A.   It's a big building, and I've seen a lot of rooms, like,

14   nearly eight or nine.

15   Q.   Okay.  So it was a different building than you went to

16   before?

17   A.   Yes.

18   Q.   But still in Pleasanton?

19   A.   Yes.

20   Q.   Okay.  And did you get a chance to speak to Dr. Su on that

21   day?

22   A.   Yes.

23   Q.   What did she say?

24   A.   I asked her about showing the receipt.  Like, I asked her

25   that I didn't get a chance to take any classes in the first

CHALLAGUNDLA - DIRECT / WEST

1    semester, but I got the receipt.  I don't know how, and how

2    does it work out.

3    Q.   You're saying "receipt."  Did you mean transcript?

4    A.   Yeah, transcript.

5    Q.   Okay.  So you were asking her about the transcript that --

6    where you got grades even though you hadn't taken classes; is

7    that right?

8    A.   Yes.  Yes.

9    Q.   Okay.  What did she say?

10   A.   She said, like, that she was trying to -- she was trying to

11   arrange the in-person classes from the second semester onwards

12   as she was busy on getting permissions and all, stating that --

13   that day I came to her that -- what the accreditation means.

14   She said, like, she was trying to get the accreditation for the

15   university and --

16   Q.   I'm sorry.  Let me slow you down a little.

17        She was trying to get accreditation?

18   A.   Yes.

19   Q.   Okay.  That's what she was telling you?

20   A.   Yes.

21   Q.   Okay.  Go ahead.

22   A.   She was trying to get the accreditation to the university.

23   So she was busy in getting all the permissions for the

24   university, and also she was busy on getting the equipment for

25   the classrooms.

1                    (Court reporter clarification.)

2              THE WITNESS:  Equipment.

3              THE COURT:  Equipment.

4     BY MS. WEST:

5     Q.   Equipment?

6     A.   Yes.

7     Q.   Okay.  And did she explain what this had to do with you

8     getting a transcript for classes you never attended in any way?

9     A.   Sorry.  Could you please repeat the question.

10    Q.   Yes.

11              Did she explain what her seeking accreditation and getting

12    equipment had to do with you getting a transcript?

13    A.   I -- I -- from -- from her answer, I came to know that they

14    don't have the accreditation to the university, and also -- and

15    also I came to know that that was the new building where they

16    are going to start the classes.  So I -- but I asked her.  She

17    said, like, she was busy on getting all this stuff to get done,

18    and -- and I thought that's the reason why they don't have

19    anything to arrange for classes.

20    Q.   All right.  My question was a little different.

21              Did -- did you ask Dr. Su, "Why did I get a transcript?"

22    A.   Yes, I asked.

23    Q.   What did she say?

24    A.   She said, "I want to run your status, and your SEVIS is

25    under Tri-Valley University."  So if I don't get the transcript

1    for the first semester after -- after a few months of the

2    course registration, then I'll be out of status.

3    Q.   That you would be out of status?

4    A.   Yeah, I'll be out of status.

5    Q.   Did you then discuss with Dr. Su whether there would

6    actually be classes at Tri-Valley in the future?

7    A.   Yes.

8    Q.   What did she say?

9    A.   She said, "Yes, definitely," and she showed me the

10   classrooms, and I've seen two classrooms, and I don't see

11   any -- any students there.

12   Q.   Okay.  So you saw classrooms but no students?

13   A.   Yeah.

14   Q.   Did you consider whether to transfer to a different school?

15   A.   Yes.

16   Q.   Tell us about that.

17   A.   After -- after that day -- after my meeting with Susan Su,

18   I got -- decided to transfer my SEVIS to another university,

19   and I approached some of my friends who had gotten their

20   Master's at National University and also at Central Michigan

21   University.

22   Q.   Was that Central Michigan?

23   A.   Yes.

24   Q.   Okay.  And did you have any conversations with those

25   schools?

1    A.   Yes.

2    Q.   Did you attempt to try to transfer to those schools?

3    A.   Yes.

4    Q.   What happened?

5    A.   When I contacted them, they asked me -- they gave -- by

6    accepting all of my certificates, they gave -- they sent me an

7    offer letter accepting me to their university for the course --

8    for the Master's course in Healthcare.  And also, after getting

9    the letter -- along with that, I -- they asked me to get a

10   letter from Susan Su, like, stating that she was okay to

11   transfer my SEVIS to National University or to Central Michigan

12   University.

13   Q.   Now, did you try to contact Dr. Su about that?

14   A.   First of all, before reaching there, I tried to reach her

15   over the phone and then the e-mails, but I did not get any

16   response.

17   Q.   Hold on a moment before you continue.

18        So did you actually try calling Dr. Su?

19   A.   Yes.

20   Q.   And no response?

21   A.   No response.

22   Q.   And did you try e-mailing Dr. Su?

23   A.   Yes.

24   Q.   And did you get a response?

25   A.   No.

1    Q.   So what did you do then?

2    A.   And then afterwards, I again tried to -- to reach her at

3    the university itself as I did the last time.

4    Q.   You mean to go there in person?

5    A.   Yes.

6    Q.   Okay.  And did you -- were you -- did you find a way to get

7    there in person?

8    A.   Yes.

9    Q.   How did you get there?

10   A.   The same -- I mean, I had previously contacted my friends

11   for taking me to the university, the same way I got from my

12   friends.

13   Q.   And was Susan Su there when you got there?

14   A.   Well, yes.

15   Q.   Did you get a chance to talk with her?

16   A.   Yes.

17   Q.   What did she say?

18   A.   She said, like, it won't be possible to transfer my SEVIS

19   after I complete my three semesters from Tri-Valley University,

20   and she told me that that's the U.S. Government rule.  If I

21   came to one university for the first time, I should be able to

22   complete my three semesters from the same university.

23   Q.   Was that three semesters you recall?

24   A.   I can complete them, like -- that would be one year.  She

25   said, like, one year -- one year would be, like, three

1    semesters with a break period.

2    Q.   Did you have any conversation with -- or let me stop --

3    what was your reaction when she told you that you had to be

4    there for one year?

5    A.   I thought, like, I was stuck somewhere with no use.  I'd be

6    wasting my money and time, and I tried to -- I tried to

7    continue there until I complete my three semesters.

8    Q.   Did you have any discussion with Susan Su on that day about

9    classes?

10   A.   Yes.

11   Q.   What did she say?

12   A.   She said, like, "Okay.  You have already completed the

13   first semester.  So if you can complete" -- "as I said

14   previously, I was trying to get all the" -- "all the" -- "all

15   the information, like, from the accreditation and also with all

16   the classes."

17        So she told me that she was going to, like, inform us --

18   inform students whenever the classes were going to begin at the

19   university.

20   Q.   Did she tell you whether you had to wait a while?

21   A.   I'm sorry?

22   Q.   Did she tell you whether you would have to wait?

23   A.   Wait, like -- yeah.  She said, like, "Just wait for a

24   couple of weeks.  Then we're going to inform you about the

25   classes."  That's all she said, and also she asked me to

1    register for courses on the day -- first day of the second

2    semester.

3    Q.   And did you?

4    A.   Yes, I did.

5    Q.   Why?

6    A.   Because I have no other option to -- because I have my

7    offer letter in my hand from other universities, but she told

8    me, like, there's no other option to -- to move -- to go to

9    other universities until I complete the three semesters here.

10   Q.   Did you pay Dr. Su the full amount for that second

11   semester?

12   A.   No, I did not.

13   Q.   Do you recall how much you paid her?

14   A.    I paid less than the first semester.  I paid, like, maybe a

15   thousand dollars or so I paid.  I'm not -- I'm not sure of the

16   number.

17   Q.   Why did you not pay the full amount?

18   A.   Because the first semester, I came to know what exactly

19   happened without taking the classes at all.  I got the

20   transcript.  And as she said, she asked me to wait for a couple

21   of weeks for -- for classes -- for in-person classes at the

22   university.  So I thought of paying the rest of the fee if I go

23   to the university to take my classes.

24   Q.   Now, at some point, did you learn whether there actually

25   were physical classes that semester?

1    A.   After paying some amount at the university, I went back to

2    my home, and after a couple of weeks, I got a link for

3    registration of the courses, and at that time I -- I'm able to

4    see the -- see the link -- see the e-mail provided with the

5    date and the time of the class.

6    Q.   Okay.  And did you find out whether that class was online

7    or in person?

8    A.   It's online.

9    Q.   All right.  Did you find out whether there were any

10   physical classes that semester?

11   A.   No.

12   Q.   Let me try that question again.

13        Did you learn one way or another whether there were going

14   to be physical classes that semester?

15   A.   On that day when I was at the university as per our

16   conversation, I came to know that there would be in-person

17   classes for that semester.

18   Q.   And did you later find out whether that was true?

19   A.   Later that -- I found out that there would be no in-person

20   classes also for the second semester, too.

21   Q.   Did you ever try to log into the online classes for that

22   second semester?

23   A.   Yes.

24   Q.   What happened when you tried to log in?

25   A.   In the second semester when I tried to log in, I can just

1    see the -- regarding a "Play" button and some -- some -- I

2    don't know whether those were student names or professors'

3    names.  I can see some names listed on the left side of the web

4    page.

5    Q.   Okay.  So you saw a list of names on the side?

6    A.   Yes.

7    Q.   And you saw a window with a "Play" button?

8    A.   Yes.

9    Q.   Did you press "Play"?

10   A.   Yeah.

11   Q.   And what happened?

12   A.   After -- after I started playing the recording, I thought

13   there was, like, a professor who was teaching the students

14   because that's the first time I'm taking the online -- online

15   course, and I don't have that option in India.

16   Q.   So --

17   A.   So --

18   Q.   So you thought there was an instructor there?

19   A.   Yes.

20   Q.   Did you find -- did you do anything to find out whether

21   that was correct?

22   A.   I just -- I just tried to say, "Hello?  Hello?" for a

23   couple of times, and I did not get any response, and then I

24   came to know that it's just a recording.  There was no

25   instructor.

1    Q.   Did you do any assignments during the course of that

2    semester?

3    A.   Yes, I did.

4    Q.   And how did you do that?

5    A.   I got some e-mails for -- for some topics which are related

6    to the courses, and after that, I tried to get some book

7    information from the university because without that, I don't

8    have any professor names to reach out.

9    Q.   Did you have a contact information for an instructor?

10   A.   No.

11   Q.   Okay.  So do you see an assignment on -- in an e-mail?

12   A.   Yes.

13   Q.   And were you able to turn in your assignment?

14   A.   I can't be able to use the information, what they provided,

15   because it's just a topic, what I received in my personal

16   e-mail address from the university students who were working

17   there in the university.  I thought of contacting them to get

18   some books so that I can prepare for the assignments and all,

19   but I didn't get any response from them.

20        So I typed -- I typed the topics in Google to get some

21   information, and I reload the -- reload the assignment after

22   reading the information of what I see on the Google.

23   Q.   Okay.  So do I understand you correctly that there was an

24   assignment?  It was a topic?

25   A.   Yes.

1    Q.   And you tried to inquire about books?

2    A.   Yes.

3    Q.   But you got no response?

4    A.   Yes.

5    Q.   So you did some research on your own -- what did you

6    say? -- on Google?

7    A.   Yes.

8    Q.   And you wrote up an assignment?

9    A.   Yes.

10   Q.   Did you turn that assignment in to an instructor?

11   A.   No.

12   Q.   Why not?

13   A.   I don't have any information to whom do I need to submit

14   and to -- to whose e-mail I needed to submit it on.

15   Q.   Did you take any exams that semester?

16   A.   No.

17   Q.   Did you register for a third semester?

18   A.   For the third semester, no.  I did not register for the

19   third semester, no.  I should say, like, in the third

20   semester -- after completing the third semester, I'll be able

21   to transfer my SEVIS, she said.

22        So I thought of taking a break because I completed almost,

23   like, two semesters.  So I thought of taking a break, and in

24   the break period, I tried to approach California -- Cal State

25   University, which is in Hayward, to get my SEVIS transferred.

1    Q.   Okay.  Let me stop you a second.

2                THE COURT:  Ms. West, any time in the next five

3    minutes, I'd like to break for the day.

4                MS. WEST:  Thank you.  I think we'll actually be able

5    to finish the direct in five.

6    BY MS. WEST:

7    Q.   Did you pay any fees for a third semester?

8    A.   For the third semester?

9    Q.   Do you recall paying fees in December of that year?

10   A.   Yes, I paid the fee, but it's not for the third semester.

11   It's for -- because in the second semester, I just paid a

12   thousand dollars.  So I thought of paying some amount.  I mean,

13   before that, I tried to approach Cal State University.

14   Actually, I was worried at that time about my status because if

15   I don't pay the fee, they won't enroll for classes.  If I don't

16   enroll for classes, I'll be out of status.

17   Q.   And did you have another discussion with Susan Su at that

18   time about transferring?

19   A.   No.  I just met her three times, and that's all.

20   Q.   Did Susan Su actually transfer you?

21   A.   No.

22                MS. WEST:  I think it's actually going to be more

23   than another couple minutes, so why don't we break now.

24        Thank you, your Honor.

25                THE COURT:  Very good.

1          Members of the jury, we're going to break for the day.

2          All right.  Remember my prior admonition not to form or

3     express any opinion, not to give or accept information from any

4     source, including a person or Internet.

5          Have a good evening.  We'll see you tomorrow morning at

6     8:30.

7                    THE CLERK:  All rise.

8          (Proceedings were heard out of the presence of the jury:)

9                    THE COURT:  All right.  Ms. Challagundla, you can

10    step down.  I'll order you to return tomorrow at 8:30 in the

11    morning.

12                   THE WITNESS:  Thank you.

13                   THE COURT:  We're outside the presence of the jury.

14    I should have said that a moment ago.

15         If no one objects and I remember, I'm going to bring

16    pastries for the jury tomorrow morning because it's a long

17    trial, and there's a good bakery near my house.

18                   MR. BABCOCK:  No objection.

19                   MS. WEST:  No objection.

20                   THE COURT:  Is there anything else we need to put on

21    the record or talk about before we all break for the day?

22                   MS. WEST:  Just that the Government -- after she

23    steps down, we plan to read our factual stipulations into the

24    record, if that's okay with the Court.

25                   THE COURT:  All right.  That's fine.  I remember

1    earlier the parties wanting -- I remember the Government

2    wanting to read them in.

3              MS. WEST:  Or we're happy to have the Court do it.

4    It was more of an issue of timing.

5              THE COURT:  Right.

6              MS. WEST:  If the Court prefers that, that's fine.

7              THE COURT:  I -- I think it's -- I don't know that I

8    have a strong preference.  So we can -- we can address that

9    first thing in the morning tomorrow.

10        All right.  If there's nothing else, the Court will be in

11   recess, then.

12             MS. WEST:  Thank you.

13             MR. RHYNE:  Thank you, your Honor.

14             MR. BABCOCK:  Thanks, your Honor.

15             THE CLERK:  All rise.

16        Court is in recess.

17                   (Proceedings adjourned at 1:36 p.m.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, James C. Pence, Federal Official Realtime Court

6     Reporter, in and for the United States District Court for the

7     Northern District of California, do hereby certify that

8     pursuant to Section 753, Title 28, United States Code that the

9     foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14
                              Dated this 13th day of June, 2014.
15

16

17    _____
                   JAMES C. PENCE, RMR, CRR, CSR NO. 13059
18                 FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25