1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          BEFORE THE HONORABLE JON S. TIGAR

4    UNITED STATES OF AMERICA,        )
                                      ) Volume 6
5              Plaintiff,             ) Pages 928 - 1123
                                      )
6         VS.                         ) NO. 11-00288 JST
                                      )
7    SUSAN XIAO-PING SU,              )
                                      ) San Francisco, California
8              Defendant.             ) Wednesday, March 12, 2014
     _____) 8:34 a.m.

9

10              **TRANSCRIPT OF COURT PROCEEDINGS**

11

     **APPEARANCES:**

12

13   **For Plaintiff:**          MELINDA HAAG
                                  UNITED STATES ATTORNEY
14                                1301 Clay Street, Suite 340S
                                  Oakland, California 94612
15                       BY:     **HARTLEY M.K. WEST, ESQ.**
                                 **WADE M. RHYNE, ESQ.**
16                               **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**          Law Offices of Erik G. Babcock
18                               717 Washington Street, Second Floor
                                 Oakland, California 94607
19                       BY:     **ERIK G. BABCOCK, ESQ.**
                                 **ATTORNEY AT LAW**

20

21

22

23

24

     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                 Official Court Reporter - U.S. District Court
                   Computerized Transcription By Case CATalyst

**I N D E X**

Wednesday, March 12, 2014 - Volume 6

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **CHALLAGUNDLA, BHANU  (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 932 | 6 |
| Direct Examination (Resumed) by Ms. West | 932 | 6 |
| Cross-Examination by Mr. Babcock | 935 | 6 |
| **CRITTEN, DYLAN** | | |
| (SWORN) | 958 | 6 |
| Direct Examination by Ms. West | 958 | 6 |
| Cross-Examination by Mr. Babcock | 972 | 6 |
| Redirect Examination by Ms. West | 986 | 6 |
| Recross-Examination by Mr. Babcock | 988 | 6 |
| **TAYLOR, DALE** | | |
| (SWORN) | 992 | 6 |
| Direct Examination by Ms. West | 992 | 6 |
| Cross-Examination by Mr. Babcock | 1101 | 6 |

**E X H I B I T S**

| **GOVERNMENT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 200B | 998 | 998 | 6 |
| 202B | 1033 | 1033 | 6 |
| 202C | 1010 | 1012 | 6 |
| 202D | 1009 | 1009 | 6 |
| 203C | 1026 | 1026 | 6 |
| 203D | 1028 | 1028 | 6 |
| 203E | 1017 | 1018 | 6 |
| 203F | 1031 | 1032 | 6 |
| 204B | 1038 | 1039 | 6 |
| 204C | 1045 | 1045 | 6 |
| 204D | 1043 | 1043 | 6 |

# E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 205B | 1053 | 1053 | 6 |
| 205C | 1051 | 1051 | 6 |
| 206 | 1058 | 1058 | 6 |
| 206A | 990 | 991 | 6 |
| 207 | 1069 | 1069 | 6 |
| 207A | 990 | 991 | 6 |
| 208B | 1092 | 1093 | 6 |
| 208D | 1095 | 1096 | 6 |
| 209D | 961 | 961 | 6 |

```
 1    Wednesday, March 12, 2014                        8:34 a.m.

 2                          ---oOo---

 3         (Proceedings were heard in the presence of the jury:)

 4            THE CLERK:  All rise.

 5        You may be seated.

 6            THE COURT:  Good morning, Ms. Challagundla.  Did I

 7    remember to say your name correctly?  You can come up to the

 8    witness stand, please.  I'll remind you that you're still under

 9    oath.

10        All right.  Members of the jury, good morning to you.  I

11    put some pastries in the -- caused some pastries to be put, as

12    we say, in the jury room this morning.  There's a local

13    bakery -- there's a local bakery near my house, and they just

14    opened up a few months ago.  I think they're doing an

15    outstanding job, and so I want them to stay in business.  I try

16    to patronize them when I can.

17        And it was -- it was just a way of my expressing a very,

18    very small measure of gratitude for your getting up early every

19    day and coming in here to do the hard, important work of being

20    jurors and for the commute that you're making every day.  And I

21    told you at the beginning of this trial how grateful I was, and

22    so we've been going a good long while now.  So this is just

23    another chance for me to say thank you.  So enjoy.

24        Ma'am, go ahead and have a seat.  You're still under

25    oath --
```

 1          THE WITNESS:  Thank you.

 2          THE COURT:  -- and that water, as I said yesterday,

 3   is for you.

 4       Ms. West, your witness.

 5          MS. WEST:  Thank you.

 6                    **BHANU CHALLAGUNDLA,**

 7   Called as a witness by the Government, having previously been

 8   sworn, resumed the stand and testified further as follows:

 9                **DIRECT EXAMINATION (RESUMED)**

10   BY MS. WEST:

11   Q.   Good morning.

12   A.   Good morning.

13   Q.   When we finished yesterday, we were just -- excuse me.  We

14   were just talking about your paying the fees in December of

15   2010.  Do you remember that?

16   A.   Yes.

17   Q.   And we were talking about how you were seeking to transfer?

18   A.   Yes.

19   Q.   Okay.  And did you actually transfer at that time?

20   A.   No.

21   Q.   Now, Ms. Challagundla, what is your current status in the

22   United States?

23   A.   F-1.

24   Q.   F-1?

25   A.   Yes.

1   Q.  At some point, were you out of status?

2   A.  From 2011 for -- my status got terminated from February --

3   probably, like, two months.  My SEVIS got terminated.

4   Q.  Was that when Tri-Valley University was shut down?

5   A.  Yes.

6   Q.  Okay.  Now, how did you get back in F-1 status after your

7   SEVIS status was terminated?

8   A.  I approached an advocate by the name Kalpana V.

9   Peddibhotla.

10                  (Court reporter clarification.)

11              THE WITNESS:  Kalpana, K-a-l-p-a-n-a.

12  BY MS. WEST:

13  Q.  So I don't want to talk about any advice that you got from

14  an attorney --

15  A.  Okay.

16  Q.  -- but were you reinstated?

17  A.  Yes, I started the reinstatement process.

18  Q.  The reinstatement process?

19  A.  Yeah.

20  Q.  To get back into F-1 status?

21  A.  Yes.

22  Q.  And did you attend any schools after Tri-Valley University

23  was shut down?

24  A.  Yes.

25  Q.  Can you please tell us about that.

1    A.  I started my reinstatement process in April, and then

2    for -- before starting that, they asked me -- I can be eligible

3    to apply for the reinstatement only if I enroll in a

4    university.  And then at that point, I approached DeVry

5    University.

6    Q.  DeVry?

7    A.  DeVry, which is in New York.  It's near to Fremont.  So I

8    approached them, and I researched for healthcare courses first

9    of all.  They don't have individual courses on healthcare.

10   They have a concentration with MBA in Healthcare.  My major was

11   MBA, and then I have taken some concentration courses, which is

12   in healthcare.

13   Q.  Okay.  So you were able to do an MBA program there?

14   A.  Yes.

15   Q.  And did you finish the program at DeVry?

16   A.  Yes.

17   Q.  And are you currently in school now?

18   A.  Yes.

19   Q.  Where are you in school now?

20   A.  I'm taking some follow-up courses regarding MBA at ITU.

21   Q.  And what kind of courses are those?

22   A.  Engineering Management courses.

23              (Court reporter clarification.)

24         THE WITNESS:  Engineering Management courses.

25         MS. WEST:  Okay.  Thank you.

1          THE WITNESS:  Thank you.

2          THE COURT:  Cross-examination?

3          MR. BABCOCK:  Yes, your Honor.  Thank you.

4                    **CROSS-EXAMINATION**

5     BY MR. BABCOCK:

6     Q.  Good morning, ma'am.

7     A.  Good morning.

8     Q.  My name is Erik Babcock, and I represent Dr. Su.

9     A.  Okay.

10    Q.  You -- you first came to this country in the spring of

11    2010 --

12    A.  Yes.

13    Q.  -- is that right?

14    A.  May 5th, 2010.

15    Q.  May 5th, 2010.

16         You got your Bachelor's degree in India?

17    A.  Yes.

18    Q.  And you hired a consultant -- consulting agency to help you

19    apply for schools in the United States?

20    A.  Yes.

21    Q.  What was the name of that consulting agency?

22    A.  Albright Consulting.

23    Q.  Albright -- Albright Consulting.

24    A.  Okay.

25    Q.  And I assume when you applied, you had to provide your -- a

CHALLAGUNDLA - CROSS / BABCOCK

1    copy of your degree in India?

2    A.   Yes.

3    Q.   As well as your transcripts?

4    A.   Yes.

5    Q.   Did you get some letters of recommendation?

6    A.   Yes.

7    Q.   And you were accepted to Tri-Valley University?

8    A.   Yes.

9    Q.   Did you apply to any other schools at the same time?

10   A.   National University, which is in San Diego.

11   Q.   Okay.  And did you also get into National University?

12   A.   Sorry?

13   Q.   Were you also admitted at National University?

14   A.   No.  When the consultancy applied to both universities,

15   before National University, I got I-20 from Tri-Valley.  So

16   they asked me to go for a visa interview based on Tri-Valley

17   University's I-20.

18   Q.   Do you remember -- when did you finish your degree in

19   India?

20   A.   2009.

21   Q.   What time of year?

22   A.   2009, I completed it.

23   Q.   Like, in the spring or the fall or the summer?

24   A.   In summer.

25   Q.   In the summer of 2009?

CHALLAGUNDLA - CROSS / BABCOCK

1    A.   Yeah.  Yeah.

2    Q.   Okay.  And how soon did you start looking into going to

3    school in the United States after that?

4    A.   When I approached the consultancy, they asked me to submit

5    the certificates, and after completion of my Bachelor's degree,

6    I needed to wait for the -- for at least two months.  So I

7    waited until that period, and also they asked me to prepare for

8    a TOEFL examination or an IELTS examination where I have to

9    submit a score card to the universities in the United States to

10   get the admission.

11        So I took training for the TOEFL examination for about one

12   and a half months, and after that, I gave the test in India,

13   and I got passed, and probably it takes, like, eight to

14   nine months to process everything.

15   Q.   Okay.  And when -- do you remember -- so you were first

16   admitted to TVU?

17   A.   Yes.

18   Q.   And got an I -- an I-20?

19   A.   I-20, yes.

20   Q.   Do you remember when the I-20 was -- when you received

21   that?

22   A.   I received it in April.

23   Q.   Of 2010?

24   A.   2010.  And then the consultancy ordered for -- for a date

25   for a visa interview schedule in Hyderabad.  So after that,

1   I -- and by this time -- yeah.  After I got my I-20, I went to

2   the visa interview in Hyderabad.

3   Q.   And you went for the interview at the U.S. Consulate in

4   Hyderabad?

5   A.   Yes.

6   Q.   And they gave you an F-1 visa?

7   A.   Yes.

8   Q.   Okay.  You at some point -- you called Dr. Su from India;

9   right?

10  A.   From India, I never contacted Susan Su.  I approached only

11  Keerthana.

12  Q.   You didn't have a phone call with Dr. Su?

13  A.   No.

14          MR. BABCOCK:  May I approach, your Honor?

15          THE COURT:  Yes.

16  BY MR. BABCOCK:

17  Q.   Ms. Challagundla --

18  A.   Yes.

19  Q.   -- I'm going to ask you to review something and see if it

20  refreshes your recollection about whether -- you don't need to

21  read the whole document, but I'll direct you to this sort of

22  last paragraph here.  Just read that to yourself.

23  A.   Oh.  This one?

24  Q.   Yes, please.

25  A.   "Priority" --

1    Q.   No.  I'm sorry.  Just read it -- don't read it out loud.

2    A.   Oh.  Okay.

3    Q.   Just review it yourself.

4    A.   Okay.

5              THE COURT:  While that's happening, members of the

6    jury, I'll just tell you that you will note that from time to

7    time, I'll ask the lawyers to make it clear what a particular

8    document is.  The rules on refreshing recollection are

9    different.  You can show a witness anything to refresh their

10   recollection.

11        My favorite Bar study video has a professor that says that

12   you can show a witness a plate of spaghetti if you think that

13   will refresh their recollection, but it isn't part of the

14   record, and it's not read into the record, and that's why from

15   time to time you'll see what's just happened, and that is the

16   witness will be shown something, and nothing further will be

17   said about it.

18   BY MR. BABCOCK:

19   Q.   Did you have a chance to review that?

20   A.   Yes.

21   Q.   Does that refresh your recollection about whether you, in

22   fact, talked with Dr. Su while you were still in India?

23   A.   I never contacted Su when I was in India.  I contacted only

24   Keerthana, and I told her, like, I don't know anyone, and I

25   need accommodation of where I should live, and also I asked her

1    to bring someone to pick me up from the San Francisco Airport.

2    Q.   So did you ever -- did you not ever tell -- you were

3    interviewed by -- strike that.  Let's start over.

4        You were interviewed by agents from -- Agent Taylor from

5    the Immigration Service or Homeland Security, I guess, back in

6    November of 2011.  Do you remember that interview?

7    A.   Which --

8    Q.   This gentleman was there, Mr. Rhyne, as well as an agent.

9    Actually, you know what?  It was a telephonic interview, and

10   you were with your attorney.

11   A.   I don't remember that.

12   Q.   Okay.  Do you remember --

13   A.   Because --

14   Q.   -- having a telephonic interview?

15   A.   Because --

16   Q.   I'm sorry.  Hold on.  There's just -- there's no questions

17   here.

18       Do you remember having a telephonic interview with agents

19   from Immigration in -- around November of 2011?

20   A.   I don't remember the name, but I had spoken with

21   immigration -- immigration persons --

22   Q.   Okay.  Did you ever --

23   A.   -- through my advocate.

24   Q.   How many times have you spoken with immigration people

25   about your experiences at T -- at Tri-Valley University and

1    Dr. Su?

2    A.   It's in the reinstatement process paperwork.  So I have

3    spoken, like, maybe four times, I guess.

4    Q.   Okay.

5    A.   Three or four times.

6    Q.   And did you ever tell -- during any of those four times,

7    did you ever tell them that prior to departing India for the

8    United States, you contacted Dr. Su to make arrangements for

9    your arrival in the United States?

10   A.   From my memory, like, I never contacted her.  I contacted

11   Keerthana.  So I -- maybe, like -- no, I never contacted her.

12   Q.   Okay.  Did you contact the school?

13   A.   I contacted Keerthana.  I just got -- after that, I got her

14   contact from my consultancy -- through my consultancy.  When

15   they did some research in the ARKOD, they tried to get some

16   students' information from the ARKOD website, whether they were

17   only Indian students, foreign.  So from there, they got -- they

18   did contact Keerthana, and I got her contact from there.

19   Q.   Okay.  So the consult -- your consultancy put you in touch

20   with Keerthana?

21   A.   Sorry?

22   Q.   The consultancy put you in touch with Keerthana.  Am I

23   understanding that right?

24   A.   I don't know whether they talked over the phone with her.

25   They told me, like, they did some chat with her in the ARKOD,

1    and from there, they explained about my admission to the

2    Tri-Valley University.  And then she came up with giving her

3    contact number to them, and from them, I got her contact.  I

4    contacted her.

5    Q.   Okay.  You contacted her about arranging for housing in the

6    United States?

7    A.   Yes.

8    Q.   Okay.  You had not paid any tuition to Tri-Valley

9    University before you came to the United States; right?

10   A.   At the time of my interview -- visa interview schedule --

11   before going to the visa interview, I did some research at that

12   point because my consultancy people -- they told me, like,

13   "They will ask you about the university, when it got founded

14   and who's the founder and what courses they have, why did you

15   choose the healthcare program, and all these questions they

16   would come up with."  That's what they told me.

17        So I researched the university to get to know what it is

18   and what information they have and --

19             THE COURT:  All right.  Ms. Challagundla, Mr. Babcock

20   is just asking you a relatively simple question.  He wants to

21   know:  Did you pay any money to Tri-Valley University before

22   you came to the United States?

23             THE WITNESS:  Pay money to them?

24             THE COURT:  Yeah.

25   ///

1    BY MR. BABCOCK:

2    Q.   Yes, tuition.

3    A.   I paid to the consulting people but not directly to

4    Tri-Valley University.

5    Q.   You paid the consulting people for their services?

6    A.   I don't know why they asked -- I mean, I thought, like,

7    simply they were doing any work for the students who approached

8    them for early admission.  So that's their business.  So I

9    probably can remember, like, I paid nearly 20- to 30,000 rupees

10   to them to process my application.

11   Q.   And roughly do you know how much, for those of us that

12   don't know what the rupees --

13   A.   In U.S. dollars, it would be $250 or something.

14   Q.   250?

15   A.   $50, yeah.

16   Q.   Okay.  That was the total amount that you paid to the

17   consultancy?

18   A.   Sorry?

19   Q.   That was the total amount --

20   A.   Yes.

21   Q.   -- you paid to the consultancy?

22   A.   Yes.  Yes.

23   Q.   $250?

24   A.   Yes.

25   Q.   Okay.  So you didn't just -- so you paid some money to the

1    consultancy.  You never made any transfers or wrote any checks

2    to Tri-Valley University before you came to the United States;

3    is that right?

4    A.  I made one check from Andhra Bank before coming to the

5    United States.  My dad -- he was asking me to carry checks

6    instead of cash.  So half of the amount I took -- we gave them

7    rupees to Andhra Bank, and they gave me dollars with the check.

8    Q.  You brought the check with you?

9    A.  Yes.

10   Q.  Physically carried the check, in other words?

11   A.  Yes.

12   Q.  You didn't give that check to Tri-Valley University until

13   after you arrived in the United States?

14   A.  I gave it to Keerthana.  I had already took Keerthana to

15   where she's working at Tri-Valley University.  She's part of

16   the job there.

17   Q.  I understand --

18   A.  So --

19   Q.  -- but you gave it to Keerthana after you arrived in the

20   United States?

21   A.  Yes.  After I arrived to the United States, I gave my check

22   to Keerthana --

23   Q.  Okay.

24   A.  -- to pay the fee.

25   Q.  And as I understand it, you didn't give her the check until

1    after you had gone to the school and took -- you waited some

2    period of time after you went to the school to decide whether

3    you were going to follow through with it; is that right?

4    A.   The first time I visited Tri-Valley University -- after my

5    first visit, I gave my check, not the day of the visit.

6    Q.   Not the same day?

7    A.   Not the same day.

8    Q.   I understand, and about how long after your visit to

9    Tri-Valley University did you give Keerthana the check for the

10   tuition?

11   A.   I waited for -- like, for ten days, more than ten days.

12   Q.   Okay.  And I'm sorry.  The amount of that check was how

13   much?

14   A.   $2,365.

15   Q.   Okay.  Was that the full amount of the tuition for the

16   semester?

17   A.   That's -- that's not the full amount.  That's only the

18   half-amount I paid with the check --

19   Q.   Okay.

20   A.   -- because as I said, I just got the half-of-the-amount

21   check from India.  So whatever the amount I brought, I gave it

22   to her, 2,365.

23   Q.   I understand, and how did you know to bring that particular

24   amount as opposed to pay -- bringing a check for the full

25   amount of the tuition?

1    A.   I asked the consulting -- my dad asked the consulting

2    people when I was in India to discuss, like, how much fee do I

3    need to pay for each semester, and so depending on that, we'll

4    get an idea to approach a bank and get a loan from them.

5    Q.   So you had an idea -- you knew before you came that you

6    didn't have to pull -- pay the full amount of tuition up front;

7    is that right?

8    A.   Yes.

9    Q.   Okay.  And you were allowed to pay off the balance of the

10   tuition when?

11   A.   Along with that check, I brought some traveller checks with

12   me.  I opened a Bank of America account after I deposited the

13   checks into the account.  After that, I -- I mean, I had some

14   due for the first semester.  So I paid that with a debit card.

15   Q.   And when did you make -- this was the balance of tuition?

16   A.   The same day I gave my credit card and also the check to

17   her, but I asked her to process -- to process the check first,

18   and then afterwards, I asked her to process from the debit

19   card.

20   Q.   "Her" being Keerthana?

21   A.   Sorry?

22   Q.   You said "her."  You were referring to Keerthana?

23   A.   I don't get the question.

24   Q.   You just said you gave your debit card number to someone.

25   A.   Yes, to Keerthana, I gave, not the number.  I -- because

CHALLAGUNDLA - CROSS / BABCOCK

1    I -- I stayed with her in the same apartment, and she's the one

2    who helped me out, and she's the one who took me to the

3    university for the first day of my year.  For the first week, I

4    went to the university along with her, and I knew that she was

5    working in the university, and I came to know that she's the

6    one who processed the --

7    Q.  I understand.

8    A.  -- transactions and all.  So I trusted her, and I gave my

9    permission.

10   Q.  I understand.

11       You were living with Keerthana; right?

12   A.  Sorry?

13   Q.  When you arrived in the United States, you were living with

14   Keerthana; right?

15   A.  I was living with -- I lived with Keerthana.

16   Q.  And she was your point of contact for the school?

17   A.  Yes.

18   Q.  Okay.  She's the one that you gave your first tuition

19   payment to, the check that your dad got from the bank; right?

20   A.  Yes.

21   Q.  Okay.  What I'm trying to understand is that was just half

22   the tuition, the check; right?  And you paid that about ten

23   days after you first went to the school; right?

24   A.  Yes.

25   Q.  Okay.  When did you pay the second half of the tuition,

1    just approximately when?

2    A.   I did not get any receipt for the rest of the payment.  I

3    don't have that receipt at that time.  She said she processed

4    that, and I did not ask her when did the process went on

5    because they gave -- she gave me the receipt.  On the receipt,

6    I can see that the rest of the amount is still due.

7          She said she's going to charge afterwards from the card,

8    and because -- and the reason why I gave my check on the

9    university -- I waited until ten days to know what will -- what

10   can happen with the university or not because in the first --

11   Q.   Let me stop you there.

12        When did you pay the second half of the tuition?

13   A.   When I gave my check, along with that, I gave the debit

14   card.  I'm not sure whether -- because she didn't -- she did

15   not give me any check for the second half amount.  So I'm not

16   sure whether they processed the check or not.  She didn't give

17   me the receipt also.

18   Q.   So you just gave Keerthana your debit card number?

19   A.   Yes.

20   Q.   And you're not sure when she processed it?

21   A.   Yes.

22   Q.   Okay.  Did you ever check to see if it had been processed?

23   Was the -- was the full tuition eventually paid?

24   A.   I did not check.

25   Q.   This was for the summer trimester, right, this first money

CHALLAGUNDLA - CROSS / BABCOCK

1    that you paid Tri-Valley, the check from your father and the

2    money -- whatever money was taken from your debit card?

3    A.   Yes.

4    Q.   That money was the tuition for your first trimester at TVU;

5    is that right?

6    A.   Yes.

7    Q.   Okay.  Which was in the summer of 2010?

8    A.   Yes.

9    Q.   Okay.  You also registered in the fall for the fall

10   trimester; right?

11   A.   Yes.

12   Q.   And do you remember when the fall trimester started, just a

13   month?

14   A.   It was September or -- September.

15   Q.   Okay.  When did you -- when did you pay the tuition for the

16   fall trimester?

17   A.   In August, I received the transcript for the first

18   semester.  After that, I -- I went to the new building, to

19   Tri-Valley University, to reach out to her to ask about the

20   transcript.  That same day, I did not pay anything, but for

21   the -- but for the third time when I visited, I paid at that

22   time, maybe October -- sorry -- November, I guess.  I don't

23   remember that.

24   Q.   Not until November?

25   A.   October, I guess.  I'm not sure.

CHALLAGUNDLA - CROSS / BABCOCK

1    Q.   Were you -- were you already registered for the fall

2    trimester?

3    A.   Yes.

4    Q.   So you were allowed to register before you had paid any

5    tuition for that semester; is that right?

6    A.   I did not pay anything that -- the day I was at the second

7    time to Tri-Valley University.

8    Q.   Okay.

9    A.   Yes.

10   Q.   At which point you did -- you were registered for the

11   second -- for your second trimester, the fall trimester?

12   A.   Yes.

13   Q.   Okay.  And at some point after that in October/November,

14   you made your first payment towards the tuition for that

15   trimester --

16   A.   Yes.

17   Q.   -- is that right?

18        Okay.  Did you pay the full amount of the second

19   trimester's tuition in October or November?

20   A.   I did not pay the full amount.  I just paid less than

21   half -- half amount, like, maybe a thousand dollars.

22   Q.   Okay.  Say a thousand dollars.

23        Do you remember what the full tuition was for the second

24   trimester?

25   A.   Sorry?

CHALLAGUNDLA - CROSS / BABCOCK

1    Q.   Do you remember how much the tuition was, the full amount

2    of the tuition for the second trimester?

3    A.   I think when I was in India itself, I came to know it's --

4    it would be more than -- more than $3,000.

5    Q.   $3,000?

6    A.   More than 3,000.

7    Q.   Okay.

8    A.   Between 3,000 to 4,000.

9    Q.   Okay.  And so you paid in October or November of 2010 --

10   you paid a thousand dollars towards that 3- or $4,000.  When

11   did you pay the balance?

12   A.   I did not pay the balance.  I just -- I just paid the

13   thousand dollars, and then the third time I did not -- I did

14   not pay the balance for the second semester.

15   Q.   You did not pay the balance?

16   A.   I did not clear the balance --

17   Q.   Okay.

18   A.   -- for the second semester.

19   Q.   Okay.  But you did register for a third trimester that was

20   supposed to start in January; right?

21   A.   Yes.

22   Q.   Although it never started because in -- on January 19th,

23   you were visited by, I think, three -- was it three immigration

24   agents?

25   A.   Yes.

CHALLAGUNDLA - CROSS / BABCOCK

1    Q.   At your apartment?

2    A.   Yes.

3    Q.   Or home in Fremont; right?

4    A.   Yes.

5    Q.   They came to your apartment about 6:30 or 7:00 in the

6    morning?

7    A.   Between 6:00 to 6:30.

8    Q.   Okay.  6:00 to 6:30.

9         Were you asleep when they showed up?

10   A.   Yes, I'm sleeping at that time.

11   Q.   And did they -- did they arrest you?

12   A.   Yes.

13   Q.   They asked you some questions about Tri-Valley University?

14   A.   Yes.

15   Q.   Okay.  Did they take you to the Immigration Court?

16   A.   Yes.

17   Q.   And tell you that your F-1 status was no longer valid?

18   A.   Yes.

19   Q.   And that you were -- they were going to start deportation

20   proceedings; right?

21   A.   No.  I've been there for a couple of hours, and -- and

22   they -- and they -- and they put an anklet to my leg, and then

23   they released to my home.

24   Q.   I understand.  They put, like, an electronic device --

25   A.   Electronic device.

CHALLAGUNDLA - CROSS / BABCOCK

1   Q.   -- around your ankle?

2   A.   To my leg, yes.

3   Q.   As a condition of letting you out of jail; right?

4   A.   Yes.

5   Q.   While -- pending whatever happened in the Immigration

6   Court; is that right?

7   A.   Yes.

8   Q.   Okay.  You enrolled in a new school?

9   A.   Yes.

10  Q.   But you had to go through a whole process with Immigration

11  before they would approve your reinstatement of your F-1 visa;

12  right?

13  A.   Yes.

14  Q.   Okay.  You -- you said that you applied -- you started

15  looking at some other schools?

16  A.   Yes.

17  Q.   I think one was at Central Michigan.

18  A.   One is Central Michigan University.

19  Q.   I don't remember what the second one was.  National?

20  A.   One is National at San Diego.

21  Q.   National -- that's right.  National in San Diego?

22  A.   Yes.

23  Q.   And as I understand it, yesterday you said you asked for a

24  letter from Dr. Su saying it was okay to transfer; is that

25  right?

CHALLAGUNDLA - CROSS / BABCOCK

1    A.   Yes.  Yes.

2    Q.   And was this a verbal request, or did you e-mail her?

3    A.   I did some e-mails and calls.  I did not get any response.

4    Q.   Who did you e-mail?

5    A.   To Susan and also to the other students who were working in

6    Tri-Valley.

7    Q.   And also to who?

8    A.   Some students who usually work there at the Tri-Valley.

9    Q.   Was Keerthana still working there?

10   A.   I'm sorry?

11   Q.   Your -- Keerthana, your first contact at Tri-Valley

12   University -- was she still working -- working there?

13   A.   Keerthana?  No.  At that point, she got married, and she

14   left.

15   Q.   Okay.  Do you remember the names of any of the office staff

16   that you dealt with?

17   A.   No.

18   Q.   Okay.  Do you remember which e-mail you used?

19   A.   Which e-mail?  No.  All their e-mails will end with the

20   name of tvu.edu.  That's all I remember.  I don't remember the

21   names.  I submitted all the e-mail conversations to my -- in

22   the reinstatement process, I submitted all the e-mails.

23   Q.   Okay.  Did you get an e-mail response back -- back from

24   Dr. Su about your request to transfer?

25   A.   No, I did not get anything.

CHALLAGUNDLA - CROSS / BABCOCK

1   Q.   Which classes did you register for in the fall trimester at

2   TVU?  Do you remember?

3   A.   I don't remember what courses I registered.

4   Q.   You -- if I understand it -- correct me if I'm wrong -- you

5   said you got your MBA at DeVry?

6   A.   Yes.

7   Q.   Okay.  And now you're studying engineering?

8   A.   Now?

9   Q.   Yes.

10  A.   Yes.

11  Q.   Okay.  I'm sorry.  At what school was that?

12  A.   ITU.

13  Q.   At ITU?

14  A.   Yes.

15  Q.   Thank you, ma'am.

16          MR. BABCOCK:  That's all I have, your Honor.

17          THE COURT:  Redirect?

18          MS. WEST:  No more questions.  Thank you.

19          THE COURT:  All right.  Thank you.

20      Ms. Challagundla, you're excused as a witness.  You can

21  step down.

22          THE WITNESS:  Thank you.

23          THE COURT:  Thank you.

24          THE WITNESS:  Can I --

25          THE COURT:  Oh.  You're free to go.

1          THE WITNESS:  Oh.  Thank you.

2          THE COURT:  Yeah.  You can stick around if you want.

3     You don't have to sit in the witness stand anymore.  You can do

4     whatever you want.

5       Government's next witness?

6          MS. WEST:  Your Honor, at this point we would like to

7     enter some factual stipulations in evidence however the Court

8     wishes to do that.

9          THE COURT:  Very good.

10      I'll allow the Government to read those.  Let me just tell

11    the jury:

12      Members of the jury, as I instructed you at the beginning,

13    sometimes the lawyers can agree that certain facts are true.

14    Those agreements are called stipulations.  That's the name we

15    give those in the law.

16      If the lawyers reach a stipulation, then you are to view

17    whatever facts have been stipulated to as having been proven in

18    the case.  The lawyers don't need to introduce evidence.  These

19    are just facts that the lawyers agree are true.

20      The Court was presented with some stipulations before the

21    trial started, and now Ms. West will read those into the record

22    consistent with the instruction I just gave you.

23      Ms. West?

24          MS. WEST:  Thank you.

25      Factual Stipulation No. 1:  During the dates of the

1    offenses charged in this case, Wells Fargo Bank and Citibank

2    were financial institutions and banks insured by the Federal

3    Insurance Deposit Corporation -- actually, I think that should

4    have been Federal Deposit Insurance Corporation, FDIC.

5        Factual Stipulation No. 2:  During the dates of the

6    offenses charged in this case, all e-mails sent to or from

7    Special Agents for the Department of Homeland Security with

8    e-mails ending in dhs.gov electronically traveled in interstate

9    commerce through servers located in Virginia.

10       Factual Stipulation No. 3:  During the dates of the

11   offenses charged in this case, the Student Exchange Visitor

12   Information System, SEVIS, was a nonpublic computer system

13   located in Rockville, Maryland.  All entries made into the

14   SEVIS computer system electronically traveled in interstate

15   commerce to servers located in Rockville, Maryland.

16       And with that, the Government calls its next witness, Dylan

17   Critten.

18            MR. BABCOCK:  Dylan?

19            THE COURT:  Good morning, sir.

20            THE WITNESS:  Good morning.

21            THE COURT:  May I ask you to come up to the witness

22   stand?  And when you get there, just remain standing, face my

23   courtroom deputy, and raise your right hand, please.

24            THE CLERK:  Do you solemnly swear or affirm that the

25   testimony you're about to give in the matter now pending before

CRITTEN - DIRECT / WEST

1  this Court shall be the truth, the whole truth, and nothing but

2  the truth?

3            THE WITNESS:  I do.

4            THE CLERK:  Thank you.  Please be seated.  You'll

5  need to speak directly into this microphone over here.

6            THE WITNESS:  Sure.

7            THE CLERK:  Please state your full name and spell

8  your last name.

9            THE WITNESS:  My name is Dylan Critten.  Last name is

10  spelled C-r-i-t-t-e-n.

11                         **DYLAN CRITTEN,**

12  Called as a witness by the Government, having been duly sworn,

13  testified as follows:

14                      **DIRECT EXAMINATION**

15  BY MS. WEST:

16  Q.   And is your first name D-y-l-a-n?

17  A.   Yes.

18  Q.   Good morning.

19  A.   Good morning.

20  Q.   Agent Critten, what do you do for a living?

21  A.   I am a criminal investigator, also referred to as a Special

22  Agent.

23  Q.   With what entity?

24  A.   I work for Homeland Security Investigations.  It's a

25  division of the United States Department of Homeland Security.

1    Q.   How long have you been a Special Agent with HSI?

2    A.   About four and a half years now.

3    Q.   Can you please describe your duties with them.

4    A.   I'm a part of the Document and Benefit Fraud Task Force.

5    We investigate crimes, including identity theft, counterfeit

6    identity documents, false or falsified claims for immigration

7    benefits.

8    Q.   Were you at some point involved in an investigation of

9    something called Tri-Valley University?

10   A.   I was.

11   Q.   And did you go to Tri-Valley University on January 7th,

12   2011?

13   A.   Yes.

14   Q.   Why?

15   A.   My colleague had made a phone call, and I went there to

16   follow up on a phone call and to get some documents from

17   Dr. Su.

18   Q.   And where was it that you went to?

19   A.   I went to 405 Boulder Court in Pleasanton, California.

20   Q.   Did you speak to Dr. Su on that day?

21   A.   I did.

22   Q.   How did you know it was Dr. Su to whom you were speaking?

23   A.   I recognized her from her driver's license photo, and I

24   also -- she introduced herself as Dr. Su.

25   Q.   Did she describe her role at Tri-Valley University to you?

1    A.   She stated that she was the president and the designated

2    school official.

3    Q.   Are you able to identify Dr. Su in this courtroom?

4    A.   I am.

5    Q.   Can you please describe where she is to the jury.

6    A.   She's sitting at the table over there between the two men.

7         MS. WEST:  Let the record reflect that Agent Critten

8    has identified the defendant.

9         THE COURT:  The record will so reflect.

10   BY MS. WEST:

11   Q.   Now, did you identify yourself to Dr. Su?

12   A.   I did.

13   Q.   How did you identify yourself?

14   A.   I gave Dr. Su my airport identification badge with the

15   Homeland Security symbol on it as well as a photo of myself and

16   name.

17   Q.   So you identified yourself as a member of Department of

18   Homeland Security?

19   A.   Yes.

20   Q.   Did you explain to Dr. Su your purpose in being there?

21   A.   Yes.  I explained that I was there to follow up on the

22   phone call that she had received earlier in the morning.  There

23   were two students who I needed documentation for to show that

24   they were indeed Tri-Valley University students.

25   Q.   And did -- in response to your presence there, did Dr. Su

1    provide you with anything?

2    A.   She did.  She provided me documentation for both students.

3         (Government's Exhibit 209D marked for identification.)

4    BY MS. WEST:

5    Q.   I'm going to show you what is marked for identification as

6    Government Exhibit 209D.

7         Are those the documents that Dr. Su provided to you?

8    A.   These are the documents.

9              MS. WEST:  The United States offers Exhibit 209D.

10             MR. BABCOCK:  No objection.

11             THE COURT:  Exhibit 209D is admitted.

12        (Government's Exhibit 209D received in evidence.)

13             MS. WEST:  Let me go ahead and take those back,

14   please.

15        Thank you.

16   BY MS. WEST:

17   Q.   All right.  Let's take a look at Page 1 of Exhibit 209D.

18        Is this an I-20 document?

19   A.   This is a Form I-20, yes.

20   Q.   Let's zoom in a little.

21        Okay.  Are you able to tell the name of the person for whom

22   this I-20 was printed?

23   A.   Yeah.  This was issued to Mohammad Rizwan.

24   Q.   And the school to which it was issued?

25   A.   Tri-Valley University.

1    Q.   And you're reading from Boxes 1 and 2 on here; is that

2    correct?

3    A.   Yes.

4    Q.   All right.  Let's go down to Box 3.  What does Box 3 say?

5    A.   This gives the reason why the I-20 was printed as a travel

6    document as proof during travel.

7    Q.   And it states, "Continued attendance at this school.

8    Reprint reason:  Travel"?

9    A.   Yes.

10   Q.   All right.  And then Box 10, "School Certification."  Do

11   you see there's a name of Susan Su?

12   A.   I do.

13   Q.   And a signature of Susan Su?

14   A.   Yes.

15   Q.   And this was an original signature on here that you

16   received; is that right?

17   A.   It appears so.  It's in blue ink.

18   Q.   Okay.  If we scoot it over, the date issued.  Do you see

19   there January 7th, 2011?

20   A.   Yes.

21   Q.   And that's the date that you went there; is that right?

22   A.   The same day.

23   Q.   Let's -- I'm going to show you Page 3 of the same exhibit.

24   Let's zoom out again.  Is this Page 3 of an I-20, the last page

25   of an I-20?

1    A.   Yes.

2    Q.   Okay.  And if we scroll down to the bottom, narrowly

3    scrolling, do we see two signatures there?

4    A.   I do.

5    Q.   Both dated January 7th?

6    A.   Correct.

7    Q.   And the top signature again is Susan Su; is that right?

8    A.   Yes.

9    Q.   And then below that, Sophie Su?

10   A.   Correct.

11   Q.   Did you see Dr. Su sign these documents?

12   A.   I did not see her sign the documents.  She came into the

13   room with the documents.

14   Q.   They were already signed?

15   A.   Already signed.

16   Q.   Okay.  So you don't know who actually signed them?

17   A.   No.

18   Q.   Let's take a look at Page 4.

19        What is this document?

20   A.   This is a letter often provided by students to customs

21   officials indicating their attendance at -- at a school.  It's

22   a letter issued by the school stating that Mohammad Rizwan is

23   currently a current student currently pursuing his course of

24   study.

25   Q.   And the date on this is also January 7th, 2011?

```
 1    A.   Yes.

 2    Q.   And a signature of Sophie Su?

 3    A.   Yes.

 4    Q.   Now, this one was not actually -- does not appear to be an

 5    original signature; right?  It appeared to be something

 6    electronically on there?

 7    A.   It appears that way.

 8    Q.   Now, the name we've just been talking about is Mohammad

 9    Rizwan; is that correct?

10    A.   Yes.

11    Q.   Last name R-i-z-w-a-n?

12    A.   That is correct.

13    Q.   What's this?

14    A.   This is a transcript for Razwan Mohammad.

15    Q.   Okay.  So different name?

16    A.   Yes.

17    Q.   But this was provided to you by Dr. Su?

18    A.   Yes.

19    Q.   And the -- this is a transcript from TVU; is that right?

20    A.   That is correct.

21    Q.   And if you see the term on there, Fall 2010, and four

22    courses listed?

23    A.   Yes.

24    Q.   With the grades A, A, A-minus, A-minus?

25    A.   Uh-huh.
```

1   Q.   Let's take a look at the bottom of here, "TVU Transcript

2   of," and there's the name Rajiv Batra.  Do you see that?

3   A.   I do.

4   Q.   And then "Issued to Rajiv Batra"?

5   A.   Yes.

6   Q.   And then an e-mail address, rizwanuddinmohd@gmail.

7   A.   Yes.

8   Q.   Do you see that?

9   A.   Yes, I do see that.

10  Q.   It says it was issued December 29th, 2010, at the bottom?

11  A.   Correct.

12  Q.   Let's zoom out again.  We're now looking at Page 6 of

13  Exhibit 209D.  What is this?

14  A.   This is a student profile page for a student named

15  Rizwanuddin Mohammad.  It shows his information at Tri-Valley

16  University.

17  Q.   Let's take a look at Page 7.  Is this another Form I-20?

18  A.   This is another Form I-20 for Rajiv Batra.

19  Q.   Okay.  Let's zoom in so everyone can see the name.

20       Okay.  First name R-a-j-i-v, last name B-a-t-r-a?

21  A.   Yes.

22  Q.   All right.  And again, Tri-Valley University?

23  A.   Correct.

24  Q.   If we go down, whose name do we see as the school official

25  signing?

```
 1    A.   I see Susan Su.

 2    Q.   With a date again of January 7th, 2011; is that right?

 3    A.   Correct.

 4    Q.   Okay.  We're now looking at Page 9 of this exhibit.  This

 5    is the third page of the I-20 again; right?  Oh, there we go.

 6         Can you see that this is the third page of that I-20?

 7    A.   Yes, I see that.

 8    Q.   And again, if we go to the signature block, do you see the

 9    blue ink names of Susan Su and Sophie Su on here?

10    A.   I see both.

11    Q.   And again, the date January 7th, 2011?

12    A.   Yes.

13    Q.   Now, we're looking at Page 10 of this exhibit.  Is this the

14    same letter of good standing but for now Rajiv Batra?

15    A.   Yes.  This is a letter from Tri-Valley University

16    indicating that Rajiv Batra is a full-time student.

17    Q.   And do you see down here -- let me zoom in a little -- "He

18    has been registering and attending class at the university and

19    in good standing with all academic requirements and

20    regulation"?

21    A.   I see that.

22    Q.   And that same language was on the Rizwan Mohammad --

23    Mohammad Rizwan, rather?

24    A.   Both were very similar.

25    Q.   Page 11 of this exhibit is -- this appears to be a
```

1    transcript for Rajiv Batra.  Do you see that?

2    A.   I do.

3    Q.   And the grades there:  A, A, A-minus?

4    A.   Yes.

5    Q.   And again, Fall 2010?

6    A.   Correct.

7    Q.   Okay.  And now at the bottom here, the "TVU Transcript of"

8    and "Issued to" name is correct?  It says, "Rajiv Batra"?

9    A.   Yes, it does.

10   Q.   And an e-mail address for Rajiv Batra?

11   A.   I see that, yes.

12   Q.   Now, there's four other pages to this exhibit.  Do these

13   appear to be attendance records?

14   A.   Yes, these are attendance records that I received that day.

15   Q.   And it says, "Tri-Valley University" at the top?

16   A.   It does.

17   Q.   And do you see the left-hand column, student name, and

18   there's a bunch of student names centered down that column?

19   A.   Yes.  I see one name on the left column, and the rest are

20   centered.

21   Q.   Okay.  And the one name that is not centered is Batra

22   Rajiv.  Do you see that?

23   A.   Yes, I see that.

24   Q.   We're looking at Page 13 now.  Is this another attendance

25   record?

1    A.   It is.

2    Q.   And the name here is Batra Rajiv.  That is in blue ink as

3    opposed to the black of the others.  Do you see that?

4    A.   Yes.  It's the only name in blue.

5    Q.   And the PPP down the other columns are all also in blue; is

6    that right?

7    A.   They are.

8    Q.   And the last attendance record is Page 14 of this exhibit.

9    Again, do you see "Batra Rajiv" in blue?

10   A.   Yes, it's in blue.

11   Q.   And here it's X's instead of P's, but they're all in blue

12   as opposed to the black and red of the others; is that right?

13   A.   Yes, in blue.

14   Q.   In looking at the Mohammad Rizwan documents, we looked at

15   one where the name was different.  It was Rizwanuddin Mohammad.

16   You noted that; correct?

17   A.   Yes, I did.

18   Q.   Did you happen to notice whether the date of birth and

19   student ID were actually correct for the individual that they

20   had been requested for, Mohammad Rizwan?

21   A.   The date of birth was correct for the Mohammad Rizwan that

22   we requested documents for, and it was correct for the Rajiv

23   Batra that we had requested student records on.

24   Q.   Okay.  So although the names seemed to vary, the -- some of

25   the biographical data remained the same?

1    A.   Yes, and the last seven digits of the student ID number on

2    the transcript also matched the last seven digits of those

3    students' SEVIS ID issued by the Government.

4    Q.   Now, we just looked at attendance records for Rajiv Batra.

5    Did you get any attendance records for Mohammad Rizwan?

6    A.   I did not.

7    Q.   Did you have a conversation with Dr. Su about that?

8    A.   Yes.  I indicated to Dr. Su that the student attendance

9    logs for -- for -- I believe it was Mohammad Rizwan were

10    missing.

11    Q.   What did she say?

12    A.   She said, "Oh, I can get those.  I can get those for you,

13    but I" -- "I can tell you he's attending.  He's in good

14    standing.  In fact, he attended one of my classes that I taught

15    this last semester."

16    Q.   So Dr. Su said that she personally taught him; is that

17    correct?

18    A.   That is correct.

19    Q.   And did she make any representations directly to you about

20    Rajiv Batra's attendance and classes?

21    A.   She also stated that Rajiv Batra had attended a class that

22    she taught as well.

23    Q.   Did you say anything to Dr. Su about what this information

24    was going to be used for?

25    A.   During the visit, I made a phone call to Officer Ramirez.

CRITTEN - DIRECT / WEST

1    During the phone call, I stated that the documents appear to be

2    in good order and Dr. Su has attested that both these students

3    are attending and have no -- no problems and that it was okay

4    to admit both students into the United States on an F-1 visa.

5    Q.   Okay.  And I think we need to give a little bit of

6    background here because you're being called sort of out of

7    order in this case; is that right?

8    A.   That is correct.

9    Q.   And the -- are you expecting a baby?

10   A.   Yes.  We had a false alarm on Monday, so anytime now.

11   Q.   Okay.  So can you tell the jury, please, who Officer

12   Ramirez is.

13   A.   Officer Ramirez is a Special Agent that is on the Document

14   and Benefit Fraud Task Force that works as part of the team.

15   He had made a couple of ruse phone calls earlier in the day

16   posing as a Customs and Border Protection officer at John F.

17   Kennedy Airport in New York.

18       He indicated to Dr. Su that a couple of Tri-Valley students

19   were flying into the country, and they didn't have any

20   documentation on them.  So we needed to verify whether or not

21   they were valid students at Tri-Valley University.

22   Q.   And then you --

23            MR. BABCOCK:  I'm going to -- I'm sorry.  I'm going

24   to -- I'm going to object and move to strike that last

25   testimony but ask the Court to hold off ruling on the

CRITTEN - DIRECT / WEST

1    assumption that Mr. Ramirez will be testifying later.

2              MS. WEST:  Agent Ramirez will testify --

3              THE COURT:  Hold on.

4         Is the ground of the objection hearsay?

5              MR. BABCOCK:  Yes.

6              THE COURT:  The objection is overruled.  I think the

7    fact that the statement was made has independent legal

8    significance.

9    BY MS. WEST:

10   Q.   So is it fair to say, Agent Critten, that your role then

11   was to go pick up the documents that Officer Ramirez had

12   initially requested?

13   A.   Yes.  I wanted to get the documents directly from the

14   school and --

15   Q.   Okay.  So now let's go back to the chronology that you were

16   describing to the jury.

17        It -- when you made that call to Officer Ramirez, was that

18   in front of Dr. Su?

19   A.   It was.

20   Q.   Okay.  So she was right there?

21   A.   Yes.

22   Q.   And did you say anything to Officer Ramirez about whether

23   the individuals that you were seeking these documents for could

24   be admitted then into the country?

25   A.   Yes.  I indicated that they were both okay to admit into

1     the country.

2     Q.  Did you ask Dr. Su to send any additional documents?

3     A.  I did.  Dr. Su indicated that she would forward the

4     attendance logs for both students as well as all of the records

5     that she handed me directly.  She would e-mail them to Officer

6     Ramirez.

7     Q.  What did you do with the documents that she gave you?

8     A.  I gave them to the case agent directly.

9     Q.  Is that Special Agent Mackey?

10    A.  It is.

11            MS. WEST:  No more questions.  Thank you.

12            THE COURT:  Cross-examination?

13                    **CROSS-EXAMINATION**

14    BY MR. BABCOCK:

15    Q.  Good morning, Agent.

16    A.  Good morning.

17    Q.  What time did you -- let's be clear.  Your wife is

18    expecting; right?

19    A.  Yeah.

20    Q.  My wife always corrected me if I said that I was expecting.

21        What time did Special Agent Ramirez call Dr. Su?

22    A.  Sometime in the morning, approximately 10:00 a.m.

23    Q.  And what time did you go to Tri-Valley University?

24    A.  I went to Tri-Valley at 2:30 in the afternoon.

25    Q.  So it had been over four hours, is that fair to say,

CRITTEN - CROSS / BABCOCK

1   between the time of Agent Ramirez's call and the time you

2   arrived to request these documents?

3   A.   Maybe a little less.  He made the call maybe later in the

4   10:00 o'clock hour, but perhaps it was.

5   Q.   Three-plus hours?

6   A.   Sure.

7   Q.   Okay.  You went to -- sorry.  Which address?  On Boulder

8   Court?

9   A.   405.

10  Q.   Okay.  And did -- presented yourself as an agent from

11  Homeland Security and asked to speak with Dr. Su?

12  A.   Correct.

13  Q.   Was she right there?  Were you taken to her office?  Tell

14  us what happened.

15  A.   Yeah.  The student or whoever was working in the office --

16  I don't know that it was a student, but whoever was in the

17  office went directly to her, got her, and I waited probably

18  less than two minutes.

19  Q.   Okay.  Then she came out to greet you?

20  A.   Yes.

21  Q.   Okay.  And you told her that you were there to follow up on

22  the documents that had been requested telephonically earlier --

23  A.   Correct.

24  Q.   -- or something to that effect?

25  A.   Uh-huh.

1    Q.   Did she indicate whether or not she had deemed -- well,

2    strike that.

3         Do you know -- did Agent Ramirez during the original call

4    give Dr. Su any sort of time frame about how quickly he wanted

5    the documents?

6    A.   He did.  He said the students were waiting to be -- to

7    enter the United States.

8    Q.   Okay.

9    A.   And so he needed the documentation as soon as possible.

10   Q.   So Dr. Su came out to greet you.  You showed her your

11   security badge --

12   A.   Uh-huh.

13   Q.   -- or identification and asked for the documents.  You

14   were -- where were you exactly?  Was there some sort of waiting

15   area?  Describe it for us a little bit.

16   A.   Dr. Su invited me into her office, and we both sat down.

17   She was at her desk, and I was in the guest chair.

18   Q.   Okay.  So you were right in her office with her?

19   A.   Yes.

20   Q.   Okay.  What was she doing?

21   A.   She showed me on her computer -- she showed me -- she

22   wanted to show me their virtual university and some of the TVU

23   stuff on her computer.  She also was going in between her

24   office and another room preparing the documents, I assume.

25   Q.   Did you hear her ask any of her staff for assistance?

1    A.   I don't -- I don't recall hearing her ask any staff --

2    Q.   Okay.

3    A.   -- for assistance.

4    Q.   But she did leave the office and leave with you remaining

5    in her office while she went to do something?

6    A.   Correct.

7    Q.   Did you see exactly where she went?

8    A.   Into the other room.  There's another office into the other

9    room --

10   Q.   Okay.

11   A.   -- but I didn't see exactly.

12   Q.   Was that a room that you had come through to enter her

13   office?

14   A.   Yeah.  I mean, she would have went into the main -- back

15   into the main lobby, and I don't know where she went from

16   there.

17   Q.   Okay.  How many -- before you went into her office, how

18   many other -- how many staff did you -- did you see around?

19   This was around 2:00 in the afternoon?

20   A.   I saw at least two that looked like staff members.

21   Q.   I assume this was a weekday.

22   A.   Yes.

23   Q.   And -- okay.  How many times did Dr. Su leave the office?

24   A.   Probably at least three.

25   Q.   Okay.  She offered to show you some -- some of the -- the

1    way the virtual university technology worked online?

2    A.   Yes.  She showed me -- she was sitting at her desk, and she

3    moved the monitor to where I could see and -- and showed me

4    herself.  It was a camera pointed at her, and it showed up on

5    the monitor.

6    Q.   Like she was being a professor?

7    A.   You could say that.

8    Q.   I mean, that was -- I mean, the point being that if you

9    logged on -- if you logged on the TVU website -- I'm just

10   trying to understand what she showed you.

11   A.   It was simply some kind of setup on her computer, some kind

12   of software to where the camera was pointed at her and the

13   entire monitor showed a screen of her.

14   Q.   Okay.  And was this -- this was a recording, or this was

15   live?

16   A.   It was live.

17   Q.   Okay.  It showed her live as she was sitting at her desk?

18   A.   Correct.

19   Q.   Okay.  What else did she -- what else did she show you

20   while you were in her office?

21   A.   That was the only thing.  We were -- I was mainly there to

22   get the documents --

23   Q.   Okay.

24   A.   -- and that was my duty.

25   Q.   Okay.  And when she finally got the documents, she got them

CRITTEN - CROSS / BABCOCK

1    in the other room, or did you see her print something out?

2    A.  She could have printed some things from her desk, but she

3    definitely brought documents from the other room as well.

4    So --

5    Q.  She went back and forth to the -- to the other office two

6    or three times --

7    A.  Yes.

8    Q.  -- right?

9        She had -- there was a printer in her own office.  Do you

10   remember that?

11   A.  I believe so.

12   Q.  Did it appear like she was -- she had asked someone on her

13   staff to help her?

14   A.  I don't --

15            MS. WEST:  Objection.  Calls for speculation.

16            THE WITNESS:  I don't exactly --

17            THE COURT:  Hold on.

18       A little more foundation.  Sustained.

19   BY MR. BABCOCK:

20   Q.  You saw two -- you say you saw at least two -- two staff

21   members when you walked into her office?

22   A.  Correct.

23   Q.  Okay.  Were they still there when you left her office?

24   A.  I believe so.

25   Q.  Okay.  Were there any more than two when you left, or was

1    it the same two people?

2    A.   I think there were two people.  You know, there were people

3    in the lobby, whether or not they were staff members --

4    Q.   Fair enough.

5    A.   -- or students.

6    Q.   Did you see people sitting at desks working?

7    A.   Maybe one.

8    Q.   Working on computers?

9    A.   Maybe one.

10   Q.   Okay.  When Dr. Su was in her office, did she communicate

11   verbally with anyone in the other room?

12   A.   I don't remember her communicating from the room.  If she

13   needed to communicate, I think she got up and went to the other

14   room.

15   Q.   It was just right next door?

16   A.   Correct.

17   Q.   Okay.  And your recollection is that she went -- went to

18   the next room three times?

19   A.   Yes.

20   Q.   Okay.  About how long were you in her office?

21   A.   Approximately 20 minutes.

22   Q.   Okay.  By the time that she gave you the documents -- and

23   you just reviewed in 209D, I think it was; right?

24   A.   Uh-huh.  Yes.

25   Q.   The -- I want to show you a couple of the documents that

1    you just reviewed, the first one being the I-20 for Rizwan

2    Mohammad.  This is the document she gave you that day?

3    A.  Yes, that's the document from Mohammad Rizwan.

4    Q.  Okay.  You mentioned a date of birth.  Is this the -- on

5    Page 1 here, is that what you were referring to?  January 2nd,

6    1981?

7    A.  It is.

8    Q.  Okay.  You also mentioned the SEVIS ID.  Are you referring

9    to the document -- the number that's on the upper sort of right

10   portion of the document?

11   A.  Yes.  The complete number is the SEVIS ID.

12   Q.  Okay.  Now, this document is dated January 7th, 2011?

13   A.  Correct.

14   Q.  The same day that you were there; right?

15   A.  Uh-huh.  Yes.

16   Q.  Okay.  This -- so it was obvious that this document was

17   printed that day; right?

18   A.  I believe so.

19   Q.  As opposed to being something -- a copy of something that

20   had been issued earlier -- for example, before Rizwan Mohammad

21   entered the country is the point I'm trying to get at.  Do you

22   understand the question?

23   A.  I know it's dated January 7th, 2011.

24   Q.  Okay.  I'm sorry.  It's -- you can't see it very well in

25   the monitor, but on the -- you can see a little bit.  The

1    signature's in sort of a purple ink; right?  It's hard to tell.

2    A.   It -- perhaps blue, perhaps a shade of purple.

3    Q.   I'll defer to you on the color, but it's a different

4    color -- it has a little color -- it's different than the rest

5    of the page; right?

6    A.   That's correct.

7    Q.   And the same is true on Page 3 of the I-20, the last page.

8    The signatures are also in a color as opposed to the rest of

9    the I-20?

10   A.   Yes, both of them are.

11   Q.   Okay.  Now, she gave you virtually an identical letter for

12   both students; right?

13   A.   Yes, with the distinction of their course of study and

14   their --

15   Q.   Their name?

16   A.   The degree and the program.

17   Q.   I think you mentioned that you had seen these types of

18   letters before.

19   A.   Yes.  It's common for schools to issue these types of

20   letters.

21   Q.   To students so that when they're leaving and trying to get

22   back in the country, they have evidence that help get -- get

23   them to the airport, right, to get admitted?

24   A.   To verify that they're actually attending and --

25   Q.   Right.

CRITTEN - CROSS / BABCOCK

1   A.   -- in good standing with the university.

2   Q.   Right.  Now, did you take any time to look at these

3   documents when she handed them to you, or did you just take

4   them all and leave?

5   A.   I looked at the names, and that was my mission, to get the

6   documents and the documentation and the name -- make sure the

7   names matched and --

8   Q.   Well, the names did not match; right?  She gave you -- gave

9   you a document for a student named Razwan Mohammad?

10  A.   Yeah.  It's common -- there are many different -- a lot of

11  times, we'll see misspellings and multiple variations of names.

12  That's very common.

13  Q.   Okay.  Fair enough.

14      So you didn't raise that issue with her, say, "Are you sure

15  this is the right student?" or anything like that?

16  A.   No.  The date of birth matched as did the last seven digits

17  of the --

18  Q.   But the name -- looking at Page 5 of Exhibit 209D, the

19  lower -- on the lower left portion, there's a name that clearly

20  doesn't match, right, for Razwan Mohammad?

21  A.   Yeah, that was -- which one are you referring to, sir?

22  Rizwan Mohammad?

23  Q.   I'm referring to where it says, "TVU Transcript for Rajiv

24  Batra, Issued to Rajiv Batra."

25  A.   Yeah.  Those --

982

CRITTEN - CROSS / BABCOCK

1    Q.  Did you --

2    A.  Those names were for the other student --

3    Q.  I understand.

4    A.  -- that I had requested, not Mohammad Rizwan.

5    Q.  But when she was handing these and you were looking through

6    them, did you note that?

7    A.  I did not note it at that time.

8    Q.  Did or did not?

9    A.  Did not.

10   Q.  Okay.  Did you ever -- did you note -- you noticed at some

11   point that there was some information for -- for a Rizwanuddin

12   Mohammad; right?

13   A.  I saw the e-mail.  People had various e-mails.  I didn't --

14   Q.  Well, the next -- the next document she gave you was --

15   wasn't just for an e-mail.  I mean, the name on the -- the name

16   on the document was Rizwanuddin Mohammad; right?

17   A.  That's correct.

18   Q.  Did you just -- was that --

19   A.  Many times, people will reverse names, first name last,

20   first name first.  Perhaps it's a middle name, very similar.

21   Q.  I understand.

22       Do you know how -- I assume you don't have any knowledge

23   about if you are searching on the TVU school database --

24   searching for a name, how the name would be entered in the

25   search.  For example, if you typed in -- if you did a search

1    and you just typed in "Rizwan," whether it would pull up the

2    name Rizwanuddin.

3    A.   Well, this very reason -- I don't -- I don't have any

4    knowledge of that -- of the TVU system, no.

5    Q.   Okay.  Fair enough.

6         Did you ever reach out to the gentleman or whoever -- I'm

7    just assuming it's a gentleman.  Did you ever reach out to the

8    person associated with that e-mail address,

9    rizwanuddinmohd@gmail.com?

10   A.   I did.  I learned later that e-mail address actually

11   belongs to another Tri-Valley University student named

12   Rizwanuddin Mohammad.

13   Q.   Rizwanuddin -- I was pronouncing it differently -- but

14   spelled -- spelled in this fashion?

15   A.   Correct.

16   Q.   Okay.  Did you -- on Page 13 of Exhibit 209D, the -- this

17   is the attendance records.  I think that's what you said it

18   was, right, or that's what it purports to be?

19   A.   The class attendance sheet, yes.

20   Q.   Class attendance sheet.

21        Which contains a list of student names along the left;

22   right?

23   A.   Yeah.  Those are -- purport to be students in that

24   particular class who attended.

25   Q.   And again, it's -- you can see that the name Rajiv Batra --

1    all the names -- all the student names are printed in black

2    except for one; right?

3    A.   Except for one of the names that I requested, yes.

4    Q.   That -- the Rajiv Batra name is like a light blue of some

5    sort --

6    A.   Correct.

7    Q.   -- right?

8         Do you know why that is, why it's printed in a different

9    color?

10   A.   Do you want me to speculate?

11   Q.   No, I don't want you to speculate.

12   A.   Okay.

13   Q.   Did you notice it?

14   A.   I did not notice particularly until looking over the

15   document more thoroughly.

16   Q.   Okay.  There's a name given for an instructor, a Richa

17   Misra.  Did you ever contact Richa or try to contact Richa

18   Misra?

19   A.   It's possible.  I spoke to a lot of people in the

20   investigation.  I -- the name doesn't ring a bell.

21   Q.   Okay.  Is the same true as to the other instructors listed

22   on the class attendance sheets, the other -- next attendance

23   sheet, an instructor named Sekhar Ganji.  Do you recall if you

24   spoke with Sekhar Ganji?

25   A.   I don't recall speaking to Sekhar Ganji.

1    Q.   Okay.  What about on the last attendance sheet, Pavan

2    Kumar?

3    A.   It's possible that I -- I don't recall.

4    Q.   So you -- after you -- after she -- after Dr. Su gave you

5    these documents, you made a call to Agent Ramirez and said

6    something to the effect of "I've got the documents that were

7    requested, and it's okay to let these people through

8    immigration"?

9    A.   I notified him that not only did I get the documents, but I

10   also had a personal attestation from the DSO at the school that

11   both students were in good standing, and it was okay to admit

12   both students based on --

13   Q.   I understand.

14   A.   -- the good-faith information that we received.

15   Q.   And this was -- sorry.  This phone call was made in your --

16   standing in front of Dr. Su?

17   A.   It was.  I was sitting in her office.

18   Q.   You were still sitting across the desk from her?

19   A.   Yes.

20   Q.   Okay.  And she could hear what you were saying?

21   A.   Absolutely.

22   Q.   You made -- now, as I understand it, this -- this -- strike

23   that.

24        Have you made similar visits to other schools on other

25   occasions requesting documents to verify documents for foreign

1   students?

2   A.  I have --

3   Q.  Okay.

4   A.  -- both in-person and on the phone.

5   Q.  And this is something you do with some regularity?

6   A.  Yes.

7   Q.  Okay.  Was Dr. Su cooperative that day?

8   A.  She provided the documents -- documentation and a personal

9   statement, sure.  She provided what I asked for.

10  Q.  Did she try to show you a little something about how the

11  school worked while she was waiting?

12  A.  Okay.  Yes.

13  Q.  Thank you.  Congratulations.

14  A.  Thank you, sir.

15                    **REDIRECT EXAMINATION**

16  BY MS. WEST:

17  Q.  Agent Critten, you were just asked on cross-examination

18  whether you made any effort to try to figure out if there

19  actually was a Rizwanuddin Mohammad.  Do you remember that?

20  A.  Yes, I remember.

21  Q.  What effort did you make?

22  A.  Myself and the case agent actually contacted -- reached out

23  to him, and we went to Chicago to interview him in person.

24  Q.  And was he living in Chicago?

25  A.  He was.

1    Q.   And so you flew there?

2    A.   Yes.

3    Q.   Did you actually interview him?

4    A.   We did.

5    Q.   And did you ask him whether he actually attended any

6    classes at Tri-Valley University?

7    A.   We did ask him.

8    Q.   What did he say?

9              MR. BABCOCK:  Objection.  Calls for hearsay.

10             MS. WEST:  Withdrawn.

11   BY MS. WEST:

12   Q.   You were also just asked whether you request the types of

13   documents that you requested from Dr. Su with any sort of

14   regularity.  You said that you did; is that right?

15   A.   That's correct.

16   Q.   Why do you request these kinds of documents generally?

17   A.   We -- we rely on -- the system relies on the DSO's, the

18   designated school officials, to provide information to

19   immigration officers verifying -- verifying that students are

20   actually attending, they are pursuing a course of study, and

21   that they are actually coming here to attend school.

22   Q.   To explain that a little bit more, are you familiar with

23   students actually being stopped at points of entry into the

24   United States without documentation?  Does that happen?

25   A.   Yes, it happens.

1    Q.   And is it in response to that that you then contact the

2    schools?

3    A.   Yes, that happens often, both.

4    Q.   Now, in this case, were those two students actually stopped

5    at an airport?

6    A.   Those two students didn't exist.  They were fictitious

7    students that had been enrolled at the university.

8    Q.   All right.  Just one more question, I think.

9        Taking a look at Page 5 of Exhibit 209D, this was the --

10   whoops -- the transcript of -- for Mohammad Rizwan but in the

11   name Razwan Mohammad.  Do you see that?

12   A.   I see that.

13   Q.   Okay.  And does this -- here under "Registrar Office," does

14   this appear to bear an official stamp?  There's no official

15   stamp here, is there?

16   A.   I don't see one.

17   Q.   And in the second transcript provided to you by Dr. Susan

18   Su for Rajiv Batra, there's no official stamp there, either, is

19   there?

20   A.   I don't see an official stamp, no.

21           MS. WEST:  No more questions.  Thank you.

22                        **RECROSS-EXAMINATION**

23   BY MR. BABCOCK:

24   Q.   You --

25           MR. BABCOCK:  Just briefly.

1    BY MR. BABCOCK:

2    Q.   You said that these two students -- purported students that

3    you went to verify were fictitious; right?

4    A.   Yes.  They were not actually persons.  They were enrolled

5    in Tri-Valley University as a part of the law enforcement ruse.

6    Q.   You did verify that there was an actual student named

7    Rizwanuddin Mohammad; right?

8    A.   Yes, after the fact.

9    Q.   I understand.

10       And Dr. Su thought he was stuck at the airport; right?

11   A.   Okay.

12           MR. BABCOCK:  Nothing further.

13           MS. WEST:  No more questions.  Thank you.

14           THE COURT:  Agent Critten, thanks.  You're excused.

15   Congratulations.

16           THE WITNESS:  Thank you, your Honor.

17           THE COURT:  Best of luck to you.  Fatherhood is a

18   great thing.

19       All right.  Well, it's a couple minutes shy of

20   10:00 o'clock, and we're in between witnesses.  So this seems

21   like a very good time to take our first morning recess, and

22   that's what we'll do.  Remember my prior admonition not to form

23   or express any opinion.

24       Court is in recess for 15 minutes.

25           THE CLERK:  All rise.

```
 1            Court is in recess.

 2                          (Recess taken.)

 3         (Proceedings were heard out of the presence of the jury:)

 4            THE COURT:  Before the jurors come in -- and we're

 5    outside their presence -- I understand we're going to be

 6    playing a video of some kind.

 7                MR. RHYNE:  Just audio.

 8                THE COURT:  Or audio.

 9                MS. WEST:  Audio.

10                THE COURT:  Has a transcript of the audio been

11    prepared?

12                MS. WEST:  Yes.

13                MR. RHYNE:  Yes.

14                THE COURT:  Is the transcript -- has the transcript

15    been marked as an exhibit?

16                MS. WEST:  Yes.

17                THE COURT:  What is the exhibit number?

18         (Government's Exhibits 206A and 207A marked for

19    identification.)

20                MS. WEST:  The transcript would be 206A and 207A.  We

21    actually have it loaded up so that it can scroll for the jury

22    while they're listening also.

23                THE COURT:  Yes.

24         I'm asking for a housekeeping purpose related to our court

25    reporter, and that is:  Will counsel stipulate that the jury
```

1    may be informed that the transcript of the audio that is in

2    Exhibits 206A and 207A -- that the Court will admit those

3    exhibits into evidence and that the court reporter may be

4    relieved of any need to report the audiotape?

5            MR. BABCOCK:  Certainly, your Honor.

6            THE COURT:  Ms. West?

7            MS. WEST:  That's fine by us.

8            THE COURT:  That's the Court's order, then.

9      (Government's Exhibits 206A and 207A received in evidence.)

10          THE COURT:  Very good.

11     Let's bring in the jurors.

12          THE CLERK:  Yes, sir.

13     (Proceedings were heard in the presence of the jury:)

14          THE COURT:  All right.  Let's go back on the record.

15     Ms. West?

16          MS. WEST:  Thank you.

17     The United States calls Special Agent Taylor, Dale Taylor.

18          THE COURT:  Good morning, Agent Taylor.

19          THE WITNESS:  Good morning, sir.

20          THE COURT:  I'm going to ask you to come up to the

21    witness stand to my right.  And when you get there, just remain

22    standing, raise your right hand, and face my courtroom deputy,

23    please.

24          THE CLERK:  Do you solemnly swear or affirm that the

25    testimony you're about to give in the matter now pending before

1    this Court shall be the truth, the whole truth, and nothing but

2    the truth?

3                   THE WITNESS:  I do.

4                   THE CLERK:  Thank you.  Please be seated.  You'll

5    need to speak directly into the microphone in order to be

6    heard.

7                   THE WITNESS:  Yes, sir.

8                   THE CLERK:  Please state your full name and spell

9    your last name.

10                   THE WITNESS:  First name is Dale.  Last name is

11   Taylor.  Last name is spelled T-a-y-l-o-r.

12                   THE COURT:  Thank you.

13                              **DALE TAYLOR,**

14   Called as a witness by the Government, having been duly sworn,

15   testified as follows:

16                         **DIRECT EXAMINATION**

17   BY MS. WEST:

18   Q.   Agent Taylor, what do you do for a living?

19   A.   I'm a Special Agent with the Department of Homeland

20   Security, Homeland Security Investigations.

21   Q.   And to -- are you particularly -- are you assigned a

22   particular section?

23   A.   I'm currently assigned to the Document and Benefit Fraud

24   Task Force.

25   Q.   Are you familiar with the case of the United States versus

TAYLOR - DIRECT / WEST

1    Susan Su?

2    A.   Yes, I am.

3    Q.   Did you have some role in the investigation in that case?

4    A.   I did.

5    Q.   What was your role?

6    A.   I was the co-case agent.

7    Q.   In your capacity as co-case agent, were you involved in any

8    ruse or undercover operations with something called Tri-Valley

9    University?

10   A.   Yes, I was.

11   Q.   Can you tell the jury, please, what a ruse is.

12   A.   A ruse is an investigative technique that we sometimes use

13   during the course of our investigations.  It often involves

14   approaching the target without that target being aware that the

15   person is acting on behalf of or in a law enforcement capacity.

16   Q.   And how about an undercover operation?  What is that?

17   A.   An undercover operation generally employs a certified

18   undercover agent.  They're generally more in-depth and require

19   prior approval.

20   Q.   Approval from the Department of Homeland Security?

21   A.   Yes.

22   Q.   Now, were you involved in an operation on June 3rd, 2010?

23   A.   Yes, I was.

24   Q.   Okay.  What was the purpose of that operation?

25   A.   In that operation, we had requested a cooperating

TAYLOR - DIRECT / WEST

1    individual by the name of Anji Dirisanala -- he was a former

2    student and employee at Tri-Valley.  We requested that he enter

3    Tri-Valley's business and attempt to enroll two students who

4    were reported to be on status.

5    Q.   And can you just please spell "Dirisanala" for the court

6    reporter, please.

7    A.   I believe it's D-i-r-i-s-a-n-a-l-a.

8    Q.   And Anji, A-n-j-i?

9    A.   A-n-j-i.

10   Q.   Did you have an opportunity to set up with Mr. Dirisanala

11   before the operation began?

12   A.   Yes, I did.

13   Q.   Can you please describe to the jury what was involved in

14   that setup.

15   A.   Myself and the other agents involved in the operation met

16   with Mr. Dirisanala at a parking lot and briefed him on what

17   we'd be doing that day and supplied him with the devices that

18   he would be wearing, namely a body wire and a recording device,

19   audio-recording device.

20   Q.   Okay.  Let me ask you to explain a little bit of that.

21   A.   Sure.

22   Q.   First of all, when you say you were with other agents, was

23   Special Agent Mackey one of those?

24   A.   Yes, he was.

25   Q.   And you mentioned a body wire.  Can you please explain to

1     the jury what that means.

2     A.   Yes.  A body wire is a device that we place on people for

3     safety.  It -- all it does is transmit a live feed of the

4     conversation that they're having.

5     Q.   And how is it placed on a person?

6     A.   It can be placed in several ways.  Generally, it's taped to

7     an undershirt or the skin.  It can be also placed in a pocket.

8     Q.   Okay.  Then you said that separate from the body wire,

9     there was audio recording?

10    A.   Yes.

11    Q.   And was that transmitting live also?

12    A.   No.  That only records -- we have to listen to that after

13    the fact.

14    Q.   Okay.  Was Mr. Dirisanala provided with any information

15    that he was supposed to use during the visit with Tri-Valley?

16    A.   Yes.  Mr. Dirisanala was provided names and dates of birth

17    for two individuals as well as two foreign addresses.

18    Q.   And were those -- do you recall the names of those

19    individuals?

20    A.   Yes, I do.

21    Q.   What were they, and if you can spell them each, please?

22    A.   Sure.  The first individual was Kadir Dirikan, spelled

23    K-a-d-i-r, last name D-i-r-i-k-a-n, and the second individual

24    was Sparsh Agrawat.  Sparsh is S-p-a-r-s-h.  Agrawat is

25    A-g-r-a-w-a-t.

1    Q.   Was he -- "he" being Mr. Dirisanala -- was he provided with

2    any applications for these individuals?

3    A.   No, he was not.

4    Q.   Any identity documents?

5    A.   No.

6    Q.   Or transcripts?  Anything like that?

7    A.   Nothing.

8    Q.   Okay.  So it was just the names, dates of birth, and

9    addresses?

10   A.   That's correct.

11   Q.   And you mentioned those were foreign addresses?

12   A.   Correct.

13   Q.   Did you escort Mr. Dirisanala to Tri-Valley that day?

14   A.   Yes, we did.

15   Q.   Where was Tri-Valley located at that time?

16   A.   That was the Bernal address.  It was located in Pleasanton

17   Unified School District.

18   Q.   When Mr. Dirisanala went inside, were you able to hear via

19   the body wire what was happening?

20   A.   Yes, I was.

21   Q.   And are you familiar with Susan Su's voice?

22   A.   I am.

23   Q.   With that familiarity, were you -- are you able to identify

24   the voices that you heard on that day?

25   A.   Yes, I am.

TAYLOR - DIRECT / WEST

1    Q.   And did you hear Mr. Dirisanala talking with Susan Su?

2    A.   Yes, I did.

3    Q.   Did you hear him also speaking with any staff members?

4    A.   Yes, I did.

5    Q.   Okay.  Can you summarize for the jury what you heard

6    while -- where were you waiting at that time?

7    A.   We were in the parking lot right outside the office.

8    Q.   Okay.  What did you hear when you were in the parking lot?

9    A.   We heard Mr. Dirisanala engage in a conversation with Ms.

10   Su.  He told her that he had a couple friends from New York who

11   were out-of-status students from the University of Northern

12   Virginia and that they would like to take an I-20 from her

13   school.

14   Q.   Did Susan Su respond?

15   A.   Yes.

16   Q.   What did she say?

17   A.   She agreed to provide an I-20.  She referred him to a staff

18   member.

19   Q.   A staff member?

20   A.   Yes.

21   Q.   Do you know which staff member that was?

22   A.   Yes.

23   Q.   Who?

24   A.   Mr. Vishal Dasa.

25   Q.   Vishal Dasa?

1    A.   Yes.

2    Q.   Did Mr. Dirisanala provide anything to you when he came

3    out?

4    A.   He did.

5    Q.   What did he give you?

6    A.   He provided us two initial I-20 forms, one for

7    Mr. Dirisanala and one for Mr. Agrawat.

8        (Government's Exhibit 200B marked for identification.)

9    BY MS. WEST:

10   Q.   I'm going to show you what's been marked as Government

11   Exhibit 200B.

12       Can you please tell me if you recognize this.

13   A.   These appear to be the forms that Mr. Dirisanala provided

14   us upon his exit from Tri-Valley.

15       MS. WEST:  The United States offers Exhibit 200B in

16   evidence.

17       THE COURT:  Any objection?

18       MR. BABCOCK:  No objection.

19       THE COURT:  200B is admitted.

20       MS. WEST:  Thank you.

21       (Government's Exhibit 200B received in evidence.)

22   BY MS. WEST:

23   Q.   I'm going to show you what's marked as Page 1 of 200B, and

24   what is this torn piece of paper?

25   A.   That paper is the paper that Mr. Dirisanala took into

1        Tri-Valley with him that day containing the names, dates of

2        birth, and foreign addresses of the two individuals.

3        Q.   Okay.  Do you know who wrote the information on here?

4        A.   Mr. Dirisanala did.

5                 MR. BABCOCK:  I'm sorry.  I couldn't understand --

6                 THE WITNESS:  I'm sorry.  Mr. Dirisanala.

7                 MR. BABCOCK:  Thank you.

8        BY MS. WEST:

9        Q.   Could you move the microphone a little bit towards you?

10       A.   Sorry.

11       Q.   Thank you.

12            And how was he provided with this information?

13       A.   Agent Mackey provided that information to him.

14       Q.   So the top one, Kadir Dirikan, a date of birth, and an

15       address?

16       A.   Yes, that's correct.

17       Q.   And the second one, there's Sparsh Prashant Agrawat?

18       A.   Yes.

19       Q.   And, again, a date of birth and an address?

20       A.   Correct.

21       Q.   Let's look at Page 2.  What is this?

22       A.   This is a letter of recommendation from Tri-Valley

23       University informing Mr. Agrawat that he had been accepted as a

24       student.

25       Q.   And do you see the date there, June 3rd, 2010?

1    A.   Yes, I do.

2    Q.   Let's look at Page 3 of this exhibit, and what is this?

3    A.   That is the initial attendance I-20 for Sparsh Prashant

4    Agrawat.

5    Q.   From Tri-Valley University?

6    A.   Yes.

7    Q.   And when you say "initial attendance I-20," are you

8    referring to Box 3?

9    A.   Correct.

10   Q.   If we look at Box 10, which DSO's name is on this I-20?

11   A.   It's in the name of Wenchao Vince Wang.

12   Q.   And does that appear to be an original signature on here?

13   A.   It does.

14   Q.   And the date -- the date again is June 3rd; is that right?

15   A.   Correct.

16   Q.   Let's take a look at Page 6 of this exhibit.  What is this

17   document?

18   A.   That's an admission letter from Tri-Valley University for

19   Mr. Kadir Dirikan.

20   Q.   And again with the same date?

21   A.   Yes.

22   Q.   And Page 7.  What is this?

23   A.   Page 7 is an initial I-20 for Kadir Dirikan from Tri-Valley

24   University.

25   Q.   Same DSO, Wenchao Vince Wang?

1    A.  Yes.

2    Q.  And again an original signature?

3    A.  It appears to be so.

4    Q.  All right.  Sometime after that operation, did you have an

5    opportunity to verify whether an entry in the SEVIS system had

6    actually been made for Mr. Dirikan and Mr. Agrawat?

7    A.  Yes, I did.

8    Q.  I'm going to show you what is already in evidence as

9    Government Exhibit 50.

10       What is this?

11   A.  That is a printout from the SEVIS system for Mr. Sparsh

12   Agrawat's SEVIS record.

13   Q.  Okay.  And is this the kind of information you would see on

14   SEVIS when you were trying to verify whether an entry had been

15   made for --

16   A.  Yes, it is.

17   Q.  All right.  And do you actually see in here Sparsh Prashant

18   Agrawat's name?

19   A.  Yes, I do.

20   Q.  With the date of birth that was provided?

21   A.  Correct.

22   Q.  And the address that was provided?

23   A.  The foreign address, yes.

24   Q.  Okay.  Let's look down at the bottom half here under

25   "Financial Information" about halfway down.  Do you see

TAYLOR - DIRECT / WEST

1     "Student's Personal Funds:  $12,000"?

2     A.  Yes, I do.

3     Q.  Was Mr. Dirisanala provided any information about finances

4     for these names?

5     A.  No, he was not.

6     Q.  And if we look on the right, do you see there "Visa Type:

7     F-1"?

8     A.  Yes.

9     Q.  Now, actually, if you look up at the top, it says,

10    "Terminated" there, and below that, "Otherwise Failing to

11    Maintain Status."  Do you -- is there a way of telling when

12    this document was printed so when that information would have

13    been current as of?

14    A.  Actually, at the bottom of that document, there's a date.

15    Q.  There?  July 31st, 2013?

16    A.  Yes.

17    Q.  Okay.  And then do we also see "Degree Program, Major Type

18    Information" for this individual?

19    A.  Yes.

20    Q.  And the program start date of June 3rd, 2010?

21    A.  Yes.

22    Q.  I'm going to show now what's already in evidence as

23    Government Exhibit 60.

24        Is this the same sort of SEVIS information but now in the

25    name of Kadir Dirikan?

1    A.   Yes, it is.

2    Q.   All right.  Is this the same date of birth that was

3    provided?

4    A.   It is not.

5    Q.   What's the difference?

6    A.   The date of birth that was provided to Mr. Dirisanala was

7    1985 and not 1983.

8    Q.   Were you able to determine whether this actually was

9    supposed to be the same individual that Mr. Dirisanala

10   attempted to enter?

11   A.   Yes.

12   Q.   How?

13   A.   The foreign address was the same, and he was also -- the

14   start date was the same date of the operation.

15   Q.   When you're referring to the start date, are we looking at

16   the second column over where it says, "Program Start Date"?

17   A.   Yes.

18   Q.   June 3rd, 2010?

19   A.   Correct.

20   Q.   And what U.S. address is provided for this individual?

21   A.   The U.S. address is 620 Iris Avenue, Sunnyvale, California.

22   Q.   Now, I forgot to actually ask you that question on the

23   document we just looked at, which was Exhibit 50.  Do you see

24   the same U.S. address there, 620 U.S. -- sorry -- 620 Iris

25   Avenue?

1    A.   Yes.

2    Q.   In Sunnyvale?

3    A.   Yes.

4    Q.   Now, was there a second operation involving Mr. Dirisanala

5    on July 27th, 2010?

6    A.   Yes, there was.

7    Q.   Okay.  Can you please tell the jury what the purpose of

8    that was.

9    A.   The purpose of that was to request Mr. Dirisanala to enter

10   Tri-Valley University, now located at its last location, 405

11   Boulder Court.  We provided him with some funds that he was

12   going to use to make payments for those individuals in order to

13   activate their SEVIS.

14   Q.   Did you again have an opportunity to meet with Mr.

15   Dirisanala beforehand?

16   A.   Yes, I did.

17   Q.   And was he provided with anything?

18   A.   He was provided with $2,000 in cash.

19   Q.   Okay.  And was he wearing a body wire again?

20   A.   Yes, he was.

21   Q.   Was there another audio-recording device?

22   A.   Yes, there was.

23   Q.   Did you escort him to Tri-Valley University?

24   A.   No.  This time, he drove himself.

25   Q.   All right.  And you said Tri-Valley was now at 405 Boulder

1    Court?

2    A.   Yes.

3    Q.   Did you situate yourself in some way so you could see what

4    was going on?

5    A.   We did.

6    Q.   I'm going to show -- it's already been admitted -- the

7    image -- images of Tri-Valley University.  We have it enlarged

8    here.

9         MS. WEST:  This -- I believe it's Exhibit 400; is

10   that right?

11        MR. RHYNE:  There's three of them on there.

12        MS. WEST:  Do you remember what the exhibit numbers

13   were?

14        MR. RHYNE:  It should state --

15        MS. WEST:  It does.

16   Can all the jurors see?

17   BY MS. WEST:

18   Q.   Okay.  These have already been admitted in evidence as

19   Government Exhibit 400, 401, and 403.

20        Agent Taylor, are you able to see that?

21   A.   Yes, I can.

22   Q.   Okay.  Does this show Tri-Valley University as it was on

23   that day?

24   A.   Yes, it does.

25   Q.   And using any of these images, can you explain to the jury

1    where you were situated during the operation where Mr.

2    Dirisanala went in on July 27th?

3    A.   Yes.  Our vantage point would have been most accurately

4    represented by Exhibit 400.  We were parked across the street

5    in another business's parking lot facing Tri-Valley University,

6    Suite 700.

7    Q.   So when you say, "Suite 700," that's -- if we're looking at

8    the top image, is that the door that you can see in front under

9    the Tri-Valley University sign?

10   A.   Yes.

11   Q.   Okay.  And were you able to see just kind of around the

12   bend there as well?

13   A.   We could, yes.

14   Q.   Now, did you provide Mr. Dirisanala with any instructions

15   before he went in?

16   A.   The instructions were to attempt to make a payment and to

17   ask about some undergrads that we wanted to enroll as well.

18   Q.   Undergrads?

19   A.   Undergrad students.

20   Q.   Okay.  Was he supposed to make one payment or two payments?

21   A.   He was supposed to make two payments, one for each student.

22   Q.   Did you see Mr. Dirisanala go in?

23   A.   Yes, I did.

24   Q.   About how long was he inside?

25   A.   The first time -- he was actually in twice that day.  The

1    first time, he was in there for roughly 20 minutes.

2    Q.   And he came back out?

3    A.   He did.  Would you like me to explain the situation?

4    Q.   Just in an overview now, and then we'll break it down.

5    A.   Sure.  So before -- at 20 minutes, he came out, we met

6    again, and he reentered Tri-Valley a short time later.

7    Q.   Could you hear what was going on through that body wire?

8    A.   Yes.

9    Q.   Were you able to identify Susan Su's voice?

10   A.   Yes.

11   Q.   Can you summarize for the jury, please, what Susan Su said.

12   A.   Yes.  Mr. Dirisanala entered and began a conversation with

13   Ms. Su.  He told her he wanted to make a payment for the

14   students he previously enrolled.  She accepted the money.  She

15   told him at that time that she could not enter the students in

16   SEVIS because she had given out all her SEVIS passwords.  She

17   said she would mail it to him.

18       He -- Mr. Dirisanala persisted, and she eventually

19   relented, went into the system, and entered the data.  She --

20   excuse me.  Sorry about that.  She advised him that she could

21   not print the documents for him.  He continued to persist, and

22   he eventually left the office, and that's when he met with us

23   again.

24       Thank you.

25   Q.   Was -- did -- the first time that he was in there, did she

TAYLOR - DIRECT / WEST

1    print the I-20's for him?

2    A.   No.

3    Q.   Did she offer an explanation as to why not?

4    A.   She said her printer was not working.

5    Q.   Did Mr. Dirisanala respond to that?

6    A.   He did attempt to have her print it, but he was not

7    successful on the first attempt.

8    Q.   Okay.  At some point, did Mr. Dirisanala ask for the money

9    back?

10   A.   During that time, no, he did not.

11   Q.   All right.  Is that when he came out and talked with you?

12   A.   Yes.

13   Q.   What happened when he came out and spoke with you?

14   A.   We were concerned that we had turned over a large portion

15   of money and had no documents to show for it.  We advised him

16   that he needed to either retrieve the money or retrieve the

17   I-20's.  He understood and immediately reentered Tri-Valley.

18   Q.   What happened when he went back in?

19   A.   I believe he approached one of the office employees and

20   asked them to print it, which they did, and then he presented

21   those documents to Ms. Su for signature.

22   Q.   When he came back out, did he provide you with anything?

23   A.   Yes, he did.

24   Q.   What did he provide you with?

25   A.   He provided us with continued attendance I-20's for Kadir

1    and Sparsh Agrawat.

2    Q.   Now, at some point when he -- at all during this operation,

3    did he request to have any of the money returned if he was not

4    getting the I-20's?

5    A.   I don't recall if he did.

6    Q.   Okay.  Again, am I confused with a different operation?

7    A.   Possibly, yes.

8    Q.   Yeah.

9         (Government's Exhibit 202D marked for identification.)

10   BY MS. WEST:

11   Q.   Let me show you Exhibit 202D.

12        Do you recognize Exhibit 202D?

13   A.   Yes.  These are the documents that Mr. Dirisanala provided

14   us on that day.

15           MS. WEST:  The United States offers Exhibit 202D in

16   evidence.

17           THE COURT:  Any objection?

18           MR. BABCOCK:  No objection.

19           THE COURT:  202D is admitted.

20           MS. WEST:  Thank you.

21        (Government's Exhibit 202D received in evidence.)

22   BY MS. WEST:

23   Q.   Showing you Page 1, what is this?

24   A.   That is the active I-20 for Kadir Dirikan that he received

25   from Tri-Valley University.

1    Q.  And when you say "active," are you referring to Box 3 where

2    it says, "Continued attendance at this school"?

3    A.  Yes.

4    Q.  What signature does this I-20 bear?

5    A.  The signature is Wenchao Vince Wang.

6    Q.  And the date -- do you see there July 27th, 2010?

7    A.  Yes.

8    Q.  The same day of this operation?

9    A.  Correct.

10   Q.  Showing you now Page 4 of Exhibit 202D, what is this?

11   A.  That is the active I-20 for Sparsh Agrawat.

12   Q.  And in Box 3, "Continued attendance at this school"?

13   A.  Yes.

14   Q.  And what signature do you see on Box 10?

15   A.  Wenchao Vince Wang.

16   Q.  Did you receive any verification directly from Tri-Valley

17   University that these individuals -- that is, Mr. Dirikan and

18   Mr. Agrawat -- were registered?

19   A.  Yes, I did.

20   Q.  What form of that verification did you receive?

21   A.  I received verification via e-mail.

22       (Government's Exhibit 202C marked for identification.)

23   BY MS. WEST:

24   Q.  I'm showing you what's marked as 202C.

25       Do you recognize this?

1    A.   Yes, I do.

2    Q.   What is it?

3    A.   This is an e-mail from sus@trivalleyuniversity.org to

4    kadir.dirikan@gmail.com containing a login password, login

5    information for the Tri-Valley system as well as two e-mail

6    attachments.

7    Q.   And what is the e-mail address kadir.dirikan@gmail.com?

8    A.   That was an e-mail address we provided to Tri-Valley

9    University as Kadir Dirikan's e-mail address.  So he

10   corresponds with -- through that.  It was an e-mail address

11   controlled by myself and Agent Mackey.

12   Q.   When you said that was provided to Tri-Valley University,

13   how was that provided?

14   A.   Through Mr. Dirisanala.

15   Q.   Okay.  So you actually gave that e-mail address to Mr.

16   Dirisanala?

17   A.   Yes.

18   Q.   Was that in advance of the July 27th date we just talked

19   about?

20   A.   Yes.

21   Q.   And did you hear him provide that to Tri-Valley University?

22   A.   I don't recall.

23   Q.   But in any event, you received this e-mail?

24   A.   Yes.

25            MS. WEST:  All right.  The Government offers

1    Exhibit 202C.

2                THE COURT:  Any objection?

3                MR. BABCOCK:  No objection.

4                THE COURT:  202C is admitted.

5            (Government's Exhibit 202C received in evidence.)

6    BY MS. WEST:

7    Q.   Looking at Page 1 of Exhibit 202C -- let's go up a little.

8         Okay.  Do you see "Summer Registration," and then it's from

9    sus@trivalleyuniversity.org?

10   A.   Yes.

11   Q.   To kadir.dirikan@gmail.com?

12   A.   Yes.

13   Q.   Again, that's the e-mail address that you provided to Mr.

14   Dirisanala?

15   A.   Yes.

16   Q.   "CC:  Anjiredi@gmail.com"?

17   A.   Yes.

18   Q.   Do you know that e-mail address?

19   A.   I do.

20   Q.   What is it?

21   A.   That's Mr. Reddy Dirisanala's personal e-mail address.

22   Q.   "Please see attached official fee receipt and registration

23   I-20.  The three courses are in your TVU account.  Please catch

24   up with the classes."  And then do you see a TVU ID and

25   password?

1    A.   Yes, I do.

2    Q.   And a login?

3    A.   A login URL, correct.

4    Q.   And the signature line on this e-mail?

5    A.   "Susan Su."

6    Q.   And then there's two attachments; is that right?

7    A.   Yes.

8    Q.   Let's take a look at those attachments.

9              THE WITNESS:  Bless you.

10             MS. WEST:  Bless you.

11             THE COURT:   Thank you.

12   BY MS. WEST:

13   Q.   What is this?

14   A.   That is a Tri-Valley fee receipt for Mr. Kadir Dirikan.

15   Q.   And the same e-mail address we just looked at?

16   A.   Yes.

17   Q.   Do you see the term, Summer 2010?

18   A.   Yes.

19   Q.   And what's the program?

20   A.   Program is Ph.D.

21   Q.   Do you know what CS refers to?

22   A.   Computer Science.

23   Q.   And "School of Engineering"?

24   A.   Correct.

25   Q.   And does this document reflect that three courses were

1    registered?

2    A.   Yes, it does.

3    Q.   "Web Design with Dreamweaver, Operating System Design, Data

4    Mining"?

5    A.   Yes.

6    Q.   And a total due of -- including a registration -- well,

7    let's see.  For the three classes, 900 each?

8    A.   Yes.

9    Q.   And it says, "Registration Fee:  $50.  Application Fee

10   Waived," minus $50, but still the total appears to be 2750?

11   A.   Correct.

12   Q.   Let's look at the line here at the bottom.  "Receive

13   Payment of $1,000 on July 28th, 2010.  1750 due by

14   August 27th"?

15   A.   Yes.

16   Q.   And here, the box marked is "Credit Card."  Do you see

17   that?

18   A.   Correct.

19   Q.   Was Mr. Dirisanala actually provided with a credit card?

20   A.   He was not.

21   Q.   Let's look at Page 3.  Let's zoom in on that a little.

22       What is this?

23   A.   That is a continued attendance I-20 for Kadir Dirikan.

24   Q.   Okay.  And there's no signature on this one?

25   A.   Correct.

TAYLOR - DIRECT / WEST

1    Q.   Can you explain to the jury why that is?

2    A.   That is a soft copy version of the document.  It was

3    attached to the e-mail that he sent -- that Tri-Valley

4    University sent to Kadir Dirikan's e-mail account.

5    Q.   Did it appear otherwise the same as the hard copy that Mr.

6    Dirisanala provided you that day?

7    A.   Yes, it did.

8    Q.   With the signature?

9    A.   Yes.

10   Q.   Did you receive one for Mr. -- or an e-mail from

11   Mr. Agrawat the same day?

12   A.   Not the same day, no.

13   Q.   At some point later?

14   A.   Yes, we did.

15   Q.   Okay.  We're going to circle back to that.

16        At some point after July 27th, did you ever look on SEVIS

17   to confirm whether these individuals had been upgraded to

18   active status?

19   A.   Yes, I did.

20   Q.   And had they?

21   A.   Yes, they had.

22   Q.   I'm going to show you Exhibit 51, which is already in

23   evidence.  This is the SEVIS event history.

24        Do you see that?

25   A.   Yes, I do.

TAYLOR - DIRECT / WEST

1   Q.   Is this the -- what you looked at in order to see whether

2   their status had been upgraded?

3   A.   Yes.

4   Q.   And this one, if we zoom in, is for Mr. Agrawat?

5   A.   Correct.

6   Q.   Do you see on here "Record Created June 3rd, 2010"?

7   A.   Yes.

8   Q.   And "Initial"?

9   A.   Correct.

10  Q.   That was the day of the first operation?

11  A.   Yes.

12  Q.   Can you tell us when you see it upgraded to active?

13  A.   The next line, "Registration:  7/27/2010, Active."

14  Q.   Did you look at similar information for Mr. Dirisanala?

15  A.   I did.

16  Q.   I'm showing you what's already in evidence as Government

17  Exhibit 61, which appears to have been bent.

18       Okay.  Is this the event history for Kadir Dirikan?

19  A.   Yes, it is.

20  Q.   And again, do we see initial registration created June 3rd?

21  A.   Yes.

22  Q.   And active July 27th?

23  A.   Correct.

24  Q.   When Mr. Dirisanala spoke to Susan Su on July 27th, did you

25  hear whether he had a conversation with her about registering

1    those three undergraduate students you referred to?

2    A.   Yes, I did.

3    Q.   And did she register them on that day?

4    A.   No, she did not.

5    Q.   Did she provide him with any instructions?

6    A.   She did.

7    Q.   What did she tell him?

8    A.   She requested that he e-mail the application form for the

9    file for each student.

10   Q.   Did you take any steps based on that instruction later?

11   A.   Yes, I did.

12   Q.   What was -- what was that?

13   A.   We created an e-mail address for Anji Reddy that mocked

14   his -- or mimicked his real e-mail address and submitted an

15   e-mail to Susan's -- to Tri-Valley with information related to

16   the students on August 4th.

17        (Government's Exhibit 203E marked for identification.)

18   BY MS. WEST:

19   Q.   Okay.  I'm going to show you what's marked as Government

20   Exhibit 203E.

21        Can you please tell us if you recognize that.

22   A.   Yes.  This appears to be the e-mail chain that I engaged in

23   with Ms. Su.

24             MS. WEST:  The Government offers Exhibit 203E.

25             MR. BABCOCK:  No objection.

1    THE COURT:  203E is admitted.

2    (Government's Exhibit 203E received in evidence.)

3    BY MS. WEST:

4    Q.  Let's take a look at Page 1.

5    All right.  Do you see at the top "New Admission for Three

6    Students, Urgent"?

7    A.  Yes, I do.

8    Q.  Is this the mail you created?

9    A.  Yes, it is.

10    Q.  Let's zoom in a little, which means we're going to have to

11    move it back and forth to read, but at least this way, we can

12    read it.

13    Now, does this e-mail address for our -- Mr. Dirisanala

14    differ from the real one that we just saw?

15    A.  Yes, it does.

16    Q.  How?

17    A.  It has a 1 at the end of it.

18    Q.  So his e-mail address on the original e-mail from TVU is

19    anjiredi@gmail.com; right?

20    A.  I believe so, yes.

21    Q.  And this one is anjireddy1?

22    A.  Correct.

23    Q.  And so then do these e-mails go directly to you?

24    A.  From me?

25    Q.  Well, let me try that again.

TAYLOR - DIRECT / WEST

1    This e-mail address, anjireddy1, is controlled by the

2    Department of Homeland Security; right?

3    A.   Yes, it is.

4    Q.   So you had access to that?

5    A.   Yes, I did.

6    Q.   And it's to sus@trivalleyuniversity.org and

7    ssu@trivalleyuniversity.org.  Why did you use both of those?

8    A.   Those were two e-mail addresses that we were aware of that

9    Tri-Valley used to conduct business.

10   Q.   Okay.  Let's read it here.

11       "Hi, Susan.  You remember last week I told you about three

12   new admissions for Bachelor's degree.  They were terminated and

13   are having status problem and need urgently I-20.  Now I'm

14   sending you all the details required for getting initial I-20.

15   Please send the initial I-20 to this e-mail ID so that they can

16   pay the fees tomorrow.  They are just waiting for I-20 to pay

17   the fee.  Now they do not have the documents to scan.  So I'm

18   mailing you the details of three students.  Bit urgent."

19       Did I read that right?

20   A.   Yes.

21   Q.   Okay.  And then below, we've got three individuals; is that

22   right?

23   A.   Correct.

24   Q.   The first one is Mohammad Rizwan?

25   A.   Yes.

1    Q.   Do you see that?

2    A.   Yes, I do.

3    Q.   R-i-z-w-a-n?

4    A.   Yes.

5    Q.   And you've provided a date of birth and an address, the

6    degree Bachelor's, and an e-mail address; is that right?

7    A.   Yes, it is.

8    Q.   Rizzymohammad@gmail.com?

9    A.   Correct.

10   Q.   And then two other individuals, same sorts of information?

11   A.   Yes.

12   Q.   All right.  Did you receive a response from Susan Su?

13   A.   I didn't.

14   Q.   Let me make it just large enough to see but not much to

15   make one seasick.

16        Okay.  "Information is not enough.  Bachelor's in which

17   area?  Please specify."

18   A.   Yes.

19   Q.   Now, was there immediately following that another e-mail

20   from Susan Su?

21   A.   There was.

22   Q.   And can you read that from where you are?

23   A.   Yes, I can.

24   Q.   What's it say?

25   A.   "Bachelor in which area?  Also, which term, Summer 2010 or

1   Fall 2010?  Please fill the undergraduate application form for

2   each of you, need to be in file.  Susan."

3   Q.  And did you respond?

4   A.  I did.

5   Q.  How did you respond?

6   A.  I created application forms for each student and drafted a

7   reply e-mail attached to the e-mail.

8   Q.  Okay.  And this just states that you put the application

9   for the three students in the initial I-20 and added --

10   submitted the area below?

11   A.  Correct.

12   Q.  And here, you've added "Electrical Engineering" for

13   Mohammad Rizwan?

14   A.  Yes.

15   Q.  If we look at Page 2, are these the applications that you

16   attached?

17   A.  Yes, they are.

18   Q.  And did you receive a response?

19   A.  I did.

20   Q.  From Tri-Valley?

21   A.  Yes, I did.

22   Q.  Okay.  And this states, "Hi.  Attached to the I-20's and

23   admission letter.  Thanks, Jimmy."  Do you see that?

24   A.  Yes, I do.

25   Q.  Okay.  So this one is not signed "Susan."  It's signed

1    "Jimmy"?

2    A.   Signed "Jimmy," correct.

3    Q.   Do you know who Jimmy is?

4    A.   Yes, I do.

5    Q.   Who is it?

6    A.   Jimmy is a former Tri-Valley employee whose real name is

7    Tushar Tambe.

8    Q.   And are you aware that he's pleaded guilty in this case?

9    A.   Yes, I am.

10   Q.   Were you present at the time --

11            MR. BABCOCK:  I'm actually going to move to strike

12   that last question and answer, your Honor.  It's hearsay.

13   BY MS. WEST:

14   Q.   Were you present at the time he pled guilty in court?

15   A.   I was.

16            MR. BABCOCK:  Same objection.

17            MS. WEST:  It's not hearsay.

18            THE COURT:  Let me see counsel at sidebar with the

19   reporter, please.

20       (The following proceedings were heard at the sidebar:)

21            THE COURT:  We're at sidebar outside the hearing of

22   the jury.

23       Didn't -- didn't this witness -- or didn't this subject of

24   this question -- didn't Mr. Dirisanala already testify?

25            MS. WEST:  This is about a different cooperator.

1        THE COURT:  Oh, I see.

2        MR. BABCOCK:  So we're waiting for the witness to

3   testify.

4        MS. WEST:  We can admit the certified copy of the

5   plea agreement if we want to.

6        THE COURT:  Mr. Babcock, why is it hearsay if he

7   observed the witness enter a guilty plea?  Why is -- why is --

8   if I say, "Did you see him?  Did you see that person say

9   something?" --

10       MR. BABCOCK:  That's -- it's -- it is still hearsay.

11  Even if he observed it, it's still hearsay.

12       MS. WEST:  It's not offered for the truth.  It's

13  offered for the fact that he uttered the words, "Did you plead

14  guilty?"

15       "Yes."

16       MR. BABCOCK:  What is it offered for?  What's the

17  relevance?

18       THE COURT:  Yes.

19       The objection is overruled.

20       (Proceedings were heard in the presence of the jury:)

21       THE COURT:  The hearsay objection is overruled.

22  BY MS. WEST:

23  Q.  Did you see the individual identified up here as Jimmy

24  enter a guilty plea?

25  A.  Yes, I did.

TAYLOR - DIRECT / WEST

1    Q.   And are there six attachments to this e-mail?

2    A.   Yes.

3    Q.   Let's take a look at a couple of those attachments.  We

4    won't walk through all of them but just a few.

5         Showing you what's Page 5 of Exhibit 203E, what is this

6    document?

7    A.   That is the undergraduate application form I submitted to

8    Tri-Valley for Mohammad Rizwan.

9    Q.   Showing you now what is Page 15 of this exhibit, can you

10   tell us what this is, please.

11   A.   Yes.  That's the initial Form I-20 for Mohammad Rizwan.

12   Q.   A soft copy?

13   A.   Yes, it is.  Well, it's --

14   Q.   Yeah.  It's -- there we go.

15   A.   Correct.

16   Q.   And the date, August 11th, 2010?

17   A.   Correct.

18   Q.   And this document?

19   A.   That appears to be an admission letter for Mr. Rizwan from

20   Tri-Valley.

21   Q.   Here, the name is reversed, Rizwan Mohammad?

22   A.   Yes.  Yes.

23   Q.   I'm going to go back to Page 5 for just a moment.

24        In this application, did you provide an address for

25   Mohammad Rizwan?

1    A.   Just the city.

2    Q.   New York?

3    A.   Yes.

4    Q.   All right.  Were you involved in another operation

5    involving Mr. Dirisanala on August 11th, 2010?

6    A.   Yes, I was.

7    Q.   What was the purpose of that one?

8    A.   The purpose of that one was to request Mr. Dirisanala to

9    enter Tri-Valley, make a payment on behalf of Mr. Dirikan to

10   pay off the remaining balance of his tuition, and to inquire as

11   to the status of the applications that we had mailed --

12   e-mailed him.

13   Q.   And did you set yourself up again outside of Tri-Valley?

14   A.   We did.

15   Q.   Was it the same vantage point that we're looking at with

16   this exhibit?

17   A.   Yes.

18   Q.   Just outside where you can see both entrances?

19   A.   Yes.

20   Q.   Did you provide Mr. Dirisanala with any particular

21   instructions?

22   A.   We provided him with two money orders, one in the amount of

23   $1,000 and the second in the amount of 750.

24   Q.   Was he equipped with a body wire again?

25   A.   He was.

1    Q.   Any recording devices?

2    A.   He -- at this time, we had a body camera, which was a

3    camera that affixes to the clothing, appears to be a button,

4    and he is able to film as well as record audio.

5         (Government's Exhibit 203C marked for identification.)

6    BY MS. WEST:

7    Q.   I'm showing you what's marked as 203C.

8         Can you please tell us what this is.

9    A.   It's a copy of the two money orders we provided Mr.

10   Dirisanala.

11              MS. WEST:  The Government offers 203C.

12              MR. BABCOCK:  No objection.

13              THE COURT:  The document is admitted.

14        (Government's Exhibit 203C received in evidence.)

15   BY MS. WEST:

16   Q.   Now, you don't still have the actual money order; right?

17   This is just a photocopy?

18   A.   That's the photocopy, correct.

19   Q.   Okay.  And the top one -- is that there $750?

20   A.   It is.

21   Q.   And the second one 1,000?

22   A.   Yes.

23   Q.   Did you see Mr. Dirisanala go in?

24   A.   Yes, I did.

25   Q.   How long was he in this time?

1    A.   He was in for quite a while.

2    Q.   And were you again able to hear what was going on while he

3    was inside?

4    A.   Actually, I'd like to retrace what I previously said.

5    He -- on this operation, he was in for approximately

6    20 minutes, I believe.

7    Q.   Okay.  Were you able to hear what was going on while he was

8    inside?

9    A.   Yes.

10   Q.   And what did you hear Susan Su say?

11   A.   He approached her and advised her he would be making a

12   payment, and she appeared to be confused as to the amount.  He

13   explained, "I made a payment for this student on a previous

14   occasion for a thousand dollars.  The total tuition is 2750.

15   So I'm paying you 1750, which would be the remainder."  She

16   acknowledged that that was the correct amount, and then she

17   took the money.

18   Q.   Okay.  So she took the money orders?

19   A.   Yes.

20   Q.   And did she provide Mr. Dirisanala with anything in

21   response to that after taking the money?  Did he get an active

22   I-20?  Was this to an active individual?

23   A.   No.  It was half the remaining balance.

24   Q.   Okay.  Was there any discussion about referral fees?

25   A.   Yes, there was.

1             (Government's Exhibit 203D marked for identification.)

2     BY MS. WEST:

3     Q.   I'm going to show you Exhibit 203D.

4          Do you recognize 203D?

5     A.   Yes, I do.

6     Q.   What is it?

7     A.   It is a check made payable to Mr. Anji Reddy D. with a

8     notation of Mr. Dirikan's referred fee.

9     Q.   Okay.  How about the other pages in this exhibit?  Were

10    these provided to you -- my question is:  Were these provided

11    to you by Mr. Dirisanala after he left?

12    A.   Yes, these were.

13             MS. WEST:  Okay.  The Government offers Exhibit 203D.

14             MR. BABCOCK:  No objection.

15             THE COURT:  203D is admitted.

16             MS. WEST:  Thank you.

17         (Government's Exhibit 203D received in evidence.)

18    BY MS. WEST:

19    Q.   All right.  This is the check that you were just talking

20    about; is that right?

21    A.   Yes.

22    Q.   Made payable to Mr. Anji Reddy D.?

23    A.   Correct.

24    Q.   I'll put my glasses on because that looks fuzzy to me.

25    There it is.  $405?

1    A.   Yes.

2    Q.   And the date was August 11th?

3    A.   Correct.

4    Q.   Do you see at the bottom Mr. Dirikan's referred fee?

5    A.   Yes, I do.

6    Q.   And the signature "Susan Su"?

7    A.   Yes.

8    Q.   What was this referral fee for?

9    A.   That was a referral fee for the student Kadir Dirikan.  He

10   had paid his tuition, and he was entitled to a referral fee

11   according to Ms. Su.

12              MR. BABCOCK:  Again, I'm going to object and move to

13   strike unless there's more foundation on that one.

14   BY MS. WEST:

15   Q.   Did you hear discussion or statements from Susan Su

16   explaining what this referral fee was for?

17   A.   She asked if he would like his referral fee.

18   Q.   And for Mr. Dirikan, was this when he was paying for --

19   A.   Yes.

20   Q.   Let me do the full question.

21        Was this when he was paying for Kadir Dirikan?

22   A.   It was.

23   Q.   With the two money orders?

24   A.   Correct.

25   Q.   And she asked him if he wanted his referral fee?

1    A.  Yes.

2              MR. BABCOCK:  Withdrawn.

3    BY MS. WEST:

4    Q.  Showing you Page 2 of Exhibit 203D, what is this?

5    A.  That is an initial attendance I-20 for Mr. Mohammad Rizwan.

6    Q.  And do you see a signature for Susan Su?

7    A.  Yes.

8    Q.  Do you see the date August 11th, 2010?

9    A.  Yes, I do.

10   Q.  Did you hear any statements from Susan Su relating to this

11   initial I-20 for Mohammad Rizwan?

12   A.  Yes.

13   Q.  Please tell us what you heard Susan Su say.

14   A.  Mr. Dirisanala inquired as to the status of the

15   undergraduate application forms that were submitted via e-mail,

16   and Ms. Su asked him, "Did you get them from my staff?" I took

17   that to mean that they were already created.

18        And Mr. Dirisanala said, "Are they available?  Are they

19   ready?"  And she instructed him to see one of the staff

20   members.

21   Q.  Okay.  I'm showing you Page 4 of this document, 203D, and

22   this is just another page of the I-20; is that right?

23   A.  It is.

24   Q.  Again, there's a signature there.  Do you see that?

25   A.  Yes.

1    Q.   In whose name?

2    A.   Susan Su.

3    Q.   And this is ballpoint ink; is that right?

4    A.   It appears to be so.

5    Q.   Let me just hand you Page 4.

6    A.   Yes.

7    Q.   Did you also receive from Mr. Dirisanala after he exited

8    TVU signed I-20's for the two other individuals?

9    A.   Yes.

10   Q.   And these were the three undergraduates; is that right?

11   A.   Correct.

12   Q.   Also signed in Susan Su's name?

13   A.   Correct.

14   Q.   Did you receive any verification directly from TVU that

15   tuition had been paid for Mr. Dirikan?

16   A.   I believe I received an e-mail.

17        (Government's Exhibit 203F marked for identification.)

18   BY MS. WEST:

19   Q.   Showing you what's marked for identification as

20   Exhibit 203F, do you recognize that?

21   A.   Yes, I do.

22   Q.   What is it?

23   A.   It's an e-mail from sus@trivalleyuniversity.org to

24   kadir.dirikan@gmail.com.

25   Q.   Did you receive this e-mail?

1    A.   Yes, I did.

2                MS. WEST:  The Government offers 203F.

3                MR. BABCOCK:  No objection.

4                THE COURT:  203F is admitted.

5            (Government's Exhibit 203F received in evidence.)

6    BY MS. WEST:

7    Q.   Showing you Page 1, from sus@trivalleyuniversity.org to

8    kadir.dirikan@gmail.com, "Official Fee Receipt."  Do you see

9    that?

10   A.   Yes.

11   Q.   And it states, "We have received 1750 of you tuition

12   payment today...attached the fee receipt"?

13   A.   Yes.

14   Q.   And there's an attachment there -- icon; right?

15   A.   Yes, there is.

16   Q.   Let's look at Page 2.

17        Okay.  Is this the fee receipt that was attached to that

18   e-mail?

19   A.   Would you mind bringing it up a little bit, please.

20   Q.   Yep.  Let me zoom out.  I think that's easier.

21   A.   Yes, it was.

22   Q.   Okay.  How can you tell?

23   A.   The notation at the bottom states it was received -- 1750

24   on 8/11/2010.  "Tuition is completed."

25   Q.   Did you receive around the same time anything directly from

1    Tri-Valley University regarding Sparsh Agrawat?

2    A.   Yes, we did.

3         (Government's Exhibit 202B marked for identification.)

4    BY MS. WEST:

5    Q.   I'm going to show you Exhibit 202B and ask if you recognize

6    this.

7              MR. BABCOCK:  Exhibit 202B?

8              MS. WEST:  202B.

9              THE WITNESS:  Yes, I do.

10   BY MS. WEST:

11   Q.   What is it?

12   A.   This is an e-mail from sus@trivalleyuniversity.org to

13   sparky.agrawat@gmail.com dated August 11th, 2010.

14             MS. WEST:  The United States offers Exhibit 202B.

15             MR. BABCOCK:  No objection.

16             THE COURT:  202B is admitted.

17        (Government's Exhibit 202B received in evidence.)

18             MS. WEST:  Okay.  Ms. Hughes, I think this one is

19   actually going to be easier if we can do it up on the screen,

20   please.  Can you pull up 202B?

21        Okay.  And can you just try to enlarge the text part?  What

22   if we do it without the date on the right so it's a little

23   larger?

24        Thank you.

25   ///

1    BY MS. WEST:

2    Q.   Okay.  Do you see "Forward:  Registration" up at the top?

3    It says sus@trivalleyuniversity.org to

4    sparky.agrawat@gmail.com?

5    A.   Yes.

6    Q.   Okay.  First of all, what is the e-mail address

7    sparky.agrawat?

8    A.   That is the e-mail address we provided to Mr. Dirisanala

9    that was provided to Tri-Valley University for Sparsh Agrawat.

10   Q.   Okay.  And can you explain to us what this document shows?

11   A.   Yes.  It appears that on July 29th in addition to an e-mail

12   received from Mr. Dirisanala, an e-mail was also drafted for

13   Sparsh Agrawat.  However, it does not appear that they address

14   the e-mail correctly.  There's two e-mails sent at the time,

15   both with an incorrect e-mail address.

16   Q.   And you're referring to those two box sections where it

17   says, "Original Message"?

18   A.   Yes, I am.

19   Q.   And July 29th, 2010?

20   A.   Yes.

21   Q.   Okay.  And one was sparky.agarwat?

22   A.   Correct.

23   Q.   And the other was sparky.ag -- I'm sorry.  What -- aganwat?

24   A.   Correct.

25   Q.   All right.  And then the true one up at the top is

1    "Agrawat"; is that right?

2    A.  Correct.

3    Q.  All right.  So the text of this states, "Please see the

4    attached fee receipt.  The three courses are in your account.

5    Please catch up with the classes."  Do you see that?

6    A.  Yes, I do.

7    Q.  And then ID, password, and login link?

8    A.  Yes.

9    Q.  And again, signed "Susan"?

10   A.  Yes.

11   Q.  So basically the same as the e-mail that we saw to --

12   regarding Mr. Dirikan back in July?

13   A.  Correct.

14   Q.  All right.  And then there's the two attachments?

15   A.  Yes.

16        MS. WEST:  Can you please pull up the next page of

17   this exhibit, Ms. Hughes.

18   BY MS. WEST:

19   Q.  What is this?

20   A.  Appears to be a Tri-Valley fee receipt.

21        MS. WEST:  And can we zoom in on maybe just the --

22   yeah, the box section down through the "Payment" part.

23      Great.

24   BY MS. WEST:

25   Q.  Okay.  Do you see that this is registration of the School

1    of Business, Ph.D. in BA?

2    A.   Yes.

3    Q.   And there's three classes here registered for?

4    A.   Yes.

5    Q.   And "Receive Payment of $1,000 on July 27th, 2010"?

6    A.   Yes.

7    Q.   Which was the money that Mr. Dirisanala had been provided;

8    is that right?

9    A.   Yes, it was.

10            MS. WEST:  Can we please pull up the next page of

11   this exhibit.

12        Thank you.

13   BY MS. WEST:

14   Q.   What is this?

15   A.   It appears to be an I-20.

16   Q.   And this is the soft copy; is that right?

17   A.   I can't -- I'm sorry.  I can't see it from this far.

18            MS. WEST:  Okay.  Can we enlarge the -- Box 10,

19   please.

20            THE WITNESS:  Yes.

21   BY MS. WEST:

22   Q.   Okay.  This was the other attachment to the e-mail?

23   A.   Correct.

24            MS. WEST:  Can you go out of that and just enlarge

25   the -- Box 1 and 2 at the top, please.

1     That's great.  Right there.

2  BY MS. WEST:

3  Q.  Okay.  So do you see that this is in the name of Sparsh

4  Prashant Agrawat?

5  A.  Yes, I do.

6  Q.  And from Tri-Valley University?

7  A.  Correct.

8  Q.  Thank you.

9          MS. WEST:  You can take that down.

10 BY MS. WEST:

11 Q.  Now, at some point, did you again verify in SEVIS that

12 Tri-Valley University had made an entry for Mohammad Rizwan?

13 A.  Yes, I did.

14 Q.  I'm going to show you what is already in evidence as

15 Government Exhibit 70.  There.

16    Okay.  Now, is this the same sort of SEVIS student

17 information that you saw that we already looked at for other

18 individuals?

19 A.  Yes, it is.

20 Q.  Okay.  But this one, if we zoom in, is for Mohammad Rizwan;

21 is that right?

22 A.  Yes, it is.

23 Q.  And it contains the date of birth and address that was

24 provided to Mr. Dirisanala?

25 A.  Correct.

1    Q.  Can you tell the visa type on this?

2    A.  Visa type is F-1.

3    Q.  And the program start date, September 7th, 2010?

4    A.  Correct.

5    Q.  And let's just see -- from the date at the bottom, can we

6    tell when this document was printed?

7    A.  Appears to be August 5th, 2013.

8    Q.  Okay.  And so at that time, the status here for this

9    individual is terminated?

10   A.  Correct.

11   Q.  Was there another operation involving Anji Dirisanala on

12   August 31st, 2010?

13   A.  Yes, there was.

14   Q.  What was the purpose of that one?

15   A.  The purpose of that one was to have Mr. Dirisanala make a

16   payment on behalf of Mohammad Rizwan.

17   Q.  Did you again set up with Mr. Dirisanala beforehand?

18   A.  Yes, I did.

19   Q.  Where?

20   A.  At the parking lot across the street from Tri-Valley

21   University.

22   Q.  Was he provided with anything?

23   A.  He was provided with a thousand-dollar money order.

24       (Government's Exhibit 204B marked for identification.)

25   ///

1    BY MS. WEST:

2    Q.   I'm going to show you what is marked as 204B.

3         Do you recognize this?

4    A.   Yes.  This is a picture of the thousand-dollar money order.

5              MS. WEST:  The Government offers 204B in evidence.

6              MR. BABCOCK:  No objection.

7              THE COURT:  204B is admitted.

8         (Government's Exhibit 204B received in evidence.)

9    BY MS. WEST:

10   Q.   Let's see.  I'm showing you Page 1, which is this little

11   thing.  What is this?

12   A.   That's the receipt that attaches to the money order.

13   Q.   Okay.  And can you see on here the amount and the -- I

14   guess it's lower right.

15   A.   The amount is $1,000.

16   Q.   And then Page 2.  This is just a copy of the original money

17   order; is that right?

18   A.   It's a photograph of it.

19   Q.   Photograph.  Thank you.

20        Now, was Mr. Dirisanala equipped with a body wire again?

21   A.   Yes, he was.

22   Q.   Any recording devices?

23   A.   He had the button cam on him again.

24   Q.   Button cam?  You mean button camera?

25   A.   Button camera.  I'm sorry.

TAYLOR - DIRECT / WEST

1    Q.   With audio as well?

2    A.   Yes.

3    Q.   And where were you situated this time?

4    A.   In the parking lot across from Tri-Valley.

5    Q.   Same vantage point that we have in Exhibit 400?

6    A.   Yes.

7    Q.   What instructions was Mr. Dirisanala provided this time?

8    A.   At that time, he was instructed to enter Tri-Valley and

9    make a payment to activate Mohammad Rizwan.

10   Q.   Were you able to hear what was happening when he was inside

11   through the body wire?

12   A.   Yes.

13   Q.   Did you hear Susan Su make any statements?

14   A.   Yes, she did.

15   Q.   Please tell us what she said.

16   A.   Mr. Dirisanala explained his reason for the visit.  He was

17   going to make a payment on behalf of the undergrad student.

18   She became very agitated, it appeared, and took the payment and

19   then told him she couldn't help him at this time and asked him

20   to leave the office.

21   Q.   What was her tone when she was speaking to him?

22   A.   She appeared to be upset with him.

23   Q.   Can you describe what made you think she was upset?

24   A.   The tone of her voice, the inflection, her appearance on

25   the film.

1    Q.   Did Anji leave after that?

2    A.   No.

3    Q.   What happened?

4    A.   He advised her that he needed to collect the I-20 because

5    if he didn't, the other students would not trust him.  So he

6    told her he would like the I-20, and she continued to deny him

7    that.

8    Q.   Now, at some point, did she provide him with an I-20?

9    A.   At some point, Tri-Valley provided him with an I-20.

10   Q.   Tell us what happened to get to that point.

11   A.   Okay.  This continued on for a few minutes.  She continued

12   to ask him to leave.  He continued to persist, saying that they

13   would not trust him.  He said, "Fine.  Please give me my money

14   back.  I'll come back at a time you can assist" -- "assist me."

15   Q.   Okay.  So this was the time when he asked for the money

16   back?

17   A.   Yes.

18   Q.   Not that last time?

19   A.   Yes.

20   Q.   Okay.  What happened after he asked for his money back?

21   A.   The tone changed slightly to where it appeared she was

22   going to relent to his request.  She was -- she didn't handle

23   it personally.  She told him, "Get out.  Go talk to Vishal."

24   Q.   Is that Mr. Dasa?

25   A.   She wanted him to talk to Vishal, correct.

1    Q.   I'm sorry.  I didn't mean to interrupt you.

2         Did he then speak with Mr. Dasa?

3    A.   No, he did not.

4    Q.   What happened?

5    A.   He approached Jimmy, Mr. Tambe, and began a conversation

6    with him.  At that time, Ms. Su exited her office and advised

7    him to give the information and get out, and they kicked him

8    out of the building.

9    Q.   Okay.  Where did he go?

10   A.   He stood outside the front door.

11   Q.   For approximately how long?

12   A.   A few minutes.

13   Q.   What happened then?

14   A.   They requested he come back inside and provide the

15   information for the student.

16   Q.   Did he?

17   A.   He did.

18   Q.   What happened next?

19   A.   He sat down at the waiting area, and they advised him he

20   needed to wait outside.

21   Q.   Did he then go back outside?

22   A.   He did.

23   Q.   Approximately how long was he waiting outside, if you

24   remember?

25   A.   I'd say 15 minutes maybe.

1   Q.   At some point, was he provided with anything?

2   A.   Eventually, yes, he was.

3   Q.   What was he provided with?

4   A.   The secretary poked her head out and shoved some documents

5   at him.

6        (Government's Exhibit 204D marked for identification.)

7   BY MS. WEST:

8   Q.   I'm going to show you what's marked as Government

9   Exhibit 204D.

10       Do you recognize this?

11  A.   Yes, I do.

12  Q.   Are these the documents that Mr. Dirisanala provided to you

13  after?

14  A.   Yes, they are.

15            MS. WEST:  The Government offers 204D in evidence.

16            MR. BABCOCK:  No objection.

17            THE COURT:  204D is admitted.

18       (Government's Exhibit 204D received in evidence.)

19  BY MS. WEST:

20  Q.   Okay.  I'm showing you Page 1 of 204D.  I'm just going to

21  show it to you first, and then I'll zoom in so you can answer

22  some questions about it.

23       All right.  What is this document?

24  A.   That is the continued attendance I-20 for Mohammad Rizwan.

25  Q.   Otherwise known as an active I-20?

1    A.   Yes.

2    Q.   Okay.  And do you see "Tri-Valley University" on here?

3    A.   Yes, I do.

4    Q.   And in Box 3, "Continued Attendance"?

5    A.   Yes.

6    Q.   All right.  Let's look at the signature block, Box 10.

7         What do you see there?

8    A.   "Wenchao Vince Wang."

9    Q.   And was that a ballpoint signature?

10   A.   Yes.

11   Q.   And the date?

12   A.   August 31st, 2010.

13   Q.   Showing you now Page 4, what is this document?

14   A.   That's a Tri-Valley fee receipt.

15   Q.   For who?

16   A.   For -- it says Mr. Rizwan Mohammad.

17   Q.   Okay.  That's referring again to Mohammad Rizwan?

18   A.   Correct.

19   Q.   And let's look at the payment information at the bottom.

20   Can you please -- can you see that okay?

21   A.   Yes, I can.

22   Q.   What does it say?

23   A.   It says, "Receive Payment of $1,000 on 8/31/2010.  1500 is

24   due by November 15th, 2010."

25   Q.   Let me just ask you about the e-mail on here.

1      Do you see the e-mail address of rezzymohammad@gmail.com?

2   A.   Yes, I do.

3   Q.   Showing you now Page 5, what is this?

4   A.   It also appears to be a fee receipt for Mr. Mohammad

5   Rizwan.

6   Q.   For the same term?

7   A.   Yes.

8   Q.   And the fee information there is the same of paid 1,000 on

9   8/31?

10  A.   Correct.

11  Q.   But this e-mail address is different?

12  A.   It's not -- the address provided is different.

13  Q.   Did you receive anything directly from TVU?

14  A.   Yes.  We received an e-mail.

15       (Government's Exhibit 204C marked for identification.)

16  BY MS. WEST:

17  Q.   I'm going to show you 204C.

18       Can you please tell us if this is the e-mail you received.

19  A.   Yes, it is.

20           MS. WEST:  The Government offers 204C in evidence.

21           MR. BABCOCK:  No objection.

22           THE COURT:  204C is admitted.

23       (Government's Exhibit 204C received in evidence.)

24  BY MS. WEST:

25  Q.   Okay.  We're looking at Page 1 from

1    sus@trivalleyuniversity.org to rizzymohammad@gmail.com.  Do you

2    see that?

3    A.  Yes, I do.

4    Q.  Was that the e-mail address you provided?

5    A.  Yes, it was.

6    Q.  And below that, anjiredi1?

7    A.  Correct.

8    Q.  Is that a fictitious e-mail address for Anji Reddy

9    Dirisanala that DHS created?

10   A.  Yes, it is.

11   Q.  All right.  So you received this through both of those

12   accounts; is that right?

13   A.  Yes.

14   Q.  All right.  "Hi.  Please find the attached doc."  And then

15   do you see three icon attachments?

16   A.  I do.

17   Q.  Let's take a look at the attachments and show you Page 2.

18   What is this?

19   A.  That appears to be a printout from the Tri-Valley system

20   showing courses for one of the students.

21   Q.  Okay.  And this actually says, "Rizwan Syed," doesn't it?

22   A.  It does.

23   Q.  And that e-mail address of mesyed, underscore, rizwan -- is

24   that an e-mail address that you provided?

25   A.  It is not.

1    Q.   Okay.  So this appears to be for somebody else?

2    A.   It does.

3    Q.   Let's take a look at Page 3.

4         Is this the attachment that's an I-20 for Mohammad Rizwan?

5    A.   Could you scroll up, please.

6         Yes, that appears to be the soft copy.

7    Q.   But we've got the same date there of August 31st?

8    A.   Correct.

9    Q.   Oh.  And this name is actually correct; right?

10   A.   Yes, it is.

11   Q.   And let's look at Page 6.

12        Tell us what this is, please.

13   A.   That's a Tri-Valley fee receipt.

14   Q.   For Mr. Rizwan Mohammad?

15   A.   Correct.

16   Q.   Okay.  And do you recognize that e-mail address?

17   A.   No, I do not.

18   Q.   rezzymohammad@gmail.com?

19   A.   It's similar to the one we provided, but the E should be an

20   I.  Mr. Dirisanala brought this up with staff while he was in

21   the office that day.

22   Q.   You heard that on the wire?

23   A.   Yes, I did.

24   Q.   Do you see here "Receive Payment of $1,000 on 8/31/2010"?

25   A.   Yes, I do.

TAYLOR - DIRECT / WEST

1    Q.   And that was the date of the operation?

2    A.   Correct.

3    Q.   Did you do anything to verify whether Mohammad Rizwan had

4    some status created in SEVIS?

5    A.   Yes.  We checked the status in the SEVIS database.

6    Q.   I'm going to show you what is already in evidence as

7    Government Exhibit 71, and this is the event history for

8    Mohammad Rizwan; is that right?

9    A.   Yes, it is.

10   Q.   With the correct name?

11   A.   Correct.

12   Q.   And the correct date of birth?

13   A.   Yes.

14   Q.   Do you see "Record Created 8/11/2010.  Status:  Initial"?

15   A.   Yes, I do.

16   Q.   And "Personal Information Updated" on the same day?

17   A.   Yes.

18   Q.   "Registration:  8/31/2010"?

19   A.   Yes.

20   Q.   And it says, "Active" under "Status"?

21   A.   Correct.

22   Q.   So from that, can we tell that the fictitious individual

23   Mohammad Rizwan actually was activated in SEVIS on that day?

24   A.   Yes.

25   Q.   Now, were you involved in an operation involving a Special

1    Agent Rajeev Bhatia?

2    A.   I was.

3    Q.   Can you tell us about that just generally?  We're going to

4    hear from him as well, but if you can give us an overview.

5    A.   Sure.  Agent Bhatia was acting in an undercover capacity

6    and requested that he enter Tri-Valley in an attempt to enroll

7    himself as a student.  He was given specific instructions as

8    well as money of a thousand dollars.

9    Q.   What was your role?

10   A.   Primarily for safety, officer safety.

11   Q.   And were you involved in giving him instructions?

12   A.   Yes, I was.

13   Q.   Okay.  Did that happen on September 7th, 2010?

14   A.   Yes, it did.

15   Q.   Do you know whether Agent Bhatia used a different name?

16   A.   He did.

17   Q.   What was the name he used, please.

18   A.   The name he used was Rajiv Batra.

19   Q.   B-h-a-t-r-a?

20   A.   I believe there's an H in there, if I'm not mistaken.  I

21   could be wrong.

22   Q.   And "Rajiv" was spelled differently in the undercover name?

23   A.   Yes, it was spelled differently, pronounced the same.

24   Q.   Was Agent Bhatia provided with any money?

25   A.   Yes, he was.

1    Q.   How much?

2    A.   A thousand dollars cash.

3    Q.   Was he wired up?

4    A.   Yes, he was.

5    Q.   And did you watch when he went inside?

6    A.   Yes, we did.

7    Q.   Where were you situated?

8    A.   Across the street in the parking lot.

9    Q.   Did you see him go in?

10   A.   Yes, we did.

11   Q.   Were you able to listen realtime?

12   A.   Yes.

13   Q.   So he was wearing a body wire as well?

14   A.   Yes, he was.

15   Q.   What language was he speaking in?

16   A.   Initially, the initial conversation was in English, but it

17   quickly switched to Hindi.

18   Q.   Do you speak Hindi?

19   A.   I do not.

20   Q.   Okay.  So were you able to understand the English?

21   A.   The very small portion of it, yes.

22   Q.   Okay.  Were you able to understand the Hindi?

23   A.   No.

24   Q.   How long was he inside approximately?

25   A.   He was actually inside a few times that day.  The first

1    time was a little bit longer, I'd say 30 minutes.

2    Q.   You said he was inside a few times.  Did you have an

3    opportunity to speak to him in between?

4    A.   Yes, I did.

5    Q.   When he came out at the end, did he provide you with

6    anything?

7    A.   He did.

8         (Government's Exhibit 205C marked for identification.)

9    BY MS. WEST:

10   Q.   I'm going to show you what is marked as 205C and ask if you

11   recognize this.

12   A.   Yes, I do.

13   Q.   Are these the documents that Agent Bhatia provided to you

14   after he left?

15   A.   Yes.

16            MS. WEST:  The Government offers Exhibit 205C.

17            MR. BABCOCK:  No objection.

18            THE COURT:  205C is admitted.

19        (Government's Exhibit 205C received in evidence.)

20   BY MS. WEST:

21   Q.   Okay.  And we're going to hold off on going into a lot of

22   detail on it, but I just want to show the jury so they're not

23   wondering.

24        Is this an I-20 for Rajiv Batra?

25   A.   It is.

1    Q.   No H; right?

2    A.   You are correct.

3    Q.   Okay.  And this one is unsigned; is that right?

4    A.   Correct.

5    Q.   But the date on here, 9/7/2010?

6    A.   Correct.

7    Q.   Did you also get a signed one?

8    A.   We get signed I-20's.  We do.

9    Q.   I'll show you the top.

10        Do you see the name "Rajiv Batra"?

11   A.   Yes, I do.

12   Q.   And here, this one is signed in the name Wenchao Vince

13   Wang?

14   A.   Yes, it is.

15   Q.   And the date again, 9/7/2010?

16   A.   Correct.

17   Q.   And a TVU receipt?

18   A.   Yes.

19   Q.   Do you know what that e-mail address is?

20   A.   That was an e-mail address that we created and controlled

21   for Mr. Batra.

22   Q.   And at the bottom, do you see "Payment Received:  $1,000"?

23   A.   Yes, I do.

24   Q.   Is there also a page of notes?

25   A.   Yes, there was a page of notes.

1    Q.   Okay.  And we'll wait to hear directly from Agent Bhatia

2    about those.

3         Now, did you receive anything directly from TVU with regard

4    to Rajiv Batra?

5    A.   I believe we just received an e-mail.

6         (Government's Exhibit 205B marked for identification.)

7    BY MS. WEST:

8    Q.   I'll show you 205B.

9         Is that the e-mail you received?

10   A.   Yes, it is.

11            MS. WEST:  The Government --

12            THE WITNESS:  Yes.

13            MS. WEST:  -- offers Exhibit 205B.

14            MR. BABCOCK:  No objection, your Honor.

15            THE COURT:  205B is admitted.

16        (Government's Exhibit 205B received in evidence.)

17   BY MS. WEST:

18   Q.   Okay.  Do you see "From:  sus@trivalleyuniversity.org"?

19   A.   Yes, I do.

20   Q.   "To:  Rajiv.batra30@gmail.com?

21   A.   Yes.

22   Q.   That was the e-mail address you created?

23   A.   Correct.

24   Q.   And let's see the date.  September 7th, 2010?

25   A.   Yes.

1    Q.   Same day as the operation?

2    A.   Correct.

3    Q.   "Hi.  Please find the attached doc."  And do you see a

4    signature there?

5    A.   Yes, I do.

6    Q.   What does it say?

7    A.   "Vishal Dasa, International Admission Advisor."

8    Q.   Not Susan Su; right?

9    A.   Correct.

10   Q.   And three attachment icons.  Do you see those?

11   A.   Yes, I do.

12   Q.   Let's look at the attachments.  What is this?

13   A.   That's a printout from the Tri-Valley University system

14   showing the courses that Mr. Batra was enrolled in.

15   Q.   International Marketing, Human Resource Management,

16   Business Communication?

17   A.   Correct.

18   Q.   Whoa.  I'm just trying to show you the whole thing.

19        So you can tell this is an unsigned I-20?

20   A.   It is.

21   Q.   Soft copy?

22   A.   Yes.

23   Q.   And do we see Rajiv Batra's name at the top?

24   A.   We do.

25   Q.   Okay.  I'm showing you Page 6.  What is this?

1    A.   It's a Tri-Valley University fee receipt.

2    Q.   For Rajiv Batra?

3    A.   Yes.

4    Q.   Same courses?

5    A.   Correct.

6    Q.   And does this reflect that a thousand dollars had been paid

7    on that day?

8    A.   Yes, it does.

9    Q.   Now, were you involved in a ruse call at some point?

10   A.   Yes, I was.

11   Q.   I want to direct your attention to September 20th, 2010.

12   Do you have that date in mind?

13   A.   I do.

14   Q.   What happened on that day?

15   A.   That day, myself and Agent Mackey conducted a surveillance

16   at the Tri-Valley University campus.  We waited for Ms. Su to

17   arrive in her vehicle, which we were familiar with at this

18   point.  Upon her arrival, we placed a ruse phone call to the

19   Tri-Valley office.

20   Q.   Okay.  And roughly what time of day was this?

21   A.   This was afternoon, after 4:00 o'clock, I believe.

22   Q.   Was it light outside?

23   A.   It was still light, yes.

24   Q.   Okay.  So you were able to see what was going on?

25   A.   Yes.

1    Q.   And I'm sorry.  You said you saw Dr. Su arrive?

2    A.   Yes, we did.

3    Q.   How did she arrive?

4    A.   In her red Mercedes.

5    Q.   How did you decide what numbers to call or what number to

6    call?

7    A.   We picked the numbers off the Tri-Valley website, the

8    contact numbers, and began randomly dying -- dialing them.

9    Q.   Did you ultimately reach anyone?

10   A.   Yes.

11   Q.   Who did you reach?

12   A.   Initially, a female voice answered the phone.  I wasn't

13   aware of who that person was.

14   Q.   Did you identify yourself in some way?

15   A.   I identified myself as Officer Taylor from the airport.

16   Q.   And did you ask to speak with anyone in particular?

17   A.   I asked to speak with a DSO.

18   Q.   Did somebody else then get on the phone?

19   A.   Yes.

20   Q.   And how did that person identify themselves?

21   A.   It was Dr. Su.

22   Q.   Did you recognize her voice at that point?

23   A.   Yes, I did.

24   Q.   Can you explain generally what happened?

25   A.   Yes.  We informed Dr. Su that there was a student that

1    appeared to be a Tri-Valley student that had arrived at the

2    airport without any proper documentation.

3    Q.  Which airport?

4    A.  San Francisco International Airport.

5    Q.  And did you --

6    A.  And --

7    Q.  -- ask her for anything?

8    A.  Yes, we did.

9    Q.  What did you ask her for?

10   A.  We asked her to provide a letter from the school stating

11   that the identified student was in good standing and a current

12   student.  We requested a signed copy of the student's I-20 and

13   current transcripts for the student.

14   Q.  And what identifying information did you provide for that

15   student to make sure she was checking for the right person?

16   A.  We spelled his name out for her.

17   Q.  What was the name?

18   A.  Sparsh Agrawat.

19   Q.  Did you provide other information besides spelling the

20   name?

21   A.  No, I don't believe so.

22   Q.  Okay.  Did you ask her to do anything?

23   A.  We requested her to submit those documents via fax and via

24   e-mail to my e-mail address.

25   Q.  Was this call recorded in some way?

1    A.   It was.

2    Q.   How was it recorded?

3    A.   It was an essentially recorded phone call from our end.

4    Q.   So just an audio-recording device?

5    A.   Yes.

6    Q.   And have you listened to that recording?

7    A.   Yes, I have.

8    Q.   Is it a fair and accurate recording of the conversation

9    that you had with Dr. Su?

10   A.   Absolutely.

11        (Government's Exhibit 206 marked for identification.)

12        MS. WEST:  The Government offers Exhibit 206.

13        MR. BABCOCK:  No objection.

14        THE COURT:  Exhibit 206 is admitted.

15        (Government's Exhibit 206 received in evidence.)

16        THE COURT:  Members of the jury, I anticipate that

17   today there will be two different audio recordings that were

18   made by the Government, and those will be played for you.

19        There also will be transcripts.  There are transcripts of

20   those recordings.  Rather than the court reporter reporting

21   these recordings, these transcripts will be Exhibit 206A and

22   207A and will be in evidence if you should ever need to review

23   those.

24        MS. WEST:  Okay.  So the transcript is 206A.  We'll

25   offer to admit that at this time, too.

1    THE COURT: Exhibit 206A and 207A were previously

2    admitted at a hearing outside the presence of the jury.

3    MS. WEST: Can we please play the audio that is

4    Exhibit 206, Ms. Hughes.

5    (Audio was played but not reported.)

6    MS. WEST: Could we go for another couple minutes?

7    THE COURT: Sure.

8    BY MS. WEST:

9    Q.   Okay.  Agent Taylor -- Taylor, are you familiar with people

10   being stopped at the airport as they are trying to reenter the

11   country when they're F-1 students?

12   A.   Yes, I am.

13   Q.   Are you familiar with the kind of information that is

14   requested or whether information is requested for those

15   individuals?

16   A.   Generally, yes.

17   Q.   Okay.  And Department of Homeland Security does actually

18   ask for documentation sometimes when F-1 students come into the

19   country without documentation?

20   A.   Yes, they do.

21   Q.   Are these the same sorts of documents that are generally

22   requested?

23   A.   Yes.

24   Q.   And you provided a phone number on that recording.  What

25   was that phone number?

1    A.    I provided a fax number.

2    Q.    I'm sorry.  Fax number.

3          What was that fax number?

4    A.    (415) 844-5335.  That's our office fax.

5    Q.    Okay.  And what happened after you hung up from that call?

6    A.    Agent Mackey and I continued to surveil the location, and

7    we witnessed Ms. Su exit the building and retrieve something

8    from her car and then reenter the building.

9    Q.    Okay.  At some point, did you get e-mails?

10   A.    Yes.

11   Q.    About how long after?

12   A.    Not too long, maybe ten, 15 minutes.

13   Q.    Okay.  I'm going to show you Exhibit 206B, which is already

14   in evidence.

15             MR. BABCOCK:  Sorry.  What number are you getting?

16             MS. WEST:  206B.  It's already in.

17   BY MS. WEST:

18   Q.    Agent Taylor, is this the e-mail that you received from

19   Dr. Su?

20   A.    Yes, it is.

21   Q.    September 20th, 2010?

22   A.    Yes.

23   Q.    And was that your true e-mail address that you provided?

24   A.    The e-mail addresses I provided?  Yes, it was my DHS e-mail

25   address.

1    Q.   Okay.  And that text here: "It was nice speaking with you.

2    Please see the attached documents.  Let me know if you need

3    anything else."

4    A.   Yes.

5    Q.   "Have a wonderful day.  Susan."

6    A.   Yes.

7    Q.   And handwritten on this document are two initials, S.S.

8         Do you see that?

9    A.   Yes.

10   Q.   Do you know what that's from?

11   A.   Yes.  On the day we interviewed Ms. Su, we presented this

12   document to her and asked her to verify it, and she did and

13   placed her initials.

14   Q.   And did she say whether she actually had sent this to you?

15   A.   Yes, she did.

16   Q.   Did you receive another e-mail from her?

17   A.   Yes, we did.

18   Q.   Okay.  This one is the same day?

19   A.   Correct.

20   Q.   And it just says, "Would you please acknowledge the

21   receiving of my e-mail.  Susan"?

22   A.   Yes.

23   Q.   Did you at some point have a -- did you send an e-mail back

24   to her?

25   A.   Yes, I did.

1    Q.   Let's look at Page 3 of this 206B, and do you see about

2    halfway down, "Dr. Su, my apologies..."?

3    A.   Yes, I do.

4    Q.   Can you read that in, please.

5    A.   "Dr. Su, my apologies, but I just noticed that the I-20 was

6    not signed by anyone.  Could I get the student's signed I-20

7    for our records?  Thank you very much for your cooperation on

8    this matter.  Dale."

9    Q.   Okay.  And did she respond?

10   A.   Yes, she did.

11   Q.   "I am attaching the scanned I-20 with original signatures.

12   Let me know if that is okay," and it's signed "Susan"?

13   A.   Yes.

14   Q.   Okay.  Was there an attachment?

15   A.   Yes, there was.

16   Q.   Showing you Page 4, is this an I-20 in the name Sparsh

17   Prashant Agrawat?

18   A.   Yes, it is.

19   Q.   Let's go down to the bottom.  Do you see there in Paragraph

20   10 "School Certification"?

21   A.   Yes, I do.

22   Q.   And let's see if we can bring that a little better.

23        The date issued?

24   A.   September 20th, 2010.

25   Q.   Same date as this call?

1    A.  Yes.

2    Q.  And is there a signature on here?

3    A.  There is.

4    Q.  Of what name?

5    A.  Sophie Su.

6    Q.  Did you also receive a transcript?

7    A.  Yes, we did.

8    Q.  Let's show you Page 7.

9        Is this the TVU official transcript, Sparsh Prashant

10   Agrawat?

11   A.  Yes, it is.

12   Q.  How did Mr. Agrawat do?

13   A.  Did very well actually.

14   Q.  B-plus, A, A?

15   A.  Yes.

16   Q.  Does that say, "Summer 2010"?  Can you see that?  Sorry.

17   A.  Just a little bit -- yes.  Sorry.

18   Q.  Okay.  And are these the same courses that you registered

19   him in?

20   A.  Well, we didn't pick any courses.  They were chosen for us

21   but yes.

22   Q.  Who picked those courses?

23   A.  Whoever enrolled him.

24   Q.  You mean whichever staff?

25   A.  Whichever staff member processed him picked the classes for

1    us.

2    Q.   And I'm showing you Page 8 -- oh.  A little more.

3         All right.  What is this document?

4    A.   That's the letter received from Ms. Su as an e-mail

5    attachment signifying that Mr. Agrawat was a full-time student

6    at Tri-Valley and was in good standing.

7    Q.   Okay.  Do you see the date September 20th in the upper

8    right?

9    A.   Yes, I do.

10   Q.   Okay.  And you said this is for Mr. Agrawat; right?

11   A.   It -- yes, it appears to be for Mr. Agrawat, but there also

12   appears to be a typo on the first line.

13   Q.   Okay.  So let's read it.

14        "This letter is written to verify Mr. Sanjaykumar Devatbhai

15   Ahir's full-time graduate student status at Tri-Valley

16   University.  Mr. Sparsh Prashant Agrawat currently enrolls as a

17   full-time graduate student at Tri-Valley University pursuing

18   the Ph.D. in Business Administration at the School of

19   Business."

20        Do you see that?

21   A.   Yes, I do.

22   Q.   Okay.  And then it continues, "Mr. Sparsh Prashant Agrawat

23   was an admitted" -- I'm sorry -- "was admitted to the Ph.D.

24   program at Tri-Valley University based on complete evaluation

25   of his credentials by the Admission Committee."

1        Do you see that?

2    A.  Yes, I do.

3    Q.  And then it continues, "He has been registering class at

4    the university and in good standing."

5        Do you see that?

6    A.  Yes, I do.

7    Q.  Sorry.  "Good standing with all academic requirements and

8    regulation."

9        Did I read that right?

10   A.  Yes, you did.

11   Q.  "Should you have any question, please do not hesitate to

12   contact our office."

13       Do you see that?

14   A.  Yes, I do.

15           MS. WEST:  Did the Court wish to take the second

16   recess?

17           THE COURT:  I do.

18       Members of the jury, we're going to take our second morning

19   recess.

20       The Court will be in recess for 15 minutes.

21           THE CLERK:  All rise.

22       Court will be in recess for 15 minutes.

23                   (Recess taken.)

24           THE COURT:  All right.  Let's go back on the record.

25   Agent Taylor is still on the stand.

1    Ms. West?

2         MS. WEST:  Thank you.

3    BY MS. WEST:

4    Q.  Agent Taylor, we were looking a few moments ago at the I-20

5    form for Mr. Agrawat.

6    A.  Yes.

7    Q.  And that was signed in the name Sophie Su.  Do you recall

8    that?

9    A.  Yes, I do.

10   Q.  And where were you during the time of this call and until

11   you got the e-mail?

12   A.  We were parked down the street about 50 yards from the

13   Tri-Valley office.

14   Q.  Did you have any visibility of Tri-Valley at that time?

15   A.  We had a very good visible shot of Tri-Valley at that time.

16   Q.  You were not inside, though; right?

17   A.  No, we were not.

18   Q.  From outside, did you see any indication that Sophie Su was

19   there?

20   A.  I did not.

21   Q.  Did you make another ruse call to Susan Su?

22   A.  Yes, I did.

23   Q.  Do you have the date September 24th, 2010, in mind?

24   A.  Yes, I do.

25   Q.  Was that the date of the call?

1   A.   Yes, it was.

2   Q.   What was the plan?

3   A.   The plan was to contact Tri-Valley and, as in the first

4   instance, inform them that a student had been stopped at the

5   airport for attempting to enter without documentation and to

6   request that documentation be provided.

7   Q.   And who was the individual that you were requesting for

8   this time?

9   A.   The second individual was Kadir Dirikan.

10   Q.   Did you situate yourself again outside of Tri-Valley

11   University?

12   A.   Yes, we did.

13   Q.   What time of day was it?

14   A.   I believe that was -- I'd say early -- early afternoon.

15   Q.   And was it light outside?

16   A.   Yeah, it was light outside.

17   Q.   Okay.  What number did you call?

18   A.   I can't recall the exact number.

19   Q.   Same number you called before?

20   A.   Same numbers from the Tri-Valley website.

21   Q.   Did you identify yourself this time?

22   A.   Yes, I did.

23   Q.   How did you identify yourself?

24   A.   I believe I identified myself again as Officer Taylor.

25   Q.   Did you speak with Susan Su?

1    A.  I did.

2    Q.  How do you know it was Susan Su?

3    A.  She recognized my name and said, "Is this Dale?"

4    Q.  And did you recognize her voice as well?

5    A.  Yes, I did.

6    Q.  Can you explain generally to the jury what happened, and

7    then we'll listen to the audio again.

8    A.  Again, we placed the phone call, requested to speak with

9    Dr. Su, identified ourselves as officers of the airport.  Upon

10   Ms. Su answering the phone, she recognized my name, and I

11   explained to her that we had a similar situation as we had four

12   days earlier.  There was a student of hers attempting to enter.

13       She asked us if the student was going to be admitted, and I

14   said, "Yes."  We requested the same documentation that we

15   requested for Mr. Agrawat and was provided.

16   Q.  Okay.  To be clear, when you asked if the student was going

17   to be admitted, was that if the documentation was provided?

18   A.  Yes.

19   Q.  Did you ask her again to e-mail that information to you?

20   A.  Yes, I did.

21   Q.  Was that call recorded in the same fashion?

22   A.  Yes, it was.

23   Q.  And have you had an opportunity to listen to that

24   recording?

25   A.  Yes, I have.

1    Q.  Was that a fair and accurate recording of the conversation

2    that you had with Tri-Valley that day?

3    A.  Yes.

4        (Government's Exhibit 207 marked for identification.)

5        MS. WEST:  The Government offers Exhibit 207, which

6    is the recording, and then 207A is the transcript, which, as

7    the Court had mentioned, has already been admitted.

8        THE COURT:  Yes.  I believe the Court and counsel

9    earlier agreed that 207 would be played for the jury, and the

10   Court did previously admit 207A.

11       (Government's Exhibit 207 received in evidence.)

12       MS. WEST:  Sorry for the confusion.

13   Ms. Hughes, can we please pay -- play Exhibit 207.

14       (Audio was played but not reported.)

15   BY MS. WEST:

16   Q.  Agent Taylor, is it routine to ask for the I-20 to be

17   signed when it needs to be sent to the airport for a student

18   stop there?

19   A.  Yes.

20   Q.  Why is that?

21   A.  The signature certifies that somebody has reviewed that

22   this student is a bona fide student, intends to engage in a

23   full course of study.  It's the certification portion of our

24   I-20.

25   Q.  Okay.  What happened after this phone call?

1    A.   We received an e-mail from Dr. Su.

2    Q.   I'm going to show you what is already admitted as

3    Government Exhibit 207B.

4         MS. WEST:  Actually, Ms. Hughes, could we pull up

5    207B, please.

6    BY MS. WEST:

7    Q.   Is this the e-mail you received?

8    A.   It appears to be the e-mail that I received.

9         MS. WEST:  No.  That's actually -- just to the line

10   is fine, Ms. Hughes.

11        There you go.  Thank you.

12   BY MS. WEST:

13   Q.   Okay.  Do you see the date September 24th?

14   A.   Yes, I do.

15   Q.   And to Dale Taylor?

16   A.   Yes.

17   Q.   All right.  Do you see -- it says, "Please see the

18   attachments and let me know.  Susan"?

19   A.   Yes.

20   Q.   All right.  And then you've got the initials S.S.?

21   A.   Correct.

22   Q.   Do you know how those initials got on there?

23   A.   During our interview of Ms. Su, she affixed them to the

24   document.

25   Q.   And why was she affixing -- why was she writing them there?

1   A.   We presented the document to her and asked her to

2   authenticate it.

3   Q.   And did she state that, in fact, she had sent this e-mail?

4   A.   Yes, she did.

5          MS. WEST:  Can we please pull up, Ms. Hughes --

6   BY MS. WEST:

7   Q.   Actually, there's other e-mails in this chain; right?

8   A.   I believe there were.

9   Q.   Was that just forwarding what -- the e-mail exchange you

10  had the other day?

11  A.   Yeah.  She used the e-mail that she had previously sent on

12  September 20th as a forward.  So it was -- it was the same

13  e-mails we received before.

14         MS. WEST:  Okay.  Ms. Hughes, can we please pull up

15  Page 5 of this exhibit, and can we start with Box 10 actually.

16  BY MS. WEST:

17  Q.   Okay.  Did you see -- receive the -- I'm sorry.  That's

18  kind of -- is there some other way I should do this?  It's cut

19  off the screen.

20         Okay.  Is this an I-20 for that individual Mr. Dirikan?

21  A.   It appears to be, yes.

22  Q.   And this one is signed under the name Sophie Su?

23  A.   Correct.

24  Q.   Do you see the 9/24/2010 there?

25  A.   Yes.

1    Q.   Did you have an opportunity to see who was coming and going

2    during the course of your call?

3    A.   There was nobody coming and going, but we did see Ms. Su's

4    vehicle at the building.

5    Q.   When you say "Ms. Su" --

6    A.   I'm sorry.

7    Q.   -- you're referring to the defendant, Dr. Susan Su?

8    A.   Dr. Susan Su, yes.

9    Q.   Did you see any indication of Sophie Su's presence?

10   A.   No, I did not.

11          MS. WEST:  Can we go out and just do the top part of

12   this document, please, just the name block -- Box 1.

13       That's great.  Thank you.

14   BY MS. WEST:

15   Q.   Okay.  And this is the I-20 in the name Kadir Dirikan;

16   right?

17   A.   Yes, it is.

18          MS. WEST:  Okay.  Can we please pull up Page 8, Ms.

19   Hughes.

20       That's perfect.  Thank you.

21       You know what?  I'm going to switch over because that's too

22   hard to read.

23   BY MS. WEST:

24   Q.   All right.  This is Page 8, and are you able to read that,

25   Agent Taylor?

1    A.   Yes, I am.

2    Q.   Okay.  Do you see there the student name Kadir Dirikan up

3    at the top?

4    A.   Yes, I do.

5    Q.   And three classes here?

6    A.   Yes.

7    Q.   With the grades A, A, B-plus?

8    A.   Yes.

9    Q.   And -- there we go -- what's the term?

10   A.   Summer 2010.

11   Q.   And Page 9.  What is this?

12   A.   That's a letter from Tri-Valley attesting to the full-time

13   status of Kadir Dirikan as listed in Tri-Valley.

14   Q.   Okay.  And do you see the date September 24th, 2010?

15   A.   Yes, I do.

16   Q.   And is this basically the same as the letter that we saw

17   already for Mr. Agrawat?

18   A.   Basically the same letter, yes.

19   Q.   "This letter is written to confirm Mr. Kadir Dirikan's

20   full-time graduate student status at Tri-Valley University."

21        Do you see that first line?

22   A.   I do.

23   Q.   And then it states that he "currently enrolls as a

24   full-time graduate student at Tri-Valley pursuing the Doctor of

25   Philosophy (Ph.D.) in Computer Science the Department of

1      Computer Science and Engineering."

2          Do you see that?

3      A.  Yes, I do.

4      Q.  "Mr. Kadir Dirikan was admitted to the Ph.D. program at

5      Tri-Valley University based on complete evaluation of his

6      credentials by the Admission Committee."

7          Do you see that?

8      A.  I do.

9      Q.  And then it says, "He has been registering and attending

10     class at the university and in good standing with all academic

11     requirement and regulation."

12         Do you see that?

13     A.  I do.

14     Q.  Okay.  Did you go to Tri-Valley University on December 1st,

15     2010?

16     A.  Yes, I did.

17     Q.  For what purpose?

18     A.  We were conducting a ruse site visit of Ms. Su's school,

19     Tri-Valley University.

20     Q.  What do you mean "site visit"?

21     A.  The program that oversees the SEVIS system -- they conduct

22     site visits of schools occasionally to gauge their compliance,

23     and we were attempting to do that.

24     Q.  Okay.  So is it normal, then, for there to be site visits

25     or site inspections while the school is already in operation?

1     A.    Yes.

2     Q.    Okay.  Did you arrange this site visit with Tri-Valley

3     University in advance?

4     A.    I did.

5     Q.    How did you do that?

6     A.    I called the office and asked to speak to, I believe, DSO

7     Sophie Su.

8     Q.    Why did you ask for her?

9     A.    She's listed as the primary designated school official.  So

10    she'd be the initial point of contact for us as agents.

11    Q.    Okay.  Did you speak to her that day?

12    A.    No, I did not.

13    Q.    Who did you speak to?

14    A.    I initially left a message from -- I'm sorry -- a message

15    with an unidentified female, I believe it was, advising that we

16    were going to be in the area conducting site visits, and we

17    requested to -- to conduct a site visit of Tri-Valley

18    University.  I left Agent Mackey's phone number as the return

19    phone number and asked that we be contacted.

20    Q.    Were you contacted?

21    A.    We were contacted.

22    Q.    Did you speak with anyone from Tri-Valley University to

23    arrange that site inspection?

24    A.    I did.

25    Q.    Who did you speak to?

1    A.   I spoke with Ms. Susan Su.

2    Q.   And did you recognize her voice?

3    A.   Yes, I did.

4    Q.   And did the person who called back identify herself as Dr.

5    Susan Su?

6    A.   Yes.

7    Q.   Okay.  What did you tell her?

8    A.   Again, I informed her that we were going to be in the area

9    conducting site visits, requested to conduct a site visit of

10   her school, and asked if she was amenable to that, and she said

11   she was.

12   Q.   Did you give her any instructions as to who had to be

13   present?

14   A.   I informed her that the -- any available DSO's should be

15   present, and also Ms. Sophie Su as the primary designated

16   school official should be present.

17   Q.   Did you give her any sense of what to expect from the site

18   visit?

19   A.   I gave her a general outline of what we'd be doing.  I told

20   her that we'd request a tour of the campus, and we had a

21   general questionnaire that we'd be asking questions from.

22   Q.   And is the tour and questionnaire -- in general, is that

23   something that is routine for these sort of mid-review site

24   visits?

25   A.   Yes.  I've been on site visits with SEVIS.  That is normal

1    course.

2    Q.  Did you identify yourself in that call with Dr. Su?

3    A.  I don't recall if I identified myself at that time.  I may

4    have.

5    Q.  When you actually went to the site visit, how many days

6    later was that?

7    A.  It was the following day.

8    Q.  Did you identify yourself at that time?

9    A.  Yes.  I identified myself as Dave Johnson.

10   Q.  Why did you not use your true name?

11   A.  Ms. Su was already aware of Dale Taylor since her previous

12   dealings with him, and I didn't want her to have questions as

13   to why somebody from the airport would show up at her school.

14   Q.  So did you go by yourself or with anyone else?

15   A.  Myself and Agent Mackey went.

16   Q.  What happened when you got there?

17   A.  We entered the building, approached the secretary and began

18   a conversation, and almost immediately Ms. Su greeted us and

19   took us into her office.

20   Q.  And again, because there are two Ms. Sus with Sophie and

21   Susan --

22   A.  I'm sorry.  Susan Su.

23   Q.  She brought you into her office?

24   A.  Yes.

25   Q.  Can you describe what that office looks like?

1    A.   It's a typical office.  It's rather small.  There's a desk

2    with a computer monitor.  To your left, there's also a monitor

3    that's connected to her monitor so you can see what's going on

4    on her screen.  On the right wall, there was her diplomas.  I

5    believe there was a -- I believe there was a refrigerator --

6    appears to be a refrigerator in the back left corner, a small

7    one.

8    Q.   Okay.  Were there file cabinets and stuff in there as well?

9    A.   Yes.  To the left -- to the -- my immediate left, there was

10   file cabinets.

11   Q.   Did Agent Mackey identify himself?

12   A.   Agent Mackey did identify himself.

13   Q.   Did he present any credentials?

14   A.   He did.

15   Q.   Did Dr. Su express any concern as to whether she was in

16   trouble?

17   A.   She did.

18   Q.   What did she say about that?

19   A.   After reviewing Agent Mackey's credentials, she mentioned

20   that they said, "Special Agent" on them, and she asked if the

21   school was in trouble, if there was any trouble.

22   Q.   And what was the response?

23   A.   We told her that this was a routine visit, that these were

24   regularly conducted, and that we were trying to gain an

25   average -- conduct an average with her, make sure that she knew

1    that she had a point of contact to go to if she had any issues

2    with students.  She seemed to agree to that.

3    Q.  Did anything else substantive happen in her office?

4    A.  No.

5    Q.  Okay.  What happened after you were in her office?

6    A.  For the brief time we were in her office, we then exited

7    and asked for a tour.  She provided us a tour of the campus.

8    Q.  Let me ask you about that.

9        How many floors were there?

10   A.  Two floors.

11   Q.  And did you start on the first floor?

12   A.  We did.  We were outside her office.

13   Q.  What did you see outside the office?

14   A.  She took us right outside her main office and showed us an

15   open-space area that contained a screen similar to that, which

16   didn't have anything projected on it, and a few tables and

17   chairs that were lined up.

18   Q.  Okay.  When you say "similar to that," are you referring to

19   the projection screen?

20   A.  Yeah, similar to that projection screen.

21   Q.  The one that we've been using to show exhibits?

22   A.  Yes.  It was affixed to the wall.  It was one of the ones

23   you can pull down.

24   Q.  Okay.  It's just -- on the record, it just says "that."  So

25   we need to describe it a little more particularly.

1    After you saw the projection screen and some chairs, what

2  else did you see?

3  A.   At that time, Ms. Su identified that as the classroom.

4  Q.   Okay.  Any other classrooms?

5  A.   No.  No.  We didn't -- we weren't shown any other

6  classrooms during our site visit there.  She next showed us her

7  networking closet, wire closet.

8  Q.   What is a networking closet?

9  A.   It's a room where typically IT equipment is kept, network

10  servers, exchange servers, stuff like that --

11  Q.   Okay.

12  A.   -- routers.

13  Q.   Did you see anything in there?

14  A.   We did see some boxes of what appeared to be equipment.  I

15  didn't open the boxes.  Ms. Su stated something to the effect

16  that there were -- there was an e-mail server in the box, but

17  she was going to have to set up a -- she didn't have the funds

18  at the time.

19  Q.   And did she have any explanation for that e-mail server?

20  A.   I don't recall off the top of my head.

21  Q.   What else did she show you after the networking closet?

22  A.   Next, we traversed from Suite -- we were now in Suite 800.

23  She took us to Suite 700 and showed us her staff area where her

24  staff worked.

25  Q.   Okay.  So are these two areas connected to 800 --

1    A.   They are connected.

2    Q.   Okay.  You have to wait for me to finish asking my question

3    so we don't upset the court reporter.

4         Okay.  So they're connected inside?

5    A.   Yes.

6    Q.   You walked from 800 into 700, and what did you see?

7    A.   It was another open room, appeared to be desks on the

8    outsides, and at this time we were introduced to Sophie Su.

9    Q.   Okay.  Did Susan Su say anything about what that space was

10   used for?

11   A.   Yes.  She said that this was where her staff worked, and

12   she also identified the back left corner as the TVU library.

13   Q.   Can you describe the TVU library?

14   A.   It consisted of two bookshelves, which had various books on

15   it, and a single computer.

16   Q.   Did you see any staff working in the staff work center?

17   A.   We saw what she identified as staff.  They were basically

18   standing there waiting to greet us.

19   Q.   How many people?

20   A.   Two.

21   Q.   And you said you met Sophie Su at that point?

22   A.   Yes.

23   Q.   Did Dr. Su introduce her to you?

24   A.   Yes, she did.

25   Q.   How did she -- how did she do that?

1    A.   She said, "This is Sophie Su."

2    Q.   Was she there by herself?

3    A.   Ms. --

4    Q.   Sophie -- I'm sorry -- Sophie Su.

5    A.   At this time, she was alone.

6    Q.   Did you see in the staff work center how many people it was

7    set up to handle?

8    A.   There were desks along the outside of the room.  I would

9    say maybe ten.

10   Q.   All right.  Let me ask you a question about the staff work

11   center versus Susan Su's office that you started in.

12        Did you have a sense from what you viewed there whether

13   Susan Su's office that you started the site visit in was her

14   exclusive domain?

15   A.   Her office?

16   Q.   Yes.

17   A.   It appeared to be so, yes.

18   Q.   What makes you think that?

19   A.   It was very small compared to the rest of the office.  It

20   had her belongings on there, the diplomas.  I never saw -- in

21   the videos that I reviewed, I never saw anybody conducting

22   visits in there other than to walk in and have some document

23   exchanges.

24   Q.   How many desks in there?

25   A.   Just one.

TAYLOR - DIRECT / WEST

1    Q.   How many chairs?

2    A.   There was two chairs.  Sorry.

3    Q.   Can you explain where the two chairs were situated?

4    A.   On the opposite side of Ms. Su's desk.

5    Q.   So guest chairs?

6    A.   Yes.

7    Q.   Okay.  Was there a chair behind the desk?

8    A.   Yes, there was.

9    Q.   And was that the one that Dr. Su was seated in when you met

10   with her?

11   A.   Yes.

12   Q.   Okay.  Did you have an opportunity to -- let me make sure I

13   cover -- was there anything else on the first floor that you

14   saw, or did we cover it?

15   A.   That was it.

16   Q.   Okay.  Did you get a chance to go upstairs?

17   A.   I did.

18   Q.   What did you see upstairs?

19   A.   Ms. Su escorted us to the top of Suite 700, which consisted

20   of three consecutive rooms.

21   Q.   What -- what did you see?  Can you describe the rooms for

22   us, please.

23   A.   The rooms were sparsely furnished.  Ms. Su identified them

24   as staff rooms, faculty rooms.  In the center room, Ms. Sophie

25   Su was there with a small child.

1    Q.   And was that room furnished?

2    A.   It was sparsely furnished.

3    Q.   What do you mean by that?

4    A.   It appeared to be -- it looked to me as if it was a folding

5    picnic table, not an actual desk.

6    Q.   Was there a chair?

7    A.   Yes, there was a chair.

8    Q.   And was Sophie Su in that?

9    A.   Yes, she was.

10   Q.   By herself?

11   A.   In the chair, yes, but again, she had a small child with

12   her.

13   Q.   Okay.  But by herself in the chair?

14   A.   Yes.

15   Q.   Okay.  What else did you see upstairs?

16   A.   That was it.

17   Q.   Did you get to see the second floor of Suite 800?

18   A.   No.

19   Q.   Why not?

20   A.   We requested to see it, but she was very insistent that we

21   couldn't go in there for some reason.  I believe she stated it

22   was under construction and that they were building some type of

23   student auditorium.  I asked a couple times and -- you know,

24   "Can we just go on the steps and take a look?"  And it was "No"

25   each time.  So we never made it up there.

1    Q.   And who was saying, "No"?

2    A.   Dr. Su.

3    Q.   Did you get a chance to meet any other DSO's besides Sophie

4    Su and Dr. Su?

5    A.   No, I did not, not at that time.

6    Q.   Are you familiar with what Wenchao Vince Wang looks like?

7    A.   Yes, I am.

8    Q.   Was he there?

9    A.   No, he was not.

10   Q.   How are you familiar with what he looks like?

11   A.   I've spoken with him several times in person.

12   Q.   Now, you mentioned that you were also going to ask

13   questions from a questionnaire.  Do I have that right?

14   A.   Yes.

15   Q.   Did you get a chance to do that?

16   A.   We did.

17   Q.   Have you seen questionnaires from other routine inspections

18   before?

19   A.   Yes, I have.

20   Q.   How did this one compare with those?

21   A.   It was very similar.  We actually used the SEVP site visit

22   questionnaires -- it has a template -- and slightly modified

23   it, added questions, and removed questions.

24   Q.   During the course -- well, where did you -- where did you

25   go through the questionnaire?

1    A.   After Suite 700, after viewing the upstairs, she took us

2    back downstairs and back to her office.

3    Q.   Okay.  So it was in her office that you went through the

4    questionnaire?

5    A.   Yes.

6    Q.   Did you get a chance to talk about DSO's generally?

7    A.   We did.

8    Q.   Did you talk to Dr. Su about who the DSO's were for

9    Tri-Valley?

10   A.   Yes.

11   Q.   What did she say?

12   A.   She said that Sophie Su was the P/DSO and that her husband

13   Wenchao Wang was a DSO as well.

14   Q.   Did she say anything about whether they were full-time

15   DSO's?

16   A.   Yes.  We asked her if they were full time.  She said they

17   weren't, but they had jobs of their own --

18   Q.   Did --

19   A.   -- but -- sorry.

20   Q.   Go ahead.  Finish your answer.

21   A.   That's it.

22   Q.   Was she asked about office space for the DSO's?

23   A.   Yes.  We did ask if she had office space for the DSO's.

24   She said that Sophie and Vince shared the office space upstairs

25   that we saw Ms. Sophie Su in.

1    Q.  Was there any discussion about whether DSO responsibilities

2    were shared in some way?

3    A.  Yes, there was.

4    Q.  What did she say?

5    A.  Ms. Su mentioned that the DSO's had assistants and that the

6    assistants had -- she called it "open the window," and we

7    clarified -- at this point, we had an idea that there was

8    possibly nonauthorized people accessing SEVIS.  We asked her,

9    "Do you mean the SEVIS window?"

10        And she said, "Yes."

11   Q.  Was there any follow up on that?

12   A.  Yes.  She said, "But we're not doing that anymore.  We

13   learned that that was wrong, and we haven't done that since we

14   moved to the new location."

15   Q.  Being Boulder Court?

16   A.  Yes.

17   Q.  By the way, when you're asking Dr. Su questions from the

18   questionnaire -- or actually, during the entire site visit, did

19   you interview anyone besides Dr. Su?

20   A.  We briefly spoke with the two employees that were there,

21   just greetings and "What do you do here?" basically.  That was

22   it.

23   Q.  Okay.  And how about for the questionnaire?

24   A.  No.  That was -- it was just strictly Ms. Su -- Ms. Susan

25   Su.

1    Q.   Did you have any discussions with Susan Su about

2    instructors?

3    A.   Yes, we did.

4    Q.   What did she say about that?

5    A.   We asked her how many instructors she had, and she

6    indicated she had 50 instructors.

7    Q.   Was there any instructors to -- whether they were full

8    time?  Part time?

9    A.   Yeah.  We asked her if they were full time, and she said

10   the majority of them were part time and only taught one class

11   but that five -- five of them were considered full time.

12   Q.   Did you ask her where faculty offices were?

13   A.   Yes.

14   Q.   What did she say?

15   A.   She indicated that the suites in the upstairs of Suite 700

16   were faculty offices, that they could use them when they came

17   there.

18   Q.   Was there any discussion about how instructors were

19   selected for Tri-Valley University?

20   A.   Yes.  She stated that they had to have a minimum of a

21   Master's degree and that they had to have taught before and

22   that they conduct an interview through the computer.  So one

23   person would be on the other end of the computer, and she would

24   be on her end and ask them to do, like, a mockup demonstration

25   of their teaching skills.

1    Q.   Did she describe or characterize the selection process in

2    any way?

3    A.   I -- I can't remember the exact words, but she -- I took

4    from that they were rigorous or that they were very selective

5    on who they had to teach there.

6    Q.   Did you have a discussion with Dr. Su about students at

7    Tri-Valley?  Let's start with the number of students.

8    A.   Oh.  We did ask her how many students were currently

9    enrolled for that semester.

10   Q.   What did she say?

11   A.   She provided a number of 500 students.

12   Q.   And was there any discussion of how many students may have

13   been on break that semester as opposed to active?

14   A.   She told us that 500 of her students were on break.

15   Q.   Was there any discussion as to what portion or percentage

16   of all of Tri-Valley students were F-1 foreign students?

17   A.   Yes.  She provided a number of 80 percent being F-1.

18   Q.   Was there any discussion of the admissions process at

19   Tri-Valley?

20   A.   Yes, there was.

21   Q.   What did she say about that?

22   A.   We asked her, "How are students admitted?"  And she told us

23   the documents that they collect and the review that they do and

24   the students are paid -- or admitted based on that information.

25   Q.   Did she say anything about whether there were prerequisites

1    of degrees or GPA?

2    A.   Yes.  She did say that a person enrolling in a Bachelor's

3    program had to have an undergrad or high school diploma.  A

4    person enrolling in a Master's or Ph.D. program had to have a

5    minimum of a Bachelor's degree, and we asked her if there was a

6    grade point average requirement.  She said they had to have a

7    3.0.

8    Q.   Was there any discussion as to the percentage or number of

9    students who applied who were actually admitted?

10   A.   Yes, we did have a conversation about that.  At one point,

11   Agent Mackey asked her how many students had applied this

12   semester, and she provided a number of a thousand and that 800

13   or so were admitted.

14   Q.   Did that information change at any point?

15   A.   She gave contradictory information later on.  She said that

16   out of a hundred people that applied, only ten to 15 of those

17   will get a visa from her school.

18   Q.   When you say "visa," are you talking about --

19   A.   I-20.

20   Q.   Okay.  Was there discussion as to the classes themselves

21   that TVU offered?

22   A.   Yes, there was.

23   Q.   Did she say anything about how many were offered at that

24   time?

25   A.   She said there were 50 classes.

1    Q.   Did she say anything about whether those classes were

2    physical; that is, in-person classes or online?

3    A.   We asked her where classes took place, and she said, "At

4    this campus," and then she went kind of off on a tangent

5    saying, "Sometimes the students don't like to drive here.  They

6    don't like the traffic."  So they project it on the wall, and

7    they can -- the students can watch it in their system.

8    Q.   Did you seek any clarification on that?

9    A.   Yeah, we did ask her to clarify.  I think we -- it was

10   myself that said, "When classes are held, they're held at this

11   location?"

12        And she said, "Yes."

13   Q.   Did she say anything about what days or what times the

14   classes were offered?

15   A.   Yeah.  She said the classes were offered from 5:30 to 8:30,

16   I believe, Monday through Saturday.  And we asked her if there

17   was classes that evening, and she said, "Yes."

18   Q.   Was there any discussion as to requirements for attendance?

19   A.   We did ask her if the DSO's reviewed attendance records,

20   who kept track of attendance, and she initially said it was the

21   instructors' job to do that.  And then we asked her, "Do DSO's

22   review those, seeing as how they're responsible for the

23   students' attendance?"

24        And she said, "Yes."

25   Q.   Was there any question posed to her about the regulations

1    regarding attendance?

2    A.   Yes.  At one point, we asked her if she had any classes

3    that didn't require physical attendance, and she said she had

4    two courses that didn't require physical attendance.  They were

5    related to, I think, the Business Administration.  She gave the

6    course numbers as BA.  I forget the number off the top of my

7    head, but she said those two courses were videotaped, and the

8    students could watch those from anywhere.

9         We asked her of the -- per term, how many student -- how

10   many clock hours or credit hours could a student count towards

11   their full-time attendance that required physical attendance,

12   and she said 30.

13   Q.   And why did you ask that?

14   A.   That's the regulation.  That's what the regulation says.

15   Q.   Okay.  So her answer was correct?

16   A.   Yes.

17   Q.   How did the site visit end?

18   A.   We provided Ms. Su with a request for evidence.

19   Q.   What is that?

20   A.   It's a document that basically states, you know, "We

21   visited your school.  We'd like to have you send us certain

22   documents related to your operation, the things that we asked

23   for."

24   Q.   Well, hold on a second.

25        (Government's Exhibit 208B marked for identification.)

1    BY MS. WEST:

2    Q.   Let's show you what's marked as 208B.

3         Do you recognize that?

4    A.   Yes, I do.

5    Q.   What is it?

6    A.   This is the request for evidence that we provided to Ms. Su

7    on the date of the site visit.

8              MR. RHYNE:  The Government offers Exhibit 208B into

9    evidence.

10             MR. BABCOCK:  No objection, your Honor.

11             THE COURT:  208B is admitted.

12        (Government's Exhibit 208B received in evidence.)

13   BY MS. WEST:

14   Q.   All right.  Now that we can all look at it now, you can

15   tell us what's requested.  Can you read that from there?

16   A.   Yes, I can.

17   Q.   What does it say?

18   A.   It states, "Request for Evidence.  Please provide

19   Immigration and Customs Enforcement with the following

20   documentation:

21        "A copy of your institution's most current catalog.

22        "A copy of your institution's current teaching staff

23   roster.

24        "A copy of attendance records for the following three

25   courses -- BA331, International Marketing; BA300, Business

1    Communications; BA353, Human Resource Management -- for the

2    previous two weeks."

3    Q.   Now, is it routine for site inspectors to issue requests

4    for evidence?

5    A.   Yes.

6    Q.   And are these items that you requested on here routine

7    items?

8    A.   Yes, they are.

9    Q.   The catalog?

10   A.   Yes.

11   Q.   And the teaching staff roster?

12   A.   Yes.

13   Q.   Both asking for most current; right?

14   A.   Correct.

15   Q.   Now, how about the attendance records?  Is it normal to ask

16   for attendance records?

17   A.   Yes, it is.

18   Q.   How did you choose these attendance records to ask for?

19   A.   Those courses were the courses that our undercover agent

20   had enrolled in.

21   Q.   Who is that?

22   A.   Mr. Rajiv Batra, also known as Rajeev Bhatia.

23   Q.   Okay.  Bhatia being the agent's name?

24   A.   Bhatia is the agent's name.

25   Q.   All right.  And did you hand this to her at that time?

1       A.   Agent Mackey did.

2       Q.   And do you see a signature here at the bottom under

3       "Designated School Official"?

4       A.   Yes, I do.

5       Q.   What is the name?

6       A.   The name is Susan Su.

7       Q.   And the date?

8       A.   2/1/2010 -- 12/1/2010.  Excuse me.

9       Q.   12/1?

10      A.   Correct.

11      Q.   And the title written in here?

12      A.   "President."

13      Q.   Did you see her sign this?

14      A.   I did.

15      Q.   Did she respond to your request for evidence?

16      A.   She did.

17           (Government's Exhibit 208D marked for identification.)

18      BY MS. WEST:

19      Q.   I am now going to show you what is marked as Government

20      Exhibit 208D as in "Dog."

21           Is that the response that you received from Dr. Su?

22      A.   It is.

23              MS. WEST:  The Government offers Exhibit 208D in

24      evidence.

25              MR. BABCOCK:  No objection, your Honor.

1          THE COURT:  208D is admitted.

2          MS. WEST:  Thank you.

3          (Government's Exhibit 208D received in evidence.)

4     BY MS. WEST:

5     Q.  I'm going to show you Page 1 of that.

6          What is this?

7     A.  That's the FedEx bill that came affixed to the mail she

8     sent us.

9     Q.  It's rather faint there, but can you see that it's from

10    Susan Su, Tri-Valley University?

11    A.  Yes, I can.

12    Q.  Well, while we're at it -- and it's to Mr. Jason Mackey?

13    A.  Correct.

14    Q.  Immigration Customs Enforcement?

15    A.  Yes.

16    Q.  Did you get everything you asked for?

17    A.  Yes, we did.

18    Q.  Let's take a look at Page 2.

19         All right.  Is this one of the attendance sheets you had

20    requested?

21    A.  Yes, it is.

22    Q.  And for the course there in the middle, it says, "Course

23    Name:  International Marketing"?

24    A.  Yes.

25    Q.  And do you see the students' names down on the left?

1    A.   I do.

2    Q.   Did you review this when you got it?

3    A.   Yes, I did.

4    Q.   And did it contain the name Rajiv Batra?

5    A.   No, it did not.

6    Q.   Let's look at Page 3.

7         This is attendance records for Course Name BA353 -- I'm

8    sorry -- 353.  Do you see that?

9    A.   Yes, I can.

10   Q.   Did you look through these student names?

11   A.   Yes, I did.

12   Q.   Did they contain the name Rajiv Batra?

13   A.   No, they do not.

14   Q.   Now, to be clear, you didn't ask Dr. Su for anything -- you

15   didn't mention Rajiv Batra's name to her; right?

16   A.   No.

17   Q.   You just asked for the classes that you knew he had been

18   enrolled in?

19   A.   Correct.

20   Q.   All right.  Let's look at Page 4.  "Course Name:  Business

21   Communication."

22        Do you see that?

23   A.   Yes, I do.

24   Q.   Did you review the student names listed down the side?

25   A.   I did.

TAYLOR - DIRECT / WEST

1    Q.  Did you see the name Rajiv Batra?

2    A.  No, I did not.

3    Q.  All right.  Now, you also asked for the instructional staff

4    listing; right?

5    A.  Yes, I did.

6    Q.  And this is Page 6 that we're looking at.

7         You asked for a current one?

8    A.  Correct.

9    Q.  Do you see "Date Form Completed:  December 1st, 2010"?

10   A.  Yes.

11   Q.  Okay.  But it represented that -- when you asked for the

12   most current one, that this would be the most current?

13   A.  Correct.

14   Q.  All right.  I'm looking on the left column under the

15   instructors' names.  Do you see -- I'll zoom in a little

16   there -- A. Miller Allen?

17   A.  I do.

18   Q.  Did you -- let's go to Page 7.

19        Do you see last name Jing, J-i-n-g?  First name is spelled

20   C-h-i?

21   A.  Yes, I do.

22   Q.  From Carnegie-Mellon?

23   A.  Correct.

24   Q.  And -- there we go.  Do you see Hao Luo?

25   A.  Yes, I do.

TAYLOR - DIRECT / WEST

1    Q.   Or L-u-o?

2    A.   Yes.

3    Q.   Also Carnegie-Mellon?

4    A.   Yes.

5    Q.   As well as a bunch of other instructors; right?

6    A.   Yes.

7    Q.   Did you also receive a course catalog?

8    A.   Yes, we did.

9    Q.   And we won't look through all of that, I'm sure the jury

10   will be glad to hear, but just to show it -- there we go.

11        Agent Taylor, were you involved in any other operations in

12   early 2011?

13   A.   Yes, I was.

14   Q.   Was that January 7th, 2011?

15   A.   Yes, I was.

16   Q.   Can you please tell the jury very generally about that.

17   A.   Yes.  We had another agent who we work with contact

18   Tri-Valley and request documents for the students Rajiv Batra

19   and Mohammad Rizwan.

20   Q.   And who was that agent?

21   A.   That agent was David Ramirez.

22   Q.   Okay.  And did he make a call?

23   A.   Yes, he did.

24   Q.   Was that recorded?

25   A.   I believe so.

1    Q.   What was your role in this?

2    A.   I assisted in directing the -- Agent Ramirez, provided him

3    details of what he would be saying, what he would be asking

4    for, and I monitored the call.

5    Q.   And was any other agent then sent in person to Tri-Valley

6    on January 7th, 2011?

7    A.   Yes.

8    Q.   Who was that?

9    A.   That was agent Dylan Critten.

10   Q.   And after the call by Agent Ramirez, did you receive any

11   documents from Tri-Valley University?

12   A.   Agent Ramirez did receive some, and Special Agent Critten

13   provided some as well.

14   Q.   Okay.  Those documents that Agent Ramirez obtained -- did

15   he provide them to you and Agent Mackey?

16   A.   Yes, he did.

17   Q.   Okay.  And did Agent Critten provide documents to you and

18   Agent Mackey?

19   A.   Yes, he did.

20   Q.   Now, was that a ruse-type operation as well?

21   A.   The phone call was a ruse.  Agent Critten had went under

22   his actual identity.

23   Q.   What about the phone call was a ruse?

24   A.   We had Agent Ramirez tell Ms. Su that he was an inspector

25   of JFK, similar to the phone calls that we had previously.  He

1    had requested information.  She had provided it.  We -- at some

2    point, we told her that there was a problem with the network,

3    and it wasn't getting through, and we had Agent Critten enter

4    Tri-Valley and request the documents in person.

5    Q.   Can you tell us again, please -- I think you already said

6    it, but who were the students who these documents were

7    requested for?

8    A.   Rajiv Batra and Mohammad Rizwan.

9    Q.   Now, Rajiv Batra is the undercover name that was used by

10   Agent Bhatia?

11   A.   Yes, it is.

12   Q.   And Mohammad Rizwan was the name of a student who had not

13   actually enrolled in the university; is that right?  How was --

14   how was Mohammad Rizwan involved?

15   A.   Mohammad Rizwan was the one we had enrolled in previously.

16   Q.   Okay.  Through Mr. Dirisanala?

17   A.   Yes.

18   Q.   Okay.  That's all I have.  Thank you.

19   A.   Thank you.

20        THE COURT:  Cross-examination?

21                    **CROSS-EXAMINATION**

22   BY MR. BABCOCK:

23   Q.   So -- good afternoon, Agent Taylor.

24   A.   Good afternoon.

25   Q.   You had -- you were involved in a rather, fair to say,

1    lengthy investigation of Dr. Su?

2    A.   Yes, sir.

3    Q.   The first -- your first undercover -- not "undercover."

4    The first time that you used Anji Reddy Dirisanala to go to

5    Tri-Valley University was in June 2010?

6    A.   Yes.  That's right.  Yes, that's correct.

7    Q.   Is that right?

8         And the last time Mr. Dirisanala went to Tri-Valley

9    University when he was all wired up and the like was when?

10   A.   August 31st.

11   Q.   August 31st?

12   A.   2010.

13   Q.   And he went to Tri-Valley University wearing a wire on how

14   many occasions?

15   A.   All occasions, he was wired up.

16   Q.   And how many occasions was that?

17   A.   I believe four.

18   Q.   Okay.  And then you were involved in making some phone

19   calls to Tri-Valley University and speaking with Dr. Su?

20   A.   Yes.

21   Q.   And you made a total of how many calls to Dr. Su?

22   A.   I personally placed two calls.

23   Q.   Okay.  Then you were also involved in this so-called site

24   inspection on -- was that December 1st --

25   A.   Yes, it was.

TAYLOR - CROSS / BABCOCK

1    Q.   -- of 2010?

2         That was you and Agent Mackey?

3    A.   Correct.

4    Q.   And then finally, you also participated not directly but

5    monitored at least calls that were made from Agent Ramirez on

6    January 7th, 2011 --

7    A.   Yes.

8    Q.   -- is that right?

9    A.   Yes.

10   Q.   And so a total of four -- four visits by Dirisanala, two

11   phone calls from you, actually one undercover operation by an

12   agent --

13   A.   Correct.

14   Q.   -- right?

15        One site visit by you and Agent Mackey and another phone

16   call from Agent Ramirez?

17   A.   Correct.

18   Q.   Okay.  Were there any other ruse or undercover efforts made

19   to -- directed to Dr. Su that you were --

20   A.   Not that I recall.

21   Q.   -- that you were involved in?

22   A.   No.

23   Q.   Okay.  And you were also involved in the -- were you

24   involved in the -- on January 19th when the school and Dr. Su's

25   home and the like were searched?

1    A.   Yes, sir, I was.

2    Q.   And she was interviewed then as well?

3    A.   Yes.

4    Q.   Were you present for that interview?

5    A.   Yes, sir, I was.

6    Q.   Okay.  You and Agent Mackey?

7    A.   Correct.

8    Q.   You mentioned at the beginning of your testimony that you

9    were the co-case agent; right?

10   A.   Correct.

11   Q.   In other words, you haven't been sitting -- you haven't

12   been forced to sit through every day here at this table with

13   the Assistant U.S. Attorneys, but you are equally in charge of

14   this case along with Agent Mackey.  Is that fair to say?

15   A.   That's fair to say.

16   Q.   Okay.  The first time that Mr. Dirisanala went to

17   Tri-Valley University was -- remind me -- remind me what

18   date -- it was June, I know.

19   A.   June 3rd, 2010.

20   Q.   June 3rd.

21       Okay.  And his instructions were to try to register two

22   people.  I say "people" in quotes because those people weren't

23   real people at least so far as you know --

24   A.   No, sir.

25   Q.   -- right?

1    A.   Correct.

2    Q.   They were just two names with addresses and other

3    information that you had provided to Dirisanala?

4    A.   That is correct.

5    Q.   With instructions to go into the school and have them

6    registered --

7    A.   Yes.

8    Q.   -- right?

9         And the two names that you gave Mr. Dirisanala were --

10   A.   Sparsh Prashant Agrawat and Kadir Dirikan.

11   Q.   Agrawat and Dirikan.

12        And Mr. Dirisanala was wearing a wire during this -- during

13   this event; right?

14   A.   Yes, he was.

15   Q.   And you were, I guess, parked out in your car across the

16   street somewhere?

17   A.   In the parking lot outside the office, yes.

18   Q.   And you were able to hear when he went in?

19   A.   Yes.

20   Q.   And this -- on this occasion, as I understand it, his --

21   his instructions were to say that these two -- these -- I

22   assume they were men.  I don't even know.  Are they supposed to

23   be men?

24   A.   Yes.

25   Q.   Okay.  That these two gentlemen had been going to school

1    back east but were no longer going to school?

2    A.   Correct.

3    Q.   And that they wanted to enroll in TVU and get new I-20's?

4    A.   Yes.

5    Q.   Okay.  Ms. -- Dr. Su -- when Mr. Dirisanala went into the

6    school -- I assume when you're sitting out in your car, you

7    cannot actually see inside the school?

8    A.   No, sir, I could not.

9    Q.   Those windows -- not "windows."

10        Yeah.  I'm not going to put the whole thing up, but at

11   least on the photograph, the -- on Exhibits 400, 401 and 403,

12   it looks like there are shades on all the pertinent windows; is

13   that right?

14   A.   Actually, sir, on the date on question, that was not the

15   campus.

16   Q.   Okay.  That's right.  It was on a different campus?

17   A.   Yes.

18   Q.   The -- we don't have a picture of that one.  The -- the

19   windows on the first campus was at Pleasanton Unified?

20   A.   Yes, sir.

21   Q.   So you were not able to see inside the school from where

22   you were parked?

23   A.   No, I was not.

24   Q.   Okay.  So you were just -- you were just relying on the

25   recording as well as what Mr. Dirisanala reported to you?

TAYLOR - CROSS / BABCOCK

1    A.   Correct.

2    Q.   Okay.  You were able to overhear Dirisanala speaking with

3    Dr. Su at some point; right?

4    A.   Yes, I was.

5    Q.   And said that he had these two students back east that

6    wanted to transfer to Tri-Valley University?

7    A.   Yes, sir.

8    Q.   All right.  And at some point, Dr. Su referred Dirisanala

9    to a staff member to do the legwork --

10   A.   Correct.

11   Q.   -- is that right?

12   A.   Yes.

13   Q.   Do you know which staff member that was?

14   A.   Yes.  That was Mr. Vishal Dasa.

15   Q.   Vishal Dasa.  That's right.

16        And Dirisanala gave the information -- dealt directly with

17   Vishal Dasa as far as you're aware.  I know you weren't

18   present, but from the sound of it -- did it sound as if Mr. --

19   Mr. Dirisanala was dealing directly with Mr. Dasa to get the --

20   get the paperwork done?

21   A.   It did.  Part of the conversation was in another language

22   that I was not familiar with.

23   Q.   That's right.  I believe you said it was Hindi.

24   A.   Yes, I believe so.  Could be -- that conversation that I

25   think we referred to as Hindi was between Mr. Batra and

1    Mr. Dasa.  I don't know if Mr. Dasa speaks another language or

2    if Mr. Dirisanala -- I don't know what language he speaks as

3    well --

4    Q.  Okay.

5    A.  -- but it was a foreign language to me.

6    Q.  Did you have it -- did you have a -- have it translated at

7    some point, or did you just rely on what Mr. Dirisanala told

8    you happened?

9    A.  I don't know if we had it translated.

10   Q.  Okay.  At some point -- now, did Mr. Dirisanala have money

11   with him on this first time?

12   A.  No, he did not.

13   Q.  So he was able to get some students registered at TVU

14   without making a payment up front?

15   A.  They weren't registered.

16   Q.  Okay.  Actually, do you remember hearing Dr. Su say that

17   they needed to be registered at the school?

18   A.  I don't recall that specific language, no.

19   Q.  Okay.  Let me see if I can refresh your recollection.

20       May I show you something to see if that will refresh your

21   recollection?  This is the transcript.

22   A.  Okay.  Okay.

23   Q.  Does that refresh your recollection?

24   A.  Yes.  It appears that she asked him to register at classes.

25   Q.  "She" -- "she" being Dr. Su --

1    A.   Correct.

2    Q.   -- right?

3         So we don't have an exact verbatim transcript of what --

4    Mr. Dirisanala's discussions with Mr. Dasa; is that right?

5    A.   You prepared that transcript.  I did not see that at the

6    time.

7    Q.   Okay.

8    A.   I can't tell you if that's verbatim or not.

9    Q.   Fair enough.

10        When Mr. Dirisanala came out -- I think you -- was it his

11   first visit?  Did he just go into the school once, or did he go

12   into it twice?

13   A.   He went in one time.

14   Q.   Okay.  It was a subsequent visit where he came out and had

15   to go back in?

16   A.   Yes.

17   Q.   Because at the next visit, he went back with -- he had some

18   money?

19   A.   Correct.

20   Q.   And was it a thousand dollars?

21   A.   It was $2,000.

22   Q.   That's right.  It was $2,000.

23        And at that point, his instructions were -- had the -- had

24   the students been registered at that point, the purported

25   students?

1    A.   They had not.

2    Q.   Okay.  Had they been issued I-20's?

3    A.   They had been issued initial I-20's.

4    Q.   Okay.  And that happened how soon after Mr. Dirisanala's

5    first visit?

6    A.   The first -- excuse me.  The first visit took place on

7    June 3rd.  The second visit was July 27th.

8    Q.   Okay.  And do you recall off the top of your head -- so I

9    don't have to scrap through all my papers here -- when the

10   I-20's were issued?

11   A.   The deactive I-20's?

12   Q.   The initial I-20's.

13   A.   The initial I-20's were issued June 3rd.

14   Q.   Okay.  The same day?

15   A.   Yes.

16   Q.   And Mr. Dirisanala did not go back for over a month and a

17   half?

18   A.   Correct.

19   Q.   Until the end of July?

20   A.   Correct.

21   Q.   At which point, he went back to make a payment for the

22   students?

23   A.   Yes.

24   Q.   And once again, he was wearing a wire?

25   A.   Yes, he was.

TAYLOR - CROSS / BABCOCK

1    Q.   Was he wearing a video camera at this time?

2    A.   At that time, he did not have the video camera, no.

3    Q.   Okay.  So it was just an audio recording?

4    A.   He had the audio -- audio recording and the body wire.

5    Q.   Just as matter of curiosity -- so the body wire is

6    transmittal -- is transmitted live to whoever is listening on

7    your end; right?

8    A.   Yes, sir.

9    Q.   And the recording device just records what's happened so

10   you can hear it later?

11   A.   Yes, sir.

12   Q.   And presumably those two recordings match up?  They're --

13   they're --

14   A.   Well, one recording.  The first one is not recorded.  It's

15   just as if you were talking through --

16   Q.   I see.  I got it.

17   A.   -- a cell phone or walkie-talkie, something to that effect.

18   Q.   So the body wire is just live, but you can't actually play

19   it back until you get the recording device back from the

20   person?

21   A.   Correct.

22   Q.   Okay.  Now, the -- Mr. Dirisanala was able to make a

23   payment --

24   A.   Yes, he was.

25   Q.   -- right?

1    A.   Yes.

2    Q.   And subsequently, you had given him an e-mail account to be

3    used; right?

4    A.   Two e-mail accounts.

5    Q.   Two e-mail accounts, one for each purported student?

6    A.   Correct.

7    Q.   Just as a matter of curiosity, did you consider using --

8    Mr. Dirisanala was supposedly cc'ed on those e-mails, although

9    the e-mail that he used was not his personal e-mail.  It was a

10   different one; right?

11   A.   Initially, the e-mail was his e-mail, and then later on it

12   became a different e-mail address --

13   Q.   Okay.

14   A.   -- similar to his.  So it would appear the same but not his

15   e-mail address.

16   Q.   I gotcha.

17        So the second time that Mr. Dirisanala went back to TVU,

18   was this the occasion when Ms. Su appeared to get somewhat

19   angry with him?

20   A.   No.

21   Q.   Okay.  That was a later -- that was a later time?

22   A.   That was a later time.

23   Q.   Okay.  Mr. Dirisanala went in and was able to make a

24   payment?

25   A.   Yes, sir.

TAYLOR - CROSS / BABCOCK

1    Q.   Okay.  And this was -- I think you said July 27th?

2    A.   Yes, sir.

3    Q.   And you got the e-mails with -- with the registration

4    information and receipts the same day?

5    A.   No, sir.

6    Q.   Beginning of August?

7    A.   No, sir.

8    Q.   When would --

9    A.   The first one received for Kadir Dirikan was received

10   July 29th.

11   Q.   So two days later?

12   A.   Yes, sir.

13   Q.   And the second one?

14   A.   The second one was received, I believe, August 11th, 2010.

15   Q.   Do you have any notion why there was such a difference

16   between the two?

17   A.   Yes, I do.

18   Q.   Was it because of the payment arrangements?

19   A.   No, it was not.

20   Q.   What was -- what was the difference?

21   A.   The difference was the e-mail address was wrong when they

22   initially sent it to Mr. Agrawat.

23   Q.   I see.

24        Okay.  Now, the second time Mr. Dirisanala went back to TVU

25   at your request and was given the $2,000, this was in cash;

1    right?

2    A.   Yes, sir, it was.

3    Q.   Did -- were you able to hear who he gave the money to?

4    A.   As far as counting it out and giving it to somebody, he

5    came in and said, "I have a payment," and he was speaking to

6    Susan at the time.

7    Q.   Okay.  And who else did he speak to on that day?

8    A.   At that time, I believe just Ms. Su.

9    Q.   Okay.

10   A.   Actually, excuse me.  I'm sorry.  He did speak to somebody

11   else, but I couldn't make out who it was.

12   Q.   Okay.  Somebody that was not Dr. Su's voice?

13   A.   I couldn't tell you.  It was rather inaudible.  I don't

14   believe it was her.

15   Q.   Did you know Dr. -- did you recognize Dr. Su's voice --

16   A.   Yes, I recognized Dr. Su's voice.

17   Q.   -- at that time?

18       Now, the e-mails that -- these e-mails that you got back

19   with the registration information and receipts were from two

20   different Tri-Valley e-mails or just one?

21   A.   At this time, I couldn't recall.  If you'd like to refresh

22   my memory --

23   Q.   Do you recall there was a -- one e-mail, for example, being

24   on Exhibit 205B?

25   A.   This is the wrong one.

1    Q.   Yeah, I understand.  You got a -- you had got a number of

2    e-mails from TVU.

3         Let's use, for example, Mr. -- the receipt for Mr. Dirikan

4    from August 11th.

5    A.   This is -- this is a receipt for Mr. Dirikan from

6    August 11th.

7    Q.   Right.

8    A.   It's not from the July 29th payment.

9    Q.   Okay.  I understand.  It's -- my point being --

10   A.   Oh.  I'm sorry.

11   Q.   -- did you -- all the e-mails you received -- were they

12   always from this address?

13   A.   If you'd like me to look at them, I can look at them and

14   tell you.

15   Q.   Do you remember receiving any e-mail -- well, without going

16   through them all, do you remember receiving e-mails from any

17   accounts that did not begin "sus@trivalleyuniversity.org"?

18   A.   Yes, we did.

19   Q.   Do you recall what they were?

20   A.   I believe we received from ssu@trivalley.

21   Q.   Okay.  Fair enough.

22        Do you recall any others?

23   A.   Not off the top of my head, sir.

24   Q.   It's not a trick question.

25   A.   I don't.

1    Q.   I'm just -- they were all -- they were all

2    trivalleyuniversity.org e-mails, is my point.

3    A.   You mean -- you mean the domain?

4    Q.   Yes.

5    A.   Correct.

6    Q.   Okay.  And just as a -- we've seen several of these

7    receipts that you received for these purported students and the

8    payments that were made towards their registration.  All of

9    them reflected credit card payments; right?

10   A.   Yes, sir, I believe -- well, off the top of my head, I can

11   recall a few that did note a credit card payment.

12   Q.   Which was incorrect because the school was never paid by

13   credit card; right?

14   A.   No, it was never paid by a student credit card.

15   Q.   But it was paid either in cash or with money orders?

16   A.   Yes, sir.

17   Q.   But the amounts paid were accurate each time?

18   A.   Yes.

19   Q.   In other words, when $1,000 was paid, you received an

20   accurate $1,000 receipt --

21   A.   Yes.

22   Q.   -- right?

23        When you -- when you paid a different amount, you received

24   a receipt that accurately -- accurately reflected that amount?

25   A.   Yes.

1    Q.   Okay.  Now, was there a reason that there was such a gap

2    between the first time Dirisanala went to Tri-Valley University

3    and on June 3rd, 2010, until the second time, which wasn't

4    until late July?

5    A.   I can't remember a specific cause for there being a gap.

6    We may have had to get approval for something.  I don't recall

7    a specific reason.

8    Q.   All right.  Nothing stands out in your head?

9    A.   No, sir.

10   Q.   Actually, while I've got you up there, there's something

11   that I've been wanting to ask that I've not done yet.

12       The -- each foreign student who is active in SEVIS gets a

13   particular number; right?

14   A.   Yes, sir.

15   Q.   And is that number -- let me see if I can find one here.

16       That number shows up on the I-20; right?

17   A.   I believe it does.

18   Q.   For example, on Exhibit 204C, which is the -- one of the

19   I-20's for Rizwan Mohammad, if you can make that out -- here, I

20   can zoom in.

21   A.   I -- yeah, I can't --

22   Q.   Or I can give you the original, if you'd like.

23       Can you see that far?

24   A.   I can see that.  Thank you.

25   Q.   As I understand it, the SEVIS number for the student is

1    this number over on the upper right-hand?

2    A.   Yes, it is.

3    Q.   Where it's beneath -- where it says, "Student's Copy"?

4    A.   Correct.

5    Q.   And in this particular case, there's, like, an N000, and

6    then it's 7531828.  Is --

7    A.   That's correct.

8    Q.   Is that -- if you disregard the N and the zeroes, it would

9    be 7,531,828?

10   A.   That appears to be correct.

11   Q.   Does that reflect that there is up -- about seven and a

12   half million foreign students admitted to the country or issued

13   I-20's?

14   A.   Honestly, sir, I cannot tell you how they assign those

15   numbers.  I mean, I couldn't explain it.

16   Q.   Okay.  Now, you received -- some of these e-mails that you

17   received were just from the school with no -- with no name

18   attached; right?  For example, just as an example, in 203F,

19   which is the one from August 11th, 2010 -- do you remember this

20   one?

21   A.   Yes, sir.

22   Q.   It was a receipt for the $1,750 that was paid?

23   A.   Yes.

24   Q.   And it is from sus@trivalleyuniversity.org; right?

25   A.   Correct.

1119

TAYLOR - CROSS / BABCOCK

1    Q.  But it doesn't have anyone's -- anyone's name from

2    Tri-Valley affixed to it; right?

3    A.  Not that I can see, sir.

4    Q.  Okay.  Some of the e-mails did; right?

5    A.  Yes, they did.

6    Q.  For example, on Exhibit 205B, which is the e-mail from

7    September 7th, 2010, to the -- the Rajiv Batra address; right?

8    A.  Yes, sir.

9    Q.  And that one was signed by Vishal Dasa?

10   A.  Yes, sir.

11   Q.  I don't know if "signed" is -- not "signed," but his name

12   is affixed to it?

13   A.  Yes, sir.

14   Q.  And this was the same Vishal Dasa that Mr. Dirisanala dealt

15   with on June 3rd, 2010 --

16   A.  Yes.

17   Q.  -- right?

18   A.  Yes.

19   Q.  This -- the I-20 -- we've seen a lot of these over the last

20   week.  The I-20 is -- as I understand it, this document is

21   initially issued before a foreign student even comes to the

22   U.S. so that they can obtain an F-1 visa; right?

23   A.  Generally, yes.

24   Q.  And then typically they would probably also have a copy

25   when they flew into the country and arrived at the airport --

1    A.   Yes.

2    Q.   -- right?

3    A.   Yes.

4    Q.   But they would also need the F-1 visa at that point; right?

5    A.   Correct.  Correct.

6    Q.   They can't get into the country without a visa unless

7    you're from certain countries; right?

8    A.   Correct.

9    Q.   But the I-20 itself is not identification?

10   A.   No, I would not consider it identification.

11   Q.   In other words, the I-20 has a name and a date of birth as

12   well as some other information, but someone with -- someone

13   presenting themselves at the airport with a visa and an I-20 --

14   they would need some sort of valid identification to go along

15   with that, in other words, a passport; right?

16   A.   Yes, sir.

17   Q.   With the same name and the same date of birth; right?

18   A.   Correct.

19   Q.   This I-20 is not -- doesn't do anyone any good unless

20   there's a person that's identified in there and they have valid

21   ID to show that they're that person?

22   A.   It contributes to the legitimacy of the -- of the person

23   trying to enter.  If they say that they're a student and

24   they're traveling to the United States with an F-1 visa, they

25   should have an I-20 with them that matches that information.

1121

1  Q.  I understand, but somebody with an I-20 is never going to

2  get into the country unless they have valid ID as well as a

3  visa?

4  A.  I would hope not.

5        THE COURT:  Mr. Babcock, at any point in the next

6  five minutes, I'd like to break for the day.

7        MR. BABCOCK:  We can certainly stop on that point,

8  your Honor.

9        THE COURT:  All right.  That's what we'll do.

10     Members of the jury, thanks for your close attention today.

11  Tomorrow is Thursday, which means it's the last day of the week

12  that this trial will be in session.  Remember my prior

13  admonition not to discuss the case with anybody, even amongst

14  yourselves, until the case is submitted to you for

15  deliberation.

16     Have a restful evening.  We'll see you tomorrow evening at

17  8:30.

18        THE CLERK:  All rise.

19     (Proceedings were heard out of the presence of the jury:)

20        THE COURT:  All right.  We're outside the presence of

21  the jury.

22     Agent Taylor, I'll order you back in court tomorrow morning

23  at 8:30.

24     Is there anything that we need to put on the record?

25        MR. RHYNE:  One minor point, your Honor.

 1          We've reached another factual stipulation which will

 2    eliminate one more witness from the Government's witness list,

 3    namely the witness who would come in to testify about the

 4    location of the e-mail and website servers of Tri-Valley

 5    University, namely in Utah.

 6          So we've signed it, and we're ready to tender it to the

 7    Court if the court --

 8                THE COURT:  All right.

 9                MR. RHYNE:  -- courtroom deputy would like it.

10                THE COURT:  Would you just hand that to Mr. Noble,

11    and he'll hand it to me.

12                MR. RHYNE:  I'm sorry.  One more stip.  It should

13    help streamline things.

14                THE COURT:  And do you -- I have reviewed the

15    stipulation.  That's fine.

16          And so will the Government just be reading this at some

17    point during its case-in-chief?

18                MR. RHYNE:  Yes.  I think we'll try to read it after

19    Agent Taylor's testimony is complete.

20                THE COURT:  All right.  This is the original of the

21    parties' stipulation.  So let me hand that to Mr. Noble for

22    filing.

23          Anything else we need to put on the record?

24                MR. RHYNE:  No, your Honor.

25                MR. BABCOCK:  I don't think so.

1          THE COURT:  All right.  Thank you.

2          MR. RHYNE:  Thank you.

3          THE COURT:  The Court is in recess.

4     I'm going to stay at the bench, though, because somebody

5     just sent me a scheduling order, and I want to get it out in a

6     timely way.  So --

7          MR. RHYNE:  Thank you, your Honor.

8          THE COURT:  -- thank you.

9          THE CLERK:  Court is in recess.

10               (Proceedings adjourned at 1:33 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, James C. Pence, Federal Official Realtime Court

6     Reporter, in and for the United States District Court for the

7     Northern District of California, do hereby certify that

8     pursuant to Section 753, Title 28, United States Code that the

9     foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14

15                          Dated this 19th day of June, 2014.

16

17    _____

      JAMES C. PENCE, RMR, CRR, CSR NO. 13059
18    FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25