1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          BEFORE THE HONORABLE JON S. TIGAR

4   UNITED STATES OF AMERICA,      )
                                   ) Volume 7
5              Plaintiff,          ) Pages 1124 - 1332
                                   )
6        VS.                       ) NO. 11-00288 JST
                                   )
7   SUSAN XIAO-PING SU,            )
                                   ) San Francisco, California
8              Defendant.          ) Thursday, March 13, 2014
    _____) 8:31 a.m.

9

10          **TRANSCRIPT OF COURT PROCEEDINGS**

11
    **APPEARANCES:**

12

13   **For Plaintiff:**         MELINDA HAAG
                                UNITED STATES ATTORNEY
14                              1301 Clay Street, Suite 340S
                                Oakland, California 94612
15                     BY:  **HARTLEY M.K. WEST, ESQ.**
                            **WADE M. RHYNE, ESQ.**
16                          **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**        Law Offices of Erik G. Babcock
18                             717 Washington Street, Second Floor
                               Oakland, California 94607
19                    BY:  **ERIK G. BABCOCK, ESQ.**
                           **ATTORNEY AT LAW**

20

21

22

23

24
     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                 Official Court Reporter - U.S. District Court
                   Computerized Transcription By Case CATalyst

<u>**I N D E X**</u>

Thursday, March 13, 2014 - Volume 7

<u>**GOVERNMENT'S WITNESSES**</u>                                    <u>PAGE</u> <u>VOL.</u>

<u>**TAYLOR, DALE  (RECALLED)**</u>
(PREVIOUSLY SWORN)                                          1128  7
Cross-Examination (Resumed) by Mr. Babcock                  1128  7
Redirect Examination by Ms. West                           1142  7
Recross-Examination by Mr. Babcock                         1144  7

<u>**DIRISANALA, ANJI REDDY**</u>
(SWORN)                                                     1145  7
Direct Examination by Ms. West                             1146  7
Cross-Examination by Mr. Babcock                           1248  7
Redirect Examination by Ms. West                           1304  7

<u>**BHATIA, RAJEEV**</u>
(SWORN)                                                     1307  7
Direct Examination by Ms. West                             1308  7
Cross-Examination by Mr. Babcock                           1326  7

<u>**E X H I B I T S**</u>

<u>**GOVERNMENT'S EXHIBITS**</u>                        <u>IDEN</u> <u>EVID</u> <u>VOL.</u>

  86                                             1314 1315  7

```
1    Thursday, March 13, 2014                          8:31 a.m.

2                        ---oOo---

3         (Proceedings were heard out of the presence of the jury:)

4             THE COURT:  So we're outside the presence of the

5    jury.

6         Before we bring the jurors in, I wanted to ask the

7    Government to submit their -- I understand the jury

8    instructions were jointly proposed, but I think they're in the

9    Government computer somewhere.  That's what it looks like.  If

10   those can be submitted in Microsoft Word format, that would be

11   great.  I'd like to put them into the format that I typically

12   use.

13        We have not heard anything from the defendant about

14   witnesses or documents, and so it seems possible to me that the

15   jury could have this case when the Government finishes, as I

16   understand it.  I might have heard next week.

17            MR. RHYNE:  I believe that's correct, your Honor.

18            THE COURT:  So I think just to do a little trial

19   management, I should get to the jury instructions in order.

20            MR. BABCOCK:  Good idea.

21            THE COURT:  Is there any -- do counsel think there's

22   a value in having a jury instruction conference -- well, let me

23   put it this way.  Let me ask you to please take a look at the

24   jury instructions and just advise me on Monday morning before

25   we get going whether we should have a jury instruction
```

1    conference or whether anybody's making any --

2           MR. BABCOCK:  Right.

3           THE COURT:  -- last-minute requests on jury

4    instructions.

5           MR. BABCOCK:  Fair enough.

6           THE COURT:  Has the Government submitted a proposed

7    form of verdict also?

8           MS. WEST:  We did, although I think that we may tweak

9    that a little bit, and there was one jury instruction that we

10   were going to sort of reorganize because it was pretty awkward,

11   we thought, when we submitted it.  We've gotten some ideas that

12   we think will streamline that one particular instruction, too.

13          THE COURT:  Okay.  And obviously, counsel need to

14   meet and confer regarding the instruction before it's given to

15   the Court.

16          MS. WEST:  Yes.

17          THE COURT:  Will the Government be proceeding on all

18   of the counts in the indictment?

19          MR. RHYNE:  I think there will be three of the

20   money-laundering counts that we'll likely be dismissing.

21          THE COURT:  Okay.

22          MR. RHYNE:  I don't know which numbers they are.

23   They're not the last three, though.  So in our presentation, we

24   didn't renumber the counts.  So there may be a small gap in

25   there.

1    THE COURT:  All these matters go together.  So we --

2    when we reconvene on Monday morning, the parties should just

3    suggest a sensible time for all of us to get together and

4    discuss whether the Government will be dismissing any of the

5    counts in the indictment and these other matters.

6    Anything else we should talk about before the jury comes

7    in?

8    MR. RHYNE:  I don't believe so.

9    MR. BABCOCK:  I think we're good.

10    THE COURT:  All right.  Thank you.

11    MR. RHYNE:  Thank you, your Honor.

12    (Proceedings were heard in the presence of the jury:)

13    THE COURT:  Good morning.

14    All the jurors are in their assigned seats.  Agent Taylor

15    is on the stand.

16    Sir, I'll just remind you you're still under oath.

17    I believe that it is the cross-examination of this witness.

18    Mr. Babcock?

19    MR. BABCOCK:  Thank you, your Honor.

20    **DALE TAYLOR,**

21    Called as a witness by the Government, having previously been

22    sworn, resumed the stand and testified further as follows:

23    **CROSS-EXAMINATION (RESUMED)**

24    BY MR. BABCOCK:

25    Q.  Good morning, Agent Taylor.

1    A.   Good morning, sir.

2    Q.   So when we left off yesterday, I think I was asking you

3    about these I-20's and how they can be used, if at all, and we

4    talked about how it's not a -- it's not an identification per

5    se; right?

6    A.   I would say not.

7    Q.   It needs to be -- it doesn't get -- by itself, it

8    doesn't -- would not get a foreign student into the country;

9    right?

10   A.   On its -- alone, I would think not, no.

11   Q.   I would certainly think not.

12        You've worked at the airport?

13   A.   I've been to the airport.  I don't work there, no.

14   Q.   Okay.  But you're familiar with generally how the process

15   is supposed to work?

16   A.   Yes, sir.

17   Q.   As far as foreign nationals coming into the United States

18   and what kinds of documents are required for them to be

19   admitted to the United States; right?

20   A.   Correct.

21   Q.   And they need a passport for starters; right?

22   A.   Yes.

23   Q.   And if they're coming in on an F-1 visa, the pass -- the

24   person identified in the passport has to match the person

25   that's identified in the visa; right?

1    A.    Yes.

2    Q.    Okay.  So the I-20, for example, for Agrawat -- who was not

3    a real person; right?

4    A.    Correct.

5    Q.    There may be a real person named Agrawat somewhere, but

6    when you guys picked these names, that's not -- you didn't have

7    anyone in particular in mind; right?

8    A.    Correct.

9    Q.    So for example, the I-20 in 2 -- Exhibit 200B for Sparsh

10   Prashant Agrawat -- the screen looks different today.  So this

11   document would be of no use to anybody unless there is a

12   gentleman named Sparsh Prashant Agrawat whose date of birth is

13   May 11th, 1988, and has a valid passport to prove that, and it

14   would be of no use as far as getting into the country; right?

15   A.    That would be correct.

16   Q.    Okay.  Are there documents as a matter of curiosity besides

17   a passport -- other forms of identification that a foreign

18   national could be presented at the airport as valid

19   identification?

20   A.    It can be contributing information.  I wouldn't consider it

21   information that would allow them admittance into the United

22   States.  If there's question -- a question as to their identity

23   and they had additional documentation on their person that

24   contributed to that factor -- in this case, the I-20 -- then

25   it's -- like I said, it was contributing information.

1   Q.  I understand, but if they didn't have a passport, can you

2   get into the country without a passport?

3   A.  No.

4   Q.  Okay.  I'd like to jump ahead a little bit.

5       You mentioned you and Jason -- Agent Mackey went to

6   Tri-Valley University on December 1st, I believe, 2010?

7   A.  Yes, sir.

8   Q.  To do a -- a site visit?

9   A.  Yes, sir.

10  Q.  You called ahead of time -- was it, I think, the day

11  before?

12  A.  That's correct.

13  Q.  Said you were in the area.  You wanted to come by and do a

14  site visit; right?

15  A.  Correct.

16  Q.  Do you know if Tri-Valley University had had other site

17  visits during its existence?  Did you check into that at all?

18  A.  The only one I'm aware of is the initial one that was

19  conducted.

20  Q.  Back in 2008?

21  A.  Correct.

22  Q.  Okay.  You -- I think you said you had gone along on these

23  SEVIS site visits before.

24  A.  Correct, sir.

25  Q.  It -- your office works in conjunction with the -- what is

1    it called again, the Student Exchange Visitor Information

2    Program or something?

3    A.   The database is called SEVIS, but the program is called

4    SEVP, Student Exchange Visitor Program.

5    Q.   Right.  You work in conjunction with the people from that

6    office?

7    A.   Yes.

8    Q.   And they sometimes take you along on their site visits?

9    A.   Yes.

10   Q.   These visits happen at all schools where foreign nationals

11   are going to -- are being educated?

12   A.   They can happen at any school that's approved by SEVP.

13   Q.   Okay.  Have you -- so you've attended these site visits at

14   other universities?

15   A.   Yes, sir.

16   Q.   Okay.  Always private universities?

17   A.   The ones that we attended, yes.

18   Q.   Have you ever done any of the site -- site visits at a high

19   school?

20   A.   No.

21   Q.   Or a community college?

22   A.   No.

23   Q.   How about a public university?

24   A.   Not that I recall, no.

25   Q.   Okay.  You and Agent Mackey introduced yourselves.  You

1    used a different name; right?

2    A.   Yes, sir.

3    Q.   Agent Mackey used his real name to Dr. Su on December 1st,

4    2010, and she gave you a little tour around the school; right?

5    A.   Correct.

6    Q.   And you asked her a series of questions; right?

7    A.   Yes, sir.

8    Q.   Some of which were sort of like going through

9    checklist-type questions?

10   A.   A questionnaire, yes.

11   Q.   And you asked her at some point what percentage of her

12   student body was -- were F-1 students?

13   A.   That's correct.

14   Q.   And I think you said yesterday -- correct me if I'm

15   wrong -- that she -- that she said it was about 80 -- she said

16   it was -- 80 percent of her student body were F-1 -- F-1

17   students --

18   A.   Yes, sir.

19   Q.   -- is that right?

20   A.   That's correct.

21   Q.   Isn't it true that she actually -- well, she wasn't -- when

22   you asked her this question, did she immediately jump on the

23   computer and look up any documents, do some sort of research on

24   it?

25   A.   No, I don't recall that.

1    Q.  You were just sitting across the desk from her, having a

2    conversation; right?

3    A.  Yes, sir.

4    Q.  Wasn't it clear she was sort of estimating or ballparking

5    it?

6    A.  Could have been a ballpark.

7    Q.  Actually, what she said was she said 80, 90 -- 80 percent,

8    something like that?

9    A.  If those were her exact words, then yes.

10   Q.  Do you remember that?

11   A.  I don't remember it verbatim, no.

12   Q.  Okay.  I'm going to see if I can refresh your recollection.

13   A.  Sure.

14   Q.  This is 20 -- 208A.

15       Does that refresh your recollection, Agent Taylor?

16   A.  Yes, sir.

17   Q.  Isn't it true that she told you 80, 90 percent?

18   A.  Yes.

19   Q.  She used both those figures?

20   A.  Correct.

21   Q.  And you also mentioned that she gave some sort of confusing

22   response when you were -- you had this discussion with her

23   about how many applications there were and how many people were

24   admitted?

25   A.  Yes.

1    Q.   Do you remember that?

2    A.   Yes, sir.

3    Q.   And she seemed to say -- or she did say -- you asked her

4    how many applications she received for the current semester,

5    and she said, "Probably a thousand"?

6    A.   That sounds correct.

7    Q.   And -- and I forget exactly what you said yesterday, and

8    then she said something about "We give I-20's to, like, ten or

9    15"?

10   A.   Would you like me to recount what I said or recount it?

11   Q.   Sure.

12   A.   I believe that the subject was Agent Mackey asked her how

13   many students had enrolled for the current semester, and she

14   said a thousand.  Agent Mackey seemed to be taken aback at that

15   number, and she began to backpedal on it and say maybe 800.

16   She would later say that out of all the students that applied

17   don't get visas -- out of a hundred, they only give ten, 15

18   visas to F-1 students, a hundred applications.

19   Q.   Well, she actually said right after that that there were

20   1500 active students.  Do you remember that?

21   A.   It sounds familiar.

22   Q.   Active as in active F-1 students?

23   A.   Yes.

24   Q.   Do you remember her saying that?

25   A.   It sounds familiar, yes.

1    Q.   It's -- that's okay.  I'm referring to --

2    A.   She said it at one point.  I'm just not sure if it was

3    during that line of questioning.

4    Q.   I'm referring you again to Exhibit 208A.

5            MS. WEST:  Your Honor, the witness hasn't stated that

6    he didn't remember.

7            MR. BABCOCK:  Well, he said he didn't remember when

8    she said that, the point being that she said it right after

9    that.

10           THE COURT:  To the extent that -- I don't think

11   there's a foundation we've heard to refresh his recollection --

12           MR. BABCOCK:  Okay.

13           THE COURT:  -- if that's the objection.

14   BY MR. BABCOCK:

15   Q.   Do you remember, Agent Taylor -- you were having this

16   conversation with Ms. Su about how many -- started out with how

17   many applications the student -- I'm sorry -- how many

18   applications the school received; right?

19   A.   Yes, I do.

20   Q.   And she estimated probably a thousand; right?

21   A.   Correct.

22   Q.   At which point, Agent Mackey said, "Wow"?

23   A.   Something to that effect.

24   Q.   Do you remember that?

25   A.   Yes.

1    Q.   Then Ms. Su said, "Maybe 800, but not everybody gets a

2    visa, you know" --

3    A.   That sounds correct.

4    Q.   -- right?

5         And then she gave this -- which seemed to be sort of a

6    confusing figure -- "we give I-20's, like, a hundred -- only,

7    like, ten, 15"?

8    A.   Right.

9    Q.   Which -- those numbers didn't appear to make any real sense

10   at all, did they?

11   A.   Correct.

12   Q.   Given the context of what you were discussing?

13   A.   Yes.

14   Q.   Isn't it true that -- and it looks like you then asked her,

15   "Out of a thousand, only 100 got to come to the school?"  Do

16   you remember that?

17   A.   Yes.

18   Q.   Do you remember what her response was?

19   A.   Not off the top of my head, no.

20        MR. BABCOCK:  Okay.  May I refresh his recollection,

21   your Honor?

22        THE COURT:  Yes.

23   BY MR. BABCOCK:

24   Q.   If you'd look at the top of Page 24.

25   A.   This one?

1   Q.   Yeah.

2   A.   Okay.

3   Q.   Does that refresh your recollection?

4   A.   The conversation, yes.

5   Q.   Isn't it true that when you asked her -- you asked her,

6   "Out of a thousand, only 100 got to come to the school"; right?

7   A.   Right.

8   Q.   And her response was "We have a record total -- 3,500 about

9   but only 1,500 active"; right?

10  A.   Correct.

11  Q.   And "active" is sort of a term of art, as I understand it,

12  for an F-1 student; right?

13  A.   No.  I take that to mean that there's SEVIS records

14  activated.  You can have a number of --

15  Q.   Okay.

16  A.   -- individuals in initial status.  You can have 10,000

17  students in initial status but only 100 active.

18  Q.   Okay.  So "active status" being students who had been

19  activated whose -- whose I-20 had been activated through the

20  school?

21  A.   Who were considered active students, correct.

22  Q.   Right.  So about 1,500 active students?

23  A.   Yes.

24  Q.   You or your colleague later did some sort of analysis of

25  how many students were active -- were enrolled at the school;

1    right?

2    A.   I believe so.

3    Q.   And do you remember roughly what that figure was?

4    A.   Off the top of my head, I believe it being around 1700

5    active.  I could be wrong, give or take.

6    Q.   Okay.  So it was -- it was certainly in the ballpark of a

7    thousand-500, not exactly but somewhere in that neighborhood.

8    Is that fair to say?

9    A.   In the ballpark, yes.

10   Q.   Okay.  She also told you that the school had been growing a

11   lot.  Do you remember that?

12   A.   I believe she did say that.

13   Q.   Getting back -- before I let you off the hook here

14   entirely, I'll just do a little follow-up on the visits that

15   you arranged or supervised with Anji Reddy Dirisanala at

16   Tri-Valley University.

17        There were four visits; right?

18   A.   Yes, sir.

19   Q.   Just to remind the jury, the first one on June 3rd, the

20   second one on July 27th, I believe?

21   A.   Those are correct.

22   Q.   Then August 11th and August 31st?

23   A.   Yes, sir.

24   Q.   And at the June 3rd -- the June 3rd visit, you gave

25   Mr. Reddy -- or Mr. -- do you know -- does he prefer to go by

1    Reddy or Dirisanala?

2    A.   We referred to him as Anji Dirisanala.

3    Q.   Okay.  Mr. Dirisanala was given a couple names and told to

4    go in and see if he could get I-20's --

5    A.   Correct.

6    Q.   -- basically?

7    A.   To enroll the students.

8    Q.   To -- was it to enroll the students the first time?

9    A.   At that time, he was seeking admission for the students.

10   Q.   Okay.  And do you recall that -- and Mr. -- you were able

11   to hear on it the -- on the -- over the body wire to hear Mr.

12   Dirisanala's conversation with Dr. Su; right?

13   A.   Yes, sir.

14   Q.   And isn't it true that he never -- Mr. Dirisanala never

15   told Dr. Su the names of the prospective students he wanted to

16   enroll?

17   A.   That's correct.

18   Q.   Okay.  And actually, I think he said -- he used the word,

19   quote, "friend," unquote, that he wanted to enroll.  Do you

20   remember that?

21   A.   Yes.

22   Q.   Okay.  And he also never told her that he didn't have

23   copies of any documentation for them.  Do you remember that?  I

24   don't need you to guess.  We can --

25   A.   I don't think he told her that he had documentation.

1    Q.   He didn't say -- he didn't go in and say, "All I have is

2    their names."  He says, "I have" -- "I have a friend that I'd

3    like to" -- I'm not quoting here but the gist being "I have a

4    friend that I would like to enroll in TVU"; right?

5    A.   During this visit, he did not say that he had anything more

6    than the names.  In the subsequent visit, he said, "All I have

7    is names, dates of birth."

8    Q.   I understand, but the first time he didn't -- first off, he

9    didn't tell her any names; right?

10   A.   No.

11   Q.   And he didn't tell her that he didn't have any of the

12   relevant documentation?

13   A.   Correct.

14   Q.   Okay.  And then she referred him to Vishal Dasa to do the

15   legwork, so to speak.  Is that fair to say?

16   A.   Yes.

17   Q.   Okay.  You mentioned that in a subsequent visit he did say

18   that he didn't have any documentation.  You were referring to

19   the July 27th visit?

20   A.   I believe that's correct.

21   Q.   Okay.  And during that visit, Mr. Dirisanala had a much

22   longer conversation with Dr. Su than he did during the first

23   visit.  Do you remember that?

24   A.   Yes.

25   Q.   Do you remember when Mr. Dirisanala told Dr. Su that he

1    didn't have the documentation for these students what her

2    response was?

3    A.   I don't recall exactly, no.

4    Q.   Would it refresh your recollection to look at the

5    transcript of that --

6    A.   Yes.

7    Q.   -- of that conversation?

8         That's 201A, Page 13.

9    A.   Okay.

10   Q.   Does that refresh your recollection, sir?

11   A.   Yes, sir.

12   Q.   What was her response?

13   A.   She said she needed the documents.

14        MR. BABCOCK:   Thank you.

15        That's all I have, your Honor.

16        THE COURT:   Thank you.

17        Ms. West, redirect?

18        MS. WEST:   Yes.   Thank you, your Honor.

19                      **REDIRECT EXAMINATION**

20   BY MS. WEST:

21   Q.   Good morning, Agent Taylor.

22   A.   Good morning, Ms. West.

23   Q.   Referring back to some of the questions that you received

24   yesterday, we talked a little bit about instructors on the

25   teaching list at Tri-Valley University.   Do you recall that?

1   A.   Yes, I do.

2   Q.   Did you -- or were you involved in interviews of any other

3   instructors besides Hao Luo, Qi Jing, and Miller Allen?

4   A.   Yes, I was.

5   Q.   In fact, you interviewed many instructors; correct?

6   A.   Yes, I did.

7   Q.   Now, there was some discussion about -- yesterday and today

8   with regard to the individual Sparsh Agrawat and Kadir Dirikan.

9   Do you recall that?

10   A.   Yes, I do.

11   Q.   Do you know how those names were selected?

12   A.   I believe Agent Mackey obtained them from the SEVIS

13   database for terminated students.

14   Q.   Okay.  So they actually were real individuals.  They just

15   happened not to be real students at Tri-Valley.  They were just

16   enrolled with the names; is that correct?

17   A.   That is correct.

18   Q.   Now, there was some discussion today about -- and I believe

19   yesterday afternoon as well -- about the documents that are

20   needed to enter the United States.  Do you recall that?

21   A.   Yes, I do.

22   Q.   And as you stated, there's a passport and a visa that

23   generally would be required if it's a country from which a

24   passport and a visa are required; correct?

25   A.   Yes.

1    Q.   Now, are you aware one way or another whether CBP stamps

2    the I-20 upon arrival?

3    A.   I believe they do.

4    Q.   So the I-20 is required as well?

5    A.   Yes.

6          MS. WEST:  No more questions.  Thank you.

7          THE COURT:  Mr. Babcock, anything within the scope?

8                        **RECROSS-EXAMINATION**

9    BY MR. BABCOCK:

10   Q.   The -- so the name Sparsh Agrawat and the other names were

11   selected from this SEVIS database?

12   A.   Yes, sir.

13   Q.   Do you remember what schools those -- so presumably, they

14   were real students at another school at some point or --

15   A.   They had records in SEVIS that were terminated.

16   Q.   Okay.

17   A.   I can't go into depth about what their -- the students'

18   history was.

19   Q.   You don't remember what schools they had been admitted to?

20   A.   No, sir.  I'm sorry.

21   Q.   Or if -- so if a DSO at TVU or any other school for that

22   matter had gone into SEVIS and looked up -- looked up the name

23   Sparsh Agrawat, would they have been able to see what -- what

24   school they had previously been admitted to?

25   A.   I don't know what access the schools have in the SEVIS

1    database.  I know I'm able to, but I'm not sure if the other

2    DSO's have that access.

3              MR. BABCOCK:  Okay.  Thank you.

4              MS. WEST:  Nothing further.  Thank you.

5              THE COURT:  Agent Taylor, thank you.  You're excused.

6              THE WITNESS:  Thank you, sir.

7              THE COURT:  Government's next witness?

8              MS. WEST:  The United States calls Anji Reddy

9    Dirisanala.

10             THE COURT:  Mr. Dirisanala, good morning.

11             THE WITNESS:  Good morning, sir.

12             THE COURT:  Let me ask you to come up to the witness

13   stand, which is where this chair is right over here.  When you

14   get there, remain standing, raise your right hand, and face my

15   courtroom deputy.

16             THE CLERK:  That's me right over here, sir.

17             THE WITNESS:  Okay.

18             THE CLERK:  Do you solemnly swear or affirm that the

19   testimony you're about to give in the matter now pending before

20   this Court shall be the truth, the whole truth, and nothing but

21   the truth?

22             THE WITNESS:  Yes.

23             THE CLERK:  Thank you.  Please be seated.  You'll

24   need to speak real close to this microphone in order to be

25   heard.

1          Please state your full name and spell your last name.

2          THE WITNESS:  Anji Reddy Dirisanala,

3     D-i-r-i-s-a-n-a-l-a.

4                     **ANJI REDDY DIRISANALA,**

5     Called as a witness by the Government, having been duly sworn,

6     testified as follows:

7                      **DIRECT EXAMINATION**

8     BY MS. WEST:

9     Q.   Good morning, Mr. Dirisanala.

10    A.   Good morning.

11    Q.   Where did you grow up?

12    A.   In India.

13    Q.   Where are you living now?

14    A.   I'm living in Sunnyvale.

15    Q.   Why did you come to the United States?

16    A.   I came here to do my Master's in Industrial Engineering.

17    Q.   Can you tell us about your educational background in India?

18    A.   I did my Bachelor's in Automotive Engineering.  Then after

19    that, I did -- I worked for two and a half years in Hyundai.

20    Then I came here for doing my Master's.

21    Q.   What made you decide to do your Master's?

22    A.   Most of my classmates and friends came here to do their

23    Master's.  Then they wanted to come here, finish their

24    Master's, then get into a good job.  So that's why I came here

25    to do it.

1    Q.   Well, that's what your friends did; right?

2    A.   Yeah.

3    Q.   What made you decide to do that?

4    A.   Oh.  I came here to finish my Master's and get into some

5    good job to --

6    Q.   Did you say H-1?

7    A.   H-1.

8    Q.   Was making money a factor in your decision to come?

9    A.   Yes.

10   Q.   Why was money a factor for you?

11   A.   I've been supporting my family from the day I finished my

12   Bachelor's, and I'm the only son in my family.  So my father is

13   in too many debts.  So I took up all the responsibilities.  So

14   that's the main factor for me to come here to do Master's, then

15   to earn money here.

16   Q.   And was part of your motivation for coming to the United

17   States to get a Master's itself to make money?

18   A.   See, the only option I have as a Bachelor's student is only

19   to come as a Master's to the United States.  I do not have much

20   experience.  So there's nobody to file an H-1 visa for me.

21   That's work regulation here.  So for students, it is the only

22   option to come to the United States to do the Master's degree.

23   Q.   So you thought an F-1 visa would be your only chance?

24   A.   Yes.

25   Q.   Now, do you know the defendant in this case, Susan Su?

1    A.   Yes.

2    Q.   Can you identify her here in the courtroom?

3    A.   Yeah.  She's sitting there.

4    Q.   Are you referring to this table between the two gentlemen?

5    A.   Yes.

6         MR. BABCOCK:  Stipulate they know each other.

7    BY MS. WEST:

8    Q.   How do you know Susan Su?

9    A.   Oh, she's the Tri-Valley University president, and I worked

10   in the university along with her for three months in that

11   office.

12   Q.   When you first came to the United States, did you -- excuse

13   me.  Did you go to Tri-Valley University or someplace else?

14   A.   No.  I actually got a visa to attend International

15   Technological University in Sunnyvale.  So -- but I didn't join

16   the university due to financial issues, and I'm not able to get

17   some part-time job in -- like, a campus job in the college.

18   Then I was -- I told through my friends to join that Tri-Valley

19   University.  That's my second option going there.

20   Q.   All right.  I want to talk about how you came to learn

21   about Tri-Valley University.  You mentioned it was through a

22   friend.  What was -- or how did Tri-Valley University first

23   come up for you?

24   A.   I was waiting in the ITU university.  Then I met an Indian

25   guy named -- the name of Vandesh.  Then he told me there is one

1149

DIRISANALA - DIRECT / WEST

1    university in Pleasanton, but he didn't give me much details,

2    but he told me through his friend he would give me an

3    admission, and he would talk to the university president so I

4    can -- that he can give me a campus job.  So --

5    Q.   Let me stop you for a moment, please.

6         Was the campus job important to you?

7    A.   Yes, the campus job was important to me.

8    Q.   Why?

9    A.   Because I have to support myself to pay the fee, and if

10   there is some money remaining, I need to send it to India to

11   support my family.

12   Q.   How much money did you have when you came to the United

13   States?

14   A.   When I enter first entered the United States, I had around

15   $30.

16   Q.   And why couldn't you work while at ITU?

17   A.   Can you repeat it?

18   Q.   Why could you not work at ITU?

19   A.   Oh.  ITU University -- they are full with all the students,

20   and they do not have much jobs available there.  So they said

21   they can only try to give me a campus job the next semester.

22   Q.   And would that work for you?

23   A.   No.  I thought -- no.  I need to work somewhere in, like, a

24   legal job to make money.  So that was my option, to look up

25   something else who can offer me a job.

```
 1              THE COURT:  Mr. Dirisanala, that pitcher there is
 2    water, and it's there for you if you get thirsty.
 3              THE WITNESS:  Yes.
 4    BY MS. WEST:
 5    Q.   So then you heard about Tri-Valley University and the
 6    possibility of a job there; is that correct?
 7    A.   Yes.
 8    Q.   Okay.  And did you follow up on that?
 9    A.   No.  Van -- he referred me to a person by the name of
10    Vishal.  So Vishal confirmed it to me if that -- he talked with
11    the university president, and they are ready to give me a
12    campus job if I move into that university.
13    Q.   So you actually had a direct conversation with Vishal?
14    A.   Yes.
15    Q.   After he told you that you could get a campus job if you
16    switched to that university, what did you do?
17    A.   So I send my documents to Vishal, and he give me -- he came
18    to my house, and he gave me the admission letter and the
19    initial I-20 to transfer to the Tri-Valley University.
20    Q.   What documents did you provide to Vishal?
21    A.   I gave him my educational documents to get a -- like,
22    documents required for a -- for my education, my certificates,
23    then my passport.  I think I gave all the documents required
24    for --
25    Q.   And then you received an admission letter?
```

DIRISANALA - DIRECT / WEST

1    A.   Yes, I received an admission letter.

2    Q.   Was that from Vishal?

3    A.   Through Vishal, yes.

4    Q.   Okay.  He actually delivered it to you?

5    A.   Yes.

6    Q.   All right.  Did he deliver you with anything else?

7    A.   He just give me an admission letter.  So -- that's it, only

8    the admission letter.

9    Q.   What did you do with that admission letter?

10   A.   I went to the ITU University and requested them to transfer

11   my SEVIS to Tri-Valley University.

12   Q.   And did they do that?

13   A.   Yes.  They did it within two days' time.

14   Q.   Okay.  So you didn't have to attend ITU for two semesters

15   first?

16   A.   I didn't get it.  What was it?

17   Q.   You did not have to attend or pay fees to ITU for two

18   semesters first, did you?

19   A.   Oh, no.  That's not -- I just entered there into the

20   university.  So if I enroll in the ITU, I need to pay them the

21   fee, but we didn't -- at the time, I moved to TVU.  So there's

22   no need for me to pay the fee in ITU.

23   Q.   Now, at some point did you do any research about Tri-Valley

24   University?

25   A.   No, I didn't do anything.

DIRISANALA - DIRECT / WEST

1    Q.   Did you look at the website?

2    A.   I looked at the website.

3    Q.   When did you do that?

4    A.   I did it after I got the admission letter.

5    Q.   What did you see when you looked at the website?

6    A.   I saw the Tri-Valley University website, and it has, like,

7    a few pictures on that and all the courses available, all of

8    the courses they offer.

9    Q.   What kinds of courses were you looking for?

10   A.   I was looking for Master's, and basically I came here for

11   Industrial Engineering.  So I was looking at some courses

12   related to that, but I couldn't find them.  So I thought,

13   "Okay."  The main courses they provided at Tri-Valley is

14   computer science.  So I looked at the computer science courses

15   available.

16   Q.   Now, at some point did you get an I-20 for TVU?

17   A.   Yes.

18   Q.   How did you get that?

19   A.   We did it after the -- after my SEVIS transferred to

20   Tri-Valley University, I and my brother-in-law went to the

21   Tri-Valley University on February 9th so we would register for

22   the classes.

23   Q.   Why did you go with your brother-in-law?

24   A.   I went there to see the university and register for the

25   classes and pay the fee.

1    Q.   But why did your brother-in-law go with you?

2    A.   He came with me to pay the fee because I do not have any

3    money.  My brother-in-law said he will pay my college fee.  So

4    Tri-Valley gave me an option to just pay a thousand dollars at

5    the start.  So he came along with me to pay the fee.

6    Q.   Did you have any trouble locating Tri-Valley University?

7    A.   Yes.

8    Q.   Can you describe that to us, please.

9    A.   On the website, we saw an address.  It's, like, on

10   Stoneridge Avenue.  So me and brother-in-law went to Stoneridge

11   Avenue, but we couldn't find it.  We researched all the

12   buildings.  There's nothing at Tri-Valley University there.

13       Then we took the phone number of Susan Su and called her.

14   She said, "No.  Come over here.  Our office has moved to Bernal

15   Avenue."  Then we later on went to the Bernal Avenue to meet

16   Susan Su.

17   Q.   And did you have any trouble finding it then?

18   A.   Yeah, because it's, like, a used building.  I think -- when

19   I went first, I do not know what kind of -- I was thinking it's

20   a huge university, but I couldn't find where is the university

21   located.  So I needed to call her from the parking lot, and she

22   just came out, and she get me to the university, but it was a

23   small room.

24   Q.   I'm sorry.  You said a small room?

25   A.   A small room.  She got us to the university admission

1    office.

2    Q.   When you got to the admission office, did you have a

3    conversation with Susan Su?

4    A.   Yes.

5    Q.   What did you talk about?

6    A.   Okay.  I told her, like, "Okay.  This is a problem."  And

7    Vishal confirmed it to me that "You are going to give me a

8    campus job if I come to your university."

9         Then she said, "Yeah.  Yes."  Then she said, "Yes."  Then

10   she asked us to pay the fee right away, and we paid a

11   thousand-dollar fee, and she gave the receipt to us.  In

12   addition, she also told me, "Okay.  You can come over tomorrow.

13   I'm going to give you the job."

14   Q.   All right.  Let me break that down a little bit, please.

15        After you paid the fee, you said she gave you a receipt?

16   A.   Yes.

17   Q.   Did she also give you an I-20?

18   A.   Yeah, she gave me a register I-20.

19   Q.   And did she sign it?

20   A.   Yes.

21   Q.   Now, did you have any conversation with her about classes?

22   A.   Yeah.  In the conversation with her -- and I was also

23   imagination [sic] the whole building belongs to Tri-Valley

24   University.  The way she told us -- actually, I was sitting

25   next to my brother-in-law, and he asked where are the classes

1    going on.

2        She said, like, "This" -- "these are all the classes where

3    people take classes."  So we were on the assumption that the

4    entire rooms there belong to Tri-Valley University.

5    Q.  Did you have any conversation with Dr. Su about when the

6    classes would start?

7    A.  Oh, I talked with her when other classes were going to

8    start.  She said once all the students sign up, it's going to

9    start.  So she didn't give me a specific time period, but she

10   said all the classes are going to start once all the people

11   sign up for the classes.

12   Q.  Now, how did you know where to go for your campus job?

13   A.  Oh, she told me to come over to the same office tomorrow.

14   So I took the -- we have the address over there, the Bernal

15   Avenue address.  So I came early morning by 7:30.  She didn't

16   tell me the timing -- what time to come since I do not have a

17   car, and my brother-in-law has to go to the office.  He dropped

18   me early morning around 7:00 o'clock, 7:30.

19   Q.  Was Dr. Su there when you arrived?

20   A.  No, she's not there.

21   Q.  What time -- or did she arrive?

22   A.  She came somewhere around 9:00 o'clock time, around

23   9:00 o'clock.

24   Q.  Did you have any conversation with Dr. Su that day about

25   classes?

1    A.   Oh, we really didn't have any conversation with her.  The

2    moment I came, I started noticing a lot of schoolchildren

3    coming there to all the classrooms there until 7:30.  I am

4    there until 9:00 o'clock.  I noticed most of the schoolchildren

5    coming there.

6    Q.   When you say "schoolchildren," what do you mean?

7    A.   Oh, like, maybe, like, five years, six years, seven, like,

8    up to eight years, kids like that, small kids.

9    Q.   Five, six, seven years old?

10   A.   Something like that, maybe first time -- first-grade,

11   second-grade -- somewhere around that age -- students.

12   Q.   Did you discuss that with Dr. Su?

13   A.   No, I didn't talk with her about anything the first day.  I

14   didn't talk with her about anything.

15   Q.   Now, this is -- do you remember what day this was that you

16   went there for your first day of work?

17   A.   It was on February 10th, 2010.

18   Q.   And was this -- where did this fall in Tri-Valley

19   University's semester, if you know, or trimester?

20   A.   I think it's spring or something.  I don't what the

21   semesters --

22   Q.   Okay.

23        MR. BABCOCK:  I'm sorry.  I didn't hear any of that.

24        THE COURT:  I'm sorry.  I didn't hear -- I didn't

25   hear your testimony.  Can you say that more loudly?

1        THE WITNESS:  Oh.  It was a starting semester, but

2    I'm confused with the names, whether it is spring -- I think it

3    is spring semester.

4    BY MS. WEST:

5    Q.   Was this semester already underway at that point?

6    A.   Yes.

7    Q.   Was it unusual to you that there were no classes yet when

8    the semester was already technically underway?

9    A.   Yeah, because mostly -- that was my first day.  That is

10   actually just a week after I entered into the United States.

11   I'm used to the Indian climate.  In most of the Indian colleges

12   and schools, once it is started they take at least ten to

13   15 days -- everything to get set up there.

14        So I was in admissions.  Okay?  The university started, and

15   then one day it takes, like, ten to 15 days to start the class.

16   Q.   So it didn't seem so unusual to you?

17   A.   No, it wasn't unusual to me.

18   Q.   From that first day at Tri-Valley's admissions office, what

19   were your job duties?

20   A.   Okay.  The first day when I went to the university, Susan

21   Su told me, "Okay.  You are going to bring all the addresses

22   for the people who have sent in the e-mail."  So my job is to

23   print out address of the students on the envelope and just be

24   ready for the evening when they would sign all the I-20's or --

25   my job was to put all the I-20's and everything in the envelope

1      and give it in the evening back to Susan Su.

2      Q.   Okay.  Do I understand correctly you were supposed to go

3      through the e-mails?

4      A.   Go through the e-mails and print all the address of the

5      students.

6      Q.   And put everything -- put the address on envelopes?

7      A.   Yes.

8      Q.   And put I-20's in the envelopes?

9      A.   Yes.

10     Q.   What time did you leave that day?

11     A.   I left evening, around 7:00.

12     Q.   So from that first day, February 10th -- do I have that

13     right?

14     A.   Yes.

15     Q.   How long did you work for Tri-Valley?  What was your last

16     day?

17     A.   Last day is May 12th.

18     Q.   And approximately over that roughly three-month period,

19     approximately how many hours a day did you work?

20     A.   Most of the day is Monday to Saturday and some days on

21     Sunday.  Most of the days I worked, I used to come to the

22     university around 7:00 o'clock, 7:30 in the morning, and I

23     leave around 6:30 to 7:30 in the evening.

24     Q.   From those hours and the days Monday through Saturday,

25     sometimes Sunday, did you ever see somebody -- or do you know

1   the name Sophie Su?

2   A.   Who?

3   Q.   Do you know who Sophie Su is?

4   A.   I just know the name because on the admission letter

5   there's an electronic signature of Sophie Su, and on the I-20's

6   there is a DSO name of Sophie Su, but I never saw her.  I don't

7   know who that person is.

8   Q.   Do you know the name Wenchao or Vince Wang?

9   A.   Yeah.  I saw his name on the DSO, but I never saw him

10  personally.

11  Q.   Are you aware from your roughly three months working at

12  Tri-Valley whether the school had a librarian?

13  A.   No.

14  Q.   Was there a librarian?

15  A.   I don't think there was a librarian.  I didn't see any

16  person there.

17  Q.   You never saw a librarian; is that right?

18  A.   Yes.

19  Q.   Did you ever see somebody who was referred to as the

20  webmaster?

21  A.   No, I do not know that.

22  Q.   How about a registrar?

23  A.   No, I didn't see anyone by that name.

24  Q.   Who handled registration of students at Tri-Valley?

25  A.   Most of the student employees there and Susan Su.

1    Q.   Over time, did your job duties expand at Tri-Valley?

2    A.   Yes.

3    Q.   How did they -- how did they first enlarge?

4    A.   First I was printing all the envelopes, addresses, and

5    everything, and then later on I was told by Susan Su that

6    "Okay.  I'm going to give you this I-20," and she gave me a

7    laptop, and she started telling me to do the I-20 admission

8    letters and I-20's for the students who wish to transfer into

9    Tri-Valley.

10   Q.   Okay.  So that was for students transferring in?

11   A.   Transferring in.

12   Q.   How -- how did you learn how to do that?  Did somebody

13   instruct you?

14   A.   Yes.  Susan Su instructed to me, and she gave me a working

15   manual, what all I should input there in the new I-20.

16   Q.   What do you mean "a working manual"?

17   A.   Like, a -- there are some steps to be followed in the

18   I-20 -- with creating an I-20 like putting the address, then

19   what is the starting day of the semester and what other funds

20   are available for the student to do their studies and how much

21   is their expenditure in the U.S. and what is the physical

22   address they are staying.  So there's some things like this.

23        So everything -- Susan Su gave me a manual, and on it with

24   paper, she gave -- wrote and gave to me the starting and ending

25   of the semester dates I should input in the SEVIS system.

1    Q.   Now, how would you know what address to list for the

2    students?

3    A.   It was given to me by Susan Su.

4    Q.   And was there a particular address?

5    A.   Yeah.  It is 555 El Camino Real, Sunnyvale.

6    Q.   Did she explain to you why to use that address?

7    A.   Oh, she told me, like, "This is the address where all the

8    students are going to stay to show that this is the record

9    being maintained by SEVIS," and they need some address in

10   California to show students are living there and they're coming

11   to the Tri-Valley University.

12   Q.   Did you know one way or another whether these people were

13   actually staying at 555 El Camino?

14   A.   Later on, I came to know that nobody stays in address, and

15   it is just us putting some address there in --

16          MR. BABCOCK:  Objection.

17          THE WITNESS:  -- in the SEVIS system.

18          MR. BABCOCK:  Objection.  I'm sorry.  Move to strike

19   absent a foundation for the last response.

20          THE COURT:  Overruled.

21   BY MS. WEST:

22   Q.   How did you come to know that, Mr. Dirisanala?

23   A.   Later on, there is a person by the name Samuel Steven who

24   comes to the university often.  I have a discussion with him,

25   and I asked him, like, "Who are the people staying at this 555

1    El Camino Real?"  Then he told me it was this apartment address

2    he previously lived in in Sunnyvale, and Susan Su is using the

3    address on I-20.

4            MR. BABCOCK:  I'm going to renew my objection and

5    move to strike.

6            MS. WEST:  Statement of coconspirator.

7            MR. BABCOCK:  It's hearsay.

8            THE COURT:  The motion will be granted.

9    BY MS. WEST:

10   Q.   How did you get the information about student finances to

11   put in the I-20's?

12   A.   Okay.  Please repeat it.

13   Q.   Yes.

14        You mentioned that one of the things that you had to enter

15   into the I-20 was something about the students' money?

16   A.   Yes.

17   Q.   How did you get that information?

18   A.   Oh, there is a fixed amount for all the students.  So it

19   was written in the manual that is given to me by Susan Su.  So

20   it states that -- put 5,500 for education, 5,000 for

21   expenditure live -- to live, and $500 for miscellaneous

22   charges.  So it come out to be about $11,000.

23   Q.   That's the expenses for the school?

24   A.   For the school and for the students to stay in the United

25   States.  Basically, it is like -- every student has to give

1    their own financial information when applying for college

2    admission, and everybody has their own financial, like -- okay.

3    I have $30,000 or $40,000.  That is the amount to be put in the

4    SEVIS system, but Tri-Valley has the same option of following

5    the same amount for all the students.

6    Q.   Okay.  I want to make sure that we understand what you're

7    saying.

8         All students have their own amount of money that they

9    possess when they're transferring; right?

10   A.   Yes.

11   Q.   How -- did students convey to you maybe through e-mails or

12   some other way how much money they had?

13   A.   Basically, no, because that is a process that students have

14   to do, sending the financial information, but Tri-Valley

15   University doesn't request the students to give financial

16   information.  So that --

17   Q.   So stop for a moment.

18        How do you actually get that information to put in the

19   I-20, then?

20   A.   It was given to me by Susan Su in a working manual to put a

21   particular amount for all the students.  I do the I-20's.

22   Q.   Now, how do you actually access the I-20 form?  Is that

23   through a computer?

24   A.   Yeah, through a computer.

25   Q.   And were you able to log into the computer and open up the

1     I-20?

2     A.   No.  Actually, Susan Su carries the laptops always with

3     her, and she logs in the login information and password, and

4     she gives computers to the students -- students and to me also

5     to access the I-20 on the SEVIS system.

6     Q.   Okay.  So would you actually enter a login ID and password?

7     A.   No.

8     Q.   That would be done by Susan Su?

9     A.   By Susan Su, and sometimes she will ask -- if I am standing

10    next to her, she will say, "Okay.  Turn that side.  I'm going

11    to enter the details."

12    Q.   And then what would she do after she entered that

13    information?

14    A.   After she enters the information, I take the laptop and

15    just sit next to her maybe this much distance.  She sits here,

16    and I'd be almost sitting next to her because the size of the

17    room is so small, everybody has to sit next to each other.

18         THE COURT:  Indicating a distance of not more than

19    three feet for the record.

20    BY MS. WEST:

21    Q.   So she would log in, and then she'd hand the computer to

22    you to work on.  Is that fair?

23    A.   Yes.

24    Q.   Okay.  Aside from working on the transfer I-20's -- well,

25    actually, let me ask you first:  Do you know the name of that

DIRISANALA - DIRECT / WEST

1    computer system that you would work on for the I-20's?

2    A.   I was not knowing until I give the printout -- first

3    printout for any student.  Then the name comes up of who is the

4    DSO.  Until that time, I cannot know, like, whose name I'm

5    working -- on whose DSO name I'm working.

6              THE COURT:  Right.  Mr. Dirisanala, I think what Ms.

7    West is asking is not do you know the name of the student or of

8    any of the people mentioned on the form but the whole system

9    itself.  That computer system -- do you know if that had a

10   name?

11             THE WITNESS:  Yes.

12             THE COURT:  What?

13             THE WITNESS:  Each and every person who access the

14   SEVIS -- they have a login ID and password.

15   BY MS. WEST:

16   Q.   Let me just stop you for a moment.

17        You mentioned SEVIS.  Is that the name of the computer

18   system?

19   A.   All -- SEVIS is operated by USCIS to maintain the students'

20   details there, all the international students.

21   Q.   All right.  I'm going to stop you for a moment.

22        When you fill out I-20's --

23   A.   Yes.

24   Q.   -- Susan Su had to log in and put in a password --

25   A.   Yes.

1    Q.   -- is that right?

2    A.   Yes.

3    Q.   Okay.  Do you know the name of the system that she is

4    logging into and putting the password into?

5    A.   I will not be knowing under whose DSO name I am working.

6    Q.   I'm asking a different question.  Let me stop you.

7    A.   Okay.

8    Q.   Is the name of the computer system -- is that what you're

9    referring to as SEVIS?

10   A.   Yes.

11   Q.   Okay.  Now, you're talking about a DSO's name.  Can you

12   explain that to the jury?

13   A.   Okay.  SEVIS can be accessed only by a DSO, who is

14   authorized people to access the SEVIS system.  So what --

15   Tri-Valley University has four DSO's who are authorized people

16   to access SEVIS.

17   Q.   Four?

18   A.   Four.

19   Q.   What are the names of those four?

20   A.   Susan Su and Renu Philip.  There's one more person.  Sophie

21   Su, then Wang, W-a-n-g.

22   Q.   Okay.  So when the DSO logs in to SEVIS, is there some way

23   that you find out whose account you're in?

24   A.   I can find out whose account I am in only after I print out

25   one document from there.  Until then, I cannot find out who --

DIRISANALA - DIRECT / WEST

1    Q.   How do you find out when the document prints?

2    A.   Okay.  On the I-20 on the bottom page, it will be written

3    the DSO, and their name will be written there.  So for the rest

4    of the day with other I-20's I do, only their name comes up

5    there as the DSO.

6    Q.   So it automatically prints?

7    A.   Yes.

8    Q.   Now, aside from the transfer I-20's, did your job duties at

9    Tri-Valley expand in other ways?

10   A.   Yes.

11   Q.   How so?

12   A.   I started answering the e-mails to the students who have

13   request for an admission.  Then I start -- I was trained to do

14   the new admissions to the students.  So I used to create new

15   initial I-20's for new students.

16   Q.   Which -- is that different from the transfer I-20's?

17   A.   Yes.  That is for new students if they wanted to come from

18   other countries into a new --

19   Q.   How does that differ?

20   A.   Okay.  Most of the students -- they only came on F-1 -- F-1

21   visa, and they already have a SEVIS number.  So if they're

22   transferring to the university, the same SEVIS number will be

23   transferred, but if I am giving a new I-20, then a new SEVIS

24   number is created.

25        So it says that -- a new I-20 means basically a new student

1    applying as a student -- as a new person applying as a student

2    in the most --

3    Q.   Did you assign that SEVIS number?

4    A.   No.  It automatically comes up when I click on the new I-20

5    column, and new -- every time, a new SEVIS number is generated

6    by the system.

7    Q.   Okay.  So is there a button to press when it's for a new

8    I-20?

9    A.   Yes.

10   Q.   And the new I-20's -- are they created in SEVIS also?

11   A.   Yes.

12   Q.   How did you learn how to do new I-20's?

13   A.   I was trained by Susan Su in addition to that and was

14   trained by Vishal, who was also working at the university

15   previously.  Then some people used to come to the university

16   who have an access to the SEVIS.  So it was my first time

17   there.  It's not that easy to learn about SEVIS so fast.  There

18   are a lot of things to be done.

19        So I got it from other students also, like, who were

20   already working there.  So those people also taught me, but

21   basic information was given to me by Susan, and when I read out

22   the manual, it clearly says what to do at each step.

23   Q.   So the manual also walks you through it?

24   A.   Yes.

25   Q.   Now, how would you get the information that you had to

1    input into the new I-20?

2    A.   Oh, from the working manual.

3    Q.   And did you get -- well, how did you get the name of the

4    student?

5    A.   I got the name of the students from the e-mail address.

6    Like, some students -- they send their details through e-mail

7    like their educational documents or their application form, or

8    some people just send only the first name and last name and

9    date of birth.

10        So depending on that, I talk with Susan Su.  I didn't get

11   more documents.  See, it was -- actually went out in a flow

12   starting out when I was working --

13   Q.   Well, let me stop you there and let's break it down a

14   little bit more so we can all understand.

15        At this point, part of your job is to access e-mails?

16   A.   E-mails and create new I-20's who have request for new

17   admissions.

18   Q.   Okay.  So are the e-mails on a Tri-Valley University e-mail

19   account?

20   A.   Yes, it is under a Tri-Valley University e-mail account.

21   Q.   Now, how do you access that account?

22   A.   Well, even the e-mail account I -- that Susan Su gives to

23   me on the same computer -- she opens the e-mail ID and

24   password, and she gives to me.

25   Q.   All right.  So when you get in, do you look through the

DIRISANALA - DIRECT / WEST

1    e-mails?

2    A.   Yes.  I have, like, two pages from the same computer.  So I

3    keep on changing -- reading the e-mail and then entering the

4    details in the SEVIS system.  So I keep on shifting those

5    pages.

6    Q.   Were some of those e-mails asking for admission to

7    Tri-Valley University?

8    A.   Yes.

9    Q.   Can you please tell us what you would do when you would see

10   one of those e-mails.  Let's say somebody is asking to be

11   admitted to Tri-Valley.  Tell us what you do when you see that

12   e-mail.

13   A.   See, most of the students in Tri-Valley University -- when

14   they request for an admission, they don't send all their

15   documents.  They rarely send all the documents required for the

16   university admission.

17        Some people send only the application form, just one page,

18   and no documents are attached to it, and some people send only

19   the first name and last name and their date of birth if they're

20   in -- if they are not able to send their documents right away.

21   Q.   Okay.  You said that some people don't send all of their

22   documents.  What is "all of their documents"?  If somebody sent

23   everything they're supposed to send, what would that be?

24   A.   Okay.  To get an admission, they need the documents -- for

25   example, all the educational documents.  Actually, what I

DIRISANALA - DIRECT / WEST

```
 1    did -- what I followed to get an admission in ITU is -- it is
 2    the rule for the universities to take all the documents -- for
 3    example, their educational documents.  It has to be registered
 4    by the university, and it has to be in a sealed cover.  Only
 5    the university has to open it, then create an admission of
 6    anything.
 7    Q.  I'm not sure I really understood your answer.  So I want to
 8    make sure.
 9        We're talking about Tri-Valley University here?
10    A.  Yeah.
11    Q.  Okay.  Do you know whether Tri-Valley University said that
12    it required certain documents for admission?
13    A.  Yes.
14    Q.  Okay.  Let me stop for a moment.
15        What documents did Tri-Valley University say that it
16    required for admission?
17    A.  If you look at the website or anything, they'll ask the
18    students to send educational documents, a letter from the bank
19    stating they have enough financial funds, and their passport
20    details.  Then -- what else?  Then they have an offer letter.
21    They need an exam letter requesting for admission.  So these
22    other documents are required.
23    Q.  And an application, too?
24    A.  And an application form.
25    Q.  Okay.  Now, over your three months with Tri-Valley, how
```

1    many -- how many new admission requests did you personally

2    process roughly?

3    A.   I did more than a hundred.

4    Q.   Okay.  So from those more than a hundred, did all of them

5    have the documents that Tri-Valley's website said were

6    required?

7    A.   No.

8    Q.   Did most of them?

9    A.   Not most.  Very few people had the documents required for

10   an admission.

11   Q.   So what did you do when you saw an e-mail?  Was it usually

12   by e-mail people were requesting?

13   A.   Yes.

14   Q.   Okay.  So when you saw an e-mail requesting new admission

15   but it didn't have the required documents, what did you do?

16   A.   So starting of the year, I -- starting off my work,

17   whatever jobs I had, I used to ask Susan the same way I asked a

18   few students.  "This person doesn't have these documents.  This

19   document is missing."  She --

20   Q.   What did she say?

21   A.   "It's okay.  No problem.  Just look at the application form

22   and fill out the details."  Eventually, it went like -- there

23   were many admissions coming up, and at one point she told me,

24   "Okay.  Don't even bother what they are sending.  Just look at

25   their application form, what" -- "their ID details, and print

1    out I-20's."

2    Q.   So if you just had the application, would that give you all

3    of the information you needed to fill out the I-20?

4    A.   Yes.

5    Q.   The application contained everything?

6    A.   The application contains their address and what courses

7    they wanted to go for.  The paper has details.

8    Q.   Did you ever process a new admission for somebody where you

9    did not have a local physical address?

10   A.   Most of the admissions I processed -- rarely people live in

11   California.  Most of the people are outside California, and

12   they have their own different address in different states.

13   Q.   Now, if it's an address from a different state, is that

14   what you put into SEVIS?

15   A.   That is what SEVIS requests, to put only the actual address

16   of the students where they are staying, but in Tri-Valley

17   University, Susan asked me to put only the 555 El Camino Real

18   address.

19   Q.   From your three months and the -- I think you said more

20   than a hundred new admission requests.  Was anybody ever

21   rejected?

22   A.   No.

23   Q.   Did you ever have a conversation with Susan Su about

24   whether any people seeking admission should be rejected?

25   A.   No.  She told me, "Don't worry about any documents, what

1   they are telling.  Just keep on transferring the student."

2   Most of the admissions coming to the university are only

3   transfer students.  They're all from different universities.

4   So she told me, "Just don't worry about it.  Just keep on

5   giving the I-20's, whether they have it or not."

6   Q.   Okay.  So that's for transfers; right?

7   A.   Yes.

8   Q.   Did you ever have a conversation with Dr. Su about whether

9   to admit or deny anyone who was a new applicant, not a

10  transfer?

11  A.   No.  She told me, "Don't deny anybody.  Just put them in

12  place.  Immediately do it."

13  Q.   Did you --

14         MR. BABCOCK:  I'm sorry.  I missed that last part.

15         THE WITNESS:  Oh.  "Whoever applies for admission,

16  give them the admission."  There's no denying anyone in the

17  university.

18  BY MS. WEST:

19  Q.   Did you ever see any applicants, whether transfer or new

20  admission, who were not already F-1 students?

21  A.   Yes.

22  Q.   Were there people who were United States citizens?

23  A.   I don't think I'd done even one or two citizens.  I'm not

24  sure about it.  I don't think I did any citizen applications.

25  Q.   So who were the non-F-1's?

1     A.   Most of the students that got an admission are -- who are

2     H-4 visa -- like, most of the women who come -- if their

3     husband is working as an H-1 visa, they come as an H-4.  So

4     they are not supposed to do anything here.  So since this

5     university has an option of giving CPT --

6     Q.   What is CPT?

7     A.   It's credit program training.  It's like a permission to

8     work in any company related to the field they're taking.

9     Q.   Okay.

10    A.   So they got there -- all the students -- like, some

11    students who are on a tourist visa -- there is only -- who come

12    to visit the United States, they're going to apply for an

13    admission, and they are given I-20.  Then H-4 -- they are --

14    that's their dependents.  Even dependents are given an I-20.

15    Q.   All right.  So from all of the applicants you saw, you

16    don't remember seeing any citizens; is that right?  Yes or no?

17    A.   I'm not sure about it --

18    Q.   Okay.

19    A.   -- but up to my knowledge, I don't think I did, and --

20    because U.S. citizens -- there is no need to do any SEVIS for

21    them.  It's just an admission to them.

22    Q.   Okay.  But I'm talking not just about the I-20 but all of

23    the e-mails.  Do you remember doing an admission -- a letter of

24    admission for anybody you did not have to create an I-20 for?

25    A.   I don't remember.

1    Q.   Okay.  So if there's F-1's and then H -- was it H-4?

2    A.   H-4.

3    Q.   And then maybe a couple of tourists?

4    A.   Couple of people who were on a tourist visa.

5    Q.   Okay.  Out of all of those, which were the most?

6    A.   Most of them are from H-4 who wants to transfer to student

7    and they want to take CPT and start working.

8    Q.   Okay.  So they wanted to go F-1?

9    A.   Yeah, F-1.

10   Q.   Now, you discussed how on the I-20 after you print the

11   first one, you see the DSO's name on it --

12   A.   Yes.

13   Q.   -- is that right?

14   A.   Yes.

15   Q.   And for the rest of the day, using that same computer, are

16   they all the same DSO?

17   A.   Yes.

18   Q.   Who signs those I-20's?

19   A.   Susan Su signs for all their DSO's.

20   Q.   Did you see her sign the name of Sophie Su?

21   A.   Yes.

22   Q.   Did you see her sign the name of Wenchao Wang?

23   A.   Yes.

24   Q.   And you mentioned another person.  Renu Philip?

25   A.   Renu Philip.

DIRISANALA - DIRECT / WEST

1    Q.   Who is that?

2    A.   Renu Philip -- I think she is a citizen or a green card

3    holder in the United States.

4    Q.   Well, hold on a moment.  Do you -- do you know her

5    personally?

6    A.   I saw her sometimes.  She comes to the office to submit her

7    work.  So I saw her face.

8    Q.   What do you mean "submit her work"?

9    A.   She doesn't work in the office.  She works in her home.

10   She accesses the SEVIS at her home, and she comes --

11   Q.   How do you know that?

12   A.   Whatever work she does, she saves it on a pen drive.  Then

13   she brings the pen drive, like, every week or two weeks once to

14   the office, and she takes the pen drive and gives it to Susan

15   Su.

16   Q.   Okay.  So did you see Susan Su sign --

17            THE COURT:  You said -- I'm sorry.  You said save it

18   on a pen drive, like, a little thumb drive?

19            THE WITNESS:  Yes.

20            THE COURT:  And she would bring in a thumb drive, and

21   she would bring that into the office?

22            THE WITNESS:  Office, yes.

23   BY MS. WEST:

24   Q.   And did you see Susan Su sign Renu Philip's name as well?

25   A.   No.  Renu Philip sign -- she signs it on her own, Renu

1    Philip.  See, this system -- how it works is since four DSO's

2    are there and a few people are working in the university,

3    anybody can get any DSO's user ID and their password.  One day,

4    I can work on Sophie Su's ID or Susan Su's ID or Wang's ID or

5    Renu Philip's ID.  If me or other students work in Renu

6    Philip's ID, then Susan Su signs Renu Philip.  If Renu is

7    working on her name, she signs it in the office.

8    Q.   Okay.  Did you -- you said that you never saw Sophie Su

9    there?

10   A.   No, I never saw her.

11   Q.   Okay.  So I take it that means you never saw Sophie sign

12   her own name?

13   A.   Yes.

14   Q.   And did you ever see Wenchao Vince Wang sign his own name?

15   A.   No.

16   Q.   But you did sometimes see Renu Philip sign her own name?

17   A.   Yes.

18   Q.   Okay.  So for -- let's put aside Renu Philip.  Did you see

19   Susan Su sign Sophie Su and Wenchao Wang's names?

20   A.   Yes.

21   Q.   How often?

22   A.   Every day.

23   Q.   Can you give us a rough number from your three months

24   there?

25   A.   I did more than a hundred.  It can be very large number of

1    I-20's I did.  So all the I-20's from morning until evening,

2    whatever I work, I take a printout and keep next to me.  At the

3    end of the day, I take it to Susan Su.  She keeps on signing,

4    and I just collect the papers.  So every day, I see her signing

5    the DSO names there.

6    Q.   Okay.  And approximately how many would you do a day?

7    A.   Some days, I do ten.  And if it is a transfer I-20, it only

8    takes a minute.  It is just entering a date there.  So if it is

9    transfer, I can do at least 20 or 30 a day also.

10   Q.   20 or 30 a day?

11   A.   Sometimes if the -- coming in -- transferring students are

12   not -- it only takes less than a minute to do it for transfer

13   students.  So those days, I do more.

14   Q.   So over the three months, is it fair to say that you saw

15   Susan Su sign the name of Sophie Su or Wenchao Wang on the

16   I-20's more than a hundred times?

17   A.   Yeah.  I personally did hundreds of I-20's there.  So

18   everything is signed by her.  In addition to that, all the

19   staff -- whoever works, I saw her signing because I'm only --

20   like, I'm sitting here, and Susan is sitting there.  So it's

21   just watching her while she's doing it, and she can watch me

22   what I'm doing.  So every day, I see her signing the documents.

23   Q.   Okay.  And you mentioned that other staff were creating

24   I-20's as well?

25   A.   Yes.

1    Q.   Did you have a discussion -- or I'm sorry.  Did your job

2    duties ever include processing fees?

3    A.   Yes.

4    Q.   Can you tell us what that involved?

5    A.   Most of the students pay by credit card data.  So what they

6    do is they send, like, credit card data, the numbers,

7    expiration, and the CVV number.  So I just take a printout of

8    that and go to the -- there's a processing machine.  I type the

9    numbers there and charge them and take a printout.

10   Q.   Did students pay in any ways besides credit card?

11   A.   Some people who wanted to pay -- they paid through PayPal.

12   Q.   PayPal?

13   A.   PayPal.

14   Q.   Did you get instructions from anybody about how to process

15   the fees?

16   A.   Yeah.  I got instruction from Susan Su how to process the

17   fee.

18   Q.   Did you ever have any job duty involving registering people

19   for classes?

20   A.   Yes.

21   Q.   Can you tell us about that, please.

22   A.   After the process is -- like, after the I-20 is transferred

23   to the Tri-Valley University, I will send an e-mail to the

24   student that "Okay.  Your initial I-20 is ready," and I'd send

25   them a copy through e-mail requesting them to send the credit

1     card data to pay the fee.

2         Once they pay the fee, I process it in the system and

3     create a fee receipt, then register them in the I-20 as a

4     registered student.  Then I put on the subjects -- what

5     subjects they wanted to take.

6     Q.   And how did you find out what subjects they wanted to take?

7     A.   Most of the students really -- they don't select what

8     courses they want.  They are, like, specific subjects.  Susan

9     Su tells us, "Okay.  If this guy is from computer science, add

10    these three subjects for this semester."  So I look at it and

11    add it.

12        Most of the times, it is already -- it's already in the

13    system, like, computer -- computer -- if it's a Master's in

14    Computer Science.  So there is one for a Master's in Computer

15    Science.  I will open the document -- Word document, just

16    change the student's name, save it, and send it.  So all the

17    students are registered for the same subjects then.

18    Q.   All of them?

19    A.   Like, if it is computer science, they are registered for

20    three subjects unless they specifically say what subjects they

21    want, but most of the students are given whatever is there at

22    that point of time.

23    Q.   Okay.  So some students actually choose their own classes

24    that they want?

25    A.   Some students choose their classes.

DIRISANALA - DIRECT / WEST

1   Q.  And then you're saying that most people don't choose

2   classes?

3   A.  No.

4   Q.  Okay.  So how did you -- who told you what classes to give

5   them?

6   A.  Oh, Susan Su told me, like, "Okay.  If it's computer

7   science, put everybody for these three classes."  So I already

8   have it printed pretty -- no.  The Word document there.  So I

9   just changed the name of the student and save it and send it to

10  him.  "Okay.  These are your three classes."

11  Q.  How would you send it?

12  A.  I would save it as a PDF document, and I will e-mail it to

13  them back.

14  Q.  Now, when you sent e-mails -- did you send a lot of e-mails

15  in your -- in your job?

16  A.  Yes.  For every work I do there, whether creating an I-20

17  or transferring the student or giving admission, everything is

18  done only through e-mail.

19  Q.  Okay.  So when you send an e-mail, would you sign your

20  name?

21  A.  No, I will not sign anything in my name.  I only -- it is

22  all -- if it is an admission letter and if it is registering

23  for the classes, it's an I-20 signature of Sophie Su.

24  Q.  I'm not talking about on a document.  You're talking about

25  the admission letter document?

1    A.    Uh-huh.

2    Q.    When you're sending an e-mail, do you say, "Here are the

3    classes that you're registered for," and then below that, did

4    you ever type in "Susan"?

5    A.    At first, I didn't do that.  At the starting of the work, I

6    just reply them back to me.  Later on when many people were

7    working, then Susan Su told, like, whoever is doing work, "You

8    put your name at the bottom."  So then I started putting my

9    name there, but previously it was already Susan Su's signature

10   as university president.  It's an electronic signature there.

11   Q.    Okay.  Does it say, "Susan Su, Tri-Valley University

12   President"?

13   A.    Yes.

14   Q.    So at the beginning, that was the default signature?

15   A.    Yes.

16   Q.    And then at some point, Susan Su told you to write "Anji

17   Dirisanala"?

18   A.    Yeah.  I'd write my name, but below that, it is still --

19   the electronic signature remains the same for Susan Su.

20   Q.    Okay.  Did you ever type in "Susan"?

21   A.    No.

22   Q.    All right.  I want to go back to talking about SEVIS for a

23   moment.

24         When you first began creating I-20's in SEVIS, did you know

25   that it was not allowed for you to be using SEVIS?

1    A.   I only -- see, I came to know that after I am working for

2    some time.  If I don't access the system for a few minutes, it

3    automatically logs off.  Then the warning comes on the screen,

4    and it says it is accessible only to the DSO's who are

5    authorized, and it says, "Authorized people are allowed to

6    access this," something like that.

7    Q.   Okay.  So when you first learned that you weren't allowed

8    to do it was when it timed out and you saw that warning?

9    A.   Yes.

10   Q.   Did you have a discussion with Susan Su about that?

11   A.   Within two -- like, two, three days after I started working

12   on I-20's, I asked her, "Susan, this sign came up.  I'm

13   unauthorized to do it."

14        She said, "Don't you worry.  I'm the university president.

15   You take just continue doing it.  Don't worry."

16   Q.   Mr. Dirisanala, did you attend classes while you were

17   working in Tri-Valley's office?

18   A.   No, I didn't attend any classes.

19   Q.   Why not?

20   A.   I'm working in the university.  So at -- starting, I was

21   thinking there will be classes.  Actually, to be frank, on the

22   first day, I came with the hopes also -- like, to take notes if

23   any classes would go on, anything like that.

24   Q.   On your first day?

25   A.   On my first day, I came with, like, a notebook.  So I was

1   on the assumption classes would go on, but eventually then I

2   thought, "Okay.  Maybe it will start within one week or

3   ten days," but the classes didn't start.  So I never took any

4   classes there.

5   Q.  Did you have any conversation with Susan Su about "Hey, the

6   classes haven't started yet.  When are they going to start?"

7   A.  The first two or three days, she said that classes are

8   going to start when all the people show up.  And within four,

9   five -- like, a week at a time, then it is clear there are no

10  classes.

11      So this university doesn't -- like, all the classrooms are

12  not belonging to this university, only that small room and the

13  next -- one classroom she's renting a few hours a day.  So I

14  came to know that, and it is clear.  Okay?  This is one

15  university where there are no classes.

16  Q.  Did you actually see any classes take place at that

17  classroom next door she had rented?

18  A.  No.  There are no classes at all.

19  Q.  Did you ever worry about being here as an F-1 student but

20  not taking classes?

21  A.  Yes.

22  Q.  Did you ever have a conversation with Susan Su about that?

23  A.  Yes.  I had a conversation with her that I'm not taking

24  classes.  "What will happen?"

25      And she told me, "Since you are working in the university,

1    you don't worry.  I'll take care of you."

2    Q.  At any point, did you switch your degree program to help in

3    that somehow?

4    A.  Yeah.  It went on around a month time.  Then there are no

5    classes going on.  And, like, someone told me, "If you are an

6    F-1 student, it's mandatory for you to take classes.  Somebody

7    might check on you any time what you are doing."

8         Then I asked Susan Su in the office.  I said, "I'm not

9    taking any classes.  So what will happen to me now?  I'm really

10   scared."

11        And she said, "Okay."  She asked me then, "What degree did

12   you have?"

13        I told her, "Automotive Engineering," and I told her the

14   subject I took.

15        Then she said, "Okay.  I already have a Ph.D. in

16   Mechanical.  So why don't you shift to Mechanical.  Then I will

17   be your professor."

18   Q.  That Susan Su would be your professor?

19   A.  Yes.  And she said, "I will take care of your grades even

20   if you don't take care of" -- "if you don't attend online

21   classes."  Then she changed my SEVIS to Mechanical Engineering

22   from Computer Science.

23   Q.  Okay.  So you just mentioned online classes.  You said that

24   there weren't any classes at all.  At some point, did there

25   start online classes?

1    A.   Yes.

2    Q.   How did you learn that?

3    A.   Some students used to call me and say, "The classes didn't

4    start.  There's no professor, nothing.  How do I access the

5    class?"  Or sometimes -- when I was working, I was also given

6    work to attend the phone calls along with e-mail.  So some

7    people called me and said, "There's no professor," or a

8    professor calls me up and says, "Hey, no students are there.

9    What do I do?"

10        And I asked Susan Su.  She tells them, "Just wait for the

11   students to sign up" or "Wait for the professor to log in."  So

12   that went on.  Most of the time, we keep telling the students,

13   "The system is down.  So you cannot access the classes today."

14   Q.   And why did you tell them that the system was down?

15   A.   Because there's nobody to teach the classes there, those

16   subjects.

17   Q.   How do you know there's nobody to teach the class?

18   A.   Because I know, like, only the first few professors are --

19   are recruited by Susan Su who were the students actually in the

20   Tri-Valley University.

21   Q.   Okay.  Let me stop you for a moment.

22        How do you know that there were instructors who were --

23   well, how do you know that there were -- let me try that again.

24   Did you at some point learn that there actually were some

25   instructors who were attempting to teach classes?

1    A.  Yes.

2    Q.  How did you learn that?

3    A.  Some people call me up.  Like, professors call me up and

4    say, "Hey, there are no students."  So only through the phone

5    calls, I used to know what classes are going on at that -- and

6    at some point of time, Susan Su told me these three classes are

7    going on or these four classes are going on like that.

8        In addition to that, the day when my brother-in-law came to

9    join me in the university, she asked my brother-in-law, "What

10   is it you're doing?"  And he said he's a software engineer

11   working in Apple.  Then she requested, "Hey, we need somebody

12   to teach the classes.  Will you be able to teach online

13   classes?"  She didn't mention any -- it's an online class on

14   the first -- Day 1.  She told me that he needed to come and

15   teach the classes.

16   Q.  And did he actually come and teach a class in person at

17   Tri-Valley?

18   A.  No, he never came to the university to teach classes.

19   Q.  Did you see him?

20   A.  Yeah, I --

21   Q.  You never saw him come --

22   A.  I never saw him in the university.  He only comes to pick

23   me up and drop me.  That's it.

24   Q.  All right.  Did you ever receive an e-mail communication

25   about online classes?

DIRISANALA - DIRECT / WEST

1    A.   I have one --

2    Q.   I mean for yourself.

3    A.   For myself, there's one professor who used to send an

4    e-mail.  I showed it to Susan Su.  "Susan, this guy is sending

5    me e-mails to attend the class.  What do I do?"

6         She said, "Don't worry.  Leave it."  So that's only one I

7    got an e-mail to attend classes -- for one class.

8    Q.   And did you ever even try to log in for that class?

9    A.   No, I didn't do it.

10   Q.   Why not?

11   A.   Because I'm already working from 1:00 -- 7:00 o'clock in

12   the evening, 7:00 o'clock, approximately at that time.  So

13   there's no time for me to attend classes or do anything, and in

14   addition, I got assurances from Susan she would take care of

15   me.

16   Q.   Did you ever get a transcript --

17             THE COURT:  I'm just looking at the transcript, sir.

18   Can you say again what time would you typically start your work

19   day?

20             THE WITNESS:  I come around in the morning,

21   7:00 o'clock, and I stay at least up to 6:30, 7:00 o'clock in

22   the evening.

23             THE COURT:  Thank you.

24   BY MS. WEST:

25   Q.   Did you ever receive a transcript from Tri-Valley?

1    A.   At the end of the semester, I received a transcript.

2    Q.   How did you receive it?

3    A.   On May 17th, when I was interviewed by ICE for the first

4    time, I was a little bit scared, and I went to the university

5    on the 18th requesting for a transfer.  Then they give me a

6    transcript for Mechanical Engineering.

7    Q.   Who gave you a transcript?

8    A.   Susan Su gave me a transcript.

9    Q.   Okay.  Let me -- let me stop for a second.

10        So this is when?  When did this happen?

11   A.   On May 18th.

12   Q.   Of 2010?

13   A.   2010.

14   Q.   Okay.  And were you still working for Tri-Valley on that

15   day?

16   A.   No.  I worked only until May 12th.

17   Q.   Okay.  So from February to May 18th, you did not receive a

18   transcript; is that right?

19   A.   Yes.

20   Q.   So did you actually go to Tri-Valley University on

21   May 18th?

22   A.   Yes.

23   Q.   And did you create your own transcript?

24   A.   No.  Susan Su typed it and gave it to me.

25   Q.   Did you ask her for it?

1    A.   Yeah, I asked for it.  I told her, "I am changing the

2    university.  I need a transcript."  So she gave it to me, one

3    copy.  And later on, I got an e-mail from Susan Su for a

4    different degree that's for Computer Science.  From the

5    Tri-Valley University e-mail ID, I got the transcript.  Then I

6    replied back to them.  "Now I have two transcripts.  Which one

7    do you want me to use?"

8    Q.   And did you receive a response?

9    A.   No.

10   Q.   So your -- the one Susan gave you was for -- I'm sorry.

11   The one Dr. Su gave you was for Mechanical Engineering?

12   A.   Yes.

13   Q.   And then later, you received an e-mail?

14   A.   For Computer Science.

15   Q.   I think we may have already covered this, but I want to

16   make sure I -- I want to make sure that we've gone over it

17   clearly.

18        From the -- Monday through Saturday, sometimes Sunday?

19   A.   Yes.

20   Q.   You said about 7:00 in the morning to 6:30 or 7:00 at

21   night?

22   A.   Yes.

23   Q.   Did you ever see any classes being held onsite where an

24   instructor is teaching and there are students physically there?

25   A.   No.

1   Q.   Did you ever see an instructor teaching on a camera?

2   A.   No, I never saw any instructor teaching on camera.

3   Q.   From -- you mentioned that you received calls from students

4   about no instructor or they can't access the system; is that

5   right?

6   A.   Yes.

7   Q.   Can you estimate for us, please, about how many of those

8   kinds of calls that you received from students who actually

9   seemed to be trying to attend a class.

10  A.   Very few.  Very few.  Maybe one or two in a day.

11  Q.   One or two a day?

12  A.   One or two a day.

13  Q.   So over the three-month period --

14  A.   Yeah.

15  Q.   -- can you give us an estimate?

16  A.   I would attend, like, ten or 15 people on the phone because

17  the phone keeps on changing to all the people.  Something --

18  Q.   Okay.  So then you received -- you recall maybe ten to 15?

19  A.   Ten to 15 people would call me.

20  Q.   Did you receive a salary working at Tri-Valley?

21  A.   Yes.

22  Q.   What was the salary?

23  A.   First day when I joined the university, she told me she

24  would pay me a thousand dollars per month.

25  Q.   Did you receive a thousand dollars per month?

1    A.   I think first she paid me very less, like, around 400 or

2    something, because I started on the 10th of February.

3    Q.   Okay.  So it was prorated for the month?

4    A.   10th of February, and she told I didn't work properly

5    because -- since I was learning at that month, she said, "You

6    didn't work properly.  So I'm going to pay you, like" -- I

7    think -- I'm not sure but around 400 or 5- that she paid me for

8    that month.

9    Q.   How about after that?

10   A.   Then after that, she paid me for one month a

11   thousand-dollar check.

12   Q.   Would that be for March?

13   A.   Yes.

14   Q.   Okay.  How about for April?

15   A.   I think April -- I'm sure -- I think she paid me a

16   thousand-dollar check.

17   Q.   Okay.  And then you left --

18   A.   May.

19   Q.   -- about May 12th?

20   A.   May 12th.

21   Q.   And did you get paid for May?

22   A.   No.  She told -- because I only paid a thousand-dollar fee

23   at the starting, and I still have to pay 18 -- $1,750.

24   Q.   For the tuition?

25   A.   Yeah, for tuition.  She gave me a receipt.  Like, it is

1    registered towards May work.  Instead of paying, she -- she

2    told me she's just going to charge for tuition.

3    Q.   Okay.  So she deducted your salary from the tuition?

4    A.   She actually did $1,750.  She told since I worked there for

5    a long time, she's going to pay off the 1750.  So for those

6    ten, 12 days, I would have got maybe at least, like, 5 or $6,

7    but she paid a total of 1750 for that month.

8    Q.   Okay.  So --

9                THE COURT:  Ms. West, at some point in the next few

10   minutes, I'd like to take our morning break.

11               MS. WEST:  Yes.  Thank you, your Honor.

12   BY MS. WEST:

13   Q.   So she cancelled out the salary of 400 or $500 against your

14   tuition?  Do I understand that right?

15   A.   Yes.

16   Q.   Did you find another way to make money?

17   A.   Yes.

18   Q.   Can you tell us briefly what that was?

19   A.   Oh.  Within one month of time I joined there, she said

20   she's going to give me only a thousand dollars.  That's not

21   enough for me.  Then I started receiving phone calls from the

22   students telling that they need their registered I-20's and

23   their work authorization the same day.  Like, that means they

24   wanted it to be posted on the same day.  They can start working

25   at their companies for the next day.

1     What -- Susan used to send all the I-20's in a normal UPS

2     or USPS, which might take three or four days to reach them.  So

3     people started calling, "Can you send us through FedEx?"

4         But at the starting, Susan Su said she doesn't have a FedEx

5     option, then "If you pay $50 online fee, we can FedEx it to

6     you."  Then she told, "Okay.  Anji, you stay in Sunnyvale."

7         "Is there a close-by FedEx?"

8         She said, "Yes."  Then she told me, "Whoever request for a

9     FedEx, charge them $50 on the machine credit card machine, and

10    you send them FedEx, whatever it is there.  At the end of the

11    week, you give me a total.  I'm going to pay you a check."

12        Credits cost me sometimes only $20 or $27, but she still

13    paid me $50 for each student at the end of the week.  That

14    was -- I made money.  Then later on, I --

15    Q.  Let's take a break now.  We'll come back at the next part

16    after the break.  Thank you.

17            THE COURT:  All right.  Thank you.

18        The Court will be in recess for 15 minutes.

19            THE CLERK:  All rise.

20        Court will be in recess for 15 minutes.

21                        (Recess taken.)

22    (Proceedings were heard out of the presence of the jury:)

23            THE COURT:  Mr. Dirisanala, you're welcome to --

24    first of all, we're outside the presence of the jury.  I do

25    want to put this on the record.

1           Mr. Dirisanala, you're welcome to remain in the courtroom.

2      We're going to have a hearing outside the presence of the jury

3      while the jury is in the jury room.  If you'd like to wait in

4      the witness room, you can do that, or you can remain in court.

5      That's up to you.

6                THE WITNESS:  I'll wait.

7                THE COURT:  Okay.  Thank you, sir.

8      We're still outside the presence of the jury.

9      Ms. Su -- Dr. Su, I'll just remind you that these recesses

10     are 15 minutes, and I'd like to ask that you get back to court

11     within 15 minutes after the recess starts.

12     We're going to have a hearing now outside the presence of

13     the jury.  The Government has requested such a hearing for the

14     purpose, as I understand it, of discussing the admission of

15     coconspirator statements in the trial.

16     Mr. Rhyne?

17               MR. RHYNE:  Yes, your Honor.

18     I think going forward with Mr. Dirisanala, there's going to

19     be a number of questions that are asked of him that are going

20     to call for responses that fall within the exemption to the

21     hearsay rule under 801(d), and the reason -- the reason why is

22     because the statements that he's going to be testifying to were

23     made at the time that we believe multiple conspiracies were

24     going on in this case, namely the conspiracy charged in Count

25     15, which is a conspiracy to commit visa fraud.

1          I believe there's also one of the uncharged conspiracies

2     that the Court can properly rely on that are also ongoing at

3     this time, including a conspiracy to access SEVIS without

4     authorization.  As the Court is likely aware, you can rely on

5     any evidence in concluding by a preponderance of the evidence

6     that a conspiracy exists at the time, and those conspiracies

7     need not be charged.

8          So we just wanted to call it to the Court's attention that

9     there will likely be questions that will call for answers that

10    will fall in the scope of that exemption to the rule.

11          THE COURT:  There is one -- there was one question

12    earlier in today's proceeding to which that exemption was

13    proffered.

14          Sam Steven's name kind of fell out of the sky.  I mean, his

15    name exists in the pretrial memorandum, and I appreciate the

16    Government calling my attention to the memorandum.  I did

17    reread the portions at Pages 10 and 13 of that memorandum, and

18    that was very helpful.  So I think I have a better

19    understanding now of foundation for the Government's reliance

20    on that exemption.

21          Does the defendant wish to be heard?

22          MR. BABCOCK:  Well, I don't know exactly which

23    statements they're going to try to get in.  So I think we'll

24    have to take it on a case-by-case basis.

25          I do note I would -- just to give you a heads-up, I --

1    probably the issue would be -- I assume there will be people

2    that -- there's some evidence of a conspiracy admission,

3    probably more whether the statements are in furtherance of it

4    somehow.

5             THE COURT:  Yes, and I will also say that I -- it's

6    not -- it's not uncommon for me upon reconsideration to vacate

7    a prior evidentiary ruling and tell the jury that I've changed

8    my mind and then, if I didn't strike something, then strike it

9    at that time, or if I did strike something, I can tell them

10   they can properly consider it.

11       I've not done that in this case, and I do that by way --

12   without waiting for someone to ask me to do it.  In fact,

13   asking me to do it doesn't usually have the effect that -- if I

14   sent the signal that all my evidentiary rulings were subject to

15   reconsideration, then I would be inundated with those requests,

16   and that's not good trial management.

17       So I usually only do it on my own admission.  I didn't do

18   it in this case because the information sought to be elicited

19   by the question about Mr. Stevens came in six different ways

20   from this witness.  So it just didn't seem worth the -- for me

21   to go back and examine the transcript close ly.  But as I said,

22   I did review this memorandum, I do have the elements of that

23   exemption in mind, and I'll listen closely to the testimony.

24       Anything further?

25             MR. RHYNE:  Submitted, your Honor.

1          THE COURT:  All right.  Thank you.

2      Let's bring in the jurors.

3          THE CLERK:  Yes, sir.

4      Can we get our witness back on the stand?

5          THE COURT:  Oh, yes.

6      Would the Government go to the witness room and get Mr.

7   Dirisanala, please.

8      Okay.  Mr. Dirisanala, let me ask you to come back up to

9   the witness stand, and the jurors will come in in just a

10  second, and if I can ask you just to remain standing until the

11  jurors come in and they've taken their seats, please.

12      (Proceedings were heard in the presence of the jury:)

13          THE COURT:  Back on the record.  All the jurors are

14  in their assigned seats.

15      Ms. West?

16          MS. WEST:  Thank you.

17  BY MS. WEST:

18  Q.  Mr. Dirisanala, I wanted to circle back to one thing that I

19  think we didn't close the loop on before we continue with the

20  line of questioning where we left it, and that is:  You made --

21  you said that there were some instructors who called and said

22  there were no students?

23  A.  Yes.

24  Q.  Are you aware whether any F-1 students themselves were

25  instructors?

1    A.   Yes.

2    Q.   How did you become aware of that?

3    A.   When they called me to process their CPT I-20 or registered

4    I-20, then they tell me, "Hey, I'm teaching this subject" or

5    "I'm teaching this subject."

6         And, like, 3 or 4 students called the university phone,

7    which I attended that, and they asked me, like, "Are there any

8    teaching positions available?"  Most of the students in that

9    university are from India, and many of them are from my state,

10   like, where I lived, Andhra Pradesh, and most of them speak my

11   language, what I speak, Telugu.

12        So most of the time, they used to talk with me in my

13   language, and it was, like -- they requested me, "Hey, can you

14   ask Susan Sue whether they can give us a teaching job?"

15        And then I told to Susan Su that "These three guys or four

16   students called me up.  They needed teaching," and Susan Su

17   tell -- told me -- requested them to send an e-mail that they

18   wanted to teach this subject.  Then I will get back to them.

19   So then they are offered jobs.

20        Later on, they call me and said, "Anji, thank you.  Susan

21   gave us to teach these subjects."

22   Q.   All right.  Let's go back now to where we left off about

23   other ways that you found to make money.

24   A.   Yes.

25   Q.   You just told the jury about how you found a way to make a

1     profit off of the FedEx fees; is that right?

2     A.   Yes.

3     Q.   Was there another way that you found to make money?

4     A.   Yeah.  I -- in the university, I see a lot of students

5     coming in, and they are referring the students, and they are

6     getting paid money.  Like, the first semester -- if a student

7     pays $2,750, Susan used to write a check to them for $1,200 for

8     referring the students.

9     Q.   A referral fee?

10    A.   A referral fee for referring the students to the

11    university.

12    Q.   Did you try to do the same thing?

13    A.   Yeah.  I tried to do the same thing and told Susan, "There

14    are many people calling me.  Can I" -- "can I also refer the

15    students and get that $1,200?"

16         She told, "No.  You're already working in the office.  You

17    cannot do that."

18         And I said, "Okay."  Then I talked with my friend, and I

19    told him, see, there's an option like this.  Many people who

20    are all on F-1 status are referring their students -- referring

21    their friends, and they are getting paid $1,200 per student.

22    Then me and my friend thought, "Okay.  She's not going to give

23    out my name, but she can give it on your name."

24         Then my friend contacted Susan Su, and she gave a referral

25    agreement to my friend.  He can send the documents for new

1    students, and she will pay him for every student $1,200 if they

2    pay the fee.

3    Q.  Were you going to make money off of that somehow?

4    A.  Yes.

5    Q.  How?

6    A.  Since I was attending phone calls, some people asked me --

7    the phone is always busy.  If I am taking one phone call, there

8    will be, like, five or six phone calls waiting on that.  So not

9    all calls are returned back to the students.  So some people --

10   they state, "I'm going to" -- "I'm trying to get hours.  Can

11   you give me your phone number?"  And some people -- I give my

12   phone number.  So my number works.

13       Some people are, like, "Okay.  This guy is working in the

14   university.  You can call him day to day."  Somehow, they have

15   my number, and some people say, "We want to get into this

16   university."

17       Then I tell them, "Okay.  This is my friend.  You will call

18   him, he will send you the documents, and he will get admission

19   for you."  So there is -- we got new admissions, and then Susan

20   Su pays.  I got money off of it.

21   Q.  What portion of the referral fee of your friend did you

22   get?

23   A.  Most of the money, I got it because I'm only just using my

24   friend as a name there.  Most of the monies was based on -- I

25   got at least a thousand dollars per student and around 200 for

1    my friend because he's not doing anything.  Everything -- I did

2    it like passing on the number -- passes on the phone number for

3    the admission.

4    Q.   About when did you start getting money from referrals?

5    A.   February -- somewhere in -- after one month or one and a

6    half month I joined -- after May 15th, I believe.

7    Q.   I'm sorry.  You said May?

8    A.   March.  Sorry.  After March 15th or something like that.

9    Q.   And about how many students did you refer?

10   A.   I had through my friend e-mailed -- he forwarded around 35,

11   40 students, and he got paid for 18 to 20 students, referral

12   fee.

13   Q.   Okay.  So he did not get paid for all of the referrals?

14   A.   Yes.

15   Q.   So approximately how much money did you make from the

16   referral fees?

17   A.   Around 20,000.

18   Q.   Did you ever do any work for Susan Su that was not at

19   Tri-Valley University?

20   A.   Yes.

21   Q.   Can you tell us about that, please.

22   A.   One day, Susan Su took me to her mother's house.  Me and

23   Susan went to her mother's house and bought all the furniture.

24   Like, she wants to add new tables and computers to the next two

25   rooms she had for a few hours a week, she wants to put a few

1   more computers there.  She wants to recruit more people to work

2   in the office.  So I helped her bring in all the furniture

3   there.

4   Q.  All right.  So you helped move?

5   A.  Yeah.  Like, I gathered all the furniture to the car and

6   from the car to the office.

7   Q.  Was there any other work that you did for Susan Su that was

8   not at Tri-Valley?

9   A.  Yeah.  I -- she actually owns an apartment, like, her own

10  apartment.  So she told me and the other person Previn, like,

11  if we can paint that house, she will pay us the money.

12  Q.  To paint her house?

13  A.  Paint her house.

14  Q.  How much was she going to pay you?

15  A.  Oh, she told us she would pay us $400 for painting the

16  house.

17  Q.  Did you paint?

18  A.  Me and Previn painted for one day.  Then she told, "Okay."

19  I actually painted one bedroom, then one -- actually, it was

20  two bedrooms we painted.  So she told, "Okay.  Come over

21  tomorrow and do the rest of the thing," but we didn't go, but

22  the person by the name of Ramakrishna -- he took us out of town

23  later that evening.  So we couldn't go next day to paint it.

24  Q.  You were out of town?

25  A.  Yeah.

1    Q.   Did she pay you for the day you did work?

2    A.   No.  She told -- we left without informing her.  So she

3    hired somebody to paint.  So she didn't pay us.

4    Q.   Now, you've told the jury that you left -- you stopped

5    working for Tri-Valley University -- did you say May 12th?

6    A.   Around May 12th.

7    Q.   Why did you stop working for Tri-Valley?

8    A.   When I was working, all the students and their credit card

9    data were all in the e-mail.  So it's Sunday -- Sunday when I

10   am at home, Susan Su called me on my phone and said, "Hey,

11   Anji, did you process any of the credit cards outside the

12   university?"

13       I said, "No."  Then I asked her what happened.  She told

14   me, like, one student called her up and said his credit card

15   was processed somewhere else at the university.  So she dealt

16   it on me and somebody else.

17       So she said, "Anji, I believe you did access this credit

18   card somewhere outside the office.  So you don't come to work

19   for one week.  I'm going to investigate what happened."

20       Then I told Susan Su right away, "Susan, I didn't access

21   anybody's credit card outside the university.  If you want, you

22   can request the student to call up the bank and ask the bank

23   where this card was charged and where it was declined so you'll

24   have a clear idea of who did it."

25       But she refused to do that, and she said, "It's okay, Anji.

1    You just stay out there for one week.  You don't come to the

2    office."

3        So I said, "Okay."

4    Q.   Now, after that week, did you go back to work at

5    Tri-Valley?

6    A.   No, I didn't go back there.  She told she was going to call

7    me when I can come back and start working.

8    Q.   What happened during that week?

9    A.   So within three days, all this simultaneously -- many

10   things happened in two or three days' timing.  She told me not

11   to come.  I said, "Okay."  I'm at home for two days.  I didn't

12   go anywhere.  Then Ramakrishna came to my house.  Usually,

13   Ramakrishna had a car, and he used to take me and Previn

14   somewhere to San Francisco or somewhere just to -- for fun.  He

15   takes us --

16   Q.   Let me just stop you for a moment.

17       Who is Ramakrishna?  Is that another employee?

18   A.   No.  He's not an employee at Tri-Valley University, but he

19   has a consulting company in India.  He recruits students to

20   Tri-Valley University.  He has a referral agreement from Susan

21   Su to recruit new students.

22   Q.   So he doesn't work in the office, but he would often come

23   there?

24   A.   Yes.  He doesn't work often -- actually, he comes every day

25   to the university, collects the documents, and go back.

1    Q.   Okay.  So please continue.

2    A.   So I left.  Ramakrishna came to my house, and he said,

3    "Anji, let's go to San Francisco."  I just went with him.  Then

4    he took me to the ICE office.  Until that time, not -- I'm not

5    aware why he's taking me there.  Then I met Agent Mackey.  Then

6    he told me, "We want to talk with you regarding this

7    university.  You are working in this."

8         So since it's the very first time for me and I do not have

9    any idea, I didn't talk with them much, and I am not very

10   clear -- like, I'm not very truthful to them, what I'm telling.

11   Q.   All right.  Let me stop you for a moment.

12        You said that Ramakrishna took you to ICE.  Do you mean the

13   immigration --

14   A.   Yeah, Immigration --

15   Q.   -- building?

16   A.   -- Customs Enforcement office.

17   Q.   Okay.  And you spoke with Agent Mackey?

18   A.   Yes.

19   Q.   And did you tell him the truth that day?

20   A.   No.

21   Q.   Did you have -- did you have another opportunity to speak

22   to Agent Mackey?

23   A.   Yes.

24   Q.   When was that?

25   A.   So after that, May 17th, I met.  Then I went back home.  By

```
 1    that time, they told me, "Okay.  This is one university."

 2    While riding back, Ramakrishna told me --

 3    Q.  Well, hold on.  Did you ultimately give more information to

 4    Agent Mackey about Tri-Valley University?

 5    A.  Yes.

 6    Q.  And did you at some point agree to cooperate with the

 7    United States Government's investigation --

 8    A.  Yes.

 9    Q.  -- of Tri-Valley?

10    A.  Yes.

11    Q.  Did you at some point during this period transfer to

12    another university?

13    A.  Yeah.  The very next day, I transferred back to the ITU

14    University, where I got a first-time visa to attend that

15    college.

16    Q.  The next day after you first spoke with Agent Mackey?

17    A.  Yes.

18    Q.  All right.  Now, is that the time that you're referring to

19    where you got a transcript from Susan Su?

20    A.  Yes.

21    Q.  Why did you transfer to ITU then?

22    A.  After talking with Agent Mackey, I was a little bit scared,

23    and while coming back, even Ramakrishna told me that if I

24    didn't report that this is one fraud university running all

25    these things --
```

1   Q.   Well, hold on.  Let me just stop you.

2        Why did you decide to enroll in school?  You hadn't been

3   going to classes for this period of time.

4   A.   Yeah.  Yeah.

5   Q.   Why did you decide to change to a different school?

6   A.   Because if something happens to the university and SEVIS

7   goes off, then my visa automatically gets cancelled.  So I'm

8   scared of that, and I moved to a different university the very

9   next day.

10  Q.   Next -- so you transferred to ITU?

11  A.   ITU.

12  Q.   Did you attend any classes at ITU?

13  A.   No, I didn't attend any classes.  It was the summer

14  semester, and F-1 students have an option to take a break for

15  summer.  So just for time's sake, like, in -- I took an

16  admission, and I came back to Tri-Valley and met Susan Su, and

17  I told her, "I need to change back to the ITU university."

18       Then she asked me the reason.  I actually told her, "I went

19  to some office.  I do not know what it is," because by that

20  time, I am not sure what is ICE or anything, but I told, "It's

21  like police.  I met them.  Somebody questioned me about this

22  university.  So I'm scared.  I cannot be here.  I am moving

23  out."

24       But Susan was -- she didn't believe me.  She thought I was

25  telling her just to get back to the university for the job

DIRISANALA - DIRECT / WEST

1    again.  I told her, "I'm not ready to work here.  I am

2    leaving," and I tell her.  She transferred me.

3    Q.  Did you, after ITU, transfer to any other school?

4    A.  Yeah.  I was in ITU University for -- my admission is there

5    for two months.  I had the time to register for classes within

6    two months.  Then I was -- like, these guys want -- ITU

7    University wants me to pay the fee, 2,700.  I said, "No."

8         Then I got another option to move to De Anza College for

9    doing automotive certification courses.  Then I moved back, and

10   I attended -- I registered for classes there.

11   Q.  And did you actually attend class at De Anza?

12   A.  It's actually the summer semester.  Only one day is

13   remaining, and the instructor at De Anza college said, "F-1

14   students need not attend any classes in summer.  So just to

15   register your I-20, you can take anything.  Like, you can take

16   swimming class or soccer or anything."  So I registered for

17   soccer, and I went for two months there.

18   Q.  All right.  I want to go back and cover something that we

19   kind of skipped over.

20        When you were finding other ways to make money, did you

21   attempt to make money through somebody known as Jimmy?

22   A.  No.

23   Q.  Did you do any work with Jimmy?

24   A.  No, I didn't do any work with Jimmy.

25   Q.  Did you receive anything from somebody named Jimmy?

1    A.   No.

2    Q.   Did you use a cell phone?

3    A.   No.

4         THE COURT:  Excuse me.  Do you know who that is?  Do

5    you know who Jimmy is?

6         THE WITNESS:  I know Jimmy after I went to the office

7    when they moved to Boulder Court.  Then I received -- I know

8    who Jimmy is.

9    BY MS. WEST:

10   Q.   Okay.  So let's -- let's go back.

11        Who is Jimmy?

12   A.   Jimmy is an employee in the university like me.  He's a

13   student there, and he used to work like what I do there, the

14   same thing he does in the university.

15   Q.   And did you ever offer to do any work with Jimmy?

16   A.   No.  I never worked with Jimmy, but I worked with

17   Ramakrishna.  I do not have any contact with Jimmy.

18   Q.   Okay.  In your work with Ramakrishna, what was that?

19   A.   Ramakrishna used to come every day to the university and

20   refer admissions and take the documents from there.  Then he

21   told me, "Anji, you left the university.  So if anybody calls

22   you, refer my name.  So if I get them an admission, I will give

23   you the money."

24        I said, "Okay," but by that time, I'm already doing it with

25   my friend, referring the students.  So I didn't do anything

1    much with Ramakrishna by that time.

2    Q.   Okay.  Did you receive any compensation from him?

3    A.   I didn't receive any compensation from Ramakrishna, but

4    from Day 1, he's the only guy I know except my brother, and I

5    don't know anybody here.  So he became like a friend to me.  So

6    me, Vishal, Ramakrishna, and the other person by the name of

7    Previn were our friends.  We used to hang out on weekends

8    somewhere.  He gave me an iPhone for all -- he says it is his

9    birthday.  So he gave to four of us iPhones.

10   Q.   For his birthday?

11   A.   Yes.

12   Q.   Okay.  Did you understand that to be payment for anything?

13   A.   No, it's not payment.  He said it's just -- "use it.  It's,

14   like, my birthday.  I'm giving you guys," but I never used his

15   phone.

16   Q.   All right.  So now let's go back to after you met with

17   Agent Mackey the first time.

18        And you were untruthful --

19   A.   Yes.

20   Q.   -- correct?

21        And then you said that you met with him again later?

22   A.   Yes.

23   Q.   And you agreed to assist in the investigation of

24   Tri-Valley?

25   A.   Yes.

1   Q.  At some point, did you enter into a plea agreement?

2   A.  Yes.

3   Q.  And did you plead guilty to a charge?

4   A.  Yes.

5   Q.  And you came into the courthouse?

6   A.  Yes.

7   Q.  Now, was the charge that you pleaded guilty to conspiracy

8   to commit unauthorized access of a government computer?

9   A.  Yes.

10  Q.  And as part of pleading guilty, you admitted certain things

11  that you had done wrong.  Is that fair?

12  A.  Yes.

13  Q.  Did you admit to creating false I-20 documents?

14  A.  Yes.

15          MR. BABCOCK:  Objection, your Honor.  What's the

16  relevance?

17          THE COURT:  Overruled.

18  BY MS. WEST:

19  Q.  As part of your plea agreement, did you admit to creating

20  false I-20 documents?

21  A.  Yes.

22  Q.  Did you admit that you had created these Forms I-20,

23  entered in false information about the applicant's residence,

24  means of support, course of study, and purpose of entry into

25  SEVIS?

DIRISANALA - DIRECT / WEST

1    A.   Yes.

2    Q.   Did you say anything about -- when you pled -- when you

3    pleaded guilty, did you say anything about whether you had seen

4    Susan Su forge signatures on those I-20's?

5    A.   Yes.

6    Q.   Did you admit as part of your plea agreement that you

7    received approximately $18,000 in referral fees?

8    A.   Yes.

9    Q.   As part of your plea agreement, did you -- was it part of

10   your plea agreement that -- where it set out the potential

11   penalties --

12   A.   Yes.

13   Q.   -- for what you did?

14   A.   Yes.

15   Q.   And did you understand that you could be sentenced up to

16   one year in prison?

17   A.   Yes.

18   Q.   And a $100,000 fine?

19   A.   Yes.

20   Q.   Did you understand when you were pleading guilty and was it

21   part of your plea agreement that you could be deported?

22   A.   Yes.

23   Q.   Was it part of your plea agreement that you agreed to

24   forfeit to the United States the referral fees that you made

25   from these false I-20's?

1    A.   Yes.

2    Q.   Mr. Dirisanala, have you been sentenced yet?

3    A.   Not yet.

4    Q.   Who -- who will issue your sentence?  Who will order your

5    sentence?

6    A.   The judge.

7    Q.   Now, as part of your plea agreement, did you agree to

8    cooperate?

9    A.   Yes.

10   Q.   Did you agree to provide documents and information to the

11   United States?

12   A.   Yes.

13   Q.   And have you done that?

14   A.   Yes.

15   Q.   And did you also agree to participate in undercover-type

16   activities?

17   A.   Yes.

18   Q.   And have you done that?

19   A.   Yes.

20   Q.   What is your current status in the United States?

21   A.   Right now, I applied for federal benefits; that is, parole

22   for the United States.

23   Q.   At some point, were you placed on what's called deferred

24   action?

25   A.   Yes.

1    Q.   And at some time, were you permitted to return to India?

2    A.   Yes.

3    Q.   For what purpose?

4    A.   My sister's marriage in 2012 in January.

5    Q.   And was it from India that you were paroled back into the

6    United States?

7    A.   Yes.

8    Q.   And did you understand that that was for the purpose of

9    testifying in this case?

10   A.   Yes.

11   Q.   Okay.  Now, I'd like to talk about some of the cooperation

12   that you provided in this case.

13        Did you -- did you at some point wear a wire and go into

14   Tri-Valley University?

15   A.   Yes.

16   Q.   All right.  I want to turn your attention, please, to

17   June 3rd of 2010.

18        Do you have that date in mind?

19   A.   Yes.

20   Q.   Okay.  Did you meet with agents -- immigration agents, in

21   particular Agent Mackey and Agent Dale Taylor, on June 3rd,

22   2010?

23   A.   Yes.

24   Q.   Where did you meet them?

25   A.   I met them close by Bernal Avenue.  There's a shopping

1    complex.  I met them in the parking lot.

2    Q.   And was that Bernal Avenue -- was that where Tri-Valley

3    University was located when you worked there?

4    A.   Yes.

5    Q.   And still on June 3rd?

6    A.   Yes.

7    Q.   At some point, it moved; right?

8    A.   Later on, it moved.

9    Q.   Okay.  So when you met with the agents near Bernal Avenue,

10   did they give you any instructions?

11   A.   Yes, they gave me instructions.  Since this university is

12   giving admissions, we got documents with just the names and the

13   date of birth.  So they gave me a paper with the two students

14   stating their name, their date of birth, and address to get new

15   admissions for them.

16   Q.   What did you do with that paper?

17   A.   So I wrote it down with my handwriting on the paper.  Then

18   I went back to the university.

19   Q.   Why did you put it in your own handwriting?

20   A.   Because Susan Su knows my handwriting just to make sure

21   that nobody is sending me or something -- just make sure that I

22   am writing it on the paper.

23   Q.   Were your actions -- were you being monitored in some way?

24   A.   Yes, I'm being monitored, and I was instructed by Agent

25   Mackey to rip -- to tell, "Help" if I am in trouble when I am

1   in the university.

2   Q.   Okay.  So were you wearing a body wire?

3   A.   Yes.

4   Q.   And how were you wearing that?

5   A.   It was inside my shirt.  So it's on my shirt.

6   Q.   So it --

7   A.   It was placed with, like, a tape.  It was taped inside.

8   Q.   Okay.  In addition to the body wire, was there an

9   audio-recording device?

10  A.   Yeah, there's a recording.  It comes under my shirt into my

11  pant pocket.

12  Q.   Into your pant pocket?

13  A.   Yes.

14  Q.   Okay.  So when you went to Tri-Valley University, did you

15  have a chance to talk with Susan Su?

16  A.   Yeah.  Yes.

17  Q.   What did she say?

18  A.   Okay.  When I went to the university, she asked me, like,

19  why did I come there.  Then I told her it's -- since I'm a

20  friend of the students, I told her there are two students from

21  New York/New Jersey area that are terminated from different

22  university.  So they needed new admissions from this college,

23  and I brought the -- just the name and the date of birth and

24  details.  So I requested her to give a new admission.

25  Q.   Did you show Susan Su the paper with your handwriting?

1    A.   Yes.

2    Q.   Did you show her anything else?

3    A.   No, nothing, just the paper, what I wrote, the data's name,

4    date of birth, and address.

5    Q.   I'm showing you what is already in evidence as Government

6    Exhibit 200B.

7         Is this the paper that you showed to Susan Su?

8    A.   Yes.

9    Q.   And is this your handwriting with "Kadir Dirikan" and

10   "Sparsh Prashant Agrawat"?

11   A.   Yes, that's my handwriting.

12   Q.   Do you know what this writing is over here?

13   A.   Oh, that is some address in my hometown.  So when I went to

14   meet Agent Mackey, I took a paper from my car.  So there's

15   already an address there on that paper.

16   Q.   Okay.

17   A.   That's my paper.  I brought it.  It's already in the car.

18   Q.   All right.  So this part on the left here, "5211," does

19   it -- does that have anything to do with Tri-Valley?

20   A.   No.

21   Q.   All right.  It's the information on the right, that "Kadir

22   Dirikan," date of birth, and address, and the same for Sparsh

23   Agrawat --

24   A.   Yes.

25   Q.   -- that you wrote down?

1   A.   Yes.

2   Q.   Okay.  So when you spoke with Susan Su, where were you?

3   A.   I'm in the Bernal Avenue -- in the office, the Susan Su

4   office where I previously worked in the room.

5   Q.   Can you describe that room to the jury?  Was it big?

6   Small?

7   A.   It is not that big of a room.  It's actually very small,

8   maybe the size of this -- from here to the end of this block.

9   Q.   About the size of the judge's bench?

10  A.   Yes.

11  Q.   Okay.

12  A.   And it's a little bit long -- little bit --

13  Q.   Little longer?

14  A.   Yes.

15  Q.   And was that the Tri-Valley office, or was that a special

16  office for Susan Su?

17  A.   No.  She said this is the Tri-Valley University admission

18  office.

19  Q.   Did she have her own office space within that, or did

20  everybody share?

21  A.   Everybody shared that along with students, like, who are

22  working at -- like me.  Along with me and Susan, everybody

23  share that room.

24  Q.   How close to Susan Su were you when you were talking?

25  A.   Very close.

1    Q.   Now, did you hand her the piece of paper, or did you hold

2    it and show it to her?

3    A.   No.  I went and I showed and gave it to her in her hand and

4    told her these two students need an admission.  I gave it to

5    her in hand.

6    Q.   Were you carrying any other papers with you at the time?

7    A.   No.

8    Q.   When you handed that to Susan Su and told her that these

9    two people needed admission, what did she say?

10   A.   She told, "Okay.  These are terminated students.  I will

11   give them a new I-20.  Ask them to pay the SEVIS fee."

12   Q.   How did she know they were terminated?

13   A.   I told her.

14   Q.   Okay.  You told her they had already been terminated?

15   A.   They were already terminated from the university.

16   Q.   All right.  And please continue.  What did she say?

17   A.   She said, "Okay.  No problem.  I will give the

18   university" -- "the admission in this university, and I will

19   give a new I-20.  Ask them to pay the SEVIS fee and register

20   for classes, pay the fee and register for classes."

21   Q.   And did she issue you an I-20?

22   A.   No, because she's sitting in the office, and there's

23   another person, Vishal, sitting next to her.  So she told

24   Vishal to type the I-20 and give it.

25   Q.   And did Vishal print out that I-20 for you?

1    A.   Yes.  He typed out -- whatever, like -- I took this paper

2    back from Susan Su, and I was reading the names and details.

3    So Vishal typed it, and he printed.

4    Q.   Was Susan Su there while Vishal did that?

5    A.   Yes.  Susan Su is sitting just next to him.

6    Q.   I am showing you Page 3 of this same exhibit now.  Let's

7    see.

8         Okay.  Can you see this from there?

9    A.   No.

10   Q.   All right.  Let me hand it to you first.  Let's try that.

11        Is this an I-20 for Sparsh Agrawat?

12   A.   Yes.

13   Q.   And is it signed?

14   A.   Yes.

15   Q.   In whose name?

16   A.   It's signed in the Wang name.  He's another DSO in the

17   university.

18   Q.   Did you see anybody sign this document?

19   A.   No.  This is signed by Susan Su.  After Vishal did it, he

20   gave it to Susan, and Susan signed it and gave it to me.

21        THE COURT:  Ms. West, would you say the exhibit

22   number, please.

23        MS. WEST:  Yes.  It's still 200B, Page 3.

24        THE COURT:  Thanks.

25   ///

BY MS. WEST:

Q.   All right.  So let's just zoom in a little so the jury can

see.

     Okay.  And when you are talking about the -- the student's

name or the individual's name, is that from the top Sparsh

Agrawat?

A.   Yes.

Q.   And if we look at the bottom in Box 10, is that blue

there -- is that the signature "Wenchao Wang" that you saw

Susan Su sign?

A.   Yes.

Q.   And the day of this was the same date this was issued,

June 3rd, 2010?

A.   Yes.

Q.   And you got another I-20, too; is that right?

A.   Yeah.  That was for the other student.

Q.   Okay.  I'm going to hand this one to you as well.  This is

Page 7 of Exhibit 200B.

     Is that the other I-20 you received?

A.   Yeah.  It's for the other student, Dirikan.  Yes.

Q.   Dirikan?

A.   Yes.

Q.   All right.  And in whose name is this signature?

A.   It's in the same name, Wang.

Q.   And did you see somebody sign that?

1    A.   Yeah.   Susan Su signed it.

2    Q.   You actually saw her sign it?

3    A.   Yes.

4    Q.   All right.  I'm going to put Page 7 of 200B up for the jury

5    to see now.

6         There at the top, is that -- Kadir is the first name and

7    Dirikan the second?

8    A.   Yes.

9    Q.   And there in blue, is that the signature that you saw Susan

10   Su sign?

11   A.   Yes.

12   Q.   Wenchao Vince Wang?

13   A.   Yes.

14   Q.   And again, the same date of June 3rd, 2010; right?

15   A.   Yes.

16   Q.   Now, when you went back to Tri-Valley on June 3rd, that was

17   just a couple of weeks after Susan Su had told you not to come

18   to work for a week; right?

19   A.   Yes.

20   Q.   Was she still mad at you when you went in?

21   A.   No.

22   Q.   Had you had any conversation leading her to no longer be

23   upset?

24   A.   I did not have any conversation with her.  She just told

25   me, "Are you still at ITU?"

1      Then I told her, "No.  I registered for De Anza College."

2      Then she said, "Okay."  Then she told me, "De Anza doesn't

3   have a Master's degree."

4      And I said, "No.  I went for Associate Degree to do some

5   certifications there and get a job."

6      So that was the conversation.  She was not mad at me.  As

7   long as she understood that if not me, somebody would have

8   accessed the credit card, someone she was thinking of.

9   Q.  So you had no more communications with her about the credit

10  card?

11  A.  Yes.

12  Q.  Now, after June 3rd, was there a time when you then went

13  back to Tri-Valley University again wearing a wire?

14  A.  Yes.

15  Q.  Okay.  Do you have July 27th, 2010, in your mind?

16  A.  Yeah.  That's my second visit.

17  Q.  Okay.  So on that day, did you again meet with agents

18  beforehand?

19  A.  Yes.

20  Q.  Did you meet with Agent Mackey and Agent Taylor?

21  A.  Yes.

22  Q.  All right.  Where did you meet with them this time?

23  A.  I met them at a new office, Boulder Court.  That is my

24  first time visiting that office there.

25  Q.  And by this time, had Tri-Valley moved?

1  A.   Yeah.  Tri-Valley moved, and I'm not aware of that.  So

2  Agent Mackey told me to come over to this new address.

3  Q.   It was at 405 Boulder Court?

4  A.   Yes.

5  Q.   And where did you meet with the agents at Boulder Court?

6  Was it in a parking lot?

7  A.   Yeah, in the parking lot behind the building, close to

8  that.

9  Q.   Did you receive any instructions from the agents?

10  A.   Yeah.  I got an instruction from the agent to go to the

11  university and pay the fee for the two I-20's I got admissions

12  for the last month.

13  Q.   How were you supposed to pay the fee?

14  A.   They paid me cash, like, a thousand dollars to pay for each

15  student, and I got money from Agent Mackey to pay to the

16  university.

17  Q.   So you got from Agent Mackey $1,000 for each of the --

18  A.   Students.

19  Q.   Okay.  So $2,000 total?

20  A.   Yes.

21  Q.   And were you again wearing a body wire?

22  A.   Yes.

23  Q.   Was there any recording device this time?

24  A.   Yes.  There's a camera.

25  Q.   There's a camera?

1    A.    And a recording device.

2    Q.    There was audio and video this time?

3    A.    I'm not sure.  I think -- I'm not sure about the video, but

4    I was -- had the video for the second or the third time.

5    Q.    Okay.  So at some point, there was video?

6    A.    But always there is audio.

7    Q.    Okay.  So there was at least audio this time?

8    A.    Yes.

9    Q.    And this time when you went in, was Susan Su there?

10   A.    Yeah, she's there in the university.

11   Q.    Did you talk to her?

12   A.    Yeah, I talked with her.

13   Q.    Please tell us what happened.

14   A.    Yeah.  I went back inside of the university and told Susan

15   Su, "Okay.  Do you remember, Susan, last month you gave two

16   people admissions who are terminated?  And they sent me the fee

17   to my bank account.  So I'm here to pay a thousand dollars for

18   each student.  So can you can register them and give the fee

19   receipt?"

20        She told, "Okay," and she took the money and printed out

21   the fee receipt, and she sent one copy to e-mail ID, and she

22   printed the register I-20.  She signed it and gave it to me.

23   Q.    Okay.  Let's take a look at the I-20's first.  I'm going to

24   show you what is already in evidence as Government

25   Exhibit 202D, and I am going to show you two pages, Pages 1 and

1      Pages 4 of that exhibit.

2           Are these the two registered I-20's you just mentioned?

3      A.   Yes.

4      Q.   And do these both bear blue signatures?

5      A.   Yes.

6      Q.   In whose name?

7      A.   It's under Wang, the DSO.

8      Q.   Wenchao Wang?

9      A.   Yes.

10     Q.   And did you see somebody sign this?

11     A.   Yeah.  This one, Susan Su signed it before me.  I was

12     sitting just opposite to her in the table.  This -- she signed

13     and gave it to me.

14     Q.   Okay.  You saw her sign both names, "Wenchao Wang"?

15     A.   Yes.

16     Q.   And let's show the jury Page 1 of Exhibit 202D.  Let's

17     start at the top.

18          This is for Kadir Dirikan.  Can you read it from there?

19     A.   No.  It's not --

20     Q.   All right.  Let me make it bigger.  There we go.

21     A.   Yes.  Now I can.

22     Q.   You can see "Kadir Dirikan"?

23     A.   Yes.

24     Q.   And in Box 2, can you see "Tri-Valley University"?

25     A.   Yes.

1    Q.   And also below that, "School Official:  Wenchao Vince

2    Wang"?  Do you see that right there in Box 2?

3    A.   No.  That's not actually clear for me.

4    Q.   Okay.  Let me make it a little bigger.

5    A.   Yeah.  Now I see it.

6    Q.   Okay.  And below that, it says, "Registration Officer"?

7    A.   Yes.

8    Q.   Is that part of what you were telling us earlier comes up

9    automatically when people are entering in SEVIS?

10   A.   Yes.

11   Q.   Okay.  And you said this was for registered attendance.  Is

12   that what you mean here when it says, "Continued attendance at

13   this school"?

14   A.   Yes.  There is a registration ID.  Whoever pays the fee,

15   then they are registered into I-20, and that's the I-20 that

16   comes out of the system.

17   Q.   Okay.  And when you were entering this I-20 information as

18   part of your job, did you input this kind of information when

19   somebody paid the fee?

20   A.   No.  That automatically comes up in the system.  There is

21   an option to register a student in the SEVIS.  When I click on

22   the SEVIS, if you can look down there, there are dates starting

23   no later than 12/30/2015.  That is for completion.  So I need

24   to input that date there.

25   Q.   You input the date, but the part of "Continued attendance"

1    comes out automatically --

2    A.  Yes.

3    Q.  -- when you -- when you press a certain button?

4    A.  Yes.

5    Q.  All right.  And let's look down here at the signature.  Is

6    that the blue there -- is that the blue signature you saw Susan

7    Su sign?

8    A.  Yes.

9    Q.  Where it says, "Wenchao Wang"?

10   A.  Yes.

11   Q.  And did she give it to you that same date you were there,

12   July 27th, 2010?

13   A.  Yes.

14   Q.  Now, we're looking at Page 4 of Exhibit 202D, the same one

15   you just looked at that I had handed to you, but this one is --

16   do you see there "Sparsh Prashant Agrawat"?

17   A.  Yes.

18   Q.  And again, "Continued attendance at the school"?

19   A.  Yes.

20   Q.  And -- there we go.  That blue signature, "Wenchao Vince

21   Wang," is what you saw Susan Su sign?

22   A.  Yes.

23   Q.  Did she print these herself for you this time?

24   A.  Yeah, she printed it for me.  Yes.

25   Q.  Okay.  She didn't have one of her staff do it?

1    A.   No.

2    Q.   Whoops.   There we go.

3         And the same date of July 27th?

4    A.   Yes.

5    Q.   You mentioned that she also sent you an e-mail?

6    A.   Yeah.   She sent me the thousand-dollar fee receipt for each

7    student and a completed copy of registered I-20 with signature.

8    We sent an e-mail ID.

9    Q.   All right.   I'm going to show you what is already in

10   evidence as Government Exhibit 202C.

11        All right.   Let's just look at the header information here.

12   It's a little fuzzy.

13        All right.   I think that's as clear as we can get.   Can you

14   read that from where you are?

15   A.   Yeah.

16   Q.   Want me to make it a little bigger?

17        All right.   Oh, that's good.   That's good.   Thank you.

18        Do you see on the cc line "anjiredi-" -- I'm sorry -- at

19   gmail.com?

20   A.   Yes.   That's my e-mail ID.

21   Q.   Okay.   That's your true e-mail address?

22   A.   Yes.

23   Q.   All right.   So you were cc'ed on this; is that right?

24   A.   Yes.

25   Q.   And do you know -- do you recognize that e-mail address up

1    above where it says, "To: kadir.dirikan@gmail.com"?

2    A.   Yeah.   That's the e-mail ID I brought there to -- the

3    e-mail ID.

4    Q.   You provided it?

5    A.   Yes.

6    Q.   How did you get that?

7    A.   I got it from Agent Mackey.

8    Q.   And there were two attachments to this e-mail?

9    A.   Yes.

10   Q.   And you see there it says, "Susan Su"?

11   A.   Yes.

12   Q.   Let's look at the attachments.  I'm showing you now Page 2

13   of this Exhibit 202C.

14        Is this the Tri-Valley receipt that she sent you?

15   A.   Yeah.   That's the Tri-Valley University fee receipt and the

16   courses they select for that particular semester.

17   Q.   Who selected these?

18   A.   Susan Su selected these courses.

19   Q.   Did you provide her with any information about what courses

20   to choose for this person?

21   A.   No.

22   Q.   And at the bottom, it says, "Total Due:  2750."  Do you see

23   that?

24   A.   Yes.

25   Q.   And in blue at the very bottom just above the signature,

1    can you read that?  "Received payment of $1,000 on July 28th,

2    2010."

3    A.   Yes.

4    Q.   Is that the thousand dollars that you paid?

5    A.   Yes.

6    Q.   But you actually paid it the day before, is that right,

7    July 27th?

8    A.   No.  The same day, I paid a thousand dollar cash, and right

9    after she printed it to me.

10   Q.   Right, but let's look back at that I-20.

11        I'm showing you again Page 1 of Exhibit 202D.  The date

12   this I-20 was issued was July 27th; right?

13   A.   Yes.

14   Q.   And that was the date that you were there?

15   A.   Yes.

16   Q.   Okay.  So then if we go back to 202C, Page 2, you actually

17   paid the thousand dollars on July 27th; right?

18   A.   No.  I paid only on the 27th, but they made a mistake.

19   Susan Su -- while entering there, she put the 28th.

20   Q.   Okay.  But you actually paid it on the 27th?

21   A.   27th.  And the receipt is July, and the receipt date is

22   generated on the 27th.

23   Q.   And let's look at the other attachment.  This is another

24   I-20; right?

25   A.   Yes.

1     MR. BABCOCK:  Which exhibit number are you on?

2     MS. WEST:  I'm sorry.  We're back at 202C now.  We're

3     on Page 3.

4     MR. BABCOCK:  Thank you.

5     MS. WEST:  Okay.  Sorry.

6     BY MS. WEST:

7     Q.  And if we look at Box 10, this attachment that was e-mailed

8     just has no signature on it; right?

9     A.  There is no signature, yes.

10    Q.  Was it part of your practice when you worked at

11    Tri-Valley -- after somebody registered, you would send them

12    just an e-mail soft copy of the I-20?

13    A.  Yes.

14    Q.  And is that what this appears to be?

15    A.  Yes.

16    Q.  When you went into Tri-Valley first on July 27th, did you

17    get a receipt at that time, or did you have to go back?

18    A.  Well, first time she gave me, she told she was sending an

19    e-mail.  Then she gave it to me back.

20    Q.  She gave you back what?

21    A.  The fee receipt.  When I paid a thousand dollars, she gave

22    it to me right away.

23    Q.  Did you at some point on July 27th go out and speak with

24    the agents and then go back into Tri-Valley?

25    A.  Yeah, because she needed the last name of the student

1    for -- in the two students -- I am confused which one is the

2    last name.  So Susan Su wants me to give the last name of the

3    student to pull out their SEVIS record.  So I went and called

4    them, and they told me what is their last name.

5    Q.   And then you went back inside?

6    A.   Went back inside and gave Susan Su the last name to print

7    it out.

8    Q.   Did you go back to Tri-Valley University a third time at

9    the request of agents?

10   A.   Yes.

11   Q.   Do you have in mind the date August 11th, 2010?

12   A.   Yes.

13   Q.   Was that the day that you went back the third time?

14   A.   Yeah, that was my third time.

15   Q.   Did you again meet with agents beforehand?

16   A.   Yeah.  I met them at the same place in the parking lot,

17   Boulder Court.

18   Q.   Did you receive any instructions from them?

19   A.   Yeah.  I received instructions to pay the remaining fee --

20   1,750 -- through money order for completion of student fee for

21   one student.

22   Q.   All right.  I'm showing you what is already in evidence as

23   Government Exhibit 203C.  Just let me hand it to you first so

24   you can see it up close.

25        Do you recognize -- it's a photocopy, but can you tell what

1      that is?

2      A.   Yeah.   This is the money order given to me to pay for one

3      student fee.   The first, I paid a thousand dollars in cash.

4      This is the remaining $1,750, remaining fee.

5      Q.   All right.   And so let's let the jury see.

6           These are two money orders; is that right?

7      A.   Yes.

8      Q.   One at the bottom for $1,000?

9      A.   Yes.

10     Q.   And then up at the top for 750?

11     A.   Yes.

12     Q.   Okay.   And what did you do with these money orders?

13     A.   I went back into the university, and I gave it to Susan Su

14     and told her, "This is the remaining fee for one student who

15     already paid a thousand dollars.   So can you take this and give

16     me the printout of that fee completed for this particular

17     student?"

18     Q.   And you're mentioning a conversation you had with Susan Su.

19     Were you again wearing a body wire?

20     A.   Yes.

21     Q.   And was there also a recording device?

22     A.   Yes.

23     Q.   When you had the conversation and -- with Susan Su and

24     handed her the money order, was there any conversation about

25     referral fees?

1    A.   Yeah.

2    Q.   Tell us about that, please.

3    A.   Since Susan Su is giving all the students $1,200 for

4    referring the student, even she gave me an agreement that she

5    will pay me $1,200 if I refer any student.

6    Q.   Well, let me stop you because I thought you said before she

7    said you could not have a referral agreement.

8    A.   After I left the university, she gave me to refer students.

9    Q.   So before she said you could not have one because you

10   worked in the office?

11   A.   I worked in the office.

12   Q.   But then once you left the office, she gave you one?

13   A.   On May 18th when I went to the university for transfer, she

14   told me, "Okay.  If anybody calls and you refer them to me, I

15   will pay you the money."

16   Q.   Okay.  So by this time, August of 2010, you actually do

17   have a referral agreement?

18   A.   Yes.

19   Q.   All right.  And did she actually give you a referral fee?

20   A.   She paid me $400.

21   Q.   For what?

22   A.   $405 referral fee.

23   Q.   What was that for?  What student?

24   A.   Oh.  For the first student, Kadir Dirikan.  He completed

25   his fee.  So she paid me $405.

1    Q.  All right.  I am going to show you what is already in

2    evidence as Government Exhibit 203D, and I'm going to show you

3    what's marked as Page 1.

4        Mr. Dirisanala, what is this?

5    A.  Yeah.

6    Q.  Can you see it?

7    A.  This is the referral check.  She gave it to me after I

8    completed paying one student fee for 2,750.

9    Q.  Okay.  And then that's the same date at the top,

10   August 11th --

11   A.  Yes.

12   Q.  -- 2011?

13   A.  Yes, the same day.

14   Q.  And it's for $405; is that --

15   A.  Yes.

16   Q.  Is that right?

17       Do you recognize Susan Su's signature there at the bottom?

18   A.  Yes.

19   Q.  And did you see her fill out this check?

20   A.  Yes.  She wrote it in front of me.

21   Q.  And then she handed it to you; is that right?

22   A.  Yes.

23   Q.  And is that part of the fees that -- what did you do with

24   this check after you got it?

25   A.  Oh.  I came out, and I handed it back to Agent Mackey.

1    Q.   All right.  So when you went in there and paid the money

2    orders for -- I'm sorry.  Just a moment.  You paid the money

3    orders for Mr. Dirikan; right?

4    A.   Yes.

5    Q.   And did you have any other purpose in going to Tri-Valley

6    on that day?

7    A.   In addition to that, I -- I requested for three new -- more

8    admissions for three new students who want their Bachelor's

9    degree.  So I went -- I actually e-mailed -- on behalf of me,

10   Agent Mackey e-mailed them the name data and their address, but

11   they needed admission for Bachelor's degree.

12   Q.   Hold on.  Let me stop you for a second.

13        When you were sent in by the agents on August 11th --

14   A.   Yeah.

15   Q.   -- did you receive any instructions from the agents about

16   three students for Bachelor's degrees?

17   A.   Yes.

18   Q.   What were those instructions?

19   A.   Those three instructions were for telling Susan Su to see

20   their e-mail ID.  They already sent an e-mail requesting for a

21   new admissions for three students.  So they asked me to go and

22   ask Susan Su to give printout for three students' admissions.

23   Q.   Printout of what?

24   A.   New I-20's.

25   Q.   Did you get any?

1    A.   I went and asked Susan Su.  So she told me to go and talk

2    with her staff, who is working outside the room.  So her staff

3    created, and they gave it to me.

4    Q.   All right.  You said Susan told you to talk to staff who

5    was working outside the room?

6    A.   Yes.

7    Q.   What room were you in when you were having the conversation

8    with Susan Su?

9    A.   It is her office.  Actually, the new office has two rooms.

10   One -- Susan Su is using only one herself, and the rest -- all

11   the students were working there, using that particular room.

12   Q.   Okay.  So at the new location, Boulder Court, did Susan Su

13   actually have her own office space?

14   A.   Yes.

15   Q.   And did other -- did student employees get to use that?

16   A.   No.  Everybody else sit in other room outside that.

17   Q.   Okay.  So she referred you to one of the employees in the

18   other room to create the I-20?

19   A.   Yes.

20   Q.   And was it anyone in particular she sent you to?

21   A.   She told me go to Jimmy there.

22   Q.   Okay.  That's the same Jimmy we talked about before?

23   A.   Yes.

24   Q.   All right.  So did you go to Jimmy?

25   A.   Yeah, I went to Jimmy.

1    Q.   Did he create an I-20?

2    A.   Yes.

3    Q.   For each of these three students?

4    A.   Yes.

5    Q.   Did -- did you see anyone sign the I-20?

6    A.   Yeah.  He gave it back, and Susan Su signed those three

7    I-20's.

8    Q.   Did you actually see her sign them?

9    A.   Yes.

10   Q.   All right.  Let's take a look at -- let's just look at one

11   of them.  This is already in evidence as Government

12   Exhibit 203D, Page 2.  Let me hand it to you first so you can

13   see it clearly.

14        Is that the I-20 that you saw Susan sign for Mohammad

15   Rizwan?

16   A.   Yes.

17   Q.   Okay.  So when you get the name Mohammad Rizwan, that's

18   from Box 1 at the top?

19   A.   Yes.

20   Q.   Yes?

21   A.   Yes.

22   Q.   You can pull that microphone a little closer to you if you

23   want so you don't need to lean forward.  It moves.  There you

24   go.

25        Okay.  And this was the initial one; is that right?

1   A.   Yeah, this is the initial I-20 for student.

2   Q.   And let's look at the signature block.  This one is

3   actually in Susan Su's name; right?

4   A.   It is under Susan Su's name, but this one was being used by

5   Jimmy on that day.

6   Q.   Okay.  But you saw Susan sign, and she actually signed her

7   own name here?

8   A.   Yes.

9   Q.   All right.  And if we look at the date, August 11th, that

10  was the day you were there; right?

11  A.   Yes.

12  Q.   And did you get signed I-20's for the other two students as

13  well?

14  A.   Yeah, the other two students also.

15  Q.   Mr. Dirisanala, was there a fourth day that you were sent

16  by the agents to Tri-Valley University?

17  A.   Yes.

18  Q.   And that was the last one; right?

19  A.   That was the last one.

20  Q.   Do you have August 31st, 2010, in mind?

21  A.   Yes.

22  Q.   Was that the date?

23  A.   Yes.

24  Q.   And did you again meet with agents beforehand?

25  A.   Yeah.  I met them in the parking lot of Boulder Court.

1    Q.   Do you remember who the agents were?

2    A.   Agent Taylor, Dale Taylor, and Agent Mackey.

3    Q.   And did they give you any instructions on that day?

4    A.   Yes.  They told me -- they gave me a money order for a

5    thousand dollars, and they told me to go and pay for Mohammad

6    Rizwan's fee --

7    Q.   Okay.

8    A.   -- and requesting for fee -- and requesting for a fee

9    receipt for a thousand dollars.

10   Q.   Okay.  I'm going to show you what is already in evidence as

11   Government Exhibit 204B, Page 2.  That's too close.

12        Is this a picture of the money order that the agents gave

13   to you?

14   A.   Yes.

15   Q.   And it says $1,000.  Was that the amount they gave to you?

16   A.   Yes.

17   Q.   Were you again wearing a wire?

18   A.   Yes.

19   Q.   And --

20   A.   And a camera.

21   Q.   A camera this time?

22   A.   Yes.

23   Q.   Okay.  And audio also?

24   A.   Audio, yes.

25   Q.   Did you talk to Susan Su?

1    A.   Yeah.  I went inside the office of Susan Su and told her,

2    like, "I took last time three admissions for students.  Only

3    one student sent me a thousand dollars to pay the fee."  So I

4    gave it to her, and she gave me a fee receipt for a thousand

5    dollars for Mohammad Rizwan's name.

6    Q.   And did she give you an I-20 as well?

7    A.   Yes.

8    Q.   All right.  I'm going to show you what is already in

9    evidence as Government Exhibit 204D.  I'm going to show you

10   first Page 1 of this exhibit.

11        Is this the I-20 for Mohammad Rizwan?

12   A.   Yeah.  This is one for registered I-20, Mohammad Rizwan,

13   yes.

14   Q.   Okay.  And is there an ink signature there for DSO Wenchao

15   Wang?

16   A.   Yeah.  Yes.

17   Q.   Who did you see sign that?

18   A.   Oh.  This was signed by Susan Su.

19   Q.   Did you actually see her sign it?

20   A.   Yes.

21   Q.   All right.  I'm going to hand you now Page 4 of this

22   exhibit.

23   A.   This is the fee receipt.  She gave it to me for paying a

24   thousand-dollar fee.

25   Q.   Let me take that back, please.  Let's put up for the

```
 1      jury -- this was Page 1 of the I-20.  There we go.

 2           Up at the top left, do you see "Mohammad Rizwan" at the

 3      name?

 4      A.   Yes.

 5      Q.   And the ink signature Wenchao Vince Wang.  Do you see that?

 6      A.   Yes.

 7      Q.   And you saw Susan Su sign it?

 8      A.   Yes.

 9      Q.   And do you see the date issued 8/31/2010?

10      A.   Yes.

11      Q.   That was the day you were there?

12      A.   Yes.

13      Q.   Now, did you actually get two receipts?

14      A.   I got one receipt from Susan, the thousand-dollar receipt.

15      Q.   Well, let's take a look.

16           What did you do with these documents after you got them?

17      A.   I went out and handed it all back to Agent Mackey.

18      Q.   All right.  Let's take a look at Page 4, which is the one

19      that you just looked at that I handed to you a moment ago.

20           Do you see there "Mr. Rizwan Mohammed" [sic]?

21      A.   Yes.

22      Q.   The name is actually reversed; right?

23      A.   Yes, "Rizwan Mohammed."

24      Q.   Do you -- do you recognize the e-mail address

25      rezzymohammad@gmail?
```

1    A.   Yes.

2    Q.   How do you recognize that?

3    A.   This was already sent from the e-mail I did.  Agent Mackey

4    asked me to type these addresses and give it back to them.  So

5    this e-mail is sent to Susan Su from Agent Mackey.

6    Q.   Well, this -- this isn't an e-mail we're looking at here.

7    This is the fee receipt; right?  Let's look so we can see the

8    whole thing.

9        Okay.  Do you see this is the TVU receipt?

10   A.   Yeah.  That's the TVU fee receipt.

11   Q.   Okay.  Is this what she handed to you?

12   A.   Yes.

13   Q.   Okay.  And do you see "Receive Payment" here at the bottom?

14   Let me make it bigger.

15   A.   Oh.

16   Q.   "Receive Payment of $1,000.00 on 08/31/2010"?

17   A.   Yes.

18   Q.   And that was the money order that you gave her?

19   A.   Yes.

20   Q.   Okay.  And you see here the e-mail address rezzymohammad?

21   A.   Yes.

22   Q.   Okay.  I'm going to show you what is Page 5 -- and I'm

23   going to actually overlay it here -- Page 5 of the same

24   exhibit, 204D.  Let's see if we can do that.

25       Can you read that from where you are?

1    A.   Oh, no.

2    Q.   No?

3         All right.  So this is the one we were just looking at,

4    which is Page 4, and I'm going to show you Page 5.  First,

5    let's do a full picture.  There we go.

6         This is another TVU receipt; right?

7    A.   Yes.

8    Q.   Okay.  And let me zoom in a bit.  Let's see.

9         Do you see it's "Receive Payment of $1,000.00 on

10   08/31/2010"?

11   A.   Yes.

12   Q.   And the name at the top again is "Mr. Rizwan Mohammed

13   [sic]"?

14   A.   Yes.

15   Q.   Do you see that?

16   A.   Yes.

17   Q.   But this e-mail is different; right?  It's M-e-s-y-e-d

18   underscore Rizwan?

19   A.   Yes.

20   Q.   Okay.  Do you know why there's two different e-mail

21   addresses on here?  Do you know?  Yes or no?

22   A.   No, I do not know.

23   Q.   Thank you, Mr. Dirisanala.

24             MS. WEST:  No more questions.

25             THE COURT:  Cross-examination?

1          **CROSS-EXAMINATION**

2     BY MR. BABCOCK:

3     Q.   Good morning, Mr. Dirisanala.

4     A.   Good morning, sir.

5     Q.   Do you -- you said several times, if I heard you correctly,

6     that you picked -- when you paid Dr. Su, she gave you a

7     receipt?

8     A.   Yes.

9     Q.   But then Ms. West was showing you an I-20; right?  That's

10    what you were referring to?

11    A.   No.  What receipt are you talking about?

12    Q.   Well, that's what I'm trying to figure out.

13         Did she give you a receipt as you were standing there on

14    August 31st?

15    A.   She gave me a receipt for the fee and an I-20 after taking

16    the money.

17    Q.   And did she give you that I-20?

18    A.   Yes.

19    Q.   On August 31st, she actually asked you to step outside the

20    building --

21    A.   Yes, sir.

22    Q.   -- isn't that right?

23    A.   Yeah, she asked me to step out of the building.

24    Q.   And to wait?

25    A.   Yes.

1    Q.   You were asking her for documents, and she said she was too

2    busy --

3    A.   Yes.

4    Q.   -- right?

5    A.   Yes.

6    Q.   That she didn't have time to deal with it?

7    A.   Yes.

8    Q.   But you kept asking her?

9    A.   Yes.

10   Q.   She said she was in the middle of something else --

11   A.   Yes.

12   Q.   -- right?

13   A.   Yes.

14   Q.   And she also asked you not to have students that you were

15   referring to the school -- she didn't want you to take their

16   money --

17   A.   Yes.

18   Q.   -- right?

19   A.   Yes.

20   Q.   She told you to have them make their payments online?

21   A.   Yes.

22   Q.   Through the university website --

23   A.   Yes.

24   Q.   -- right?

25        Isn't it true you didn't get any of the documents from TVU

1    that day until after you were waiting outside?

2    A.   Yeah.  I went -- I waited outside.  Later, I got the

3    documents.  I came back, and then I collected it.

4    Q.   The documents were prepared while you were waiting outside?

5    A.   Yes.

6    Q.   You were not there while they were being prepared.  You

7    were not inside?

8    A.   It's a glass window.  I can see what is happening inside.

9    Q.   Okay.

10   A.   So I see them preparing the documents.

11   Q.   Ah.  So your testimony is that you were watching outside to

12   see who was doing it?

13   A.   Yes.

14   Q.   I see.

15        Let's go back to the first time.  Ramakrishna Karra took

16   you to Immigration on May 17th --

17   A.   Yes.

18   Q.   -- right?

19        Introduced you to Agent Mackey?

20   A.   Yes.

21   Q.   Who told you that they were investigating Tri-Valley

22   University; right?

23   A.   Yes.

24   Q.   And that -- that made you scared; right?

25   A.   Sir, it's not clear.

1    Q.  I'm sorry.  That made -- that made you -- that made you

2    nervous?

3    A.  Yes.

4    Q.  Because you were working there?

5    A.  Yes.

6    Q.  And you were supposed to be going to school there?

7    A.  Yes.

8    Q.  And your -- your legal status here in the United States was

9    through Tri-Valley University?

10   A.  Yes.

11   Q.  You went in and -- what, two days later, or was it the next

12   day?

13   A.  Very next day on the 18th.

14   Q.  Very next day?

15   A.  I think the 18th, I went to the university.  Yes.  The

16   18th, I went back.

17   Q.  And told her you wanted to transfer?

18   A.  Yes.

19   Q.  And she was okay with that?

20   A.  She asked me the reason why I needed to transfer.  Then I

21   told her, "Somebody called me into the office.  I went inside

22   San Francisco.  I don't know who they are, but I think it's,

23   like, police.  They inquired me about this university and what

24   I am doing at that university."

25   Q.  I understand.

DIRISANALA - CROSS / BABCOCK

1    A.   Then I told her, "I'm really scared to be here.  I want to

2    move out."

3    Q.   You told her that somebody from Immigration was

4    investigating the school; right?

5    A.   I did not tell her an investigation.  I told her, "Somebody

6    questioned me about this university."

7    Q.   Okay.  Fair enough.

8         Somebody questioned you about the university.  Someone from

9    Immigration?

10   A.   I didn't tell her it was Immigration.  I said, "I went to

11   one building.  I don't know who they are.  I think they are

12   police" because still -- by that time, I'm not sure what ICE

13   is, what FBI -- I'm not aware of that.

14   Q.   Okay.  So you didn't use the word "Immigration"?

15   A.   Yes.

16   Q.   You used the word "police"?

17   A.   Yes, "police."

18   Q.   Okay.  So you told her the police were investigating the

19   school?

20   A.   Yes.

21   Q.   Not in those exact words, but that's what you told her;

22   right?

23   A.   That's what I told her.

24   Q.   And she didn't believe it?

25   A.   She didn't believe it.

1    Q.   She thought you were just making something up -- making up

2    a reason to go to a different school?

3    A.   No.  She thought I'm telling her -- the reason -- since she

4    told me not to come one week back to the university, she

5    thought that I'm telling her this so that she would take me

6    back to the job as a campus job.

7    Q.   That's right, because you had just had a conversation with

8    her where she thought perhaps you had processed a student's

9    credit card on your own, not through the school; right?

10   A.   Yes.

11   Q.   She found out that someone had processed a student's credit

12   card not through the school, and she was trying to figure out

13   who it was?

14   A.   Yes.

15   Q.   And that's why she told you to take a week off while she

16   investigated?

17   A.   Yeah.

18   Q.   She also told you that she reported this to the Pleasanton

19   Police; right?

20   A.   Yes.

21   Q.   So you believed that the reason she didn't believe you is

22   because you were just trying to force her to give your job

23   back?

24   A.   Yeah.  When I came back and told her that somebody asked me

25   about this university, she was thinking maybe I'm coming back

1    for some false reason to get a job back there.

2    Q.   She did not know that you had been -- strike that.  I'll

3    start it over.

4        You had been taking money from Ms. Su, from the school, for

5    a couple of months by then; right?

6    A.   Through how?

7    Q.   Well, let's get into that.

8        She had a rule that if -- other people -- if they referred

9    students to the school, the school would pay them a percentage?

10   A.   Yes.

11   Q.   A referral fee.

12       But she had a rule that if you worked in the office at the

13   school, you were not allowed to collect referral fees --

14   A.   Yes.

15   Q.   -- right?

16       Do you know why she had that rule?

17   A.   She has the rule because if anybody comes -- calls the

18   office, they might take the numbers, and they would do it on

19   their own.

20   Q.   Which is exactly what you did; right?

21   A.   I only -- if anybody calls the university, I never took

22   anybody's phone number.  Before -- as I told you, like, my

23   number went out to many people because most of them speak my

24   language.  So my number spread to different people who want to

25   take admissions, and they call me up.  "Hey, my friend gave me

1    your number" --

2    Q.   You got --

3    A.   -- "and they want an admission."

4    Q.   You got calls from a lot of people?

5    A.   Yes.

6    Q.   Who were from mostly -- I assume from the same area in

7    India; right?

8    A.   Yes.

9    Q.   Who speak the same language as you besides English?

10   A.   Yes.

11   Q.   Telugu; right?

12   A.   Yes.

13   Q.   And -- but if you got called from someone who wanted to go

14   to school at TVU, Dr. Su would not pay you a referral fee?

15   A.   Yes.

16   Q.   So to get around that rule, you had your friend, a friend

17   who didn't work at the school, make the call?

18   A.   Yes.

19   Q.   And Dr. Su paid him the referral fees?

20   A.   Yes.

21   Q.   Because he wasn't connected with the school?

22   A.   Yes.

23   Q.   And you took most of the money that he collected; right?

24   A.   Yes.  Yes.

25   Q.   Because you were the one getting the referral?

1    A.   Yes.

2    Q.   And you collected some 18- to $20,000 in this fashion --

3    A.   Yes.

4    Q.   -- right?

5         During your -- about a two-month period?

6    A.   Yes.

7    Q.   From the middle of March until the middle of May in 2010?

8    A.   No, after May until she paid, two months -- it was more

9    than a two months' period.

10   Q.   Well --

11   A.   Maybe two or three months to the event.

12   Q.   Well, you said this started about in the middle of March;

13   right?

14   A.   Middle of March.

15   Q.   And you worked there only for -- until --

16   A.   May 12th, around May 12th.

17   Q.   Around May 12th.

18        So that's a little less than two months; right?

19   A.   Even after that, students started paying the fee.  They

20   only paid a thousand dollars.  So even after I left the

21   university, some people completed their fee.  So whoever

22   completes, Susan Su pays that.

23   Q.   I see.

24        Some of the students that you referred while you were

25   there, you didn't get paid until later?

1    A.   Until they completed the fee.

2    Q.   So you were still collecting money for this referral scheme

3    even after you were no longer working at Tri-Valley University?

4    A.   Yes.

5    Q.   Okay.  So you kept collecting money until what, June?

6    A.   I don't think so.

7    Q.   July?

8    A.   I'm not sure because after that, if they complete -- if

9    they paid the fee to the university, she used to send a check

10   to Ramakrishna's address.  So after that, I didn't really

11   follow up that much.  With the 800, she used to send it to my

12   friend who was referring.

13   Q.   So you made some $20,000 over several months?

14   A.   Yes.

15   Q.   Whatever the exact time period?

16   A.   Yes.

17   Q.   That was a whole lot more money than she was paying you for

18   the work that you were doing; right?

19   A.   Yes.

20   Q.   She was paying you a thousand dollars a month?

21   A.   Yes.

22   Q.   So you were making what, 4-, 5-, $6,000 a month on the

23   side?

24   A.   Yes.

25   Q.   And this was money -- this was money that was coming out of

1    the school's bank account?

2    A.   That is as a referral.

3    Q.   I understand --

4    A.   Yes.

5    Q.   -- but the rule was if you worked at the school --

6    A.   Yes.

7    Q.   -- you weren't allowed to collect referral fees --

8    A.   Yes.

9    Q.   -- right?

10   A.   I didn't collect it.  It is actually being collected from a

11   friend.

12   Q.   That's right.  The checks went to your friend --

13   A.   Friend.

14   Q.   -- because he wasn't connected to the school?

15   A.   Yes.

16   Q.   And he paid you?

17   A.   Yes.

18   Q.   Did he pay you in cash?

19   A.   He used to transfer money to my bank account.

20   Q.   Did he receive checks from Tri-Valley University?

21   A.   Yes.

22   Q.   Checks on -- Tri-Valley University checks like the one we

23   saw made out to you for $405; right?

24   A.   Yes.  Yes.

25   Q.   Signed by Dr. Su that said right on there, "Referral

```
 1    Fees" --
 2    A.   Yes.
 3    Q.   -- right?
 4    A.   Yes.
 5    Q.   But in this case, the checks were all made out to your
 6    friend?
 7    A.   Yes.
 8    Q.   What was his name?
 9    A.   Romid Thomas, R-o-m-i-d, T-h-o-m-a-s.
10         MR. BABCOCK:  Excuse me one second, your Honor.
11    BY MR. BABCOCK:
12    Q.   Did Mr. Thomas -- did Mr. Thomas live in the Bay Area?
13    A.   No.  He -- he was a student in Bethany State University.
14    So he used to live there in Bethany.
15    Q.   Dr. Su did not know you were taking money in referral fees
16    that were being paid to Mr. Thomas --
17    A.   Yes.
18    Q.   -- is that right?
19    A.   She does not.
20    Q.   And you started working on behalf of Immigration, Agent
21    Mackey, at least by June 3rd?
22    A.   Yes.
23    Q.   When exactly -- strike that.
24         You met Agent Mackey for the first time on May 17th --
25    A.   Yes.
```

1   Q.   -- is that right?

2   A.   Yes.

3   Q.   Okay.  Did you agree at that meeting that first time you

4   met him to work with him to investigate the school?

5   A.   He didn't ask me to work with them.  They just told me, "We

6   just have general questions about this university since you are

7   working there.  Can you tell us about that university?"

8        So I was, like, a little bit -- "oh, these are new people."

9   I don't know who they are.  So I'm a little bit -- refused to

10  answer their questions on that day.

11  Q.   All right.  You did answer their questions, but now you're

12  saying you weren't entirely truthful with them?

13  A.   Yes.

14  Q.   Okay.  Now, what happened between May 17th and June 3rd

15  about what, three weeks or so -- what happened to cause you to

16  start working with Agent Mackey?

17  A.   The person who filed -- who reported the accident -- I'm

18  sorry -- who reported the university to Agent Mackey -- his

19  name is Ramakrishna.

20  Q.   Ramakrishna?

21  A.   He came -- Ramakrishna Karra.  He came to my house and

22  said, "Anji, this is one university where you also did fraud by

23  creating I-20's, and ICE is investigating this university.  So

24  it's better you cooperate with them and tell them the truth.

25  You don't try to escape."

1    So I was also convinced, and I realized, "Okay. All these

2    three months, I made a mistake. I did all the I-20's and

3    everything. So I will cooperate with them."

4    Q.  So you decided to come clean?

5    A.  Decided to come clean, and I have an option to escape and

6    go back to India, and nobody is to stop me here because nothing

7    started or anything started. So it's my only realization. I

8    made a mistake. I need to correct it somehow.

9    Q.  So your testimony is that your friend, Ramakrishna,

10   persuaded you to come clean and cooperate with Immigration and

11   stop doing anything wrong --

12   A.  Yes.

13   Q.  -- is that right?

14   A.  Yes.

15   Q.  But you didn't tell Agent Mackey at least right away that

16   you were still collecting referral fees?

17   A.  No, I didn't tell him.

18   Q.  Even after you told him you were going to be cooperating

19   with him?

20   A.  Yes.

21   Q.  You continued to hide these -- the fact that you were

22   taking money -- you were collecting money on the side that was

23   coming out of the Tri-Valley University bank account --

24   A.  Yes.

25   Q.  -- isn't that right?

1    A.   That's true.

2    Q.   That's true, is it not?

3    A.   Yes.

4         THE COURT:  Mr. Babcock, I'm going to jump into the

5    void at this brief silence and ask you whether this --

6         MR. BABCOCK:  This is.

7         THE COURT:  -- or something close to this might be a

8    good time for us.

9         MR. BABCOCK:  This is fine, your Honor.

10        THE COURT:  All right.  Members of the jury, we're

11   going to take our second morning break.  The Court will be in

12   recess for 15 minutes.

13        THE CLERK:  All rise.

14      Court is in recess for 15 minutes.

15                    (Recess taken.)

16        THE COURT:  All right.  Back on the record.

17      Mr. Babcock?

18        MR. BABCOCK:  Thank you, your Honor.

19   BY MR. BABCOCK:

20   Q.   You left -- strike that.

21      Susan Su told you not to come back to work at TVU because

22   she found out that some students' credit cards had been charged

23   not on school accounts?

24   A.   One student credit card.

25   Q.   One student credit card.  I understand, but she was upset

1    about that, was she not?

2    A.  She was upset about that, and --

3    Q.  She suspected you?

4    A.  Yes.

5    Q.  And she suspected your friend Ramakrishna Karra?

6    A.  I'm not sure about that.

7    Q.  Okay.  But she told you she suspected you?

8    A.  Yes.

9    Q.  And that she reported the matter to the Pleasanton Police

10   Department to look into?

11   A.  I'm not aware of that, whether she reported it to the

12   police department.  I found out only after maybe two months

13   later on through Vishal.

14   Q.  That's -- I'm assuming that's what you'd say.  In fact, you

15   found out you were being investigated before you decided to

16   cooperate with Immigration?

17   A.  No.

18   Q.  Ms. Su told you not to come back to work because she

19   suspected you of fraud?

20   A.  Yes.

21   Q.  She suspected you of stealing from her and using a

22   student's credit card?

23   A.  Yes, she suspected me of that.  I tried to charge one

24   credit card, and she told me she would investigate it, and she

25   asked me to come back after one week.

1    Q.   She asked you to come back, but it never got to that point?

2    A.   Yes.

3    Q.   Because you decided to leave once you decided -- once you

4    heard that she had reported the matter to the Pleasanton --

5    A.   No.

6    Q.   -- Pleasanton Police Department; isn't that true?

7    A.   It's not true because I left the university.  Within three,

8    four days, I went to the ICE office.  So all these things

9    happened within a week's time.

10   Q.   I certainly understand that.

11        After you were basically let go from Ms. Su's employment --

12   Dr. Su's employment and told that you were being suspected of

13   fraud, you took advantage -- you took advantage of an

14   opportunity to work with Immigration?

15   A.   I'm not aware of Susan Su -- whether she complained about

16   me to anybody until one or two months later on, but within two

17   days, I left the office.  I went to Immigration, and I talked

18   with them.

19   Q.   And by the time of June 3rd, the first time you wore a body

20   wire to Tri-Valley University, you say that you had decided to

21   cooperate with them and to be fully forthcoming; right?

22   A.   Yes.

23   Q.   To come clean?

24   A.   Yes.

25   Q.   And tell them what was really going on?

1    A.   Yes.

2    Q.   But that's not what happened, is it?

3    A.   That's what happened.

4    Q.   Well, did you tell them that you had been paid -- had this

5    referral scheme with your friend Mr. Thomas where you took

6    referral fees that you weren't supposed to take according to

7    the school rules?

8    A.   Well, it never came up in our conversation, and one day I

9    told Mackey -- I'm sorry -- Agent Mackey I went to the

10   university to refer students.  Then this conversation came up.

11   I would -- "do you take students" -- or "Do you take money?"

12        Then I told him, "Yeah.  I did it through my friend Romid

13   Thomas."

14   Q.   Well, let's -- let's break that down a little bit.

15        It didn't just happen a few days later that you told him.

16   Agent Mackey -- the whole next year, months and months and

17   months went by, and then Agent Mackey comes back at you one day

18   and said, "Is there something about the referral fees that you

19   haven't told us about before?"  Isn't that right?

20   A.   Yes.

21   Q.   It wasn't until the spring of 2011 -- you had been working

22   with Immigration for nine months by then --

23   A.   I started --

24   Q.   -- right?  Isn't that right?

25   A.   Yes.

1    Q.   The school had already been shut down?

2    A.   Yes.

3    Q.   You had worn a wire to the school on four occasions?

4    A.   Yes.

5    Q.   You had met with them on other times to talk about what you

6    knew and what you could testify to?

7    A.   Yes.

8    Q.   And during all these meetings and all these conversations,

9    not once did you mention that you made $20,000 by having --

10   making a false arrangement that your friend was referring

11   students to the school when he wasn't?

12   A.   Yes.

13   Q.   And that's not the only thing that you didn't come clean

14   about with Immigration; right?

15   A.   I think that's all -- I didn't tell them I took the money

16   from the university -- from different students because until

17   that time, Susan was telling referral -- or referring a student

18   is legal, and she gave me an example.  If you go to work for

19   somebody at Bank of America, they'll give you money.  So it's

20   the same way.  So I was on the assumption, "Okay.  These

21   referral fees are also legal."

22   Q.   Oh, I'm not saying there was anything illegal about

23   referral fees.

24   A.   Okay.

25   Q.   I'm saying you took $20,000 away from the school that

1    should have remained with the school?

2    A.   Yeah.

3    Q.   Without Dr. Su knowing; right?

4    A.   Yes.

5    Q.   If your friend had actually referred those students, she

6    would have been happy to pay him; right?

7    A.   Yes.

8    Q.   She paid you -- she agreed to pay you referral fees for

9    these nonexistent students that you enrolled a couple months

10   later; right?

11   A.   I'm sorry.  The question is not clear.  Can you repeat it?

12   Q.   Certainly.

13        The problem wasn't that the school paid referral fees.  The

14   problem was since you worked in the office and you had access

15   to the school information -- you were there in the office

16   almost every day.

17   A.   Okay.

18   Q.   Dr. Su said anyone that worked in the office could not get

19   referral fees?

20   A.   Yes.

21   Q.   Too much chance for mischief there; right?

22   A.   Yes.

23   Q.   But you got around that rule?

24   A.   Yes.

25   Q.   By having -- by having people supposedly be referred by

1    your friend Mr. Thomas?

2    A.   Yes.

3    Q.   When they weren't from Mr. Thomas?

4    A.   See, they called me on my personal number --

5    Q.   I understand.

6    A.   -- and they never had to contact the university.  They got

7    their -- my number through their friends, and they asked me,

8    "Hey, I want to get into this university."

9         Then I tell them, "Okay.  Talk with my friend Romid Thomas.

10   He's the one who is referring students."  So they called Romid

11   Thomas and get admission and get the referral fee.

12   Q.   I understand.

13        You got your friend Mr. Thomas involved in this?

14   A.   Yes.

15   Q.   And he collected the money and handed over most of it to

16   you?

17   A.   Yes.

18   Q.   A pretty good chunk of change?

19   A.   Yes.

20   Q.   Some $20,000?

21   A.   Yes.

22   Q.   Which you've agreed to pay back to the Government; right?

23   A.   Yes.

24   Q.   Has it collected any of that money from you yet?

25   A.   Not yet.

1    Q.   In the meantime, this happened from the middle of March

2    until May 12th, your last day at TVU --

3    A.   Yes.

4    Q.   -- right?

5    A.   Yes.

6    Q.   You see Dr. Su five or six days a week; right?

7    A.   Yes.

8    Q.   Never told her once that you were collecting money from the

9    school without her knowledge?

10   A.   Yes.

11   Q.   And you worked with Agent Mackey and other agents at

12   Immigration for nearly nine months before you told them about

13   this --

14   A.   Yes.

15   Q.   -- right?

16   A.   Yes.

17   Q.   You wanted to keep that $20,000?

18   A.   Yes.

19   Q.   And that's not the only thing you didn't tell Agent Mackey;

20   right?

21   A.   That one I didn't tell him because there's -- no

22   conversation came up between us.  So I didn't tell him.

23   Q.   You didn't tell him just because it didn't come up?  Is

24   that your testimony?

25   A.   To be frank, I don't want to tell them I made money out of

1    it.

2    Q.   Exactly.

3         You were worried about your status in the United States;

4    right?

5    A.   I'm not worried at that time.

6    Q.   Well, you said the reason you transferred to -- asked

7    Dr. Su to transfer to ITU was because you were worried the

8    school was going to be shut down?

9    A.   Yes.

10   Q.   You were worried about your status?

11   A.   Yes.

12   Q.   Otherwise, you wouldn't have had to ask for a transfer?

13   A.   Yes.

14   Q.   Your school status was the only reason that you were

15   legally in the United States; right?

16   A.   Yes.

17   Q.   So it's not true that you weren't worried about it; isn't

18   that right?

19   A.   Actually, at that Tri-Valley University, it was, like --

20   the investigation started.  So I was worried what will happen

21   to my status.

22   Q.   Okay.  So you weren't worried after you started working

23   with Immigration because you knew they'd take care of you; is

24   that right?

25   A.   That was correct.

1    Q.   You -- you thought -- you felt as long as you kept Agent

2    Mackey happy and did what he wanted -- he wanted you to do, you

3    wouldn't be deported?

4    A.   That's not true because from that day, I cooperated, and I

5    told every information to Agent Mackey.  The first day, he told

6    me, "Anji, you are a part of this, whatever happened in this

7    university.  We are definitely going to file a case on you, and

8    you can even be jailed for some time."

9         So I cannot tell you how it is, but on that day itself, he

10   clearly told me that I will be sentenced to jail or something

11   on or around that date.

12   Q.   You didn't tell him everything right away, did you?

13   A.   I didn't understand that.

14   Q.   You didn't tell him everything you were doing right away?

15   A.   I didn't tell him about the referral.  Other than that, I

16   told him most of the things.  I think everything I told him.

17   Q.   Most or everything?  Which is it?

18   A.   Everything.

19   Q.   No.  Everything but the referral fees.

20           MS. WEST:  Your Honor, asked and answered.  We've

21   been over this several times.

22           MR. BABCOCK:  It's cross-examination.

23           THE COURT:  And also, it was a comment, not a

24   question.  So --

25           MR. BABCOCK:  True.

```
 1              THE COURT:  -- on both of those grounds, the

 2     objection will be sustained.

 3     BY MR. BABCOCK:

 4     Q.  Isn't it true -- so you didn't tell him everything?

 5     A.  About the referral fee, and I told him everything -- the

 6     rest in addition to the referral fee.

 7     Q.  You told him about everything by March of 2011?

 8     A.  No.  I -- by -- within a month's time, I met them, and

 9     before the investigation started, I sent a document to Agent

10     Mackey what all is happening inside the university.  So

11     everything -- I typed, I think, around three or four pages, and

12     I sent it to them.

13     Q.  You typed, like, a statement and sent it to Agent Mackey?

14     A.  Not a statement, like, a -- like, what is happening inside

15     the university, how admissions are being given, how people are

16     misusing that CPT.

17     Q.  When did you send him that document?

18     A.  I sent it to Agent Mackey on -- maybe within two to

19     three weeks of the first meeting.

20     Q.  Well, you met him on -- was it May 17th?

21     A.  Yes.

22     Q.  So by the end of May?

23     A.  Within one month.  I have it in my e-mail the exact date

24     that I sent him everything related to what is happening in that

25     university --
```

1    Q.   Did --

2    A.   -- even before the first meeting with -- regarding

3    everything.

4    Q.   So it was before June 3rd?

5    A.   Yes.

6    Q.   Excuse me for one second.

7         Isn't it true, sir, that you and your friend Ramakrishna

8    decided to do what you could to take down Tri-Valley

9    University?

10   A.   No.

11   Q.   Sometime after Dr. Su told you not to come back to work

12   after May -- which was May what?  12th?

13   A.   Around May 12th.

14   Q.   Shortly after that, you began cooperating with Immigration?

15   A.   Yes.

16   Q.   Although you didn't tell them everything you knew about

17   Tri-Valley University --

18   A.   Yes.

19   Q.   -- isn't that right?

20   A.   Yes.

21   Q.   And even -- you cooperated through the rest of that summer

22   and in -- through the fall and the next winter?

23   A.   Yes.

24   Q.   And it wasn't until March of 2011 that you fully disclosed

25   to them that you had taken $20,000 in referral fees?

1    A.    Yeah, regarding only the referral.  I disclosed later on

2    when this amount came out, like, "How much did you make for a

3    referral fee?"  Then I told them that amount.

4    Q.    The first thing you did when you started working for Dr. Su

5    was responding to e-mails; right?

6    A.    For printing out from the e-mail addresses.

7    Q.    For the applications?

8    A.    Yeah, for taking address down on the application where --

9    where I worked at and putting them on envelopes.

10   Q.    And eventually, you started to learn how to enter

11   information into the I-20?

12   A.    Yeah.  Susan Su taught me how to do it.

13   Q.    You had to enter a name; right?

14   A.    Yes.

15   Q.    Country they were from?

16   A.    Yes.

17   Q.    Address and the country they were from?

18   A.    Yes.

19   Q.    An address in the United States --

20   A.    Yes.

21   Q.    -- right?

22         Some money about their finances and their expenses?

23   A.    Yes.

24   Q.    Each of these -- each of these was a different -- for

25   example, on Exhibit 204D, when you went on -- when you went

DIRISANALA - CROSS / BABCOCK

1    onto the -- when you were entering this information, the screen

2    did not show -- did not look like this; right?

3    A.   Sir, can you zoom it?

4    Q.   Sure.

5    A.   Yeah.  Thank you.

6    Q.   Is this exactly what you would see when you would -- when

7    you would log --

8    A.   No.

9    Q.   You would -- you would be prompted through a series of

10   fields --

11   A.   Yes.

12   Q.   -- right?

13   A.   Yes.

14   Q.   Was the first field the name?

15   A.   It depends on which I-20.  If I am creating an initial I-20

16   regarding an F-1, then it will start from the name, their

17   country, their -- whatever country, their address.  So it's a

18   step-by-step process.

19   Q.   And everything that we see on this I-20, all the

20   information here, is that all the information that you've

21   entered on the computer when you were creating an I-20?

22   A.   Yes.

23   Q.   In other words, there's not -- there wasn't other

24   information -- other data that you had to enter that's not

25   reflected here?

1    A.   If you can zoom it, I'll tell you what all I entered on

2    that.  The rest of them are already there.  I entered the first

3    name, last name, date of birth, and the country of birth.

4         And, sir, can you please zoom in a little bit.

5    Q.   Which one?

6    A.   Just "Pakistan:  Country of citizenship."  I entered that,

7    and "Tri-Valley University" is already there.  I don't enter

8    that "Tri-Valley University" part.

9    Q.   Once it was already logged in, you didn't have to enter

10   this school?

11   A.   Yes.

12   Q.   Because that -- the login was associated with the school;

13   right?

14   A.   Yeah.  So the bank name --

15   Q.   As I understand it -- let me stop you there -- Dr. Su did

16   not allow you to log in?

17   A.   She doesn't allow anybody to log in.  She logs in herself

18   and gives the computer to me.

19   Q.   I understand.

20        She would take the laptop, enter the ID and password or

21   whatever was required?

22   A.   Yes.

23   Q.   Takes some steps to make sure you didn't see it; right?

24   A.   Yeah.  Yes.

25   Q.   Or anyone else in the office for that matter?

1    A.   Yes.

2    Q.   And then once it was already logged in, hand you back the

3    laptop?

4    A.   Yes.

5    Q.   Okay.  So the school would already pop up as well as the

6    school code; right?

7    A.   Yes.

8    Q.   As well as that "Approved On" date?

9    A.   Yeah.  That also comes up automatically.

10   Q.   And then starting at what here is Number 3, did you have to

11   enter that information?

12   A.   Number 3 automatically comes up if I open the registered

13   I-20.  If I register them, it automatically comes up.  It's

14   "Continued attendance at school."

15   Q.   Okay.  And then what -- then you have to -- what about the

16   field for the level of education?

17   A.   I need to select the education, which one they wanted to

18   do, when they wanted to start doing it, and by when they can

19   finish it.  So I need to enter that detail.

20   Q.   So you had to enter either a Bachelor's, Master's, or

21   Ph.D.; right?

22   A.   Yes.

23   Q.   There are three choices for that?

24   A.   And the number of months I need to enter there.

25   Q.   And the number of months you're talking about --

1    A.   They need to complete that completely by that time.

2    Q.   -- would correspond to which degree; right?

3    A.   Yes.

4    Q.   In other words, here it says, "Bachelor's."  So it would be

5    four years?

6    A.   Yes.

7    Q.   How long was the period if it was for a Master's?

8    A.   Sir, I'm not sure.

9    Q.   How long was the course of study to be if it was for a

10   Master's degree?

11   A.   They can do it however they want.  Since Tri-Valley

12   University has three semesters in a year -- so -- and they can

13   take three courses each subject -- each semester.  So if they

14   continue without a break, they can finish it within four

15   semesters, just like -- in 12 months, they can complete it.

16   Q.   Well, four semesters would be a little more than 12 months;

17   right?

18   A.   It's a three-semester -- I think three semesters each month

19   in Tri-Valley.

20   Q.   Three trimesters?

21   A.   Yeah.  And from the --

22   Q.   Then you have to enter something about English proficiency?

23   A.   No.

24   Q.   No?

25   A.   It's already automatic there.

1   Q.   That was already automatically there in the SEVIS system?

2        And then there's some information about tuition and

3   expenses and the like?

4   A.   Yeah.  That all -- I enter it from the working manual.  I

5   got it from the university.

6   Q.   So as I understand it, you first started taking -- you

7   first did transfer I-20's?

8   A.   Yes.

9   Q.   And then you started later on doing new admissions?

10  A.   Yes.

11  Q.   During all this time that you were entering information --

12  and at some point, you learned -- at some point, you learned

13  that this was a system associated with SEVIS?

14  A.   Yes.

15  Q.   Okay.  And you understood -- did you understand what the

16  purpose of the I-20 was?

17  A.   Yes.

18  Q.   You had an I-20 yourself when you first came to the United

19  States; right?

20  A.   Yes.

21  Q.   And when did you first come to the United States?

22  A.   On January 27th, 2010.

23  Q.   January 2010?

24  A.   January 27th, 2010.

25  Q.   And that -- that I-20 that you got was from ITU --

1    A.   Yes.

2    Q.   -- right?

3         Down in Sunnyvale?

4    A.   Yes.

5    Q.   So you ended up not attending there, and you went to TVU

6    instead?

7    A.   Yes.

8    Q.   Susan -- Dr. Su asked your brother-in-law to teach a

9    course?

10   A.   Yes.

11   Q.   He, I think you said, was a software engineer at Apple?

12   A.   Yes.

13   Q.   Was he qualified to teach a course?

14   A.   I'm not sure whether he is qualified to teach, but Susan Su

15   took a five minutes' interview, and she said, "Okay.  I'm

16   giving you these three subjects to teach."

17   Q.   Do you know what kind of educational background your

18   brother-in-law has?

19   A.   He has a Bachelor's in Computers and a Master's in

20   Computers.

21   Q.   So he has a Master's degree?

22   A.   Yes.

23   Q.   So you would think he would be qualified to teach some sort

24   of courses; right?

25   A.   I'm not sure about it.

1    Q.   Are you familiar --

2    A.   Sorry.

3    Q.   Are you familiar with whether or not schools allow graduate

4    students to teach some courses?

5    A.   Yeah, I'm familiar about that.  They can be as teaching

6    assistants, but they -- it's not that they can just take all

7    the classes they want.

8    Q.   I understand, but --

9    A.   Excuse me.

10   Q.   You need some water?

11   A.   No.

12   Q.   Graduate students quite typically teach courses at

13   colleges; isn't that right?

14   A.   Yeah.  They work as teaching assistants to professors.

15   Q.   I'm sorry?

16   A.   They work as teaching assistants to the professors.

17   Q.   Uh-huh.

18   A.   I don't think they really teach classes.

19   Q.   You and -- you speak Telugu?

20   A.   Yes.

21   Q.   Mr. Karra speaks Telugu?

22   A.   Yes.

23   Q.   As well as Vishal Dasa?

24   A.   Yes.

25   Q.   Are you aware of Dr. -- whether or not Dr. Su speaks

1    Telugu?

2    A.   No, she does not Telugu.

3    Q.   As I understand your testimony, Ramakrishna Karra asked you

4    to -- wanted to do a similar referral system with him?

5    A.   Yes.

6    Q.   That if you got referrals for prospective students -- so

7    you would give them his name, and then he would pretend as if

8    he was the original referrer?

9    A.   Yes.

10   Q.   And collect a fee from Dr. Su?

11   A.   Yes.

12   Q.   And did you, in fact, refer Ramakrishna Karra students?

13   A.   I referred two or three students --

14   Q.   Okay.  And did --

15   A.   -- or --

16   Q.   Did he ever get paid by Dr. Su for those referrals?

17   A.   I'm not sure about that.

18   Q.   Okay.  Did Mr. Karra ever pay you for those referrals?

19   A.   No.

20   Q.   He did give you an iPhone?

21   A.   He gave me an iPhone along with three other guys.

22   Q.   He gave all of you iPhones?

23   A.   Yes.

24   Q.   And the other guys -- the other guys had also agreed to

25   participate in this referral thing with him as well; right?

1    A.   I'm not sure about it.

2    Q.   The -- as I understand your testimony -- so you wore a wire

3    to Tri-Valley University four times?

4    A.   Yes.

5    Q.   Starting on June 3rd and ending on August 31st.

6         The first time, you went in with this note that you had

7    written down two names for Agent Mackey?

8    A.   Yes.

9    Q.   And you said that you had a friend that was staying in the

10   United States, and he wanted to move to Tri-Valley University?

11   A.   Yes.

12   Q.   She asked you to have him make the payment online, did she

13   not?

14   A.   She didn't tell me that.  She told me to take I-20 and ask

15   them to make a payment, and then she can give them the

16   registered I-20.

17   Q.   She asked you to make the payment first before the I-20 was

18   issued?

19   A.   No.  She gave an initial I-20, looking up the names.  Then

20   she told me if they pay the fee, she's going to give them

21   registered I-20 and register them for the classes.

22   Q.   She did, in fact, ask you to have them pay online, did she

23   not?

24   A.   I'm not sure about it.

25   Q.   Let me see if I can refresh your recollection.

1        This is Government's 200A.

2    A.   Yeah.

3    Q.   Does that refresh your recollection about whether she asked

4    you to have them pay online?

5    A.   Yeah, she told me, "Ask the students to pay online."

6    Q.   You asked her if you would get a referral fee; right?

7    A.   Yes.

8    Q.   And she said that you would?

9    A.   Yes.

10   Q.   But she said she wouldn't give it to you right away because

11   she wanted to make sure that they didn't drop out right away?

12   A.   No.  She told me she will give me the referral fee once

13   they complete paying the fee -- completed the 2,750 fee.

14   Q.   Right.  She didn't ask -- she allowed students to pay in

15   installments; right?

16   A.   Yes.

17   Q.   They didn't have to pay all the tuition up front?

18   A.   Yes.

19   Q.   You actually -- to get these documents, you dealt directly

20   with Vishal Dasa; right?

21   A.   Sir, can you repeat it?

22   Q.   You dealt directly with Vishal to -- to have Vishal enter

23   the appropriate information to get the I-20's?

24   A.   I met with Susan Su and explained it.  Then she said,

25   "Okay.  Ask Vishal to do the I-20.  He will do it."

1    Q.   I understand.

2         You told her you had a friend that wanted to transfer to

3    TVU, and she referred you to Vishal to do the legwork; right?

4    A.   Yes.

5    Q.   And then you went back on July 27th, over a month and a

6    half later?

7    A.   Yes.

8    Q.   Was that the next time you saw Dr. Su?

9    A.   Yes.  I went and -- I went the last time.

10   Q.   Did you talk with Dr. Su at all in person or on the phone

11   between June 3rd and July 27th?

12   A.   Yes.  I talked with her in between my first visit and

13   second visit.

14   Q.   You talked to her on the phone or in person?

15   A.   In person.

16   Q.   Okay.  When did you go back to TVU after June 3rd?

17   A.   I'm not sure of the exact date, but Ramakrishna asked me

18   that he had some fight with Susan Su, and she's not responding

19   to Ramakrishna properly.  So he told me, "Anji, can you come to

20   the office and request for these new I-20's?  I need to post it

21   to the students whom I referred already before."

22        Then I said, "Okay."

23        Then he give me a particular name -- I'm not sure about the

24   name -- and he said, "Can you also bring the fee receipt from

25   Susan Su for that particular student?"

1        So I went inside Susan's office and asked her, "Susan,

2   Ramakrishna told me to get the fee receipt for this particular

3   student.  So can you please give it to me."

4        Then Susan said, "I'm not going to give anything.  I'm

5   going to e-mail it to the student."

6        I told her, "Okay."  Then I collected two or three I-20's.

7   The university gave it to me.  Then I came out.

8   Q.   On behalf of Ramakrishna?

9   A.   On behalf of Ramakrishna.

10  Q.   Okay.  Was this -- this was after June 3rd but before

11  July 27th?

12  A.   Yes.

13  Q.   Okay.  Was that -- did you do that with the knowledge of

14  Agent Mackey?

15  A.   No.

16  Q.   Okay.  Did you tell him about it afterwards?

17  A.   Yeah, I tell him later on.

18  Q.   Was that the only time you saw Dr. Su between June 3rd and

19  July 27th?

20  A.   My best recollection, I think so.

21  Q.   Okay.  So then the next time you saw Dr. Su after that was

22  when you were wearing a wire on July 27th?

23  A.   Yes.

24  Q.   You went in, and you told her -- you testified on direct --

25  that you were going to pay for the two students that you had

1    referred earlier?

2    A.   Yes.

3    Q.   All right.  And that you had gotten some money and you were

4    there to pay the fee; right?

5    A.   Yeah, a thousand dollars each.

6              THE COURT:  I didn't hear.  I'm sorry.  Could you --

7              THE WITNESS:  A thousand dollars each for each

8    student.

9              THE COURT:  Okay.

10   BY MR. BABCOCK:

11   Q.   You had $2,000 total from Agent Mackey; right?

12   A.   Yes.

13   Q.   You testified on direct that she took the money, printed

14   out the I-20, and gave it to you; is that right?

15   A.   Yes, sir.

16   Q.   That's not exactly how that happened, though?

17   A.   If you give me, like, two minutes, I will explain to you

18   what all happened in a month's time.  Then whatever you are

19   asking me, you will have a clear answer for that.  Can I take

20   two minutes and explain?

21   Q.   No, you may not.  I'm sorry.  That's not how this works.

22   A.   Okay.

23   Q.   You were in the office with Dr. Su for quite a while, a few

24   minutes; right?

25   A.   Yes.

1    Q.   Maybe what, 15, 20 minutes?

2    A.   Yeah, somewhere like that.

3    Q.   That's when you had this conversation with her when she

4    asked what you were studying at De Anza College; right?

5    A.   No.  That happened at the start, yes.

6    Q.   At the beginning, you told her you were studying automotive

7    technology?

8    A.   Yes.

9    Q.   And she said that she thought they only had a business

10   degree?

11   A.   Yes.

12   Q.   You told her that you would give her the SEVIS numbers

13   because you weren't sure of the -- of the first and last names

14   of this person; right?

15   A.   Yes.

16   Q.   This was Sparsh Agrawat?

17   A.   And Kadir Dirikan.

18   Q.   You had a conversation with her about building some

19   classrooms.  Do you remember that?

20   A.   Yeah.  She said she just got the new building, and she's

21   planning to build some classrooms here.

22   Q.   And then you had some discussion with her about what caused

23   her to -- to have a concern about you back in May; is that

24   right?

25   A.   Yes.

DIRISANALA - CROSS / BABCOCK

1    Q.   She said she had gotten a call from a student who was

2    stopped at the airport, but he had never registered for

3    classes?

4    A.   Yes.

5    Q.   Do you remember that?

6    A.   Yes.

7    Q.   And she said that for some -- for some reason, he got an

8    I-20 out of the office?

9    A.   Susan Su gives I-20 -- travel I-20 to anybody who ever

10   sends an e-mail telling, "I need a travel I-20 right away."

11        She tells the office staff, "Okay.  Bring that I-20."  Then

12   she signs it, and the I-20 student carries it and goes back to

13   his country.

14   Q.   She didn't know -- she obviously didn't know you were

15   wearing any sort of wire --

16   A.   She didn't know.

17   Q.   -- right?

18   A.   Yes.

19   Q.   You didn't tell her?  You didn't show her; right?

20   A.   No.  No.

21   Q.   I mean, that's the whole point of wearing a wire --

22   A.   Yes.

23   Q.   -- is that the person that you're talking about doesn't

24   know they're being recorded?

25   A.   Yes.

1   Q.   She had this conversation with you -- she said she was

2   trying to do things the proper way.  Do you remember that?

3   A.   Yes.

4   Q.   And that she said a student called her, and she wanted to

5   protect the student.  Do you remember that?

6   A.   I remember that.

7   Q.   But she did say she didn't want to be let down by someone

8   who had cheated on her?

9   A.   She didn't mention anybody's name, but she told that.  So I

10  was on the assumption she was talking about Ramakrishna.

11  Q.   She had learned that Ramakrishna had been -- had been

12  not -- not entirely honest with her; right?

13  A.   Yes.

14  Q.   And had been trying to steal students and money from TVU?

15  A.   I'm not sure about that, but before I left the university,

16  Ramakrishna had a fight with Susan Su.  Even the day I'm

17  working, May 12th, in the university, he already complained to

18  Immigration there is some fraud happening in this university.

19  So even before I left, there is a fight between Susan and

20  Ramakrishna.  I'm not aware of it.

21  Q.   I understand.

22      Ramakrishna is the one that took you to Immigration?

23  A.   Yes.

24  Q.   He didn't even tell you that's where he was taking you?

25  A.   Yeah.  He didn't tell me.

1   Q.   And you didn't get any of the documents right away from

2   Dr. Su that -- on July 27th; right?

3   A.   Well, she was, like, telling this incident happened,

4   somebody was stopped there at Tri-Valley University for

5   immigration, and there was some issue.  Then she started --

6   there was a little bit of an argument that I didn't do it

7   properly in the office.

8   Q.   I'm sorry?

9   A.   There was a little bit argument.  She -- she blamed on me

10  that I didn't do her paperwork properly, like, registering the

11  classes, that particular date or anything.

12  Q.   I see.

13       This was the student who was stopped -- who wasn't

14  registered that you're referring to?

15  A.   No.  Generally, she didn't tell me who did the I-20 for

16  that student.

17  Q.   Okay.  She was just complaining more generally that you

18  weren't doing things properly?

19  A.   Yeah.  She complained.  She was, like, I didn't do the work

20  properly in regards to putting the dates and everything.

21  Q.   You -- well, you were -- after you decided to cooperate

22  with Agent Mackey, you were given a work permit; right?

23  A.   I was given a work permit because there's a case pending on

24  me, and in the United States when there is a case pending, that

25  is going to work until the case is completed.  On that basis, I

1   was assigned -- given a work permit, but even after I started

2   cooperating, at least for six to seven months, I stayed at home

3   without work.

4   Q.   I understand, but eventually -- eventually you were able to

5   work; right?

6   A.   I was able to work because there's a case on my name.

7   Q.   And you made -- you made a deal with -- with the Government

8   in this case; right?

9   A.   Yes.

10   Q.   In particular, this gentleman here, Mr. Rhyne, and -- and

11   Ms. West; right?

12   A.   What deal?

13   Q.   I'm sorry?

14   A.   What kind of deal are you talking about?

15   Q.   Well, good question.

16        You made a plea agreement with them?

17   A.   Yes.

18   Q.   You pleaded guilty; right?

19   A.   Yes.

20   Q.   To an offense and promised to cooperate with them?

21   A.   Yes.

22   Q.   And by "cooperate," "cooperate" includes testifying against

23   Dr. Su --

24   A.   Yes.

25   Q.   -- right?

1        But you haven't been sentenced yet?

2   A.   Yes.

3   Q.   And you're not going to be sentenced until the case against

4   Dr. Su is over?

5   A.   I'm not sure about that.

6   Q.   Okay.  Well, do you have a sentencing date?

7   A.   It's not yet confirmed.  I need to talk with my lawyer and

8   ask her.

9   Q.   You're not sure of the date?

10  A.   Yeah.

11  Q.   So presumably, it's not this week or next week?

12  A.   No.

13  Q.   You would know if your sentencing was coming up sooner

14  rather than later; right?

15  A.   Yeah.

16  Q.   Okay.  You agreed to cooperate against Dr. Su and to

17  testify against her; right?

18  A.   Yes.

19  Q.   And you know generally what she's charged with, maybe not

20  the specific counts but generally; right?

21  A.   I'm charged with accessing the computers, accessing the

22  SEVIS system.

23  Q.   I understand.

24       Your deal with -- your deal with the Government requires

25  you to testify; right?

1    A.   Yes.

2    Q.   If you don't testify, then they can recommend whatever

3    sentence they want to the Court?

4    A.   That's a part of my plea agreement, if I paid -- plead

5    guilty.

6    Q.   That you would testify?

7    A.   Yes.

8    Q.   I understand.

9         My point being, though, you haven't been sentenced yet;

10   right?

11   A.   Yes.

12   Q.   And you understand before you get to sentencing, the

13   Government is going to make some sort of recommendation to the

14   Court about what your sentence should be?

15   A.   I'm not sure about that part of the recommendations.  They

16   give it to me, but as far as I know it, the range of my

17   sentence days -- I can be sentenced to one year in jail and pay

18   a 100K fine and pay back the money -- what I got through the

19   fraud.  So they didn't tell me anything they are going to

20   recommend to the judge or anything.

21   Q.   I understand.

22        They haven't told you what they are going to recommend?

23   A.   No.  They didn't even tell me they are going to recommend

24   jails.

25   Q.   They didn't tell you that they're going to make any

1    recommendation?

2    A.   I don't think so.

3    Q.   Is that your understanding?

4    A.   Yeah.

5    Q.   Do you have any sort of understanding about what a 5K1.1

6    motion is?

7    A.   The motion is like -- as a cooperating witness.

8    Q.   That's right.

9         You understand that there's certain sentencing guidelines?

10   A.   Yes.

11   Q.   And when you're convicted of an offense in Federal Court,

12   one of the things the judge looks at is the sentencing

13   guidelines?

14   A.   Yes.

15   Q.   The Government has agreed to consider whether to make a

16   motion to depart from the guidelines?

17   A.   They didn't tell me specifically that they are going to

18   file any motions for that.

19   Q.   Well, they didn't promise to make a motion; right?

20   A.   Yeah, they didn't promise.

21   Q.   But they agreed to consider it depending on how your

22   testimony goes; isn't that right?

23   A.   I'm not sure about this question, sir.

24   Q.   I understand.  I don't expect you to understand the

25   legalese.

1           You --

2                   MR. BABCOCK:  May I approach, your Honor?

3                   THE COURT:  Yes.

4       BY MR. BABCOCK:

5       Q.   Showing what -- Government's Exhibit 452, do you recognize

6       that document?

7       A.   Yeah.  That's my plea agreement.

8       Q.   That's your plea agreement with the Government?

9       A.   Yes.

10      Q.   And it's got your signature on Page 9.  Oops.  Is that your

11      signature at the top there?

12      A.   Yes, sir.

13      Q.   Okay.  As well as a signature, looks like, by Ms. West?

14      A.   Yes.

15                  THE COURT:  Mr. Babcock, now that the witness has the

16      exhibit, perhaps you could withdraw from the witness stand,

17      and --

18                  MR. BABCOCK:  Well, I was --

19                  THE COURT:  -- you can leave the exhibit --

20                  MR. BABCOCK:  -- showing it to him without admitting

21      it.

22                  THE COURT:  I see.  I got that.  I understood that

23      there's some benefit in being able to show him where the

24      signatures are and that sort of thing, but generally the

25      examination needs to happen from the table -- or the podium.

1        MR. BABCOCK:  Fair -- fair enough.

2    BY MR. BABCOCK:

3    Q.   You read this before signing it; right?

4    A.   Yes, sir.

5    Q.   Went over it with your lawyer?

6    A.   Yes, sir.

7    Q.   And asked her questions if you had any?

8    A.   Yeah.

9    Q.   Isn't it true that the Government -- the Government -- the

10   Government's decision whether to file a motion -- a 5K motion

11   is based on its sole and exclusive decision on whether you've

12   provided substantial assistance?

13   A.   Yes.

14   Q.   You've heard those words before?

15   A.   Yes.

16   Q.   Do you remember reading them?

17   A.   Yes.

18   Q.   What do you think that means, "substantial assistance"?

19   A.   Like, assisting them, like, since I've been cooperating

20   with them, if I still cooperate truthfully to them.

21   Q.   I understand.

22        You've assisted them in investigating Tri-Valley University

23   and Dr. Su; right?

24   A.   Yes.  Yes.

25   Q.   And you're assisting them some more by testifying today?

1    A.   Yes.

2    Q.   Is there anyone else that you're testifying against?

3    A.   No.

4    Q.   Is there anyone else that you're cooperating against?

5    A.   No.

6    Q.   It's all -- it's all about Tri-Valley University and

7    Dr. Su; right?

8    A.   That's the only university I know what happened.  I was

9    involved in that.

10   Q.   But they haven't promised you what the sentence is going to

11   be yet?

12   A.   They haven't promised me anything, but as of my plea

13   agreement, my understanding is that the judge can decide

14   whether -- how long -- like, one year of jail they can give me

15   or how much fine.  So they can't promise me anything they are

16   going to do.

17   Q.   I understand.

18        The judge gets the final say --

19   A.   Yeah.

20   Q.   -- right?

21        The judge gets to make the final decision --

22   A.   Yes.

23   Q.   -- what your sentence will be?

24   A.   Yes.

25   Q.   But I assume you're hoping for probation; right?

DIRISANALA - CROSS / BABCOCK

1    A.   I'm not sure, sir, what I'm asking for because it depends

2    on -- I pleaded guilty to my mistake.  So it's up to the judge

3    to decide what he wants to give me.

4    Q.   Well, you don't want to go to jail, do you?

5    A.   No.  If the judge feels that I did a mistake, I'm ready to

6    go.

7    Q.   You're ready to step up and do a year in jail?

8    A.   Yes.

9    Q.   Without any hesitation?

10   A.   Yes.

11   Q.   You're not even going to ask for probation?

12   A.   No.  If the judge asks me my opinion, I will tell him

13   truthfully that what I did were the mistakes I committed and

14   what all I did to rectify it.  So it's up to the judge to

15   decide what he wants to give me.

16   Q.   You were -- you were already given -- you were already

17   allowed to plead to a misdemeanor; right?

18   A.   Yes, sir.

19   Q.   You were only looking at a year in jail?

20   A.   Yes.

21   Q.   Originally, you were charged with felonies; isn't that

22   right?

23   A.   Yes, sir.

24   Q.   You could have done many years in prison?

25   A.   Yes.

1300

```
 1          MR. BABCOCK:  That's all I have, your Honor.

 2          MS. WEST:  Your Honor, may we please have a brief

 3    sidebar before redirect.

 4          THE COURT:  Yes.

 5       Mr. Pence, would you join us at sidebar, please.

 6       (The following proceedings were heard at the sidebar:)

 7          THE COURT:  We're at sidebar outside the hearing of

 8    the jury.

 9       Ms. West?

10          MS. WEST:  Yes.  Thank you.

11       The -- this witness referred to some notes.  These notes

12    that he referred to came to my attention within the last

13    several days.  I have a memory of having them scanned and

14    sending it to defense counsel.  I -- while Agent -- or while

15    Mr. Babcock was examining the witness, I sent the agent down to

16    go get a copy to make sure defense counsel had it and saw the

17    e-mail.

18          THE COURT:  May I ask you a question --

19          MS. WEST:  Yes.

20          THE COURT:  -- for clarification?

21          MS. WEST:  Yes.

22          THE COURT:  Mr. Dirisanala testified that at an early

23    point in time in the investigation he wrote up notes of what

24    happened and e-mailed those to Agent Mackey.  Is it those notes

25    you're talking about?
```

```
1              MS. WEST:  It is those notes, although I can't
2       remember whether he said he e-mailed them or handed them.
3              THE COURT:  Yes.
4          Okay.  But in any event, we're all talking about the same
5       notes?
6              MS. WEST:  Yes, the same notes.
7              THE COURT:  Okay.
8              MS. WEST:  So I asked Agent Mackey to go get a copy
9       to provide to the defense during the examination to make sure
10      that the defense had seen my e-mail.  Agent Mackey wasn't able
11      to locate them quickly.  So I want to make sure I don't have a
12      false memory over the last several days, which have been
13      admittedly crazy.
14         I would like to offer to have Mr. Dirisanala subject to
15      recall if for some reason I had made a mistake in not sending
16      those notes as I thought I did.  If we've confirmed that I
17      actually sent the notes to the defense, then there would be no
18      reason for recall --
19             MR. BABCOCK:  Right.
20             MS. WEST:  -- but I want to make sure the defense has
21      an opportunity to examine him on those notes which I believe I
22      provided.
23             MR. BABCOCK:  So if I recall, when he mentioned that,
24      I went over to Mr. Morley and asked him because I have no
25      recollection of ever seeing anything like that.
```

```
 1                    THE COURT:  Yeah.

 2                    MR. BABCOCK:  He said he hadn't, either.  I talked to

 3          Hartley -- Ms. West, who said she had e-mailed them last week

 4          sometime.  I believe her, but I --

 5                    MS. WEST:  I --

 6                    THE COURT:  Well, here's -- here's --

 7                    MR. BABCOCK:  I didn't see it.  If I didn't see it,

 8          that's my fault.

 9                    THE COURT:  No.  No, but let me cut through this.

10              I hear the Government saying that if the Government erred,

11          it wants to be able to correct that error and cure any

12          prejudice by making the witness available for recall.  So as

13          I -- as I hear what Ms. West is saying, the only issue that

14          requires any judicial decision is whether or not to allow that.

15              Do you object?

16                    MR. BABCOCK:  No, I don't -- I don't object.

17                    THE COURT:  Instructing the witness that he may need

18          to be available for recall --

19                    MR. BABCOCK:  That's fine.

20                    THE COURT:  -- if I order that, and that's all I

21          would say in front of the jury about that.

22                    MR. BABCOCK:  No objection.

23                    THE COURT:  Okay.

24                    MS. WEST:  Okay.  Thank you.

25              And there was one other thing, which is I only have
```

1    probably two minutes maybe with this witness on redirect.

2              THE COURT:  Yes.

3              MS. WEST:  We have a witness who has been here for a

4    few days.  He is an agent, so he's in the power of the

5    Government.  However, he has some Joint Terrorism Task Force

6    obligations.  My examination of him is very brief.  I would

7    like to be able to get him on and off the stand so that he can

8    return to -- I think it's the East Coast or New York.

9        If it's necessary -- and I don't think it would come to

10   this -- would the Court consider asking the jurors to stay an

11   extra couple minutes so we can conclude his testimony?

12             THE COURT:  I would, but I have to tell you that I

13   have three law and motion matters, including a summary judgment

14   in a patent case scheduled at 2:00 p.m. --

15             MS. WEST:  Okay.

16             THE COURT:  -- and I need some time to get my head in

17   a correct frame of mind --

18             MS. WEST:  Understood.

19             THE COURT:  -- to perform those duties adequately.

20   So "a couple minutes" can't be in quotation marks.

21             MS. WEST:  Understood.  I don't think we'll even get

22   to that point.  I just wanted to flag it for the Court in

23   advance.

24             THE COURT:  Okay.

25             MS. WEST:  Okay.  Thank you.

1          THE COURT:  Very good.

2          MR. RHYNE:  Thank you, your Honor.

3          THE COURT:  Thank you.

4     (Proceedings were heard in the presence of the jury:)

5          THE COURT:  Thank you.

6     Redirect?

7          MS. WEST:  Thank you, your Honor.

8                      **REDIRECT EXAMINATION**

9     BY MS. WEST:

10    Q.  Mr. Dirisanala, just a few questions.

11        You mentioned on cross-examination that Dr. Su asked you to

12    have students pay online.  Do you recall that?

13    A.  Yes.

14    Q.  Do you know why she said that?

15    A.  Because most of the students pay online or send credit card

16    data.  So by the time I left the university, there's a fight

17    between Ramakrishna and Susan Su regarding money-taking.  So --

18    and one more thing I would like -- she has thought that I

19    accessed somebody's credit card.  So that might be the reason

20    she's asking everybody to pay online.

21    Q.  You were also asked -- and you stated that Dr. Su told you

22    during -- I believe it was the July 27th operation -- that she

23    was trying to do things the proper way.  Do you remember saying

24    that?

25    A.  Yes.

1  Q.  What did you understand her to mean?

2  A.  Obviously, by that time, one student was stopped in the

3  immigration for not enrolling in the classes, and there was

4  some mistake in his documents, what he got.

5      So I assumed that she meant to say she wants to put all the

6  documents legally.  That means even if students are not coming

7  or they're not doing anything, as far as the documentation

8  part, she wants to make it perfect in the system to show the

9  people.

10 Q.  Okay.  So you understood her to mean that she wants the

11 documents in the system --

12 A.  To be accurate if somebody checks up like Immigration or

13 anybody.

14 Q.  Did you understand her to mean anything about whether

15 students would actually have to attend classes?

16 A.  No.

17 Q.  While you were at Tri-Valley University, were you an F-1

18 student or here on an F-1 visa the entire time?

19 A.  When I was at Tri-Valley University, I was an F-1 visa.

20 Q.  The whole time?

21 A.  The whole time, I was an F-1.

22 Q.  After May -- was it mid-May when you first spoke to ICE,

23 Agent Mackey, and any other agents aside from the referral

24 fees?

25 A.  Yeah.

DIRISANALA - REDIRECT / WEST

1    Q.   Did you have -- before you got the work permit that you

2    talked about, did you have any other source of income?

3    A.   No.

4    Q.   Did you have any money to live on the United States -- live

5    on while in the United States?

6    A.   No.  That's the only income for -- the referral fees is the

7    only income.  I lived on that.

8    Q.   And did the United States issue this work permit to you?

9    A.   They give me the work permit on that -- after the case is

10   filed on me.  Then everybody, whenever a case is filed there,

11   is going to work until the case is completed.  So through that,

12   I requested them to file a work authorization, and from there,

13   I work started -- I started working.

14   Q.   So you said until this case is completed?

15   A.   Yes.

16   Q.   So from sometime in mid-2010 --

17   A.   Oh, no.

18   Q.   -- to --

19   A.   I think maybe somewhere around August or September.

20   Q.   Of 2010?

21   A.   Yeah.

22   Q.   Okay.  And now, of course, it's March of 2014?

23   A.   Yes.

24            MS. WEST:  No more questions.  Thank you.

25            THE COURT:  Recross?

1              MR. BABCOCK:  No, your Honor.

2              THE COURT:  Mr. Dirisanala, thank you.  You can step

3       down.

4              THE WITNESS:  Thanks.

5              THE COURT:  You're subject to recall, which means

6       that one of the parties may decide that they need your

7       testimony again, and I'm sure the Government will provide you

8       with more information about that.

9              THE WITNESS:  Yes.

10             THE COURT:  But for now, you can step down.

11         Thank you, sir.

12             THE WITNESS:  Thank you.

13             MS. WEST:  The United States calls Rajeev Bhatia.

14             THE COURT:  Good afternoon, Mr. Bhatia.

15             THE WITNESS:  Good afternoon.

16             THE COURT:  Let me ask you to come up to the witness

17      stand next to me.  And when you get there, just remain

18      standing, raise your right hand, and face my courtroom deputy,

19      please.

20             THE CLERK:  Do you solemnly swear or affirm that the

21      testimony you're about to give in the matter now pending before

22      this Court shall be the truth, the whole truth, and nothing but

23      the truth?

24             THE WITNESS:  I do.

25             THE CLERK:  Thank you.  Please be seated.  You need

1      to speak directly into the microphone to be heard.

2                  THE WITNESS:  All right.  Thank you.

3                  THE CLERK:  Okay.  Please state your full name and

4      spell your last name.

5                  THE WITNESS:  Rajeev Bhatia.  Last name is spelled

6      B-h-a-t-i-a.

7                            **RAJEEV BHATIA,**

8      Called as a witness by the Government, having been duly sworn,

9      testified as follows:

10                         **DIRECT EXAMINATION**

11     BY MS. WEST:

12     Q.   And can I ask you to please spell your first name as well.

13     A.   R-a-j-e-e-v.

14                  THE COURT:  All right.  Your witness.

15                  MS. WEST:  Thank you.

16     BY MS. WEST:

17     Q.   Mr. Bhatia, what do you do for a living?

18     A.   I'm a Special Agent with the Department of Homeland

19     Security, Immigration Customs Enforcement, Homeland Security

20     Investigations.

21     Q.   How long have you been doing that?

22     A.   Since 2006.

23     Q.   Can you please describe for the jury what your assignments

24     have been with Homeland Security.

25     A.   I started off my career working with Operation Predator,

1    which was administrative arrests of individuals who had been

2    convicted of sex-related crimes and subsequently violated their

3    immigration status.  I did that from 2006 until about 2008.

4         And from 2008 until about 2011, I was with the Document and

5    Benefit Fraud Task Force where we investigated various visa

6    violations, and since 2011, I've been with the Joint Terrorism

7    Task Force where we do various investigations of individuals --

8    with my squad, it's Afghanistan and Pakistan -- who have

9    associations with individuals who may or may not be involved in

10   terrorism against the United States.

11   Q.   Can I ask you to please pull that microphone a little bit

12   closer to you.

13   A.   Sure.

14   Q.   That way, you don't need to lean forward.  Thank you.

15        Before becoming an agent, what was your job?

16   A.   I was an adjunct professor at John Jay College of Criminal

17   Justice in New York.

18   Q.   Now, in the course of your work -- and I want to talk

19   particularly about when you were assigned to the Document and

20   Benefit -- Benefit Fraud Task Force.  In the course of that,

21   did you ever work in an undercover capacity?

22   A.   Yes.

23   Q.   And -- well, is undercover a law enforcement tool?

24   A.   Yes, it is.

25   Q.   Okay.  Is that something that needs -- do undercover

1    operations need any prior approval?

2    A.   They do.

3    Q.   That would be from the Department of Homeland Security?

4    A.   Yes.

5    Q.   Are you familiar with an investigation of Tri-Valley

6    University?

7    A.   Yes.

8    Q.   How did you become familiar with that?

9    A.   I was called by the case agent for that investigation and

10   asked if I would be willing to assist them in an undercover

11   role.

12   Q.   Was that Special Agent Mackey?

13   A.   Yes.

14   Q.   And did you agree?

15   A.   Yes, I did.

16   Q.   Did you receive any instructions from Agent Mackey?

17   A.   The basic instructions were that I was to enter the

18   university and try to solicit an I-20 from one of the TVU

19   employees.

20   Q.   Okay.  And did that happen in September 2010?

21   A.   Yes, it did.

22   Q.   Do you remember specifically September 7th?

23   A.   I do.

24   Q.   Did you use your own name?

25   A.   No.

1    Q.   What name did you use?

2    A.   First name of Rajiv spelled R-a-j-i-v and the last name of

3    Batra spelled B-a-t-r-a.

4    Q.   Were you equipped with any audio- or video-recording

5    device?

6    A.   Yes.

7    Q.   Were you provided with any money?

8    A.   Yes, I was.

9    Q.   How much?

10   A.   1,000 USD in cash.

11   Q.   And did you actually go to TVU on that day?

12   A.   Yes, I did.

13   Q.   Do you recall where that was?

14   A.   It was located at 405 Boulder Court, Suite 800 in

15   Pleasanton, California.

16   Q.   Can you describe what you saw when you went there?

17   A.   I drove my own vehicle there.  I pulled up to the front.

18   It was located in a typical business park, seemed fairly new.

19   A lot of the locations around that area were somewhat empty.

20   When I pulled up -- or walked up to the location of TVU, they

21   have their logo above the front entrance.  On either side of

22   the door, there were two windows, and each window had a -- what

23   appeared to be a poster that said, "Tri-Valley University."

24   Q.   What -- I'm sorry.  Go ahead.

25   A.   I walked into the location, and there was a secretary

1    receptionist sitting in the very front behind the desk.  She

2    was answering phone calls.  She just greeted me when I first

3    walked in.

4         To the left of me, there were two offices.  One was more in

5    the front of the building, one towards the rear, both on the

6    left-hand side.  In the middle, there were round tables where

7    it appeared to be other individuals were seated and appeared to

8    be waiting for two individuals who were Tri-Valley University

9    employees.  They were seated more towards the middle of the

10   room on the horizontal tables.  They were sitting behind the

11   computers.

12   Q.  All right.  Thank you.

13        And what happened when you went inside?

14   A.  I walked up to the receptionist and told her that I was

15   interested in attending school, and she asked me to sit down

16   and wait for one of the TVU employees to help me.

17   Q.  And did somebody eventually help you?

18   A.  Yes.

19   Q.  Do you know the name of who that was?

20   A.  It was a gentleman by the name of Vishal Dasa.

21   Q.  And did you speak with Mr. Dasa?

22   A.  Yes, I did.

23   Q.  Did you speak with him in English?

24   A.  It was a mixture of English and Hindi but mainly in Hindi.

25   Q.  And do you speak Hindi fluently?

BHATIA - DIRECT / WEST

1    A.    Yes.

2    Q.    What did you tell Mr. Dasa?

3    A.    I told him that I had come from New York, and I was trying

4    to find out if I could get the process started of getting

5    enrolled in school, and one of the first questions he asked me

6    was what my immigration status was.  He actually asked for my

7    status when I talked to him about the immigration status.

8    Q.    What did you tell him?

9    A.    I told him that I had come to this country in 2002 on an

10    F-1 visa, but that visa had long been expired.  I never

11    actually went to school.  I just started working when I came

12    there.

13    Q.    Did you have any further discussion with Mr. Dasa?

14    A.    I did.  I told him that recently a roommate of mine had

15    been deported, and I was afraid the same thing might happen to

16    me.  So I was trying to find out what options I had, and he

17    told me that as of right now, I was totally out of status, and

18    I said yes, I was.  And he said that he'd be able to enroll me

19    into the school, create an I-20 for me, and give me CBT or work

20    authorization, as he put it.

21    Q.    Okay.  Was there any discussion about whether you had any

22    identity documents?

23    A.    He asked me whether or not I had a passport, and I told him

24    that my passport was in New York.  So we were trying to figure

25    out what other identity documents I could provide to him.  I

1    told him I did have a New York state driver's license.  So I

2    showed him that.

3    Q.   Okay.  And that driver's license that you showed him -- was

4    that in your undercover name?

5    A.   Yes.

6    Q.   At some point, did Mr. Dasa ask you to fill out an

7    application?

8    A.   Yes, he did.

9    Q.   And did you?

10   A.   I did.

11       (Government's Exhibit 86 marked for identification.)

12   BY MS. WEST:

13   Q.   I'm going to show you what is marked for identification as

14   Government Exhibit 86.

15       Do you recognize this?

16   A.   Yes.  This is the application that Mr. Dasa had me

17   complete.

18   Q.   And did you provide this to TVU?

19   A.   He provided me with a blank, and I filled it out in front

20   of him.

21   Q.   And did you give it to him?

22   A.   Yes.

23            MS. WEST:  The United States offers Government

24   Exhibit 86.

25            MR. BABCOCK:  No objection.

1            THE COURT:  Exhibit 86 is admitted.

2            (Government's Exhibit 86 received in evidence.)

3     BY MS. WEST:

4     Q.   Let's take a look at Page 1 of Exhibit 86.  I'm going to go

5     a little out so the jury can see the whole document first.

6            Okay.  Now, let's zoom in.

7            Did Mr. Dasa give you any instructions as to which parts of

8     this application you needed to fill out?

9     A.   He told me to fill out the area where my name, address,

10    date of birth, telephone number, and e-mail address were listed

11    there.

12    Q.   Was there any part that he filled out --

13    A.   Yes.

14    Q.   -- that you saw?

15    A.   Above that, you'll see some checkmarks.  One is marked

16    "International," the other one "MS Program."  And the country

17    of citizenship where it says, "India," he filled that portion

18    out.

19    Q.   All right.  And so then the part that you filled out that

20    you're referring to is the handwritten part where it says,

21    "Last Name, First Name, Address," and "Date of Birth" and

22    "Phone Numbers"?

23    A.   "Place of Birth," and then also we have "Sex" on the

24    right-hand side.

25    Q.   All right.  Taking a look at the address on there in New

1    York, is that an undercover address?

2    A.   It was.

3    Q.   All right.  Thank you.

4         It was at that time?

5    A.   Yes.

6    Q.   Okay.  And the e-mail address on here -- can you tell us

7    what that is, please.

8    A.   That was an e-mail address that was provided to me by

9    Special Agent Jason Mackey prior to me going to TVU.

10   Q.   Now, if we look at the -- let's go down to "Degree

11   Program."

12        Do you see that okay?

13   A.   Yes.

14   Q.   All right.  How was this degree chosen?

15   A.   Mr. Dasa asked me whether or not I had completed a Master's

16   degree as of yet, and I told him that I hadn't completed a

17   Bachelor's degree.  Then he asked me what subject I studied

18   when I was in India.  I told him that I only completed up to

19   the tenth grade.

20        So he suggested to me that I get into a Master's program

21   because with that I'd be able to get the CBT or work

22   authorization.  So he told me that as of right now, the program

23   that was popular was the Master's in Computer Science.  He said

24   with that I can work in some sort of software programs.  He

25   said, "Or you can get into" -- "get an MBA."  So he asked me

1    which one I would like to do, and I said just to go with the

2    MBA.

3              THE COURT:  Mr. Bhatia, I just want to clear

4    something up on the transcript that was -- as we were scrolling

5    by.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Did you indicate to Mr. Dasa that you had

8    or had not completed a Bachelor's degree?

9              THE WITNESS:  I told him that I had not completed a

10   Bachelor's degree.

11             THE COURT:  Thank you.

12        Ms. West?

13   BY MS. WEST:

14   Q.  Let's look at Page 2 of Exhibit 86, please, in particular

15   at the bottom.

16        Do you see "Referral Information"?

17   A.  Yes.

18   Q.  Do you know who that name is, Hari P. Golla?

19   A.  This was the name that was provided to me by Mr. Dasa.

20   Mr. Dasa told me that this individual was a friend of his and

21   that if I put his name down in this portion of the form, that

22   the friend would receive some sort of points.

23   Q.  All right.  And then at the very bottom, "Applicant's

24   Electronic Signature."  Do you see that?

25   A.  Yes.

1    Q.   And did you sign this?

2    A.   Yes, I did.

3    Q.   That was September 7th, 2010?

4    A.   That's correct.

5    Q.   Did you have any discussion with Mr. Dasa about fees?

6    A.   Yes.  I asked him how much it would cost to -- for this

7    process, and he said there was a $50 application fee and that

8    it would cost $2,800 to register for the courses, which can be

9    paid in three installments.  A thousand dollars was the first

10   installment, and then the second and third installment he said

11   could be paid by November 15th.

12   Q.   Was there any discussion in particular about any

13   relationship between fees and your status?

14   A.   What he told me was that while I was enrolled in the

15   school, in order to continue to maintain the status, I would

16   have to continue to pay the fees.

17        So he broke down the year into three different semesters

18   and said that every semester, $2,800 would be due except for

19   I'd be able to take a break during one of the semesters during

20   the year where I wouldn't have to pay any fees but would be

21   enrolled in the school free of charge.

22   Q.   And did you pay fees on that day?

23   A.   I did, yes.

24   Q.   How much?

25   A.   $1,000.

1    Q.   Was there discussion between yourself and Mr. Dasa about

2    classes at Tri-Valley?

3    A.   He told me that he was going to register me in some courses

4    related to the Master's degree program that I was being

5    enrolled in.  He told me one of the courses would be

6    International Marketing, and he started to explain what

7    International Marketing was.

8         And I simply told him, "Whatever you think is best, go

9    ahead and enroll me in that."  So I don't know -- at that point

10   in time, I didn't know which three classes he was going to

11   enroll me in.

12   Q.   Did you have any discussion with Mr. Dasa about whether you

13   intended to attend classes in any way?

14   A.   I told Mr. Dasa that in New York, I worked two jobs, one in

15   the morning doing construction and 1:00 at night working in a

16   warehouse.  So I wouldn't have time to attend any sort of

17   classes, nor did I have access to the Internet, and he told me

18   not to worry about it, that he would take care of that for me.

19   Q.   Did you have any conversation with him about whether you

20   would still get some sort of certificate from Tri-Valley even

21   if you did not attend classes?

22   A.   That discussion I had with another individual, not

23   Mr. Dasa.

24   Q.   Who was that discussion with?

25   A.   That was another employee by the name of Jimmy.

1   Q.   Now, after you filled out the application form, did you get

2   an I-20 right away?

3   A.   He provided me with an initial -- it was called an initial

4   I-20, is what he referred to it as.  It was -- on the front of

5   the form, it said, "Initial attendance at the school."

6        And he said that once the fees were paid and I was

7   registered, then I would get what was called a continuing I-20

8   where it said, "Continuing student at the school," and with

9   that I-20, I'd be able to renew my driver's license and open up

10  a bank account.

11  Q.   All right.  So the initial I-20 that he gave to you -- was

12  that signed or unsigned?

13  A.   That was unsigned.

14  Q.   Was that before you paid your thousand dollars?

15  A.   Yes.

16  Q.   Now, what happened after you paid your thousand dollars?

17  A.   After I paid the thousand dollars, he printed up a second

18  form, which was the I-20 that said, "Continuing student at the

19  school."  That one, he said, would need to be signed by Susan

20  Su.  Once it was signed, then that would become valid.

21  Q.   So up to this point, had you seen anyone known to you as

22  Susan Su?

23  A.   No.

24  Q.   Did Susan Su then sign the document?

25  A.   Not at that initial time.  I actually came back two more

1    times that same day to Tri-Valley.  It was on the third time

2    that she actually signed the document.

3    Q.  All right.  So let's talk about that.

4         Did Mr. Dasa say anything to you about whether you would

5    have to wait for Susan -- or what did he -- what did he tell

6    you?

7    A.  He called her "Susan," just referred to her as "Susan," and

8    he also referred to her as "Madam."

9    Q.  And was there discussion about having to wait?

10   A.  He told me that I could either wait or leave and then I

11   could come back in about two to three hours.

12   Q.  And what did you choose to do?

13   A.  I chose to leave and come back.

14   Q.  Were you advised in some way as to when she came back?

15   A.  He asked me for my telephone number prior to leaving.  He

16   told me that he would call me when she came back and signed the

17   document.  So prior to leaving, Jimmy also provided me with his

18   telephone number in the event that Vishal was out of the office

19   so that I could get in touch with somebody at the -- at the

20   school.

21   Q.  And did you get a call?

22   A.  I did get a call, yes.

23   Q.  Advising that Dr. Su had returned?

24   A.  Yes.  Vishal had called me and said that she had returned.

25   Q.  And did you then go back to Tri-Valley?

1    A.   Yes.

2    Q.   What happened?

3    A.   I came back to Tri-Valley, and as soon as I walked in, I

4    was told that she had just come and left, that she came very

5    quickly and left very quickly.

6    Q.   So what happened then?

7    A.   Apparently, she had not signed the document, and so they

8    suggested that I come back in another two hours or so.

9    Q.   At that point, did you meet with Agents -- Agent Mackey and

10   Agent Taylor?

11   A.   After I left the office there, yes, I did go back and meet

12   with Special Agents Mackey and Taylor.

13   Q.   What did you do while you were meeting with them?

14   A.   We took off the recording equipment, and I left my vehicle

15   parked and got into their vehicle, and then we sat near the

16   Tri-Valley University entrance across the street in the parking

17   lot to wait and see for Ms. Su to return in her red Mercedes.

18   Q.   And at some point, did a red Mercedes pull up?

19   A.   Yes.

20   Q.   At that point, did you return to Tri-Valley?

21   A.   Yes.

22   Q.   What happened then?

23   A.   I put the recording -- put it back on, and I drove my

24   vehicle back over to Tri-Valley.  When I entered, I motioned

25   over to Vishal, and he said, "Oh, she just returned."

1     So I went ahead and sat down in the chair, and Vishal went

2     into her office with my documents, and I watched her sign those

3     forms.  And as soon as she did, he said, "Your papers are

4     ready," and I went over there, and he showed me the I-20, which

5     was signed showing a list of classes he had enrolled me into

6     and then a receipt for the fees that were paid for that day.

7     Q.   And did you ask him anything about that signature?

8     A.   I looked at the signature.  I pointed to it, and I asked

9     him if this was his madam, and he said, "Yes."

10    Q.   All right.  I am going to show you what is already in

11    evidence as Government Exhibit 205C.  I'm showing you Page 4 of

12    Exhibit 205C.  Let's see -- let's see if I can give you a whole

13    view first.

14         Are you able to see that at all from there?

15    A.   It's a little blurry, but I can make most of it out.

16    Q.   Okay.  Does this appear to be the signed I-20 that you

17    received?

18    A.   Yes, it does.

19    Q.   All right.  Let me zoom in a little now so we can actually

20    read it.

21         And do you see your undercover name there at the top?

22    A.   Yes.

23    Q.   "Rajiv Batra"?

24    A.   That's correct.

25    Q.   And in Box 10, an ink signature there for Wenchao Vince

1    Wang?

2    A.   Yes.

3    Q.   And if we move it over, do you see the date you were there,

4    9/7/2010?

5    A.   That's correct.

6    Q.   And is this the signature that you saw Dr. Su sign?

7    A.   Yes.

8    Q.   I'm showing you now Page 7 of Exhibit 205C.

9         Is this the fee receipt you received?

10   A.   Yes.

11   Q.   And do you see at the bottom reflected "Receive Payment of

12   $1,000 on 9/7/2010"?

13   A.   Yes.

14   Q.   Let me zoom in.

15   A.   Yes, I do see that.

16   Q.   Can you see that okay?

17   A.   Yes.

18   Q.   And then three classes listed there?

19   A.   That's correct.

20   Q.   I'm going to show you what's been marked as Page 9 of

21   Exhibit 205C and ask if you can tell us what this is, please.

22   A.   This was -- when I was sitting with Mr. Dasa, he was

23   explaining how the school years are broken down by semester.

24   So on the top there -- actually, at the very top, you'll see

25   something that is crossed out.  That doesn't pertain to me.

1     This was just a piece of paper that he pulled out from the

2     table there, and that had already been written on it prior to

3     him explaining how the school year is broken down.

4          So if you look towards the top, it says, "September to

5     December," which is fall, January to April is spring, and May

6     to August is summer.  So he explained to me that these are the

7     months that the semester is broken down into and that for every

8     semester, a fee of $2,800 is due.

9     Q.  All right.

10    A.  And if you look --

11    Q.  Sorry.  Let me just ask you about the writing up at the top

12    that appears to be crossed out.

13    A.  Yes.

14    Q.  What is that?

15    A.  I don't know what that is.  It does not pertain to me.  We

16    selected that piece of paper from the table.  That was already

17    written on there.  So prior to him having any discussion with

18    me, that was already there.

19    Q.  Okay.  So the part that he wrote for purposes of talking to

20    you is below that crossed-out section?

21    A.  Correct.  Yes.

22    Q.  And then down below, we see a "Vishal Dasa" with a number

23    below that?

24    A.  Yes.  He provided me with his name and telephone number.

25    Q.  And then below that, "Jimmy" and a number?

1    A.   Yeah.  I wrote that telephone number down after Jimmy

2    provided it to me.

3    Q.   And now there appears to be a sticky note below that.  Do

4    you see that?

5    A.   Yes.

6    Q.   And what is that?

7    A.   That's the name of the friend that Mr. Dasa had asked me to

8    put down on the Tri-Valley University application so that the

9    friend could receive some sort of points.  That's his name and

10   his e-mail address.

11             MS. WEST:  Thank you.

12             THE COURT:  Cross-examination?

13                         **CROSS-EXAMINATION**

14   BY MR. BABCOCK:

15   Q.   Good afternoon, Officer.

16   A.   Good afternoon, sir.

17   Q.   I understand you've got a plane to catch.

18   A.   I do.

19   Q.   We'll be brief.

20        You -- what time did you go to Tri-Valley University -- I

21   don't remember if you said what time that day.

22   A.   Yeah.  I went on three different occasions, but --

23   Q.   The first time?

24   A.   The first time was approximately 11:30 in the morning.

25   Q.   Okay.  And the last time -- what time was it the third time

 1   you went and actually got some documents?

 2   A.   Close to 5:00 o'clock.

 3   Q.   Okay.  So over a period of about five and a half hours, you

 4   went there three times?

 5   A.   That's correct.

 6   Q.   You dealt primarily, it sounds like, with Vishal Dasa?

 7   A.   Correct.

 8   Q.   Each time?

 9   A.   Vishal Dasa I met with each time I was there, yes.

10   Q.   Okay.  The first time you went there -- you've seen Dr. Su

11   before?

12   A.   Yes.

13   Q.   You saw her the third time you went that day?

14   A.   That's correct.

15   Q.   Okay.  You didn't see her in the office at all the first

16   time?

17   A.   No.

18   Q.   How long were you in the office the first time?

19   A.   Approximately an hour and 15 minutes.

20   Q.   Okay.  So you didn't see her coming and going at all?

21   A.   No.

22   Q.   And the second time you went back, you got a phone call

23   from -- was it Vishal?

24   A.   Yes.

25   Q.   Saying that she had come back?

BHATIA - CROSS / BABCOCK

1   A.  Correct.

2   Q.  But by the time you got there, she had come and gone?

3   A.  That's correct.

4   Q.  So it doesn't sound like she was there very long at all the

5   second -- prior to you being there?

6   A.  Correct.

7   Q.  How long was it between when Vishal called you and you

8   showed up and she wasn't there?

9   A.  Oh, I would say maybe 15 or 20 minutes at the most.

10  Q.  Okay.  The third time you went, you did see Dr. Su?

11  A.  Yes.

12  Q.  And was she in her office or an office?

13  A.  When I initially saw her, she was kind of running back and

14  forth --

15  Q.  Uh-huh.

16  A.  -- at the office.  She was dealing with somebody.  It

17  looked like they had some sort of delivery they were dropping

18  off --

19  Q.  Okay.

20  A.  -- because it was a Home Depot truck parked outside, and I

21  saw her kind of walking back and forth and then eventually saw

22  her sitting in an office, and that's when Vishal Dasa came over

23  to her.

24  Q.  Okay.  Vishal appeared to bring her some documents?

25  A.  Yes.

1    Q.   And you saw her sign something?

2    A.   Yes.

3    Q.   Did you see what she was signing?

4    A.   I saw her sign -- it was from a distance, but I saw that it

5    was the I-20 that Vishal Dasa returned to me.  Those were the

6    two things that she signed.

7    Q.   Okay.  Did Vishal and Dr. Su have any sort of discussion

8    when he brought those in, or did he just hand them to her and

9    she signed them?

10   A.   They appeared to have a brief discussion, but I couldn't

11   hear them as I was too far away to hear.

12   Q.   Okay.  Fair enough.

13        I think that's all I have.

14        Do you -- oh.  You spoke primarily to Vishal in Hindi?

15   A.   Primarily in Hindi, yes.

16   Q.   Okay.  Do you have any notion whether my client speaks or

17   understands Hindi?

18   A.   I'm not aware.

19        MR. BABCOCK:  Thank you.

20   Nothing further.

21        MS. WEST:  No questions.  Thank you.

22        THE COURT:  Agent, thank you for your testimony.

23        THE WITNESS:  Thank you, your Honor.

24        THE COURT:  You are excused.  You may step down.

25        All right.  Well, we're on the verge of 1:30.  So we're

1    going to stop for the day and also for the week because it's

2    Thursday.  We don't have trial on Fridays unless you're here

3    deliberating, and we'll talk about that -- on that eventually

4    when it gets a little closer.

5        I do continue and the parties continue very much to

6    appreciate your hard work and attention, and I can tell you're

7    still paying very close attention, and so enjoy your time off.

8    Remember not to talk about the case with anybody or get any

9    information or provide any information about it.  The best

10   thing is probably not to think about it at all.  Just enjoy

11   this beautiful weather we're starting to have.

12       I'll see you on Monday morning at 8:30.

13           THE CLERK:  All rise.

14       (Proceedings were heard out of the presence of the jury:)

15           MS. WEST:  Your Honor --

16           THE COURT:  Yes.  Hold on.  I just want to say that

17   we're now outside the presence of the jury.

18       Ms. West?

19           MS. WEST:  Yes.  I did receive a note and -- I think

20   from Mr. Rhyne that defense counsel was able to find those

21   notes.

22           MR. BABCOCK:  E-mail, yes --

23           MS. WEST:  Okay.

24           MR. BABCOCK:  -- that you -- that you remembered.

25           MS. WEST:  I'm glad it wasn't a false memory that

```
 1        those had, in fact, been turned over.  So --

 2                 THE COURT:  I see.

 3           And this is the issue we were discussing at sidebar

 4      earlier?

 5                 MS. WEST:  Correct.

 6                 THE COURT:  All right.

 7                 MS. WEST:  So I think there's no reason to recall Mr.

 8      Dirisanala.

 9                 THE COURT:  Very good.

10                 MR. BABCOCK:  I'll look at the notes and see, but --

11                 THE COURT:  Is there anything else -- we've not had

12      any off-the-record proceedings today now that we're reporting

13      our sidebars, but is there anything else that anyone wants to

14      either discuss or place on the record before we recess for the

15      day?

16                 MR. BABCOCK:  I don't think so.  I'll take a look at

17      the jury instructions before next week.

18                 THE COURT:  Very good.

19                 MS. WEST:  And we will speak about them.

20                 MR. BABCOCK:  And --

21                 THE COURT:  And if --

22                 MR. BABCOCK:  -- whatever --

23                 THE COURT:  If the Government could forward me those

24      instructions in Microsoft Word format this weekend, that will

25      be helpful.
```

1                    MS. WEST:  Will do.  Thank you.

2                    THE COURT:  All right.  Very good.  Thank you.

3                    MR. BABCOCK:  Thank you, your Honor.

4                    MR. RHYNE:  Thank you, your Honor.

5                    MR. BABCOCK:  Have a good weekend.

6                    THE CLERK:  All rise.

7              Court is in recess.

8                         (Proceedings adjourned at 1:30 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5        I, James C. Pence, Federal Official Realtime Court

6   Reporter, in and for the United States District Court for the

7   Northern District of California, do hereby certify that

8   pursuant to Section 753, Title 28, United States Code that the

9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14
                          Dated this 20th day of June, 2014.
15

16

17   _____
     JAMES C. PENCE, RMR, CRR, CSR NO. 13059
18   FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25