Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE


UNITED STATES OF AMERICA,    )
                             )
               Plaintiff,    )
                             )    No. CR 11-0288 JST
     vs.                     )
                             )
SUSAN XIAO-PING SU,          )
                             )    San Francisco, California
                             )    Friday, February 7, 2014
               Defendant.    )    9:47 a.m.
                             )
_____

**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

For Plaintiff:        Melinda L. Haag
                      United States Attorney
                      450 Golden Gate Avenue
                      San Francisco, California 94102
                 BY:  **HARTLEY WEST**
                      **DAVID COUNTRYMAN**
                      **ASSISTANT UNITED STATES ATTORNEYS**


                      Department of Justice
                      United States Attorney's Office
                      1301 Clay Street, Suite 340S
                      Oakland, California 94612
                 BY:  **WADE MAXWELL RHYNE**
                      **ASSISTANT UNITED STATES ATTORNEY**


          (APPEARANCES CONTINUED ON FOLLOWING PAGE.)


Reported By:  Sarah Goekler, RPR, CSR No. 13446
              Court Reporter Pro Tem

1  **APPEARANCES:**  (CONTINUED)

2  For Defendant:          Law Offices of Erik Babcock
                          717 Washington Street, 2nd Floor
3                          Oakland, California 94607
                     BY:  **ERIK G. BABCOCK, ATTORNEY AT LAW**
4

5                          ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Friday, February 7, 2014                        9:47 a.m.

 2                     P R O C E E D I N G S

 3        THE CLERK:  Calling criminal case 11-288, United

 4   States of America versus Susan Su.

 5      Counsel, will you please make your appearances for the

 6   record.

 7        MR. BABCOCK:  Erik Babcock for Ms. Su, who's present

 8   out of custody.  Good morning, Your Honor.

 9        THE COURT:  Good morning.

10        MS. WEST:  Good morning.  Hartley West for the

11   United States.

12        MR. RHYNE:  Good morning, Your Honor.  Wade Rhyne for

13   the United States.

14        THE COURT:  Is it West, W-E-S-T?

15        MS. WEST:  It is.

16        THE COURT:  Good morning.

17        MS. WEST:  Good morning.

18        THE COURT:  Well, you have a trial date coming up

19   soon.

20        MS. WEST:  We do.

21        THE COURT:  I didn't see a pretrial conference

22   statement on the docket.  Did I miss it?

23        MS. WEST:  That was filed previously just before our

24   trial date with Judge Armstrong that was vacated.

25        THE COURT:  That's interesting.  I saw the other
```

1 materials that jointly proposed jury instructions, the voir

2 dire.  I must have overlooked it.

3    **MS. WEST:**  I'm happy to pass a copy up to the Court

4 right now.

5    **THE COURT:**  That would be helpful.

6     (Document tendered to the Court.)

7    **THE COURT:**  It's my recollection that we have a

8 further pretrial conference set on March the 3rd and that we

9 had thought to actually do jury selection the following day.

10 Is that accurate?

11    **MR. BABCOCK:**  It is, Your Honor.

12    **MS. WEST:**  It is.

13    **THE COURT:**  I'm going to go through some of the items

14 in this trial memorandum in just a second.  When we were last

15 together we talked briefly about a motion in limine that had

16 been filed by the Government with regard to the admissibility

17 of certain records.  I think it's the only motion in limine

18 that the Government had filed.  The parties were going to

19 discuss that motion further.

20    **MR. BABCOCK:**  We have.  And I think we've reached an

21 agreement on basically 90, 95 percent of the records at issue.

22 I don't have objections to virtually all of them, they are

23 business records or otherwise admissible, as long as it's a

24 two-way street.  For example, if they had bank records from

25 Wells Fargo, I'm not objecting to those.  As long as there's

1    other bank records that I need to use, then I'll object.

2         **THE COURT:**  It's always hard for the Court to know in

3    advance whether everyone's idea of sauce for the gander is the

4    same.

5         So I gather you've not produced the records in question to

6    the Government?

7         **MR. BABCOCK:**  I don't have any particular records of

8    mine at this point.

9         **THE COURT:**  I'm not suggesting you have any

10   obligation to do that.  Where I don't want to be, though, is in

11   a situation where you believe that the Government is required

12   to withhold a valid objection to the admissibility of something

13   because you withheld a valid objection to the admissibility of

14   something.  I can't -- not having been present at the

15   negotiation of the deal, all I can do at that situation is

16   enforce the Evidence Code.

17        **MR. BABCOCK:**  True.

18        **THE COURT:**  And I'm quite familiar with your

19   reputation, which is excellent.  And I'm -- already observed

20   the good working relationship that you have with the

21   United States Attorney's Office.  I'm not anticipating any

22   problems, I just want to make sure I've done everything I need

23   to to avoid any issues during trial.

24        **MR. BABCOCK:**  Certainly.

25        **THE COURT:**  Everybody feel okay about their deal?

1       **MR. RHYNE:**  I believe so, Your Honor.  I think that

2  what Mr. Babcock is contemplating, based on the conversations

3  that we had about these stipulations, is bank records, PayPal

4  records, largely financial records, and everything that he had,

5  I believe, came from us so they're all certified.

6       **THE COURT:**  I see.

7       **MR. RHYNE:**  And we wouldn't have an objection to

8  that.

9       **THE COURT:**  And I will say the usual exception to the

10  rule I just articulated is if Party A wants to use business

11  records from a certain institution and then Party B wants to

12  use the same kind of records from the same institution, that's

13  an objection I normally don't pay a lot of attention to.  So if

14  that's what you're talking about it doesn't sound like there'll

15  be any problem.

16       **MR. BABCOCK:**  That's not going to be a problem.  And

17  the other sort of category apart from the financial records is

18  the documents on computers that were seized during searches of

19  the school basically.  I'm not going to make them put on their

20  mirror imaging expert technologist about each record, of which

21  computer it came from and testify it's a true copy of what was

22  on the computer, on the agreement that if there's other things

23  from that same computer -- the same computers, that I don't

24  have to do that same authentication.

25       **MR. RHYNE:**  And probably the only caveat to that --

1  and we didn't discuss this yesterday -- is if we're talking

2  about a substantive e-mail that would otherwise be hearsay,

3  that obviously we would --

4          **MR. BABCOCK:**  Right.  I'm just talking about the

5  foundational aspects, not whether it qualifies for admission.

6          **THE COURT:**  It sounds like everybody's clear on that.

7  And I'm satisfied that unless -- unless you all think that we

8  need to talk about that further, I don't need to.

9          **MR. BABCOCK:**  I don't think so.

10         **THE COURT:**  I'm not going to worry about that.

11     You said 99.5 percent a moment ago.  What's the .5?

12         **MR. BABCOCK:**  There was one -- not evidentiary but

13  factual stipulation they've requested that I've not agreed to

14  where certain e-mails were routed through for purposes of

15  interstate connection.  I told them we would revisit it later,

16  but ...

17         **THE COURT:**  I don't feel the need to talk about that

18  any further.

19         **MR. BABCOCK:**  I do have a couple other things -- I

20  don't mean to interrupt -- when the Court's ready.

21         **THE COURT:**  No.  Please.

22         **MR. BABCOCK:**  I wanted to alert the Court first --

23  and I was -- did not tell them this yesterday during our

24  conference, but my client has been diagnosed with some sort of

25  mass, I guess, right in this region, the left carotid area, and

1    she's scheduled -- I think last week, and she's scheduled to go

2    in for an MRI on Tuesday, the 11th, next week.  And her

3    doctor's told her, depending on what the MRI shows, it's

4    possible she might need some sort of surgery.

5         So I just wanted to alert the Court.  It may turn out to

6    be nothing, but if it turns out to be something and she has to

7    have a procedure, it could impact our schedule.

8             THE COURT:  We'll visit that issue.

9             MR. BABCOCK:  And I also -- as far as the scheduling

10   goes -- and I did speak with the prosecution about this

11   yesterday -- Court may remember Ms. Alanna Coopersmith is

12   helping me out on this case.  She's not here today; she has a

13   preliminary hearing.  But we had -- when we were scheduling the

14   trial last time, we had sort of worked around a little trip she

15   had planned.

16            THE COURT:  Yes.  We were not going to be in session

17   on the 10th of March.

18            MR. BABCOCK:  Right.  I had preexisting plans with

19   my -- which were purchased with MileagePlus miles to go to

20   Hawaii on April 12th.

21            THE COURT:  Yes.

22            MR. BABCOCK:  And I'm just a little concerned we

23   might be pushing up against that.  I know the Government's

24   estimate is three weeks, but they do have a lot of documents,

25   and if the -- you never know how long a jury is going to take

1    to deliberate.

2              **THE COURT:**  Yes.

3              **MR. BABCOCK:**  So I'm wondering if the Court would

4    consider -- we talked about doing a pretrial the 3rd and

5    starting jury selection on the 4th, and then coming back on the

6    11th for opening statements and the like.  And I'm wondering if

7    the Court -- I don't know what the Court's schedule, but if the

8    Court would consider, assuming the Government's ready, which I

9    believe they can be, starting the trial more on the heels of

10   the jury selection, sometime during that week.

11             **THE COURT:**  I'm confident we don't have the time for

12   that.

13             **MR. BABCOCK:**  Okay.

14             **THE COURT:**  I don't even have to look at my schedule.

15   Every minute in March is spoken for.  I'm impaneling the next

16   grand jury, for one thing.  I think I might be doing it the day

17   after our jury selection.  We're going to have -- when we're

18   not in trial in your case, we're going to be doing other things

19   in this courtroom for the entirety of March.  Every day when we

20   say good-bye to you at 1:30, half an hour we'll have a claim

21   construction hearing or something else going on here.

22             **MR. BABCOCK:**  Okay.  I hear the Court.  I am --

23             **THE COURT:**  This is a big, important, delayed wire

24   fraud trial.  We have moved a lot of things to make room for

25   this case.

1          **MR. BABCOCK:**  I understand.

2          **THE COURT:**  We're going to start it when we said.

3     We'll finish it as soon as it's done.

4          **MR. BABCOCK:**  Okay.  I may -- if we're not -- don't

5     have a verdict by the 11th, I may have someone stand in for me

6     for questions or deliberations, but --

7          **THE COURT:**  I'm happy to address that as the need

8     arises.

9          **MR. BABCOCK:**  I can't reschedule my kids' spring

10    break, but -- okay.  We'll be ready on the 11th.

11         **MS. WEST:**  We did have a few other issues to raise

12    when the Court's ready.

13         **THE COURT:**  I am.

14         **MS. WEST:**  There was a letter that was filed by the

15    defendant's father.  It is in Mandarin.  I don't know if the

16    Court speaks Mandarin.

17         **THE COURT:**  I don't.

18         **MS. WEST:**  We did --

19         **THE COURT:**  I complied with what I viewed to be my

20    obligations and made the parties aware of the existence of the

21    letter as soon as it was brought to me by my courtroom deputy.

22    I don't read Mandarin.  I didn't have it translated, and I

23    don't know what it says.

24         **MS. WEST:**  We did get a very rough translation of it,

25    which is appearing to call into question the defendant's mental

1    health by her father, who's the author of the letter, and

2    requesting, based on that, that the Court dismiss the charges

3    because there has been some discussion of the defendant's

4    mental health over the course of this trial.

5         We've spoken with defense counsel and just wanted to make

6    sure that we do have on the record defense counsel's belief and

7    full familiarity with the case law that this defendant is

8    competent to stand trial and that he does not have any concerns

9    as her attorney, so I think Mr. Babcock's prepared to do that.

10         **THE DEFENDANT:** (Inaudible.)

11         **THE COURT:** Ma'am, don't talk.

12         Excuse me, Mr. Babcock. Ms. Su is attempting to address

13    the Court.

14         Ms. Su, if you have something to say, ask to speak to your

15    lawyer and he'll tell me. You have the right to remain silent

16    and not incriminate yourself. You're on the record. You talk

17    through your lawyer. If you insist on talking to the Court,

18    please consult with your lawyer first. But until you've done

19    that, please don't address me. Okay?

20         Mr. Babcock?

21         **MR. BABCOCK:** I wouldn't go so far as to say I have

22    no concerns, Your Honor. My client did have a 5150 commitment

23    about nine years ago for a couple of nights. And when she

24    appeared -- first came to Magistrate's Court on the complaint

25    in this case where I was not the attorney of record yet, but I

1  do know that Judge Ryu had some concerns.  I think more

2  addressed to whether or not she was suicidal.  And one of the

3  conditions of her release was that she attend counseling or

4  therapy, which she did for a couple years as a condition of her

5  pretrial release.

6      So -- but I have not declared a doubt as to her competence

7  to stand trial at this point.  And I'm not a therapist; I'm a

8  lawyer, but I do believe she understands the proceedings and is

9  able to help me to the extent required.  That's what the

10  Court's looking for -- or the Government, I guess.

11      **MS. WEST:**  We -- just so the Court's aware of some of

12  the prior proceedings regarding this, the counsel preceding

13  Mr. Babcock had asked for some sort of evaluation of the

14  defendant, after which he advised the Government and I believe

15  the Court as well; is that right?

16      **MR. RHYNE:**  I believe so.

17      **MS. WEST:**  That he did not have any concerns as to

18  the defendant's competence to stand trial and there were

19  whatever conditions had been put in place by the Court at that

20  early stage were lifted at defense counsel's request.

21      I do note that there's been no sort of mental health-type

22  defense proffered -- affirmative defense proffered by the

23  defense here, so we did want to raise it and just to advise the

24  Court that despite this filing, there has been no concern

25  raised by either defense counsel as to the competency of this

1  defendant.

2          **THE COURT:**  Those comments are noted for the record.

3          **MS. WEST:**  Okay.  Then there are a couple of other

4  issues.  One -- and I believe we have already notified defense

5  counsel of this.  The expert that the Government had previously

6  noticed who would be coming from the Department of Homeland

7  Security Student and Exchange Visitor Program, with the change

8  in trial date, that person is not available.  There will be a

9  different expert from the same entity who will be testifying to

10  the same substance.  We will be producing her CV probably

11  Monday to the defense.

12      So just to address that one issue on the change in expert.

13      There will be a need for an interpreter for one of the

14  Government's witnesses -- Mandarin?

15          **MR. RHYNE:**  Correct.

16          **MS. WEST:**  Mandarin interpreter that we'll need.  So

17  we'll address that, but I just wanted to flag that for the

18  Court.

19      Did you want to address anything else before we talk about

20  forfeiture?

21          **MR. RHYNE:**  We've been updating the exhibits,

22  e-mailing the new exhibits, substitution of some of the

23  exhibits to the defense.  We're going to file a second amended

24  exhibit list to the Court that's just going to note some of the

25  minor changes to the previously produced exhibit list.  We will

1   then provide -- whatever the Court would like -- copies of the

2   exhibit binders.  I believe they were previously produced to

3   Judge Armstrong, but I'd like to just give you an updated copy,

4   and I wanted to know when the Court would like those.

5           **THE COURT:**  Just the beginning of March would be

6   fine.  Thank you.

7           **MR. RHYNE:**  Very good.

8           **MS. WEST:**  Okay.  So the -- one sort of more

9   substantive issue that I wanted to flag for the Court.  I'm

10  sorry that you didn't have an opportunity to review the trial

11  memorandum before today.

12          **THE COURT:**  It's obvious I did have an opportunity,

13  but I didn't avail myself of it so that's on me.

14          **MR. BABCOCK:**  Probably didn't tell your clerk to go

15  back six months in the Pacer to get it, so ...

16          **MS. WEST:**  But laid out fairly fully in that is an

17  explanation of the criminal forfeiture proceedings.  We weren't

18  sure to what extent the Court is familiar with those.  We are

19  happy to address them.  I took the liberty in bringing with us

20  an expert in forfeiture from our office who can walk through

21  the Court in detail if the Court would like that.

22      The one thing we need to do on the record today -- and

23  we've discussed this with defense counsel, but it does need to

24  be on the record, is that the defense is waiving their right to

25  have a jury decide the forfeiture issue and therefore can be

1  decided by the Court.

2      So we do ask to have that done today, and we're happy to

3  walk the Court through the forfeiture procedure.

4          **THE COURT:**  I have never done anything -- I haven't

5  done that before.  So -- and it doesn't -- I'm not in any way

6  feeling the need to make myself look smarter than I am.  So if

7  there's something you think that your Trial Judge needs to know

8  in your wire fraud trial, then you should go ahead and tell me.

9      And I'm not familiar with the civil forfeiture proceedings

10  beyond having ordered -- beyond having some cases -- some

11  pending civil cases brought by the United States Attorney's

12  Office that deal with civil forfeiture or having ordered

13  forfeiture as a condition of sentence in criminal cases, I'm

14  not familiar with it.  So I would welcome further information

15  on that subject.

16          **MS. WEST:**  Okay.  So why don't I go through sort of a

17  brief overview and then we can call up the esteemed David

18  Countryman to address any more detailed issues.

19      For criminal forfeiture, this is something that is decided

20  after the guilt phase of the trial.  We can rely on any

21  evidence that was presented during the trial or additional

22  evidence, including hearsay, after the guilt phase, that is,

23  after the jury has delivered its verdict.  And the -- if as --

24          **THE COURT:**  That was admitted during the prior

25  proceeding or that -- or supplemental evidence or both; right?

1          **MS. WEST:**  Both.  That's correct.

2          **THE COURT:**  Okay.

3          **MS. WEST:**  So the forfeiture is a criminal penalty.

4   The issue for the Court at that phase is just to determine if

5   there's an adequate nexus measured by a preponderance of the

6   evidence, not the usual criminal burden of proof.  But if

7   there's an adequate nexus between the criminal offense and the

8   property, and that's the issue for the Court at that point.

9       At that point then the Court would order forfeiture and

10  deal thereafter with what are referred to as ancillary

11  proceedings to determine whether there is some priority of a

12  third-party interest in the property.

13      So this is a phase that does take place after the --

14         **THE COURT:**  How do third parties become aware of the

15  potential forfeiture?

16         **MS. WEST:**  There are notice provisions, and at this

17  point I'm going to invite Mr. Countryman to come up so that he

18  can provide answers to all the Court's questions.

19         **THE COURT:**  Good morning, Mr. Countryman.

20         **MR. COUNTRYMAN:**  Good morning, Your Honor.  David

21  Countryman for the United States.

22         **THE COURT:**  Yes, I saw your substitution of counsel

23  as I was getting ready for this morning's proceedings.

24         **MS. WEST:**  Sorry that was so late.

25      Ms. West is correct; basically, after trial we will ask

the Court to determine the nexus between the particular

properties seeking to be forfeited.  The Court will enter a

determination as to that for the defendant.  We will submit a

preliminary order of forfeiture, which will forfeit the

defendant's interest in that property.  We will then send

notice to anyone who we think that has interest in that

property, as well as publish it on a government website for

anyone who we did not send notice to have notice of the

Government's forfeiture.

**THE COURT:**  Thank you.

**MR. COUNTRYMAN:**  And there may be additional

forfeiture money judgment sought for, as mentioned, the Bill of

Particulars that was filed for additional funds that have not

been seized and the Government doesn't possess, such as the

rents or additional funds.  We would then ask the Court for a

money judgment, which is just an in persona IOU against the

defendant.  And the Court -- and the parties can litigate the

amount of that, and there would be no third-party issue because

it's an in persona judgment against the defendant.

**MS. WEST:**  In terms of the personal property and real

property that the Government has provided notice that it's

seeking forfeiture of -- against the defendant, there are --

the defendant's car, which is a Mercedes Benz.  There's three

bank accounts:  Wells Fargo Bank account, Citibank account,

PayPal account.

1    And there are four parcels of real property:  One is the

2    Tri-Valley University property itself, and then three

3    residences owned by the defendant, one of which we understand

4    she is still currently -- two of the Tri Valley University

5    properties are both 405 Boulder Court in Pleasanton but there

6    are two separate suites, so I guess that does separately --

7    specifically count as two.

8        And then in addition to that, there are three residences,

9    one of which the defendant, we believe, is currently residing

10   in.  That was, as I understand it, with permission of the

11   Court.  We've been advised that she is renting out some portion

12   of the properties.  And so those are the rents to which

13   Mr. Countryman is referring that we'll seek forfeiture of as

14   well.

15       **THE COURT:**  This is getting a little farther ahead

16   than I need to.  But if the properties are encumbered, is the

17   defendant in that circumstance required to offset the

18   forfeiture by her need to pay obligations for mortgage,

19   insurance, or property taxes?  This is my family law background

20   coming to the fore.

21       **MR. COUNTRYMAN:**  I think that there's two ways that

22   the parties could do this.  We could seek -- the Government

23   steps into the shoes of the defendants --

24       **THE COURT:**  Yes.

25       **MR. COUNTRYMAN:**  -- so seeking specific forfeiture of

1 the property, third parties would be paid upon the sale of

2 proceeds and any delinquency would be less money obtained by

3 the Government.

4       **THE COURT:** When you say "rents," what do you mean?

5       **MR. COUNTRYMAN:** The Government steps into the shoes

6 of the defendant at the time the criminal act is committed.

7       **THE COURT:** Yes.

8       **MR. COUNTRYMAN:** So the Government's position is that

9 the rental property belongs to the Government so that any

10 rental income earned from that property since the time of the

11 crime are proceeds that are owed to the Government.

12       **THE COURT:** Yes. Separate and apart from -- okay.

13     So let's assume hypothetically that a defendant commits a

14 crime for which forfeiture is appropriate. And on January 1 of

15 a particular year -- five years ago. Then purchases a house

16 with the proceeds of the crime. And then rents the house out

17 and some of the rent is put in a bank account at Bank of

18 America. And the Government already has an order seizing the

19 money from the Bank of America. That's where the rent went.

20     How is that overlap accounted for?

21       **MR. COUNTRYMAN:** If we could show that that was

22 rental income, it would be offset.

23       **THE COURT:** If you could show that. But you don't

24 have any interest in showing that. The litigator is the person

25 who has the interest in proving that to show it. Does the

1    defendant show it?  How do I ever found that out?  And you can

2    also say, "Judge, this never comes up," and I'll stop asking

3    these questions.

4            **MR. BABCOCK:**  I can't imagine it's going to come up.

5            **MR. COUNTRYMAN:**  The Government -- I mean, the

6    obligation would be on Mr. Babcock, but the Government does not

7    have the intent to overreach.  So to the extent that we've

8    traced money in there, we can see where it's coming from and

9    have the bank records and we'll be only asking for the funds

10   that we are owed.

11           **MR. BABCOCK:**  That's the more interesting question

12   because these properties were purchased a number of years ago

13   and they've gone up in value quite a bit, I understand,

14   informally.  I don't have official appraisals, but there may be

15   significant equity if we get to that point that was not

16   purchased with funds at issue, et cetera, et cetera.

17           **MR. COUNTRYMAN:**  And the Government's position is

18   stepping back to the time the property was purchased it

19   belonged to the Government.  So any appreciation belongs to the

20   Government, and there's case law we can argue back at the

21   appropriate time.

22           **THE COURT:**  Sounds like an interesting issue.

23           **MR. BABCOCK:**  If we get there.

24           **THE COURT:**  If we get there.  All right.

25           **MR. BABCOCK:**  We never accuse the Government of

1    overreaching.

2           **MS. WEST:**  So the one thing that we do need to do on

3    the forfeiture issue right now is to have the defense announce

4    on the record that they waive the jury review of the forfeiture

5    aspect and are prepared to have the Court decide that.

6           **THE COURT:**  Mr. Babcock?

7           **MR. BABCOCK:**  That has been my discussions with the

8    Government.  I have never tried a forfeiture issue to a jury.

9    I wasn't planning to start now.  In past cases, the forfeiture

10   issue has been dealt with by briefing an argument after the

11   verdict when appropriate.  And that was my intention here.

12          **THE COURT:**  Mr. Babcock, your client has a right to

13   have any forfeiture issue in this case decided by a jury.  Does

14   she waive that right?

15          **THE DEFENDANT:**  I'm thinking ...

16          **THE COURT:**  I can pass this case, ma'am.  If you need

17   more time.

18          **THE DEFENDANT:**  Please.  Thank you.

19          **THE COURT:**  That means that you'd have to sit down

20   and I'll take some pleas in some other cases and you can have

21   the time you need to think about it.  We'll recall your case in

22   about an hour and a half.

23          **THE DEFENDANT:**  Okay.  We'll have the Court decide.

24          **THE COURT:**  All right.  Mr. Babcock, that's your --

25   you join in your client's waiver?

1          MR. BABCOCK:  I do.

2          THE COURT:  What else do we need to discuss this

3   morning?

4          MS. WEST:  Well, did the Court want to wait and do

5   the jury selection issue the day preceding jury selection, that

6   is, March 3rd?

7          MR. BABCOCK:  Has the Court figured out how it's

8   going to pick a jury?

9          THE COURT:  No.  What are your ideas about that?

10         MR. BABCOCK:  I prefer a six-pack method myself.  I

11  think it's hard to question 50, 60 people and then pick a jury.

12         THE COURT:  I like it -- so let me think out loud

13  about this, which will make for a bad record, but we can

14  hopefully make some progress on this issue.

15      In a State Court every jury I ever picked -- civil or

16  criminal -- I used the six-pack and it worked great.  I just

17  picked a couple of juries using Judge Alsup's method, which is

18  a modification of that.  I think we had 14 instead of 18.  But

19  we didn't need to have a 12-person jury at the end of the day

20  because in a civil trial in Federal Court you don't need 12.

21  So we used 14 instead of 18.

22      With regard to preemptory challenges, this is, again,

23  using Judge Alsup's method, I had the lawyers write down the

24  names of who the challenges were without showing each other and

25  exchanged those lists.

1          **MR. BABCOCK:**  Simultaneously?

2          **THE COURT:**  Simultaneously.  And I don't remember if

3    there was any -- I think there was one juror overlap, which was

4    interesting.  There is someone on both sides that felt we don't

5    really think this person would be helpful to the decision in

6    this case.  But that's a little later in the process than what

7    you're describing, just the mechanics of voir dire.

8          I have to think about it.  But I'm a fan of -- I'm a fan

9    of talking to 18 people at a time as opposed to the whole room

10   or as opposed to 12.

11         The one difference -- the one additional difference in my

12   most recent trial was in the State Court, what I would do is

13   whoever was in the box, that was your jury.  So you would

14   exercise a peremptory to somebody in the box.

15         **MR. BABCOCK:**  Right.

16         **THE COURT:**  And then you would take somebody from the

17   six-pack and put them in to replace them.  So you never

18   exercised a blind peremptory.  You knew exactly what you were

19   getting, what you were giving up.

20         **MR. BABCOCK:**  Certainly my preference.

21         **THE COURT:**  Well, I know as a lawyer I like that

22   better too.  What I did in this other trial was -- well, we did

23   this simultaneous exchange.  That's why it's relevant to this

24   discussion because simultaneous exchange, I had 14, needed 8 --

25         **MR. BABCOCK:**  How many challenges did they get in a

```
 1   civil case?
 2            THE COURT:  They had three each.
 3            MR. BABCOCK:  So I'm just trying to understand --
 4            THE COURT:  The logistics are probably impossible
 5   here.  I need a bigger jury.  Anyway, I'll think about that.
 6   I'll give you some -- we'll decide this finally on the 3rd.
 7   I'm glad we started the discussion now.
 8       Does the Government want to be heard on this point?
 9            MS. WEST:  Well, I was just going to say I am most
10   familiar with -- most of my trials have been in front of
11   Judge Alsup and Judge Breyer.  They have similar approaches --
12   not identical.  For the preemptories, for instance, there is a
13   paper that the parties then silently hand back and forth each.
14   Sometimes one by the Government, two by the defense, just to --
15   or one by the Government, one by the defense to get to the
16   ultimate number to be exercised.  And it's sort of a silent
17   exchange between the parties, and then it's presented to the
18   Court, and then the Court handles it all at once after the four
19   causes.
20       But Judge Breyer does have the entire room questioned,
21   which certainly is one way of going about it.  I am wondering,
22   given that this may be a three- to four-week trial, and this is
23   backing up a little bit.  I think that I would ask that we
24   could have three alternates rather than two.  Just to give a
25   little bit more wiggle room.  I'm not sure how the defense
```

1    feels about that.

2            **MR. BABCOCK:**  I don't care.  I'm just wondering where

3    they're going to sit.

4            **THE COURT:**  Seems like a good idea to me.

5            **MS. WEST:**  Possibly even four.  We did, I think, have

6    four in my most recent trial in front of Judge Breyer a couple

7    of months ago, and we did end up using all of them.

8            **MR. BABCOCK:**  I only see space for 14 in the box,

9    though.

10           **MS. WEST:**  We put chairs to the side.  So I mean,

11   it's maybe not the cleanest, but in a trial that is a little

12   bit of a longer one, it may make things easier later if we

13   start losing some jurors.

14       So I do think on behalf of the Government that we would

15   request four alternates rather than two.

16           **THE COURT:**  We have 16 peremptory challenges.  The

17   Government has 6; the defendant has 10.  Isn't that right?

18           **MS. WEST:**  That is right.

19           **THE COURT:**  So even if it's three alternates or not,

20   four -- we're going to try to pick 15 jurors.  We have

21   16 peremptory challenges.  We have a three-week trial.  I'm

22   just wondering if we're going to get jury selection done in a

23   day.

24           **MS. WEST:**  I have actually never had it last longer

25   than a day.  But we can be prepared to resume or have it take

1  as long as the Court needs to and the -- to get a fair jury.

2          **THE COURT:**  I don't have my schedule in front of me.

3  I do believe that I am impaneling a grand jury later in that

4  week.

5          **MR. BABCOCK:**  Thursday probably; right?  Unless the

6  Court --

7          **THE COURT:**  Would be my guess.  And so it would be

8  difficult in any event for me to intrude on my later schedule.

9  It would be particularly difficult that week.  That would be

10  impossible, frankly.  I can't -- however many people I would be

11  inconveniencing for our trial, I would be inconveniencing more

12  people by --

13          **MR. BABCOCK:**  We start Tuesday morning.  I can't

14  imagine we won't have a jury later than Wednesday.

15          **THE COURT:**  That's what I'm wondering.  And that is

16  should we try to figure out how to make sure any pretrial

17  matters get disposed of and actually start jury selection on

18  the 3rd instead of the 4th.

19          **MS. WEST:**  That's fine with the Government.  I

20  actually am not sure that there really are any other pretrial

21  matters.

22      The only other issue we were going to bring up for the

23  Court is it's come to our attention as we've been going through

24  the trial preparation process that there are a couple of the

25  money laundering counts that we anticipate dismissing, so we

1    need to finish our analysis of that.  And that's something that

2    we will file a motion on and notify the defense of -- in

3    advance of that.

4         **MR. BABCOCK:**  If the Court just -- I appreciate the

5    head's up when you're ready.

6         We could come in the Friday before for the pretrial and do

7    the jury on Monday.

8         **THE COURT:**  Unfortunately, I'll be in Washington.

9    One of the reasons why my schedule in March and April for that

10   matter is so chaotic is because I'll be gone the last two weeks

11   in February.  I'll be here next week.  And then after that not

12   here, and I essentially come back for your trial.

13        **MS. WEST:**  I don't think there are any disputed

14   issues as to jury instructions.  If there are some that relate

15   to substantive instructions that haven't been raised -- I mean,

16   they were filed jointly, but --

17        **THE COURT:**  The jury instructions were jointly

18   proposed.  I did read those earlier this morning.  I don't

19   think I have a pretrial conference statement from the

20   defendant; is that true?

21        **MR. BABCOCK:**  That's true, Your Honor.

22        **THE COURT:**  So let me just go through Local

23   Rule 17.1-1 and invite the parties to tell me whether there are

24   issues that we should be discussing this morning or prior to

25   jury selection.

1    Are there any Jencks Act issues?

2         **MR. BABCOCK:**  Not that I'm aware of.  I've been

3    getting statements on a sort of ongoing basis, so -- and

4    there's lots of them.

5         **MR. RHYNE:**  We produced all the prior witness

6    statements.  And as we continue to prepare for trial, to the

7    extent a witness says something that could be construed as

8    different than what was said before, we've been memorializing

9    those ROIs, Reports of Investigation, promptly producing them

10   to the defense.

11        **THE COURT:**  Is there an issue about grand jury

12   testimony?

13        **MR. BABCOCK:**  I've been given grand jury testimony.

14   I'm not aware that there's any subsequent grand jury testimony.

15        **THE COURT:**  Are there any facts that the parties

16   could stipulate to which would eliminate the need to prove

17   those facts at trial?

18        **MR. BABCOCK:**  There are.  And we made agreements on

19   them.

20        **THE COURT:**  All right.  Have the parties considered

21   in their time estimate the fact that when testimony is

22   translated by an interpreter, that it essentially doubles the

23   length of the witness' testimony because first the witness has

24   to say it, then the interpreter has to say it again, then the

25   questioner asks the question, then the interpreter says the

1    question again?

2         Now, I note that the Government said earlier there will be

3    a Mandarin interpreter.  That is not an issue that was directly

4    addressed by the Local Rule, but it is consistent with my

5    experience.

6              **MR. BABCOCK:**  I think it's just one witness.

7              **MS. WEST:**  It is just one witness, that the testimony

8    will be pretty brief, including with the inclusion of the

9    interpreter.  So that is taken into account in the time

10   estimate.

11             **THE COURT:**  Very good.  How long -- just out of

12   curiosity, how long was your trial in front of Judge Breyer

13   where you used four alternates?

14             **MS. WEST:**  That most recent one was about a week and

15   a half.

16             **MR. BABCOCK:**  That's pretty cautious.

17             **THE COURT:**  There's an interesting -- there's some

18   interesting facts none of us is allowed to talk about, about

19   how you go through four alternates in a week and a half.

20   That's okay.

21             **MS. WEST:**  There was an issue -- the only one that

22   might apply was there was an issue where one of the jurors, it

23   turns out, was able to speak and understand English fine, but

24   it turns out could not read English.  And we did not learn that

25   until a late stage in the trial, and there were a number of

1   documents that would be important.  So it will, I think, be

2   important here that we make sure jurors also, if they

3   understand English, can read English as well.

4          **MR. BABCOCK:**  You never know.  I once lost two jurors

5   in the very first day of trial.  And we did a four-month trial

6   where we never needed an alternate.

7          **THE COURT:**  Yeah.  I've -- twice I've gotten nab down

8   to no alternates, but I've never gone below 12.  I've come

9   close, but I've never gone below 12.  Well, I think that an

10  alternate a week is not usually a bad rule of thumb.  I think

11  three alternates will be enough in this case.  We'll figure out

12  where to put the third alternate.  That's a seating issue; we

13  can figure that out.  I'm not worried about that.

14      We'll talk about this fully and finally on March the 3rd.

15  Everybody should be here at 8:00 o'clock.

16          **MR. BABCOCK:**  8:00 o'clock?

17          **THE COURT:**  Yes, sir.

18      When you're in trial, we'll start taking evidence at 8:30.

19  We will be done at 1:30.  The lawyers need to be here at

20  8:00 o'clock.  That way if anything comes up we can resolve it

21  before the jury gets here.  I don't like the jury to have to

22  wait ever while we're dealing with whatever issues we have.

23      You'll think of things between now and then that will need

24  resolution.  If you don't, that's great.  Then you'll have a

25  very relaxing morning.  But if you do think of things, we will

```
 1   have plenty of time to resolve them.  Probably the jury won't
 2   get here until about 9:30.
 3        Tentatively, though, just because it's consistent with
 4   your experience and mine and therefore comfortable for all of
 5   us, I probably will just use a six-pack, like I did in State
 6   Court.  And unless -- and the way that'll work is you'll get
 7   the number of peremptory challenges with regard to the
 8   12 jurors that I articulated earlier.  Then we'll start from
 9   scratch when we're impaneling alternates.  You get pursuant to
10   the Federal Rule.  Two peremptory challenges for those three
11   alternates.
12        And don't be surprised if we have at least three people
13   sitting in the six-pack and I call you to side bar and say, do
14   you want to just take the first three people sitting in the
15   six-pack.  I don't expect you to say yes.  About 40 percent of
16   the time people do say yes.  So why wouldn't I ask, because
17   everybody can go home.  If you say no, we'll finish the
18   process.  You'll have a lot of company.  That's what most
19   people do.
20             MS. WEST:  Will the Court do an initial biographical
21   voir dire of the jurors?
22             THE COURT:  I will.  I'll do -- I wouldn't say
23   exhaustive.  I'll say a couple things about voir dire.  I like
24   attorney voir dire.  I liked it when I was a lawyer and I still
25   like it when I'm a judge.  I'd rather you all be satisfied with
```

your jury when you leave than have us save 45 minutes or an
hour in the process.  It doesn't mean that I want you to waste
your time, but I tell you, jurors do a much better job
penalizing lawyers that waste their time than voir diring
judges ever do.

I was trying a case once where in this voir dire a lawyer
was doing some things he shouldn't have been doing but the
other side wasn't objecting, so I didn't do anything.  And he
said, "Is there anyone here that doesn't like me?"  That's an
example of the things he was doing he wasn't supposed to be
doing.

But this is a question that he asked of the jurors, and
the juror in the back row -- she would have been Juror No. 6 in
this courtroom.  She was in the back row all the way to the
left.  Raised her hand, and someone in the front row did too.
So he talked to the person in the front row first and then he
talked to Juror No. 6, and he said, "Ma'am, you had your hand
up.  Why did you raise your hand?"

And she said, "Because you're trying this case before any
of the evidence has started."

I could feel the oxygen going out of the room.  You knew
he was probably going to lose the case in that moment.  So they
pay very close attention.  They don't like to have their time
wasted.

So -- the other thing, though, is I want to be the one

1  that lets the air out of the tire.  So somebody says something

2  hard, somebody says something racist or emotional.  If I can,

3  I'll try to flush that issue out so that one of you is not put

4  in the position of trying to choose between having the juror

5  fully disclose relevant information to you and you be worried

6  about, now I'm getting off on a bad foot with this juror or

7  somebody else in the room.

8       I'm not always totally successful in doing that, but -- if

9  there's an issue that I think will bother one side or the

10  other, I'll try to get at least most of it out on the table.

11       **MR. BABCOCK:**  Does jury selection go until just 1:30,

12  or is that going to be all day if need be?

13       **THE COURT:**  It'll go all day if we need to because I

14  like to -- most of these folks are not going to be on the jury

15  and we bring them in from very far here in the Federal Court.

16  Very far.  And it's a tremendous imposition on people.  So my

17  goal would be to get it done that day if there's any way we can

18  humanly do that.

19       There was a statement in the United States' pretrial

20  statement about wanting to have summaries of voluminous

21  evidence.  Does the defendant think that's likely -- evidence

22  is likely to be an issue, or do you know anything about that

23  even?

24       **MR. RHYNE:**  It's next to the money flow diagram.

25       **MR. BABCOCK:**  I don't think it's going to be anything

1 that will affect admissibility.

2    **THE COURT:**  All right.

3   Is that something I haven't seen yet?

4   The United States has asked to allow the two case agents

5 to remain present at the Government's table during trial.

6   Does the defendant have any objection to that?

7    **MR. BABCOCK:**  Yeah, I don't see why they need more

8 than one.  As I understood it, one named case agent who has put

9 in substantial time in this case.  I'm sure he's intimately

10 familiar with all of the evidence.  He's going to be one of

11 their main witnesses.  I don't know why they need the advantage

12 of having two.

13    **MS. WEST:**  They both actually have been involved

14 throughout the case.  We do request to have two, but if the

15 Court prefers us to have one, we'll choose one of them.

16    **THE COURT:**  I don't have a preference yet.  I'm just

17 going to take argument, go back into chambers, read the rule

18 and issue an order.

19   Is there anything further anyone wants to say on this

20 point?

21    **MR. BABCOCK:**  They're both going to be witnesses, I

22 would assume.  So it is an unfair advantage to have their

23 witnesses sit through the trial.  And usually they're the last

24 witness so they've heard all the testimony before they testify.

25 So my view -- one is allowing them to have one summary witness

1    at the case who's heard all the testimony is something of an

2    advantage.  I don't see the need to double that.  If they're

3    going to go first, that's fine.  They can sit through the rest

4    of the trial, but I've never seen it happen that way.

5            **THE COURT:**  Anything further from the Government's

6    point of view?

7            **MS. WEST:**  We'll submit.

8            **MR. RHYNE:**  No.  We'll submit.

9            **THE COURT:**  Thank you.

10        I'll try to get an order out today, not later than Monday

11   on this point so you'll know.

12        Is there anything further?

13        I've tried, in my questions in court, to anticipate any

14   disputes between the parties that might need to be resolved

15   before jury selection, and that's based on my quick review of

16   the Government's trial memorandum.  Is there any other order

17   that the Government is seeking based on the issue raised in the

18   trial memorandum that the Court has not addressed?

19            **MS. WEST:**  I think that's it, Your Honor.  There's

20   nothing further on our list.

21            **THE COURT:**  Mr. Babcock, is there anything further

22   from the defendant's point of view that the defendant was

23   hoping to discuss today that we have not discussed?

24            **MR. BABCOCK:**  No, Your Honor.  I'll just note that we

25   submitted those jury instructions, what, I think five months or

1    so ago, and I did not review them again before this morning.

2    So hopefully we can take a second look at them some point

3    before the trial.

4         THE COURT:  If there've been significant developments

5    in the law in the last five months, I'm sure the parties will

6    let me know about that.

7         MR. BABCOCK:  Fair enough.

8         THE COURT:  All right.  Well, I will -- hold on.

9    Let's go off the record for just one second.  I just want to

10   talk to court staff.

11                     (Off the record.)

12        THE COURT:  I've discussed with court staff --

13   apparently, I've outsmarted myself.  I already set aside two

14   days in this case for jury selection on the 4th and the 5th.

15   So I don't need to have you come in -- well, and that also

16   means that some information that I gave to Mr. Babcock earlier

17   in this case was wrong.  So I had assumed, not having my

18   calendar in front of me, that the rest of that week was spoken

19   for.

20        And so, Mr. Babcock, I cannot take evidence on the 6th.

21   That date I can't move.

22        MR. BABCOCK:  Okay.  I understand.

23        THE COURT:  But if the parties -- we can do one of

24   two things:  Because I've allocated the 3rd, 4th and 5th of

25   March to your case, we can begin jury selection on the 3rd --

1    let me back up.

2        It would be, as I think about it, based on Counsel's prior

3    experience of not having taken longer than a day to pick a

4    jury, one possibility would be we do move jury selection up to

5    the 3rd; we pick a jury.  And then we just get going the next

6    day, and we tell the jurors we're going to -- so we -- even if

7    jury -- in other words, even if jury selection spills over to

8    the 4th, we'd still have opening statements on the 4th.  We'd

9    start evidence on the 5th, and then we would just continue it

10   the following week.

11           **MR. BABCOCK:**  That'd be my preference.

12           **THE COURT:**  Does that work for the Government also?

13           **MS. WEST:**  That's fine with the Government.  The only

14   thing is we need to re-subpoena the witnesses, but we will do

15   that.  So it's fine.  We may ask -- it may shuffle around our

16   intended witness order, but we'll work around that.

17           **THE COURT:**  I appreciate that.  Okay.  Well, I don't

18   hear anybody saying it's a problem, so I --

19           **MR. BABCOCK:**  But then we will not be in session on

20   the 6th, the Thursday?

21           **THE COURT:**  We will not be in session on the 6th, on

22   that Thursday.  And we will not be in session on the 10th, the

23   following Monday, pursuant to the defendant's request.

24           **MR. BABCOCK:**  Got it.

25           **THE COURT:**  The jury selection in this case will now

1   occur on March the 3rd.  I'll ask the jurors to be here at

2   9:00, so when you're here at 8:00, if there's something we need

3   to talk about, we have the opportunity to do that before the

4   jurors come out.

5        How big of a veneer do we need?

6            MR. BABCOCK:  We got six -- mostly depends on if the

7   Court has a sense of how generous your heart is with hardship

8   requests.  You know, about a month on trial, it's going to be a

9   fair number of people trying to get out of it.  I would say if

10  we have -- if both sides use all their challenges, plus we're

11  going to have 3 alternates, 6.  Potentially 22 challenges;

12  right?  Or no.  20 challenges.

13           THE COURT:  20.

14           MR. BABCOCK:  Twenty challenges and 15 people.  I'd

15  say anywhere around 60 should be pretty comfortable.

16           MS. WEST:  I think we should leave a little more

17  wiggle room than that.

18           MR. BABCOCK:  That's fine.  70.

19           THE COURT:  What's the Government's last bid?

20           MR. BABCOCK:  I don't think it's a type of case where

21  we're going to lose a lot of jurors for cause.  It's either

22  going to be hardships or challenges.

23           MS. WEST:  We think, Your Honor, just because of the

24  probable claims for hardship for the duration of the trial, we

25  would request 80 to 85.

1          **THE COURT:**  Very good.  I'll talk to the jury office

2    and in this consultation with that office, determine an

3    appropriate number.  I am likely to move on the high side just

4    based on my own personal experience with hardship requests.

5    And given the fact that in addition to the length of time,

6    jurors in this district have to come from so far away, even

7    with the Court's modified half-day schedule, it can work a

8    hardship on people.

9          **MR. BABCOCK:**  I don't know if it's still doing it,

10   but the jury commissioner used to do sort of a prescreening on

11   hardships.  So -- but I actually --

12         **THE COURT:**  Let me ask you this question -- I have

13   not determined how I would deal with this in my own personal

14   judicial practice.  But let's say that the Court asked the jury

15   office to do a hardship screening so I did not see jurors whom

16   the jury office had not already determined who were willing and

17   available to serve on a trial at this length.  Would any of you

18   have any objection to my doing that?

19         **MS. WEST:**  I don't have an objection, and I do

20   believe that the jury commissioner does do that sometimes.  I

21   know they did it in a recent case, although that was a

22   two-month-long trial.

23         **THE COURT:**  Mr. Babcock --

24         **MR. BABCOCK:**  I'm fine with that.

25         **THE COURT:**  -- any objection?

1      **MR. BABCOCK:**  No.

2      **THE COURT:**  I'll have to figure out what to do.

3   That's one way of doing it.  Another way is to send out a

4   questionnaire, have the questionnaires come back.  I review

5   them and make that decision.

6      This will be an excellent opportunity to turn that device

7   off, whatever's making that noise.

8      I'll figure that out promptly.  I think I'll talk to the

9   jury office this afternoon, actually.  It may be that there

10  will be some event where I've got paperwork coming back into

11  court from these prospective jurors and Counsel have an

12  opportunity to review that paperwork before I make any

13  decisions.  If I think that's likely to happen, I'll let you

14  know promptly.

15     **MR. BABCOCK:**  Fair enough.

16     **MS. WEST:**  All right.

17     **THE COURT:**  Anything else?

18     **MS. WEST:**  I don't think so.  Thank you.  We'll see

19  you at 8:00 o'clock on the 3rd.

20     **THE COURT:**  Very good.  Thank you.

21     **MR. BABCOCK:**  Thanks, Judge.  Have a good trip.

22     **THE COURT:**  Thank you.

23          (Proceedings concluded at 10:43 a.m.)

24                    ---o0o---

25

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4   _____   September 16, 2014

5   Signature of Court Reporter/Transcriber    Date
    Sarah L. Goekler

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25