1   MELINDA HAAG (CABN 132612)
    United States Attorney
2
    J. DOUGLAS WILSON (DCBN 412811)
3   Chief, Criminal Division

4   HARTLEY M.K. WEST (CABN 216799)
    WADE M. RHYNE (CABN 216799)
5   Assistant United States Attorneys

6        1301 Clay Street, Suite 340S
         Oakland, California 94612
7        Telephone: (510) 637-3680
         FAX: (510) 637-3724
8        E-Mail:  hartley.west@usdoj.gov
                  wade.rhyne@usdoj.gov
9
    Attorneys for United States of America
10

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                        OAKLAND DIVISION

14

15  UNITED STATES OF AMERICA,          )   CASE NO. CR-11-00288 JST
                                       )
16          Plaintiff,                 )   **UNITED STATES' OPPOSITION TO**
                                       )   **DEFENDANT'S RULE 29(c) MOTION**
17      v.                             )
                                       )   Hearing Date: October 31, 2014
18  SUSAN XIAO-PING SU,                )   Time: 9:30 a.m.
                                       )   Judge:  Hon. Jon S. Tigar
19          Defendant.                 )
                                       )
20                                     )
                                       )
21  _____)

22          Plaintiff United States of America, by and through its counsel of record, Assistant United States

23  Attorneys Wade M. Rhyne and Hartley M. K. West, hereby submits this memorandum of points and

24  authorities in opposition to Defendant Susan Xiao-Ping Su's motion for judgment of acquittal pursuant

25  to Federal Rule of Criminal Procedure Rule 29(c).

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

RELEVANT PROCEDURAL HISTORY ...........................................................................2

SUMMARY OF RELEVANT FACTS ...............................................................................3

    A.  Summary ...............................................................................................................3

    B.  Student Visa Program ..........................................................................................3

    C.  TVU's Fraudulent Form I-17 Petition .................................................................4

    D.  Student Recruiting, Admission, and Form I-20s ..................................................5

    E.  Student Victims .....................................................................................................6

        1.       TVU Student Bhanu Challagundla ..........................................................6

        2.       TVU Student Kalpana Challa ..................................................................7

    F.  Su Enrolls Fictitious TVU Students for Money ...................................................9

        1.       S.A. and K.D. ..........................................................................................9

        2.       M.R. and R.B. ........................................................................................10

    G.  Su's Money Laundering .....................................................................................11

    H.  Search Warrants and Su's Interview .................................................................12

LEGAL STANDARD.........................................................................................................12

ARGUMENT ......................................................................................................................13

    A.  Su's I-17 Submissions Were Part of Her Fraud Scheme ..................................13

    B.  Su Committed Wire and Visa Fraud When She Created and Maintained Immigration Status for the Fictitious Students .......................................................................................15

    C.  Su Conspired With Others to Commit Visa Fraud ...........................................16

    D.  Su Harbored Dasa and Dirisanala ...................................................................17

    E.  Su's Money Laundering Does Not Merge With Her Fraud Scheme ..................20

CONCLUSION...................................................................................................................22

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**TABLE OF AUTHORITIES**

Glasser v. United States, 315 U.S. 60 (1942) ........................................................................ 13

Jackson v. Virginia, 443 U.S. 307 (1979).............................................................................. 13

Mohammadi–Motlagh *v. INS*, 727 F.2d 1450 (9th Cir. 1984)........................................ 20, 21

Schmuck v. United States, 489 U.S. 705 (1989) ............................................................... 14, 16

United States v. Arbelaez, 719 F.2d 1453 (9th Cir. 1983)..................................................... 18

United States v. Atandi, 376 F.3d 1186 (10th Cir. 2004) ...................................................... 20

United States v. Bazargan, 992 F.2d 844 (8th Cir. 1993) ..................................................... 20

United States v. Bosch, 951 F.2d 1546 (9th Cir. 1991) ......................................................... 13

United States v. Bush, 626 F.3d 527 (9th Cir. 2010)............................................................. 23

United States v. Chao Fan Xu, 706 F.3d 965 (9th Cir. 2013)................................................ 18

United States v. Christoffel, 952 F.2d 1086 (9th Cir. 1991).................................................. 13

United States v. Dann, 652 F.3d 1160 (9th Cir. 2011) ..................................................... 21, 22

United States v. Dreitzler, 577 F.2d 539 (9th Cir. 1978)....................................................... 13

United States v. French, 748 F.3d 922 (9th Cir. 2014).............................................. 13, 14, 16

United States v. Garlick, 240 F.3d 789 (9th Cir. 2001) ................................................... 14, 16

United States v. Gillock, 886 F.2d 220 (9th Cir. 1989) ......................................................... 13

United States v. Igbatayo, 764 F.2d 1039 (5th Cir. 1985) ..................................................... 20

United States v. Jinian, 725 F.3d 954 (9th Cir. 2013) ..................................................... 14, 16

United States v. Lane, 474 U.S. 438 (1986) ........................................................... 16, 17, 18

United States v. Lo, 231 F.3d 471 (9th Cir. 2000)........................................................... 14, 16

United States v. Louderman, 576 F.2d 1383 (9th Cir. 1978).................................................. 14

United States v. McNally, 483 U.S. 350 (1989) ..................................................................... 16

United States v. Mincoff, 574 F.3d 1186 (9th Cir. 2009)....................................................... 13

United States v. Montgomery, 150 F.3d 983 (9th Cir. 1998) ................................................. 18

United States v. Nelson, 419 F.2d 1237 (9th Cir. 1969)......................................................... 13

United States v. Phillips, 704 F.3d 754 (9th Cir. 2012).......................................................... 23

United States v. Reyes-Alvarado, 963 F.2d 1184 (9th Cir. 1992) .......................................... 13

ii

United States v. Salman, 266 F.Supp.2d 1367 (C.D. Fla. 2003) ............................................. 20

United States v. Van Alstyne, 584 F.3d 803 (9th Cir. 2009) .................................................... 23

**STATUTES**

8 U.S.C. § 1324(a)(1)(A) ................................................................................................. 2, 22

18 U.S.C. § 371 ........................................................................................................................ 2

18 U.S.C. § 1001(a)(2) ............................................................................................................. 2

18 U.S.C. § 1001(a)(3) ............................................................................................................. 2

18 U.S.C. § 1030(a)(3) ............................................................................................................. 2

18 U.S.C. § 1324(a)(1)(B)(i) .................................................................................................. 19

18 U.S.C. § 1341 ...................................................................................................................... 2

18 U.S.C. § 1343 ...................................................................................................................... 2

18 U.S.C. § 1546 .................................................................................................................... 17

18 U.S.C. § 1546(a) .................................................................................................................. 2

18 U.S.C. § 1957 ...................................................................................................................... 2

**RULES**

Federal Rule of Criminal Procedure Rule 29(c) ...................................................................... 1

iii

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1

**INTRODUCTION**

2   The United States respectfully requests this Court to deny defendant Dr. Susan Xiao-Ping Su's

3   motion for judgment of acquittal. Each of Su's challenges to the sufficiency of the trial evidence fails.

4   The jury could and did rationally conclude that Su engaged in a scheme to defraud non-immigrant

5   student aliens of money by fraudulently creating and operating an unaccredited east bay university

6   known as "Tri-Valley University" (TVU).

7   First, there was sufficient trial evidence for the jury to find that Su's fraudulent I-17 petitions

8   were part of her fraud scheme. Su's scheme began during her creation of TVU when she fraudulently

9   petitioned the government to grant TVU authorization to admit non-immigrant student aliens – the same

10   student aliens who would be her victims. Because Su's fraudulent petition was an essential part of

11   kicking off her scheme, the Court should reject Su's arguments to carve it from her offense conduct.

12   Second, there was sufficient evidence for the jury to conclude that Su committed wire fraud and

13   visa fraud when she granted admission and immigration status to, and later created and transmitted

14   bogus school records for, four fictitious student aliens created by law enforcement as part of a ruse.

15   Because Su's conduct met the elements for wire and visa fraud, the Court should deny Su's motion as to

16   those counts as well.

17   Third, there was sufficient evidence for the jury to decide that Su conspired with ABS

18   Consultancy, and with her own TVU student employees, to commit visa fraud by fraudulently creating

19   and maintaining F-1 visa status for TVU's tuition-paying students.

20   Fourth, there was sufficient evidence for the jury to conclude that Su harbored Anji Dirisanala

21   and Vishal Dasa when she fraudulently created and maintained their F-1 immigration status in order for

22   them to work at TVU. Su used fraudulent SEVIS entries to create the appearance that both men were in

23   compliance with their visa requirements. Because Su knew that both aliens were out of status, and

24   therefore not lawfully in the United States, there was sufficient evidence for the jury to convict her of

25   alien harboring.

26   Finally, there was sufficient evidence for the jury to find that Su committed money laundering

27   when she spent the fraud proceeds on commercial properties, residences, and a luxury car. And, because

28

1

1   Su's financial transactions in spending the money constituted separate and distinct acts from the

2   predicate fraud scheme, the money laundering counts are not barred by the merger doctrine.

3        For each of these reasons, the Court should deny Su's motion for judgment of acquittal and

4   proceed to sentencing.

5                              **RELEVANT PROCEDURAL HISTORY**

6        On November 10, 2011, the Grand Jury returned a thirty-five count Superseding Indictment,

7   charging Su with wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-12); mail fraud, in violation of

8   18 U.S.C. § 1341 (Counts 13-14); conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371

9   (Count 15); visa fraud, in violation of 18 U.S.C. § 1546(a) (Counts 16-19); use of a false document, in

10  violation of 18 U.S.C. § 1001(a)(3) (Count 20); false statements, in violation of 18 U.S.C. § 1001(a)(2)

11  (Count 21); alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A) (Counts 22-24); unauthorized

12  access, in violation of 18 U.S.C. § 1030(a)(3) (Count 25); and money laundering, in violation of 18

13  U.S.C. § 1957 (Counts 26-35).  (Dkt. 41.)  The Superseding Indictment also included four forfeiture

14  allegations.

15       Trial commenced on March 3, 2014.  (Dkt. 99.)  On March 18, the Court granted the United

16  States' motion to dismiss Counts 23, 28, 30, and 33.  (TR 1713.)  On March 19, both parties rested, after

17  which Su moved for a judgment of acquittal on all counts pursuant to Rule 29.  (TR 1764-65.)  The

18  Court reserved ruling on Su's motion until after the verdict.  (TR 1765.)  On March 24, the jury returned

19  guilty verdicts as to all remaining counts.  (Dkt. 119, TR 1919-24.)

20       On April 22, the Court addressed the merits Su's anticipated written Rule 29 motion. Requesting

21  briefing on the alien harboring counts, the Court stated:  "With regard to the other counts, my

22  recollection of the evidence is it would be difficult for the Court to conclude that no reasonable juror

23  could find that the counts had been proven beyond a reasonable doubt."  (Dkt. 183 at 4)

24  ///

25  ///

26  ///

27  ///

28

2

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1

**SUMMARY OF RELEVANT FACTS**

2

**A.      Summary**

3        The United States' trial evidence consisted of testimony from 25 witnesses along with 156

4   exhibits over three weeks.  This evidence showed that, between September 2008 and January 2011, Su

5   engaged in a scheme to defraud non-immigrant aliens of money and property, specifically tuition and

6   other fees, through her establishment and operation of TVU, located in Pleasanton, California.  In

7   furtherance of her scheme, she fraudulently obtained authorization from the U.S. Department of

8   Homeland Security (DHS), Student and Exchange Visitor Program (SEVP), to admit foreign students.

9   Su then collected over $5.6 million in tuition and other payments from the aliens in exchange for

10  maintaining them in an active student visa status, and used these funds to purchase millions of dollars'

11  worth of real property and other assets.  Su employed some of these aliens at TVU, causing them to

12  access government databases without authorization and to create fraudulent visa-related documents.

13  When questioned by DHS agents regarding certain students' status, Su made materially false

14  representations and submitted materially false documents to the agents.

15

**B.      Student Visa Program**

16       The testimony of Special Agent (SA) William R. Elliott of the United States Department of State

17  established that there are different categories of foreign nationals who may be admitted to the United

18  States for nonimmigrant purposes, and that one such category, designated "F-1" based on the applicable

19  statutory subsection, comprised bona fide students coming temporarily to study at an approved school.

20  (TR 232.)  Aliens wishing to study in the United States obtain F-1 visas, and those students are admitted

21  for a temporary period called "duration of status," which federal regulations define as the time during

22  which the student is pursuing a full course of study at an approved school.  (TR 228-33.)

23       In turn, Susanna Warner, a SEVP section chief, testified that schools seeking to admit foreign

24  students must submit a petition known as a Form I-17 to SEVP in Washington, DC, and meet the criteria

25  for approval.  (TR 247-48.)  Among other things, the school must establish that it is a bona fide

26  educational institution and, if unaccredited, must provide "articulation agreements" showing that its

27  courses have been and are unconditionally accepted to at least three accredited institutions of higher

28

3

learning.  (TR 256-60.)  The I-17 must also identify "Designated School Officials" (DSOs), who certify

their knowledge of and intent to comply with student immigration laws and regulations.  (TR 284.)  The

I-17 warned DSOs that they could "not delegate [their] designation to any other person."  (Exh. 1 and 3.)

Once a school's I-17 is approved, SEVP issues the DSOs login IDs and passwords enabling them

to access the Student and Exchange Visitor Information System (SEVIS) – a nonpublic computer system

located in Rockville, Maryland, which is used by the United States government and operated through

SEVP for the purpose of collecting nonimmigrant student information from approved schools and

monitoring such aliens' status.   (TR 248 -54.)  SEVIS is used to create student records, including a

Certificate of Eligibility for Nonimmigrant (F-1) Student Status, also known as a Form I-20, which is

required to obtain a student visa.  (TR 287, 296, 329-38.)  SEVP may decertify a school that fails to

follow immigration laws and regulations.  (TR 243, 271-72.)

### C.    TVU's Fraudulent Form I-17 Petition

DHS's approval of Su's fraudulent I-17 was a foundational component of her scheme.  Su

electronically submitted her I-17 to SEVIS on September 15, 2008, on behalf of TVU.  (TR 261-62, 278,

311; Exh. 1.)  Su's I-17 was full of materially false statements.  It fraudulently identified as TVU's

administrators and DSOs Su's sister, Sophie Su, and Sophie's husband, Vince Wang.  (TR 301, 590.)

Su admitted to agents that when she submitted the I-17 she knew that her DSOs had no intention to be

DSOs but that she submitted the false I-17 anyway.  (TR 589-90.)  Su also included with her I-17 a

fraudulent list of instructors, many of whom never agreed to teach at TVU, as Su later admitted to

agents.  (TR 447-51, 467-68, 561-62, 599.)  Su's I-17 also contained materially false representations

about TVU's admissions standards, grading policies, and graduation requirements.  (Exh. 1.)   In

December 2008, in response to SEVP's request for clarification, Su mailed SEVP a revised Form I-17,

which contained the same materially false statements.  (TR 316-17, 411; Exh. 3.)

As part of TVU's approval process Su also provided materially false documents to a DHS

contractor who had physically inspected TVU's campus as part of the approval process.  Su gave the

contractor a signed copy of her I-17, as well as articulation agreements from three schools, which the

contractor passed on to SEVP.  (TR 278-82; Exh. 5 at p. 8.)

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1    Su later mailed revised articulation agreements to SEVP on February 10, 2009, two of which

2    were confirmed to be forgeries based on testimony from two school officials and from a DHS expert

3    forensic document examiner.  (TR 319-28; Exh. 4, 102, 112.)  The school officials testified they never

4    entered into articulation agreements with TVU.  (TR 774-80, 474-97.)  The forensic document examiner

5    established that the signatures of the purported school officials on TVU's articulation agreements were

6    essentially lifted from other "source" documents.  (TR 511-52.)  SA Mackey confirmed that those

7    source documents were located on Su's computer and in her residence during execution of the search

8    warrant.  (TR 667, 649.)

9    Relying on Su's materially false submissions, SEVP approved TVU to admit F-1 students on

10   February 19, 2009.  (Exh. 7.)  Su's SEVIS electronic I-17 submission and supplemental mailings formed

11   the basis of the first wire fraud charge (Count 1), and both mail fraud charges (Counts 13 and 14).

12          **D.     Student Recruiting, Admission, and Form I-20s**

13   After TVU received SEVP's approval to admit F-1 students, Su entered into recruiting

14   agreements, paying as commissions a percentage of tuition fees for each new F-1 student recruited.  Su

15   agreed to pay these "referral" commissions to ABS Consultancy (ABS) and to her own TVU students to

16   find, recruit, and enroll non-immigrant student aliens.  (Exh. 303b, 580-592 at TR 617-24, 711-12; Exh.

17   330 at TR 679-680; Exh. 477, 478 at TR 820-29; Exh. 588A at TR 831-32.)  Indeed, Su's visa fraud

18   conspiracy with ABS began with an email proposal that she sent only two days after she had defrauded

19   SEVP.  (Exh. 300; TR 609-13.)  ABS well knew that TVU was not a legitimate school, as confirmed by

20   email correspondence in which Su sells TVU diplomas and transcripts to ABS's clients.  (Exh. 305; TR

21   660, Exh. 307; TR 654, Exh. 309 at TR 658, Exh. 311 at TR 756.)  ABS's knowledge of TVU's

22   illegitimacy was further confirmed by more emails and by Su's admissions to the agents all showing that

23   she used TVU to fraudulently maintain F-1 immigration status for her ABS's coconspirators.  (Exh. 315;

24   TR 610-12.)

25   To process the admission of the new student recruits, Su admitted that she hired her own F-1

26   students to work in the TVU office.  (TR 605, 624-25.)  Multiple F-1 students testified that Su gave

27   them access to SEVIS through DSO accounts and instructed them to create and print Form I-20s for new

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

F-1 students, after which time Su forged DSO signatures on the I-20s.  (TR 813-815, 1163-65, 1213-14, 1223-24, 1228-30, 1244-45, 1323-24, 1445, 1449, 1514-15.)  TVU employees also testified that Su admitted all alien applicants without regard to their academic qualifications or intent to pursue a full course of study (TR 809-11, 1172-74, 1506-07); that she instructed them to enter false addresses and other information in SEVIS for hundreds of students (TR 809-11, 1173, 1514-15); that there were no physical classes although some were taught online (TR 818, 920-21, 1186-87, 1518, 1525, 1362, 1405, 1407, 1420-21, 1464-65); and that Su directed passing grades for everyone, with none below a B+ (TR 626, 801, 804, 811-12, 912, 914, 1186, 1385-86, 1575).  The student-employees testified that they did not attend online classes at TVU, as Su knew.  (<u>Id</u>.)

TVU student-employees, Vishal Dasa and Anji Dirisanala, testified that they were criminally charged for their criminal conduct with Su, pleaded guilty pursuant to plea agreements, were cooperating with the United States' investigation of TVU, and were awaiting sentencing.  (TR 876, 1292.)  In his plea agreement, admitted in evidence by, Dasa admitted that he conspired with Su to commit visa fraud by creating false I-20s, and to commit unauthorized access to SEVIS.  (Exh. 450.)

The unauthorized SEVIS access was charged in Count 25.  The agreement between Su and her student-employees to create fraudulent SEVIS records was charged as conspiracy to commit visa fraud, Count 15.  Su's employment of two student-employees was charged as alien harboring in Counts 22 and 24.  The above-referenced email from Su soliciting recruiters of Indian students was charged as wire fraud in Count 2.

### E.  Student Victims

By January 2011, TVU had approximately 1,760 active students in SEVIS, many of whom enrolled believing it was a legitimate school.  (TR 572.)  At least two such students testified at trial – Bhanu Challagundla (identified in the Superseding Indictment as "B.C.") and Kalpana Challa (identified in the Superseding Indictment as "K.C.").  Their I-20s contained signatures forged by Su, and formed the basis of wire fraud Counts 3 and 4.

#### 1.  TVU Student Bhanu Challagundla

Bhanu Challagundla testified that she had an undergraduate degree in Pharmacy from a

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1   university in India and was seeking to enroll in a Master's program in the United States.  (TR 887-88.)

2   Using a consultancy in India, she applied to TVU and another university, ultimately choosing TVU

3   primarily because it admitted her immediately and provided an initial I-20.  (TR 888-93.)  The I-20 was

4   dated January 11, 2010, and signed in the name of Sophie Su.  (Exh. 12 at TR 892-95.)

5     Shortly after arriving in the United States, Challagundla reported to TVU on May 10, 2010.  (TR

6   896-97.)  TVU was a single room office rather than a traditional university like she had expected.  (TR

7   898-99.)  Challagundla paid tuition to Su for the fall semester but never received confirmation of her

8   classes.  (TR 899-903, 907.)  Her multiple calls to TVU went unreturned and, on August 28, 2010, she

9   received a transcript with passing grades for classes she had never taken.  (Exh. 15; TR 902-03, 909-12.)

10    Challagundla went to TVU to ask Su about receiving a transcript for classes she had not taken.

11  (TR 912-16.)  Su told her she could not help her because she was busy working on TVU's accreditation

12  but promised that TVU would have classes in a couple of weeks.  (TR 919-20.)  When Challagundla

13  informed Su that she wanted to transfer to another school immediately, Su said that the rules precluded

14  transfers until students had completed three semesters.  (TR 918-20.)  Challagundla testified that she

15  was "stuck," that she felt she had to continue at TVU until she completed three semesters, and that she

16  therefore registered for the following semester and made a tuition payment.  (TR 919-20.)  Shortly

17  thereafter, Challagundla received an email with links for her classes but, when she logged in, she found

18  that the classes were online and the instruction was a looping audio tape.  (TR 921-22.)

19       2. <u>TVU Student Kalpana Challa</u>

20    Kalpana Challa testified that she had a university degree from Paris and was looking for an MBA

21  degree from the United States.  (TR 1415-17.)  She was enrolled in another Bay Area school and later

22  transferred to TVU because it was less expensive for international students, among other reasons.  (TR

23  1417-18.)  After looking at TVU's website, Challa called Su and set up a campus visit.  (<u>Id</u>.)

24    When Challa arrived at TVU for the visit she noted that TVU consisted of a single small room

25  and a couple of student employees.  (TR 1419.)  Su told Challa that TVU was providing online classes

26  but that physical classes would be starting soon in a nearby building.  (TR 1420.)  Challa explained that

27  physical classes were important for her to comply with her student visa requirements.  (TR 1421.)  After

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1 speaking with Su, Challa enrolled at TVU for the Spring semester, registered for three classes, and made

2 a tuition payment to Su.  (Exh. 530; TR 1421-22.)  Su gave Challa an I-20 in the name of Sophie Su,

3 dated January 27, 2010.  (Exh. 32; TR 1423-24.)  Challa testified that she also paid tuition to Su for her

4 husband and a friend, who were also enrolling as TVU students.  (Exh. 531 at TR 1426-27.)

5          However, Challa never received any information from Su or TVU about her Spring classes.  (TR

6 1428.)  She unsuccessfully attempted to log in to her classes and was unable to get assistance from Su or

7 TVU.  (TR 1427-28.)  When Challa was finally able to log in, her classes did not exist and there was no

8 instructor.  (TR 1429.)

9          At the end of the Spring semester Challa raised her concerns with Su who told Challa that TVU

10 would have physical classes in the fall.  (TR 1429-30.)   Challa testified that she elected to come back in

11 the fall but first had to pay the balance of her Spring tuition.  (TR 1430-36.)  In doing so, Challa paid

12 tuition for herself and her husband with a bank check in amount of $6,217.  (Exh. 532; TR 1433-35.)

13 Because the bank check amount exceeded what Challa owed to TVU, Challa asked Su for change.  (TR

14 1434-35.)  Su refused to provide change and directed Challa to use the balance to pay for her friends'

15 tuition, telling her to settle up with her friends for the change owed by TVU.  (Exh. 35; TR 1435-38.)

16 Challa later received TVU transcripts with passing grades despite the fact that classes for that semester

17 did not exist.  (Exh. 36; TR 1438-39.)

18          After taking a summer break, Challa returned to TVU for the Fall 2010 semester and told Su she

19 wanted to transfer out.  (TR 1439-40.)  Su told her she could not until she had paid for three semesters;

20 otherwise Su would terminate Challa's F-1 status.  (TR 1440-41.)  To keep her immigration status,

21 Challa paid Su with two post-dated $500 checks.  (Exh. 533, 534; TR 1441-44.)  After receiving

22 Challa's payment, Su provided her with an I-20, forged in the name of another DSO.  (Exh. 33 at TR

23 1444-45.)  Su promptly cashed Challa's post-dated checks despite Challa's instructions to hold them.

24 (TR 1446-47.)  When Challa confronted Su about the checks, Su told her she was too busy to talk.  (TR

25 1448.)

26          Challa tried to attend her Fall semester classes but continued having problems logging in.  (TR

27 1450.)  In November, she re-approached Su about transferring out of TVU and Su again told her that she

28

8

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

needed to pay the rest of her fees to transfer out.  (TR 1451-52.)  Challa testified that she planned to pay the remainder with another post-dated check, and then promptly cancel payment.  (Id.)  Before that happened, however, TVU was shut down.  (TR 1453.)

### F.     Su Enrolls Fictitious TVU Students for Money

HSI agents and student-employee Dirisanala testified regarding his enrolling four fictitious students at TVU during nine undercover operations in late 2010 and early 2011.

#### 1.     S.A. and K.D.

On June 3, 2010, HSI equipped Dirisanala with an audio recording device and provided him with written identifying information for two foreign nationals – Sparsh Agrawat (identified in the Superseding Indictment as "S.A.") and Kadir Dirikan (identified in the Superseding Indictment as "K.D.") – whose student status had been terminated in SEVIS.  (TR 993-1004; Exh. 200b, 50, 60.)  Dirisanala told Su that he had two friends in New York who had been terminated in SEVIS and needed TVU admission and new I-20s reflecting their admission.  (TR 1218-21.)  Su told him to obtain I-20s from Dasa.  (TR 1221-22.)  Dasa created and printed admissions letters for TVU's Ph.D. program, entered Agrawat and Dirikan's data into SEVIS, and printed their initial I-20s.  (TR 1221-25; Exh. 200b.)  Dirisanala observed Su sign the I-20s in DSO Wang's name.  (Id.)

On July 27, 2010, Dirisanala, again wearing a wire, went to TVU's office and paid Su $2,000 to activate Agrawat and Dirikan's status as students at TVU.  (TR 1004-24, 1225-35; Exh. 202d, 202c, 202d.)  Dirisanala saw Su sign new I-20s, again in DSO Wang's name.  (TR 1228.)  Despite neither student actually attending classes at TVU, a SEVIS search confirmed that TVU maintained them in active status.  (Exh. 51, 61.)  The SEVIS entries and forged I-20s for Agrawat and Dirikan were charged as wire and visa fraud in Counts 5, 6, 16, and 17.

The jury also heard a recorded call by an HSI agent, posing as an immigration officer at San Francisco International Airport, on September 20, 2010.  (Exh. 206, 206a.)  The agent told Su that he had stopped S.A. attempting to reenter the United States, and Su confirmed that her records reflect Agrawat was a current, full-time student at TVU.  (Id.)  The agent asked Su to email him scanned copies of Agrawat's I-20, transcripts, and a letter confirming his active full-time status.  (Id.)  After the call

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

concluded, a surveilling agent saw Su quickly exit the TVU office, get an item from her Mercedes Benz, and go back into the TVU office.  (TR 1059-60.)  A few minutes later, the calling agent received an email from ssu@trivalleyuniversity.org, with three attachments: an active Form I-20 for Agrawat bearing a signature of "Sophie Su"; TVU transcripts for Agrawat; and a letter signed by "Sophie Su" representing that Agrawat is a "full time" graduate student "in good standing."  (Exh. 206b.)  This emailing was charged as wire fraud in Count 9.

On September 24, 2010, an HSI agent telephoned TVU, spoke to Su, and stated that he was an immigration officer who had stopped Dirikan returning from Yemen.  (TR 1066-70; Exh. 207, 207a.) Again, Su advised that her records confirmed Dirikan was a current TVU student and, from the same email account, emailed the agent an active I-20, transcript, and letter confirming that Dirikan is a full time student in good standing.  (Id.; Exh. 207b.)  The I-20 and letter again bore the name "Sophie Su." (Id.)  This email was charged as wire fraud in Count 10 and as use of a false document in Count 20.

### 2.  M.R. and R.B.

On August 11, 2010, Dirisanala, wearing a wire, went to TVU's offices to request initial I-20s for three foreign nationals purportedly residing in New York, one of whom was Mohammed Rizwan (identified in the Superseding Indictment as "M.R."), using names, dates of birth, foreign addresses, and email addresses all provided by HSI.  (TR 1024-36.)  Su instructed Dirisanala to obtain the I-20s from student-employee Tuchar (Jimmy) Tambe, after which Dirisanala brought them back to Su for signing. (TR 1239-41.)  Su later emailed the three I-20s to Dirisanala.  (Exh. 203e.)  The I-20s were signed by Su in her own name.  (Id.)

On August 31, 2010, Dirisanala returned to TVU's office, again wearing a wire, to make a $1,000 tuition payment for Rizwan, using funds provided by HSI, and get an active I-20.  (TR 1038-49; Exh. 204b.)  Su instructed Dirisanala to give Rizwan's information to Dasa and wait outside.  (Id.)  A secretary then handed Dirisanala an active I-20 in Rizwan's name and bearing a signature for DSO Wang, who was not in the office.  (Id.; Exh. 204d.)  This I-20 was the basis of wire fraud Count 7 and visa fraud Count 18.

On September 7, 2010, an undercover HSI agent went to TVU, wearing an audio and video

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

recording device and posing as a prospective foreign student.  (TR 1048-55 and Exh. 205c).  The agent was introduced to Dasa, with whom he conversed in Hindi.  (Id.)  The agent advised Dasa that his F-1 visa had expired in 2002 because he never went to school, that he was now "completely out of status," that he feared being deported, that he lived and worked in New York, and that he would not attend classes physically or online.  (TR 1310-26.)  Dasa created an admission letter and an initial I-20 in SEVIS, using the name provided by the agent, Rajiv Batra (identified in the Superseding Indictment as "R.B.").  (Id.)  Dasa instructed the agent to return later that day for his "madam" to sign.  (TR 1320-21.)  When he returned, Dasa walked Batra's I-20 to Su, who signed it and handed it back to Dasa, forged with DSO Wang's name.  (TR 1322-25; Exh. 205c.)  SEVIS records confirm Batra was placed in active student status at TVU the same day, and that he remained in such status despite the agent never attending class.  (Exh. 81, 205b.)  This I-20 was the basis of wire fraud Count 8 and visa fraud Count 19.

On January 7, 2011, an HSI agent called TVU, identifying himself as from Immigration at JFK airport, and spoke to Su.  (TR 1099-1101; Exh. 209, 209a.)  The agent said that Rizwan and Batra had entered the country from Pakistan without I-20s, claiming to be F-1 students at TVU, and were being held at secondary inspection.  (Exh. 209, 209a; TR 1600-10.)  To verify their status, the agent requested that she email him – for both students – signed I-20s, transcripts, attendance records from the most recent grading period, and letters confirming their active status.  (Id.)  Three hours later, the agent received an email from Su, attaching I-20s for Rizwan and Batra, transcripts for both (although Rizwan's stated at the bottom "TVU transcript of Rajiv Batra"), attendance records for Batra, and letters bearing signatures of Sophie Su.  (Id.; Exh. 209b.)  These emails supported wire fraud Counts 11 and 12.

Two hours later, an HSI agent went to TVU, claiming a problem with the email transfer, and collected the documents in person from Su.  (TR 958-71.)  Su advised the agent that she had not had time to complete Rizwan's attendance sheets, but that he had attended a class that she personally taught, and that the attendance log reflected that his attendance had been good.  (Id.)  These false statements were charged as Count 21.

## G.    Su's Money Laundering

The jury convicted Su of money laundering in Counts 26, 27, 29, 31, 32, 34, and 35, arising out

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1   of her purchases of commercial properties, three residences, and a Mercedes Benz. (Dkt 119.) The jury

2   heard testimony that the funds used came from TVU business accounts controlled by Su, about 99% of

3   which consisted of money received from F-1 students, commingled with about 1% that was in the

4   account before she got F-1 approval. (Exh. 650, 651.) Su admitted to SA Mackey that she purchased

5   these assets entirely with TVU F-1 student proceeds. (TR 630, 633, 634.) SA Mackey further testified

6   how his financial analysis tracked the money into and out of Su's accounts. (Exh. 650, 651.)

7        **H.    Search Warrants and Su's Interview**

8        SA Mackey testified that Su's fraud scheme ended on January 19, 2011, when HSI executed

9   search warrants at TVU's offices, Su's homes, and Su's car. (TR 584.) SA Mackey testified to finding

10  the Articulation Agreements, draft I-17 Petitions, student records, Form I-20s and other SEVIS

11  documents, emails, and correspondence, among other things.

12       Su consented to an interview at the time of the search and then made a series of incriminating

13  admissions. (TR 587.) She admitted hiring recruiters and paying commissions to get F-1 students (TR

14  610-12, 620); instructing her staff to enter false addresses in SEVIS as applicants' residences (TR 605);

15  providing her student-employees with unauthorized access to SEVIS (TR 624-25); and instructing her

16  staff not to give students grades below B+ (TR 626). She also admitted sending the I-17 and its

17  supplements (TR 588), and the emails and attachments to HSI regarding Agrawat, Dirikan, Rizwan, and

18  Batra. (TR 642-43, 1060-61, and 1071.) While Su denied falsifying the articulation agreements, she

19  asked the agents "please, please, please" not to contact the schools. (TR 591-96.) When the agents said

20  they already did, she refused to discuss the articulation agreements further. (TR 597.)

21                              **LEGAL STANDARD**

22       The Supreme Court and Ninth Circuit have held that when considering a motion for acquittal

23  under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable

24  to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond

25  a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original); <u>United</u>

26  <u>States v. Mincoff</u>, 574 F.3d 1186, 1192 (9th Cir. 2009) (same); <u>see also</u> <u>United States v. Dreitzler</u>, 577

27  F.2d 539, 545 (9th Cir. 1978). In making this determination, the evidence and all the inferences from

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1    the evidence must be viewed in the light most favorable to the Government; the defendant bears a heavy

2    burden.  See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Christoffel, 952 F.2d

3    1086 (9th Cir. 1991); United States v. Bosch, 951 F.2d 1546, 1550 (9th Cir. 1991).  The court must

4    consider that it is "the exclusive province of the jury to determine the credibility of witnesses, to resolve

5    evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury

6    resolved all such matters in a matter which supports the verdict."  United States v. Gillock, 886 F.2d

7    220, 222 (9th Cir. 1989).  Circumstantial evidence and reasonable inferences drawn from that evidence

8    are sufficient to sustain a conviction.  United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir.

9    1992); see also United States v. Nelson, 419 F.2d 1237, 1239 (9th Cir. 1969).

10                                          **ARGUMENT**

11   **A.     Su's I-17 Submissions Were Part of Her Fraud Scheme**

12           There was sufficient evidence for the jury to find that Su's I-17 petitions were part of her fraud

13   scheme.  Su's materially false I-17 submissions seeking TVU's approval to admit non-immigrant

14   student aliens were the initial stage in her scheme.  Because the success of Su's scheme depended first

15   upon TVU's ability to admit student aliens, her I-17 submissions were essential to the crime.  Simply

16   put, SEVP's approval of Su's fraudulent I-17 petitions made it possible for Su to admit a pool of tuition-

17   paying student alien victims.  Because the I-17s were an essential part of Su's fraud scheme, the Court

18   should deny her motion as to Counts 1 and 13.

19           The elements of wire and mail fraud are closely related.  See 9th Cir. Model Jury Ins. Nos. 8.121

20   and 8.124; see also Joint Jury Instruction Nos. 47 and 48, TR 1765-1803; United States v. French, 748

21   F.3d 922, 935 (9th Cir. 2014).  The basic elements of wire fraud are: (1) the defendant participated in a

22   scheme to defraud to obtain money or property by means of false statements; (2) the statements made or

23   facts omitted as part of the scheme were material; (3) the defendant acted with the intent to defraud; (4)

24   the defendant used, or caused to be used, the wires to carry out or attempt to carry out an essential part

25   of the scheme; and (5) the wire communication traveled in interstate commerce.  See 9th Cir. Model

26   Jury Ins. Nos. 8.121 and 8.124; see also Joint Jury Instruction Nos. 47 and 48.  The elements of mail

27   fraud are the same but substitute the use of the "wires" with the use of the "mails" – which is anything to

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1  be sent or delivered by the Postal Service or by any private or commercial interstate carrier – to carry

2  out or attempt to carry out an essential part of the scheme.  See id.; see also United States v. Louderman,

3  576 F.2d 1383, 1387-88 (9th Cir. 1978) (noting similarity in construing wire and mail fraud statutes.)

4       Su contends that her wire and mail communications to SEVP were not in furtherance of her fraud

5  scheme.  In addressing this issue, the Ninth Circuit has held that a communication is "in furtherance" of

6  a fraud scheme if it is "incident to the execution of the scheme," United States v. Lo, 231 F.3d 471, 478

7  (9th Cir. 2000), meaning that it "need not be an essential element of the scheme, just a 'step in the

8  plot,'" United States v. Garlick, 240 F.3d 789, 795 (9th Cir. 2001) (quoting Schmuck v. United States,

9  489 U.S. 705, 711 (1989).  Put another way, the communication need only be "incident to an essential

10  part of the scheme."  Schmuck, 489 U.S. at 710 (citations omitted).  It does not matter whether the

11  information wired or mailed was itself false or deceptive so long as the wires or mails were used to

12  execute the scheme.  See id. at 714-15 (innocent and routine mailings satisfy mail fraud statute when

13  sent incident to a fraud scheme.); see also United States v. Jinian, 725 F.3d 954, 965 (9th Cir. 2013).

14       Su's electronic transmissions of her initial I-17 petition on September 15, 2008 (charged in

15  Count 1), and her mailing of the revised I-17 on December 23, 2008 (charged in Count 13), were an

16  essential part of her fraud scheme.  Indeed, the I-17 petitions were a procedural prerequisite for TVU to

17  admit non-immigrant student aliens.  (TR 247-72.)  SEVP's I-17 school adjudication expert, Susanna

18  Warner, testified that in order to obtain approval to admit non-immigrant student aliens, SEVP requires

19  schools to submit an I-17 petition, (TR 247-72), and that SEVP relies on the school's I-17

20  representations in deciding whether to grant approval (TR 257-59, 272, 288, 313).

21       These I-17s were loaded with material misrepresentations as to DSOs who had no intention of

22  working at TVU, instructors who had no intention of teaching at TVU, and TVU's admissions standards,

23  grading policies, and graduation requirements.  The I-17s also incorporated a catalogue of classes that

24  did not exist and forged articulation agreements.  The evidence showed that Su immediately began

25  enrolling students, and collecting money from them, despite knowing that TVU could not provide the

26  educational services it had promised in its I-17 materials, on its website, or in its catalogue.  (Exh. 650,

27  651.)  This evidence established that TVU was fraudulent from its inception with the false I-17s, and

28

14

that Su's transmission of these documents was an essential part of her fraud scheme.

The Court should therefore deny Su's motion as to Counts 1 and 13.

**B.    Su Committed Wire and Visa Fraud When She Created and Maintained Immigration Status for the Fictitious Students**

Sufficient evidence supports Su's wire fraud and visa fraud convictions relating to the fictitious students (Counts 1-12 and 16-19).  Su argues that these counts must fail because the purported victims were not real people, and as such could not actually be harmed.  But real harm is not an element of either offense.

Wire fraud requires the government to prove: (1) the defendant participated in a scheme to defraud to obtain money or property by means of false statements; (2) the statements made or facts omitted as part of the scheme were material; (3) the defendant acted with the intent to defraud; (4) the defendant used, or caused to be used, the wires to carry out or attempt to carry out an essential part of the scheme; and (5) the wire communication traveled in interstate commerce.  See 9th Cir. Model Jury Ins. Nos. 8.121 and 8.124.  The "relevant question at all times" is whether a transmission "is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether [the transmission] may . . . return to haunt the perpetrator of the fraud."  Schmuck, 489 U.S. at 715.

Here, the evidence showed that Su participated in a scheme to defraud TVU student aliens out of money (tuition and fees) through materially false representations, that Su intended to defraud, and that she used interstate wires to carry out her offense.  In Counts 5 through 8, these wires were the SEVIS entries to create I-20s, which she caused through her scheme.  In Counts 9 through 12, the wires were the emails attaching false I-20s, transcripts, attendance records, and admission letters, which she sent to DHS agents based on their ruse calls pretending to be immigration officials.  Each of these wires was part of the execution of the scheme as Su conceived it.  The wire itself does not need to have deprived anyone of money or property.  See United States v. Lane, 474 U.S. 438, 453 (1986) ("[transmissions] which facilitate concealment of the scheme are covered by the statute.")   Accordingly, the evidence was sufficient to support wire fraud in Counts 5 through 8.

Visa fraud requires the government to prove either that the defendant forged or falsely made an

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

immigration document and acted knowingly, or that the defendant knowingly used, attempted to use, possessed, obtained, or received an immigration document, which the defendant knew was forged, falsely made, or procured by fraud.  See 9th Cir. Model Jury Ins. Nos. 8.132 and 8.133.  Again, it is not an element that the immigration forged or false immigration document be for a true person.

The evidence established that Su knowingly forged and caused her employees to falsely make I-20s for fictitious students.  It also established that she knowingly used I-20s for the fictitious students, which she knew were forged, falsely made, and procured by fraud.  Accordingly, the evidence was sufficient to support visa fraud in Counts 16 through 19.

### C.    Su Conspired With Others to Commit Visa Fraud

Su next contends there was insufficient proof that she conspired to commit visa fraud as charged in Count 15.  However, the jury heard evidence that Su conspired with: (1) TVU's purported I-17 DSOs, Sophie Su and Vince Wang, neither of whom intended to work at TVU; (2) ABS, who agreed to recruit student aliens from India; and (3) TVU's student employees, who routinely accessed SEVIS for the purpose of creating fraudulent Form I-20s for Su.

The elements of conspiracy are: (1) an agreement; (2) the defendant became a member knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members performed at least one overt act to carry out the conspiracy.  See 9th Cir. Model Jury Ins. No. 820; TR 1784-85. The crime does not require a formal agreement or consensus on every detail.  Id.; see also United States v. Chao Fan Xu, 706 F.3d 965, 980 (9th Cir. 2013).  The agreement may be inferred from the conspirators' acts pursuant to the scheme, or other circumstantial evidence.  Chao Fan Xu, 706 F.3d at 980.  Not all conspirators need to have full knowledge of all the details and they can join at different times.  United States v. Montgomery, 150 F.3d 983, 998 (9th Cir. 1998).  The overt act need not be itself illegal so long as it is done in furtherance of the conspiracy.  See 9th Cir. Model Jury Ins. No. 820.  Only a slight connection is necessary to convict a defendant of knowing participation in a conspiracy.  United States v. Arbelaez, 719 F.2d 1453, 1459 (9th Cir. 1983).

The evidence amply supports Su's visa fraud conspiracy conviction.  The jury heard evidence that she conspired with family members in completing the fraudulent I-17 submissions to SEVP.  Su

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

admitted to SA Mackey that when her sister and brother-in-law signed the I-17 promising to be DSOs, they had no intention of actually working at TVU and that Su knew was so aware.  (TR 589-90.)

The jury also heard evidence that Su conspired with ABS members by enlisting their help in the scheme.  Two days after defrauding SEVP, Su emailed an ABS member seeking assistance in recruiting student aliens, (Exh. 300 at TR 609-13), and approximately a week later, Su and ABS memorialized their recruitment agreement with an MOU, (Exh. 303b at TR 617-24).  Consistent with the MOU, Su paid a series of referral checks to ABS in amounts up to $39,010.  (Exh. 580-592 at TR 617-24, 711-12.)  The jury also heard Su's admission to SA Mackey that she used TVU to fraudulently maintain F-1 immigration status for her ABS coconspirators even though they did not attend classes.  (TR 663-66 and TR 610-12.)  Corroborating that admission, Su sent an August 2009 email to ABS thanking them for their productivity and offering to further maintain their immigration status in exchange for the payment of tuition, which she described as "the most generous good deal."  (Exh. 315.)  Finally, the jury heard that ABS and Su agreed on the sale of fraudulent TVU diplomas and transcripts to ABS's clients, further showing that ABS knew TVU was not a legitimate school.  (Exh. 305 at TR 660, Exh. 307 at TR 654, Exh. 309 at TR 658, Exh. 311 at TR 756.)

The evidence showed that Su also conspired to commit visa fraud with her own F-1 employees.  Dasa and Dirisanala testified that Su instructed them to create and print fraudulent I-20s from SEVIS for TVU's students (TR 809-14, 1168-77), and Dasa's plea agreement specifically states that he agreed with Su "to create fraudulent Forms I-20 for purported TVU students and then submit the forms to DHS."  (Exh. 450, 3:8-11 at TR 874.)

The jury could and did rationally conclude that Su conspired with multiple people in committing visa fraud.

### D.    Su Harbored Dasa and Dirisanala

The evidence adequately establishes that Su harbored Dasa and Dirisanala as alleged in Counts 22 and 24, when she fraudulently created and maintained their F-1 immigration status in order to employ them at TVU.

Alien harboring requires the government to prove: (1) the student – Dasa or Dirisanala – was an

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1  alien; (2) the student was not lawfully in the United States; (3) Su knew or acted in reckless disregard of

2  the fact that the individual was not lawfully in the United States; (4) Su either: (a) harbored, concealed,

3  or shielded from detection the student through employment at TVU, for the purpose of avoiding his

4  detection by immigration authorities, or (b) attempted to harbor, conceal, or shield from detection the

5  student, through employment at TVU, for the purpose of avoiding his detection by immigration

6  authorities and did something that was a substantial step toward committing the crime; and (5) Su acted

7  for the purpose of commercial advantage or private financial gain.  See 9th Cir. Model Jury Ins. No. 9.3,

8  see also, 18 U.S.C. § 1324(a)(1)(B)(i).  An alien is a person who is not a natural-born or naturalized

9  citizen of the United States.  Id.

10         Su argues the government failed to prove that Dasa and Dirisanala were illegal aliens, or that

11  they were harbored.  However, the government proved Dasa and Dirisanala were aliens through their

12  testimony that they were in the United States on F-1 visas, and that they were here illegally because they

13  were not engaged in a full course of study and thus out of status.  A non-immigrant F-1 student alien

14  who fails to comply with immigration regulations is considered to be out of status and "unlawfully in the

15  United States."   See United States v. Atandi, 376 F.3d 1186, 1190 (10th Cir. 2004) (discussing alien's

16  unlawful presence in the context of possession of a firearm under § 922(g)(5)) (citing United States v.

17  Igbatayo, 764 F.2d 1039, 1040 (5th Cir. 1985) and United States v. Bazargan, 992 F.2d 844, 847 (8th

18  Cir. 1993)).

19         In Atandi, an F-1 student alien was found to be removable after he failed to maintain his status

20  by not attending classes.  Atandi, 376 F.3d at 1187.   Thereafter he was found in possession of a firearm

21  and charged under § 922(g)(5)(A).  Id.  The defendant argued that because removal proceedings were

22  ongoing at the time he had the firearm, his presence in the United States could not be said to be then

23  "unlawful."  The Tenth Circuit disagreed and held that once the alien had committed a status violation,

24  i.e., failing to maintain his student status – which was a prerequisite for his lawfully remaining in

25  country – he was "not lawfully in the United States" and could be charged under § 922(g)(5)(A).  Id. at

26  1188.

27         Su relies on United States v. Salman, 266 F.Supp.2d 1367 (C.D. Fla. 2003) for the proposition

28

18

1  that an alien's "unlawful presence is not triggered by a status violation alone."  (Def.'s Mot. at 19:9-15.)

2  However, Salman's proposition relies on Atandi's district court decision, which was overruled by the

3  Tenth Circuit holding that once an alien committed a status violation, he was "not lawfully in the United

4  States."  Atandi, 376 F.3d at 1188.

5      Similarly, in Bazargan, an F-1 student alien was found to be out of status when he failed to

6  follow immigration regulations pertaining to a school transfer.  Bazargan, 992 F.2d at 845.  The

7  defendant argued that he was not unlawfully in the United States because he had been provided

8  employment authorization pending a ruling on an amnesty application.  Id. at 848-49.  The Eighth

9  Circuit similarly disagreed finding that once the defendant fell out of status not even his pending

10  employment authorization could "convert [him] back into a legal alien."  Id. at 848; see also

11  Mohammadi–Motlagh v. INS, 727 F.2d 1450, 1453 (9th Cir. 1984) (affirming immigration board

12  finding that student alien was not lawfully in the United States because he violated conditions of his F-1

13  visa.).  Accordingly, the government's theory was legally sound – an F-1 student who falls out of status

14  is "not lawfully in the United States."  And, there was sufficient evidence for the jury to conclude that

15  Dasa and Dirisanala were out of status, and therefore "not lawfully in the United States."

16      There was also sufficient evidence for the jury to find that Su knowingly harbored Dasa and

17  Dirisanala.  Both aliens expressed concern to Su about the visa status she had granted them.  (TR 789-

18  90, 796-809, 1152-57, 1184-86.)  The jury heard repeated testimony that TVU was not offering physical

19  classes, that TVU had only a few online classes, and that Su knew that Dasa and Dirisanala were

20  working 10-12 hours per day in TVU's office rather than attending classes.  (TR 830, 1158-59.)  Dasa

21  testified that after raising concerns about TVU's lack of classes, Su told him that he could take a break

22  from classes and continue in his F-1 visa status while he worked for TVU.  (TR 805-07.)  Dasa never

23  attended or saw a physical class during his entire employment at TVU.  (817-18.)   Dirisanala testified

24  that when he expressed similar concern about classroom attendance, Su stated: "Since you are working

25  in the university, you don't worry.  I'll take care of you."  (TR 1185-86.)

26      Su did take care of them – as part of their TVU employment, she concealed their unlawful status

27  in SEVIS by creating the appearance that they were making satisfactory progress in their studies despite

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1   knowing that neither was attending classes.  (Id.; see also, Exh. 420 and 440.)   The evidence was

2   sufficient for the jury to find that Su harbored Dasa and Dirisanala.

3          Su contends that employment alone does not constitute alien harboring.  She relies on United

4   States v. Vargas-Cordon, 733 F.3d 366 (2d Cir. 2013), for the proposition that the government must

5   prove "conduct which is intended to facilitate an alien's remaining in the United States illegally and to

6   prevent detection by the authorities of the alien's unlawful presence." Id. at 382.  She also cites United

7   States v. Rubio-Gonzalez, 674 F.2d 1067 (5th Cir. 1982), among other cases, for the same principle.

8          But the government's evidence meets this test.  The jury heard evidence that, as part of their

9   employment, Su engaged in and caused a series of acts designed to conceal their unlawful status and

10  shield them from detection.  She enrolled them in classes that did not exist, issued them bogus grades

11  and transcripts, assured them that their immigration status was secure, transmitted fraudulent SEVIS

12  entries to the government, printed fraudulent I-20s, and locked them inside the TVU office when she left

13  for lunch.  About being locked in, one alien employee testified: "I did try to open [the door] and leave,

14  but I couldn't open [it]." (Id.)  Such evidence is sufficient.  See United States v. Dann, 652 F.3d 1160,

15  1174 (9th Cir. 2011) (sufficient evidence for jury to conclude that defendant harbored alien and

16  prevented detection by employing her as a nanny and housekeeper, restricting her movement, and

17  forbidding her to speak to anyone outside the home.).

18         The jury also heard evidence that Su employed one of the aliens outside of TVU.  Dirisanala

19  testified that she employed him to paint her apartment after which Su then refused to pay him for the

20  completed work (TR 1204-05), and later to move furniture at Su's mother's house (TR 1203-04).

21         Because the jury heard sufficient evidence to conclude that Su concealed Dasa and Dirisanala

22  from detection through the series of steps she took to employ them at TVU the Court should deny her

23  motion as to Counts 22 and 24.

24         **E.     Su's Money Laundering Does Not Merge With Her Fraud Scheme**

25         Su contends that her money laundering counts should be dismissed under the merger doctrine.

26  As time for motions to dismiss has passed, the government interprets her motion as one for acquittal for

27  insufficient evidence.

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

A "merger problem" arises when the government relies on a single transaction to charge both a predicate illegal offense (such as mail or wire fraud) and a money laundering offense.  See United States v. Phillips, 704 F.3d 754, 765 (9th Cir. 2012) (citing United States v. Bush, 626 F.3d 527, 537 (9th Cir. 2010)).  The essential concern is not to punish the defendant twice for the same transaction.  See Bush, 626 F.3d at 535.  The appropriate test for merger is whether the charged money laundering transaction "was a central component of the defendant's criminal scheme."  Id. (quoting United States v. Van Alstyne, 584 F.3d 803, 815 (9th Cir. 2009)).  When the transactions are separate and distinct, there are no merger concerns.  See Bush, 626 F.3d at 537.

Here, Su's merger argument fails because it blends her initial receipt of the F-1 student proceeds with her future expenditures of those proceeds.  The evidence established that Su engaged in fraud and subsequently laundered the proceeds of that fraud by buying residences, commercial properties, and a luxury car.  Moreover, none of the purchases underlying the money laundering counts was also charged as a substantive offense.  The wire and mail fraud counts were based on  SEVIS entries, DHS emails, coconspirator emails, and I-17 mailings, while the money laundering counts relied on financial transactions – Su's expenditures for the Mercedes Benz (Exh. 600), the two commercial properties (Exh. 603 and 605), and the three residences (Exh. 606, 608, and 609).  Because the predicate fraud counts and the money laundering counts originate from completely distinct transactions occurring at different times, there is no merger problem.  The Court should therefore deny Su's motion as to Counts 26, 27, 29, 32, 34, and 35.

///
///
///
///
///
///
///
///

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**CONCLUSION**

For each of these reasons, the United States respectfully requests this Court to deny Su's motion for judgment of acquittal.

DATED: September 26, 2014                    Respectfully submitted,

                                            MELINDA HAAG
                                            United States Attorney


                                            _____/s/_____
                                            HARTLEY M. K. WEST
                                            WADE M. RHYNE
                                            Assistant United States Attorneys

22