1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  HARTLEY M.K. WEST (CABN 191609)
   WADE M. RHYNE (CABN 216799)
5  Assistant United States Attorneys

6      1301 Clay Street, Suite 340S
       Oakland, California 94612
7      Telephone: (510) 637-3680
       FAX: (510) 637-3724
8      E-Mail:  hartley.west@usdoj.gov
                wade.rhyne@usdoj.gov
9
   Attorneys for United States of America
10

11                      UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                           OAKLAND DIVISION

14

15 UNITED STATES OF AMERICA,        )  CASE NO. CR-11-00288 JST
                                    )
16        Plaintiff,                )  **UNITED STATES' SENTENCING**
                                    )  **MEMORANDUM**
17    v.                            )
                                    )  Hearing Date: October 31, 2014
18 SUSAN XIAO-PING SU,              )  Time: 9:30 a.m.
                                    )  Judge:  Hon. Jon S. Tigar
19        Defendant.                )
                                    )
20                                  )
                                    )
21 _____)

22

23

24

25

26

27

28

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST

1

**TABLE OF CONTENTS**

2   INTRODUCTION ....................................................................................................................1

3   RELEVANT PROCEDURAL HISTORY ...............................................................................1

4   SUMMARY OF RELEVANT FACTS ....................................................................................2

5       A.  Student Visa Program ..................................................................................................2

6       B.  TVU's Fraudulent Form I-17 Petition ........................................................................3

7       C.  Student Recruiting, Admission, and Form I-20s .........................................................4

8       D.  Su's Student Victims....................................................................................................5

9       E.  Su Enrolls Fictitious TVU Students for Money...........................................................6

10      F.  Su's Money Laundering................................................................................................6

11      G.  Search Warrants and Su's Interview ............................................................................7

12  LEGAL STANDARD................................................................................................................8

13  ARGUMENT .............................................................................................................................8

14      A.  Su's Crimes Place Her at Total Offense Level 40 .......................................................8

15      B.  The Section 3553(a) Factors Support a Sentence of 292 Months' Imprisonment ........18

16          1.   Nature and Circumstances of the Offense and Characteristics of the Defendant .................18

17              a.   Nature and Circumstances of the Offense....................................................18

18              b.   Characteristics of the Defendant .................................................................19

19          2.   Need to Reflect the Seriousness of the Offenses .................................................20

20          3.   Deterrence of Criminal Conduct.........................................................................21

21          4.   Need to Protect the Public..................................................................................21

22          5.   Avoiding Sentencing Disparities ........................................................................21

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Cases**

3   United States v. Bussell, 504 F.3d 956 (9th Cir. 2007) ........................................ 21, 22

4   United States v. Cantrell, 433 F.3d 1269 (9th Cir. 2006) ........................................ 8

5   United States v. Crandall, 525 F.3d 907 (9th Cir. 2008) ........................................ 21

6   United States v. Gordon, 393 F.3d 1044 (9th Cir. 2004) ........................................ 21

7   United States v. Horob, 735 F.3d 866(9th Cir. 2013) ........................................ 13

8   United States v. McCormac, 309 F.3d 623 (9th Cir. 2002) ........................................ 11

9   United States v. Showalter, 569 F.3d 1150 (9th Cir. 2009) ........................................ 12

10   United States v. Tanke, 743 F.3d 1296 (9th Cir. 2014) ........................................ 13

11   United States v. Zolp, 479 F.3d 715 (9th Cir. 2007) ........................................ 11, 12

12

**Statutes**

13   8 U.S.C. § 1324(a)(1)(A) ........................................ 2

14   18 U.S.C. § 371 ........................................ 2, 9

15   18 U.S.C. § 1001 ........................................ 9

16   18 U.S.C. § 1001(a)(2) ........................................ 2

17   18 U.S.C. § 1001(a)(3) ........................................ 2

18   18 U.S.C. § 1030(a)(3) ........................................ 2, 10

19   18 U.S.C. § 1324 ........................................ 10

20   18 U.S.C. § 1341 ........................................ 2, 9

21   18 U.S.C. § 1343 ........................................ 1, 9

22   18 U.S.C. § 1546(a) ........................................ 2, 9

23   18 U.S.C. § 1957 ........................................ 2, 10

24   18 U.S.C. § 3553(a) ........................................ 8

25   18 U.S.C. § 3663A(a)(2) ........................................ 21

26   18 U.S.C. § 3663A(c) ........................................ 21

27

**Rules**

28   U.S.S.G. §1B1.1(a)(1) & (2) ........................................ 8

1   U.S.S.G. § 1B1.1(a)(3) & (4)................................................................. 8

2   U.S.S.G. § 2B1.1.................................................................. 11, 12, 17

3   U.S.S.G. § 2B1.1(a)(1)........................................................................ 9

4   U.S.S.G. § 2B1.1(a)(2)........................................................................ 9

5   U.S.S.G. § 2B1.1(b)(1)(J)................................................................ 9, 11

6   U.S.S.G. § 2B1.1(b)(2)(C)................................................................... 9

7   U.S.S.G. § 2B1.1(b)(9)(A)................................................................... 9

8   U.S.S.G. § 2B1.1(b)(9)(C)................................................................. 13

9   U.S.S.G. § 2B1.1(b)(10)(C)............................................................ 9, 14

10  U.S.S.G. § 2B2.3(a)......................................................................... 10

11  U.S.S.G. § 2B2.3(b)(1)..................................................................... 10

12  U.S.S.G. § 2B2.3(c)(1)..................................................................... 10

13  U.S.S.G. § 2L2.1........................................................................ 9, 17

14  U.S.S.G. § 2L2.1(a)........................................................................ 9

15  U.S.S.G. § 2L2.1(b)(2)(C)............................................................ 9, 10

16  U.S.S.G. § 2S1.1(a)(1)..................................................................... 10

17  U.S.S.G. § 2S1.1(b)(2)(A)................................................................ 10

18  U.S.S.G. § 2X1.1............................................................................ 9

19  U.S.S.G. § 3B1.1........................................................................... 14

20  U.S.S.G. § 3B1.1(a)................................................................ 9, 10, 14

21  U.S.S.G. § 3C1.1............................................................... 9, 10, 11, 15

22  U.S.S.G. § 3D1.2........................................................................... 17

23  U.S.S.G. § 3D1.2(b)....................................................................... 17

24  U.S.S.G. § 3D1.2(d)............................................................ 11, 17, 18

25  U.S.S.G. § 3D1.4(b)....................................................................... 11

26

27

28

# INTRODUCTION

The United States of America respectfully requests this Court to sentence the defendant Susan Xiao-Ping Su to: (1) serve 292 months of imprisonment, representing the low-end of the applicable United States Sentencing Guidelines range for Offense Level 40 and Criminal History Category I; (2) serve five years of supervised release; (3) pay restitution to the victims of her fraud scheme; (4) be subject to a preliminary order of forfeiture in an amount not less than $5,601,844.72; and (5) pay a $3,100 special assessment.

This sentencing recommendation is fair and reasonable for Su who carried out a sophisticated multi-year scheme to defraud non-immigrant student aliens out of over $5.6 million, in the form of tuition and other payments, through her creation and operation of Tri-Valley University (TVU).  As part of her scheme, Su fraudulently obtained authorization from the U.S. Department of Homeland Security (DHS), Student and Exchange Visitor Program (SEVP), to admit foreign students.  She then collected millions of dollars from the aliens in exchange for maintaining their student visas in active status, and used these funds to purchase millions of dollars' worth of real property and other assets, including a mansion on the Ruby Hills Golf Course and a Mercedes Benz.  Su also employed some of these aliens at TVU, instructing them to access government databases without authorization and to create fraudulent visa-related documents in furtherance of her scheme.  When questioned by DHS agents regarding her students' status, Su made materially false representations and submitted materially false documents to the agents.

Su never provided TVU's student aliens with the education she had promised, yet she continued to demand tuition payments.  When students complained about TVU's lack of classes, course materials, or instructors, Su responded by demanding additional tuition payments and threatening them with deportation if they did not pay up.  Su's chain of lies, her insatiable greed, and an absence of mitigation on this record collectively compel the conclusion that a Guideline sentence of 292 months is appropriate and not greater than necessary to achieve the goals of sentencing.

# RELEVANT PROCEDURAL HISTORY

On November 10, 2011, the Grand Jury returned a thirty-five count Superseding Indictment, charging Su with wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-12); mail fraud, in violation of

1   18 U.S.C. § 1341 (Counts 13-14); conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371

2   (Count 15); visa fraud, in violation of 18 U.S.C. § 1546(a) (Counts 16-19); use of a false document, in

3   violation of 18 U.S.C. § 1001(a)(3) (Count 20); false statements, in violation of 18 U.S.C. § 1001(a)(2)

4   (Count 21); alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A) (Counts 22-24); unauthorized

5   access, in violation of 18 U.S.C. § 1030(a)(3) (Count 25); and money laundering, in violation of 18

6   U.S.C. § 1957 (Counts 26-35).  (Dkt. 41.)  The Superseding Indictment also included four forfeiture

7   allegations.

8         Trial commenced on March 3, 2014.  (Dkt. 99.)  On March 18, the Court granted the United

9   States' motion to dismiss Counts 23, 28, 30, and 33.  (TR 1713.)  On March 24, the jury returned guilty

10  verdicts as to all remaining counts.  (Dkt. 119, TR 1919-24.)

11                          **SUMMARY OF RELEVANT FACTS**

12        The following facts are taken from the trial record and from the United States Probation

13  Officer's (USPO) pre-sentence investigation report (PSR).

14  **A.      Student Visa Program**

15        There are different categories of foreign nationals who may be admitted to the United States for

16  nonimmigrant purposes, and that one such category, designated "F-1" based on the applicable statutory

17  subsection, comprised bona fide students coming temporarily to study at an approved school.  (TR 232.)

18  Aliens wishing to study in the United States obtain F-1 visas, and those students are admitted for a

19  temporary period called "duration of status," which federal regulations define as the time during which

20  the student is pursuing a full course of study at an approved school.  (TR 228-33.)

21        Schools seeking to admit foreign students must submit a petition known as a Form I-17 to SEVP

22  in Washington, DC, and meet the criteria for approval.  (TR 247-48.)  Among other things, the school

23  must establish that it is a bona fide educational institution and, if unaccredited, must provide

24  "articulation agreements" showing that its courses have been and are unconditionally accepted to at least

25  three accredited institutions of higher learning.  (TR 256-60.)  The I-17 must also identify "Designated

26  School Officials" (DSOs), who certify their knowledge of and intent to comply with student

27  immigration laws and regulations.  (TR 284.)  The I-17 warned DSOs that they could "not delegate

28  [their] designation to any other person."  (Exh. 1 and 3.)

1   Once a school's I-17 is approved, SEVP issues the DSOs login IDs and passwords enabling them

2   to access the Student and Exchange Visitor Information System (SEVIS) – a nonpublic computer system

3   located in Rockville, Maryland, which is used by the United States government and operated through

4   SEVP for the purpose of collecting nonimmigrant student information from approved schools and

5   monitoring such aliens' status.  (TR 248 -54.)  SEVIS is used to create student records, including a

6   Certificate of Eligibility for Nonimmigrant (F-1) Student Status, also known as a Form I-20, which is

7   required to obtain a student visa.  (TR 287, 296, 329-38.)  SEVP may decertify a school that fails to

8   follow immigration laws and regulations.  (TR 243, 271-72.)

9   **B.     TVU's Fraudulent Form I-17 Petition**

10   DHS's approval of Su's fraudulent I-17 was a foundational component of her scheme.  Su

11   electronically submitted her I-17 to SEVIS on September 15, 2008, on behalf of TVU.  (TR 261-62, 278,

12   311; Exh. 1.)  Su's I-17 was full of materially false statements.  It fraudulently identified as TVU's

13   administrators and DSOs Su's sister, Sophie Su, and Sophie's husband, Vince Wang.  (TR 301, 590.)

14   Su admitted to agents that when she submitted the I-17 she knew that her DSOs had no intention to be

15   DSOs but that she submitted the false I-17 anyway.  (TR 589-90.)  Su also included with her I-17 a

16   fraudulent list of instructors, many of whom never agreed to teach at TVU, as Su later admitted to

17   agents.  (TR 447-51, 467-68, 561-62, 599.)  Su's I-17 also contained materially false representations

18   about TVU's admissions standards, grading policies, and graduation requirements.  (Exh. 1.)   In

19   December 2008, in response to SEVP's request for clarification, Su mailed SEVP a revised Form I-17,

20   which contained the same materially false statements.  (TR 316-17, 411; Exh. 3.)

21   As part of TVU's approval process Su also provided materially false documents to a DHS

22   contractor who had physically inspected TVU's campus as part of the approval process.  Su gave the

23   contractor a signed copy of her I-17, as well as articulation agreements from three schools, which the

24   contractor passed on to SEVP.  (TR 278-82; Exh. 5 at p. 8.)

25   Su later mailed revised articulation agreements to SEVP on February 10, 2009, two of which

26   were confirmed to be forgeries based on testimony from two school officials and from a DHS expert

27   forensic document examiner.  (TR 319-28; Exh. 4, 102, 112.)  The school officials testified they never

28   entered into articulation agreements with TVU.  (TR 774-80, 474-97.)  The forensic document examiner

1   established that the signatures of the purported school officials on TVU's articulation agreements were

2   essentially lifted from other "source" documents.  (TR 511-52.)  SA Mackey confirmed that those

3   source documents were located on Su's computer and in her residence during execution of the search

4   warrant.  (TR 667, 649.)

5          Relying on Su's materially false submissions, SEVP approved TVU to admit F-1 students on

6   February 19, 2009.  (Exh. 7.)  Su's SEVIS electronic I-17 submission and supplemental mailings formed

7   the basis of the first wire fraud charge (Count 1), and both mail fraud charges (Counts 13 and 14).

8          **C.     Student Recruiting, Admission, and Form I-20s**

9          After TVU received SEVP's approval to admit F-1 students, Su entered into recruiting

10  agreements, paying as commissions a percentage of tuition fees for each new F-1 student recruited.  Su

11  agreed to pay these "referral" commissions to ABS Consultancy (ABS) and to her own TVU students to

12  find, recruit, and enroll non-immigrant student aliens.  (Exh. 303b, 580-592 at TR 617-24, 711-12; Exh.

13  330 at TR 679-680; Exh. 477, 478 at TR 820-29; Exh. 588A at TR 831-32.)  Indeed, Su's visa fraud

14  conspiracy with ABS began with an email proposal that she sent only two days after she had defrauded

15  SEVP.  (Exh. 300; TR 609-13.)  ABS well knew that TVU was not a legitimate school, as confirmed by

16  email correspondence in which Su sells TVU diplomas and transcripts to ABS's clients.  (Exh. 305; TR

17  660, Exh. 307; TR 654, Exh. 309 at TR 658, Exh. 311 at TR 756.)  ABS's knowledge of TVU's

18  illegitimacy was further confirmed by more emails and by Su's admissions to the agents all showing that

19  she used TVU to fraudulently maintain F-1 immigration status for her ABS coconspirators.  (Exh. 315;

20  TR 610-12.)

21         To process the admission of the new student recruits, Su admitted that she hired her own F-1

22  students to work in the TVU office.  (TR 605, 624-25.)  Multiple F-1 students testified that Su gave

23  them access to SEVIS through DSO accounts and instructed them to create and print Form I-20s for new

24  F-1 students, after which time Su forged DSO signatures on the I-20s.  (TR 813-815, 1163-65, 1213-14,

25  1223-24, 1228-30, 1244-45, 1323-24, 1445, 1449, 1514-15.)  TVU employees also testified that Su

26  admitted all alien applicants without regard to their academic qualifications or intent to pursue a full

27  course of study (TR 809-11, 1172-74, 1506-07); that she instructed them to enter false addresses and

28  other information in SEVIS for hundreds of students (TR 809-11, 1173, 1514-15); that there were no

physical classes although some were taught online (TR 818, 920-21, 1186-87, 1518, 1525, 1362, 1405, 1407, 1420-21, 1464-65); and that Su directed passing grades for everyone, with none below a B+ (TR 626, 801, 804, 811-12, 912, 914, 1186, 1385-86, 1575).  The student-employees testified that they did not attend online classes at TVU, as Su knew.  (Id.)

TVU student-employees Vishal Dasa and Anji Dirisanala were criminally charged for their criminal conduct with Su, pleaded guilty pursuant to plea agreements, cooperated with the United States' investigation of TVU, and were awaiting sentencing at the time of trial.  (TR 876, 1292.)

The unauthorized SEVIS access was charged in Count 25.  The agreement between Su and her student-employees to create fraudulent SEVIS records was charged as conspiracy to commit visa fraud, Count 15.  Su's employment of two student-employees was charged as alien harboring in Counts 22 and 24.  The above-referenced email from Su soliciting recruiters of Indian students was charged as wire fraud in Count 2.

### D.    Su's Student Victims

By January 2011, TVU had approximately 1,760 active students in SEVIS, many of whom enrolled believing TVU was a legitimate school.  (TR 572.)  However, when these students arrived at TVU they quickly learned that TVU did not have proper infrastructure to provide the education it had promised in its website and course catalogue.  Students confirmed that TVU consisted of a single classroom and offered no physical classes or legitimate instructors.  The only classes that did exist were a handful of online classes that were fraught with log in issues and/or minimal instructional content.

To allay concerns about TVU's legitimacy, Su routinely lulled students by telling them that classes would soon begin and that their immigration status would be secure.  To create the appearance that TVU's tuition-paying students were progressing in their studies, as required by the terms of their visas, Su created bogus transcripts with passing grades for classes that the students did not take.  In many instances the classes depicted on the transcripts did not exist at all.  By doing so she was able to create the perception that she controlled the aliens' visa status thereby allowing her to demand additional tuition payments.

Several students testified that they felt "stuck" with no choice but to pay Su or face possible deportation.  Indeed, if a student requested to transfer or if they complained about TVU's lack of classes,

1  course materials, or instructors, then Su would either ignore them or threaten them.  Su's threats came in

2  the form of a demand for more tuition payments followed by a threat to terminate the student's visa

3  status if they did not pay her.  Many TVU students saw no good choice but to pay her.

4        **E.**      **Su Enrolls Fictitious TVU Students for Money**

5          HSI agents and a student-employee testified regarding the enrollment of four fictitious students

6  at TVU during nine undercover operations in late 2010 and early 2011.  A more detailed summary of the

7  operations is set forth in the United States' Opposition to Su's Rule 29 Motion.  (Dkt. No. 186.)  In

8  summary, using Dirisanala and an undercover agent, HSI agents were able enroll four fictitious students

9  at TVU.  Su approved the enrollment of, and granted immigration status to, the fictitious students after

10 receiving tuition payments.  Thereafter agents contacted Su during a series of airport ruses claiming to

11 be airport officials.  The agents claimed that the students were stuck at the airport with inadequate

12 evidence of their immigration status.  During the calls, Su vouched for the students and later emailed

13 false admissions documents, I-20s, and transcripts to the agents.

14         As a further part of the operation, an agent posing as an airport official went to TVU to

15 personally pick up the requested documents from Su.  During the encounter, Su advised the agent that

16 she had not had time to complete one of the student's attendance sheets, but that he had attended a class

17 that she personally taught, and that the attendance log reflected that his attendance had been good.

18       **F.**      **Su's Money Laundering**

19         The jury convicted Su of money laundering in Counts 26, 27, 29, 31, 32, 34, and 35, arising out

20 of her purchases of commercial properties, three residences, and a Mercedes Benz.  (Dkt 119.)  Su

21 utilized five different financial accounts to funnel fraud proceeds from her students into her pockets.

22 (Exh. 650.)  Su's accounts included, PayPal (#1921), Citibank (#3045), and Wells Fargo (#0454, #3640,

23 and #4780).  Su engaged in a series of monetary transactions using those accounts over the course of

24 nearly two years.

25         Su admitted that she engaged in the charged transactions using TVU business accounts that she

26 controlled.  Financial analysis confirmed that close to 99% of the funds consisted of money received

27 from F-1 students, commingled with about 1% that was in the account before she got F-1 approval.

28 (Exh. 650, 651.)  SA Mackey further testified how his financial analysis tracked the money into and out

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST            6

1   of Su's accounts.  (Exh. 650, 651.)  Furthermore, Su admitted to SA Mackey that she purchased these

2   assets entirely with TVU F-1 student proceeds.  (TR 630, 633, 634.)

3       **G.     Search Warrants and Su's Interview**

4           Su's fraud scheme ended on January 19, 2011, when HSI executed search warrants at TVU's

5   offices, Su's homes, and Su's car.  (TR 584.)  During the searches, agents found the Articulation

6   Agreements, draft I-17 Petitions, student records, Form I-20s and other SEVIS documents, emails, and

7   correspondence, among other things.

8           Su consented to an interview at the time of the search and then made a series of incriminating

9   admissions.  (TR 587.)  She admitted hiring recruiters and paying commissions to get F-1 students (TR

10  610-12, 620); instructing her staff to enter false addresses in SEVIS as applicants' residences (TR 605);

11  providing her student-employees with unauthorized access to SEVIS (TR 624-25); and instructing her

12  staff not to give students grades below B+ (TR 626).  She also admitted sending the I-17 and its

13  supplements (TR 588), and the emails and attachments to HSI regarding the fictitious students enrolled

14  during undercover operations.  (TR 642-43, 1060-61, and 1071).  While Su denied falsifying the

15  articulation agreements, she asked the agents "please, please, please" not to contact the schools.  (TR

16  591-96.)  When the agents said they already did, she refused to discuss the articulation agreements

17  further.  (TR 597.)

18      **H.     Su's Pre-Trial Conduct**

19          After the Grand Jury indicted Su, she continued her efforts to operate TVU.  TVU's website

20  content included a solicitation for credit card or PayPal donations to save the school.  The monetary

21  solicitation was accompanied by a picture of a burning candle and a dove.  Shortly thereafter, in or about

22  January 2012, Su attempted to re-open TVU under the name of "Global TV University" ("Global

23  TVU").  Su created a Global TVU website at www.globaltvu.us and incorporated the entity with the

24  California Department of State identifying herself as the agent for service of process at her Ruby Hills

25  mansion.

26      **I.      Su's Attempts to Obstruct Justice During Trial**

27          Immediately before and during trial Su made multiple attempts to influence the testimony of

28  government witnesses by emailing information using aliases and fictitious online accounts.  (Rhyne

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    7

Decl., Exh. 1; PSR, ¶¶ 39-46.)  A more detailed summary of her email content is set out below in discussing the application of the guideline adjustment for Su's attempted obstruction of justice.

## LEGAL STANDARD

In arriving at an appropriate sentence, the first step is to accurately calculate the Sentencing Guidelines offense level and sentencing range.  United States v. Cantrell, 433 F.3d 1269, 1280-81 (9th Cir. 2006).  After calculating the guidelines, the Court must then apply the factors set forth in 18 U.S.C. § 3553(a) to arrive at a reasonable sentence.  See id. (stating that after determining the guidelines calculation is correct the appellate court turns to whether the sentence is reasonable "in light of all the 18 U.S.C. § 3553(a) factors").  These factors include consideration of the circumstances of the offense and the defendant, along with the need for the sentence to (a) reflect the seriousness of the offense (including promoting respect for the law and providing just punishment), (b) afford adequate deterrence, (c) protect the public from further criminal conduct by the defendant, and (d) avoid sentencing disparities among similarly situated defendants.

## ARGUMENT

### A.     Su's Crimes Place Her at Total Offense Level 40

Su's total offense level is 40 with criminal history category I, resulting in a guideline range of 292 to 365 months.  In calculating the total offense level, the Court must first compute the offense level for each count of conviction under Chapter 2: wire fraud (Counts 1-12), mail fraud (Counts 13-14), conspiracy to commit visa fraud (Count 15), visa fraud (Counts 16-19), use of a false document (Count 20), false statements to a government agency (Count 21), alien harboring (Counts 22 and 24), unauthorized access (Count 25), and money laundering (Counts 26-27, 29, 31-32, 34-35).  U.S.S.G. §1B1.1(a)(1) & (2); Dkt. 41.  The next step is to apply any "adjustments" related to victim, role, and obstruction for each count of conviction pursuant to Chapter 3.  U.S.S.G. §1B1.1(a)(3) & (4).  And finally, the court must "group" any related counts of conviction pursuant to Part D of Chapter 3. U.S.S.G. §1B1.1(a)(4).

///

///

In this case, Su's total offense level, followed by a more detailed analysis of the calculation, is as follows:

**GROUP 1**:

<u>COUNTS ONE – FOURTEEN</u>:  (18 U.S.C. §§ 1343 & 1341 – Wire Fraud/Mail Fraud)

a.     <u>Base Offense Level</u>:
(U.S.S.G. §2B1.1(a)(1) – wire fraud/mail fraud):             7

b.     <u>Specific Offense Characteristics</u>:
(U.S.S.G. §2B1.1(b)(1)(J) – Loss of more than $2.5 million
and less than $7 million):            +18
(U.S.S.G. §2B1.1(b)(2)(C) – Offense involved more than 250 victims):   +6
(U.S.S.G. §2B1.1(b)(10)(C) – Offense involved sophisticated means):   +2

c.     <u>Adjustment for Role</u>:
(U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a
criminal activity that involved five or more participants or was
otherwise extensive, increase by 4 levels – wire fraud/mail fraud):   +4

d.     <u>Adjustment for Obstruction</u>:
(U.S.S.G. §3C1.1 – Defendant attempted to obstruct
administration of justice):         <u>+2</u>

e.     <u>Group Offense Level</u>:         39

<u>COUNTS FIFTEEN – NINETEEN</u>:  (18 U.S.C. §§ 371 & 1546(a) – Conspiracy/Visa Fraud)

a.     <u>Base Offense Level</u>:
(U.S.S.G. §§ 2X1.1 & 2L2.1(a) – Use base offense level for substantive
Offense (visa fraud)):         11

b.     <u>Specific Offense Characteristics</u>:
(U.S.S.G. §2L2.1(b)(2)(C) – Offense involved 100 or more documents):   +9

c.     <u>Adjustment for Role</u>:
(U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a
criminal activity that involved five or more participants or was
otherwise extensive, increase by 4 levels – visa fraud):   +4

d.     <u>Adjustment for Obstruction</u>:
(U.S.S.G. §3C1.1 – Defendant attempted to obstruct
administration of justice):         <u>+2</u>

e.     <u>Group Offense Level</u>:         26

<u>COUNTS TWENTY – TWENTY-ONE</u>:  (18 U.S.C. § 1001 – False Document/Statements)

a.     <u>Base Offense Level</u>:
(U.S.S.G. §2B1.1(a)(2)):         6

b.     <u>Specific Offense Characteristics</u>:
(U.S.S.G. §2B1.1(b)(1)(J) – Loss of more than $2.5 million
and less than $7 million):         +18

|  |  | (U.S.S.G. §2B1.1(b)(2)(C) – Offense involved more than 250 victims): | +6 |
|  |  | (U.S.S.G. §2B1.1(b)(9)(A) – Offense involved a misrepresentation the defendant was acting on behalf of an educational organization): | +2 |
|  | c. | Adjustment for Role:<br>(U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels – wire fraud/mail fraud): | +4 |
|  | d. | Group Offense Level: | 36 |

COUNTS TWENTY-TWO & TWENTY-FOUR:  (18 U.S.C. § 1324 – Alien Harboring)

|  | a. | Base Offense Level:<br>(U.S.S.G. §2L1.1(a)(3)): | 12 |
|  | b. | Specific Offense Characteristics:<br>(U.S.S.G. §2L1.1(b)(2)(C) – Offense involved harboring 100 or more aliens): | +9 |
|  | c. | Adjustment for Role:<br>(U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels – alien harboring): | +4 |
|  | d. | Adjustment for Obstruction:<br>(U.S.S.G. §3C1.1 – Defendant attempted to obstruct administration of justice): | +2 |
|  | e. | Group Offense Level: | 27 |

COUNTS TWENTY-SIX, TWENTY-SEVEN, TWENTY-NINE, THIRTY-ONE, THIRTY-TWO, THIRTY-FOUR, AND THIRTY-FIVE:  (18 U.S.C. § 1957 – Money Laundering)

|  | a. | Base Offense Level:<br>(U.S.S.G. §2S1.1(a)(1) – Offense level for the most serious underlying conduct *before* application of Chapter Three adjustments (See App. N. 2(C)) – wire fraud/mail fraud): | 33 |
|  | b. | Specific Offense Characteristics:<br>(U.S.S.G. §2S1.1(b)(2)(A) – Convicted under 18 U.S.C. § 1957): | +1 |
|  | c. | Group Offense Level: | 34 |

### **GROUP 2**:

COUNT TWENTY-FIVE:  (18 U.S.C. § 1030(a)(3) – Unauthorized Access of a Government Computer)

|  | a. | Base Offense Level:<br>(U.S.S.G. §2B2.3(a)): | 4 |
|  | b. | Specific Offense Characteristics:<br>(U.S.S.G. §2B2.3(b)(1) – Offense involved computer system used in furtherance of national security): | +2 |

c.   Cross Reference:
     (U.S.S.G. §§ 2B2.3(c)(1) & 2L2.1 – Offense committed with intent
     to commit a felony offense (visa fraud)):                    20

d.   Adjustment for Role:
     (U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a
     criminal activity that involved five or more participants, increase
     by 4 levels – unauthorized access):                          +4

e.   Adjustment for Obstruction:
     (U.S.S.G. §3C1.1 – Defendant attempted to obstruct
     administration of justice):                                  +2

f.   Group Offense Level:                                         32

## DETERMINING COMBINED OFFENSE LEVEL:

MULTIPLE COUNT ANALYSIS:
(U.S.S.G. §§ 3D1.2(d), 3D1.4(b) – charged offenses constitute two Groups:
(1) unauthorized access to government computer count; and (2) all other counts.
Count as one-half unit any Group that is 5 to 8 levels less serious than the Group
with the highest offense level, resulting in 1.5 units and 1 additional level):      39+1

TOTAL OFFENSE LEVEL:                                              **40**

A more detailed discussion of the contested components of this calculation is set forth below.

### 1.    Su is Responsible for Between $2.5 and $7 Million of Loss

The United States and the USPO agree that the applicable loss amount is between $2.5 million and $7 million, resulting in an 18-level increase in Su's offense level pursuant to U.S.S.G. §2B1.1(b)(1)(J).

The starting point for calculating loss is §2B1.1.  See Cantrell, 433 F.3d at1280.  Typically, the loss amount is the greater of actual loss or intended loss.  U.S.S.G. § 2B1.1, cmt. n. 2(A) (Nov. 2002) (emphasis added); see also United States v. Zolp, 479 F.3d 715, 718-19 (9th Cir. 2007); United States v. McCormac, 309 F.3d 623,627-28 (9th Cir. 2002).

"Actual loss" means the reasonably foreseeable pecuniary harm that result from the offense. U.S.S.G. § 2B1.1, cmt. n. 2 (A)(i) and (iii) (Nov. 2002).  "Intended loss" means the pecuniary harm that was intended to result from the offense, even including intended harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).  U.S.S.G. § 2B1.1, cmt. n. 2(A)(ii) (Nov. 2002).  "Pecuniary harm" is "harm that is monetary or that otherwise is readily measurable in money."  U.S.S.G. § 2B1.1, cmt. n. 2

1   (A)(iii) (Nov. 2002).  And finally, "reasonably foreseeable pecuniary harm" means harm "that the

2   defendant knew or, under the circumstances, reasonably should have known, was a potential result of the

3   offense."  U.S.S.G. § 2B1.1, cmt. n. 2(A)(iv).  Where the court is unable to determine either actual or

4   intended loss with sufficient certainty, it may rely on the defendant's personal gain from the fraud as an

5   alternate measure of loss.  U.S.S.G. § 2B1.1, cmt. n. 2(B) (Nov. 2002).

6          In determining loss amount under these approaches, the court need only make "a reasonable

7   estimate of the loss."  U.S.S.G. § 2B 1.1, cmt. n. 2(C) (Nov. 2002).  The court's estimate of monetary

8   loss can be based on "[t]he approximate number of victims multiplied by the average loss to each

9   victim" or "[m]ore general factors, such as the scope and duration of the offense and revenues generated

10  by similar operations."  United States v. Showalter, 569 F.3d 1150, 1161 (9th Cir. 2009) (citing U.S.S.G.

11  § 2B1.1, cmt. n. 3(C)(iii) & (v)).  Thus, a district court has a number of permissible methods for

12  determining monetary loss, and "need not make its loss calculation with absolute precision."  Zolp, 479

13  F.3d at 719.

14         Here, in calculating "actual loss" and "gain," it cannot be reasonably disputed that Su is

15  responsible for over $5.6 million.  (Exh. 651-2.)  SA Mackey's financial analysis confirmed Su's

16  opening bank account balances and traced the flow of fraud proceeds into, out of, and among the

17  accounts over time.  (Exh. 650.)  His $5.6 million conclusion was conservative.  He gave Su the benefit

18  of the doubt over nearly $400,000 of additional income that he could not directly trace to a particular F-

19  1 student, despite Su's admissions to him that all her income came from TVU.  (Exh. 651-3) (showing

20  total deposit amount into Su's accounts of over $5.9 million.)  Because the Court can calculate the $5.6

21  million of actual loss, and gain, with certainty, it should use that amount for purposes of Su's guideline

22  calculation.

23         Although "intended loss" is somewhat speculative, Su's admissions from her tort claim against

24  DHS confirm that she intended to make much more from her operation of TVU:  "The University grows

25  within 3 years into close to 20 million incomes [sic] yearly.  With the business model, in Summer 2011,

26  the student body is expected to double or triple, more than 20 million income expecting [sic] this year."

27  (Exh. 800-4.)  Accordingly, had Su been able to run TVU without law enforcement intervention, she

28  would have inflicted millions more in victim losses.

### 2. Su Used Sophisticated Means to Carry Out Her Scheme

The United States and the USPO agree that Su utilized sophisticated means to execute her scheme, thereby qualifying her for an additional 2-level increase pursuant to U.S.S.G. §2B1.1(b)(10)(C).

The guidelines define "sophisticated means" as "especially complex or especially intricate conduct pertaining to the execution or concealment of an offense." U.S. S.G. §2B1.1(b)(9)(C), n. 8 (B). The 2-level increase for sophisticated means does not require the defendant to be responsible for designing the "sophisticated means" of the scheme, only that she engaged in a scheme involving such means. See United States v. Tanke, 743 F.3d 1296, 1307 (9th Cir. 2014) (affirming district court application of sophisticated means where defendant showed high level of planning, created six false invoices, and falsified carbon copies of checks); United States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam) (affirming the application of sophisticated means because, among other things, the defendant "fabricated numerous documents" and "the complicated and fabricated paper trail made discovery of his fraud difficult). Sophisticated means must be something more than a usual fraud offense. See United States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013).

Here, Su's scheme went far beyond the usual fraud offense. Su's multistaged scheme required a high level of planning that included layers of lies to DHS in order to obtain SEVP approval; the forgery of two articulation agreements using a photoshop-type program; the aid of family members to forge I-17 documents as DSOs; the assistance of her sister-in-law to pose as a DSO during SEVP's site visit; the creation and preservation of a facade of a legitimate university, to include the use of a website, course catalogue, and bogus instructors; the use of specialized knowledge in the area of student visas that she used to legitimize her deportation threats; the daily entry of false information into SEVIS to create the appearance that TVU and its students were complying with visa regulations; the creation and issuance of bogus school schedules and transcripts; the marketing of Su's own academic credentials as President of the school; and the use of multiple bank accounts at different financial institutions through which she funneled fraud proceeds. In summary, Su was continuously orchestrating diverse facets of her scheme to keep it all going.

1    Su's elaborate scheming also made her crimes difficult to detect.  But for one student's

2    complaint to DHS, the scheme may have continued for a significantly longer duration.  Because Su's

3    scheme went far beyond the usual fraud offense, this Court should apply the 2-level increase for

4    sophisticated means pursuant to U.S.S.G. §2B1.1(b)(10)(C).

5              **3.      Su Was An Organizer/Leader of Extensive Criminal Activity**

6         The United States and the USPO further agree that Su acted as an organizer or leader for each

7    count of conviction, thereby qualifying her for a four-level adjustment pursuant to U.S.S.G. §3B1.1(a).

8         Section 3B1.1 of the guidelines provides for a four-level adjustment for aggravating role "[i]f the

9    defendant was an organizer of leader of a criminal activity that involved five or more participants or was

10   otherwise extensive."  In applying the adjustment, the court should consider "the exercise of decision

11   making authority, the nature of participation in the commission of the offense, the recruitment of

12   accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in

13   planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control

14   and authority exercised over others."  See id., cmt. n. 4.

15        The record is full of compelling examples of Su's leadership role.  Su was the self-proclaimed

16   Founder and President of TVU.  (Exh. 1-017.)  Once created, Su exclusively controlled TVU's proceeds

17   and directed over $5.9 million into accounts she controlled.  (Exh. 650-651.)  At no time did anyone else

18   exercise control over TVU's income or expenditures.  Su also exercised exclusive decision-making

19   authority at TVU.  She recruited accomplices and controlled the payroll and payment of recruiting

20   bonuses.  As TVU's leader, Su recruited three members of ABS to assist her in increasing enrollment.

21   And, to further ABS's efforts, Su used her authority as TVU's President to create and maintain

22   immigration status for ABS's members.

23        Su also exercised control by making hiring decisions of office staff, including Dasa, Dirisanala,

24   Tambe, Ignatius, and Kundur, to input fraudulent data into SEVIS or create bogus school records.

25   Because SEVIS access was vital to her control of the scheme, Su limited who had access to it and

26   controlled which student-employees could print I-20s.  Multiple witnesses testified that before Su

27   distributed SEVIS laptops to office workers she would first login using the password of one TVU's

28   approved DSOs.  In turn, all subsequently printed I-20s came to Su for approval and signature before

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                  14

1   issuance.  By controlling the immigration status of her subordinates Su was able to project a higher

2   degree of authority than most fraud scheme leaders.  For each of these reasons the Court should find that

3   Su qualifies for this adjustment.

4               **4.      Su Attempted to Obstruct Justice Before and During Trial**

5           The United States and the USPO also agree that Su qualifies for the two-level adjustment for

6   obstruction of justice pursuant to U.S.S.G. §3C1.1 arising from her conduct immediately before and

7   during trial.

8           Section 3C1.1 provides that the adjustment applies where the defendant's obstructive conduct

9   occurred with respect to the investigation, prosecution, or sentencing in the instant offense.  See id., n. 1.

10  Qualifying "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness .... [and

11  it] is not subject to precise definition."  See id., cmt. n. 3.  As a result, the commentary provides "a non-

12  exhaustive list of examples" to "assist the court in determining whether application of this enhancement

13  is warranted in a particular case."  Id., cmt. nn. 3 & 4.  Those examples include "threatening,

14  intimidating, or otherwise unlawfully influencing a [ ] witness [ ] directly or indirectly, or attempting to

15  do so.  Id.

16          As noted in the PSR, Su made multiple attempts to intimidate and influence the testimony of

17  government witnesses by sending emails using fictitious names from bogus email accounts.  The United

18  States reported Su's conduct to the Court during trial and provided notice of its intent to seek the

19  obstruction adjustment at sentencing based on her emails, which are set out more fully below. (TR 349-

20  55.)

21          On February 25, 2014, less than one week before trial, Su emailed cooperating witness Dasa

22  under the name of "Dacey Dale" at "dacey2012@yahoo.com."  Su threatened Dasa that the United

23  States would arrest him in court if he admitted to being out of immigration status:

24                  We have your class attendance record, and will prove ur legal status in
                    court Do not be intimated by the gov and lied. Look at what they did to
25                  Anji Reddy, they used him as a decoy, and right after they arrest him. only
                    if we can prove your legal status, all you did was just administrative
26                  mistakes, not a big deal. that you can stay in US and reduce the
                    sentence..do not be afraid to tell all the truth .. [sic]

27

28

1 (Rhyne Decl., Exh. 1, Witness Email #1.)  Su attached multiple emails and school record screenshots

2 with her version of the facts embedded therein.

3       The next day, Su wrote to Syed Ahmed, another witness identified on the government's witness

4 list.  Su provided Ahmed a summary-like script for his testimony telling him among other things, that he

5 "earned two grades in Spring 2010," that he "also audited and studied three more TVU course [sic] in

6 the Summer, that "he never requested a transfer out," that the "President has made it mandatory to all

7 TVU students to attend class meeting [sic]," that he "did attend lots of classes," and that his "transcript

8 is just a record to keep what course you took each term."  (Id., Exh. 1, Witness Email #2.)  Su's emails

9 continued days later.

10      Two days before trial, she again emailed Dasa as "Dacey Dale" this time attaching TVU records

11 and warning him about trial questions pertaining to the fictitious students that Su enrolled at TVU during

12 HSI's ruses.  (Id., Exh. 1, Witness Email #3.)  Su encouraged Dasa to state that he only "contingently

13 admitted" the fictitious students and that they intended to collect the rest of their application at a later

14 date.  (Id.)  Su provided more information for Dasa about the fictitious students: "They were admitted

15 late in Summer, they have one more term to complete their study and earn a grade. They are in the

16 process of studying. You did the right thing, except for a couple of typos. Need to tell truth here!"  (Id.)

17      The following day, while posing as "Dacey Dale," Su emailed testifying government witness Dr.

18 Shy-Shenq Liou.  (Id., Exh. 1, Witness Email #4.)  Su provided Dr. Liou with her version of the

19 "[c]omplete truth on TVU's I-17 petition . . ." and attached over 100 pages of attachments summarizing

20 Su's opinions of the evidence.  (Id.)  The attachments included trial exhibits, emails, TVU records,

21 testimony summaries of witnesses, and written issue summaries pertaining to the case.  (Id.)  In the

22 attachment entitled "TVU I-17.pdf," Su lied about the authenticity of TVU's articulation agreements and

23 wrote, "[a]ll of these three documents are all with original signatures."  (Id., at Tab: TVU I-17.pdf.)   In

24 the attachment entitled "Gov-Mistakes.pdf," Su told Dr. Liou about the problems in the government's

25 case.  (Id., at Tab: Gov-Mistakes.pdf.)   Therein, she accused SA Jason Mackey of committing perjury

26 during the grand jury investigation, among other unsupported contentions.  (Id.)

27

28

On March 3, after the first day of trial, Su again emailed Dr. Liou this time posing as "Josephie Jo" using another bogus email account.  (Id., Exh. 1, Witness Email #5.)  Su attached voluminous documents including emails, school records, and I-17 excerpts with embedded commentary.  (Id.)

On March 4, after the second day of trial, Su emailed Amy Guo, identified on the government's witness list as someone whose name appeared in TVU's catalogue without her permission.  Again posing as "Dacey Dale," Su emailed Guo with a proposed explanation as to how her name came to be used in TVU's instructor listing: "Research Faculty are normally manger and directors at industry and do not need to teach classes. [sic] only to supervise graduate student dissertation."  (Id., Exh. 1, Witness Email #6.)

Because Su used aliases and bogus email accounts in an attempt to intimidate and influence the testimony of multiple government witnesses, the Court should apply the 2-level adjustment for obstruction.

### 5.    Su's Total Offense Level is the Same Under §3D1.2(b) and (d)

The United States and the USPO agree that Su's total offense level is 40, but disagree on the grouping methodology under §3D1.2.  The USPO finds two groups pursuant to §3D1.2(b) (grouping counts that involve the same victim and two or more acts connected by a common criminal objective, scheme, or plan); while the United States finds two groups pursuant to §3D1.2(d) (grouping counts where offense levels are determined on the basis of loss or quantity, or where behavior is ongoing or continuous in nature.)

The United States contends that its grouping methodology under §3D1.2(d) is more applicable on this record.  Recognizing that subsection (d) "likely will be used with the greatest frequency," the Application Notes specify that § 3D1.2(d) should apply where the crimes' guidelines are based on loss, harm, or quantity or otherwise contemplate continuing behavior.  Id., cmt. n. 6.

Here, each of Su's offenses in the United States' Group 1 is calculated based on some type of aggregation resulting from continuing criminal behavior.  Her mail/wire fraud offenses are based on loss amount (§2B1.1); visa fraud/conspiracy offenses based on number of documents (§2L2.1), alien harboring offenses based on number of aliens (§2L1.1), false statement/document offenses based on amount of harm (§2B1.1), and money laundering offenses based on underlying loss amount (§2B1.1).

1  Furthermore, each of these Group 1 offenses are specifically enumerated in §3D1.2(d) as offenses to be

2  grouped.  See id.

3          In contrast, only Su's conviction for unauthorized access of a government computer (§2B2.3)

4  stands alone in Group 2.  Its placement in Group 2 is proper because it is the only guideline provision at

5  issue not based on some form of aggregation and not enumerated in §3D1.2(d).  As such, it should not

6  be grouped with the remaining counts of conviction.

7          For these reasons, the Court should adopt the United States' grouping methodology pursuant to

8  §3D1.2(d) and find Su's total offense level at 40.

9          **B.      The Section 3553(a) Factors Support a Sentence of 292 Months' Imprisonment**

10         The current record offers no reasonable justification for a variance below the low-end of the

11 guidelines.  The recommended 292 months' of imprisonment fairly holds Su responsible for her criminal

12 conduct.

13                 **1.      Nature and Circumstances of the Offense and Characteristics of the
                             Defendant**
14
                          **a.      Nature and Circumstances of the Offense**
15

16         The nature and circumstances of the offense counsel in favor of a 292-month term of

17 imprisonment.  Su lied in furtherance of her fraud scheme at every turn, from her creation and

18 submission to SEVP of the fraudulent I-17 and her manufactured articulation agreements, to her lies to

19 DHS officers posing as immigration officials and site inspectors, to her lies to students that the school

20 would begin classes soon, to her lies to HSI agents when they interviewed her.

21         These lies were about exploiting others for her own benefit.  When Dr. Liou had generously

22 offered to assist Su in starting a legitimate educational institution, she chose to betray him by forging his

23 signature on a bogus articulation agreement.  She exploited student-employees to create and print I-20s

24 because, as she told SA Mackey, it would have been too expensive to hire a full-time DSO at a $50,000

25 salary.  (TR 625.)  She locked her employees in, requiring them to work exceptionally long days for

26 very little pay – which she paid by deducting it from their tuition.  She refused to let students she

27 ensnared transfer out of TVU unless they paid three semesters' tuition.

28         The evidence was that Su created and operated TVU with a single purpose – to make her rich.

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                         18

1   She showed no signs of stopping or changing TVU's business practices.  Financial analysis and her own

2   admissions prove that TVU's revenue was increasing each year.  And, as noted above, in her tort claim,

3   Su anticipated receiving close to $20 million per year from TVU at the time DHS executed the search

4   warrants.  She even sold TVU transcripts and diplomas.  (Exh. 305; TR 660, Exh. 307; TR 654, Exh.

5   309 at TR 658, Exh. 311 at TR 756.)  From its inception to its closure, the record proves that Su never

6   intended to lawfully operate TVU, and that every dollar of TVU's proceeds went to Su's exclusive

7   benefit.

8        Aside from the well-documented financial losses to her fraud victims, Su caused additional non-

9   economic harm.  Su victimized family members, colleagues, and strangers through her creation and

10  operation of TVU.  As a result of her conduct, Su implicated her brother and Dr. Liou based on their

11  signatures appearing on the bogus articulation agreements.  Su also implicated a long list of purported

12  TVU instructors.  Su used the names and credentials of these industry experts – some colleagues and

13  some strangers – to make TVU appear legitimate. TVU's fraudulent catalogue claimed that these

14  purported instructors were receiving salaries from TVU.  When HSI confirmed the classes did not exist

15  it conducted interviews with the purported instructors to learn their involvement, if any, with TVU.

16  After confirming they had no association with TVU, many of the purported instructors were upset to

17  have their names and reputations associated with TVU.

18       For these reasons, 292 months is an appropriate term of imprisonment.

19                    **b.      Characteristics of the Defendant**

20       Su's background and characteristics also support the recommended sentence.  She appears to

21  have grown up in an extremely supportive family with every advantage.  She is highly educated, with

22  Masters and PhD degrees and an undergraduate degree from what she reports to be the best university in

23  China.  She had a steady work history and was gainfully employed before embarking on this fraud

24  scheme.

25       The only mitigating circumstances she presents are a purported history of mental and emotional

26  issues.  There is no evidence, however, that these issues caused her to commit her crimes.  Nor did they

27  apparently hinder her efforts to carry out her scheme with ruthless efficiency as she generated over $5.6

28  million.

1    Consistent with her intelligence and penchant for fraud, Su also appears to be faking at least

2    some of her mental health problems.  Her retained mental health expert noted that Su's "responses fell in

3    the range of scores for individuals who are likely to be malingering. . . .  [She] appeared to be

4    exaggerating or feigning some symptoms of psychosis and mood on this test."  (Rpt. at 6.)  Indeed, Dr.

5    Gregory observed that Su appeared to be claiming schizophrenia because she read that such a diagnosis

6    may help her get her convictions reversed.  Even if Su's mental health may have contributed to her

7    impulsiveness, the expert nonetheless determined that it does not appear that "her behavior was driven

8    by mental illness throughout the process." (Rpt. at 12.)

9                    **2.    Need to Reflect the Seriousness of the Offenses**

10    The economic harm does not fully reflect the seriousness of Su's offenses.  Su's student victims

11    not only suffered $5.6 million in economic losses; they also suffered from the opportunity cost of

12    choosing to attend TVU.  None of TVU's students received the benefit of what Su promised them.

13    Therefore, each of TVU's students lost out on available alternatives of attending another U.S. school

14    during the duration of their visas, of attending a school in their home country, or of working at paying

15    job.  Su's acts of lulling the students with promises of future classes, along with her threats of

16    deportation for transfer requests, all contributed to more lost semesters of education and time.  As a

17    result, most of TVU's student body wasted countless semesters that could have been spent more

18    productively elsewhere.

19    Also compelling is that Su fails to see the seriousness of her conduct.  She has completely failed

20    to express any degree of remorse.  Her defense at trial was essentially that she tried her best but fell

21    short because the regulations were confusing.  Still post-trial, as reported in the PSR, she couches her

22    conduct more like negligence:  "I was always trying to learn the law, but my mind is a huge mess, and

23    was not good enough to identify what I can and cannot do.  I am sorry for causing such a big mess."

24    There is no question that Su knew it was wrong to lie, cheat, and steal from vulnerable non-

25    immigrant students whom she had lured to TVU with false promises of a real education, and that it was

26    wrong to forge signatures, create false documents and records, and lie to federal officers.  Su's failure to

27    accept responsibility for her obvious criminal conduct coupled with resulting negative externalities that

28    go beyond the economic harm all support a guideline-based sentence of 292 months.

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    20

### 3.     Deterrence of Criminal Conduct

The need to deter future criminal conduct is also a compelling sentencing factor in this case. Her criminal conduct – whether lying, forging, stealing, laundering, or concealing – occurred on a daily basis for nearly two years.  More concerning is that following SEVP's closure of TVU and HSI's search warrants, Su was undeterred.  Shortly thereafter, she took steps to solicit donations and open a new for-profit school, Global TVU.  Su's relentless efforts to re-open TVU, together with her greed and apparent lack of remorse, raise credible concerns about her future intent to run a similar scheme.  A lengthy sentence is necessary for specific deterrence.

From the standpoint of general deterrence, this case provides an opportunity to demonstrate that white collar criminals are similarly sentenced in accordance with the guidelines.

### 4.     Need to Protect the Public

This sentencing factor is closely related to specific deterrence.  A sentence of 292 months would prevent Su from targeting and defrauding additional vulnerable victims with the same or similar schemes.

### 5.     Avoiding Sentencing Disparities

For the same reasons noted above, Su should be held to the same guideline-based consequences as other criminals, namely 292 months' imprisonment.  This sentence will hold Su similarly accountable and will reflect the true gravity of her greed and criminal conduct.

### C.     Full Restitution to the Victims is Mandatory

The Mandatory Victims Restitution Act (MVRA) requires courts to order restitution to victims who have suffered pecuniary loss as a result of certain criminal offenses, such as mail fraud, wire fraud, and visa fraud.  See 18 U.S.C. § 3663A(c).  The "purpose of restitution" under the MVRA, however, is not to punish the defendant, but to "make the victim[ ] whole" again by restoring to him or her the value of the losses suffered as a result of the defendant's crime.  United States v. Crandall, 525 F.3d 907, 916 (9th Cir. 2008) (quoting United States v. Gordon, 393 F.3d 1044, 1052 n. 6 (9th Cir. 2004)).  The statute defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ."  18 U.S.C. § 3663A(a)(2).   Although the amount of loss for purposes of the guidelines may be higher, the amount for purposes of restitution "is limited to

1  the victim's actual losses." United States v. Bussell, 504 F.3d 956, 964 (9th Cir. 2007); see also

2  Crandall, 525 F.3d at 916. "[A]ctual loss for restitution purposes is determined by comparing what

3  actually happened with what would have happened if the defendant had acted lawfully." Bussell, 504

4  F.3d at 964 (quotations and brackets omitted).

5       Here, the primary financial victims are PayPal and Total Merchant Services (TMS). PayPal and

6  TMS provided financial services to TVU in the form of processing online and credit card payments,

7  respectively. TVU used these payment processing services to process approximately $2.4 million of

8  credit card payments and $2.9 million of online payments. (Exh. 651-2.) Accordingly, after TVU

9  closed its doors many students exercised their right to seek refunds from PayPal and TMS on grounds

10 that they did not receive the promised services they had purchased. Such requests are commonly called

11 "chargebacks," "buyer protection claims," or "bank reversals." PayPal and TMS honored their

12 customers' requests and refunded a total of $595,111.00 and $420,684.64, respectively. PayPal's claim

13 would have been higher, however they were unable to confirm their losses as to some of the older TVU

14 student chargeback claims.

15      Because PayPal and TMS have suffered pecuniary losses as a result of Su's offenses, the Court

16 should order restitution accordingly.

17      **D.    An Order of Forfeiture is Also Mandatory**

18      For the reasons stated in its Application for a Preliminary Order of Forfeiture, the United States

19 respectfully requests this Court to enter a preliminary order of forfeiture in an amount not less than $5.6

20 million. (Dkt. 129.)

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    22

1

**CONCLUSION**

2          For the above reasons, the United States requests the Court to sentence Su to: (1) serve 292

3    months of imprisonment; (2) serve five years of supervised release; (3) pay restitution to the victims of

4    her fraud scheme; (4) be subject to a preliminary order of forfeiture in an amount not less than

5    $5,601844.72; and (5) pay a $3,100 special assessment.

6

7    DATED: October 24, 2014                                         Respectfully submitted,

8                                                                    MELINDA HAAG
                                                                     United States Attorney
9

10

11                                                                   HARTLEY M. K. WEST
                                                                     WADE M. RHYNE
12                                                                   Assistant United States Attorneys

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28