Pages 1 - 89

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  vs.                          )   NO. CR 11-288 JST
                               )
SUSAN XIAO-PING SU,            )
                               )   San Francisco, California
          Defendant.           )   Friday
                               )   October 31, 2014
_____)   9:47 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          MELINDA L. HAAG
                        United States Attorney
                        1301 Clay Street
                        Suite 340S
                        Oakland, California  94612
                BY:  WADE RHYNE
                     DAVID COUNTRYMAN
                     HARTLEY WEST
                     Assistant United States Attorneys


For Defendant:          LAW OFFICE OF JOHN J. JORDAN
                        400 Montgomery Street
                        Suite 200
                        San Francisco, California  94104
                BY:  JOHN JORDAN, ESQ.



Also Present:           JESSICA GOLDSBERRY, U.S. Probation


Reported by BELLE BALL, CSR 8785, CRR, RDR
          Official Reporter, U.S. District Court

| | |
|---|---|
| 1 | **FRIDAY, OCTOBER 31, 2014**                    **9:47 A.M.** |
| 2 | P R O C E E D I N G S |
| 3 | **THE CLERK:**  Calling Criminal Case 11-288, United |
| 4 | States of America versus Susan Xiao-Ping Su.  Counsel, will |
| 5 | you please make your appearances for the Record. |
| 6 | **MR. RHYNE:**  Good morning, Your Honor.  Wade Rhyne, |
| 7 | Hartley West and David Countryman for the United States. |
| 8 | **MS. WEST:**  Good morning. |
| 9 | **THE COURT:**  Good morning. |
| 10 | **MR. JORDAN:**  Good morning, Your Honor.  John Jordan |
| 11 | on behalf of my client, Dr. Susan Su. |
| 12 | Your Honor, with your permission, may she sit at the |
| 13 | counsel table during the arguments? |
| 14 | **THE COURT:**  Yes. |
| 15 | **MR. JORDAN:**  Thank you. |
| 16 | **PROBATION OFFICER GOLDSBERRY:**  Good morning, Your |
| 17 | Honor.  Jessica Goldsberry for the Probation Office. |
| 18 | **THE COURT:**  Good morning. |
| 19 | This morning we have several matters on calendar.  The |
| 20 | Defendant has filed a Rule 29 motion and a Rule 33 motion. |
| 21 | Those need to be heard.  If those motions are denied, then |
| 22 | this morning also is set for Dr. Su's sentencing. |
| 23 | And so I'll talk for -- in just a moment about time |
| 24 | management to make sure we are able to give all these very |
| 25 | important matters the time that they deserve and require. |

1    But before I did that, I just wanted to say that I'm sure

2    that there are people here in the audience who are family

3    members of Dr. Su and supporters of Dr. Su, and perhaps you

4    will take the opportunity to come to the microphone and

5    address the Court.  And if you do that, I'll hear from you

6    then.  Perhaps there are victims of the offense here, too.  I

7    don't know.

8    Perhaps you will take that opportunity.  But if you don't,

9    I just want you to know that I appreciate you coming here.

10    Even when I don't hear from the victims of an offense directly

11    or I don't hear from family members or supporters directly, I

12    welcome your attendance here.  And I know that the government

13    and the Defendant also are glad that you're here.  And so, I

14    wanted to just welcome you this morning.

15    My suggestion, unless Counsel have a different one, is

16    that we set aside a certain amount of time for argument on

17    these motions at the beginning, and then proceed to

18    sentencing.  And that we do it that way to make sure that if

19    there's to be a sentencing in this case, that adequate time is

20    allocated to it.  I think that is likely to be the most of

21    complicated part of the proceedings this morning.

22    And my suggestion would be that we allow a maximum of an

23    hour for argument on these motions with 15 minutes for each

24    side of both of the two motions.  You don't have to use all

25    your time.  If you don't, the other side won't use it.  That

 1  will just be more time that we have for our sentencing.

 2       How does that sound?

 3            **MR. RHYNE:**  Very good, Your Honor.

 4            **MR. JORDAN:**  Sounds very reasonable, Your Honor.

 5            **THE COURT:**  All right, then let's proceed on that

 6  basis.

 7       What I would like to do is to first address the Rule 29

 8  motion and then the Rule 33 motion.

 9       And the Rule 29 motion -- and I should tell the parties

10  that I have read everything that both sides have filed in

11  connection with all three of these matters very carefully and

12  to those of you in the audience who submitted letters on

13  behalf of Dr. Su, I read those also.

14       But I don't think that we have enough time to go through

15  each and every item in the Rule 29 motion.  You should address

16  the parts that you think are most important to you.  I.

17       Will tell you that from the Court's perspective the

18  knottiest parts of the motion were the factual-impossibility

19  portion, with regard to Counts 5 through 12 and 16 through 19.

20  Although, I'll tell you I see 5 through 12 and 16 through 19

21  in very different lights.

22       But, anyway.  That issue, and then the concealment --

23  Concealing, Harboring or Shielding from Detection count --

24  counts for violations of 18 United States Code Section 1324.

25  As to those matters, I think that as to Counts 5 through 12 --

1   the Defendant actually has a pretty good factual-impossibility

2   argument.  Factual impossibility is not a defense to inchoate

3   crimes like conspiracy or attempt.  And had the crimes been

4   charged that way, factual impossibility would not be

5   available.

6       But and I think it is -- I can fairly say that I read

7   every Ninth Circuit case in which the phrase "factual

8   impossibility" -- every criminal case in which "factual

9   impossibility," that phrase, appears.  At least for the

10  purposes of determining -- at least enough of it that it would

11  help me decide the issue this morning.

12      I did read the government's -- the one case the government

13  cites, *United States versus Lane*.  And I recognize that these

14  remarks -- that I'm going on at some length, but because I

15  thought that these issues were the hardest, I thought it would

16  be helpful to provide the parties with the equivalent of a

17  tentative ruling.

18      The government cites *Lane* for the proposition that each of

19  the wires charged in these counts was part of the execution of

20  the scheme, and that the wire itself does not need to have

21  deprived anyone of money or property, citing *United States*

22  *versus Lane*, 474 U.S. 438, at 453.

23      It's true, *Lane* holds that.  But, *Lane* is not a

24  factual-impossibility case.  In *Lane*, the Defendant committed

25  mail fraud in connection with his arson of one of his own

1    buildings and his subsequent claim to his insurance company.

2        Secondly, in *Lane*, there was a victim.  It was Lane's

3    insurance company.  And the issue in that case was whether the

4    letters that Lane sent to the insurance company after they had

5    already paid him could be counted against him for mail fraud

6    purposes.  And the Court held that they could because the

7    letters had a lulling effect on the insurance company that

8    made it more likely that Lane could keep the proceeds that he

9    had already received.

10       So, I wish there were more case-law guidance on factual

11   impossibility.  Frankly, there isn't a lot.  But I do think

12   that the Defendant has shown that, unknown to her, the

13   consummation of the intended criminal act is physically

14   impossible.

15       I'm taking that definition from *United States versus*

16   *McCormick*.  72 F.3d, 1404 at 1408.

17       But I think that analysis only applies to Counts 5 through

18   12.  Counts 16 through 19, as to which the Defendant also

19   asserts this defense, charge visa fraud.  In visa fraud, the

20   victims of that crime are not the non-existent fake students,

21   but the United States.  And the fact that Dr. Su used fake

22   names in her visa application doesn't prevent the claim from

23   being committed; it just makes the applications more

24   fraudulent.

25       So, that is how the Court at the moment is likely to rule

1  with regard to that issue.

2      With regard to harboring an alien, for reasons I could go

3  into in more detail, I don't think that the government has

4  shown concealing and harboring.  But I do think they have

5  shown shielding from detection.

6      And, I thought the government did a very good job in its

7  brief of reciting all of the many things that Dr. Su did:

8  Enrolling these fake students in classes that didn't exist,

9  showing bogus grades in transcripts and on and on and on.  And

10  certainly, viewing that evidence favorably to the government,

11  I think the evidence was more than sufficient to show that

12  Dr. Su engaged in conduct tending to: directly or

13  substantially facilitate an alien's remaining in the United

14  States unlawfully with the intent to prevent detection from

15  the immigration authorities." Which was the definition in

16  *United States versus Aguilar*, 883 F.2d, 662.

17      The other basis for the Defendant's motion with regard to

18  those counts is that Messrs. DASA, D-A-S-A, and DIRISANALA,

19  D-I-R-I-S-A-N-A-L-A, were not illegal aliens for the purposes

20  of this statute.  I've not been able to find a case that

21  addresses that issue in the context of a harboring allegation,

22  but I think the government's citation to the Tenth Circuit

23  case *United States versus Atandi*, A-T-A-N-D-I, is persuasive

24  on this point.

25      And, I think that these non-immigrant F1 student aliens

1  were failing to comply with immigration regulations; they were

2  out of status; they were unlawfully in the United States.  So,

3  I think the government has satisfied that element.

4      So, I would deny the Rule 29 as to the remainder of the

5  counts in the case.  I would grant it tentatively as to Counts

6  5 through 12.  That would be the Court's tentative ruling.

7      Mr. Jordan.

8      **MR. JORDAN:**  Yes, Your Honor.  Of course, I

9  appreciate all Your Honor's comments, and just briefly, in one

10 or two sentences, would submit to the Court that we do ask

11 that you grant them as to all counts that Dr. Su believes the

12 evidence is insufficient of those.  And we would object to any

13 rulings contrary to that.

14     Getting to Your Honor's comments, I appreciate the

15 guidance for Counts 5 through 12.  Of course I'm in agreement

16 with the Court.  Those are legitimate law-enforcement

17 techniques to gather evidence.  But the way they're charged,

18 they simply don't fit that statute.

19     Like Your Honor, I'm sure -- I searched through Lexis for

20 every factual-impossibility case in Ninth Circuit and others,

21 and there were few, but this does seem to fit squarely within

22 those few cases.

23     It's simply not part of the scheme to defraud.  It can't

24 be a lulling technique or something to keep the government

25 from finding out about the scheme to defraud, because the

1    government is actually using this as an investigative

2    technique to build a case.

3         The evidence is relevant to the scheme to defraud in the

4    other counts.  But it doesn't make out these counts.  There's

5    no victim; it was factually impossible for her to commit wire

6    fraud for these victims.  It's never going to get -- any

7    furtherance of her scheme with these four.

8         I'll switch to the counts for the visa fraud, 16 through

9    19, which I see, of course, are different.  The U.S. is a

10   victim.  My point on that was:  Although there were

11   immigration forms -- if you want to call them that --

12   generated, the government knew these forms were invalid from

13   the get-go, because they're generated for aliens that don't

14   exist.

15        So the documents, themselves, although they might say

16   "I-17" on top of them, or they might be generated by Dr. Su at

17   the school, they're not legitimate, not real immigration

18   documents, because persons they are being given to, the United

19   States government, knows before receiving them that they are

20   invalid.  That they are for fictitious people.

21        So, that's my point on the other four counts.

22             **THE COURT:**  Well, that just makes it unlikely.

23   Factual impossibility is a very high bar.  This is a Rule 29

24   motion.  The Court has to view the evidence in the light most

25   favorable to the government.

1    And, I hear what you're saying about the visa fraud

2    counts, and I considered that point.  And I continue to

3    consider it.  But, it depends on the absolute inevitability of

4    certain things taking place after the -- after the forms are

5    submitted.

6        And obviously, we would expect Agent Mackey to pick up the

7    phone and say, "Hey, by the way, you probably don't want to

8    issue those visas."  But it's not factually impossible.

9        That's the defense, right?

10        **MR. JORDAN:**  It is, Your Honor.  And it is

11   interesting, it goes really back to my first year of law

12   school with a professor there talking about if you're playing

13   chess, it's fine.  If two people change the rules and are

14   cheating, and they agree to play, are they still playing

15   chess?  Or have they invented a new game?

16        And that is what I think happened here.  My simple point

17   in one sentence is:  It's impossible for the government to

18   prove that Dr. Su committed visa fraud for these four counts

19   because the government can't be defrauded.  They know these

20   four people are not immigrants.  So it's going to be

21   impossible for them to be defrauded.  That's my point.

22        **THE COURT:**  The point is well argued.

23        **MR. JORDAN:**  Thank you, Your Honor.

24        Switching to the harboring.

25        **THE COURT:**  Yes.

1          **MR. JORDAN:**  Well, I disagree.  I think the defense

2    has proven under the case law that the two named victims are

3    simply not here illegally under the statute.

4          They might be potentially out of status, but at the time

5    charged in the indictment, I look at it this way:  If they

6    were pulled over by an immigration officer, and he said, "What

7    is your status here" and they told him they were at the school

8    and they showed him their paperwork, that would be valid in

9    the system.  They're just --

10         **THE COURT:**  Here is the difficulty I have with that

11   argument.  And again, I thought the point was exceedingly well

12   made in the papers, and very well argued by you.  And that is

13   why it's one of the items that I wanted to address at our

14   hearing this morning.

15         But the only thing in the Court's mind that gives these

16   two individuals the superficial patina of lawful status is

17   that Dr. Su was given the power by the United States

18   government to get access to the SEVIS system, and so, let's

19   use as an example the family in *Dann*, I think the case is

20   *Dann*, D-A-N-N, where you have an illegal nanny working in a

21   house.

22         What if the husband and wife in that house had the power

23   to somehow use their computers to submit forms to the

24   government that would all of a sudden make their housekeeper

25   lawful?

1      The only thing that gave these two individuals this

2   superficial gloss of lawful status was Dr. Su's underlying

3   illegal conduct.

4      Now, is there another case in which that's not the way

5   someone got their lawful status in which this *Atandi* analysis

6   might not apply?  Perhaps.  The Court's analysis is limited to

7   the facts here.  But that's what gave me the most difficulty

8   in going your way.

9          **MR. JORDAN:**  Your Honor, if I might address a couple

10   of points.  One, in the situation hypothetically you just came

11   up with, that seems wrong what they did, and it is wrong.  But

12   it is visa fraud.  That is the crime that you would be

13   committing.  There were other facts in that case which you

14   argue are not present here that also show harboring.

15      My second rebuttal would be:  If you imagine these two

16   named victims in the two counts, if one of them was arrested

17   for having a gun then, he would have a defense under the cases

18   I cited -- *Salman,* *Hernandez* and *Brissett* -- to being an

19   illegal alien with a gun.  He would say "No, I'm not out of

20   status."

21      "Well, but the school's a fraud and we're going to prove

22   that."

23      "Yes, but right, now I'm not out of status.  You can't

24   prove this charge against me."

25      I think under those cases, he would prevail.  And again,

1    as I said in the brief, we have *Arizona versus United States*

2    where the Supreme Court has said it's generally not a crime

3    for -- for a removable alien to remain in the United States.

4        I saw the cases cited by the government, and I (Inaudible)

5    in my reply brief.

6        In all those cases, there had already been steps taken by

7    the U.S. government to place those individuals out of status.

8    Removal proceedings were started; orders to show cause were

9    issued.  Here, there's nothing against these two individuals

10   to in any way show that they are illegal aliens.

11       Finally, one brief point which occurred to me last night:

12   On the harboring count, we can't forget that Dr. Su did notify

13   the government through SEVIS where these people were, that

14   they're students at the school, which cuts against harboring

15   them or secreting them.

16       I also think the government has to prove that she was

17   doing that to hide them from an imminent ICE raid, you know,

18   enforcement action by the Homeland Security.  And here there's

19   just no showing on that.

20       I would submit my points on those grounds.

21           **THE COURT:**  Thank you.

22       Mr. Rhyne?

23           **MR. RHYNE:**  Yes, Your Honor.  I'll obviously start by

24   addressing Counts 5 through 12.  And I think the best place to

25   start is really the only place I can start, is looking at the

1    elements of the offense that we have to prove in the case.

2        And, as we stated in our brief, there's no requirement for

3    wire fraud, mail fraud, or visa fraud, for that matter, that

4    there be an actual victim harmed as a result of the wire, the

5    underlying wire for each count.

6        **THE COURT:**  Well, there doesn't have to be harm.  But

7    your summary of the elements of the Court's jury instruction

8    elide over the phrase "a person."  I went back and checked the

9    jury instruction that I gave.  And that phrase appears in the

10   instruction, but not in your brief.  And what about that?

11       **MR. RHYNE:**  Well, I think the focus of the Court's

12   inquiry needs to be:  Is there a scheme to defraud?  From

13   there:  Is this wire sent in furtherance of that scheme to

14   defraud?

15       And I think the only way to answer that question on this

16   record is:  Yes.  It was a scheme conceived by her at the time

17   she sent these wires.  Even though these were not real

18   students, the scheme, as conceived by her, she sent these

19   wires in furtherance of that scheme.  And I think it's

20   important to start from that -- that first opening element.

21       **THE COURT:**  Isn't the scheme described in the

22   indictment as a scheme to defraud students out of their money?

23       **MR. RHYNE:**  (Nods head)

24       **THE COURT:**  I mean --

25       **MR. RHYNE:**  Yes.

1           **THE COURT:**  -- I'm using too few words.  But that's

2    the essence of it.

3           **MR. RHYNE:**  Yes.

4           **THE COURT:**  So, the scheme is described in the

5    indictment as a scheme to defraud students out of their money.

6    And then this -- so, so it's -- the focus in the government's

7    indictment is on the student in question.  And there may be

8    others.  Certainly, there were.  Thousands --

9           **MR. RHYNE:**  Very good.

10          **THE COURT:**  -- of other incidents of wire or mail

11   fraud that defrauded real people.

12          **MR. RHYNE:**  Here is the problem with that analysis:

13   That analysis would require for every wire that Dr. Su sends

14   to have some degree of success.  She has to strike gold with

15   every wire that she sends.  Somebody has to be harmed.

16       That's not the elements of the offense.  The offense is

17   that she has to send a wire in furtherance of a larger scheme.

18   The fact that we create an opportunity for her to send wires

19   in furtherance of her pre-existing scheme, we shouldn't be

20   penalized by saying, "Hey, those wires she sent didn't

21   actually harm anybody because we knew the score at the time

22   she sent them."

23       That would require basically every wire-fraud or

24   mail-fraud count that the government charges to be based on a

25   wire or a mailing that actually, for lack of a better term,

1    strikes gold (Indicating quotation marks).  That's successful,

2    that causes harm to a real person.  And that's not the

3    elements of the offense.  It's just not.

4         **THE COURT:**  So, I have tried as hard as I could to

5    survey the law on this point.  And go beyond the authorities

6    that were cited by the parties in their briefs.

7         There are -- the cases are legion that make the point that

8    in essence you don't reward the pick-pocketer by dismissing

9    the indictment just because the pocket he tried to pick was

10   empty.

11        So, there are cases in which the government will create a

12   fake victim for purposes of internet sex solicitation, or give

13   somebody drugs to sell that aren't really drugs.  That kind of

14   thing.  Those cases are generally charged as conspiracy or

15   attempt.

16        And if this had been charged that way, we wouldn't really

17   be having this discussion.  I mean, perhaps the Defendant

18   would assert that defense, but it wouldn't go anywhere.

19        And of course, with regard to the thousands of other --

20   it's not that she -- the Court is saying -- is not she has to

21   strike gold in the sense of there being harm in connection

22   with every wire.  She could send a wire or make a phone call

23   with regard to a real person, and not have it harm anybody.

24   The law is good for you on that point.

25        It's the not-a-real-person part, that's where I'm stuck.

1          **MR. RHYNE:**   And I understand the Court's analysis.

2    Again, I have to keep running back to the elements of the

3    offense.  And I feel like that analysis almost adds an element

4    that we need to prove in a wire fraud or a mail fraud type of

5    setting.

6          And I think if you look at it from a common-sense

7    standpoint of undercover operations or ruse operations, it's

8    going to be very difficult if the Court is going to impose

9    essentially a sixth or seventh element for mail or wire fraud.

10         Because again, she sent these wires in furtherance of a

11    preexisting scheme that she had created that was then ongoing.

12    And I just don't see how another element can be added to the

13    offense.

14         **THE COURT:**   This isn't the first undercover operation

15    that the United States has engaged in?

16         **MR. RHYNE:**   It is not.

17         **THE COURT:**   There are thousands of such operations in

18    the reported cases, right?

19         **MR. RHYNE:**   Yes.

20         **THE COURT:**   You and I can both feel confident that

21    there are several ongoing elsewhere in the United States, even

22    as we are conducting this hearing.

23         **MR. RHYNE:**   Certain of it.

24         **THE COURT:**   And yet, there is not a single reported

25    case in your favor.  Why is that?

1          MR. RHYNE:  Well, I think it's -- I don't know if

2    this has been raised.  I don't know if -- I don't think that

3    this argument has been successful before in this context.

4          THE COURT:  There isn't one in Mr. Jordan's favor

5    either, just so we don't -- I'm setting the table in a fair

6    way.

7          MR. RHYNE:  I think it's because the courts focus on

8    the elements of the offense.  And I don't think that that

9    element is there that requires us to use a real person.

10      With respect to attempt, I agree, she would be guilty of

11    attempt.  But just because she's guilty of attempt doesn't

12    mean she's not guilty of wire fraud.

13          THE COURT:  All right.

14          MR. RHYNE:  And then, I'll move to the alien

15    harboring.  Obviously, we agree with the Court's analysis on

16    the unlawful component of that offense.  She's hiding these

17    people in plain sight.

18      And the reason she's able to do it, as the Court noted, is

19    because she's making the entries in SEVIS, she's cutting these

20    false transcripts, she's creating the facade and the

21    perception that there is nothing to worry about, that these

22    people are complying with their immigration status.

23      I think that there is a big difference between, as what

24    the defense noted, that it's not in and of itself illegal to

25    be in the United States in an unlawful status.  I think that;

1    the case law says that.  But there's a difference between

2    being that person and shielding or hiding that person from

3    detection from the United States.

4        I also think there is a distinction that is made in the

5    case law between that person who may not be unlawfully in the

6    United States for purposes of 922 or 1324 like we have in the

7    case law, and in this case, and somebody that's actually going

8    through immigration proceedings.

9        We're not required to have the aliens that underlie our

10   counts here to actually have gone through some due process and

11   have a finding by an immigration judge that they are

12   unlawfully in the United States.  That would be -- that would

13   make it almost impossible to charge these crimes.

14       From a harboring standpoint or shielding standpoint, as we

15   noted, SEVIS transcripts, school record, repeated assurances

16   to multiple students that their immigration status was secure,

17   she's signing I-20s.  There was testimony in the record at

18   trial that she locked some of them in at one point.  She had

19   them paint houses, or at least had Anji Dirisinala paint her

20   house, and also move furniture.  So, I think there is ample

21   evidence in the record to support the 1324 counts.

22       And I believe I covered Your Honor's issues at that point,

23   unless you have more questions.

24           **THE COURT:**  I don't.  I think what I would like to do

25   is take argument with regard to the Rule 33 motion, and take a

```
 1   short break.  There's something I want to look at back in

 2   chambers.  And then I can come out and rule on those motions.

 3       So let's turn to the -- first of all, is the Rule 29

 4   motion submitted?

 5               MR. JORDAN:  It is, Your Honor.

 6               MR. RHYNE:  Yes, Your Honor.

 7               THE COURT:  Let's turn to the Rule 33 motion.

 8   Mr. Jordan.

 9               MR. JORDAN:  Well, Your Honor, I was hoping you would

10   give us some guidance if you had any concerns.

11       Do you have any questions specifically I could focus in

12   on, given the low -- certainly have sufficient time to argue

13   the motion; I know you'll give me all the time I need.

14       But, was there a concern you had a point to address?

15               THE COURT:  The Court doesn't intend to provide a

16   tentative with regard to this motion.

17               MR. JORDAN:  Your Honor, I would argue -- I don't

18   want to repeat what's in my brief -- that you were at the

19   trial.  You saw the behavior of Dr. Su.

20       And, from my reading of the cold transcript, I was struck

21   at one point when I realized I was making notes of, you know,

22   incidents by Dr. Su.  And then I looked at the dates and it

23   occurred to me that it looked like it was every single day,

24   and they were getting increasingly severe toward the end date.

25   I wasn't here, so I'm reading from a cold transcript, but that
```

1   was my view of the matter.

2       Having gotten the case, at that point I would say Dr. Su

3   was, if I could use a layman's term, frantic.  And at times,

4   saying things that seem to indicate some delusional thinking.

5       Now, at all times, it seems to be a big concern of the

6   government if I'm making an incompetency motion.  I am not.

7   My view today was that Dr. Su was competent during the trial

8   and is competent today.  However, that is not the issue we're

9   raising.

10      The issue is whether in the interest of justice, under the

11  first prong of the motion, the jury didn't hear evidence that

12  they should have as to her mental state.  My opening brief

13  lays out that I believe *mens rea*, intentional conduct, is an

14  element for all the crimes charged, if not all the significant

15  ones.

16      Dr. Amanda Gregory –– who, by the way, Your Honor is

17  present in court if you have any questions for her –– did

18  evaluate the Defendant.  I've submitted now two reports.  The

19  initial report, and then the last updated report, which I

20  think are material both to this motion and sentencing.

21      But if I was focusing on this motion, I would rely heavily

22  on the case out of Puerto Rico in the District Court case, I

23  believe it's *Gutierrez*.

24          **THE COURT:**  Yes.

25          **MR. JORDAN:**  Where the Judge faced almost the exact

1    same situation.  A jury decided guilt without hearing critical

2    evidence on *mens rea*.  Here, I think we have a couple of added

3    factors.

4         The added point I was making was that the jury saw Dr. Su,

5    and her behavior, which was unexplained to them.  And that

6    could have prejudiced her separately, even apart from the jury

7    not hearing evidence of guilt or innocence on the intent part.

8         That is the summary of the Defendant's motion.  There was

9    an objection by the government that it's untimely.  As I read

10   the statute, there are two grounds:  Interest of justice,

11   newly-discovered evidence.  Interest of justice has to be made

12   within a certain time period.  However, Your Honor did reserve

13   a right to set a motions schedule at a later date.

14        I think the fair inference from that is that you intended

15   that to include both Rule 29 and potential Rule 33 motions, so

16   that this motion would be timely under the first prong.

17        And if one were to even to take a strict view of what

18   Your Honor said as to what motions were reserved, I believe

19   the statute still provides you may find just cause for

20   allowing it to be filed at a later date.

21        The second prong, newly-discovered evidence, as I recall,

22   allows the motion to be filed within, I believe, two years.  A

23   certain period of time longer than the initial setting.  And I

24   think here, there is a good argument that this is newly

25   discovered.

1          Although the Defendant's behavior was at some point

2     apparent to Defense Counsel, it seems from the record that it

3     got much worse as it went along, to the point it became

4     obvious.  And at that point, we did have Dr. Su evaluated by

5     Dr. Gregory.

6          I'll submit on it that, unless Your Honor has questions.

7               **THE COURT:**  I don't.  Thank you, Mr. Jordan.

8     Ms. West?

9               **MS. WEST:**  Yes, thank you.

10         Beginning with the untimeliness, I'm not quite sure what

11    Your Honor intended, but what was actually articulated on the

12    Record was that the Court would set the date for filing the

13    Rule 29 motion when counsel was ready to set that date.  There

14    was no discussion of a Rule 33.  It was only with regard to

15    Rule 29.

16         Moving on to the more substantive matters, what I hear

17    from defense counsel now is actually slightly different than

18    what was articulated in the brief.  And that is that the only

19    argument they are now raising is that expert testimony was

20    required to provide evidence as to the Defendant's mental

21    state.  So, that's what I'm hearing now.

22         That argument is basically an

23    ineffective-assistance-of-counsel argument.  They are saying

24    that prior counsel was ineffective in not retaining an expert

25    to opine as to her mental state, to form the *mens rea* for the

 1   offenses, or -- or -- and to explain what they describe as,

 2   you know, erratic or inappropriate behavior during trial.

 3        Both of those arguments at core come down to an argument

 4   of ineffective assistance of counsel, which is not properly

 5   before this Court now.  The cases are clear that that needs to

 6   be raised post-sentencing, in the habeas context.

 7        So, I think really the only other thing for the Court to

 8   consider is:  Is there some other interest of justice.  And I

 9   would submit that that's premature; it is not properly before

10   the Court.

11        But even if the Court were to consider that on the merits,

12   there isn't.  This Court was here.  This Court isn't going

13   from a cold record.  This Court was able to see the

14   Defendant's behavior during the trial, and the Court also has

15   the benefit of knowing -- partly from the cold record, but

16   partly from the Court's own experience during the trial and

17   with prior counsel -- no prior counsel thought that this was

18   appropriate for the Defendant to raise some sort of

19   mental-health defense or to challenge her competency.  It was

20   something that they had certainly considered, and we made sure

21   that that was articulated to this Court on the Record when

22   Your Honor took over this case, as well.

23        So, unless the Court has any questions, this seems like an

24   easy one.

25             **THE COURT:**  Mr. Jordan, reply argument?

1          **MR. JORDAN:**  Yes, Your Honor.

2      I think my argument has been consistent throughout.  Under

3  *Gutierrez*, the District Court there said:  No, this could be

4  made now.  We don't have to wait for a 2255.  It fits under

5  the statute for either newly-discovered evidence or evidence

6  in the interest of justice that the jury should have heard.

7      So, I'll submit it on that.

8          **MS. WEST:**  I think the only newly-discovered evidence

9  is that the Defendant was malingering and doing some research

10  and faking some symptoms, Your Honor.  Everything else was

11  historical.

12          **THE COURT:**  Is the motion submitted?

13          **MR. JORDAN:**  It is, Your Honor.

14          **MS. WEST:**  It is.

15          **THE COURT:**  Thank you.  Both of these motions have

16  now been submitted.

17      As I said a moment ago, I would like to take a brief

18  break.  There's something I would like to look up before I

19  provide a ruling on both these motions.  And so, the Court

20  will now take a brief recess.

21          **THE CLERK:**  All rise.

22      (Recess taken from 10:21 to 10:32 a.m.)

23          **THE COURT:**  The Court will now provide its ruling

24  regarding the Defendant's Rule 29 motion and Rule 33 motion.

25      I think I will remember to say this at the end, but in

```
 1  case I don't, these transcripts -- excuse me -- the transcript
 2  of this hearing will serve as the Court's order with regard to
 3  both of these motions.  And that has been my -- I've attempted
 4  this morning to place sufficient reasons on the Record that it
 5  will be clear to any reviewing court why the Court rules the
 6  way that it does.
 7          With regard to the Rule 29 motion, and Counts 5
 8  through 12, I conclude that my prior tentative ruling with
 9  regard to those counts was in error.  And that I would be
10  making new law if I were to acquit the Defendant of those
11  counts.  Perhaps a reviewing court will feel differently.  As
12  I've said earlier, there isn't a great deal of law that
13  supports either side of this issue.
14    Also, I think it bears mention that this particular ruling
15  doesn't have any effect on the sentence that will be imposed
16  later this morning because of the way these offenses are
17  grouped.  Nonetheless, I took the motion seriously, and it
18  gave me serious pause.  But ultimately I conclude that as to
19  those counts, the motion has to be denied.
20    I think it bears mention that the defense asserted here
21  was not raised at trial.  I think it bears mention here that
22  the Court can find no case reported or otherwise that would
23  support the granting of the motion.
24    I have rereviewed the wire fraud and mail fraud jury
25  instructions, and I find that the evidence that was adduced at
```

 1   trial was more than sufficient for the jury to find that the

 2   government had proven each element.

 3       And so, for those reasons, the Court will reverse its

 4   tentative ruling and deny the motion as to those counts.

 5       With regard to alien harboring I'll adopt my tentative

 6   ruling, but I would like to place some further analysis on the

 7   Record for the benefit of any reviewing court and for the

 8   benefit of the parties.

 9       This portion of the motion relates to Dr. Su's conviction

10   for harboring an alien pursuant to 18 United States Code

11   Section 1324, which criminalizes the conduct of any person

12   who, quote, "willfully or knowingly conceals, harbors or

13   shields from detection, an unlawful alien."

14       And as we discussed earlier this morning, there really are

15   two issues at play in the motion.  The first is whether the

16   Defendant did anything that would constitute concealing,

17   harboring and shielding.

18       I don't think -- well, let me start by saying, just a few

19   days ago the Seventh Circuit decide a case called *The United*

20   *States versus Campbell* which appears at 2014 Westlaw 533,

21   4645.  And the only reason I mention that is they note that

22   the terms "conceal," "harbor" and "shield from detection" are

23   not defined in the statute, and the courts have devoted a lot

24   of effort to pinning down their precise meaning in the context

25   of the statute.

1     So it just bears mention that it is not plain from the

2     face of the statute, itself, what kind of conduct necessarily

3     would constitute a violation.

4     So let's talk first about harboring and concealing, which

5     I don't think the Defendant did, and next about shielding

6     which I think the Defendant did do.

7     I think the terms "harboring and concealing" denote

8     putting the alien in a physical space such as a home in which

9     they are unlikely to be detected.

10    The plain meaning of "harbor" means to give shelter or

11    refuge to.  That is the way the phrase is used in *United*

12    *States versus Dann*, 652 F.3d, 1160, the case cited by the

13    government.  That court used the phrase "provided the alien

14    with shelter."

15    And in the *Campbell* case the Seventh Circuit case I

16    mentioned a moment ago, the Court defined harboring as, quote,

17    "providing or offering a known illegal alien a secure haven, a

18    refuge, a place to stay, in which the authorities are unlikely

19    to be seeking him."  Close quote.

20    That's not what happened here.  The fake students -- which

21    is what I'll call them -- were free to come and go.  They

22    didn't live at TVU; they didn't live with Dr. Su.  There was a

23    lunch hour, it's true, in which Dr. Su locked the door.  But

24    that was aberrational.  And, it wasn't -- this wasn't like the

25    *Dann* case in which somebody was locked in a house and not free

 1    to go all the time.

 2        So I don't think the conduct qualifies as harboring or

 3    concealing.  But that still leaves shielding from detection.

 4    And the Ninth Circuit has defined that term as, quote,

 5    "Conduct tending to directly or substantially facilitate an

 6    alien's remaining in the United States unlawfully with the

 7    intent to prevent detection by the Immigration and

 8    Naturalization Service."  And that is the *United States versus*

 9    *Aguilar*, 883 F.2d, 662, at Pages 689 to-90.  That is a 1989

10    case.

11        I think that definition is met here.  Dr. Su fraudulently

12    created and maintained Dasa and Dirisinala's F1 immigration

13    status in order to employ them at TVU.  She enrolled them in

14    classes that did not exist; she issued them bogus grades and

15    transcripts; she assured them that their immigration status

16    was secure.  She transmitted fraudulent SEVIS -- S-E-V-I-S --

17    entries to the government.  She printed fraudulent I-20 forms.

18        Viewing this evidence favorably to the government, there

19    was more than enough evidence here to qualify as shielding

20    from detection.

21        I won't say anything further about the question of whether

22    Dasa and Dirisinala were unlawful aliens within the meaning of

23    the statute.  As I said earlier, I think that the analysis in

24    the *Atandi* case -- A-T-A-N-D-I -- applies here, as the

25    government urges in its brief.  And so, the Court will deny

1    the Rule 29 motion in all respects.

2         With regard to those counts we haven't discussed, I'll say

3    only that the evidence was more than sufficient to meet the

4    government's burden of permitting the jury to find against the

5    Defendant with regard to each of the elements contained --

6    each of the elements supporting a conviction for each of the

7    counts for which the Defendant was convicted, and the

8    transcript of this hearing shall serve as the Court's order.

9         With regard to the Rule 33 motion, the Defendant asserts

10   two grounds:  That new evidence has been discovered, and that

11   the interests of justice require a new trial.

12        In order to obtain a new trial based on newly-discovered

13   evidence, Dr. Su must establish five things:

14        First, that the evidence is newly discovered.  Secondly,

15   that her failure to discover the evidence sooner was not the

16   result of a lack of diligence.  Thirdly, that the evidence is

17   material.  Fourth, that the evidence is neither cumulative nor

18   merely impeaching.  And fifth, that the evidence indicates a

19   new trial would probably result in acquittal.

20        That comes from a very recent case, *United States versus*

21   *Wilkes*, 744 F.3d, 1101 and 1110.  It's a 2014 case.

22        Here, I find the evidence is not newly discovered in the

23   exercise of diligence.  Had Dr. Su wanted to present

24   information regarding her mental health at trial, she could

25   have done that.

1        While there is some discussion of Dr. Su's behavior during

2   the trial, which parenthetically I think is consistent with

3   someone who is experiencing the stress of a multi-week

4   wire-fraud case in which she has to sit and listen to a lot of

5   very unfavorable evidence, putting that to one side, almost

6   all the evidence referenced in Dr. Gregory's report occurred

7   before trial.  And even before Dr. Su's arrest.  So, had

8   Dr. Su wanted to present this evidence, she could have.

9   There's nothing that would have prevented that.

10       Also, with regard to the last element under the *Wilkes*

11  test, I cannot find, do not find that this evidence indicates

12  that a new trial would probably result in an acquittal.  And

13  it fails that element also.

14       Dr. Gregory concludes in her report -- and I read both

15  reports closely -- that Dr. Su suffers from schizo-affective

16  disorder, bipolar type.  And I accept that tentative diagnosis

17  for purposes of this hearing.  It's not that I don't think

18  that Dr. Gregory's diagnosis is correct, or that I in any way

19  doubt her qualifications or the thoroughness of her testing.

20       There also is no doubt that Dr. Su was hospitalized in

21  2005 for an acute psychotic episode.  And it does appear to

22  the Court that she could benefit from mental-health treatment.

23  But I don't accept Dr. Gregory's conclusions about the effect

24  of Dr. Su's mental health or her ability to make the decisions

25  that led to her conviction in this case.

1     Dr. Gregory also noted Dr. Su's exaggeration of her

2  symptoms.  And that also informed the Court's analysis of her

3  report.

4     I think Dr. Su's conduct during her interview with

5  Dr. Gregory and the information she provided during that

6  interview do support Dr. Gregory's diagnosis.  But, they also

7  appear at the same time to be motivated by the desire to

8  obtain a report that would result in a positive outcome in

9  Dr. Su's criminal case, rather than simply to provide

10  Dr. Gregory with the objective information she needed to make

11  a good diagnosis.

12     Finally, Dr. Gregory's report does -- I don't think would

13  permit a reasonable jury to conclude that Dr. Su was not

14  responsible for her criminal conduct, or her forming the

15  specific intent to defraud someone.  I don't read the report

16  as doing that.

17     *Gutierrez* is cited by the Defendant.  I think to support

18  both the new-evidence and the interest-of-justice aspects of

19  the motion, so I'll discuss it now, that's a very interesting

20  case.  And I think that the District Court judge in that case

21  is to be commended for -- for taking the bull by the horns,

22  frankly, and making sure that the Defendant in that case got a

23  fair trial.

24     But that's a very different case from this case.  In

25  *Gutierrez*, the court and counsel discovered after the jury

1   verdict and before sentencing that the defendant suffered

2   severe cognitive impairment, and the defendant is described as

3   being someone with subnormal intellectual functioning.

4   Quoting from the *Gutierrez* case now, the Court said, I quote

5   (As read):

6           "The test results revealed that Defendant was

7           functioning at slightly above the moderate mental

8           retardation range of intelligence with an IQ of 57.

9           According to the profile of a person within this

10          range, Defendant is a person who is trainable, can

11          talk, and take care of himself with some supervision.

12          Would probably be unable to pass the second grade in

13          academic subjects."

14      That's not Dr. Su.  And, were we in a situation like the

15  one faced by the court in the *Gutierrez* case, I hope that I

16  would acquit myself as well as the District Court judge did in

17  that case.  But, I don't think this is that case.

18      With regard to the portion of the motion grounded on the

19  interest of justice, the District Court should grant a Rule 33

20  motion on that basis only in extraordinary circumstances.  The

21  Second Circuit has gone so far as to indicate that such a

22  motion should be granted only if there exists a real concern

23  that an innocent person may have been convicted.

24      This isn't the standard here, this isn't the Second

25  Circuit, but I say that only to make it plain that the federal

1    courts agree that the bar on a Rule 33 motion on the grounds

2    of the interests of justice is a very high bar.

3        It's true that a District Court's power to grant a motion

4    for a new trial is much broader than its power to grant a

5    motion for judgment of acquittal.  I don't have to view the

6    evidence in the light most favorable to the government as I do

7    on a Rule 29 motion.  I'm free to weigh the evidence and

8    evaluate for myself the credibility of the witnesses.  But, my

9    focus has to be whether letting a guilty verdict stand would

10   be a manifest injustice.

11       Let me just say first, I find that the motion is not

12   timely.  But, I want to go ahead and address the motion on the

13   merits anyway because secondly, I do not conclude that

14   allowing the verdict to stand would work a manifest injustice.

15       Dr. Gregory's report does not succeed in raising a doubt

16   in my mind that Dr. Su knew what she was doing.  She was

17   taking advantage of her position of authority to make a lot of

18   money.  And she was using that money to support an extravagant

19   lifestyle.  So, Defendant's Rule 33 motion will be denied.

20       And, the transcript of this hearing shall serve as the

21   Court's order with regard to that motion.

22       The Court is now prepared to proceed to sentencing, if the

23   parties also are ready.

24           **MR. RHYNE:**  We are, Your Honor.

25           **MR. JORDAN:**  Yes, Your Honor.

1          **THE COURT:**  Very good.  So, let me start in the

2     interest of making sure that everyone is appropriately heard

3     this morning, and the Court has the ability to consider all

4     the information the parties want to give the Court.

5          Let me start by finding out whether there is anyone here

6     besides Dr. Su and her lawyer who wish to speak on the

7     Defendant's behalf.

8          **MR. JORDAN:**  Your Honor, her family is here.  I

9     submitted letters to you from everyone who's here, I believe.

10    And I've asked them if they wanted to speak to you, and I

11    think they did tell me they would rely on the letters.

12         **THE COURT:**  All right.

13         **MR. JORDAN:**  They are fairly comprehensive.

14         **THE COURT:**  So I'll tell those of you who are here, I

15    thank you very much for your letters.  The letters are a very

16    important part of what I read in getting ready for any

17    sentencing.  And I've read your letter closely.  But if you

18    came to court and you wanted to address the Court, you have

19    that right.

20         And, and so I just want to ask, is there anyone here who

21    came this morning in order to speak to the Court about Dr. Su

22    this morning?  At the microphone?

23         (No response)

24         **THE COURT:**  Okay, I'm not seeing any hands.

25         And I hope I'm not trespassing on your role as counsel

1   there.  I just wanted to make sure I was doing everything I

2   could.

3            **MR. JORDAN:**  Not at all, Your Honor.

4            **THE COURT:**  Is there anyone in court here who was a

5   victim of these crimes, who wishes to address the Court?

6      (No response)

7            **THE COURT:**  Mr. Rhyne, are you aware of anybody who

8   wishes to address the Court in that capacity?

9            **MR. RHYNE:**  I am not, Your Honor.

10           **THE COURT:**  All right.

11      Ms. Goldsberry, good morning.

12           **PROBATION OFFICER GOLDSBERRY:**  Good morning.

13           **THE COURT:**  Is there anything further that Probation

14   wants to say this morning in regard to the substance of the

15   presentence report or any of the objections?  All of which I

16   know you address in the report, itself, but is there anything

17   further you would like to say this morning?

18           **PROBATION OFFICER GOLDSBERRY:**  There's nothing

19   further, Your Honor.

20           **THE COURT:**  All right.  Before we begin, I need to

21   just say for the Record what it is specifically that I have

22   read in preparing for this morning's hearing.  I did read the

23   presentence report; I read the sentencing memoranda submitted

24   by both parties.  I read the letters attached to Mr. Jordan's

25   sentencing memorandum.

```
 1        I read Dr. Gregory's report.  I read it in connection with
 2   the Rule 33 motion, but I have taken it into account in regard
 3   to the sentencing of Dr. Su.
 4        And I have also read Dr. Gregory's supplemental report,
 5   which she prepared after interviewing Dr. Su's ex-husband and
 6   other of her family members.
 7        So, that's what I've read so far.
 8        I think the order that I would suggest, subject to hearing
 9   from counsel, is that I determine whether Dr. Su wants to
10   address the Court, and I hear from her; that we then resolve
11   any objections to the presentence report.
12        And there are some weighty issues there involving grouping
13   and many, many issues related to various enhancements.  And,
14   that the Court then finally impose sentence.
15        MR. RHYNE:  Your Honor, one issue I wanted to put on
16   the Record.  There was also a declaration that I submitted
17   with a binder of attachments that I wanted to make sure you
18   referenced.
19        THE COURT:  Thank you.  I did, I did read that
20   declaration.  And I did read a sufficient amount of the
21   attachments to satisfy myself that the materials there were as
22   they were described by the government.
23        And just so that the transcript is clear, I think it's
24   important for me to be candid with the Record about there's
25   these hundreds and hundreds and hundreds of pages of
```

```
 1    attachments to a large -- handful, but nonetheless, a handful

 2    of emails Dr. Su sent to government witnesses, for the most

 3    part.  And, either immediately prior to or during the trial of

 4    this case.  And it is to those materials that Mr. Rhine is

 5    referring.

 6        And, as I say, I've read a lot of them, and I've read

 7    enough to satisfy myself that they say what the government

 8    says they say.  So, I have read that.

 9        Going back to the order of proceedings, does anyone want

10    to suggest an alternative order of proceedings, or add

11    something that the Court may have left out?

12            MR. JORDAN:  No, Your Honor.

13            MR. RHYNE:  No, Your Honor.

14            THE COURT:  All right.  Mr. Jordan, does Dr. Su wish

15    to address the Court this morning?

16            MR. JORDAN:  Your Honor, when I spoke to her on

17    Monday when I met with her and then -- on Tuesday when I met

18    with her and on Thursday by phone, she indicated she did not

19    want to speak.  And I think she is visually affirming that

20    decision.

21            THE COURT:  Yes.  And the Record will reflect that

22    Mr. Jordan looked at Dr. Su as he made his remarks, and Dr. Su

23    shook her head from side to side to indicate she did not wish

24    to address the Court this morning.

25        And so, we can move on to the next item, which is to
```

resolve any objections to the presentence report.  I think the

most sensible thing is to go through the objections one at a

time to allow each side to address the Court, and then for the

Court to make a final ruling.

The Probation Office obviously very carefully considered

the parties' objections, and even went back to the Sentencing

Commission at one point to -- Ms. Goldsberry, to satisfy

herself that her grouping was correct.  And, I appreciate the

work that the Probation Department did in putting together

this report.

I think what I will do is let me just tell you what my

tentative rulings are regarding these various objections, and

then you can address those -- Counsel can address those they

want to address further.

I think the United States' grouping methodology is

correct, actually.  I don't think it has a sentencing effect.

But, in any event, I do think that the crimes in what the

United States describes as Group 1, which is essentially

everything except misuse of a government computer, those are

all crimes in which the guideline sentence is based on loss,

harm or quantity, or otherwise contemplate continuing

behavior.  That language comes from a comment to Section

3D1.2D of the sentencing guidelines.  And, I recognize that

the Probation Department heard directly from the Sentencing

Commission, so perhaps someone will have a different view down

 1   the line, but I thought the United States' analysis on that

 2   point was correct.

 3       I would overrule the Defendant's objections for reasons I

 4   can put on the Record later, with one exception.  And that is

 5   the misrepresentation the Defendant was acting on behalf of an

 6   educational organization I do not think is an appropriate

 7   enhancement here, because the comments to the sentencing

 8   guidelines make clear that the purpose of that enhancement is

 9   to reach conduct where the Defendant represents that the money

10   is going to be to an educational, religious or charitable

11   organization, but the money is really going to her.  And here,

12   the money actually was going to TVU.

13       Now, of course, TVU is a sham, but that fact is already

14   accounted for in other portions of the sentencing

15   calculations.  So I think that the group offense level for

16   Counts 20 and 21 is 34, not 36.  And that the Defendant's

17   objection on that point is well-taken.

18       I apologize to the parties and the Defendant.  I know

19   you're not supposed to eat in court but I'm doing too much

20   talking, and I'm starting to get a sore throat, so I'm going

21   to put a lozenge in my mouth.

22       So anyway, that would be the Court's tentative ruling with

23   regard to the objections.

24       Mr. Jordan, let me hear first from you.  Let's talk about

25   grouping first.

1           **MR. JORDAN:**  Your Honor, before we get to that,

2   there's just one little minor point.  I very much appreciate

3   the work done by the probation officer in this case.  But in

4   the second reading --

5           **THE COURT:**  Oh --

6           **MR. JORDAN:**  We did come up with a few little

7   corrections.

8           **THE COURT:**  You did.  And thank you for reminding me.

9   I made a note of those, and I meant to put those in my outline

10  for this morning's proceedings.  And if you will give me just

11  a second, I'll make a good record of this.

12      In addition to objections to various enhancements and so

13  forth, the Defendant also interposed more minor objections, as

14  set forth on the bottom of Page 4 of the Defendant's

15  sentencing memorandum.  These are described by the Defendant

16  as "minor corrections."

17      The first is that in Paragraph 85, the name of David Kerns

18  needs to be spelled differently.  In Paragraph 26, the salary

19  should read "$1,000 per month" instead of what it actually

20  says.  And that in Paragraphs 22 and 35, the lowest grade

21  should read "B-."

22      Does anyone object to the Court sustaining these

23  objections and ordering that these corrections be made?

24          **MR. RHYNE:**  Your Honor, the only comment that I would

25  want in the Record is that there were -- I believe there were

1   times in trial where people testified that the lowest grade

2   should be a B+.  I know Mr. Jordan has cited a reference here

3   to B-, but I believe that there was some differing testimony

4   on that.

5        So, I have no objection to B- being in there as long as

6   there is reference to the fact other students -- employees

7   said the instruction was B+.

8            **THE COURT:**  The transcript of this hearing now does

9   contain such a reference.

10           **MR. RHYNE:**  (Nods head)

11           **THE COURT:**  And so, the Court will order the

12  Probation Department to make each of the corrections that are

13  contained on Page 4 of the Defendant's sentencing memorandum

14  at Lines 21 through 25.

15       Mr. Jordan, grouping.

16           **MR. JORDAN:**  Thank Your Honor.  Well, Your Honor, the

17  -- the papers filed by both parties, I think, really briefed

18  well, if I may say that.

19       The technical issue is, so I won't repeat too much, it's

20  the Defendant's view that all the counts should be grouped

21  because under 3D1.2B, they're all part of a common scheme or

22  plan.  So I think that covers all of the counts here.

23       To a lesser extent, they could be grouped under 3D1.2C

24  because it's the same conduct.  I know even under the

25  government's calculations, there are additions to those

1   guideline scores based on visa fraud, which is already being

2   counted in Group 1.

3       So I think that's where the Defendant is prejudiced here,

4   where an additional count which comprises the same common

5   scheme and which relies on conduct charged in Group 1 is being

6   used to increase her potential sentence.  I think the whole

7   rationale between -- behind the grouping scheme, as pointed

8   out in 3D1.2 is that if it's substantially the same harm,

9   there should be no further increase.

10      I will also add that although my arguments were as to the

11  scheme heard by the Probation Officer, the double-counting

12  scheme under *US v. Smith* cited in my brief, I think, also

13  applies to the government scheme.  If you're going to increase

14  the score because of the visa fraud, which is already in

15  Group 1, that's double-counting.

16      I will submit it on that.

17          **THE COURT:**  Mr. Rhyne, further comment?

18          **MR. RHYNE:**  Your Honor, I'll be very brief.

19      The only response I have with respect to 3D1.2B is:  I

20  believe it's problematic because that subsection is premised

21  on the same victim.  And I think that there are different

22  victims based on the counts in this case, which I think is why

23  it makes more sense, as the Court noted, to go to 3D1.2.  And

24  for the reasons we stated in our sentencing memo, we believe

25  that that's correct.

1          As far as double counting goes, I don't there's any issue

2     with respect to double counting.  I think that each individual

3     offense level is computed correctly, and they are adequately

4     accounted for in the end when the units are assigned to the

5     different groups in this case.  So, I don't think there is any

6     issue there.  So, I would submit on grouping.

7          **THE COURT:**  The Court will adopt the United States'

8     grouping methodology, and place all of the counts in Group 1,

9     save and except the misuse of a government computer count.

10         Next, the Defendant objects to the calculation of actual

11    loss.  I have to say, also -- this is really probably a side

12    note -- the government cites Section 2B1.1, Comment N of the

13    sentencing guidelines, 2002 edition, for the proposition that

14    the Court can rely on the Defendant's personal gain as an

15    alternate measure of the loss when it is unable to determine

16    actual or intended loss with sufficient certainty.

17         **MR. RHYNE:**  May I have a moment, Your Honor?

18         **THE COURT:**  Yes.

19         And what I will say is I didn't find that comment.  To

20    prepare for the hearing, I actually used both the 2010 and

21    2013 versions of the sentencing manual because the conduct in

22    the case occurred predominately in 2010, seemed like the right

23    thing to do.  And in neither of those manuals did I find that

24    comment.

25         I don't doubt that it appeared in 2002.  I didn't look.

 1   But perhaps you could help me.

 2            MR. RHYNE:  Your Honor, that might be an erroneous

 3   cite.  I believe the -- as I'm quickly looking here, the gain

 4   is noted in Allocation Note 3 and 4 (As read):

 5            "...shall use the gain that resulted from the offense

 6            as an alternative measure of loss only if there is a

 7            loss but it reasonably cannot be determined."

 8            THE COURT:  This is at comment 3 -- 2B1.1?

 9            MR. RHYNE:  Yes, Your Honor.  And I don't -- I think

10   gain and loss are computed exactly the same in this case.  It

11   will be on Page 87 of the November 1st, 2013, guideline.

12            THE COURT:  I have it now.  Thank you.  It's comment

13   3, large B.

14       Okay, Mr. Jordan.

15            MR. JORDAN:  Your Honor, again, I'll emphasize what I

16   wrote in my papers:  The defense believes that the loss here

17   is exaggerated based on the government's proof.

18       And we are pointing to the trial testimony of Parth Patel

19   who testified at trial, frankly, that in his view, there were

20   two types of students here.  On the one hand those who were

21   unhappy and defrauded, and a second group which he estimated

22   as 65 to 70 percent of the students as those, in his words,

23   "just interested in maintaining their immigration status."

24       The counts here for loss don't view -- don't list the

25   United States as a victim.  They list a scheme to defraud

1    students.  My point is if -- there is not sufficient evidence

2    by the government -- and it's their burden -- to show that all

3    the students were defrauded here.  If students, as Mr. Patel

4    testified, were willing participants, they are not victims.

5    And the money they paid shouldn't be included in the loss

6    figure.  I can't say it any simpler than that.

7          **MR. RHYNE:**  Your Honor, I think there is a difference

8    in the victims in this case.  I think that there are certainly

9    victims that were bona-fide victims from start to finish.  And

10   I think the government has to reasonably concede that there

11   were people that came here as victims, and then realized: Hey,

12   I can -- I can stay in the country, I don't have to go to

13   class, and I can go work in Silicon Valley and make an income

14   that I can't make in India, and this works out great for me.

15       That doesn't mean that they weren't defrauded at the

16   beginning of this scheme, though.

17       It doesn't mean that Susan Su gets to escape the loss that

18   she caused those people when they initially came into the

19   country just because it turned out that they, for lack of a

20   better term, liked being a victim in this scheme.

21       I think that the evidence in this case is overwhelming

22   that the school was not what it purported to be.  Its

23   projection publicly was that it was a real school, on its

24   website and all its course material.  And as soon as it got

25   SEVIS approval, the money started rolling in.

1        And I think there is adequate evidence in the record for

2   the Court to find by a preponderance of the evidence, and for

3   that matter, by clear and convincing evidence, that the loss

4   amount in this case is at least $5.6 million.

5        I note also that that's a conservative number.  As Jason

6   Mackey testified at trial, it's actually probably more like

7   5.9 million.  And that discrepancy was a result of the trial

8   subpoenas and grand jury subpoenas that went out in this case

9   that limited the returns to certain dollar amounts.  So he

10  wasn't able to capture some of the smaller charges.

11       Add to that we haven't spoken about intended loss here.

12  The government could be asking for a lot more than it actually

13  is.  Based on the exponential growth that TVU was experiencing

14  just in the snapshot of the of time that we have, I think that

15  Susan Su's claim that she made to ASI and DHS is compelling.

16  I don't think she was going to make $20 million the next year

17  but I think she was going to make a lot more than she made the

18  year before.  And she certainly intended to do that and she

19  certainly was on a vector to do that.

20       So for the government to stand here before the Court and

21  say "We know $5.6 million is a safe number, and we should go

22  with that," I think we are taking a very reasonable approach.

23  I think we could be asking for a lot more.

24       And on that, I would submit.

25           **MR. JORDAN:**  Just briefly in reply, Your Honor,

1   again, it's the government's burden to prove that all of these

2   people at the beginning were defrauded; that they didn't know

3   at the beginning what TVU was.

4        Secondly, briefly, even under the government's view if

5   somebody comes here at first and is defrauded, but then sees:

6   Oh, this is good, I can work in Silicon Valley, his or her

7   subsequent payments should be deducted from that loss figure.

8        **THE COURT:**  The Court will overrule the objection and

9   adopt the $5.6 million figure.  For several reasons.

10        First, I think that the government makes a good point

11   about intended loss.  It would be easy for the government to

12   put too much weight on the $20 million figure that Dr. Su

13   included in her tort claim.  But I don't think they do that.

14   I think what the government simply says is all we need to show

15   is that the intended loss was at least this much.

16        And since Dr. Su asked for a lot more from the government,

17   in her tort claim, based on her reasonable expectations about

18   the growth of TVU, 5.6 is reasonable.  And I think on an

19   intended-loss basis, that argument is reasonable.

20        Secondly, I think that there -- this income came from a

21   scheme that included an element of -- of visa fraud that has

22   as its victim, the United States government.  And, it's not

23   just that these individual students were defrauded, although

24   most of them probably were.  There are separate and

25   independent -- these are all separate and independent bases

1    for the court to feel comfortable with this loss figure.

2        I take it as a given that many of the students who paid

3    TVU tuition only wanted visas, and never actually expected to

4    go to class.  How many were there?  I don't know.  Was there

5    at least one?  Is it reasonable to think that there was at

6    least one who was in on it from the beginning?  We don't -- I

7    can't say for certain.  That person didn't testify.  But, the

8    argument that there were such people is not frivolous.  Those

9    people are just co-conspirators in Dr. Su's visa fraud.

10       And even accepting that argument, there's no way to

11   quantify the number of students who were intent on visa fraud

12   versus the number who thought they were getting actual

13   classes, because the only evidence on that point is the

14   estimate of a TVU student who didn't have good information,

15   and I find that estimate to be unreliable.

16       And then lastly, to the point that it's hard to know how

17   many of the students were actually defrauded and how many were

18   in on it, to the extent that that's even relevant, and I'm not

19   sure that it is, then we get back to this comment that

20   Mr. Rhine had to straighten out a few minutes ago.  And that

21   is that the actual loss is hard to determine.

22       And, and we know what Dr. Su's gain from this conduct was.

23   It was at least $5.6 million.  Because her only source of

24   income during this time was TVU, and TVU was a sham.  And, and

25   that money has been adequately traced.

1          So the Court will overrule that objection, and adopt an

2     actual loss of $5.6 million for sentencing purposes.

3          Next, we come to sophisticated means and organizer leader.

4     And I would like to discuss those two enhancements together,

5     if we might.

6          **MR. JORDAN:**  I think that is a good idea, Your Honor.

7          And first, with the sophisticated means, we did raise an

8     objection to that.  But frankly, it's there also to -- of

9     course it's relevant to the 3553 arguments later, which is

10    perhaps technically, this is a sophisticated scheme.

11         But, how many schemes involving this amount of money

12    wouldn't also qualify for that?  Of course, that is not

13    properly in this section (Indicating).  It's an argument we

14    make later.  But, that's one reason we raise it now, to relate

15    it back to that point.

16         Focusing more perhaps on the role.  Just looking at 3B1.1,

17    Application Note 1 says a participant is a person who is

18    criminally responsible for the commission of this offense.

19    When I read the transcript under the government's theory of

20    the case, it seemed very much a one-person scheme.  No one

21    else apparently profited directly.  I didn't see any evidence

22    in the trial that anyone else knew about these articulation

23    agreements.  There might have been people working at TVU, of

24    course there were; might have been other people there.

25         But, are they participants under 3B1.1?  That I think is

1   the only question.  Are they part of a criminal conspiracy

2   that Dr. Su is properly being penalized for being the

3   organizer or the leader of criminal activity that involved

4   other participants?

5        That's, I think, a technical argument.  But here, I think

6   the other people fall below the definition of "participant"

7   under 3B1.1.

8              **THE COURT:**  Mr. Rhyne?

9              **MR. RHYNE:**  Yes, Your Honor.

10       With respect to sophisticated means, I think it's briefed

11   in our sentencing memo.  There's obviously many cases on the

12   subject.  I don't think there's any case that I was able to

13   find that included the degree of sophistication and layers of

14   lies that we saw in this case that didn't qualify for

15   sophisticated means.

16       I spelled out in a list why the government believed that

17   this qualified on Page 13 of the sentencing memo.  And it

18   includes the first lies that she tells to DHS in order to

19   obtain the SEVIS approval in the I-17.  The forgery of the two

20   articulation agreements using the photo shop type program.

21   The aid of her family members to forge I-17 documents as DSOs.

22       And although they didn't testify, Jason Mackey testified

23   that Susan Su told him that they had no intention to be DSOs.

24   She knew it; they knew it.

25       The assistance of her sister Sophie, to pose as a DSO

1    during SEVIS site visit.  There was an actual skit that was

2    run for the site inspector that was there.  Sophie sat at a --

3    roughly a card table just to be a prop, so that they could

4    pull the ruse over on the actual physical site inspector,

5    which was roughly a government contractor who was there to

6    just kind of take a look around.

7         You've got the creation of -- preservation of the facade

8    of the university, including the website, the course catalog,

9    the bogus instructors that she listed.  She also -- I don't

10   think there's any evidence to dispute the fact that Dr. Su had

11   specialized knowledge.  Not only in her field of expertise,

12   but she was trying very hard to navigate the specialized

13   knowledge that she learned in the visa fraud regulations.

14        She knew where she needed to improve the school's

15   appearance and where she needed to skirt around certain issues

16   to avoid detection.  I think that the daily entry of false

17   information into SEVIS also contributes to the sophistication

18   of this scheme per her orchestration --

19        (Document handed up to the Court)

20        (Reporter interruption)

21            **MR. RHYNE:**  Her orchestration of multiple DSOs to

22   carry this out.  And I use "DSOs" in quotes because they

23   obviously were not DSOs; they were people whom she controlled

24   with laptops that she distributed to them that were

25   pre-admitted or pre-logged on into SEVIS.

1      You've got those daily entries in turn are creating the

2  appearance to the government that TVU students are complying

3  with their visa regulations.

4      There's, although closely related, the creation and

5  issuance of bogus school schedules and transcripts.  Again, a

6  completely kind of new dimension of the facade that she's

7  creating here.

8      You have the marketing of her own academic credentials as

9  president of the school, and her academic credentials as a

10  Ph.D. from Cal.  You've got the use of multiple bank accounts

11  at the back end of the scheme that she used to collect the

12  money, and later spend the money after the scheme was done.

13      So, we just think that her orchestration of these multiple

14  facets of this crime go well beyond what the case law shows

15  would be required for sophisticated means.

16      And on that, we would submit.

17          **THE COURT:**  Submitted?

18          **MR. JORDAN:**  Yes, Your Honor.

19          **THE COURT:**  The Court will overrule the Defendant's

20  objection, and adopt both of these enhancements.  I'll say --

21  first let me make a couple of comments.

22      First, I take the Defendant's point that at least with

23  regard to sophisticated means, and I think frankly also with

24  regard to organizer/leader, that these arguments have at least

25  as much force in the context of 3553(a) as they do to the

1    technical application of the sentencing guidelines.

2        I think sophisticated means is an easy call on this case.

3    You look at the amount of computer work, forms, the number of

4    people who had to be in on it at least to some extent.  And,

5    this seems to me like a textbook sophisticated-means case.

6        With regard to organizer/leader, I think the Defendant

7    made a very good argument, but there's a comment in the

8    guidelines that says:

9            "In assessing whether an organization is otherwise

10           extensive, all persons involved during the course of

11           the entire offense are to be considered.  Thus a

12           fraud that involved only three participants but used

13           the unknowing services of many outsiders could be

14           considered extensive."

15       And I think that's what happened here.  I think there were

16   a few people who knew everything.  Then there was a layer of

17   people who knew not everything, but they knew enough to serve

18   Dr. Su's purposes.

19       And then there was a third layer of people who really

20   didn't know in any respect that this university was one big

21   scam.  But they were nonetheless providing their services in

22   some form to Dr. Su, unknowingly.  And so within the meaning

23   of that comment, they helped make the organization extensive.

24   So, I think that those enhancements are both appropriate.

25       Let's turn to obstruction of justice.  Mr. Jordan?

1           **MR. JORDAN:**  Your Honor, I think at this point

2      Dr. Gregory's report would be relevant also.  Obstruction of

3      justice does have, as I briefed, a *mens rea*, an element of

4      willfulness.  I've looked at, of course, the emails sent by

5      Dr. Su and reviewed the transcript for her, you know, comments

6      or actions during the trial.  And I think there is a strong

7      argument to be made here that of course, the emails were sent.

8      And of course, she did what she did at trial.

9           But, was it willful?  Was she really trying to obstruct

10     justice?  She had her own view, I believe, of what the truth

11     was here.  And she was urging the witnesses to testify in

12     accordance with that.  In her mind, I don't think she was

13     trying to get them to perjure themselves.  Or urge them to do

14     that.  She was urging them to testify consistent with her

15     beliefs, with her belief system that she was operating under.

16          So, the question just resolves down to:  Did she really

17     have the intent to willfully obstruct justice?  And I think

18     that's not proven here.

19          **THE COURT:**  Mr. Rhyne?

20          **MR. RHYNE:**  Then, why use an alias?  If what she's

21     doing is okay, why can't she just be herself?  The reason is

22     because she doesn't want people to know that it's her.  She's

23     trying to influence the testimony of multiple people that were

24     on the government's witness list.

25          I think the opening email is probably one of the most

1    compelling ones where she talks about, with Vishal Dasa, "Look

2    what they did to Anji Reddy" R-E-D-D-Y, "they used him as a

3    decoy and right after they arrest him."  That follows through

4    the rest of her emails that she is sending.  It's clear she

5    has a theory that she thinks is going to be successful on

6    different components of this trial.  And she's trying to get

7    witnesses to get on board with it.

8         And she's using an alias because she knows that she

9    shouldn't be doing it, which underscores the fact that it is

10   willful.

11        And on that, we would submit.

12             **THE COURT:**  Reply?

13             **MR. JORDAN:**  Your Honor, again I think she explained

14   there that the use of the alias was because she was suspicious

15   of the government interfering with her attempts -- again I

16   think under this belief system she had a -- to get the

17   witnesses to tell the truth as she saw it.

18        I'll submit it with that.

19             **THE COURT:**  Submitted?

20             **MR. RHYNE:**  Submitted.

21             **THE COURT:**  The Court will overrule the objection,

22   and adopt the obstruction-of-justice enhancement.

23        This is a case in which Dr. Su contacted witnesses before

24   and during the trial, and urged them to give false testimony.

25   The Defendant in connection with a separate motion has already

 1   made it plain that she is not making a competency argument;

 2   she's not arguing legally that she was unable to distinguish

 3   between right and wrong.

 4        And I don't think that she didn't know that what she did

 5   was a criminal offense.  I don't think that she didn't know

 6   that what she was doing -- and I mean, doing in the underlying

 7   conduct involving TVU -- was wrong.

 8        And, and perhaps I'll say a little bit more about that

 9   later in the hearing.  But, for those reasons I don't -- I am

10   unable to conclude that she sent these emails for the purpose

11   of encouraging witnesses to give what she honestly believed to

12   be truthful testimony.  And so I think the

13   obstruction-of-justice enhancement is appropriate.

14        I think that leaves only, other than the -- than the

15   imposition of sentence itself, the defendant's objection that

16   the enhancement for her having acted on behalf of -- falsely

17   on behalf of an educational organization is inappropriate.

18        And Mr. Rhyne, let me start with you.

19        **MR. RHYNE:**  Your Honor, we actually talked about this

20   this morning, and it is the government's position that we

21   actually agree with Mr. Jordan that this probably is not an

22   offense characteristic that should be included.  So, those two

23   levels should come off.

24        I note that the application notes for that have some

25   examples, and they are not the fact pattern we see in this

```
 1   case.  It's more like you noted:  Fundraising and seeking
 2   donations.  And I don't think that that's what she's doing in
 3   this case.
 4        THE COURT:  Those -- I read those examples, myself,
 5   last night, and they were informative of the Court's
 6   tentative.
 7        MR. RHYNE:  I don't think it changes the final
 8   calculation of the guidelines.  It knocks that -- for Count 20
 9   to 21, it knocks it down to 34.  Which is a subset of Group 1
10   that does not affect the ultimate unit grouping.  So --
11        THE COURT:  The Court will sustain the objection
12   without opposition, and rule that the enhancement for -- I
13   wish I had put the report in front of me, I could cite the
14   right provision of the sentencing guidelines.
15      But, the enhancement for falsely acting on behalf of an
16   educational organization is not appropriate, and that the
17   group offense level for Counts 20 and 21 be reduced from 36 to
18   34.
19      So, that will be the Court's order.
20        MR. RHYNE:  (Nods head)
21        THE COURT:  Is there any matter raised by either side
22   in connection with this sentencing this morning, other than
23   the length of sentence, that we have not yet addressed?
24        MR. JORDAN:  I don't believe so, Your Honor.
25        MR. RHYNE:  No, Your Honor.  We don't believe so.
```

1          **THE COURT:**  All right.  Then what we will do this

2     morning is I'll allow Mr. Jordan to make an argument on behalf

3     of the Defendant.  I will allow Mr. Rhyne to make an argument

4     on behalf of the government.  I will allow Mr. Jordan to very

5     briefly make a reply argument if he wants.

6          And then the Court probably will take a brief recess and

7     then I'll come out, and I'll impose sentence.

8          Mr. Jordan?

9          **MR. JORDAN:**  Thank you, Your Honor.

10         Your Honor, I appreciate the work done by the probation

11    officer and the recommendation by her for a variance down to

12    168 months.  But, I think even that sentence is too high for

13    this offense.

14         Of course, at this point you've denied the Rule 29 and the

15    Rule 33 motions.  We take objection to that.  But, we are now

16    faced with you finding that the Defendant is guilty and is

17    going forward to sentencing.

18         So, assuming those facts, putting us in that context, I

19    will go back to a statement you said earlier about how in this

20    case, there are two groups of victims.  I think we all agree

21    to that.  Some were defrauded, under Your Honor's findings.

22    But others were not.  And guidelines here are being driven by

23    that high loss figure.

24         That loss figure and the other factors result in a

25    guideline offense level of 40 which was -- I believe the

```
 1  highest the guidelines go to are Level 43?  Which is the

 2  equivalent for major, major crimes.  Not to say that this

 3  isn't a major crime, but murders, treason, and the like.

 4           THE COURT:  Yes.  43 is the highest offense level.

 5           MR. JORDAN:  In talking with the Probation Officer

 6  informally before this, I believe I said to her "This

 7  situation here -- we have almost a perfect storm where various

 8  factors are in here that keep increasing her score."

 9       Some of which we take exception to Your Honor's rulings,

10  but those are the rulings, and those are the guideline

11  provisions.  But some of which, although not legally

12  double-counting, have the same effect.

13       My strong opinion that a fraud that Your Honor finds is

14  5.6, $5.8 million is going to have sophisticated means.  It's

15  going to have more than one person.  It's going to have many

16  of these other factors in there.

17       So, again, is it legally double-counting?  Not under

18  Your Honor's rulings.  But does it have the effect of

19  exponentially increasing the punishment here?  And I think it

20  does.

21       So I believe the guidelines, themselves, as ruled on by

22  Your Honor, overstate the severity of the crime.  That's my

23  first point.

24       The second point under 3553 is there are other factors

25  here.  Now, taking note of the government's comments today,
```

and its comments in the sentencing memorandum, I know they

think Dr. Su is malingering, that she is exaggerating her

mental condition.  And that, I guess, it should not be taken

into account here today.

I strongly disagree with that.  We have Dr. Gregory here

if you want to ask any questions.  We submitted the report.  I

was well aware of Dr. Gregory's statements about Dr. Su

perhaps trying to exaggerate her symptoms.  That wasn't in any

way to try to hide that from the Court or submit a report that

didn't have all of the information in it.  That's all true.

It doesn't take away from the fact that Dr. Su has been

suffering, I believe, from a mental disease for some time.

The earlier incidents were well before any criminal

proceedings started.  So there can't be any argument that she

was malingering then to try to avoid guilt now.

Reading Dr. Gregory's report, this isn't a situation where

Dr. Su got treatment, was cured -- if you want to use that

phrase -- for a mental condition, and is now reinventing it.

I think instead, and I believe the Probation Officer

recognizes this, that Dr. Su is suffering from an untreated

mental condition.  And that you may take that into account at

sentencing as a mitigating factor.

Although she isn't present here today, because she goes to

Duke University, I really think Dr. Su's youngest daughter

really just hit the nail on the head when she stated that

```
 1   Dr. Su in her mind probably believed what she was doing was
 2   good.  She had this delusional belief that she was running a
 3   school that was going to rival Harvard or Stanford, and that
 4   she was going to be a world-famous educator, and people would
 5   respect her, her family would respect her, and she would
 6   accomplish this on her own.
 7       We are not saying she's innocent.  We're not saying she's
 8   not guilty by reason of insanity.  We're not saying that she
 9   should not be punished, after Your Honor has now ruled in
10   denying the Rule 29 and Rule 33 motions.  There were victims
11   under Your Honor's rulings.  The sentence should be imposed.
12   But the sentence recommended by the Probation Officer, which I
13   appreciate, I believe is still too high.
14       Finally, we have, as Your Honor realizes, the family in
15   court.  We have a lot of the good factors we often look at
16   when we are structuring the sentence.  Lack of a prior record.
17   Good family support.  I think an argument that this is
18   aberrant behavior, which we used to argue a lot back when the
19   guidelines were mandatory, just a situation where I believe
20   Your Honor can look at this, and say, "This is a situation
21   where the guidelines over-calculate some of the factors here
22   and that the reasonable sentence should be lower."
23       I've explained in my sentencing memorandum the rationale
24   how I came up with my recommendation for the 70 months.  I
25   think that's a fair sentence, a reasonable sentence.  It
```

doesn't punish her for going to trial.  And I would urge

Your Honor consider adopting that sentence.

    **THE COURT:**  Thank you, Mr. Jordan.

    **MR. JORDAN:**  (Nods head)

    **THE COURT:**  Mr. Rhyne?

    **MR. RHYNE:**  Yes, Your Honor.  I'll start with the

request that we are making at 292 months.  Obviously it is the

low end of the guideline.  And, we don't want the Court to

think that just because it's the low end of the guideline we

think that's what the Court should impose.  There's some

rationale as far as the amount of time or opportunity costs

that Dr. Su caused other people to lose.

   And just doing some rough calculations I would just like

to, if you start with the $5.6 million that she made, and you

figure as the evidence at trial was that it cost $2,800 per

student per semester at the school, that means that she took

about 2,000 semesters from those students if you multiply a

semester by three months, roughly the length of a semester,

probably that is conservative, that is 6,000 months that she

cost other people in opportunity cost to go somewhere else.

That is not taking into account the additional loss that they

suffered of their out-of-pocket money that went into her

pocket.

   Now, again, we're reasonable with respect to probably not

every dollar of that $5.6 million came from somebody who was

1    completely defrauded from beginning to end, so take half of

2    that.  If you have take half of that, 2.8 million, divided by

3    2,800, follow it through, obviously it's half.  It's 3,000

4    months lost, of lost student time.

5        And if you compare those 3,000 months of lost time that

6    she caused other people against the backdrop of the 292 months

7    we are asking for, it is one tenth of the time that she took

8    from other people.  So that, that is at least a starting point

9    or at least a rationale as to how we think that 292 is -- is

10   reasonable and appropriate on this record.

11       The next thing I would like to address is Mr. Jordan

12   mentioned a preliminary plea offer that was based --

13           **THE COURT:**  I don't wish there to be any discussion

14   of that topic at this hearing.

15           **MR. RHYNE:**  Very good, Your Honor.

16           **THE COURT:**  I don't -- and I'll be clear about why I

17   say that.  I don't think that it's helpful to the Court -- I'm

18   not saying it is inappropriate.  I don't know that there is

19   any rule against it.  But I don't think it is helpful to the

20   Court for the Court to consider the parties' various pretrial

21   plea negotiations positions in determining what a fair

22   sentence is.

23       And I would feel that way regardless of whether the

24   position in question were the one advanced by the government

25   or the Defendant.  Certainly, if the shoe were -- in this

1  case, the Defendant has said that the government made a

2  certain offer to resolve the case.  Certainly if the shoe were

3  on the other foot, and the Defendant had in negotiations

4  offered to accept a higher sentence than the one that the

5  Court -- that the Defendant was urging the Court to impose at

6  sentencing, the Court would feel justifiably uncomfortable in

7  using that offer as a floor that the Defendant was allowed to

8  argue.  And I -- I think the same reasoning applies the other

9  way.  So, you don't need to talk about that.

10       **MR. RHYNE:**  Okay, Your Honor.

11       So I think the next question becomes:  What, if any, facts

12  are in this record to justify a well-founded variance below

13  the low end of the guidelines?

14       And I think that Mr. Jordan makes fair points.  I think

15  that the strongest point that they have is -- is her mental

16  health condition.  But, I keep coming back to the undisputed

17  facts in this case, and that is that that condition did not

18  cause her to commit these offenses, and it certainly didn't

19  slow her down from committing the offenses.

20       When she was confronted by law enforcement about her

21  conduct, it didn't stop her from lying to Jason Mackey when he

22  was interviewing her at her kitchen table when she's still

23  trying to conceal things that she knew she was doing that were

24  wrong.  So, I don't think it's compelling at all for Dr. Su to

25  argue that, you know, this is somehow a mistake.

1          And I noted in our sentencing memo, her statement in the

2     PSR.  It sounds of negligence.  Still, today, she doesn't

3     believe that what she did was wrong.  And she committed so

4     many acts that are so clearly wrong.  She lied from start to

5     finish in this case.  And for her to stand here before the

6     Court and not make any -- not express any remorse or any

7     recognition that what she did was wrong I think is compelling.

8          And it's compelling against the backdrop of the fact that

9     even before this trial started, while she was aware she was

10    under indictment, she tried to start a new school.  And before

11    that, she was soliciting donations to save Tri-Valley

12    University.

13         I think it proves that she is relentless.  I think it

14    raises serious concerns that if she were released today, she

15    would be right back at this, a little bit -- well a lot

16    smarter.  But, still under the belief that what she did was

17    not wrong.

18         And I think from a 3553(a) factor, the Court can consider

19    that with respect to the characteristics of the offense,

20    deterrence, risk to the community, I think it -- it transcends

21    many of the relevant factors that the Court should be

22    considering.

23         And I also think that undercuts Mr. Jordan's argument that

24    it was aberrant behavior.  I think it was up until this point,

25    but I think the record since then shows that it's what she

1    wants to do.  So, I think that should be a concern.

2        With respect to the guideline calculation overstating the

3    harm, there -- there aren't any close calls in this

4    calculation.  Every base offense level, offense characteristic

5    and adjustment that is applied in this case is well-founded on

6    multiple pieces of evidence that came not from a plea --

7    guilty plea record, but from trial.

8        So for those reasons, we think that the recommendation of

9    292 months is appropriate.

10       I should note that I should have responded to Your Honor's

11   question before about whether there were any other issues that

12   we should raise.  And obviously, restitution and forfeiture

13   are something that, at least with respect to forfeiture,

14   Mr. Countryman is here to address, if there's any issues on

15   that.

16       But, on that basis, we would submit.

17       **THE COURT:**  Mr. Jordan, reply argument with regard to

18   the length of sentence?

19       And also, the Court did enter a preliminary order of

20   forfeiture, and I'm prepared at the conclusion of the

21   proceedings this morning to make that order final.  So if you

22   wish to be heard on that issue, you should say so.

23       **MR. JORDAN:**  I do, Your Honor.  That would go to our

24   earlier points made under the argument about loss.  Again we

25   object to that forfeiture amount, because it's -- it's the

1  defense position the government hasn't proved that amount of

2  loss.

3        And Dr. Su would request a continuation of the stay

4  through the appeal until that issue is resolved.  She's said

5  that to me several times, and I did promise I would mention

6  that to the Court as her position.

7        I understand Your Honor's rationale in the forfeiture

8  order.  But again, the defense believes that the loss is

9  overstated, that the government hasn't met its proof, and that

10  the forfeiture amount should be limited to the restitution

11  amount as proposed by Ms. Goldsberry of the Probation Office.

12        And then briefly, in reply, hearing what Mr. Rhyne said at

13  the very end, we just disagree on whether there is any

14  reasonable view that Dr. Su will get right back at it.  When I

15  see the facts in this case, the testimony, and I read it and

16  then I talk to Dr. Su and she tells me again and again and

17  again that she didn't intend to defraud, that the government

18  doesn't understand, I think that goes more to her mental

19  illness than it does to any evilness on her or some kind of

20  belief that she's going to now become a career criminal or

21  habitual criminal.

22        Obviously, Your Honor is going to impose a custodial

23  sentence.  I will be asking Your Honor to attach Dr. Gregory's

24  reports to the PSR.  What she needs, even if Your Honor is

25  going to impose a custodial sentence, which you will, is

1   mental-health treatment, which she has never gotten.

2       And I'll submit it on that, Your Honor.

3           **THE COURT:**  Mr. Rhyne, is the matter submitted?

4           **MR. RHYNE:**  It is, Your Honor.

5           **THE COURT:**  The Court will now take a brief recess.

6           **THE CLERK:**  All rise.

7       (Recess taken from 11:40 to 11:48 a.m.)

8           **THE CLERK:**  Remain seated and come to order.  The

9   Court is now in session.

10          **THE COURT:**  The Defendant and the counsel will please

11  rise.

12      Dr. Su, you are ordered to stand up.

13      (Request complied with by the Defendant)

14          **THE COURT:**  This is the time for the Court to impose

15  sentence.  And before I impose sentence, it is my obligation

16  to explain why I'm doing what I'm doing.

17      The Court is required always, in every criminal case, in

18  the Federal Court, to start by consulting the guidelines

19  manual promulgated by the United States Sentencing Commission.

20  And to perform a calculation under those guidelines.  We've

21  done that, and spent a substantial amount of time.

22      And I appreciate the work of the Probation Department in

23  putting together its presentence report, and the work of

24  counsel in arriving at the sentencing recommendation -- excuse

25  me -- in arriving at the sentencing calculation that results

1  in a total offense level of 40.

2      But, the guidelines are not mandatory.  They are a

3  necessary starting point for the Court in making its

4  calculations, and they are to be given serious weight.  The

5  Court also has to consider the factors set out in 18 United

6  States Code Section 3553(a).

7      Although there are many considerations set out there, the

8  predominant ones in most sentencing hearings are the ones set

9  forth in subpart (a)(1) and subpart (a)(2) which, itself, has

10  several subparts.  We'll talk about those a little more in a

11  second.

12      The Defendant has asked that the Court impose a sentence

13  of 70 months.  I will not be adopting that sentence, for

14  reasons that I'll state in a moment.  The government has

15  requested that the Court impose a sentence of 292 months,

16  which is the bottom of the sentencing range at Defendant's

17  total offense level.  And for reasons that I'll explain in a

18  moment, I will not be imposing that sentence, either.

19      Sentencing is, I think, the most important and the hardest

20  thing that federal judges do.  And, if this were just a case

21  of baseball arbitration then I would have to choose one

22  party's proposal or the other.  But it isn't.  I have the

23  obligation to consider each case on its facts, and fashion a

24  sentence that is sufficient, but not greater than necessary to

25  comply with the purposes of the federal law and the sentencing

1   guidelines.

2       Let me talk first about why I will not adopt the

3   Defendant's proposed sentence of 70 months.  I do not think a

4   sentence of 70 months begins to come close to capturing the

5   magnitude of the Defendant's crime.  This was a massive,

6   lucrative fraud scheme that generated at least a thousand

7   false visas.  TVU in its totality was a sham.  The scope of

8   the fraud was enormous.

9       In May, 2009, TVU had 11 "students."  And I put "students"

10   in quotation marks because the school did not offer any

11   classes or have real instructors.  By September, 2009 it had

12   75 students.  By January of 2010 it had 447.  By May, 2010, it

13   had 939.  Those numbers were taken from the documents that

14   were submitted to me before the hearing.

15       My recollection of the testimony at trial —— I'm just

16   operating from recollection —— is that by the time of her

17   arrest, Dr. Su had more than a thousand students.

18       More than half of the students, these fake students, were

19   registered as living at the same address in Sunnyvale.  They

20   were registered by her as living at the same address in

21   Sunnyvale.

22       Although the defense at trial was that this university was

23   a legitimate enterprise, the evidence was overwhelmingly to

24   the contrary.  There were no classes beyond the playing of a

25   few online videos.  And even in those, there were no

1    examinations, or grades, or instructors.

2        Dr. Su lied to the federal government about who her

3    instructors would be.  She made up classes that didn't exist.

4    She issued transcripts for classes that had never occurred.

5    For many of the courses listed in the university's catalog,

6    there were no classes whatsoever.

7        There was no relationship between the grades on students'

8    transcripts and their performance in these largely-nonexistent

9    classes, because Dr. Su or her subordinates issued transcripts

10   from their central office, assigning grades largely at random,

11   except that Dr. Su required that no one be given less than a B

12   or a B- or a B+.

13       TVU was nothing more than a mill for the issuance of F1

14   visas, for the sole purpose and effect of massively enriching

15   Dr. Susan Su.

16       The fraud started from the beginning.  The SEVIS petition

17   was false.  This is not a situation where it started as a

18   legitimate enterprise and slowly crept over to the realm of

19   illegality.  Dr. Su knew that the DSOs listed on her SEVIS

20   petition were never going to be involved in the administration

21   of TVU.  She listed professors she hadn't hired or even talked

22   to.  She listed three universities as willing to accept

23   credits from TVU, when that assertion was knowingly false as

24   to two of them.  She submitted forged paperwork to the federal

25   government.

1        There weren't instructors.  There weren't classrooms;

2   there weren't real classes.  It wasn't a case of Dr. Su giving

3   people less than they bargained for in their education.  It

4   was a case of TVU giving people nothing at all.  It was a

5   fraudulent visa mill.  It was a fraud on TVU students, and a

6   fraud on the people of the United States.

7        When immigration authorities confer the right to supply

8   visa information to the SEVIS system, to someone, they create

9   a bond of trust.  A person with SEVIS authority holds the keys

10  to the right to remain lawfully in the United States.  Dr. Su

11  violated that trust, for her own personal financial gain.  And

12  she made approximately $6 million doing it.

13       A sentence of 70 months does not capture that conduct.

14       There has there has been some talk about Dr. Su's good

15  motives.  About how she wanted to introduce new educational

16  methods.  About how she wanted to instill good values in her

17  students.  About how her school rested on Christian

18  principles.  I find that none of that has any basis in fact.

19       The Defendant's lack of remorse in this case is striking.

20  I'm attempted to say "stunning," but that might be a little

21  overly dramatic.

22       Shortly after her arrest in this case, she attempted

23  almost immediately to establish another fake university called

24  "Global University," which fortunately never got off the

25  ground.

1          She continues to this day to maintain to her family

2     members and acquaintance that's she was trying to do the right

3     thing, and that this was awful some kind misunderstanding.

4     Selling completed visa paperwork for $2,000 is not doing the

5     right thing.  Providing transcripts for classes that never

6     took place is not doing the right thing, or trying to.  Having

7     a policy of awarding no grade lower than a B is not doing the

8     right thing.  Issuing forms for students who don't actually

9     exist is not doing the right thing.

10         It's always difficult to predict recidivism.  It's

11    something that federal judges are asked to do all the time.

12    And usually there is no information from which the judge can

13    make as good a decision as he or she would like.

14         There isn't great information here.  I won't pretend to

15    predict the future.  But, I would say uniquely in my

16    experience, at least to this date, it seems that the Defendant

17    simply hasn't learned any significant lesson from her arrest

18    or prosecution in this case.  And that concerns me.

19         Dr. Su is someone who could easily have made better

20    choices.  She's an intelligent, well-educated woman with a

21    sophisticated background who has held a variety of

22    interesting, well-paid jobs.  She is a loving mother.  She had

23    many advantages in life that others don't enjoy.

24         And, I will say that I feel sorry for her family.  It is

25    probably -- it is one of the most heartbreaking parts of being

a judge that when you impose a sentence, it has a consequence

on loving, close family members like Dr. Su's daughters.  And

it may be that one of you is here.  And if you are, I'm sorry

you have to see this.

Dr. Su urges the Court to place the responsibility for her

crimes on her mental illness.  She does appear to have some

mental-health issues.  I said earlier I accept Dr. Gregory's

diagnosis.

I think she is entitled to some consideration for her

mental illness which in part will lead the Court to vary

somewhat from the sentencing guidelines.  And, I do think she

needs treatment.  But I don't think that her mental illness is

an explanation or excuse for her crimes.  At the end, I think

this was a massive fraud that was done for greed, for which

Dr. Su still refuses to take responsibility.

Having said all that, I think a guideline sentence is

necessary -- I think a guideline sentence of 292 months is

greater than necessary to accomplish the goals of the

sentencing guidelines.

Let me start by saying for those of you who haven't done

the math, that 292 months is 24 and 1/3 years.  It's difficult

even to hear that without recognizing its enormity.  And I

think there are crimes that deserve that sentence, and there

are cases in which I imposed sentences longer than that.

And I think clearly, a substantial sentence in this case

1   is appropriate.  But for a few reasons, I think that some

2   reduction from that lower boundary is appropriate in this

3   case.

4       First of all, I do think that Dr. Su's mental condition is

5   entitled to some consideration.  I think she knew what she was

6   doing was wrong, but I think that she also operated under

7   delusions of grandeur or other beliefs that mitigate her

8   criminal conduct.

9       I think it is significant that this is Dr. Su's first

10  offense.  And obviously, the guidelines take account of that

11  in some respects by providing for the addition of a criminal

12  history calculation.

13      But, when you are at the place that we are in the

14  sentencing guidelines, and all the proposed sentences are so

15  severe, I don't think that the sentencing guidelines

16  adequately take that into account.

17      And lastly, I think to a small extent, Mr. Jordan is

18  right, that the guidelines overstate the severity of this

19  crime.

20      Mr. Rhyne is a very good lawyer.  I hadn't thought of the

21  metric of the various months and so forth of lost opportunity.

22  And Mr. Rhyne knows, I think from prior experience, that I

23  think like an economist, and it was a very good argument.

24      And there is no doubt that this crime was severe.  But

25  just for example, even if you were to reduce the guidelines

1   total offense level by four points, Dr. Su would be in the

2   range of 188 to 235 months.  And, and I'm not saying that that

3   is precisely the amount of overstatement, because that is not

4   the only ground on which I would base a variance in this case.

5   But, I do think that there has been some overstatement.

6       And I conclude that an appropriate sentence in this case

7   is 198 months, which is 16 and 1/2 years.  And, that is the

8   sentence that the Court will impose.

9       Having placed on the Record the Court's -- well, let me

10  say a few more things before I actually impose sentence.

11      I hope that Dr. Su does receive mental-health treatment

12  while she is in custody.  And I will order that it be

13  provided.

14      I don't have any doubt that 198 months is an adequate

15  sentence to provide the general-deterrence effect that I am

16  required to attempt to achieve.  I think anybody looking at

17  this conduct -- and I know it's been reported in the press --

18  will conclude that this sentence very much made this crime not

19  worth it.  And that's what deterrence is.

20      Secondly, I think any reasonable viewer would conclude

21  that a sentence of that length reflects the seriousness of

22  this offense and promotes respect for the law.

23      And, lastly, the offense is of -- excuse me -- that

24  sentence is of a sufficient length that while I have the

25  concerns about recidivism and specific deterrence that I

1    articulated earlier, it's my hope that after a sentence of

2    that length, Dr. Su will have learned her lesson, and we don't

3    have to worry any further about Dr. Su believing that she can

4    commit crimes like this and get away with them.

5         So, I've considered all of the factors under United States

6    Code 3553(a) in addition to the sentencing guidelines.

7         Turning now to the imposition of sentence itself, Dr. Su,

8    pursuant to the Sentencing Reform Act of 1984, it is my

9    judgment that you are hereby committed to the custody of the

10   Bureau of Prisons, to be imprisoned for a term of 198 months.

11   This term consists of 198 months on Counts 1 through 14, 60

12   months on Counts 15 through 19, 188 -- excuse me.

13        188 months on Counts 20 through 21, 26, 27, 29, 31, 32,

14   34, and 35.  And 12 months on Count 25.  All counts to be

15   served concurrently.

16        Upon release from imprisonment, you shall be placed on

17   supervised release for a term of three years.  This term

18   consists of three years on each of Counts 1 through 22, 24,

19   26, 27, 29, 31, 32, 34, 35; and one year on Count 25, all such

20   terms to run concurrently.

21        Within 72 hours of release from the custody of the Bureau

22   of Prisons, the Defendant shall report -- excuse me you shall

23   report in person to the Probation Office in the district to

24   which you are released.  Unless you are deported.

25        A copy of Dr. Gregory's report shall be attached to this

1    transcript when the record is transmitted to the Bureau of

2    Prisons.  It is recommended by the Court that the Bureau of

3    Prisons place Dr. Su in a facility where she can receive

4    mental-health treatment.

5        While on supervised release, Dr. Su, you shall not commit

6    another federal, state or local crime; you shall comply with

7    the standard conditions that have been adopted by this Court,

8    except that the mandatory drug-testing provision is suspended;

9    and you shall comply with the following additional conditions.

10       First, you shall participate in a mental-health program --

11   a mental-health treatment program, as directed by your

12   Probation Officer.  You shall pay part or all of the costs of

13   that treatment, at an amount not to exceed the cost of

14   treatment, as deemed appropriate by your Probation Officer.

15   The payments shall never exceed the total cost of

16   mental-health counseling, and the actual co-payment schedule

17   shall be determined by the Probation Officer.

18       You shall abstain from the use of all alcoholic beverages.

19   You shall not maintain a position of fiduciary capacity

20   without the prior permission of your Probation Officer.  You

21   shall pay any restitution and special assessment that is

22   imposed by this judgment, and that remains unpaid at the

23   commencement of the term of supervised release.  You shall not

24   open any new lines of credit, or incur new debt without the

25   prior permission of the Probation Officer.

1        You shall provide your Probation Officer with access to

2    any financial information, including tax returns, and you

3    shall authorize the Probation Officer to conduct credit checks

4    and obtain copies of income tax returns.  You will be subject

5    to a search clause, pursuant to which you shall submit your

6    person, residence, office, vehicle, or any property under your

7    control to a search.

8        For sake of clarity, "residence" means anywhere you are

9    living, and "office" means anywhere you are working.

10       Such a search shall be conducted by a United States

11   Probation Officer at a reasonable time and in a reasonable

12   manner, based upon reasonable suspicion of contraband or

13   evidence of a violations of a condition of release.  Failure

14   to submit to such a search may be grounds for revocation.  And

15   you need to warn any residents where you're staying that those

16   premises are subject to search.

17       You shall not possess any false identification.  And you

18   shall provide your true identity at all times.  You shall

19   cooperate in the collection of DNA as directed by your

20   Probation Officer.

21       You shall not own or possess any firearms, ammunition,

22   destructive devices, or other dangerous weapons.  And I will

23   advise you that that is not only a condition of your

24   supervised release, but that you have now been convicted of a

25   felony, and that the possession of a firearm, destructive

1   devices or ammunition is a crime in every jurisdiction in the

2   United States, for which you could be separately punished.

3       I further order that you shall pay to the United States a

4   special assessment of $3,025, which shall be due immediately.

5       While you are incarcerated, the payment of criminal

6   monetary penalty is due during imprisonment at the rate of not

7   less than $25 per quarter.  And payment shall be through the

8   Bureau of Prisons Inmate Financial Responsibility Program.

9   The address for those payments will be contained in your

10  paperwork.

11      I find that you don't have the ability to pay a fine, and

12  I order the fine waived.

13      I further order that you pay restitution totaling

14  $904,198.84.  That restitution is owing to the student

15  charge-backs that are described in the presentence report.

16  And those amounts have not been contested.

17      That amount shall by due immediately to the following

18  victims in the following amounts:  To the victim PayPal, Inc.,

19  Attention Michael Rou, Global Regulatory Policy, 2211 North

20  First Street, San Jose California, 950131, restitution in the

21  amount of $595,111.

22      To the victim Total Merchant Services Inc., Attention

23  Director of Operations, 255 Gold River Road, Third Floor,

24  Basalt, Colorado, 81621, the amount of $309,087.84.

25      For a total restitution order of $904,198.84.

1          While you are incarcerated, payment of restitution is due

2     during imprisonment at the rate of not less than $25 per

3     quarter.  And payment shall be through the Bureau of Prisons

4     Inmate Financial Responsibility Program at an address that

5     will be contained in your paperwork.

6          With regard to the issue of forfeiture, the Court orders

7     that its preliminary order of forfeiture now be made final.

8     The Defendant's request for a stay of that order is denied.

9          Are there further matters the Court needs to take up?

10          **MR. RHYNE:**  Your Honor, there is one matter.  Excuse

11     me.  About a week ago, we got a revised restitution total from

12     Total Merchant Services.  I forwarded it to Probation.  And I

13     failed to raise it in this proceeding.

14          We did include the number in our sentencing memo.  It is

15     actually $420,684.64.  And, the evidence that we sent to

16     Probation is a detailed spreadsheet of that calculation of

17     loss.

18          And, that was my fault.  I apologize for not raising that

19     earlier, or noticing that it was in the original PSR.

20          **THE COURT:**  I think the Defendant is entitled to

21     consider that question on something other than a pop-quiz

22     basis.

23          **MR. RHYNE:**  (Nods head)

24          **THE COURT:**  So perhaps that matter, alone, need to be

25     set for separate hearing.

1    Mr. Jordan, would you like to respond?

2    **MR. JORDAN:**  Yes, Your Honor, this is -- you know,

3  getting -- at this point it's a little late.  So --

4    **THE COURT:**  What is the Court to do, Mr. Rhyne, this

5  morning, that doesn't include ordering that amount of

6  restitution from the bench?

7    **MR. RHYNE:**  I think that you can order the 309,000 at

8  this point, subject to us coming back after we are able to

9  review this.  And I should say I forwarded this as soon as we

10  got it.  I apologize for the late notice.

11    **THE COURT:**  That's all right.  I don't have any

12  problem implementing that request, and that is that the

13  Court's order of a moment ago will stand, and if the

14  government want to seek further relief it obviously has the

15  right to do that.

16    Further matters to be taken up this morning?

17    **MR. JORDAN:**  Yes, Your Honor.  Just briefly, we would

18  note our objection to your forfeiture order.

19    **THE COURT:**  Oh.  Actually, you reminded me of

20  something.  And I'm going to want to hear from the government

21  about this.

22    Oh, I had a copy of my preliminary order in my hand, but I

23  must have left it in chambers.

24    The issue is this:  The forfeiture order rests on

25  alternate grounds.  As to the first ground, there is no issue.

```
 1        The second ground is:  The use of the properties for the
 2   -- oh, never mind.  Well, let me say -- and I'll invite both
 3   Counsel to comment on this -- and Mr. Jordan, I see you have a
 4   copy of the order there.
 5             MR. JORDAN:  Yes.
 6             THE COURT:  That would be a courtesy to the Court if
 7   I could just borrow it.  Thank you.
 8        (Document handed up to the Court)
 9             THE COURT:  This paragraph -- and I'm addressing
10   myself to Page 4 at Lines 4 through 14.  I think the Defendant
11   did use the properties at 405 Boulder Court to facilitate her
12   crime.  But, I think not exactly in the way that perhaps this
13   paragraph describes.
14        As I said earlier, the basis of my belief that the
15   evidence with regard to these counts was adequate really isn't
16   so much simply the provision of employment.  It was all the
17   other things that Dr. Su did.  Now, she used Suite 700 and 800
18   to do all those things.
19        So, I think that those properties were used to facilitate
20   her crimes of alien harboring.  It's from these properties,
21   for example, that she generated all of this fraudulent
22   paperwork, and that sort of thing.  So the adjustment is a
23   minor one.
24        But, I want to ask Counsel if, based on that statement on
25   the Record, the Court believed -- that either counsel thinks
```

1    the Court needs to do anything further before reducing this to

2    a final order of forfeiture, understanding that the Defendant

3    objects to the reduction to a final order at all.

4         Mr. Countryman?

5         **MR. COUNTRYMAN:**  No, Your Honor, that comports with

6    the government's understanding.

7         Just one sort of language question, to have a final order

8    of forfeiture, the government still needs to publish to allow

9    third parties to claim.  So it becomes final as to Defendant

10   Su, but it's not a final order of forfeiture per se.

11        **THE COURT:**  Yes.  I saw that in the statute earlier

12   this morning.  Does that require that we set a further date

13   here?  Or is this Court simply --

14        **MR. COUNTRYMAN:**  (Shakes head)

15        **THE COURT:**  Okay.

16        **MR. COUNTRYMAN:**  Third-party claimants could file

17   petitions.  I think there could be an ancillary proceeding

18   where those third-party petitions are resolved.  But -- and

19   unless and until that happens, there is no further date that

20   needs to be set, Your Honor.

21        **THE COURT:**  I see.  All right.

22        Mr. Jordan, any further comment on that point?

23        **MR. JORDAN:**  No, Your Honor.  Just that we have our

24   objection on the Record.

25        **THE COURT:**  Very good.  Dr. Su, you are remanded into

```
1   the custody --
2          MR. JORDAN:  Your Honor I'm sorry.  Sorry, I had two
3   or three other ancillary requests.
4          THE COURT:  Yes.
5          MR. JORDAN:  Of course --
6       (Reporter interruption)
7          MR. JORDAN:  Of course, mental-health treatment is
8   the biggest priority.  But if that could be ordered to a
9   facility closest to her family so they could visit her, if
10  Dublin is appropriate, we would make that recommendation.
11         THE COURT:  The Court recommends to the Bureau of
12  Prisons that the Defendant, Dr. Su, be designated to the
13  closest facility to the Bay area consistent with her
14  classification, to facilitate visitation with her family
15  members, including her two daughters.
16         MR. JORDAN:  And then finally, my last request is
17  that Your Honor consider recommending her placement in RDAP.
18  She does have an alcohol issue.  Your Honor just ordered her
19  not to use alcohol at all during her supervised release.  And
20  I think the program would help her now, and help her comply
21  with that requirement when she's released.
22         THE COURT:  The Court will recommend to the Bureau of
23  Prisons that Dr. Su participate in the RDAP program, and that
24  she be designated to a facility that offers that program.
25         MR. JORDAN:  Thank you, Your Honor.
```

1    **PROBATION OFFICER GOLDSBERRY:**  Your Honor, out of an

2    abundance of caution, I wonder if we could go through the

3    custody sentence one more time a little slower, to ensure we

4    don't hit any of the stat maxes on any of the counts.

5        **THE COURT:**  Okay.  This is not a statement of the

6    imposition of sentence.  This is the Court's recollection of

7    what it said earlier.

8        My recollection of what I said earlier is that I imposed a

9    sentence of 198 months on Counts 1 through 14.  Sixty months

10   on Counts 15 through 19, which is different from the counts

11   that you listed in your probation report.

12       **PROBATION OFFICER GOLDSBERRY:**  Exactly.  That is what

13   threw me off.

14       **THE COURT:**  And I think I did that after checking the

15   indictment.

16       **PROBATION OFFICER GOLDSBERRY:**  Okay.

17       **THE COURT:**  But if you think I made an error, this is

18   a great time to tell me.

19       **PROBATION OFFICER GOLDSBERRY:**  I think you're okay.

20       **THE COURT:**  It's different on purpose.  188 months on

21   Counts 20 through 21, 22 --

22       **PROBATION OFFICER GOLDSBERRY:**  Your Honor, I have 20

23   and --

24       **MR. JORDAN:**  21 has a five-year max.

25       **PROBATION OFFICER GOLDSBERRY:**  Both 20 and 21 are

1    five-year statutory maxes.

2            **THE COURT:**  Oh, I see what I did.  Yes, no, I made a

3    mistake in this transposition.  So I need to correct my

4    earlier statement.

5       Sixty months applies to Counts -- 60 months applies to

6    Counts -- it does apply -- 60 months applies to Counts 15

7    through 19, 20 and 21.  I see the error that I made.

8            **MR. JORDAN:**  So Your Honor, 15 through 21, 60 months.

9            **PROBATION OFFICER GOLDSBERRY:**  No, 15 through 19 --

10           **THE COURT:**  15 through 19.

11           **PROBATION OFFICER GOLDSBERRY:**  Yes, 20 and 21.

12           **THE COURT:**  And 20 and 21.  That's right.  And then,

13   188 months on Counts 22, 24, 26, 27, 29, 31, 32, 34, 35.

14           **MR. JORDAN:**  But Your Honor, I think 20 and 24 are

15   ten-year maximums.

16           **PROBATION OFFICER GOLDSBERRY:**  That's correct.  20

17   and 24 are ten years.  20 -- 27, 29, 31, 32, 34, 35 are 120.

18           **THE COURT:**  I think the safest thing to do is simply

19   with regard to the counts other than 1 through 14, simply to

20   adopt the Probation Department's recommendation.  And that's

21   what the Court will do.  And therefore, I will now restate the

22   sentence, for the sake of clarity.

23      Dr. Su is committed to the custody of the Bureau of

24   Prisons to be imprisoned for a term of 198 months.  This term

25   consists of 198 months on Counts 1 through 14; 60 months on

1    Counts 15 through -- excuse me, 15, 20, and 21; 120 months on

2    Counts 16 through 19, 22, 24, 26, 27, 29, 31, 32, 34 and 35;

3    and 12 months on Count 25, all counts to be served

4    concurrently.

5             **PROBATION OFFICER GOLDSBERRY:**  Thank you.

6             **THE COURT:**  I appreciate very much the correction.

7         Anything else?

8             **MR. JORDAN:**  No, Your Honor.

9             **MR. RHYNE:**  Submitted, Your Honor.

10            **THE COURT:**  Thank you.

11            **THE CLERK:**  All rise.

12        Court is now in recess.

13        (Conclusion of Proceedings)

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Monday, December 15, 2014

Belle Ball, CSR 8785, CRR, RDR